UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

——————————————————— x

LYDIA GARCIA, Individually and On Behalf
of All Others Similarly Situated,

                 Plaintiff(s),

    vs.

JAKKS PACIFIC, INC., JACK FRIEDMAN,
STEPHEN BERMAN, and JOEL BENNETT,

              Defendant(s).

——————————————————— x

**04 CV 08807**

Civil Action No.:

**CLASS ACTION COMPLAINT FOR
VIOLATIONS OF FEDERAL SECURITIES
LAWS**

<u>JURY TRIAL DEMANDED</u>



RECEIVED
NOV - 5 2004
U.S.D.C. S.D. N.Y.
CASHIERS

Plaintiff has alleged the following based upon the investigation of Plaintiff's counsel, which included a review of United States Securities and Exchange Commission ("SEC") filings by JAKKS Pacific, Inc. ("JAKKS" or the "Company"), as well as regulatory filings and reports, securities analysts' reports and advisories about the Company, press releases and other public statements issued by the Company, a review of the complaint filed in the case captioned *World Wrestling Entertainment, Inc. V. JAKKS Pacific, Inc. et al.*, 04 CV 8223 (S.D.N.Y.) and media reports about the Company, and Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of purchasers of the common stock of JAKKS between February 17, 2004 and October 19, 2004, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

## JURISDICTION AND VENUE

2.      The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act [15 U.S.C. §§78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder by the Securities and Exchange Commission ("SEC") [17 C.F.R. §240.10b-5].

3.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act [15 U.S.C. §78aa].

4.      Venue is proper in this District pursuant to Section 27 of the Exchange Act, and 28 U.S.C. §1391(b), as and many of the acts and practices complained of herein occurred in substantial part in this District.

5.      In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

6.     Plaintiff Lydia Garcia, as set forth in the accompanying certification, incorporated by reference herein, purchased the common stock of JAKKS at artificially inflated prices during the Class Period and has been damaged thereby.

7.     Defendant JAKKS is a Delaware corporation which describes itself as a multi-line, multi-brand toy company that designs, develops, produces and markets toys and related products.

8.     (a)     Defendant Jack Friedman, ("Friedman") served as JAKKS' Chairman and Chief Executive Officer during the Class Period.

(b)     Defendant Stephen Berman ("Berman") served as JAKKS' President, Secretary and Chief Operating Officer during the Class Period.

(c)     Defendant Joel Bennett ("Bennett") served as JAKKS' Chief Financial Officer during the Class Period.

(d)     Defendants Friedman, Berman and Bennett are collectively referred to herein as the "Individual Defendants."

9.     Because of the Individual Defendants' positions with the Company, they had access to the adverse undisclosed information about the Company's business, operations, operational trends, financial statements, markets and present and future business prospects via access to internal corporate documents (including the Company's operating plans, budgets and forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof and via reports and other information provided to them in connection therewith.

10.     It is appropriate to treat the Individual Defendants as a group for pleading purposes and to presume that the false, misleading and incomplete information conveyed in the Company's public filings, press releases and other publications as alleged herein are the collective actions of the

- 2 -

narrowly defined group of defendants identified above. Each of the above officers of JAKKS, by virtue of their high-level positions with the Company, directly participated in the management of the Company, was directly involved in the day-to-day operations of the Company at the highest levels and was privy to confidential proprietary information concerning the Company and its business, operations, growth, financial statements, and financial condition, as alleged herein. Said Defendants were involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein, were aware, or recklessly disregarded, that the false and misleading statements were being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.

11.    As officers and controlling persons of a publicly-held company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, and was traded on the NASDAQ National Market ("NASDAQ"), and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to disseminate promptly, accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, markets, management, earnings and present and future business prospects, and to correct any previously-issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly-traded common stock would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

12.    The Individual Defendants participated in the drafting, preparation, and/or approval of the various public and shareholder and investor reports and other communications complained of herein and were aware of, or recklessly disregarded, the misstatements contained therein and omissions therefrom, and were aware of their materially false and misleading nature. Because of

- 3 -

their Board membership and/or executive and managerial positions with JAKKS, each of the Individual Defendants had access to the adverse undisclosed information about JAKKS' financial condition and performance as particularized herein and knew (or recklessly disregarded) that these adverse facts rendered the positive representations made by or about JAKKS and its business issued or adopted by the Company materially false and misleading.

13.    The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to and did control the content of the various SEC filings, press releases and other public statements pertaining to the Company during the Class Period. Each Individual Defendant was provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected.  Accordingly, each of the Individual Defendants is responsible for the accuracy of the public reports and releases detailed herein and is therefore primarily liable for the representations contained therein.

14.    Each of the defendants is liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of JAKKS common stock by disseminating materially false and misleading statements and/or concealing material adverse facts.  The scheme: (a)  deceived the investing public regarding JAKKS' business, operations, management and the intrinsic value of JAKKS common stock; (b)  enabled the Company to complete a significant corporate acquisition using common stock, in part, as consideration; and (c)  caused Plaintiff and other members of the Class to purchase JAKKS common stock at artificially inflated prices.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

15.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired the common stock of JAKKS between February 17, 2004 and October 19, 2004, inclusive

(the "Class Period") and who were damaged thereby. Excluded from the Class are defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

16.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, JAKKS common shares were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by JAKKS or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

17.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

18.     Plaintiff will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

19.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by defendants' acts as alleged herein;

(b)    whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of JAKKS; and

(c)    to what extent the members of the Class have sustained damages and the proper measure of damages.

20.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## SUBSTANTIVE ALLEGATIONS

**Background Facts**

21.    Defendant JAKKS describes itself as a multi-line, multi-brand toy company that designs, develops, produces and markets toys and related products. The Company focuses its business on acquiring or licensing well-recognized trademarks and brand names with long product histories. Its products are toys and accessories that include action figures and accessories, craft, activity and stationery products, child guidance infant and pre-school products, seasonal toys and leisure products, toy candy, electronics products, junior sports products, fashion and mini dolls and related accessories. In addition to developing its proprietary brands and marks, JAKKS licenses brands such as World Wrestling Entertainment, Nickelodeon, Rugrats, Dora the Explorer, Blue's Clues, SpongeBob SquarePants, Mickey Mouse, Winnie the Pooh, Kim Possible, Finding Nemo and Hello Kitty.

22.    In or about February 1997, JAKKS and World Wrestling Entertainment, Inc. ("WWE"), which describes itself as an integrated media and entertainment company and is known for professional wrestling, entered into an international toy license.

23.    On June 23, 1998, JAKKS and WWE entered into a videogame license with JAKKS and JAKKS' joint venture partner THQ, Inc. ("THQ"). The term of the license was to end on December 31, 2009, subject to the right to renew for an additional five years in favor of JAKKS and THQ. At the same time, JAKKS and WWE extended the terms of the toy license agreement to match those of the videogame license.

24.    Historically, the WWE licenses have generated significant profits for JAKKS.

25.    On October 19, 2004, WWE filed a lawsuit against JAKKS and the Individual Defendants, among others, which alleged that the videogame license and certain toy licenses that the WWE previously granted to JAKKS were obtained through a pattern of racketeering and commercial bribery and seeking, among other things, that the licensing agreements be declared void (the "WWE Action"). According to the WWE Action, among other acts, JAKKS bribed a licensing agent to help it secure the WWE licenses.

26.    The WWE Action further details exactly how JAKKS made offshore payments to a licensing agent which helped it secure the WWE licenses and how JAKKS concealed those payments from the WWE during discovery in a related litigation.

27.    By at least the start of the Class Period, Defendants were aware that the WWE was contending that the WWE licenses had been obtained through a pattern of commercial bribery. Furthermore, Defendants knew or recklessly disregarded that the fact that the WWE was contending that the WWE licenses had been obtained through commercial bribery exposed the Company to the heightened risk that the WWE would seek some modification to the WWE licensing agreements or

complete nullification of those agreements. During the Class Period, Defendants issued numerous positive statements about the WWE licenses and the Company's operations but failed to disclose these known adverse facts and risks.

28.    On October 19, 2004, JAKKS issued a press release announcing its financial results for the third quarter of 2004, the period ending September 30, 2004. The Company reported that net income increased 195.8% to $25.7 million or $0.95 per share. JAKKS further reported that it was "engaged in discussions with WWE concerning the restructuring of its toy license and with WWE and THQ with respect to the restructuring of the JAKKS THQ Joint Venture video games license agreement with WWE." The press release stated in pertinent part as follows:

> The Company also announced that it is engaged in discussions with WWE concerning the restructuring of its toy license and with WWE and THQ with respect to the restructuring of the JAKKS THQ Joint Venture video games license agreement with WWE. The discussions are an outgrowth of certain litigation that has been pending between WWE and a former licensing consultant to WWE and a former employee of WWE, to which the Company is not a party. WWE has raised questions about the validity of the licenses as a result of certain transactions between the Company and that licensing consultant that occurred more than six years ago. The Company has denied any wrongdoing in connection with the transactions with the licensing consultant and maintains that they were unrelated to either the toy or video game license. **If the discussions are satisfactorily concluded, the restructuring of the licenses may have an impact on the Company's future revenues and net income to an extent that is presently unknown. If the discussions with WWE and THQ are not satisfactorily concluded, the Company anticipates that litigation is likely to be commenced by WWE challenging the validity of the licenses and seeking compensatory and punitive damages, in which event the Company intends to vigorously defend itself against claims which it believes are without merit.** [Emphasis added.]

29.    In response to the announcement of the problems with the WWE licenses, the price of JAKKS stock declined from $24.15 per share to $18.81 per share despite the fact that JAKKS reported "record" results for the third quarter and increased its earnings guidance for the fiscal year.

30.    Then, later that day, the WWE Action was filed. The filing of the WWE Action was made public after the market closed on October 19, 2004. The next trading day, October 20, 2004,

in response to the news that the problems with the WWE were much more pronounced and serious than the impression conveyed by JAKKS' third quarter financial release, the price of JAKKS common stock declined precipitously falling from $18.81 per share to $12.96 per share on extremely heavy trading volume.

**Materially False and Misleading**
**Statements Issued During the Class Period**

31.    The Class Period begins on February 17, 2004. On that date, JAKKS issued a press release announcing its financial results for the fourth quarter of 2003 and fiscal year 2003. The Company reported net income of $0.36 per share, excluding certain charges, for the fourth quarter of 2003 and fiscal 2003 earnings of $1.18 per share excluding certain charges. Defendant Friedman commented on the results stating in pertinent part as follows:

> We are pleased to report another year of solid sales for 2003 including robust growth in the fourth quarter, with strong sell-through in our mass merchant and other retail distribution channels. While we continue to be affected by a challenging industry environment, including the recent bankruptcies of KB Toys, FAO Schwarz and others, we believe that with our diverse product offerings and categories, we are well positioned for growth in 2004. As the number of stores in our primary channel base has declined, we are working to place more SKUs on these shelves, while at the same time concentrating on expanding sales of our products beyond traditional toy retailers to other retail channels, including electronics, drug, convenience and office supply stores.

> We were pleased with sales of our products featuring key licenses during the quarter, including WWE and Dragon Ball figure assortments, and our Atari and Namco TV Games. We have announced a number of new key licenses that we are adding to our TV Games line of product, including Ms. Pac-Man(R) and Spider-Man(R), and are pleased with strong initial sales of our two newest titles: a relaunch of Activision TV Games and a version based on SpongeBob SquarePants.

Defendant Berman also commented on the announcement stating in pertinent part as follows:

> As we look for additional ways to grow our business in 2004, we will continue to focus on the internal development of new licensed and proprietary concepts, as well as innovative extensions to product lines based on our top licenses. We are particularly excited about several new TV Games versions in the first half of the year, with many more to follow in the second half, a new scrapbook line for teens developed internally called My OverStuffed Life and the launch of our Mucha Lucha

product at retail. Other highlights include toys for Universal Studios' Classic Monsters and new monsters based on their feature film Van Helsing, and new products for our WWE and other boys action product lines.

Our strategy for 2004 will be to increase our marketing endeavors to launch new and extend existing categories throughout the year, while maximizing our operating efficiencies and further leveraging our retail sales channels and international distribution efforts. In the first quarter of 2004, we will see nominal sales growth in conjunction with an increase in advertising and marketing spending, but expect to see results from these efforts beginning in the second quarter and moving forward with higher sales and profit growth. In addition, we will continue to actively pursue complementary and accretive acquisitions that provide both near and long-term growth potential and market-share expansion opportunities.

32.    Also on February 17, 2004, JAKKS held a conference call for analysts and institutional investors to review the Company's earnings announcement and detail the Company's business and prospects. During the conference call, Defendant Bennett spoke positively about the WWE videogame license stating in pertinent part:

During the fourth quarter we released Smack Down! Here Comes the Pain! for Play Station 2 which was awarded Best Fighting Games at Spike TVs first annual Video Game Awards and which was among the top ten best selling Play Station 2 games of the holiday season. Sales were up year-over-year even with fierce competition for this title. We expect that the WWE games under the joint venture with THQ will keep pace with the industry in 2004.

Later on the call, Defendant Friedman also spoke positively about the WWE line stating in pertinent part as follows:

For WWE Pay-Per-View is up, attendance at house shows are up, ratings are up, the marketing initiatives have been increased by WWE as they gear up for Wrestle Mania 20 and as a result our wrestling toy sales are seeing a pickup as well.

33.    On March 15, 2004, JAKKS filed its Form 10-K with the SEC which confirmed its previously announced financial results and was signed by each of the Individual Defendants, among others (the "2003 Form 10-K"). The 2003 Form 10-K contain numerous positive statements concerning the WWE licenses as follows:

We have capitalized on our relationship with the WWE by obtaining an exclusive worldwide license for our joint venture with THQ Inc. ("THQ"), which develops,

- 10 -

produces, manufactures and markets video games based on WWE characters and themes. Since the joint venture's first title release in 1999, it has released 19 new titles. We have received $41.6 million as our share of the joint venture's profit through December 31, 2003.

*     *     *

We have an extensive toy license with the WWE pursuant to which we have the exclusive worldwide right, until December 31, 2009, to develop and market a full line of toy products based on the popular WWE professional wrestlers. These wrestlers perform throughout the year at live events that attract large crowds, many of which are broadcast on free and cable television, including pay-per-view specials. We launched this product line in 1996 with various series of 6 inch articulated action figures that have movable body parts and feature real-life action sounds from our patented bone-crunching mechanism that allows the figures' "bones" to crack when they are bent. We continually expand and enhance this product line by using technology in the development and in the products themselves. The 6 inch figures currently make up a substantial portion of our overall WWE line, which has since grown to include many other new products including playsets using interactive technology. Our strategy has been to release new figures and accessories frequently to keep the line fresh and to retain the interest of the consumers.

*     *     *

In June 1998, we formed a joint venture with THQ®, a developer, publisher and distributor of interactive entertainment software for the leading hardware game platforms in the home video game market. The joint venture entered into a license agreement with the WWE under which it acquired the exclusive worldwide right to publish WWE video games on all hardware platforms. The term of the license agreement expires on December 31, 2009, and the joint venture has a right to renew the license for an additional five years under various conditions.

The games are designed, developed, manufactured and distributed by THQ. THQ arranges for the manufacture of the CD-ROMs and game cartridges used in the various video game platforms under non-exclusive licenses with Sony, Nintendo, Sega and Microsoft. No other licenses are required for the manufacture of the personal computer titles.

Through June 30, 2006, we are entitled to receive a guaranteed percentage preferred return from the joint venture at varying rates of net sales of the video games depending on the cumulative unit sales and platform of each particular game, as well as on the royalties earned by the joint venture from the publishing of game guides by third parties. After June 30, 2006, the amount of our preferred return from the joint venture will be subject to renegotiation between THQ and us. THQ is entitled to receive the balance of the profits.

- 11 -

The joint venture currently publishes titles for the Sony PlayStation® and PlayStation 2®, Nintendo 64® and GameCube® and Microsoft Xbox® consoles, Nintendo Game Boy Color® and Game Boy Advance® hand-held platforms and personal computers. The joint venture launched its first products in November 1999. It will also publish titles for new hardware platforms when, and as they are introduced to the market and have established a sufficient installed base to support new software. These titles are marketed to our existing customers as well as to game, electronics and other specialty stores, such as Electronics Boutique and Best Buy.

*       *       *

Wrestling video games have demonstrated consistent popularity, with five of our wrestling-themed video games each having sold in excess of 1 million units in 1999, 2000, 2001, 2002 and 2003, at retail prices ranging from approximately $42 to $60 per game. We believe that the success of WWE titles is dependent on the graphic look and feel of the software, the depth and variation of game play and the popularity of WWE. We believe that as a franchise property, WWE titles have brand recognition and sustainable consumer appeal, which may allow the joint venture to use titles over an extended period of time through the release of sequels and extensions and to re-release such products at different price points in the future. In 2001, our PlayStation title SmackDownTM was re-released as a "greatest hit."

The 2003 Form 10-K also contained a chart setting forth the profits that JAKKS had made from the JAKKS/THQ joint venture, which holds the WWE videogame license.

34.     On April 20, 2004, JAKKS issued a press release announcing its financial results for the first quarter of 2004, the period ending March 30, 2004. The Company reported net income of $0.23 per share, excluding certain one-time items. Defendant Berman commented positively on the contribution that sales of WWE products were making to the Company's bottom line stating in pertinent part as follows:

We are also pleased with sales of our World Wrestling Entertainment(TM), Dragon Ball(R) and Mucha Lucha(TM) action figures and Road Champs(R) vehicles. Some additions to our product offerings include toys based on Universal Studios' Classic Monsters and new monsters based on the feature film Van Helsing(TM), which is scheduled for a May release. We expect these new licenses, combined with our core business, will contribute to our top and bottom line growth in 2004 and beyond.

Our financial position remains strong with $248.9 million of working capital, including cash of $156.6 million as of March 31, 2004. Given the strength of our balance sheet and positive cash flow, we remain well positioned to continue to grow our business by actively pursuing additional complementary and accretive

acquisitions, executing on internal growth initiatives and securing new licenses that provide both near term and long-term growth potential and market share expansion opportunities.

35.    Also on April 20, 2004, JAKKS issued a press release announcing that it had reached

an agreement in principle to acquire substantially all of the assets of the Play Along companies.

According to the press release, the Play Along companies are "privately-held toy companies based in

Deerfield, Fla., manufacture traditional toys, including plush, dolls, action figures and preschool and

construction toys, and holds a number of licenses including Cabbage Patch Kids(R) for dolls, Care

Bears(R) for plush and preschool learning, Teletubbies(R) for preschool and playsets and DC

Comic's(R) Batman(R) and Justice League(R) for construction toys." JAKKS announced that the

consideration for the acquisition was anticipated to be $116 million, consisting of $75 million in

cash and approximately $11 million of JAKKS common stock.

36.    Finally, on April 20, 2004, JAKKS held a conference call for analysts and

institutional investors to review the Company's earnings announcement and detail the Company's

business and prospects. During the conference call, Defendant Friedman spoke positively about the

WWE line of toys and videogames stating in pertinent part:

> March marked 20 years of Wrestlemania from WWE and Jakks has had a comprehensive program with WWE entertainment, Toys R Us, and our JV partner, THQ. We create an exclusive Wrestlemania 20 product line for Toys R Us stores and participated in several high profile events revolving around Wrestlemania in New York City. Same week year over year sales of WWE voice toys are considerably up. Sales of our core new Lucia Luca action figures have begun to meet expectations as have our Dragon Ball Z figures.

Later on the call, Defendant Friedman again spoke positively about the WWE line stating in

pertinent part as follows:

> Our boys action figure lines include WWE, Dragon Ball, Lucia Luca continue to gain shelf space and WWE in particular is doing very well. Again this quarter, WWE's pay per view numbers are up. Attendance at house shows are up. Television ratings are up and we are seeing the increased marketing initiatives by WWE coupled with the Wrestlemania initiatives are producing higher sales for our WWE toys.

- 13 -

37.    On June 14, 2004, JAKKS issued a press release announcing that it had completed the Play Along acquisition. The Company reported that the consideration for the acquisition consisted of $70 million in cash, 749,005 shares of JAKKS common stock and an earn-out of up to an aggregate amount of $30 million based on certain financial performance criteria.

38.    On July 20, 2004, JAKKS issued a press release announcing its financial results for the second quarter of 2004, the period ending June 30, 2004. The Company reported net income of $9.9 million or $0.38 per share. Defendant Friedman commented on the announcement stating in pertinent part as follows:

> We are very excited to report record revenue and net income for the second quarter and believe that we are on track to achieve the upper range of our increased 2004 guidance... We believe our strong sales and earnings growth results from increased product advertising and marketing, as well as keen focus on product innovation and operating efficiencies, and the phenomenal success of our TV Games line of plug it in and play video games.

> In addition to TV Games, a number of our brands performed particularly well, including our WWE action figures and Vivid Velvet in our art activities category. Our International sales also increased.

Defendant Berman also commented on the announcement stating in pertinent part as follows:

> We are enthusiastic about the opportunity to grow our business and are very encouraged about the upcoming holiday season based on early responses from our retailer partners. We believe that we will have prime placement for our TV Games line in the third and fourth quarters of this year, and expect our Dragon Ball, World Wrestling Entertainment and extreme sports product lines, as well as other lines to also do well.

39.    On September 8, 2004, JAKKS filed a Form S-3 with the SEC seeking to register the shares that had been issued in the Play Along acquisition as well as another acquisition for resale to the public.

40.    The statements referenced in ¶¶31-36 and 38 were each materially false and misleading because they failed to disclose and misrepresented the following adverse facts which were known to Defendants or recklessly disregarded by them:

(a)    that the WWE was contending that the WWE licenses had been obtained through a pattern of commercial bribery;

(b)    that the Company's relationship with the WWE was being negatively impacted by the WWE's contention that the licenses it had granted to the Company were improperly obtained; and

(c)    Given the foregoing, the Company was subject to the heightened risk that the WWE would seek some modification to the WWE licensing agreements or complete nullification of those agreements, which would negatively impact the Company's future financial results.

**The Truth Begins To Emerge**

41.    On October 19, 2004, JAKKS issued a press release announcing its financial results for the third quarter of 2004, the period ending September 30, 2004. The Company reported that net income increased 195.8% to $25.7 million or $0.95 per share. The Company further reported that it was "engaged in discussions with WWE concerning the restructuring of its toy license and with WWE and THQ with respect to the restructuring of the JAKKS THQ Joint Venture video games license agreement with WWE." The press release stated in pertinent part as follows:

> The Company also announced that it is engaged in discussions with WWE concerning the restructuring of its toy license and with WWE and THQ with respect to the restructuring of the JAKKS THQ Joint Venture video games license agreement with WWE. The discussions are an outgrowth of certain litigation that has been pending between WWE and a former licensing consultant to WWE and a former employee of WWE, to which the Company is not a party. WWE has raised questions about the validity of the licenses as a result of certain transactions between the Company and that licensing consultant that occurred more than six years ago. The Company has denied any wrongdoing in connection with the transactions with the licensing consultant and maintains that they were unrelated to either the toy or video game license. **If the discussions are satisfactorily concluded, the restructuring of the licenses may have an impact on the Company's future revenues and net income to an extent that is presently unknown. If the discussions with WWE and THQ are not satisfactorily concluded, the Company anticipates that litigation is likely to be commenced by WWE challenging the validity of the licenses and seeking compensatory and punitive damages, in which event the**

- 15 -

**Company intends to vigorously defend itself against claims which it believes are without merit.** [Emphasis added.]

42.    In response to the announcement of the problems with the WWE licenses, the price of JAKKS stock declined from $24.15 per share to $18.81 per share despite the fact that JAKKS reported "record" results for the third quarter and increased its earnings guidance for the fiscal year.

43.    Then, later that day, the WWE Action was filed. The filing of the WWE Action was made public after the market closed on October 19, 2004. The next trading day, October 20, 2004, in response to the news that the problems with the WWE were much more pronounced and serious than the impression conveyed by JAKKS' third quarter financial release, the price of JAKKS common stock declined precipitously falling from $18.81 per share to $12.96 per share on extremely heavy trading volume.

44.    The market for JAKKS' common stock was open, well-developed and efficient at all relevant times. As a result of these materially false and misleading statements and failures to disclose, JAKKS' common stock traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired JAKKS' common stock relying upon the integrity of the market price of JAKKS' common stock and market information relating to JAKKS, and have been damaged thereby.

45.    During the Class Period, defendants materially misled the investing public, thereby inflating the price of JAKKS' common stock, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make defendants' statements, as set forth herein, not false and misleading. Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations, as alleged herein.

- 16 -

46.     At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, defendants made or caused to be made a series of materially false or misleading statements about JAKKS' business, prospects and operations. These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of JAKKS and its business, prospects and operations, thus causing the Company's common stock to be overvalued and artificially inflated at all relevant times. Defendants' materially false and misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's common stock at artificially inflated prices, thus causing the damages complained of herein.

**Additional Scienter Allegations**

47.     As alleged herein, Defendants acted with scienter in that defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding JAKKS, their control over, and/or receipt and/or modification of JAKKS' allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning JAKKS, participated in the fraudulent scheme alleged herein.

48.     Defendants' scienter is further evidenced by the acquisition of the Play Along companies. In the Play Along acquisition, JAKKS issued 749,005 shares of common stock as part

- 17 -

of the consideration for the transaction. Defendants were motivated to conceal the problems with the WWE in order to artificially inflate the price of JAKKS common stock and reduce the number of shares that would have to be issued in the Play Along acquisition.

49.     Finally, shortly before the disclosure of the problems with the WWE, in August 2004, Defendant Bennett sold approximately 44,000 shares of JAKKS common stock, thereby generating proceeds of approximately $850,000.  These sales were unusual and suspicious because, among other reasons, Defendant Bennett had never sold any shares of JAKKS common stock previously.

**Applicability of Presumption of Reliance:**
**Fraud-On-The-Market Doctrine**

50.     At all relevant times, the market for JAKKS' common stock was an efficient market for the following reasons, among others:

(a)     JAKKS' stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b)     As a regulated issuer, JAKKS filed periodic public reports with the SEC and the NASDAQ;

(c)     JAKKS regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)     JAKKS was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

51.    As a result of the foregoing, the market for JAKKS' common stock promptly digested current information regarding JAKKS from all publicly-available sources and reflected such information in JAKKS' stock price. Under these circumstances, all purchasers of JAKKS' common stock during the Class Period suffered similar injury through their purchase of JAKKS' common stock at artificially inflated prices and a presumption of reliance applies.

**No Safe Harbor**

52.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of JAKKS who knew that those statements were false when made.

**FIRST CLAIM**

**VIOLATION OF §10(B) OF**
**THE EXCHANGE ACT AGAINST AND RULE 10B-5**
**PROMULGATED THEREUNDER AGAINST ALL DEFENDANTS**

53.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

54.    During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public,

including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase JAKKS' common stock at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

55.  Defendants (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for JAKKS' common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

56.  Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of JAKKS as specified herein.

57.  These defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of JAKKS' value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about JAKKS and its business operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein,

and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of JAKKS common stock during the Class Period.

58.     Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of his responsibilities and activities as a senior officer and/or director of the Company was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of and had access to other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

59.     The defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.  Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing JAKKS' operating condition and future business prospects from the investing public and supporting the artificially inflated price of its common stock.  As demonstrated by defendants' overstatements and misstatements of the Company's business, operations and earnings throughout the Class Period, defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such

knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

60.     As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of JAKKS' common stock was artificially inflated during the Class Period.  In ignorance of the fact that market prices of JAKKS' publicly-traded common stock were artificially inflated, and relying directly or indirectly on the false and misleading statements made by defendants, or upon the integrity of the market in which the common stock trades, and/or on the absence of material adverse information that was known to or recklessly disregarded by defendants but not disclosed in public statements by defendants during the Class Period, Plaintiff and the other members of the Class acquired JAKKS common stock during the Class Period at artificially high prices and were damaged thereby.

61.     At the time of said misrepresentations and omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that JAKKS was experiencing, which were not disclosed by defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their JAKKS common stock, or, if they had acquired such common stock during the Class Period, they would not have done so at the artificially inflated prices which they paid.

62.     By virtue of the foregoing, defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

63.     As a direct and proximate result of defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's common stock during the Class Period.

- 22 -

### SECOND CLAIM

### VIOLATION OF §20(A) OF
### THE EXCHANGE ACT THE INDIVIDUAL DEFENDANTS

64.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

65.     The Individual Defendants acted as controlling persons of JAKKS within the meaning of §20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contend are false and misleading.  The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

66.     In particular, each of these defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

67.     As set forth above, JAKKS and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of defendants' wrongful conduct, Plaintiff and other

- 23 -

members of the Class suffered damages in connection with their purchases of the Company's

common stock during the Class Period.

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

A.    Determining that this action is a proper class action, designating Plaintiff as Lead

Plaintiff and certifying Plaintiff as class representatives under Rule 23 of the Federal Rules of Civil

Procedure and Plaintiff counsel as Lead Counsel;

B.    Awarding compensatory damages in favor of Plaintiff and the other Class members

against all defendants, jointly and severally, for all damages sustained as a result of defendants'

wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this

action, including counsel fees and expert fees; and

D.    Such other and further relief as the Court may deem just and proper.

### JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.


DATED:  November 5, 2004            LERACH COUGHLIN STOIA GELLER
                                    RUDMAN & ROBBINS LLP,
                                    SAMUEL H. RUDMAN (SR-7957)
                                    DAVID A. ROSENFELD (DR-7564)



                                    _____
                                            SAMUEL H. RUDMAN
                                    200 Broadhollow Road, Suite 406
                                    Melville, NY  11747
                                    Telephone:  631/367-7100
                                    631/367-1173 (fax)

LERACH COUGHLIN STOIA GELLER RUDMAN & ROBBINS, LLP
197 South Federal Highway, Suite 200
Boca Raton, FL 33432
(561) 750-3000
(561) 750-3364 Facsimile

## CERTIFICATION OF NAMED PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

I, _Lydia Garcia_ ("Plaintiff"), declares as to the claims asserted, or to be asserted, under the federal securities laws, that:

1.     Plaintiff has reviewed the _JakKS PaciFic_ complaint and authorized its filing.

2.     Plaintiff did not purchase any common stock/securities that are the subject of this action at the direction of Plaintiff's counsel or in order to participate any private action under the federal securities laws.

3.     Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary. I understand that this is not a claim form, and that my ability to share in any recovery as a member of the class is not dependent upon execution of this Plaintiff Certification.

4.     The following includes all of Plaintiff's transactions during the Class Period specified in the complaint for the common stock/securities that are the subject of this action:

| SECURITY (Common Stock, Call, Put, Bonds) | TRANSACTION (Purchase, Sale) | QUANTITY | TRADE DATE | PRICE PER SHARE/SECURITY |
|---|---|---|---|---|
| Jakks Pacific (Jakk) | Purchase | 110 | 7/20/06 | 19.75 |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

Please list additional transactions on a separate sheet if necessary.

5.     Plaintiff has not sought to serve or served as a representative party for a class in an action filed under the federal securities laws within the past three years, unless otherwise stated in the space below:

_Digimarc Corp, Tommy Hilfiger, Intelligroup_

6.     Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this _25_ day of _Oct_, 2004.

SIGNATURE