## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

IN RE JAKKS PACIFIC, INC. SHAREHOLDERS
CLASS ACTION LITIGATION

Case No. 04-CV-8807 (KMK)

## DECLARATION OF GUSTAVO BRUCKNER IN SUPPORT
## OF MOTION OF QUANTUM EQUITIES LLC AND FRANK WHITING
## FOR APPOINTMENT AS LEAD PLAINTIFF
## AND APPROVAL OF SELECTION OF LEAD COUNSEL

I, Gustavo Bruckner, hereby declare:

1.      I am an associate of the law firm of Wolf Haldenstein Adler Freeman & Herz LLP.  I submit this Declaration in support of the motion of Quantum Equities LLC and Frank Whiting for consolidation, appointment as lead plaintiff and approval of their selection of Wolf Haldenstein Adler Freeman & Herz LLP as Lead Counsel.

2.      Attached hereto as Exhibit A is a true and correct copy of the notice of pendency published by Business Wire on November 5, 2004.

3.      Attached hereto as Exhibit B is a true and correct copy of the notice of pendency of the expanded class period action initiated by Movant Quantum Equities LLC published by PRNewswire on November 9, 2004.

4.      Attached hereto as Exhibit C are true and correct copies of the plaintiff certifications executed by Quantum Equities LLC and Frank Whiting, which demonstrates their class standing and requisite financial interest in the outcome of the litigation.

388325

5.      Attached hereto as Exhibit D is a true and correct copy of a loss chart of Quantum Equities LLC and Frank Whiting's transactions in Jakks Pacific, Inc. securities during the relevant Class Period and their approximate losses.

6.      Attached hereto as Exhibit E is a true and correct copy of the firm biography of Wolf Haldenstein Adler Freeman & Herz LLP.

7.      Attached hereto as Exhibit F is a true and correct copy of the complaint styled Quantum Equities LLC v. Jakks Pacific, Inc., et al., 04-cv-08877-KMK.

Signed under penalty of perjury this 1st day of February, 2005.


_____/s/_____
Gustavo Bruckner


2

388325

# Exhibit A

 FINANCE  Search - Finance Home - Yahoo! - Help



**Welcome** [Sign In]                                    To track stocks & more, Register

**Financial News**

Enter symbol(s) [＿＿＿] [Basic ▼] [Get] Symbol Lookup

**Press Release**                          Source: Lerach Coughlin Stoia Geller Rudman & Robbins LLP

# Lerach Coughlin Stoia Geller Rudman & Robbins LLP Files Class Action Suit against Jakks Pacific, Inc.

Friday November 5, 5:05 pm ET

NEW YORK--(BUSINESS WIRE)--Nov. 5, 2004--Lerach Coughlin Stoia Geller Rudman & Robbins LLP ("Lerach Coughlin") (http://www.lerachlaw.com/cases/jakks/) today announced that a class action lawsuit has been commenced in the United States District Court for the Southern District of New York on behalf of purchasers of JAKKS Pacific, Inc. ("JAKKS") (NASDAQ:JAKK - News) common stock during the period between February 17, 2004 and October 19, 2004 (the "Class Period").

If you wish to serve as lead plaintiff, you must move the Court no later than 60 days from today. If you wish to discuss this action or have any questions concerning this notice or your rights or interests, please contact plaintiff's counsel, Samuel H. Rudman or David A. Rosenfeld of Lerach Coughlin at 800/449-4900 or via e-mail at wsl@lerachlaw.com. If you are a member of this class, you can view a copy of the complaint as filed or join this class action online at http://www.lerachlaw.com/cases/jakks/. Any member of the purported class may move the Court to serve as lead plaintiff through counsel of their choice, or may choose to do nothing and remain an absent class member.

The complaint charges JAKKS and certain of its officers and directors with violations of the Securities Exchange Act of 1934. JAKKS describes itself as a multi-line, multi-brand toy company that designs, develops, produces and markets toys and related products.

The complaint alleges that, throughout the Class Period, defendants issued numerous positive statements concerning the increasing sales of JAKKS's products licensed through the World Wrestling Entertainment Inc. ("WWE"). As alleged in the complaint, these statements were materially false and misleading because defendants knew, but failed to disclose: (a) that the WWE was contending that the WWE licenses had been obtained through a pattern of commercial bribery; (b) that the Company's relationship with the WWE was being materially impacted by the WWE's contention that the licenses it had granted to the Company were improperly obtained; and (c) given the foregoing, the Company was subject to the heightened risk that the WWE would seek some modification to its WWE licensing agreements or complete nullification of those agreements, which would negatively impact the Company's future financial results.

On October 19, 2004, JAKKS issued a press release announcing that it was "engaged in discussions with WWE concerning the restructuring of its toy license and with WWE and THQ with respect to the restructuring of the JAKKS THQ Joint Venture video games license agreement with WWE." In response to the announcement of the problems with the WWE licenses, the price of JAKKS stock declined from $24.15 per share to $18.81 per share. Then, after the market closed for trading, it was reported that the WWE had just filed a lawsuit against JAKKS which alleged that the videogame license and certain toy licenses that the WWE previously granted to JAKKS were obtained through a pattern of racketeering and commercial bribery and seeking, among other things, that the licensing agreements be declared void. Following this announcement, on the next day of trading, the price of JAKKS common stock continued to fall to close at $12.96 per share on extremely heavy trading volume.

Plaintiff seeks to recover damages on behalf of all purchasers of JAKKS common stock during the Class Period (the "Class"). The plaintiff is represented by Lerach Coughlin, which has expertise in prosecuting investor class actions and extensive experience in actions involving financial fraud.

Lerach Coughlin, a 140-lawyer firm with offices in San Diego, San Francisco, Los Angeles, New York, Boca Raton, Washington, D.C., Houston, Philadelphia and Seattle, is active in major litigations pending in federal and state courts

throughout the United States and has taken a leading role in many important actions on behalf of defrauded investors, consumers, and companies, as well as victims of human rights violations. Lerach Coughlin lawyers have been responsible for more than $20 billion in aggregate recoveries. The Lerach Coughlin Web site (http://www.lerachlaw.com) has more information about the firm.

*Contact:*

```
Lerach Coughlin Stoia Geller Rudman & Robbins LLP
William Lerach, 800-449-4900
Samuel H. Rudman
David A. Rosenfeld
wsl@lerachlaw.com
```

Source: Lerach Coughlin Stoia Geller Rudman & Robbins LLP

Copyright © 2005 Yahoo! Inc. All rights reserved. Privacy Policy - Terms of Service - Copyright Policy - Ad Feedback
Copyright © 2005 Business Wire. All rights reserved. All the news releases provided by Business Wire are copyrighted. Any forms of copying other than an individual user's personal reference without express written permission is prohibited. Further distribution of these materials by posting, archiving in a public web site or database, or redistribution in a computer network is strictly forbidden.

# Exhibit B

**YAHOO!** FINANCE  Search - Finance Home - Yahoo! - Help


PRNewswire

**Welcome** [Sign In]                                      To track stocks & more, Register

**Financial News**

Enter symbol(s) [          ]  [ Basic      ▼]  [ Get ]  Symbol Lookup

**Press Release**                               Source: Wolf Haldenstein Adler Freeman & Herz LLP

# Expanded Class Period Alleged in Class Action Lawsuit on Behalf Of JAKKS Pacific, Inc. Shareholders Filed by Wolf Haldenstein Adler Freeman & Herz

Tuesday November 9, 6:24 pm ET

NEW YORK, Nov. 9 /PRNewswire/ -- On November 9, 2004, Wolf Haldenstein Adler Freeman & Herz LLP filed a class action lawsuit in the United States District Court for the Southern District of New York on behalf of all persons who purchased or otherwise acquired the common stock of JAKKS Pacific, Inc. ("JAKKS" or the "Company") (Nasdaq: JAKK - News) between October 26, 1999 and October 19, 2004, inclusive (the "Class Period"), against defendants JAKKS and certain officers and directors of the Company.

The case name is Quantum Equities LLC v. JAKKS Pacific, Inc., et al., 04-CV-08877. A copy of the complaint filed in this action is available from the Court, or can be viewed on the Wolf Haldenstein Adler Freeman & Herz LLP website at http://www.whafh.com/modules/case/index.php?action=view&id=728.

The complaint alleges that defendants violated the federal securities laws by issuing materially false and misleading statements throughout the Class Period that had the effect of artificially inflating the market price of the Company's securities.

Specifically, the Complaint alleges that defendants' statements were each materially false and misleading because they failed to disclose and misrepresented the following adverse facts: (a) the Company had obtained the WWE license as a result of its participation in an illicit bribery scheme; (b) the Company's success in obtaining at least one lucrative license was not reflective of the Company's ability to enter into licensing agreements through arms-length transactions but was, instead, reflective of the Company's perpetration of an unsustainable business tactic; (c) discovery of the Company's participation in the bribery scheme would substantially impact the Company's past, present and future revenue stream from the WWE license as the terms of the license could be materially modified, or revoked in its entirety, and the Company would be exposed to significant liability in the form of damages sought by WWE; (d) the Company's viability as an ongoing business operation would be materially impacted by potential business partners' reluctance to conduct business with an entity involved in such a bribery scheme; and (e) the Company's revenues and earnings would have been significantly less had the Company not engaged in the bribery scheme.

If you purchased or otherwise acquired JAKKS common stock during the Class Period, you may request that the Court appoint you as lead plaintiff by January 4, 2005. A lead plaintiff is a representative party that acts on behalf of other class members in directing the litigation. In order to be appointed lead plaintiff, the Court must determine that the class member's claim is typical of the claims of other class members, and that the class member will adequately represent the class. Under certain circumstances, one or more class members may together serve as "lead plaintiff." Your ability to share in any recovery is not, however, affected by the decision whether or not to serve as a lead plaintiff. You may retain Wolf Haldenstein, or other counsel of your choice, to serve as your counsel in this action.

Wolf Haldenstein has extensive experience in the prosecution of securities class actions and derivative litigation in state and federal trial and appellate courts across the country. The firm has approximately 60 attorneys in various practice areas and offices in Chicago, New York City and San Diego. The reputation and expertise of this firm in shareholder and other class litigation have been repeatedly recognized by the courts, which have appointed it to major positions in complex securities multi-district and consolidated litigation.

If you wish to discuss this action or have any questions, please contact Wolf Haldenstein Adler Freeman & Herz LLP

at 270 Madison Avenue, New York, New York 10016, by telephone at (800) 575-0735 (Fred Taylor Isquith, Esq., Christopher S. Hinton, Esq., or Derek Behnke), via e-mail at classmember@whafh.com, or visit our website at http://www.whafh.com . All e- mail correspondence should make reference to JAKKS.

Source: Wolf Haldenstein Adler Freeman & Herz LLP

Copyright © 2005 Yahoo! Inc. All rights reserved. Privacy Policy - Terms of Service - Copyright Policy - Ad Feedback
Copyright © 2005 PR Newswire. All rights reserved. Republication or redistribution of PRNewswire content is expressly prohibited without the prior written consent of PRNewswire. PRNewswire shall not be liable for any errors or delays in the content, or for any actions taken in reliance thereon.

# Exhibit C

## CERTIFICATION PURSUANT TO FEDERAL SECURITIES LAWS

**Frank S. Whiting** declares, as to the claims asserted under the federal securities laws, that:

1. I have reviewed the complaint and authorized the commencement of an action on my behalf.

2. I did not purchase the security that is the subject of this action at the direction of plaintiffs' counsel or in order to participate in this private action.

3. I am willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4. My transactions in **Jakks Pacific, Inc.** during the Class Period are as follows:

   See Attached.

5. I have not served as a class representative in any case under the federal securities laws in the last three years.

6. I will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 3rd day of January, 2004 2005.

Frank S. Whiting

Jakks Pacific Transactions

| Purchase Date | # Shares | Price | Sale Date | # Shares | Price |
|---|---|---|---|---|---|
| 2/26/1999* | 1,750 | 11.50 | 9/27/2000 | 2250 | 10.00 |
| 8/26/1999* | 3,000 | 20.917 | 9/27/2000 | 2250 | 10.00 |
| 10/6/1999* | 1,500 | 27.00 | 9/27/2000 | 1500 | 10.00 |
| 10/5/1999* | 1,000 | 40.928 | 9/27/2000 | 500 | 10.25 |
| 10/11/1999* | 4,000 | 31.108 | 9/27/2000 | 4000 | 10.25 |
| 10/14/1999* | 2,250 | 25.819 | 9/28/2000 | 10000 | 9.425 |
| 12/20/1999 | 2500 | 21.00 | 9/28/2000 | 5550 | 9.425 |
| 12/20/1999 | 500 | 20.937 | 9/28/2000 | 5000 | 9.425 |
| 2/16/2000 | 4000 | 21.708 | 9/28/2000 | 5000 | 9.25 |
| 4/6/2000 | 1000 | 22.375 | 9/28/2000 | 5000 | 9.375 |
| 4/6/2000 | 8000 | 22.50 | 9/28/2000 | 200 | 9.406 |
| 4/6/2000 | 1000 | 22.50 | 9/28/2000 | 1000 | 9.525 |
| 4/18/2000 | 3000 | 21.75 | | | |
| 4/18/2000 | 2500 | 21.937 | | | |
| 4/18/2000 | 1500 | 22.00 | | | |
| 4/18/2000 | 1500 | 22.375 | | | |
| 4/18/2000 | 1500 | 22.5 | | | |
| 4/26/2000** | 1750 | 21.625 | | | |

*These shares are adjusted for the [3:2] stock split on 11/5/99.
**Settlement date

## PLAINTIFF'S CERTIFICATION

Quantum Equities LLC ("Plaintiff"), by Michael Fishman, Managing Director, declares under penalty of perjury, as to the claims asserted under the federal securities laws, that:

1.    Plaintiff has reviewed the complaint and authorized the commencement of an action on Plaintiff's behalf.

2.    Plaintiff did not purchase the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action.

3.    Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.    Plaintiff's transactions in Jakks Pacific, Inc. securities during the Class Period specified in the Complaint are as follows:

| Date | # of Shares Purchased | # of Shares Sold | Price |
|------|----------------------|------------------|-------|
| 10/19/2004 | 25,000 | | $23.2378 |
| 10/19/2004 | | 25,000 | $20.4842 |

5.    During the three years prior to the date of this Certificate, Plaintiff has not sought to serve or served as a representative party for a class in an action filed under the federal securities laws.

6.    Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this _8th_ day of _November_ 2004.

Michael Fishman, Managing Director
Quantum Equities LLC

# Exhibit D

Jakks Pacific Loss Chart

| Name | Purchase Date | # Shares | Price | Purchase Cost | Total | Sale Date | # Shares | Price | Redeemed Value | Total Loss |
|---|---|---|---|---|---|---|---|---|---|---|
| Frank S. Whiting | 12/20/1999 | 2,500 | $21.00 | $52,500.00 | | | | | | |
| | 12/20/1999 | 500 | $20.937 | $10,468.50 | | | | | | |
| | 2/16/2000 | 4,000 | $21.708 | $86,830.20 | | | | | | |
| | 4/6/2000 | 1,000 | $22.375 | $22,375.00 | | | | | | |
| | 4/6/2000 | 8,000 | $22.50 | $180,000.00 | | | | | | |
| | 4/6/2000 | 1,000 | $22.50 | $22,500.00 | | 9/28/2000 | 7,000 | $9.425 | $65,975.00 | |
| | 4/18/2000 | 3,000 | $21.75 | $65,250.00 | | 9/28/2000 | 5,550 | $9.425 | $52,308.75 | |
| | 4/18/2000 | 2,500 | $21.937 | $54,842.50 | | 9/28/2000 | 5,000 | $9.425 | $47,125.00 | |
| | 4/18/2000 | 1,500 | $22.00 | $33,000.00 | | 9/28/2000 | 5,000 | $9.25 | $46,250.00 | |
| | 4/18/2000 | 1,500 | $22.375 | $33,562.50 | | 9/28/2000 | 5,000 | $9.375 | $46,875.00 | |
| | 4/18/2000 | 1,500 | $22.50 | $33,750.00 | | 9/28/2000 | 200 | $9.406 | $1,881.20 | |
| | 4/26/2000* | 1,750 | $21.625 | $37,843.75 | | 9/28/2000 | 1,000 | $9.525 | $9,525.00 | |
| | | 28,750 | | $632,922.45 | $632,922.45 | | 28,750 | | $269,939.95 | $362,982.50 |
| | | | | | | 9/27/2000 | 2,250 | $10.00 | $22,500.00 | |
| | | | | | | 9/27/2000 | 2,250 | $10.00 | $22,500.00 | |
| | | | | | | 9/27/2000 | 1,500 | $10.00 | $15,000.00 | |
| | | | | | | 9/27/2000 | 500 | $10.25 | $5,125.00 | |
| | | | | | | 9/27/2000 | 4,000 | $10.25 | $41,000.00 | |
| | | | | | | 9/28/2000 | 3,000 | $9.425 | $28,275.00 | |
| | | | | | | | 13,500 | | $134,400.00 | ($134,400.00) |
| Quantum Equities | 10/19/2004 | 25000 | $23.2378 | $580,945.00 | $580,945.00 | 10/19/2004 | 25000 | $20.4842 | $512,105.00 | $68,840.00 |

Total Shares Purchased: 53,750

Total Purchase Cost: $1,213,867.45

Total Shares Sold: 67,250

Total Redeemed Value: $916,444.95

Total Loss of Class Period Purchased Stock: $431,822.50

Total Loss: $297,422.50

*Settlement date

391399

# Exhibit E

# Wolf

# Haldenstein

# Adler

# Freeman &

# Herz llp

## Firm Resume

*"The class action is one of the few legal remedies the small claimant has against those that command the status quo."*

**Justice William O. Douglas,**
**United States Supreme Court**

WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP

# WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP

## The Firm

Founded in 1888, Wolf Haldenstein Adler Freeman & Herz LLP is a full service law firm with practice groups in corporate/tax, pension/benefits, real estate, trusts and estates, healthcare, bankruptcy, limited partnerships, and civil and commercial litigation, with a particular specialty in complex class and shareholder litigation under both federal and state law.

What distinguishes Wolf Haldenstein from other firms is our total-practice approach, supported by the mid-range size and structure of our firm. Our longstanding tradition of a close attorney/client relationship ensures that each one of our clients receives prompt, individual attention and does not become lost in an institutional bureaucracy. Our team approach is at the very heart of Wolf Haldenstein's practice. All of our lawyers are readily available to all of our clients and to each other. The result of this approach is that we provide our clients with an efficient legal team having the broad perspective, expertise and experience required for any matter at hand. We are thus able to provide our clients with cost effective and thorough counsel focused on our clients' overall goals.

The Firm has its principal office with lawyers in the various practice areas, at 270 Madison Avenue, New York, NY 10016. The firm's general telephone number in New York is (212) 545-4600. The fax number in New York is (212) 545-4653. The firm also has offices at Symphony Towers, 750 B Street, Suite 2770, San Diego, CA 92101, telephone: (619) 239-4599, fax: (619) 234-4599; 656 W. Randolph Street, Suite 500W, Chicago, IL 60661, telephone: (312) 466-9200, fax: (312) 466-9292; and 625 N. Flagler Drive, West Palm Beach, Florida 33401. The firm's web site is accessible at http://www.whafh.com.

## The Wolf Haldenstein Class Action Litigation Group

Wolf Haldenstein's Class Action Litigation Group has been recognized by courts throughout the country as being highly experienced in complex litigation, particularly with respect to securities, consumer, ERISA, and antitrust class actions and shareholder rights litigation.  The Class Action Litigation Group consists of 30 attorneys and 10 paraprofessional assistants.  Brief resumes of each of the attorneys begin on page 10.

Also included are the resumes of some attorneys from other areas of the Firm's practice who routinely lend their expertise to the Firm's class action litigators in the areas of tax, bankruptcy, corporate, trusts, labor, and ERISA law.  The ability to call upon the internal expertise of practitioners in such varied areas of the law greatly enhances the strength and efficiency of the Firm's representative litigation practice and, indeed, makes Wolf Haldenstein unique among national firms specializing in class action litigation.

The nature of the Firm's activities in representative litigation is extremely broad.  In addition to a large case load of securities fraud and other investor class actions, Wolf Haldenstein has represented classes of corn farmers in connection with the devaluation of their crops; contact lens purchasers for contact lens manufacturers' violations of the antitrust laws; merchants compelled to accept certain types of debit cards; insurance policyholders for insurance companies' deceptive sales practices; victims of unlawful strip searches under the civil rights laws; and various cases involving violations of Internet users' on-line privacy rights.

The Firm's experience in class action securities litigation, and, in particular, public shareholder rights under state law and securities fraud claims arising under the federal securities laws and regulations, including the Private Securities Litigation Reform Act of 1995 ("PSLRA"), is particularly extensive.  The Firm was one of the lead or other primary counsel in securities class action cases that have recouped billions of dollars on behalf of investor classes, in stockholder rights class actions that have resulted in billions of dollars in increased merger consideration to shareholder classes, and in derivative litigation that has recovered billions of dollars for corporations.

Among its colleagues in the plaintiffs' securities bar, as well as among its adversaries in the defense bar, Wolf Haldenstein is known for the high ability of its attorneys, the exceptionally high quality of its written and oral advocacy on behalf of class action clients, and for its pioneering efforts in difficult or unusual areas of securities or investor protection laws, including: groundbreaking claims that have been successfully brought under the Investment Company Act of 1940 regarding fiduciary responsibilities of investment companies and their advisors toward their shareholders; claims under ERISA involving fiduciary duties of ERISA trustees who are also insiders in possession of

[3]

**WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP**

adverse information regarding their fund's primary stockholdings, the fiduciary duties of the directors of Delaware corporations in connection with change of control transactions, the early application of the fraud on the market theory to claims against public accounting firms in connection with their audits of publicly traded corporations, and the application of federal securities class certification standards to state law claims often thought to be beyond the reach of class action treatment.

Wolf Haldenstein's performance in representative litigation has repeatedly received favorable judicial recognition. The following representative judicial comments over two decades indicate the high regard in which the Firm is held:

- In In re MicroStrategy Securities Litigation, 150 F. Supp. 2d 896, 903 (E.D. Va. 2001), where the Firm was a co-lead counsel, Judge Ellis commented "Clearly, the conduct of all counsel in this case and the result they have achieved for all of the parties confirms that they deserve the national recognition they enjoy."

- In the In Re Toys R Us Antitrust Litigation, 98 MDL 1211 (NG) 191 F.R.D. 347, 351, 356 (E.D.N.Y. 2000), where the Firm served as co-lead counsel and liaison counsel, Judge Gershon wrote: "Class counsel are highly skilled and experienced and can fairly and adequately represent the interests of the class . . . . Counsel for both the class plaintiffs and the States have well-earned the compensation that they request."

- In Yud v. Saf T Lok, No. 98-8507-Civ-Hurley (S.D. Fla. Dec. 15, 1999), where the firm was sole lead counsel, the court stated: "The attorneys have done an outstanding amount of work and fine legal work in a short period of time to bring this class action to resolution in a successful fashion."

- In Kurzweil v. Philip Morris Companies, 94 Civ. 2373, 94 Civ. 2546 (MBM) (S.D.N.Y. Nov. 13, 1998), where the Firm was sole lead counsel, now Chief Judge Mukasey, in approving a $116.5 million settlement stated: "In this case, this represents a lot of good, hard, serious work by a lot of talented lawyers and I appreciate it on both sides."

- In Paramount Communications v. QVC Network Inc.; In re Paramount Communications Inc. Shareholders' Litigation, 637 A.2d 34, 37 n.2 (Sup. Ct. Del. 1994), where the Firm was co-lead counsel for the Paramount shareholders, the Supreme Court of Delaware noted "its appreciation of . . . the professionalism of counsel in this matter in handling this expedited litigation with the expertise and skill which characterize Delaware proceedings of this nature." The Court further "commended the parties for their professionalism in conducting expedited discovery, assembling and organizing the record, and preparing and presenting very helpful briefs, a joint appendix, and oral argument."

- In In re Laser Arms Corp. Securities Litigation, 794 F. Supp. 475, 496 (S.D.N.Y. 1989), where the Firm was lead counsel, the Court stated "plaintiffs' counsel have

[4]

demonstrated their experience in securities litigation and the Court is confident that counsel will proceed vigorously on behalf of all class and subclass members."

- In In re Public Service Co. of  Indiana Derivative Litigation, 125 F.R.D. 484, 486 (S.D. Ind. 1988), concerning the construction of the Marble Hill Nuclear Power Plant, where the Firm was lead counsel, the court said "[t]hroughout the life of this litigation, it has been both vigorously prosecuted and aggressively defended by thoroughly competent counsel on all sides."

- In In re Public Service Co. of New Hampshire Derivative Litigation, 84-220-D (D.N.H. 1986), involving the construction of the Seabrook Nuclear Power Plant, where the Firm was lead counsel, the court said of plaintiffs' counsel that "the skill required and employed was of the highest caliber."

- In In re Warner Communications Securities Litigation, 618 F. Supp. 735, 749 (S.D.N.Y. 1985), where the Firm served as co-lead counsel, the court said: "'plaintiffs' counsel constitute the cream of the plaintiffs' bar.'  The Court cannot find fault with that characterization."

- In Steiner v. Equimark Corp., No. 81-1988 (W.D. Pa. 1983), a case involving complex issues concerning banking practices in which the Firm was lead counsel, then District Judge Mannsman described, in part, the work the Firm performed:

> We look at the complexity of the issue, the novelty of it, the quality of work that, as the trial judge, I am able to perceive, and then, finally, the amount of recovery obtained: I think I have certainly said a lot in that regard.  I think it's been an extraordinary case.  I think it's an extraordinary settlement. Certainly defense counsel and plaintiffs' counsel as well are all experienced counsel with a tremendous amount of experience in these particular kinds of cases.  And under those circumstances . . . I think it was, really, the strategy and ingenuity of counsel in dividing up the workload and strategizing the cases as to who was to do what and what ultimately should be done to bring about the settlement that was achieved.

## Current Cases:

Wolf Haldenstein is a leader in the class action litigation field and is currently the Court-appointed lead counsel, co-lead counsel, or executive committee member in some of the largest and most significant class action lawsuits currently pending across the United States, including:

- In re Initial Public Offering Securities Litigation, 21 MC 92 (SAS) (S.D.N.Y.).

**WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP**

- In re Initial Public Offering Antitrust Litigation, 01 CV 2014 (WHP) (S.D.N.Y.).

- In re Comdisco Securities Litigation, 01 C 2110 (N.D. Ill.).

- Spagnola v. Kilrea, et al. (HA-LO, Inc.) 02 C 0270 (N.D. Ill.).

- In re Globalstar Securities Litigation, Case No. 01-CV-1748 (SHS) (S.D.N.Y.).

- Camino v. UBS PaineWebber, Inc. (U.B.S. Goals Litigation), 04-CV-175 (E.D.N.Y.).

- In re Pre-Paid Securities Litigation, Civ.-02-182-C (W.D. Okla.).

- In re Profit Recovery Group International, Inc. Securities Litigation, No. 1:00-CV-1416-CC (N.D. Ga.).

- Johnson v. Aegon USA, Inc., 1-02-CV-2617-CAP (N.D. Ga.).

- Lewis v. Advanced Technical Products, Inc., 1:00-CV-1702-WBM (N.D. Ga.).

- Azzolini v. CorTS Trust II for Provident Fin. Trust I, et al., 1:03-CV-1003 (D. Tenn.)

- Sepracor Corp. Securities Litigation, Civ. No. 02-12238 (D. Mass.).

- In re CNL Hotels & Resorts, Inc. Securities Litigation, No. 6:04-cv-1231 (Orl-31).

- Iac/Interactive Corp. Securities Litigation, 04 Civ. 8802 (S.D.N.Y.).

- In re Luxottica Group S.p.A. Securities Litigation, No. CV 01-3285 (E.D.N.Y.).

- In re Clarus Corp. Securities Litigation, No. 1:00-CV-2841-CAP (N.D. Ga.).

- In re Acclaim Entertainment, Inc., Securities Litigation, C.A. No. 03-CV-1270 (E.D.N.Y.).

- In re ARM Financial Group, Inc., Securities Litigation., C.A. No. 23:99CV-539H (W.D. Ky.).

- In re Central Parking Corporation Securities Litigation, 03-CV-0546 (M.D. Tenn.).

- In re Concord EFS, Inc. Securities Litigation, 02-CV-2697-Ma. (W.D. Tenn.).

- In re Adelphia Communications Corp. Securities and Derivative Litigation (Adelphia Business Actions), 03-ML 1529, 03 CV 5755 (LMM) (S.D.N.Y.).

[6]

**WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP**

- In re Iridium Securities Litigation, C.A. No. 99-1002 (D.D.C.).

- In re MCI Communications Corp. Securities Litig., 97-CV-1976 (RWR) (D.D.C.).

- In re PEC Solutions Securities Litigation, 03-331-A (E.D. Va.)

- In re PerkinElmer, Inc., et al., Civ. 02-C-11572-GAO (D. Mass.).

- In re Ventro Corporation Securities Litigation, Master File No. Civ. 01-1287 SBA (N.D. Cal.).

- In re Qwest Software, Inc. Securities Litigation, Master File No. SA-CV-03-1192 (S.D. Cal.).

- In re Emerson Radio Corp. Securities Litigation, Civil Action No. 03-CV-4201 (D. N.J.).

- In re BearingPoint, Inc. Securities Litigation, Civil Action No. 03-CV-1062-A (E.D. Va.).

- In re Elevators and Escalators Antitrust Litigation, 04-CV-1644 (S.D.N.Y.)

- In re Sulfuric Acid Antitrust Litigation, Master File No. 03 C 4576 (N.D. Ill.).

- In re Compact Disc. Minimum Advertising Price Antitrust Litigation, MDL No. 1361 (D. Me.).

- In re Carbon Black Antitrust Litigation, Master Docket No. 03 CV 10191 (D. Mass.).

- In re Dynamic Random Access Memory (DRAM) Antitrust Litigation, Master File No. M 02-1486 (N.D. Cal).

- In re New Motors Vehicles Canadian Export Antitrust Litigation, Master File No. 03 MD 1532 (D. Me.).

- In re Loral Space & Communications Shareholders' Securities Litigation, 03 Civ. 8262 (JES) (S.D.N.Y).

- In re Drugstore.Com, Inc. Securities Litigation, CV 4-1474 (RSM) (W.D. Wash.).

Beginning on page 18 is a representative listing of cases in which the Firm has been lead or a primary plaintiffs' counsel and the results achieved in those cases. In addition, a representative list of published decisions in cases in which Wolf Haldenstein has played a lead or other significant role begins on page 21.

[7]

**WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP**

Wolf Haldenstein is a leader in the derivative litigation field, and is currently leading counsel in some of the most significant derivative actions pending in the United States, including:

- In re Qwest Communications International Inc. Derivative Litigation, 19826-NC (Del. Chan.).

- In re Tyco International Ltd. Derivative Litigation, 02-352-B (D.N.H.).

- In re Mutual Fund Investment Litigation, MDL No. 1586 (D. Md.).

## PRIVATE ACTIONS FOR INSTITUTIONAL INVESTORS

In addition to its vast class action practice, the Firm also regularly represents institutional clients such as public funds, investment funds, limited partnerships and qualified institutional buyers.  The firm has represented institutional clients in non-class federal and state actions concerning a variety of matters, including private placements, disputes with investment advisors, and disputes with corporate management.  Examples of such cases include:

- Steed Finance LDC v. Laser Advisers, Inc., 99 Civ. 4222 (PKC)(SDNY), a fraud, negligence, breach of contract and breach of fiduciary duty action brought by a hub fund, a related feeder fund and individual investors in the feeder fund against the funds' former investment advisors for mispricing certain securities and derivative instruments in the funds' fixed-income securities portfolio.

- Diversified Asset Securitization Holdings I, L.P. v. Enterprise Mortgage Acceptance Co, LLC, et al, 02 Civ. 10228 (SWK) (SDNY), a federal and state securities fraud action brought by limited partnerships that pooled the investments of various insurance companies against the issuer and management and controlling shareholder of the issuer concerning misrepresentations made in connection with a private placement of certificates representing interests in a securitized pool of loans made to franchise operations of car care businesses, gas stations, convenience stores and quick service restaurants.

- Gramercy Park Investments v. Airfund International, No. 97-22734B (Super. Ct. Mass.); Gramercy Park Investments v. The Krupp Realty Fund, No. 97-1612 (Super. Ct. Mass.); Geodyne Resources v. Gramercy Park Investments, No. CJ-96-05548 (Dist. Ct. Okla.); Gramercy Park Investments v. Wells Real Estate Fund, No. 97-A-0241-3 (Super. Ct. Ga.); Gramercy Park Investments v. Swift Energy, No. 96-61729 (Dist. Ct. Tex.); and Lexington Family Investments v. Dean Witter, No. 15217-96 (Sup Ct. N.Y.); actions brought on behalf of

[8]

**WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP**

institutional investors in state courts throughout the nation demanding inspection of investor lists and other corporate and partnership information.

- Madison Partnership Liquidity Investors v. American Cable TV Investors, 97 Civ. 4950 (JSM) (SDNY); and Madison Partnership Liquidity Investors v. PLM Equipment Growth Fund, 98 Civ. 4057 (JSM)(SDNY); actions brought on behalf of institutional investors against fund management for improper defensive actions taken in response to investors' acquisitions of large positions in funds.

The firm has also acted as special counsel to investors' committees in efforts to assert the investors' interests without resort to litigation.  For example, the firm served as Counsel to the Courtyard by Marriott Limited Partners Committee for several years in its dealings with Host Marriott Corporation, and as Special Counsel to the Windsor Park Properties 7 and 8 limited partners to insure the fairness of their liquidation transactions.

## THE CLASS ACTION LITIGATION GROUP

The qualifications of the attorneys in the Wolf Haldenstein Litigation Group are set forth below and are followed by descriptions of some of the Firm's attorneys who normally practice outside the Litigation Group who contribute significantly to the class action practice from time to time.

## PARTNERS

**DANIEL W. KRASNER**:  *admitted*:  New York; Supreme Court of the United States; U.S. Courts of Appeals for the Second, Third, Fourth, Sixth, Eighth, Ninth, Tenth and Eleventh Circuits; U.S. District Courts for the Southern and Eastern Districts of New York, Central District of Illinois, and Northern District of Michigan.  **Education**: Yeshiva College (B.A. 1962); Yale Law School (LL.B., 1965). Lecturer: Practicing Law Institute; Rutgers Graduate, School of Business. Member, the Association of the Bar of the City of New York; Rockland County, New York State and American Bar Associations; Federal Bar Council.  Mr. Krasner has lectured frequently before bar groups and has educated groups on securities laws and investors rights.  His qualifications have received favorable judicial recognition on many occasions.  *See, e.g., Shapiro v. Consolidated Edison Co.*, [1978 Transfer Binder] Fed. Sec. L. Rep. (CCH) & 96,364 at 93,252 (S.D.N.Y. 1978) (". . . the Court's opinion the reputation, skill and expertise of . . .  [Mr.] Krasner, considerably enhanced the probability of obtaining as large a cash settlement as was obtained.");  *Steiner v. BOC Financial Corp.*, [1980 Transfer Binder] Fed. Sec. L. Rep. (CCH) & 97,656, at 98,491.4, (S.D.N.Y. 1980) ("This Court has previously recognized the high quality of work of plaintiffs' lead counsel, Mr. Krasner").  *The New York Law Journal*,

WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP

August 1, 1983, at p. 5 (referring to Mr. Krasner as one of the "top rank plaintiffs' counsel" in the securities and class action fields.).

**FRED TAYLOR ISQUITH**: *admitted*:  New York; District of Columbia; Supreme Court of the United States; U.S. Courts of Appeals for the First, Second, Third, Fourth and Eighth Circuits; U.S. District Courts for the Southern, Eastern and Northern Districts of New York, District of Arizona, District of Colorado, Central District of Illinois, Western District of Michigan and District of Nebraska.  *Education*: Brooklyn College of the City University of New York (B.A., 1968); Columbia University (J.D., 1971).  Author, "Post Arbitration Remedies," for an Introduction to Securities Arbitration (NYSBA, 1994); "A Plaintiff's Lawyer Examines Limited Partnership Roll-ups" for Real Estate Exit Strategies" (American Conference Institute, 1994); Federal Civil Practice Supplement, "Representative Actions," (NYSBA, 2000). Columnist for weekly column "From the Courts," for *The Class Act*, National Association of Securities and Class Action Attorneys. Lecturer, IPO Tie In/Claims Seminar, Professional Liability Underwriter Society; Securities Arbitration New York State Bar Association; Real Estate Exit Strategies, American Conference Institute; Fundamental Strategies in Securities Litigation (NYSBA, CLE Program).  Mediator for New York State Supreme Court, County of New York, Complex Litigation Panel. Member: The Association of the Bar of the City of New York (Committee on: Federal Courts); New York County Lawyers' Association (Former Chair: Business Tort/Consumer Fraud-Tort Law Section); Brooklyn (Member: Committee on Civil Practice Law and Rules, 1983-; Committees on Legislation and Federal Courts, 1984-), New York State (Member: Committee on Legislation, Trial Lawyers Section, 1981-; Committee on Securities, Commercial and Federal Litigation Section, 1989-) and American (Member, Sections on: Litigation; International Law; Individual Rights and Responsibilities) Bar Associations; The District of Columbia Bar.  Mr. Isquith has been Chairman of the Business Tort/Consumer Fraud Committee of the Tort Law Section of the New York State Bar Association and is a member of that association's Committees on Securities Law and Legislation.  Legislation and Civil Practice Law and Rules of the Brooklyn Bar Association.  He is an arbitrator with the American Arbitration Association and with the Civil Court of the City of New York and a mediator for the ADR Program of the Supreme Court, County of New York. He has served as a judge for the Moot Court Competition of Columbia University Law School and Fordham University's National Competition.  President-elect, National Association of Securities and Commercial Law Attorneys.  The April 1987 issue of *Venture* magazine listed Mr. Isquith as among the nation's top securities class action attorneys.

**JEFFREY G. SMITH**: *admitted:*  New York; California; Supreme Court of the United States; U.S. Courts of Appeals for the Second, Third, Fourth, Fifth, Sixth, Eighth and Ninth Circuits; U.S. Tax Court; U.S. District Courts for the Southern and Eastern Districts of New York, Southern and Central Districts of California and the Districts of Colorado and Nebraska.  *Education*: Vassar College (A.B., *cum laude generali*, 1974); Woodrow Wilson School of Public and International Affairs, Princeton University, (M.P.A., 1977); Yale Law School (J.D., 1978).  At Yale Law School, Mr. Smith was a

[10]

**WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP**

teaching assistant for the Trial Practice course and a student supervisor in the Legal Services Organization, a clinical program.  Member, The Association of the Bar of the City of New York; New York State and American (Section on Litigation) Bar Associations; State Bar of California (Member, Litigation Section).  Mr. Smith has frequently lectured on corporate governance issues to professional groups of Fund trustees and investment advisors as well as to graduate and undergraduate business student groups and regularly serves as a moot court judge for the A.B.A. and at New York University Law School.  Mr. Smith has substantial experience in complex civil litigation, including class and derivative actions, tender offer, merger, and takeover litigation.

**FRANCIS M. GREGOREK**: *admitted*:  New York; California; U.S. Court of Appeals for the District of Columbia and Ninth Circuit; U.S. District Courts for the Eastern and Southern Districts of New York, and Central, Southern and Northern Districts of California; *Education*: University of Virginia (B.A., with high distinction, 1975); New York University (J.D., 1978); Durham University, Durham, England. Phi Beta Kappa; Phi Alpha Theta. Member, State Bar of California; American Bar Association.

**MARY JANE FAIT**: *admitted*:  New York; Illinois; U.S. District Courts for the Southern and Eastern Districts of New York, and Northern District of Illinois; U.S. Court of Appeals for the Seventh Circuit.  *Education*: St. John's College and University of Illinois (B.A., Economics, 1976); Cornell Law School (J.D., 1979). Member, Chicago Bar Association; Illinois Bar Associations; Antitrust Division of the American Bar Association.

**PETER C. HARRAR**:  *admitted*:  New York; U.S. District Courts for the Southern, Eastern and Northern Districts of New York.  *Education*:  Princeton University (A.B., with high honors, 1980); Columbia University (J.D., 1984). Phi Beta Kappa.  Mr. Harrar has extensive experience in complex securities and commercial litigation on behalf of individual and institutional clients.

**LAWRENCE P. KOLKER**:  *admitted*:  New York; U.S. Courts of Appeals for the Second and Eleventh Circuits; and U.S. District Courts for the Southern and Eastern Districts of New York, Western District of Michigan and the District of Colorado. *Education*:  State University of New York at Binghamton (B.A., 1978); Brooklyn Law School (J.D., 1983). Editor, Brooklyn Law Review, 1982-1983.  Panelist, Early Neutral Evaluator for the Eastern District of New York, 1992-1997. Lecturer, Brooklyn Law School, 1989. Assistant Corporation Counsel, City of New York, 1983-1987. Member, The Association of the Bar of the City of New York; New York State Bar Association.  Mr. Kolker has spoken at numerous conferences of the Investment Program Association and the Strategic Research Institute concerning limited partnership tender offers and litigation strategies, and published articles entitled "Litigation Strategies for Limited Partnership Tender Offers" (February 1996) and "Limited Partnership Five Percent Tender Offers" (October 1997) in Standard & Poor's *Review of Securities and Commodities Regulation*.  Mr. Kolker has acted as lead counsel in numerous class and derivative actions asserting the

rights of investors since joining Wolf Haldenstein in 1989.  Mr. Kolker also counsels investment management firms in transactional and securities matters and represents them in corporate and business litigation.

**MARK C. RIFKIN:**  *admitted*:  Pennsylvania; New Jersey; U.S. Supreme Court; U.S. Courts of Appeals for the Second, Third, Fifth, and D.C. Circuits; U.S. District Courts for the Southern and Eastern Districts of New York, the Eastern and Western Districts of Pennsylvania, the District of New Jersey, the Eastern District of Wisconsin and the Western District of Michigan. **Education:** Princeton University (A.B., 1982); Villanova University School of Law (J.D. 1985).  Contributor, PACKEL & POULIN, *Pennsylvania Evidence* (1987).  Mr.  Rifkin has extensive experience in complex class and derivative actions in securities, antitrust, intellectual property, and consumer protection litigation. Mr. Rifkin has lectured before diverse business and professional organizations in the areas of securities and complex litigation and corporate governance.

**MICHAEL JAFFE**:  *admitted*:  California; New York; U.S. District Courts for the Southern and Eastern Districts of New York. **Education**:  University of California at Berkeley (B.S., with highest distinction, 1982); Hastings College of the Law, University of California (J.D., 1987). Judicial Extern to the Honorable Thelton E. Henderson, Northern District of California, 1986-1987. Member: The Association of the Bar of the City of New York. Languages: French.

**BETSY C. MANIFOLD**:  *admitted*:  Wisconsin; New York; California; U.S. District Courts for the Western District of Wisconsin, Eastern and Southern Districts of New York, and Northern, Central and Southern Districts of California. **Education**:  Elmira College; Middlebury College (B.A., *cum laude*, 1980); Marquette University (J.D., 1986); New York University. Thomas More Scholar. Recipient, American Jurisprudence Award in Agency. Member: The Association of the Bar of the City of New York. Languages: French.

**GREGORY M. NESPOLE**:  *admitted*:  New York; U.S. District Courts for the Southern and Eastern Districts of New York. **Education**:  Bates College (B.A., 1989); Brooklyn Law School (J.D., 1993). Member, The Association of the Bar of the City of New York; New York State Bar Association.  Mr. Nespole's experience includes complex civil and criminal litigation.

**DAVID L. WALES**:  *admitted*:  New York; District of Columbia; United States Court of Appeals for the Second and Fourth Circuits, the United States District Courts for the Southern, Eastern and Western Districts of New York, and the District of Columbia. **Education**:  State University of New York, Albany (BA, *magna cum laude*, 1984); Georgetown University Law Center, (J.D., *cum laude*, 1987); Notes and Comments Editor, Georgetown Journal of Law and Technology.  Mr. Wales was an Assistant United States Attorney for the Southern District of New York (1992-1998), where he specialized in investigating and prosecuting fraud and white collar criminal cases.  Mr. Wales has extensive jury trial experience.  Mr. Wales' recent trials include: (i) a jury verdict in May

**WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP**

2004 for more than $11 million in a derivative action against the general partner of a hedge fund; and (ii) a multi-million dollar settlement with an accounting firm reached during trial of a class action in April 2003.

**FRANCIS A. BOTTINI, JR.**: *admitted*:  California; Supreme Court of the United States; U.S. Court of Appeals for the Ninth Circuit; U.S. District Courts for the Southern, Central and Northern Districts of California.  *Education*:  St. Louis University (B.A., *magna cum laude*, 1990); University of San Diego (J.D., *cum laude*, 1994). Recipient, American Jurisprudence Award in Property. Lead Articles Editor, San Diego Law Review, 1993-1994. Licensed Real Estate Broker, California.  Author, "An Examination of the Current Status of Rating Agencies and Proposals for Limited Oversight of Such Agencies," 30 San Diego Law Review 579, 1993; "People v. Wheeler: A Pyrrhic Victory For The Prosecution?," 27 Beverly Hills Bar Assoc. Journal 140, 1993.  *The Federal Sentencing Guidelines For Organizations: Effects On Sentencing And Implications For Imposition Of Vicarious Liability*, 22 Academy of Legal Studies In Business National Proceedings 149 (1993), republished in part, *Los Angeles Daily Journal*, October 13, 1994; *Internal Corporate Investigations Under The Federal Sentencing Guidelines For Organizations: Suggestions For Their Conduction And Disclosure Duties Under The Federal Securities Laws*, 23 Academy of Legal Studies in Business National Proceedings (1994).  Adjunct Professor, Business Law, University of San Diego, 1995-1997.  Mr. Bottini is also an Adjunct Professor of Business Law at the University of San Diego. Languages: Spanish.

**DEMET BASAR**: *admitted*:  New York; New Jersey; U.S. District Court for the District of New Jersey, and Southern District of New York.  *Education*: Fairleigh Dickinson University (B.A., *summa cum laude*, 1984), Phi Omega Epsilon; Rutgers University School of Law (J.D., 1990). Recipient, West's Scholarship Award, Senior Notes and Comments Editor, Rutgers Law Review. Member, The Association of the Bar of the City of New York. Languages: Turkish.

**ADAM J. LEVITT**: *admitted:*  Illinois; Supreme Court of the United States; U.S. Courts of Appeals for the First and Seventh Circuits; U.S. District Courts for the Northern and Southern Districts of Illinois, Northern District of Indiana, District of Nebraska, and the Northern and Eastern Districts of Texas.  *Education*: Columbia College, Columbia University (A.B., *magna cum laude*, 1990); Northwestern University School of Law (J.D., 1993).  Member, American Law Institute.  Member, Chicago, Federal and American Bar Associations; Lawyers for the Creative Arts.  Seventh Circuit Contributing Editor, *Class Actions & Derivative Suits* (ABA).  Author, An Illinois Lawyer's Guide to Service of Process in Mexico," 82 *Illinois Bar Journal* 434 (1994).  Mr. Levitt also regularly serves as a moot court judge in the Julius H. Miner Moot Court Competition, Northwestern University School of Law.  In recognition of his achievements to date, Mr. Levitt was named one of the "40 Illinois Attorneys Under 40 Years Old to Watch" by the *Chicago Daily Law Bulletin* and the *Chicago Lawyer*.  Mr. Levitt specializes in securities, consumer, technology, and agricultural litigation.

[13]

WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP

---

<div style="text-align:center">

**OF COUNSEL**

</div>

**ROBERT ABRAMS**: *admitted*:  New York; U.S. Court of Appeals for the Third Circuit; U.S. District Courts for the Southern and Eastern Districts of New York, Eastern District of Missouri, District of Maryland, and District of Delaware. *Education:* Haverford College (B.A. 1961); Columbia University (Ph.D., 1966), Brooklyn Law School (J.D., 1992). Woodrow Wilson Fellow; International Business Law Fellow.  Adjunct Professor, Mediation Clinic, Brooklyn Law School, 1983-1984.  Mr. Abrams was formerly a Professor of Political Science at Brooklyn College and the Graduate Center of the City University of New York.  Member, New York State Bar Association.  Mr. Abrams is the author of books on the theory of collective choice (Columbia University Press) and voting theory (Sage), as well as articles on Soviet politics, game theory and bargaining and negotiations.  He has focused his practice on complex securities, ERISA and consumer actions.

**ROBERT B. WEINTRAUB**: *admitted*:  New York; Supreme Court of the United States; U.S. Court of Appeals for the Federal and Second Circuits; District of Columbia; U.S. District Courts for the Southern and Eastern Districts of New York. *Education*: Syracuse University (B.A., *cum laude*, 1972); Georgetown University Law Center (J.D., 1977). Member, 1975-1977, Articles Editor and Member, Executive Board, 1976-1977, Law and Policy in International Business, the Georgetown International Law Journal. Assistant Editor, Competition Working Group, "The OECD Guidelines for Multinational Enterprises: A Business Appraisal," 1977. Author, Law Backs Women Warriors, National Law Journal, June 7, 1993. Co-contributor: Chapter 7, "The Celler-Kefauver Act of 1950," 4 The Legislative History of the Federal Antitrust Laws and Related Statutes, edited by E. Kintner, Chelsea House Publishers, 1980. Mediator, U.S. District Court, Southern District of New York.  Member, The Association of the Bar of the City of New York (Member, Committee on Securities Regulation; Council on International Affairs; Chair, 1991-1994 and Member, 1987-1990, Committee on Military Affairs and Justice; International Arms Control and Security Affairs, 1990-1991); American Bar Association.  He has counseled corporations on contract negotiation and antitrust matters, and provided antitrust advice on mergers to the arbitrage department of a major brokerage house.  He has served as an arbitrator for the NYSE, the NASD and the Municipal Securities Rulemaking Board and as a mediator for the federal District Court in New York.  Mr. Weintraub also previously served as Senior Vice President and General Counsel of a broker-dealer investment bank which is a member of the NYSE, the NASD and other principal exchanges.  Mr. Weintraub has particular experience in litigation involving investment firms and broker-dealers.

[14]

WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP

<div style="border: 1px solid black; text-align: center;">

**ASSOCIATES**

</div>

**RACHELE R. RICKERT**:  *admitted*:  California; U.S. District Court for the Southern District of California.  *Education*:  Point Loma Nazarene College (B.A., 1994); University of California, Hastings College of the Law (J.D., 1997).  Member, State Bar of California.  Former Deputy Alternate Public Defender for the County of San Diego.

**THOMAS H. BURT**:  *admitted*:  New York; U.S. District Courts for the Southern and Eastern Districts of New York.  *Education*: American University (B.A., 1993); New York University (J.D., 1997).  Articles Editor with New York University Review of Law and Social Change.

**SCOTT J. FARRELL**: *admitted*:  New York; New Jersey; Southern and Eastern Districts of New York; District of New Jersey. *Education*: Yeshiva University (B.A., *magna cum laude,* 1996), where he was a Max Stern Scholar and Gruss Scholar; New York University School of Law (J.D., 1999), where he was an Article and Note Editor of the *Journal of Legislation and Public Policy*. He is the co-author of "In re Gary Glass and Zoltan Guttman," CFTC Docket No. 93-4, Futures & Derivatives Law Report, July/August, 1998.

**KATE MCGUIRE**: *admitted*:  New York; U.S. District Courts for the Southern and Eastern Districts of New York.  *Education*: University of California at Santa Cruz (B.A. 1995), Georgetown University Law Center (J.D., 1998); Member, Georgetown Immigration Law Journal.

**GUSTAVO BRUCKNER**:  *admitted*:  New York; New Jersey; United States District Court for the Districts of New Jersey, Eastern District of New York and Southern District of New York.  *Education*: New York University (B.S., 1988); New York University (M.B.A. 1989); Benjamin N. Cardozo School of Law, Yeshiva University (J.D., 1992).

**STACEY T. KELLY**: *admitted*:  New York; New Jersey; U.S. District Courts for the Southern and Eastern Districts of New York.  *Education*: New York University (B.A., 1997); Rutgers School of Law - Newark (J.D., 2000). Member, New York State Bar Association; New York County Lawyers Association

**PAULETTE S. FOX**: *admitted*:  New York, New Jersey, S.D.N.Y., E.D.N.Y.; Education: Benjamin N. Cardozo School of Law (J.D. 2001), Syracuse University (B.A. in Public Policy, summa cum laude, Phi Beta Kappa, 1998).

**CHRISTOPHER S. HINTON**:  *admitted*:  New York.  *Education*: Marquette University (B.A., *magna cum laude*, 1997), Phi Beta Kappa; University of Illinois College of Law at Champaign (J.D., *cum laude*, 2002).  Member, New York State Bar Association.

**WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP**

**TAMARA E. GROSS**: *admitted:* New York. *Education:* George Washington University (B.A., *summa cum laude,* 1999), Benjamin N. Cardozo School of Law, Yeshiva (J.D., 2002).

**MICHAEL J. MISKE**: *admitted*: New York. *Education:* St. John's University (B.A., *cum laude* (2000), New York Law School (J.D., 2000).

**AYA BOUCHEDID**: *admitted:* New York *Education*: McGill University School of Law, Bachelor of Laws (LL.B.) & Bachelor of Civil Laws (B.C.L) with Great Honors, June 2002; University of Montreal (B.A. Political Science, 1998).

**MATTHEW GUINEY:** *admitted:* New York. *Education:* Georgetown University Law Center (J.D. 2002). The College of William & Mary (B.A. in Govt. and Economics 1998).

**JESSICA HOFF**: *admitted:* Connecticut New York. *Education:* Denver University (B.A. 1999); University of Denver College of Law (J.D. 2003).

**JULIE E. FOX**: *admitted*: Texas; Illinois; U.S. District Court for the Northern District of Illinois, Eastern Division. *Education*: Indiana University (B.A., 1991); John Marshall Law School (J.D., 1994).

### Wolf Haldenstein partners who regularly provide their non-litigation expertise to class action litigation matters

**CHARLES H. BALLER**: *admitted*: New York. *Education*: New York University (B.S., *magna cum laude*, 1954); Columbia University (LL.B., 1957); New York University (L.L.M., Taxation, 1962). Beta Gamma Sigma; Beta Alpha Psi. Harlan Fiske Stone Scholar. Co-Editor and Contributing Author, April, 1981, with 1986 Supplement, Business Acquisitions, Practicing Law Institute. Member: The Association of the Bar of the City of New York; New York State and American Bar Associations. He worked in the office of Chief Counsel, Internal Revenue Service (Interpretative Division). A lecturer and author for the Practicing Law Institute (co-editor of the reference work *Business Acquisitions: Planning and Practice*), Mr. Baller is a corporate and tax attorney with extensive expertise in mergers and acquisitions, in complex estate planning, particularly relating to corporate and business holdings, and in employee benefits and compensation, including ERISA.

**ERIC B. LEVINE**: *admitted*: New York; U.S. Courts of Appeals for the Second and Eleventh Circuits, U.S. District Courts for the Southern and Eastern Districts of New York, and Eastern District of Michigan; U.S. Tax Court. *Education*: State University of New York at Buffalo (B.A., *summa cum laude*, 1974); University of Pennsylvania (J.D., *cum laude*, 1977). Order of the Coif, Phi Beta Kappa. Associate Editor, University of Pennsylvania Law Review, 1976-1977. Member, The Association of the Bar of the City of New York; New York State Bar Association. Mr. Levine's practice focuses on

[16]

**WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP**

complex commercial and civil litigation, including in the area of bankruptcy and receivership litigation, creditors' rights, and lender liability.

**MARK C. SILVERSTEIN**: *admitted*: New York. *Education*: State University of New York at Binghamton (B.S., *summa cum laude*, 1980); New York University (J.D., *cum laude*, 1983). Order of the Coif. Editor, Journal of International Law and Politics, 1982-1983. Member, the Association of the Bar of the City of New York; New York State and American Bar Associations. Mr. Silverstein serves as general counsel to corporations and handles matters involving tax planning and mergers and acquisitions. He also provides counseling in the structure of complex settlements and the administration of complex claims administrations.

**ELI D. GREENBERG**: *admitted*: New York. *Education*: New York University (B.S., *magna cum laude*, 1981. New York University (J.D., 1984). Beta Gamma Sigma. Lecturer, New York University. Member, American Health Lawyers Association. Mr. Greenberg has extensive experience in pension, tax, benefits, and ERISA.

---

### SUBSTANTIAL RECOVERIES OBTAINED IN REPRESENTATIVE PAST CLASS ACTION CASES IN WHICH A WOLF HALDENSTEIN ATTORNEY WAS LEAD COUNSEL OR HAD ANOTHER SIGNIFICANT ROLE

---

- In re BankAmerica Corp. Securities Litigation, MDL Docket No. 1264 (JFN) (E.D. Mo.) (class recovered $490 million).

- In re MicroStrategy, Inc. Securities Litigation, Civ. No. 00-473-A (E.D. Va.) (class recovered $160 million in cash and securities).

- Kurzweil v. Philip Morris Cos., 94 Civ. 2373, 94 Civ. 2546 (S.D.N.Y.) (securities fraud) (class recovered $116.5 million in cash).

- In re Starlink Corn Products Liability Litigation, (N.D. Ill.) (class recovered $110 million).

- Computer Associates 2002 Class Action Litigation, 2:2002 CV 1226 (E.D.N.Y.) ($130 million settlement in this and two related actions).

- Berger v. Compaq Computer Corp., Docket No. 98-1148 (S.D. Tex.) (class recovered $29 million).

- In re Arakis Energy Corporation Securities Litigation, 95 CV 3431 (E.D.N.Y.) (class recovered $24 million in cash).

- In re E.W. Blanche Holdings, Inc. Securities Litigation, Civ. No. 01-258 (D. Minn.) (class recovered $20 million).

- In re Musicmaker.com Securities Litigation, CV-00-2018 (C.D. Cal.) (class recovered $13.75 million).

- In re Bausch & Lomb, Inc. Securities Litigation, 01 Civ. 6190 (CJS) (W.D.N.Y) (class recovered $12.5 million)

- In re Allaire Corp. Securities Litigation, 00-11972 (D. Mass.) (class recovered $12 million).

- Curative Health Services Securities Litigation, 99-2074 (E.D.N.Y.) (class recovered $10.5 million).

- City Partnership Co. v. Jones Intercable, 99 WM-1051 (D. Colo.) (class recovered $10.5 million).

- In re Tenfold Corporation Securities Litigation, 2:00-CV-652 (D. Utah) (class recovered $5.9 million).

- In re Industrial Gas Antitrust Litigation, 80 C 3479 and related cases (N.D. Ill.) (class recovered $50 million in cash and coupons).

- In re Chor-Alkalai and Caustic Soda Antitrust Litigation, 86-5428 and related cases (E.D. Pa.) (class recovered $55 million).

- In re Infant Formula Antitrust Litigation, M.D.L. 878 (N.D. Fla.) (class recovered $126 million).

- In re Brand Name Prescription Drug Antitrust Litigation, M.D.L. 940 (N.D. Ill.) (class recovered $715 million).

- Landon v. Freel, M.D.L. No. 592 (S.D. Tex.) (class recovered $12 million).

- Holloway v. Peat, Marwick, Mitchell & Co., No. 84 C 814 EU (N.D. Okla.) (class recovered $38 million).

- In re The Chubb Corp. Drought Insurance Litigation, C-1-88-644 (S.D. Ohio) (class recovered $100 million.).

- Wong v. Megafoods, Civ-94-1702 (D. Ariz.) (securities fraud) (class recovered $12.25 million).

- In re Del Val Financial Corp. Securities Litigation, 92 Civ 4854 (S.D.N.Y.) (class recovered $11.5 million).

[18]

**WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP**

- In re Home Shopping Network Shareholders Litigation, Consolidated Civil Action No. 12868, (Del. Ch. 1995) (class recovered $13 million).

- In re Paine Webber Limited Partnerships Litigation, 94 Civ 8547 (S.D.N.Y.) (class recovered $200 million).

- In re Bristol-Meyers Squibb Co. Securities Litigation, 92 Civ 4007 (S.D.N.Y.) (class recovered $19 million).

- In re Spectrum Information Technologies Securities Litigation, CV 93-2245 (E.D.N.Y.) (class recovered $13 million).

- In re Chase Manhattan Securities Litigation, 90 Civ. 6092 (LJF) (S.D.N.Y.) (class recovered $17.5 million).

- Prostic v. Xerox Corp., No. B-90-113 (EBB) (D. Conn.) (securities fraud) (class recovered $9 million).

- Steiner v. Hercules, Civil Action No. 90-442-RRM (D. Del.) (securities fraud) (class recovered $18 million).

- In re Ambase Securities Litigation, 90 Civ 2011 (S.D.N.Y.) (class recovered $14.6 million).

- Steiner v. Phillips (In re Southmark Securities Litigation), CA No. 3-89-1402-D (N.D. Tex. (class recovered $70 million).

- Steiner v. Ideal Basic Industries, Inc., No. 86-M 456 (D. Colo. 1989) (securities fraud) (class recovered $18 million).

- Tucson Electric Power Derivative Litigation, 2:89 Civ. 01274 TUC. ACM (shareholder derivative action) (corporation recovered $30 million).

- Alleco Stockholders Litigation, (Cir. Ct. Prince Georges County, Md.) (class recovered $16 million).

- In re Revlon Group, Inc. Shareholders Litigation, No. 8362 (Del. Ch.) (class recovered $30 million).

- In re Taft Broadcasting Company Shareholders Litigation, No. 8897 (Del. Ch.) (class recovered $20 million).

- In re Southland Corp. Securities Litigation, No. 87-8834-K (D. Tex.) (class recovered $20 million).

**WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP**

- In re Crocker Bank Securities Litigation, CA No. 7405 (Del. Ch.) (class recovered $30 million).

- In re Warner Communications Securities Litigation, No. 82 Civ. 8288 (JFK) (S.D.N.Y.) (class recovered $17.5 million).

- Joseph v. Shell Oil, CA No. 7450 (Del. Ch.) (securities fraud) (class recovered $200 million).

- In re Flight Transportation Corp. Securities Litigation, Master Docket No. 4-82-874, MDL No. 517 (D. Minn.) (class recovered $50 million.).

- In re Whittaker Corporation Securities Litigation, CA000817 (Cal. Super. Ct., Co. of Los Angeles) (class recovered $18 million).

- Naevus International, Inc. v. AT&T Corp., C.A. No. 602191/99 (N.Y. Sup. Ct.) (consumer fraud) (class recovered $40 million).

- Sewell v. Sprint PCS Limited Partnership, C.A. No. 97-188027/CC 3879 (Cir. Ct. for Baltimore City) (consumer fraud) (class recovered $45.2 million).

---

### REPRESENTATIVE REPORTED OPINIONS SINCE 1990 IN WHICH WOLF HALDENSTEIN WAS LEAD COUNSEL OR HAD ANOTHER SIGNIFICANT ROLE

---

### Federal Appeals Court Opinions

---

- Perlman v. Pharmatrak, Inc., 2003 U.S. App. LEXIS 8758 (1st Cir. May 9, 2003).

- Berger v. Compaq Computer Corp., 257 F.3d 475 (2001), clarified, 279 F.3d 313 (5th Cir. 2002).

- In re Bankamerica Corp. Securities Litigation, 263 F.3d 795 (8th Cir. 2001).

- Wright v. Ernst & Young LLP, 152 F.3d 169 (2d Cir. 1998).

- Romine v. Compuserve Corp., 160 F.3d 337 (6th Cir. 1998).

- Felzen v. Andreas, 134 F.3d 873 (7th Cir. 1998).

- Brown v. Radica Games (In re Radica Games Securities Litigation), No. 96-17274, 1997 U.S. App. LEXIS 32775 (9th Cir. Nov. 14, 1997).

**WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP**

- Robbins v. Koger Properties, 116 F.3d 1441 (11th Cir. 1997).

- In re Painewebber Inc. Limited Partnerships Litigation, 94 F.3d 49 (2d Cir. 1996).

- Glassman v. Computervision Corp., 90 F.3d 617 (1st Cir. 1996).

- Alpern v. Utilicorp United, Inc., 84 F.3d 1525 (8th Cir. 1996).

- Shaw v. Digital Equipment Corp., 82 F.3d 1194 (1st Cir. 1996).

- Riley v. Simmons, 45 F.3d 764 (3d Cir. 1995).

- Stepak v. Addison, 20 F.3d 398 (11th Cir. 1994).

- County of Suffolk v. Long Island Lighting Co., 907 F.2d 1295 (2d Cir. 1990).

---

### District Court Opinions

---

- Johnson v. Aegon USA, Inc., 1:01-CV-2617 (N.D. Ga. Sept. 20, 2004).

- Freeland v. Iridium World Communications, LTD., 99-1002 (D.D.C. Aug. 31, 2004).

- In re Acclaim Entertainment, Inc. Securities Litigation, 03-CV-1270 (E.D.N.Y. June 22, 2004).

- In re Sepracor, Inc. Securities Litigation, 308 F. Supp. 2d 20 (D. Mass. 2004).

- In re Concord EFS, Inc. Securities Litigation, No. 02-2697 (W.D. Tenn. Jan. 7, 2004).

- In re Enterprise Mortgage Acceptance Co., LLC, Sec. Litig., 02-Civ. 10288 (SWK) (S.D.N.Y. Nov. 5, 2003).

- In re PerkinElmer, Inc. Securities Litigation, 286 F. Supp. 2d 46 (D. Mass. 2003).

- In re Initial Public Offering Securities Litigation, 241 F. Supp. 2d 281 (S.D.N.Y. 2003).

- In re Comdisco Securities Litigation, 2003 U.S. Dist. LEXIS 5097 (N.D. Ill. March 3, 2003).

- City Partnership Co. v. Cable TV Fund 14-B, 213 F.R.D. 576 (D. Colo. 2002).

WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP

- In re Allaire Corporation Securities Litigation, Docket No. 00-11972 - WGY, 2002 U.S. Dist. LEXIS 18143 (D. Mass., Sept. 27, 2002).

- In re StarLink Corn Products Liability Litigation, 212 F. Supp. 2d 828 (N.D. Ill. 2002)

- In re Comdisco Securities Litigation, 166 F. Supp. 2d 1260 (N.D. Ill. 2001).

- In re Crossroads Systems, Inc. Securities Litigation, Master File No. A-00-CA-457 JN, 2001 U.S. Dist. LEXIS 14780 (W.D. Tx. Aug. 15, 2001).

- In re Microstrategy, Inc. Securities Litigation, 150 F. Supp. 2d 896 (E.D. Va. 2001).

- Lindelow v. Hill, No. 00 C 3727, 2001 U.S. Dist. LEXIS 10301, Fed. Sec. L. Rep. (CCH) P91,483 (N.D. Ill. July 19, 2001).

- In re Microstrategy, Inc. Securities Litigation, 148 F. Supp. 2d 654 (E.D. Va. 2001).

- Jeffries v. Pension Trust Fund of the Pension, Hospitalization & Benefit Plan of the Electrical Industry, 172 F. Supp. 2d 389 (S.D.N.Y. 2001).

- Carney v. Cambridge Technology Partners, Inc., 135 F. Supp. 2d 235 (D. Mass. 2001).

- Weltz v. Lee, 199 F.R.D. 129 (S.D.N.Y. 2001).

- Schoers v. Pfizer, Inc., 00 Civ. 6121, 2001 U.S. Dist. LEXIS 511 (S.D.N.Y. Jan. 23, 2001).

- Kurzweil v. Philip Morris Cos., 94 Civ. 2373 (MBM), 2001 U.S. Dist. LEXIS 83 (S.D.N.Y. Jan. 9, 2001).

- Goldberger v. Bear, Stearns & Co., 98 Civ. 8677 (JSM), 2000 U.S. Dist. LEXIS 18714, Fed. Sec. L. Rep. (CCH) P91, 287 (S.D.N.Y. Dec. 28, 2000).

- In re Newell Rubbermaid, Inc., Securities Litigation, Case No. 99 C 6853, 2000 U.S. Dist. LEXIS 15190 (N.D. Ill. Oct. 2, 2000).

- Stanley v. Safeskin Corp., Case No. 99 CV 454 BTM (LSP), 2000 U.S. Dist. LEXIS 14100, Fed. Sec. L. Rep. (CCH) P91, 221 (S.D. Cal. Sept. 18, 2000).

- In re Microstrategy, Inc. Securities Litigation, 115 F. Supp. 2d 620 (E.D. Va. 2000).

**WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP**

- In re USA Talks.com, Inc. Securities Litigation, 2000 U.S. Dist. LEXIS 14823, Fed. Sec. L. Rep. (CCH) P91, 231 (S.D. Cal. Sept. 14, 2000).

- In re Sotheby's Holdings, Inc. Securities Litigation, 00 CIV. 1041 (DLC), 2000 U.S. Dist. LEXIS 12504, Fed. Sec. L. Rep. (CCH) P91, 059 (S.D.N.Y. Aug. 31, 2000).

- Dumont v. Charles Schwab & Co., Inc., Civil Action No. 99-2840 2000 U.S. Dist. LEXIS 10906 (E.D. La. July 21, 2000).

- Berger v. Compaq Computer Corp., Civil Action No. H-98-1148, 2000 U.S. Dist. LEXIS 21424 (S.D. Tex. July 17, 2000).

- In re BankAmerica Corp. Securities Litigation, 95 F. Supp. 2d 1044 (E.D. Mo. 2000).

- In re Carnegie International Corp. Securities Litigation, 107 F. Supp. 2d 676 (D. Md. 2000).

- Berger v. Compaq Computer Corp., Civil Action No. H-98-1148, 2000 U.S. Dist. LEXIS 21423 (S.D. Tex. Mar. 13, 2000).

- In re Imperial Credit Industries Securities Litigation, CV 98-8842 SVW, 2000 U.S. Dist. LEXIS 2340, Fed. Sec. L. Rep. (CCH) P90, 965 (C.D. Cal. Feb. 23, 2000).

- Sturm v. Marriott Marquis Corp., 85 F. Supp. 2d 1356 (N.D. Ga. 2000).

- In re Health Management Systems Securities Litigation, 82 F. Supp. 2d 227 (S.D.N.Y. 2000).

- Dumont v. Charles Schwab & Co., Inc., Civil Action No. 99-2840, 2000 U.S. Dist. LEXIS 619 (E.D. La. Jan. 19, 2000).

- In re Microstrategy, Inc. Securities Litigation, 110 F. Supp. 2d 427 (E.D. Va. 2000).

- In re BankAmerica Corp. Securities Litigation, 78 F. Supp. 2d 976 (E.D. Mo. 1999).

- Kurzweil v. Philip Morris Cos., 94 Civ. 2373 (MBM), 1999 U.S. Dist. LEXIS 18378 (S.D.N.Y. Nov. 24, 1999).

- In re Nanophase Technologies Corp. Litigation, 98 C 3450, 1999 U.S. Dist. LEXIS 16171 (N.D. Ill. Sept. 27, 1999).

[23]

- In re Clearly Canadian Securities Litigation, File No. C-93-1037-VRW, 1999 U.S. Dist. LEXIS 14273, Fed. Sec. L. Rep. (CCH) P90, 664 (N.D. Cal. Sept. 7, 1999).

- Yuan v. Bayard Drilling Technologies, Inc., 96 F. Supp. 2d 1259 (W.D. Okla. 1999).

- In re Spyglass, Inc. Securities Litigation, No. 99 C 512, 1999 U.S. Dist. LEXIS 11382, Fed. Sec. L. Rep. (CCH) P90, 607 (N.D. Ill. July 20, 1999).

- Carley Capital Group v. Deloitte & Touche, L.L.P., 1:97-CV-3183-TWT, 1999 U.S. Dist. LEXIS 11595 (N.D. Ga. June 30, 1999).

- Carley Capital Group v. Deloitte & Touche, L.L.P., 1:97-CV-3183-TWT, 1999 U.S. Dist. LEXIS 11596 (N.D. Ga. June 30, 1999).

- Blue Cross & Blue Shield of N.J., Inc. v. Philip Morris, Inc., 98 CV 3287, 1999 U.S. Dist. LEXIS 11363 (E.D.N.Y. June 1, 1999).

- Carley Capital Group v. Deloitte & Touche, L.L.P., 1:97-CV-3183-TWT, 1999 U.S. Dist. LEXIS 1368, Fed. Sec. L. Rep. (CCH) P90, 429 (N.D. Ga. Jan. 19, 1999).

- Longman v. Food Lion, Inc., 186 F.R.D. 331 (M.D.N.C. 1999).

- Walsingham v. Biocontrol Technology, Inc., 66 F. Supp. 2d 669 (W.D. Pa. 1998).

- Sturm v. Marriott Marquis Corp., 26 F. Supp. 2d 1358 (N.D. Ga. 1998).

- Carley Capital Group v. Deloitte & Touche, L.L.P., 27 F. Supp. 2d 1324 (N.D. Ga. 1998).

- In re MobilMedia Securities Litigation, 28 F. Supp. 2d 901 (D.N.J. 1998).

- Weikel v. Tower Semiconductor, Ltd., 183 F.R.D. 377 (D.N.J. 1998).

- In re Health Management Systems Securities Litigation, 97 Civ. 1865 (HB), 1998 U.S. Dist. LEXIS 8061, Fed. Sec. L. Rep. (CCH) P90, 235 (S.D.N.Y. May 27, 1998).

- In re Painewebber Ltd. Partnership Litigation, 999 F. Supp. 719 (S.D.N.Y. 1998).

- Carley Capital Group v. Deloitte & Touche, L.L.P., 1:97-cv-3183-TWT, 1998 U.S. Dist. LEXIS 23222 (N.D. Ga. Feb. 10, 1998).

- In re TCW/DW North American Government Income Trust Securities Litigation, 95 Civ. 0167 (PKL), 1997 U.S. Dist. LEXIS 18485 (S.D.N.Y. Nov. 20, 1997).

- Wright v. Ernst & Young, LLP, 97 Civ. 2189 (SAS), 1997 U.S. Dist. LEXIS 13630, Fed. Sec. L. Rep. (CCH) P99, 567 (S.D.N.Y. Sept. 9, 1997).

- Felzen v. Andreas, No. 95-2279, 1997 U.S. Dist. LEXIS 23646 (C.D. Ill. July 7, 1997).

- Felzen v. Andreas, No. 95-2279, 1997 U.S. Dist. LEXIS 23647 (C.D. Ill. July 7, 1997).

- A. Ronald Sirna, Jr., P.C. Profit Sharing Plan v. Prudential Securities, Inc., 964 F. Supp. 147 (S.D.N.Y. 1997).

- Kurzweil v. Philip Morris Companies., 94 Civ. 2373 (MBM), 1997 U.S. Dist. LEXIS 4451, Fed. Sec. L. Rep. (CCH) P99, 446 (S.D.N.Y. April 8, 1997).

- Bobrow v. Mobilmedia, Inc., Civil Action No. 96-4715, 1997 U.S. Dist. LEXIS 23806 (D.N.J. March 31, 1997).

- Kalodner v. Michaels Stores, 172 F.R.D. 200 (N.D. Tex. 1997).

- In re Painewebber Ltd. Partnerships Litigation, 171 F.R.D. 104 (S.D.N.Y. 1997).

- A. Ronald Sirna, Jr., P.C. Profit Sharing Plan v. Prudential Securities, Inc., 95 Civ. 8422 (LAK), 1997 U.S. Dist. LEXIS 1226 (S.D.N.Y. Feb. 7, 1997).

- Dresner Co. Profit Sharing Plan v. First Fidelity Bank, N.A., 95 Civ. 1924 (MBM), 1996 U.S. Dist. LEXIS 17913 (S.D.N.Y. Dec. 3, 1996).

- Simon v. American Power Conversion Corp., 945 F. Supp. 416 (D.R.I. 1996).

- TII Industries, Inc., 96 Civ. 4412 (SAS), 1996 U.S. Dist. LEXIS 14466 (S.D.N.Y. Oct. 1, 1996).

- In re TCW/DW North American Government Income Trust Securities Litigation, 941 F. Supp. 326 (S.D.N.Y. Oct. 1, 1996).

- In re Painewebber Ltd. Partnership Litigation, 94 Civ. 8547 (SHS), 1996 U.S. Dist. LEXIS 9195 (S.D.N.Y. June 28, 1996).

- In re Tricord Systems, Inc., Securities Litigation, Civil No. 3-94-746, 1996 U.S. Dist. LEXIS 20943 (D. Minn. April 5, 1996).

- In re Painewebber Limited Partnership Litigation, 94 Civ. 8547 (SHS), 1996 U.S. Dist. LEXIS 1265 (S.D.N.Y. Feb. 6, 1996).

- Zitin v. Turley, [1991 Transfer Binder] Fed. Sec. L. Rep. (CCH) P.& 96,123 (D. Ariz. June 20, 1994).

- In re Southeast Hotel Properties Limited Partnership Investor Litigation, 151 F.R.D. 597 (W.D.N.C. 1993).

<div style="border:1px solid black; text-align:center; font-weight:bold;">State Court Opinions</div>

- Naevus Int'l v. AT&T Corp., 283 A. D.2d 171, 724 N.Y.S. 2d 721 (2001).

- Paramount Communications, Inc. v. QVC Network, Inc., 637 A.2d 34 (Del. Supr. 1994).

- In re Western National Corp. Shareholders Litigation, Consolidated C.A. No. 15927, 2000 Del. Ch. LEXIS 82 (May 22, 2000).

- In re Cencom Cable Income Partners, L.P. Litigation, C.A. No. 14634, 2000 Del. Ch. LEXIS 90 (May 5, 2000).

- In re Cencom Cable Income Partners, L.P. Litigation, Consolidated C.A. No. 14634, 2000 Del. Ch. LEXIS 10 (Jan. 27, 2000).

- In re Marriott Hotels Properties II Limited Partnership Unitholders Litigation, Consolidated C.A. No. 14961, 2000 Del. Ch. LEXIS 17 (Jan. 24, 2000).

- Romig v. Jefferson-Pilot Life Insurance Company, 132 N.C. App. 682, 513 S.E.2d 598 (Ct. App. 1999), aff'd, 351 N.C. 349, 524 S.E.2d 804 (S. Ct. 2000).

- Wallace v. Wood, 752 A.2d 1175 (Del. Ch. 1999).

- Greenwald v. Batterson, C.A. No. 16475, 1999 Del. Ch. LEXIS 158 (July 26, 1999).

- Brown v. Perrette, Civil Action No. 13531, 1999 Del. Ch. LEXIS 92 (May 18, 1999).

- In re Cencom Cable Income Partners, L.P. Litigation, C.A. No. 14634, 1997 Del. Ch. LEXIS 146 (Oct. 15, 1997).

- In re Marriott Hotel Properties II Limited Partnership Unitholders Litigation, Consolidated C.A. No. 14961, 1997 Del. Ch. LEXIS 128 (Sept. 17, 1997).

**WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP**

- In re Cheyenne Software Shareholders Litigation, Consolidated C.A. No. 14941, 1996 Del. Ch. LEXIS 142 (Nov. 7, 1996).

- Seinfeld v. Robinson, 246 A.D.2d 291, 676 N.Y.S.2d 579 (N.Y. 1998).

- Werner v. Alexander, 130 N.C. App. 435, 502 S.E.2d 897 (N.C. Ct. App. 1998).

## NON-DISCRIMINATION POLICIES

Wolf Haldenstein does not discriminate or tolerate harassment against any employee or applicant because of race, creed, color, national origin, sex, age, disability, marital status, sexual orientation, or alienage or citizenship status and designs its hiring practices to ensure that minority group members and women are afforded equal employment opportunities without discrimination. The Firm is in compliance with all applicable Federal, State, County, and City equal employment opportunity laws.

Wolf Haldenstein is proud of its long history of support for the rights of, and employment opportunities for, women, the disadvantaged, and minority group persons, including the participation in civil rights and voter registration activities in the South in the early 1960's by partners of the Firm; the part-time employment of disadvantaged youth through various public school programs; the varied *pro bono* activities performed by many of the Firm's lawyers; the employment of many women and minority group persons in various capacities at the Firm, including at the partner level; the hiring of ex-offenders in supported job training programs; and the use of minority and women-owned businesses to provide services and supplies to the Firm.

**WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP**
**270 MADISON AVENUE**
**NEW YORK, NY 10016**
**Telephone: 212-545-4600**
**Telecopier: 212-545-4653**

**WWW.WHAFH.COM**

| | |
|---|---|
| **SYMPHONY TOWERS** | **656 WEST RANDOLPH STREET** |
| **750 B STREET, SUITE 2770** | **SUITE 500W** |
| **SAN DIEGO, CA 92101** | **CHICAGO, IL 60661** |
| **Telephone: 619-239-4599** | **Telephone: 312-466-9200** |
| **Telecopier: 619-234-4599** | **Telecopier: 312-466-9292** |

**WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP**

**625 NORTH FLAGLER DRIVE**
**WEST PALM BEACH, FL 33401**
**Telephone:  561-833-1776**

# Exhibit F

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

RECEIVED
NOV - 9 2004
U.S.D.C. S.D. N.Y.
CASHIERS

QUANTUM EQUITIES LLC, Individually
And On Behalf Of All Others Similarly
Situated,

Plaintiff,

v.

JAKKS PACIFIC, INC., JACK FRIEDMAN,
STEVEN G. BERMAN AND JOEL M.
BENNETT,

Defendants.

CIVIL ACTION NO. 04-CV-08877

CLASS ACTION COMPLAINT
FOR VIOLATIONS OF FEDERAL
SECURITIES LAWS

JURY TRIAL DEMANDED

Plaintiff, individually and on behalf of all other persons similarly situated, by plaintiff's

undersigned attorneys, for plaintiff's Complaint, alleges upon the investigation made by and

through plaintiff's counsel, which included, inter alia, a review of relevant public filings made by

JAKKS Pacific, Inc. ("JAKKS" or the "Company") with the Securities and Exchange

Commission (the "SEC"), as well as, tele-conferences, press releases, news articles, analyst

reports, and media reports concerning the Company. This complaint is based upon plaintiff's

personal knowledge as to plaintiff's own acts, and upon information and belief as to all other

matters, based upon the aforementioned investigation.

## NATURE OF THE ACTION

1.      This is a federal securities class action brought on behalf of investors in the

common stock of JAKKS between October 26, 1999 and October 19, 2004, inclusive (the "Class

Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange

Act").

2.      JAKKS is multi-line, multi-brand toy company that designs, develops, produces and markets toys and related products. The focus of the Company's business is on acquiring or licensing well-recognized trademarks and brand names with long product histories. World Wrestling Entertainment ("WWE") licenses its trademarks and intellectual property to other companies for the development and production of products based on its professional wrestling entertainment properties.  During the Class Period, James Bell ("Bell") was employed by WWE to manage the domestic licensing of WWE's intellectual property.  Around April 1995, WWE hired Stanley Shenker & Associates ("Shenker") as a licensing agent to assist WWE in brokering and negotiating licensing contracts with companies engaged in the manufacturing of products based on licensed properties.   In March 1997, Shenker became the exclusive outside licensing agent for WWE.

3.      In 1997, WWE and JAKKS entered into a toy licensing agreement.  In 1998, Shenker was asked by WWE to procure a licensee to produce video games based on WWE properties.  In March 1998, Bell, on the advice of Shenker, recommended that JAKKS be awarded the video game license despite JAKKS having neither a video game division nor ability to perform a video game license.

4.      Not disclosed to WWE was that Bell's recommendation was the result of an unlawful bribery scheme perpetrated by Shenker and Bell and furthered by JAKKS.  Although the logistics of the bribery scheme were intricate, the scheme itself was not - Shenker and Bell directed WWE to award licenses to businesses that paid commercial bribes to Shenker and Bell. According to the complaint filed in World Wrestling Entertainment, Inc. v. Jakks Pacific, et al., 04-cv-8223 (S.D.N.Y. Oct. 19, 2004), JAKKS knowingly paid commercial bribes to influence

Shenker and Bell to direct the WWE video game license to JAKKS. A criminal investigation into these matters is ongoing.

5.     JAKKS concealed their involvement in the illegal scheme in various inventive ways. According to the complaint, JAKKS involvement in the purported bribery scheme was concealed from WWE until November 14, 2003, when the Company produced records relating to the illegal payments made by JAKKS.

6.     During the Class Period, defendants made numerous positive statements concerning its business performance and prospects, including statements about products stemming from the WWE license as a significant portion of JAKKS revenue derived from the WWE licensing agreement. These statements were false and misleading because the Company failed to disclose that it had obtained the WWE license through its participation in an unlawful bribery scheme and that the Company was exposed to significant liability in the form of damages and termination, or modification, of the WWE license agreement.

## JURISDICTION AND VENUE

7.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Securities and Exchange Act of 1934 (the "Exchange Act") [15 U.S.C. §§ 78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder by the SEC [17 C.F.R. § 240.10b-5].

8.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337 and Section 27 of the Exchange Act [15 U.S.C. § 78aa].

9.     Venue is proper in this District pursuant to Section 27 of the Exchange Act, and 28 U.S.C. § 1391(b), as many of the acts and practices complained of herein occurred in substantial part in this District.

10.     In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not

limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

**PARTIES**

11.     Plaintiff Quantum Equities LLC purchased JAKKS common stock during the Class Period as per the annexed certificate.

12.     JAKKS is a multi-line, multi-brand toy company that designs, develops, produces and markets toys and related products. The focus of the Company's business is on acquiring or licensing well-recognized trademarks and brand names with long product histories. JAKKS products are typically simpler, lower-priced, toys and accessories.  JAKKS corporate offices are located at 22619 Pacific Coast Highway, Malibu, California 90265.

13.     The Company also participates in a joint venture with THQ Inc. that has exclusive worldwide rights to publish and market WWE video games.  In addition, the Company sells action figures and accessories including licensed characters, principally based on WWE among others.

14.     Defendant Jack Friedman ("Friedman") was, at all relevant times, the Company's Chairman and Chief Executive Officer.

15.     Defendant Steven G. Berman ("Berman") was, at all relevant times, the Company's Chief Operating Officer and President.

16.     Defendant Joel M. Bennett ("Bennett") was, at all relevant times, the Company's Executive Vice President and Chief Merchandising Officer.

17.     The individuals named as defendants in paragraphs 14 through 16 are referred to herein as the "Individual Defendants."  Because of the Individual Defendants' positions within the Company, each had access to the adverse undisclosed information about the Company's business, operations, operational trends, financial statements, markets and present and future

business prospects via access to internal corporate documents (including the Company's operating plans, budgets and forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof and via reports and other information provided to them in connection therewith.

18.     It is appropriate to treat the Individual Defendants as a group for pleading purposes and to presume that the false, misleading and incomplete information conveyed in the Company's public filings, press releases and other publications as alleged herein are the collective actions of the narrowly defined group of defendants identified above.  Each of the above officers of JAKKS, by virtue of their high-level positions with the Company, directly participated in the management of the Company, was directly involved in the day-to-day operations of the Company at the highest levels and was privy to confidential proprietary information concerning the Company and its business, operations, products, growth, financial statements, and financial condition, as alleged herein.  Said defendants were involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein, was aware, or recklessly disregarded, that the false and misleading statements were being issued regarding the Company and approved or ratified these statements, in violation of the federal securities laws.

19.     As officers and controlling persons of a publicly-held company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, and was traded on the NASDAQ, and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to disseminate promptly, accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial

statements, business, products, markets, management, earnings, as well as, present and future business prospects, and to correct any previously-issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly-traded securities would be based upon truthful and accurate information. The misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

20.    The Individual Defendants are individually liable as participants in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of JAKKS common stock by disseminating materially false and misleading statements and/or concealing material adverse facts.  The scheme: (i) deceived the investing public regarding JAKKS business, operations, management and the intrinsic value of JAKKS common stock; and (ii) caused plaintiff and other members of the Class to purchase JAKKS common stock at artificially inflated prices.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

21.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all purchasers of JAKKS common stock who obtained their stock during the Class Period and who were damaged thereby (the "Class").  Excluded from the Class are JAKKS, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns and any entity in which defendants have or had a controlling interest.

22.    The members of the Class are so numerous that joinder of all members is impracticable.  As of August 6, 2004, there were 26,131,776 shares of the Company's common stock outstanding.  While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of

the Class may be identified from records maintained by JAKKS or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

23.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

24.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

25.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)    Whether the federal securities laws were violated by defendants' acts as alleged herein;

(b)    Whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business, operations, financial condition and management of JAKKS;

(c)    Whether defendants acted knowingly or recklessly in making materially false and misleading statements during the Class Period;

(d)    Whether the market prices of the common stock were artificially inflated or distorted during the Class Period because of defendants' conduct complained of herein; and

(e)    Whether members of the Class have sustained damages, and, if so, the extent of damages and the proper measure of damages.

26.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## SUBSTANTIVE ALLEGATIONS

27.     On October 26, 1999, the first day of the Class Period, JAKKS issued a press release entitled, "JAKKS Pacific, Inc. Reports Record Results for 1999 Third Quarter."  The press release stated in pertinent part:

> Berman also announced that JAKKS has reached a more comprehensive agreement with THQ, Inc. concerning the terms of the joint venture between JAKKS and THQ relating to sales of video games based on the WWF license. Under the agreement, THQ will record revenue from the sale of WWF video games, and JAKKS will receive a guaranteed preferred return from the joint venture based uponWWF video game sales, with the balance of the profits allocated to THQ.  JAKKS will continue to be responsible for maintaining the integrity of the WWF brand and managing the approval process and other relationship matters with the WWF, while THQ will continue to be responsible for the development, sales and distribution of the WWF products.

28.     On February 16, 2000, JAKKS issued a press release entitled, "JAKKS Pacific, Inc. Reports Record Fourth-Quarter and Year-End Results; Anticipates Strong Growth in 2000." The press release stated in pertinent part:

> "This marks our fourteenth consecutive quarter of record year-over-year financial results.  Going into the year 2000, we believe that we are better positioned than ever to continue our growth," said Stephen Berman, president and chief operating officer of JAKKS Pacific Inc. "Our WWF product line, which was recently ranked the number one product in the overall action figure category, continues to be a stellar performer as evidenced by its recently having been designated 'Boys' Toy of Year' by British Association of Toy Retailers and by the huge success of our WWF Wrestlemania® 2000™…which achieved sales in excess of one million units within two months of its November 18th launch."

8

29.    On April 25, 2000, the Company issued a press release entitled, "JAKKS Pacific Inc. Reports Record First Quarter Results; JAKKS Revenues Increase 104% and Profit Increases 229%." The press release stated in pertinent part:

> "This marks the fifteenth consecutive quarter in which we have reported record year-over-year financial results," said Jack Friedman, chairman and chief executive officer of JAKKS Pacific Inc. "Some of this incremental growth has come from the successful assimilation of our 1999 acquisitions, while core products such as WWF wrestling products…continued their solid performance[s.] Our balance sheet – with over $96 million in cash and marketable securities, $118 million in working capital and only nominal long-term debt – remains exceptionally strong. Our solid balance sheet and our history of successful acquisitions positions us well to take further advantage of acquisition opportunities and to continue to execute our growth strategy."

30.    On September 20, 2000, The Wall Street Journal reported in an article entitled, "Jakks Shares Decline On Profit Warning For Third Quarter." The article stated in pertinent part:

> Shares of Jakks Pacific Inc. plummeted 25% after the toy company warned that it would miss analysts' third-quarter earnings estimates mainly due to a slowdown in sales of its World Wide Wrestling Federation Entertainment licensed products.
>
> *      *      *
>
> The company said it is optimistic about the upcoming releases of its new WWF video games for the fourth quarter and next year.
>
> *      *      *
>
> Jakks Chief Executive Jack Friedman said in a statement that the company has been working to diversify its product offerings away from a reliance on wrestling through acquisitions and internal product management.

31.    On January 25, 2001, the company issued a press release entitled, "JAKKS Pacific Makes Top 5 of U.S. Toy Companies for 2000." The press release stated in pertinent part:

> JAKKS Pacific Inc. today announced that according to recently released TRSTS(R) (Toy Retail Sales Tracking Service) data from the NPD Group Inc. for the year 2000 the company is the fifth largest traditional toy company in the United States, based on total dollar share.
> TRSTS data is gathered weekly and monitors sell-through retail sales nationwide.

"In 2000 we saw incredible sales from our Flying Colors division with the introduction of Goooze, the first of our Nickelodeon compound introductions," commented Stephen Berman, president and COO, JAKKS Pacific. "In addition our consistent presence in the boys action toy category with our extreme sports vehicles and WWF figures were responsible for significant sales throughout the year."

32.     On March 7, 2001, the Company issued a press release entitled, "JAKKS Pacific

Reports Record Year-End Results; Year's Net Income Rises 30% on 37% Increase in Sales with

Continued Growth Forecast for 2001." The press release stated in pertinent part:

"Overall, 2000 was a most satisfying one for our company," said Jack Friedman, chairman and chief executive officer of JAKKS Pacific. "In what was a relatively tough year for the toy industry, JAKKS was able to continue both its internal and external growth and strengthen its position with retailers and consumers in the toy and crafts industries."

Looking to the current year, Friedman reiterated the company's previously announced sales and earnings forecast: "The company looks forward to another record year in 2001, when we expect net sales to increase to the range of $290 to $310 million, with net income increasing to a range of $30 to $32 million, or $1.61 to $1.71 per diluted share."

"The company expects to continue to derive substantial earnings from its video game joint venture with THQ, although the WWF video games, due to the hardware transition, are anticipated to make considerably less of a contribution to net income in the year 2001 than in the prior year. However, we expect this to be more than offset by our other product lines."

33.     On April 23, 2001, the Company issued a press release entitled, "JAKKS Pacific

Reports First-Quarter Results; Reaffirms Guidance for 2001 and Announces Stock Repurchase

Program" that stated as follows:

Commenting on the strength of the Company's core businesses, Stephen Berman, president and COO of JAKKS Pacific, noted: "As a multi-brand and diverse company with a broad array of products, many of which sell for less than $10, we believe we are exceptionally well-positioned to weather the economic slowdown that some are anticipating at retail. Our diverse product line, including action figures, toy vehicles and collectibles, craft and activity sets, school-related products, including writing instruments, dolls and infant toys, provides the Company with stability, while at the same time presenting broad opportunities for growth."

Berman continued, "Also, the fact that we have the unique opportunity to be involved in the software business for WWF video games through our joint venture with THQ gives us additional balance and further opportunities to profit from the popularity of such games, particularly as new hardware platforms, like Microsoft `Xbox' and Nintendo `GameCube' and `GameBoy Advance', are introduced. Based on industry reports, these new hardware platforms are expected to be introduced toward the end of this year or the beginning of the next, and we believe that the Company will achieve substantial earnings growth from its joint venture in 2002. In addition, JAKKS' balance sheet, with virtually no debt and $51.6 million in cash and marketable securities, remains exceptionally strong and positions the Company to pursue strategic acquisitions as opportunities present themselves."

Berman concluded, "With the recent market valuation of our stock, in light of our commitment to enhance shareholder value and reflective of the Board of Directors' confidence in the future prospects of the Company, the Board has approved a stock repurchase program that provides for the repurchase of up to one million shares of the Company's common stock."

34.    On July 19, 2001, the Company issued a press release entitled, "JAKKS Pacific Reports Record Second-Quarter Results; Reaffirms Revenue and Earnings Forecast for Balance of Year." The press release stated in pertinent part:

For the six months ended June 30, 2001, net sales were $130.1 million compared to $101.4 million in the same period a year ago. Net income was $12.9 million, or $0.67 per diluted share, compared to net income of $12.8 million, or $0.63 per diluted share, in the first six months of 2000, which included a profit of $6.8 million from the company's joint venture for World Wrestling Federation(R) video games with THQ, while in the first six months of 2001 the joint venture contributed a profit of only $0.9 million.

Stephen Berman, the company's president and COO, noted that as in the first quarter, lower joint venture profits from the company's WWF video games during the industry's transition to new platforms -- notably Microsoft's "Xbox" and Nintendo's "GameCube" -- that are not expected to be available at retail until the fourth quarter at the earliest. "Accordingly," said Berman, "joint venture profits for the balance of the year are expected to be substantially below those of the comparable period of 2000, but will not impact our 2001 forecast of $1.61 to $1.71 per share.

35.    On October 18, 2001, the Company issued a press release entitled, "JAKKS Pacific Reports Third-Quarter Results; Updates Revenue and Earnings Forecast for Fiscal 2001."

The press release stated in pertinent part:

"Our JAKKS Pacific/THQ World Wrestling Federation(R) video game joint venture is highly anticipating three new titles during the fourth quarter, including games for the Sony PlayStation 2, new Microsoft Xbox and Game Boy Advance platforms," continued Friedman. "As the installed base for the new hardware systems increases, it bodes extremely well for sales of our World Wrestling Federation video games for the fourth quarter, fiscal 2002 and beyond."

"Our balance sheet remains exceptionally strong, given that -- in addition to $73 million in cash and marketable securities -- we now have our $50 million syndicated line of credit from a consortium led by Bank of America, N.A., which we announced earlier this week," said Stephen Berman, JAKKS' president and COO. "With virtually no debt and a growing cash position, we are favorably positioned to seek attractive acquisitions that will further strengthen out product lines while adding to profitability.

"We continue to anticipate that results for this year will reflect net sales of $290 to $300 million and earnings per diluted share of $1.61 to $1.71 on net income of $30 to $32 million. This represents midrange percentage growth in 2001 of 17%, 18% and 8%, respectively, over fiscal 2000 net sales of $252.3 million and earnings per diluted share of $1.41 on net income of $28.6 million," Berman continued.

For the nine months ended Sept. 30, 2001, net sales were $222.9 million compared to $193.2 million in the same period a year ago. Net income was $23.8 million, or $1.24 per diluted share, compared to net income of $22.6 million, or $1.11 per diluted share, in the first nine months of 2000. Net income for the first nine months of 2000 reflected a profit of $8.2 million from the video game joint venture, compared to $1.0 million in the first nine months of 2001.

"Given our current environment, for 2002 our outlook remains positive," concluded Friedman. "With World Wrestling Federation(R) action figures, accessories and video games; stationery and activity products from Flying Colors (for assorted properties including Nickelodeon(R) programs, Cubix(TM), and other top licenses); BattleBots(TM), Junkyard Wars(TM) and extreme sports lines from Road Champs(R); our growing stable of writing instruments; and a number of items from our other divisions, we believe we have a solid product base going into 2002. This coupled with our strong financial position and depth of management position us well to continue our business strategies."

36.    On February 12, 2002, the Company issued a press release entitled, "JAKKS

Pacific Reports Net Sales and Income for 2001; Further Growth Expected in 2002." The press

release stated in pertinent part:

For the year, net sales were a record $284.4 million compared to $252.3 million in 2000, an increase of 12.7%. Net income on a pro forma basis increased 11.5% to

$32.0 million, or $1.65 per diluted share, from $28.7 million, or $1.41 per diluted share, in the prior year. Including a special reserve of $5.0 million relating to Kmart Corporation's recent bankruptcy filing, net income was $28.2 million, or $1.45 per diluted share. Also included in the full year net income are non-cash charges of $2.6 million and $0.1 million for 2001 and 2000, respectively, relating to the 2000 price reset of certain of the Company's outstanding stock options. In 2001, the THQ/JAKKS joint venture contributed profit of $6.7 million compared to $15.9 million in 2000. Fully diluted shares outstanding were 19.4 million in 2001 and 20.3 million in 2000.

<div align="center">*    *    *</div>

"We expect 2002 will be another record year for JAKKS, with new introductions expected in all segments," said Stephen Berman, President and Chief Operating Officer of JAKKS Pacific. "New introductions this year include new writing instruments using gel ink technologies, extensions to our extreme sports toy lines with gyros, and new World Wrestling Federation(R) action figures and accessories scheduled for release this year. Likewise, with the industry's transition to new video game hardware essentially complete, and with several exciting new titles due for release, we anticipate substantially higher profits from JAKKS' World Wrestling Federation video game joint venture with THQ Inc.

37.    On April 23, 2002, the Company issued a press release entitled, "JAKKS Pacific Reports First Quarter Financial Results; Net Income Increases 16.1%; Reiterates 2002 Sales Forecast and EPS Guidance."  The press release stated in pertinent part:

> Mr. Friedman continued, "The response to our products has been strong and reinforces our expectations for another record sales year. We believe we have our broadest and best product line across our different product segments. Sales have been extremely promising for our first-quarter new product introductions, which include Liqualoons, our new bubble solution from Flying Colors, as well as our Nickelodeon-branded products - Smatter, Gak Splat and Skweeez, which has already won the Oppenheim Toy Portfolio Gold Seal Award. As always, our World Wrestling Federation product line continues to make significant contributions to our operations as it evolves along with the ever-changing themes in the story lines, including the distinction of the two leagues, Raw and Smackdown."

38.    On July 22, 2002, the Company issued a press release entitled, "JAKKS Pacific Reports Second Quarter Financial Results; 28th Consecutive Quarter of Profitability."  The press release stated in pertinent part:

Jack Friedman, Chairman and Chief Executive Officer of JAKKS Pacific commented, "Our operations and financial results have proven resilient, even considering a challenging economy and a lackluster toy retail environment. This is a tribute to our company, its dedicated employees worldwide and our business strategy. Through our broad, expanding and diverse product lines, which include Flying Colors, Pentech, World Wrestling Entertainment action figures, accessories and video games, Funnoodle and Go Fly a Kite, amongst others, we have been able to continue our strategy of providing great value to our retailers and our consumers."

39.    On October 22, 2002, the Company issued a press release entitled, "JAKKS Pacific Reports Record Sales and Earnings." The press release stated in pertinent part:

Mr. Friedman continued, "We also have had nice sell-in of our Nickelodeon lines for the holidays, as well as a number of new WWE items and the first shipments of our Disney Princess craft and activity toys. In the fourth quarter, we with our joint venture partner, THQ, will see the launch of two new World Wrestling Entertainment games, WWE(TM) SmackDown!(TM) Shut Your Mouth(TM) for the PlayStation(R) 2 and WWE(TM) Road to WrestleMania(R) X8 for Game Boy(R) Advance, and have recently shipped the new WWE(TM) Raw(TM)(R)for the PC, which we believe will appeal to a new group of gamers."

40.    On February 11, 2003, the Company issued a press release entitled, "JAKKS Pacific Announces Fourth Quarter and Year-End Results for 2002." The press release stated in pertinent part:

Jack Friedman, Chairman and Chief Executive Officer of JAKKS Pacific, offered his perspective on 2002 and the business outlook for 2003, "Increased sales and earnings, continued diversification of our product lines, expanded distribution channels, and a continuing strong balance sheet, give us much to be pleased with in 2002 -- a year that presented overall economic and retail challenges. These strengths and accomplishments, together with our dedicated employees, and new and exciting licenses and products, give us cause to be optimistic about our prospects for continued growth in 2003 and beyond."

For the first time since the Class Period began, the Company neglected to mention World Wide Entertainment during an earnings announcement.

41.    On July 22, 2003, the Company issued a press release entitled, "JAKKS Pacific Reports Second Quarter 2003 Financial Results." The press release stated in pertinent part:

Second quarter net sales were $73.3 million, compared to $79.0 million in the comparable period last year. Excluding one-time charges, net income for the period was $5.3 million, or $0.21 per diluted share, compared to $8.9 million, or $0.41 per diluted share, for the second quarter of last year. Including one-time charges, net income was $3.2 million, or $0.13 per diluted share in 2003, compared to $7.8 million, or $0.36 per diluted share, for the same period last year. The Company recognized pre-tax charges of $2.7 million in 2003 and $1.5 million in 2002 relating to the voluntary recalls of one of its products. The Company had 24.7 million diluted shares outstanding in the second quarter of 2003, 12.4% more than the 22.0 million diluted shares outstanding in the second quarter of 2002.

The Company's net sales for the six months ended June 30, 2003 were $141.0 million compared to $138.9 million during the same period in 2002. Excluding one-time charges, net income during the period was $11.2 million, or $0.45 per diluted share, compared to $15.9 million, or $0.76 per diluted share, for the comparable period last year. Including the restructuring charges of $6.6 million taken in the first quarter of 2002 and the one-time second quarter charges for the aforementioned product recalls, net income for the first six months of 2003 was $9.2 million, or $0.37 per diluted share, compared to $10.0 million, or $0.47 per diluted share, for the same period in 2002.

"The second quarter was a challenging one for JAKKS Pacific, as well as for many of our peers," said Jack Friedman, Chairman and Chief Executive Officer. "As a result of general economic conditions and unusually poor weather, particularly in the Northeast section of the United States, cutbacks in orders from some of our customers in late June had an adverse effect on our performance for the quarter as a whole. This included sales of seasonal products, including kites from our Go Fly a Kite line and water products from our Funnoodle and Trendmaster/Storm brands. In addition, due to strict labor constraints in factories throughout China as a result of the SARS epidemic, production continued but was somewhat slowed during the second quarter, causing a delay in the initial shipping of our NASCAR(R) line, as well as a key SpongeBob SquarePants item, which we had expected to ship in June. As a result, we first began to ship these items during the third quarter.

Again, the Company did not mention World Wrestling Entertainment.

42.     On October 21, 2003, the Company issued a press release entitled, "JAKKS

Pacific Reports Third Quarter 2003 Financial Results." The press release stated in pertinent part:

Third quarter net sales were $90.3 million, compared to $102.6 million in the comparable period last year. Net income for the period was $9.6 million, or $0.39 per diluted share, compared to $14.0 million, or $0.58 per diluted share, for the third quarter of last year. Excluding a one-time gain, net income was $9.0 million, or $0.37 per diluted share in 2003. The Company recognized a pre-tax gain of

$0.7 million in the third quarter of 2003 relating to recoveries on a recall of one of its products.

The Company's net sales for the nine months ended September 30, 2003 were $231.4 million, compared to $241.5 million during the same period in 2002. Excluding one-time net charges, net income during the period was $20.3 million, or $0.82 per diluted share, compared to $29.9 million, or $1.35 per diluted share, for the comparable period last year. Including the one-time net charges of $2.0 million for the product recall in 2003, and the restructuring and recall charges of $8.1 million in 2002, net income for the nine months of 2003 was $18.7 million, or $0.76 per diluted share, compared to $23.9 million, or $1.09 per diluted share for the same period in 2002.

43.    On February 17, 2004, the Company issued a press release entitled, "JAKKS

Pacific Reports Fourth Quarter and Year-End Results for 2003; Company Achieves Record

Fourth Quarter Sales; Sales and Earnings Growth Expected in 2004." The press release stated in

pertinent part:

> Jack Friedman, Chairman and Chief Executive Officer, said, "We are pleased to report another year of solid sales for 2003 including robust growth in the fourth quarter, with strong sell-through in our mass merchant and other retail distribution channels. While we continue to be affected by a challenging industry environment, including the recent bankruptcies of KB Toys, FAO Schwarz and others, we believe that with our diverse product offerings and categories, we are well positioned for growth in 2004. As the number of stores in our primary channel base has declined, we are working to place more SKUs on these shelves, while at the same time concentrating on expanding sales of our products beyond traditional toy retailers to other retail channels, including electronics, drug, convenience and office supply stores.

> "We were pleased with sales of our products featuring key licenses during the quarter, including WWE and Dragon Ball figure assortments, and our Atari and Namco TV Games. We have announced a number of new key licenses that we are adding to our TV Games line of product, including Ms. Pac-Man(R) and Spider-Man(R), and are pleased with strong initial sales of our two newest titles: a relaunch of Activision TV Games and a version based on SpongeBob SquarePants."

> JAKKS Pacific is forecasting 2004 net sales, excluding acquisitions, to be in the range of $330 to $340 million and diluted earnings per share of $1.20 to $1.30, excluding non-cash stock-based compensation expense of $9.3 million, of which $8.3 million is related to restricted stock grants, which the Company expects to incur in the first quarter.

44.    On April 20, 2004, the Company issued a press release entitled, "JAKKS Pacific Reports First Quarter 2004 Financial Results; Record First Quarter Sales; Proposed Acquisition Expected to Further Increase Sales and Earnings." The press release stated in pertinent part:

> Stephen Berman, President and Chief Operating Officer commented, "A number of our seasonal products, including our Go Fly a Kite(R) and Funnoodle(R) lines, were also strong performers, but these gains were offset by the temporary withdrawal of The Storm(TM) water guns from the market in the first quarter, which is set for relaunching in 2005. We are encouraged by the sell-in of a number of lines in our crafts, stationery and writing instruments categories, including our Flying Colors(R) lines for Dora the Explorer(TM) and SpongeBob SquarePants(TM), as well as expanded offerings of our Hello Kitty(R) products and traditional writing instruments.

> "We are also pleased with sales of our World Wrestling Entertainment(TM), Dragon Ball(R) and Mucha Lucha(TM) action figures and Road Champs(R) vehicles. Some additions to our product offerings include toys based on Universal Studios' Classic Monsters and new monsters based on the feature film Van Helsing(TM), which is scheduled for a May release. We expect these new licenses, combined with our core business, will contribute to our top and bottom line growth in 2004 and beyond."

> Mr. Berman concluded, "Our financial position remains strong with $248.9 million of working capital, including cash of $156.6 million as of March 31, 2004. Given the strength of our balance sheet and positive cash flow, we remain well positioned to continue to grow our business by actively pursuing additional complementary and accretive acquisitions, executing on internal growth initiatives and securing new licenses that provide both near term and long-term growth potential and market share expansion opportunities."

45.    On July 20, 2004, the Company issued a press release entitled, "JAKKS Pacific Reports Second Quarter 2004 Financial Results; Company Achieves Record Sales and Earnings; Revenue Increased 49% to $109.4M and Net Income Increased 62% to $9.9M." The press release stated in pertinent part:

> "We are very excited to report record revenue and net income for the second quarter and believe that we are on track to achieve the upper range of our increased 2004 guidance," said Jack Friedman, Chairman and Chief Executive Officer of JAKKS Pacific. "We believe our strong sales and earnings growth results from increased product advertising and marketing, as well as keen focus on product innovation and operating efficiencies, and the phenomenal success of our TV Games line of plug it in and play video games.

"In addition to TV Games, a number of our brands performed particularly well, including our WWE action figures and Vivid Velvet in our art activities category. Our International sales also increased."

Stephen Berman, "During the second quarter, we also completed the accretive acquisition of Play Along. This acquisition brings a management team with years of experience to our organization and serves to strengthen our category offerings while expanding our shelf space at all our major customers. Play Along adds such well-known brands and licenses as Cabbage Patch Kids(R) for dolls, Care Bears(R) for plush and preschool learning, Teletubbies(R) for preschool and playsets and DC Comic's(R) Batman(R) and Justice League of America(R) for construction toys."

Mr. Berman continued, "Despite the record results, we continue to focus on areas of our business that can be improved. Our Storm product line of water guns and foam balls will be relaunched next year and some of our art activities and writing instruments products are being enhanced with new product concepts and licenses. With these changes, we expect these categories to improve over the latter half of this year and in 2005.

"We are enthusiastic about the opportunity to grow our business and are very encouraged about the upcoming holiday season based on early responses from our retailer partners. We believe that we will have prime placement for our TV Games line in the third and fourth quarters of this year, and expect our Dragon Ball, World Wrestling Entertainment and extreme sports product lines, as well as other lines to also do well."

46.    The above statements made by the defendants were each materially false and misleading because they failed to disclose and misrepresented the following adverse facts:

(a)    the Company had obtained the WWE license as a result of its participation in an illicit bribery scheme;

(b)    the Company's success in obtaining at least one lucrative license was not reflective of the Company's ability to enter into licensing agreements through arms-length transactions but were, instead, reflective of the Company's perpetration of an unsustainable business tactic;

(c)    discovery of the Company's participation in the bribery scheme would substantially impact the Company's past, present and future revenue stream from the

18

WWE license as the terms of the license could be materially modified, or revoked in its

entirety, and the Company would be exposed to significant liability in the form of

damages sought by WWE;

(d)     the Company's viability as an ongoing business operation would be

materially impacted by potential business partners' reluctance to conduct business with

an entity involved in such a bribery scheme; and

(e)     the Company's revenues and earnings would have been significantly less

had the Company not engaged in the bribery scheme.

## THE TRUTH EMERGES

47.     On October 19, 2004, at 3:00 a.m., the Company issued a press release entitled,

"JAKKS Pacific Reports Third Quarter 2004 Financial Results" wherein the Company

announced "record results" including a 128.2% increase in net sales for the third quarter and an

increase of 148.8% in reported income for the third quarter 2004 as compared to the same period

in 2003.  In the press release, defendant Berman commented on the Company's financial

performance as follows:

> We are pleased with the performance of our new products obtained through the acquisition of Play Along, including our new Cabbage Patch Kids(R) dolls and Care Bears(R) plush and preschool learning toys.

> Our ability to reinvent and expand our portfolio of brands is most evident in our traditional toys segment, which includes action figures, wheels, TV Games and plush dolls. We have maintained our industry-leading position in TV Games, and expect to continue to capitalize on this growing market in the coming quarters through innovation and new products based on top current and retro licenses. By the end of 2004, we will have a total of 12 TV Games(TM) products in the market, up from four at the end of 2003. We have also begun to expand our distribution of the games to international markets, including Europe, Australia and New Zealand. Looking to 2005, JAKKS will be introducing over 20 new exciting titles.

We are very encouraged about the upcoming holiday season based on early responses from our retail partners. We anticipate that Care Bears, Cabbage Patch Kids and TV Games will top several 'Hot Toy' lists for the 2004 holiday season, as they have been named to several already. We have secured prime placement at retailers nationwide for our TV Games line in the fourth quarter of this year, and expect our plush toys and World Wrestling Entertainment product lines, as well as other lines, to perform very well.

Our strong performance led to $86.4 million in cash flow from operations during the first nine months of 2004. We have over $218.5 million of working capital, including cash and equivalents and marketable securities of $151.9 million. Given the increasing strength of our balance sheet, we are well positioned to take advantage of acquisition opportunities and to continue to deliver both sales and earning expansion throughout 2004 and beyond.

48.    At the end of the lengthy press release, after the many positive comments

regarding the Company's performance, the press release stated:

The Company also announced that it is engaged in discussions with WWE concerning the restructuring of its toy license and with WWE and THQ with respect to the restructuring of the JAKKS THQ Joint Venture video games license agreement with WWE. The discussions are an outgrowth of certain litigation that has been pending between WWE and a former licensing consultant to WWE and a former employee of WWE, to which the Company is not a party. WWE has raised questions about the validity of the licenses as a result of certain transactions between the Company and that licensing consultant that occurred more than six years ago. The Company has denied any wrongdoing in connection with the transactions with the licensing consultant and maintains that they were unrelated to either the toy or video game license. If the discussions are satisfactorily concluded, the restructuring of the licenses may have an impact on the Company's future revenues and net income to an extent that is presently unknown. If the discussions with WWE and THQ are not satisfactorily concluded, the Company anticipates that litigation is likely to be commenced by WWE challenging the validity of the licenses and seeking compensatory and punitive damages, in which event the Company intends to vigorously defend itself against claims which it believes are without merit.

49.    The Company's ambiguous statement regarding "certain litigation" between

parties other than itself failed to disclose the true nature of the dispute between itself and WWE

and completely disclose the full extent to which the dispute impacted the Company's past,

present and future business operations.  The October 19th press release's failure to serve as

adequate disclosure is evidenced by the trading activity of the Company's stock that same day,

when the price of the Company's stock opened flat, without change, from the prior day's closing

price.

50.     Later on October 19, 2004, WWE commenced a civil action against JAKKS. The

commencement of the WWE lawsuit was the first complete disclosure setting forth the full

extent of the seriousness of the allegations made against the Company.

51.     On October 19, 2004, at 9:51pm, JAKKS issued a press release in response to the

WWE lawsuit. The press release stated:

> JAKKS Pacific, Inc. announced that a civil lawsuit was filed in the United States
> District Court for the Southern District of New York yesterday afternoon by
> World Wrestling Entertainment, Inc. ("WWE") concerning the video game
> license between WWE and the joint venture company operated by the Company
> and THQ, Inc. and the toy license between the Company and WWE. The
> Company denies any allegations of wrongdoing and believes that it will be
> completely vindicated in the litigation, and looks forward to having the claims
> against it dismissed. The Company will continue to devote its full energies and
> resources to bringing its outstanding products to market during the busy holiday
> season and beyond.

52.     With the additional information provided to the marketplace through the WWE

lawsuit, the market's reaction was strong and swift. On October 20, 2004, the first trading day in

which the investing public had knowledge of the full extent of JAKKS participation in the

purported bribery scheme, the Company's stock opened for trading at $15.28, down $3.53 per

share from the previous day's close. The stock would close at $12.96 per share on October 20,

2004.

## UNDISCLOSED ADVERSE FACTS

53.     The market for JAKKS securities was open, well-developed and efficient at all

relevant times. As a result of these materially false and misleading statements and failures to

disclose, JAKKS securities traded at artificially inflated prices during the Class Period. Plaintiff

and other members of the Class purchased or otherwise acquired JAKKS securities relying upon

the integrity of the market price of JAKKS securities and market information relating to JAKKS, and have been damaged thereby.

54.     During the Class Period, defendants materially misled the investing public, thereby inflating the price of JAKKS securities, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make defendants' statements, as set forth herein, not false and misleading. Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations, as alleged herein.

55.     At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by plaintiff and other members of the Class. As described herein, during the Class Period, defendants made or caused to be made a series of materially false or misleading statements about JAKKS' business, prospects and operations. These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of JAKKS and its business, prospects and operations, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times. Defendants' materially false and misleading statements during the Class Period resulted in plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein.

## SCIENTER ALLEGATIONS

56.     As alleged herein, defendants acted with scienter in that defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced

in the issuance or dissemination of such statements or documents as primary violations of the

federal securities laws. As set forth elsewhere herein in detail, defendants, by virtue of their

receipt of information reflecting the true facts regarding JAKKS, their control over, and/or

receipt and/or modification of JAKKS allegedly materially misleading misstatements and/or their

associations with the Company which made them privy to confidential proprietary information

concerning JAKKS, participated in the fraudulent scheme alleged herein.

57.     Defendants knew and/or recklessly disregarded the falsity and misleading nature

of the information which they caused to be disseminated to the investing public. The ongoing

fraudulent scheme described in this complaint could not have been perpetrated over a substantial

period of time, as has occurred, without the knowledge and complicity of the personnel at the

highest level of the Company, including The Individual Defendants.

### APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE

58.     At all relevant times, the market for JAKKS securities was an efficient market for

the following reasons, among others:

(a)     JAKKS stock met the requirements for listing, and was listed and actively

traded on the Nasdaq, a highly efficient and automated market;

(b)     As a regulated issuer, JAKKS filed periodic public reports with the SEC

and the Nasdaq;

(c)     JAKKS regularly communicated with public investors via established

market communication mechanisms, including through regular disseminations of press

releases on the national circuits of major newswire services and through other wide-

ranging public disclosures, such as communications with the financial press and other

similar reporting services; and

(d)    JAKKS was followed by numerous securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

59.    As a result of the foregoing, the market for JAKKS securities promptly digested current information regarding JAKKS from all publicly available sources and reflected such information in JAKKS stock price. Under these circumstances, all purchasers of JAKKS securities during the Class Period suffered similar injury through their purchase of JAKKS securities at artificially inflated prices and a presumption of reliance applies.

### NO SAFE HARBOR

60.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements were made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of JAKKS who knew that those statements were false when made.

## FIRST CLAIM

### Violation Of Section 10(b) Of The Exchange Act And Rule 10b-5
### (Against All Defendants)

61.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

62.    During the Class Period, defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (1) deceive the investing public, including plaintiff and other Class members, as alleged herein; and (2) cause plaintiff and other members of the Class to purchase JAKKS securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

63.    Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for JAKKS securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.  All defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

64.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the interstate mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of the JAKKS common stock as specified herein.

65.     These defendants employed devices, schemes and artifices to defraud, while in possession of material, adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of JAKKS securities value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about JAKKS and its business operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the JAKKS investors who purchased JAKKS common stock during the Class Period.

66.     The Individual Defendants primary liability, and controlling person liability, arises from the following facts: (i) The Individual Defendants were  high-level executives and/or directors at the Company during the Class Period and a member of the Company's management team or had control thereof; (ii) The Individual Defendants, by virtue of their responsibilities and activities as senior officers and/or directors of the Company were privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) The Individual Defendants enjoyed significant personal contact and had access to other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) The Individual Defendants were aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

67.     The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that

they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing the true value of the JAKKS common stock from the investing public and supporting the artificially inflated price of its securities. As demonstrated by defendants' misstatements concerning the value of the JAKKS common stock throughout the Class Period, defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

68.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of JAKKS common stock was artificially inflated during the Class Period.  In ignorance of the fact that the market prices of JAKKS publicly-traded common stock were artificially inflated, and relying directly or indirectly on the false and misleading statements made by defendants, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by defendants but not disclosed in public statements by The Individual Defendants during the Class Period, plaintiff and the other members of the Class purchased JAKKS common stock during the Class Period at artificially high prices and were damaged thereby.

69.    At the time of said misrepresentations and omissions, plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true. Had plaintiff and the other members of the Class and the marketplace known the truth regarding the value of the JAKKS common stock, which were not disclosed by defendants, plaintiff and other members of

the Class would not have purchased or otherwise acquired JAKKS securities, or, if they had

acquired such securities during the Class Period, they would not have done so at the artificially

inflated prices which they paid.

70.     By virtue of the foregoing, defendants have violated Section 10(b) of the

Exchange Act, and Rule 10b-5 promulgated thereunder.

71.     As a direct and proximate result of defendants' wrongful conduct, plaintiff and

the other members of the Class suffered damages in connection with their respective purchases

and sales of the Company's securities during the Class Period.

## SECOND CLAIM

### Violation Of Section 20(a) Of The Exchange Act
### (Against The Individual Defendants)

72.     Plaintiff repeats and re-alleges each and every allegation contained above as if

fully set forth herein.

73.     The Individual Defendants acted as a controlling person of JAKKS within the

meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level

positions, and ownership and contractual rights, participation in and/or awareness of the

Company's operations and/or intimate knowledge of the false financial statements filed by the

Company with the SEC and disseminated to the investing public, The Individual Defendants had

the power to influence and control and did influence and control, directly or indirectly, the

decision-making of the Company, including the content and dissemination of the various

statements which plaintiff contends are false and misleading.  The Individual Defendants were

provided with or had unlimited access to copies of the Company's reports, press releases, public

filings and other statements alleged by plaintiff to be misleading prior to and/or shortly after

28

these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

74.    In particular, each of these defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

75.    As set forth above, JAKKS and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their position as a controlling person, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of defendants' wrongful conduct, plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

WHEREFORE, plaintiff prays for relief and judgment, as follows:

(A)    Determining that this action is a proper class action, designating plaintiff as Lead Plaintiff and certifying plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and plaintiff's counsel as Lead Counsel;

(B)    Awarding compensatory damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(C)    Awarding plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(D)    Such other and further relief as the Court may deem just and proper.

### JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated:  November 9, 2004

Respectfully submitted,

**WOLF HALDENSTEIN ADLER
FREEMAN & HERZ LLP**

By: _____
Fred Taylor Isquith, Esq. (FI6782)
Christopher S. Hinton, Esq. (CH0759)
270 Madison Avenue
New York, NY 10016
Telephone: (212) 545-4600
Facsimile: (212) 545-4653

Louis F. Burke, Esq.
Louis F. Burke P.C.
460 Park Avenue, 21st Floor
New York, NY 10022
Telephone: 212/682-1700
Facsimile: 212/808-4280

Attorneys for Plaintiff

382341