UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------- x
                                         :  Case No. 04-CV-8807 (KMK)
IN RE JAKKS PACIFIC, INC.                :
SHAREHOLDERS CLASS ACTION                :
LITIGATION                               :
                                         :
---------------------------------------- x


MEMORANDUM IN FURTHER SUPPORT OF THE MOTION OF
INDIANA ELECTRICAL WORKERS FOR APPOINTMENT AS LEAD
PLAINTIFF AND FOR APPROVAL OF SELECTION OF LEAD COUNSEL
AND IN OPPOSITION TO THE COMPETING MOTION

Indiana Electrical Workers Pension Trust Fund IBEW ("Indiana Electrical Workers") respectfully submits this memorandum of law in further support of its motion for appointment as Lead Plaintiff and approval of its selection of Lerach Coughlin Stoia Geller Rudman & Robbins LLP ("Lerach Coughlin") as Lead Counsel.

I.  **PRELIMINARY STATEMENT**

On or about February 1, 2005, two competing motions were filed with the Court, each seeking appointment of the respective movant or movant group as lead plaintiff to represent the Class of investors of JAKKS Pacific, Inc. ("JAKKS") stock in the above-captioned consolidated action. The motions also sought approval of the respective movants' selection of lead counsel. The two motions were made by: (i) Frank Whiting ("Whiting") and Quantum Equities LLC ("Quantum"); and (ii) Indiana Electrical Workers.

In accordance with the formula for selecting lead plaintiff, as set forth in the Private Securities Litigation Reform Act of 1995 ("PSLRA"), the Court is instructed to evaluate the competing movants to determine which movant should be appointed lead plaintiff. 15 U.S.C. § 78u-4(a)(3)(B)(i). As part of the initial inquiry, the Court is directed to determine which movant, among all of the competing movants, "has the largest financial interest in the relief sought by the class," 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I)(bb), and "otherwise satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure." 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I)(cc). The presumption afforded to such a plaintiff, however, may be rebutted if it is determined that such plaintiff "is subject to unique defenses that render such plaintiff incapable of adequately representing the class." 15 U.S.C. § 78u-4(a)(3)(B)(iii)(II)(bb).

Here, Whiting and Quantum purport to represent the largest financial interest of any movant. However, as explained herein, the inquiry into their adequacy does not stop there. Indeed, both Whiting and Quantum suffer from irreconcilable adequacy issues which render them inappropriate

lead plaintiffs. Specifically, Whiting has not suffered any harm as a result of the fraud alleged in the complaints. In fact, his last sale of JAKKS stock took place on September 28, 2000 – *more than 4 years before the fraud was disclosed!* How can Whiting claim to have been defrauded when he sold his stock for a loss in September 2000 if the disclosure that caused a decline in the price of JAKKS stock was only made in October 2004? While Whiting does appear to have sustained trading losses, *none* of those losses can be attributed to fraud. Accordingly, a securities fraud class action is the wrong forum for Whiting to seek any redress.

Similarly, Quantum is also inadequate to serve as a lead plaintiff because it is subject to unique defenses since it bought and sold all of its shares with knowledge of the problems at JAKKS: Quantum bought and sold all of its shares of JAKKS stock on October 19, 2004. On that day, JAKKS disclosed that World Wrestling Entertainment ("WWE") had raised serious questions about JAKKS's toy licenses, a significant component of JAKKS's revenues. Accordingly, as a result of the timing of its purchases, Quantum will be subject to unique defenses and is an inadequate lead plaintiff. *See In re Cardinal Health, Inc. Sec. Litig.*, 2005 U.S. Dist. LEXIS 1431, at *42 (S.D. Ohio Jan. 26, 2005) ("The timing of New Jersey's purchases undermines any causal nexus between the Defendants' alleged misrepresentation and the resulting injury").

For these reasons, and as more fully set forth below, Indiana Electrical Workers, a sophisticated institutional investor, is the only *bona fide* lead plaintiff movant whose claims are typical and adequate of the rest of the Class and, as such, its motion should be granted in full.

## II.     ARGUMENT

### A.     WHITING AND QUANTUM ARE SUBJECT TO UNIQUE DEFENSES

The PSLRA provides that an investor who claims to represent the largest financial interest of all competing movants is afforded presumptive lead plaintiff status. That presumption may be

rebutted, however, if it is determined that such plaintiff "is subject to unique defenses that render such plaintiff incapable of adequately representing the class."  15 U.S.C. § 78u-4(a)(3)(B)(iii)(II)(bb).

### 1. Whiting Is an Inadequate Lead Plaintiff Because He Has Suffered No Harm As a Result of Defendants' Alleged Fraud

Courts have consistently concluded that investors who sell *all* of their shares *prior* to the disclosure of a fraud have not suffered any recoverable losses since they were not holding any shares at the time that the stock declined.  *See, e.g., In re Carreker Corp. Sec. Litig.*, 2003 U.S. Dist. LEXIS 25988 at *8-9 (N.D. Tex. Aug. 14, 2003) (rejecting lead plaintiff movant that sold all of his shares before the stock drop at the end of the class period and holding that the movant "may or may not have actually been damaged, and a great deal of time, effort and expense will undoubtedly be incurred to determine if he is subject to a unique no damage defense . . . .").  Indeed, the Second Circuit, in *Lentell v. Merrill Lynch & Co.*, 2005 U.S. App. LEXIS 1016, at *31 (2d Cir. Jan. 20, 2005) (citation omitted), recently held that to establish loss causation, "a plaintiff must allege . . . that the subject of the fraudulent or omission was the cause of the actual loss suffered, i.e. that the misstatement or omission concealed something from the market that, when disclosed negatively affected the value of the security.  Otherwise the loss in question was not foreseeable."  Because Whiting sold all of his shares of JAKKS stock in 2000, he will not be able to show that defendants' alleged fraud, which was disclosed in October 2004, "was the cause of the actual loss suffered" (since he was no longer holding any shares of JAKKS at the time of their decline following the disclosure at the end of the Class Period).

Similarly, in *In re Cable & Wireless, PLC, Securities Litigation*, 217 F.R.D. 372, 379 (E.D. Va. 2003), the court concluded that if an investor sells all of its stock before the disclosure of the

fraud, as is the case here with Whiting, it has "fail[ed] to establish that its harm was caused by the Defendants' conduct." *Id.* More fully, the court stated:

> Fourth and finally, West Virginia sold all of its shares before the fraud allegedly perpetrated by C&W was revealed to the public. Accordingly, it follows that West Virginia could not have suffered any loss as a result of the Defendants' alleged fraud. *See Arduini/Messina P'ship v. Nat'l Med. Fin. Servs. Corp.*, 74 F. Supp. 2d 352, 361-62 (S.D.N.Y. 1999) (movant's losses that occurred prior to disclosure of defendant's fraud are not, as a matter of law, recoverable). Because West Virginia sold all of its C&W shares before the alleged fraud became public, it fails to establish that its harm [**22] was caused by the Defendant's conduct. Without causation, West Virginia cannot prevail on its claims. Moreover, West Virginia would therefore have no standing to pursue its claims against the Defendants because its losses cannot be attributed to the Defendants.

*Cable & Wireless*, 217 F.R.D. at 379.

Here, Whiting sold "all of [his] shares" significantly before the fraud allegedly perpetrated by defendants was revealed to the public, which then caused the decline in the price of JAKKS's stock. Accordingly, Whiting's "losses cannot be attributed to the Defendants" since he was not holding any shares of JAKKS's stock when defendants' disclosure caused JAKKS's stock to decline. *See Arduini/Messina P'ship v. Nat'l Med. Fin. Servs. Corp.* 74 F. Supp. 2d 352, 261-62 (S.D.N.Y. 1999) (granting the defendants' motion to dismiss the plaintiff's claims where plaintiff sold all of his shares in the subject company prior to disclosure of the fraud and could not demonstrate that his damages were caused by the defendants' fraudulent statements); s*ee also Carreker*, 2003 U.S. Dist. LEXIS 25988 at *8-9 (rejecting lead plaintiff movant that sold all of his shares before the stock drop at the end of the class period and holding that the movant "may or may not have actually been damaged, and a great deal of time, effort and expense will undoubtedly be incurred to determine if he is subject to a unique no damage defense . . . ."); *In re MicroStrategy, Inc. Sec. Litig.*, 110 F. Supp. 2d 427, 437 n.23 (E.D. Va. 2000) (holding that a lead plaintiff movant who sold shares in the subject company prior to the disclosure of the fraud also may be subject to "unique defenses based on the timing of its loss."); *In re McKesson HBOC, Inc. Sec. Litig.*, 97 F. Supp. 2d 993, 998 (N.D. Cal.

1999) (holding that "it is inappropriate to count losses (or profits) by 'in-and-out' traders in this case when determining the plaintiff with the greatest financial interest in the litigation"). Whiting, an in-and-out trader who was not holding *any* shares of JAKKS's stock in October 2004, has not sustained any losses as a result of defendants' fraud, and, accordingly, has no financial interest in the outcome of this litigation.

### 2. Quantum Is an Inadequate and Atypical Lead Plaintiff Based on the Timing of Its Trades

Quantum[1] is also an inadequate lead plaintiff because it purchased and sold *all* of its shares of JAKKS on October 19, 2004, *after* the Company had issued a press release disclosing that WWE "has raised questions about the validity of [its toy] licenses as a result of certain transactions between the Company and [a] licensing consultant." *See* Press Release dated October 19, 2004, 3:00 a.m., headlined "JAKKS Pacific Reports Third Quarter 2004 Financial Results," attached hereto as Exhibit A. This announcement, which was made before the opening of the market on October 19, 2004, caused JAKKS stock to fall $5.30 per share, or 22.5%.

Similarly, in *Cardinal Health*, 2005 U.S. Dist. LEXIS 1431, *42, decided just last week, the court held that the "presumption of typicality and adequacy" for a lead plaintiff movant who bought its shares *after* the disclosure of the fraud was adequately "rebutted." Specifically, the court stated:

> The timing of New Jersey's purchases undermines any causal nexus between the Defendants' alleged misrepresentations and the resulting injury. *It will be difficult to*

---

[1] Quantum now claims that since it is a hedge fund, it is also an institutional investor and should be afforded a preference in that regard. Courts, however, routinely reject hedge funds as lead plaintiffs because they engage in irregular trading of securities. *See In re Bank One Shareholders Class Action*, 96 F. Supp. 2d 780 (N.D. Ill. 2000) (court rejected a hedge fund as a lead plaintiff because of its irregular trading patterns). In fact, that is exactly the problem with Quantum's motion here – Quantum itself engaged in irregular trading of JAKKS stock by day-trading 25,000 shares of JAKKS stock on October 19, 2004, *after* the Company had already disclosed problems with its WWE license.

*argue that the presumptive Lead Plaintiff incurred the vast bulk of its injury after Cardinal acknowledged that its accounting methodologies were under investigation. New Jersey's trading patterns will make it susceptible to claims that New Jersey did not rely on the Defendants' alleged misrepresentations when purchasing Cardinal stock.* Thus the Court finds the presumption of typicality and adequacy rebutted.

Here, Quantum "incurred" *all* "of its injury" after JAKKS "acknowledged" that questions had been raised by WWE about the validity of JAKKS's toy licenses. Indeed, over the entire five year class period, Quantum only purchased shares on October 19, 2004 – *the very same day – and after -- JAKKS announced that it was experiencing difficulties with its WWE license!* This trading is *clearly not typical of the rest of the Class*. *See In re Enron Corporation Securities Litigation*, 206 F.R.D. 427, 455-56 (S.D. Tex. 2002) (holding that purchases after revelations of fraud creates a conflict of interest with those who purchased stock before the disclosure). Here, Quantum's trading pattern will subject it to unique defenses, which will clearly prejudice the class.[2]

By contrast, Indiana Electrical Workers purchased its shares of JAKKS stock *throughout* the Class Period and continues to hold 500 shares. Indiana Electrical Workers faces no unique defenses as its investment patterns in JAKKS stock are typical – it purchased, sold and held JAKKS stock as

---

[2] *See also Epstein v. Am. Reserve Corp.*, 1988 U.S. Dist. LEXIS 3382, at *11-*12 (N.D. Ill. Apr. 20, 1988) (holding that purchases of stock late in a class period and "after the alleged fraudulent information had become known" renders a plaintiff subject to a unique defense that might "vitiate" typicality); *Koenig v. Benson*, 117 F.R.D. 330, 335-36 (E.D.N.Y. 1987) (citations omitted) (finding a plaintiff subject to unique defenses because (among other things) the plaintiff had bought stock after undisclosed losses became public. "There is a concern that if a named plaintiff is subject to 'unique defenses' concerning his individual reliance, then attention will be diverted away from issues common to the class. This would impair his ability to act as a representative for the class. Also, questions of individual reliance may place the materiality of the alleged misrepresentations into doubt.").

did countless other institutional and individual investors. Thus, Indiana Electrical Workers' claims are typical of the Class it seeks to represent.

Judge Harmon's opinion in *Enron*, 206 F.R.D. at 455-56, is instructive on this point. In *Enron*, Judge Harmon rejected the Florida public pension fund as the lead plaintiff even though it claimed a loss of over $300 million – far larger than the lead plaintiff Judge Harmon ultimately designated. The rejection was based on Florida's continuing to purchase Enron stock "after the initial public disclosure regarding Enron's overstatement its assets." *Id*. at 455. This created "issues and interests atypical of and antagonistic to those of the rest of the class" and "creates a conflict of interest with those who purchased stock before the disclosure." *Id*. Here, it is even worse. Quantum did not purchase **any** JAKKS shares **prior** to the first adverse revelations but rather, **all** of its shares were purchased **after** the initial negative disclosures. If Indiana Electrical Workers is not appointed as a lead plaintiff here, the Class will likely be jeopardized at the class certification stage of the litigation. Indeed, even if Quantum and Whiting are able to survive class certification – which we do not view as likely – their ability to fairly and adequately represent the class during the balance of the case will be hopelessly compromised by its unusual trading patterns which defense counsel will most assuredly make the focus of the case, shifting attention from their own clients' questionable conduct. It is for this very reason that courts have refused to appoint movants like Quantum and Whiting as lead plaintiffs.[3]

---

[3] In light of the unique defenses faced by Whiting and Quantum, if the Court prefers, Indiana Electrical Workers is prepared to serve as a co-lead plaintiff and its counsel as co-lead counsel, together with the other movants in order to properly protect the interests of the Class. *See Malasky v. IAC/InteractiveCorp*, 2004 U.S. Dist. LEXIS 25832 (S.D.N.Y Dec. 21, 2004) (Holwell, J.) (appointing what the court believed to be an institutional investor as a co-lead plaintiff and its counsel as co-lead counsel, even though it did not claim the largest financial interest, since the court concluded that only an institutional investor "can ensure adequate representation to the prospective class."). *Id.* at *13.

### III.    CONCLUSION[4]

For all the foregoing reasons, Indiana Electrical Workers respectfully requests that the Court: (i) appoint Indiana Electrical Workers as Lead Plaintiff in the Action; (ii) approve its selection of Lerach Coughlin as Lead Counsel; and (iii) grant such other relief as the Court may deem just and proper.

DATED:  February 8, 2005

LERACH COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
SAMUEL H. RUDMAN (SR-7957)
DAVID A. ROSENFELD (DR-7564)
MARIO ALBA JR. (MA-7240)


               /s/ David A. Rosenfeld.
DAVID A. ROSENFELD

200 Broadhollow Road, Suite 406
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)

[Proposed] Lead Counsel for Plaintiffs

---

[4]    At the January 25, 2005 conference held before the Court, the Court stated that it would be interested in hearing any alternative suggestions for how it should appoint lead plaintiff and lead counsel.  Indiana Electrical Workers concurs with Whiting and Quantum that the preferred method for determining which plaintiff and counsel should represent the class is in accordance with the procedure set forth in the PSLRA at 15 U.S.C.§ 78u-4 *et seq*.  The method proposed by the Court of conducting an auction for lead counsel has consistently been rejected in recent caselaw.  *See In re Cendant Corp. Litig*., 264 F.3d 201, 220 (3d Cir. 2001) (holding that, where an institutional investor is a lead plaintiff and agreed on terms of a retainer with its counsel, "the District Court erred in using an auction to appoint lead counsel; rather it should have done so pursuant to the terms of the Retainer Agreement.").  Here too, Indiana Electrical Workers has entered in to a retainer agreement with Lerach Coughlin, its choice of lead counsel, and respectfully requests that the Court honor such agreement.  Accordingly, under the analysis provided for in the PSLRA, Indiana Electrical Workers is the ***only*** movant that is not subject to unique defenses and its motion for appointment as lead plaintiff and approval of its selection of lead counsel should be approved.  *See* 15 U.S.C.§ 78u-4(a)(3)(B)(v) ("the most adequate plaintiff shall, subject to the approval of the court, select and retain counsel to represent the class.").

# Exhibit A

BUS      JAKKS Pacific Reports Third Quarter 2004 Financial Results
         Oct 19 2004  3:00


MALIBU, Calif.--(BUSINESS WIRE)--Oct. 19, 2004


        Reported Revenue and Net Income Surge 128.2% and 148.8%
            Company Raises 2004 Revenue and Earnings Guidance

   JAKKS Pacific, Inc. (NASDAQ:JAKK), a leading multi-brand company
that designs and markets a broad range of consumer products, including
toys and writing instruments, today announced record results for the
three- and nine-month periods ended September 30, 2004.
   Third quarter net sales increased 128.2% to $206.1 million in
2004, compared to $90.3 million in the comparable period last year.
Excluding non-cash, stock-based compensation charges and also a
one-time gain in 2003, net income for the period increased 195.8% to
$25.7 million, or $0.95 per diluted share, compared to $8.7 million,
or $0.35 per diluted share, for the third quarter of last year.
Reported net income for the third quarter 2004, including pre-tax
non-cash, stock-based compensation charges of $2.5 million, was $23.8
million, or $0.88 per diluted share, in 2004, an increase of 148.8%
over the $9.6 million, or $0.39 per diluted share, for the same period
last year, after a one-time, pre-tax gain of $0.7 million relating to
recoveries on a recall of one of the Company's products.
   The Company's net sales for the nine months ended September 30,
2004, increased 68.3% to $389.5 million, from $231.4 million during
the same period in 2003. Excluding pre-tax, non-cash, stock-based
compensation charges and a one-time net product recall charge, net
income for the nine-month period was $41.3 million, or $1.57 per
diluted share, an increase of 106.7% from $20.0 million, or $0.81 per
diluted share, in the comparable period last year. Reported net income
for the first nine months of 2004, including pre-tax charges of $8.5
million for non-cash, stock-based compensation in 2004 and a one-time
net charge of $2.0 million for the voluntary product recall in 2003,
was $34.7 million, or $1.32 per diluted share, compared to first
nine-month 2003 earnings of $18.7 million, or $0.76 per diluted share.
   "We are extremely pleased with our third quarter results and the
dramatic success of our TV Games line of products," said Jack
Friedman, Chairman and Chief Executive Officer, JAKKS Pacific. "Our
strategy to build an extensive portfolio of innovative non-licensed
and licensed products, while simultaneously improving operating
efficiencies, is reflected in the strength of our record revenue and
net income for the third quarter. We continue to expand our category
offerings and believe our marketing programs are fueling sales and
product placement, even in the face of a challenging retail
environment. The current pace of our business is robust as we head
into the holiday season, and due to this continuing strength, we are
raising our 2004 guidance. We now anticipate revenue for 2004 to be

Copyright (c) 2005

BUS        JAKKS Pacific Reports Third Quarter 2004 Financial Results
           Oct 19 2004  3:00

approximately $500 million and earnings to be in the range of $1.85 to $1.90 per diluted share before non-cash stock-based compensation charges, up from $440 million in sales and earnings in the range of $1.75 to $1.80 per diluted share.

"We are pleased with the performance of our new products obtained through the acquisition of Play Along, including our new Cabbage Patch Kids(R) dolls and Care Bears(R) plush and preschool learning toys."

Stephen Berman, President and Chief Operating Officer, stated, "Our ability to reinvent and expand our portfolio of brands is most evident in our traditional toys segment, which includes action figures, wheels, TV Games and plush dolls. We have maintained our industry-leading position in TV Games, and expect to continue to capitalize on this growing market in the coming quarters through innovation and new products based on top current and retro licenses. By the end of 2004, we will have a total of 12 TV Games(TM) products in the market, up from four at the end of 2003. We have also begun to expand our distribution of the games to international markets, including Europe, Australia and New Zealand. Looking to 2005, JAKKS will be introducing over 20 new exciting titles."

Mr. Berman continued, "We are very encouraged about the upcoming holiday season based on early responses from our retail partners. We anticipate that Care Bears, Cabbage Patch Kids and TV Games will top several `Hot Toy' lists for the 2004 holiday season, as they have been named to several already. We have secured prime placement at retailers nationwide for our TV Games line in the fourth quarter of this year, and expect our plush toys and World Wrestling Entertainment product lines, as well as other lines, to perform very well."

Mr. Berman concluded, "Our strong performance led to $86.4 million in cash flow from operations during the first nine months of 2004. We have over $218.5 million of working capital, including cash and equivalents and marketable securities of $151.9 million. Given the increasing strength of our balance sheet, we are well positioned to take advantage of acquisition opportunities and to continue to deliver both sales and earning expansion throughout 2004 and beyond."

The Company also announced that it is engaged in discussions with WWE concerning the restructuring of its toy license and with WWE and THQ with respect to the restructuring of the JAKKS THQ Joint Venture video games license agreement with WWE. The discussions are an outgrowth of certain litigation that has been pending between WWE and a former licensing consultant to WWE and a former employee of WWE, to which the Company is not a party. WWE has raised questions about the validity of the licenses as a result of certain transactions between the Company and that licensing consultant that occurred more than six years ago. The Company has denied any wrongdoing in connection with the transactions with the licensing consultant and maintains that they were unrelated to either the toy or video game license. If the discussions are satisfactorily concluded, the restructuring of the

Copyright (c) 2005

BUS        JAKKS Pacific Reports Third Quarter 2004 Financial Results
           Oct 19 2004   3:00

licenses may have an impact on the Company's future revenues and net income to an extent that is presently unknown. If the discussions with WWE and THQ are not satisfactorily concluded, the Company anticipates that litigation is likely to be commenced by WWE challenging the validity of the licenses and seeking compensatory and punitive damages, in which event the Company intends to vigorously defend itself against claims which it believes are without merit.

   Anyone interested will be able to listen to the teleconference, scheduled to begin at 9:00 a.m. EDT (6:00 a.m. PDT) on October 19, via the Internet at www.jakkspacific.com or www.CompanyBoardroom.com. These websites will host an archive of the teleconference for 30 days.

   A telephonic playback will be available from 11:00 a.m. EDT on October 19 through 12:00 a.m. EDT on November 2. Calling 800-642-1687 or 706-645-9291 for international callers, password "271443," can access the playback.

   JAKKS Pacific, Inc. is a multi-brand company that designs and markets a broad range of toys and leisure products. The product categories include: Action Figures, Arts
& Activity Kits, Stationery,
Writing Instruments, Performance Kites, Water Toys, Sports Activity Toys, Vehicles, Infant/Pre-School, Plush, Construction Toys and Dolls. The products are sold under various brand names, including Flying Colors(R), Play Along(R), Road Champs(R), Remco(R), Child Guidance(R), Pentech(R), Trendmasters(R), Toymax(R), Funnoodle(R), Go Fly a Kite(R) and ColorWorkshop(TM). The Company also participates in a joint venture with THQ Inc. that has exclusive worldwide rights to publish and market World Wrestling Entertainment(TM) video games. For further information, visit www.jakkspacific.com.

   This press release contains statements that are forward-looking statements within the meaning of the Private Securities Litigation Reform Act of 1995. These statements are based on current expectations, estimates and projections about JAKKS' business based, in part, on assumptions made by its management. These statements are not guarantees of JAKKS' future performance and involve risks, uncertainties and assumptions that are difficult to predict. Therefore, actual outcomes and results may differ materially from what is expressed or forecasted in such forward-looking statements due to numerous factors, including, but not limited to, those described above and the following: changes in demand for JAKKS' products, product mix, the timing of customer orders and deliveries, the impact of competitive products, and pricing and difficulties encountered in the integration of acquired businesses. The forward-looking statements contained herein speak only as of the date on which they are made, and JAKKS does not undertake any obligation to update any forward-looking statement to reflect events or circumstances after the date of this release.

Copyright (c) 2005

BUS    JAKKS Pacific Reports Third Quarter 2004 Financial Results
       Oct 19 2004  3:00

-0-
*T

```
                    JAKKS Pacific, Inc. and Subsidiaries
                    Condensed Consolidated Balance Sheets

                                      September 30,    December 31,
                                          2004             2003
                                      -------------   ----------------
                                            (In thousands)

                              ASSETS

Current assets:
  Cash and cash equivalents             $131,796         $118,182
  Marketable Securities                   20,091           19,345
  Accounts receivable, net               129,041           86,119
  Inventory, net                          49,315           44,400
  Prepaid expenses and other current
    assets                                27,989           16,762
                                      -------------   ----------------
  Total current assets                   358,232          284,808
                                      -------------   ----------------

Property and equipment                    44,632           43,473
Less accumulated depreciation and
  amortization                            32,786           31,751
                                      -------------   ----------------
  Property and equipment, net             11,846           11,722
                                      -------------   ----------------

Goodwill, net                            291,179          206,952
Trademarks
& other assets, net           24,347          24,785
Investment in joint venture                4,265            9,097
                                      -------------   ----------------
  Total assets                          $689,869         $537,364
                                      =============   ================


              LIABILITIES AND STOCKHOLDERS' EQUITY

Current liabilities:
  Accounts payable and accrued expenses  $126,712          $50,168
  Current portion of long-term debt           -                 19
  Income taxes payable                    13,021            2,021
                                      -------------   ----------------
  Total current liabilities              139,733           52,208
```

Copyright (c) 2005

BUS        JAKKS Pacific Reports Third Quarter 2004 Financial Results
           Oct 19 2004  3:00

```
                                          --------------   ----------------
Long-term debt, net of current portion        98,000              98,042
Deferred income taxes                          1,164               1,164
                                          --------------   ----------------
                                              99,164              99,206
                                          --------------   ----------------
  Total liabilities                          238,897             151,414

Stockholders' equity:
  Common stock, $.001 par value                  26                  25
  Additional paid-in capital                275,624             245,219
  Retained earnings                         175,774             141,055
  Accumulated other comprehensive
    income (loss)                              (452)               (349)
                                          --------------   ----------------
                                             450,972             385,950
                                          --------------   ----------------
  Total liabilities and stockholders'
    equity                                  $689,869            $537,364
                                          ==============   ================
```

                       JAKKS Pacific, Inc. and Subsidiaries
                     Third Quarter Earnings Announcement, 2004
                    Condensed Statements of Operations (Unaudited)

```
                           Three Months Ended    Nine Months Ended
                              September 30,        September 30,
                            2004       2003       2004       2003
                          ---------  ---------  ---------  ---------
                           (In thousands, except per share data)

Net sales                 $206,083    $90,308   $389,463   $231,358
Less cost of sales
  Cost of goods            100,754     42,949    194,120    118,169
  Royalty expense           22,661      9,741     38,013     16,951
  Amortization of tools and
    molds                      867      1,392      3,783      4,664
                          ---------  ---------  ---------  ---------
  Cost of sales            124,282     54,082    235,916    139,784
                          ---------  ---------  ---------  ---------
  Gross profit              81,801     36,226    153,547     91,574
Direct selling expenses     19,258      9,895     39,578     27,900
Selling, general and
  administrative expenses   30,961     13,879     66,166     35,909
Acquisition shut-down and
```

Copyright (c) 2005

BUS        JAKKS Pacific Reports Third Quarter 2004 Financial Results
           Oct 19 2004  3:00

|  | | | | |
|---|---:|---:|---:|---:|
| recall costs | — | (700) | — | 2,000 |
| Depreciation and amortization | 784 | 573 | 2,037 | 1,618 |
| Income from operations | 30,798 | 12,579 | 45,766 | 24,147 |
| Other (income) expense: | | | | |
| Profit from Joint Venture | (911) | (936) | (1,274) | (1,303) |
| Interest, net | 785 | 922 | 1,954 | 794 |
| Other | — | — | — | — |
| Income before provision for income taxes | 30,924 | 12,593 | 45,086 | 24,656 |
| Provision for income taxes | 7,112 | 3,023 | 10,367 | 5,918 |
| Net income | $23,812 | $9,570 | $34,719 | $18,738 |
| Earnings per share - diluted | $0.88 | $0.39 | $1.32 | $0.76 |
| Shares used in earnings per share - diluted | 27,019 | 24,629 | 26,343 | 24,716 |

*T

CONTACT:
JAKKS Pacific, Inc.
Genna Goldberg, 310-455-6235
 or
Integrated Corporate Relations
John Mills, 310-395-2215
-0- Oct/19/2004  7:00 GMT

Copyright (c) 2005