UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

—————————————————— x
                                    :    Case No. 04-CV-8807 (KMK)
IN RE JAKKS PACIFIC, INC.           :
SHAREHOLDERS CLASS ACTION           :
LITIGATION                          :
                                    :
—————————————————— x


MEMORANDUM IN FURTHER SUPPORT OF THE MOTION OF
INDIANA ELECTRICAL WORKERS FOR APPOINTMENT AS LEAD
PLAINTIFF AND FOR APPROVAL OF SELECTION OF LEAD COUNSEL
AND IN OPPOSITION TO THE TUCKER GROUP'S EFFORTS
TO BE APPOINTED CO-LEAD PLAINTIFF

Indiana Electrical Workers Pension Trust Fund IBEW ("Indiana Electrical Workers") respectfully submits this memorandum of law in further support of its motion for appointment as Lead Plaintiff and approval of its selection of Lerach Coughlin Stoia Geller Rudman & Robbins LLP ("Lerach Coughlin") as Lead Counsel.

## I.    PROCEDURAL HISTORY

On January 4, 2005, motions were filed by four movants, seeking appointment of each movant or movant group as lead plaintiff and approval of their respective selections of lead counsel. The Court subsequently requested that all of these motions be withdrawn, without prejudice, until after a pre-motion conference could be held on January 25, 2005.  At the January 25, 2005 conference, the Court told all of plaintiffs' counsel present that they could file new motions by February 1, 2005.  On February 1, 2005, only two movants filed motions: (i) Frank Whiting ("Whiting") and Quantum Equities LLC ("Quantum"); and (ii) Indiana Electrical Workers.

Then, ten days after the Court's stated deadline for filing motions had passed, counsel for the Tucker Group sent a letter to the Court stating that if the Court should prefer to appoint a co-lead plaintiff, then the Court should appoint "Tucker Group members Kenneth J. Tucker and/or Scott J. Pearlstone, both of whom stand ready and able to serve, because Tucker and Pearlstone's respective losses of $27,201 and $6,050 are in the aggregate and individually greater than the $5,164 loss reported by Indiana Electrical Workers."  *See* Letter to Hon. Kenneth M. Karas from Peter E. Seidman, dated Feb. 11, 2005 ("Seidman Letter"), at 2.[1]  In other words, counsel for the Tucker

---

[1]    Since the remaining members of the Tucker Group have reported smaller losses than Indiana Electrical Workers, and have not given any indication of their interest in pursuing this action, *see* Seidman Letter at 2, Indiana Electrical Workers focuses its opposition argument only on Kenneth J. Tucker ("Tucker") and Scott J. Pearlstone ("Pearlstone").

Group was concerned that Indiana Electrical Workers would prevail on its motion, but was unwilling to directly challenge Quantum or Whiting.

Shortly thereafter, opposition and reply memoranda were filed by Whiting/Quantum and Indiana Electrical Workers and oral argument on the motions of Whiting/Quantum and Indiana Electrical Workers was heard on March 28, 2005 ("Oral Argument"). At Oral Argument, the Court expressed its concerns about the motions of Whiting/Quantum and Indiana Electrical Workers. Specifically, the Court stated that Quantum is "going to have transaction causation issues which others are not going to have."[2] Transcript at 13.[3] Similarly, the Court described Whiting as an "investor four years removed from when the fraud is revealed. And, in light of that, how does he not have serious loss causation issues?" Transcript at 29.

With regard to Indiana Electrical Workers, the Court was concerned that, while under a First-In-First-Out ("FIFO") analysis, Indiana Electrical Workers had demonstrated that it had sustained a loss, the Court was unsure if Indiana Electrical Workers had also sustained a loss under a Last-In-First-Out ("LIFO") analysis. *See* Transcript at 15.

As set forth herein, even under a LIFO analysis, Indiana Electrical Workers has sustained a loss on its trading of JAKKS Pacific shares. Indeed, the size of its losses increases substantially when calculated using LIFO. *See* Exhibit A, attached hereto (calculating Indiana Electrical

---

[2]     As the Court is aware, defendants have submitted intra-day trading in JAKKS stock for October 19, 2004 to the Court. A review of this trading makes clear that JAKKS's October 19, 2004 early morning press release had virtually the same impact on the price of JAKKS's stock as did the disclosure of the filing of the WWE lawsuit later in the day. This erases any issue as to whether or not Quantum, a hedge fund that engages in unique trading strategies, bought with knowledge of the adverse news – it did.

[3]     References to "Transcript at __" are to the Transcript of the Oral Argument held before the Court on March 28, 2005, a copy of which is attached hereto as Exhibit B.

Workers' losses under FIFO and LIFO). For this reason alone, the Court should conclude that there is no need for Indiana Electrical Workers to have a co-lead plaintiff appointed with it.

Furthermore, the Court's previously-stated concerns about Whiting and Quantum will not be remedied by the appointment of Pearlstone and/or Tucker as a co-lead plaintiff. Specifically, Pearlstone, like Whiting, sold his last shares of JAKKS stock long before the disclosure of any fraud (his last shares were sold in July 2003). Similarly, Kenneth J. Tucker's trading patterns are very much like Quantum's since he purchased more than half of his shares of JAKKS on October 19, 2004 – after defendants had already made a partial disclosure of the problems it was having with World Wrestling Entertainment, and then he sold all of his shares on October 19, 2004.[4]

Moreover, Tucker and Pearlstone's attempt to reenter this case at this time should also be disallowed since they have already missed every deadline set out so far by the Court. They first failed to file a motion on time (deadline of February 1, 2005) and then failed to oppose the other motions in a timely manner (deadline of February 8, 2005). The only submission they made is the Seidman Letter – and that was only filed on February 11, 2005. In that letter, Mr. Seidman expresses his support for the motion of Whiting/Quantum and states that he believes that Whiting and Quantum have the largest financial interest of the other movants "and are otherwise adequate and typical." Seidman Letter at 1. What Mr. Seidman fails to disclose, however, is that the reason he has not opposed the motion of Whiting/Quantum is because both of his clients – Tucker and Pearlstone – are subject to the same unique defenses as Whiting/Quantum. How can Mr. Seidman now come and argue that his clients, who suffer from the same deficiencies as Whiting/Quantum, be

---

[4]     For the Court's convenience, attached hereto as Exhibit C is a copy of the two press releases issued on October 19, 2004 that relate to this action. The first press release was issued at 3:00 a.m. (before the opening of trading) and the second press release was issued at 3:16 p.m. (shortly before the close of regular trading).

- 3 -

appointed as co-lead plaintiffs? What value would be added by bringing them in to this case (especially since they have no motion before the Court)?[5]

For these reasons, and as set forth in its earlier submissions, Indiana Electrical Workers respectfully requests that the Court grant its motion and appoint it as lead plaintiff to represent the Class and approve of its selection of Lerach Coughlin Stoia Geller Rudman & Robbins LLP to serve as lead counsel.

## II.     ARGUMENT

### A.     Indiana Electrical Workers Has Sustained a Loss Both Under FIFO and LIFO and Is Ready, Willing and Able to Serve as Lead Plaintiff

As set forth in its earlier submissions, Indiana Electrical Workers's reported losses were calculated using a FIFO analysis. Under this approach, the 500 shares that Indiana Electrical Workers held prior to the start of the Class Period were offset against the first 500 shares that were sold during the Class Period. This results in a loss of $5,443.55.

Under the LIFO analysis, Indiana Electrical Workers' pre-Class Period purchases are excluded from the loss calculation since the most recently purchased shares are presumed to be the first shares sold (in other words, only purchases and sales made during the Class Period are considered). Even under this analysis, however, Indiana Electrical Workers has sustained a loss. Indeed, its loss under this approach increases to $8,928.80. *See* Exhibit A (attached hereto). Thus, there is no need to appoint any other investor as a co-lead plaintiff as the Indiana Electrical Workers

---

[5]     In any event, Tucker and Pearlstone's non-committal and half-hearted effort to become lead plaintiff ("I would like our clients to be considered conditionally" and "[I]t is our position that at this time that we believe that Mr. Isquith's clients are the most adequate in terms of the PSLR[A] analysis," Transcript at 36-37) appears to be completely lawyer-driven, which is exactly what the Reform Act was designed to prevent against. *See In re Razorfish, Inc. Sec. Litig.*, 143 F. Supp. 2d 304, 308 (S.D.N.Y. 2001) (Rakoff, J.) (stating that the Reform Act "contemplates that client-driven litigation will replace lawyer-driven litigation.").

also has a loss under LIFO, thereby addressing the Court's concerns at Oral Argument. *See*

Transcript at 23 (questioning whether Indiana Electrical Workers had a gain under LIFO).[6]

**B.    Pearlstone and Tucker Are Subject to the Same Unique Defenses as Whiting/Quantum**

**1.    Pearlstone is an In-and-Out Trader Who Has Not Suffered Any Harm As a Result of the Alleged Fraud**

Pearlstone made only one purchase of JAKKS stock in July 2003 and sold all of those shares

that he purchased on the very next day. As such, he has not held any shares of JAKKS since July

2003 and has not been harmed by defendants' actions. *See* Memorandum in Further Support of The

Motion of Indiana Electrical Workers For Appointment As Lead Plaintiff And For Approval Of

Selection Of Lead Counsel and in Opposition to the Competing Motion, dated February 8, 2005, at

3-5 for a full discussion of this issue.

**2.    Tucker Purchased the Majority of his Shares After the First Disclosure By Defendants and May Not Have Been Holding Any Shares After the Second Disclosure by Defendants**

Similar to Quantum, Tucker purchased and sold the majority of his shares on October 19,

2004. Those shares were certainly purchased after a partial disclosure of the problems at JAKKS –

and very possibly after the second disclosure near the end of the trading day. Accordingly, as a

result of the timing of his purchases, Tucker will be subject to unique defenses and is an inadequate

lead plaintiff. *See In re Cardinal Health, Inc. Sec. Litig.*, 2005 U.S. Dist. LEXIS 1431, at *42 (S.D.

---

[6]    It is Indiana Electrical Workers' understanding that the Court's primary interest in requesting additional information about its loss calculations was the Court's concern that Indiana Electrical Workers may have had a gain on its trading. As set forth above, even under a LIFO analysis, Indiana Electrical Workers has sustained a loss. Accordingly, we respectfully submit that the Court need not look at any other plaintiffs to serve as co-lead plaintiffs, especially those that do not have any pending motions for lead plaintiff, since the Court's concerns about Indiana Electrical Workers have been fully addressed.

Ohio Jan. 26, 2005) ("The timing of New Jersey's purchases undermines any causal nexus between the Defendants' alleged misrepresentation and the resulting injury"). A more complete discussion of this issue can be found at Memorandum in Further Support of The Motion of Indiana Electrical Workers For Appointment As Lead Plaintiff And For Approval Of Selection Of Lead Counsel and in Opposition to the Competing Motion, dated February 8, 2005, at 5-7.[7]

## III.    CONCLUSION

For all the foregoing reasons, and as set forth in its earlier submissions and at the Oral Argument, Indiana Electrical Workers respectfully requests that the Court: (i) appoint Indiana Electrical Workers as Lead Plaintiff in the Action; (ii) approve its selection of Lerach Coughlin as Lead Counsel; and (iii) grant such other relief as the Court may deem just and proper.

DATED:  April 4, 2005               LERACH COUGHLIN STOIA GELLER
                                      RUDMAN & ROBBINS LLP
                                    SAMUEL H. RUDMAN (SR-7957)
                                    DAVID A. ROSENFELD (DR-7564)
                                    MARIO ALBA JR. (MA-7240)


                                          /s/ David A. Rosenfeld
                                    _____
                                        DAVID A. ROSENFELD

                                    200 Broadhollow Road, Suite 406
                                    Melville, NY  11747
                                    Telephone:  631/367-7100
                                    631/367-1173 (fax)

                                    [Proposed] Lead Counsel for Plaintiffs

---

[7]     At the Court's suggestion, counsel for Indiana Electrical Workers attempted to resolve the issue of which class members would serve as lead plaintiff, but was unable to reach an agreement with the other plaintiffs.

Movant's Purchases, Sales and Losses Using Class Period Purchases and Sales (LIFO)                                      Jakks Pacific

| Name | Date | Shares Purchased | Share Price | Total Cost | Date | Shares Sold | Share Price | Total Proceeds | Total Gain (Loss)* |
|------|------|------------------|-------------|------------|------|-------------|-------------|----------------|---------------------|
| Indiana Electrical Workers Pension Trust Fund IBEW | 07/07/2003 | 1,100 | $13.31 | $14,636.60 | 7/24/2003*** | 500 | $11.60 | $5,797.50 | |
| Indiana Electrical Workers Pension Trust Fund IBEW | 07/08/2003 | 400 | $13.35 | $5,338.40 | 7/28/2003*** | 500 | $11.63 | $5,817.00 | |
| Indiana Electrical Workers Pension Trust Fund IBEW | 07/11/2003 | 900 | $13.70 | $12,330.00 | 07/30/2003 | 500 | $11.41 | $5,703.00 | |
| Indiana Electrical Workers Pension Trust Fund IBEW | 07/11/2003 | 1,100 | $13.79 | $15,169.00 | 07/31/2003 | 500 | $11.44 | $5,720.50 | |
| Indiana Electrical Workers Pension Trust Fund IBEW | | | | | 08/11/2003 | 500 | $10.27 | $5,137.00 | |
| Indiana Electrical Workers Pension Trust Fund IBEW | | | | | 08/11/2003 | 400 | $10.68 | $4,272.40 | |
| Indiana Electrical Workers Pension Trust Fund IBEW | | | | | 08/13/2003 | 600 | $10.16 | $6,097.80 | |
| | | | | | | | | | |
| Movant's Total | | 3,500 | | $47,474.00 | | 3,500 | | $38,545.20 | ($8,928.80) |
| | | | | | | | | | |
| | | | | | | | | | |
| *For shares held at the end of the class period, damages are calculated | | | | | | | | | |
| by multiplying the shares held by the average share price during the 90 | | | | | | | | | |
| calendar days after the end of the class period.  The price used is $18.57 | | | | | | | | | |
| as of December 31, 2004. | | | | | | | | | |
| | | | | | | | | | |
| **Class period purchases and sales | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| ***The 500 shares that were sold on both 7/24/03 and 7/28/03 were | | | | | | | | | |
| inadvertently listed on plaintiff's certification as one lump sale of 1000 | | | | | | | | | |
| shares on 7/28/03.  The correct dates of sale are set forth herein. | | | | | | | | | |

Movant's Purchases, Sales and Losses Using FIFO Methodology                                                                    Jakks Pacific

| Name | Date | Shares Purchased | Share Price | Total Cost | Date | Shares Sold | Share Price | Total Proceeds | Total Gain (Loss)* |
|---|---|---|---|---|---|---|---|---|---|
| Indiana Electrical Workers Pension Trust Fund IBEW | 07/07/2003 | 1,100 | $13.31 | $14,636.60 | 07/28/2003 | 500 | $11.63 | $5,817.00 | |
| Indiana Electrical Workers Pension Trust Fund IBEW | 07/08/2003 | 400 | $13.35 | $5,338.40 | 07/30/2003 | 500 | $11.41 | $5,703.00 | |
| Indiana Electrical Workers Pension Trust Fund IBEW | 07/11/2003 | 900 | $13.70 | $12,330.00 | 07/31/2003 | 500 | $11.44 | $5,720.50 | |
| Indiana Electrical Workers Pension Trust Fund IBEW | 07/11/2003 | 1,100 | $13.79 | $15,169.00 | 08/11/2003 | 500 | $10.27 | $5,137.00 | |
| Indiana Electrical Workers Pension Trust Fund IBEW | | | | | 08/11/2003 | 400 | $10.68 | $4,272.40 | |
| Indiana Electrical Workers Pension Trust Fund IBEW | | | | | 08/13/2003 | 600 | $10.16 | $6,097.80 | |
| Indiana Electrical Workers Pension Trust Fund IBEW | | | | | held | 500 | $18.57 | $9,282.75 | |
| | | | | | | | | | |
| Movant's Total | | 3,500 | | $47,474.00 | | 3,500 | | $42,030.45 | ($5,443.55) |
| | | | | | | | | | |
| | | | | | | | | | |
| *For shares held at the end of the class period, damages are calculated | | | | | | | | | |
| by multiplying the shares held by the average share price during the 90 | | | | | | | | | |
| calendar days after the end of the class period.  The price used is $18.57 | | | | | | | | | |
| as of December 31, 2004. | | | | | | | | | |
| | | | | | | | | | |
| **Using the FIFO (First In First Out) methodology, the first 500 shares sold were offset against the opening position | | | | | | | | | |
| | | | | | | | | | |
| Opening position of 500 shares. | | | | | | | | | |
| | | | | | | | | | |
| Fifoed Sales | 07/24/2003 | 500 | $11.60 | $5,797.50 | | | | | |
| | | | | | | | | | |
| Total | | 500 | | $5,797.50 | | | | | |
| | | | | | | | | | |

```
                                                              1
        53S7JAKM
  1     UNITED STATES DISTRICT COURT
  1     SOUTHERN DISTRICT OF NEW YORK
  2     ------------------------------x
  2
  3     IN RE JAKKS PACIFIC, INC.
  3     SHAREHOLDERS CLASS ACTION              04 Civ. 8807
  4     LITIGATION
  4
  5     ------------------------------x
  5
  6                                         March 28, 2005
  6                                         2:30 p.m.
  7
  7     Before:
  8
  8                     HON. KENNETH M. KARAS
  9
  9                                         District Judge
 10
 10                         APPEARANCES
 11
 11     LERACH COUGHLIN STOIA GELLER RUDMAN & ROBBINS LLP
 12          Attorneys for Indiana Electrical Workers
 12     BY:  DAVID A. ROSENFELD
 13
 13     WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP
 14          Attorneys for Quantum
 14     BY:  FRED T. ISQUITH
 15          GUSTANO BRUCKNER
 16     MILBERG WEISS
 16          Attorneys for Jonco and Tucker Group
 17     BY:  PETER E. SEIDMAN
 17
 18     FEDER KASZOVITZ ISAACSON WEBER SKALA BASS & RHINE LLP
 18          Attorneysf for
 19     BY:  MURRAY L. SKALA
 19          JONATHAN HONIG
 20
 20     SKADDEN ARPS SLATE MEAGHER & FLOM LLP
 21          Attorneys for Jakks
 21     BY:  JONATHAN J. LERNER
 22          MICHAELH. GRUENGLAS
 22          MAURA BARRY GRINALDS
 23          MARCO G. ARGENTIERI
 24
 25
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

53S7JAKM

1              (Case called)

2              (In open court)

3              MR. ROSENFELD:  David Rosenfeld on behalf of Indiana

4    Electrical Workers.

5              MR. ISQUITH:  Fred Isquith from Wolf Haldenstein New

6    York on behalf of Quantum and others.  And this is my colleague

7    Gustano Bruckner.

8              MR. SEIDMAN:  Good afternoon.  Pete Seidman with

9    Milberg Weiss on behalf of the Tucker Group.

10             THE COURT:  Good afternoon.

11             MR. LERNER:  Jonathan Lerner, Skadden Arps, for

12   defendants.  With me is my partner Michael Greunglas and my

13   partner Maura Grinalds, and Marco Argentieri down on the end.

14             MR. SKALA:  Murray Skala, attorney for the defendants,

15   from Feder Kaszovitz, and my colleague Jonathan Honig at the

16   other end.

17             THE COURT:  Good afternoon.

18             Well, I guess the back seat is the front row to this

19   show, is that right?  Nobody in the back has a position on who

20   ought to be lead plaintiff or lead plaintiff's counsel, is that

21   right?

22             MR. LERNER:  That's right, your Honor.

23             THE COURT:  All right.  I have had a chance to review

24   the voluminous materials that have been submitted on behalf of

25   the two proposed lead plaintiff groups on behalf of the Quantum

                    SOUTHERN DISTRICT REPORTERS, P.C.

                            (212) 805-0300

53S7JAKM

1   group and of course on behalf of the IBEW.

2          My take on this, having read the submissions and

3   having read the case law, is that I don't think anybody has the

4   ideal facts to back this up, and so I do have some questions,

5   and I think I may need some additional information.  I don't

6   know who is going to speak on behalf of the Quantum group.  Mr.

7   Isquith, is it going to be you?

8          MR. ISQUITH:  Yes, your Honor.

9          THE COURT:  Let's start with Quantum for a second.  My

10  understanding, in your submission, what you admit to is that

11  Quantum purchases and sells all the shares in Jakks on the 19th

12  of October, is that right?

13         MR. ISQUITH:  That's correct.

14         THE COURT:  All right.  And at 3 a.m. Jakks issues its

15  press release.  I assume that's 3 a.m. Eastern Time?

16         MR. ISQUITH:  No, that's incorrect.

17         THE COURT:  All right.

18         MR. ISQUITH:  Our client purchases its stock prior to

19  the issuance of the notice, as best as we know, and sells it

20  afterwards.

21         THE COURT:  You say the notice.  The notice of what?

22         MR. ISQUITH:  The press release.

23         THE COURT:  All right.  They certainly buy and sell

24  before WWE files the action that I have before me, is that

25  right?

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

4

53S7JAKM

1           MR. ISQUITH:  Of course.

2           THE COURT:  OK.  But you are also taking the view that

3     your client, that Quantum buys and sells before the press

4     release comes out?

5           MR. ISQUITH:  No, no.  No, your Honor.

6           THE COURT:  That's my point.

7           MR. ISQUITH:  As best as we know -- we could

8     probably -- as best as we know, Quantum purchases prior to the

9     press release coming out on the earnings and sells as the

10    market drops.  It sells as the stock comes down.

11          THE COURT:  So when is it, under your version of the

12    facts, the press release is issued?

13          MR. ISQUITH:  We believe it was issued sometime in the

14    afternoon, towards the close of the market.

15          THE COURT:  So what's the 3 a.m. thing that I read on

16    the press release?

17          MR. ROSENFELD:  I think Mr. Isquith is confusing the

18    two press releases.  There was a press release in the early

19    morning hours and then later on on the 19th shortly before the

20    close of the market.

21          THE COURT:  I am talking about the one where there is

22    this rosey earnings discussion and at the end, oh, by the way,

23    we are in some discussions with WWE, we did some fraudulent

24    stuff and they may sue us, that press release.  That comes out

25    at 3 in the morning on the 19th.  All right?  Quantum buys

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

5

53S7JAKM

1    after the 3 a.m. press release where Jakks announces that there

2    are some discussions, as they phrase it, but they at least

3    admit that the discussions may result in litigation.  Right?

4            MR. ISQUITH:  That's the early morning before the

5    market opens press release.

6            THE COURT:  Right.  And there is a statement I believe

7    in your brief where the price of Jakks remains flat.  And I

8    have representations from IBEW that the stock price loses about

9    a quarter of its value almost instantly that morning of the

10   19th.

11           MR. ROSENFELD:  Your Honor, I have a chart.

12           THE COURT:  That would be very helpful.  Have you

13   shown this to Mr. Isquith?

14           MR. ROSENFELD:  Of course.

15           THE COURT:  The record should reflect a color chart.

16           The chart that I have shows that it says prior to 1

17   a.m.

18           MR. ROSENFELD:  Bloomberg had it as midnight, one

19   version of Bloomberg, which is really 3 a.m.

20           THE COURT:  Before the market opens.

21           MR. ISQUITH:  Before the market opens.

22           THE COURT:  So Jakks makes this announcement, and at

23   least as of the close on the 18th the stock is trading

24   somewhere around 24 it looks like.  Is that right?

25           MR. ISQUITH:  That's correct, according to this chart.

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

53S7JAKM

1            THE COURT:  According to this chart.  Now, what the

2    chart doesn't tell me for sure -- maybe somebody can enlighten

3    me -- what happens to the stock at 9:31 on the morning of the

4    19th?  Let me ask this.

5            MR. ISQUITH:  I'm not certain.

6            THE COURT:  What happens between when the market opens

7    and Quantum buys the shares it buys?

8            MR. ISQUITH:  We're not certain, but it clearly has

9    fallen since the close, so one must assume it has dropped in

10   price.

11           THE COURT:  All right.  But what time of the day did

12   Quantum make its purchase?

13           MR. ISQUITH:  We're not certain.  We believe it was in

14   the a.m., but I'm not certain.

15           THE COURT:  All right.

16           MR. ISQUITH:  And then there is another press release.

17           THE COURT:  And then there is another press release

18   that comes out at what time?

19           MR. ISQUITH:  Towards the close of the market.

20           THE COURT:  That says what?

21           MR. ISQUITH:  Basically it says we have bigger

22   problems than anybody realized, and then the market really

23   starts dropping.

24           THE COURT:  Because also at the close is when WWE

25   files its lawsuit.  I think we are all in agreement on that.

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

7

53S7JAKM

1     The lawsuit doesn't get filed until after the bell, right?

2          MR. ISQUITH:  That's correct.

3          THE COURT:  All right.  Then what happens to the

4     stock --

5          MR. ROSENFELD:  It was disclosed right before the end

6     of the day.

7          MR. ISQUITH:  And they don't file until the next day.

8          MR. LERNER:  I'm informed by Feder Kaszovitz it was

9     filed at one o'clock in the afternoon.

10         THE COURT:  On the 19th.  All right.

11         Now when the public knew about that would be a

12    different story.

13         MR. SEIDMAN:  It was not publicized until after the

14    market closed on the 19th.

15         MR. ROSENFELD:  I think it was a little before the

16    end.  Close.

17         MR. SKALA:  I don't think that that's -- WWE

18    immediately issued a release in the afternoon.

19         MR. ROSENFELD:  That's correct.

20         MR. SKALA:  And I believe so did Jakks Pacific, before

21    the close of the market.  I think that WWE probably issued its

22    release simultaneously with the issuance of the complaint.

23         THE COURT:  All right.

24         MR. SKALA:  So I think by 1 o'clock the news was

25    already extant that the litigation had started.

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

8

53S7JAKM

1            THE COURT:  All of this jumping up and down from all

2    corners, I need some more information.  This just highlights

3    that.

4            There are a couple of other things I am going to need.

5    I am keenly aware of what the statute says and this should have

6    been done within 60 days, but since I need all the information

7    from all the interested would-be lead plaintiffs, I don't think

8    there is any prejudice to getting some additional information

9    that I think can be obtained fairly expeditiously.

10           It appears as though at a minimum we can all agree

11   that Quantum makes its purchase after the first press release,

12   which is a fairly ominous press release.  I will grant you it

13   doesn't say we've been sued.  I will grant you it doesn't say

14   that the company is about to lose X percent of its earnings or

15   anything like that, but it certainly is a very severe warning

16   shot that there is a storm on the horizon.  Even after that is

17   when your client purchases.

18           So in looking at this -- and I recognize that I am

19   supposed to look at Rule 23 both in determining whether or not

20   you get the rebuttable presumption and also whether or not the

21   presumption can be rebutted.  And Judge Becker has that very

22   useful analysis in his case in the Third Circuit.

23           In any event, when you look at this from the

24   standpoint of assuming for the movement you've got a financial

25   loss that you can assert here, and it's a couple hundred

9

53S7JAKM

1    thousand dollars, how is it that you get by the unique defense

2    problem where you have a reliance issue?  I mean you have a

3    transaction causation issue, do you not?

4              MR. ISQUITH:  No.

5              THE COURT:  Tell me why.

6              MR. ISQUITH:  Because that press release clearly

7    doesn't bring the market into knowledge.  It's the second press

8    release that does.

9              THE COURT:  How do you explain the drop in the price?

10             MR. ISQUITH:  Well, that doesn't mean it's the

11   greatest press release in the world, your Honor.

12             THE COURT:  But it's a press release.

13             MR. ISQUITH:  But it also doesn't mean that all the

14   news is out.  Indeed, your Honor, if that were correct you

15   would have to cut the class period off earlier than even any of

16   the parties have done so, because then you are saying the news

17   is out.

18             THE COURT:  No, because I think the time frame we are

19   talking about here and everybody agrees ends on the 19th.

20             MR. ISQUITH:  No.  We all agree it ends at the close

21   of business on the 19th.

22             THE COURT:  OK.  Well, I will grant you that nobody

23   has delineated for me a certain hour of the day on the 19th,

24   but the class period has been -- everybody has defined it by at

25   least a definition of a day as October 19.

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

53S7JAKM

1      MR. ISQUITH:  And if the news comes out at 1 o'clock

2   in the morning and your Honor is convinced -- which I urge your

3   Honor not to be convinced --

4      THE COURT:  I'm not convinced of anything.  Wait.

5   Wait.  The whole purpose of this is to have argument, and I'm

6   trying to sort this out.  I have imperfect information.  I

7   haven't reached any conclusions -- let me underscore that --

8   and I am not making any fact findings.  I am trying to do what

9   you are supposed to do in oral argument, which is play devil's

10  advocate as to your position.  So go ahead.

11     MR. ISQUITH:  If the class period ends with the

12  announcement, then the close of business on the 18th would be

13  the end of the class period, which no one urges here.

14     THE COURT:  But Quantum is in a unique situation here

15  at least among the three, because you buy and sell after the

16  first press release, which you have to admit certainly doesn't

17  suffer from so much vagueness that the market took it as

18  neutral news.

19     Because at least what's been represented to me, the

20  price drops that day, and it would seem as though the only

21  event that would precipitate that drop would be the news in the

22  release that says we've got problems with WWE.

23     And certainly, while I agree it's not as concrete as a

24  lawsuit, the release does portend the possibility of a lawsuit,

25  predicts it accurately, as it turns out, within 12 hours.  So

11

53S7JAKM

1    forgetting the class period for a minute, tell me why you don't

2    have a reliance issue.

3         MR. ISQUITH:  Because, your Honor, the full story does

4    not come out until the second press release.  And I think all

5    plaintiffs here agree on that.  The question of whether this is

6    unique or not is, with all due respect to the court, you have

7    to examine the word "unique".  This is not a unique defense.

8    This would be a defense presumably that would be available or

9    not available to everyone who purchased prior to the last press

10   release and after the first.

11        Our client -- the market was, we believe, not fully

12   advised and informed, but from the trading pattern it does not

13   appear to have been fully advised or informed.  They were

14   looking at the earnings release.  It was only later that the

15   information concerning the lawsuits and the other problems

16   began to be absorbed in the market.

17        THE COURT:  You keep saying fully advised.  I am

18   wondering whether that's the test here.  Because clearly the

19   market had a reaction, had a pretty strong reaction to the news

20   that was in the press release.  And while the market didn't

21   know for sure the allegations that WWE would make, the market

22   certainly took the news in the press release seriously enough

23   to chop the price significantly.  Put it this way, if the press

24   release comes out on October 19th of '04, you don't think for

25   purposes of statute of limitations that wouldn't be enough for

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

12

53S7JAKM

1    inquiry notice?

2            MR. ISQUITH:  It might be.

3            THE COURT:  So if it's enough for inquiry notice, why

4    wouldn't it be enough for at least -- unique to your client as

5    to the other plaintiffs that I have had presented as possible

6    lead plaintiffs, it is unique because you are the only one in

7    this who bought and sold after this ominous press release.

8            MR. ISQUITH:  Well, the word unique, your Honor,

9    suggests -- I don't mean to debate with you -- the word unique

10   suggests something unique to this particular purchase that

11   doesn't exist for the rest of the class, anybody else in the

12   class or in the class generally.

13           The broader answer to your question is just because

14   there are things out there does not mean that people who

15   purchased at that time were advised or fully advised of the

16   problem.  And that's really the test.

17           With all due respect, your Honor, you are confusing

18   two different questions that the law asks.

19           THE COURT:  Tell me what questions I should ask then.

20           MR. ISQUITH:  The question that deals with inquiry

21   notice --

22           THE COURT:  Look, I was using it by way of analogy.  I

23   get the difference.  I'm talking about the inquiry that needs

24   to be made for these purposes.  And one of the things -- even

25   assuming I look at the adequacy and typicality question after

53S7JAKM

1    you are presumed to be the lead plaintiff, based on the amount

2    of loss that you have suffered here, even assuming I ignore the

3    sort of third component of the threshold question, you are in a

4    different situation than certainly IBEW and presumably others

5    who bought before that early a.m. press release --

6            MR. ISQUITH:  Sure.

7            THE COURT:  -- who can at least argue they bought

8    based on a fraud in the market, that the stock was artificially

9    inflated, they bought because they didn't know or didn't have

10    any reason to know about the problems with WWE.

11            Your client can't make that claim.  Your client is

12    going to have -- separate from any problems anybody else would

13    have in terms of loss causation -- you are going to have

14    transaction causation issues which others are not going to

15    have.

16            MR. ISQUITH:  For the moment I wish to pass on that,

17    because I disagree with your Honor.

18            THE COURT:  But tell me why.  Tell me why.  Tell me

19    why.

20            MR. ISQUITH:  Because, your Honor, if the information

21    is not out there, then my client does not have transaction

22    causation problems.  There is a whole series of cases.  The

23    fact that information differs throughout a class period does

24    not mean that people are not within a single class of misled

25    shareholders until the news is out.

14

53S7JAKM

1          And to continue my thought, were it a fact that you

2     were going to segment this class between the notices, then of

3     course it's not IBEW that steps into the shoes of the next most

4     adequate class member.  It's Mr. Seidman's client that steps

5     into those shoes.

6          THE COURT:  We may be heading there.  I may agree with

7     you.  Right?

8          MR. ISQUITH:  OK?  Because assuming you were going to

9     do that -- which I urge you not to do -- then what the law says

10    is, well, you look at the next person with the loss to fill

11    those shoes.  We do not believe, with all due respect -- we

12    believe that notice was not sufficient to put the class or

13    shareholders who purchased during that day on full notice and,

14    therefore, they have both transactional reliance and they have

15    loss causation.

16         THE COURT:  All right.  Mr. Rosenfeld, you have been

17    standing there patiently for a while.

18         MR. ROSENFELD:  Just to comment on that last point,

19    Mr. Seidman currently does not have a motion pending before the

20    court.  After his initial withdrawal, he never subsequently

21    filed a motion.

22         THE COURT:  I'm fully aware of that.  But, you know,

23    the problem is I didn't think any of the three -- and even if I

24    group Whiting and Quantum -- are clean.  And I think that to

25    the extent that I'm thinking about your suggestion, cobbling

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

53S7JAKM

1    together coleads, I may hear from Mr. Seidman.  Some of the

2    pluses his client brings makes up for some of the minuses some

3    of the others bring.  But since you're standing up, let me ask

4    you this.  Your client has got a whopping $5,000 loss at best,

5    and that's assuming we go with FIFO.  And the cases vary on

6    whether or not that's appropriate.  I mean there is a

7    forecaster test, there is FIFO.  At the end of the day can you

8    tell me at the end of the day if you did anything with LIFO?

9            MR. ROSENFELD:  I have not calculated according to

10    LIFO.

11            MR. ISQUITH:  You have it the other way around.  They

12    should have done it -- again, I am sorry to interrupt.

13            THE COURT:  Look --

14            MR. ISQUITH:  If they had properly used FIFO, they

15    have a loss -- excuse me -- a gain.  If they properly used

16    LIFO.

17            First in and first out, they didn't calculate it

18    properly and they never calculated it by LIFO.  Had they done

19    that, maybe they would have a gain.

20            MR. ROSENFELD:  We did properly calculate it by FIFO.

21    My client was holding 500 shares before the start of the class

22    period, and he continues to hold 500 shares.

23            THE COURT:  I have to say I thought it was more of a

24    LIFO issue.  Tell me what's deficient about the FIFO.

25            MR. ISQUITH:  The problem is as follows.  They have

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

16

53S7JAKM

1    500 shares coming into the class period.  One of the first ones

2    out when they sell it -- the first ones out when they sell them

3    are the ones they had beforehand.  On those shares, because the

4    stock was inflated, they sold inflated stock, they gained.

5         You have to count that gain, the benefit they gained

6    from the fraud.  So they sell stock that they hold beforehand,

7    at the end of the day they still hold 500 shares, but when all

8    those transactions are netted out they actually have gain, not

9    a loss.

10        You know, you have pointed out that this union of

11   union trustees who have five or $6,000 loss at best, which is

12   still less, by the way, than my second client, bring this

13   action and presume to sit as fiduciaries and pay enormous

14   attention to this lawsuit.  And another question that your

15   Honor has to ask himself -- and I am sure your Honor has asked

16   it -- is with even a $6,000 loss, assuming that's what it is,

17   what are these fiduciaries, who have all these other things on

18   their plate, what are they doing with this lawsuit when they

19   have so much else and so many other lawsuits and so many other

20   things to contend with?

21        THE COURT:  I'm trying to find out whether there is

22   even a loss, because I think maybe it's small change for IBEW.

23   Whether it's a 5,000 loss or 1,000 gain, I am just trying to

24   address your specific objection to their claim that they even

25   lost here.  That's what I'm trying to get to the bottom of.  Go

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

17

53S7JAKM

1    ahead.

2            MR. ROSENFELD:  The way we calculated the losses,

3    which as Mr. Isquith just presented it, we do have a loss, I

4    mean we have asked for him to show us a copy of his

5    calculation.  We have not seen that.  If you could provide us

6    that, we would be happy to respond.  But he just threw out a

7    number in the papers, and we could not back into that number,

8    so we don't understand how he arrived at that figure.  But it

9    is still our position that we have a $5,000 loss.

10            THE COURT:  All right.  Based on FIFO.

11            MR. ROSENFELD:  Correct.

12            THE COURT:  You haven't done a LIFO analysis.

13            MR. ROSENFELD:  No.

14            THE COURT:  All right.  Now, what about the point

15    that, you know, $5,000 is a lot of money in some respects but

16    in this type of litigation and representing the kind of client

17    you do, what's the sweat off their nose over $5,000?  Why are

18    they someone who is going to represent the class vehemently?

19            MR. ROSENFELD:  This is a long-term client of the firm

20    which is involved in other cases as well in which they have

21    larger losses and some of them have smaller losses.  Their

22    board of trustees has authorized the litigation.  They review

23    each case on the merits, and they think it's a strong case on

24    the merits.  They think based on that they want to recover

25    their money.

53S7JAKM

1          THE COURT:  So they are doing you a favor?

2          MR. ROSENFELD:  Not doing us any favor.

3          THE COURT:  I don't understand.  They are a long-term

4     client of the firm's, and they are willing to go along with

5     this as just kind of the way you described it to me.

6          MR. ROSENFELD:  I'm saying this is a client who

7     understands these types of cases, and they understand when

8     there is a serious fraud involved, and they feel this is a

9     pretty strong case on the merits, and that's why they want to

10    pursue it.

11         THE COURT:  It's a strong case on the merits, but it's

12    a strong case that even if it's a slam dunk they get $5,000.

13    When all is said and done they get $5,000.

14         MR. ROSENFELD:  When you are have been defrauded you

15    tend to want to pursue something against that.

16         THE COURT:  Sure, I understand that in the abstract.

17    But, you know, if you're a multimillionaire and you drop $20 on

18    the street, are you going to go back and look for it at two in

19    the morning?  You know, there is something to the fact that

20    $5,000 to IBEW is not the same as $500,000 to IBEW, and it's

21    not the same as $5,000 to say a Whiting.

22         So why are they going to vigorously pursue this given

23    that in relative terms this is not the biggest judgment on

24    their to-do list?

25         MR. ROSENFELD:  That's correct, it is not the largest

19

53S7JAKM

1    amount of money that they've lost in other cases, but they

2    understand their fiduciary obligations, and institutional

3    investors have routinely stepped into these kinds of cases.

4    And we represent institutional investors in other cases with

5    smaller losses, as do other firms.  Institutional investors

6    have become aware of their fiduciary obligations to

7    representing the class, and especially when there are no other

8    institutional investors that have stepped in to adequately

9    represent the class.  They feel it's their duty to step in and

10   fight for the shareholders.

11           THE COURT:  What about Mr. Isquith's point that the

12   class period has been misdefined, that it should be cut off at

13   October 18th?  If that press release is --

14           MR. ROSENFELD:  Mr. Isquith said it should be cut off

15   October 18th?  That would cut off his clients.

16           MR. ISQUITH:  That was the logic of your Honor's

17   argument, not mine.  What I said, your Honor, is if you

18   followed your Honor's question to where it was going, you would

19   cut the class period off, which none of the plaintiffs urge --

20           THE COURT:  Well --

21           MR. ISQUITH:  -- including us.

22           THE COURT:  But none of the plaintiffs are in your

23   shoes, because they at least bought before the press release

24   came out.

25           MR. ROSENFELD:  The majority of the courts that have

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

53S7JAKM

 1    considered that issue of investors who purchased after partial

 2    disclosure, such as the Enron case and in that case the court

 3    disqualified the presumptive lead plaintiff there who had the

 4    larger financial interest.

 5         THE COURT:  That's why I'm asking Mr. Isquith all

 6    these questions.  I read the cases.  I understand what they

 7    say.  And I understand Mr. Isquith's point, that, you know,

 8    we're not here to try the case, but it certainly does stand

 9    out, Mr. Isquith, as an issue that Quantum has that nobody else

10    has.  We will get to Whiting in a minute, because there is a

11    whole separate set of issues there.  But it does seem as

12    though, at least with the people who have formally moved to be

13    lead plaintiff, you are in that unique position.

14         MR. ISQUITH:  I hear you.  I'm not going to repeat

15    what I said.

16         THE COURT:  Is the Enron case wrongly decided?

17         MR. ISQUITH:  Enron case is a very odd decision.

18         THE COURT:  That's a yes.

19         MR. ISQUITH:  That is a yes.  And to go into the Enron

20    decision is to go into a number of things.  If you really want

21    me to --

22         THE COURT:  Talk to me.

23         MR. ISQUITH:  Enron is a very interesting situation.

24         THE COURT:  I am here to work this out.

25         MR. ISQUITH:  And no one worked on Enron candidly more

                    SOUTHERN DISTRICT REPORTERS, P.C.

                           (212) 805-0300

53S7JAKM

1     than Mr. Lerach's firm.

2             Enron starts, as I understand it, with the Lerach firm

3     representing client A.  Lo and behold in comes -- and, by the

4     way -- and I have said this, and I will say it today, and I

5     have said it privately -- no one did a better job in developing

6     that case for plaintiffs firm than Bill Lerach, and that's a

7     very, very important thing to understand about the Enron case.

8

9             Bill goes out there.  Bill's firm goes out there and

10    before they become lead plaintiff and lead counsel they dig in

11    and they do the kind of job that plaintiffs lawyers should be

12    doing but usually don't have the capital or incentive to do.

13            Lo and behold in comes the second plaintiff with a

14    considerable loss.  Lerach's firm then goes out and gets client

15    C -- and I no longer remember what the names of the plaintiffs

16    are -- with a very considerable loss, a very considerable loss,

17    the difference being insignificant in the real world of money

18    between the first contestant and the second client.

19            What really goes on in Enron is the judge is saying

20    here is a firm -- and you can read the opinion -- that's done

21    all this work, there is an insignificant difference between the

22    plaintiffs, we're going to appoint the lawyer and the plaintiff

23    who has done all this work.  That's how you explain Enron, and

24    that's what happened there.  It was a terrific job they did.

25            THE COURT:  I'm moved to tears.

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

53S7JAKM

1          MR. ROSENFELD:  I'm not going to dispute that, your

2     Honor.

3          MR. ISQUITH:  Make my day.

4          MR. ROSENFELD:  But, your Honor, there are many

5     findings in the case as to why our clients were more

6     appropriate to serve as the plaintiffs.  In addition, Judge

7     Harmon pointed out this additional fact, that it was the

8     Florida State Board of Administration in that case which had

9     purchased Enron stock after certain disclosures came out about

10    problems existing in the company.

11         THE COURT:  It's not that the market is fully

12    informed, but there are certainly alarms going off.

13         MR. SEIDMAN:  I am speaking actually in my capacity as

14    a supporter of Mr. Isquith's clients in Quantum Equity.  I

15    think at the risk of digressing, I believe that the discussion

16    of the Enron case and some of the other matters that have been

17    raised here brings us far afield of the type of analysis that

18    is required by the PSLRA, which is really in some ways quite a

19    bit simpler than this discussion would suggest.

20         The PSLRA says that the court shall appoint the movant

21    with the largest financial interest in the litigation who is

22    otherwise adequate and typical.

23         THE COURT:  You know what, I thought that's what we

24    were doing.

25         MR. SEIDMAN:  I don't mean any disrespect by this, but

53S7JAKM

1    I think the first step of this is determining which client has

2    the largest financial interest in this case, and I would agree

3    that this court does not have sufficient information to really

4    make that determination, because in this district courts most

5    often determine financial interest using the type of

6    analysis -- either a LIFO or net net analysis -- and there is

7    nobody among the movants that has really presented that

8    analysis.

9         And I think it's important in this case because if you

10   were persuaded for other reasons to appoint the IBEW as lead

11   plaintiff, it would create a big problem down the road if you

12   were to find that in fact under the financial interest

13   calculation endorsed by courts in this District they actually

14   made money.

15        So I think as an initial matter if your Honor is going

16   to require additional information -- which I think perhaps it

17   should under these circumstances -- then the first thing it

18   should require is an analysis of the relative financial losses

19   of the movants on a net net basis, as have other courts in this

20   District that have decided lead plaintiff motions in major,

21   major securities litigations.  OK, so that's number one.

22        THE COURT:  Look, I have already said I'm hearing

23   about these heroic efforts in Enron, and I feel hurt we haven't

24   seen anything like that here.  There is a lot of information,

25   all kidding aside, and I'm looking through these papers and I'm

24

53S7JAKM

1   getting one-page spread sheets that don't tell me very much.

2   And, Mr. Seidman, I couldn't agree with you more, and I am

3   going to set a rigorous schedule to get complete information

4   that I think is essential to applying exactly what the statute

5   requires me to apply in figuring out who is most appropriate.

6   Go ahead, Mr. Seidman.

7           MR. SEIDMAN:  I guess my second point is that with

8   respect to the adequacy and typicality requirements, I believe

9   that the court is correct in examining the timing of Quantum's

10  purchases and sales, because the PSLRA requires a prima facie

11  showing of adequacy and typicality, and here we have on the

12  face of the papers a trading pattern that perhaps raises

13  questions on their face about the adequacy and typicality of

14  Quantum.

15          However, I think that facially the issue is properly

16  resolved in favor of Quantum Equities for a couple of reasons.

17  First for the reasons that Mr. Isquith has already put forward.

18          The second thing I would note is that the disclosure

19  in the early hours of the 19th is quite a bit different --

20  assuming that it can be called a disclosure, by the way -- the

21  press release is quite a bit different.  It says that Jakks and

22  Worldwide Wrestling were having a dispute over how these

23  licenses were obtained, in that if the dispute were not

24  resolved then there would be litigation.  OK?

25          Now, I agree it's not a market neutral statement, but

53S7JAKM

1    it's a fairly tepid one.

2            THE COURT:  But if it's tepid, why did the stock drop

3    like a rock?

4            MR. SEIDMAN:  I would point out, just looking if at

5    nothing else the chart that Mr. Rosenfeld provided, that the

6    drop was, I believe, just as great after, you know, upon

7    release of the second release.

8            THE COURT:  Well, actually I don't think the chart can

9    be read with that sort of hour-by-hour precision.  I don't

10   believe it was meant to be.

11           MR. ROSENFELD:  No, it's not.

12           MR. SEIDMAN:  I would say at the least it's something

13   we should be providing additional information on, because I

14   believe you can get -- provided not too much time has

15   elapsed -- that you can get real-time or close to real-time

16   stock quotes.

17           But I would say that the second disclosure, where it

18   becomes clear that this is a RICO action, it subjects the

19   company to treble damages, that there is a widespread elaborate

20   scheme pled.  I mean the quality of this disclosure is very

21   different than the initial disclosure, and I think that Mr.

22   Isquith has made the other arguments.  I mean there are people

23   who bought on the morning of the 19th and sold after that

24   second announcement.

25           THE COURT:  It's called shorting.  I have a hedge fund

                    SOUTHERN DISTRICT REPORTERS, P.C.

                          (212) 805-0300

53S7JAKM

1   here that's buying after this press release that says, for the

2   record, if the discussions with WWE and THQ are not

3   satisfactory concluded, the company anticipates that litigation

4   is likely to commenced by WWE, challenging the validity of the

5   licenses and seeking compensatory and punitive damages, in

6   which event the company intends to vigorously defend itself.

7           All that happened is that the lawsuit they said likely

8   was going to be brought was brought.

9           MR. SEIDMAN:  I believe if you parse that, with all

10  due respect, it says if the discussions are not successful a

11  lawsuit will likely be brought.  I would say there are two

12  conditions that have to be met.

13          THE COURT:  And the market woke up and read that and

14  brushed aside that little typical sort of it's all rosey but if

15  it's not it's really going to hell, and that's what happened,

16  that's why the stock dropped.

17          MR. SEIDMAN:  I would agree.

18          MR. ISQUITH:  That I assume is rhetorical.

19          THE COURT:  Yes.

20          MR. ISQUITH:  Thank you.

21          THE COURT:  I appreciate you asking that question.

22  I'm happy to answer it.

23          MR. ISQUITH:  The record can sometimes be very cold.

24          THE COURT:  Go ahead.

25          MR. SEIDMAN:  I would think we would have to look a

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

53S7JAKM

1    little more closely about the way the stock moved during this

2    period.

3              THE COURT:  I agree.

4              MR. SEIDMAN:  And with respect to Quantum, they may or

5    may not be a hedge fund, but the fact is that someone could

6    very reasonably have read that release in the morning, have

7    determined that there was some bad news about the stock and

8    decided that likely nothing would come of it, and seen it as a

9    buying opportunity and purchased them, and then was

10   disappointed when the certainty was revealed.  That would not

11   be an irrational purchase.  I could see myself doing something

12   like that.

13             THE COURT:  And you know what, that's why you're a

14   lawyer, and a very good one, but a lawyer nonetheless.

15             MR. ROSENFELD:  I think Quantum already conceded it is

16   a hedge fund and engages in sophisticated trading activities.

17             THE COURT:  Look, I think it's very important that

18   lawyers who have done a very good job of making legal arguments

19   provide me with some more facts, because I do think you,

20   Mr. Rosenfeld, have got to do a detailed analysis using

21   different methods, not just the FIFO method you chose to use,

22   but to use LIFO, as well as the sort of four-factor test that

23   other courts have used, and tell me how much IBEW lost here.

24   Because I think at best right now you are looking at a $5,000

25   loss and at worst you may be looking at a gain.  And of course

53S7JAKM

1     that's relevant here.  I think everybody needs to figure out

2     what happened to the stock, and I assume that's not something

3     that's hard to get.

4              MR. ROSENFELD:  It is a little difficult past 30 days

5     to get intraday trading.  We are going to endeavor to try that.

6              THE COURT:  Then I think you should try hard, because

7     I have heard about all the Enron efforts that you all made, so

8     the bar is very high now.  The expectations are very high.  But

9     I think it's important because I think it potentially is very

10    problematic for Quantum to have bought after this news is

11    released -- which the market, at least from what I've been

12    told, treated with great concern -- and it certainly goes to

13    transaction causation.

14             Now let's talk for a minute, if we can, about your

15    other client, Mr. Isquith, Whiting.

16             MR. ISQUITH:  Yes, sir.

17             THE COURT:  He is the opposite problem of Quantum,

18    because he buys and sells for years before this, even this

19    early hour press release.

20             MR. ISQUITH:  Yes, your Honor.

21             THE COURT:  Why does he not have a loss causation

22    problem?

23             MR. ISQUITH:  Well, your Honor, the answer to that is

24    Mr. Whiting might have a loss causation problem.  We don't

25    believe at this stage of the game we can say he does have a

53S7JAKM

1   loss causation problem.  And so again when you look at the

2   cases and you look at who has been appointed the lead plaintiff

3   in the post-1995 regime, and you look at the four factor tests

4   or the Olsen factors and the others, Mr. Whiting stands right

5   there with a whole lot of other people as someone who says,

6   listen, I lost too, and I had a lot invested, and I bought a

7   lot of stock during the class period, and like so many

8   others -- and we have cited some cases to you, and we can cite

9   legions more -- I too should be a lead plaintiff.

10          THE COURT:  I think the four factors goes to the

11   financial stake that he might have in the case, but they don't

12   address the question as to whether or not the presumption that

13   favors him -- because he does lose here -- whether that

14   presumption isn't rebutted by the fact that he is an in-house

15   investor four years removed from when the fraud is revealed.

16   And in light of that, how does he not have serious loss

17   causation problems?

18          MR. ISQUITH:  Let me again rephrase what I said,

19   because I have no other argument than this, your Honor.


20          It may turn out when the proof is in that in-and-out

21   traders, and even my client, have such a loss causation problem

22   that they have no losses -- no compensable damages would be the

23   way to put it.  Losses they have.  Damages under the law that

24   can be compensated for, possibly no.  But that's a long time in

25   the future.

30

53S7JAKM

1        In the meantime, your Honor, under the PSLRA regime

2    there have been a host of cases, some of which we cite -- we

3    could get you more -- where in-and-out traders are in fact

4    under these kinds of circumstances appointed because of their

5    losses.  And the reluctance of the court at this time, rightly

6    so, to penetrate the loss causation issues and others to

7    determine as a matter of fact that in-and-out traders do not

8    have compensable damages --

9        THE COURT:  But I don't know how long in the future it

10   is, because let's assume you walked out of here today and

11   Whiting is appointed lead counsel.  The gang of lawyers behind

12   you will have their motion to dismiss here, you know, probably

13   by the time we get leaves on the trees.

14       MR. ISQUITH:  In fact, your Honor, their answer was

15   due today, but we have forgiven them.

16       THE COURT:  I mean seriously, look in Lotel it was all

17   about a motion to dismiss that Judge Pollack granted and the

18   Circuit affirmed.  I don't know that there has to be that much

19   fact inquiry here in a situation where somebody buys and sells

20   four years before there is any hint of any fraud being revealed

21   here.  I'm not prejudging the issue, but I'm saying playing

22   devil's advocate that's the motion that's coming.  You know

23   that.

24       MR. ISQUITH:  It is one of the motions.

25       THE COURT:  It's one of them.

53S7JAKM

1          MR. ISQUITH:  They will throw them all at us.  They
2     always do.
3          THE COURT:  Right.  But let's assume for the sake of
4     argument if IBEW has a loss here, they don't have that problem.
5          MR. ISQUITH:  They don't have that problem.
6          THE COURT:  And I appreciate that there are some cases
7     that at least allow for the possibility of in-and-out
8     plaintiffs staying in as lead, but there are certainly a
9     plethora of cases, to use your word, that DQ the plaintiffs as
10    well.
11         Is it not at least to some extent a comparative
12    analysis?  If it came down to maybe Whiting versus Quantum,
13    maybe that's one way to look at it, but if there is another
14    player here, institutional investor who has lost some money,
15    I'm not really sure what you would say that rebuts the
16    presumption against that.
17         MR. ISQUITH:  You always need to select the person you
18    feel more comfortable with, I grant you that.  I see zero
19    benefit and zero favor of an institutional plaintiff.  I know
20    you said that in passing in our colloquy today but, again,
21    there are at least two players in this plaintiffs court who
22    have filed complaints and/or motions that stand between my
23    clients and the union.  So your Honor needs again to do, with
24    all due respect, the analysis that the PSLRA requires, the kind
25    of analysis that Mr. Seidman was describing.

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

53S7JAKM

1          THE COURT:  You keep saying that as if what I'm asking

2     you to do is give you the standard for a TRO.  I'm giving you

3     the language in the statute, and I am asking you if typicality

4     and adequacy are what we have to consider.  I give you that the

5     loss, however you calculate it, certainly Whiting and Quantum

6     have lost more money than IBEW.  I give you that, but...

7          MR. ISQUITH:  And IBEW less so than Mr. Seidman's

8     client.

9          THE COURT:  Who is not in right now.

10         MR. ISQUITH:  Oh, no.

11         MR. SEIDMAN:  I would like to speak to that at some

12    point.

13         MR. ISQUITH:  And less money than Shutts & Noble's

14    clients who withdrew.

15         THE COURT:  I agree with that.

16         MR. ISQUITH:  And I'm not trying to hurt these guys.

17         THE COURT:  No, you will all shake hands when it's

18    over, I'm sure.  But the question goes beyond just loss.  I

19    mean you know that.

20         And the PSLRA, which you all read -- you guys know it

21    very well -- requires that these kinds of things have to be

22    considered.  They have to be considered vis-a-vis simply your


23    client.  But as you point out, I have to look at this with a

24    bigger picture and figure out what makes sense in terms of who

25    is going to lead this class.

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

53S7JAKM

1           MR. ISQUITH:  So far so good, we agree.

2           THE COURT:  I think that's what we have been doing the

3    whole time.  What I have been screaming for -- again I'm not

4    literally screaming -- but what I'm asking for is some more

5    information that I think is appropriate under the

6    circumstances.  I understand the difference between getting

7    some information and not trying the case.  All right?  And I

8    appreciate there are differences potentially in the claims and

9    defenses among a lead plaintiff and others in the class.  I get

10   that, and the cases all talk about that.

11          But the cases all talk about a situation where if it

12   is a situation where the would-be lead plaintiffs, the

13   situation is so different that it deserves the class, then I

14   have to consider that as well.  That is if the presumption is

15   rebutted regarding typicality and adequacy.

16          MR. ISQUITH:  Give us a date and we will fill you in

17   on this information.

18          THE COURT:  But I think at least in terms of the facts

19   as to Whiting, there is nothing knew in terms of when Whiting

20   bought, and that I need to learn.  And it comes down then to

21   the legal question of whether or not in this circumstance the

22   in-and-out investor is the appropriate lead plaintiff.  Do you

23   agree with me on that?

24          MR. ISQUITH:  Agreed.  Give us a date, and we will

25   fill you in.

34

53S7JAKM

1              MR. ROSENFELD:  I do have another chart which is

2    similar to the type of graph we distributed in the Enron case,

3    and this shows that Whiting did sell all of its shares early on

4    in the class period.

5              Now, Mr. Isquith made reference to this plethora of

6    cases which support his position in which in-and-out investors

7    have been appointed lead plaintiffs.  I am not really aware of

8    what those cases are.  It's my understanding, and my reading of

9    the case law shows that the majority of cases have held that

10   in-and-out purchasers do not have any financial interest in

11   pursuing a fraud claim.

12             THE COURT:  I think I read a Northern District of

13   California case.

14             MR. ROSENFELD:  There were one or two but certainly

15   not a plethora.

16             The extent of my research has shown that the majority

17   of the cases, Caraker case in the Northern District of Texas,

18   the Caitlin and Wireless cases in Virginia, the Ardwini case

19   right here in the Southern District of New York, and a case in

20   California, have all found that in-and-out investors do not

21   have a financial interest in this litigation.

22             THE COURT:  So it seems to me that that's a legal

23   call.  There is no more facts we can learn about Whiting.  OK.

24             Anything else on that issue?  Mr. Seidman you wanted

25   to be heard about his status in all of this?

53S7JAKM

1          MR. SEIDMAN:  Yes, I would like to -- I think at this
2     point our clients would like to be considered as lead plaintiff
3     movants.  We filed a motion as required by the statute on the
4     day that we were supposed to file it.  In deference to your
5     Honor's rules, we withdrew the motion and submitted a letter
6     that essentially stated much of what was in our motion and
7     explained why we thought our client should be appointed as lead
8     plaintiff.  Then your Honor asked that motion be submitted
9     again.  And in lieu of submitting a motion we supported Quantum
10    Equity and Mr. Whiting but noted in that letter on February 11
11    that in the event the court were to consider joining other
12    movants with Mr. Isquith's clients that our client be
13    considered as well in that.
14          I have not anticipated what is transpiring here today
15    exactly, but --
16          THE COURT:  Well, what has transpired that changes
17    your mind?
18          MR. SEIDMAN:  Well, frankly I thought -- and perhaps
19    mistakenly so -- that between Mr. Whiting and Quantum Equities,
20    that they would be -- I thought there was a fairly good chance
21    that they would be appointed as lead plaintiff, and I do
22    believe they would make the most adequate lead plaintiffs under
23    the analysis required by the PSLRA.
24          THE COURT:  But not enough so that you now want to add
25    your name into the ring, right?

36

53S7JAKM

1              MR. SEIDMAN:  Well, I'm saying that I would like our

2      clients to be considered conditionally, and if that is

3      distasteful for any number of reasons, then we would like to be

4      considered.

5              We do have a motion that was made pursuant to the

6      statute, and so we would like the opportunity to be heard on

7      all of these issues and for the court to recognize that we did

8      file a motion pursuant to the --

9              THE COURT:  I do recognize it.  And, you know, the

10     thing that I haven't asked anybody to explicitly address is

11     IBEW's suggestion that maybe there be a little bit of a pairing

12     up here of coleads.  And as I alluded to you earlier, based on

13     the facts as I have them -- and I recognize I am missing some

14     key facts -- it may very well be that whatever inadequacies one

15     plaintiff may have can be made up by another.  But there is no

16     question as to the counsel.  You are all very experienced, very

17     successful counsel, so that's not the issue.

18             The issue really is which plaintiff is going to best

19     serve the class under the PSLRA.  And the cases do talk about

20     in certain circumstances permitting coleads.  And I suppose one

21     thing that you may all want to think about in the time while we

22     are getting some of these last facts gathered up is if you go

23     for broke or more formal alliance to resolve the issue.

24             But for the record, are you reactivating your motion?

25             MR. SEIDMAN:  Well, it's our position -- it is our

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

53S7JAKM

1    position that at this time that we believe that Mr. Isquith's

2    clients are the most adequate in terms of the PSLR analysis.

3            If your Honor were to find that one of his clients

4    were inadequate for whatever reason, then we would like the

5    opportunity to have our clients considered in a colead position

6    with the remaining client.

7            THE COURT:  OK.

8            MR. ROSENFELD:  Your Honor, the PSLRA makes it very

9    clear that there is a deadline for filing lead plaintiff

10   motions, in other words, to give everybody an opportunity to

11   review the pleadings in a timely matter.

12           Mr. Seidman did not timely file the motion.  Even his

13   letter I think was sent in the oppositions briefs, not with the

14   initial motions, so he never filed a motion in a timely basis.

15           THE COURT:  Let's assume you are right about that.

16   What if I on my own think it makes sense.

17           MR. ROSENFELD:  Then I think we should be granted an

18   opportunity to review his client's certification and

19   transactions and review and reopen all the briefing with regard

20   to that issue.

21           THE COURT:  Mr. Isquith?

22           MR. ISQUITH:  Your Honor, I was going to suggest the

23   following.  By the way, as Mr. Rosenfeld probably knows --

24   maybe not -- his own firm has dropped a motion, and there were

25   problems, and then reentered into the fray, so to speak, and I

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

53S7JAKM

1   think that was fine.

2           THE COURT:  But I think I was the cause of that.

3           MR. ISQUITH:  No.

4           THE COURT:  Because I thought --

5           MR. ISQUITH:  No, different job.

6           MR. ROSENFELD:  Your Honor --

7           MR. SEIDMAN:  May I speak for just one minute?

8           THE COURT:  Wait, wait, wait.  Hang on.  That sounded

9   to me like a little bit of a cheap shot if you are talking

10  about a different case.

11          MR. ISQUITH:  It was not intended to be.  It was meant

12  to be the answer to -- they didn't file a motion, and they

13  dropped out, or they didn't continue, and therefore they're

14  barred in some way and judges shouldn't do anything.

15          THE COURT:  But, I mean, first of all, Mr. Seidman is

16  a big boy and he can defend himself.  Second, I'm not here to

17  sort of see who has clean hands.  A moment ago you were

18  praising Mr. Rosenfeld's firm.

19          MR. ISQUITH:  I thought they did a good job.

20          THE COURT:  Let's let that go.

21          MR. ISQUITH:  My point is this.  My point is this.  If

22  I'm hearing the court correctly today, and understanding the

23  court's questions today, it is that your Honor and the court

24  are troubled still by who should lead this litigation from the

25  plaintiff's side.

                    SOUTHERN DISTRICT REPORTERS, P.C.

                         (212) 805-0300

53S7JAKM

1              If so, I see no trouble, and I see only benefit to the

2     court -- although I would very much like to be standing here

3     alone at the end of the day, even today, which is not going to

4     happen.  Even though that's the case, we might as well examine

5     all the possible contenders.  And if that means Mr. Seidman,

6     his client wishes to rejoin this procedure, I think they should

7     be allowed to do so.  I think only the court and the class can

8     benefit from that kind of examination.  That's all I was going

9     to say.

10             MR. ROSENFELD:  Your Honor, I'm not sure what kind of

11    backroom arrangement these two firms have between themselves,

12    but apparently there is something going on that each one is

13    willing to support the other one as necessary.

14             THE COURT:  I thought we wanted lawyers to get along.

15             Look, I think that even if there was a timeliness

16    issue with respect to what Mr. Seidman is saying -- again, I

17    haven't decided anything, but let's assume for the sake of

18    argument that I thought it made sense to pair up your client

19    with the Tucker Group.  Let's assume just for the sake of

20    argument that I thought was going to best represent the class.

21    I don't know that I need a formal motion.  I think I would need

22    consent.  If they didn't want to go along with it, that's fine,

23    they wouldn't have to go along with that.  I don't think I need

24    a formal motion.  Do you disagree with that?

25             MR. SEIDMAN:  No.

53S7JAKM

1          MR. ROSENFELD:  No, not under that circumstance.

2          THE COURT:  Right.  Just so you know, Mr. Seidman may

3    be picking up on something I threw out earlier which is that

4    I'm glad he is here today.  I read his motion papers.  I read

5    the letter he submitted on behalf of his good friend Mr.

6    Isquith here, but I do think regardless of whether or not the

7    proof be these lead plaintiffs be perfect -- I don't think

8    that's the question.  I have to pick the best among the lot.

9    But I also have discretion to see if there is a way to cobble

10   together two.  The question is who among the plaintiffs, if

11   there can't be one, who among the ones who want the prize can

12   work and best represent the class.

13         I can't answer that today, because I do think there

14   are some key facts missing.  And we will spell it out here at

15   the end.  I would like to see if I could get those gaps -- fill

16   those gaps within a week.  We had to get lead plaintiff and

17   counsel on board, but I'm not prepared to rule today, because I

18   think there are some key things I need.  All right?

19         All right.  So I think what I need is from

20   Mr. Rosenfeld, a complete valuation analysis on whether or not

21   IBEW gained or lost.  Both sides can do this.  They can do

22   their own analysis.

23         And, Mr. Isquith, the same with you.  I want to make

24   sure I'm clear on exactly what you say each of your clients

25   lost in this.  And, Mr. Seidman, for the sake of argument you

                    SOUTHERN DISTRICT REPORTERS, P.C.

                         (212) 805-0300

41

53S7JAKM

1    should do the same.

2          There are some questions I would have as to your

3    clients in this in terms of my understanding is -- and again I

4    may be operating on imperfect data -- that at least some of the

5    shares that were purchased were on the 19th, so after this

6    first press release came out, is that right?

7          MR. SEIDMAN:  That's correct, your Honor.

8          THE COURT:  OK.  And all of the shares among the

9    Tucker group had been sold, and were sold --

10         MR. SEIDMAN:  No, I believe.

11         THE COURT:  That's what I want to make sure.

12         MR. SEIDMAN:  I'm not sure about that.

13         THE COURT:  All right.  So I think you need to let me

14   know that, because those are obviously questions that go to

15   Quantum, and they certainly go to the valuation analysis and

16   who wins the presumption prize based on the greatest financial

17   loss.

18         And I think to the extent anybody can provide it, I

19   think an hour-by-hour recording of what the stock did that day.

20   I mean, I realize it may be gone, but, look, I was in this

21   business about 20 years ago, so you guys are probably much more

22   current than I can imagine.

23         MR. BRUCKNER:  We tried off Bloomberg to obtain this

24   information several weeks ago, and it was no longer available.

25         MR. ROSENFELD:  Bloomberg was the 30-day intraday

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

42

53S7JAKM

1    charts which we tried as well.

2           THE COURT:  See if you can do it.  Because I do think

3    it matters here.  It may not be dispositive but it's certainly

4    relevant, and it's not the kind of thing that needs recovery.

5           I do think it's important for deciding this.  If you

6    can't find it, fine, but why don't we say if you can get me the

7    answer to these questions by a week from today.

8           And if you need more time and you think the time will

9    be productive, I will hear you on that.  But if you have made a

10   diligent effort and you can't find the data, then don't worry

11   about asking for more time.  And if I need to bring you all

12   back, I will.  Otherwise, I will just decide it on the papers.

13   And, as I said, Mr. Seidman, I have read your papers, so, you

14   know, Mr. Rosenfeld, if you want to respond, can you get me

15   something by a week from today?

16          MR. ROSENFELD:  Sure, your Honor.

17          MR. SEIDMAN:  If Mr. Rosenfeld were to respond --

18          THE COURT:  Then you want a reply.

19          MR. SEIDMAN:  Then I would want a reply.

20          THE COURT:  Oh.

21          MR. SEIDMAN:  That only seems fair.

22          THE COURT:  Then that's going to delay this another

23   week while I give you a chance to respond.

24          MR. SEIDMAN:  I suggest that Mr. Rosenfeld simply

25   dispense with his response.

43

53S7JAKM

1           MR. ROSENFELD:  I appreciate that.

2           THE COURT:  And you're an environmentalist too, right?

3           If he wants to respond, I will let you respond.

4    That's fine.

5           So by the 4th?  Are we talking about the 4th?  You get

6    me the data.  And Mr. Rosenfeld your response.  And then by the

7    11th, Mr. Seidman, your reply to Mr. Rosenfeld's response.

8           Then I will let you know the week of the 11th if I

9    need to see you all again, or if I can just decide this on the

10   papers.

11          You know what also may be helpful?  If people want to

12   suggest coleads, now is your time to do it.  If you don't want

13   to, then tell me that.  If you want to go it alone, then let me

14   know.  But I will leave it all to you all to let me know if you

15   have any suggestions along those lines.  All right?

16          MR. ROSENFELD:  By the 4th?

17          THE COURT:  By April 4th, yeah.

18          All right.

19          Now, I believe in the back, do we have counsel from

20   the related cases?

21          UNIDENTIFIED SPEAKER:  Yes, your Honor.

22          THE COURT:  All right.  These are the two derivative

23   actions, your Honor?

24          UNIDENTIFIED SPEAKER:  Yes, your Honor.

25          THE COURT:  All right.  I think in light of this if

                    SOUTHERN DISTRICT REPORTERS, P.C.

                         (212) 805-0300

44

53S7JAKM

1    you want to work out some kind of schedule with counsel for

2    Jakks, I know that there had been -- maybe you just want to

3    resubmit what you already gave to me.  Then maybe I will

4    reconsider that.  I thought when I had asked you to come here

5    today I thought this would be resolved here.  That's before I

6    had a chance to take a hard look and realized I needed some

7    more hard data.

8            UNIDENTIFIED SPEAKER:  I'm glad you invited us anyway.

9    It was very instructive.

10           THE COURT:  Always glad to be instructive.

11           If you want to get together with counsel for Jakks,

12   let me know what you want to do.  If you want to resubmit what

13   you already submitted --

14           UNIDENTIFIED SPEAKER:  Yeah.

15           THE COURT:  The dates seemed a little loose to me,

16   which is why I wanted you here.  But the idea is fine, about

17   having it be contingent upon the filing of a consolidated

18   complaint.

19           Is that OK with you, Mr. Lerner?

20           MR. LERNER:  With respect to the derivative actions, I

21   think we had a slightly different regime.  I think your Honor

22   characterized this somewhat loose, the agreement we had with

23   the class.

24           THE COURT:  Separate.

25           MR. LERNER:  Yes.

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

45

53S7JAKM

1          THE COURT:  I didn't have a chance to comment at the
2   last go-around because I hadn't seen the schedules that had
3   been agreed to by you and counsel and counsel in the derivative
4   action.  I think I issued an order.  I didn't sign the stips,
5   and I think I asked counsel to come here today so we could work
6   out a schedule, but that was based on the assumption that I
7   would resolve the question of colead and we would have a
8   schedule in this case, and then that would help with the
9   schedule of the derivative actions.
10          MR. LERNER:  What we had agreed with the derivative
11   plaintiffs pending before your Honor was to await the
12   adjudication of the class motions.
13          THE COURT:  Right.
14          MR. LERNER:  That's essentially what we have agreed.
15          THE COURT:  Right.  But what happened was there was a
16   schedule that was contingent upon this being resolved, and I
17   didn't sign it because I thought it would be resolved today,
18   and we could just have that.
19          Now that it's clear to me it's not going to be
20   resolved, what I'm saying is if you want, I will take a look at
21   what you have all submitted to me, and I may tweek some of the
22   days, but it will still be contingent upon this issue being
23   resolved.
24          MR. LERNER:  We're comfortable with that.
25          THE COURT:  Is that all right with everybody?

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

46

53S7JAKM

1        UNIDENTIFIED SPEAKER:  Yes, your Honor.

2        UNIDENTIFIED SPEAKER:  Yes, your Honor.

3        MR. LERNER:  With respect to the class action, I think

4    I need your Honor to just continue our time.  I think it was

5    extended until your Honor scheduled or resolved the lead

6    counsel issue.  And we would just ask your Honor to continue

7    that until we are in a position to schedule consolidated

8    amended complaint in a dismissal motion.

9        THE COURT:  Any opposition to that?

10        MR. ISQUITH:  No.

11        THE COURT:  What I think makes sense to do is grant

12    the request and then say that your time to respond to the

13    consolidated complaint will be extended.

14        We should put in a contingency.  I could say April

15    11th, but then you will have to get me another letter.

16        Why don't we say -- why can't we say it's continued

17    until -- why wouldn't it be the ordinary time until the

18    ordinary time it is filed?  Any problems with that?  I realize

19    there is no date there.

20        MR. ISQUITH:  It may be, your Honor, that since the

21    normal time is ten days --

22        MR. LERNER:  I was about to say.

23        MR. ISQUITH:  And they want more than that, why don't

24    we do something along the lines of the following:  That after

25    the lead plaintiff is appointed -- and I assume your Honor will

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

53S7JAKM

1    then be ordering a consolidated complaint and set a date for

2    that -- that the plaintiffs and defendants will provide your

3    Honor with a schedule for their response, the defendant's

4    response to the amended complaint.  Presumably they are going

5    to make a motion, and any briefing schedule, and we will get

6    that into your Honor.

7           THE COURT:  We are saying the same thing, but what I

8    would say then is that we will do this:

9           That the time they respond, to give you all time to

10   work out the revised date, the time to respond to the complaint

11   is extended until ten days after I issue a ruling on lead

12   plaintiff, lead plaintiff's counsel.  Then that gives you time

13   to work out the schedule.

14          MR. ISQUITH:  OK.

15          THE COURT:  All right?

16          MR. LERNER:  That's perfectly fine, your Honor.

17          THE COURT:  All right.  All right.  Good.  Anything

18   else we should take up while we're all here?  All right.  Thank

19   you all for coming.

20                                - - -

21

22

23

24

25

BUS         JAKKS Pacific Reports Third Quarter 2004 Financial Results
            Oct 19 2004  3:00


MALIBU, Calif.--(BUSINESS WIRE)--Oct. 19, 2004

Reported Revenue and Net Income Surge 128.2% and 148.8%
            Company Raises 2004 Revenue and Earnings Guidance

   JAKKS Pacific, Inc. (NASDAQ:JAKK), a leading multi-brand company
that designs and markets a broad range of consumer products, including
toys and writing instruments, today announced record results for the
three- and nine-month periods ended September 30, 2004.
   Third quarter net sales increased 128.2% to $206.1 million in
2004, compared to $90.3 million in the comparable period last year.
Excluding non-cash, stock-based compensation charges and also a
one-time gain in 2003, net income for the period increased 195.8% to
$25.7 million, or $0.95 per diluted share, compared to $8.7 million,
or $0.35 per diluted share, for the third quarter of last year.
Reported net income for the third quarter 2004, including pre-tax
non-cash, stock-based compensation charges of $2.5 million, was $23.8
million, or $0.88 per diluted share, in 2004, an increase of 148.8%
over the $9.6 million, or $0.39 per diluted share, for the same period
last year, after a one-time, pre-tax gain of $0.7 million relating to
recoveries on a recall of one of the Company's products.
   The Company's net sales for the nine months ended September 30,
2004, increased 68.3% to $389.5 million, from $231.4 million during
the same period in 2003. Excluding pre-tax, non-cash, stock-based
compensation charges and a one-time net product recall charge, net
income for the nine-month period was $41.3 million, or $1.57 per
diluted share, an increase of 106.7% from $20.0 million, or $0.81 per
diluted share, in the comparable period last year. Reported net income
for the first nine months of 2004, including pre-tax charges of $8.5
million for non-cash, stock-based compensation in 2004 and a one-time
net charge of $2.0 million for the voluntary product recall in 2003,
was $34.7 million, or $1.32 per diluted share, compared to first
nine-month 2003 earnings of $18.7 million, or $0.76 per diluted share.
   "We are extremely pleased with our third quarter results and the
dramatic success of our TV Games line of products," said Jack
Friedman, Chairman and Chief Executive Officer, JAKKS Pacific. "Our
strategy to build an extensive portfolio of innovative non-licensed
and licensed products, while simultaneously improving operating
efficiencies, is reflected in the strength of our record revenue and
net income for the third quarter. We continue to expand our category
offerings and believe our marketing programs are fueling sales and
product placement, even in the face of a challenging retail
environment. The current pace of our business is robust as we head
into the holiday season, and due to this continuing strength, we are
raising our 2004 guidance. We now anticipate revenue for 2004 to be

Copyright (c) 2005

approximately $500 million and earnings to be in the range of $1.85 to
$1.90 per diluted share before non-cash stock-based compensation
charges, up from $440 million in sales and earnings in the range of
$1.75 to $1.80 per diluted share.
     "We are pleased with the performance of our new products obtained
through the acquisition of Play Along, including our new Cabbage Patch
Kids(R) dolls and Care Bears(R) plush and preschool learning toys."
     Stephen Berman, President and Chief Operating Officer, stated,
"Our ability to reinvent and expand our portfolio of brands is most
evident in our traditional toys segment, which includes action
figures, wheels, TV Games and plush dolls. We have maintained our
industry-leading position in TV Games, and expect to continue to
capitalize on this growing market in the coming quarters through
innovation and new products based on top current and retro licenses.
By the end of 2004, we will have a total of 12 TV Games(TM) products
in the market, up from four at the end of 2003. We have also begun to
expand our distribution of the games to international markets,
including Europe, Australia and New Zealand. Looking to 2005, JAKKS
will be introducing over 20 new exciting titles."
     Mr. Berman continued, "We are very encouraged about the upcoming
holiday season based on early responses from our retail partners. We
anticipate that Care Bears, Cabbage Patch Kids and TV Games will top
several `Hot Toy' lists for the 2004 holiday season, as they have been
named to several already. We have secured prime placement at retailers
nationwide for our TV Games line in the fourth quarter of this year,
and expect our plush toys and World Wrestling Entertainment product
lines, as well as other lines, to perform very well."
     Mr. Berman concluded, "Our strong performance led to $86.4 million
in cash flow from operations during the first nine months of 2004. We
have over $218.5 million of working capital, including cash and
equivalents and marketable securities of $151.9 million. Given the
increasing strength of our balance sheet, we are well positioned to
take advantage of acquisition opportunities and to continue to deliver
both sales and earning expansion throughout 2004 and beyond."
     The Company also announced that it is engaged in discussions with
WWE concerning the restructuring of its toy license and with WWE and
THQ with respect to the restructuring of the JAKKS THQ Joint Venture
video games license agreement with WWE. The discussions are an
outgrowth of certain litigation that has been pending between WWE and
a former licensing consultant to WWE and a former employee of WWE, to
which the Company is not a party. WWE has raised questions about the
validity of the licenses as a result of certain transactions between
the Company and that licensing consultant that occurred more than six
years ago. The Company has denied any wrongdoing in connection with
the transactions with the licensing consultant and maintains that they
were unrelated to either the toy or video game license. If the
discussions are satisfactorily concluded, the restructuring of the

Copyright (c) 2005

BUS          JAKKS Pacific Reports Third Quarter 2004 Financial Results
             Oct 19 2004  3:00

licenses may have an impact on the Company's future revenues and net
income to an extent that is presently unknown. If the discussions with
WWE and THQ are not satisfactorily concluded, the Company anticipates
that litigation is likely to be commenced by WWE challenging the
validity of the licenses and seeking compensatory and punitive
damages, in which event the Company intends to vigorously defend
itself against claims which it believes are without merit.

    Anyone interested will be able to listen to the teleconference,
scheduled to begin at 9:00 a.m. EDT (6:00 a.m. PDT) on October 19, via
the Internet at www.jakkspacific.com or www.CompanyBoardroom.com.
These websites will host an archive of the teleconference for 30 days.

    A telephonic playback will be available from 11:00 a.m. EDT on
October 19 through 12:00 a.m. EDT on November 2. Calling 800-642-1687
or 706-645-9291 for international callers, password "271443," can
access the playback.

    JAKKS Pacific, Inc. is a multi-brand company that designs and
markets a broad range of toys and leisure products. The product
categories include: Action Figures, Arts
& Activity Kits, Stationery,
Writing Instruments, Performance Kites, Water Toys, Sports Activity
Toys, Vehicles, Infant/Pre-School, Plush, Construction Toys and Dolls.
The products are sold under various brand names, including Flying
Colors(R), Play Along(R), Road Champs(R), Remco(R), Child Guidance(R),
Pentech(R), Trendmasters(R), Toymax(R), Funnoodle(R), Go Fly a Kite(R)
and ColorWorkshop(TM). The Company also participates in a joint
venture with THQ Inc. that has exclusive worldwide rights to publish
and market World Wrestling Entertainment(TM) video games. For further
information, visit www.jakkspacific.com.

    This press release contains statements that are forward-looking
statements within the meaning of the Private Securities Litigation
Reform Act of 1995. These statements are based on current
expectations, estimates and projections about JAKKS' business based,
in part, on assumptions made by its management. These statements are
not guarantees of JAKKS' future performance and involve risks,
uncertainties and assumptions that are difficult to predict.
Therefore, actual outcomes and results may differ materially from what
is expressed or forecasted in such forward-looking statements due to
numerous factors, including, but not limited to, those described above
and the following: changes in demand for JAKKS' products, product mix,
the timing of customer orders and deliveries, the impact of
competitive products, and pricing and difficulties encountered in the
integration of acquired businesses. The forward-looking statements
contained herein speak only as of the date on which they are made, and
JAKKS does not undertake any obligation to update any forward-looking
statement to reflect events or circumstances after the date of this
release.

Copyright (c) 2005

BUS         JAKKS Pacific Reports Third Quarter 2004 Financial Results
            Oct 19 2004  3:00


-0-
*T
                    JAKKS Pacific, Inc. and Subsidiaries
                    Condensed Consolidated Balance Sheets

|  | September 30, 2004 | December 31, 2003 |
|---|---|---|
|  | (In thousands) | |

### ASSETS

| | | |
|---|---|---|
| Current assets: | | |
| Cash and cash equivalents | $131,796 | $118,182 |
| Marketable Securities | 20,091 | 19,345 |
| Accounts receivable, net | 129,041 | 86,119 |
| Inventory, net | 49,315 | 44,400 |
| Prepaid expenses and other current assets | 27,989 | 16,762 |
| Total current assets | 358,232 | 284,808 |
| | | |
| Property and equipment | 44,632 | 43,473 |
| Less accumulated depreciation and amortization | 32,786 | 31,751 |
| Property and equipment, net | 11,846 | 11,722 |
| | | |
| Goodwill, net | 291,179 | 206,952 |
| Trademarks & other assets, net | 24,347 | 24,785 |
| Investment in joint venture | 4,265 | 9,097 |
| Total assets | $689,869 | $537,364 |

### LIABILITIES AND STOCKHOLDERS' EQUITY

| | | |
|---|---|---|
| Current liabilities: | | |
| Accounts payable and accrued expenses | $126,712 | $50,168 |
| Current portion of long-term debt | - | 19 |
| Income taxes payable | 13,021 | 2,021 |
| Total current liabilities | 139,733 | 52,208 |

Copyright (c) 2005

BUS        JAKKS Pacific Reports Third Quarter 2004 Financial Results
           Oct 19 2004  3:00

|                                              | | |
| -------------------------------------------- | ----------- | ----------- |
|                                              | ----------- | ----------- |
| Long-term debt, net of current portion       | 98,000      | 98,042      |
| Deferred income taxes                         | 1,164       | 1,164       |
|                                              | ----------- | ----------- |
|                                              | 99,164      | 99,206      |
|                                              | ----------- | ----------- |
| Total liabilities                             | 238,897     | 151,414     |
|                                              |             |             |
| Stockholders' equity:                         |             |             |
| Common stock, $.001 par value                 | 26          | 25          |
| Additional paid-in capital                    | 275,624     | 245,219     |
| Retained earnings                             | 175,774     | 141,055     |
| Accumulated other comprehensive income (loss) | (452)       | (349)       |
|                                              | ----------- | ----------- |
|                                              | 450,972     | 385,950     |
|                                              | ----------- | ----------- |
| Total liabilities and stockholders' equity    | $689,869    | $537,364    |
|                                              | =========== | =========== |

JAKKS Pacific, Inc. and Subsidiaries
Third Quarter Earnings Announcement, 2004
Condensed Statements of Operations (Unaudited)

|                                                | Three Months Ended September 30, | | Nine Months Ended September 30, | |
| ---------------------------------------------- | --------- | -------- | --------- | --------- |
|                                                | 2004      | 2003     | 2004      | 2003      |
|                                                | --------- | -------- | --------- | --------- |
|                                                | (In thousands, except per share data) | | | |
| Net sales                                      | $206,083  | $90,308  | $389,463  | $231,358  |
| Less cost of sales                             |           |          |           |           |
| Cost of goods                                  | 100,754   | 42,949   | 194,120   | 118,169   |
| Royalty expense                                | 22,661    | 9,741    | 38,013    | 16,951    |
| Amortization of tools and molds                | 867       | 1,392    | 3,783     | 4,664     |
|                                                | --------- | -------- | --------- | --------- |
| Cost of sales                                  | 124,282   | 54,082   | 235,916   | 139,784   |
|                                                | --------- | -------- | --------- | --------- |
| Gross profit                                   | 81,801    | 36,226   | 153,547   | 91,574    |
| Direct selling expenses                        | 19,258    | 9,895    | 39,578    | 27,900    |
| Selling, general and administrative expenses   | 30,961    | 13,879   | 66,166    | 35,909    |
| Acquisition shut-down and                      |           |          |           |           |

BUS        JAKKS Pacific Reports Third Quarter 2004 Financial Results
           Oct 19 2004  3:00

| | | | |
|---|---|---|---|
| recall costs | - | (700) | - | 2,000 |
| Depreciation and amortization | 784 | 573 | 2,037 | 1,618 |
| Income from operations | 30,798 | 12,579 | 45,766 | 24,147 |
| Other (income) expense: | | | | |
| Profit from Joint Venture | (911) | (936) | (1,274) | (1,303) |
| Interest, net | 785 | 922 | 1,954 | 794 |
| Other | - | - | - | - |
| Income before provision for income taxes | 30,924 | 12,593 | 45,086 | 24,656 |
| Provision for income taxes | 7,112 | 3,023 | 10,367 | 5,918 |
| Net income | $23,812 | $9,570 | $34,719 | $18,738 |
| Earnings per share - diluted | $0.88 | $0.39 | $1.32 | $0.76 |
| Shares used in earnings per share - diluted | 27,019 | 24,629 | 26,343 | 24,716 |

*T

CONTACT:
JAKKS Pacific, Inc.
Genna Goldberg, 310-455-6235
 or
Integrated Corporate Relations
John Mills, 310-395-2215
-0- Oct/19/2004  7:00 GMT

Copyright (c) 2005

BUS         World Wrestling Entertainment, Inc. Files Suit against Jakks
            Oct 19 2004  15:16


Pacific, Inc., THQ, Inc. and Related Defendants


STAMFORD, Conn.--(BUSINESS WIRE)--Oct. 19, 2004

---

WWE Cites RICO Violations and Commercial Bribery Scheme in Connection
with Intellectual Property Licenses

    World Wrestling Entertainment, Inc. ("WWE") today filed a fourteen
count complaint in the United States District Court for the Southern
District of New York against Jakks Pacific, Inc. ("Jakks"), two
foreign subsidiaries of Jakks, THQ, Inc. ("THQ"), a joint venture
involving Jakks and THQ, Stanley Shenker
& Associates, Inc. ("SSAI")
and Bell Licensing, LLC. The suit also names as defendants certain
individuals employed by the corporate defendants, including
specifically Jack Friedman, Stephen Berman and Joel Bennett, the three
highest-ranking executives of Jakks, and Stanley Shenker and James
Bell.
    The suit alleges numerous violations of the Racketeer Influenced
and Corrupt Organization Act (RICO); violations of the anti-bribery
provisions of the Robinson-Patman Act; and various claims arising
under state law. By the action, WWE is seeking treble, punitive and
other damages, as well as a declaration that the videogame license
with the joint venture of Jakks and THQ, and a related amendment to
the toy license with Jakks, are void and unenforceable due to
commercial bribery and other violations of state law. The lawsuit can
be viewed at corporate.wwe.com.
    The suit arises out of litigation initially commenced by SSAI
against WWE in Connecticut state court for commissions SSAI claimed it
had earned while serving as WWE's licensing agent. During that
litigation, WWE discovered certain irregularities in its licensing
program beginning in the 1998 time frame when SSAI served as WWE's
licensing agent and Bell served as WWE's Senior Vice President of
Licensing and Merchandising. Specifically, WWE learned in the
Connecticut state court proceeding that SSAI split its commissions
with Bell on various licenses allegedly procured by SSAI and
recommended to WWE management by Bell. WWE also learned that certain
licensees had paid monies into a foreign bank account controlled by
Shenker during the time he was WWE's licensing agent. In the
Connecticut case, the Court found that Stanley Shenker had committed
serial perjury in order to cover up his payments to Bell and his
receipt of monies in a foreign bank account from WWE licensees,
including Jakks, and granted a default judgment in favor of WWE
against SSAI on counterclaims asserted against SSAI. The Court in the
Connecticut case has also granted partial summary judgment against

Copyright (c) 2005

BUS        World Wrestling Entertainment, Inc. Files Suit against Jakks
           Oct 19 2004  15:16


Bell in favor of WWE on claims asserted against Bell by WWE.
     The federal lawsuit filed by WWE against Jakks and the other
defendants relates to a series of payments made in 1998 to Shenker's
foreign bank account by two foreign subsidiaries of Jakks. The Company
has discovered that the payments in question were then split with Bell
by Shenker. Two of the payments in question occurred during the time
that WWE was in the process of selecting a licensee for videogames
featuring WWE talent. One of the payments was directed to be made by
Jakks' officers on the same day that SSAI and Bell recommended that
the videogame license be granted to Jakks. The third payment was made
after the videogame license was awarded to a joint venture of Jakks
and THQ.
     In a statement issued today, Linda McMahon, the Chief Executive
Officer of WWE, stated:
     "We very much regret having to take this action today, but regret
even more the facts and circumstances which have compelled us to do
so. WWE's intellectual property is a valuable asset of the Company,
and we believe the actions taken today are necessary to preserve the
integrity of our licensing process and essential to ensure that WWE
receives appropriate and fair compensation for the grant of a license
to use our intellectual property."
     Jakks has been WWE's toy licensee since late 1995 and the current
toy licenses are otherwise set to expire in 2009. The joint venture of
Jakks and THQ obtained the videogame license in 1998, with its term
also scheduled to expire in 2009, subject to a right to renew the
license by the joint venture for another five years on certain
conditions.

     World Wrestling Entertainment, Inc. (NYSE: WWE) is an integrated
media and entertainment company headquartered in Stamford, Conn., with
offices in New York City, Los Angeles, Toronto, and London.

     Trademarks: The names of all World Wrestling Entertainment
televised and live programming, talent names, images, likenesses,
slogans and wrestling moves and all World Wrestling Entertainment
logos are trademarks which are the exclusive property of World
Wrestling Entertainment, Inc.

     Forward-Looking Statements: This news release contains
forward-looking statements pursuant to the safe harbor provisions of
the Securities Litigation Reform Act of 1995, which are subject to
various risks and uncertainties. These risks and uncertainties include
general market conditions, which could result in only a portion or
none of the shares being registered to be offered and sold, the
conditions of the markets for live events, broadcast television, cable
television, pay-per-view, Internet, entertainment, professional
sports, and licensed merchandise; acceptance of the Company's brands,

Copyright (c) 2005

BUS          World Wrestling Entertainment, Inc. Files Suit against Jakks
             Oct 19 2004  15:16


media and merchandise within those markets; uncertainties relating to
litigation; risks associated with producing live events both
domestically and internationally; uncertainties associated with
international markets; risks relating to maintaining and renewing key
agreements, including television distribution agreements; and other
risks and factors set forth from time to time in Company filings with
the Securities and Exchange Commission. Actual results could differ
materially from those currently expected or anticipated.

CONTACT:
World Wrestling Entertainment, Inc.
Gary Davis, 203-353-5066
-0- Oct/19/2004 19:16 GMT

Copyright (c) 2005