UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

——————————————————— x

In re JAKKS PACIFIC, INC.
SHAREHOLDERS CLASS ACTION
LITIGATION

——————————————————— x

:   Civil Action No. 04-CV-8807 (KMK)
:
:   CONSOLIDATED AMENDED
:   COMPLAINT FOR VIOLATIONS OF THE
:   FEDERAL SECURITIES LAWS
:
:

Plaintiffs have alleged the following based upon the investigation of plaintiffs' counsel, which included a review of United States Securities and Exchange Commission ("SEC") filings by JAKKS Pacific, Inc. ("JAKKS" or the "Company"), as well as regulatory filings and reports, securities analysts' reports and advisories about the Company, press releases, and media reports about the Company, a review of the Complaint filed in the case captioned *World Wrestling Entertainment v. JAKKS Pacific, Inc. et al.*, 04cv8223 (S.D.N.Y.) and plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This consolidated class action is filed on behalf of all persons and entities who purchased or otherwise acquired the securities of JAKKS between December 3, 1999, and October 19, 2004, inclusive, and who were damaged thereby, seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2.      Defendant JAKKS designs, develops, produces and markets toys and related products. The Company focuses its business on acquiring or licensing well-recognized trademarks and brand names, such as Nickelodeon, Rugrats, Dora the Explorer, Blue's Clues, SpongeBob Squarepants, Mickey Mouse, Winnie the Pooh, Kim Possible, Finding Nemo and Hello Kitty. JAKKS also develops proprietary brands and marks.

3.      JAKKS also licensed certain intellectual property from World Wrestling Entertainment, Inc. ("WWE"). WWE is an integrated media and entertainment company engaged in the development, production and marketing of television and live events, and the licensing and sale of products featuring its WWE brands.

4.      On or about October 24, 1995, JAKKS and WWE entered into a license agreement whereby JAKKS had the right to manufacture and market WWE toys in the United States. Later,

- 1 -

however, in an effort to expand its lucrative WWE licenses, JAKKS bribed a senior WWE executive, James Bell ("Bell"), who was responsible for negotiating and managing license agreements, and WWE's licensing agent, Stanely Shenker & Associates, Inc. ("SSAI"), among others. In exchange for the bribes from JAKKS, laundered through foreign corporations, Bell and SSAI agreed to assist JAKKS in securing a WWE videogame license and favorable amendments to the toy license.

5.     The scheme worked and, on or about February 10, 1997, WWE, at the recommendation of SSAI and Bell, entered into an international toy license agreement with JAKKS. Then, in June 1998, SSAI and Bell convinced WWE management to enter into a video game license agreement with THQ & JAKKS Pacific LLC ("THQ/JAKKS"), a joint venture formed by JAKKS and video game maker THQ Inc. The ten year video game license expires December 31, 2009, with an additional five year renewal option in favor of THQ/JAKKS. In June 1998, SSAI and Bell also directed WWE to extend the term of the JAKKS' domestic and international toy licenses to make them conterminous with the long-term video game license.

6.     The WWE videogame license and toy licenses were extremely lucrative for JAKKS. Throughout the Class Period, JAKKS publicly reported quarter after quarter of positive results which it attributed, in material part, to its WWE product line. At all relevant times, however, defendants failed to disclose that in order to get the licenses, they had bribed SSAI and Bell, among others.

7.     The truth began to emerge on October 19, 2004. On that day, before the market opened, JAKKS issued a press release announcing its third-quarter 2004 financial results. At that time, JAKKS stunned investors when it revealed that the Company was "engaged in discussions with WWE over the validity of its toy and video games license." This press release stated, in relevant part, the following:

*The Company also announced that it is engaged in discussions with WWE concerning the restructuring of its toy license and with WWE and THQ with respect to the restructuring of the JAKKS THQ Joint Venture video games license agreement with WWE*. The discussions are an outgrowth of certain litigation that has been pending between WWE and a former licensing consultant to WWE and a former employee of WWE, to which the Company is not a party. *WWE has raised questions about the validity of the licenses as a result of certain transactions between the Company and that licensing consultant that occurred more than six years ago. The Company has denied any wrongdoing in connection with the transactions with the licensing consultant and maintains that they were unrelated to either the toy or video game license*. If the discussions are satisfactorily concluded, the restructuring of the licenses may have an impact on the Company's future revenues and net income to an extent that is presently unknown. *If the discussions with WWE and THQ are not satisfactorily concluded, the Company anticipates that litigation is likely to be commenced by WWE challenging the validity of the licenses and seeking compensatory and punitive damages, in which event the Company intends to vigorously defend itself against claims which it believes are without merit*. [Emphasis added.]

8.      In reaction to this news, the price of JAKKS common stock declined precipitously, falling $5.34 per share, or 22%, from its previous day's closing price of $24.15, to close at $18.81.

9.      Later that same day, also on October 19, 2004, news reports indicated that the WWE had filed a complaint against JAKKS and the Individual Defendants, among others ("WWE Action"), alleging that they had perpetrated a massive bribery scheme involving lucrative licensing deals, in violation of the Racketeer Influenced and Corrupt Organization Act ("RICO") and anti-bribery laws. On the following trading day, October 20, 2004, the price of JAKKS stock again dropped in reaction to this news: falling $5.85 per share, or 31 % from its closing price on October 19, 2004, to close at $12.96 per share. In total, the price of JAKKS common stock declined from $24.15 per share to $12.96 per share in reaction to the news of the problems with the WWE and the WWE licenses.

## JURISDICTION AND VENUE

10.      The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act [15 U.S.C. §§78j(b) and 78t(a)], and Rule 10-5 promulgated thereunder by the SEC

[17 C.F.R. §240.10b-51].

11.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C.

§§1331 and 1337 and Section 27 of the Exchange Act [15 U.S.C. §78aa].

12.    Venue is proper in this District pursuant to Section 27 of the Exchange Act, and 28

U.S.C. §1391(b).  Many of the acts charged herein, including the preparation and dissemination of

materially false and misleading information, occurred in substantial part in this District.

13.    In connection with the acts alleged in this complaint, defendants, directly or

indirectly, used the means and instrumentalities of interstate commerce, including, but  not limited

to, the mails, interstate telephone communications and the facilities of the NASDAQ National

Market.

**PARTIES**

14.    Lead Plaintiffs Indiana Electrical Workers Pension Trust Fund IBEW, Kenneth J.

Tucker, Tonia R. Tucker-Kraus and Michael Kraus purchased JAKKS common stock during the

Class Period, as set forth in their respective certifications, filed previously with this Court which are

incorporated herein by reference, and were damaged thereby.

15.    Defendant JAKKS is a Delaware corporation which maintains its corporate

headquarters at 22619 Pacific Coast Highway, Malibu, CA 90265.

16.    Defendant Jack Friedman ("Friedman") was, at all relevant times, Chairman and

Chief Executive Officer of the Company.  Prior to co-founding JAKKS, defendant Friedman was

CEO and a director of THQ, Inc.

17.    Defendant Steven G. Berman ("Berman") was, at all relevant times, President, Chief

Operating Officer, and Secretary of the Company.  Prior to co-founding JAKKS, defendant Berman

was Vice President and Managing Director of THQ International, a subsidiary of THQ, Inc.

18.    Defendant Joel M. Bennett ("Bennett") was, at all relevant times, Chief Financial Officer and an Executive Vice President of the Company.

19.    Defendants Friedman, Berman, and Bennett are collectively referred to herein as the "Individual Defendants."

20.    Because of the Individual Defendants' positions with the Company, they had access to the adverse undisclosed information about its business, operations, products, operational trends, financial statements, markets and present and future business prospects, access to internal corporate documents (including the Company's operating plans, budgets and forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof and via reports and other information provided to them in connection therewith.

21.    It is appropriate to treat the Individual Defendants as a group for pleading purposes and to presume that the false, misleading and incomplete information conveyed in the Company's public filings, press releases and other publications as alleged herein are the collective actions of the narrowly defined group of defendants identified above.  Each of the above officers of JAKKS, by virtue of their high-level positions with the Company, directly participated in the management of the Company, was directly involved in the day-to-day operations of the Company at the highest levels and was privy to confidential proprietary information concerning the Company and its business, operations, products, growth, financial statements, and financial condition, as alleged herein.  Said defendants were involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein, were aware or recklessly disregarded, that the false and misleading statements were being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.

22.    As officers and controlling persons of a publicly-held company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, traded on the NASDAQ National Market during the Class Period, and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to disseminate promptly, accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings and present and future business prospects, and to correct any previously-issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly-traded securities would be based upon truthful and accurate information.  The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

23.    The Individual Defendants participated in the drafting, preparation, and/or approval of the various public reports and other communications complained of herein and were aware of, or recklessly disregarded, the misstatements contained therein and omissions therefrom, and were aware of their materially false and misleading nature.  Because of their Board membership and/or executive and managerial positions with JAKKS, each of the Individual Defendants had access to the adverse undisclosed information about JAKKS' business prospects and financial condition and performance as particularized herein and knew (or recklessly disregarded) that these adverse facts rendered the positive representations made by or about JAKKS and its business issued or adopted by the Company materially false and misleading.

24.    The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to and did control the content of the various SEC filings, press releases and other public statements pertaining to the Company during the Class Period.  Each Individual Defendant was provided with copies of the documents alleged herein to be

misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent

their issuance or cause them to be corrected.  Accordingly, each of the Individual Defendants is

responsible for the accuracy of the public reports and press releases detailed herein and is therefore

primarily liable for the representations contained therein.

25.     Each of the defendants is liable as a participant in a fraudulent scheme and course of

business that operated as a fraud or deceit on purchasers of JAKKS common stock by disseminating

materially false and misleading statements and/or concealing material adverse facts.  The scheme: (i)

deceived the investing public regarding JAKKS business, finances, financial statements and the

intrinsic value of JAKKS common stock; and (ii) caused plaintiffs and other members of the Class to

purchase JAKKS securities at artificially inflated prices.

## CLASS ACTION ALLEGATIONS

26.     Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil

Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise

acquired the securities of JAKKS between December 3, 1999 and October 19, 2004, inclusive, and

who were damaged thereby.  Excluded from the Class are defendants, the officers and directors of

the Company, at all relevant times, members of their immediate families and their legal

representatives, heirs, successors or assigns and any entity in which defendants have or had a

controlling interest.

27.     The members of the Class are so numerous that joinder of all members is

impracticable.  As of November 9, 2004, there were approximately 26.2 million shares of JAKKS

common stock outstanding that were actively traded on the NASDAQ.  While the exact number of

Class members is unknown to plaintiffs at this time and can only be ascertained through appropriate

discovery, plaintiffs believe that there are hundreds or thousands of members in the proposed Class.

Record owners and other members of the Class may be identified from records maintained by

JAKKS or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

28.    Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

29.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

30.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)    whether the federal securities laws were violated by defendants' acts as alleged herein;

(b)    whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business, operations and financial statements of JAKKS; and

(c)    to what extent the members of the Class have sustained damages and the proper measure of damages.

31.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## SUBSTANTIVE ALLEGATIONS

### Background

32.     JAKKS was formed as a Delaware corporation in January 1995 and began operations as of April 1, 1995.  Since its inception, the Company has operated as a multi-line, multi-brand toy company that designs, develops, produces and markets toys and related products.  At the start of the Class Period, the Company's principal products were: (i) action figures and accessories featuring licensed characters, principally from WWE; (ii) Flying Colors molded plastic activity sets, clay compound playsets and lunch boxes; (iii) Wheels division products, including Road Champs die-cast collectible and toy vehicles and Remco toy vehicles and role-play toys and accessories; (iv) Child Guidance infant and pre-school electronic toys, toy foam puzzle mats and blocks, activity sets and outdoor products; and (v) fashion and mini dolls and related accessories.

33.     WWE is an integrated media and entertainment company, engaged in the development, production, and marketing of television and pay-per-view programming, and live events; and the licensing and sale of branded consumer products.  WWE has a worldwide licensing program using its WWE marks and logos, copyrighted works, and characters on a variety of retail products, including toys, video games, apparel, and books.  Its direct merchandise operations consist of the design, sourcing, marketing, and distribution of various WWE-branded products, such as T-shirts, caps, and other novelty items, all of which feature its superstars and/or its logo.  WWE also publishes two magazines, RAW and SmackDown!  The company has offices in New York City, Los Angeles, Toronto, and London.  WWE was founded by Vincent and Linda McMahon, and is headquartered in Stamford, Connecticut.

34.     On or about October 24, 1995, WWE and JAKKS entered into a domestic toy license, the term of which was to end on December 31, 2007, with a one-year right to renew if JAKKS achieved certain requirements.  In obtaining this license, the JAKKS toy license proposal was

presented to WWE through its licensing agent, Stanley Shenker and/or Stanley Shenker & Associates Inc. ("SSAI").  Previously, in or about April 1995, WWE had retained Shenker and SSAI as the Company's non-exclusive licensing agent.

35.    Unbeknownst to WWE and investors, however, after such time as the original JAKKS/WWE toy license was negotiated, defendants entered into an undisclosed agency agreement with Shenker and/or SSAI.  Defendants' failure to disclose the relationship with Shenker and/or entities he controlled was material at that time, because Shenker already had an agency relationship with WWE.  The simultaneous representation of WWE by Shenker and/or SSAI, and of JAKKS by Shenker and/or SSAI, constituted a clear conflict of interest.

36.    Moreover, having previously acted as the non-exclusive agent who negotiated the WWE/JAKKS domestic toy license, Friedman and Berman were well aware of Shenker's agency relationship with WWE at the time he was hired by the Company to act as JAKKS agent related to WWE products, at the 1996 New York Toy Fair.  Moreover, as early as 1996, Friedman and Berman had received a legal opinion from Murray Skala, JAKKS outside legal counsel and a member of the Board of the Company, that the Company's retention of Shenker and/or SSAI to represent it in negotiating with WWE resulted in a material conflict of interest.  According to Skala, at that time, an arrangement between Shenker, SSAI and JAKKS would ***not*** be legal absent WWE's informed consent.

37.    Unaware of the undisclosed relationship between Shenker, SSAI and JAKKS, however, on or about February 10, 1997, WWE and JAKKS entered into an international toy license having a term which was to end December 31, 1999.  At that time, no disclosure was made regarding Shenker's representation of JAKKS.  Additionally, on March 7, 1997, WWE expanded its

relationship with Shenker and SSAI, and entered into an Agency Agreement with SSAI, whereby SSAI became the *exclusive* outside licensing agent for WWE.

38.     Under the Agency Agreement, SSAI was responsible for procuring potential licenses and presenting all license proposals to WWE.  The procedure for presenting such license proposals was for SSAI to present a deal memo to James Bell, Senior Vice President of Licensing and Merchandising for WWE.   Bell, a long-time friend and business associate of Shenker, was responsible for reviewing the licensing proposals, and advising WWE senior management whether to accept or reject the proposed licensing offers.

39.     Pursuant to the SSAI Agency Agreement, however, SSAI was not entitled to any commissions for licenses independently procured by Bell and/or WWE.  In addition, SSAI was also *not* entitled to commissions for licenses between WWE and third parties that pre-existed the formation of the SSAI Agency Agreement.  Accordingly, SSAI was *not* entitled to any commissions relating to WWE's preexisting video game license with Acclaim Entertainment, Inc. ("Acclaim") which was, at that time, the exclusive licensee for the manufacture and sale of video games using WWE intellectual property.  In the event that the Acclaim video game license was renewed, SSAI and Shenker would also *not* receive any commission on the preexisting license renewal.

40.     Thus, in order for Shenker to gain commissions on WWE video games, and in order for JAKKS to take this license from Acclaim, in or around 1998, Friedman, Berman and Shenker implemented a scheme and illegal course of conduct whereby defendants arranged to pay bribes and kickbacks to Shenker, which Shenker agreed to split with Bell, in exchange for their assistance in helping JAKKS procure the WWE video game licenses.  These illegal payments ultimately allowed JAKKS to gain the license to WWE's valuable video game franchise, as well as to make valuable amendments to, and expand the scope of, the Company's toy licenses.

41.     In order to perpetrate this scheme and illegal course of conduct, the illegal bribes and kickback payments were not recorded anywhere on the financial reports or records of JAKKS. Rather, to accomplish this bribery scheme, defendants "laundered" a series of clandestine payments through foreign corporations controlled by JAKKS and by Shenker and/or entities subject to his control, located primarily in Hong Kong, including an entity called Stanfull Industrial, Ltd. ("Stanfull").

42.     In early 1998, as negotiations were ongoing concerning WWE's video game license, at the direction of defendants Friedman and/or Berman, Shenker caused to be delivered to JAKKS, a handwritten $80,000 invoice from Stanfull.  This invoice, dated January 2, 1998, stated that this request for payment related to the development of "Possible Latex Based Soft Toys With Special Coating."  This invoice also directed that such payment be made to a Stanfull account at the Hang Seng Bank in Hong Kong.  At that time, no contract existed between JAKKS and Stanfull or any other Shenker entity to develop any "Soft Toys," and no such toys were ever developed by JAKKS for Shenker or Stanfull.

43.     Regardless of the fact that invoices submitted to the Company needed the signature of JAKKS CFO, defendant Bennett, the $80,000 Soft Toy invoice was paid without any signature. Rather, at the direction of defendants Berman and Friedman, this invoice was sent by defendant Bennett to JAKKS foreign agent in Hong Kong, with the instruction that $40,000 immediately be transferred to Stanfull, which payment was made on or about January 14, 1998.  Apparently, the $40,000 payment was withdrawn from an account at the Hang Seng Bank in Hong Kong, of Road Champs, Ltd., a foreign subsidiary owned and controlled by JAKKS.  The same day, Shenker obtained a demand draft for $20,000 from the Hang Seng Bank, payable to James Bell, representing his equal split of the illegal bribe and kickback paid to Shenker and Stanfull.

- 12 -

44.     At or about the time that Road Champs paid the $40,000 to Stanfull, another foreign subsidiary of the Company, JAKKS Pacific, H.K., sent $40,000 via wire transfer to Road Champs to reimburse it for making the prior illegal kickback payment.  Road Champs did not record the payment to Stanfull, and recorded the $40,000 debit and credit as inter-company transfers. In connection with these payments, the general ledgers of Road Champs were falsified to conceal the payment to Stanfull.  In addition, JAKKS did not record the invoice, nor any ensuing steps it took to pay the invoice, and this payment was not recorded anywhere on the financial reports or records of JAKKS.

45.     After receiving his split of the $40,000 bribe, Bell used his influence with WWE to cause it *not* to renew the Acclaim video game license.  Thus, before Acclaim could even submit its proposal, on or about March 30, 1998, Bell initialed a deal memo recommending to senior management of WWE that this valuable license be awarded to "JAKKS Pacific-Electronic Game Division," and identifying SSAI as the agent that had negotiated and procured the deal.  At that time, JAKKS did not maintain an "Electronic Game Division" and the Company had no ability to create or manufacture video games.

46.     On March 31, 1998, the day immediately after Bell had initialed the deal memo recommending the WWE video game license be awarded to JAKKS, defendant Bennett again directed JAKKS Hong Kong subsidiary to pay another $40,000 to Stanfull.  On or about April 2, 1998, JAKKS Pacific, H.K. wire transferred $40,000 to the Stanfull account at the Hang Seng Bank in Hong Kong.  That money was eventually split evenly with Bell.  This payment was also not recorded anywhere on the financial reports or records of JAKKS.

47.     On or about April 8, 1998, WWE management approved the deal memo submitted by Bell and SSAI, favoring grant of the WWE video game license to JAKKS.  Following this time, both

- 13 -

THQ and Activision sent SSAI and/or Bell licensing proposals which were both superior to the JAKKS proposal. These proposals were not provided to WWE management but, rather, were shared with defendants Friedman and/or Berman.

48.    Following this time, JAKKS was able to convince THQ, a company at which both Friedman and Berman previously held senior management positions, to become its partner in the video game business. Since JAKKS had no ability to manufacture or develop video games, the partnership was nothing more than a tax on a deal which may otherwise have gone solely to THQ. Regardless of the fact that JAKKS had no Electronic Games Division, SSAI, Shenker and Bell recommended to WWE management that the video game license be awarded to JAKKS for an unprecedented 10 year term, with a five-year renewal right.

49.    Having been convinced that JAKKS would receive the WWE video game license, and rather than risk losing the opportunity to participate entirely in this valuable license opportunity, in June 1998, THQ formed a joint venture with JAKKS. The purpose of this joint venture was to develop, manufacture and market, under an exclusive license with World Wrestling Federation Entertainment ("WWF"), video games based on WWF characters and themes.

50.    Thereafter, on June 23, 1998, WWE executed a video game license agreement with JAKKS and THQ. By this time, Shenker had also promised Bell that SSAI would split equally *all* commissions or payments that SSAI would receive as a result of the JAKKS/WWE video game license. Also, at that time, SSAI, Shenker and Bell recommended to WWE that the JAKKS toy license be extended such that the terms of this license coincided with the terms of the video game license.

51.    The following day, June 24, 1998, the toy licenses granted to JAKKS by WWE were extended. By July 15, 1998, another fake invoice requesting payment of $20,000 was sent to the

attention of Berman at JAKKS, by Shenker.  Clandestine payment was achieved in a manner similar to that as had been done previously, Bennett directed JAKKS' Hong Kong subsidiary, Road Champs, to make payment to Stanfull at the Hang Seng Bank.  In addition, JAKKS did not record this invoice, nor any ensuing steps it took to pay this invoice, and this payment was not recorded anywhere on the financial reports or records of JAKKS.

52.    At no time prior to or during the Class Period did Defendants ever disclose that JAKKS had engaged in this scheme and illegal course of conduct in obtaining the WWE video games license or in extending or procuring the WWE toys licenses.  When repeatedly questioned by WWE, throughout the Class Period, as to whether the Company had ever made payments to Shenker, SSAI and/or Bell or any entities controlled thereby, Defendants repeatedly lied to WWE. In fact, rather than disclose Defendants' scheme and illegal course of conduct, throughout the Class Period, Defendants repeatedly cited their success in obtaining the WWE licenses and used this purported success to justify multi-million dollar bonuses.

53.    By early 2004, if not earlier, Defendants were further aware that the WWE was contending that the WWE licenses had been obtained through a pattern of commercial bribery. Furthermore, Defendants knew or recklessly disregarded that the fact that the WWE was contending that the WWE licenses had been obtained through commercial bribery exposed the Company to the heightened risk that the WWE would seek some modification to the WWE licensing agreements or complete nullification of those agreements.

54.    As a result of Defendants' materially false and misleading statements and material omissions, throughout the Class Period, Defendants also caused the price of JAKKS shares to be artificially inflated.  Defendants were then able to take advantage of the fraud that they had caused, by directing the Company to issue millions of shares of Company stock and almost $100 million in

debt convertible into shares of the Company. In connection with these offerings, Company Insiders, including certain defendants named herein were able to sell millions of dollars of their personally held JAKKS common stock to the public while in possession of material adverse non-public information about the Company. In addition, throughout the Class Period, Company insiders including certain of the defendants named herein, also routinely sold significant amounts of their privately held JAKKS common shares directly into the open market while in possession of material adverse non-public information about the Company. In total, during the Class Period, JAKKS insiders were able to reap over $37.68 million in illicit proceeds from the sale of their personally held JAKKS shares.

55.     It was only at the end of the Class Period, however, on or about October 19, 2004, that investors learned the truth about JAKKS. At that time, Defendants shocked investors after it was revealed that WWE had filed suit against the Company, seeking to rescind the WWE video game and toy licenses, and to recover damages, because such licenses were procured pursuant to a fraudulent scheme and illegal course of conduct which the WWE had since uncovered. These belated disclosures also had a sudden dramatic effect on the price of JAKKS shares, causing the stock to fall in price precipitously and resulting in significant damages to plaintiffs and the Class.

**Materially False and Misleading
Statements Issued During the Class Period**

56.     The Class Period begins on December 3, 1999, immediately following the November 1999 press release of the Company's first series of WWF video games. At that time, JAKKS filed a prospectus with the SEC on a Form 424B 1 ("Prospectus") in connection with a public offering of 3 million shares of common stock priced at $25.00 per share. In part, to convince investors to purchase these shares, Defendants highlighted the Company's strong product line of licensed and proprietary toys and products, including the WWE branded products, as follows:

We are a multi-line, multi-brand toy company that designs, develops, produces and markets licensed and proprietary toys and related products . . . . **We believe that our growth results from our well-known brand names, the breadth, quality and innovation of our product offerings and our strong relationships with retailers and suppliers**. Our net sales have increased from $41.9 million in 1997 to $85.3 million in 1998, representing a growth rate of 103.2%. Our net income has increased from $2.8 million in 1997 to $6.4 million in 1998, representing a growth rate of 128.8%. Our pro forma net sales and net income for the nine months ended September 30, 1999 were $158.0 million and $13.8 million, respectively, representing growth rates of 68.0% and 118.5% over the prior period. [Emphasis added.]

57. The Prospectus also identified action figures and accessories featuring licensed characters, primarily from the WWF, among JAKKS "principal produce categories." In addition the Prospectus represented that one of the Company's "key strategies" was to "grow through the acquisition or licensing of product lines, concepts and characters." For investors, this "key strategy" was demonstrated by the November 1999 launch of WWF video games, following the Company's success in the sale of WWF action figures. In this regard, the Prospectus stated, in pertinent part, as follows:

[W]e have entered the video game market through our participation in a joint venture with THQ Inc. The joint venture launched its line of World Wrestling Federation licensed video games in November 1999.

\*        \*        \*

Net sales increased $59.8 million, or 97.4%, to $121.2 million in 1999 from $61.4 million in 1998. **The significant growth in net sales [in the first three quarters of 1999] was due primarily to the continuing growth of the World Wrestling Federation action figure product line** with its expanded product offerings and frequent character releases . . . ." [Emphasis added.]

58. As a result of the significance of the WWE video game and toy licenses to the future growth and prosperity of the Company, the Prospectus provided significant detail about JAKKS WWF video game development, its relationship with WWE and its agreement with THQ, stating, in pertinent part, as follows:

- 17 -

WORLD WRESTLING FEDERATION VIDEO GAMES

In June 1998, we formed a joint venture with THQ, a developer, publisher and distributor of interactive entertainment software for the leading hardware game platforms in the home video game market. ***The joint venture entered into a license agreement with World Wrestling Federation Entertainment under which it acquired the exclusive worldwide right to publish World Wrestling Federation video games on all hardware platforms***. The games will be designed, developed, manufactured and marketed by the joint venture. We are entitled to receive a guaranteed preferred return, based on sales of the video games, and THQ is entitled to receive the balance of the profits. The term of the license agreement expires on December 31, 2009, subject to a right of the joint venture to renew the license for an additional five years under various conditions.

*      *      *

Wrestling video games have demonstrated consistent popularity, with two wrestling-theme video games among the top 10 video games, in terms of unit sales volumes, in 1998. Approximately 2.3 million units of these two games were sold in 1998, at retail prices ranging from approximately $42 to $60 . . . . ***We believe that as a franchise property, the World Wrestling Federation titles will have brand recognition and sustainable consumer appeal, which may allow the joint venture to use titles over an extended period of time through the release of sequels and extensions and to re-release such products at different price points in the future*** . . . . [Emphasis added.]

59.    In connection with this Offering, certain "Selling Stockholders" liquidated hundreds

of thousands of shares of their personally held JAKKS stock, as follows:

PRINCIPAL AND SELLING STOCKHOLDERS

| Name | Number of Shares Offered | Estimated Gross Proceeds |
|------|--------------------------|--------------------------|
| Jack Friedman (*)………… | 289,683 | $ 7,242,075.00 |
| Stephen G. Berman(*)……. | 115,873 | $ 2,896,825.00 |
| Robert E. Glick................... | 45,000 | $ 1,125,000.00 |
| Michael G. Miller................ | 45,000 | $ 1,124,000.00 |
| Murray L. Skala................... | 60,000 | $ 1,500.000.00 |
| Total | 555,556 | $ 13,396,900.00 |

(*) If the underwriters' over-allotment option is exercised in full, Mr. Friedman will sell 355,635 shares and will beneficially own 757,230 shares (4.0% of the outstanding shares) after this offering and Mr. Berman will sell 133,254 shares and will beneficially own

62,516 shares (0.3% of the outstanding shares) after this offering.

60.     On December 8, 1999, following the exercise by the underwriters of their over-subscription allotment option, JAKKS announced that, in total, 2.811 million shares were sold by the Company, for gross proceeds of approximately $70 million, and 638,889 shares were sold by insiders, for gross proceeds of approximately $16 million.  At that time, shares of the Company traded above $25.00 per share, trading as high as $27.00 per share on December 8, 1999.

61.     Following the completion of the Company's Offering, on January 20, 2000, Defendants also published a press release announcing the successful launch of its WWF licensed video games, in part, as follows:

> *"WWF WrestleMania 2000'' for Nintendo 64 Exceeds 1 Million Units in Less Than Two Months At Retail; Holiday Sell-Out* Back on Store Shelves Nationwide This Week
>
> "WWF WrestleMania 2000" Game Boy Color is also enjoying tremendous sales success in the hand held arena . . . .
>
> *                *                *
>
> "*We're delighted with the ongoing success of our first joint-venture release and look forward to our second release, WWF(R) SmackDown!(tm)' for PlayStation, in early March*," said Maureen Kassel, vice president of sales and marketing, Jakks Pacific.  [Emphasis added.]

62.     On February 16, 2000, JAKKS issued a press release announcing its financial results for the fourth quarter and year-ended December 31, 1999.  Defendant Friedman commented on the results stating, in pertinent part, as follows:

> "*We are delighted with the results of operations for our fourth quarter and year end.  We expect to continue our excellent top line and bottom line growth*," said Jack Friedman, chief executive officer of JAKKS Pacific Inc. "In 1999, JAKKS Pacific emerged as one of the leading and fastest growing toy companies in North America and *we remain committed to our growth strategy of developing and acquiring brands and product lines that will continue to strengthen our Company*."
>
> "*This marks our fourteenth consecutive quarter of record year-over-year financial results.  Going into the year 2000, we believe that we are better positioned than*

- 19 -

*ever to continue our growth*," said Stephen Berman, president and chief operating officer of JAKKS Pacific Inc. "*Our WWF product line, which was recently ranked the number one product in the overall action figure category, continues to be a stellar performer* as evidenced by its recently having been designated 'Boys' Toy of Year' by British Association of Toy Retailers and by *the huge success of our WWF WrestlemaniaQ 2000TM . . . which achieved sales in excess of one million units within two months of its November 18th launch*." [Emphasis added.]

63.    On March 1, 2000, JAKKS issued a press release announcing the launch of the "WWF SmackDown!" video game for the PlayStation game console. In the press release Company spokesperson, Maurine Kassal, as well as WWE Sr. V.P. of Licensing, James Bell, were also quoted, in pertinent part, as follows:

"*The momentum hasn't waned since the release of the first THQ/JAKKS Pacific joint venture hit, WWF WrestleMania 2000' for Nintendo 64*," stated Maureen Kassal, senior vice president of sales and marketing, JAKKS Pacific. "*The World Wrestling Federation remains one of the hottest names in both the game and toy industries* and continues to provide exciting media content for all of our interactive and action figure releases."

"A major part of WWFE's overall corporate strategy includes building extensions of our most popular brands. WWF SmackDown!' has an extremely loyal following as well as tremendous brand recognition among our fans. *THQ and JAKKS have done an excellent job at capturing the feel of the show and implementing it into this video game. They truly understand our unique product*, and I believe that our fans will be excited with the end result," said Jim Bell, senior vice president of licensing and merchandising, WWFE. [Emphasis added.]

64.    On or about March 30, 2000, JAKKS filed its Annual Report on Form 10-K, with the SEC which was signed by defendants Friedman, Berman and Bennett, among others. In addition to reiterating the results announced in the February 16, 2000 press release, the Company's 2000 Form 10-K again described JAKKS video game licensing agreement with WWE and it joint venture with THQ, in part, as follows:

WORLD WRESTLING FEDERATION VIDEO GAMES

In June 1998, we formed a joint venture with THQ, a developer, publisher and distributor of interactive entertainment software for the leading hardware game platforms in the home video game market. *The joint venture entered into a license agreement with World Wrestling Federation Entertainment under which it*

- 20 -

*acquired the exclusive worldwide right to publish World Wrestling Federation video games on all hardware platforms*.  The games will be designed, developed, manufactured and marketed by the joint venture.  We are entitled to receive a guaranteed preferred return, based on sales of the video games, and THQ is entitled to receive the balance of the profits.  The term of the license agreement expires on December 31, 2009, subject to a right of the joint venture to renew the license for an additional five years under various conditions.

*     *     *

Wrestling video games have demonstrated consistent popularity, with two wrestling-theme video games among the top 10 video games, in terms of unit sales volumes, in 1998.  Approximately 2.3 million units of these two games were sold in 1998, at retail prices ranging from approximately $42 to $60.  We believe that the success of the World Wrestling Federation titles is dependent on the graphic look and feel of the software, the depth and variation of game play and the popularity of the World Wrestling Federation.  *We believe that as a franchise property, the World Wrestling Federation titles will have brand recognition and sustainable consumer appeal, which may allow the joint venture to use titles over an extended period of time through the release of sequels and extensions and to re-release such products at different price points in the future*.  Also, as new hardware platforms are introduced, software for these platforms requires new standards of design and technology to fully exploit these platforms' capabilities and requires that software developers devote substantial resources to product design and development.  [Emphasis added.]

65.     On April 25, 2000, JAKKS issued a press release announcing its financial results for

the first quarter ended March 31, 2000.  According to the press release, JAKKS achieved another

quarter of purported "Record" setting revenues and profits, driven in substantial part by the success

of its WWF products.  In pertinent part, the press release quoted Defendants, as follows:

"*This marks the fifteenth consecutive quarter in which we have reported record year-over-year financial results*," said Jack Friedman, chairman and chief executive officer of JAKKS Pacific Inc.  "Some of this incremental growth has come from the successful assimilation of our 1999 acquisitions, *while core products such as WWF wrestling products . . . continued their solid performances.*  Our balance sheet – with over $96 million in cash and marketable securities, $118 million in working capital and only nominal long-term debt - remains exceptionally strong.  *Our solid balance sheet and our history of successful acquisitions positions us well to take further advantage of acquisition opportunities and to continue to execute our growth strategy.*"  [Emphasis added.]

66.     On May 10, 2000, JAKKS filed its quarterly report on Form 10-Q with the SEC,

signed by defendant Bennett.  The Company's 1Q:00 Form 10-Q represented that JAKKS "key

- 21 -

strategies" continued to depend upon licensing. Because the credibility of JAKKS senior

management and the Company's representations about its financial and operational strength and

stability were of critical importance to JAKKS licensing partners as well as its investors, JAKKS

Form 10-Q also stated that the Company's public disclosures were true, accurate and correct, as

follows:

> Note 1 - Basis of presentation
>
> The accompanying 1999 and 2000 unaudited interim condensed **consolidated financial statements included herein have been prepared by the Company, without audit, pursuant to the rules and regulations of the Securities and Exchange Commission (the "SEC")**. Certain information and footnote disclosures normally included in financial statements prepared in accordance with generally accepted accounting principles have been condensed or omitted pursuant to such rules and regulations. However, **the Company believes that the disclosures are adequate to prevent the information presented from being misleading**. [Emphasis added.]

In addition to the foregoing, the Company's 1Q:00 Form 10-Q also described the THQ joint venture

and WWE license in a manner substantially similar or the same as was previously disclosed in the

Company's prior SEC filings, reproduced herein *supra*.

67.    On May 12, 2000, JAKKS issued a press release announcing the debut of the "WWF

SmackDown! 2 Know Your Role" video game for the PlayStation game console. In this press

release Company spokesperson, Jennifer Richmond, as well as WWE Sr. V.P of Licensing, Jim

Byrne, were also quoted, in relevant part, as follows:

> "**From the success of the first THQ/JAKKS Pacific joint venture hit, WWF Wrestlemania 2000' for Nintendo 64, through this year's WWF SmackDown!,' the popularity just keeps intensifying**," stated Jennifer Richmond, vice president of marketing, JAKKS Pacific Inc . . . .
>
> "**A major part of WWFE's overall corporate strategy includes building extensions of our most popular brands**. WWF SmackDown! 2 Know Your Role' will benefit from an extremely loyal following as well as tremendous brand recognition among WWF fans. **THQ and JAKKS have again done an outstanding job at capturing the spirit of the show** for PlayStation gamers. As with the original game, they have shown that **they truly understand the unique personality and subtleties of our**

*product* and I believe our fans will be very excited with the end result," said Jim Byrne, senior vice president of marketing, WWFE. [Emphasis added.]

68. On or about May 22, 2000, JAKKS filed the Company's Proxy Statement in connection with the election of directors for 2000-2001 with the SEC. According to the Proxy, for 1999, defendant Friedman received a base salary of $521,000, a bonus of $1.75 million and 232,500 options, and defendant Berman received a base salary of $496,000, a bonus of $1.75 million and 394,500 options. According to the Proxy, such payments were justified because of the following:

*We believe that our success to date has been to a significant extent attributable to the personal efforts of Mr. Friedman and Mr. Berman*. They founded the Company, established its business philosophy and operating structure and were the driving force behind our central theme of focusing our business on "evergreen" products. *Mr. Friedman's long-term relationship with Titan Sports was instrumental in our acquiring our successful World Wrestling Federation licenses*. In his nearly four-decade-long career in the toy industry, he has established an important network of relationships that we have been able to exploit in product acquisition, production and sales. Both Mr. Berman and Mr. Friedman embody our management philosophy with a "hands on" approach in all areas of our business. In addition to their general supervisory functions, *they are directly involved in license acquisition*, product design and development, production, and sales and marketing, as well as our financing and acquisition efforts. *Their efforts have resulted in our identifying and securing the World Wrestling Federation licenses and other desirable licenses and properties*, the rapid expansion of our product lines, our achieving significant production efficiencies and the development of a loyal and growing customer base. *In 1999, they guided us through two significant acquisitions, the implementation of our video game joint venture with THQ Inc. and two public offerings*.

*Based on their contributions to our outstanding performance in 1999*, which witnessed a 116% increase in net sales, 245% increase in net income, 136% increase in earnings per share and 160% increase in the market price of our common stock, *the Board determined that it would be appropriate to award Mr. Friedman and Mr. Berman a substantial discretionary bonus with respect to 1999*. Our Compensation Committee commissioned a report from an independent consulting firm to advise it on the appropriate level of compensation for Mr. Friedman and Mr. Berman. Based on this report, *our Compensation Committee recommended to the Board that we give Mr. Friedman and Mr. Berman a bonus of $750,000, in addition to the 4% Bonus, and the Board approved this recommendation. At the same time, we also increased the cap on the 4% Bonus from $1,000,000 to $2,000,000 effective in 2000*. [Emphasis added.]

69.     In addition to the foregoing, the Proxy also summarized defendant Friedman and

Berman's new and augmented Employment Agreements, which compensated them as follows:

EMPLOYMENT AGREEMENTS

**We entered into 10-year employment agreements with Mr. Friedman and Mr. Berman, pursuant to which Mr. Friedman serves as our Chairman and Chief Executive Officer and Mr. Berman serves as our President and Chief Operating Officer**.  Mr. Friedman's annual base salary in 2000 is $771,000 and Mr. Berman's is $746,000.  Their annual base salaries are subject to annual increases in an amount, not less than $25,000, determined by our Board of Directors.  **Each of them is also entitled to receive an annual bonus equal to 4% of our pre-tax income, but not more than $2,000,000, if our pre-tax earnings are at least $2,000,000** . . . . [Emphasis added.]

70.     On July 25, 2000, JAKKS issued a press release announcing its results for the second

quarter ended June 30, 2000.  According to the press release, JAKKS achieved another quarter of

purported "Record" setting revenues and profits, driven in substantial part by the success of its

licensed WWF products.  In relevant part, the press release quoted Defendants, as follows:

"**Our strong growth and emergence as a leading toy company reflects the Company's three-pronged strategy of generating new products through internal development, acquisition and marketing alliances, and licensing agreements**," said Friedman.   "This strategy has enabled us to dramatically expand the Company's product offerings **while building on the strength of such core businesses as Road Champs(R), WWF** and Flying Colors(R), which continue to turn in solid results . . . .

"**We continue to remain focused on executing our growth strategy and capitalizing and expanding on existing and new product lines**," added Stephen Berman, president and chief operating officer of JAKKS . . . .   [Emphasis added.]

71.     On August 14, 2000, JAKKS filed its quarterly report for the second quarter of 2000

on Form 10-Q with the SEC, which was signed by defendant Bennett.  The Company's 2Q:00 Form

10-Q also contained statements concerning the Company's "key strategies" and its "Basis of

Presentation," similar to or the same as those statements contained in JAKKS previous SEC filings,

reproduced herein, *supra*.

72.     On August 14, 2000, JAKKS issued a press release announcing the debut of the "WWF Royal Rumble" video game for the Sega Dreamcast game platform.  Company spokesperson Jennifer Richmond was quoted therein as stating that, "***The hottest license in interactive entertainment just got hotter***."  [Emphasis added.]

73.     On September 19, 2000, JAKKS issued a press release that purported to provide updated guidance for the third quarter ended September 30, 2000.  At that time, Defendants represented that, "earnings attributable to the sales of wrestling video games . . . remain in line with the Company's projections ***and the Company is optimistic about the upcoming releases of new WWF wrestling games***" in the fourth quarter of 2000 and continuing into 2001.  Defendants, however, lowered earnings and revenue projections at that time, in part, as a result of the "general softness in the toy industry."

74.     The following day, the price of JAKKS common stock declined 25%.  Financial commentators, however, were quick to point out that this share price decline was due, in part, to the fact that only days before Defendants issued the quarterly update, defendant Friedman appeared in front of 80 analysts and investors at a Donaldson Jufkin & Jenrette conference during which he stated that, while there was some softness in the market, that he was still comfortable with third quarter estimates.  Accordingly, on September 20, 2000, TheStreet.com reported, in part, the following:

> ***So, what happened between then and Tuesday morning, when Jakks lowered the boom***?  Did an order suddenly get canceled?  Is the CEO out of the loop on financials?  Did everybody misunderstand what he said?  Hard to say, though it clearly wasn't the latter.
>
> Jakks officials haven't returned my call, but this much we know: Analyst Arvind Bhatia of Southwest Securities, which has provided investment banking services to Jakks, lowered his estimates for the quarter before Jakks issued its warning.  How'd he know?  ***He told me that in his conversations with the company on Monday "their body language was not convincing," and upon further questioning the company conceded to him that his prior forecasts were too aggressive.  When he***

*asked whether the company would miss the numbers, Bhatia says, "they didn't say no*." That was all Bhatia needed to know.  [Emphasis added.]

75.     By mid-October 2000, SSAI had been terminated as WWE's licensing agent and it had actually initiated suit against WWE for breach of contract.  Realizing that discovery in that action put Defendants at risk of their fraudulent scheme being discovered, Defendant Friedman telephoned Linda McMahon, CEO of WWE, and made the unsolicited offer to use his connections to attempt to broker a settlement with Shenker.  At that time, Friedman did not disclose his or JAKKS' prior agency relationship with Shenker or SSAI.  WWE declined his offer of assistance.

76.     On October 25, 2000, JAKKS issued a press release announcing its financial results for the third quarter ended September 30, 2000.  According to the press release, JAKKS achieved another quarter of purported "Record" setting revenues and profits, driven in substantial part by the success of its WWF licensed products.  Defendants commented on the results stating, in pertinent part, as follows:

> Jack Friedman, chairman and chief executive officer of JAKKS Pacific Inc., said, "*In a relatively soft year for the toy industry overall, we believe it is a great accomplishment for us to have sustained our strong top-line and bottom-line growth*."
>
> "*Sales of WWF video games through our joint venture with THQ Inc. did well, and we look forward to very strong sales of our video games in the fourth quarter*."
>
> "With a wealth of talent, exciting new products due for release over the next several months, and a balance sheet that will support further acquisitions, *we are clearly poised for further growth*," added Stephen Berman, president and chief operating officer of JAKKS." . . . .  [Emphasis added.]

77.     On November 8, 2000, JAKKS filed its quarterly report for the third quarter of 2000 on Form 10-Q with the SEC, which was signed by defendant Bennett.  The Company's 3Q:00 Form 10-Q also contained statements concerning the Company's "key strategies" and its "Basis of Presentation," similar to or the same as those statements contained in JAKKS previous SEC filings, reproduced herein, *supra*.

78.    On February 21, 2001, JAKKS issued a press release announcing the debut of the

Company's two newest WWF video games for PlayStation 2.  In addition to the foregoing, this press

release stated, in relevant part, the following:

> "*These additional games and platforms will strongly compliment the previously announced 'WWF Raw Is War(TM)' for Xbox(TM), as well as our other World Wrestling Federation videogames already on the market*," said Jamie Wood, senior vice president Action Toys, JAKKS Pacific, Inc.  [Emphasis added.]

79.    On March 7, 2001, JAKKS issued a press release announcing its financial results for

the fourth quarter and year-ended December 31, 2000.  According to the press release, the

Company's net income in fiscal 2000 rose 30.3% compared to the prior year.  In the press release,

defendant Friedman credited the Company's WWE product line for JAKKS' purported success in

2000:

> "*Overall, 2000 was a most satisfying one for our company*," said Jack Friedman, chairman and chief executive officer of JAKKS Pacific.  "*In what was a relatively tough year for the toy industry, JAKKS was able to continue both its internal and external growth and strengthen its position* with retailers and consumers in the toy and crafts industries."

> Looking to the current year, Friedman reiterated the company's previously announced sales and earnings forecast: "*The company looks forward to another record year in 2001, when we expect net sales to increase to the range of $290 to $310 million*, with net income increasing to a range of $30 to $32 million, or $1.61 to $1.71 per diluted share."

> "*The company expects to continue to derive substantial earnings from its video game joint venture with THQ*, although the WWF video games, due to the hardware transition, are anticipated to make considerably less of a contribution to net income in the year 2001 than in the prior year.  However, we expect this to be more than offset by our other product lines."  [Emphasis added.]

80.    On April 2, 2001, JAKKS filed its 2000 Annual Report on Form 10-K with the SEC,

which was signed by defendants Bennett, Friedman and Berman, among others.  In addition to

reiterating the results announced in the March 7, 2001 press release, the Company's 2000 Form 10-K

also contained statements concerning the Company's "key strategy" and its agreement with WWE

and joint venture with THQ, similar to or the same as those statements contained in JAKKS prior

SEC filings, reproduced herein, *supra*. In addition, the 2000 Form 10-K also reported that, during

2000, the JAKKS/THQ joint venture had earned over $15.9 million in profits, versus total net

income of $28.6 million for JAKKS, as follows:

> In June 1998, the Company formed a joint venture with a company that develops,
> publishes and distributes interactive entertainment software for the leading hardware
> game platforms in the home video game market. The joint venture has entered into a
> license agreement under which it acquired the exclusive worldwide right to publish
> video games on all hardware platforms . . . . *During 2000 the Company earned
> $15,905,860 in profit from the joint venture*. [Emphasis added.]

81.    On April 23, 2001, JAKKS issued a press release announcing its financial results for

the first quarter ended March 30, 2001, and reaffirming guidance for the remainder of the year. This

press release also announced a one million share buy-back, in addition to stating, in pertinent part, as

follows:

> "*We are very pleased with the first-quarter results*," said Jack Friedman, chairman
> and CEO of JAKKS Pacific. "*Our core businesses are doing extremely well, and
> 2001 is clearly off to a good start*, consistent with our forecast. *We remain
> comfortable with our earlier forecast for second quarter net sales and earnings per
> diluted share in the range of $63 to $66 million and $0.34 to $0.37, respectively*,
> compared to second quarter 2000 results of $50.6 million and $0.31 respectively.
>
> "*With strong demand for our core products as we had anticipated, we continue to
> expect revenue growth in 2001 of 15% to 23%, and earnings growth of 5% to 12%
> over the prior year's results*, notwithstanding the fact that we are expecting a lesser
> contribution from our video game joint venture this year. *This should translate to
> full year sales of $290 to $310 million, with net income of $30 to $32 million, or
> $1.61 to $1.71 per diluted share*, compared to 2000 results of $252.3 million, $28.6
> million and $1.41, respectively. And, *for 2002 we are expecting a significantly
> greater contribution from the joint venture as new hardware platforms, like
> Nintendo 'GameCube', are introduced and as the penetration of Sony 'PlayStation
> 2' and Microsoft 'Xbox' increases*."
>
> \*        \*        \*
>
> Commenting on the strength of the Company's core businesses, Stephen Berman,
> president and COO of JAKKS Pacific, noted: "As a multi-brand and diverse
> company with a broad array of products, many of which sell for less than $10, *we
> believe we are exceptionally well-positioned to weather the economic slowdown*

*that some are anticipating at retail*. Our diverse product line, including action figures, toy vehicles and collectibles, craft and activity sets, school-related products, including writing instruments, dolls and infant toys, provides the Company with stability, while at the same time presenting broad opportunities for growth."

Berman continued, "*Also, the fact that we have the unique opportunity to be involved in the software business for WWF video games through our joint venture with THQ gives us additional balance and further opportunities to profit from the popularity of such games, particularly as new hardware platforms, like Microsoft 'Xbox' and Nintendo 'GameCube' and 'GameBoy Advance', are introduced*. Based on industry reports, these new hardware platforms are expected to be introduced toward the end of this year or the beginning of the next, and we believe that the Company will achieve substantial earnings growth from its joint venture in 2002 . . . ." [Emphasis added.]

82. On May 15, 2001, JAKKS filed its quarterly report for the first quarter of 2001 on Form 10-Q with the SEC, which was signed by defendant Bennett. The Company's 1Q:01 Form 10-Q also contained statements concerning the Company's "key strategies," its "Basis of Presentation," and its relationship with THQ and WWE, similar to or the same as those statements as were made in JAKKS previous SEC filings, reproduced herein, *supra*.

83. On or about June 12, 2001, JAKKS filed its Proxy Statement in connection with the election of directors for 2001-2002 with the SEC. According to the Proxy, for 2000, defendant Friedman received a base salary of $771,000, a bonus of $1.613 million and 207,254 options, and defendant Berman received a base salary of $746,000, a bonus of $1.613 million and 345,024 options. According to the Proxy, such payments were justified because of the following:

*We believe that our success to date has been to a significant extent attributable to the personal efforts of Mr. Friedman and Mr. Berman*. They founded the Company, established its business philosophy and operating structure and were the driving force behind our central theme of focusing our business on "evergreen" products. *Mr. Friedman's long-term relationship with World Wrestling Federation Entertainment, Inc. was instrumental in our acquiring our successful World Wrestling Federation licenses. In his nearly four-decade-long career in the toy industry, he has established an important network of relationships that we have been able to exploit in product acquisition, production and sales*. Both Mr. Berman and Mr. Friedman embody our management philosophy with a "hands on" approach in all areas of our business. *In addition to their general supervisory functions, they are directly involved in license acquisition*, product design and development,

- 29 -

production, and sales and marketing, as well as our financing and acquisition efforts. *Their efforts have resulted in our identifying and securing the World Wrestling Federation licenses and other desirable licenses and properties, the rapid expansion of our product lines*, our achieving significant production efficiencies and the development of a loyal and growing customer base. [Emphasis added.]

84.    Attached as Exhibit A of this Proxy was the Charter of the Audit Committee of the

Board of Directors of the Company which outlined the functions and responsibilities of the Audit

Committee – including the duty oversee the integrity of the Company's management – in part, as

follows:

*The Committee shall monitor the Company's management's compliance with legal requirements and ethical standards applicable to their conduct at the Company*. For this purpose, the Committee may approve and adopt *appropriate rules or policies for the Company and its personnel, including without limitation with respect to conflicts of interest* and the use of corporate assets, or recommend such rules or policies for approval and adoption by the Board. *The Committee shall review and investigate any actions or matters pertaining to the integrity of the Company's management and their compliance with such legal requirements and ethical standards*, and, if appropriate, recommend remedial action to be taken by the Board. [Emphasis added.]

85.    On or about July 11, 2001, JAKKS disseminated its year-end 2000 Annual Report to

shareholders. The 2000 Annual Report also contained a Letter to Shareholders signed by defendants

Berman and Friedman which stated, in part, the following:

*In 2000, we remained true to the formula that has fueled our company's strength and growth from inception*: strong brands, savvy management, diversified product lines, speed-to-market, and a *disciplined acquisition strategy*.

\*       \*       \*

Perhaps *most central to our success is our ability to maximize our licensed categories*. We do this by encouraging innovation, extending product lines and building merchandizing programs . . . .

\*       \*       \*

Meanwhile, our WWF video games for the Sony PlayStation, Nintendo 64, and Nintendo GameBoy Color hardware platforms, developed through our joint venture with THQ Inc., sold extremely well throughout the year. *We expect WWF software*

- 30 -

*products in 2001 to continue to sell well, followed by robust growth in 2002 as consumers migrate to the next generation of platforms*.  [Emphasis added.]

86.     On July 19, 2001, JAKKS issued a press release announcing its financial results for the second quarter ended June 30, 2001.  In addition to the foregoing, defendant Berman used this press release to condition investors to believe that lower sales of WWF video games in the second quarter were the result of the "industry's transition to new [game] platforms," which was not expected to have a long-term negative impact on the Company.  Accordingly, defendant Berman maintained a positive outlook for the Company's performance for the remainder of 2001, in part, as follows:

> Stephen Bennan, the company's president and COO, noted that as in the first quarter, lower joint venture profits from the company's WWF video games during the industry's transition to new platforms – notably Microsoft's "Xbox" and Nintendo's "GameCube" – that are not expected to be available at retail until the fourth quarter at the earliest.  "Accordingly," said Berman, "joint venture profits for the balance of the year are expected to be substantially below those of the comparable period of 2000, but will not impact our 2001 forecast of $1.61 to $1.71 per share.

87.     On July 31, 2001, JAKKS filed its quarterly report on Form 10-Q for the second quarter of 2001 with the SEC which was signed by defendant Bennett.  The Company's 2Q:01 Form 10-Q also contained statements concerning the Company's "key strategies," "Basis of Presentation," and its relationship with THQ and WWE, similar to or the same as those statements as were made in JAKKS previous SEC filings, reproduced herein, *supra*.

88.     On August 20, 2001, JAKKS issued a press release announcing that the Company had been named to *Fortune* Magazine's list of 100 Fastest-Growing companies for the third consecutive year.  This press release also quoted defendant Berman, in part, as follows:

> Stephen Berman, president and COO of JAKKS Pacific, noted that among the factors in JAKKS' ranking were an earnings per share growth rate of 67%, revenue growth of 85%, and a total return of 32%, over the past three years.  "We are extremely proud to have once again made FORTUNE's Fastest-Growing Companies list," said Berman.  "***We are fortunate to have developed a proven business model that continues to serve us well***."  [Emphasis added.]

- 31 -

89.    On October 18, 2001, JAKKS issued a press release announcing its financial results for the third quarter ended September 30, 2001.  In the press release, Defendants highlighted the strong sales of WWE video games stating, in relevant part, the following:

> "Our JAKKS Pacific/THQ World Wrestling Federation(R) video game joint venture is highly anticipating three new titles during the fourth quarter, including games for the Sony Playstation 2, new Microsoft Xbox and Game Boy Advance platforms," continued Friedman. "*As the installed base for the new hardware systems increases, it bodes extremely well for sales of our World Wrestling Federation video games for the fourth quarter, fiscal 2002 and beyond*."

> *            *            *

> "*We continue to anticipate that results for this year will reflect net sales of $290 to $300 million and earnings per diluted share of $1.61 to $1.71 on net income of $30 to $32 million*.  This represents midrange percentage growth in 2001 of 17%, 18% and 8%, respectively, over fiscal 2000 net sales of $252.3 million and earnings per diluted share of $1.41 on net income of $28.6 million," Berman continued. [Emphasis added.]

In part, based on the continued success of JAKKS' WWE licensed products, defendant Friedman stated that the Company was well-positioned going into 2002, as follows:

> "Given our current environment, for 2002 our outlook remains positive," concluded Friedman. "*With World Wrestling Federation action figures, accessories and video games*; stationery and activity products from Flying Colors (for assorted properties including Nickelodeon(R) programs, Cubix(TM), and other top licenses); BattleBots(TM), Junkyard Wars(TM) and extreme sports lines from Road Champs(R); our growing stable of writing instruments; and a number of items from our other divisions, *we believe we have a solid product base going into 2002.  This coupled with our strong financial position and depth of management position us well to continue our business strategies*."  [Emphasis added.]

90.    Following the press release of these strong financial results, shares of the Company rallied over $2.00 per share, to close trading that day at $18.30 per share.

91.    On November 14, 2001, JAKKS filed its quarterly report for the third quarter of 2001 on Form 10-Q with the SEC, which was signed by defendant Bennett.  The Company's 3Q:01 Form 10-Q also contained statements concerning the Company's "key strategies," its "Basis of

Presentation," and its relationship with THQ and WWE, similar to or the same as those statements as were made in JAKKS' previous SEC filings, reproduced herein, *supra*.

92.     Taking further advantage in the artificial inflation in the price of JAKKS shares caused in significant part by defendants' materially false and misleading statements and omissions, on February 10, 2002, defendants announced the proposed acquisition of Toymax International Inc., a New York-based toy designer and marketer.  This deal, valued at approximately $55 million, consisted primarily of payment of $3.00 per Toymax share in cash, plus an additional $1.50 per share payable in JAKKS common stock to Toymax's three principal shareholders who together held a 64% stake in Toymax.  The remainder of Toymax's shareholders would receive $4.50 per share in cash.

93.     On February 12, 2002, JAKKS issued a press release announcing that the Company had begun shipping the "WWF Raw" video game, the first WWF licensed title for the Microsoft Xbox game platform.  The press release stated, in pertinent part, as follows:

> "WWF Raw" marks the 10th THQ/JAKKS Pacific World Wrestling Federation video game release; ***a franchise that now boasts sales in excess of $250 million (see note) at retail nationwide***.
>
> *            *            *
>
> "Bringing an exclusively licensed World Wrestling Federation title to Xbox is a continuing example of our commitment to delivering exciting and unique games to new platforms," stated Michael Rubinelli, vice president, product development, THQ.  "'WWF Raw' utilizes all of the technology of the Xbox by bringing realistically depicted models, authentic signature moves and smooth character animations to one of the most powerful gaming systems available."  [Emphasis added.]

94.     On February 12, 2002, JAKKS issued a press release announcing its financial results for the fourth quarter and year-ended December 31, 2001 results.  The press release stated, in pertinent part, as follows:

For the year, net sales were a record $284.4 million compared to $252.3 million in 2000, an increase of 12.7%.  Net income on a pro forma basis increased 11.5% to $32.0 million, or $1.65 per diluted share, from $28.7 million, or $1.41 per diluted share, in the prior year.  Including a special reserve of $5.0 million relating to Kmart Corporation's recent bankruptcy filing, net income was $28.2 million, or $1.45 per diluted share.  Also included in the full year net income are non-cash charges of $2.6 million and $0.1 million for 2001 and 2000, respectively, relating to the 2000 price reset of certain of the Company's outstanding stock options.  ***In 2001, the THQ/JAKKS joint venture contributed profit of $6.7 million*** compared to $15.9 million in 2000.  Fully diluted shares outstanding were 19.4 million in 2001 and 20.3 million in 2000.

Fourth-quarter net sales were $61.4 million compared to $59.1 million a year ago, and net income on a pro forma basis was $8.1 million, or $0.42 per diluted share, compared to net income of $6.0 million, or $0.32 per diluted share, in the fourth quarter of 2000.  Including the special reserve of $5.0 million, net income was $4.4 million, or $0.22 per diluted share.  Also included in the fourth quarter results were non-cash charges of $1.1 million and $0.1 million for 2001 and 2000, respectively, relating to the 2000 stock option price reset.  ***In the fourth quarter of 2001, the THQ/JAKKS joint venture contributed profit of $5.7 million*** compared to $7.7 million in 2000.  Fully diluted shares outstanding were 19.8 million in 2001 and 18.6 million in 2000.  [Emphasis added.]

Defendant Berman projected another "record year" in 2002, driven by the introduction of new products, including WWE video games and accessories, as  follows:

"***We expect 2002 will be another record year for JAKKS***, with new introductions expected in all segments," said Stephen Bennan, President and Chief Operating Officer of JAKKS Pacific.  'New introductions this year include new writing instruments using gel ink technologies, extensions to our extreme sports toy lines with gyros, and ***new World Wrestling Federation(R) action figures and accessories scheduled for release this year.  Likewise, with the industry's transition to new video game hardware essentially complete, and with several exciting new titles due for release, we anticipate substantially higher profits from JAKKS' World Wrestling Federation video game joint venture with THQ Inc.***  [Emphasis added.]

95.     On April 1, 2002, JAKKS filed its 2001 Annual Report on Form 10-K with the SEC, which was signed by defendants Bennett, Friedman and Berman, among others.  In addition to reiterating the results announced in the February 12, 2002 press release, the Company's 2001 Form 10-K also contained statements concerning the Company's "key strategy" and agreements with WWE and THQ, similar to or the same as those statements contained in JAKKS previous SEC

- 34 -

filing, reproduced herein, *supra*. In addition, regarding the THQ/WWE license, the Company's

2001 Form 10-K also stated, in part, the following:

> *We have a fifty percent interest in a joint venture with THQ, a developer, publisher and distributor of interactive entertainment software, and the joint venture licensed the rights from World Wrestling Federation Entertainment to publish World Wrestling Federation electronic video games on all platforms*. The first games produced under this license, which expires initially December 31, 2009 and has a five-year renewal option, were released in November 1999. Through June 30, 2006, we are entitled to receive a guaranteed preferred return at varying rates of net sales of the video games depending on the cumulative unit sales and platform of each particular game, which we accrue in the quarter the games are sold. *THQ retains the financial risk of the joint venture and is responsible for the day-to-day operations, including the development, sales and distribution of the licensed games for which they are entitled to receive the balance of any profits*. For periods after June 30, 2006, the amount of the preferred return will be subject to renegotiation between THQ and us. Distributions of the preferred return from the joint venture contributed significantly to our pre-tax income, representing 11.9% of pre-tax income in 1999, 39.4% in 2000 and 17.6% in 2001. The annual minimum preferred return to be distributed to us by the joint venture during each of the years in the period ending December 31, 2003 is $2.6 million per year. *We expect our aggregate return over this period to be significantly in excess of this amount, although we cannot predict with certainty that expected levels of return will be achieved* and, in any case, we anticipate substantial fluctuations in the amount of the preferred return distributed to us from year to year. *The amount of our preferred return in any year will be subject to various factors, including the number of games released, life cycle of hardware platforms, market conditions and changes in consumer interests*. [Emphasis added.]

96.    On April 23, 2002, JAKKS issued a press release announcing its financial results for

the first quarter ended March 31, 2002. Defendant Friedman reiterated the importance of the WWE

product line in terms of its contribution to the Company's operations, stating, in pertinent part, as

follows:

> "*With the continuing increase in penetration of the new video game platforms, our joint venture is on track to increase significantly its contribution to our profitability and cash flow through the remainder of the current hardware cycle*. Our video game joint venture is excited about our first Nintendo GameCube(TM) title, WWF Wrestlemania X8, slated for a June launch, and continued sales of WWF Raw(TM) for Microsoft Xbox(TM) and WWF Smackdown! Just Bring It(TM) for PlayStation 2."

"*We continue to be excited about 2002 and reiterate our sales forecast, which anticipates $360 million to $380 million of sales for the year*, and our forecast for diluted earnings per share to be $1.90 to $2.01 (excluding restructuring charges)," stated Mr. Friedman.

Mr. Friedman continued, "The response to our products has been strong and reinforces our expectations for another record sales year. We believe we have our broadest and best product line across our different product segments. Sales have been extremely promising for our first-quarter new product introductions, which include Liqualoons, our new bubble solution from Flying Colors, as well as our Nickelodeon-branded products – Smatter, Gak Splat and Skweeez, which has already won the Oppenheim Toy Portfolio Gold Seal Award. *As always, our World Wrestling Federation product line continues to make significant contributions to our operations as it evolves along with the ever-changing themes in the story lines, including the distinction of the two leagues, Raw and Smackdown*." [Emphasis added.]

97.     Also, on April 23, 2002, Defendants issued a press release announcing that JAKKS had filed a registration statement with the SEC, in connection with the public offering of an additional 3.5 million shares of common stock – 3 million shares of which were to be sold by the Company and the remaining 500,000 shares of which were to be sold by certain Selling Shareholders, including certain of the defendants named herein. This press release also stated that defendants granted underwriters an over-subscription option to purchase an additional 525,000 shares of JAKKS common stock to cover over-allotments.

98.     On May 3, 2002, JAKKS filed its quarterly report for the first quarter of 2002 on Form 10-Q with the SEC, which was signed by defendant Bennett. The Company's 1Q:02 Form 10-Q also contained statements concerning the Company's "key strategies," its "Basis of Presentation" and its joint venture with THQ regarding the WWE video game development and toy sales, and similar to or the same as those statements contained in JAKKS previous SEC filings, reproduced herein, *supra*.

99.     On May 23, 2002, JAKKS issued a press release announcing that the Company had completed the sale of 3.5 million shares of common stock priced at $17.75 per share. These shares

were sold pursuant to a registration statement filed with the SEC and declared effective on or about

May 22, 2002.  In addition to repeating many of the same or substantially similar statements

concerning the financial and operational condition of the Company as had been previously filed with

the SEC, this registration statement stated, in part, the following:

> *We have capitalized on our relationship with World Wrestling Entertainment, Inc.*
> *(WWE) by obtaining an exclusive worldwide license for our joint venture with*
> *THQ Inc*. (THQ), which develops, produces, manufactures and markets video games
> based on World Wrestling Entertainment characters and themes.  Since the joint
> venture's first title release in 1999, it has released 11 new titles.  *We have received*
> *$27.5 million as our share of the joint venture's profit through March 31, 2002*.
>
> \*          \*          \*
>
> World Wrestling Entertainment Video Games
>
> In June 1998, we formed a joint venture with THQ, a developer, publisher and
> distributor of interactive entertainment software for the leading hardware game
> platforms in the home video game market.  The joint venture entered into a license
> agreement with the WWE under which it acquired the exclusive worldwide right to
> publish World Wrestling Entertainment video games on all hardware platforms.  The
> term of the license agreement expires on December 31, 2009, and the joint venture
> has a right to renew the license for an additional five years under various conditions.
> [Emphasis added.]

100.    In addition to the foregoing, the Registration Statement also identified the Selling

Shareholders, who together sold 500,000 shares of stock in this offering priced at $17.75 per share,

including: Jack Friedman – 300,000 shares; Stephen Berman – 150,000 shares; and Murray Skala –

30,000 shares.

101.    Unbeknownst to investors, on or about June 11, 2002, JAKKS received a subpoena in

connection with WWE's then on-going litigation with Bell and Shenker, ordering JAKKS to produce

a variety of records relating to the Company's dealings with them.  This subpoena included all

documents related to any agreements between JAKKS, Shenker and/or SSAI and all documents

related to any payments to Shenker or SSAI.

102.    In or about July 2002, Defendants disseminated the Company's year-end 2001 Annual Report to shareholders.  In addition to reiterating many of the same materially false and misleading statements as had been made previously and reproduced herein, the 2001 ARS also contained a Letter to Shareholders signed by defendants Berman and Friedman which stated, in part, the following:

> This time a year ago, we said JAKKS Pacific would act decisively on strategic opportunities, enter new partnerships and reinforce existing ones. ***We promised you that we would remain true to our philosophy, developing products and acquiring licenses with the potential for significant success***.  And we stated that we would remain operationally lean and financially healthy, even as we pursued new initiatives.
>
> ***JAKKS Pacific has faithfully and effectively implemented its successful business strategy from day one***.  And 2001 was no different, in spite of a turbulent global economic climate and a challenging retail environment. In short, we kept true to our word.
>
> *            *            *
>
> ***Our World Wrestling Federation actions figures, playsets and accessories, along with the World Wrestling Federation video games created through our joint venture with THQ, just keep getting better***.  The World Wrestling Federation brand continues to dominate the action figure category and this product line has positioned JAKKS Pacific as a leader in boys action toys.  We consistently challenge our product development teams to use the most advanced technology possible, and they continue to meet those challenges.
>
> *            *            *
>
> ***Additionally, the highly anticipated new video game platform transition is well underway***.  With our next generation World Wrestling Federation video game titles for Microsoft Xbox, Nintendo Game Cube, Sony PlaysStation 2, Nintendo GameBoy Advance and several additional platforms, ***we are well positioned for explosive growth, and we anticipate substantial profits from our World Wrestling Federation joint venture with video game developer THQ over at least the next eight years***. [Emphasis added.]

103.    On July 22, 2002, JAKKS issued a press release announcing its financial results for the second quarter ended June 30, 2002.  Defendant Friedman used this press release to condition investors to believe that the Company's performance was "resilient," and attributed JAKKS'

purported stellar results to its diverse product lines, including WWE toys and video games, as follows:

> Jack Friedman, Chairman and Chief Executive Officer of JAKKS Pacific commented, "***Our operations and financial results have proven resilient***, even considering a challenging economy and a lackluster toy retail environment. ***This is a tribute to our company, its dedicated employees worldwide and our business strategy. Through our broad, expanding and diverse product lines, which include Flying Colors, Pentech, World Wrestling Entertainment action figures, accessories and video games, Funnoodle and Go Fly a Kite, amongst others, we have been able to continue our strategy of providing great value to our retailers and our consumers***." [Emphasis added.]

104.    On August 14, 2002, JAKKS filed its quarterly report for the second quarter of 2002 on Form 10-Q with the SEC, which was signed by defendant Bennett. The Company's 2Q:02 Form 10-Q also contained statements concerning the Company's "key strategies," its "Basis of Presentation," and its joint venture with THQ regarding the WWE video game and toy development similar to or the same as those statements contained in JAKKS previous SEC filings, reproduced herein, *supra*. In addition, the Company's 2Q:02 Form 10-Q also contained Certifications by defendants Friedman and Bennett which purported to certify the veracity and completeness of JAKKS' regulatory disclosures, as follows:

> EXHIBIT 99.1

> ### CERTIFICATION OF CHIEF EXECUTIVE OFFICER

> Pursuant to 18 U.S.C. Section 1350, the undersigned officer of JAKKS Pacific, Inc. ("JAKKS"), ***hereby certifies that JAKKS' Quarterly Report on Form 10-Q for the quarter ended June 30, 2002 (the "Report") fully complies with the requirements of Section 13(a) or 15(d), as applicable, of the Securities Exchange Act of 1934 and that the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of JAKKS***. [Emphasis added.]

> /s/ Jack Friedman                    Dated: August 14, 2002

> -------------

Jack Friedman
Chairman and Chief Executive Officer
Principal Executive Officer

EXHIBIT 99.2

CERTIFICATION OF CHIEF FINANCIAL OFFICER

Pursuant to 18 U.S.C. Section 1350, the undersigned officer of JAKKS Pacific, Inc. ("JAKKS"), *hereby certifies that JAKKS' Quarterly Report on Form 10-Q for the quarter ended June 30, 2002 (the "Report") fully complies with the requirements of Section 13(a) or 15(d), as applicable, of the Securities Exchange Act of 1934 and that the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of JAKKS*.  [Emphasis added.]

/s/ Joel M. Bennett                    Dated: August 14, 2002

---------------

Joel M. Bennett
Chief Financial Officer
Principal Financial Officer

105.    On October 14, 2002, in connection with the press release of the Company's newest WWE licensed video game "WWE Raw" for PC, JAKKS issued a press release which stated, in part, that this new game introduction *allowed JAKKS to bring "one of the most successful software licenses in the interactive entertainment market to the personal computer*."  Similarly, on October 17, 2002, when defendants announced the re-launch of WWE SmackDown!  Under PlayStation 2 "Greatest Hits" collection, Company spokesman Nelo Lucich, Director of Interactive at JAKKS stated, "*Our inclusion in Sony's Greatest Hits' collection is a testament to the success of the video game franchise*, and we are extremely proud to have WWE SmackDown! Just Bring It included in this prestigious line-up."  [Emphasis added.]

106.    On or about August 21, 2002, JAKKS filed its Proxy Statement in connection with the election of directors for 2002-2003 with the SEC.  According to the Proxy, for 2001, defendant Friedman received a base salary of $821,000, a bonus of $1.706 million and 175,000 options, and

- 40 -

defendant Berman received a received a base salary of $796,000, a bonus of $1.706 million and

175,000 options. According to the Proxy, such payments were justified because:

> *We believe that our success to date has been to a significant extent attributable to the personal efforts of Mr. Friedman and Mr. Berman*. They founded the Company, established its business philosophy and operating structure and were the driving force behind our central theme of focusing our business on "evergreen" products. *Mr. Friedman's long-term relationship with World Wrestling Federation Entertainment, Inc. was instrumental in our acquiring our successful World Wrestling Federation licenses.* In his nearly four-decade-long career in the toy industry, he has established an important network of relationships that we have been able to exploit in product acquisition, production and sales. *Both Mr. Berman and Mr. Friedman embody our management philosophy with a "hands on" approach in all areas of our business. In addition to their general supervisory functions, they are directly involved in license acquisition, product design and development, production, and sales and marketing, as well as our financing and acquisition efforts. Their efforts have resulted in our identifying and securing the World Wrestling Federation licenses and other desirable licenses and properties*, the rapid expansion of our product lines, our achieving significant production efficiencies and the development of a loyal and growing customer base. [Emphasis added.]

107. In addition to the foregoing, this Proxy also reported certain "Related Transactions"

between insiders and/or defendants herein and the Company, including the following:

> One of our directors, Murray L. Skala, is a partner in the law firm of Feder, Kaszovitz, Isaacson, Weber, Skala, Bass & Rhine LLP, which has performed, and is expected to continue to perform, legal services for us. In 2001, *we incurred approximately $1,129,000 for legal fees and reimbursable expenses payable to that firm. [Compared to $975,000 for legal fees and reimbursable expenses payable to that firm in 2000, and $1,000,000 in 1999.]*
>
> *In April 2000, we loaned $1,500,000 to each of Jack Friedman and Stephen G. Berman*. The entire principal amount of each loan is due on April 28, 2003 and, until repaid, interest thereon is payable semi-annually at the rate of 6.5% per annum. Mr. Berman's indebtedness to us under his loan is secured by a deed of trust on certain real property. As of May 7, 2002, the outstanding principal balances of Mr. Friedman's and Berman's loans were $975,000 and $995,000, respectively. *In May 2000, we loaned $250,000 to Joel M. Bennett*. The entire principal amount of his loan, together with interest accrued thereon at the rate of 7.0% per annum, was due on May 12, 2002. *Pursuant to our agreement with Mr Bennet, we agreed to forgive all of his indebtedness to us under his loan if he continued to be employed by us on such date*. As of May 12, 2002, accrued interest to date on Mr. Bennett's loan was $35,000.00. All three loans were made to assist our executive officers in meeting certain personal financial obligations. [Emphasis added.]

- 41 -

108.    On October 22, 2002, JAKKS issued a press release titled, "JAKKS Pacific Reports Record Sales and Earnings," for the third quarter ended June 30, 2002.  In part, based on the success of the Company's WWE licenses and its joint venture with THQ, defendant Berman again used the Company's press release to assure investors of JAKKS' purported strong operational condition and anticipated growth prospects, as follows:

> "***Our financial position remains strong*** with $156.2 million of working capital, cash in excess of $10 1 million and net stockholder's equity of $14.47 per share.  Given the strength of our balance sheet and $50 million bank line, ***we are well positioned to continue to grow our business through strategic acquisitions and internal development that will further diversify our product offerings to our existing and new retail customers***."  [Emphasis added.]

In addition, defendant Friedman predicted the successful launch of two new WWE videogames in the fourth quarter:

> Mr. Friedman continued, "We also have had nice sell-in of our Nickelodeon lines for the holidays, as well as a number of new WWE items and the first shipments of our Disney Princess craft and activity toys.  In the fourth quarter, we with our joint venture partner, THQ, will see the launch of two new World Wrestling Entertainment games, WWE(TM) SmackDown!(TM) Shut Your Mouth(TM) for the PlayStation(R) 2 and WWE(TM) Road to WrestleMania(R) X8 for Game Boy(R) Advance, and have recently shipped the new WWE(TM) Raw(TM)(R)for the PC, which we believe will appeal to a new group of garners."

109.    Unbeknownst to investors, on or about October 30, 2002, JAKKS responded by letter to WWE's June 11, 2002 subpoena.  At that time defendants concealed and did not reveal either the $80,000 or $20,000 invoice paid to Stanfull in 1998, nor any payments made to Shenker or SSAI, nor any documents or invoices indicating that such payments had been made.  At that time, JAKKS had also failed to disclose that Shenker had acted as agent for the Company.

110.    On November 8, 2002, Company spokesperson Geena Goldberg granted a widely-reported interview on Minnesota Public Radio's Marketplace.  During this interview, Goldberg reiterated defendants' growth strategy of becoming a "billion-dollar toy company" within the next three to five years.  During the Goldberg interview, it was again revealed that defendants had built

the Company upon the strength of JAKKS' WWE licenses, which had allowed defendants to acquire

other assets and diversify JAKKS' revenue mix. While Goldberg stated that JAKKS had by then

grown beyond the WWE licenses, she clearly stated that both "***internally and externally [we] still***

***remain loyal to and count on WWE very much***." [Emphasis added.]

111.    On November 14, 2002, JAKKS filed its quarterly report for the third quarter of 2002

on Form 10-Q with the SEC, which was signed by defendant Bennett. The Company's 3Q:02 Form

10-Q also contained statements concerning the Company's "key strategies," its "Basis of

Presentation," and its joint venture with THQ regarding the WWE video game development, similar

to or the same as those statements contained in JAKKS previous SEC filings, reproduced herein,

*supra*. In addition, the Company's 3Q:02 Form 10-Q also contained expanded Certifications signed

by defendants Friedman and Bennett which purported to certify the veracity and completeness of

JAKKS disclosures, as follows:

### CERTIFICATIONS

1.    I have reviewed this quarterly report on Form 10-Q of JAKKS Pacific, Inc.;

2.    ***Based on my knowledge, this quarterly report does not contain any untrue
statement of a material fact or omit to state a material fact necessary to make the
statements made, in light of the circumstances under which such statements were
made, not misleading with respect to the period covered by this quarterly report***;

3.    ***Based on my knowledge, the financial statements, and other financial
information included in this quarterly report, fairly present in all material respects
the financial condition, results of operations and cash flows of the registrant as of,
and for, the periods presented in this quarterly report***;

4.    The registrant's other certifying officer and I are responsible for establishing
and maintaining disclosure controls and procedures (as defined in Exchange Act
Rules 13a-14 and 15d-14) for the registrant and we have:

a)    ***designed such disclosure controls and procedures to ensure that material
information relating to the registrant, including its consolidated subsidiaries, is
made known to us by others within those entities, particularly during the period in
which this quarterly report is being prepared***;

- 43 -

b)      evaluated the effectiveness of the registrant's disclosure controls and procedures as of a date within 90 days prior to the filing date of this quarterly report (the "Evaluation Date"); and

c)      presented in this quarterly report our conclusions about the effectiveness of the disclosure controls and procedures based on our evaluation as of the Evaluation Date;

5.      The registrant's other certifying officer and I have disclosed, based on our most recent evaluation, to the registrant's auditors and the audit committee of the registrant's board of directors:

a)      all significant deficiencies in the design or operation of internal controls which could adversely affect the registrant's ability to record, process, summarize and report financial data and have identified for the registrant's auditors any material weaknesses in internal controls; and

b)      any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal controls; and

6.      The registrant's other certifying officer and I have indicated in this quarterly report whether or not there were significant changes in internal controls or in other factors that could significantly affect internal controls subsequent to the date of our most recent evaluation, including any corrective actions with regard to significant deficiencies and material weaknesses.  [Emphasis added.]

Date: November 14, 2002

112.    Unbeknownst to investors, on January 14, 2003, pursuant to its right under the licensing agreement WWE's auditors formally requested, in writing, that JAKKS provide a complete list of any and all payments made to Shenker, SSAI, Bell and/or any entity controlled by them.  On January 17, 2003, JAKKS provided yet another false and misleading response, stating that it had *already* "provided any documents that may exist," in response to the June 11, 2002 subpoena.  At that time, defendant Bennett received a copy of JAKKS false response and did nothing to correct it, despite his personal knowledge of the fake invoices presented to the Company by Shenker and/or SSAI and the subsequent payments at issue, all of which he personally directed and orchestrated.

113.    On February 11, 2003, JAKKS issued a press release announcing its financial results for the fourth quarter and year-ended December 31, 2002.  The press release stated, in pertinent part, as follows:

> For the fourth quarter of 2002, the Company's net sales increased 11.5% to $68.5 million compared to $61.4 million for the corresponding period last year.  Net income for the quarter was $7.3 million, or $0.30 per diluted share, compared to $4.4 million, or $0.22 per diluted share for the same period last year . . . .
>
> The Company's net sales for the year increased to a record $3 10 million, compared to $284.3 million for 2001, an increase of 9%.  Net income for the year was $31.3 million, or $1.37 per diluted share, compared to $28.2 million or $1.45 per diluted share in 2001 . . . .
>
> Jack Friedman, Chairman and Chief Executive Officer of JAKKS Pacific, offered his perspective on 2002 and the business outlook for 2003, "*Increased sales and earnings, continued diversification of our product lines, expanded distribution channels, and a continuing strong balance sheet, give us much to be pleased with in 2002* – a year that presented overall economic and retail challenges.  *These strengths and accomplishments, together with our dedicated employees, and new and exciting licenses and products, give us cause to be optimistic about our prospects for continued growth in 2003 and beyond*."
>
> *                *                *
>
> *Based on current initiatives and economic conditions, the Company is targeted to achieve sales and earnings growth of at least 10% in 2003*, excluding non-recurring charges.  [Emphasis added.]

114.    Despite what the *Los Angeles Times* reported as a 65% "jump" in fourth quarter profits, after releasing these results shares of the Company fell more than 14%.  According to *CBS MarketWatch*, on February 12, 2003, JAKKS earnings of $6.2 million, or $0.25 per share, were shy of analysts' consensus estimate for a profit of $0.33 per share.  Partly in response to this share price decline, on February 16, 2003, JAKKS announced that the Board of the Company had authorized a $20 million JAKKS share buy-back.

115.    Only weeks after the JAKKS Board authorized this share support, unbeknownst to investors, on February 25, 2003, WWE auditors again sent a letter to JAKKS requesting copies of all

invoices or a description of each transaction whereby payments were made by the Company to Shenker, SSAI or Stanfull. Later, on March 14, 2003, by letter to JAKKS corporate counsel, WWE again requested an answer as to whether payments had been made by JAKKS to Shenker, Stanfull or SSAI. On March 19, 2003, JAKKS corporate counsel, Murray Skala, ultimately responded to WWE. Despite the fact that JAKKS had provided no information about its relationship with, or payments to, Shenker and/or SSAI, Skala falsely stated that JAKKS had **already** responded to the June 11, 2002 subpoena "months ago." Later, on March 26, 2003, JAKKS counsel again informed WWF that there was "**no additional information**" of the type requested pursuant to the June 11, 2002 subpoena.

116.    On March 31, 2003, JAKKS filed its 2002 Annual Report on Form 10-K with the SEC, which was signed by defendants Bennett, Friedman and Berman, among others. In addition to stating that the Company had "capitalized" on its relationship with the WWE "by obtaining an exclusive worldwide license for [its] joint venture with THQ" to develop and market video games, the 2002 Form 10-K also reiterated the results announced in JAKKS' February 11, 2003 press release. In addition, the Company's 2002 Form 10-K also contained Certifications by defendants Bennett and Friedman as well as statements concerning the Company's "critical accounting policies," its "key strategy" and the agreement with WWE and THQ, similar to or the same as those statements contained in JAKKS previous annual SEC filing, reproduced herein, *supra*.

117.    On April 22, 2003, JAKKS issued a press release announcing its financial results for the first quarter ended March 31, 2003. According to the press release:

> First quarter net sales increased 13.1 % to $67.8 million, compared to $59.9 million in the comparable period last year. Net income for the period increased to $6.0 million, or $0.24 per diluted share, compared to $2.2 million, or $0.11 per diluted share for the first quarter of last year. The Company had 24.9 million diluted shares outstanding in the first quarter of 2003, 23% more than the 20.2 million diluted

shares outstanding in the first quarter of 2002. First quarter 2002 net income excluding one-time acquisition charges was $7.0 million, or $0.35 per diluted share.

Defendant Berman attributed the Company's purportedly positive results to JAKKS' WWE video games and toys, among other products, and stated that the Company is well positioned for continued growth:

> Mr. Berman added, "We are seeing solid inttial (sic) results from our new licenses for the Dragon Ball(R) franchise and Yu Yu Hakusho(R) and retailers are already looking forward to new introductions of these products. And, *relative to our video game joint venture, we are encouraged by the initial feedback for our new video game Wrestlemania XIX, and other WWE(TM) wrestling titles slated for release later this year*."

> Mr. Berman concluded, "Our financial position remains strong with $135.9 million of working capital, cash in excess of $71 million, or $2.97 per share, and net stockholder's equity of $362 million, or $14.97 per share. Given the strength of our balance sheet and $50 million bank line, *we remain well positioned to continue to grow our business through strategic acquisitions and internal development that will further diversify our product offerings to our existing and new retail customers*." [Emphasis added.]

118.    On May 15, 2003, JAKKS filed its quarterly report for the first quarter of 2003 on Form 10-Q with the SEC, which was signed by defendant Bennett. The 1Q:03 Form 10-Q reiterated the results announced in the April 22, 2003 press release. The 1Q:03 Form 10-Q also contained Certifications by defendants Friedman and Bennett, as well as statements concerning the Company's "key strategies," its Controls and Procedures, its "Basis of Presentation" and its joint venture with THQ regarding the WWE video game development, similar to or the same as those statements contained in JAKKS previous SEC filings, reproduced herein, *supra*.

119.    On July 22, 2003, JAKKS issued a press release announcing its financial results for the second quarter ended June 30, 2003. In the press release, Defendants stated, in pertinent part, as follows:

> Second quarter net sales were $73.3 million, compared to $79.0 million in the comparable period last year. Excluding one-time charges, net income for the period

was $5.3 million, or $0.21 per diluted share, compared to $8.9 million, or $0.41 per diluted share, for the second quarter of last year . . . .

The Company's net sales for the six months ended June 30, 2003 were $141.0 million compared to $138.9 million during the same period in 2002. Excluding one-time charges, net income during the period was $11.2 million, or $0.45 per diluted share, compared to $15.9 million, or $0.76 per diluted share, for the comparable period last year . . . .

"***The second quarter was a challenging one for JAKKS Pacific, as well as for many of our peers***," said Jack Friedman, Chairman and Chief Executive Officer. "As a result of general economic conditions and unusually poor weather, particularly in the Northeast section of the United States, cutbacks in orders from some of our customers in late June had an adverse effect on our performance for the quarter as a whole.  This included sales of seasonal products, including kites from our Go Fly a Kite line and water products from our Funnoodle and Trendmaster/Storm brands.  In addition, due to strict labor constraints in factories throughout China as a result of the SARS epidemic, production continued but was somewhat slowed during the second quarter, causing a delay in the initial shipping of our NASCAR(R) line, as well as a key SpongeBob Squarepants item, which we had expected to ship in June.  As a result, we first began to ship these items during the third quarter.  [Emphasis added.]

120.    Following the release of these results, defendants hosted a conference call for analysts and investors during which one analyst referred to the quarter as "Quite a train wreck."  Defendant Friedman again characterized it merely as "challenging," and stated, in part, the following:

***The second quarter was a challenging one for JAKKS Pacific as well as our peers***.  Sales for the second quarter from $73.3 million due the a challenging retail and economic environment, as well as unusually cool weather throughout the U.S., which adversely affected sales of our seasonal products from Go Fly A Kite to Storm(ph) and Funnoodle.

Our top line was also impacted in the second quarter, by the strict work force constraints due to mandated labor quarantines in factories throughout China as a result of SARS epidemic . . . .

Our bottom line earnings were directly affected by lower sales in the second quarter, and by lower margins due to shifts in product mix.  Additionally, we saw a lesser contribution from our World Wrestling (inaudible) with THQ, (inaudible) during the second quarter as compared to the last quarter last year, due to fewer game introductions during this time period.

***We are, however, expecting to release three new WWE games through our joint venture during the second half of this year, and we believe joint venture profits for***

*the balance of this year will be well above those during the first six months of 2003.*

*We continue to be excited about the future prospects for our WWE video games* . . . . [Emphasis added.]

121.    Following the announcement of these results, shares of the Company again declined, falling in after-hour trading to just above $10.50 per share.  At that time, analysts and investors were very concerned over the fact that Defendants had unexpectedly scaled back JAKKS' growth projections so shortly after selling the $98 million in convertible debt.  As Bear Stearns & Co. analyst Joseph Yourman wrote at that time, "we are more troubled by the fact that the Company was marketing a $98 million convertible bond offering in early July if such a dramatic miss was even a remote possibility."  Bear Stearns acted as lead underwriter of JAKKS' convertible bond offering.

122.    Adding pressure to the Company's stock price, at the end of July, JAKKS also came under fire from Wall Street analysts over the pay to defendants Berman and Freidman.  On July 31, 2003, the Los Angeles Times reported, in part, the following:

*The top two executives at Jakks Pacific Inc.*, under fire from Wall Street analysts over their pay and the company's performance, received *salary increases this year of 14% and 17.5%*, according to a regulatory filing Wednesday.

*The raises, which exceeded the Malibu-based toy maker's 2002 profit and stock performance, came after a tough year for shareholders*.  The company's earnings per share fell 5.5% last year, and its stock lost 29%, as the firm struggled to integrate acquisitions and increase the market share of its core brands, including World Wrestling Entertainment action figures.

*        *        *

*For 2003, Friedman and Berman each will take home a salary of $965,000, a 14% increase for Friedman and a 17.5% boost for Berman*.

*Under the bonus plan that is in effect through the end of this year, the two will receive 4% of pretax profit, not to exceed $2 million.  Jakks has said its pre-tax profit this year would be flat; if that is the case, each would get a bonus of about $1.4 million*.  [Emphasis added.]

123.    According to the *LA Times*, compensation experts said that the Company's filing revealed several "unusual perks" for defendants Friedman and Berman, including:

- Guaranteed annual raises of $25,000 each.

- Restricted stock grants totaling 1.08 million shares over the life of their newly signed eight-year employment contracts, provided only that annual profit at Jakks exceeds $2 million. **At the stock's then current value, those grants were worth $12.5 million**.

- When they signed the new contracts in March, Friedman and Berman received 240,000 shares apiece. Each will get an additional 120,000 shares every year "in consideration for modifying and replacing the pretax income formula for determining his annual bonus and for entering into the amended agreement," according to the filing. **Compensation experts said the two officers didn't need any consideration because the two probably would have little to lose from the new bonus plan**.

- **The length of the new employment contracts was unusual**. Todd Meyer, an independent compensation consultant based in Los Angeles, called eight years "a bit excessive." "**The board is locking the two top executives in for a long time, and they're locking them in at very high total compensation levels**," he said. Of the companies that make up the Standard & Poor's 500 index, only about two dozen offer executives contracts longer than three years, Hodgson said.

124.    In addition to the foregoing, the LA Times reported that the Company had also failed to elaborate on how JAKKS would determine bonuses for the top two officers. While defendants stated that, under the new bonus plan, which would go into effect during 2004, JAKKS would base bonuses on earnings-per-share growth targets, defendants did not say what the targets would be. According to the *LA Times*, Paul Hodgson, senior research analyst with Corporate Library, a corporate-governance information service, complained that "Unless they tell us what the targets are – and the analysts and the stockholders are satisfied that they're sufficiently challenging – then we're never going to find out whether the incentive pay is aligned with stockholder interests. They could be setting themselves meaningless [targets] of a couple of percent a year." Arvind Bhatia, an analyst with Southwest Securities in Dallas, said the "meagerness" of the information shared by JAKKS "raised questions."

125.    On August 14, 2003, JAKKS filed its quarterly report for the second quarter of 2003 on Form 10-Q with the SEC, which was signed by defendant Bennett.  The 2Q:03 Form 10-Q reiterated the results announced in the July 22, 2003 press release.  The 2Q:03 Form 10-Q also contained Certifications by defendants Friedman and Bennett which attested to the purported veracity and completeness of the Company's statements.  In addition, the 2Q:03 Form 10-Q also contained statements concerning the Company's "key strategies," its "Basis of Presentation," its Controls and Procedures, and  its joint venture with THQ regarding the WWE video game development, similar to or the same as those statements contained in JAKKS previous SEC filings, reproduced herein, *supra*.

126.    Unbeknownst to investors, during the first week of September, JAKKS, through defendant Bennett, had provided to the Company's outside counsel documentary evidence of the illegal payments to the Standfull entity controlled by Shenker.  Again, at that time, Defendants made no disclosure to WWE or to investors of the clandestine payments to Shenker and/or SSAI, or the documentary evidence of such payments.

127.    On October 9, 2003, JAKKS issued a press release announcing the launch of the WWE "SmackDown!  Here Comes the Pain" video game for the PlayStation 2 game platform.  In this press release, defendants again described WWE "SmackDown! Here Comes the Pain" as ***the next installment in one of the most successful video game franchises of all time*.***"

128.    On October 21, 2003, JAKKS issued a press release entitled, "JAKKS Pacific Reports Third Quarter 2003 Financial Results."  In this press release defendants stated, in pertinent part, the following:

> Third quarter net sales were $90.3 million, compared to $102.6 million in the comparable period last year.  Net income for the period was $9.6 million, or $0.39 per diluted share, compared to $14.0 million, or $0.58 per diluted share, for the third quarter of last year . . . .

> The Company's net sales for the nine months ended September 30, 2003 were $231.4 million, compared to $241.5 million during the same period in 2002. Excluding one-time net charges, net income during the period was $20.3 million, or $0.82 per diluted share, compared to $29.9 million, or $1.35 per diluted share, for the comparable period last year . . . .

In addition to reporting what the *Midnight Trader* described as "consensus beating" net income of $0.82 per share, excluding special charges – well above First Call consensus estimates of $0.58 per share – this press release also quoted defendant Friedman, in part, as follows:

> ***We remain committed to building long-term growth and profitability for JAKKS Pacific****.* Looking ahead, we intend to devote more attention and resources to internal development, building evergreen lines, and building brand identity while providing retailers and consumers with the high quality product lines at reasonable prices they have come to expect from JAKKS since our inception." [Emphasis added.]

129.    The same day, JAKKS also hosted a conference call for analysts and investors during which defendant Friedman made the following remarks about the Company's WWE license:

> ***The contribution from our WWE video game joint venture with THQ was modestly up during the third quarter compared to last year***. And recently, (technical difficulty) joint venture announced the release of three new WWE games for Q4. Two games were released at the end of the third quarter, and the other will be released during the fourth quarter of this year. ***We believe these new releases will generate joint venture profits comparable to that during the fourth quarter of 2002. We continue to be greatly excited about our WWE video game joint venture***. [Emphasis added.]

130.    Unbeknownst to investors, on or about November 11, 2003, after WWE made it known that it had independently discovered an $80,000.00 payment to Shenker and/or entities controlled by him, defendant Friedman telephoned WWE's Chief Executive Officer, Linda McMahon. During this telephone call, defendant Friedman again misrepresented the true cause of this payment, and told WWE's CEO that such payment related to a "project development" for a mechanical dinosaur project unrelated to the WWE licenses. In addition, at that time, Defendant Friedman also continued to fail to disclose the additional $20,000 payment to Shenker which was paid immediately after the WWE video game license was secured. On or about November 14, 2003,

Defendants presented to WWE a copy of an $80,000 invoice payable to an entity controlled by Shenker, which stated that such payment was for "development of possible latex based soft toys with special coatings."

131.    On November 14, 2003, JAKKS filed its quarterly report for the third quarter of 2003 on Form 10-Q with the SEC, which was signed by defendant Bennett.  JAKKS 3Q:03 Form 10-Q reiterated the results announced in the October 21, 2003 press release.  The Company's 3Q:03 Form 10-Q also contained Certifications by defendants Friedman and Bennett which attested to the purported veracity and completeness of the Company's statements.  In addition, this Form 10-Q also contained statements concerning the Company's "key strategies," its Controls and Procedures, its "Basis of Presentation," and its joint venture with THQ and relationship with WWE, similar to or the same as those statements contained in JAKKS previous SEC filings, reproduced herein, *supra*.

132.    Following the placement of $98 million in convertible notes during the second quarter of 2003, on or about December 23, 2003, Defendants filed a registration statement, registering such notes for sale.  In addition to making many of the same or substantially similar representations concerning the financial and operational condition of the Company, this registration statement stated, in part, the following:

> ***We have capitalized on our relationship with World Wrestling Entertainment, Inc. (WWE) by obtaining an exclusive worldwide license for our joint venture with THQ Inc. (THQ), which develops, produces, manufactures and markets video games based on World Wrestling Entertainment characters and themes***.  Since the joint venture's first title release in 1999, it has released 15 new titles.  We have received $34.6 million in preferred returns as our profit from the joint venture through June 30, 2003.  [Emphasis added.]

133.    On February 17, 2004, JAKKS issued a press release announcing "record" fourth quarter and year-ended December 31, 2003 results, as follows:

> For the fourth quarter of 2003, net sales increased to $84.4 million from $68.5 million in the comparable period last year.  Excluding a pre-tax charge of $2.1 million, or $0.07 per diluted share, for the accounts receivable write-offs attributable

- 53 -

to recent customer bankruptcies, net income for the fourth quarter of 2003 was $8.9 million, or $0.36 per diluted share, as compared to net income of $6.2 million, or $0.25 per diluted share, in the fourth quarter of 2002, which excludes a one-time pre-tax restructuring and recall benefit of $1.4 million.  Reported net income for the fourth quarter of 2003 was $7.1 million, or $0.29 per diluted share, as compared to $7.3 million, or $0.30 per diluted share, for the fourth quarter of last year.

The Company's net sales for the year increased to $315.8 million, as compared to $310.0 million in 2002.  Excluding the one-time charge of $2.0 million for a product recall earlier in the year, the $2.1 million charge for the customer bankruptcies in 2003, and the net restructuring and recall charges of $6.7 million in 2002, net income for the year was $29.2 million, or $1.18 per diluted share, as compared to $36.5 million, or $1.6 1 per diluted share in 2002.  Reported net income for 2003 was $25.9 million, or $1.05 per diluted share, as compared to $31.3 million, or $1.37 per diluted share in 2002.

In "blowing past" Wall Street consensus revenue estimate of $66 million and earnings per share of

$0.29, defendant Friedman credited the solid results to the sale of the Company's products featuring

key licenses, including its WWE toy and videogame licenses, in part, as follows:

Jack Friedman, Chairman and Chief Executive Officer, said, "***We are pleased to report another year of solid sales for 2003 including robust growth in the fourth quarter, with strong sell-through in our mass merchant and other retail distribution channels***.  While we continue to be affected by a challenging industry environment, including the recent bankruptcies of KB Toys, FA0 Schwarz and others, we believe that with our diverse product offerings and categories, ***we are well positioned for growth in 2004***.  As the number of stores in our primary channel base has declined, we are working to place more SKUs on these shelves, while at the same time concentrating on expanding sales of our products beyond traditional toy retailers to other retail channels, including electronics, drug, convenience and office supply stores.

***We are pleased with sales of our products featuring key licenses during the quarter, including WWE and Dragon Ball figure assortments, and our Atari and Nanmco TV Games***.  We have announced a number of new key licenses that we are adding to our TV Games line of product, including Ms. Pac-Man(R) and SpiderMan(R), and are pleased with strong initial sales  of our two newest titles: a relaunch of Activision TV Games and a version based on SpongeBob SquarePants."

***JAKKS Pacific is forecasting 2004 net sales, excluding acquisitions, to be  in the range of $330 to $340 million and diluted earnings per share of $1.20 to $1.30***, excluding non-cash stock-based compensation expense of $9.3 million, of which $8.3 million is related to restricted stock grants, which the Company expects to incur in the first quarter.  [Emphasis added]

- 54 -

134.    On March 15, 2004, JAKKS filed its 2003 Annual Report on Form 10-K with the SEC, which was signed by defendants Bennett, Friedman and Berman, among others.  In addition to again stating that the Company had "capitalized" on its relationship with the WWE, "by obtaining an exclusive worldwide license for [its] joint venture with THQ" to develop and market video games, the 2003 Form 10-K also reiterated the results announced in JAKKS' February 17, 2004, press release.  In addition, the Company's 2003 Form 10-K also contained Certifications by defendants Bennett and Friedman, as well as statements concerning the Company's "critical accounting policies," Controls and Procedures, its "key strategy" and the agreement with WWE and THQ, similar to or the same as those statements contained in JAKKS previous SEC filing, reproduced herein, *supra*.

135.    The 2003 Form 10-K also contained a "Code of Ethics" which applies to all employees and executives of the Company.  This Code stated, in part, the following:

> **As a public company, it is of critical importance that filings with the Securities and Exchange Commission and others be accurate and timely**.  The Subject Parties bear a special responsibility for promoting integrity throughout the Company, with responsibilities to stakeholders both inside and outside of the Company. The Subject Parties have a special role both to adhere to these principles themselves, and also to ensure that a culture exists throughout the Company as a whole that ensures the fair, timely and accurate reporting of the Company's financial results and condition.

> Because of this special role, the Subject Parties are bound by this Code to:

> **act with honesty and integrity, practice and promote ethical conduct, and disclose to the Company's General Counsel, the Board or any committee established by the Company for the purpose of receiving such disclosures (the "Committee"), any material transaction or relationship that reasonably could be expected to give rise to actual or apparent conflicts of interest between any Subject Party's personal and professional relationships**;

> **provide information in the Subject Party's possession that is complete, objective, relevant, and otherwise necessary to ensure the Company provides full, fair, accurate, timely and understandable disclosure in the reports and documents that the Company files with, or submits, to, the Securities and Exchange Commission** or others, and in other public communications made by the Company;

> *comply with applicable laws, rules, standards, best practices and regulations of federal, state, provincial and local governments*, and other appropriate private and public regulatory, listing and standard-setting agencies; and

> *avoid any breach of fiduciary duty*, any self-interested transactions with the Company without full disclosure to the Board or Committee, and promptly report to the Company's General Counsel, the Board or the Committee any conduct *that he or she believes is or may be in violation of law, regulations, business ethics or of any provision of this Code*, including any transaction or relationship that reasonably could be expected to give rise to such a violation.

> *Any waiver of or amendment to this Code may only be made by the Board and will be promptly disclosed in accordance with applicable laws, rules and regulations*. Requests for waivers of any provision of this Code must be made in writing to the Board.  [Emphasis added.]

136.    On April 20, 2004, JAKKS issued a press release announcing its financial results for the first quarter ended March 31, 2004.  In the press release, Defendants stated, in relevant part, the following:

> First quarter net sales increased 9.2% to $74.0 million in 2004, from $67.8 million in the comparable period last year.  Excluding the impact of noncash stock-based compensation, and additional bad debt related to the prior bankruptcy filing of a major customer in 2004, net income for the period was $6.0 million, or $0.23 per diluted share, compared to $5.2 million, or $0.21 per diluted share for the first quarter of last year.  Reported net income for first quarter 2004, including pre-tax charges of $1.7 million for non-cash stock-based compensation and $0.4 million for bad debt, was $4.3 million, or $0.17 per diluted share, compared to $6.0 million, or $0.24 per diluted share in 2003.

Again, defendant Berman used this press release to condition investors to believe that sales of the Company's successful WWE licensed toys and games had driven, and foreseeably would continue to drive, strong financial results at JAKKS.  Defendants Berman was quoted, in part, as follows:

> "*We are also pleased with sales of our World Wrestling Entertainment(TM)*, Dragon Ball(R) and Mucha Lucha(TM) action figures and Road Champs(R) vehicles.  Some additions to our product offerings include toys based on Universal Studios' Classic Monsters and new monsters based on the feature film Van Helsing(TM), which is scheduled for a May release.  We expect these new licenses, combined with our core business, will contribute to our top and bottom line growth in 2004 and beyond."

Mr. Berman concluded, "***Our financial position remains strong*** with $248.9 million of working capital, including cash of $156.6 million as of March 31, 2004. Given the strength of our balance sheet and positive cash flow, ***we remain well positioned to continue to grow our business by actively pursuing additional complementary and accretive acquisitions, executing on internal growth initiatives and securing new licenses*** that provide both near term and long-term growth potential and market share expansion opportunities." [Emphasis added.]

137.    The same day, April 20, 2004, JAKKS also issued a press release announcing the proposed acquisition of Play Along, a privately held toy company based in Florida and Hong Kong. Consideration for the acquisition was anticipated to be up to $116 million, consisting of $75 million in cash, approximately $11 million in JAKKS stock and an earn-out provision of approximately $30 million.

138.    Based on the Company's purported strong financial and operational results and also based, in part, on the announcement that JAKKS was acquiring Play Along, shares of the Company rallied. The following day, April 21, 2004, shares of JAKKS were trading up over $2.25 per share, to close at $17.50 per share.

139.    On April 26, 2004, JAKKS filed its quarterly report for the first quarter of 2004 on Form 10-Q with the SEC, which was signed by defendant Bennett. The 1Q:05 Form 10-Q reiterated the results announced in the April 20, 2004 press release. The Company's 1Q:04 Form 10-Q also contained Certifications by defendants Friedman and Bennett, as well as statements concerning the Company's strategies, its Controls and Procedures, its "Basis of Presentation," and its joint venture with THQ and relationship to WWE, similar to or the same as those statements contained in JAKKS previous SEC filings, reproduced herein, *supra*.

140.    On May 6, 2004, JAKKS issued a press release titled, "World Wrestling Entertainment Line-up Set to Enter the Ring." The press release announced the Company's 2005 WWE licensed video game line-up and guided investors to believe that these games would, foreseeably, continue to drive revenues and earnings in the near-term, in part, as follows:

THQ Inc. (Nasdaq:THQI) and JAKKS Pacific, Inc. (Nasdaq:JAKK) today announced their fiscal 2005 World Wrestling Entertainment(R) (NYSE:WWE) licensed videogame line-up. In addition to the previously announced WWE(TM) Day of Reckoning(TM), which is scheduled for release for the Nintendo(R) GameCube(TM) in Fall 2004, THQ plans to release WWE(TM) licensed videogames for the PlayStation(R) 2 computer entertainment system, Xbox(TM) video game system from Microsoft and Nintendo(R)'s Game Boy(R) Advance.

WWE(TM) SmackDown!(TM) Vs. Raw(TM) -- Scheduled for release exclusively on PlayStation 2 for holiday 2004 -- Two of the biggest brands in Sports Entertainment will face-off this holiday season. Developed by Yukes, WWE SmackDown! Vs. ***Raw takes the top-selling, critically acclaimed SmackDown! franchise to the next level*** with added features and improved graphics.  [Emphasis added.]

141.    On July 20, 2004, JAKKS issued a press release entitled, "JAKKS Pacific Reports Second Quarter 2004 Financial Results; Company Achieves Record Sales and Earnings; Revenue Increased 49% to $109AM and Net Income Increased 62% to $9.9M."  In the press release, Defendants stated, in relevant part, the following:

Second quarter net sales increased 49% to $109.4 million in 2004, compared to $73.3 million in the comparable period last year.  Excluding non-cash stock-based compensation and restricted stock charges and also a one-time charge in 2003, net income for the period increased 62% to $9.9 million, or $0.38 per diluted share, compared to $6.1 million, or $0.25 per diluted share, for the second quarter of last year.  Reported net income for the second quarter of 2004, including pre-tax non-cash stock-based compensation and restricted stock charges of $4.3 million, was $6.6 million, or $0.25 per diluted share, in 2004, compared to $3.2 million, or $0.13 per diluted share, for the same period last year, after a charge of $1.1 million for stock-based compensation and a one-time pre-tax charge of $2.7 million relating to a voluntary product recall.

*        *        *

"***We are very excited to report record revenue and net income for the second quarter and believe that we are on track to achieve the upper range of our increased 2004 guidance***," said Jack Friedman, Chairman and Chief Executive Officer of JAKKS Pacific . . . .

*        *        *

Mr. Berman continued, "Despite the record results, we continue to focus on areas of our business that can be improved . . . ."

- 58 -

"*We are enthusiastic about the opportunity to grow our business and are very encouraged about the upcoming holiday season based on early responses from our retailer partners*.  We believe that we will have prime placement for our TV Games line in the third and fourth quarters of this year, and expect our Dragon Ball, *World Wrestling Entertainment and extreme sports product lines, as well as other lines to also do well*."  [Emphasis added.]

142.    On August 9, 2004, JAKKS filed its quarterly report for the second quarter of 2004 on Form 10-Q with the SEC, which was signed by defendant Bennett.  The 2Q:04 Form 10-Q reiterated the results announced in the July 20, 2004 press release.  The Company's 2Q:04 Form 10-Q also contained Certifications by defendants Friedman and Bennett, as well as statements concerning the Company's strategies, its Controls and Procedures, its "Basis of Presentation," and its joint venture with THQ and relationship to WWE, similar to or the same as those statements contained in JAKKS' previous SEC filings, reproduced herein, *supra*.

143.    On August 30, 2004, JAKKS issued a press release announcing that the Company had begun shipping WWE "Day of Reckoning" video games for the Nintendo GameCube platform.  At that time, Company spokesman Nelo Lucich, Vice President of Interactive for JAKKS stated, "*WWE licensed videogames are becoming deeper than ever*, and we're pleased to give GameCube fans a solid addition to their library with WWE Day of Reckoning."

144.    On or about September 10, 2004, JAKKS filed its Proxy Statement in connection with the election of directors for 2004-2005 with the SEC.  According to the Proxy, for 2003 under the terms of their modified employment agreements, both defendants Friedman and Berman received base salaries of $965,000, bonuses of $1.327 million and restricted stock awards of 2.524 million shares.  In addition, the Proxy also reported that the law firm of Feder, Kaszovitz, Isaacson, Weber, Skala *et al*., had earned legal fees and expenses related to the Company in excess of $3.682 million during 2003.

145.    The statements referenced above in ¶¶56-58, 61-73, 76-89, 91, 93-99, 102-108, 110-111, 113, 116-120, 125, 127-129, 131-137, and 139-144 were each materially false and misleading, and were known by defendants to be false at that time, or were recklessly disregarded as such thereby, because they failed to disclose and misrepresented the following adverse facts:

(a)    that JAKKS had obtained the WWE toy and videogame licenses as a result of an illegal commercial bribery scheme;

(b)    that JAKKS relationship with the WWE was being negatively impacted by the WWE's contention that the licenses it had granted to the Company were improperly obtained;

(c)    given the foregoing, the Company was subject to the heightened risk that the WWE would seek some modification to the WWE licensing agreements or complete nullification of those agreements which would negatively impact the Company's future financial results; and

(d)    based on the foregoing, Defendants' positive statements about the Company's earnings and prospects were lacking in a reasonable basis at all times.

## THE TRUTH EMERGES

146.    The truth about the Company began to emerge on October 19, 2004.  On that date, before the market opened, Defendants shocked investors when JAKKS published a press release reporting third quarter 2004 results, in which JAKKS first revealed that the Company was "engaged in discussions with the WWE" concerning the "validity of the licenses as a result of certain transactions between the Company and that licensing consultant that occurred more than six years ago."  This press release stated, in relevant part, the following:

> **The Company also announced that it is engaged in discussions with WWE concerning the restructuring of its toy license and with WWE and THQ with respect to the restructuring of the JAKKS THQ Joint Venture video games license agreement with WWE**.  The discussions are an outgrowth of certain litigation that has been pending between WWE and a former licensing consultant to WWE and a former employee of WWE, to which the Company is not a party. **WWE has raised questions about the validity of the licenses as a result of certain transactions**

*between the Company and that licensing consultant that occurred more than six years ago. The Company has denied any wrongdoing in connection with the transactions with the licensing consultant and maintains that they are unrelated to either the toy or video game license.* If the discussions are satisfactorily concluded, the restructuring of the licenses may have an impact on the Company's future revenues and net income to an extent that is presently unknown. *If the discussions with WWE and THQ are not satisfactorily concluded, the Company anticipates that litigation is likely to be commenced by WWE, challenging the validity of the licenses and seeking compensatory and punitive damages, in which event the Company intends to vigorously defend itself against claims which it believes are without merit.* [Emphasis added]

147.    In reaction to this news, the price of JAKKS common stock declined precipitously, falling $5.34 per share, or 22% from its previous day's closing price of $24.15, to close at $18.81. After the close of trading, shares continued to fall in after-hours trading, dropping to $17.85 per share.

148.    Later that day, defendants hosted a conference call for analysts and investors. When asked about the WWE dispute, however, defendants refused to answer questions or provide more information. Accordingly, when asked what sort of impact the dispute would have on JAKKS toy and video game sales, defendant Friedman stated, "Until our discussions are completed, we cannot comment about this subject at all." Similarly, when defendant Bennett was asked if he could provide "more color" on the WWE dispute, he stated that "we cannot make any further comments."

149.    Later that same day, also on October 19, 2004, news reports indicated that the WWE had filed a complaint against JAKKS and the Individual Defendants, among others, alleging that they had perpetrated a massive bribery scheme involving lucrative license deals. WWE alleged that in order to obtain the WWE videogame license and favorable amendments to the toy licenses, JAKKS made substantial bribery payments to Stanley Shenker, president and sole owner of SSAI, and James Bell, WWE's former licensing and merchandising senior vice president. To conceal the payments, JAKKS laundered monies through its foreign bank accounts and corporations to pay Shenker via Shenker's Hong Kong corporation. Shenker then split the payments with Bell. The

details of JAKKS' corrupt scheme were set forth in the WWE complaint which alleged as follows, in

relevant part:

> *During the conversation regarding Shenker serving as Jakks' agent on WWE matters at the same time he was a WWE agent, a call was placed by Friedman, Berman and Shenker to Mr. Murray Skala, Jakks' outside legal counsel and a member of the Board of Directors of Jakks, regarding the proposed arrangement. Mr. Skala advised all participants in the call that it would be a conflict of interest for Shenker to serve as Jakks' agent on WWE matters at the same time Shenker was acting as WWE's agent* and that such an arrangement could not be done without first making full disclosure to WWE and obtaining their consent.

> *Following the conversation with Jakks' corporate counsel, neither Friedman, Berman, Shenker, nor Jakks disclosed the conversation to WWE nor sought their consent*.  On information and belief, all three men did not disclose the conversation because they knew WWE would not agree to such an obvious conflict of interest and because disclosure might also cause it to be revealed that Shenker was already acting as Jakks' agent.  Instead, *all three men kept the conversation secret and eventually implemented, in or around 1998, a plan whereby Shenker would accept and split bribes from Jakks with Bell to secure the videogame license and related amendments to the domestic toy license and an international toy license secured by Jakks following the aforementioned conversation*.  The plan devised and implemented *by Jakks and its three highest executives utilized monies laundered through foreign corporations controlled by Jakks and bank accounts of those foreign corporations in Hong Kong*.  An essential part of the scheme was that the monies paid as commercial bribes were *not recorded anywhere on the financial books and records of Jakks* situated in America at the headquarters of the parent corporation.

> On or about February 10, 1997, WWE and Jakks entered into an international toy license having a term which was to end on December 31, 1999.  *At no time prior to entering into the license did SSAI, Shenker or Jakks disclose that Shenker had performed services for Jakks*.  Likewise none of the aforementioned parties disclosed to WWE the conversation about Shenker serving as Jakks' agent on WWE matters.

*     *     *

> *In order to place Jakks in control of the videogame license*, and with the intent to cause SSAI and Bell to breach their fiduciary duties, Defendants *Friedman and/or Berman and/or Bennett devised and implemented a corrupt scheme to foreclose competition for the videogame license and to obtain it by the commercial bribery of Shenker and Bell*.  Pursuant to the scheme, Jakks agreed to pay monies to Shenker's alter ego – Stanfull – by *a series of payments to Stanfull's foreign bank account with the understanding that Shenker would then serve as a conduit for the payment of bribes directly to Bell*.

- 62 -

\*     \*     \*

*On or about January 14, 1998*, acting upon the direction of Defendant Bennett, *$40,000 was, in fact, paid to Stanfull via a series of transactions undertaken with the intent to conceal the transactions and bury them in fraudulent accounting* of foreign corporations owned by Jakks and bank accounts of those foreign subsidiaries.

*On January 14, 1998, $40,000 was withdrawn from an account at the Hang Seng Bank in Hong Kong of Road Champs, Ltd.* ("Road Champs"), a foreign subsidiary owned and/or controlled by Jakks.  The $40,000 was deposited that same day into Stanfull's bank account at the Hang Seng Bank.

*On January 14, 1998*, the same day as the Jakks' monies were deposited into Stanfull's account, *Shenker, acting in concert with Jakks to conceal the disposition of the monies, and with the intent of inducing Bell to violate his fiduciary duties, obtained a demand draft for $20,000 payable to James Bell from the Hang Seng Bank*, which he subsequently gave to Bell upon returning to the United States, thereby splitting the money equally with Bell.

\*     \*     \*

*On March 31, 1998, the day after Bell had initialed the deal memo recommending that the videogame license be awarded to Jakks, Defendant Bennett again directed Will Hons to use Jakks' foreign subsidiaries to pay another $40,000 to Stanfull*. Bennett advised Hons on the day after Bell had recommended to WWE management that it grant the videogame license to Jakks that it was "imperative" that the funds be available to Stanfull not later than April 2, 1998.

\*     \*     \*

Having obtained WWE's agreement to grant the videogame license to Jakks *via* the aforementioned scheme, and in order to get a cut of the anticipated revenues from the anticipated revenues associated with the videogame license, *Jakks then solicited THQ to become a Joint Venture partner instead of submitting an independent proposal on behalf of THQ.  THQ agreed to become a Joint Venture partner* with Jakks on the videogame license instead of making its own formal and independent proposal, *and agreed to pay Jakks monies which otherwise would have, and should have, been promised to WWE in an independent proposal*.  THQ did so as consideration for Jakks' role in securing the license.  *For all intents and purposes, Jakks and THQ both knew that the videogaine license would be performed by THQ as Jakks had no ability to perform a videogame license*.  [Emphasis added.]

150.    In response to the WWE Action, JAKKS published a press release on October 19,

2004, at 9:51pm, stating, in relevant part, the following:

JAKKS Pacific, Inc. announced that a civil lawsuit was filed in the United States District Court for the Southern District of New York yesterday afternoon by World

Wrestling Entertainment, Inc. ("WWE") concerning the video game license between WWE and the joint venture company operated by the Company and THQ, Inc. and the toy license between the Company and WWE. The Company denies any allegations of wrongdoing and believes that it will be completely vindicated in the litigation, and looks forward to having the claims against it dismissed. The Company will continue to devote its full energies and resources to bringing its outstanding products to market during the busy holiday season and beyond.

151. The following trading day, October 20, 2004, the price of JAKKS stock fell an additional $5.85 per share, or 31% from its regular session closing price on October 19, 2004, to close at $12.96. The Daily News of Los Angeles reported at least one analysts' reaction who stated, "***If this gets carried through and it gets into a nasty court fight, it could hurt their relationship with other licenses. You'd think, if they really did this to WWE, why would I want to do business with them***?" In addition, investors were also concerned by reports that WWE was seeking to make the JAKKS license "void and unenforceable" due to commercial bribery as well as indications that WWE is asking for treble and punitive damages.

152. As a result of the foregoing, that day, analysts at Whitaker Securities downgraded the Company to "SELL" from "BUY." Likewise, Southwest Securities lowered its rating to "NEUTRAL" from "STRONG BUY." Monarch Research also adopted a "SELL" rating on shares of the Company.

153. As a prologue to these events, on February 12, 2005, the Ventura County Star (California) reported that James Bell had pleaded guilty to taking kickbacks in connection with WWE's licensing deal with JAKKS. According to this report, Bell pleaded guilty to mail fraud in U.S. District Court in Bridgeport, Connecticut. According to a statement by the state attorney general, Bell will face a maximum sentence of five years and a fine of $3.8 million for defrauding WWE.

## UNDISCLOSED ADVERSE INFORMATION

154.    The market for JAKKS' securities was open, well-developed and efficient at all relevant times.  As a result of these materially false and misleading statements and failures to disclose, JAKKS' common stock traded at artificially inflated prices during the Class Period.  The artificial inflation continued until at least October 19, 2004.  Plaintiff and other members of the Class purchased or otherwise acquired JAKKS securities relying upon the integrity of the market price of JAKKS' securities and market information relating to JAKKS, and have been damaged thereby.

155.    During the Class Period, defendants materially misled the investing public, thereby inflating the price of JAKKS' securities, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make defendants' statements, as set forth herein, not false and misleading.  Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations.

156.    At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by plaintiff and other members of the Class.  As described herein, during the Class Period, defendants made or caused to be made a series of materially false or misleading statements about JAKKS' business, prospects and operations.  These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of JAKKS and its business, prospects and operations, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times.  Defendants' materially false and misleading statements during the Class Period resulted in plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein.

- 65 -

## LOSS CAUSATION/ECONOMIC LOSS

157.    During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated JAKKS' stock price and operated as a fraud or deceit on Plaintiffs and Class Period purchasers of JAKKS securities by failing to disclose that the Company had obtained the WWE licenses through commercial bribery, that the Company's relationship with the WWE was being negatively impacted by the WWE's contention that the licenses it had granted the Company were improperly obtained and that the Company was subject to the heightened risk that the WWE would seek some modification to the WWE licensing agreements as complete nullification of those agreements.    When Defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the price of JAKKS securities fell precipitously as the prior artificial inflation came out of JAKKS' stock price.  As a result of their purchases of JAKKS stock during the Class Period, Plaintiffs and the other Class members suffered economic loss, *i.e.*, damages under the federal securities laws.

158.    By improperly concealing the problems with the WWE licenses, Defendants presented a misleading picture of JAKKS' business and prospects.  Thus, instead of truthfully disclosing during the Class Period the true risks that JAKKS was exposed to, Defendants caused JAKKS to conceal the problems with the WWE licenses.

159.    Defendants' false and misleading statements had the intended effect and caused JAKKS securities to trade at artificially inflated levels throughout the Class Period.

160.    As a direct result of Defendants' admissions and the public revelations regarding the problems with the WWE licenses, JAKKS stock price plummeted approximately 46%, falling from $24.15 per share to $12.96 per share.  This drop removed the inflation from JAKKS stock price,

causing real economic loss to investors who had purchased the Company's securities during the Class Period.

161.    The approximate 46% decline in JAKKS stock price at the end of the Class Period was a direct result of the nature and extent of Defendants' fraud finally being revealed to investors and the market. The timing and magnitude of JAKKS stock price declines negate any inference that the loss suffered by Plaintiffs and the other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to the defendants' fraudulent conduct. The economic loss, *i.e.*, damages, suffered by Plaintiffs and the other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate JAKKS stock price and the subsequent significant decline in the value of JAKKS stock when Defendants' prior misrepresentations and other fraudulent conduct was revealed.

## ADDITIONAL SCIENTER ALLEGATIONS

162.    As alleged herein, Defendants acted with scienter in that defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, defendants, by virtue of their receipt of information reflecting the true facts regarding JAKKS, their control over, and/or receipt and/or modification of JAKKS' allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning JAKKS, participated in the fraudulent scheme alleged herein.

- 67 -

163.    In addition, defendants were motivated to engage in the fraudulent scheme in order for Company insiders, including the Individual Defendants, to sell hundreds of thousands of their personally-held JAKKS securities and reap millions of dollars in proceeds, as follows:

| Insider | Date of Sales | # of Shares Sold | Price ($) | Value of Sales ($) |
|---|---|---|---|---|
| Jack Friedman (Chairman and Chief Executive Officer) | 12/08/1999 | 355,635 | 23.62 | 8,400,098.70 |
| | 06/29/2001 | 135,000 | 18.81 | 2,538,675.00 |
| | 10/22/2001 | 57,800 | 19.20 | 1,109,760.00 |
| | 10/23/2001 | 86,700 | 18.06 | 1,565,802.00 |
| | 10/24/2001 | 25,500 | 18.00 | 459,000.00 |
| | 05/29/2002 | 150,078 | 17.75 | 2,663,884.50 |
| | 05/29/2002 | 149,922 | 17.75 | 2,661,115.50 |
| **Total Friedman:** | | **960,635** | | **19,398,335.70** |
| Stephen G. Berman (President, Chief Operating Officer, and Secretary) | 12/08/1999 | 133,254 | 23.62 | 3,147,459.48 |
| | 06/29/2001 | 63,260 | 18.80 | 1,189,288.00 |
| | 06/29/2001 | 1,740 | 18.80 | 32,712.00 |
| | 10/22/2001 | 27,200 | 19.20 | 522,240.00 |
| | 10/23/2001 | 40,800 | 18.06 | 736,848.00 |
| | 10/24/2001 | 12,000 | 18.00 | 216,000.00 |
| | 05/29/2002 | 42,514 | 17.75 | 754,623.50 |
| | 05/29/2002 | 44,986 | 17.75 | 798,501.50 |
| | 05/29/2002 | 62,500 | 17.75 | 1,109,375.00 |
| **Total Berman:** | | **428,254** | | **8,507,047.48** |
| Joel M. Bennett (Chief Financial Officer and an Executive Vice President) | 07/27/2001 | 20,000 | 19.93 | 398,600.00 |
| | 07/27/2001 | 7,710 | 19.93 | 153,660.30 |
| | 07/27/2001 | 39 | 19.93 | 777.27 |
| | 07/27/2001 | 1 | 19.93 | 19.93 |
| | 08/03/2001 | 5,148 | 20.60 | 106,048.80 |

| Insider | Date of Sales | # of Shares Sold | Price ($) | Value of Sales ($) |
|---|---|---|---|---|
| | 08/03/2001 | 5,148 | 20.60 | 106,048.80 |
| | 08/03/2001 | 3,523 | 20.60 | 72,573.80 |
| | 08/03/2001 | 1,328 | 20.60 | 27,356.80 |
| | 08/03/2001 | 1,328 | 20.60 | 27,356.80 |
| | 08/20/2001 | 5,770 | 20.63 | 119,035.10 |
| | 08/20/2001 | 5,770 | 20.63 | 119,035.10 |
| | 08/20/2001 | 530 | 20.63 | 10,933.90 |
| | 08/20/2001 | 530 | 20.63 | 10,933.90 |
| | 02/27/2002 | 3,855 | 19.33 | 74,517.15 |
| | 02/27/2002 | 1,329 | 19.33 | 25,689.57 |
| | 08/10/2004 | 1,000 | 19.50 | 19,500.00 |
| | 08/11/2004 | 29,510 | 19.25 | 568,067.50 |
| | 08/13/2004 | 4,680 | 19.50 | 91,260.00 |
| **Total Bennett:** | | **97,199** | | **1,931,414.72** |
| Michael Bianco (Executive Vice President) | 08/07/2001 | 4,059 | 20.55 | 83,412.45 |
| | 08/07/2001 | 1,466 | 20.55 | 30,126.30 |
| | 08/08/2001 | 5,687 | 20.70 | 117,720.90 |
| | 08/08/2001 | 1,544 | 20.70 | 31,960.80 |
| | 08/10/2001 | 4,600 | 21.55 | 99,130.00 |
| | 08/16/2001 | 1,000 | 21.00 | 21,000.00 |
| | 11/06/2001 | 7,500 | 19.51 | 146,325.00 |
| | 11/06/2001 | 100 | 19.52 | 1,952.00 |
| | 11/07/2001 | 16,500 | 20.00 | 330,000.00 |
| | 11/07/2001 | 12,150 | 19.75 | 239,962.50 |
| | 11/07/2001 | 7,800 | 19.77 | 154,206.00 |
| | 11/07/2001 | 6,850 | 20.90 | 143,165.00 |
| | 11/07/2001 | 2,500 | 20.02 | 50,050.00 |
| | 11/07/2001 | 2,300 | 20.91 | 48,093.00 |
| | 11/07/2001 | 1,850 | 19.76 | 36,556.00 |
| | 11/07/2001 | 900 | 20.01 | 18,009.00 |
| | 11/07/2001 | 600 | 20.94 | 12,564.00 |
| | 11/07/2001 | 100 | 19.78 | 1,978.00 |
| | 11/07/2001 | 100 | 19.79 | 1,979.00 |
| | 11/07/2001 | 100 | 20.05 | 2,005.00 |
| **Total Bianco:** | | **77,706** | | **1,570,194.95** |

| Insider | Date of Sales | # of Shares Sold | Price ($) | Value of Sales ($) |
|---|---|---|---|---|
| David C. Blatte (Director) | 03/08/2002 | 2,000 | 18.85 | 37,700.00 |
| | 03/12/2002 | 2,000 | 18.75 | 37,500.00 |
| | 03/14/2002 | 6,000 | 19.07 | 114,420.00 |
| | 03/14/2002 | 2,000 | 19.60 | 39,200.00 |
| | 03/15/2002 | 2,000 | 20.00 | 40,000.00 |
| | 03/15/2002 | 1,000 | 20.60 | 20,600.00 |
| **Total Blatte:** | | **15,000** | | **289,420.00** |
| Robert E. Glick (Director) | 12/08/1999 | 45,000 | 23.62 | 1,062,900.00 |
| | 07/26/2001 | 9,375 | 18.76 | 175,875.00 |
| | 07/26/2001 | 9,375 | 18.76 | 175,875.00 |
| | 07/26/2001 | 8,662 | 18.76 | 162,499.12 |
| | 05/29/2002 | 9,375 | 17.75 | 166,406.25 |
| | 05/29/2002 | 625 | 17.75 | 11,093.75 |
| **Total Glick:** | | **82,412** | | **1,754,649.12** |
| Michael G. Miller (Director) | 12/08/1999 | 45,000 | 23.62 | 1,062,900.00 |
| | 07/26/2001 | 9,375 | 18.77 | 175,922.81 |
| | 07/26/2001 | 9,375 | 18.77 | 175,922.81 |
| | 07/26/2001 | 7,537 | 18.77 | 141,432.56 |
| | 05/29/2002 | 9,302 | 17.75 | 165,110.50 |
| | 05/29/2002 | 698 | 17.75 | 12,389.50 |
| **Total Miller:** | | **81,l287** | | **1,733,678.18** |
| Michael L. Skala (Director) | 12/08/1999 | 60,000 | 23.62 | 1,417,200.00 |
| | 07/23/2001 | 9,375 | 18.00 | 168,783.75 |
| | 07/23/2001 | 9,375 | 18.00 | 168,783.75 |
| | 07/23/2001 | 8,137 | 18.00 | 146,495.29 |
| | 07/23/2001 | 3,598 | 18.00 | 64,776.95 |
| | 05/29/2002 | 9,375 | 17.75 | 166,406.25 |
| | 05/29/2002 | 9,375 | 17.75 | 166,406.25 |
| | 05/29/2002 | 9,375 | 17.75 | 166,406.25 |
| | 05/29/2002 | 1,875 | 17.75 | 33,281.25 |
| **Total Skala:** | | **120,485** | | **2,498,539.74** |
| **Total Insiders:** | | **1,862,978** | | **$37,683,279.89** |

## FIRST CLAIM

## VIOLATION OF SECTION 10(b) OF
## THE EXCHANGE ACT AND RULE 10b-5
## PROMULGATED THEREUNDER AGAINST ALL DEFENDANTS

164.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

165.    During the Class Period, JAKKS and the Individual Defendants, and each of them, carried out a plan, scheme and course of conduct which was intended to aid, throughout the Class Period, did: (i) deceive the investing public, including plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of JAKKS' securities; (iii) allow Company Insiders, including defendants herein, to sell over $37.68 million of their privately held Company stock and to facilitate the offering of millions of more shares of JAKKS stock and almost $100 million of convertible debt during the Class Period, and (iv) cause Plaintiffs and other members of the Class to purchase JAKKS' securities at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

166.    Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for JAKKS' securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5.  All defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

167.    In addition to the duties of full disclosure imposed on defendants as a result of their making of affirmative statements and reports, or participation in the making of affirmative

statements and reports to the investing public, defendants had a duty to promptly disseminate truthful information that would be material to investors in compliance with the integrated disclosure provisions of the SEC as embodied in SEC Regulation S-X (17 C.F.R. Sections 210.01 et seq.) and Regulation S-K (17 C.F.R. Sections 229.10 et seq.) and other SEC regulations, including accurate and truthful information with respect to the Company's operations, financial condition and earnings so that the market price of the Company's securities would be based on truthful, complete and accurate information.

168.    JAKKS and the Individual Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of JAKKS as specified herein.

169.    These defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of JAKKS' value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about JAKKS and its business operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of JAKKS' securities during the Class Period.

170.    Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team

or had control thereof; (ii) each of these defendants, by virtue of his responsibilities and activities as a senior officer and/or director of the Company was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of and had access to other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

171.    The defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.  Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing JAKKS' operating condition and future business prospects from the investing public and supporting the artificially inflated price of its securities.  As demonstrated by defendants' overstatements and misstatements of the Company's business, operations and earnings throughout the Class Period, defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

172.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of JAKKS' securities was artificially inflated during the Class Period.  In ignorance of the fact that market prices of JAKKS'

- 73 -

publicly-traded securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by defendants, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was know to or recklessly disregarded by defendants but not disclosed in public statements by defendants during the Class Period, Plaintiffs and the other members of the Class acquired JAKKS securities during the Class Period at artificially high prices and were damaged thereby.

173.    At the time of said misrepresentations and omissions, Plaintiffs and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiffs and the other members of the Class and the marketplace known of the true financial condition and business prospects of JAKKS, which were not disclosed by defendants, Plaintiffs and other members of the Class would not have purchased or otherwise acquired their JAKKS securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

174.    By virtue of the foregoing, defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

175.    As a direct and proximate result of defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

**SECOND CLAIM**

**VIOLATION OF SECTION 20(a) OF
THE EXCHANGE ACT AGAINST THE INDIVIDUALS DEFENDANTS**

176.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

177.    The Individual Defendants acted as controlling persons of JAKKS within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the  Company with the SEC and disseminated to the investing public, the individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which plaintiff contends are false and misleading.  The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

178.    In particular, each of these defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

179.    As set forth above, JAKKS and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

1.    Determining that this action is a proper class action and appointing Plaintiffs as class representatives under Rule 23 of the Federal Rules of Civil Procedure;

2.    Awarding compensatory damages in favor of Plaintiffs and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

3.    Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

4.    Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

DATED:  July 11, 2005                LERACH COUGHLIN STOIA GELLER
                                       RUDMAN & ROBBINS LLP
                                     SAMUEL H. RUDMAN (SR-7957)
                                     DAVID A. ROSENFELD (DR-7564)
                                     MARIO ALBA, JR. (MA-7240)


                                     _____
                                          SAMUEL H. RUDMAN

                                     200 Broadhollow Road, Suite 406
                                     Melville, NY  11747
                                     Telephone:  631/367-7100
                                     631/367-1173 (fax)

MILBERG WEISS BERSHAD
  & SCHULMAN LLP
STEVEN G. SCHULMAN (SS-2561)
DANIEL B. SCOTTI (DS-4139)


_____
             DANIEL B. SCOTTI

One Pennsylvania Plaza
New York, NY  10119-0165
Telephone:  212/594-5300
212/868-1229 (fax)

Lead Counsel for Lead Plaintiffs and the Class

I:\Jakks\Pleadings\050711 Consolidated Complaint.doc