UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- x

IN RE JAKKS PACIFIC, INC.
SHAREHOLDERS CLASS ACTION
LITIGATION

                       :

                       :

Civil Action No. 04-CV-8807
(KMK)
(ECF CASE)

-- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- x

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION
TO DISMISS THE CONSOLIDATED AMENDED COMPLAINT**

FEDER, KASZOVITZ, ISAACSON, WEBER,
  SKALA, BASS & RHINE LLP
Murray L. Skala (MS 9354)
Jonathan D. Honig (JH 7577)
750 Lexington Avenue
New York, New York 10022
Phone: (212) 888-8200
Fax: (212) 888-5968

SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
Jonathan J. Lerner (JL 7117)
Michael H. Gruenglas (MG 8705)
Maura B. Grinalds (MG 2836)
Sharon Garb (SG 7928)
Four Times Square
New York, New York 10036
Phone: (212) 735-3000
Fax: (212) 735-2000

September 9, 2005

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ........................................................................ iv

PRELIMINARY STATEMENT ................................................................... 1

FACTS ALLEGED ...................................................................................... 8

    A.    The Parties ......................................................................... 8

    B.    The WWE Action .............................................................. 8

    C.    The Alleged Payment Scheme ........................................... 9

    D.    WWE Continues to Affirm Relationship ........................... 10

    E.    Plaintiffs' Section 10(b) and Rule 10b-5 Claims ............... 12

ARGUMENT ............................................................................................... 12

I.    THE COMPLAINT FAILS TO STATE A CLAIM FOR
    VIOLATION OF SECTION 10(b) BECAUSE DEFENDANTS
    HAD NO DUTY TO DISCLOSE THE ALLEGED ILLEGAL
    CONDUCT ........................................................................................ 12

    A.    There Is No Affirmative Duty Under the Federal Securities
        Laws to Disclose Uncharged Illegal Conduct or to
        Speculate About Possible Litigation ................................. 14

    B.    The SEC Regulations Do Not Require Disclosure of
        Uncharged Illegal Conduct or Speculation About Possible
        Litigation ........................................................................... 18

    C.    None of Defendants' Truthful Statements Were Rendered
        Misleading By Failure To Disclose the Alleged Bribery or
        Failure to Predict the Repercussions ................................ 21

        1.    Accurate Historical Statements of Earnings and
            Product Performance Do Not Trigger a Duty to
            Disclose Alleged Misconduct ..................................... 23

        2.    Accurate Historical Facts Concerning the Joint
            Venture Between Jakks and THQ Do Not Trigger a
            Duty to Disclose ......................................................... 26

        3.    Projected Earnings Statements and Expressions of
            Optimism Do Not Trigger a Duty to Disclose ............. 28

i

4.     The Acknowledgement of Messrs. Friedman's and
Berman's Contribution to the Company's Success
Does Not Trigger a Duty to Disclose............................................ 30

5.     Certifications of Jakks' Financial Statements Do
Not Trigger a Duty to Disclose...................................................... 33

6.     Descriptions of the Company's Audit Committee
and the Company's Code of Ethics Published in
2004 Do Not Trigger a Duty to Disclose ...................................... 35

7.     General Corporate Optimism Does Not Trigger A
Duty to Disclose............................................................................. 36

II.     THE COMPLAINT FAILS TO COMPLY WITH THE STRICT
PLEADING MANDATES OF RULE 9(b) AND THE PSLRA ......................... 37

A.     Plaintiffs Fail To Specify Which of the Complaint's
Statements Are Alleged to be Misleading and Why They
Are Misleading.......................................................................................... 38

III.     THE COMPLAINT FAILS TO PLEAD PARTICULARIZED
FACTS GIVING RISE TO A STRONG INFERENCE OF
FRAUDULENT INTENT ........................................................................................ 40

A.     Plaintiffs' Motive Allegations Are Insufficient......................................... 41

1.     The Insider Stock Sales Allegations Fail to Provide
an Adequate Motive to Commit Fraud .......................................... 42

2.     Plaintiffs' General Motive Allegations Are
Insufficient .................................................................................... 46

B.     Plaintiffs Fail to Allege Scienter Based on Conscious
Misbehavior or Recklessness.................................................................... 47

1.     Plaintiffs Fail to Plead Facts to Suggest that
Defendants Knew They Had A Duty to Disclose the
Alleged 1998 Transactions ........................................................... 48

2.     Executive Status Does Not Create a Strong
Inference of Scienter ..................................................................... 49

3.     The Complaint Fails Adequately To Plead Scienter
Against Each of the Individual Defendants as
Mandated by Rule 9(b) and the PSLRA ....................................... 50

ii

        C.      Plaintiffs' Resort to Group Pleading to Establish Scienter
             Must Be Rejected ................................................................................... 53

IV.   PLAINTIFFS FAIL TO STATE A CLAIM FOR CONTROL
       PERSON LIABILITY UNDER SECTION 20(a) ................................................ 54

CONCLUSION.............................................................................................................. 55

# TABLE OF AUTHORITIES

## CASES

In re 1993 Corning Securities Litigation, No. 93 Civ. 7015 (AGS), 1996 WL
    257603 (S.D.N.Y. May 15, 1996).................................................................................46

Acito v. IMCERA Group, Inc., 47 F.3d 47 (2d Cir. 1995).....................................2, 43, 44, 45, 46

In re Advanta Corp. Securities Litigation, 180 F.3d 525 (3d Cir. 1999)..........................42, 44, 45

In re Alcatel Securities Litigation, No. 02 Civ. 3818 (RCC), 2005 U.S. Dist.
    LEXIS 3053 (S.D.N.Y. Feb. 28, 2005)........................................................................39, 54

Amalgamated Clothing & Textile Workers Union v. J.P. Stevens & Co., 475 F.
    Supp. 328 (S.D.N.Y. 1979).........................................................................................25

In re Apple Computer Securities Litigation, 886 F.2d 1109 (9th Cir. 1989)................................43

Backman v. Polaroid Corp., 910 F.2d 10 (1st Cir. 1990)...............................................................33

In re Baker Hughes Sec. Litig., 136 F. Supp. 2d 630, 642 (S.D. Tex. 2001) ...............................46

Ballan v. Wilfred American Educational Corp., 720 F. Supp. 241 (E.D.N.Y. 1989)....................16

Basic, Inc. v. Levinson, 485 U.S. 224 (1988)..........................................................................4, 13

Bolger v. First State Financial Services, 759 F. Supp. 182 (D.N.J. 1991) ....................................15

Bragger v. Trinity Capital Enterprise Corp., No. 92 Civ. 2124 (LMM), 1994 WL
    75239 (S.D.N.Y. Mar. 7, 1994) .........................................................................23, 32, 36

In re Browning-Ferris Industries, Inc. Shareholder Derivative Litigation, 830 F.
    Supp. 361 (S.D. Tex. 1993), aff'd, 20 F.3d 465 (5th Cir. 1994)........................................16

In re Bristol-Myers Squibb Securities Litigation, 312 F. Supp. 2d 549 (S.D.N.Y.
    2004) .......................................................................................................11, 28, 34, 42

In re Burlington Coat Factory Securities Litigation, 114 F.3d 1410 (3d Cir. 1997) ...............25, 43

In re Canandaigua Securities Litigation, 944 F. Supp. 1202 (S.D.N.Y. 1996)...........13, 20, 23, 26,
    28, 48

In re Carter-Wallace, Inc. Securities Litigation, 220 F.3d 36 (2d Cir. 2000)................................47

In re Cendant Corp. Securities Litigation, 76 F. Supp. 2d 539 (D.N.J. 1999)...............................50

Chiarella v. United States, 445 U.S. 222 (1980)............................................................13

Chill v. General Electric Co., 101 F.3d 263 (2d Cir. 1996)..........................................47

Ciresi v. Citicorp, 782 F. Supp. 819 (S.D.N.Y. 1991)..................................................15

In re Citigroup, Inc. Sec. Litigation, 330 F. Supp. 2d 367 (S.D.N.Y. 2004)..............16, 25, 33, 36

In re Cornerstone Propane Partners, L.P. Sec. Litig., 355 F. Supp. 2d 1069 (N.D.
    Cal. 2005).........................................................................................................39

Cortec Industries, Inc. v. Sum Holding L.P., 949 F.2d 42 (2d Cir. 1991)......................3

In re Cross Media Marketing Corp. Securities Litigation, 314 F. Supp. 2d 256
    (S.D.N.Y. 2004)............................................................................................45, 54

DiLeo v. Ernst & Young, 901 F.2d 624 (7th Cir. 1990)................................................50

In re Donald J. Trump Casino Securities Litigation, 7 F.3d 357 (3d Cir. 1993)..........29

Duncan v. Pencer, No. 94 Civ. 0321 (LAP), 1996 WL 19043 (S.D.N.Y. Jan. 18,
    1996).................................................................................................................42

Elliott Associates L.P. v. Covance, Inc., No. 00 Civ. 4115 (SAS), 2000 U.S. Dist.
    LEXIS 17099 (S.D.N.Y. Nov. 28, 2000).........................................................29

Endovasc Ltd. v. J.P. Turner & Co., No. 02 Civ. 7313 (LAP), 2004 U.S. Dist.
    LEXIS 5075 (S.D.N.Y. Mar. 30, 2004).......................................................39, 54

Ernst & Ernst v. Hochfelder, 425 U.S. 185 (1976).......................................................40

Ferber v. Travelers Corp., 785 F. Supp. 1101 (D. Conn. 1991) ....................................1

Field v. Trump, 850 F.2d 938 (2d Cir. 1988) ................................................................4

Florida State Board of Administration v. Green Tree Financial Corp., 270 F.3d
    645 (8th Cir. 2001)...........................................................................................45

In re Ford Motor Co. Securities Litigation, 381 F.3d 563 (6th Cir. 2004) ...................25

Frazier v. Vitalworks, Inc., 341 F. Supp. 2d 142 (D. Conn. 2004)...........................37, 44

GAF Corp. v. Heyman, 724 F.2d 727 (2d Cir. 1983)................................................14, 17

Garr v. U.S. Healthcare, Inc., 22 F.3d 1274 (3d Cir. 1994).....................................1, 52

Garvey v. Arkoosh, 354 F. Supp. 2d 73 (D. Mass. 2005)..............................................52

Geiger v. Solomon-Page Group, Ltd., 933 F. Supp. 1180 (S.D.N.Y. 1996) ................................45

General Electric Co. v. Cathcart, 980 F.2d 927 (3d Cir. 1992) ....................................................19

In re Glenayre Technologies, Inc. Securities Litigation, 982 F. Supp. 294
    (S.D.N.Y. 1997)........................................................................................24, 42, 45

Glickman v. Alexander & Alexander Services, Inc., No. 93 Civ. 7594 (LAP),
    1996 WL 88570 (S.D.N.Y. Feb. 29, 1996)........................................................49

In re Green Tree Financial Corp. Stock Litigation, 61 F. Supp. 2d 860 (D. Minn.
    1999), rev'd on other grounds sub nom, Florida State Board of
    Administration v. Green Tree Financial Corp., 270 F.3d 645 (8th Cir.
    2001). ....................................................................................................................44

Greenstone v. Cambex Corp., 777 F. Supp. 88 (D. Mass, 1991), aff'd, 975 F.2d 22
    (1st Cir. 1992)................................................................................23, 35, 36

Greenstone v. Cambex Corp., 975 F.2d 22 (1st Cir. 1992) ..........................................16

Guerra v. Teradyne Inc., No. Civ. A. 01-11789, 2004 WL 1467065 (D. Mass. Jan.
    16, 2004) ...............................................................................................................25

In re Health Management, Inc. Securities Litigation, 970 F. Supp. 192 (E.D.N.Y.
    1997) ......................................................................................................................46

In re Health Management Systems, Inc. Security Litigation, No. 97 Civ. 1865,
    1998 WL 283286 (S.D.N.Y. Jun. 1, 1998) ...............................5, 42, 45, 47, 49

Herzog v. GT Interactive Software Corp., No. 98 Civ. 0085 (DNE), 1999 WL
    1072500 (S.D.N.Y. Nov. 29, 1999) , aff'd in part, rev'd in part on other
    grounds sub nom, Rothman v. Gregor, 220 F.3d 81 (2d Cir. 2000) ................42

Hillson Partners L.P. v. Adage, Inc., 42 F.3d 204 (4th Cir. 1994) ...............................30

I. Meyer Pincus & Associates, P.C. v. Oppenheimer & Co., 936 F.2d 759 (2d Cir.
    1991) .......................................................................................................................3

In re Independent Energy Holdings PLC Securities Litigation, 154 F.Supp. 2d
    741 (S.D.N.Y. 2001).............................................................................................54

Kahn v. Wien, 842 F. Supp. 667 (E.D.N.Y. 1994).......................................................17

vi

Kalnit v. Eichler, 85 F. Supp. 2d 232 (S.D.N.Y. 1999), aff'd, 264 F.3d 131 (2d Cir. 2001) ...................................................................................................................55

Kalnit v. Eichler, 264 F.3d 131 (2d Cir. 2001) ...........................................41, 46, 47, 48

In re Keyspan Corp. Securities Litigation, No. 01 Civ. 5852 (ARR), 2003 U.S. Dist. LEXIS 20746 (S.D.N.Y. Mar. 18, 2003) ...................................................44

Kowal v. MCI Communications Corp., 16 F.3d 1271 (D.C. Cir. 1994) .......................30

Lasker v. New York State Electric & Gas Corp., 85 F.3d 55 (2d Cir. 1996) ................29

Leventhal v. Tow, 48 F. Supp. 2d 104 (D. Conn. 1999)................................................46

Levine v. NL Industries, Inc., 926 F.2d 199 (2d Cir. 1991) .........................................16

Long v. Quantex Resources, 108 F.R.D. 416 (S.D.N.Y.1985), aff'd mem., 888 F.2d 1376 (2d Cir. 1989)..........................................................................................53

In re Miller Industries, Inc. Securities Litigation, 12 F. Supp. 2d 1323 (N.D. Ga. 1998) ...............................................................................................................16

Missouri Portland Cement Co. v. Cargill, Inc., 498 F.2d 851 (2d Cir. 1974) ..............15

New York Transportation, Inc. v. Naples Transportation, Inc., 116 F. Supp. 2d 382 (E.D.N.Y. 2000)..................................................................................................53

In re Nike, Inc. Securities Litigation, 181 F. Supp. 2d 1160 (D. Or. 2002) ..................44

In re Nokia Corp. Securities Litigation, No. 96 Civ. 3752(DC), 1998 WL 898334 (S.D.N.Y. Dec. 22, 1998)...............................................................................26, 28

Novak v. Kasaks, 216 F.3d 300 (2d Cir. 2000) .....................................................41, 47

In re Par Pharmaceutical, Inc. Securities Litigation, 733 F. Supp. 668 (S.D.N.Y. 1990) ....................................................................................................17, 18, 26

In re Party City Securities Litigation, 147 F. Supp. 2d 282 (D.N.J. 2001)...................44

Portannese v. Donna Karan International, Inc., No. 97-CV-2011, 1998 WL 637547 (E.D.N.Y. Aug. 14, 1998).........................................................................40

Press v. Chemical Investment Services Corp., 988 F. Supp. 375 (S.D.N.Y. 1997), aff'd, 166 F.3d 529 (2d Cir. 1999) ....................................................................13

Raab v. General Physics Corp., 4 F.3d 286 (4th Cir. 1993) ........................................29

vii

In re Razorfish, Inc. Securities Litigation, 143 F. Supp. 2d 304 (S.D.N.Y. 2001)..........................1

In re Razorfish, Inc. Securities Litigation, No. 00 Civ. 9474 (JSR), 2001 WL
    1111502 (S.D.N.Y. Sept. 21, 2001)............................................................31

Renz v. Schreiber, 832 F. Supp. 766 (D.N.J. 1993)..........................................30

Ressler v. Liz Claiborne, Inc., 75 F. Supp. 2d 43 (E.D.N.Y. 1999) .....................................43, 44

Roeder v. Alpha Industries, Inc., 814 F.2d 22 (1st Cir. 1987)........................................15

Rombach v. Chang, 355 F.3d 164 (2d Cir. 2004)...................................................37, 50

Rothman v. Gregor, 220 F.3d 81 (2d Cir. 2000).................................................43

In re Safeguard Scientifics, No. Civ.A.01-3208, 2004 WL 2700291 (E.D. Pa. Nov.
    18, 2004) ...........................................................................................14

Salinger v. Projectavision, 972 F. Supp. 222 (S.D.N.Y. 1997) ...............................3

San Leandro Emergency Medical Group Profit Sharing Plan v. Philip Morris Cos.,
    75 F.3d 801 (2d Cir. 1996).............................................................3, 23, 28, 29

In re Scholastic Securities Litigation, 252 F.3d 63 (2d Cir. 2001)...............................43

In re Seagate Technology II Securities Litigation, 843 F. Supp. 1341 (N.D. Ca.
    1994) ............................................................................................14

Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124 (2d Cir. 1994) ...........................................28, 54

In re Sofamor Danek Group, Inc., 123 F.3d 394 (6th Cir. 1997) ........13, 15, 20, 23, 24, 25, 26, 34

In re Splash Technology Holdings, Inc. Securities Litigation, 160 F. Supp. 2d
    1059 (N.D. Cal. 2001).......................................................................37

TSC Industries, Inc. v. Northway, Inc., 426 U.S. 438 (1976) .......................................26

In re Teledyne Defense Contracting Derivative Litigation, 849 F. Supp. 1369
    (C.D. Cal. 1993)..............................................................................15

In re Time Warner Securities Litigation, 9 F.3d 259 (2d Cir. 1993) .......................................27, 29

Unioil, Inc. v. E.F. Hutton & Co., 809 F.2d 548 (9th Cir. 1986)..................................53

In re Union Carbide Class Action Securities Litigation, 648 F. Supp. 1322
    (S.D.N.Y. 1986)..............................................................................4

In re U.S. Aggregates, Inc. Securities Litigation, 235 F. Supp. 2d 1063 (N.D. Cal. 2002) ....................................................................................................................50

United States v. Crop Growers Corp., 954 F. Supp. 335 (D.D.C. 1997).....................................20

United States v. Matthews, 787 F.2d 38 (2d Cir. 1986) ...............................................................14

Wielgos v. Commonwealth Edison Co., 892 F.2d 509 (7th Cir. 1989)........................................29

Wilson v. Comtech Telecommunications Corp., 648 F.2d 88 (2d Cir. 1981) ...............................14

World Series of Casino Gambling, Inc. v. King, 1986-87 Fed. Sec. L. Rep. (CCH) 92,981 (S.D.N.Y. Oct. 30, 1986) .................................................................................16

## STATUTES

17 C.F.R. § 229.103 (2005) .........................................................................................................19

17 C.F.R. § 229.303 (2005) .........................................................................................................19

17 C.F.R. § 229.406 (2005) .........................................................................................................36

Fed. R. Civ. P. 9(b) .......................................................................................................................1

Fed. R. Civ. P. 11(b) ...................................................................................................................52

Fed. R. Civ. P. 12(b)(6)................................................................................................................1

S. Rep. No. 104-98 (1995), reprinted in 1995 U.S.C.C.A.N. 679 ...................................................2

15 U.S.C. § 78u-4 .........................................................................................................................1

15 U.S.C. § 78u-4(b)(1) ...........................................................................................................5, 38

15 U.S.C. § 78u-4(b)(2) .........................................................................................................40, 50

Defendants Jakks Pacific, Inc., ("Jakks"), Jack Friedman, Steven G. Berman, and Joel M. Bennett (collectively, "Defendants") respectfully submit this memorandum of law in support of their motion, pursuant to Rules 12(b)(6) and 9(b) of the Federal Rules of Civil Procedure and Section 21D of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78u-4, for an Order dismissing Plaintiffs' Consolidated Amended Complaint (the "Complaint").

## PRELIMINARY STATEMENT

In this action, Plaintiffs seek to parlay a recent business dispute that led to civil litigation between Jakks and World Wrestling Entertainment, Inc. ("WWE") into a federal securities class action. Seizing on the Company's disclosure that WWE had filed a sensationalized complaint accusing Jakks of violating the Racketeering Influenced and Corrupt Organization Act (RICO) and other federal and state statutes in connection with certain transactions dating back to 1998 -- and assuming without any investigation whatsoever that these unverified allegations are established "facts"[1] -- Plaintiffs assert that Jakks's failure to disclose earlier this alleged wrongdoing and to predict publicly that WWE might sue Jakks was fraudulent.

Plaintiffs' attempt to bootstrap the untested -- and ever-changing -- allegations of wrongdoing asserted in the related WWE litigation (the "WWE Action") into claims

---

[1] Several courts have condemned such copycat pleading as a hallmark of strike suits. See, e.g., Ferber v. Travelers Corp., 785 F. Supp. 1101, 1106 n.8 (D. Conn. 1991) (noting that hastily filed securities complaints were "virtually identical (including typographical errors)"); see also In re Razorfish, Inc. Sec. Litig., 143 F. Supp. 2d 304, 306 n.1 (S.D.N.Y. 2001) (raising Rule 11 concerns where numerous complaints had "copied the original complaint essentially verbatim"); See Garr v. U.S. Healthcare, Inc., 22 F.3d 1274, 1280 (3d Cir. 1994) (holding that plaintiff class action attorney who merely relied on another attorney's securities fraud complaint failed to comply with Rule 11).

under Sections 10(b) and 20(a) of the Exchange Act is fatally flawed.  The gravaman of the Complaint -- which imports wholesale allegations from the initial and since abandoned complaint in the WWE Action -- is that Defendants violated the securities laws by failing to confess in all of their public filings spanning a five year period dating back to 1999 that they were guilty of the uncharged alleged misconduct concerning certain payments in 1998 (the "1998 Transactions") now challenged by WWE in the action it filed on October 19, 2004.

On its face, this condemned pleading formula known as "fraud by hindsight," cannot state a cognizable securities fraud claim.  Acito v. IMCERA Group, Inc., 47 F.3d 47, 53 (2d Cir. 1995) ("Mere allegations that statements in one report should have been made in earlier reports do not make out a claim of securities fraud.").  This action epitomizes the type of "frivolous 'strike' suits alleging violations of the Federal securities laws, [which] are often based on nothing more than a company's announcement of bad news, not evidence of fraud" that Congress sought to eradicate by enacting the Private Securities Litigation Reform Act ("PSLRA") in 1995.  S. Rep. No. 104-98, at 4 (1995), reprinted in 1995 U.S.C.C.A.N. 679, 683.

As shown below, the Complaint fails to allege cognizable federal securities claims for three separate and independent reasons:

First, the securities laws do not require corporations to disclose allegedly illegal conduct or the potential liability flowing from it before the alleged wrongdoing is even charged absent some specific Securities and Exchange Commission ("SEC") disclosure rule.  See Point I.A., infra.  Nor do the SEC regulations Plaintiffs cite require disclosure of uncharged illegal conduct -- even if that conduct is illegal and could have a material

impact on the company -- unless and until that conduct becomes the subject of a pending
or probable legal proceeding.

    In this case, Plaintiffs allege no facts suggesting, much less demonstrating, that
legal proceedings against Jakks were known or probable prior to Jakks' public
announcement in October 2004.  On the contrary, WWE's SEC filings establish that
throughout the Class Period, there was no hint -- much less probability -- of litigation
with WWE.[2]  Indeed, as late as July 2004, far from threatening litigation, WWE
continued to praise Jakks for its performance as a licensee of WWE videogame products
and tout Jakks' ability to generate "substantial revenues" for WWE.[3]  To be sure, WWE
was engaged in litigation against third parties, but Jakks could not have anticipated that it
would be sued.  After all, on January 15, 2004, WWE entered into a covenant not to sue
and a broad general release pursuant to which it released Jakks from all known and
unknown claims "of any nature whatsoever."  <u>See</u> Exs. B at 29; C.[4]  Under these

---

[2]    On this motion to dismiss, the Court may consider the full text of documents
partially quoted in the Complaint, <u>see</u> <u>San Leandro Emergency Med. Group Profit
Sharing Plan v. Philip Morris Cos.</u>, 75 F.3d 801, 808-09 (2d Cir. 1996),
documents "integral to the complaint," <u>see</u> <u>I. Meyer Pincus & Assocs., P.C. v.
Oppenheimer & Co.</u>, 936 F.2d 759, 762 (2d Cir. 1991), and documents actually
filed with the SEC, <u>see</u> <u>Cortec Industries, Inc. v. Sum Holding L.P.</u>, 949 F.2d 42,
47-48 (2d Cir. 1991), even if they are not referenced in the complaint.  <u>See</u>
<u>Salinger v. Projectavision</u>, 972 F. Supp. 222, 226 (S.D.N.Y. 1997) (citing <u>Kramer
v. Time Warner, Inc.</u>, 937 F.2d 767, 773-74 (2d Cir. 1991)).

[3]    A copy of WWE's Form 10-K for the fiscal year ended April 30, 2004 is attached
as Exhibit A to the accompanying Declaration of Jonathan J. Lerner ("Ex. A").  A
copy of Jakks' Form 10-K/A for the period ended December 31, 2004, is attached
as Exhibit B to the accompanying Lerner Decl. ("Ex. B").  References herein to
"Ex. _" are to the exhibits annexed to the Lerner Declaration.

[4]    Ex. C is a copy of the fully executed January 15, 2004 release between WWE and
Jakks, which was included as part of the Jakks Defendants' February 16, 2005
publicly available motion to dismiss the WWE Action.

circumstances, the securities laws do not require one to "read tea leaves" or speculate what another might do.

It is equally well settled that Plaintiffs cannot parlay their substantive allegations of bribery into federal securities law claims simply by cataloging Company statements and tacking the phrase "failed to disclose" onto the substantive allegations of bribery. "[P]laintiff may not 'bootstrap' a claim of breach of fiduciary duty into a federal securities law claim by alleging that directors failed to disclose that breach of fiduciary duty." Field v. Trump, 850 F.2d 938, 947 (2d Cir. 1988) (quoting Kas v. Financial Gen. Bankshares, Inc., 796 F.2d 508, 513 (2d Cir. 1988)). Where, as here, "the complaint sounds more in possible corporate mismanagement, viewed retrospectively, than in fraud," the claims fail as a matter of law. In re Union Carbide Class Action Sec. Litig., 648 F. Supp. 1322, 1328 (S.D.N.Y. 1986) (purported omissions about the company's numerous reported safety defects did not render its disclosures about its purportedly exceptional safety standards false and misleading). Only where affirmative statements are so closely linked to the allegedly omitted information so as to render them false or misleading could a duty to disclose possibly exist. Here, none of the statements challenged in the Complaint refers, or even remotely relates, to the alleged payments in 1998 and the ramifications of their discovery by WWE. Accordingly, none of these uncontestedly truthful statements is rendered misleading by the failure to disclose the alleged payments in 1998. See Point I.C., infra.

Ultimately, Plaintiffs are forced to argue that Defendants had an affirmative duty to confess that alleged payments made in 1998 were improper simply because that information might be material to investors, a contention that has been uniformly rejected.

4

See Basic Inc. v. Levinson, 485 U.S. 224, 239 n.17 (1988) ("[s]ilence, absent a duty to disclose is not misleading under Rule 10b-5"). See Point I., infra. Accordingly, Plaintiffs fail to plead any actionable misstatement or omission, which is the sine qua non of a Section 10(b) claim.

Second, the Complaint fails to satisfy the stringent pleading requirements of the PSLRA and Rule 9(b), which require, inter alia, that Plaintiffs plead fraud with particularity on a statement-by-statement basis. As a threshold matter, the PSLRA provides that "if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1) (emphasis added); see also In re Health Mgmt. Sys., Inc. Sec. Litig., No. 97 Civ. 1865, 1998 WL 283286, at *3 (S.D.N.Y. Jun. 1, 1998) (Baer, J.). The Complaint, which is based entirely on information and belief, fails to meet this requirement. Here, Plaintiffs simply download extracts from Defendants' SEC filings over a five year period, and assert, in one sweeping, broad-brush allegation that all of these disclosures were rendered false and misleading because Defendants failed to disclose the underlying alleged 1998 Transactions and the myriad speculative ramifications of WWE's discovery of them. This is precisely the type of generalized pleading that courts have consistently rejected as woefully inadequate under both Rule 9(b) and the PSLRA. See Point II.A., infra.

Third, Plaintiffs fail to plead the essential element of scienter. The Complaint lacks specific facts (1) demonstrating motive and opportunity to defraud, or (2) showing strong circumstantial evidence of conscious misbehavior or recklessness as required to allege scienter. To be sure, Plaintiffs try to plead "motive" by selectively itemizing stock

sales by the individual Defendants throughout the entire five year Class Period. But, they fail to allege any facts, as they must, to show that any of these sales -- much less all of them -- was unusual in scope or in timing. This is hardly surprising because virtually all of these sales occurred in or before May 2002 -- before WWE served its first subpoena on Jakks and years before Jakks disclosed the "adverse facts" of WWE's allegations. Indeed, during 2004, the critical year, only one defendant, Mr. Bennett, sold any stock, and these sales occurred more than two months before the announcement of the WWE Action. (Compl. ¶ 163.) Significantly all other individual Defendants continued to hold their shares.

Wholly apart from the timing of these sales, as a matter of law, Plaintiffs' stock sales chart does not supply evidence of "scienter" because it fails to show (1) the percentage of the shares retained, or (2) purchases by Defendants during the same period. As a matter of law, these allegations raise no inference of scienter and, a fortiori, fail to establish a strong inference of fraudulent intent based on stock sales. See Point II.A.1., infra. Plaintiffs' remaining attempt to allege "motives" -- by claiming that Defendants desired to increase compensation, raise capital, and conduct acquisitions -- fail as a matter of law to plead fraudulent intent because they are legally recognized to be general motives possessed by most corporate executives. See Point II.A.2., infra.

The Complaint also fails to allege any strong circumstantial evidence of conscious misbehavior or recklessness. Indeed, Plaintiffs do not allege that any of the individual Defendants recklessly disregarded, much less knew of, facts showing that WWE was likely to initiate legal action prior to the October 2004 announcement. In this same vein, the absence of any legal duty to disclose also negates, ipso facto, any possible claim that

6

the individual Defendants <u>knew</u> they had a duty to disclose the alleged payments dating back to 1998 and consciously or recklessly failed to do so. <u>See</u> <u>In re Canandaigua Sec. Litig.</u>, 944 F. Supp. 1202, 1213 (S.D.N.Y. 1996) (Pollack, J.).

The allegations in the Complaint accusing the individual Defendants of participating in the alleged payment scheme also fall woefully short of the particularity mandated by Rule 9(b) and the PSLRA. As a matter of law, the lack of basic factual details, such as what the alleged payments were for, is fatal. <u>See</u> Point C. at 11, <u>infra</u>. The allegations in this Complaint still parrot the <u>original</u> WWE complaint, <u>even though it is outdated and was radically altered on March 30, 2005, when WWE filed its amended complaint</u>. Indeed, Plaintiffs' central claim -- that the January 1998 Transactions were a <u>quid pro quo</u> to obtain the videogame license and amendments to the toy licenses -- has been <u>abandoned</u> in the WWE Action. <u>See</u> Point B., <u>infra</u>. Nevertheless, Plaintiffs here rotely assert that payment of the $80,000 "soft toy invoice" dated January 2, 1998 was a payment to obtain the award of the videogame license and the extension of the toy licenses. In sharp contrast, the amended complaint in the WWE Action ("WWE AC") now specifically alleges that the $80,000 invoice and corresponding payments were generated in connection with a transaction to acquire the rights and inventory of wrestling action figures manufactured by a competitor of Jakks named "Playmates," and that procurement of the videogame license and extension of the toy licenses was not discussed until <u>after</u> January 1998. (<u>Compare</u> Compl. ¶¶ 42-46, <u>with</u> WWE AC ¶¶ 58, 61, 79, 83-94, 101.) Under these circumstances, it defies common sense, not to mention credulity, to allege that Jakks was reckless in failing to disclose unproven allegations that <u>WWE itself has abandoned</u>. It certainly violates Rule 9(b) and the PSLRA's pleading

7

requirements to advance these allegations, as Plaintiffs do, without identifying with particularity the source of the information on which they are based.

<strong>FACTS ALLEGED</strong>

### A.     The Parties

Lead plaintiffs ("Plaintiffs") allegedly purchased Jakks common stock between December 3, 1999 and October 19, 2004 (the "Class Period") on the dates set forth in their class certifications. (Compl. ¶¶ 1,14.) Jakks is a Delaware corporation headquartered in California. (Id. ¶ 32.) Established in January 1995, Jakks designs, develops, produces and markets a wide variety of toys and related products, which include action figures and other products licensed from WWE, a media and entertainment company that grants licenses for WWE brand products. (Id. ¶¶ 2, 3, 15, 32.)

The individual Defendants are officers of Jakks. Jack Friedman is the Chairman and Chief Executive Officer; Steven Berman is the President, Chief Operating Officer and Secretary; and Joel Bennett is the Chief Financial Officer and an Executive Vice President (collectively, the "Individual Defendants"). (Id. ¶¶ 16-18.) The Individual Defendants are alleged to have signed certain financial reports during the Class Period. (Id. ¶¶ 64, 71, 77, 80, 82, 87, 90, 95, 98, 104, 111, 118, 125, 131, 134, 135, 139, 142.)

### B.     The WWE Action

On October 19, 2004, Jakks and the Individual Defendants were named as defendants in a complaint filed by WWE in this Court, captioned World Wrestling Entertainment, Inc. v. JAKKS Pacific, Inc., 1:04-CV-08223-KMK (the "Initial WWE Complaint"). See Ex. D. In its Initial Complaint, WWE alleged that certain payments relating to a January 2, 1998 invoice for "soft toys" were directed solely towards

8

"secur[ing] the WWE videogame license and the 1998 amendments to the toy licenses." (Initial WWE Compl. ¶ 188; see also Compl. ¶¶ 175, 181, 188.)

On March 30, 2005, WWE abruptly filed an amended complaint that drastically changed the core factual allegations underlying WWE's claims. See Ex. E. In its amended complaint, WWE recanted its allegations that the allegedly illicit payments in 1998 were a quid pro quo for the videogame license and the extension of the toy licenses. Instead, WWE alleged that the January 2, 1998 "soft toy" invoice for $80,000 and corresponding payments in 1998 were to acquire rights and inventory of wrestling action figures manufactured by a company named Playmates, which is not a party to any of these actions. (Compare WWE Initial Comp., Ex. D ¶¶ 42-46, 59, with WWE AC, Ex. E ¶¶ 58, 61, 79, 83-94, 101.) Moreover, WWE's amended complaint now admits that procurement of the videogame license and extension of the toy licenses was not even discussed until after January 1998 -- thus divorcing them from the January 2, 1998 invoice. (WWE AC ¶¶ 58, 61, 79, 83, 90, 91, 92, 93-101.) Accordingly, the source of Plaintiffs' allegations --WWE -- has now specifically refuted Plaintiffs' core allegation that the January 1998 payment was a bribe to obtain the videogame license and an extension of the toy license.

### C.    The Alleged Payment Scheme

Relying blindly on the allegations of WWE's initial complaint, Plaintiffs here contrive to allege that after entering into a domestic toy license agreement with WWE on October 24, 1995 and an international toy license agreement on February 10, 1997 (Compl. ¶ 32), Jakks procured a videogame license and an extension of the toy license from WWE by paying an $80,000 bribe to agents of WWE. (Compl. ¶¶ 4-6, 40, 145.) Plaintiffs' Complaint alleges that "in early 1998" defendants "Friedman and/or Berman"

9

caused Stanley Shenker ("Shenker"), an agent of WWE, to deliver an $80,000 invoice to Jakks dated January 2, 1998 from an entity called Stanfull Industrial Ltd. ("Stanfull") which was paid in two installments. (Compl. ¶ 42.) The first payment allegedly was made by Mr. Bennett at the direction of Messrs. Berman and Friedman "on or about January 14, 1998" and paid from the bank account of a foreign subsidiary of Jakks. (Compl. ¶ 43.) The Complaint conspicuously fails to allege, as it must to satisfy Rule 9(b) and the PSLRA, the <u>purpose</u> of the January 14, 1998 payment.

The Complaint further alleges that, at Mr. Bennett's direction, another $40,000 was paid on or about April 2, 1998 after WWE's agent recommended that WWE grant the videogame license to Jakks. (Compl. ¶ 46.) According to the Complaint, Jakks then allegedly convinced THQ, a competitor which allegedly had submitted a superior proposal for the videogame license, to enter into a joint venture with Jakks to produce the WWE videogames. (Compl. ¶¶ 48, 49.) On June 23, 1998, WWE entered into a videogame license with Jakks and THQ and on June 24, 1998, the toy licenses were extended. (Compl. ¶¶ 50, 51.) On July 15, 1998, Shenker allegedly sent another $20,000 invoice to the attention of Berman, and Bennett directed that the $20,000 payment be made to Stanfull through a bank account belonging to the foreign subsidiary. (Compl. ¶ 51.)

### D.   <u>WWE Continues To Affirm Its Relationship With Jakks Despite WWE's Ongoing Litigation With Bell And Shenker</u>

Plaintiffs allege that in mid-October 2000, WWE terminated its relationship with Shenker, that litigation ensued between Shenker and WWE in Connecticut (Compl. ¶ 75), and that on June 11, 2002, WWE issued a <u>third party</u> subpoena to Jakks requesting information relating to payments between Jakks, Shenker and Stanley Shenker &

10

Associates, Inc. ("SSAI") -- but not Stanfull -- to which Jakks responded. (Compl. ¶¶ 101, 109.) On January 14, 2003, pursuant to their licensing agreement, WWE's auditors requested payment information relating to Stanfull. (Compl. ¶¶ 112, 115, 126.) On November 14, 2003, Jakks produced to WWE the $80,000 invoice payable to Stanfull. (Compl. ¶ 130.) It bears emphasis that Plaintiffs do not claim that WWE <u>ever</u> attempted or threatened to sue Jakks as part of its ongoing litigation with Shenker in Connecticut.

Nevertheless, Plaintiffs conclusorily assert that "[b]y early 2004, if not earlier, Defendants were further aware that WWE was contending that the WWE licenses had been obtained through a pattern of commercial bribery" and that "Defendants knew or recklessly disregarded the fact that the WWE was contending that the WWE licenses had been obtained through commercial bribery exposed the Company to the heightened risk that the WWE would seek some modification of the WWE licensing agreements or complete nullification of those agreements." (Compl. ¶ 53.)

Apart from the lack of any <u>factual</u> support, this conclusory allegation is directly negated by the actions and SEC filings of <u>both</u> WWE <u>and</u> Jakks during 2003 and 2004.[5] In its Form 10-K filed with the SEC on July 7, 2004, WWE does not disclose <u>any</u> potential controversy involving Jakks, much less make any suggestion that Jakks had engaged in commercial bribery. On the contrary, WWE described its relationship with Jakks in glowing terms: "We maintain licenses with approximately 75 licensees worldwide. Video games represent an important component of this licensing program, generating substantial revenues through our license with THQ/Jakks Pacific, LLC, a joint

---

[5]    The Court "need not accept as true an allegation that is contradicted by documents on which the complaint relies." <u>In re Bristol-Myers Squibb Sec. Litig.</u>, 312 F. Supp. 2d 549, 555 (S.D.N.Y. 2004) (citing <u>In re Livent Inc. Noteholders Sec. Litig.</u>, 151 F. Supp. 2d 371, 405-06 (S.D.N.Y. 2001)).

venture between THQ Inc. and Jakks Pacific, Inc." (See Ex. A at 8.)  On its face, this

public statement by WWE demolishes Plaintiffs' bald allegation that by January 2004,

WWE was accusing Jakks of having obtained the videogame license through "a pattern of

commercial bribery" and threatening legal repercussions.  On January 15, 2004, after

conducting a full audit of Jakks involving payments to Shenker (WWE Initial Compl., Ex

D ¶¶ 103, 104), WWE entered into a covenant not to sue and general release, releasing

Jakks from all known and unknown claims involving the audit -- and agreed to indemnify

Jakks for any violation of that agreement.  (See Exs. B at 29; C.)  Significantly, the

Complaint is devoid of any factual allegation showing that prior to October 2004 WWE

made any threat to Jakks that it would seek to terminate the licenses or initiate litigation

for any reason, much less due to allegedly improper payments in 1998.

### E.      Plaintiffs' Section 10(b) and Rule 10b-5 Claim

Plaintiffs' Section 10(b) and Rule 10b-5 claim is predicated upon Defendants'

failure to disclose in Jakks' public filings during the five year Class Period that: (i) Jakks

had obtained the WWE videogame licenses and toy licenses through the scheme alleged

in the original WWE Action; (ii) Jakks' relationship with WWE was being negatively

impacted by WWE's discovery of the alleged 1998 Transactions; and (iii) Jakks' future

was clouded by the impact of WWE's discovery of the alleged payments.  (Compl. ¶¶145,

156.)  As shown below, none of these contentions states a viable claim under the federal

securities laws.

## ARGUMENT

I.  **THE COMPLAINT FAILS TO STATE A CLAIM FOR VIOLATION
OF SECTION 10(b) BECAUSE DEFENDANTS HAD NO DUTY TO
DISCLOSE THE ALLEGED ILLEGAL CONDUCT**

As a matter of law, Plaintiffs' allegations fail to state an actionable securities fraud claim because there is no affirmative duty under the securities laws to disclose uncharged, unadjudicated illegal conduct and Plaintiffs' allegations do not fall within any of the limited situations that could give rise to such a duty.

Before liability can attach under the securities laws, a plaintiff must establish that defendants have violated an affirmative duty of disclosure. See Basic Inc. v. Levinson, 485 U. S. 224, 239 n. 17 (1988) ("Silence, absent a duty to disclose, is not misleading under Rule 10b-5."). "Even if information is material, there is no liability under Rule 10b-5 unless there is a duty to disclose it." Press v. Chemical Inv. Servs. Corp., 988 F. Supp. 375, 385 (S.D.N.Y. 1997) (Cote, J.), aff'd, 166 F.3d 529 (2d Cir. 1999); Chiarella v. United States, 445 U.S. 222, 235 (1980). In the context of Section 10(b), a duty to disclose even the most material information arises only where -- unlike here -- there is "(1) insider trading, (2) a statute or regulation requiring disclosure, or (3) an inaccurate, incomplete or misleading prior disclosure." In re Canandaigua, 944 F. Supp. at 1208 (citing Glazer v. Formica Corp., 964 F.2d 149, 157 (2d Cir. 1992)); see also Roeder v. Alpha Indus., Inc., 814 F.2d 22, 27 (1st Cir. 1987).

Plaintiffs fail to identify any statute that requires disclosure of alleged illegal conduct before it is even challenged as wrongful, much less becomes the subject of any action or proceeding. And Plaintiffs cannot identify any fact, misleading statement or half-truth that would trigger an affirmative duty to disclose the alleged 1998 Transactions. Accordingly, as there is no general affirmative duty to disclose uncharged alleged

wrongdoing under the securities laws, the Complaint fails, as a legal matter, to allege a

claim for violation of Section 10(b).[6]

A.    **There Is No Affirmative Duty Under the Federal Securities
Laws to Disclose Uncharged Illegal Conduct or to Speculate
About Possible Litigation**

It is apodictic that the federal securities laws do not require issuers to engage in

"self-flagellation" in their disclosure statements. <u>Missouri Portland Cement Co. v.

Cargill, Inc.</u>, 498 F.2d 851, 873 (2d Cir. 1974).  Accordingly, it is well settled in the

Second Circuit that the federal securities laws do not impose any obligation that a

corporation disclose uncharged illegal conduct. <u>See, e.g.</u>, <u>GAF Corp. v. Heyman</u>, 724

---

[6]    Here, Plaintiffs do not purport to allege that a duty to disclose arose on the basis
of insider trading, nor could they.  Courts have rejected attempts to import the
"disclose or abstain" duty into a fraud on the market case. <u>See, e.g.</u>, <u>In re
Sofamor Danek Group, Inc.</u>, 123 F.3d 394, 403 (6th Cir. 1997) (rejecting notion
that duty to disclose under Rule 10b-5 might arise from insider trading because it
would result in enormous liability on insider traders, and would eviscerate
limitations on corporations' duty to disclose, all of which would be contrary to
Congressional intent); <u>In re Seagate Technology II Sec. Litig.</u>, 843 F. Supp. 1341,
1369 (N.D. Ca. 1994) (declining to impose duty to disclose on corporation based
on insider trades: "such a rule, when applied in fraud-on-the-market cases, would
lead to enormous liability on insider traders -- liability that could not have been
anticipated by Congress."); <u>In re Safeguard Scientifics</u>, No. Civ.A.01-3208, 2004
WL 2700291, at *3 (E.D. Pa. Nov. 18, 2004) ("as Plaintiffs have not brought
insider trading claims against Defendants, they may not rely on the 'abstain or
disclose' rule to impose a duty of disclosure in this [Section 10(b)] case").
Moreover, Plaintiffs have not alleged an insider trading claim. Plaintiffs allege
that they purchased their shares in July 2003 and on October 11, 13 and 19, 2004.
(<u>See</u> Compl. ¶ 14 (referencing Plaintiffs' purchases of Jakks' stock); <u>see also</u> Ex. F
(chart evidencing Plaintiffs' stock purchases attached to their memorandum of law
seeking appointment as lead plaintiffs).)  The Individual Defendants are alleged to
have sold shares in December 1999, in June, July and August 2001, in February
and May of 2002, and on August 10, 11, and 13 of 2004.  (Compl. ¶ 163.)
Plaintiffs cannot, as a matter of law, state a claim under Rule 10b-5 on the basis of
these temporally attenuated trades. <u>See</u> Point III.A.1., <u>infra</u>; <u>see also</u> <u>Wilson v.
Comtech Telecomms. Corp.</u>, 648 F2d 88, 94-95 (2d Cir. 1981) (insiders had no
duty to disclose information to plaintiff or to abstain from trading under Section
10(b) where there was one month gap between plaintiff's purchases and insiders'
trades).

F.2d 727, 739, 740 (2d Cir. 1983) (securities laws "'simply do not require management to accuse itself of antisocial or illegal policies;'" holding that incumbent director was not required to disclose unproven allegations in pending breach of trust lawsuit against him); United States v. Matthews, 787 F.2d 38, 45 (2d Cir. 1986) (no duty under Rule 14a-9 to disclose that director candidate had engaged in conspiracy to bribe New York public officials and was subject of criminal investigation); Ciresi v. Citicorp, 782 F. Supp. 819, 823 (S.D.N.Y. 1991) (securities laws do not impose duty to disclose uncharged, unadjudicated wrongdoing).

Courts in other circuits have likewise held that there is no obligation to disclose or speculate about uncharged illegal conduct. See, e.g., Roeder, 814 F.2d at 27 (no affirmative duty under Rule 10b-5 to disclose alleged bribe paid to secure subcontract);In re Sofamor Danek Group, Inc., 123 F.3d 394, 402 (6th Cir. 1997) (companies have no duty to characterize their actions as otherwise improper); see also In re Miller Indus., Inc. Sec. Litig., 12 F. Supp. 2d 1323, 1331 (N.D. Ga. 1998) (rejecting purported securities fraud claim brought after company announced antitrust investigation by Department of Justice alleging that the corporation failed to disclose in its prior public filings that its conduct could give rise to antitrust violations under the Sherman Act "because the Defendants were under no duty to disclose potential but conjectural antitrust liability"); In re Teledyne Defense Contracting Derivative Litig., 849 F. Supp. 1369, 1382 (C.D. Cal. 1993) ("[d]irectors and officers simply need not confess guilt to involvement in criminal conduct and breaches of fiduciary duties of care when such charges have not yet been brought, let alone proven"); Bolger v. First State Fin. Servs., 759 F. Supp. 182, 194-95, 97 (D.N.J. 1991) (holding that company was "under no obligation to disclose Bolger's

15

mere allegations as to illegal conduct and mismanagement by First State officers and directors" or to "implicate its officers in wrong-doing based on his unproven charges").

Plaintiffs' contention that Defendants should have disclosed the possibility of litigation with WWE fares no better. There is no legal duty under the federal securities laws to predict potential exposure to possible future litigation. See Acito, 47 F.3d at 52-53; In re Citigroup, Inc. Sec. Litig., 330 F. Supp. 2d 367, 377 (S.D.N.Y. 2004) (Citigroup not required to make disclosures predicting litigation associated with Enron banking activities that were subject of third party litigation and criminal investigation); Ballan v. Wilfred American Educ. Corp., 720 F. Supp. 241, 248 (E.D.N.Y. 1989) ("defendants were not bound to predict as the 'imminent' or 'likely' outcome of the investigations that indictments of Wilfred and its chief financial officer would follow, with financial disaster in their train" -- securities fraud defendants "cannot be held liable for failing to 'disclose' what would have been pure speculation.").[7] A fortiori, Jakks had no duty to engage in sheer speculation that WWE suddenly would decide to sue it and then disclose this conjecture absent any alleged threat of litigation by WWE during the Class Period.

Plaintiffs' claims to the contrary are all the more preposterous here given: (i) the positive public statements of WWE in July 2004 about its ongoing license transactions with Jakks, which would be false and misleading if it was planning to sue; and (ii)

---

[7]     Accord, e.g., In re Browning-Ferris Indus., Inc. S'holder Derivative Litig., 830 F. Supp. 361, 369 (S.D. Tex. 1993) (no duty to disclose a "target" letter from the Antitrust Division of the Department of Justice because the defendant at that time "was not convicted, indicted or even the subject of a pending criminal proceeding"), aff'd, 20 F.3d 465 (5th Cir. 1994); Greenstone v. Cambex Corp., 975 F.2d 22, 25-27 (1st Cir. 1992) (no duty to predict commencement of lawsuit and settlement); World Series of Casino Gambling, Inc. v. King, 1986-87 Fed. Sec. L. Rep. (CCH) ¶ 92,981, at 94,817 (S.D.N.Y. Oct. 30, 1986) (no duty to predict that grand jury will return an indictment).

16

WWE's issuance of a release and covenant not to sue with an express indemnification

obligation if it were violated, which directly negated the potential of litigation. See

Levine v. NL Industries, Inc., 926 F.2d 199, 204 (2d Cir. 1991) (holding that issuer's

nondisclosure of potential liability arising out of environmental law violations was

immaterial in light of a third party's agreement to indemnify issuer in event of any

liability or loss arising out of such violations).

Indeed, Plaintiffs have not even satisfied their burden to plead that the alleged

undisclosed transactions, or their revelation, are "material" so as to require disclosure. In

Kahn v. Wien, 842 F. Supp. 667 (E.D.N.Y. 1994), the Court stated: "the fact that SEC

regulations require that all pending criminal proceedings be disclosed in proxy

solicitations, but do not require corresponding disclosure of pending civil actions

'strongly suggests that regardless of how serious they may appear on their face,

unadjudicated allegations in a pending civil action . . . should not be material.'" Id. at 678

(ellipsis in original; emphasis added) (quoting GAF Corp. v. Heyman, 724 F.2d 727, 739-

40 (2d Cir. 1983)).[8]

As Defendants had no duty to predict litigation, they certainly had no duty, as

Plaintiffs contend, to speculate that the risks from such litigation would "negatively

impact[]" Jakks' relationship with WWE, that WWE might seek to terminate the licenses

(which it has not done), or, that if these events occurred, the Company's financial results

---

[8]     In Kahn, Judge Dearie granted summary judgment dismissing a proxy claim
based on the failure to disclose unproven civil allegations precisely because such
unproven allegations were not "material" and "the lack of materiality is
dispositive in this case." 842 F. Supp at 679 & n.8. In so holding, the Court
emphasized that "[t]he Second Circuit has cautioned against placing 'much stock
in the bald, untested allegations in a civil complaint' in 'a society as litigious as
ours, where plaintiffs are permitted great latitude in their pleadings . . . .'" Id.
(quoting GAF Corp., 724 F.2d at 739-40) (internal citations omitted).

might be negatively effected. (See Compl. ¶¶ 145.) This precise contention was rejected

in In re Par Pharmaceutical, Inc. Sec. Litig., 733 F. Supp. 668 (S.D.N.Y. 1990) (Patterson,

J.), in which the defendant corporation allegedly failed to disclose multiple bribes to

Food and Drug Administration officials to obtain expedited approval of Par's products.

There, the bribes actually resulted in the criminal prosecution and guilty pleas of the

Company's President and Chief Executive Officer and another director. In Par, plaintiffs

asserted, just like Plaintiffs assert here, that "defendants should have disclosed to the

investment community 'the profound harmful effect that the public disclosure and/or

termination of the bribery scheme would have on Par's sales, profit margins and

earnings.'" Id. at 678. Rejecting this claim, this Court held in language that applies with

equal force here that the "company was not obligated to speculate as to the myriad of

consequences, ranging from minor setbacks to complete ruin, that might have befallen the

company if the bribery scheme was discovered, disclosed or terminated." Id. (emphasis

added). A fortiori, Defendants here had no duty under the securities laws to disclose that

alleged payments in 1998 would later be characterized as "bribery" or to predict the

possible consequences if the alleged payments in 1998 were discovered and challenged

by WWE.

**B.      The SEC Regulations Do Not Require Disclosure of Uncharged
          Illegal Conduct or Speculation About Possible Litigation**

Plaintiffs vaguely allude to a general "duty to promptly disseminate truthful

information that would be material to investors in compliance with the integrated

disclosure provisions" of SEC Regulations S-K and S-X. (Compl. ¶167.) In their

Complaint, Plaintiffs conspicuously fail to identify any specific SEC Regulation that

would require Jakks to disclose the uncharged wrongdoing any earlier than it did. (Id.)

18

Not surprisingly, not a single item in Regulation S-K or S-X supports Plaintiffs' conclusory allegation.

Item 103 of Regulation S-K (entitled "Legal Proceedings") merely requires a "brief" description of "material pending legal proceedings" and similar information as to such "proceedings known to be contemplated by governmental authorities." 17 C.F.R. § 229.103 (2005) (emphasis added). This Regulation does not require a company to disclose the mere possibility of civil litigation. See Gen. Elec. Co. v. Cathcart, 980 F.2d 927, 935 (3d Cir. 1992) (no duty to disclose until there is pending litigation, and even at that point, the SEC regulations only require disclosure for non-routine lawsuits). As courts have squarely held: "By its plain language, the regulation . . . does not require the disclosure of uncharged criminal conduct." United States v. Crop Growers Corp., 954 F. Supp. 335, 347 (D.D.C. 1997) (emphasis added). By alerting investors on the eve of the filing that if discussions with WWE failed, litigation was "likely to be commenced," and by promptly disclosing the pending WWE Action the day it was filed, Defendants more than complied with this item. (Compl. ¶¶ 7, 149, 150.)

Item 303 of Regulation S-K is similarly unavailing to Plaintiffs. Item 303, entitled "Management's Discussion and Analysis of Financial Condition and Results of Operations," merely requires disclosure of "any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or incomes from continuing operations." 17 C.F.R. § 229.303 (2005). It contains no requirement to disclose uncharged illegal conduct. Instruction Seven for this item makes plain that it is totally inapposite to this case by specifying that this item pertains to "presently known data which will impact upon future

operating results, such as known future increases in costs of labor or materials" --
circumstances that bear no relation to the uncharged illegal conduct alleged here or to
what, if anything, WWE might do, and how, if at all, any such action might impact
financial results. See Sofamor Danek, 123 F.3d at 402.[9]

Nothing pled in the Complaint suggests that during the Class Period, Defendants
had any inkling -- let alone knew -- that WWE would commence an action based on the
alleged 1998 Transactions or that the commencement of the action could have a material
impact on Jakks' financial results. Plaintiffs' conclusory assertion -- that Defendants
knew "[b]y early 2004" that WWE was contending the licenses were obtained through
"commercial bribery" and threatening repercussions against Jakks (Compl. ¶ 53) -- not
only lacks factual support; it contravenes statements made by WWE in its public filings.

Until October 2004, WWE never publicly mentioned any possible action against
Jakks as a result of the alleged payments in 1998. On the contrary, it affirmatively
acknowledged the value of Jakks' performance to its business as late as July 7, 2004,
describing its relationship with Jakks as an "important component" of its licensing
program: "Video games represent an important component of this licensing program,
generating substantial revenues through our license with THQ/Jakks Pacific, LLC, a joint
venture between THQ Inc. and Jakks Pacific, Inc." Ex. A at 8.

---

[9]    In any event, even if S-K 303 imposed a disclosure obligation here (which it does
not), "[i]t is far from certain that the requirement that there be a duty to disclose
under Rule 10b-5 may be satisfied by importing the disclosure duties from S-K
303," In re Canandaigua, 944 F. Supp. at 1210, or that there even exists a private
cause of action for alleged violations of Item 303. E.g., In re Sofamor, 123 F.3d
at 402-03; see also United States v. Crop Growers Corp., 954 F. Supp. 335, 348
(D.D.C. 1997).

It bears emphasis that by July of 2004, almost six years had elapsed since the alleged payments in 1998, and even though it admittedly knew about these payments as early as 2003, WWE had taken no action to sue Jakks or terminate the licenses.[10]

## C.    None of Defendants' Truthful Statements Were Rendered Misleading By Failure To Disclose The Alleged Bribery Or Failure To Predict The Repercussions

Without pointing to a single specific disclosure, Plaintiffs generally allege that virtually every public filing by Jakks spanning a five year period was rendered misleading because Jakks failed to disclose that its financial results were allegedly inflated as result of the undisclosed 1998 Transactions alleged by WWE in the WWE Action. (Compl. ¶¶ 145, 156.)   Plaintiffs' position boils down to the preposterous theory that any comment by a corporation imposes an affirmative duty to confess even the most remote possibility of a potential allegation of wrongdoing that could conceivably bear on the subject.  As discussed below, this discredited theory has been uniformly rejected.

In shotgun fashion, Plaintiffs allege that all the following categories of statements were rendered misleading by Defendants' failure to disclose the alleged 1998 Transactions and all of their possible ramifications years later on Jakks' relationship with WWE:

---

[10]    Plaintiffs' reference to Regulation S-X, 17 C.F.R. part 210 (2005), in connection with an alleged duty to disclose is similarly misguided.  Regulation S-X governs the disclosure requirements in connection with registration statements and prospectuses.  Like Regulation S-K, it contains no disclosure requirement for untested, uncharged illegal conduct before it is challenged as being wrongful, regardless of its materiality.  Characteristically, Plaintiffs point to no item in Regulation S-X that has any bearing under the circumstances alleged, much less that imposes a disclosure duty here.  Thus, Regulation S-X must be rejected as a source of Defendants' disclosure obligations for the same reasons as Regulation S-K.

o <u>Accurate Reports of Jakks' Historical Financial Results and Continued Sales Growth during the Class Period</u>: (<u>E.g.</u>, Compl. ¶¶ 57, 61, 65, 67, 89, 94, 128, 133, 136), including general comments on the Company's growth strategies through the addition of new products and acquisitions. (<u>See, e.g.</u>, Compl. ¶¶ 56, 57, 70, 83, 85, 88, 102, 110, 177);

o <u>Accurate Historical Facts Concerning the Joint Venture between Jakks and THQ</u>: <u>E.g.</u>, "in June 1998, we formed a joint venture with THQ . . . .[t]he joint venture entered into a license agreement with World Wrestling Federation Entertainment under which it acquired the exclusive worldwide right to publish World Wrestling Federation video games on all hardware platforms." (Compl. ¶ 64; <u>see also</u> Compl. ¶¶ 58, 80, 86, 93-96, 99, 132);

o <u>Accurate Historical Reports on the Performance of WWE Licensed Products</u>: <u>E.g.</u>, "WWF WrestleMania 2000" for Nintendo 64 Exceeds 1 Million Units in Less Than Two Months At Retail" (Compl. ¶ 61); "WWF wrestling products . . . continued their solid performance." (Compl. ¶ 65; <u>see also</u> Compl. ¶¶ 71, 76, 77, 128, 80, 94, 119, 133);

o <u>Projected Earnings and Expressions of Optimism</u>: <u>E.g.</u>, "the Company looks forward to another record year . . . when we expect net sales to increase to the range of $290 to $310 million" (Compl. ¶¶ 79, 89, 93, 96, 81); "we expect that these new [WWE action figure toy licenses], combined with our core business, will contribute to our top and bottom line growth in 2004 and beyond." (Compl. ¶ 135); and "our joint venture is on track to increase significantly its contribution to our profitability and cash flow . . ." (Compl. ¶ 96; <u>see also</u> Compl. ¶¶ 102, 110, 105, 140, 143, 62, 73, 76, 81, 85, 108, 114, 129, 133, 136);

o <u>Acknowledgement of Messrs. Friedman's and Berman's Contribution to the Company's Success</u>: <u>E.g.</u>, "[w]e believe our success to date has been to a significant extent attributable to the personal efforts of Mr. Friedman and Mr. Berman . . . Mr. Friedman's long-term relationship with Titan Sports was instrumental in our acquiring our successful World Wrestling Federation licenses;" "both Mr. Berman and Mr. Friedman embody our management philosophy with a 'hands on' approach in all areas of our business. In addition to their general supervisory functions, they are directly involved in license acquisition;" "[I]n 1999, they guided us through two significant acquisitions, the implementation of our video game joint venture with THQ Inc. and two public offerings." (Compl. ¶ 68; <u>see also</u> Compl. ¶¶ 69, 83, 106, 107);

o <u>Certifications of Jakks' Financial Statements</u> attesting to the accuracy of the financial information contained therein. (<u>See</u> Compl. ¶¶ 66, 104, 111);

o <u>Descriptions of the Company's Audit Committee and the Company's Code of Ethics Published in 2004</u>. (<u>See</u> Compl. ¶¶ 84, 135);

22

o   General Corporate Optimism:  characterizations of financial results as "record" or "satisfying" (Compl. ¶¶ 62, 79, 113, 141); glowing announcements of the debut of various WWE video games. (See, e.g., Compl. ¶¶ 67, 72, 78, 93, 127, 12);

o   Amalgamations of All of the Above. (See Compl. ¶¶ 116, 118, 125, 131, 134, 139, 142.)

Of course, Plaintiffs' vague pleading technique carefully avoids specifying exactly which statement was misleading and why. See Point II.A., infra.  Courts have not hesitated to dismiss claims where, as here, accurate information is alleged to have been rendered misleading by the failure to disclose illegal conduct that was, at most, tenuously related to disclosed information. See, e.g., Bragger v. Trinity Capital Enter. Corp., No. 92 Civ. 2124 (LMM), 1994 WL 75239, at *4 (S.D.N.Y. Mar. 7, 1994); Greenstone v. Cambex Corp., 777 F. Supp 88 (D. Mass, 1991), aff'd, 975 F.2d 22 (1st Cir. 1992). Moreover, courts have routinely refused to find a duty to disclose where the alleged undisclosed information does not contradict or render misleading the challenged statements. See, e.g., In re Canandaigua, 944 F. Supp. at 1208-09; San Leandro, 75 F.3d at 810.  As a matter of law, none of the smorgasbord of indisputably accurate statements challenged here can form the basis for a securities law claim.

> 1.   Accurate Historical Statements of Earnings and Product Performance Do Not Trigger a Duty to Disclose Alleged Misconduct

Plaintiffs contend that Jakks' statements concerning its historical earnings and the performance of the WWE licensed products from 1999 to 2004 were rendered misleading by the alleged failure to speculate on the potential ramifications of the alleged payments by Jakks in 1998. (Compl. ¶¶ 57, 61, 65, 67, 89, 94, 128, 133, 136, see also ¶¶ 56, 57, 70, 83, 85, 88, 102, 110, 177.)  As a threshold matter, truthful statements of historical facts are not misleading as a matter of law. See, e.g., Sofamor Danek, 123 F.3d at 401 & n.3

(6th Cir. 1996) ("it is clear that a violation of federal securities law cannot be premised upon a company's disclosure of accurate historical data" even if less favorable results might be predicted in the future); In re Glenayre Techs., Inc. Sec. Litig., 982 F. Supp. 294, 296 (S.D.N.Y. 1997) (dismissing complaint where plaintiffs identified numerous documents and press releases issued by defendants but failed to allege that that numbers provided by defendants were inaccurate).

The decision of the Court of Appeals for the Sixth Circuit in Sofamor Danek is particularly instructive. There, plaintiffs alleged that Sofamor Danek failed to disclose that it was promoting bone plates and spinal screw products for illegal use in spinal surgeries. 123 F.3d at 400. As in this case, plaintiffs alleged that Sofamor Danek's financial disclosures were incomplete and misleading "because they attributed the company's success to such things as increased sales volume without properly explaining how the sales were being achieved" and "pointed to growth in the number of spinal implant operations being performed [and] increased demand for the company's products for use in these operations" without disclosing that the sales growth was due to promotion of the products for illicit uses. Id. at 400-01. Holding that defendants were not required to disclose that their financial results were impacted by the allegedly known improper use of their products, the Court of Appeals for the Sixth Circuit explained:

> The proposition that the company was engaging in illegal promotion of its products . . . is not a proposition that can fairly be said to fall in the category of "hard" information. Hard information "is typically historical information or other factual information that is objectively verifiable . . . ." Such information is to be contrasted with "soft" information, which includes predictions and matters of opinion. The legality of Sofamor Danek's support for the non-profit foundation, for example, was a matter of opinion – "soft information." And "our cases firmly establish the rule that soft information . . . must be disclosed only if . . . virtually as certain as hard facts."

24

Id. at 401-402 (emphasis added; citations omitted). As in Sofamor Danek, Plaintiffs'

attempt here to predicate liability on a supposed affirmative duty to disclose the 1998

Transactions, whose legality and propriety, vel non, was at least a matter of opinion,

especially where no litigation had yet been brought, must be rejected for the same

reasons.[11]

Plaintiffs' lengthy catalogue of Jakks' accurate historical statements of past results

simply cannot create a duty to speculate on future results (see, e.g., In re Burlington Coat

Factory Sec. Litig., 114 F.3d 1410, 1432 (3d Cir. 1997) ("[e]qually well settled is the

principle that an accurate report of past successes does not contain an implicit

representation that the trend is going to continue . . . ."); Guerra v. Teradyne Inc., No. Civ.

A. 01-11789, 2004 WL 1467065, at *24 (D. Mass. Jan. 16, 2004) ("[A]ccurate reporting

of historical information cannot sustain a fraud claim and does not create any duty to

provide predictions about a less rosy future.")), or to speculate on the potential litigation

by WWE and the potential financial fall-out of such litigation. See, e.g., In re Ford

Motor Co. Sec. Litig., 381 F.3d 563, 570-72 (6th Cir. 2004) (rejecting contention that

Ford's statements about record past earnings triggered duty to disclose that eventual

"revelation" of known product defect, which ultimately necessitated product recall, would

adversely affect Ford's financial status); In re Citigroup, 330 F. Supp. 2d at 377

---

[11]   Indeed, if such a duty were to exist, anytime litigation against a company
       adversely affected its share price, it would invite -- as here -- piggy-back fraud-
       by-hindsight securities fraud claims alleging that the company "misleadingly"
       failed to disclose the underlying misconduct that is alleged in the pending
       litigation. Cf. Amalgamated Clothing & Textile Workers Union v. J.P. Stevens &
       Co., 475 F. Supp. 328, 332 (S.D.N.Y. 1979) ("[A] requirement that illegal
       intentions be disclosed would make a silly, unworkable rule. It would not
       promote increased disclosure, but would serve only to support vexatious litigation
       and abusive discovery.").

(Citigroup not required to predict litigation risks associated with its Enron-related

banking activities under securities laws); In re Par Pharm., Inc. Sec. Litig., 733 F. Supp.

668, 678 (S.D.N.Y. 1990) (no duty to speculate on myriad of potential consequences that

could arise from detection of bribery scheme); Sofamor Danek, 123 F.3d at 402 (no duty

to disclose that regulatory action might be brought against company by virtue of

company's alleged illegal activities); cf. Acito, 47 F.3d at 55 (no duty to disclose possible

future inspections by federal agency).

> 2.   Accurate Historical Facts Concerning the Joint Venture
>       Between Jakks and THQ Do Not Trigger a Duty to Disclose

In the same vein, Plaintiffs erroneously contend that Defendants' truthful

historical statements about the formation and performance of the joint venture with THQ

were rendered misleading because Defendants failed to disclose that the WWE

videogame license was wrongfully obtained.  (Compl. ¶ 64; see also Compl. ¶¶ 58, 80, 86,

93-96, 99, 132.)  Plaintiffs do not allege -- nor could they -- that any of the statements

about the THQ/Jakks joint venture were actually contradicted or rendered misleading by

the later disclosure of the alleged 1998 Transactions in the WWE Action.  Instead,

"Plaintiffs merely sound the familiar refrain that any comment by a corporation imposes

an affirmative duty to disclose all marginally-related material information.  There is no

such obligation or duty."  In re Canandaigua, 944 F. Supp. 1202, 1209 (citing San

Leandro, 75 F.3d at 810)).  To require otherwise would inundate investors "in an

avalanche of trivial information -- a result that is hardly conducive to informed

decisionmaking."  TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 448-49 (1976).

In re Nokia Corp. Securities Litigation, No. 96 Civ. 3752(DC), 1998 WL 898334

(S.D.N.Y. Dec. 22, 1998), is squarely on point.  In Nokia, Judge Chin held that a

company's statements concerning past and projected gains in market share did not trigger a duty to disclose that the company's profit margins had declined. The court held that "[i]n speaking about market share, Nokia was not under an obligation to discuss profit margin as well. A corporation has no duty to 'disclose every piece of information in its possession that could affect the price of its stock' whenever it speaks." Id. at *5 (quoting In re Time Warner Sec. Litig., 9 F.3d 259, 268 (2d Cir. 1993)). A fortiori here, where the allegedly omitted information is far more attenuated, remote in time, and involves rank speculation, there simply can be no duty to disclose it. Accord In re Comverse Tech., Inc. Sec. Litig., 01-CV-6972 (ARR) (S.D.N.Y. Oct. 2, 2002) (attached as Ex. G) (company's accurate statements about market share did not trigger duty to comment on other issues related to customer demands or company's alleged problems with major client).

Courts in this circuit have not hesitated to dismiss securities fraud complaints where, as here, the challenged historical statements were not contradicted or rendered misleading by the undisclosed information. In San Leandro, the Second Circuit held that defendants' statement that Philip Morris would focus on profits did not give rise to a duty to disclose a promotional plan that focused on market share rather than profits. 75 F.3d at 810. The Court noted that defendants had not "hyped" a specific profit plan so as to mislead investors into believing that Philip Morris had committed itself to a particular promotional plan. Id. Similarly, in In re Canandaigua, Judge Pollack ruled that Canandaigua's statements about its "brand development strategy," "[n]et sales and unit volume of the Company's varietal table wine brands" and "increases in . . . varietal table wine brands due to, among other things, line extensions and new product introductions" could not, as a matter of law, be rendered misleading by the failure to disclose a price

27

discounting scheme for the new products that caused profits to drop. 944 F. Supp. at 1209. Judge Pollack reasoned, among other things, that none of those affirmative statements were later contradicted by disclosure of the price discounting plan. Id. at 1208-09.

Here, as in San Leandro and In re Canandaigua, Defendants' comments about the establishment of the THQ/Jakks joint venture were not later contradicted or rendered misleading by the allegations at issue in the WWE Action, and these uncontradicted statements did not trigger a duty to disclose the alleged 1998 Transactions, or to speculate about their potential ramifications six years later.

> 3.    Projected Earnings Statements and Expressions
>        of Optimism Do Not Trigger a Duty to Disclose

To the extent Plaintiffs seek to predicate their fraud claim on corporate projections and expressions of optimism, their reliance is equally misplaced. (See Compl. ¶ 96; see also Compl. ¶¶ 102, 110, 105, 140, 143, 62, 73, 76, 81, 85, 108, 114, 129, 133, 136.) As a general matter, the Second Circuit has held that "[p]eople in charge of an enterprise are not required to take a gloomy, fearful or defeatist view of the future; subject to what current data indicates, they can be expected to be confident about their stewardship and the prospects of the business that they manage." Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124, 1129-30 (2d Cir. 1994). Accordingly, "[i]t is well settled that a complaint alleging violations of the securities laws may not rely upon statements that . . . constitute puffery or ordinary expressions of corporate optimism." In re Bristol-Myers, 312 F. Supp. 2d at 557; see also In re Nokia Sec. Litig., 1998 WL 150963, at *6 ("[T]he Second Circuit has ruled that general announcements that a company . . . expects

a product to perform well do not require disclosure of possible policies that might contradict those predictions.").

Under these well established cases, Jakks' hopeful earnings statements and future growth expectations relating to the WWE videogames or the Company, as a matter of law, do not constitute actionable statements under the securities laws because such statements "'lack the sort of definite positive projections that might require later correction.'" San Leandro, 75 F.3d at 811 (citation omitted); see id. at 805-06, 811 (dismissing as nonactionable corporate optimism, statement that "'we are budgeting for and expecting a strong year for all of our businesses'"); Lasker v. New York State Elec. & Gas Corp., 85 F.3d 55, 59 (2d Cir. 1996) (statements expressing the conviction that "'business strategies [would] lead to continued prosperity' . . . consist of precisely the type of 'puffery' that this and other circuits have consistently held to be inactionable"); Raab v. Gen. Physics Corp., 4 F.3d 286, 289 (4th Cir. 1993) (finding statement in annual report that "'the DOE Services Group is poised to carry the growth and success of 1991 well into the future'" to be inactionable puffing) (citation omitted).

It bears emphasis that the Complaint contains no allegations that the Individual Defendants did not hold these positive views when they made the statements, or that they were made without a reasonable basis. To state a claim based upon an optimistic statement about the future, Plaintiffs must plead facts showing that Defendants lacked a reasonable basis for the optimism at the time the statements were made. See In re Time Warner Inc. Sec. Litig., 9 F.3d 259, 266 (2d Cir. 1993); Wielgos v. Commonwealth Edison Co., 892 F.2d 509, 515 (7th Cir. 1989); In re Donald J. Trump Casino Sec. Litig., 7 F.3d 357, 368 (3d Cir. 1993); Elliott Assocs. L.P. v. Covance, Inc., No. 00 Civ. 4115

(SAS), 2000 U.S. Dist. LEXIS 17099, at *24 (S.D.N.Y. Nov. 28, 2000). Here, Plaintiffs

do not and cannot dispute that throughout the entire Class Period, Jakks had a very

reasonable basis for its optimism. Indeed, throughout and even after the Class Period,

Jakks reported stellar revenues and continuously increasing net sales. <u>See</u> Ex. B at 26.

For example, Plaintiffs cite to a February 17, 2004 press release announcing, among other

things, that Jakks was "forecasting 2004 net sales, excluding acquisitions, to be in the

range of $330 to $340 million and diluted earnings per share of $1.20 to $1.30 . . . ."

(Compl. ¶ 133). As demonstrated in Jakks' Form 10-K/A for the year ending December

31, 2004, Jakks not only met but exceeded these projections by earning $574 million in

net sales and $1.49 diluted earnings per share during 2004. <u>See</u> Ex. B at 26.

Under these circumstances, Plaintiffs' claim must fail as a matter of law. <u>See</u>

<u>Kowal v. MCI Commc'ns Corp.</u>,16 F.3d 1271, 1274, 1279 (D.C. Cir. 1994)

(management's optimistic statements were not misleading where "uninterrupted

improvement in [MCI's] revenues, earnings, and earnings per share" provided

"management with a reasonable basis for predictions of similar prospects in the future");

<u>Hillson Partners L.P. v. Adage, Inc.</u>, 42 F.3d 204, 206, 214 (4th Cir. 1994)

(management's mid-year statement that Company was "on target toward achieving the

most profitable year in its history" had a reasonable basis where Company's previous

quarters' results were in fact record breaking); <u>Renz v. Schreiber</u>, 832 F. Supp. 766, 778

(D.N.J. 1993) ("'[A] reasoned and justified statement of opinion, one with a sound factual

or historical basis, is not actionable.'") (citation omitted).

4.    The Acknowledgement of Messrs. Friedman's and Berman's
Contribution to the Company's Success Does Not Trigger a
Duty to Disclose

Plaintiffs also latch onto accurate historical statements that were made about the

contributions of Messrs. Friedman and Berman to the Company's success in the context

of the Company's executive annual compensation awards.  (Compl. ¶ 68; see also Compl.

¶¶ 69, 83, 106, 107.)  Plaintiffs rely on the statement that "Mr. Friedman's long-term

relationship with World Wrestling Federation Entertainment, Inc. was instrumental in our

acquiring our successful World Wrestling Federation licenses," (Compl. ¶¶ 83,106; see

also Compl. ¶ 68) to attempt to support their fraud claim.  On its face, this statement is

classic -- and immaterial -- general optimism of the type that cannot support a claim of

fraud.  See In re Razorfish, Inc. Sec. Litig., No. 00 Civ. 9474 (JSR), 2001 WL 1111502,

at *1-2 (S.D.N.Y. Sept. 21, 2001) (statement that "since joining Razorfish" company's

president had "done an outstanding job in helping us accomplish the success we have

achieved" was a "classic" expression of puffery and, as such, was inactionable under the

securities laws).

Furthermore, Plaintiffs do not and cannot allege any facts to show that this

statement was not accurate.  On the contrary, the Complaint itself concedes -- as it must -

- that Mr. Friedman co-founded JAKKS with Mr. Berman (Compl. ¶ 16) and that WWE's

relationship with Jakks dates back to October 24, 1995, when under the stewardship of

Mr. Friedman, Jakks entered into a "domestic toy license" with WWE through December

31, 2007. (Compl. ¶ 34.)  The Complaint also acknowledges that Jakks' relationship with

WWE was still flourishing on February 10, 1997, long before the allegedly illicit

payments, when WWE granted Jakks an international toy license as well. (Compl. ¶ 37.)

Significantly, there is no allegation in the Complaint that either of these initial WWE

licenses upon which Jakks' relationship with WWE was founded were not properly

procured by, or that they were not entirely attributable to the hard work and efforts of, Mr.

Friedman and Mr. Berman. Accordingly, the general reference to Mr. Friedman's

preexisting long-term relationship with WWE cannot be used to bootstrap a duty to

disclose the alleged 1998 Transactions.

Likewise, the general complimentary statement that defendants Berman and

Friedman "embody" a "hands-on approach" and "guided us through . . . the

implementation of our video game joint venture with THQ Inc." (Compl. ¶ 68; see also

Compl. ¶¶ 69, 83, 106, 107) -- which is not disputed -- does not compel disclosure of the

allegation that the WWE videogame license was influenced by the 1998 Transactions.

Courts regularly reject similarly attenuated claims. In Bragger v. Trinity Capital

Enterprise Corp., No. 92 CIV. 2124 (LMM), 1994 WL 75239 (S.D.N.Y. Mar. 7, 1994)

(McKenna, J.), the defendants issued a press release optimistically announcing the terms

of the merger and describing the businesses of the respective parties to the merger. Id. at

*4. The press release failed, however, to disclose that one of the parties to the merger

had violated the FDA regulations and was under investigation by the FDA, and that its

business would be negatively impacted if the FDA took adverse action against it. Id. at

*2. As here, Plaintiff alleged that defendants' description of the businesses of the parties

triggered a duty to disclose the FDA violations. Id. at *3-4. Rejecting plaintiff's

argument, Judge McKenna held that the "brief description of the nature of the business of

[the defendants]" did not create a duty to include "a detailed discussion of the financial

condition and regulatory compliance of each entity" in the press release. Id. at *4. In

32

reasoning equally applicable to the general statements about the importance of Messrs.

Friedman's and Berman's contributions to Jakks' success, the court explained:

> Plaintiff, in effect, contends that anytime an entity proffers any information about itself to the public, the proffer, in order to be "complete," must include any and all material information about the entity. Were it to accept Plaintiff's argument, this Court would make extinct the typical one-page corporate press release and, in its place, require, for even the most mundane of announcements, a binder-full of financial and regulatory data commensurate with a mandatory SEC filing. Even the broadest reading of "complete" in this context cannot rationally stretch to compel disclosure on such a grand scale in order to avoid the conclusion that anything less is misleading for the purposes of Rule 10b-5.

Id.; see also Backman v. Polaroid Corp., 910 F.2d 10, 16 (1st Cir. 1990) (requirement that

voluntary disclosure of information must be complete and accurate "does not mean that

by revealing one fact about a product, one must reveal all others that, too, would be

interesting, market-wise," and holding that disclosure that Polavision cameras were being

sold at below cost was not rendered misleading by failure to disclose at how much below

costs or that sales were below expectations).

    Similarly, In re Citigroup, Inc. Sec. Litig., 330 F. Supp. 2d 367 (S.D.N.Y. 2004),

plaintiffs alleged that Citigroup's (i) statements that "[r]isk management is the

cornerstone of Citigroup's business;" and (ii) description of various risk management-

related procedures regarding the extension of credit were rendered misleading by

Citigroup's failure to disclose that it was involved in illegal loan transactions with Enron

which put it at undue credit risk and were at odds with the risk management policies

described in its filings. Id. at 371, 375, 376. Judge Swain dismissed the complaint,

holding that these statements did not trigger a duty to disclose that the revenues were

derived from "'unsustainable and illegitimate sources.'" Id. at 377 (citation omitted).

Further, the Court explicitly rejected the contention that Citigroup was required to speculate about potential litigation arising from these challenged transactions. Id. at 377.

5.    Certifications of Jakks' Financial Statements
Do Not Trigger a Duty to Disclose

Plaintiffs apparently also contend that a duty to disclose is imposed by virtue of the required corporate certifications attached to Jakks' financial disclosures. (See Compl. ¶¶ 66, 104, 111; see also Compl. ¶¶ 84, 135.) There is no merit to this allegation. Plaintiffs here point to no financial data that was inaccurate or untrue. It is well established that accurate statements of historical fact are not misleading. See In re Bristol Myers, 312 F. Supp. 2d at 552; Sofamor Danek, 123 F.3d at 401. Accordingly, the mere certification of the financial statements did not trigger a duty to disclose the alleged 1998 Transactions.

In all events, the broad language of these disclosures -- that "the Company believes that the disclosures [in its May 10, 2000 10-Q] are adequate to prevent the information presented from being misleading" (Compl. ¶ 66); and that "the information contained in the [August 14, 2002 10-Q] fairly presents, in all material respects, the financial condition and results of operations of Jakks" (id. ¶ 104; see also id. ¶ 111) -- are not even tenuously related to, let alone rendered misleading or contradicted by, the allegedly undisclosed facts concerning the 1998 Transactions.

Greenstone v. Cambex Corp., 777 F. Supp. 88 (D. Mass. 1991), aff'd, 975 F.2d 22 (1st Cir. 1992), is directly on point. The securities fraud claim in Greenstone was based on a lawsuit brought by IBM against Cambex Corporation ("Cambex") in which IBM accused Cambex of illegally converting and reselling its computer components. 777 F. Supp. at 89. Based on IBM's lawsuit, the shareholder plaintiff identified several

34

statements made by Cambex about its revenues and financial condition and alleged that

defendants had "misrepresented the financial status of Cambex because they failed to

disclose the fact that Cambex . . . engaged in unlawful practices which influenced the

revenues of Cambex." Id. at 89-91. Rejecting plaintiff's argument, the Court of Appeals

noted that there were no false statements, and held that the tenuous nexus between the

undisclosed information about Cambex's allegedly illegal business practices and

Cambex's statements about its revenues did not give rise to a duty to disclose:

> Plaintiff does not allege that the revenues actually received by Cambex
> differed from those reported to the SEC. Nor does she contend that
> Cambex did not experience the financial success described in its quarterly
> and annual reports. She argues instead that the reports would have been
> more accurate and complete if defendants had revealed their improper
> activities because such activities allegedly influenced the financial success
> of Cambex. Beyond such vague references to the "false portrayal" of
> revenues, the plaintiff does not state how reports and statements made by
> Cambex were false or inaccurate.

Id. at 91 (emphasis added). In language squarely applicable here, the court in Greenstone

stated:

> Regardless of how the plaintiff purports to characterize the undisclosed
> information (i.e., about the defendants' improper activity) and its alleged
> influence on prior statements relating to revenue, she is, in reality,
> asserting that the defendants had an independent and affirmative duty to
> disclose the improper activity simply because it was material. Such a duty
> does not exist.

Id. (emphasis added). Just as in Greenstone, Plaintiffs here entirely fail to show how any

of the statements in Jakks' certifications were rendered misleading or contradicted by the

alleged failure to disclose the alleged 1998 Transactions. See also cases cited in Point

I.C.1-4, supra.

6.   Descriptions of the Company's Audit Committee
and the Company's Code of Ethics Published in 2004
Do Not Trigger a Duty to Disclose

In similar a vein, Plaintiffs contend that Jakks' general descriptions of the Charter

of the Audit Committee -- to "oversee the integrity of the Company's management"

(Compl. ¶ 84) and the establishment and publication in 2004 of a Code of Ethics (id. ¶

135) -- were rendered materially misleading because Defendants failed to disclose the

alleged illicit payment scheme dating back to 1998.  (Compl. ¶¶ 84, 135.)  Significantly,

both the creation of the Audit Committee and the promulgation of a Code of Ethics were

mandated by statute or regulation.  See 17 C.F.R. § 229.406 (2005) (Item 406 of

Regulation S-K, promulgated under the Securities Act of 1933, as amended (requiring

creation and publication of Code of Ethics)); see also NASD Manual § 4350(d)(1)

(requiring establishment of independent Audit Committee).  Like their allegations based

on the financial certifications, Plaintiffs cannot, and do not, allege that the descriptions of

the Audit Committee charter or the Code of Ethics were false.  Nor do they show how the

mere description of the Audit Committee charter or the Code of Ethics could possibly

trigger a duty to ferret out uncharged, untested bribery allegations dating back to 1998.

Indeed, it did not.  See Greenstone, 777 F. Supp. at 91; In re Citigroup, 330 F. Supp. 2d at

377; Bragger, 1994 WL 75239, at *4.  In the final analysis, it would be preposterous to

contend, as Plaintiffs do, that Jakks' announced compliance with SEC and NASD rules in

establishing an Audit Committee and Code of Ethics compelled Jakks to spontaneously

disclose every theoretical allegation of wrongdoing going back five years, despite the

lack of any SEC rule or statute mandating such disclosure.

36

7.    General Corporate Optimism Does Not Trigger A Duty to Disclose

Plaintiffs fare no better in their attempt to predicate their Section 10(b) claim on general corporate optimism about the WWE licensed products. (See, e.g., Compl. ¶¶ 67, 72, 78, 93, 127, 12.)  General optimistic statements, such as "[s]aying that a product is 'significant,' 'attractive' or 'great' is . . . not actionable securities fraud." Frazier v. Vitalworks, Inc., 341 F. Supp. 2d 142, 153 (D. Conn. 2004).  Likewise, "[h]yperbolic statements assigning reasons for and placing adjectives on past results generally are not actionable since they contain no implicit prediction that those events or conditions will continue in the future." In re Splash Tech. Holdings, Inc. Sec. Litig., 160 F. Supp. 2d 1059, 1076 (N.D. Cal. 2001).  "Cheerleading only becomes fraud if 'defendants had access to contrary facts' and plaintiffs can specifically identify "reports or statements" containing contrary information.'" Frazier, 341 F. Supp. 2d at 154 (citation omitted). Here, the remaining categories of Defendants statements consist of generalized optimistic corporate statements and cheerleading not worded as guarantees. (See, e.g., Compl. ¶¶ 62, 79, 113, 141 (characterizing financial results as "record" or "satisfying").)  Plaintiffs plead no specific facts contradicting these statements.  Thus, these statements are not actionable as a matter of law and cannot, therefore, trigger a duty to disclose unrelated alleged wrongdoing.

II.    **THE COMPLAINT FAILS TO COMPLY WITH THE STRICT PLEADING MANDATES OF RULE 9(b) AND THE PSLRA**

Rule 9(b) requires a complaint to "'(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.'" Rombach v. Chang, 355 F.3d 164, 170 (2d Cir. 2004) (citation omitted).  These requirements serve to

37

"'provide a defendant with fair notice of a plaintiff's claim, to safeguard a defendant's reputation from improvident charges of wrongdoing, and to protect a defendant against the institution of a strike suit.'" Id. at 171 (citation omitted).

Likewise, the PSLRA mandates that a plaintiff "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). On their face, Plaintiffs' allegations fail to meet these stringent pleading requirements.

### A.    Plaintiffs Fail To Specify Which of the Complaint's Statements Are Alleged to be Misleading and Why They Are Misleading

Despite the extreme prolixity of Plaintiffs' 76 page Complaint, nowhere do Plaintiffs specify the statements they allege to be fraudulent as mandated by both Rule 9(b) and the PSLRA. Attempting to obfuscate these fatal pleading deficiencies, Plaintiffs' litter the Complaint with lengthy quotations, some of which are bold-faced, from more than forty (40) separate public filings spread over a five-year period, and then declare in conclusory fashion that "[t]he statements referenced above in ¶¶ 56-58, 61-73, 76-89, 91, 93-99, 102-108, 110-111, 113, 116-120, 125, 127-129, 131-137 and 139-144" were false and misleading for failing to disclose a series of conclusory "adverse facts," which in turn are unproven speculative allegations drawn from WWE's untested -- and everchanging -- Initial Complaint. (Compl. ¶ 145.)

Plaintiffs' deliberate failure to specify exactly which portion of each quoted SEC filing or press release supposedly constitutes a false representation, or which statements purport to link up with which corresponding "adverse fact" on their boilerplate list at

38

paragraph 145, is fatal to their claim.  Courts have uniformly rejected this obfuscatory

pleading technique -- the very antithesis of the kind of specificity mandated by Rule 9(b)

and the PSLRA -- as inadequate.  Confronted with precisely this type of pleading, in <u>In re</u>

<u>Alcatel Securities Litigation</u>, No. 02 Civ. 3818 (RCC), 2005 U.S. Dist. LEXIS 3053

(S.D.N.Y. Feb. 28, 2005), Judge Casey dismissed the complaint precisely because, as

here, it "fail[ed] to set forth specific, false statements or misleading omissions of material

fact that are accompanied with the identification of the speaker, time, and place of each

statement and an explanation of why each statement is fraudulent." <u>Id.</u> at *52 (citation

omitted).  As the court explained:

> Although Plaintiffs' 250-paragraph, 102-page Amended Complaint is long,
> it states very little with particularity.  Plaintiffs list various statements --
> often setting forth lengthy quotations from various releases by Defendants'
> officers and securities analysts -- then follow each with a similar (in most
> cases identical) laundry list of "specific" reasons why the statements are
> allegedly false.  <u>Plaintiffs neglect to make it clear what portion of each
> quotation constitutes a false representation, or which statements link up
> with which issues in the laundry list, placing the burden on the Court to
> sort out the alleged misrepresentations and then match them up with the
> corresponding adverse facts.</u>  This method is deficient under the pleading
> standards.

<u>Id.</u> at *52-53 (emphasis added) (citing <u>Endovasc Ltd. v. J.P. Turner & Co.</u>, No. 02 Civ.

7313 (LAP), 2004 U.S. Dist. LEXIS 5075 (S.D.N.Y. Mar. 30, 2004); <u>accord</u> <u>In re</u>

<u>Citigroup</u>, 330 F. Supp. 2d at 379 (rejecting plaintiffs' tactic of quoting extensively from

Citigroup's descriptions of its risk management policies without specifying <u>which</u> of

those descriptions constituted a false or misleading statement or <u>how</u> each risk

management policy quoted in the complaint was violated); <u>see also</u> <u>In re Cornerstone</u>

<u>Propane Partners, L.P. Sec. Litig.</u>, 355 F. Supp. 2d 1069, 1081 (N.D. Cal. 2005) (noting

that the "evasive, non-committal style" of "puzzle-style pleadings" "significantly

increases the burdens to both the defendants and the court in evaluating a complaint's

satisfaction of the PSLRA pleading requirements").

      While such loose pleading may be strategically "useful to plaintiffs", see

Portannese v. Donna Karan International, Inc., No. 97-CV-2011, 1998 WL 637547, at *5

(E.D.N.Y. Aug. 14, 1998) (a "complaint that lacks this precision can prove useful for

plaintiffs" because it allows them to "shift the focus and character" of the claims in

response to a defendant's dismissal brief), it utterly fails to comply with the mandates of

Rule 9(b) and the PSLRA.  Indeed, as Judge Allyne Ross recently held in dismissing a

similar puzzle-type pleading, Plaintiffs' failure to match particular undisclosed facts to

each particular misleading statement "strongly undermines plaintiffs' argument that the

undisclosed facts relate directly to the challenged statements." In re Comverse Tech., slip.

op. at 14 (attached as Ex. G).  The Complaint here must be dismissed for the same

reasons.

### III.    THE COMPLAINT FAILS TO PLEAD PARTICULARIZED FACTS GIVING RISE TO A STRONG INFERENCE OF FRAUDULENT INTENT

      The cornerstone of any securities fraud claim is proof that that the defendants

acted with scienter -- that is, an "intent to deceive, manipulate or defraud." Ernst & Ernst

v. Hochfelder, 425 U.S. 185, 193 n.12 (1976).  Accordingly, the PSLRA mandates that

any complaint alleging a Section 10(b) or Rule 10b-5 violation "shall, with respect to

each act or omission alleged to violate this chapter, state with particularity facts giving

rise to a strong inference that the defendant acted with the required state of mind." 15

U.S.C. § 78u-4(b)(2) (emphasis added).

      In this Circuit, to establish the requisite "strong inference of fraudulent intent," a

plaintiff must plead specific facts either (a) demonstrating "that defendants had both

motive and opportunity to commit fraud", or (b) "that constitute strong circumstantial

evidence of conscious misbehavior or recklessness." Kalnit v. Eichler, 264 F.3d 131, 138

(2d Cir. 2001). Recklessness has been defined as, "'at the least, conduct which is highly

unreasonable and which represents an extreme departure from the standards of ordinary

care to the extent that the danger was either known to the defendant or so obvious that the

defendant must have been aware of it.'" Id. at 142 (citation omitted). In Novak v. Kasaks,

216 F.3d 300 (2d Cir. 2000), the Second Circuit held that while the PSLRA added the

requirement that scienter be pleaded "with particularity," it did not change the basic

scienter pleading standards applicable in this Circuit. Id. at 310-11. The Second Circuit

also stressed that there are "important limitations on the scope of liability for securities

fraud based on reckless conduct." Id. at 309. In particular, where the plaintiffs "contend

defendants had access to contrary facts, they must specifically identify the reports or

statements containing this information." Id.

## A.     Plaintiffs' Motive Allegations Are Insufficient

For insider stock sales to constitute a motive to commit fraud, a plaintiff must

allege, with factual specificity, that such sales were "unusual" or "suspicious" in scope or

timing. See Acito, 47 F.3d at 54; San Leandro, 75 F.3d at 813-14. "Sufficient motive

allegations 'entail concrete benefits that could be realized by one or more of the false

statements and wrongful nondisclosures alleged." Kalnit, 264 F.3d at 139 (citations

omitted). The Complaint attempts to plead "motive" by alleging that the Individual

Defendants benefited from: (i) stock sales (Compl. ¶¶ 56, 59, 60, 100, 163) (ii) increased

compensation as a result of the Company's growth (Compl. ¶¶ 68, 69, 83, 107, 122-24);

and (iii) the ability to raise capital and conduct acquisitions on the strength of the WWE

videogame and toy licenses (Compl. ¶¶ 58, 60, 92, 97, 99, 110.) As a matter of law,

41

these allegations are insufficient to support a strong inference of scienter because the

stock sales were not unusual in scope or timing, and the remaining "motive" allegations

boil down to mere pejorative characterizations of ordinary corporate objectives.

>    1.    The Insider Stock Sales Allegations Fail to
>           Provide an Adequate Motive to Commit Fraud

It is well settled that "executive stock sales, standing alone, are insufficient to

support a strong inference of fraudulent intent." In re Bristol-Myers, 312 F. Supp. 2d at

561; accord In re Advanta Corp. Sec. Litig., 180 F.3d 525, 541 (3d Cir. 1999) (no

inference of scienter may be drawn merely because the insider defendants realized

significant profits by selling their shares during the class period); Herzog v. GT

Interactive Software Corp., No. 98 Civ. 0085 (DNE), 1999 WL 1072500, at *8 (S.D.N.Y.

Nov. 29, 1999) ("The mere fact, however, that two of the three Individual Defendants

sold some stock during the . . . Class Period does not create a strong inference of motive

to commit securities fraud."), aff'd in part, rev'd in part on other grounds sub nom.

Rothman v. Gregor, 220 F.3d 81 (2d Cir. 2000); In re Health Mgmt., 1998 WL 283286 at

*6 (no inference of scienter based on stock sales where chief financial officer sold no

shares and actually purchased shares during class period); see also Duncan v. Pencer, No.

94 Civ. 0321 (LAP), 1996 WL 19043, at *12 (S.D.N.Y. Jan. 18, 1996).

Plaintiffs' chart depicting trades by Messrs. Friedman, Berman, Bennett, and other

executives not named in the Complaint during the Class Period fails to allege that any of

these sales were the least bit suspicious.[12]    The Complaint wholly fails to disclose the

---

[12]    Plaintiffs erroneously assume that if they maximize the aggregate dollar amounts
of all of this trading activity by including trading by non-defendants, they can
establish scienter. See In re Glenayre Techs., Inc. Sec. Litig., 982 F. Supp. 294,
296-97 (S.D.N.Y. 1997) (allegations that seven of eleven individual defendants
sold significant amounts of Glenayre stock amounting to $36 million between

number of shares <u>retained</u> by each Individual Defendant or other executive in relation to the number of shares sold. (Compl. ¶ 163.) This omission mandates dismissal because the mere fact that an insider sold shares of stock at a given time, standing alone, without any reference to the <u>percentage</u> of that insider's total holdings represented by the sale, does not raise a strong inference that such person acted with scienter. <u>See</u> <u>Rothman v. Gregor</u>, 220 F.3d 81, 95 (2d Cir. 2000) ($20 million return not inference of fraudulent intent compared to percentage of shares owned); <u>San Leandro</u>, 75 F.3d at 813-814 (where insiders retained shares, sales did not constitute scienter); <u>In re Burlington Coat</u>, 114 F.3d at 1423 (no information about the percentage of shares sold allegedly on non-public information and, thus, no showing of fraudulent intent); <u>Acito</u>, 47 F.3d at 54 (sale of 384,000 shares, without more, was insufficient to establish scienter); <u>see also</u> <u>In re Apple Computer Sec. Litig.</u>, 886 F.2d 1109, 1117-18 (9th Cir. 1989) (relative amount of officer's holding sold is important to question of whether sales can support inference of scienter).

On their face, the timing of the trades negates scienter. Here, the vast majority of the trades listed on the chart occurred <u>years</u> before the disclosure of "adverse facts," demolishing any inference of scienter. <u>See</u> <u>Acito</u>, 47 F.3d at 54; <u>Ressler v. Liz Claiborne, Inc.</u>, 75 F. Supp. 2d 43, 60 (E.D.N.Y. 1999). According to Plaintiffs, the most recent stock trades by Messrs. Friedman and Berman occurred on May 29, 2002 -- more than <u>two years</u> before the "truth emerged" on October 19, 2004 -- timing which by no measure

time of negative FCC announcement and defendants' press release informing public of the impact of the FCC announcement not probative of scienter). Whether other Jakks officials sold their stock in years prior to the October 19, 2004 announcement is irrelevant to establish motive as to Messrs. Friedman, Bennett and Berman. <u>See</u> <u>In re Scholastic Sec. Litig.</u>, 252 F.3d 63, 75 (2d Cir. 2001).

is indicative of fraud.[13]  See Ressler, 75 F. Supp. 2d at 60.[14]  In fact, with one exception, all of the challenged stock sales had occurred by May 2002 -- before Jakks had even received any subpoena from WWE (see Compl. ¶ 101) and thus before it could have any conceivable reason to suspect that WWE would ever challenge the licenses.

The only exception involved Mr. Bennett's sales on August 10, 11 and 13, 2004, which occurred more than two months before the October 19, 2004 announcement. (Compl. ¶163).  As a matter of law, such timing is not sufficiently close to the disclosure of "bad news" to establish the requisite strong inference of scienter.  See, e.g., In re Keyspan Corp. Sec. Litig., No. 01 Civ. 5852 (ARR), 2003 U.S. Dist. LEXIS 20746, at *77 (S.D.N.Y. Mar. 18, 2003) (two month gap between sales and announcement not indicative of fraud); Frazier, 341 F. Supp. 2d at 161 (nine and seven week gap between sales and bad news did not raise a "strong inference that defendants were trying to sell off stock on the basis of inside information before the market discovered the bad . . . news"); In re Green Tree Financial Corp. Stock Litig., 61 F. Supp. 2d 860, 866, 873-74 & n.14 (D.

---

[13]    The same holds true for the stock sales of the non-defendants Michael Bianco, David Blatte, Robert Glick, Michael Miller, and Murray Skala, none of whom are alleged to have sold a single share in 2003 or 2004. (Compl. ¶ 163.)

[14]    Further, there was no change in volume of insider sales around the time of the October 19, 2004 announcement -- indeed, there were no insider sales at all during that period. (Compl. ¶ 163.)  This further militates against a strong inference of fraudulent intent.  See Acito, 47 F.3d at 54 (lack of sales by defendants undermines inference of fraudulent intent); Frazier, 341 F. Supp. 2d at 162; In re Advanta Corp. Sec. Litig., 180 F.3d at 540.  And at several times during the Class Period Jakks' stock traded at prices significantly higher than the price at which any of the allegedly "suspicious" sales were effected.  (See Ex. H (Jakks Pacific Common Stock Prices from December 1, 1999 through October 19, 2004).) This further negates the inference of scienter.  See In re Party City Sec. Litig., 147 F. Supp. 2d 282, 313 (D.N.J. 2001) (failure to sell off at top of stock price negates suspicious inference) (citation omitted); cf. In re Nike, Inc. Sec. Litig., 181 F. Supp. 2d 1160, 1169-70 (D. Or. 2002).

44

Minn. 1999) (no motive where defendant sold two weeks prior to negative

announcement), rev'd on other grounds sub nom. Florida State Bd. of Admin. v. Green

Tree Financial Corp., 270 F.3d 645 (8th Cir. 2001).

Apart from the timing of the sales, which defeats scienter, the fact that only one of

the Individual Defendants is alleged to have sold shares in the year of the negative

announcement also precludes Plaintiffs' reliance on the Individual Defendants' stock sales

to establish fraudulent intent.  See Acito, 47 F.3d at 54; In re Glenayre Techs., 982 F.

Supp. at 299; In re Advanta, 180 F.3d at 540; In re Heath Mgmt. Sys., 1998 WL 283286,

at *6.  Thus, Plaintiffs cannot establish motive based on any concrete benefits to insiders.

2.    Plaintiffs' General Motive Allegations Are Insufficient

The remaining attempts by Plaintiffs to meet the stringent pleading requirements

for "scienter" -- the alleged desire to keep stock prices high to increase compensation and

to make the corporation appear profitable (Compl. ¶¶ 162-63) -- have both been

decisively rejected by the Court of Appeals for the Second Circuit as legally insufficient.

See Kalnit, 264 F.3d at 139; see also Acito, 47 F.3d at 54 (desire to increase

compensation not sufficient); In re Bristol-Myers, 312 F. Supp. 2d at 562 ('[p]laintiffs

must 'do more than merely charge that executives aim to prolong the benefits of the

positions they hold.'") (quoting Shields, 25 F.3d at 1130).  These types of generalized

motives can be readily imputed to any for-profit endeavor.  Kalnit, 264 F.3d at 139.

Similarly, the desire to raise capital and make acquisitions is insufficient to give

rise to a strong inference of scienter. "[A] company [and its officers and directors] issuing

its stock to the public always has a generalized motive to ensure the success of the issue

and to raise as much money as possible." Geiger v. Solomon-Page Group, Ltd., 933 F.

Supp. 1180, 1189 (S.D.N.Y. 1996); see also In re Cross Media Mktg. Corp. Sec. Litig.,

45

314 F. Supp. 2d 256, 265 (S.D.N.Y. 2004) (desire to raise additional capital in private placement inadequate to support allegation of intent to commit fraud); San Leandro, 75 F.3d at 814.

Leventhal v. Tow, 48 F. Supp. 2d 104 (D. Conn. 1999), which the Second Circuit specifically cited with approval in Kalnit, 264 F.3d at 140, is directly on point. In Leventhal, as here, plaintiffs alleged that "the defendants had a motive to artificially inflate Citizen's stock price during the class period in order to get more favorable terms in the stock-for-stock transactions and in the issuance of the debentures." 48 F. Supp. 2d at 115. Holding this generalized corporate motive to be wholly insufficient to establish scienter, the district court emphasized the "'unequivocal rejection [by courts of this Circuit] of the concept of motive predicated upon the desire to maximize the marketability of debt securities and to minimize interest rates.'" Id. (quoting In re 1993 Corning Sec. Litig., No. 93 Civ. 7015 (AGS), 1996 WL 257603, at *6 (S.D.N.Y. May 15, 1996)).[15]

Similarly, Plaintiffs' allegations that the Individual Defendants were motivated to inflate the value of Jakks stock because they received increased compensation and/or raised capital and/or acquired other companies (Compl. ¶ 54) are general corporate motives possessed by most corporate officers and directors. Acito, 47 F.3d at 54. As such, they are patently insufficient to establish a "motive" to commit securities fraud.

---

[15]    See also In re Health Mgmt., Inc. Sec. Litig., 970 F. Supp. 192, 200 (E.D.N.Y. 1997) (company's alleged motive to inflate the value of its stock in order to conclude and obtain financing for various acquisitions was insufficient to plead strong inference of company's motive). Accord, e.g., In re Baker Hughes Sec. Litig., 136 F. Supp. 2d 630, 642 (S.D. Tex. 2001) ("primary deficiency" of alleged motive of corporate defendants to conceal company's problems to ensure success of $200 million debt offering was failure to allege that "the Defendants would personally profit from the debt offering.").

46

**B.    Plaintiffs Fail to Allege Scienter Based on
        Conscious Misbehavior or Recklessness**

Where, as here, "motive is not apparent, it is still possible to plead scienter by

identifying circumstances indicating conscious misbehavior by the defendant, though the

strength of the circumstantial allegations must be correspondingly greater." Kalnit, 264

F.3d at 142 (emphasis added).  To prove scienter by showing conscious misbehavior or

recklessness, the alleged conduct must be "'at the least, conduct which is highly

unreasonable,'" representing "'an extreme departure from the standards of ordinary care to

the extent that the danger was either known to the defendant or so obvious that the

defendant must have been aware of it.'"  Id. (quoting In re Carter-Wallace, Inc. Sec. Litig.,

220 F.3d 36, 39 (2d Cir. 2000)); see also Chill v. Gen. Elec. Co., 101 F.3d 263, 269 (2d

Cir. 1996).  To meet this strong circumstantial evidence standard, the plaintiffs must

specifically allege defendants' knowledge of the facts or access to specific information

contradicting their public statements.  In re Bristol-Myers, 312 F. Supp. 2d at 562.  It is

well-settled that "[w]here plaintiffs contend defendants had access to contrary facts, they

must specifically identify the reports or statements containing this information." Novak v.

Kasaks, 216 F.3d 300, 309 (2d Cir. 2000).

Here, Plaintiffs' allegations do not give rise to any inference, let alone a strong

inference, that the Individual Defendants consciously or recklessly failed to disclose

information which they knew contradicted their public statements or they had a duty to

disclose.

1.    Plaintiffs Fail to Plead Facts to Suggest that Defendants Knew
      They Had a Duty to Disclose the Alleged 1998 Transactions

To show conscious or reckless disregard of a duty to disclose, Plaintiffs must, at

minimum, show that the Individual Defendants knew they had a duty to disclose the

47

alleged illegal conduct. <u>See</u> <u>Kalnit</u>, 264 F.3d at 143 (defendants' recklessness cannot be inferred from the failure to disclose where no clear duty to disclose existed); <u>see also</u> <u>In re Canandaigua</u>, 944 F. Supp. 1202, 1213-14 ("It is not enough for plaintiffs to allege that defendants knew that the disclosures did not reveal the pricing strategy or that the omitted information was material, for that alone does not suggest 'conscious misbehavior or recklessness.' Absent some allegation that defendants knew or were highly unreasonable in not knowing that they were doing something illicit, the complaint fails to adequately plead scienter.") (citing <u>Shields</u>, 25 F.3d at 1128)).

Here, Plaintiffs conclusorily allege that the Individual Defendants knew or should have known about the allegedly illegal payments as a result of their involvement in the 1998 Transactions, their responses to a third-party WWE subpoena, and their responses to the WWE audit request. (Compl. ¶¶ 53, 101, 109, 115, 126, 130.) But alleged knowledge of the 1998 Transactions is not enough. Nor is the Defendants' alleged failure to disclose these Transactions enough. Rather, there must be some allegation that Defendants <u>knew</u> that the information should have been disclosed <u>and consciously</u> failed to do so. The Complaint falls far short of alleging that the Defendants knew or should have known they had a duty to disclose uncharged, unadjudicated charges in the WWE Action -- which they continue vehemently to deny. As discussed in Point I.A-C., <u>supra</u>, the Individual Defendants had <u>no</u> duty whatsoever to disclose the uncharged payment scheme, particularly since: (i) there is no such disclosure requirement under the securities laws, (ii) WWE's public disclosures confirm that there was no basis for Jakks to believe, prior to October 2004, that WWE would claim that the licenses were obtained wrongfully as a result of anything that Jakks or its officers did, and there is not a single factual

allegation in the Complaint to suggest otherwise; and (iii) Defendants are not alleged to have made any public statements that were contradicted, undermined or rendered misleading by the alleged payment scheme. Cf. In re Bristol-Myers, 312 F.Supp. 2d at 562. To the contrary, pertinent legal authorities establish that under these circumstances, there was no duty to disclose. Plaintiffs cannot possibly show that the Individual Defendants consciously or recklessly avoided performing a duty that did not clearly exist.

2.    Executive Status Does Not Create a Strong Inference of Scienter

Plaintiffs attempt to attribute a strong inference of conscious misbehavior or recklessness to the Individual Defendants by alleging that they signed and/or certified Jakks' financial disclosures during the Class Period. (Compl. ¶¶ 64, 71, 77, 80, 82, 87, 91, 95, 98, 104, 111, 116, 118, 125, 131, 134, 135, 139, 142.)  Plaintiffs also quote from SEC filings stating that Messrs. Friedman and Berman were involved in the "day to day operations" and adopted a "hands-on" approach to Jakks' business. (Compl. ¶¶ 83, 106.)

Courts have resoundingly held that motive allegations predicated upon the status of defendants akin to those made in the Complaint -- i.e., that a defendant held a senior position, signed SEC filings, had access to inside information, and was involved in the company's day to day operations -- are legally insufficient to plead a strong inference of scienter.  See In re Health Mgmt. Sys., 1998 WL 283286, at *6 ("[C]ourts have routinely rejected the attempt to plead scienter based on allegations that because of defendants' . . . executive managerial positions, they had access to information concerning the company's adverse financial outlook."); Glickman v. Alexander & Alexander Servs., Inc., No. 93 Civ. 7594 (LAP), 1996 WL 88570, at *14 (S.D.N.Y. Feb. 29, 1996) (rejecting scienter allegation based on defendant CEO's "'unfettered access'" to company's records, noting that theory "would expose virtually any CEO, by virtue of his or her position alone, to

49

liability"); In re U.S. Aggregates, Inc. Sec. Litig., 235 F. Supp. 2d 1063, 1074-76 (N.D.

Cal. 2002) (allegations that CFO was "'very hands on'" coupled with alleged statements

by anonymous employees were insufficient to support strong inference of scienter); In re

Cendant Corp. Sec. Litig., 76 F. Supp. 2d 539, 547 (D.N.J. 1999) ("Allegations that a

director or officer signed public disclosures and/or was involved in the company's daily

operations, standing alone, will not satisfy the pleading requirements of the PSLRA or

Rule 9(b).").

      Accordingly, the allegations founded on the status of the Individual Defendants

and vague references to their "hands-on" business approach are woefully insufficient to

create the requisite "strong inference" that the Individual Defendants acted with the

required fraudulent intent in failing to disclose the alleged 1998 Transactions.

      3.    The Complaint Fails Adequately To Plead Scienter
                Against Each of the Individual Defendants as
                Mandated by Rule 9(b) and the PSLRA

      The PSLRA and Rule 9(b) require, at a minimum, that plaintiffs support their

allegations of securities fraud with all of the essential factual background that would

accompany "the first paragraph of any newspaper story"-- that is, "the who, what, when,

where and how" of the events at issue. DiLeo v. Ernst & Young, 901 F.2d 624, 627 (7th

Cir. 1990). In order to prevent "strike suits," the PSLRA requires a plaintiff alleging

securities fraud action to:

> 'specify each statement alleged to have been misleading, the reason or
> reasons why the statement is misleading, and, if an allegation regarding
> the statement or omission is made on information and belief, the complaint
> shall state with particularity all facts on which that belief is formed.'

Rombach, 355 F.3d at 170 (quoting 15 U.S.C. § 78u-4(b)(1)). Accordingly, Plaintiffs

must "state with particularity the specific facts in support of [plaintiffs'] belief that

[defendants'] statements were false when made." Id. at 172 (alteration in original; citation omitted).

Section 21D of the Exchange Act enacted by PSLRA heightens the pleading requirements for securities claims by specifically requiring a plaintiff to "state with particularity facts giving rise to a <u>strong inference that the defendant acted with the</u> <u>required state of mind</u>." 15 U.S.C. § 78u-4(b)(2) (emphasis added). To be sure, plaintiffs may rely on confidential sources for facts supporting their information and belief pleading, but they still must "supply sufficient specific facts to support their allegations." <u>Novak</u>, 216 F.3d at 314.

Here, Plaintiffs' allegations of fraud rest entirely on the conclusory, unsubstantiated, and discredited charge in WWE's Initial Complaint that certain transactions between JAKKS and Stanfull in 1998 were secretly effected to fraudulently induce WWE to confer license rights on JAKKS. Yet, nowhere in their Complaint do Plaintiffs allege a single statement showing <u>any complicity or any actual agreement</u>, at any time, among Jakks, Shenker and Bell to improperly influence the competition for the licenses. On the contrary, WWE's Initial Complaint <u>admits</u> that even after <u>recanting</u> his prior denials of receiving payments from other licensees (WWE Initial Compl., Ex. D, ¶¶ 116, 117), Shenker, like Bell, "continued" to steadfastly deny that the payments by JAKKS to Shenker were related in any way to the Licenses. (Ex. D ¶ 118.) Nor does the Complaint contain any factual allegations showing that Jakks, or any of the Individual Defendants, much less <u>each</u> of them, ever had any knowledge, at any time, of (i) any alleged agreement between Shenker and Bell to share the proceeds of alleged 1998 Transactions between Jakks and Stanfull, or (ii) any agreement between Shenker and Bell

51

relating to the alleged 1998 Transactions. See, e.g., New York Transp., Inc. v. Naples

Transp., Inc., 116 F. Supp. 2d 382, 386 (E.D.N.Y. 2000) (in cases involving multiple

defendants, Rule 9(b) requires plaintiff to provide particularized allegations of fraud

against each defendant).

On similarly deficient facts, courts have not hesitated to dismiss securities fraud

complaints. See Garvey v. Arkoosh, 354 F. Supp. 2d 73, 82 (D. Mass. 2005) (dismissing

securities fraud complaint based on alleged $750,000 payment for financial advisory

services, where "the allegations of a link between that payment and the supposed 'secret

funneling' of bribes to the stock analysts [were] based for the most part on third party

quotes extracted from newspaper articles" and the complaint was "bereft of specific

statements or acts attributed to the defendants as opposed to generalities and hearsay-

derived speculation").

Even if Plaintiffs' allegations were not fatally vague, which they are, their

admitted wholesale reliance on unverified -- and now abandoned -- assertions contained

in a complaint filed by WWE in a cynical attempt to extricate itself from a license

agreement it views as economically unfavorable, cannot support a securities fraud

complaint. It is well established that Plaintiffs have a "personal, nondelegable

responsibility" to conduct a "reasonable inquiry" to certify, inter alia, that "the allegations

and other factual contentions have evidentiary support or . . . are likely to have

evidentiary support after a reasonable opportunity for further investigation or discovery."

Fed. R. Civ. P. 11(b). On its face, Plaintiffs' wholesale adoption of conclusory untested

allegations in the WWE complaint does not discharge the burden of reasonable inquiry

and cannot sustain the Complaint. See Garr v. U.S. Healthcare, Inc., 22 F.3d 1274, 1280

(3d Cir. 1994) (sanctioning plaintiff class attorneys who failed to personally investigate the law and facts underlying a securities fraud complaint and relied on a pleading drafted by another securities attorney and a Wall St. Journal article: "Rule 11 requires that an attorney signing a pleading must make a reasonable inquiry <u>personally</u>."). Indeed, counsel is not permitted blindly to rely on the investigation of co-counsel. <u>See Unioil, Inc. v. E.F. Hutton & Co.</u>, 809 F.2d 548, 558 (9th Cir. 1986) ("An attorney who signs the pleading cannot simply delegate to forwarding co-counsel his duty of reasonable inquiry"); <u>Long v. Quantex Resources</u>, 108 F.R.D. 416 (S.D.N.Y.1985) (local counsel could not rely on investigation conducted by foreign counsel), <u>aff'd mem.</u>, 888 F.2d 1376 (2d Cir. 1989). <u>A fortiori</u>, counsel certainly cannot rely, as here, on pleadings drafted by a wholly unaffiliated law firm.

Given that plaintiffs themselves conducted no personal investigation into the facts, and have not even conducted the minimal inquiry sufficient to satisfy the basic standards of Rule 11, the Amended Complaint falls far short of the rigorous pleading standards mandated by the PSLRA.

### C.    Plaintiffs' Resort to Group Pleading to Establish Scienter Must Be Rejected

Plaintiffs purport to rely on "group pleading" allegations to establish scienter by alleging that the Individual Defendants had actual knowledge of the alleged payments in 1998 because, collectively, they "had access to the adverse undisclosed information about it business, . . . access to internal corporate documents" and were "privy to confidential proprietary information concerning Jakks" by virtue of their positions. (Compl. ¶¶ 20-21, 162.)

53

Plaintiffs' resort to group pleading is wholly unavailing. Plaintiffs are required to specifically allege knowledge as to each Individual Defendant. See In re Cross Media, 314 F. Supp. 2d at 262 (rejecting use of group pleadings doctrine in light of Reform Act's use of the singular "defendant"); see also Endovasc Ltd. v. J.P. Turner & Co., No. 02 Civ. 7313 (LAP), 2004 U.S. Dist. LEXIS 5075, at *19-20 (S.D.N.Y. Mar. 30, 2004) (holding that plaintiffs engaged in "impermissible group pleading"). As discussed in Point III.B.3., supra, Plaintiffs have not satisfied their pleading burden as to each Individual Defendant.

## IV.    PLAINTIFFS FAIL TO STATE A CLAIM FOR CONTROL PERSON LIABILITY UNDER SECTION 20(a)

Because Plaintiffs have failed to plead a primary violation of the Exchange Act, their claim for control person liability under Section 20(a) must likewise be dismissed. See Shields, 25 F.3d at 1132; Alcatel, 2005 U.S. Dist. LEXIS 3053, at *54-55. Furthermore, under Plaintiffs' theory, each Individual Defendant is a primary violator. (Compl. ¶ 170.) As a result, he cannot also be liable as a control person for the same violation. See Kalnit v. Eichler, 85 F. Supp. 2d 232 (S.D.N.Y. 1999), aff'd, 264 F.3d 131 (2d Cir. 2001). Finally, Plaintiffs have failed to allege (much less allege with specificity) any culpable participation by any given Defendant in any primary violation. See In re Indep. Energy Holdings PLC Sec. Litig., 154 F.Supp. 2d 741, 772-73 (S.D.N.Y. 2001).

## CONCLUSION

For the foregoing reasons, the Complaint should be dismissed with prejudice.

Respectfully submitted,

FEDER, KASZOVITZ, ISAACSON,
 WEBER, SKALA, BASS & RHINE LLP
Murray L. Skala (MS 9354)
Jonathan D. Honig (JH 7577)
750 Lexington Avenue
New York, New York 10022
Phone: (212) 888-8200
Fax: (212) 888-5968

SKADDEN, ARPS, SLATE,
 MEAGHER & FLOM LLP

By: _____
        Jonathan J. Lerner (JL 7117)
        Michael H. Gruenglas (MG 8705)
        Maura B. Grinalds (MG 2836)
        Sharon Garb (SG 7928)
        Four Times Square
        New York, New York 10036
        (212) 735-3000

Attorneys for Defendants