UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

IN RE JAKKS PACIFIC, INC.                Civil Action No. 04-CV-8807
SHAREHOLDERS CLASS ACTION    :   (KMK)
LITIGATION                          (ECF CASE)

                                   :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## DECLARATION OF JONATHAN J. LERNER

        Pursuant to 28 U.S.C. § 1746, JONATHAN J. LERNER declares under penalty of perjury as follows:

        1.      I am a member of the Bar of this Court and a member of the firm of Skadden, Arps, Slate, Meagher & Flom, LLP, attorneys for defendants Jakks Pacific, Inc., Jack Friedman, Steven G. Berman and Joel M. Bennett (collectively, the "Defendants") in this action.

        2.      I respectfully submit this Declaration to place before the Court true and correct copies of the following documents referred to in Defendants' Memorandum of Law in Support Their Motion to Dismiss the Consolidated Amended Complaint:

> Exhibit A:    World Wrestling Entertainment, Inc. Annual Report on
> Form 10-K for the fiscal year ended April 30, 2004,
> filed with the SEC on July 13, 2004.

> Exhibit B:    Amendment No. 1 to Jakks Pacific, Inc. Annual Report on
> Form 10-K/A for the fiscal year ended December 31, 2004,
> filed with the SEC on May 12, 2005.

> Exhibit C:    Settlement Agreement and General Release of All Claims between
> World Wrestling Entertainment, Inc. and Jakks Pacific, Inc., dated
> January 15, 2004.

> Exhibit D:    Complaint, World Wrestling Entertainment, Inc. v. Jakks Pacific,
> Inc., 04-CV-8223 (KMK) (S.D.N.Y.), filed October 19, 2004.

Exhibit E:    Amended Complaint, <u>World Wrestling Entertainment, Inc. v. Jakks Pacific, Inc.</u>, 04-CV-8223 (KMK) (S.D.N.Y.), filed March 30, 2005.

Exhibit F:    Certification of Lead Plaintiffs' purchase of shares of Jakks Pacific, Inc. during the putative class period, filed April 4, 2005.

Exhibit G:    Opinion, <u>In re Comverse Technology, Inc. Securities Litigation</u>, 01-CV-6972 (ARR) (S.D.N.Y. Oct. 2, 2002).

Exhibit H:    Daily closing price of Jakks Pacific, Inc. common stock during the putative class period (December 1, 1999 through October 19, 2004).

Dated: New York, New York
       September 9, 2005

Jonathan J. Lerner

2

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

IN RE JAKKS PACIFIC, INC.                    Civil Action No. 04-CV-8807
SHAREHOLDERS CLASS ACTION        :        (KMK)
LITIGATION                                         (ECF CASE)
                                                      :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


**EXHIBITS TO ACCOMPANY THE DECLARATION OF
JONATHAN J. LERNER**

# WORLD WRESTLING ENTERTAINMENTINC (WWE)

1241 E MAIN ST
STAMFORD, CT 06902
203. 352.8600
http://www.wwe.com

## 10-K

**FORM 10-K**
**Filed on 07/13/2004 – Period: 04/30/2004**
File Number 001-16131



LIVEDGAR Information Provided by Global Securities Information, Inc.
800.669.1154
www.gsionline.com

# UNITED STATES SECURITIES AND EXCHANGE COMMISSION
## WASHINGTON, D.C. 20549

# FORM 10-K

☒ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15 (d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the fiscal year ended April 30, 2004

or

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15 (d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the transition period from _____ to _____

Commission file number 0-27639

# WORLD WRESTLING ENTERTAINMENT, INC.
*(Exact name of Registrant as specified in its charter)*

| Delaware | 04-2693383 |
|---|---|
| *(State or other jurisdiction of incorporation or organization)* | *(I.R.S. Employer Identification No.)* |

**1241 East Main Street**
**Stamford, CT 06902**
**(203) 352-8600**
*(Address, including zip code, and telephone number, including area code, of Registrant's principal executive offices)*

SECURITIES REGISTERED PURSUANT TO SECTION 12(b) OF THE ACT

| Class A Common Stock, $.01 par value per share | New York Stock Exchange |
|---|---|
| *(Title of each class)* | *(Name of each exchange on which registered)* |

SECURITIES REGISTERED PURSUANT TO SECTION 12(g) OF THE ACT

None

Indicate by check mark whether the Registrant (1) has filed all reports required to be filed by Section 13 or 15 (d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the Registrant was required to file such reports) and (2) has been subject to such filing requirements for the past 90 days. Yes ☒  No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of Registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ☒

Indicate by check mark whether the registrant is an accelerated filer (as defined in the Exchange Act Rule 12b-2). Yes ☒  No ☐

Aggregate market value of the common stock held by non-affiliates of the Registrant at July 7, 2004, using our closing price October 23, 2003 was approximately $219,536,844.

As of July 7, 2004, the number of shares outstanding of the Registrant's Class A common stock, par value $.01 per share, was 20,810,993 and the number of shares outstanding of the Registrant's Class B common stock, par value $.01 per share, was 47,713,563 shares.

Portions of the Registrant's definitive proxy statement for the 2004 Annual Meeting of Stockholders are incorporated by reference in Part III of this Form 10-K

## TABLE OF CONTENTS

|  |  | Page |
|---|---|---|
| **PART I** | | |
| Item 1. | Business | 1 |
| Item 2. | Properties | 11 |
| Item 3. | Legal Proceedings | 11 |
| Item 4. | Submission of Matters to a Vote of Security Holders | 11 |
| **PART II** | | |
| Item 5. | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 12 |
| Item 6. | Selected Financial Data | 13 |
| Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 13 |
| Item 7A. | Quantitative and Qualitative Disclosures about Market Risk | 25 |
| Item 8. | Consolidated Financial Statements and Schedule | 25 |
| Item 9. | Changes in and Disagreements with Accountants on Accounting and Financial Disclosures | 25 |
| Item 9A. | Controls and Procedures | 26 |
| **PART III** | | |
| Item 10. | Directors and Executive Officers | * |
| Item 11. | Executive Compensation | * |
| Item 12. | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | * |
| Item 13. | Certain Relationships and Related Party Transactions | * |
| Item 14. | Principal Accountant Fees and Services | * |
| **PART IV** | | |
| Item 15. | Exhibits, Financial Statement Schedules and Reports on Form 8-K | 27 |

* Incorporated by reference from the Registrant's Proxy Statement for the 2004 Annual Meeting of Stockholders (the "Proxy Statement").

PART I

*Item 1. Business*

We are an integrated media and entertainment company engaged in the development, production and marketing of television and pay–per–view programming and live events and the licensing and sale of branded consumer products. We have been involved in the sports entertainment business for approximately 25 years, and we have developed World Wrestling Entertainment into a widely–recognized and enduring brand.

We develop unique and creative content centered around our talent and presented at our live and televised events. At the heart of our success are the athletic and entertainment skills and appeal of our WWE Superstars and our consistently innovative and multi–faceted storylines across our two brands, *RAW* and *SmackDown!*. Anchored by our successful brands, we are able to leverage our content and talent across virtually all media outlets. Our television programs, live events, pay–per–view events and branded merchandise provide significant cross–promotion and marketing opportunities that reinforce our brands. This integrated model enables us to more effectively reach our fans, including the highly–coveted 12–34 year old male demographic.

In this Annual Report on Form 10–K, "WWE" refers to World Wrestling Entertainment, Inc. and its subsidiaries and its predecessors, unless the context otherwise requires. References to "we," "us," "our" and the "Company" refer to WWE and its subsidiaries. World Wrestling Entertainment and the stylized and highly distinctive World Wrestling Entertainment scratch logo are two of our trademarks. This Annual Report on Form 10–K also contains other WWE trademarks and trade names as well as those of other companies. All trademarks and trade names appearing in this report are the property of their respective holders.

**Business Strategy**

We develop compelling storylines anchored by our Superstars. This content drives television ratings, which, in turn, drive pay–per–view buys, live event attendance and branded merchandise sales. Our strategy is to capitalize on the significant operating leverage of our business model through the distribution of this intellectual property across existing platforms as well as new and emerging distribution platforms.

Our success in 2004 reflects a focused effort on brand–building, commencing with the strategic separation of our brands and culminating in the record–setting results of *WrestleMania XX*. Building on this success, we intend to pursue the following initiatives:

- *Continue to strengthen our brands.* In spring 2002, we made the strategic decision to separate our content into two brands, *Raw* and *SmackDown!*. By having two brands, we are able to more effectively expand our fan base and establish stronger brand loyalty. The creation of dual brands with distinct storylines, tours and talent has allowed us to expand our touring schedule. The evolution of two strong brands has also supported greater international expansion and provides significant opportunity for the development of new talent.

- *Continue to expand internationally.* International expansion represents an important part of our growth. The broad appeal of our content has yielded high international demand for our television programs and live events. To further nurture this demand, we plan to continue to expand our international television distribution. Increasing our television penetration around the world will likely increase the demand for live events abroad, which, in turn, should increase sales of our branded merchandise. Our dual brands enable us to execute this strategy by freeing up schedules for talent to perform at more events in more countries.

- *Effectively utilize our valuable library of wrestling content.* Over the past three years, we have expanded our library by strategically acquiring the libraries of World Championship Wrestling ("WCW"), Extreme Championship Wrestling ("ECW"), American Wrestling Association ("AWA") and Smokey Mountain Wrestling ("SMW"). The result is an archive of more than 75,000 hours of programming content, 25,000 hours of which was previously aired or released as finished product. This library has been converted to a digital format, and is being catalogued to support future programming and other monetization opportunities, such as video–on–demand, subscription video on demand and digital channels. We currently plan to capitalize on this asset and new technologies in an effort to attract new and recapture past viewers. In this regard, we recently announced the launch of WWE 24/7, a subscription video–on–demand service that will feature the content of our library.

- *Explore options in filmed entertainment.* In 2002, we established WWE Films to explore options in filmed entertainment in order to promote our Superstars and capitalize on our intellectual property and fan base. We have acted as executive producer on several films, including *Scorpion King, The Rundown* and *Walking Tall*, all featuring WWE Superstar The Rock. We currently have several film projects in development featuring other Superstars.

1

In summary, we seek to be a preeminent global provider of entertainment that evokes a uniquely passionate emotion from our fans. We will continue to leverage our content and talent across all media platforms to drive revenue and strengthen our brand.

**Creative Development and Production**

Headed by our Chairman Vincent K. McMahon, our creative team develops compelling and complex characters and weaves them into dynamic storylines that combine physical and emotional elements. Storylines are usually played out in the wrestling ring and unfold on our weekly television shows, and culminate or change direction in our monthly pay-per-view events.

Our success is due primarily to the continuing popularity of our Superstars. We currently have exclusive contracts with approximately 140 Superstars, ranging from developmental contracts to multi-year guaranteed contracts with established Superstars. Our Superstars are highly trained and motivated independent contractors whose compensation is tied to the revenue that they help us generate. Popular Superstars include Triple H, Shawn Michaels, Randy Orton, Ric Flair, Undertaker, Kurt Angle, John Cena, Big Show, Kane, Chris Jericho, Chris Benoit and Eddie Guerrero. We own the rights to substantially all of our characters, and we exclusively license the rights we do not own through agreements with our Superstars. We continually seek to identify, recruit and develop additional talent for our business.

**Live and Televised Entertainment**

Live events and television programming are our principal creative and production activities. The following chart presents revenues from these activities for each of our five fiscal years ended April 30, 2004:

Worldwide Live & Televised Entertainment Revenue
($ in millions)



*Live Events*

In fiscal 2004, we held 297 live events throughout North America, as well as 32 international events, entertaining over 1.6 million fans at an average ticket price of $41.32. We hold many of our live events at major arenas, including Madison Square Garden in New York City, the Staples Center in Los Angeles, the Evening News Arena in Manchester, England, the SuperDome in Sydney, Australia, and the Super Arena in Saitama, Japan. In addition to providing the content for our television and pay-per-view programming, these events provide us with a real-time assessment of the popularity of storylines and characters. Live events generate revenue through ticket and merchandise sales.

2

Our two brands, *RAW* and *SmackDown!*, tour independently, each typically producing three or four events per week. This allows us to play numerous domestic markets, as well as to take advantage of the strong international demand for our events. In fiscal 2004, we had a number of successful international tours, including our *Ruthless Aggression* tour in Australia, our *Passport to Pain* tour in the UK, Germany and Finland and our *Road to WrestleMania* tour in Japan.

The following chart presents worldwide revenues from live events for each of our five fiscal years ended April 30, 2004:



Worldwide Live Events Revenue
($ in millions)

The following chart reflects worldwide attendance from live events for each of our five fiscal years ended April 30, 2004:



Worldwide Live Events Attendance
(in thousands)

– 206 Events in 2000      – 327 Events in 2003
– 212 Events in 2001      – 329 Events in 2004
– 237 Events in 2002

3

*Television Programming*

Relying on our in-house production capabilities at our technologically advanced production facility, we produce seven television shows, consisting of nine hours of original programming, 52 weeks per year. Live events provide the majority of the content for our television and pay–per–view platforms and consequently result in low incremental television programming costs. We generate revenue from our programming through television rights fees and advertising sales. The popularity of our television programming, our primary promotional vehicle, drives the success of our other businesses. Increased viewership for our television shows translates into increased pay–per–view buys, live event attendance and merchandise sales.

Our flagship television shows are *RAW* and *SmackDown!*. *RAW* is a two–hour primetime program that is broadcast live on SpikeTV and has consistently been among the top–rated regularly scheduled programs on cable television. *SmackDown!* is a taped two–hour program that airs on UPN in primetime and is consistently one of the highest rated programs on UPN. We support our *RAW* brand with *Sunday Night Heat*, which airs on SpikeTV, and our syndicated show, *Bottom Line*. We support our *SmackDown!* brand with *Velocity*, which airs on SpikeTV, and our syndicated show, *After Burn*. *The WWE Experience*, our new Sunday morning magazine style show, airs on SpikeTV and features the Superstars and storylines from both of our brands. Our domestic cable distribution agreement, which is with Viacom for its SpikeTV network and covers *RAW*, *Sunday Night Heat*, *Velocity* and *The WWE Experience*, runs until September 2005. Under this agreement we receive a rights fee totaling approximately $0.6 million per week. We are currently in negotiation to renew this agreement, and cannot give any assurance as to the outcome of these negotiations. Our domestic broadcast distribution agreement, which is with UPN and covers *Smackdown!*, expires in September 2006. Under this agreement we receive a rights fee of approximately $0.3 million per week.

The following chart presents revenues from North America television rights fees for each of our five fiscal years ended April 30, 2004:



North America Television Rights Fees Revenue
($ in millions)



Internationally, our programming is distributed in more than 100 countries and 12 different languages. We have expanded our distribution throughout Asia, Europe, Latin America, Australia and Africa and have secured new television distribution agreements on terrestrial, cable and satellite platforms throughout those locations. Our distributors include, among many others, Sky Sports in the UK, J Sports in Japan and Taj TV in India. Our distribution agreement with Sky Sports expires on December 31, 2004. We are currently in negotiations to renew this agreement, and we cannot give any assurance as to the outcome of these negotiations.

4

The following chart presents television rights fees revenues outside of North America for each of our five fiscal years ended April 30, 2004:

Television Rights Fees Revenues outside of North America
($ in millions)



In addition to rights fees, we generate revenues through the sale of a substantial portion of the advertising time on our SpikeTV programming and Canadian television programs. The strong ratings of our television programs attract advertisers and sponsors from some of the leading companies in the food and beverage, apparel, video game, toy, telecommunications and movie industries. In addition to the sale of our advertising time, we also package sponsorships to meet the needs of our advertisers. Through these sponsorships, we offer advertisers a full range of our promotional vehicles, including television, Internet and print advertising, arena signage, on–air announcements and special appearances by our Superstars.

Our arrangement with SpikeTV provides that we pay them a portion of our advertising revenues. With respect to *SmackDown!*, since October, 2003, UPN has been selling substantially all advertising inventory and sponsorship elements and pays us a rights fee.

5

The following chart reflects worldwide advertising revenues for each of our five fiscal years ended April 30, 2004:

**Worldwide Advertising Revenues**
($ in millions)



*Pay–Per–View Programming*

We have been pioneers in both the production and promotion of pay–per–view events since our first pay–per–view event, *WrestleMania I*, in 1985. At each monthly pay–per–view event, our storylines either culminate or change direction. We intensively market and promote the storylines that are associated with upcoming pay–per–view events through our television shows, Internet sites and magazines. We produced 12 domestic pay–per–view programs in fiscal 2004 and 2003, and have planned two more programs during fiscal 2005, one for each brand. Our events consistently rank among the highest selling event pay–per–view programs. These programs are distributed by our international partners including Premiere in Germany and J Sports in Japan, among others.

In fiscal 2004, our premier event, *WrestleMania XX*, achieved an estimated 885,000 pay–per–view buys at a suggested domestic retail price of $49.95. Our other monthly pay–per–view events, including *Royal Rumble, Summer Slam* and *Survivor Series*, averaged 360,000 buys at a suggested domestic retail price of $34.95. Consistent with industry practices, we share the revenues with cable systems and satellite providers and pay service fees to iNDEMAND and TVN.

6

The following chart presents worldwide revenues from our pay–per–view programming for each of our five fiscal years ended April 30, 2004:



Worldwide Pay–Per–View Revenues
($ in millions)

## Branded Merchandise

We offer a wide variety of branded merchandise through a licensing program and an integrated direct sales effort.

The following chart presents worldwide revenues from the sale of our branded merchandise for each of our five fiscal years ended April 30, 2004:



Worldwide Branded Merchandise Revenues
($ in millions)

## Licensing

We have an established worldwide licensing program using our World Wrestling Entertainment marks and logos, copyrighted works and characters on a large variety of retail products, including toys, video games, apparel

7

and books. In all of our licensing agreements, we retain creative approval over the design, packaging, advertising and promotional material associated with licensed products to maintain the distinctive style and quality of our intellectual property and brand. Currently, we maintain licenses with approximately 75 licensees worldwide. Video games represent an important component of this licensing program, generating substantial revenues through our license with THQ/Jakks Pacific, LLC, a joint venture between THQ Inc. and Jakks Pacific, Inc. Our video games cover current console platforms, including PlayStation 2, Xbox and GameCube. Some of our more recent titles include *SmackDown! Here Comes the Pain,* which sold approximately 1.8 million units in fiscal 2004, *RAW 2* and *WrestleMania XIX* .

Under our publishing licensing agreement with Simon and Schuster, we have our own book publishing imprint. This agreement has provided us the opportunity to broaden into literary genres beyond autobiographies, including historical anthologies and trivia books. Fifteen of the first 21 titles we published have appeared on The New York Times Best Seller List. Recent titles include *The Stone Cold Truth*, an autobiographical account of the life of Stone Cold Steve Austin, and *Unscripted,* a pictorial look into the personal lives of WWE Superstars.

### Merchandise

Our direct merchandise operations consist of the design, sourcing, marketing and distribution of various WWE−branded products, such as T−shirts, caps and other novelty items, all of which feature our Superstars and/or our logo. All of these products are designed by our in−house creative staff and manufactured by third parties. The merchandise is sold at our live events, through our wweshopzone.com web site and through our catalogs. During fiscal 2004, fans attending our domestic live events spent an average of approximately $8.96 each on WWE merchandise, which amount was essentially unchanged as compared fiscal 2003.

### Home Video

We own the world's largest library dedicated to wrestling and sports entertainment. It contains footage from our historical televised events, as well as the acquired libraries of WCW, ECW, AWA and SMW. In fiscal 2004, from this library, we have created such titles as *The Ultimate Ric Flair Collection*, which chronicles over three decades of Ric Flair's colorful career, and *The Monday Night War*, an account of the rivalry between WWE and WCW in the late 1990s. We also produce home video versions of each of our monthly pay−per−view events. Outside the United States, our home videos are distributed by a variety of licensees. In fiscal 2004, we sold approximately 1.8 million units across all titles in our catalog, including 27 new titles, a 30% increase over fiscal 2003. Sony Music Video markets and distributes our home videos to major retailers nationwide.

### Music

Music is an integral part of the entertainment experience at our live events and on our television programs. We compose and record most of our music, including theme songs tailored to our characters, in our recording studio. Sony Music markets and distributes our music to major retailers nationwide.

### Publishing

Our publishing operations consist primarily of two magazines, *RAW* and *SmackDown!*. Our magazines help shape and complement storylines in our television programs and at our live events. We include a direct marketing catalog in our magazines on a quarterly basis. Our in−house publishing and editorial departments prepare all editorial content, and we use outside contractors to print and distribute the magazines, which are sold both at newsstands and via subscription. The combined cumulative annual circulation of our two magazines was approximately 3.8 million for fiscal 2004, a decrease of 29% from fiscal 2003. Additionally, in fiscal 2004 we published four special issues.

### Digital Media

We utilize the Internet to promote our brands, to create a community experience among our fans and to market and distribute our products. Through our Internet sites, our fans can purchase and view our monthly pay−per−view events and purchase our branded merchandise. We promote many of our Internet sites on our televised programming, at our live events, in our magazines and in substantially all of our marketing and promotional materials. According to comScore Media Metrix, in March 2004, our Internet sites generated approximately 340 million page views, and we had approximately 7.0 million unique visitors.

**Sales outside North America**

The following chart presents revenues derived from sales outside of North America from all activities within our live and televised and branded merchandise segments for each of our three fiscal years ended April 30, 2004:

Total Revenues from Sales outside of North America
($ in millions)



**Competition**

While we believe that we have a loyal fan base, the entertainment industry is highly competitive and subject to fluctuations in popularity, which are not easy to predict. For our live, television and pay–per–view audiences we face competition from professional and college sports as well as from other forms of live, film and televised entertainment and other leisure activities.

We compete for advertising dollars with other media companies. We compete with entertainment companies, professional and college sports leagues and other makers of branded apparel and merchandise for the sale of our branded merchandise. Many companies with whom we compete have greater financial resources than we do.

**Trademarks and Copyrights**

Intellectual property is material to all aspects of our operations, and we expend substantial cost and effort in an attempt to maintain and protect our intellectual property and to maintain compliance vis–à–vis other parties' intellectual property. We have a large portfolio of registered and unregistered trademarks and service marks worldwide and maintain a large catalog of copyrighted works, including copyrights on our television programming, music, photographs, books, magazines, and apparel art. A principal focus of our efforts is to protect the intellectual property relating to our originally created characters portrayed by our performers, which encompasses images, likenesses, names and other identifying indicia of these characters. We also own a large number of Internet website domain names and operate a network of developed, content–based sites, which facilitate and contribute to the exploitation of our intellectual property worldwide.

We vigorously seek to enforce our intellectual property rights by, among other things, searching the Internet to ascertain unauthorized use of our intellectual property, seizing at our live events goods that feature unauthorized use of our intellectual property and seeking restraining orders and/or damages in court against individuals or entities infringing our intellectual property rights. Our failure to curtail piracy, infringement or other unauthorized use of our intellectual property rights effectively, or our infringement of others' intellectual property rights, could adversely affect our operating results.

**Employees**

The following chart reflects worldwide head count as of June 2004, 2003 and 2002. The headcount excludes employees of our discontinued operations, *The World* and the XFL, and our talent who are independent contractors.

Worldwide Headcount



Our in–house production staff is supplemented with contract personnel for our television production. We believe that our relationships with our employees are generally satisfactory. None of our employees are represented by a union.

**Regulation**

*Live Events*

In various states in the United States and some foreign jurisdictions, athletic commissions and other applicable regulatory agencies require us to obtain licenses for promoters, medical clearances and/or other permits or licenses for performers and/or permits for events in order for us to promote and conduct our live events. In the event that we fail to comply with the regulations of a particular jurisdiction, we may be prohibited from promoting and conducting our live events in that jurisdiction. The inability to present our live events over an extended period of time or in a number of jurisdictions could lead to a decline in the various revenue streams generated from our live events, which could adversely affect our operating results.

*Television Programming*

The production and distribution of television programming by independent producers is not directly regulated by the federal or state governments, but the marketplace for television programming in the United States is substantially affected by government regulations applicable to, as well as social and political influences on, television stations, television networks and cable and satellite television systems and channels. We voluntarily designate the suitability of each of our television shows using standard industry ratings, such as PG (L,V) or TV14.

**Discontinued Operations**

In February 2003, we closed the restaurant operations and in April 2003, we closed the retail store of our entertainment complex in New York City, *The World*. As a result, we recorded an after–tax charge of approximately $8.9 million in our fourth quarter ended April 30, 2003. The lease for *The World* property expires on October 31, 2017 and the aggregate rental payments through the end of the term are approximately $43.8 million. Included in

fiscal 2004 loss from discontinued operations was $1.7 million related to the rental payments and maintenance costs for the facility. We are actively seeking a tenant to assume this lease or enter into a sub–lease agreement.

   *The World* generated net revenue of $8.1 million and $14.1 million in fiscal 2003 and 2002, respectively, and incurred operating losses of $43.1 million and $7.9 million in fiscal 2003 and 2002, respectively.

### Available Information

   Copies of our Annual Report on Form 10–K, Quarterly Reports on Form 10–Q, current reports on Form 8–K, and any amendments to those reports, are available free of charge on our website at http://corporate.wwe.com/invest/index.html as soon as reasonably practicable after such reports are filed with the Securities and Exchange Commission. In addition, our Corporate Governance Guidelines, Code of Business Conduct and charters of our Audit Committee and Compensation Committee are also available on our website. A copy of any of these documents will be mailed to any stockholder upon request to us at World Wrestling Entertainment, Inc., 1241 East Main Street, Stamford, CT 06902, Attn: Investor Relations Department.

### *Item 2.  Properties*

   We have executive offices, television and music recording studios, post–production operations and warehouses at locations in or near Stamford, Connecticut, and have offices in New York, London, Toronto and Los Angeles. We own the buildings in which our executive and administrative offices, our television and music recording studios and our post–production operations are located. We lease space for our sales offices, WWE Films office, and our warehouse facilities.

   Our principal properties consist of the following:

| Facility | Location | Square Feet | Owned/Leased | Expiration Date of Lease |
|---|---|---|---|---|
| Executive offices | Stamford, CT | 114,300 | Owned | |
| Production studio | Stamford, CT | 39,000(1) | Owned | |
| Ring/Photo studio | Stamford, CT | 5,600 | Leased | May 11, 2006 |
| Sales office | New York, NY | 10,075 | Leased | July 15, 2008 |
| Sales office | Toronto, Canada | 7,069 | Leased | February 28, 2006 |
| Sales office | London, England | 2,215 | Leased | May 31, 2006 |
| Executive office | Los Angeles, CA | 2,100 | Leased | July 15, 2007 |
| Warehouse | Trumbull, CT | 30,000 | Leased | August 9, 2004 (2) |

(1)   Excludes 4,000 square feet of temporary space and 138,000 square feet of parking space adjacent to the production facilities.

(2)   The Company plans to move this operation to a different facility at the end of the lease. This facility and a portion of our executive offices are used in connection with our branded merchandise segment; all other properties are used in connection with our live and televised entertainment segment.

   In addition, we own a daycare facility in Stamford, Connecticut on property adjacent to our production facilities, which originally offered child care services only to our employees, but is now also open to the public. The licensing and operation of this facility is managed by a third–party contractor. We have the responsibility to obtain the required licenses and to ensure that the facility meets health, safety, fire and building codes.

   We are currently in the process of seeking a subtenant or assignee for our 46,500 square foot rental space in New York City, which was used for our entertainment complex, *The World*. The lease expires in October 2017, and aggregate rental payments through the end of the term are approximately $43.8 million.

### *Item 3.  Legal Proceedings*

   See Note 10 to Notes to Consolidated Financial Statements, which is incorporated herein by reference.

### *Item 4.  Submission of matters to a vote of Security Holders*

   None.

11

PART II

*Item 5.  Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities Price Range of Class A Common Stock*

Our Class A common stock trades on the New York Stock Exchange under the symbol "WWE."

The following table sets forth the high and the low sale prices for the shares of Class A common stock as reported by the New York Stock Exchange for the periods indicated.

| | Class A common stock | |
|---|---|---|
| **Fiscal 2004** | **High** | **Low** |
| First Quarter | $ 11.07 | $ 8.85 |
| Second Quarter | 11.00 | 9.10 |
| Third Quarter | 14.15 | 10.55 |
| Fourth Quarter | 15.44 | 12.35 |

| | Class A common stock | |
|---|---|---|
| **Fiscal 2003** | **High** | **Low** |
| First Quarter | $ 15.30 | $ 8.49 |
| Second Quarter | 10.40 | 6.76 |
| Third Quarter | 9.02 | 7.53 |
| Fourth Quarter | 9.20 | 7.43 |

There were 11,078 holders of record of Class A common stock and three holders of record of Class B common stock on July 7, 2004.

We have declared and paid quarterly cash dividends on both the Class A common stock and Class B common stock in each fiscal quarter since June 2003. The Class A common stock and Class B common stock are entitled to equal per share dividends. On July 8, 2004 we paid to shareholders of record on June 28, 2004 a quarterly dividend in the amount of $0.06 per share. Before that, our quarterly dividends were $0.04 per share.

**Equity Compensation Plan Information**

The following table sets forth certain information with respect to securities authorized for issuance under equity compensation plans as of April 30, 2004.

| Plan Category | Number of securities to be issued upon exercise of outstanding options, warrants and rights | Weighted-average exercise price of outstanding options, warrants and rights | Number of securities remaining available for future issuance under equity compensation plans (excluding securities reflected in column (a)) |
|---|---|---|---|
| | **(a)** | **(b)** | **(c)** |
| Equity compensation plans approved by security holders: | | | |
| Stock options | 2,955,625 | $ 12.47 | 6,036,777 |
| Restricted stock units | 770,848 | N/A | Same as above |
| Equity compensation plans not approved by security holders | None | N/A | None |
| Total | 3,726,473 | $ 12.47 | 6,036,777 |

12

*Item 6.  Selected Financial Data*

The following table sets forth our selected financial data for each of the five fiscal years in the period ended April 30, 2004. The selected financial data as of April 30, 2004 and 2003 and for the fiscal years ended April 30, 2004, 2003 and 2002 have been derived from the audited consolidated financial statements included elsewhere in this Annual Report. The selected historical consolidated financial data as of April 30, 2002, 2001 and 2000 and for the fiscal years ended April 30, 2001 and 2000 have been derived from our audited consolidated financial statements, which are not included in this Annual Report.  You should read the selected financial data in conjunction with our consolidated financial statements and related notes and the information set forth under "Management's Discussion and Analysis of Financial Condition and Results of Operations" contained elsewhere in this Annual Report.

|  | Year Ended April 30 (dollars in millions, except per share data) | | | | |
|---|---|---|---|---|---|
|  | 2004 | 2003 | 2002 | 2001 | 2000 |
| **Financial Highlights:** | | | | | |
| Net revenues | $  374.9 | $  374.3 | $  409.6 | $  438.1 | $  377.9 |
| Operating income | $  73.6 | $  26.6 | $  44.7 | $  87.2 | $  84.7 |
| Income from continuing operations | $  49.6 | $  16.1 | $  37.7 | $  63.5 | $  59.6 |
| Net income (loss) (1) | $  48.2 | $  (19.5) | $  38.9 | $  14.9 | $  58.9 |
| Earnings per share from continuing operations, diluted | $  0.72 | $  0.22 | $  0.51 | $  0.88 | $  0.95 |
| Earnings (loss) per share, diluted | $  0.70 | $  (0.28) | $  0.53 | $  0.21 | $  0.94 |
| Dividends paid per share (2) | $  0.16 | — | — | — | — |
| Cash and short-term investments | $  273.3 | $  271.1 | $  293.8 | $  239.1 | $  209.0 |
| Total assets | $  454.3 | $  432.2 | $  491.0 | $  464.1 | $  337.0 |
| Total debt | $  8.7 | $  9.9 | $  9.9 | $  10.5 | $  11.4 |
| Total stockholders' equity | $  353.1 | $  337.4 | $  385.1 | $  346.8 | $  258.5 |

(1)  Included in our net income (loss) was the operating results of our discontinued operations, *The World* and the XFL, and their respective estimated shutdown costs, which totaled $(1.4), $(35.6), $(0.3), $(48.5) and $(0.7) during fiscal 2004, 2003, 2002, 2001 and 2000, respectively.

(2)  Excludes the $0.06 per share dividend paid to stockholders of record as of June 28, 2004.

*Item 7.  Management's Discussion and Analysis of Financial Condition and Results of Operations*

You should read the following discussion in conjunction with the audited consolidated financial statements and related notes included elsewhere in this Form 10-K.

**Background**

We are an integrated media and entertainment company principally engaged in the development, production and marketing of television programming and live events and the licensing and sale of branded consumer products featuring our highly successful brands.

Our operations are organized around two principal activities:

•   Live and televised entertainment, which consists of live event and television programming. Revenues consist principally of ticket sales to live events, sale of television advertising and sponsorships, television rights fees and pay-per-view buys.

•   Branded merchandise, which consists of licensing and direct sale of merchandise. Revenues consist principally of sale of merchandise at live events (such as T-shirts and caps), magazines and home videos, and royalties from products sold by licensees (such as video games, toys and books).

13

*Fiscal Year Ended April 30, 2004 compared to Fiscal Year Ended April 30, 2003 (dollars in millions)*

| Net Revenues | | 2004 | | 2003 | better (worse) |
|---|---|---|---|---|---|
| Live and televised | $ | 296.1 | $ | 295.4 | 0.2% |
| Branded merchandise | | 78.8 | | 78.9 | — |
| Total | $ | 374.9 | $ | 374.3 | 0.2% |

| Operating Income: | | 2004 | | 2003 | better (worse) |
|---|---|---|---|---|---|
| Live and televised entertainment | $ | 108.9 | $ | 88.2 | 23% |
| Branded merchandise | | 33.8 | | 23.4 | 44% |
| Corporate | | (69.1) | | (85.0) | 19% |
| Total operating income | $ | 73.6 | $ | 26.6 | 177% |
| Income from continuing operations | $ | 49.6 | $ | 16.1 | 208% |

In fiscal 2004, net revenues increased slightly reflecting higher pay-per-view revenue, which benefited from the success of *WrestleMania XX* and strong performance of new home video releases, offset by a decline in average attendance at our live events, which impacts both live events and our branded merchandise revenues. Revenue from sources outside of North America represented 17% of total net revenue in 2004 as compared to 14% in 2003.

Operating income increased substantially due to the cost reduction initiatives taken in fiscal 2003 that impact both business segments as well as selling, general and administrative expenses. Income from continuing operations primarily reflects the impact of items noted above and improved returns on short term investments.

Additional details regarding these summary results follow below.

The following chart provides revenues and key drivers for our live and televised segment:

| Live and Televised Revenues | | 2004 | | 2003 | better (worse) |
|---|---|---|---|---|---|
| Live events | $ | 69.7 | $ | 72.2 | (3)% |
| Number of events | | 329 | | 327 | 1% |
| Average attendance | | 5,006 | | 5,551 | (10)% |
| Average ticket price (dollars) | $ | 41.32 | $ | 38.82 | 6% |
| Pay-per-view | $ | 95.3 | $ | 91.1 | 5% |
| Number of buys from domestic pay-per-view events | | 5,604,000 | | 5,378,100 | 4% |
| Domestic retail price, excluding *WrestleMania* (dollars) | $ | 34.95 | $ | 29.95 | 17% |
| Advertising | $ | 59.5 | $ | 72.9 | (18)% |
| Average weekly household ratings  for *RAW* | | 3.8 | | 3.7 | 3% |
| Average weekly household ratings  for *SmackDown!* | | 3.3 | | 3.4 | (3)% |
| Sponsorship revenues | $ | 6.8 | $ | 8.7 | (22)% |
| Television rights fees: | | | | | |
| Domestic | $ | 48.3 | | 38.8 | 24% |
| International | $ | 22.8 | $ | 19.7 | 16% |

Live events revenue decreased due to lower attendance at our events offset in part by an increase in the average price of tickets sold. Pay-per-view revenues increased approximately 5% due to the success of our premier event,

14

*WrestleMania XX*, which was held in March 2004. *WrestleMania XX* achieved approximately 885,000 buys as compared to approximately 560,000 buys for *WrestleMania XIX* in fiscal 2003.

Advertising revenues decreased due to a modification of our television distribution agreement with UPN. Since October 2003, UPN has been selling all advertising inventory for our *SmackDown!* broadcasts and paying us a rights fee. This arrangement accounts for a decrease of approximately $17.8 million in advertising revenue. This decrease was partially offset by the airing of make-good spots which reduced our allowance for underdelivery by approximately $5.7 million. The increase in the domestic rights fees for the current year is derived from rights fees paid to us under our modified arrangement with UPN as discussed above.

The following chart provides revenues and key drivers for our branded merchandise segment:

| Branded Merchandise Revenues | 2004 | 2003 | better (worse) |
|---|---|---|---|
| Licensing | $ 21.8 | $ 21.8 | |
| Merchandise | $ 18.6 | $ 22.4 | (17)% |
| Domestic per capita spending (dollars) | $ 8.96 | $ 8.95 | |
| Publishing | 10.7 | 15.2 | (30)% |
| Net units sold | 4,312,200 | 6,427,500 | (33)% |
| Home video | $ 21.4 | $ 13.8 | 55% |
| Net units sold: | | | |
| DVD | 1,520,200 | 916,200 | 66% |
| VHS | 283,600 | 466,800 | (39)% |
| Internet advertising | $ 5.6 | $ 4.9 | 14% |

The decrease in merchandise revenue is primarily due to a $3.5 million decrease in the merchandise sold in arenas at our live events. This decrease reflects lower attendance at these events and a change that occurred in fiscal 2004 from the direct sale of merchandise to a licensing arrangement for merchandise sold at our Canadian and international events.

Publishing revenues declined due to reductions in both newsstand copies and subscription copies sold for our two monthly magazines. Additionally, we produced two fewer special editions in fiscal 2004 as compared to the prior year.

The increase of approximately 0.6 million units of DVD sales, which carry a higher price point, drove the increase in home video revenues for the current year. Several successful titles released in the current year included *The Ultimate Ric Flair Collection*, which chronicles over three decades of Ric Flair's illustrious career, *The Monday Night War*, an account of the rivalry between WWE and WCW in the late 1990's and *WrestleMania XX*. These three titles sold a total of approximately 335,000 units in fiscal 2004. In addition, we gained distribution in one large retailer in 2004, thereby increasing sales.

| Cost of Revenues | 2004 | 2003 | better (worse) |
|---|---|---|---|
| Live and televised | $ 170.9 | $ 190.6 | 10% |
| Branded merchandise | 36.2 | 46.7 | 22% |
| Total | $ 207.1 | $ 237.3 | 13% |
| Profit contribution margin | 45% | 37% | |

| Cost of Revenues–Live and Televised | 2004 | 2003 | better (worse) |
|---|---|---|---|
| Live events | $ 51.9 | $ 56.1 | 7% |
| Pay-per-view | 36.0 | 36.7 | 2% |
| Advertising | 22.5 | 35.2 | 36% |
| Television | 50.6 | 50.2 | (1)% |
| Other | 9.9 | 12.4 | 20% |
| Total | $ 170.9 | $ 190.6 | 10% |
| Profit contribution margin | 42% | 35% | |

15

The decrease in advertising cost of revenues results primarily from the modification of our UPN distribution agreement. The impact of this change is a reduction in advertising revenues which was offset by an increase in television rights fees and the elimination of the participation costs to UPN. Although there should be no material effect on our net income relative to this change in terms, it should result in a favorable impact to our profit margins in future periods.

| Cost of Revenues–Branded Merchandise | 2004 | 2003 | better (worse) |
|---|---|---|---|
| Licensing | $ (2.2) | $ 6.7 | 133% |
| Merchandise | 17.6 | 20.4 | 14% |
| Publishing | 7.3 | 9.4 | 22% |
| Home video | 9.5 | 6.5 | (46)% |
| Digital media | 3.2 | 3.3 | 3% |
| Other | 0.8 | 0.4 | (100)% |
| Total | $ 36.2 | $ 46.7 | 22% |
| Profit contribution margin | 54% | 41% | |

Net negative licensing costs in fiscal 2004 is due to the reversal of $7.9 million of previously accrued licensing agent commissions. These costs had been accrued over the period from fiscal 2001 through fiscal 2004 and have been reversed because payment is no longer considered probable as a result of favorable litigation developments. Excluding this reversal, licensing cost of revenues decreased by approximately $0.9 million primarily due to lower costs associated with our music business and a greater mix of non–royalty bearing revenue in the current fiscal year.

During fiscal 2004 we recorded a pre–tax charge of $2.9 million in merchandise cost of revenues for the impairment of certain long–lived assets of our e–commerce business. These assets were primarily composed of capitalized software development costs incurred during the set up of the e–commerce section of our website.

Merchandise and publishing costs of revenues decreased in conjunction with fewer units sold for both businesses. In addition, merchandise cost of revenues decreased due to the change from the direct sale of merchandise to a licensing arrangement for merchandise sold at our Canadian and international events.

Home video costs increased in correlation with the increase in units sold for the year, particularly distribution and duplication related fees.

The following chart reflects the amounts and percent change of certain significant overhead items:

| Selling, General & Administrative Expenses | 2004 | 2003 | better (worse) |
|---|---|---|---|
| Staff related | $ 46.2 | $ 36.6 | (26)% |
| Legal, accounting and other professional | 15.3 | 24.5 | 38% |
| Settlement of litigation, net | (5.9) | 2.8 | 311% |
| Advertising and promotion | 6.8 | 8.6 | 21% |
| Bad debt | (2.3) | 3.8 | 161% |
| All other | 18.1 | 23.0 | 21% |
| Total SG&A | $ 78.2 | $ 99.3 | 21% |
| SG&A as a percentage of net revenues | 21% | 27% | |

The increase in staff related costs is primarily attributable to approximately $7.4 million of payments under the Company's management incentive programs, made as a result of our improved financial results. Legal expenses incurred in fiscal 2004 declined by approximately $5.5 million in the current year in conjunction with lower litigation activity in 2004. In fiscal 2004, we received a favorable settlement of approximately $5.9 million. Included in settlement of litigation in fiscal 2003 was a $3.8 million settlement of a legal dispute partially offset by $1.0 million of other net favorable settlements.

The $2.3 million negative amount of bad debt expense in fiscal 2004 is due to a payment received from a pay–per–view service provider that had been fully reserved in the prior year.

| Stock Compensation Costs | 2004 | 2003 |
|---|---|---|
| Option exchange offer | $ 2.0 | |
| Other grants of restricted stock units | $ 1.7 | — |
| Total stock compensation costs | $ 3.7 | |

Stock compensation expense relates to our restricted stock programs. These programs were initiated in fiscal 2004. During 2004, we completed an exchange offer that gave all active employees and independent contractors who held stock options with a grant price of $17.00 or higher the ability to exchange their options, at a 6 to 1 ratio, for restricted stock units, or, for holders with fewer than 25,000 options, for cash at 75% of the average price of $13.28 per share, during the offering period. Overall, 4.2 million options were eligible for the offer, of which 4.1 million were exchanged for either cash or restricted stock units. In exchange for the options tendered, we granted an aggregate of 591,416 restricted stock units and made cash payments in the aggregate amount of approximately $0.9 million, which will result in a total compensation charge of approximately $6.7 million, of which the cash payment of $0.8 million to employees was recorded in our third fiscal quarter ended January 23, 2004, and the portion related to the grant of the restricted stock units to employees will be recorded over the units' 24 month vesting period. As a result, $2.0 million of the compensation charge related to the option exchange program was recorded in fiscal 2004 and the remaining will be recorded as follows: approximately $3.6 million in fiscal 2005 and approximately $1.1 million in fiscal 2006.

Also in 2004, we granted 178,000 restricted stock units at $9.60 per share. Such issuances were granted to officers and employees under our 1999 Long–Term Incentive Plan (the "Plan"). Although originally scheduled to amortize over the seven year vesting period, a provision of the grants stipulated if EBITDA of $65.0 million was achieved in any fiscal year during the vesting period, the unvested restricted stock units would immediately vest and, accordingly, the unamortized balance at that date would be expensed. Because our EBITDA exceeded $65.0 million in fiscal 2004, we recorded a $1.7 million charge in the fourth quarter for the immediate vesting of the remaining restricted stock units. EBITDA is a measure of our operating performance, and is defined in the Plan as earnings from continuing operations before interest, taxes, depreciation, and amortization.

| | 2004 | 2003 | better (worse) |
|---|---|---|---|
| Depreciation and amortization | $ 12.3 | $ 11.0 | (12)% |

The increase is primarily attributable to the amortization of the acquired film libraries and the depreciation of the corporate jet. In January 2004, we paid $20.1 million to pay off a lease on our corporate aircraft. The purchase price of the aircraft, net of a $9.5 million estimated residual value, is being depreciated on a straight–line basis over a 10 year period. As a result of this purchase, annual depreciation expense will increase by $1.1 million. We believe this transaction will result in lower net financing costs.

| | 2004 | 2003 | better (worse) |
|---|---|---|---|
| Interest income | $ 5.9 | $ 2.0 | 195% |

The increase in interest income is a result of the switch of our liquid assets from primarily cash to other forms of short term investments in the current year.

| | 2004 | 2003 | better (worse) |
|---|---|---|---|
| Interest expense | $ 0.8 | $ 0.8 | |

| | 2004 | 2003 | better (worse) |
|---|---|---|---|
| Other income (loss), net | $ 1.3 | $ (0.9) | 244% |

During fiscal 2003, we recorded a $0.6 million write down of investments deemed other–than–temporarily impaired.

| Provision for Income Taxes | 2004 | 2003 |
|---|---|---|
| Provision | $ 30.4 | $ 10.8 |
| Effective tax rate | 38% | 40% |

The decrease in the effective tax rate was primarily due to the absence of capital losses in fiscal 2004 for which no tax benefit can be recorded.

17

*Discontinued Operations -- XFL.* Income from discontinued operations was $0.3 million for fiscal year 2004 with no income or loss recorded in fiscal year 2003. The results from fiscal 2004 reflected our final settlement of substantially all remaining liabilities at less than the originally projected amount.

*Discontinued Operations -- The World.* During fiscal 2003, as a result of continued losses, we closed the restaurant and retail operations of *The World*. As a result, we recorded a charge of approximately $12.1 million ($8.9 million, net of income taxes), the majority of which represented the present value of our obligations under the facility's lease, less estimated sub-lease rental income over the lease term. As of April 30, 2004, we had a remaining accrual balance of approximately $9.3 million relating to the shutdown. The $9.3 million accrual included accrued rent and other related costs which assumed no sub-rental income for fiscal 2004 and assumed 75% sub-rental income through the end of the lease term, which is October 31, 2017.

Loss from discontinued operations of *The World* was $1.7 million, net of income taxes, for the fiscal year ended April 30, 2004 as compared to a loss from discontinued operations of $35.6 million, net of income taxes, for the fiscal year ended April 30, 2003. Included in fiscal 2003 was an impairment charge of $32.9 million ($20.4 million, net of income taxes) as a result of impairment tests conducted on goodwill and other long-lived assets related to *The World*, as well as the $12.1 million ($8.9 million, net of income taxes) shutdown accrual discussed above.

*Fiscal Year Ended April 30, 2003 compared to Fiscal Year Ended April 30, 2002 (dollars in millions)*

| Net Revenues | 2003 | 2002 | better (worse) |
|---|---|---|---|
| Live and televised | $ 295.4 | $ 323.5 | (9)% |
| Branded merchandise | 78.9 | 86.1 | (8)% |
| Total | $ 374.3 | $ 409.6 | (9)% |

| Operating Income: | 2003 | 2002 | better (worse) |
|---|---|---|---|
| Live and televised entertainment | $ 88.3 | $ 113.9 | (22)% |
| Branded merchandise | 23.3 | 20.8 | (12)% |
| Corporate | (85.0) | (90.0) | (6)% |
| Total operating income | $ 26.6 | $ 44.7 | (41)% |

| | 2003 | 2002 | better (worse) |
|---|---|---|---|
| Income from continuing operations | $ 16.1 | $ 37.7 | (57)% |

In fiscal 2003 net revenues declined in both segments principally reflecting lower average attendance at live events, fewer pay-per-view buys and a decline in television ratings. Revenue from sources outside of North America represented 14% of total net revenue in 2003 compared to 10% in 2002.

Operating income declined primarily due to the lower revenue partly offset by savings due to lower costs that are variable compared to revenue. Income from continuing operations primarily reflects the items noted above and lower returns on short term investments.

18

Additional details regarding these summary results follow below.

The following chart provides revenues and key drivers for our live and televised segment:

| Live and Televised Revenues | | 2003 | | 2002 | better (worse) |
|---|---|---|---|---|---|
| Live events | $ | 72.2 | $ | 74.1 | (3)% |
| Number of events | | 327 | | 237 | 38% |
| Average attendance | | 5,551 | | 8,562 | (35)% |
| Average ticket price (dollars) | $ | 38.82 | $ | 35.69 | 9% |
| Pay-per-view | $ | 91.1 | $ | 112.0 | (19)% |
| Number of buys from domestic pay-per-view events | | 5,378,100 | | 7,135,464 | (25)% |
| Domestic retail price, excluding *WrestleMania* (dollars) | $ | 29.95 | $ | 24.95 | 20% |
| Advertising | $ | 72.9 | $ | 83.6 | (13)% |
| Average weekly household ratings for *RAW* | | 3.7 | | 4.6 | (20)% |
| Average weekly household ratings for *SmackDown!* | | 3.4 | | 4.0 | (15)% |
| Sponsorship revenues | $ | 8.7 | $ | 13.2 | (34)% |
| Television rights fees: | | | | | |
| Domestic | $ | 38.8 | $ | 35.0 | 11% |
| International | | 19.7 | | 18.3 | 8% |

Of the $3.8 million increase in domestic television rights fees revenues, $1.6 million was due to an executive producer fee received related to a feature film and approximately $1.1 million was due to the production of two additional television specials in the period.

The following chart provides revenues and key drivers for our branded merchandise segment:

| Branded Merchandise Revenues | | 2003 | | 2002 | better (worse) |
|---|---|---|---|---|---|
| Licensing | $ | 21.8 | $ | 24.4 | (11)% |
| Merchandise | $ | 22.4 | $ | 26.2 | (15)% |
| Domestic per capita spending (dollars) | $ | 8.95 | $ | 8.48 | 6% |
| Publishing | $ | 15.2 | $ | 16.3 | (7)% |
| Net units sold | | 6,427,500 | | 6,867,700 | (6)% |
| Home video | $ | 13.8 | $ | 13.6 | 1% |
| Net units sold: | | | | | |
| DVD | | 916,200 | | 625,900 | 46% |
| VHS | | 466,800 | | 1,041,200 | (55)% |
| Internet advertising | $ | 4.9 | $ | 4.4 | 11% |

The decrease in licensing revenues was due to a decrease of $3.3 million in toy royalties and $0.7 million in apparel royalties offset partially by a $1.6 million increase in video game royalties.

Of the $3.8 million decrease in merchandise revenues, $2.9 million was due to a reduction in our website and catalog sales. In addition, $0.8 million was due to a decrease in sales at our live events resulting primarily from lower attendance as compared to the prior year.

| Cost of Revenues | | 2003 | | 2002 | better (worse) |
|---|---|---|---|---|---|
| Live & televised | $ | 190.6 | $ | 194.2 | 2% |
| Branded merchandise | | 46.7 | | 56.9 | 18% |
| Total | $ | 237.3 | $ | 251.1 | 6% |
| Profit contribution margin | | 37% | | 39% | |

19

| Cost of Revenues–Live and Televised | 2003 | 2002 | better (worse) |
|---|---|---|---|
| Live events | $ 56.1 | $ 52.2 | (7)% |
| Pay–per–view | 36.7 | 42.5 | 14% |
| Advertising | 35.2 | 36.9 | 5% |
| Television | 50.2 | 49.6 | (1)% |
| Other | 12.4 | 13.0 | 5% |
| Total | $ 190.6 | $ 194.2 | 2% |
| Profit contribution margin | 35% | 40% | |

The decrease in the profit contribution margin was due primarily to the $3.5 million impact of the William Morris Agency, Inc. settlement, which was included in advertising cost of revenues.  Excluding the impact of this charge, the profit contribution margin for fiscal 2003 was approximately 37%.

| Cost of Revenues–Branded Merchandise | 2003 | 2002 | better (worse) |
|---|---|---|---|
| Licensing | $ 6.7 | $ 9.8 | 32% |
| Merchandise | 20.4 | 22.6 | 10% |
| Publishing | 9.4 | 10.0 | 6% |
| Home video | 6.5 | 9.4 | 31% |
| Digital media | 3.3 | 5.0 | 34% |
| Other | 0.4 | 0.1 | 300% |
| Total | $ 46.7 | $ 56.9 | 18% |
| Profit contribution margin | 41% | 34% | |

The increase in the profit contribution margin was due in part to the absence of promotional costs in fiscal 2003 related to a motor racing team sponsorship.  Such costs totaled approximately $2.4 million in fiscal 2002 and were included in licensing cost of revenues.  The profit contribution margin increase also was favorably impacted by a decrease of $1.7 million in digital media costs primarily associated with maintaining our website and by a $0.6 million decrease in home video inventory write-offs.

The following chart reflects the amounts and percent change of certain significant overhead items:

| Selling, General & Administrative Expenses | 2003 | 2002 | better (worse) |
|---|---|---|---|
| Staff related | $ 36.6 | $ 37.4 | 2% |
| Legal, accounting and other professional litigation | 18.4 | 14.6 | (26)% |
| Settlement of litigation | 8.9 | 8.9 | — |
| Advertising and promotion | 8.6 | 9.4 | 9% |
| Bad debt | 3.8 | 1.0 | (280)% |
| License and contract termination | — | 4.9 | 100% |
| All other | 23.0 | 27.0 | 15% |
| Total SG&A | $ 99.3 | $ 103.2 | 4% |
| SG&A as a percentage of net revenues | 27% | 25% | |

The increase in bad debt expense was related to reserves for delinquent pay–per–view payments from a service provider and from a cable system operating under the bankruptcy code.  Included in legal and litigation in fiscal 2003 was a $3.8 million offer to settle a legal dispute partially offset by $1.0 million of net favorable settlements.  License and contract termination costs in 2002 arose from the termination of certain WCW license and related agreements assumed in the WCW asset acquisition.

| | 2003 | 2002 | better (worse) |
|---|---|---|---|
| Depreciation and amortization | $ 11.0 | $ 10.6 | (4)% |

| | 2003 | 2002 | better (worse) |
|---|---|---|---|
| Interest income | $ 2.0 | $ 10.6 | (81)% |

The decrease in interest income is due to lower average interest rates earned on our investments as well as a loss of approximately $1.6 million from an investment in mortgage-backed securities.

| | 2003 | 2002 | better (worse) |
|---|---|---|---|
| Interest expense | $ 0.8 | $ 0.8 | |

| | 2003 | 2002 |
|---|---|---|
| Other (loss) income, net | $ (0.9) | $ 5.2 |

During fiscal 2003, we recorded a $0.6 million write down of investments deemed other-than-temporarily impaired.

During fiscal 2002, we exercised certain warrants and sold the related common stock resulting in a $6.8 million gain. In addition, prior to the sale of this common stock, we recorded an increase of $1.4 million from the revaluation of the warrants, based upon our valuation using the Black-Scholes model, using the current market assumptions.

Also in fiscal 2002, we wrote-down $2.9 million related to certain warrants that we previously received from a television programming distribution partner. As a result of the continued decline in the market value of this company's common stock coupled with our shortened window to exercise, management determined that this asset was other-than-temporarily impaired.

| Provision for Income Taxes | 2003 | 2002 |
|---|---|---|
| Provision | $ 10.8 | $ 22.0 |
| Effective tax rate | 40% | 37% |

The increase in the effective tax rate was due to capital losses generated in fiscal 2003 which may not be deductible for tax purposes. We have determined that it is more likely than not that these losses will not be fully utilized and, as such, we have recorded a valuation allowance against these benefits.

*Discontinued Operations – XFL.* Income from discontinued operations of the XFL, net of minority interest and income taxes, was $4.6 million for the fiscal year ended April 30, 2002, with no income or loss recorded in fiscal year 2003. The results from fiscal 2002 reflected the reversal of shutdown reserves that were no longer required and the recognition of certain tax benefits.

*Discontinued Operations – The World.* Loss from discontinued operations of *The World*, net of income taxes, was $35.6 million for the fiscal year 2003 as compared to $4.9 million for the fiscal year 2002. Included in fiscal 2003 was an impairment charge of $32.9 million ($20.4 million, net of taxes) as a result of impairment tests conducted on goodwill and other long-lived assets related to *The World*, as well as a charge of $12.1 million ($8.9 million, net of taxes) related to the shutdown accrual.

**Liquidity and Capital Resources**

Cash flows from operating activities for the fiscal years ended April 30, 2004 and 2003 and 2002 were $61.9, $21.1 million and $53.0 million, respectively. Cash flows provided by operating activities from continuing operations were $65.4 million in fiscal 2004 as compared to $28.0 million in fiscal 2003 and $71.6 million in fiscal 2002. Working capital, consisting of current assets less current liabilities, was $265.6 million as of April 30, 2004 and $275.2 million as of April 30, 2003.

Cash flows used in investing activities for the fiscal year ended April 30, 2004 were $111.0 million and cash flows provided by investing activities were $49.7 million in fiscal 2003. Cash flows used in investing activities for the fiscal year ended April 30, 2002 were $17.8 million. As of June 25, 2004, we had approximately $224.8 million invested primarily in fixed income mutual funds and short-term U.S. Treasury notes. Our

21

investment policy is designed to preserve capital and minimize interest rate, credit and market risk. Nevertheless, the Company foresees a rising interest rate environment and we may incur some capital loss, which we anticipate will be offset by the opportunity to earn higher interest rates on short–term securities and mutual funds.

In fiscal 2004, we had capital expenditures of approximately $5.3 million, excluding the purchase of the corporate jet, consisting primarily of digital media equipment for our website, television equipment and conversion of our critical business and financial systems. In January 2004, we paid $20.1 million to pay off a lease on our corporate aircraft. The jet was originally acquired under an operating lease in 2000. The transaction has been accounted for as a capital acquisition in 2004. Capital expenditures for fiscal 2005 are expected to be between $10.0 million and $12.0 million, which include projects related to television equipment and building improvements.

Cash flows used in financing activities for the fiscal year ended April 30, 2004 and 2003 were $30.9 and $28.8 million, respectively, and cash flows provided by financing activities was $6.8 million for the fiscal year ended April 30, 2002.

In June 2003, we repurchased approximately 2.0 million shares of our common stock from Viacom, Inc. for approximately $19.2 million, which was a slight discount to the then market value of our common stock. This transaction did not affect other aspects of our business relationship with Viacom. We made this repurchase because we believed that it was an appropriate use of excess cash and was beneficial to our company and stockholders.

We have declared and paid quarterly cash dividends of $0.04 per share on both the Class A common stock and Class B common stock in each fiscal quarter since June 2003. The Class A common stock and Class B common stock are entitled to equal per share dividends. On April 27, 2004, our Board of Directors declared a dividend of $0.06 per share of Class A and Class B common stock that was paid on July 8, 2004 to shareholders of record on June 28, 2004.

We believe that cash generated from operations and from existing cash and short–term investments will be sufficient to meet our cash needs over the next twelve months for working capital, quarterly dividends, capital expenditures and strategic investments as well as costs related to the shutdown of *The World*.

## Contractual Obligations

In addition to long–term debt, we have entered into various other contracts under which we are required to make guaranteed payments, including:

- Television distribution agreement with Viacom affiliate SpikeTV through September 2005 that provides for the payment of the greater of a fixed percentage of the revenues from the sale of television advertising time or an annual minimum guaranteed amount.

- Various operating leases.

- Employment contract with Vincent K. McMahon, which runs through October 2006, with annual renewals thereafter if not terminated by us or Mr. McMahon, as well as a talent contract with Mr. McMahon that is coterminous with his employment contract.

- Employment contract with Linda E. McMahon, which runs through October 2005, with annual renewals thereafter if not terminated by us or Mrs. McMahon.

- Other employment contracts which are generally for one–to three–year terms.

- Service contracts with certain of our independent contractors, including our talent, which are generally for one–to four–year terms.

22

Our aggregate minimum payment obligations under these contracts as of April 30, 2004 were as follows:

| | Payments due by period | | | | |
|---|---|---|---|---|---|
| | | | ($ in millions) | | |
| | Less than 1 year | 1–3 years | 4–5 years | After 5 years | Total |
| Long-term debt | $ 0.7 $ | 2.5 $ | 2.0 $ | 3.5 $ | 8.7 |
| Operating leases | 1.3 | 2.5 | 0.1 | — | 3.9 |
| Television programming agreements | 5.8 | 2.4 | — | — | 8.2 |
| Talent, employment agreements and other commitments | 17.2 | 11.7 | — | — | 28.9 |
| Total commitments from continuing operations | $ 25.0 $ | 19.1 $ | 2.1 $ | 3.5 $ | 49.7 |
| Operating lease — The World (1) | 2.7 | 8.4 | 6.1 | 26.6 | 43.8 |
| Total | $ 27.7 $ | 27.5 $ | 8.2 $ | 30.1 $ | 93.5 |

(1) Excludes any potential sub–rental income. We are actively seeking a tenant to assume this lease or enter into a sub–lease agreement.

### Seasonality

Our operating results are not materially affected by seasonal factors; however, because we operate on a fiscal calendar, the number of pay–per–view events recorded in a given quarter may vary. In addition, revenues from our licensing and direct sale of consumer products, including through our catalogs, magazines and Internet sites, may vary from period to period depending on the volume and extent of licensing agreements and marketing and promotion programs entered into during any particular period of time, as well as the commercial success of the media exposure of our characters and brand. The timing of these events as well as the continued introduction of new product offerings and revenue generating outlets can and will cause fluctuation in quarterly revenues and earnings.

### Inflation

During the past three fiscal years, inflation has not had a material effect on our business.

### Application of Critical Accounting Policies

*Accounting Policies*

We believe the following are the critical accounting policies used in the preparation of our financial statements, as well as the significant judgments and estimates affecting the application of these policies.

- *Revenue Recognition*

    Pay–per–view programming:

Revenues from our pay–per–view programming are recorded when the event is aired and are based upon our initial estimate of the number of buys achieved. This initial estimate is based on preliminary buy information received from our pay–per–view distributors. Final reconciliation of the pay–per–view buys occurs within one year and any subsequent adjustments to the buys are recognized on a cash basis. As of April 30, 2004, our pay–per–view Accounts Receivable was $28.3 million. If our initial estimate is incorrect, it can result in significant adjustments to revenues in subsequent years.

    Television advertising:

Revenues from the sale of television advertising are recorded when the commercial airs within our programming and are based upon contractual amounts previously established with our advertisers. These contractual amounts are typically based on the advertisement reaching a desired number of viewers. If an ad does not reach the desired number of viewers, we record an estimated reserve to reflect rebates or additional ad placements

23

due to advertisers, based on the difference between the intended delivery (as contracted) and actual delivery of audiences. As of April 30, 2004, our estimated reserve was $4.4 million. If our estimated reserves are incorrect, revenues in subsequent periods would be impacted.

Additionally, through our sponsorship packages, we offer advertisers a full range of our promotional vehicles, including television, Internet and print advertising, arena signage, on–air announcements and special appearances by our Superstars. We follow the guidance of Emerging Issues Task Force (EITF) Issue 00–21 "Revenue Arrangements with Multiple Deliverables," and assign the total sponsorship revenues to the various elements contained within a sponsorship package based on their relative fair value. Our relative fair values for the sponsorship elements are based upon a combination of historical prices and current advertising market conditions. Revenue from these packages is recognized as each element is delivered. Sponsorship revenues totaled $6.8 million in fiscal 2004.

Home Video:

Revenues from the sales of home video titles are recorded when shipped by our distributor to wholesalers/ retailers, net of an allowance for estimated returns. The allowance for estimated returns is based on historical information and current industry trends. As of April 30, 2004, our home video returns allowance was $2.6 million. If we do not accurately predict returns, we may have to adjust revenues in future periods.

Magazine publishing:

Publishing newsstand revenues are recorded when shipped by our distributor to wholesalers/retailers, net of an allowance for estimated returns. We estimate the allowance for newsstand returns based upon our review of historical return rates and the expected performance of our current titles in relation to prior issue return rates. As of April 30, 2004, our newsstand returns allowance was $4.5 million. If we do not accurately predict returns, we may have to adjust revenues in future periods.

• *Allowance for Doubtful Accounts*

Our receivables represent a significant portion of our current assets. We are required to estimate the collectibility of our receivables and to establish allowances for the amount of receivables that we estimate to be uncollectible. We base these allowances on our historical collection experience, the length of time our receivables are outstanding and the financial condition of individual customers. Changes in the financial condition of significant customers, either adverse or positive, could impact the amount and timing of any additional allowances that may be required. As of April 30, 2004 our allowance for doubtful accounts was $2.6 million.

• *Income Taxes*

We account for income taxes in accordance with the provisions of SFAS No. 109, "Accounting for Income Taxes." As such, we recognize the future impact of the difference between the financial statement and tax basis of assets and liabilities. As of April 30, 2004, we have $10.9 million of net deferred tax assets on our balance sheet. In addition, as of April 30, 2004, we have $13.7 million of deferred tax assets included in assets of discontinued operations related primarily to the tangible and intangible assets of our discontinued operations. We record valuation allowances against deferred tax assets that management does not believe the future tax benefits are more likely than not to be realized.

**Recent Accounting Pronouncements**

There are no accounting standards or interpretations that have been issued, but which we have not yet adopted, that we believe will have a material impact on our financial statements.

**Cautionary Statement for Purposes of the "Safe Harbor" Provisions of the Private Securities Litigation Reform Act of 1995**

The Private Securities Litigation Reform Act of 1995 provides a "safe harbor" for certain statements that are forward–looking and are not based on historical facts. When used in this Annual Report, the words "may," "will," "could," "anticipate," "plan," "continue," "project," "intend," "estimate", "believe", "expect" and similar expressions are intended to identify forward–looking statements, although not all forward–looking statements contain such words. These statements relate to our future plans, objectives, expectations and intentions and are not historical facts and accordingly involve known and unknown risks and uncertainties and other factors that may cause the actual results or the performance by us to be materially different from future results or performance expressed or implied by such forward–looking statements. The following factors, among others, could cause actual results to

24

differ materially from those contained in forward–looking statements made in this Annual Report, in press releases and in oral statements made by our authorized officers: (i) our failure to continue to develop creative and entertaining programs and events would likely lead to a decline in the popularity of our brand of entertainment; (ii) our failure to retain or continue to recruit key performers could lead to a decline in the appeal of our storylines and the popularity of our brand of entertainment; (iii) the loss of the creative services of Vincent K. McMahon could adversely affect our ability to create popular characters and creative storylines; (iv) our failure to maintain or renew key agreements could adversely affect our ability to distribute our television and pay–per–view programming; (v) a decline in general economic conditions could adversely affect our business; (vi) a decline in the popularity of our brand of sports entertainment, including as a result of changes in the social and political climate, could adversely affect our business; (vii) changes in the regulatory atmosphere and related private sector initiatives could adversely affect our business; (viii) the markets in which we operate are highly competitive, rapidly changing and increasingly fragmented, and we may not be able to compete effectively, especially against competitors with greater financial resources or marketplace presence; (ix) we face uncertainties associated with international markets; (x) we may be prohibited from promoting and conducting our live events if we do not comply with applicable regulations; (xi) because we depend upon our intellectual property rights, our inability to protect those rights, or our infringement of others' intellectual property rights, could adversely affect our business; (xii) we could incur substantial liabilities if pending material litigation is resolved unfavorably; (xiii) our insurance may not be adequate to cover liabilities resulting from accidents or injuries that occur during our physically demanding events; (xiv) we will face a variety of risks if we expand into new and complementary businesses; (xv) through his beneficial ownership of a substantial majority of our Class B common stock, our controlling stockholder, Vincent K. McMahon, can exercise control over our affairs, and his interests may conflict with the holders of our Class A common stock; (xvi) a substantial number of shares will be eligible for future sale by Mr. McMahon, and the sale of those shares could lower our stock price; (xvii) our Class A common stock has a relatively small public "float"; and (xviii) we may face risks relating to our recent restatement of our financial statements. The forward–looking statements speak only as of the date of this Annual Report and undue reliance should not be placed on these statements.

### Item 7A.  *Quantitative and Qualitative Disclosures about Market Risk*

In the normal course of business, we are exposed to foreign currency exchange rate, interest rate and equity price risks that could impact our results of operations. Our foreign currency exchange rate risk is minimized by maintaining minimal net assets and liabilities in currencies other than our functional currency.

Interest Rate Risk

We are exposed to interest rate risk related to our debt and investment portfolio. Our debt primarily consists of the mortgage related to our corporate headquarters, which has an annual interest rate of 7.6%. Due to the recent decreases in mortgage rates, this debt is now at a rate in excess of market, however due to the terms of our agreement we are prohibited from refinancing for several years. The impact of the decrease in mortgage rates is considered immaterial to our consolidated financial statements.

Our investment portfolio consists primarily of fixed income mutual funds and United States Treasury Notes, with a strong emphasis placed on preservation of capital. In an effort to minimize our exposure to interest rate risk, our investment portfolio's dollar weighted duration is approximately one year. Due to the nature of our investments and our strategy to minimize market and interest rate risk, we believe that our portfolio would not be materially impacted by adverse fluctuations in interest rates.

### Item 8.  *Consolidated Financial Statements and Schedule*

The information required by this item is set forth in the Consolidated Financial Statements filed with this report.

### Item 9.  *Changes in and Disagreements with Accountants on Accounting and Financial Disclosures*

None

*Item 9A.  Controls and Procedures*

Based on their most recent review, which was completed as of the end of the period covered by this report, our Chairman and Chief Executive Officer, as co-principal executive officers, and our Chief Financial Officer have concluded that our disclosure controls and procedures are effective to ensure that information required to be disclosed by us in the reports that we file or submit under the Securities Exchange Act of 1934, as amended, is accumulated and communicated to our management, including our Chairman and Chief Executive Officer, as co-principal executive officers, and our Chief Financial Officer, as appropriate to allow timely decisions regarding required disclosure and are effective to ensure that such information is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms.  During the fiscal year ended April 30, 2004, there have been no changes in our internal control over financial reporting, identified in connection with the evaluation thereof, which have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

PART III

The information required by Part III (Items 10–14) is incorporated herein by reference to the captions "Election of Directors", "Security Ownership of Certain Beneficial Owners and Management" and "Ratification of Selection of Independent Auditors" in our definitive proxy statement for our 2004 Annual Meeting of Stockholders.

26

PART IV

*Item 16. Exhibits, Financial Statement Schedules, and Reports on Form 8-K*

(a) The following documents are filed as a part of this report:

1.    Consolidated Financial Statements and Schedule: See index to Consolidated Financial Statements on page F-1 of this Report.

2.    Exhibits:

| Exhibit No. | Description of Exhibit |
|---|---|
| 3.1 | Amended and Restated Certificate of Incorporation (incorporated by reference to Exhibit 3.2 to our Registration Statement on Form S-1 (No. 333-84327)). |
| 3.1A | Amendment to Amended and Restated Certificate of Incorporation (incorporated by reference to Exhibit 4.1(a) to our Registration Statement on Form S-8, filed July 15, 2002). |
| 3.2 | Amended and Restated By-laws (incorporated by reference to Exhibit 3.4 to our Registration Statement on Form S-1 (No. 333-84327)). |
| 3.2A | Amendment to Amended and Restated By-Laws (incorporated by reference to Exhibit 4.2(a) to our Registration Statement on Form S-8, filed July 15, 2002). |
| 10.1 | 1999 Long-Term Incentive Plan (incorporated by reference to Exhibit 10.1 to our Registration Statement on Form S-1 (No. 333-84327))(the "LTIP").* |
| 10.1A | Form of Option Agreement under the LTIP (incorporated by reference to Exhibit 10.1A to our Annual Report on Form 10-K for the fiscal year ended April 30, 2003) * |
| 10.1B | Form of Agreement for Restricted Performance Stock Units granted during 2003 under the LTIP (incorporated by reference to Exhibit 10.2B to our Annual Report on Form 10-K for the fiscal year ended April 30, 2003).* |
| 10.2 | Employment Agreement with Vincent K. McMahon, dated October 14, 1999 (incorporated by reference to Exhibit 10.2 to our Registration Statement on Form S-1 (No. 333-84327)).* |
| 10.2A | Amendment, dated as of May 1, 2002, to Employment Agreement with Vincent K. McMahon (incorporated by reference to Exhibit 10.2A to our Annual Report on Form 10-K for the fiscal year ended April 30, 2002).* |
| 10.2B | Second Amendment, dated February 23, 2004, to Employment Agreement with Vincent K. McMahon (incorporated by reference to Exhibit 10.2B to our Quarterly Report on Form 10-Q for the fiscal quarter ended January 23, 2004) * |
| 10.3 | Booking Contract with Vincent K. McMahon, dated February 15, 2000 (incorporated by reference to Exhibit 10.3 to our Annual Report on Form 10-K for the fiscal year ended April 30, 2000).* |
| 10.3A | Amendment, dated July 3, 2001, to Booking Contract with Vincent K. McMahon (incorporated by reference to Exhibit 10.3A to our Annual Report on Form 10-K for the fiscal year ended April 30, 2001).* |
| 10.4 | Employment Agreement with Linda E. McMahon, dated October 14, 1999 (incorporated by reference to Exhibit 10.3 to our Registration Statement on Form S-1 (No. 333-84327)).* |
| 10.4A | Amendment, dated February 23, 2004, to Employment Agreement with Linda E. McMahon (incorporated by reference to Exhibit 10.4A to our Quarterly Report on Form 10-Q for the fiscal quarter ended January 23, 2004).* |
| 10.5 | Booking Contract with Linda E. McMahon, dated February 15, 2000 (incorporated by reference to Exhibit 10.5 to our Annual Report on Form 10-K for the fiscal year ended April 30, 2000).* |
| 10.6 | World Wrestling Entertainment Employee Stock Purchase Plan (incorporated by reference to Exhibit 10.6 to our Annual Report on Form 10-K for the fiscal year ended April 30, 2002).* |
| 10.7 | License Agreement with inDemand, formerly known as Viewer's Choice L.L.C., dated as of January 20, 1999 (incorporated by reference to Exhibit 10.7 to our Registration Statement on Form S-1 (No. 333-84327)). (1) |
| 10.8 | World Wrestling Entertainment, Inc. Management Bonus Plan (incorporated by reference to Appendix A to the Proxy Statement for the 2003 Annual Meeting of Stockholders, filed July 31, 2003).* |
| 10.9 | Independent Contractor Agreement, dated May 1, 2003, between the Registrant and Communications Consultants, Inc. (incorporated by reference to Exhibit 10.9 to our Annual Report on Form 10-K for the fiscal year ended April 30, 2003)* |

| 10.10 | Registration Rights Agreement, dated August 30, 2001, by and between Invemed Catalyst Fund, L.P. and World Wrestling Entertainment, Inc. (incorporated by reference to Exhibit 10.10 to our Annual Report on Form 10–K for the fiscal year ended April 30, 2002). |
|---|---|
| 10.11 | Open End Mortgage Deed, Assignment of Rents and Security Agreement between TSI Realty Company and GMAC Commercial Mortgage Corp. (assigned to Citicorp Real Estate, Inc.), dated as of December 12, 1997 (incorporated by reference to Exhibit 10.11 to our Registration Statement on Form S–1 (No. 333–84327)). |
| 10.12 | Promissory Note issued by TSI Realty Company to GMAC Commercial Mortgage Corp. (assigned to Citicorp Real Estate, Inc.), dated as of December 12, 1997 (incorporated by reference to Exhibit 10.12 to our Registration Statement on Form S–1 (No. 333–84327)). |
| 10.13 | Environmental Indemnity Agreement among TSI Realty Company, Titan Sports Inc. and GMAC Commercial Mortgage Corp. (assigned to Citicorp Real Estate, Inc.), dated as of December 12, 1997 (incorporated by reference to Exhibit 10.13 to our Registration Statement on Form S–1 (No. 333–84327)). |
| 10.14 | Assignment of Leases and Rents between TSI Realty Company and GMAC Commercial Mortgage Corp. (assigned to Citicorp Real Estate, Inc.), dated as of December 12, 1997 (incorporated by reference to Exhibit 10.14 to our Registration Statement on Form S–1 (No. 333–84327)). |
| 10.15 | Form of Tax Indemnification Agreement among the Registrant, Stephanie Music Publishing, Inc., Vincent K. McMahon and the Vincent K. McMahon Irrevocable Deed of Trust, dated as of June 30, 1999 (incorporated by reference to Exhibit 10.15 to our Registration Statement on Form S–1 (No. 333–84327)). |
| 10.16 | Agreement between WWF–World Wide Fund for Nature and Titan Sports, Inc. dated January 20, 1994 (incorporated by reference to Exhibit 10.16 to our Registration Statement on Form S–1 (No. 333–84327)). |
| 10.17 | Offer letter, dated January 13, 2003, between the Registrant and Kurt Schneider (incorporated by reference to Exhibit 10.17 to our Quarterly Report on Form 10–Q for the fiscal quarter ended July 25, 2003). * |
| 10.18 | Offer letter , dated February 24, 2003, between the Registrant and Philip B. Livingston (incorporated by reference to Exhibit 10.18 to our Quarterly Report on Form 10–Q for the fiscal quarter ended July 25, 2003). * |
| 10.19 | Booking Contract, dated as of January 1, 2000, between the Registrant and Shane B. McMahon ("McMahon Booking Contract") (incorporated by reference to Exhibit 10.19 to our Quarterly Report on Form 10–Q for the fiscal quarter ended July 25, 2003). * |
| 10.19A | First Amendment to McMahon Booking Contract, dated March 12, 2001 (incorporated by reference to Exhibit 10.19A to our Quarterly Report on Form 10–Q for the fiscal quarter ended July 25, 2003). * |
| 10.20 | Employment Agreement, dated as of October 29, 1996, between the Registrant and James W. Ross ("Ross Employment Agreement") (incorporated by reference to Exhibit 10.20 to our Quarterly Report on Form 10–Q for the fiscal quarter ended July 25, 2003). * |
| 10.20A | Amendment to Ross Employment Agreement, dated June 2, 2003 (incorporated by reference to Exhibit 10.20A to our Quarterly Report on Form 10–Q for the fiscal quarter ended July 25, 2003). * |
| 10.20B | Second Amendment to Ross Employment Agreement, dated June 2, 2003 (incorporated by reference to Exhibit 10.20B to our Quarterly Report on Form 10–Q for the fiscal quarter ended July 25, 2003). * |
| 10.20C | Third Amendment to Ross Employment Agreement, dated August 13, 2003 (incorporated by reference to Exhibit 10.20C to our Quarterly Report on Form 10–Q for the fiscal quarter ended July 25, 2003). * |
| 21.1 | List of Subsidiaries (incorporated by reference to Exhibit 21.1 to our Annual Report on Form 10–K for the fiscal year ended April 30, 2003). |
| 23.1 | Consent of Deloitte & Touche LLP (filed herewith). |
| 31.1 | Certification by Vincent K. McMahon pursuant to Section 302 of Sarbanes–Oxley Act of 2002 (filed herewith). |
| 31.2 | Certification by Linda E. McMahon pursuant to Section 302 of Sarbanes–Oxley Act of 2002 (filed herewith). |
| 31.3 | Certification by Philip B. Livingston pursuant to Section 302 of Sarbanes–Oxley Act of 2002 (filed herewith). |
| 32.1 | Certification by Vincent K. McMahon, Linda E. McMahon and Philip B. Livingston pursuant to Section 906 of Sarbanes–Oxley Act of 2002 (filed herewith). |

* Indicates management contract or compensatory plan or arrangement.

(1) Certain portions of this exhibit have been omitted based upon a request for confidential treatment filed by the Company with the Secretary of the Commission on August 25, 1999, as amended on October 8, 1999. The omitted portion of this exhibit has been separately filed with the Commission.

(b) Reports on Form 8–K:

The Registrant filed the following Forms 8–K:

| (i) Filing Date March 8, 2004 | Items 12 and 7 |
|---|---|
| (ii) Filing Date April 23, 2004 | Items 12 and 7 |
| (iii) Filing Date April 27, 2004 | Items 5 and 7 |

SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned, thereto duly authorized.

WORLD WRESTLING ENTERTAINMENT, INC.
(Registrant)

Dated: July 12, 2004                    By:         /s/ LINDA E. MCMAHON

                                                    **Linda E. McMahon**
                                                    *Chief Executive Officer*

Dated: July 12, 2004                    By:         /s/ PHILIP B. LIVINGSTON

                                                    **Philip B. Livingston**
                                                    *Chief Financial Officer*

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the registrant and in the capacities and on the dates indicated.

| Signature | Title or Capacity | Date |
|---|---|---|
| By: /s/ VINCENT K. MCMAHON <br><br> **Vincent K. McMahon** | Chairman of the Board of Directors, (co-principal executive officer) | July 12, 2004 |
| By: /s/ LINDA E. MCMAHON <br><br> **Linda E. McMahon** | Chief Executive Officer and Director, (co-principal executive officer) | July 12, 2004 |
| By: /s/ LOWELL P. WEICKER Jr. <br><br> **Lowell P. Weicker Jr.** | Director | July 12, 2004 |
| By: /s/ DAVID KENIN <br><br> **David Kenin** | Director | July 12, 2004 |
| By: /s/ JOSEPH PERKINS <br><br> **Joseph Perkins** | Director | July 12, 2004 |
| By: /s/ MICHAEL B. SOLOMON <br><br> **Michael B. Solomon** | Director | July 12, 2004 |
| By: /s/ ROBERT A. BOWMAN <br><br> **Robert A. Bowman** | Director | July 12, 2004 |
| By: /s/ PHILIP B. LIVINGSTON <br><br> **Philip B. Livingston** | Chief Financial Officer and Director, (principal financial and accounting officer) | July 12, 2004 |

29

WORLD WRESTLING ENTERTAINMENT, INC.

INDEX TO CONSOLIDATED FINANCIAL STATEMENTS

| | Page |
|---|---|
| Report of Independent Registered Public Accounting Firm | F–2 |
| Consolidated Statements of Operations for the years ended April 30, 2004, 2003 and 2002 | F–3 |
| Consolidated Balance Sheets as of April 30, 2004 and 2003 | F–4 |
| Consolidated Statements of Stockholders' Equity and Comprehensive (Loss) Income for the years ended April 30, 2004, 2003 and 2002 | F–5 |
| Consolidated Statements of Cash Flows for the years ended April 30, 2004, 2003 and 2002 | F–6 |
| Notes to Consolidated Financial Statements | F–7 |
| Schedule II – Valuation and Qualifying Accounts | F–25 |

F–1

REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

To the Board of Directors and Stockholders of World Wrestling Entertainment, Inc.:

We have audited the accompanying consolidated balance sheets of World Wrestling Entertainment, Inc. and subsidiaries (the "Company") as of April 30, 2004 and 2003 and the related consolidated statements of operations, stockholders' equity and comprehensive income (loss) and of cash flows for each of the three years in the period ended April 30, 2004. Our audits also included the financial statement schedule listed in the index at Item 16(a)1. These financial statements and financial statement schedule are the responsibility of the Company's management. Our responsibility is to express an opinion on the financial statements and financial statement schedule based on our audits.

We conducted our audits in accordance with standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, such consolidated financial statements present fairly, in all material respects, the financial position of the Company as of April 30, 2004 and 2003 and the results of its operations and its cash flows for each of the three years in the period ended April 30, 2004 in conformity with accounting principles generally accepted in the United States of America. Also, in our opinion, such financial statement schedule, when considered in relation to the basic consolidated financial statements taken as a whole, presents fairly in all material respects the information set forth therein.

As discussed in Note 3, the Company adopted Statement of Financial Accounting Standards No. 133 during the year ended April 30, 2002.

/s/ Deloitte and Touche LLP

Stamford, Connecticut

July 12, 2004

F-2

WORLD WRESTLING ENTERTAINMENT, INC.

## CONSOLIDATED STATEMENTS OF OPERATIONS
### (dollars and shares in thousands, except per share data)

| | Year ended April 30 | | |
|---|---|---|---|
| | 2004 | 2003 | 2002 |
| Net revenues | $ 374,909 | $ 374,264 | $ 409,622 |
| Cost of revenues | 207,121 | 237,343 | 251,124 |
| Selling, general and administrative expenses | 78,170 | 99,349 | 103,191 |
| Depreciation and amortization | 12,363 | 10,965 | 10,594 |
| Stock compensation costs | 3,675 | | |
| Operating income | 73,580 | 26,607 | 44,713 |
| Interest income | 5,906 | 2,011 | 10,591 |
| Interest expense | 767 | 783 | 784 |
| Other income (loss), net | 1,275 | (897) | 5,213 |
| Income from continuing operations before income taxes | 79,994 | 26,938 | 59,733 |
| Provision for income taxes | 30,421 | 10,836 | 22,020 |
| Income from continuing operations | 49,573 | 16,102 | 37,713 |
| Discontinued operations: | | | |
| Income on shutdown of the XFL, net of taxes of $178 and $2,917 for 2004 and 2002, respectively and minority interest | 290 | — | 4,638 |
| Loss from *The World* operations, net of taxes of $16,359 and $3,006, for 2003 and 2002, respectively | | (26,691) | (4,903) |
| Estimated loss on shutdown of *The World*, net of taxes of $900 and $3,257, for 2004 and 2003, respectively | (1,671) | (8,866) | — |
| Loss from discontinued operations – *The World* | (1,671) | (35,557) | (4,903) |
| Loss from discontinued operations | (1,381) | (35,557) | (265) |
| Cumulative effect of change in accounting principle, net of taxes of $911 | | | 1,487 |
| Net income (loss) | $ 48,192 | $ (19,455) | $ 38,935 |
| Earnings (loss) per common share–basic and diluted: | | | |
| Continuing operations | $ 0.72 | $ 0.22 | $ 0.51 |
| Discontinued operations | (0.02) | (0.50) | — |
| Cumulative effect of change in accounting principle | — | — | 0.02 |
| Net income (loss) | $ 0.70 | $ (0.28) | $ 0.53 |
| Shares used in per share calculations: | | | |
| Basic | 68,621 | 70,622 | 72,862 |
| Diluted | 69,036 | 70,623 | 72,866 |

See Notes to Consolidated Financial Statements.

WORLD WRESTLING ENTERTAINMENT, INC.

CONSOLIDATED BALANCE SHEETS
(dollars in thousands)

| | As of April 30 | |
| --- | --- | --- |
| | 2004 | 2003 |
| **ASSETS** | | |
| **CURRENT ASSETS:** | | |
| Cash and equivalents | $ 48,467 | $ 128,473 |
| Short-term investments | 224,824 | 142,641 |
| Accounts receivable, net | 62,703 | 49,075 |
| Inventory, net | 856 | 839 |
| Prepaid expenses and other current assets | 14,027 | 18,681 |
| Assets of discontinued operations | 691 | 21,129 |
| Total current assets | 351,568 | 360,838 |
| PROPERTY AND EQUIPMENT, NET | 71,369 | 59,325 |
| INTANGIBLE ASSETS, NET | 4,492 | 4,625 |
| OTHER ASSETS | 6,212 | 7,375 |
| ASSETS OF DISCONTINUED OPERATIONS | 20,703 | |
| TOTAL ASSETS | $ 454,344 | $ 432,163 |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | |
| **CURRENT LIABILITIES:** | | |
| Current portion of long-term debt | $ 700 | $ 777 |
| Accounts payable | 13,118 | 14,188 |
| Dividends payable | 4,106 | |
| Accrued expenses and other liabilities | 42,131 | 34,503 |
| Deferred income | 23,512 | 24,662 |
| Liabilities of discontinued operations | 2,401 | 11,554 |
| Total current liabilities | 85,968 | 85,684 |
| LONG-TERM DEBT | 7,955 | 9,126 |
| LIABILITIES OF DISCONTINUED OPERATIONS | 7,316 | |
| COMMITMENTS AND CONTINGENCIES | | |
| **STOCKHOLDERS' EQUITY:** | | |
| Class A common stock: ($.01 par value; 180,000,000 shares authorized; 13,650,476 shares and 18,215,427 shares issued as of April 30, 2004 and 2003, respectively) | 136 | 182 |
| Class B common stock: ($.01 par value; 60,000,000 shares authorized; 54,780,207 shares issued as of April 30, 2004 and 2003) | 548 | 548 |
| Treasury stock (2,578,769 shares as of April 30, 2003) | | (30,569) |
| Additional paid-in capital | 250,775 | 297,315 |
| Accumulated other comprehensive (loss) income | (1,120) | 243 |
| Retained earnings | 102,766 | 69,634 |
| Total stockholders' equity | 353,105 | 337,353 |
| TOTAL LIABILITIES AND STOCKHOLDERS' EQUITY | $ 454,344 | $ 432,163 |

See Notes to Consolidated Financial Statements.

F-4

WORLD WRESTLING ENTERTAINMENT, INC.

CONSOLIDATED STATEMENTS OF STOCKHOLDERS' EQUITY AND
COMPREHENSIVE (LOSS) INCOME
(dollars and shares in thousands)

| | Common Stock | | Treasury Stock | | Additional Paid – in Capital | Accumulated Other Comprehensive (Loss) Income | Retained Earnings | Total |
|---|---|---|---|---|---|---|---|---|
| | Shares | Amount | Shares | Amount | | | | |
| Balance, May 1, 2001 | 72,932 | $ 729 | — | $ — | 296,525 | $ (597) | $ 50,154 | $ 346,811 |
| Comprehensive income: | | | | | | | | |
| Net income | — | — | — | — | — | — | 38,935 | 38,935 |
| Translation adjustment | — | — | — | — | — | 37 | — | 37 |
| Unrealized holding gain, net of tax | — | — | — | — | — | 35 | — | 35 |
| Total comprehensive income | | | | | | | | 39,007 |
| Purchase of treasury stock | — | — | 100 | (1,139) | — | — | — | (1,139) |
| Exercise of stock options | 32 | — | — | — | 413 | — | — | 413 |
| Balance, April 30, 2002 | 72,964 | 729 | 100 | (1,139) | 296,938 | (525) | 89,089 | 385,092 |
| Comprehensive loss: | | | | | | | | |
| Net loss | — | — | — | — | — | — | (19,455) | (19,455) |
| Translation adjustment | — | — | — | — | — | 322 | — | 322 |
| Unrealized holding gain, net of tax | — | — | — | — | — | 446 | — | 446 |
| Total comprehensive loss | | | | | | | | (18,687) |
| Purchase of treasury stock | — | — | 2,489 | (29,554) | — | — | — | (29,554) |
| Proceeds from sale of treasury stock | — | — | (11) | 124 | (47) | — | — | 77 |
| Exercise of stock options | 32 | 1 | — | — | 404 | — | — | 405 |
| Tax benefit from exercise of stock options | — | — | — | — | 20 | — | — | 20 |
| Balance, April 30, 2003 | 72,996 | 730 | 2,578 | (30,569) | 297,315 | 243 | 69,634 | 337,353 |
| Comprehensive income: | | | | | | | | |
| Net income | — | — | — | — | — | — | 48,192 | 48,192 |
| Translation adjustment | — | — | — | — | — | (203) | — | (203) |
| Unrealized holding loss, net of tax | — | — | — | — | — | (1,160) | — | (1,160) |
| Total comprehensive income | | | | | | | | 46,829 |
| Retirement of treasury stock | (4,616) | (46) | (4,616) | 49,712 | (49,666) | — | — | — |
| Stock repurchase, net of issuance of new shares | 27 | — | 2,038 | (19,143) | 5 | — | — | (19,138) |
| Exercise of stock options | 24 | — | — | — | 305 | — | — | 305 |
| Tax benefit from exercise of stock options | — | — | — | — | 2 | — | — | 2 |
| Dividends paid | — | — | — | — | — | — | (10,954) | (10,954) |
| Dividends declared, not yet paid | — | — | — | — | — | — | (4,106) | (4,106) |
| Stock compensation costs | — | — | — | — | 2,814 | — | — | 2,814 |
| Balance, April 30, 2004 | 68,431 | $ 684 | — | $ — | 250,775 | $ (1,120) | $ 102,766 | $ 353,105 |

See Notes to Consolidated Financial Statements.

F–5

WORLD WRESTLING ENTERTAINMENT, INC.

CONSOLIDATED STATEMENTS OF CASH FLOWS
(in thousands)

| | Year Ended April 30 | | |
| --- | --- | --- | --- |
| | 2004 | 2003 | 2002 |
| **OPERATING ACTIVITIES:** | | | |
| Net income (loss) | $ 48,192 | $ (19,455) | $ 38,935 |
| Adjustments to reconcile net income (loss) to net cash provided by operating activities: | | | |
| Loss from discontinued operations, net of tax | 1,381 | 35,557 | 265 |
| Gain on sale of stock and revaluation of warrants, net | (671) | — | (5,287) |
| Cumulative effect of change in accounting principle, net of tax | — | — | (1,487) |
| Depreciation and amortization | 12,363 | 10,965 | 10,594 |
| Amortization of deferred income | (1,052) | (1,268) | (1,270) |
| Stock compensation costs | 2,814 | — | — |
| Provision for doubtful accounts | (2,295) | 3,697 | 900 |
| Provision for inventory obsolescence | 237 | 797 | 3,780 |
| Provision (benefit) for deferred income taxes | 5,087 | 1,490 | (3,455) |
| Impairment of long-lived asset | 2,942 | — | — |
| Changes in assets and liabilities: | | | |
| Accounts receivable | (11,332) | 10,334 | 7,388 |
| Inventory | (255) | (185) | (1,086) |
| Prepaid expenses and other assets | 2,870 | (614) | 5,689 |
| Accounts payable | (1,070) | (5,302) | 25 |
| Accrued expenses and other liabilities | 7,917 | (10,724) | 6,403 |
| Deferred income | (1,737) | 2,740 | 10,179 |
| Net cash provided by continuing operations | 65,391 | 28,032 | 71,573 |
| Net cash used in discontinued operations | (3,477) | (6,894) | (18,587) |
| Net cash provided by operating activities | 61,914 | 21,138 | 52,986 |
| **INVESTING ACTIVITIES:** | | | |
| Additions to property and equipment | (5,266) | (10,593) | (12,499) |
| Purchase of corporate aircraft | (20,122) | — | — |
| Purchase of other assets | (1,641) | (3,000) | — |
| Sale (purchase) of short-term investments, net | (83,963) | 65,416 | (13,070) |
| Net proceeds from the sale of investments | — | — | 12,914 |
| Net cash provided by (used in) continuing operations | (110,992) | 51,823 | (12,655) |
| Net cash used in discontinued operations | — | (2,134) | (5,179) |
| Net cash provided by (used in) investing operations | (110,992) | 49,689 | (17,834) |
| **FINANCING ACTIVITIES:** | | | |
| Repayments of long-term debt | (647) | (601) | (556) |
| Proceeds from (repayments of) capital lease agreement | (601) | 601 | — |
| Proceeds from sales of treasury stock | — | 77 | — |
| Purchase of treasury stock | (19,031) | (29,554) | (1,139) |
| Dividends paid | (10,954) | — | — |
| Proceeds from exercise of stock options | 305 | 405 | 413 |
| Net cash (used in) continuing operations | (30,928) | (29,072) | (1,282) |
| Net cash provided by discontinued operations | — | 322 | 8,100 |
| Net cash (used in) provided by financing activities | (30,928) | (28,750) | 6,818 |
| NET (DECREASE) INCREASE IN CASH AND EQUIVALENTS | (80,006) | 42,077 | 41,970 |
| CASH AND EQUIVALENTS, BEGINNING OF PERIOD | 128,473 | 86,396 | 44,426 |
| CASH AND EQUIVALENTS, END OF PERIOD | $ 48,467 | $ 128,473 | $ 86,396 |
| **SUPPLEMENTAL CASH FLOW INFORMATION:** | | | |
| Cash paid during the period for income taxes, net of refunds | $ 14,016 | $ 6,398 | $ 7,741 |
| Cash paid during the period for interest | $ 773 | $ 783 | $ 783 |

See Notes to Consolidated Financial Statements.

F-6

WORLD WRESTLING ENTERTAINMENT, INC.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
(dollars in thousands, except share and per share data)

**1. Basis of Presentation and Business Description**

The accompanying consolidated financial statements include the accounts of World Wrestling Entertainment, Inc., and our wholly owned subsidiaries. We are an integrated media and entertainment company, principally engaged in the development, production and marketing of television and pay–per–view event programming and live events and the licensing and sale of branded consumer products featuring our World Wrestling Entertainment brands. Our continuing operations are organized around two principal activities:

• Live and televised entertainment, which consists of live event and television programming. Revenues consist principally of attendance at live events, sale of television advertising time and sponsorships, domestic and international television rights fees and pay–per–view buys.

• Branded merchandise, which consists of licensing and direct sale of merchandise. Revenues include sales of consumer products through third party licensees and direct marketing and sales of merchandise, magazines and home videos.

All significant intercompany transactions and balances have been eliminated. Certain prior year amounts have been reclassified to conform with the current year presentation.

In 2003, we closed the operations of our entertainment complex, *The World*. We recorded the results from operations of this business and the estimated shutdown cost as discontinued operations. In early May 2001, we discontinued operations of the XFL and accordingly, reported XFL operating results and estimated shutdown costs as discontinued operations.

**2. Summary of Significant Accounting Policies**

*Use of Estimates* — The preparation of financial statements in conformity with accounting principles generally accepted in the United States requires our management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosures of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenue and expenses during the reporting period. Actual results could differ from those estimates.

*Fiscal Period* — Our fiscal year ends on April 30 of each year. Unless otherwise noted, all references to years relate to fiscal years, not calendar years, and refer to the fiscal period by using the year in which the fiscal period ends. Our fiscal quarters are thirteen–week periods that end on the thirteenth Friday in the quarter, with the exception of our fourth quarter, which always ends on April 30.

*Cash and Equivalents* — Cash and equivalents include cash on deposit in overnight deposit accounts and investments in money market accounts.

*Short–term Investments* — We classify all of our short–term investments as available–for–sale securities. Such short–term investments consist primarily of United States government and federal agencies securities, corporate commercial paper, corporate bonds, mutual funds and mortgage–backed securities, all of which are stated at market value, with unrealized gains and losses on such securities reflected, net of tax, as other comprehensive income (loss) in stockholders' equity. Realized gains and losses on short–term investments are included in earnings and are derived using the specific identification method for determining the cost of securities sold. As of April 30, 2004, the fair value of our short–term investments was approximately $1,627 less than cost and as of April 30, 2003, the fair value was $148 greater than cost. We recorded unrealized (losses) income, net of taxes, of $(1,160), $446 and $(163) for 2004, 2003 and 2002, respectively, which was included in accumulated other comprehensive income (loss). It is our intent to maintain a liquid portfolio to take advantage of investment opportunities; therefore, all securities are considered to be available–for–sale and are classified as current assets.

*Accounts Receivable* — Accounts receivable relate principally to amounts due to us from pay–per–view providers and television networks for pay–per–view presentations and television programming, respectively, and balances due from the sale of television advertising, home video and magazines. Our receivables represent a significant portion of our current assets. We are required to estimate the collectibility of our receivables and to

F–7

WORLD WRESTLING ENTERTAINMENT, INC.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
(dollars in thousands, except share and per share data)

establish allowances for the amount of receivables that we estimate to be uncollectible. We base these allowances on our historical collection experience, the length of time our receivables are outstanding and the financial condition of individual customers. Activity in the allowance for doubtful accounts is as follows:

| | Balance at beginning of period | Charged to costs and expenses | Write-offs and other | Balance at end of period |
|---|---|---|---|---|
| 2004 | $ 5,284 | $ (2,295) | $ (377) | $ 2,612 |
| 2003 | $ 2,840 | $ 3,697 | $ (1,253) | $ 5,284 |
| 2002 | $ 1,868 | $ 900 | $ 72 | $ 2,840 |

*Inventory* — Inventory consists of merchandise sold on a direct sales basis, and videotapes and DVDs, which are sold through wholesale distributors and retailers. Substantially all of our inventory is comprised of finished goods. Inventory is stated at the lower of cost (first-in, first-out basis) or market. The valuation of our inventories requires management to make market estimates assessing the quantities and the prices at which we believe the inventory can be sold.

*Property and Equipment* — Property and equipment are stated at historical cost less accumulated depreciation and amortization. Depreciation and amortization is computed on a straight-line basis over the estimated useful lives of the assets or, when applicable, the life of the lease, whichever is shorter. Vehicles and equipment are depreciated based on estimated useful lives varying from three to five years. Buildings and related improvements are amortized over the lesser of the remaining useful life of the buildings or the anticipated life of improvements. Our corporate aircraft is depreciated over ten years on a straight-line basis less an estimated residual value of $9,500.

*Leased Property Under Capital Leases* — Property under capital leases is amortized over the shorter of the lives of the respective leases or the estimated useful lives of the assets.

*Valuation of Long-Lived Assets* — In May 2002, we adopted SFAS No. 144, "Accounting for the Impairment or Disposal of Long-Lived Assets." In accordance with SFAS No. 144, we periodically evaluate the carrying value of long-lived assets when events and circumstances warrant such a review. During fiscal 2004, management performed an analysis on our long-lived assets related to our e-commerce infrastructure. These assets were primarily composed of capitalized software development costs incurred during the set up of the e-commerce section of our website. Based upon the performance of our e-commerce business as compared to the costs incurred to operate the site, management determined that the asset was impaired and recorded a pre-tax charge of $2,942 in our fourth fiscal quarter. During 2003, the economic conditions surrounding our entertainment complex in New York City, *The World*, and its continued weak operating results indicated potential impairment. In accordance with the prescribed accounting, an impairment test was performed which ultimately resulted in a non-cash pre-tax impairment charge of $30,392 that was recorded in fiscal 2003 and reflected in discontinued operations.

*Income Taxes* — We account for income taxes in accordance with the provisions of SFAS No. 109, "Accounting for Income Taxes." Our deferred provision was determined under the asset and liability method. Under this method, deferred assets and liabilities are recognized based on differences between financial statement and income tax basis of assets and liabilities using presently enacted tax rates. Valuation allowances are established to reduce deferred tax assets to amounts management believes are more likely than not to be realized. We consider estimated future taxable income and ongoing tax planning strategies in assessing the need for valuation allowances.

Revenue Recognition — *Revenues are generally recognized when products are shipped or as services are performed. However, due to the nature of several of our business lines, there are additional steps in the revenue recognition process, as described below.*

  • *Pay-per-view programming:*

    Revenues from our pay-per-view programming are recorded when the event is aired and are based upon our initial estimate of the number of buys achieved. This initial estimate is based on preliminary buy information received from our pay-per-view distributors. Final reconciliation of the pay-per-view buys generally occurs within one year and any subsequent adjustments to the buys are recognized on a cash basis.

F-8

WORLD WRESTLING ENTERTAINMENT, INC.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
(dollars in thousands, except share and per share data)

- Television advertising:

Revenues from the sale of television advertising are recorded when the commercial airs within our programming and are based upon contractual amounts previously established with our advertisers. These contractual amounts are typically based on the advertisement reaching a desired number of viewers. If an ad does not reach the desired number of viewers, we record an estimated reserve to reflect rebates or additional ad placements due to advertisers, based on the difference between the intended delivery (as contracted) and actual delivery of audiences.

Additionally, through our sponsorship packages, we offer advertisers a full range of our promotional vehicles, including television, Internet and print advertising, arena signage, on–air announcements and special appearances by our Superstars. We follow the guidance of Emerging Issues Task Force (EITF) Issue 00–21 "Revenue Arrangements with Multiple Deliverables," and assign the total sponsorship revenues to the various elements contained within a sponsorship package based on their relative fair values. Our relative fair values for the sponsorship elements are based upon a combination of historical prices and current advertising market conditions. Revenue from these packages is recognized as each element is delivered.

- Licensing:

Licensing revenues are recognized upon receipt of notice by the individual licensees as to license fees due. If we receive licensing advances, such payments are deferred and recognized as income on an as earned basis.

- Home Video:

Revenues from the sales of home video titles are recorded when shipped by our distributor to wholesalers/ retailers, net of an allowance for estimated returns. The allowance for estimated returns is based on historical information and current industry trends.

- Magazine publishing:

Publishing newsstand revenues are recorded when shipped by our distributor to wholesalers/retailers, net of an allowance for estimated returns. We estimate the allowance for newsstand returns based upon our review of historical returns rates and the expected performance of our current titles in relation to prior issue return rates.

*Advertising Expense* — Advertising costs are expensed as incurred, except for costs related to the development of a major commercial or media campaign which are expensed in the period in which the commercial or campaign is first presented.

*Foreign Currency Translation* — For translation of the financial statements of our Canadian and United Kingdom subsidiaries, we have determined that the Canadian Dollar and the U.K. Pound, respectively, are the functional currencies. Assets and liabilities are translated at the year–end exchange rate, and income statement accounts are translated at average exchange rates for the year. The resulting translation adjustments are recorded in accumulated other comprehensive income, a component of stockholders' equity. Foreign currency transactions are recorded at the exchange rate prevailing at the transaction date.

*Stock–Based Compensation* — We account for stock options issued to employees using the intrinsic value method as prescribed under Accounting Principles Board Opinion ("APB") No 25, "Accounting for Stock Issued to Employees," and related interpretations. Under this method, no compensation expense is recognized when the number of shares granted is known and the exercise price of the stock option is equal to or greater than the market price of our stock on the grant date. Stock options issued to non–employees are accounted for at fair value at the issuance date. We follow the disclosure–only provisions of SFAS No. 148, "Accounting for Stock–Based Compensation — Transition and Disclosure", and SFAS No. 123, "Accounting for Stock–Based Compensation." SFAS Nos. 148 and 123 encourage, but do not require, companies to adopt a fair value based method for determining expense related to stock–based compensation (See Note 11). Restricted stock unit grants are recorded at fair value as of the grant date, with the resulting compensation cost recorded over the vesting period, if any.

The fair value of options granted to employees, which is amortized to expense over the option vesting period in determining the pro forma impact, is estimated on the date of the grant using the Black–Scholes option–pricing model with the following assumptions:

F–9

WORLD WRESTLING ENTERTAINMENT, INC.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
(dollars in thousands, except share and per share data)

| | 2004 | 2003 | 2002 |
|---|---|---|---|
| Expected life of option | 3 years | 3 years | 3 years |
| Risk-free interest rate | 1.8% | 2.5% | 3.4% |
| Expected volatility of our common stock | 38% | 38% | 67% |
| Expected dividend yield | 1.7% | — | — |

| | 2004 | 2003 | 2002 |
|---|---|---|---|
| Weighted average fair value per share of each option granted to employees | $ 2.44 | $ 3.73 | $ 6.48 |
| Total number of options granted to employees | 852,500 | 1,219,000 | 5,000 |
| Total fair value of all options granted to employees | $ 2,082 | $ 4,548 | $ 32 |

Had compensation expense for our stock options been recognized based on the fair value on the grant date under the methodology prescribed by SFAS No.123, our income from continuing operations and basic and diluted earnings from continuing operations per common share for 2004, 2003 and 2002 would have been impacted as shown in the following table:

| | 2004 | 2003 | 2002 |
|---|---|---|---|
| Reported income from continuing operations | $ 49,573 | $ 16,102 | $ 37,713 |
| Add: Stock-based employee compensation expense included in reported income from continuing operations, net of related tax effects | 2,278 | — | — |
| Deduct: Total stock-based employee compensation expense determined under fair value-based method for all awards, net of related tax effects | (4,392) | (3,602) | (5,393) |
| Pro forma income from continuing operations | $ 47,459 | $ 12,500 | $ 32,320 |
| Reported basic and diluted earnings from continuing operations per common share | $ 0.72 | $ 0.22 | $ 0.51 |
| Pro forma basic and diluted earnings from continuing | $ 0.69 | $ 0.18 | $ 0.44 |

*Derivative Instruments* – We hold warrants received from certain publicly traded companies with whom we have licensing or distribution agreements. Warrants received from our licensees and a television programming distributor were initially recorded at their estimated fair value on the date of grant using the Black-Scholes option pricing model. That corresponding amount is recorded as deferred revenue and is amortized into operating income over the life of the related agreements using straight-line amortization. For the fiscal years ended April 30, 2004, 2003 and 2002, we recorded revenues of $1,052, $1,268 and $1,270 respectively, related to the amortization of deferred revenue resulting from the receipt of such warrants. Subsequent to receipt, warrants are adjusted to their estimated fair value each quarter, with changes in fair value included in other income. We do not utilize derivative instruments for speculative purposes or to hedge our exposure to interest rate or foreign currency risks. Upon adoption of SFAS 133 "Accounting for Derivative Instruments and Hedging Activities" we recognized $1,487, net of tax, as a cumulative effect of change in accounting principle in fiscal 2002, as a result of adjusting warrants to their estimated fair value.

*Goodwill & Other Intangible Assets* — During 2003, the economic conditions surrounding *The World*, and its continued weak operating results indicated potential impairment of the site's long-lived assets and goodwill. As a

F-10

WORLD WRESTLING ENTERTAINMENT, INC.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
(dollars in thousands, except share and per share data)

result of the indicated impairment, a valuation was performed on the site which ultimately resulted in the recording of a write–down of the long–lived assets and all goodwill related to *The World*. The write–down of the goodwill resulted in a non–cash pre–tax impairment charge of $2,533 during the third quarter of fiscal 2003. Our remaining intangible assets consist of acquired film libraries which are amortized over three years and acquired trademarks and trade names which are amortized over six years. Our intangible assets are being amortized over their estimated useful lives based on the period the assets are expected to contribute to our cash flows. We perform impairment tests annually and whenever events or circumstances indicate that intangible assets might be impaired.

*Discontinued Operations* – SFAS No. 146, "Accounting for Costs Associated with Exit or Disposal Activities" requires companies to recognize costs associated with exit or disposal activities when they are incurred rather than at the date of a commitment to an exit or disposal plan. In February 2003, we closed the restaurant operations at *The World* and in April 2003, we closed the retail operations at the facility. Costs related to the shutdown of these operations were estimated at the shutdown date and were recorded, net of applicable tax benefits, as discontinued operations in fiscal 2003, in accordance with SFAS No. 146.

Prior to the adoption of SFAS No. 146, we accounted for our discontinued XFL operations in accordance with Accounting Principles Board Opinion ("APB") No. 30, "Reporting the Results of Operations— Reporting the Effects of Disposal of a Segment of a Business, and Extraordinary, Unusual and Infrequently Occurring Events and Transactions".

*Recent Accounting Pronouncements* –In May 2003, the FASB issued SFAS No. 150, "Accounting for Certain Financial Instruments with Characteristics of both Liabilities and Equity." SFAS No. 150 establishes standards for how an issuer classifies and measures in its balance sheet certain financial instruments with characteristics of both liabilities and equity. It became effective for us in the second quarter of 2004, but, because we have no instruments falling under the provisions of SFAS No. 150, it did not have an impact on our consolidated financial statements.

## 3. Earnings Per Share

For purposes of calculating basic and diluted earnings per share, we used the following weighted average common shares outstanding:

|  | 2004 | 2003 | 2002 |
|---|---|---|---|
| Basic | 68,621,145 | 70,621,898 | 72,861,797 |
| Diluted | 69,035,634 | 70,623,129 | 72,865,624 |
| Dilutive effect of outstanding options | 86,218 | 1,231 | 3,827 |
| Dilutive effect of restricted stock units | 328,271 | — | — |
| Anti–dilutive outstanding options, end of period | 2,025,125 | 6,869,450 | 5,306,750 |

## 4. Intangible Assets

In fiscal 2004 we acquired certain film libraries for approximately $1,710. In addition, in fiscal 2003, we acquired a film library and certain other assets for $3,000. We have classified these costs as intangible assets and amortized them over three years, which is the period of the expected revenues to be derived from the film libraries. In March 2001, we acquired substantially all of the intellectual property and certain other assets of WCW, another wrestling organization, including trademarks, trade names, their film library and other intangible assets, for $2,500. The purchase price of these assets was assigned to the trademarks and trade names, and is being amortized over six years, which is the period of the expected revenues to be derived from these assets.

|  | April 30, 2004 | | |
|---|---|---|---|
|  | Gross Carrying Amount | Accumulated Amortization | Net Carrying Amount |
| Film libraries | $ 4,710 | $ (1,423) | $ 3,287 |
| Trademarks and trade names | 2,500 | (1,295) | 1,205 |
|  | $ 7,210 | $ (2,718) | $ 4,492 |

F–11

WORLD WRESTLING ENTERTAINMENT, INC.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
(dollars in thousands, except share and per share data)

| | April 30, 2003 | | |
| | | Accumulated Amortization | Net Carrying Amount |
|---|---|---|---|
| Film libraries | $ 3,000 | $ — | $ 3,000 |
| Trademarks and trade names | 2,500 | (875) | 1,625 |
| | $ 5,500 | $ (875) | $ 4,625 |

Amortization expense recorded for the years ended April 30, 2004, 2003 and 2002 was $1,843, $420 and $420, respectively.

The following table presents estimated future amortization expense:

| | |
|---|---|
| For the year ending April 30, 2005 | $ 1,986 |
| For the year ending April 30, 2006 | 1,986 |
| For the year ending April 30, 2007 | 520 |
| Total | $ 4,492 |

**5. Investments**

Short-term investments consisted of the following:

| | April 30, 2004 | | |
| | Amortized Cost | Unrealized Holding Gain (Loss) | Fair Value |
|---|---|---|---|
| Fixed income mutual funds and other | $ 180,259 | $ (1,627) | $ 178,632 |
| United States Treasury Notes | $ 46,192 | — | 46,192 |
| Total | $ 226,451 | $ (1,627) | $ 224,824 |

The unrealized holding loss of $1,627 at April 30, 2004 consisted of gross losses of $1,894 and gains of $267. The securities with unrealized losses consisted primarily of fixed income mutual funds, with a total fair value of approximately $151,515. The unrealized loss is due to changes in interest rates after the purchase of the investment. None of these securities have been in an unrealized loss position for more than one year.

| | April 30, 2003 | | |
| | Cost | Unrealized Holding Gain | Fair Value |
|---|---|---|---|
| Government obligations | $ 63,755 | $ — | $ 63,755 |
| Fixed income mutual funds | 40,027 | 148 | 40,175 |
| Corporate obligations and other | 38,711 | — | 38,711 |
| Total | $ 142,493 | $ 148 | $ 142,641 |

F-12

WORLD WRESTLING ENTERTAINMENT, INC.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
(dollars in thousands, except share and per share data)

In fiscal 2003, we recorded to other income, an impairment charge of approximately $613 related to certain stock we held.

In addition to the short-term investments included above, during fiscal 2001 we received warrants from three publicly traded companies with whom we had licensing agreements. The estimated fair value of the warrants on the date of receipt aggregated approximately $5,237, and was included in other assets. In connection with the adoption of SFAS No. 133 in fiscal 2002, we recorded a cumulative effect adjustment of $1,487, net of taxes, as a result of adjusting these warrants to their fair values. The warrants received from two of these publicly traded companies were then exercised and the related stock was sold in fiscal 2002, generating a net gain of $6,757.

During fiscal 2004, we received additional warrants from two of these publicly traded companies. These warrants were initially recorded in other assets at their fair market value of $1,638 on the date received using the Black-Scholes options pricing model with offsetting deferred revenues. This deferred revenue is amortized into operating income over the life of the respective underlying licensing agreements using the straight line method. We have recorded approximately $671 in mark to market adjustments using the Black-Scholes model, taking into account the most current market assumptions. This amount was included in other income for the year ended April 30, 2004.

We also received warrants during fiscal 2001 from another publicly traded company with whom we had a television programming distribution agreement. The estimated fair value of these warrants on the date of receipt was approximately $2,884, and was included in other assets. These warrants were treated in a different manner due to the volume of stock that we could acquire under the warrants, if exercised, as compared to the total shares of common stock outstanding of this company. This prevented us from being able to readily convert the warrant to cash and accordingly the warrants were not considered derivatives. Therefore, any fair value adjustments were recorded through equity as a component of other comprehensive income. In fiscal 2002, it became clear that the continuing decline in the market value of the common stock of this company would not reverse. This, coupled with the shortened window to exercise, caused management to make a determination that these warrants were other-than-temporarily impaired and, accordingly, we wrote the balance down to zero, resulting in a charge of $2,884, which was included in other (loss) income. These warrants expired unexercised in February, 2003.

## 6. Property and Equipment

Property and equipment consisted of the following:

|  | 2004 | 2003 |
|---|---|---|
| Land, buildings and improvements | $ 50,941 | $ 51,051 |
| Equipment | 39,398 | 40,332 |
| Corporate aircraft | 20,710 | |
| Vehicles | 639 | 639 |
| Property under capital lease | | 1,515 |
| | $ 111,688 | $ 93,537 |
| Less accumulated depreciation and amortization | 40,319 | 34,212 |
| Total | $ 71,369 | $ 59,325 |

In January 2004, we paid $20,100 to an unrelated, third party lessor to pay off a lease on our corporate aircraft. The aircraft was acquired under an operating lease in 2000. The transaction was accounted for as a capital acquisition in fiscal 2004. The purchase price of the aircraft, net of a $9,500 estimated residual value, will be depreciated on a straight-line basis over a 10 year period.

F-13

WORLD WRESTLING ENTERTAINMENT, INC.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
(dollars in thousands, except share and per share data)

**7. Accrued Expenses and Other Liabilities**

Accrued expenses and other liabilities consisted of the following:

|  | 2004 | 2003 |
|---|---|---|
| Accrued pay-per-view event costs | $ 5,884 | $ 5,580 |
| Accrued legal settlement offers | 783 | 3,750 |
| Accrued income taxes | 16,204 | 5,173 |
| Accrued talent royalties | 302 | 759 |
| Accrued payroll related costs | 8,457 | 2,359 |
| Accrued television costs | 438 | 3,364 |
| Accrued legal and professional fees | 2,090 | 2,430 |
| Accrued home video production and distribution | 2,168 | 974 |
| Accrued publishing print and distribution | 520 | 1,140 |
| Accrued other | 5,285 | 8,974 |
| Total | $ 42,131 | $ 34,503 |

**8. Debt**

Debt as of April 30, 2004 and 2003 consisted of the following:

|  | 2004 | 2003 |
|---|---|---|
| Mortgage loan agreement | $ 8,655 | $ 9,302 |
| Obligation under capital lease | — | 601 |
|  | 8,655 | 9,903 |
| Less current portion | 700 | 777 |
| Long-term debt | $ 7,955 | $ 9,126 |

In 1997, we entered into a mortgage loan agreement under which we borrowed $12,000 at an annual interest rate of 7.6%. Principal and interest are to be paid in 180 monthly installments of approximately $112. The loan is collateralized by our executive offices and television studio in Stamford, Connecticut. Interest expense for this loan was $767, $783 and $784 for 2004, 2003 and 2002, respectively.

In July 2002, we entered into a capital lease arrangement related to certain computer equipment. In fiscal 2004, when the net carrying amount of the obligation was $495, we paid off the remaining balance from available cash.

As of April 30, 2004, the scheduled principal repayments under our debt obligations were as follows:

|  |  |
|---|---|
| For the year ended April 30, 2005 | $ 700 |
| For the year ended April 30, 2006 | 756 |
| For the year ended April 30, 2007 | 817 |
| For the year ended April 30, 2008 | 881 |
| For the year ended April 30, 2009 | 952 |
| Thereafter | 4,549 |
| Total | $ 8,655 |

F-14

WORLD WRESTLING ENTERTAINMENT, INC.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
(dollars in thousands, except share and per share data)

**9. Income Taxes**

For fiscal 2004, 2003 and 2002, we were taxed on our income from continuing operations at an effective tax rate of 38.0%, 40.2% and 36.9%, respectively.  Our income tax provision related to our income from continuing operations for fiscal 2004, 2003 and 2002 was $30,421, $10,836 and $22,020, respectively, and included federal, state and foreign taxes.

The components of our tax provision from continuing operations were as follows:

|  | 2004 | 2003 | 2002 |
|---|---|---|---|
| Current: | | | |
| Federal | $ 19,541 | $ 5,990 | $ 21,456 |
| State and local | 3,133 | 1,057 | 3,129 |
| Foreign | 2,642 | 2,299 | 1,801 |
| Deferred: | | | |
| Federal | 4,503 | 1,290 | (3,802) |
| State and local | 620 | 182 | (580) |
| Foreign | (18) | 18 | 16 |
| Total | $ 30,421 | $ 10,836 | $ 22,020 |

The income tax provision allocated to continuing operations, discontinued operations and cumulative effect of change in accounting principle were as follows:

|  | 2004 | 2003 | 2002 |
|---|---|---|---|
| Provision for income taxes – continuing operations | $ 30,421 | $ 10,836 | $ 22,020 |
| Benefit for income taxes – discontinued operations | (722) | (19,616) | (5,923) |
| Provision for income taxes – cumulative effect of change in accounting principle | — | — | 911 |
| Total allocated provision (benefit) for income taxes | $ 29,699 | $ (8,780) | $ 17,008 |

The following sets forth the difference between the provision for income taxes from continuing operations computed at the U.S. federal statutory income tax rate of 35% and that reported for financial statement purposes:

F–15

WORLD WRESTLING ENTERTAINMENT, INC.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
(dollars in thousands, except share and per share data)

| | 2004 | 2003 | 2002 |
|---|---|---|---|
| Statutory U.S. federal tax at 35% | $ 27,998 | $ 9,428 | $ 20,907 |
| State and local taxes, net of federal benefit | 2,439 | (545) | 1,792 |
| Foreign rate differential | 261 | 112 | 136 |
| Valuation allowance | (162) | 2,025 | — |
| Other | (115) | (184) | (815) |
| Provision for income taxes | $ 30,421 | $ 10,836 | $ 22,020 |

The state tax benefit for 2003 is comprised of state and local taxes, net of federal benefits, reduced by the reversal of a tax reserve established in prior year. The tax reserve is no longer necessary due to the conclusion of various state examinations.

The tax effects of temporary differences that give rise to significant portions of the deferred tax assets and deferred tax liabilities of continuing operations consisted of the following:

| | 2004 | 2003 |
|---|---|---|
| Deferred tax assets: | | |
| Accounts receivable | $ 1,100 | $ 2,759 |
| Inventories | 498 | 464 |
| Prepaid royalties | 3,935 | 3,479 |
| Stock options/stock compensation | 4,442 | 4,286 |
| Investments | 4,450 | 3,736 |
| Intangible assets | 3,112 | 3,609 |
| Accrued liabilities and reserves | 1,471 | 4,516 |
| Foreign | 65 | 47 |
| Deferred tax assets, gross | 19,073 | 22,896 |
| Valuation allowance | (2,275) | (2,437) |
| Deferred tax assets, net | 16,798 | 20,459 |
| Deferred tax liabilities: | | |
| Fixed assets and depreciation | 5,891 | 4,465 |
| Deferred tax liabilities, net | 5,891 | 4,465 |
| Total deferred tax assets, net | $ 10,907 | $ 15,994 |

The temporary differences described above represent differences between the tax basis of assets or liabilities and amounts reported in the consolidated financial statements that will result in taxable or deductible amounts in future years when the reported amounts of the assets or liabilities are recovered or settled. As of April 30, 2004 and 2003, $7,003 and $11,194, respectively, of the net deferred tax assets are included in prepaid expenses and other current assets and the remaining $3,904 and $4,800, respectively, are included in other non–current assets in our consolidated balance sheets.

As of April 30, 2004, and April 30, 2003 we had valuation allowances of $2,275 and $2,437, respectively to reduce our deferred tax assets to an amount more likely than not to be recovered. The valuation allowance is primarily related to the deferred tax asset arising from losses on investments which are capital in nature for which realization is uncertain. A majority of these capital loss carry forwards expire in 2008.

We have approximately $30,362 in state and local net operating losses which begin to expire in 2023. These net operating losses were incurred in discontinued operations and, as such, the deferred tax asset related to this net operating loss carryforward is included in the assets of discontinued operations on the consolidated balance sheets. A full valuation allowance in the amount of $2,638 is recorded against these net operating loss carryforwards to reduce the asset to zero as management does not believe the tax benefit is more likely than not to be realized.

WORLD WRESTLING ENTERTAINMENT, INC.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
(dollars in thousands, except share and per share data)

U.S. income taxes have not been provided on unremitted earnings of our foreign subsidiary, because our intent is to keep such earnings indefinitely reinvested in the foreign subsidiary's operations.

## 10. Commitments and Contingencies

We have certain commitments, including various non-cancelable operating leases, performance contracts with various performers, employment agreements with certain executive officers, advertising commitments and an agreement with Viacom which guarantee a minimum payment for advertising during the term.

Future minimum payments as of April 30, 2004 under the agreements described above were as follows:

|  | Operating Lease Commitments | Other Commitments | Total |
|---|---|---|---|
| For the year ending April 30, 2005 | $ 1,283 | $ 23,678 | $ 24,961 |
| For the year ending April 30, 2006 | 1,168 | 10,947 | 12,115 |
| For the year ending April 30, 2007 | 723 | 4,725 | 5,448 |
| For the year ending April 30, 2008 | 632 | 882 | 1,514 |
| For the year ending April 30, 2009 | 128 | 952 | 1,080 |
| Thereafter | — | 4,549 | 4,549 |
| Total | $ 3,934 | $ 45,733 | $ 49,667 |

Rent expense under operating leases from continuing operations was approximately $1,906, $2,402 and $2,228 for 2004, 2003 and 2002, respectively.

In addition, we have an operating lease for space in New York City that is currently unoccupied which was related to our former entertainment complex, *The World*. We are currently seeking a sub-tenant. The total payments remaining on the lease are approximately $43,795 as of April 30, 2004, which were accrued as a liability at the shutdown date. However, in accordance with SFAS No. 146, we have reduced this accrual by our current estimate for sub-tenant rental income of approximately 75% of the remaining payments on the lease (see Note 16).

### *Legal Proceedings*

#### *World Wide Fund for Nature*

In April 2000, the World Wide Fund for Nature and its American affiliate, the World Wildlife Fund (collectively, the "Fund") instituted legal proceedings against us in the English High Court seeking injunctive relief and unspecified damages for alleged breaches of a 1994 agreement between the Fund and us regarding the use of the initials "wwf". In August 2001, the trial judge granted the Fund's motion for summary judgment, holding that we breached the agreement by using the initials "wwf" in connection with certain of our website addresses and our former scratch logo. The English Court of Appeals subsequently upheld that ruling. Since November 10, 2002, we have been subject to an injunction barring us, either on our own or through our officers, servants, agents, subsidiaries, licensees or sublicensees, our television or other affiliates or otherwise, from most uses of the initials "wwf," including in connection with the "wwf" website addresses and the use of our former scratch logo.

We have complied with the injunction and have taken a number of significant steps that go beyond the literal requirements of the injunction, including, among other things, changing our corporate name to World Wrestling Entertainment, Inc. and initials to "WWE." However, the elimination of certain historical uses of our former scratch logo, including, specifically, WWE's archival video footage containing the scratch logo during the period 1998–May 2002 and the scratch logo embedded in programming code of WWE-licensed video games created during the period 1999–2001 is, as a practical matter, not possible. On an application for relief by our videogame licensee, THQ/Jakks Pacific LLC ("THQ/Jakks"), the English Court of Appeals ruled, overturning the lower court's decision, that THQ/Jakks' marketing and sale of games with embedded references to the initials "wwf" would not violate the injunction and would not constitute contempt of court by either THQ/Jakks or us.

As part of its original complaint, the Fund included a damages claim associated with our use of the initials

F-17

WORLD WRESTLING ENTERTAINMENT, INC.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
(dollars in thousands, except share and per share data)

"wwf." Although the Fund has never initiated any proceedings or presented any evidence before the court in this regard, the Fund has claimed in correspondence that at least $360 million would be required to fund a multi−year media advertising campaign to remedy the Fund's alleged loss of recognition/exclusivity as a result of our use of the initials "wwf." In that correspondence, the Fund, through its Legal Advisor, demanded a payment of $90 million prior to the injunction compliance date to settle its alleged damages claims and resolve all remaining issues. We vigorously rejected the Fund's demand and contend that the Fund's tactics were a bad faith attempt to coerce us into an unwarranted cash payment. We strongly dispute that the Fund has suffered any such damages and indeed despite repeated requests, the Fund has never provided us with any documentation or evidence in support of its alleged damages claim. No hearings have been scheduled on the Fund's damages claim. We cannot quantify the potential impact that an unfavorable outcome of the Fund's damages claim, if such a claim ever were to be presented, could have on our financial condition, results of operations or liquidity; however based solely on the Fund's unsubstantiated out−of−court assertions, it could be material.

*Shenker & Associates*

On November 14, 2000, Stanley Shenker & Associates, Inc. ("SSAI") filed a complaint against us in Superior Court, Judicial District of Stamford/Norwalk, Connecticut, relating to the termination of an agency agreement between us and plaintiff. Plaintiff sought compensatory damages and punitive damages in an unspecified amount, attorneys' fees, an accounting and a declaratory judgment.

In May 2003, we filed a motion for sanctions asserting significant litigation misconduct by the plaintiff, including giving perjured testimony and fabricating evidence, and seeking, among other things, dismissal of all claims against us and a default judgment on our counterclaims for tortious interference with business relations, conversion, fraud and conspiracy in connection with the Plaintiff's solicitation and receipt of improper payments from various of our licensees. In October 2003, the court issued a comprehensive opinion and order, dismissing plaintiff's case against us with prejudice and entering a default judgment in our favor on all of our counterclaims. In November 2003, the plaintiff filed a motion to reconsider the court's order, which was denied. SSAI filed a renewed motion for reconsideration which was also denied. As a result of, among other things, these developments, in the fourth quarter of fiscal 2004 we reversed an expense accrued for commissions in the amount of approximately $7.9 million. A damages hearing on our counterclaims has been scheduled for September 2004. Pursuant to the court's request, we have filed a report on the discovery we need to prove the damages associated with our counterclaims.

On February 14, 2003, we filed a complaint against one of our former officers, and certain entities related to him, with respect to irregularities in the licensing program during his tenure with us, which came to light as a result of discovery in the Shenker litigation. That lawsuit has been consolidated with the Shenker litigation. In March 2004, we filed a motion for summary judgment on all of our claims, which is pending before the court. We also have filed a motion for sanctions based on the former officer's discovery misconduct, seeking a default judgment on our claims.

In December 2003, the parties entered into a stipulation regarding our application for prejudgment remedies, permitting us to attach assets up to $5.0 million against SSAI and up to $850,000 against the former officer and certain related entities (this latter amount was subsequently raised to $4.0 million). In January 2004, we began attaching assets. Based on the violation of the consent order regarding prejudgment remedies, we moved for contempt against the former officer and his associate.

We believe that the decision against SSAI was correct and that this litigation will have no material adverse effect on our financial condition or results of operations. However, the decision is subject to appeal and as a result, no assurances can be given in this regard.

*Marvel Enterprises*

In October 2001, we were served with a complaint by Marvel Enterprises, Inc. in the Superior Court of Fulton County, Georgia alleging that we breached the terms of a license agreement regarding the rights to manufacture and distribute toy action figures of various wrestling characters, assumed in the acquisition of certain assets of World Championship Wrestling, Inc. ("WCW") by one of our subsidiary corporations. The plaintiff seeks damages and a declaration that the agreement is in force and effect. Universal Wrestling Corp. ("Universal"), the successor−in−interest to WCW, was sued in a separate lawsuit, which has been consolidated with the lawsuit against us for discovery and trial. We are defending Universal in connection with these claims. In May 2003, we filed a

F−18

WORLD WRESTLING ENTERTAINMENT, INC.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
(dollars in thousands, except share and per share data)

motion for summary judgment on all claims. Universal similarly filed a motion for summary judgment on all claims. In July 2003, the court granted our summary judgment motion in its entirety and dismissed all claims against the Company, and the court granted in part and denied in part Universal's summary judgment motion. Marvel has appealed the decisions, and Universal has appealed the denial in part of its summary judgment motion. While we believe the court's decision to dismiss the claims against us was correct, we are unable to predict the likelihood of success of Marvel's appeal. In light of the summary judgment rulings, we do not believe that an unfavorable outcome of the remaining claims against Universal would have a material adverse effect on our financial condition or results of operations; however, no assurances can be given in this regard.

*IPO Class Action*

In December 2001, a purported class action complaint was filed against us asserting claims for alleged violations of the federal securities laws relating to our initial public offering in 1999. Also named as defendants in this suit were Vincent K. McMahon, Linda E. McMahon and August J. Liguori (collectively, the "Individual Defendants") and the underwriters of our initial public offering. According to the allegations of the Complaint, the Underwriter Defendants allegedly engaged in manipulative practices by, among other things, pre−selling allotments of shares of the Company's stock in return for undisclosed, excessive commissions from the purchasers and/or entering into after−market tie−in arrangements which allegedly artificially inflated the Company's stock price. The plaintiff further alleges that the Company knew or should have known of such unlawful practices. This litigation has been consolidated in the United States District Court for the Southern District of New York with claims against approximately 300 other companies that had initial public offerings during the same general time period.

The class plaintiffs and the issuer defendants, including the Individual Defendants and the Company, have reached an agreement in principle for the settlement of all claims. This settlement, if consummated, is not anticipated to have a material adverse effect on our financial condition or results of operation. While the Company strongly denies all allegations, in June 2004, the Company and the Individual Defendants executed the settlement agreement, subject to approval of the settlement by the Company's primary insurer. It is the Company's understanding that the significant majority of issuer defendants have executed the settlement agreement as well. The Company expects the settlement process will move forward; however, no assurances can be given in this regard.

We are not currently a party to any other material legal proceedings. However, we are involved in several other suits and claims in the ordinary course of business, and we may from time to time become a party to other legal proceedings. The ultimate outcome of these other matters is not expected to have a material adverse effect on our financial condition or results of operations.

## 11. Stockholders' Equity

Our Class B common stock is fully convertible into Class A common stock, on a one for one basis, at any time at the option of the holder. The two classes are entitled to equal per share dividends and distributions and vote together as a class with each share of Class B entitled to ten votes and each share of Class A entitled to one vote, except when separate class voting is required by applicable law. If, at any time, any shares of Class B common stock are beneficially owned by any person other than Vincent McMahon, Linda McMahon, any descendant of either of them, any entity which is wholly owned and is controlled by any combination of such persons or any trust, all the beneficiaries of which are any combination of such persons, each of those shares will automatically convert into shares of Class A common stock. Through his beneficial ownership of a substantial majority of our Class B common stock, our controlling stockholder, Vincent McMahon, can effectively exercise control over our affairs, and his interests could conflict with the holders of our Class A common stock.

In June 2003, we purchased approximately 2.0 million shares of our common stock from Viacom, Inc. for approximately $19,246, which was a slight discount to the then market value of our common stock. This transaction did not affect other aspects of our business relationship with Viacom.

We provide a stock purchase plan for our employees. Under the plan, any regular full−time employee may contribute up to 10% of their base compensation (subject to certain income limits) to the semi−annual purchase of shares of our common stock. The purchase price is 85% of the fair market value at certain plan−defined dates. At April 30, 2004, approximately 76 employees were participants in the plan. In fiscal 2004, employee participants purchased approximately 21,402 shares of our common stock under the plan at an average per share of $7.74.

F−19

WORLD WRESTLING ENTERTAINMENT, INC.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
(dollars in thousands, except share and per share data)

The 1999 Long−Term Incentive Plan ("LTIP") provides for grants of options as incentives and rewards to encourage employees, directors, consultants and performers in our long−term success. The LTIP provides for grants of options to purchase shares at a purchase price equal to the fair market value on the date of the grant. The options expire 10 years after the date of the grant and are generally exercisable in installments beginning one year from the date of the grant. The LTIP also provides for the grant of other forms of equity−based incentive awards as determined by the compensation committee of the board of directors.

In June 2003, we granted 178,000 restricted stock units at $9.60 per share.  Total compensation costs related to the grant of restricted stock units based on the estimated value of the units on the grant date is $1.7 million. Although originally scheduled to be amortized over the seven year vesting period, a provision of the grant stipulated that if EBITDA of $65.0 million was achieved in any fiscal year during the vesting period, the unvested restricted stock units would immediately vest and, accordingly, the unamortized balance at that date would be expensed.  Because our EBITDA exceeded $65.0 million in fiscal 2004, we recorded the entire $1.7 million charge in fiscal 2004. EBITDA is a measure of our operating performance, and is defined in the LTIP as earnings from continuing operations before interest, taxes, depreciation, and amortization.

In January 2004, we completed an exchange offer that gave all active employees and independent contractors who held stock options with a grant price of $17 or higher the ability to exchange their options, at a 6 to 1 ratio, for restricted stock units, or, for holders with fewer than 25,000 options, for cash at 75% of the average price of $13.28 per share, during the offering period.  Overall, 4.2 million options were eligible for the offer, of which 4.1 million were exchanged for either cash or restricted stock units.  In exchange for the options tendered, we granted an aggregate of 591,416 restricted stock units and made cash payments in the aggregate amount of approximately $0.9 million, which will result in a total compensation charge of approximately $6.7 million, of which the cash payment of $0.8 million to employees was recorded in fiscal 2004, and the portion related to the grant of the restricted stock units to employees will be recorded over the units' 24 month vesting period.  As a result, $2.0 million of the compensation charge related to the option exchange program was recorded in fiscal 2004 and the remaining will be recorded as follows: approximately $3.6 million in fiscal 2005 and approximately $1.1 million in fiscal 2006.

Presented below is a summary of the LTIP's activity for each of the three years ended April 30, 2004.

| | Options | | Weighted Average Exercise Price |
|---|---|---|---|
| Options outstanding at May 1, 2001 | 6,670,700 | $ | 16.36 |
| Options granted | 5,000 | $ | 13.82 |
| Options canceled | (390,100) | $ | 16.20 |
| Options exercised | (32,000) | $ | 12.94 |
| Options outstanding at April 30, 2002 | 6,253,600 | $ | 16.40 |
| Options granted | 1,219,000 | $ | 13.02 |
| Options canceled | (476,900) | $ | 15.44 |
| Options exercised | (31,250) | $ | 12.94 |
| Options outstanding at April 30, 2003 | 6,964,450 | $ | 15.89 |
| Options granted | 852,500 | $ | 9.63 |
| Options canceled | (4,837,775) | $ | 16.89 |
| Options exercised | (23,550) | $ | 12.94 |
| Options outstanding at April 30, 2004 | 2,955,625 | | |
| Restricted stock units outstanding | 770,848 | | |
| Available for future grants at April 30, 2004 | 6,036,777 | | |

The number of options exercisable as of April 30, 2004, 2003 and 2002 was 1,184,644, 5,021,600 and 3,618,735, respectively. The following table summarizes information for options outstanding and exercisable as of April 30, 2004:

F−20

WORLD WRESTLING ENTERTAINMENT, INC.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
(dollars in thousands, except share and per share data)

| Range of Exercise Prices | Number of Options Outstanding | Weighted Average Remaining Life | Weighted Average Exercise Price | Number of Options Exercisable | Weighted Average Exercise Price |
|---|---|---|---|---|---|
| $7.66 – $17.00 | 2,955,625 | 6.2 years | $12.47 | 1,184,644 | $14.11 |

## 12. Employee Benefit Plans

We sponsor a 401(k) defined contribution plan covering substantially all employees. Under this plan, participants are allowed to make contributions based on a percentage of their salaries, subject to a statutorily prescribed annual limit. We make matching contributions of 50 percent of each participant's contributions, up to 6% of eligible compensation (maximum 3% matching contribution). We may also make additional discretionary contributions to the 401(k) plan. Our expense for matching contributions and additional discretionary contributions to the 401(k) plan was $1,217, $840 and $865, during 2004, 2003 and 2002, respectively.

## 13. Segment Information

Our continuing operations are conducted within two reportable segments, live and televised entertainment and branded merchandise. Our live and televised entertainment segment consists of live events and television programming. Our branded merchandise segment includes consumer products sold through third party licensees and the marketing and sale of merchandise, magazines and home videos. The results of operations for *The World* and for the XFL are not included in the segment reporting as they are classified separately as discontinued operations in our consolidated financial statements (See Note 16). We do not allocate corporate overhead to each of the segments and as a result, corporate overhead is a reconciling item in the table below. There are no intersegment revenues.

Revenues derived from sales outside of North America were approximately $63,453, $51,840 and $38,459 for 2004, 2003 and 2002, respectively. The table presents information about the financial results of each segment for 2004, 2003 and 2002 and assets as of April 30, 2004 and 2003. Unallocated assets consist primarily of cash, short-term investments and real property and other investments.

|  | Year Ended April 30 | | |
|---|---|---|---|
|  | 2004 | 2003 | 2002 |
| **Net revenues:** |  |  |  |
| Live and televised entertainment | $ 296,088 | $ 295,432 | $ 323,458 |
| Branded merchandise | 78,821 | 78,832 | 86,164 |
| Total net revenues | $ 374,909 | $ 374,264 | $ 409,622 |
| **Depreciation and amortization:** |  |  |  |
| Live and televised entertainment | $ 4,415 | $ 3,709 | $ 3,205 |
| Branded merchandise | 2,729 | 2,062 | 458 |
| Corporate | 5,219 | 5,194 | 7,389 |
| Total depreciation and amortization | $ 12,363 | $ 10,965 | $ 10,594 |
| **Operating income:** |  |  |  |
| Live and televised entertainment | $ 108,919 | $ 88,266 | $ 113,924 |
| Branded merchandise | 33,830 | 23,362 | 20,829 |
| Corporate | (69,169) | (85,021) | (90,040) |
| Total operating income | $ 73,580 | $ 26,607 | $ 44,713 |

F–21

WORLD WRESTLING ENTERTAINMENT, INC.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
(dollars in thousands, except share and per share data)

|  | At April 30 | |
|  | 2004 | 2003 |
|---|---|---|
| Assets: | | |
| Live and televised entertainment | $ 78,162 | $ 73,727 |
| Branded merchandise | 17,437 | 17,395 |
| Unallocated (1) | 358,745 | 341,041 |
| Total assets | $ 454,344 | $ 432,163 |

(1) Includes assets of discontinued operations of $21,408 and $21,129 as of April 30, 2004 and 2003, respectively.

### 14.  Financial Instruments and Off–Balance Sheet Risk

*Concentration of Credit Risk* — Financial instruments which potentially subject us to concentrations of credit risk are principally bank deposits, short–term investments and accounts receivable. Cash and cash equivalents are deposited with high credit quality financial institutions. Short–term investments primarily consist of AAA or AA rated instruments. Except for receivables from cable companies related to pay–per–view events, concentrations of credit risk with respect to trade receivables are limited due to the large number of customers. A significant portion of trade receivables for pay–per–view events is received from our pay–per–view administrator, who collects and remits payments to us from individual cable system operators. We perform ongoing evaluations of our customers' financial condition, including our pay–per–view administrator, and we monitor our exposure for credit losses and maintain allowances for anticipated losses.

*Fair Value of Financial Instruments* — The carrying amounts of cash, cash equivalents, money market accounts, accounts receivable and accounts payable approximate fair value because of the short–term nature, and maturity of such instruments. Our short–term investments are carried at quoted market rates. Our debt primarily consists of the mortgage related to our corporate headquarters, which has an annual interest rate of 7.6%. The fair value of this debt is not significantly different from its carrying amount.

### 15.  Quarterly Financial Summaries (unaudited)

|  | 1st Quarter | 2nd Quarter | 3rd Quarter | 4th Quarter |
|---|---|---|---|---|
| **2004** | | | | |
| Net revenues | $ 74,675 | $ 94,431 | $ 79,070 | $ 126,733 |
| Gross profit | $ 25,414 | $ 42,204 | $ 35,015 | $ 65,155 |
| Income from continuing operations | $ 2,743 | $ 16,819 | $ 8,863 | $ 21,148 |
| Loss from discontinued operations (1) | $ (158) | $ 266 | $ (76) | $ (1,413) |
| Net income | $ 2,585 | $ 17,085 | $ 8,787 | $ 19,735 |
| Earnings (loss) per common share: basic | | | | |
| Continuing operations | $ 0.04 | $ 0.25 | $ 0.13 | $ 0.31 |
| Discontinued operations (1) | $ 0.00 | $ 0.00 | $ 0.00 | $ (0.02) |
| Net income | $ 0.04 | $ 0.25 | $ 0.13 | $ 0.29 |
| Earnings (loss) per common share: diluted | | | | |
| Continuing operations | $ 0.04 | $ 0.25 | $ 0.13 | $ 0.30 |
| Discontinued operations (1) | $ 0.00 | $ 0.00 | $ 0.00 | $ (0.02) |
| Net income | $ 0.04 | $ 0.25 | $ 0.13 | $ 0.28 |
| **2003** | | | | |
| Net revenues | $ 85,449 | $ 90,323 | $ 92,565 | $ 105,927 |
| Gross profit | $ 28,831 | $ 28,151 | $ 35,854 | $ 44,085 |
| Income from continuing operations | $ 3,790 | $ 195 | $ 5,923 | $ 6,194 |
| Loss from discontinued operations (1) | $ (1,327) | $ (1,863) | $ (21,988) | $ (10,379) |
| Net income (loss) | $ 2,463 | $ (1,668) | $ (16,065) | $ (4,185) |
| Earnings (loss) per common share: basic and diluted | | | | |
| Continuing operations | $ 0.05 | $ 0.00 | $ 0.08 | $ 0.09 |
| Discontinued operations (1) | $ (0.02) | $ (0.03) | $ (0.31) | $ (0.15) |
| Net income (loss) | $ 0.03 | $ (0.02) | $ (0.23) | $ (0.06) |

(1) Our discontinued operations include an after–tax impairment charge of $20,413 recorded in the third quarter of 2003 and after–tax charges related to the shutdown of *The World* of $8,866 recorded in the fourth quarter of 2003 (see Note 16).

WORLD WRESTLING ENTERTAINMENT, INC.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
(dollars in thousands, except share and per share data)

**16. Discontinued Operations**

In fiscal 2003, we recorded estimated shutdown costs of approximately $12,100, or $8,900 after tax, in connection with the closing of our operations of *The World*. The following is a listing of the major components included in the $12,100 charge:

| | |
|---|---:|
| Rent expense and other related costs | $ 9,900 |
| Severance and other related costs | 1,100 |
| Impairment of fixed assets | 1,000 |
| Inventory reserves | 100 |
| Total | $ 12,100 |

The costs associated with these disposal activities have been classified in discontinued operations in our Consolidated Statements of Operations for the year ended April 30, 2003.

*Rent expense and other related costs*—In determining the shut–down costs for the rent expense associated with the lease of *The World*, we followed the guidance established in paragraph 16 of SFAS 146. We closed the restaurant in February 2003 and the retail store in April 2003. By April 30, 2003, we had physically vacated the premises, with no intention to reoccupy, and began to show the space to potential sub–lease tenants in early fiscal 2004. Accordingly, no future economic benefit will be received by us from this operation. In calculating our accrual for the costs that will continue to be incurred under this contract through its October, 2017 term, we assumed no sub–let income in fiscal 2004 and assumed sub–let income of 75% of the lease payments beginning in fiscal year 2005. Based upon discussions with real estate brokers in New York City and a real estate appraiser engaged by us, it was determined to be probable that the property would not be rented within fiscal 2004. Factors include the large space of the facility, its unique Times Square location, the then remaining term of the lease (15 years) and the expected time needed to re–fit the space by any potential new tenant.

We analyzed broker fees incurred for similar type properties with multi–year leases in New York City in order to quantify the expected broker fee for the sublease of *The World*, and subsequently recorded as of April 30, 2003, approximately $900, which is included in the caption Rent expense and other related costs above.

*Severance and other related costs*– *The World's* employees were involuntarily terminated. The termination payments made to them were not contingent upon any future service. In accordance with paragraphs 8 and 9 of SFAS No. 146, we expensed the $1,100 of estimated payments, of which approximately $700 had been paid as of April 30, 2003.

*Impairment of fixed assets*– The $1,000 fixed assets impairment charge included in shut–down costs represented the remaining net book value of the assets at *The World* which were deemed to have no value.

*Inventory Reserves*– We also recorded a $100 charge related to the write–off of the remaining miscellaneous inventory used in the operation of *The World*.

Included in the loss from discontinued operations for 2003 was an impairment charge of $32,925 as a result of an impairment test conducted on goodwill $2,533 and other long–lived assets $30,392 at *The World*. The charge arose from continued operating losses at that facility and was taken in accordance with SFAS No. 142 and SFAS No. 144, respectively. Estimates of the fair values of the long–lived assets at *The World* were determined by an independent, third party appraiser, based on valuation methods, such as cost and fair market value approaches, with the valuation method used based upon the nature of the underlying assets.

In fiscal 2004, we recorded additional shutdown costs of $2,571, or $1,671 after tax, representing the absence of projected sub–rental payments for the first nine months of fiscal 2005, which represents our revised estimate of the expected time necessary to assign or sub–let the remaining lease. In addition, we have also re–classified the deferred tax assets related to *The World* from short–term to long–term based upon our current expectations regarding the expected realization of these deferred tax assets.

The following table presents the activity in the accruals relating to the shutdown of *The World* during the year ended April 30, 2004.

| | Accrued Rent and Other Related Costs | Accrued Severance and Other Related Costs | Total |
|---|---:|---:|---:|
| Balance as of April 30, 2003 | $ 9,900 | $ 400 | $ 10,300 |
| Amounts paid during fiscal year April 30, 2004 | (2,700) | (400) | (3,100) |
| Additional charge recorded in fiscal year April 30, 2004* | 2,100 | | 2,100 |
| Balance as of April 30, 2004 | $ 9,300 | | $ 9,300 |

*Although we are actively seeking to sub–let the property, no tenant has been located to date. The additional charge relates to the modification of our assumptions related to the accrued rent. This accrual and the related assumptions will continue to be monitored and adjusted accordingly.

The results of *The World* business, which has been classified as discontinued operations in the consolidated financial statements, are summarized as follows:

| | 2004 | 2003 | 2002 |
|---|---:|---:|---:|
| Loss from *The World* operations, net of taxes of $16,359 and $3,006 for 2003 and 2002, respectively | $ — | $ (26,691) | $ (4,903) |
| Estimated loss on shutdown of *The World*, net of taxes of $900 and $3,257 for 2004 and 2003, respectively | (1,671) | (8,866) | — |
| Loss from discontinued operations | $ (1,671) | $ (35,557) | $ (4,903) |

| | 2004 | 2003 |
|---|---|---|
| Assets: | | |
| Cash | $ — | $ 586 |
| Accounts receivable | | 5 |
| Income tax receivable | 7,002 | 5,343 |
| Prepaid expenses | 46 | 94 |
| Inventory | 60 | 65 |
| Deferred income taxes, net of valuation allowance of $2,638 and $1,350 for 2004 and 2003, respectively | 13,701 | 14,437 |
| | | |
| Total assets | $ 20,809 | $ 20,530 |
| | | |
| Liabilities: | | |
| Accounts payable | $ 14 | $ 19 |
| Accrued expenses | 9,304 | 10,648 |
| | | |
| Total liabilities | $ 9,318 | $ 10,667 |

F–23

WORLD WRESTLING ENTERTAINMENT, INC.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
(dollars in thousands, except share and per share data)

In early May 2001, we formalized our decision to discontinue operations of the XFL, and accordingly reported XFL operating results and estimated shutdown costs as Discontinued Operations in the Consolidated Statements of Operations for the year ended April 30, 2001. Estimated shutdown costs of approximately $27,000 consisted of fixed asset and other asset impairment charges of approximately $9,600, contractual labor costs of approximately $8,400, workers' compensation and severance costs of approximately $5,400, lease costs of approximately $1,700 and other shutdown related costs of approximately $2,600.

During 2002, as a result of the reversal of shutdown reserves that were no longer required and the recognition of certain tax benefits for which a valuation allowance had been established, we recorded income from discontinued operations of $4,638, net of minority interest and taxes. The remaining shutdown liabilities consist primarily of XFL medical and other shutdown costs.

On June 12, 2000, we sold approximately 2.3 million newly–issued shares of our Class A common stock at $13 per share to NBC, our partner in the XFL, for a total investment of $30,000. As a result of this stock sale, which was at a below–market price, we recorded a deferred cost of $10,673, which was being amortized over 30 month term of the XFL broadcast agreement. As a result of our decision to discontinue operations of the XFL, we wrote off the remaining unamortized deferred cost of $6,974. In May 2002, we repurchased 2.3 million shares of our Class A common stock from NBC for $27,692, which was a discount to the then market value of our common stock. These shares were included in Treasury Stock in our Consolidated Balance Sheet as of April 30, 2003.

The results of the XFL business, which has been classified as discontinued operations in the consolidated financial statements, are summarized as follows:

|  | 2004 | 2003 | 2002 |
|---|---|---|---|
| Estimated income on shutdown of the XFL, net of taxes of $178 and $2,917 for 2004 and 2002, respectively, and minority interest | $ 290 | — | $ 4,638 |
| Income from discontinued operations | $ 290 | | $ 4,638 |

|  | 2004 | 2003 |
|---|---|---|
| Assets: | | |
| Cash | $ 599 | $ 599 |
| Total assets | $ 599 | $ 599 |
| Liabilities: | | |
| Accrued expenses | 238 | 1,175 |
| Minority interest | (180) | (288) |
| Total liabilities | $ 58 | $ 887 |

F–24

WORLD WRESTLING ENTERTAINMENT, INC.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
(dollars in thousands, except share and per share data)

**17. Subsequent Event**

In June 2004, The Vincent K. McMahon Irrevocable Trust dated June 30, 1999 completed the sale of 7,066,644 shares of Class B common stock in a registered public offering. Upon the sale, the shares automatically converted into shares of Class A common stock on a one-for-one basis. The Company did not receive any proceeds from this sale of common stock.

SCHEDULE II — VALUATION AND QUALIFYING ACCOUNTS
(dollars in thousands)

| Description | Balance at Beginning of Period | Additions Charged to Costs and Expenses | Deductions (1) | Balance at End of Period |
|---|---|---|---|---|
| **For the Year Ended April 30, 2004** | | | | |
| Allowance for doubtful accounts | $ 5,284 | $ (2,295) | $ (377) | $ 2,612 |
| Inventory obsolescence reserve | 892 | 1,270 | (1,036) | 1,126 |
| Publishing allowance for newsstand returns | 5,126 | 24,944 | (25,553) | 4,517 |
| Home video allowance for returns | 1,496 | 8,888 | (7,796) | 2,588 |
| Advertising underdelivery | 6,921 | 3,170 | (5,690) | 4,401 |
| **For the Year Ended April 30, 2003** | | | | |
| Allowance for doubtful accounts | $ 2,840 | $ 3,697 | $ (1,253) | $ 5,284 |
| Inventory obsolescence reserve | 2,351 | 797 | (2,256) | 892 |
| Publishing allowance for newsstand returns | 4,178 | 29,327 | (28,379) | 5,126 |
| Home video allowance for returns | 3,150 | 5,366 | (7,020) | 1,496 |
| Advertising underdelivery | 3,935 | 4,813 | (1,827) | 6,921 |
| **For the Year Ended April 30, 2002** | | | | |
| Allowance for doubtful accounts | $ 1,868 | $ 900 | $ 72 | $ 2,840 |
| Inventory obsolescence reserve | 457 | 3,780 | (1,886) | 2,351 |
| Publishing allowance for newsstand returns | 2,428 | 23,093 | (21,343) | 4,178 |
| Home video allowance for returns | 1,200 | 6,187 | (4,237) | 3,150 |
| Advertising underdelivery | 1,750 | 2,957 | (772) | 3,935 |

(1) Deductions are comprised primarily of disposals of obsolete inventory, write-offs of specific bad debts, returns and advertising "make-goods" for underdelivery. When the Company does not deliver the guaranteed rating, additional spots, commonly referred to as 'make-goods' or at times, a cash refund, is given to the customer.

Table of Contents

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

# FORM 10−K/A
Amendment No. 1

**(Mark One)**

☒     **ANNUAL REPORT UNDER SECTION 13 OR 15(d)
OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the Fiscal Year Ended December 31, 2004**

☐     **TRANSITION REPORT UNDER SECTION 13 OR 15(d)
OF THE SECURITIES EXCHANGE ACT OF 1934**

For the transition period from _____ to _____
Commission File Number 0−28104

# JAKKS PACIFIC, INC.
(Name of registrant as specified in its charter)

| | |
|---|---|
| **Delaware** | **95−4527222** |
| **(State or other jurisdiction of** | **(I.R.S. Employer** |
| **incorporation or organization)** | **Identification No.)** |

| | |
|---|---|
| **22619 Pacific Coast Highway** | |
| **Malibu, California** | **90265** |
| **(Address of principal executive offices)** | **(Zip Code)** |

Registrant's telephone number, including area code: (310) 456−7799
Securities registered pursuant to Section 12(b) of the Exchange Act:

| | Name of each exchange |
|---|---|
| **Title of each class** | **on which registered** |
| **None** | |

**Securities registered pursuant to Section 12(g) of the Exchange Act:**
Title of Class
**Common Stock, $.001 par value per share**

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒    No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S−K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10−K or any amendment to this Form 10−K. ☐

Indicate by a check mark whether the registrant is an accelerated filer (as defined in Rule 12b−2 of the Exchange Act).    Yes ☒    No ☐

The aggregate market value of the voting and non−voting common equity (the only such common equity being Common Stock, $.001 par value per share) held by non−affiliates of the registrant (computed by reference to the closing sale price of the Common Stock on March 28, 2005) is $557,486,684.

The number of shares outstanding of the registrant's Common Stock, $.001 par value (being the only class of its common stock) is 26,665,703 (as of March 28, 2005).

**Documents Incorporated by Reference**
None.

**Table of Contents**

## EXPLANATORY NOTE

On May 9, 2005, the Company was notified by Nasdaq that the wording used in Exhibits 31.1 and 31.2 (the "302 Certifications") to the Company's Annual Report on Form 10–K for the fiscal year ended December 31, 2004 (the "2004 10–K") was inaccurate. As such, the Company is hereby amending the 2004 10–K to revise the introductory sentence of Section 4 of each of the 302 Certifications, so that such Section 4 now accurately reflects that the Company's certifying officers are responsible for establishing and maintaining not only disclosure controls and procedures, but also internal control over financial reporting.

The balance of the 2004 10–K remains unchanged.

In its notice, Nasdaq did not state that the Company had failed to satisfy any specific rule or standard for continued listing, yet did state that the Company was obligated to file this Amendment No. 1.

Except for disclosures affected by the revisions to Exhibits 31.1 and 31.2, this Amendment No. 1 speaks as of the original filing date of the 2004 10–K on March 31, 2005, and does not modify or update disclosures in the 2004 10–K to reflect events occurring or items discovered after March 31, 2005. Accordingly, this Amendment No. 1 should be read in conjunction with the Company's filings made with the Securities and Exchange Commission subsequent to March 31, 2005.

---

### JAKKS PACIFIC, INC.
### INDEX TO ANNUAL REPORT ON FORM 10-K
### For the Fiscal Year ended December 31, 2004
### Items in Form 10–K

|  |  | Page |
|---|---|---|
| **PART I** | | |
| Item 1. | Business | 2 |
| Item 2. | Properties | 22 |
| Item 3. | Legal Proceedings | 23 |
| Item 4. | Submission of Matters to a Vote of Security Holders | None |
| **PART II** | | |
| Item 5. | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 25 |
| Item 6. | Selected Financial Data | 26 |
| Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 27 |
| Item 7A. | Quantitative and Qualitative About Market Risk | 40 |
| Item 8. | Financial Statements and Supplementary Data | 41 |
| Item 9. | Changes in and Disagreements with Accountants on Accounting and Financial Disclosure | None |
| Item 9A. | Controls and Procedures | 70 |
| Item 9B. | Other Information | |
| **PART III** | | |
| Item 10. | Directors and Executive Officers of the Registrant | 72 |
| Item 11. | Executive Compensation | 75 |
| Item 12. | Security Ownership of Certain Beneficial Owners and Management | 80 |
| Item 13. | Certain Relationships and Related Transactions | 83 |
| Item 14. | Principal Accountant Fees and Services | 83 |
| **PART IV** | | |
| Item 15. | Exhibits, Financial Statement Schedules | 84 |
| Signatures | | 86 |
| EXHIBIT 21 | | |
| EXHIBIT 31.1 | | |
| EXHIBIT 31.2 | | |
| EXHIBIT 32.1 | | |
| EXHIBIT 32.2 | | |

## DISCLOSURE REGARDING FORWARD–LOOKING STATEMENTS

This report includes "forward–looking statements" within the meaning of Section 27A of the Securities Act of 1933 and Section 21E of the Securities Exchange Act of 1934. For example, statements included in this report regarding our financial position, business strategy and other plans and objectives for future operations, and assumptions and predictions about future product demand, supply, manufacturing, costs, marketing and pricing factors are all forward–looking statements. When we use words like "intend," "anticipate," "believe," "estimate," "plan" or "expect," we are making forward–looking statements. We believe that the assumptions and expectations reflected in such forward–looking statements are reasonable, based on information available to us on the date hereof, but we cannot assure you that these assumptions and expectations will prove to have been correct or that we will take any action that we may presently be planning. We have disclosed certain important factors that could cause our actual results to differ materially from our current expectations elsewhere in this report. You should understand that forward–looking statements made in this report are necessarily qualified by these factors. We are not undertaking to publicly update or revise any forward–looking statement if we obtain new information or upon the occurrence of future events or otherwise.

Table of Contents

# Item 1. *Business*

In this report, "JAKKS," the "Company," "we," "us" and "our" refer to JAKKS Pacific, Inc. and its subsidiaries.

## Company Overview

We are a leading multi-line, multi-brand toy company that designs, develops, produces and markets toys and related products. We focus our business on acquiring or licensing well-recognized trademarks and brand names with long product histories ("evergreen brands"). We seek to acquire these evergreen brands because we believe they are less subject to market fads or trends. Our products are typically lower-priced toys and accessories and include:

- Action figures and accessories including licensed characters, principally based on *World Wrestling Entertainment*[tm] ("WWE") and the *Dragon Ball*® franchise, and toy vehicles, including *Road Champs*® die-cast collectibles and *Remco*® toy vehicles and role-play toys and accessories;

- Craft, activity and stationery products, including *Flying Colors Toys*® activity sets, compounds, playsets and lunch boxes, and Colorworkshop® craft products such as the *Blopen*® and *Pentech*® writing instruments, stationery and activity products;

- Infant and pre-school electronic toys, TV activities, toy foam puzzle mats and blocks, activity sets, outdoor products, plush toys featuring *Care Bears* and *Teletubbies*, soft body dolls featuring *Cabbage Patch Kids* and slumber bags;

- Seasonal toys and leisure products, including kites, *Funnoodle*® pool toys, and *Storm*[tm] water guns;

- Electronics products, including *Plug it in & Play TV Games*[tm] and *Laser Challenge*[tm];

- Junior sports, including Disney products, *Gaksplat*[tm] and *Storm*[tm]; and

- Fashion and mini dolls and related accessories, including *Disney* Princesses sold in The Disney Store chain.

We continually review the marketplace to identify and evaluate evergreen brands that we believe have the potential for significant growth. We endeavor to generate growth within these brands by:

- creating innovative products under established brand names;

- focusing our marketing efforts to enhance consumer recognition and retailer interest;

- linking them with our evergreen portfolio of brands;

- adding new items to the branded product lines that we expect will enjoy greater popularity; and

- adding new features and improving the functionality of products in the line.

In addition to developing our proprietary brands and marks, we license brands such as *WWE*[tm], *Nickelodeon*®, *Rugrats*®, *Dora the Explorer*®, *Blue's Clues*®, *SpongeBob SquarePants*®, *Mickey Mouse*, *Winnie the Pooh*, *Hello Kitty*® and *NASCAR*®. Licensing enables us to use these high-profile marks at a lower cost than we would incur if we purchased these marks or developed comparable marks on our own. By licensing marks, we have access to a far greater range of marks than would be available for purchase. We also license technology produced by unaffiliated inventors and product developers to improve the design and functionality of our products.

2

**Table of Contents**

We have obtained an exclusive worldwide license for our joint venture with THQ Inc. ("THQ"), which develops, produces, manufactures and markets video games based on WWE characters and themes. Since the joint venture's first title release in 1999, it has released 23 new titles. We have recognized approximately $49.5 million in profit from the joint venture through December 31, 2004. On October 19, 2004, we were named as defendants in a lawsuit commenced by WWE, pursuant to which WWE is seeking treble, punitive and other damages (including disgorgement of profits) in an undisclosed amount and a declaration that the video game license with the joint venture and an amendment to our toy licenses with WWE are void and unenforceable (see "Legal Proceedings").

Through the Toymax International, Inc. ("Toymax") acquisition, we added toy brand names such as *Laser Challenge* and *Creepy Crawlers*® to our brand portfolio. In addition, pool–related products branded under the name *Funnoodle* and kites branded under the name *Go Fly a Kite*® further diversified our portfolio with products popular in the spring and summer seasons.

Through the assets acquired from Trendmasters®, Inc. ("Trendmasters"), we added to our portfolio the *The Storm* brand of water guns, gliders and junior sports toys, seasonal products for Halloween, Christmas and Easter, and vehicles, action figures, dolls and playsets under multiple brands.

In May 2003, we acquired from P&M Products USA, Inc. and an affiliated United Kingdom company, P&M Products Limited, (collectively "P&M") the *Blopen*, *Blitzer*™, *Vivid Velvet*® and *Paints*® line of products.

In June 2004, we acquired from Play Along, Inc., Play Along (Hong Kong) Limited and PA Distribution, Inc. (collectively "Play Along") pre–school toys including plush toys featuring *Care Bears* and *Teletubbies*, soft body dolls featuring *Cabbage Patch Kids*, and others.

Most of our current products are relatively inexpensive. In 2004, approximately 70% of our revenue came from products priced at twenty dollars or less at retail. We believe that these products have enduring appeal and are less subject to general economic conditions, toy product fads and trends, and changes in retail distribution channels. As of December 31, 2004, we had over 4,775 products in over 21 product categories. In addition, the simplicity of these products enables us to choose among a wider range of manufacturers and affords us greater flexibility in product design, pricing and marketing. Our product development process typically takes from three to nine months from concept to production and shipment to our customers. We believe that many licensors and retailers recognize and reward our ability to bring product to market faster and more efficiently than many of our competitors.

We sell our products through our in–house sales staff and independent sales representatives to toy and mass–market retail chain stores, department stores, office supply stores, drug and grocery store chains, club stores, toy specialty stores and wholesalers. The *Road Champs*, *Flying Colors* and *Pentech* products also are sold to smaller hobby shops, specialty retailers and corporate accounts, among others. Our five largest customers are Target, Kmart, Toys 'R' Us, Wal–Mart, and Kay Bee Toys, which collectively accounted for approximately 65.6% of our net sales in 2004. No other customer accounted for more than 2.0% of our net sales in 2004. Kay Bee Toys filed for Chapter 11 bankruptcy protection in January 2004. As a result, we have reserved $2.1 million for potential bad debt, which represents 84% of Kay Bee Toys' $2.5 million pre–petition accounts receivable balance with us. If Kay Bee Toys is unable to extricate itself from bankruptcy and we are unable to replace the revenues previously earned by us from Kay Bee Toys with other retailers, our business, financial condition and results of operations could be materially adversely affected (see "Risk Factors").

3

Table of Contents

**Our Growth Strategy**

The execution of our growth strategy has resulted in increased revenues and earnings. In 2003 and 2004, we generated net sales of $315.8 million and $574.3 million, respectively, and net income of $15.9 million and $43.6 million, respectively. We believe approximately 12.7% and 29.4% of our increase in net sales in 2003 and 2004 were respectively attributable to our acquisitions. Key elements of our growth strategy include:

• *Expand Core Products.* We manage our existing and new brands through strong product development initiatives, including introducing new products, modifying existing products and extending existing product lines. Our product designers strive to develop new products or product lines to offer added technological, aesthetic and functional improvements to our product lines. We use real−scan technology in our action toys, and we incorporate articulated joints and a flexible rubberized coating to enhance the life−like and feel of these action toys. These innovations produce higher quality and better likenesses of the representative characters.

• *Enter New Product Categories.* We will continue to use our extensive experience in the toy and other industries to evaluate products and licenses in new product categories and to develop additional product lines. We have entered the toy candy category through our internal creation of *Tongue Tape*, commenced marketing of licensed classic video games for simple plug−in use with television sets and expanded into slumber bags through the licensing of this category from our current licensors, such as Nickelodeon.

• *Pursue Strategic Acquisitions.* We intend to supplement our internal growth rate with selected strategic acquisitions. Since our inception in 1995, we have successfully completed and integrated twelve acquisitions of companies and trademarks. Most recently, in June 2004, we acquired the assets of Play Along which expanded our pre−school offerings. We will continue focusing our acquisition strategy on businesses or brands that have compatible product lines and offer valuable trademarks or brands.

• *Acquire Additional Character and Product Licenses.* We have acquired the rights to use many familiar corporate, trade and brand names and logos from third parties that we use with our primary trademarks and brands. Currently, we have license agreements with the WWE, Nickelodeon, Disney, and Warner Bros.®, as well as with the licensors of the many popular licensed children's characters previously mentioned, among others. We intend to continue to pursue new licenses from these entertainment and media companies and other licensors. We also intend to continue to purchase additional inventions and product concepts through our existing network of product developers.

• *Expand International Sales.* We believe that foreign markets, especially Europe, Australia, Canada, Latin America and Asia, offer us significant growth opportunities. In 2004, our sales generated outside the United States were approximately $68.5 million, or 11.9% of total net sales. We intend to continue to expand our international sales by capitalizing on our experience and our relationships with foreign distributors and retailers. Our recent expansion efforts included expanding internal resources and entering into a distribution agreement with Vivid Imaginations Ltd., a United Kingdom based toy distributor. We expect these initiatives to continue to contribute to our international growth in 2005 along with the addition of the Play Along product.

• *Capitalize On Our Operating Efficiencies.* We believe that our current infrastructure and low−overhead operating model can accommodate significant growth without a proportionate increase in our operating and administrative expenses, thereby increasing our operating margins.

Table of Contents

The execution of our growth strategy, however, is subject to several risks and uncertainties and we cannot assure you that we will continue to experience growth in, or maintain our present level of, net sales (see "— Risk Factors That May Affect Future Results," beginning on page 14). For example, our growth strategy will place additional demands on our management, operational capacity and financial resources and systems. The increased demand on management may necessitate our recruitment and retention of qualified management personnel. We cannot assure you that we will be able to recruit and retain qualified personnel or expand and manage our operations effectively and profitably. To effectively manage future growth, we must continue to expand our operational, financial and management information systems and to train, motivate and manage our work force. There can be no assurance that our operational, financial and management information systems will be adequate to support our future operations. Failure to expand our operational, financial and management information systems or to train, motivate or manage employees could have a material adverse effect on our business, financial condition and results of operations.

Moreover, implementation of our growth strategy is subject to risks beyond our control, including competition, market acceptance of new products, changes in economic conditions, our ability to obtain or renew licenses on commercially reasonable terms and our ability to finance increased levels of accounts receivable and inventory necessary to support our sales growth, if any.

Furthermore, we cannot assure you that we can identify attractive acquisition candidates or negotiate acceptable acquisition terms, and our failure to do so may adversely affect our results of operations and our ability to sustain growth.

Finally, our acquisition strategy involves a number of risks, each of which could adversely affect our operating results, including difficulties in integrating acquired businesses or product lines, assimilating new facilities and personnel and harmonizing diverse business strategies and methods of operation; diversion of management attention from operation of our existing business; loss of key personnel from acquired companies; and failure of an acquired business to achieve targeted financial results.

### Industry Overview

According to Toy Industry Association, Inc. ("TIA"), the leading toy industry trade group, the United States is the world's largest toy market, followed by Japan and Western Europe. Total retail sales of toys, excluding video games, in the United States, were approximately $20.1 billion in 2004. Sales by domestic toy manufacturers to foreign customers exceeded $6.0 billion in 2002. We believe the two largest United States toy companies, Mattel and Hasbro, collectively hold a dominant share of the domestic non–video toy market. In addition, hundreds of smaller companies compete in the design and development of new toys, the procurement of character and product licenses, and the improvement and expansion of previously introduced products and product lines. In the United States video game segment, total retail sales of video game software were approximately $9.9 billion in 2004.

Over the past few years, the toy industry has experienced substantial consolidation among both toy companies and toy retailers. We believe that the ongoing consolidation of toy companies provides us with increased growth opportunities due to retailers' desire to not be entirely dependent on a few dominant toy companies. Retailer concentration also enables us to ship products, manage account relationships and track retail sales more effectively and efficiently.

5

Table of Contents

## Products

We focus our business on acquiring or licensing well–recognized trademarks or brand names, and we seek to acquire evergreen brands which are less subject to market fads or trends. Some of our license agreements for products and concepts call for royalties ranging from 1% to 18% of net sales, and some may require minimum guarantees and advances. Our principal products include:

### Action Figures and Accessories

We have an extensive toy license with the WWE pursuant to which we have the exclusive worldwide right, until December 31, 2009, to develop and market a full line of toy products based on the popular *WWE* professional wrestlers. These wrestlers perform throughout the year at live events that attract large crowds, many of which are broadcast on free and cable television, including pay–per–view specials. We launched this product line in 1996 with various series of 6 inch articulated action figures that have movable body parts and feature real–life action sounds from our patented bone–crunching mechanism that allows the figures' "bones" to crack when they are bent. We continually expand and enhance this product line by using technology in the development and in the products themselves. The 6 inch figures currently make up a substantial portion of our overall *WWE* line, which has since grown to include many other new products including playsets using interactive technology. Our strategy has been to release new figures and accessories frequently to keep the line fresh and to retain the interest of the consumers.

In 2003, we began to develop, manufacture and distribute action figures and action figure accessories based on the animated series *Dragon Ball*, *Dragon Ball Z* and *Dragon Ball GT*. We also introduced action figures based on Universal Studios' Classic Monsters and Van Helsing feature film and another animated series, *Mucha Lucha*. In 2005, we will introduce action figures and accessories based on the animated series *Dragon Boosters*.

### Flying Colors/Pentech Activity Sets, Compounds, Playsets, Writing Instruments and Lunch Boxes

Through our acquisition of Flying Colors Toys we entered into the toy activity category with compounds and plastic molded activity cases containing a broad range of activities, such as make and paint your own characters, jewelry making, art studios, posters, puzzles and other projects. The activity cases, with molded and painted likenesses of popular characters, such as Nickelodeon's *Blue's Clues* and *SpongeBob SquarePants*, and *Hello Kitty*, have immediate visual appeal. Using a related production technology, our lunch boxes complement this line with similarly–styled molded and painted likenesses featuring these and other popular characters. Our product lines also include stationery, back–to–school pens, pencils, markers, notebooks and P&M craft products such as *Blopens®* and *Vivid Velvet*.

Our compounds represent another significant area of emphasis for Flying Colors. Launched under the *Blue's Clues* license, this line has expanded from play clay in a bucket to an entire *Blue's Clues* playset featuring book molds, extrusion and other devices. We are continuing to expand the compound area and have introduced a full line of innovative compounds under the *Nickelodeon* brand, including *Splish Splat*[tm], among others.

### Electronics Products

Through our acquisition of Toymax we entered into the electronic products category with our *Plug it in & Play TV Games* and *Laser Challenge* product line. Our *Laser Challenge* product line includes laser games and NRG paintball[tm]. Our current TV Games include licenses from Activision, Atari, Namco and Nickelodeon, and feature such games as Centipede® and Pac–Man®.

6

Table of Contents

In 2004, we released twelve new TV Games including Ms. Pac–Man®, Spider–Man®, Disney and several licensed and non–licensed preschool titles, and we expect to release approximately 20 new TV Games in 2005, including Batman, Star Wars and a wireless version of Ms. Pac–Man. TV Games generated a significant amount of net sales in 2004 and we expect that level of sales to continue in 2005.

**Seasonal Products**

We have a wide range of seasonal toys and leisure products. Our *Go Fly A Kite* product line includes youth and adult kites and a wide array of decorative flags, windstocks, and windwheels. Our *Funnoodle* pool toys include the basic funnoodle, pool floats and a variety of other pool toys. Our *Storm* product line includes water guns, gliders and sport balls. In addition, we added a holiday product line for Easter, Halloween and Christmas.

**Junior Sports Products**

Our junior sports products include Disney licensed products, *Gaksplat* and *Storm*. Our Disney sports include such activities as basketball, bowling and golf. Our *Gaksplat* and *Storm* junior sports include a variety of mini sport balls and activity products.

**Wheels Division Products**

• *Road Champs* die–cast collectible and toy vehicles

The *Road Champs* product line consists of highly detailed, die–cast replicas of new and classic cars, trucks, motorcycles, emergency vehicles and service vehicles, primarily in $^1/43$ scale (including police cars, fire trucks and ambulances), buses and aircraft (including propeller planes, jets and helicopters). Through licenses, we produce replicas of well–known vehicles including those from *Ford®*, *Chevrolet®* and *Porsche®*. Additionally, through our *NASCAR* license, we produce radio–controlled vehicles in a variety of scales. We believe that these licenses, increase the perceived value of the products and enhance their marketability.

• *Extreme sports die–cast collectibles and toy vehicles and action figures*

Our extreme sports offering includes our *MXS®* line of motorcycles with riders featuring "click n grip" functionality which allows the user to release the rider from the motorcycle seat and perform the signature moves of the sport's top riders. Other products include off–road vehicles, personal watercraft, surfboards and skateboards, all sold individually and with playsets and accessories.

• *Toy and activity vehicles*

Our *Remco* toy line includes toy and activity vehicles and other toys. In 2002, we also added infrared radio controlled vehicles and *Mighty Mo's®* toy vehicles. Our toy vehicle line is comprised of a large assortment of rugged die–cast and plastic vehicles that range in size from four and three–quarter inch to big–wheeled seventeen inch vehicles. The breadth of the line is extensive, with themes ranging from emergency, fire, farm and construction, to racing and jungle adventure.

In 2004, we introduced an internally developed line of toy wheels and play sets called *Fly Wheels* that feature scale replicas of popular automobile tires and wheels. The wheels are launched from a handle with the pull of a zip cord.

7

Table of Contents

*Infant and pre-school toys*
Through our acquisition of Play Along we added to our pre-school toys with *Care Bears* plush and electronic toys, *Teletubbies* plush and *Cabbage Patch Kids* soft body dolls. These products generated a significant amount of net sales in 2004, and we expect that level of sales to continue in 2005.

• *Child Guidance*
Our line of pre-school Child Guidance electronic toys features products that enhance sensory stimulation and learning through play, while offering value to the trade as well as to the consumer. Our products are designed for children ages two and under. We have combined the fun of music, lights, motion and sound with the early introduction of numbers, letters, shape and color recognition, all at a value price. In 2004, we introduced a line of licensed TV activity products featuring Disney and Nickelodeon characters as well as non-licensed versions.
• *Foam puzzle mats and playsets*
The foam toy products include puzzle mats featuring licensed characters, such as *Winnie the Pooh* and *Blue's Clues*, among others, as well as letters of the alphabet and numbers. The inter-locking puzzle pieces can also be used to build houses and other play areas. Other products include foam puzzles of the United States, foam vehicles and outdoor foam products.
• *Slumber bags*
Our line of children's indoor slumber bags features *Dora the Explorer*, *SpongeBob SquarePants* and *Blue's Clues* in addition to proprietary designs.

**Fashion and Mini Dolls and Related Accessories**
We produce various proprietary and licensed fashion and mini dolls and accessories for children between the ages of three and ten. The proprietary product lines include 11$\frac{1}{2}$ inch fashion dolls customized with high-fashion designs that correspond with particular holidays, events or themes, and fashion dolls based on children's classic fairy tales and holidays. We also have an agreement to manufacture for The Disney Store chain a full line of dolls under a private label which features *Disney* Princesses and classic Disney characters.

Our in-house product developers originate the design and functionality of most of our fashion dolls. In many cases, they work with retailers and incorporate their input on doll characteristics, packaging and other design elements to create exclusive product lines for them.

**World Wrestling Entertainment Video Games**
In June 1998, we formed a joint venture with THQ, Inc., a developer, publisher and distributor of interactive entertainment software for the leading hardware game platforms in the home video game market. The joint venture entered into a license agreement with the WWE under which it acquired the exclusive worldwide right to publish *WWE* video games on all hardware platforms. The term of the license agreement expires on December 31, 2009, and the joint venture has a right to renew the license for an additional five years under various conditions. On October 19, 2004, we were named as defendants in a lawsuit commenced by WWE, pursuant to which WWE is seeking treble, punitive and other damages (including disgorgement of profits) in an undisclosed amount and a declaration that the video game license with the joint venture and an amendment to our toy licenses with WWE are void and unenforceable (see "Legal Proceedings").

8

Table of Contents

The games are designed, developed, manufactured and distributed by THQ. THQ arranges for the manufacture of the CD–ROMs and game cartridges used in the various video game platforms under non–exclusive licenses with Sony, Nintendo and Microsoft. No other licenses are required for the manufacture of the personal computer titles.

Through June 30, 2006, we are entitled to receive a guaranteed percentage preferred return from the joint venture at varying rates of net sales of the video games depending on the cumulative unit sales and platform of each particular game, as well as on the royalties earned by the joint venture from the publishing of game guides by third parties. After June 30, 2006, the amount of our preferred return from the joint venture will be subject to renegotiation between THQ and us. THQ is entitled to receive the balance of the profits.

The joint venture currently publishes titles for the Sony *PlayStation*® and *PlayStation 2*®, Nintendo *64*® and *GameCube*® and Microsoft *Xbox*® consoles, Nintendo *Game Boy Color*® and *Game Boy Advance*® hand–held platforms, mobile/wireless and personal computers. The joint venture launched its first products in November 1999. It will also publish titles for new hardware platforms when, and as they are introduced to the market and have established a sufficient installed base to support new software. These titles are marketed to our existing customers as well as to game, electronics and other specialty stores, such as Electronics Boutique and Best Buy.

The following table presents our past results with the joint venture:

| | New Game Titles | | Profit from Joint Venture[1] |
|---|---|---|---|
| | Console Platforms | Hand–held Platforms | (In millions) |
| 1999 | 1 | 1 | $ 3.6 |
| 2000 | 4 | 1 | 15.9 |
| 2001 | 1 | 2 | 6.7 |
| 2002 | 3 | 1 | 8.0 |
| 2003 | 5 | — | 7.4 |
| 2004 | 2 | 1 | 7.9 |

(1) Profit from the joint venture reflects our preferred return on joint venture revenue less certain costs incurred directly by us.

Wrestling video games have demonstrated consistent popularity, with six of our wrestling–themed video games each having sold in excess of 1 million units since 1999, at retail prices ranging from approximately $42 to $60 per game. We believe that the success of *WWE* titles is dependent on the graphic look and feel of the software, the depth and variation of game play and the popularity of *WWE*. We believe that as a franchise property, *WWE* titles have brand recognition and sustainable consumer appeal, which may allow the joint venture to use titles over an extended period of time through the release of sequels and extensions and to re–release such products at different price points in the future.

9

Table of Contents

## Sales, Marketing and Distribution

We sell all of our products through our own in–house sales staff and independent sales representatives to toy and mass–market retail chain stores, department stores, office supply stores, drug and grocery store chains, club stores, toy specialty stores and wholesalers. Our five largest customers are Target, Kmart, Toys 'R' Us, Wal–Mart, and Kay Bee Toys, which accounted for approximately 57.7% of our net sales in 2003 and 65.6% of our net sales in 2004. Kay Bee Toys filed for bankruptcy protection under Chapter 11 in January 2004. Except for purchase orders relating to products on order, we do not have written agreements with our customers. Instead, we generally sell products to our customers pursuant to letters of credit or, in some cases, on open account with payment terms typically varying from 30 to 90 days. From time to time, we allow our customers credits against future purchases from us in order to facilitate their retail markdown and sales of slow–moving inventory. We also sell our products through e–commerce sites, including Toysrus.com.

We contract the manufacture of most of our products to unaffiliated manufacturers located in China. We sell the finished products on a letter of credit basis or on open account to our customers, who take title to the goods in Hong Kong or China. These methods allow us to reduce certain operating costs and working capital requirements. A portion of our sales originate in the United States, so we hold certain inventory in our warehouse and fulfillment facilities. To date, a significant portion of all of our sales has been to domestic customers. We intend to continue expanding distribution of our products into foreign territories and, accordingly, we have:

- engaged representatives to oversee sales in certain territories,

- engaged distributors in certain territories, such as Vivid Imaginations Ltd. in England,

- established direct relationships with retailers in certain territories, and

- expanded in–house resources.

Outside of the United States, we currently sell our products primarily in Europe, Australia, Canada, Latin America and Asia. Sales of our products abroad accounted for approximately $44.7 million, or 14.2% of our net sales, in 2003 and approximately $68.5 million, or 11.9% of our net sales, in 2004. We believe that foreign markets present an attractive opportunity, and we plan to intensify our marketing efforts and further expand our distribution channels abroad.

We establish reserves for sales allowances, including promotional allowances and allowances for anticipated defective product returns, at the time of shipment. The reserves are determined as a percentage of net sales based upon either historical experience or on estimates or programs agreed upon by our customers.

We obtain, directly, or through our sales representatives, orders for our products from our customers and arrange for the manufacture of these products as discussed below. Cancellations generally are made in writing, and we take appropriate steps to notify our manufacturers of these cancellations.

We maintain a full–time sales and marketing staff, many of whom make on–site visits to customers for the purpose of showing product and soliciting orders for products. We also retain a number of independent sales representatives to sell and promote our products, both domestically and internationally. Together with retailers, we sometimes test the consumer acceptance of new products in selected markets before committing resources to large–scale production.

10

Table of Contents

We advertise our products in trade and consumer magazines and other publications, market our products at international, national and regional toy, stationery and other specialty trade shows, conventions and exhibitions and carry on cooperative advertising programs with toy and mass market retailers and other customers which include the use of in−store displays. We also produce and broadcast television commercials for several of product lines including our *WWE* action figure line, TV Games, *Care Bears* and *Cabbage Patch Kids*, as well as for some of our *Flying Colors* and Electronics products. We may also advertise some of our other products on television, if we expect that the resulting increase in our net sales will justify the relatively high cost of television advertising.

## Product Development

Each of our product lines has an in−house manager responsible for product development. The in−house manager identifies and evaluates inventor products and concepts and other opportunities to enhance or expand existing product lines or to enter new product categories. In addition, we create proprietary products, the principal source of products for our fashion doll line, and products to more fully exploit our concept and character licenses. Although we do have the capability to create and develop products from inception to production, we generally use third−parties to provide a substantial portion of the sculpting, sample making, illustration and package design required for our products in order to accommodate our increasing product innovations and introductions. Typically, the development process takes from three to nine months from concept to production and shipment to our customers.

We employ a staff of designers for all of our product lines. We occasionally acquire our other product concepts from unaffiliated third parties. If we accept and develop a third party's concept for new toys, we generally pay a royalty on the toys developed from this concept that are sold, and may, on an individual basis, guarantee a minimum royalty. In addition, we engage third party developers to program our line of *Plug it in & Play TV Games*. Royalties payable to inventors and developers generally range from 1% to 8% of the wholesale sales price for each unit of a product sold by us. We believe that utilizing experienced third−party inventors gives us access to a wide range of development talent. We currently work with numerous toy inventors and designers for the development of new products and the enhancement of existing products. We believe that toy inventors and designers have come to appreciate our practice of acting quickly and decisively to acquire and market licensed products. In addition, we believe that all of these factors, as well as our recent success in developing and marketing products, make us more attractive to toy inventors and developers than some of our competitors.

Safety testing of our products is done at the manufacturers' facilities by an engineer employed by us or by independent third−party contractors engaged by us. Safety testing is designed to meet regulations imposed by federal and state governmental authorities. We also monitor quality assurance procedures for our products for safety purposes. In addition, independent laboratories engaged by some of our larger customers test certain of our products.

## Manufacturing and Supplies

Most of our products are currently produced by overseas third−party manufacturers, which we choose on the basis of quality, reliability and price. Consistent with industry practice, the use of third−party manufacturers enables us to avoid incurring fixed manufacturing costs, while maximizing flexibility, capacity and production technology. All of the manufacturing services performed overseas for us are paid for on open account with the manufacturers. To date, we have not experienced any material delays in the delivery of our products; however, delivery schedules are

11

Table of Contents

subject to various factors beyond our control, and any delays in the future could adversely affect our sales. Currently, we have ongoing relationships with approximately twenty–five different manufacturers. We believe that alternative sources of supply are available, although we cannot be assured that we can obtain adequate supplies of manufactured products.

Although we do not conduct the day–to–day manufacturing of our products, we participate in the design of the product prototype and production tools, dies and molds for our products and we seek to ensure quality control by actively reviewing the production process and testing the products produced by our manufacturers. We employ quality control inspectors who rotate among our manufacturers' factories to monitor the production of substantially all of our products.

The principal raw materials used in the production and sale of our toy products are plastics, zinc alloy, plush, printed fabrics, paper products and electronic components, all of which are currently available at reasonable prices from a variety of sources. Although we do not manufacture our products, we own the tools, dies and molds used in the manufacturing process, and these are transferable among manufacturers if we choose to employ alternative manufacturers. Tools, dies and molds represent a substantial portion of our property and equipment with a net book value of $7.1 million in 2003 and $6.8 million in 2004. Substantially all of these assets are located in China.

## Trademarks and Copyrights

Most of our products are produced and sold under trademarks owned by or licensed to us. We typically register our properties, and seek protection under the trademark, copyright and patent laws of the United States and other countries where our products are produced or sold. These intellectual property rights can be significant assets. Accordingly, while we believe we are sufficiently protected, the loss of some of these rights could have an adverse effect on our business, financial condition and results of operations.

## Competition

Competition in the toy industry is intense. Globally, certain of our competitors have greater financial resources, larger sales and marketing and product development departments, stronger name recognition, longer operating histories and benefit from greater economies of scale. These factors, among others, may enable our competitors to market their products at lower prices or on terms more advantageous to customers than those we could offer for our competitive products. Competition often extends to the procurement of entertainment and product licenses, as well as to the marketing and distribution of products and the obtaining of adequate shelf space. Competition may result in price reductions, reduced gross margins and loss of market share, any of which could have a material adverse effect on our business, financial condition and results of operations. In each of our product lines we compete against one or both of the toy industry's two dominant companies, Mattel and Hasbro. In addition, we compete, in our *Flying Colors* and *Pentech* product categories, with Rose Art Industries, Hasbro (Play–doh) and Binney & Smith (Crayola), and, in our toy vehicle lines, with RC2 (formerly Racing Champions). We also compete with numerous smaller domestic and foreign toy manufacturers, importers and marketers in each of our product categories. Our joint venture's principal competitors in the video game market are Electronic Arts, Activision and Acclaim Entertainment.

## Seasonality and Backlog

In 2004, approximately 63% of our pro forma net sales (which includes sales of Play Along products from January 1, 2004) were made in the third and fourth quarters. Generally, the first

12

Table of Contents

quarter is the period of lowest shipments and sales in our business and the toy industry generally and therefore the least profitable due to various fixed costs. Seasonality factors may cause our operating results to fluctuate significantly from quarter to quarter. However, our writing instrument and activity products generally are counter-seasonal to the traditional toy industry seasonality due to the higher volume generally shipped for back-to-school beginning in the second quarter. In addition, our seasonal products are primarily sold in the spring and summer seasons. Our results of operations may also fluctuate as a result of factors such as the timing of new products (and related expenses) introduced by us or our competitors, the advertising activities of our competitors, delivery schedules set by our customers and the emergence of new market entrants. We believe, however, that the low retail price of most of our products may be less subject to seasonal fluctuations than higher priced toy products.

We ship products in accordance with delivery schedules specified by our customers, which usually request delivery of their products within three to six months of the date of their orders. Because customer orders may be canceled at any time without penalty, our backlog may not accurately indicate sales for any future period.

**Government and Industry Regulation**

Our products are subject to the provisions of the Consumer Product Safety Act ("CPSA"), the Federal Hazardous Substances Act ("FHSA"), the Flammable Fabrics Act ("FFA") and the regulations promulgated thereunder. The CPSA and the FHSA enable the Consumer Products Safety Commission ("CPSC") to exclude from the market consumer products that fail to comply with applicable product safety regulations or otherwise create a substantial risk of injury, and articles that contain excessive amounts of a banned hazardous substance. The FFA enables the CPSC to regulate and enforce flammability standards for fabrics used in consumer products. The CPSC may also require the repurchase by the manufacturer of articles. Similar laws exist in some states and cities and in various international markets. We maintain a quality control program designed to ensure compliance with all applicable laws.

**Employees**

As of March 29, 2005, we employed 419 persons, all of whom are full-time employees, including four executive officers. We employed 267 in the United States, 3 in the United Kingdom, 124 in Hong Kong and 25 in China. We believe that we have good relationships with our employees. None of our employees is represented by a union.

**Environmental Issues**

We are subject to legal and financial obligations under environmental, health and safety laws in the United States and in other jurisdictions where we operate. We are not currently aware of any material environmental liabilities associated with any of our operations.

**Available Information**

We make available free of charge on or through our Internet website, www.jakkspacific.com, our annual report on Form 10-K, quarterly reports on Form 10-Q, current reports on Form 8-K, and amendments to these reports filed or furnished pursuant to Section 13(a) or 15(d) of the Securities Exchange Act of 1934 as soon as reasonably practicable after we electronically file such material with, or furnish it to, the SEC.

Table of Contents

**Our Corporate Information**

　　We were formed as a Delaware corporation in 1995. Our principal executive offices are located at 22619 Pacific Coast Highway, Malibu, California 90265. Our telephone number is (310) 456–7799 and our Internet Website address is www.jakkspacific.com.

**Risk Factors That May Affect Future Results**

　　From time to time, including in this Annual Report on Form 10–K, we publish forward–looking statements, as disclosed in our Disclosure Regarding Forward–Looking Statements, beginning immediately following the Table of Contents of this Annual Report. We note that a variety of factors could cause our actual results and experience to differ materially from the anticipated results or other expectations expressed or anticipated in our forward–looking statements. The factors listed below are illustrative of the risks and uncertainties that may arise and that may be detailed from time to time in our public announcements and our filings with the Securities and Exchange Commission, such as on Forms 8–K, 10–Q and 10–K. We undertake no obligation to make any revisions to the forward–looking statements contained in this Annual Report on Form 10–K to reflect events or circumstances occurring after the date of the filing of this report.

　　*The outcome of litigation in which we have been named as a defendant is unpredictable and a materially adverse decision in any such matter could have a material adverse affect on our financial position and results of operations.*

　　We are defendants in litigation matters, as described under "Legal Proceedings" in our periodic reports filed pursuant to the Securities Exchange Act of 1934, including the lawsuit commenced by WWE and the purported securities class action and derivative action claims stemming from the WWE lawsuit (see "— Legal Proceedings"). These claims may divert financial and management resources that would otherwise be used to benefit our operations. Although we believe that we have meritorious defenses to the claims made in each and all of the litigation matters to which we have been named a party, and intend to contest each lawsuit vigorously, no assurances can be given that the results of these matters will be favorable to us. A materially adverse resolution of any of these lawsuits could have a material adverse affect on our financial position and results of operations.

　　*Our inability to redesign, restyle and extend our existing core products and product lines as consumer preferences evolve, and to develop, introduce and gain customer acceptance of new products and product lines, may materially and adversely impact our business, financial condition and results of operations.*

　　Our business and operating results depend largely upon the appeal of our products. Our continued success in the toy industry will depend on our ability to redesign, restyle and extend our existing core products and product lines as consumer preferences evolve, and to develop, introduce and gain customer acceptance of new products and product lines. Several trends in recent years have presented challenges for the toy industry, including:

　　• *The phenomenon of children outgrowing toys at younger ages, particularly in favor of interactive and high technology products;*

　　• *Increasing use of technology;*

　　• *Shorter life cycles for individual products; and*

　　• *Higher consumer expectations for product quality, functionality and value.*

14

Table of Contents

We cannot assure you that:

• *our current products will continue to be popular with consumers;*

• *the product lines or products that we introduce will achieve any significant degree of market acceptance; or*

• *the life cycles of our products will be sufficient to permit us to recover licensing, design, manufacturing, marketing and other costs associated with those products.*

Our failure to achieve any or all of the foregoing benchmarks may cause the infrastructure of our operations to fail, thereby adversely affecting our business, financial condition and results of operations.

***The failure of our character–related and theme–related products to become and/or remain popular with children may materially and adversely impact our business, financial condition and results of operations.***

The success of many of our character–related and theme–related products depends on the popularity of characters in movies, television programs, live wrestling exhibitions, auto racing events and other media. We cannot assure you that:

• *media associated with our character–related and theme–related product lines will be released at the times we expect or will be successful;*

• *the success of media associated with our existing character–related and theme–related product lines will result in substantial promotional value to our products;*

• *we will be successful in renewing licenses upon expiration on terms that are favorable to us; or*

• *we will be successful in obtaining licenses to produce new character–related and theme–related products in the future.*

Our failure to achieve any or all of the foregoing benchmarks may cause the infrastructure of our operations to fail, thereby adversely affecting our business, financial condition and results of operations.

***There are risks associated with our license agreements.***

• *Our current licenses require us to pay minimum royalties*

Sales of products under trademarks or trade or brand names licensed from others account for substantially all of our net sales. Product licenses allow us to capitalize on characters, designs, concepts and inventions owned by others or developed by toy inventors and designers. Our license agreements generally require us to make specified minimum royalty payments, even if we fail to sell a sufficient number of units to cover these amounts. In addition, under certain of our license agreements, if we fail to achieve certain prescribed sales targets, we may be unable to retain or renew these licenses.

• *Some of our licenses are restricted as to use*

Under some of our license agreements, including WWE, Nickelodeon and NASCAR, the licensors have the right to review and approve our use of their licensed products, designs or materials before we may make any sales. If a licensor refuses to permit our use of any licensed property in the way we propose, or if their review process is delayed, our development or sale of new products could be impeded.

15

Table of Contents

   • *New licenses are difficult and expensive to obtain*

   Our continued success will depend substantially on our ability to obtain additional licenses. Intensive competition exists for desirable licenses in our industry. We cannot assure you that we will be able to secure or renew significant licenses on terms acceptable to us. In addition, as we add licenses, the need to fund additional royalty advances and guaranteed minimum royalty payments may strain our cash resources.

   • *A limited number of licensors account for a large portion of our net sales*

   We derive a significant portion of our net sales from a limited number of licensors. If one or more of these licensors were to terminate or fail to renew our license or not grant us new licenses, our business, financial condition and results of operations could be adversely affected.

*The toy industry is highly competitive and our inability to compete effectively may materially and adversely impact our business, financial condition results of operations.*

   The toy industry is highly competitive. Globally, certain of our competitors have financial and strategic advantages over us, including:

   • *greater financial resources;*

   • *larger sales, marketing and product development departments;*

   • *stronger name recognition;*

   • *longer operating histories; and*

   • *greater economies of scale.*

   In addition, the toy industry has no significant barriers to entry. Competition is based primarily on the ability to design and develop new toys, to procure licenses for popular characters and trademarks and to successfully market products. Many of our competitors offer similar products or alternatives to our products. Our competitors have obtained and are likely to continue to obtain licenses that overlap our licenses with respect to products, geographic areas and markets. We cannot assure you that we will be able to obtain adequate shelf space in retail stores to support our existing products or to expand our products and product lines or that we will be able to continue to compete effectively against current and future competitors.

*An adverse outcome in the litigation commenced against us by WWE or a decline in the popularity of WWE could adversely impact our video game joint venture with THQ.*

   The joint venture with THQ depends entirely on a single license, which gives the venture exclusive worldwide rights to produce and market video games based on World Wrestling Entertainment characters and themes. An adverse outcome against us, THQ or the joint venture in the lawsuit commenced by WWE (see the first Risk Factor, above) would adversely impact our rights under the joint venture's single license, which would adversely effect the joint venture's and our business, financial condition and results of operation.

   Furthermore, the popularity of professional wrestling, in general, and World Wrestling Entertainment, in particular, is subject to changing consumer tastes and demands. The relative popularity of professional wrestling has fluctuated significantly in recent years. A decline in the popularity of World Wrestling Entertainment could adversely affect the joint venture's and our business, financial condition and results of operations.

16

Table of Contents

*The termination of THQ's manufacturing licenses and the inability of the joint venture to otherwise obtain these licenses from other manufacturers would materially adversely affect the joint venture's and our business, financial condition and results of operations.*

The joint venture relies on hardware manufacturers and THQ's non–exclusive licenses with them for the right to publish titles for their platforms and for the manufacture of the joint venture's titles. If THQ's manufacturing licenses were to terminate and the joint venture could not otherwise obtain these licenses from other manufacturers, the joint venture would be unable to publish additional titles for these manufacturers' platforms, which would materially adversely affect the joint venture's and our business, financial condition and results of operations.

*The failure of the joint venture or THQ to perform as anticipated could have a material adverse affect on our financial position and results of operations.*

The joint venture's failure to timely develop titles for new platforms that achieve significant market acceptance, to maintain net sales that are commensurate with product development costs or to maintain compatibility between its personal computer CD–ROM titles and the related hardware and operating systems would adversely affect the joint venture's and our business, financial condition and results of operations.

Furthermore, THQ controls the day–to–day operations of the joint venture and all of its product development and production operations. Accordingly, the joint venture relies exclusively on THQ to manage these operations effectively. THQ's failure to effectively manage the joint venture would have a material adverse effect on the joint venture's and our business and results of operations. We are also dependent upon THQ's ability to manage cash flows of the joint venture. If THQ is required to retain cash for operations, or because of statutory or contractual restrictions, we may not receive cash payments for our share of profits, on a timely basis, or at all.

*We may not be able to sustain or manage our rapid growth, which may prevent us from continuing to increase our net revenues.*

We have experienced rapid growth in our product lines resulting in higher net sales over the last six years, which was achieved through acquisitions of businesses, products and licenses. For example, revenues associated with our acquired companies in 2004 and 2003 were approximately $168.9 million and $40.1 million, respectively, representing 29.4% and 12.7% of our total revenues for those periods. As a result, comparing our period–to–period operating results may not be meaningful and results of operations from prior periods may not be indicative of future results. We cannot assure you that we will continue to experience growth in, or maintain our present level of, net sales.

Our growth strategy calls for us to continuously develop and diversify our toy business by acquiring other companies, entering into additional license agreements, refining our product lines and expanding into international markets, which will place additional demands on our management, operational capacity and financial resources and systems. The increased demand on management may necessitate our recruitment and retention of qualified management personnel. We cannot assure you that we will be able to recruit and retain qualified personnel or expand and manage our operations effectively and profitably. To effectively manage future growth, we must continue to expand our operational, financial and management information systems and to train, motivate and manage our work force. There can be no assurance that our operational, financial and management information systems will be adequate to support our future operations. Failure to expand our operational, financial and management information systems or to train, motivate or manage

17

Table of Contents

employees could have a material adverse effect on our business, financial condition and results of operations.

In addition, implementation of our growth strategy is subject to risks beyond our control, including competition, market acceptance of new products, changes in economic conditions, our ability to obtain or renew licenses on commercially reasonable terms and our ability to finance increased levels of accounts receivable and inventory necessary to support our sales growth, if any. Accordingly, we cannot assure you that our growth strategy will continue to be implemented successfully.

*If we are unable to acquire and integrate companies and new product lines successfully we will be unable to implement our growth strategy.*

Our growth strategy depends in part upon our ability to acquire companies and new product lines. Revenues associated with our acquisitions represented approximately 29.4% and 12.7% of our total revenues in 2004 and 2003, respectively. Future acquisitions will succeed only if we can effectively assess characteristics of potential target companies and product lines, such as:

• *attractiveness of products;*

• *suitability of distribution channels;*

• *management ability;*

• *financial condition and results of operations; and*

• *the degree to which acquired operations can be integrated with our operations.*

We cannot assure you that we can identify attractive acquisition candidates or negotiate acceptable acquisition terms, and our failure to do so may adversely affect our results of operations and our ability to sustain growth. Our acquisition strategy involves a number of risks, each of which could adversely affect our operating results, including:

• *difficulties in integrating acquired businesses or product lines, assimilating new facilities and personnel and harmonizing diverse business strategies and methods of operation;*

• *diversion of management attention from operation of our existing business;*

• *loss of key personnel from acquired companies; and*

• *failure of an acquired business to achieve targeted financial results.*

*A limited number of customers account for a large portion of our net sales, so that if one or more of our major customers were to experience difficulties in fulfilling their obligations to us, cease doing business with us, significantly reduce the amount of their purchases from us or return substantial amounts of our products, it could have a material adverse effect on our business, financial condition and results of operations.*

Our five largest customers accounted for 65.6% of our net sales in 2004. Except for outstanding purchase orders for specific products, we do not have written contracts with or commitments from any of our customers. A substantial reduction in or termination of orders from any of our largest customers could adversely affect our business, financial condition and results of operations. In addition, pressure by large customers seeking price reductions, financial incentives, changes in other terms of sale or for us to bear the risks and the cost of carrying inventory also could adversely affect our business, financial condition and results of operations. If one or more of our major customers were to experience difficulties in fulfilling their obligations to us, cease doing business with us, significantly reduce the amount of their purchases from us or return substantial amounts of our products, it could have a material adverse effect on our business, financial condition

18

Table of Contents

and results of operations. In addition, the bankruptcy or other lack of success of one or more of our significant retailers could negatively impact our revenues and bad debt expense. For example, one of our five largest customers in 2004, Kay Bee Toys, filed for Chapter 11 bankruptcy protection in January 2004. As a result, we have reserved $2.1 million for potential bad debt, which represents 84% of Kay Bee Toys' $2.5 million pre–petition accounts receivable balance with us. If Kay Bee Toys is unable to extricate itself from bankruptcy and we are unable to replace the revenues previously earned by us from Kay Bee Toys, our business, financial condition and results of operations could be materially adversely affected.

*We depend on our key personnel and any loss or interruption of either of their services could adversely affect our business, financial condition and results of operations.*

Our success is largely dependent upon the experience and continued services of Jack Friedman, our Chairman and Chief Executive Officer and Stephen G. Berman, our President and Chief Operating Officer. We cannot assure you that we would be able to find an appropriate replacement for Mr. Friedman or Mr. Berman if the need should arise, and any loss or interruption of Mr. Friedman's or Mr. Berman's services could adversely affect our business, financial condition and results of operations.

*We depend on third–party manufacturers, and if our relationship with any of them is harmed or if they independently encounter difficulties in their manufacturing processes, we could experience raw product defects, production delays, cost overruns or the inability to fulfill orders on a timely basis, any of which could adversely affect our business, financial condition and results of operations.*

We depend on approximately twenty–five third–party manufacturers who develop, provide and use the tools, dies and molds that we own to manufacture our products. However, we have limited control over the manufacturing processes themselves. As a result, any difficulties encountered by the third–party manufacturers that result in product defects, production delays, cost overruns or the inability to fulfill orders on a timely basis could adversely affect our business, financial condition and results of operations.

We do not have long–term contracts with our third–party manufacturers. Although we believe we could secure other third–party manufacturers to produce our products, our operations would be adversely affected if we lost our relationship with any of our current suppliers or if our current suppliers' operations or sea or air transportation with our overseas manufacturers were disrupted or terminated even for a relatively short period of time. Our tools, dies and molds are located at the facilities of our third–party manufacturers.

Although we do not purchase the raw materials used to manufacture our products, we are potentially subject to variations in the prices we pay our third–party manufacturers for products, depending on what they pay for their raw materials.

*We have substantial sales and manufacturing operations outside of the United States subjecting us to risks associated with the outbreak of SARS, as well as risks common to international operations.*

We sell products and operate facilities in numerous countries outside the United States. For the fiscal year ended December 31, 2004, sales to our international customers comprised approximately 11.9% of our net sales. We expect our sales to international customers to account for a greater portion of our revenues in future fiscal periods. Additionally, we utilize third–party manufacturers located principally in The People's Republic of China ("PRC"), which has been significantly

19

Table of Contents

impacted by the outbreak of Severe Acute Respiratory Syndrome ("SARS"). The inability of the PRC to effectively control the spread of SARS within its borders or the failure of the medical community to develop a cure for this illness may deplete the workforce of the PRC available to manufacture our products, create barriers to entry into commercial markets for our products manufactured in the PRC and prevent us from sending the requisite monitors and inspectors to the PRC to ensure that our products are being manufactured in accordance with our requirements and specifications. Any of the foregoing may cause the infrastructure of our PRC operations to fail, thereby adversely affecting our business, financial condition and results of operations.

Furthermore, our PRC sales and manufacturing operations are subject to the risks normally associated with international operations, including:

• *currency conversion risks and currency fluctuations;*

• *limitations, including taxes, on the repatriation of earnings;*

• *political instability, civil unrest and economic instability;*

• *greater difficulty enforcing intellectual property rights and weaker laws protecting such rights;*

• *complications in complying with laws in varying jurisdictions and changes in governmental policies;*

• *greater difficulty and expenses associated with recovering from natural disasters;*

• *transportation delays and interruptions; and*

• *the potential imposition of tariffs.*

Our reliance on external sources of manufacturing can be shifted, over a period of time, to alternative sources of supply, should such changes be necessary. However, if we were prevented from obtaining products or components for a material portion of our product line due to medical, political, labor or other factors beyond our control, our operations would be disrupted while alternative sources of products were secured. Also, the imposition of trade sanctions by the United States against a class of products imported by us from, or the loss of "normal trade relations" status by China, could significantly increase our cost of products imported from that nation. Because of the importance of our international sales and international sourcing of manufacturing to our business, our financial condition and results of operations could be significantly and adversely affected if any of the risks described above were to occur.

*Our business is subject to extensive government regulation and any violation by us of such regulations could result in product liability claims, loss of sales, diversion of resources, damage to our reputation, increased warranty costs or removal of our products from the market, and we cannot assure you that our product liability insurance for the foregoing will be sufficient.*

Our business is subject to various laws, including the Federal Hazardous Substances Act, the Consumer Product Safety Act, the Flammable Fabrics Act and the rules and regulations promulgated under these acts. These statutes are administered by the Consumer Product Safety Commission ("CPSC"), which has the authority to remove from the market products that are found to be defective and present a substantial hazard or risk of serious injury or death. The CPSC can require a manufacturer to recall, repair or replace these products under certain circumstances. We cannot assure you that defects in our products will not be alleged or found. Any such allegations or findings could result in:

• *product liability claims;*

• *loss of sales;*

20

Table of Contents

- *diversion of resources;*

- *damage to our reputation;*

- *increased warranty costs; and*

- *removal of our products from the market.*

Any of these results may adversely affect our business, financial condition and results of operations. There can be no assurance that our product liability insurance will be sufficient to avoid or limit our loss in the event of an adverse outcome of any product liability claim.

*We depend on our proprietary rights and our inability to safeguard and maintain the same, or claims of third parties that we have violated their intellectual property rights, could have a material adverse effect on our business, financial condition and results of operations.*

We rely on trademark, copyright and trade secret protection, nondisclosure agreements and licensing arrangements to establish, protect and enforce our proprietary rights in our products. The laws of certain foreign countries may not protect intellectual property rights to the same extent or in the same manner as the laws of the United States. We cannot assure you that we or our licensors will be able to successfully safeguard and maintain our proprietary rights. Further, certain parties have commenced legal proceedings or made claims against us based on our alleged patent infringement, misappropriation of trade secrets or other violations of their intellectual property rights. We cannot assure you that other parties will not assert intellectual property claims against us in the future. These claims could divert our attention from operating our business or result in unanticipated legal and other costs, which could adversely affect our business, financial condition and results of operations.

*Market conditions and other third–party conduct could negatively impact our margins and implementation of other business initiatives.*

Economic conditions, such as rising fuel prices and decreased consumer confidence, may adversely impact our margins. In addition, general economic conditions were significantly and negatively affected by the September 11th terrorist attacks and could be similarly affected by any future attacks. Such a weakened economic and business climate, as well as consumer uncertainty created by such a climate, could adversely affect our sales and profitability. Other conditions, such as the unavailability of electronics components, may impede our ability to manufacture, source and ship new and continuing products on a timely basis. Significant and sustained increases in the price of oil could adversely impact the cost of the raw materials used in the manufacture of our products, such as plastic.

*We may not have the funds necessary to purchase our outstanding convertible senior notes upon a fundamental change or other purchase date, as required by the indenture governing the notes.*

On June 15, 2010, June 15, 2013 and June 15, 2018, holders of our convertible senior notes may require us to purchase their notes, which repurchase may be made for cash. In addition, holders may also require us to purchase their notes for cash upon the occurrence of certain fundamental changes in our board composition or ownership structure, if we liquidate or dissolve under certain circumstances or if our common stock ceases being quoted on an established over–the–counter trading market in the United States. If we do not have, or have access to, sufficient funds to repurchase the notes, then we could be forced into bankruptcy. In fact, we expect that we would require third–party financing, but we cannot assure you that we would be able to obtain that financing on favorable terms or at all.

21

Table of Contents

*We have a material amount of goodwill which, if it becomes impaired, would result in a reduction in our net income.*

Goodwill is the amount by which the cost of an acquisition accounted for using the purchase method exceeds the fair value of the net assets we acquire. Current accounting standards require that goodwill no longer be amortized but instead be periodically evaluated for impairment based on the fair value of the reporting unit. As at December 31, 2004, we have not had any impairment of Goodwill, which is evaluated on an annual basis.

At December 31, 2004, approximately $258.3 million, or 37.3%, of our total assets represented goodwill. Declines in our profitability may impact the fair value of our reporting units, which could result in a further write-down of our goodwill. Reductions in our net income caused by the write-down of goodwill could harm our results of operations.

## Item 2. *Properties*

Our principal executive offices occupy approximately 19,000 square feet of space in Malibu, California under a lease expiring on February 28, 2008. We have a lease, expiring August 31, 2007, for approximately 11,000 square feet of additional office space in Malibu, California, which contains our design offices. We have a lease, expiring December 31, 2007, for approximately 17,000 square feet of office space in Deerfield Beach, Florida. We have two leases for showroom and office space at the International Toy Center in New York City, one for approximately 14,500 square feet, which expires April 30, 2010, and an additional one for 4,500 square feet, which expires April 30, 2007. We also have leased office and showroom space of approximately 20,000 square feet in Hong Kong from which we oversee our China-based third-party manufacturing operations, 318,000 square feet of warehouse space in City of Industry, California, and 10,000 square feet of office space in Surrey, England. We entered into a lease for approximately 600,000 square feet of warehouse space in City of Industry, California that is expected to commence in July 2005. We also occupy approximately 25,000 square feet of office and warehouse space in Clinton, Connecticut under a lease expiring September 30, 2007 from which the operations of our Go Fly a Kite and Funnoodle divisions are carried out. We believe that our facilities in the United States, Hong Kong and England are adequate for our reasonably foreseeable future needs.

## Item 3. *Legal Proceedings*

On October 19, 2004, we were named as defendants in a lawsuit commenced by WWE in the U.S. District Court for the Southern District of New York concerning our toy licenses with WWE and the video game license between WWE and the joint venture company operated by THQ and us, encaptioned World Wrestling Entertainment, Inc. v. JAKKS Pacific, Inc., et al., 1:04-CV-08223-KMK (the "WWE Action"). The complaint also named as defendants THQ, the joint venture, certain of our foreign subsidiaries, Jack Friedman (our Chairman and Chief Executive Officer), Stephen Berman (our Chief Operating Officer, President and Secretary and a member of our Board of Directors), Joel Bennett (our Chief Financial Officer), Stanley Shenker and Associates, Inc., Bell Licensing, LLC, Stanley Shenker and James Bell.

WWE sought treble, punitive and other damages (including disgorgement of profits) in an undisclosed amount and a declaration that the video game license with the joint venture, which is scheduled to expire in 2009 (subject to joint venture's right to extend that license for an additional five years), and an amendment to our toy licenses with WWE, which are scheduled to expire in 2009, are void and unenforceable. This action alleged violations by the defendants of the Racketeer

22

Table of Contents

Influenced and Corrupt Organization Act ("RICO") and the anti-bribery provisions of the Robinson-Patman Act, and various claims under state law.

On February 16, 2005, we filed a motion to dismiss the WWE Action. On March 30, 2005, the day before WWE's opposition to our motion was due, WWE amended its complaint to, among other things, add the Chief Executive Officer of THQ as a defendant and to add a claim under the Sherman Act. On March 31, 2005, the WWE sent a letter to the Court proposing, *inter alia*, a briefing schedule for defendants' motions to dismiss the amended complaint.

In November 2004, several purported class action lawsuits were filed in the United States District Court for the Southern District of New York; (1) Garcia v. Jakks Pacific, Inc. et al., Civil Action No. 04-8807 (filed on November 5, 2004, (2) Jonco Investors, LLC v. Jakks Pacific, Inc. et al., Civil Action No. 04-9021 (filed on November 16, 2004), (3) Kahn v. Jakks Pacific, Inc. et al., Civil Action No. 04-8910 (filed on November 10, 2004), (4) Quantum Equities L.L.C. v. Jakks Pacific, Inc. et al., Civil Action No. 04-8877 (filed on November 9, 2004), and (5) Irvine v. Jakks Pacific, Inc. et al., Civil Action No. 04-9078 (filed on November 16, 2004) (the "Class Action"). The complaints in the Class Actions allege that defendants issued positive statements concerning increasing sales of our WWE licensed products which were false and misleading because the WWE licenses had allegedly been obtained through a pattern of commercial bribery, our relationship with the WWE was being negatively impacted by the WWE's contentions and there was an increased risk that the WWE would either seek modification or nullification of the licensing agreements with us. Plaintiffs also allege that we misleadingly failed to disclose the alleged fact that the WWE licenses were obtained through an unlawful bribery scheme. The plaintiffs in the Class Actions are described as purchasers of our common stock, who purchased from as early as October 26, 1999 to as late as October 19, 2004. The Class Actions seek compensatory and other damages in an undisclosed amount, alleging violations of Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder by each of the defendants (namely the Company and Messrs. Friedman, Berman and Bennett), and violations of Section 20(a) of the Exchange Act by Messrs. Friedman, Berman and Bennett. On January 25, 2005, the Court consolidated the Class Actions under the caption In re JAKKS Pacific, Inc. Shareholders Class Action Litigation, Civil Action No. 04-8807.

We believe that the claims in the WWE Action and the Class Actions are without merit and we intend to defend vigorously against them. However, because these Actions are in their preliminary stages, we cannot assure you as to the outcome of the Actions, nor can we estimate the range of our potential losses.

On February 16, 2005, we filed a motion to dismiss WWE's Complaint in the WWE Action. The motion is currently scheduled to be fully briefed on April 14, 2005, with oral argument to be scheduled thereafter.

On December 2, 2004, a shareholder derivative action was filed in the Southern District of New York by Freeport Partner, LLC against us, nominally, and against Messrs. Friedman, Berman and Bennett, Freeport Partners v. Friedman, et al., Civil Action No. 04-9441 (the "Derivative Action"). The Derivative Action seeks to hold the individual defendants liable for damages allegedly caused to us by their actions and in particular to hold them liable on a contribution theory with respect to any liability we incur in connection with the Class Actions. On or about February 10, 2005, a second shareholder derivative action was filed in the Southern District of New York by David Oppenheim against us, nominally, and against Messrs. Friedman, Berman, Bennett, Blatte, Glick, Miller and Skala, Civil Action 05-2046 (the "Second Derivative Action"). The Second Derivative Action seeks to hold the individual defendants liable for damages allegedly caused to us by their actions as a result

23

Table of Contents

of alleged breaches of their fiduciary duties. On or about March 16, 2005, a third shareholder derivative action was filed. It is captioned Warr v. Friedman, Berman, Bennett, Blatte, Glick, Miller, Skala, and Jakks (as a nominal defendant), and it was filed in the Superior Court of California, Los Angeles County (the "Third Derivative Action"). The Third Derivative Action seeks to hold the individual defendants liable for (1) damages allegedly caused to us by their alleged breaches of fiduciary duty, abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment; and (2) restitution to us of profits, benefits and other compensation obtained by them.

On March 1, 2005, we delivered a Notice of Breach of Settlement Agreement and Demand for Indemnification to WWE (the "Notification"). The Notification asserted that WWE's filing of the WWE Action violated A Covenant Not to Sue contained in a January 15, 2004 Settlement Agreement and General Release ("General Release") entered into between WWE and us and, therefore, that we were demanding indemnification, pursuant to the Indemnification provision contained in the General Release, for all losses that the WWE's actions have caused or will cause to us and our officers, including but not limited to any losses sustained by us in connection with the Class Actions. On March 4, 2005, in a letter from its outside counsel, WWE asserted that the General Release does not cover the claims in the WWE Action.

We are a party to, and certain of our property is the subject of, various other pending claims and legal proceedings that routinely arise in the ordinary course of our business, but we do not believe that any of these claims or proceedings will have a material effect on our business, financial condition or results of operations.

24

Table of Contents

# PART II

**Item 5.** *Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities*
**Market Information**

Our common stock is traded on the Nasdaq National Market under the symbol "JAKK." The following table sets forth, for the periods indicated, the range of high and low sales prices for our common stock on the Nasdaq National Market.

| | Price Range of Common Stock | |
|---|---|---|
| | High | Low |
| **2003:** | | |
| First quarter | $  14.49 | $   9.50 |
| Second quarter | 14.49 | 10.22 |
| Third quarter | 14.04 | 10.05 |
| Fourth quarter | 13.77 | 11.74 |
| **2004:** | | |
| First quarter | 16.25 | 12.72 |
| Second quarter | 21.00 | 14.48 |
| Third quarter | 23.22 | 18.71 |
| Fourth quarter | 25.55 | 12.75 |

**Security Holders**

To the best of our knowledge, as of March 25, 2005, there were 149 holders of record of our common stock. We believe there are numerous beneficial owners of our common stock whose shares are held in "street name."

**Dividends**

We have never paid any cash dividends on our common stock. We currently intend to retain our future earnings, if any, to finance the growth and development of our business, but may consider implementing a plan to pay cash dividends on our common stock in the future.

**Equity Compensation Plan Information**

The table below sets forth the following information as of the fiscal year ended December 31, 2004 for (i) all compensation plans previously approved by our stockholders and (ii) all compensation plans not previously approved by our stockholders, if any:

(a) the number of securities to be issued upon the exercise of outstanding options, warrants and rights;

(b) the weighted–average exercise price of such outstanding options, warrants and rights;

(c) other than securities to be issued upon the exercise of such outstanding options, warrants and rights, the number of securities remaining available for future issuance under the plans.

25

Table of Contents

| Plan Category | Number of Securities to be Issued upon Exercise of Outstanding Options, Warrants and Rights (a) | Weighted−Average Exercise Price of Outstanding Options, Warrants and Rights (b) | Number of Securities Remaining Available for Future Issuance Under Equity Compensation Plans (Excluding Securities Reflected in Column (a)) (c) |
|---|---|---|---|
| Equity compensation plans approved by security holders | 2,073,006 | $    13.22 | 1,728,523 |
| Equity compensation plans not approved by security holders | — | | — |
| Total | 2,073,006 | $    13.22 | 1,728,523 |

Equity compensation plans approved by our stockholders consists of the 2002 Stock Award and Incentive Plan.

**Item 6.** *Selected Financial Data*

You should read the financial data set forth below in conjunction with "Management's Discussion and Analysis of Financial Condition and Results of Operations" and our consolidated financial statements and the related notes (included in Item 8).

| | Year Ended December 31, | | | | |
|---|---|---|---|---|---|
| | 2000 | 2001 | 2002 | 2003 | 2004 |
| | (In thousands, except per share data) | | | | |
| **Consolidated Statement of Operations Data:** | | | | | |
| Net sales | $  252,288 | $  284,309 | $  310,016 | $  315,776 | $  574,266 |
| Cost of sales | 149,881 | 164,222 | 180,173 | 189,334 | 348,259 |
| Gross profit | 102,407 | 120,087 | 129,843 | 126,442 | 226,007 |
| Selling, general and administrative expenses | 80,435 | 89,575 | 98,111 | 113,053 | 172,282 |
| Acquisition shut−down and product recall costs | 1,469 | 1,214 | 6,718 | 2,000 | — |
| Income from operations | 20,503 | 29,298 | 25,014 | 11,389 | 53,725 |
| Profit from Joint Venture | (15,906) | (6,675) | (8,004) | (7,351) | (7,865) |
| Interest, net | (3,833) | (2,057) | (1,141) | 1,405 | 2,498 |
| Other (income) expense, net | (92) | — | — | — | — |
| Income before provision for income taxes and minority interest | 40,334 | 38,030 | 34,159 | 17,335 | 59,092 |
| Provision for income taxes | 11,697 | 9,797 | 6,466 | 1,440 | 15,533 |
| Income before minority interest | 28,637 | 28,233 | 27,693 | 15,895 | 43,559 |
| Minority interest | — | — | (237) | — | — |
| Net income | $  28,637 | $  28,233 | $  27,930 | $  15,895 | $  43,559 |
| Basic earnings per share | $    1.50 | $    1.55 | $    1.27 | $    0.66 | $    1.69 |
| Weighted average shares outstanding | 19,060 | 18,199 | 21,963 | 24,262 | 25,797 |
| Diluted earnings per share | $    1.41 | $    1.45 | $    1.23 | $    0.66 | $    1.49 |
| Weighted average shares and equivalents outstanding | 20,281 | 19,410 | 22,747 | 27,437 | 31,406 |

26

Table of Contents

|  | At December 31, | | | | |
|---|---|---|---|---|---|
|  | 2000 | 2001 | 2002 (In thousands) | 2003 | 2004 |
| **Consolidated Balance Sheet Data:** | | | | | |
| Cash and cash equivalents | $ 29,275 | $ 25,036 | $ 68,413 | $ 118,182 | $ 176,544 |
| Working capital | 86,897 | 116,492 | 129,183 | 232,601 | 229,543 |
| Total assets | 248,722 | 284,041 | 408,916 | 529,997 | 696,762 |
| Long−term debt, net of current portion | 1,000 | 77 | 60 | 98,042 | 98,000 |
| Total stockholders' equity | 204,530 | 244,404 | 357,236 | 377,900 | 451,485 |

## Item 7. *Management's Discussion and Analysis of Financial Condition and Results of Operations*

The following Management's Discussion and Analysis of Financial Condition and Results of Operations contains forward−looking statements that involve risks and uncertainties. Our actual results could differ materially from those anticipated in these forward−looking statements as a result of various factors. You should read this section in conjunction with our consolidated financial statements and the related notes (included in Item 8).

**Critical Accounting Policies**

The accompanying consolidated financial statements and supplementary information were prepared in accordance with accounting principles generally accepted in the United States of America. Significant accounting policies are discussed in Footnote 2 to the Consolidated Financial Statements, Item 8. Inherent in the application of many of these accounting policies is the need for management to make estimates and judgments in the determination of certain revenues, expenses, assets and liabilities. As such, materially different financial results can occur as circumstances change and additional information becomes known. The policies with the greatest potential effect on our results of operation and financial position include:

The allowance for doubtful accounts is based on our assessment of the collectibility of specific customer accounts and the aging of the accounts receivable. If there were a deterioration of a major customer's creditworthiness, or actual defaults were higher than our historical experience, our estimates of the recoverability of amounts due to us could be overstated, which could have an adverse impact on our operating results.

Our revenue recognition policy is significant because our revenue is a key component of our results of operations. In addition, our revenue recognition determines the timing of certain expenses, such as commissions and royalties. We follow very specific and detailed guidelines in measuring revenues; however, certain judgments affect the application of our revenue policy. Revenue results are difficult to predict, and any shortfall in revenue or delay in recognizing revenue could cause our operating results to vary significantly from quarter to quarter.

We assess the impairment of long−lived assets and goodwill at least annually or whenever events or changes in circumstances indicate that the carrying value may not be recoverable. Factors we consider important which could trigger an impairment review include the following:

• significant underperformance relative to expected historical or projected future operating results;

• significant changes in the manner of our use of the acquired assets or the strategy for our overall business; and

• significant negative industry or economic trends.

27

Table of Contents

When we determine that the carrying value of long−lived assets and goodwill may not be recoverable based upon the existence of one or more of the above indicators of impairment, we measure any impairment based on a projected discounted cash flow method using a discount rate determined by our management to be commensurate with the risk inherent in our current business model. Net long−lived assets, including goodwill, amounted to $312.0 million as of December 31, 2004.

**Recent Developments**

On June 10, 2004, we purchased substantially all of the assets and assumed certain liabilities of Play Along, Inc., Play Along (Hong Kong) Limited and PA Distribution, Inc. (collectively "Play Along"). The total purchase price of approximately $85.7 million consisted of cash in the amount of $70.8 million, 749,005 shares of our common stock at a value of $14.9 million and the assumption of certain liabilities and resulted in goodwill of $67.8 million. In addition, we agreed to pay an earn−out of up to $10.0 million per year for the four calendar years following the acquisition up to an aggregate amount of $30.0 million based on the achievement of certain financial performance criteria which will be recorded as goodwill when and if earned. Our results of operations have included Play Along from the date of acquisition.

On October 19, 2004, we were named as defendants in a lawsuit commenced by WWE in the U.S. District Court for the Southern District of New York concerning our toy licenses with WWE and the video game license between WWE and the joint venture company operated by THQ and us, encaptioned World Wrestling Entertainment, Inc. v. JAKKS Pacific, Inc., et al., 1:04−CV−08223−KMK (the "WWE Action"). The complaint also named as defendants THQ, the joint venture, certain of our foreign subsidiaries, Jack Friedman (our Chairman and Chief Executive Officer), Stephen Berman (our Chief Operating Officer, President and Secretary and a member of our Board of Directors), Joel Bennett (our Chief Financial Officer), Stanley Shenker and Associates, Inc., Bell Licensing, LLC, Stanley Shenker and James Bell.

WWE sought treble, punitive and other damages (including disgorgement of profits) in an undisclosed amount and a declaration that the video game license with the joint venture, which is scheduled to expire in 2009 (subject to joint venture's right to extend that license for an additional five years), and an amendment to our toy licenses with WWE, which are scheduled to expire in 2009, are void and unenforceable. This action alleged violations by the defendants of the Racketeer Influenced and Corrupt Organization Act ("RICO") and the anti−bribery provisions of the Robinson−Patman Act, and various claims under state law.

On February 16, 2005, we filed a motion to dismiss the WWE Action. On March 30, 2005, the day before WWE's opposition to our motion was due, WWE amended its complaint to, among other things, add the Chief Executive Officer of THQ as a defendant and to add a claim under the Sherman Act. On March 31, 2005, the WWE sent a letter to the Court proposing, *inter alia*, a briefing schedule for defendants' motions to dismiss the amended complaint.

In November 2004, several purported class action lawsuits were filed in the United States District Court for the Southern District of New York; (1) Garcia v. Jakks Pacific, Inc. et al., Civil Action No. 04−8807 (filed on November 5, 2004, (2) Jonco Investors, LLC v. Jakks Pacific, Inc. et al., Civil Action No. 04−9021 (filed on November 16, 2004), (3) Kahn v. Jakks Pacific, Inc. et al., Civil Action No. 04−8910 (filed on November 10, 2004), (4) Quantum Equities L.L.C. v. Jakks Pacific, Inc. et al., Civil Action No. 04−8877 (filed on November 9, 2004), and (5) Irvine v. Jakks Pacific, Inc. et al., Civil Action No. 04−9078 (filed on November 16, 2004) (the "Class Action"). The complaints in the Class Actions allege that defendants issued positive statements concerning

28

Table of Contents

increasing sales of our WWE licensed products which were false and misleading because the WWE licenses had allegedly been obtained through a pattern of commercial bribery, our relationship with the WWE was being negatively impacted by the WWE's contentions and there was an increased risk that the WWE would either seek modification or nullification of the licensing agreements with us. Plaintiffs also allege that we misleadingly failed to disclose the alleged fact that the WWE licenses were obtained through an unlawful bribery scheme. The plaintiffs in the Class Actions are described as purchasers of our common stock, who purchased from as early as October 26, 1999 to as late as October 19, 2004. The Class Actions seek compensatory and other damages in an undisclosed amount, alleging violations of Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b–5 promulgated thereunder by each of the defendants (namely the Company and Messrs. Friedman, Berman and Bennett), and violations of Section 20(a) of the Exchange Act by Messrs. Friedman, Berman and Bennett. On January 25, 2005, the Court consolidated the Class Actions under the caption In re JAKKS Pacific, Inc. Shareholders Class Action Litigation, Civil Action No. 04–8807.

We believe that the claims in the WWE Action and the Class Actions are without merit and we intend to defend vigorously against them. However, because these Actions are in their preliminary stages, we cannot assure you as to the outcome of the Actions, nor can we estimate the range of our potential losses.

On February 16, 2005, we filed a motion to dismiss WWE's Complaint in the WWE Action. The motion is currently scheduled to be fully briefed on April 14, 2005, with oral argument to be scheduled thereafter.

On December 2, 2004, a shareholder derivative action was filed in the Southern District of New York by Freeport Partner, LLC against us, nominally, and against Messrs. Friedman, Berman and Bennett, Freeport Partners v. Friedman, et al., Civil Action No. 04–9441 (the "Derivative Action"). The Derivative Action seeks to hold the individual defendants liable for damages allegedly caused to us by their actions and in particular to hold them liable on a contribution theory with respect to any liability we incur in connection with the Class Actions. On or about February 10, 2005, a second shareholder derivative action was filed in the Southern District of New York by David Oppenheim against us, nominally, and against Messrs. Friedman, Berman, Bennett, Blatte, Glick, Miller and Skala, Civil Action 05–2046 (the "Second Derivative Action"). The Second Derivative Action seeks to hold the individual defendants liable for damages allegedly caused to us by their actions as a result of alleged breaches of their fiduciary duties. On or about March 16, 2005, a third shareholder derivative action was filed. It is captioned Warr v. Friedman, Berman, Bennett, Blatte, Glick, Miller, Skala, and Jakks (as a nominal defendant), and it was filed in the Superior Court of California, Los Angeles County (the "Third Derivative Action"). The Third Derivative Action seeks to hold the individual defendants liable for (1) damages allegedly caused to us by their alleged breaches of fiduciary duty, abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment; and (2) restitution to us of profits, benefits and other compensation obtained by them.

On March 1, 2005, we delivered a Notice of Breach of Settlement Agreement and Demand for Indemnification to WWE (the "Notification"). The Notification asserted that WWE's filing of the WWE Action violated A Covenant Not to Sue contained in a January 15, 2004 Settlement Agreement and General Release ("General Release") entered into between WWE and us and, therefore, that we were demanding indemnification, pursuant to the Indemnification provision contained in the General Release, for all losses that the WWE's actions have caused or will cause to us and our officers, including but not limited to any losses sustained by us in connection with

29

Table of Contents

the Class Actions. On March 4, 2005, in a letter from its outside counsel, WWE asserted that the General Release does not cover the claims in the WWE Action.

On March 31, 2004, our consolidated financial statements as of December 31, 2002 and 2003 and for the two years in the period ended December 31, 2003 were restated from those originally issued to reflect certain adjustments related to the accounting for the acquisitions of Toymax, Trendmasters and P&M in accordance with Statement of Financial Accounting Standards No. 141. Specifically, the purchase price of these acquisitions was originally allocated substantially to goodwill, and, based on studies and valuations completed in 2005 by a third−party valuation consultant, the purchase price of these acquisitions was reallocated in part to intangible assets other than goodwill, including those with limited lives. The resulting adjustment to amortization expense related to the limited life intangible assets of $6.3 million in 2002 and $7.3 million in 2003 and the resulting charge to cost of sales related to the mark−up of acquired inventory of $0.7 million in 2002 and $0.2 million in 2003, which led to a reduction of operating income in 2002 and 2003.

These adjustments impacted the consolidated balance sheets as of December 31, 2002 and 2003, and the consolidated statements of operations, other comprehensive income, stockholders' equity and cash flows for each of the two years ended December 31, 2002 and 2003.

**Results of Operation**

The following table sets forth, for the periods indicated, certain statement of operations data as a percentage of net sales.

| | Years Ended December 31, | | | | |
|---|---|---|---|---|---|
| | **2000** | **2001** | **2002** | **2003** | **2004** |
| Net sales | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |
| Cost of sales | 59.4 | 57.8 | 58.1 | 60.0 | 60.6 |
| Gross profit | 40.6 | 42.2 | 41.9 | 40.0 | 39.4 |
| Selling, general and administrative expenses | 31.9 | 31.5 | 31.6 | 35.8 | 30.0 |
| Acquisition shut−down and product recall costs | 0.5 | 0.4 | 2.2 | 0.6 | — |
| Income from operations | 8.2 | 10.3 | 8.1 | 3.6 | 9.4 |
| Profit from Joint Venture | (6.3) | (2.3) | (2.6) | (2.3) | (1.4) |
| Interest, net | (1.5) | (0.7) | (0.4) | 0.4 | 0.4 |
| Income before income taxes and minority interest | 16.0 | 13.3 | 11.1 | 5.5 | 10.4 |
| Provision for income taxes | 4.6 | 3.4 | 2.1 | 0.5 | 2.7 |
| Income before minority interest | 11.4 | 9.9 | 9.0 | 5.0 | 7.7 |
| Minority interest | — | — | — | — | — |
| Net income | 11.4% | 9.9% | 9.0% | 5.0% | 7.7% |

*Comparisons of the Years Ended December 31, 2004 and 2003*

*Net Sales.* Net sales were $574.3 million in 2004 compared to $315.8 million in 2003, representing an increase of 81.9%. This increase in net sales was primarily due to the addition of $151.6 million in sales of traditional toys from our recent Play Along acquisition, as well as the addition of (i) $147.5 million in sales of some of our other traditional toy products, including primarily TV Games (with 15 titles in release in 2004, as compared to 3 titles in release in 2003) and WWE action figures and accessories; and (ii) $23.7 million in international sales (including $13.9 million by Play Along). The increase in net sales was offset in part by decreases in sales of

Table of Contents

our crafts and activities and writing instruments of $48.2 million and our seasonal products, including water guns and junior sports toys, of $16.1 million.

With the addition of Play Along, in addition to our other initiatives, we believe that the increased level of net sales should continue into 2005 (see "Forward Looking Information").

*Gross Profit.* Gross profit increased $99.6 million, or 78.8%, to $226.0 million, or 39.4% of net sales, in 2004 from $126.4 million, or 40.0% of net sales, in 2003. The overall increase in gross profit was attributable to the significant increase in net sales. The decrease in gross profit margin of 0.6% of net sales was primarily due to an increase in royalty expense as a percentage of net sales due to changes in the product mix to more products with higher royalty rates from products with lower royalty rates or proprietary products with no royalties.

*Selling, General and Administrative Expenses.* Selling, general and administrative expenses were $172.3 million in 2004 and $113.1 million in 2003, constituting 30.0% and 35.8% of net sales, respectively. The overall increase of $59.2 million in such costs was primarily due to the impact of stock−based compensation ($5.2 million), an increase in legal fees and settlements ($6.8 million) and bonus expense ($4.5 million), an increase in amortization expense related to intangible assets other than goodwill acquired in the Play Along acquisition and the addition of overhead related to the operations of Play Along ($27.2 million). Due to the increases in our grants of restricted stock awards and the price of our common stock in 2004, compared to a moderate increase in the price of our common stock in 2003, we had stock−based compensation charges of $13.6 million compared to $8.4 million in 2003. The increase in direct selling expenses ($19.3 million) is primarily due to an increase in advertising and promotional expenses in 2004 in support of the sell−through of our various products at retail. We produced and aired television commercials in support of several of our products, including World Wrestling Entertainment, Dragon Ball and Mucha Lucha action figures, TV Games, Care Bears, Cabbage Patch Kids and Flying Colors products in 2004, and World Wrestling Entertainment and Dragon Ball action figures and Flying Colors products in 2003. From time to time, we may increase our advertising efforts, if we deem it appropriate for particular products.

*Product Recall Costs* There were no product recall costs in 2004. In the second quarter of 2003, we accrued a $2.7 million charge for the recall of one of our products, and in the third quarter of 2003, we recorded a credit of $0.7 million for the recovery of recall costs from one of our third−party factories.

The remaining component of the product recall costs is as follows (in thousands):

| | Accrued Balance December 31, 2003 | Accrual | Actual | Accrued Balance December 31, 2004 |
|---|---|---|---|---|
| Product recall costs | $          490 | — | (490) | $          — |

*Profit from Joint Venture.* Profit from joint venture increased by $0.5 million in 2004 due to the joint venture having lower unit sales at lower wholesale prices of its two vehicle combat games of the five games released in 2003 compared to releasing all new titles with higher unit sales at higher wholesale prices in addition to having higher sales of carryover titles in 2004. New releases typically generate higher unit sales resulting in higher overall sales as compared to carryover titles. Profit from the joint venture contributed significantly to our pre−tax profit, representing 22.2% of pre−tax income in 2003 and 12.7% in 2004. We expect to continue to receive a preferred return over the remaining term of the license agreement ending December 31, 2009, although we cannot predict with certainty what levels of return will be achieved and, in any case, we anticipate substantial fluctuations in the amount of the preferred return distributed to us from year to year.

31

Table of Contents

*Interest Net.* Interest income increased due to higher average cash balances during 2004 than in 2003, but was offset by interest expense of $4.5 million related to the convertible notes issued in June 2003.

*Provision for Income Taxes.* Provision for income taxes included Federal, state and foreign income taxes in 2003 and 2004, at an effective tax rate of 8.3% and 26.0%, respectively, benefiting from a flat 17.0% Hong Kong Corporation Tax on our income arising in, or derived from, Hong Kong for 2003 and 2004. For 2004, the effective rate increased as a result of the recognition of U.S. taxes on a greater proportion of foreign earnings deemed to be subject to U.S. taxes. As of December 31, 2004, we had net deferred tax assets of approximately $1.9 million. In making this determination, management believes it considered all available evidence, both positive and negative, as well as the weight and importance given to such evidence.

**Comparisons of the Years Ended December 31, 2003 and 2002**

*Net Sales.* Net sales were $315.8 million in 2003 compared to $310.0 million in 2002, representing an increase of 1.9%. The increase in net sales of $17.6 million by our seasonal products, including *Trendmasters, Go Fly a Kite, Funnoodle* and sports toys, and new product introductions, including *Dragon Ball* and *NASCAR* action toys, TV games and *ColorWorkshop* craft products, were offset by a decrease of $20.6 million in sales of our other traditional products, and $8.5 million in international sales, which included a reduction in sales of our karaoke machines and Equalizer radio control vehicle in 2003, both higher priced items.

*Gross Profit.* Gross profit decreased $3.4 million, or 2.7%, to $126.4 million, or 40.0% of net sales, in 2003 from $129.8 million, or 41.9% of net sales, in 2002. The overall decrease in gross profit was attributable to a decrease in gross profit margin. The decrease in gross profit margin of 1.9% of net sales was due to higher sales of seasonal products with lower margins and an increase in royalty expense as a percentage of net sales due to changes in the product mix resulting from the sale of more products with higher royalty rates, though offset in part by a decrease in amortization expense of molds and tools used in the manufacture of our products.

*Selling, General and Administrative Expenses.* Selling, general and administrative expenses were $113.1 million in 2003 and $98.1 million in 2002, constituting 35.8% and 31.6% of net sales, respectively. The overall increase of $15.0 million in such costs was primarily due to a charge for the grant of restricted stock of $8.4 million, a charge of $2.1 million to bad debt relating to the bankruptcy of several of our customers, including Kay Bee Toys, and an increase in direct selling expenses, product development costs, option compensation expense resulting from the price reset of options in 2000 and operating expenses incurred in connection with the P&M asset acquisition. We produced and aired television commercials in support of several of our products, including *WWE* and *Dragon Ball Z* action figures and *Flying Colors* products in 2003 and *WWE* action figures and *Flying Colors* products in 2002. From time to time, we may increase our advertising efforts, if we deem it appropriate for particular products.

*Acquisition Shut-down and Product Recall Costs.* Acquisition shut-down costs in 2002 relate to shut-down costs, including lease termination, fixed asset abandonment and other costs, of certain operations of Toymax and Kidz Biz. There were no such costs in 2003. Operations impacted by these shut-downs were sales, design, distribution, and administration. The integrations of Toymax and Kidz Biz were completed in 2002. In 2003, we accrued a net amount of $2.0 million for the recall of one of our products, compared to having accrued $2.2 million in 2002 for the recall of the same product.

32

Table of Contents

The remaining component of the acquisition shut–down and product recall costs is as follows (in thousands):

| | Accrued Balance December 31, 2002 | Accrual | Actual | Accrued Balance December 31, 2003 |
|---|---|---|---|---|
| Lease abandonment costs | $ 2,310 | $ — | $ (2,310) | $ — |
| Product recall costs | — | 2,000 | (1,510) | 490 |
| Total | $ 2,310 | $ 2,000 | $ (3,820) | $ 490 |

*Profit from Joint Venture.* Profit from joint venture decreased by $0.7 million in 2003 due to the joint venture having lower unit sales at lower wholesale prices of its two vehicle combat games of the five games released in 2003 compared to releasing all new titles with higher unit sales at higher wholesale prices in addition to having higher sales of carryover titles in 2002. New releases typically generate higher unit sales resulting in higher overall sales as compared to carryover titles. Profit from the joint venture contributed significantly to our pre–tax profit, representing 19.5% of pre–tax income in 2002 and 22.2% in 2003. We expect to continue to receive a preferred return over the remaining term of the license agreement ending December 31, 2009, although we cannot predict with certainty what levels of return will be achieved and, in any case, we anticipate substantial fluctuations in the amount of the preferred return distributed to us from year to year.

*Interest Net.* Interest income increased due to higher average cash balances during 2003 than in 2002, but was offset by interest expense of $2.5 million related to the convertible notes issued in June 2003.

*Provision for Income Taxes.* Provision for income taxes included Federal, state and foreign income taxes in 2002 and 2003, at an effective tax rate of 18.9% and 8.3%, respectively, benefiting from a flat 16.5% and 17.0%, Hong Kong Corporation Tax on our income arising in, or derived from, Hong Kong for 2002 and 2003, respectively. For 2003, the effective rate decreased as a result of a higher proportionate share of income arising in Hong Kong as opposed to losses arising in the higher statutory jurisdictions. As of December 31, 2003, we had deferred tax assets of approximately $4.5 million for which no allowance has been provided since, in the opinion of management, realization of the future benefit is probable. In making this determination, management believes it considered all available evidence, both positive and negative, as well as the weight and importance given to such evidence.

33

## Quarterly Fluctuations and Seasonality

We have experienced significant quarterly fluctuations in operating results and anticipate these fluctuations in the future. The operating results for any quarter are not necessarily indicative of results for any future period. Our first quarter is typically expected to be the least profitable as a result of lower net sales but substantially similar fixed operating expenses. This is consistent with the performance of many companies in the toy industry.

The following table presents our unaudited quarterly results for the years indicated. The seasonality of our business is reflected in this quarterly presentation.

| | 2002 | | | | 2003 | | | | 2004 | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | First Quarter | Second Quarter | Third Quarter | Fourth Quarter | First Quarter | Second Quarter | Third Quarter | Fourth Quarter | First Quarter | Second Quarter | Third Quarter | Fourth Quarter |
| | | | | | (In thousands, except per share data) | | | | | | | |
| Net sales | 59,895 | 78,992 | 102,640 | 68,489 | 67,759 | 73,290 | 90,308 | 84,419 | 73,986 | 109,395 | 206,083 | 184,802 |
| As a % of full year | 19.3% | 25.5% | 33.1% | 22.1% | 21.5% | 23.2% | 28.6% | 26.7% | 12.9% | 19.0% | 35.9% | 32.2% |
| Gross profit | 26,470 | 35,192 | 41,812 | 26,369 | 27,442 | 27,906 | 36,226 | 34,868 | 30,466 | 41,281 | 81,801 | 72,459 |
| As a % of full year | 20.4% | 27.1% | 32.2% | 20.3% | 21.7% | 22.1% | 28.7% | 27.6% | 13.5% | 18.3% | 36.2% | 32.1% |
| As a % of net sales | 44.2% | 44.6% | 40.7% | 38.5% | 40.5% | 38.1% | 40.1% | 41.3% | 41.2% | 37.7% | 39.7% | 39.2% |
| Income (loss) from operations | 1,420 | 7,863 | 16,835 | (1,104) | 5,960 | 2,522 | 10,480 | (7,573) | 4,885 | 8,321 | 29,915 | 10,604 |
| As a % of full year | 5.7% | 31.4% | 67.3% | −4.4% | 52.3% | 22.1% | 92.0% | −66.5% | 9.1% | 15.5% | 55.7% | 19.7% |
| As a % of net sales | 2.4% | 10.0% | 16.4% | −1.6% | 8.8% | 3.4% | 11.6% | −9.0% | 6.6% | 7.6% | 14.5% | 5.7% |
| Income before income taxes and minority interest | 2,985 | 8,800 | 17,884 | 4,490 | 6,299 | 2,679 | 10,495 | (2,138) | 4,764 | 7,637 | 30,042 | 16,649 |
| As a % of net sales | 5.0% | 11.1% | 17.4% | 6.6% | 9.3% | 3.7% | 11.6% | −2.5% | 6.4% | 7.0% | 14.6% | 9.0% |
| Net income | 2,156 | 6,973 | 13,085 | 5,717 | 4,988 | 2,236 | 8,248 | 422 | 3,791 | 6,004 | 23,255 | 10,508 |
| As a % of net sales | 3.6% | 8.8% | 12.7% | 8.3% | 7.4% | 3.1% | 9.1% | 0.5% | 5.1% | 5.5% | 11.3% | 5.7% |
| Diluted earnings per share | $ 0.11 | $ 0.32 | $ 0.54 | $ 0.23 | $ 0.20 | $ 0.09 | $ 0.33 | $ 0.02 | $ 0.15 | $ 0.22 | $ 0.75 | $ 0.36 |
| Weighted average shares and equivalents outstanding | 20,236 | 21,953 | 24,059 | 24,800 | 24,917 | 24,683 | 24,629 | 24,642 | 30,676 | 31,123 | 31,919 | 31,855 |

Due to the restatement in 2003 relating to the accounting of the Toymax, Trendmasters and P&M acquisition and to rounding, some of the figures above may differ from our previously filed Quarterly Reports on Form 10−Q.

During the first quarter of 2002, we recorded a charge which impacted operating income by approximately $6.6 million relating to the restructuring of Toymax and Kidz Biz.

During the second quarter of 2002, we recorded a charge which impacted operating income by approximately $1.5 million relating to the recall of one of our products.

During the fourth quarter of 2002, we reversed $2.1 million of the restructuring charge recorded in the first quarter of 2002 and recorded an additional charge of approximately $0.7 million relating to the recall of one of our products, the net of which favorably impacted operating income by approximately $1.4 million. In addition, our effective tax rate for the year 2002 was reduced from 26% to 19%.

During the second quarter of 2003, we recorded a charge which impacted operating income by approximately $2.7 million relating to the recall of one of our products.

During the third quarter of 2003, we recovered $0.7 million of the recall costs, recorded in the second quarter of 2003, from one of our factories.

During the fourth quarter of 2003, we recorded a non−cash charge of $8.4 million which impacted operating income relating to the grant of restricted stock and a charge of $2.1 million to provision for bad debt impacting operating income relating to the bankruptcy filing of several of our customers, including Kay Bee Toys.

34

Table of Contents

During the fourth quarter of 2004, we recorded non−cash charges, which impacted operating income, of $5.6 million relating to the grant of restricted stock and $8.6 million relating to the amortization of short−lived intangible assets acquired in connection with the Play Along acquisition.

*Recent Accounting Standards*

In January 2003 and as revised in December 2003, the Financial Accounting Standards Board ("FASB") issued FASB Interpretation No. 46, "Consolidation of Variable Interest Entities" ("Interpretation 46") and FASB Interpretation No. 46R ("Interpretation 46R"). Interpretations 46 and 46R require companies with a variable interest in a variable interest entity to apply the guidance contained in such Interpretations as of the beginning of the first reporting period after December 15, 2003. If applicable, the application of the guidance could result in the consolidation of a variable interest entity. Interpretations 46 and 46R are not applicable to us, as we are not the beneficiary of any variable interest entities.

In May 2003, the FASB issued Statement of Financial Accounting Standards No. 150, "Accounting for Certain Financial Instruments with Characteristics of Both Liabilities and Equity" ("SFAS 150"). SFAS 150 establishes standards for how an issuer classifies and measures certain financial instruments with characteristics of both liabilities and equity. The provisions of SFAS 150 were adopted effective June 9, 2003. The adoption of SFAS 150 did not have a material effect on our financial position or results of operations.

We use the intrinsic−value method of accounting for stock options granted to employees. As required by our existing stock plans, stock options are granted at, or above, the fair market value of our stock, and, accordingly, no compensation expense is recognized for these grants in the consolidated statement of operations. We record compensation expense related to other stock−based awards, such as restricted stock grants, over the period the award vests. On December 16, 2004, the FASB issued SFAS 123 (revised 2004), "Share−Based Payment" ("SFAS 123(R)"), which amends SFAS 123, "Accounting for Stock−Based Compensation" and SFAS 95 "Statement of Cash Flows". SFAS 123(R) requires companies to measure all employee stock−based compensation awards using a fair value method and record such expense in its consolidated financial statements. In addition, the adoption of SFAS 123(R) requires additional accounting and disclosure related to the income tax and cash flow effects resulting from share−based payment arrangements. SFAS 123(R) is effective for us as of July 1, 2005. The adoption of SFAS 123(R)'s fair value method will have an impact on our results of operations, although it will have no impact on our overall financial position. While we cannot estimate the level of share−based payments to be issued in the future, based on the stock options that are currently outstanding, we expect that the adoption of SFAS 123(R) will result in a charge to operations in the second half of 2005 of approximately $1.5 million.

In accordance with Emerging Issues Task Force ("EITF") Issue 04−8, "The Effect of Contingently Convertible Instruments on Diluted Earnings per Share", which we adopted in December 2004, diluted earnings per share for 2003 was restated to reflect the dilutive effect of the assumed conversion of our convertible senior notes due in 2023. The diluted earnings per share calculations for the two fiscal years ended December 31, 2004 include adjustments to add back to earnings the interest expense, net of tax, incurred on the convertible senior notes, and to include in diluted weighted average shares the shares potentially issuable as if the contingent conversion features were met. There was no effect on 2003 diluted earnings per share.

**Liquidity and Capital Resources**

As of December 31, 2004, we had working capital of $225.9 million, as compared to $232.6 million as of December 31, 2003. This decrease was primarily attributable to disbursements relating to the acquisition of certain assets of Play Along offset in part by operating activities.

Table of Contents

Operating activities provided net cash of $131.4 million in the year ended December 31, 2004, as compared to $7.4 million in 2003. Net cash was provided primarily by net income and non–cash charges, including compensation from stock option grants and restricted stock grants, acquisition earnout expense, depreciation and amortization and loss on disposal of property and equipment, as well as increases in accounts payable, accrued expenses, reserve for sales returns and allowances, income taxes payable and deferred income taxes and a decrease in inventory, which were offset in part by an increase in accounts receivable, prepaid expenses and other and an increase in the cash received from the preferred return from our joint venture. Our accounts receivable turnover as measured by days sales outstanding in accounts receivable decreased from approximately 92 days as of December 31, 2003 to approximately 50 days as of December 31, 2004 primarily due to a shift in sales from domestic sales origin to FOB China, which carry shorter payment terms, a shift in domestic sales to customers with shorter payment terms and overall improved collection efforts and results. Other than open purchase orders, issued in the normal course of business, we have no obligations to purchase finished goods from our manufacturers. As of December 31, 2004, we had cash and cash equivalents of $176.5 million and marketable securities of $19.0 million.

Our investing activities used cash of $73.3 million in the year ended December 31, 2004, as compared to $47.3 million in 2003, consisting primarily of the purchase of office furniture and equipment and molds and tooling used in the manufacture of our products, the purchase of other assets and the goodwill and other intangible assets acquired in the acquisition of Play Along, partially offset by the sale of marketable securities. In 2003, our investing activities consisted primarily of the purchase of molds and tooling used in the manufacture of our products, the purchase of other assets, the goodwill and other intangible assets acquired in the acquisition of P&M, the purchase of marketable securities, partially offset by the repayment of notes receivable from officers. As part of our strategy to develop and market new products, we have entered into various character and product licenses with royalties ranging from 1% to 18% payable on net sales of such products. As of December 31, 2004, these agreements required future aggregate minimum guarantees of $27.2 million, exclusive of $9.1 million in advances already paid.

Our financing activities provided net cash of $1.6 million in the year ended December 31, 2004, as compared to $90.0 million in 2003. In 2004, cash was primarily provided from the exercise of stock options, partially offset by the repayment of long–term debt. In 2003, cash was primarily provided from the sale of our convertible senior notes and from the exercise of stock options, partially offset by the repurchase of $6.1 million of our common stock and the repayment of debt.

The following is a summary of our significant contractual cash obligations for the periods indicated that existed as of December 31, 2004 and is based on information appearing in the notes to the consolidated financial statements (in thousands):

| | 2005 | 2006 | 2007 | 2008 | 2009 | Thereafter | Total |
|---|---|---|---|---|---|---|---|
| Long–term debt | $ — | $ — | $ — | $ — | $ — | $ 98,000 | $ 98,000 |
| Operating leases | 6,543 | 5,714 | 4,723 | 2,819 | 2,804 | 6,603 | 29,206 |
| Minimum guaranteed license/royalty payments | 13,635 | 8,868 | 1,795 | 1,427 | 1,435 | — | 27,160 |
| Employment contracts | 5,069 | 4,557 | 4,248 | 2,180 | 2,230 | 2,280 | 20,564 |
| Total contractual cash obligations | $ 25,247 | $ 19,139 | $ 10,766 | $ 6,426 | $ 6,469 | $ 106,883 | $ 174,930 |

In December 2001, we acquired all of the outstanding capital stock of Kidz Biz Limited, a United Kingdom company, and an affiliated Hong Kong company, Kidz Biz Far East Limited, for an aggregate purchase price of approximately $12.4 million. Total consideration was paid on the closing of the transaction in cash in the amount of $6.4 million and the issuance of 308,992 shares of our common stock at a value of $6.0 million. In addition, we agreed to pay an earn–out for each of 2002, 2003, 2004 and 2005, based on the achievement of certain financial performance criteria,

36

Table of Contents

payable by delivery of up to 25,749 shares of our common stock per year. In 2002, 2003 and 2004, no earn–outs were earned because the criteria were not met. However, we paid the 2005 earn–out at a value of $0.5 million during 2004 upon the termination of employment of a principal of the seller, which was charged to expense in 2004.

In October 2001, we and all of our domestic subsidiaries jointly and severally secured a syndicated line of credit totaling $50.0 million with a consortium of banks ("Line of Credit"). On August 6, 2004, we and all of our domestic subsidiaries notified the banks that we were terminating the Line Credit effective August 13, 2004. There have never been any outstanding borrowings under the Line of Credit since its inception.

In February 2003, our Board of Directors approved a buyback of up to $20.0 million of our common stock. During 2003, we repurchased and retired 554,500 shares of our common stock for a total of approximately $6.1 million. No shares were repurchased in 2004.

In May 2003, we purchased certain product lines, related assets and assumed certain liabilities of P&M. The total purchase price of approximately $22.0 million consisted of cash paid in the amount of $20.7 million and liabilities assumed of $1.3 million and resulted in goodwill of $13.5 million. Results of operations have included P&M from the date of acquisition.

On June 10, 2004, we purchased substantially all of the assets and assumed certain liabilities of Play Along, Inc., Play Along (Hong Kong) Limited and PA Distribution, Inc. (collectively "Play Along"). The total purchase price of $85.7 million consisted of cash paid in the amount of $70.8 million and the issuance of 749,005 shares of our common stock valued at $14.9 million. In addition, we agreed to pay an earn–out of up to $10.0 million per year for the four calendar years following the acquisition up to an aggregate amount of $30.0 million based on the achievement of certain financial performance criteria which will be recorded as goodwill when and if earned. For the year ended December 31, 2004, $10.0 million of the earn–out was earned and recorded as goodwill as of December 31, 2004. Accordingly, the annual maximum earn–out for the remaining three years through December 31, 2007 is approximately $6.7 million, or an aggregate of $20.0 million. Results of operations have included Play Along from the date of acquisition.

On October 19, 2004, we were named as defendants in a lawsuit commenced by WWE in the U.S. District Court for the Southern District of New York concerning our toy licenses with WWE and the video game license between WWE and the joint venture company operated by THQ and us, encaptioned World Wrestling Entertainment, Inc. v. JAKKS Pacific, Inc., et al., 1:04–CV–08223–KMK (the "WWE Action"). The complaint also named as defendants THQ, the joint venture, certain of our foreign subsidiaries, Jack Friedman (our Chairman and Chief Executive Officer), Stephen Berman (our Chief Operating Officer, President and Secretary and a member of our Board of Directors), Joel Bennett (our Chief Financial Officer), Stanley Shenker and Associates, Inc., Bell Licensing, LLC, Stanley Shenker and James Bell.

WWE sought treble, punitive and other damages (including disgorgement of profits) in an undisclosed amount and a declaration that the video game license with the joint venture, which is scheduled to expire in 2009 (subject to joint venture's right to extend that license for an additional five years), and an amendment to our toy licenses with WWE, which are scheduled to expire in 2009, are void and unenforceable. This action alleged violations by the defendants of the Racketeer Influenced and Corrupt Organization Act ("RICO") and the anti–bribery provisions of the Robinson–Patman Act, and various claims under state law.

On February 16, 2005, we filed a motion to dismiss the WWE Action. On March 30, 2005, the day before WWE's opposition to our motion was due, WWE amended its complaint to, among other things, add the Chief Executive Officer of THQ as a defendant and to add a claim under the

37

Table of Contents

Sherman Act. On March 31, 2005, the WWE sent a letter to the Court proposing, *inter alia*, a briefing schedule for defendants' motions to dismiss the amended complaint.

In November 2004, several purported class action lawsuits were filed in the United States District Court for the Southern District of New York: (1) Garcia v. Jakks Pacific, Inc. et al, Civil Action No. 04–8807 (filed on November 5, 2004, (2) Jonco Investors, LLC v. Jakks Pacific, Inc. et al, Civil Action No. 04–9021 (filed on November 16, 2004), (3) Kahn v. Jakks Pacific, Inc. et al, Civil Action No. 04–8910 (filed on November 10, 2004), (4) Quantum Equities L.L.C. v. Jakks Pacific, Inc. et al, Civil Action No. 04–8877 (filed on November 9, 2004), and (5) Irvine v. Jakks Pacific, Inc. et al, Civil Action No. 04–9078 (filed on November 16, 2004) (the "Class Actions"). The complaints in the Class Actions allege that defendants issued positive statements concerning increasing sales of our WWE licensed products which were false and misleading because the WWE licenses had allegedly been obtained through a pattern of commercial bribery, our relationship with the WWE was being negatively impacted by the WWE's contentions and there was an increase risk that the WWE would either seek modification or nullification of the licensing agreements with us. Plaintiffs also allege that we misleadingly failed to disclose the alleged fact that the WWE licenses were obtained through an unlawful bribery scheme. The plaintiffs in the Class Actions are described as purchasers of our common stock, who purchased from as early as October 26, 1999 to as late as October 19, 2004. The Class Actions seek compensatory and other damages in an undisclosed amount, alleging violations of Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b–5 promulgated thereunder by each of the defendants (namely the Company and Messrs. Friedman, Berman and Bennett), and violations of Section 20(a) of the Exchange Act by Messrs. Friedman, Berman and Bennett. On January 25, 2005, the Court consolidated the Class Actions under the caption In re JAKKS Pacific, Inc. Shareholders Class Action Litigation, Civil Action No. 04–8807.

We believe that the claims in the WWE Action and the Class Actions are without merit and we intend to defend vigorously against them. However, because these Actions are in their preliminary stages, we cannot assure you as to the outcome of the Actions, nor can we estimate the range of our potential losses.

On February 16, 2005, we filed a motion to dismiss WWE's Complaint in the WWE Action. The motion is currently scheduled to be fully briefed on April 14, 2005, with oral argument to be scheduled thereafter.

On December 2, 2004, a shareholder derivative action was filed in the Southern District of New York by Freeport Partner, LLC against us, nominally, and against Messrs. Friedman, Berman and Bennett, Freeport Partners v. Friedman, et al., Civil Action No. 04–9441 (the "Derivative Action"). The Derivative Action seeks to hold the individual defendants liable for damages allegedly caused to us by their actions and in particular to hold them liable on a contribution theory with respect to any liability we incur in connection with the Class Actions. On or about February 10, 2005, a second shareholder derivative action was filed in the Southern District of New York by David Oppenheim against us, nominally, and against Messrs. Friedman, Berman, Bennett, Blatte, Glick, Miller and Skala, Civil Action 05–2046 (the "Second Derivative Action"). The Second Derivative Action seeks to hold the individual defendants liable for damages allegedly caused to us by their actions as a result of alleged breaches of their fiduciary duties. On or about March 16, 2005, a third shareholder derivative action was filed. It is captioned Warr v. Friedman, Berman, Bennett, Blatte, Glick, Miller, Skala, and Jakks (as a nominal defendant), and it was filed in the Superior Court of California, Los Angeles County (the "Third Derivative Action"). The Third Derivative Action seeks to hold the individual defendants liable for (1) damages allegedly caused to us by their alleged breaches of fiduciary duty, abuse of control, gross mismanagement,

38

Table of Contents

waste of corporate assets and unjust enrichment; and (2) restitution to us of profits, benefits and other compensation obtained by them.

On March 1, 2005, we delivered a Notice of Breach of Settlement Agreement and Demand for Indemnification to WWE (the "Notification"). The Notification asserted that WWE's filing of the WWE Action violated A Covenant Not to Sue contained in a January 15, 2004 Settlement Agreement and General Release ("General Release") entered into between WWE and us and, therefore, that we were demanding indemnification, pursuant to the Indemnification provision contained in the General Release, for all losses that the WWE's actions have caused or will cause to us and our officers, including but not limited to any losses sustained by us in connection with the Class Actions. On March 4, 2005, in a letter from its outside counsel, WWE asserted that the General Release does not cover the claims in the WWE Action.

Pursuant to the terms of a Purchase Agreement, dated June 9, 2003, we sold an aggregate of $98 million of 4.625% Convertible Senior Notes due June 15, 2023. The holders of the notes may convert the notes into shares of our common stock at any time at an initial conversion price of $20.00 per share, subject to certain circumstances described in the notes. We will pay cash interest on the notes at an annual rate of 4.625% of the principal amount at issuance, from the issue date to June 15, 2010, payable on June 15 and December 15 of each year, commencing on December 15, 2003. After June 15, 2010, we will not pay cash interest on the notes. At maturity, on June 15, 2023, we will redeem the notes at their accreted principal amount, which will be equal to $1,811.95 (181.195%) per $1,000 principal amount at issuance.

We may redeem the notes at our option in whole or in part beginning on June 15, 2010, at 100% of their accreted principal amount plus accrued and unpaid interest (including contingent interest and additional amounts), if any, payable in cash. Holders of the notes may also require us to repurchase all or part of their notes on June 15, 2010, for cash, at a repurchase price of 100% of the principal amount per note plus accrued and unpaid interest (including contingent interest and additional amounts), if any. Holders of the notes may also require us to repurchase all or part of their notes on June 15, 2013 and June 15, 2018 at a repurchase price of 100% of the accreted principal amount per note plus accrued and unpaid interest (including contingent interest and additional amounts), if any. Any repurchases at June 15, 2013 and June 15, 2018 may be paid in cash, in shares of common stock or a combination of cash and shares of common stock.

We believe that our cash flows from operations, cash and cash equivalents on hand and marketable securities will be sufficient to meet our working capital and capital expenditure requirements and provide us with adequate liquidity to meet our anticipated operating needs for at least the next 12 months. Although operating activities are expected to provide cash, to the extent we grow significantly in the future, our operating and investing activities may use cash and, consequently, this growth may require us to obtain additional sources of financing. There can be no assurance that any necessary additional financing will be available to us on commercially reasonable terms, if at all. We intend to finance our long-term liquidity requirements out of net cash provided by operations, marketable securities and cash on hand.

**Exchange Rates**

Sales from our United States and Hong Kong operations are denominated in U.S. dollars and our manufacturing costs are denominated in either U.S. or Hong Kong dollars. Domestic sales from our United Kingdom operations and operating expenses of all of our operations are denominated in local currency, thereby creating exposure to changes in exchange rates. Changes in the Hong Kong dollar or British Pound/U.S. dollar exchange rate may positively or negatively affect our gross margins, operating income and retained earnings. The exchange rate of the Hong Kong dollar to the

Table of Contents

U.S. dollar has been fixed by the Hong Kong government since 1983 at HK$7.80 to US$1.00 and, accordingly, has not represented a currency exchange risk to the U.S. dollar. We cannot assure you that the exchange rate between the United States and Hong Kong currencies will continue to be fixed or that exchange rate fluctuations between the United States and Hong Kong and United Kingdom currencies will not have a material adverse effect on our business, financial condition or results of operations.

## Item 7A. *Quantitative and Qualitative Disclosures About Market Risk*

Market risk represents the risk of loss that may impact our financial position, results of operations or cash flows due to adverse changes in financial and commodity market prices and rates. We are exposed to market risk in the areas of changes in United States and international borrowing rates and changes in foreign currency exchange rates. In addition, we are exposed to market risk in certain geographic areas that have experienced or remain vulnerable to an economic downturn, such as China. We purchase substantially all of our inventory from companies in China, and, therefore, we are subject to the risk that such suppliers will be unable to provide inventory at competitive prices. While we believe that, if such an event were to occur we would be able to find alternative sources of inventory at competitive prices, we cannot assure you that we would be able to do so. These exposures are directly related to our normal operating and funding activities. Historically and as of December 31, 2004, we have not used derivative instruments or engaged in hedging activities to minimize our market risk.

## Interest Rate Risk

In June 2003, we issued convertible senior notes payable of $98.0 million with a fixed interest rate of 4.625% per annum. These notes payable were outstanding as of December 31, 2004. Accordingly, we are not generally subject to any direct risk of loss arising from changes in interest rates.

## Foreign Currency Risk

We have wholly−owned subsidiaries in Hong Kong and in the United Kingdom. Sales by these operations made on a FOB China or Hong Kong basis are denominated in U.S. dollars. However, purchases of inventory and Hong Kong operating expenses are typically denominated in Hong Kong dollars and domestic sales and operating expenses made in the United Kingdom are typically denominated in British Pounds, thereby creating exposure to changes in exchange rates. Changes in the British Pound or Hong Kong dollar/ U.S. dollar exchange rates may positively or negatively affect our gross margins, operating income and retained earnings. The British Pound gave rise to the other comprehensive loss in the balance sheet at December 31, 2004. The exchange rate of the Hong Kong dollar to the U.S. dollar has been fixed by the Hong Kong government since 1983 at HK$7.80 to US$1.00 and, accordingly, has not represented a currency exchange risk to the U.S. dollar. We do not believe that near−term changes in these exchange rates, if any, will result in a material effect on our future earnings, fair values or cash flows, and therefore, we have chosen not to enter into foreign currency hedging transactions. We cannot assure you that this approach will be successful, especially in the event of a significant and sudden change in the value of the Hong Kong dollar or British Pound.

40

Table of Contents

**Item 8.** *Consolidated Financial Statements and Supplementary Data*
### REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM
The Board of Directors and Stockholders
JAKKS Pacific, Inc. and Subsidiaries

We have audited the accompanying consolidated balance sheets of JAKKS Pacific, Inc. and Subsidiaries (Company) as of December 31, 2003 and 2004, and the related consolidated statements of operations, other comprehensive income, stockholders' equity and cash flows and the financial statement schedule for each of the years in the three–year period ended December 31, 2004. We also have audited management's assessment, included in the accompanying Management's annual report on internal control over financial reporting, that the Company maintained effective internal control over financial reporting as of December 31, 2004, based on criteria established in Internal Control — Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO). The Company's management is responsible for these financial statements, for maintaining effective internal control over financial reporting, and for its assessment of the effectiveness of internal control over financial reporting. Our responsibility is to express an opinion on these financial statements, an opinion on management's assessment, and an opinion on the effectiveness of the Company's internal control over financial reporting based on our audits.

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audits to obtain reasonable assurance about whether the financial statements are free of material misstatement and whether effective internal control over financial reporting was maintained in all material respects. Our audit of the financial statements included examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, and evaluating the overall financial statement presentation. Our audit of internal control over financial reporting included obtaining an understanding of internal control over financial reporting, evaluating management's assessment, testing and evaluating the design and operating effectiveness of internal control, and performing such other procedures as we considered necessary in the circumstances. We believe that our audits provide a reasonable basis for our opinions.

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

Table of Contents

   In our opinion, the consolidated financial statements and schedule referred to above present fairly, in all material respects, the financial position of JAKKS Pacific, Inc. and Subsidiaries as of December 31, 2003 and 2004, and the results of their operations and their cash flows for each of the years in the three−year period ended December 31, 2004 in conformity with accounting principles generally accepted in the United States of America. Also in our opinion, management's assessment that JAKKS Pacific, Inc. and Subsidiaries maintained effective internal control over financial reporting as of December 31, 2004, is fairly stated, in all material respects, based on criteria established in Internal Control — Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO). Furthermore, in our opinion, JAKKS Pacific, Inc. and Subsidiaries maintained, in all material respects, effective internal control over financial reporting as of December 31, 2004, based on criteria established in Internal Control — Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO).

   In conducting their evaluation of the effectiveness of internal control over financial reporting, management of the Company did not include the internal controls of Play Along, Inc., PA Distribution, Inc. and Play Along (Hong Kong) Limited (collectively "Play Along") which the Company acquired on June 11, 2004. The acquired entities constituted approximately 26% of total consolidated assets of the Company as of December 31, 2004 and approximately 29% of consolidated net sales and approximately 75% of consolidated net income for the year ended December 31, 2004. Refer to Note 4 to the consolidated financial statements for a further discussion of the acquisitions and their impact on the Company's consolidated financial statements. Our audit of internal control over financial reporting of the Company also excluded an evaluation of the internal control over financial reporting of Play Along.

/s/ PKF

PKF
Certified Public Accountants
A Professional Corporation

Los Angeles, California
February 21, 2005, except Notes 2, 4 and 18 for which the date is March 29, 2005

Table of Contents

# JAKKS PACIFIC, INC. AND SUBSIDIARIES
## CONSOLIDATED BALANCE SHEETS

|  | December 31, | |
|---|---|---|
|  | 2003 | 2004 |
|  | (In thousands, except share data) | |
| **Assets** | | |
| **Current assets** | | |
| Cash and cash equivalents | $ 118,182 | $ 176,544 |
| Marketable securities | 19,345 | 19,047 |
| Accounts receivable, net of allowance for uncollectible accounts of $7,877 and $7,058, respectively | 86,120 | 102,266 |
| Inventory, net of reserves of $5,025 and $8,042, respectively | 44,400 | 50,000 |
| Prepaid and other | 16,763 | 24,682 |
| Total current assets | 284,810 | 372,539 |
| **Property and equipment** | | |
| Office furniture and equipment | 6,563 | 6,823 |
| Molds and tooling | 34,481 | 28,818 |
| Leasehold improvements | 2,429 | 2,572 |
| Total | 43,473 | 38,213 |
| Less accumulated depreciation and amortization | 31,751 | 27,273 |
| Property and equipment, net | 11,722 | 10,940 |
| Intangibles and other, net | 18,172 | 27,368 |
| Investment in joint venture | 9,097 | 9,816 |
| Goodwill, net | 190,728 | 258,331 |
| Trademarks, net | 15,468 | 17,768 |
| Total assets | $ 529,997 | $ 696,762 |
| **Liabilities and Stockholders' Equity** | | |
| **Current liabilities** | | |
| Accounts payable | $ 31,610 | $ 53,643 |
| Accrued expenses | 10,805 | 55,333 |
| Reserve for sales returns and allowances | 7,753 | 23,173 |
| Current portion of long–term debt | 19 | — |
| Income taxes payable | 2,021 | 10,847 |
| Total current liabilities | 52,208 | 142,996 |
| Long–term debt, net of current portion | 98,042 | 98,000 |
| Deferred income taxes | 1,847 | 4,281 |
| Total liabilities | 152,097 | 245,277 |
| Commitments and contingencies | | |
| **Stockholders' equity** | | |
| Preferred shares, $.001 par value; 5,000,000 shares authorized; nil outstanding | — | |
| Common stock, $.001 par value; 100,000,000 shares authorized; 24,926,826 and 26,234,016 shares issued and outstanding, respectively | 25 | 26 |
| Additional paid–in capital | 246,008 | 276,642 |
| Retained earnings | 133,005 | 176,564 |
| Deferred compensation from restricted stock grants | (789) | — |
| Accumulated other comprehensive loss | (349) | (1,747) |
| Total stockholders' equity | 377,900 | 451,485 |
| Total liabilities and stockholders' equity | $ 529,997 | $ 696,762 |

*See notes to consolidated financial statements.*

43

Table of Contents

# JAKKS PACIFIC, INC. AND SUBSIDIARIES
## CONSOLIDATED STATEMENTS OF OPERATIONS

**Years Ended December 31,**

|  | 2002 | 2003 | 2004 |
|---|---|---|---|
|  | (In thousands, except per share amounts) | | |
| Net sales | $ 310,016 | $ 315,776 | $ 574,266 |
| Cost of sales | 180,173 | 189,334 | 348,259 |
| Gross profit | 129,843 | 126,442 | 226,007 |
| Selling, general and administrative expenses | 98,111 | 113,053 | 172,282 |
| Acquisition shut–down and product recall costs | 6,718 | 2,000 | — |
| Income from operations | 25,014 | 11,389 | 53,725 |
| Profit from Joint Venture | (8,004) | (7,351) | (7,865) |
| Interest, net | (1,141) | 1,405 | 2,498 |
| Income before provision for income taxes and minority interest | 34,159 | 17,335 | 59,092 |
| Provision for income taxes | 6,466 | 1,440 | 15,533 |
| Income before minority interest | 27,693 | 15,895 | 43,559 |
| Minority interest | (237) | — | — |
| Net income | $ 27,930 | $ 15,895 | $ 43,559 |
| Basic earnings per share | $ 1.27 | $ 0.66 | $ 1.69 |
| Diluted earnings per share | $ 1.23 | $ 0.64 | $ 1.49 |

*See notes to consolidated financial statements.*

44

Table of Contents

## JAKKS PACIFIC, INC. AND SUBSIDIARIES
## CONSOLIDATED STATEMENTS OF OTHER COMPREHENSIVE INCOME

|  | Years Ended December 31, | | |
|  | 2002 | 2003 | 2004 |
| --- | --- | --- | --- |
|  | (In thousands) | | |
| Other comprehensive income: |  |  |  |
| Net income | $ 27,930 | $ 15,895 | $ 43,559 |
| Foreign currency translation adjustment | — | (349) | (1,398) |
| Other comprehensive income | $ 27,930 | $ 15,546 | $ 42,161 |

*See notes to consolidated financial statements.*

45

Table of Contents

# JAKKS PACIFIC, INC. AND SUBSIDIARIES
## CONSOLIDATED STATEMENTS OF STOCKHOLDERS' EQUITY
### DECEMBER 31, 2002, 2003 AND 2004
#### (In thousands)

| | Common Stock | | Additional Paid-in Capital | Treasury Stock | Retained Earnings | Deferred Compensation From Restricted Stock Grants | Accumulated Other Comprehensive Loss | Total Stockholders' Equity |
|---|---|---|---|---|---|---|---|---|
| | Number of Shares | Amount | | | | | | |
| Balance, December 31, 2001 | 18,827 | $ 20 | $ 168,115 | $ (12,911) | $ 89,180 | $ — | $ — | $ 244,404 |
| Exercise of options and warrants | 955 | 1 | 5,883 | — | — | — | — | 5,884 |
| Compensation for fully vested stock options | — | — | (1,308) | — | — | — | — | (1,308) |
| Retirement of treasury stock | — | (1) | (12,910) | 12,911 | — | — | — | — |
| Fair value of outstanding stock options in acquisition | — | — | 3,151 | — | — | — | — | 3,151 |
| Issuance of common stock for cash | 3,525 | 3 | 59,091 | — | — | — | — | 59,094 |
| Issuance of common stock for Toymax | 1,166 | 1 | 18,080 | — | — | — | — | 18,081 |
| Net income | — | — | — | — | 27,930 | — | — | 27,930 |
| Balance, December 31, 2002 | 24,473 | 24 | 240,102 | — | 117,110 | — | — | 357,236 |
| Exercise of options | 312 | — | 1,777 | — | — | — | — | 1,777 |
| Restricted stock grants | 696 | 1 | 9,152 | — | — | (789) | — | 8,364 |
| Issuance of warrants | — | — | 1,057 | — | — | — | — | 1,057 |
| Compensation for fully vested stock options | — | — | 6 | — | — | — | — | 6 |
| Repurchase and retirement of common stock | (554) | — | (6,086) | — | — | — | — | (6,086) |
| Net income | — | — | — | — | 15,895 | — | — | 15,895 |
| Foreign currency translation adjustment | — | — | — | — | — | — | (349) | (349) |
| Balance, December 31, 2003 | 24,927 | 25 | 246,008 | — | 133,005 | (789) | (349) | 377,900 |
| Exercise of options | 192 | — | 1,699 | — | — | — | — | 1,699 |
| Stock option income tax benefit | — | — | 739 | — | — | — | — | 739 |
| Restricted stock grants | 340 | — | 7,487 | — | — | 789 | — | 8,276 |
| Compensation for fully vested stock options | — | — | 5,365 | — | — | — | — | 5,365 |
| Issuance of common stock for Play Along | 749 | 1 | 14,850 | — | — | — | — | 14,851 |
| Issuance of common stock for Kidz Biz earn-out | 26 | — | 494 | — | — | — | — | 494 |
| Net income | — | — | — | — | 43,559 | — | — | 43,559 |
| Foreign currency translation adjustment | — | — | — | — | — | — | (1,398) | (1,398) |
| Balance, December 31, 2004 | 26,234 | $ 26 | $ 276,642 | $ — | $ 176,564 | $ — | $ (1,747) | $ 451,485 |

*See notes to consolidated financial statements.*

46

Table of Contents

# JAKKS PACIFIC, INC. AND SUBSIDIARIES
## CONSOLIDATED STATEMENTS OF CASH FLOWS

| | Years Ended December 31, | | |
|---|---|---|---|
| | 2002 | 2003 (In thousands) | 2004 |
| **Cash flows from operating activities** | | | |
| Net income | $ 27,930 | $ 15,895 | $ 43,559 |
| Adjustments to reconcile net income to net cash provided by operating activities | | | |
| Depreciation and amortization | 15,456 | 16,029 | 21,518 |
| Compensation for fully vested stock options | (1,308) | 6 | 5,365 |
| Acquisition Earn-out | — | — | 494 |
| Investment in joint venture | (225) | 79 | (719) |
| Loss on disposal of property and equipment | — | — | 1,096 |
| Forgiveness of officer note receivable | 285 | — | — |
| Restricted stock compensation | — | 8,364 | 8,276 |
| Minority interest | (237) | — | — |
| Changes in operating assets and liabilities | | | |
| Net sale (purchase) of marketable securities | 37,119 | — | — |
| Accounts receivable | (3,307) | (28,224) | (4,333) |
| Inventory | (10,996) | (2,654) | 784 |
| Prepaid expenses and other | 507 | (5,643) | (3,613) |
| Accounts payable | (3,698) | 16,264 | 19,192 |
| Accrued expenses | (9,534) | (3,259) | 19,742 |
| Income taxes payable | 7,056 | (1,397) | 5,945 |
| Reserve for sales returns and allowances | 8,626 | (5,827) | 13,289 |
| Deferred income taxes | 3,879 | (2,240) | 795 |
| Total adjustments | 43,623 | (8,502) | 87,831 |
| Net cash provided by operating activities | 71,553 | 7,393 | 131,390 |
| **Cash flows from investing activities** | | | |
| Purchases of property and equipment | (6,594) | (4,472) | (5,917) |
| Purchases of other assets | (21,159) | (4,936) | (26,863) |
| Cash paid for net assets | (66,232) | (19,676) | (41,438) |
| Net (purchases) sales of marketable securities | — | (19,345) | 967 |
| Notes receivable — officers | 861 | 1,113 | — |
| Net cash used by investing activities | (93,124) | (47,316) | (73,251) |
| **Cash flows from financing activities** | | | |
| Proceeds from sale of common stock | 59,094 | — | — |
| Repurchase of common stock | — | (6,086) | — |
| Proceeds from stock options and warrants exercised | 5,884 | 1,777 | 1,682 |
| Net proceeds from sale of convertible notes | — | 94,366 | — |
| Repayments of debt | (30) | (16) | (61) |
| Net cash provided by financing activities | 64,948 | 90,041 | 1,621 |
| Foreign currency translation adjustment | — | (349) | (1,398) |
| Net increase in cash and cash equivalents | 43,377 | 49,769 | 58,362 |
| Cash and cash equivalents, beginning of year | 25,036 | 68,413 | 118,182 |
| Cash and cash equivalents, end of year | $ 68,413 | $ 118,182 | $ 176,544 |
| Cash paid during the period for: | | | |
| Interest | $ 80 | $ 2,375 | $ 4,534 |
| Income taxes | $ 3,235 | $ 9,694 | $ 2,688 |

See Note 16 for additional supplemental information to consolidated statements of cash flows.
*See notes to consolidated financial statements.*

47

Table of Contents

**JAKKS PACIFIC, INC. AND SUBSIDIARIES**
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
DECEMBER 31, 2004

**Note 1—Principal Industry**

JAKKS Pacific, Inc. (the "Company") is engaged in the development, production and marketing of toys and related products, some of which are based on highly–recognized entertainment properties and character licenses. The Company commenced its primary business operations in July 1995 through the purchase of substantially all of the assets of a Hong Kong toy company. The Company markets its product lines domestically and internationally.

The Company was incorporated under the laws of the State of Delaware in January 1995.

**Note 2—Summary of Significant Accounting Policies**

*Principles of consolidation*

The consolidated financial statements include accounts of the Company and its wholly–owned subsidiaries. In consolidation, all significant inter–company balances and transactions are eliminated.

*Cash and cash equivalents*

The Company considers all highly liquid assets, having an original maturity of less than three months, to be cash equivalents. The Company maintains its cash in bank deposits which, at times, may exceed federally insured limits. The Company has not experienced any losses in such accounts. The Company believes it is not exposed to any significant credit risk on cash and cash equivalents.

*Use of estimates*

The preparation of financial statements in conformity with accounting principles generally accepted in the United States of America requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities, disclosure of contingent assets and liabilities at the dates of the financial statements, and the reported amounts of revenue and expenses during the reporting periods. Actual future results could differ from those estimates.

*Revenue recognition*

Revenue is recognized upon the shipment of goods to customers or their agents, depending on terms, provided that there are no uncertainties regarding customer acceptance, the sales price is fixed or determinable, and collectibility is reasonably assured and not contingent upon resale.

Generally, we do not allow for product returns. We provide a negotiated allowance for breakage or defects to our customers, which is recorded when the related revenue is recognized. However, we do make occasional exceptions to this policy and consequently accrue a return allowance in gross sales based on historic return amounts and management estimates.

We also will occasionally grant credits to facilitate markdowns and sales of slow moving merchandise. These credits are recorded as a reduction of gross sales at the time of occurrence. Our reserve for sales returns and allowances increased by $15.4 million from $7.8 million as of December 31, 2003 to $23.2 million as of December 31, 2004. This increase is due primarily to the significant increase in sales in 2004, the timing of customer deductions and an increase in sales of electronic products which have higher defective rates.

48

Table of Contents

## JAKKS PACIFIC, INC. AND SUBSIDIARIES
### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)
#### DECEMBER 31, 2004

*Inventory*

Inventory, which includes the ex−factory cost of goods, capitalized warehouse costs and in−bound freight and duty, is valued at the lower of cost (first−in, first−out) or market and consists of the following (in thousands):

|  | December 31, | |
|---|---|---|
|  | 2003 | 2004 |
| Raw materials | $ 1,033 | $ 1,557 |
| Finished goods | 43,367 | 48,443 |
|  | $ 44,400 | $ 50,000 |

*Marketable securities*

Marketable securities categorized as trading securities were liquidated at December 31, 2002 and related unrealized holding gains or losses are included in earnings. New investments made beginning in 2003 are categorized as available for sale and related unrealized holding gains or losses are included as a component of stockholders' equity. At December 31, 2003 and 2004, cost approximated fair market value.

*Fair value of financial instruments*

The Company's cash and cash equivalents, marketable securities and accounts receivable represent financial instruments. The carrying value of these financial instruments is a reasonable approximation of fair value. The fair value of the $98.0 million of convertible senior notes payable at December 31, 2004 was approximately $131.9 million based on the quoted market price.

*Property and equipment*

Property and equipment are stated at cost and are being depreciated using the straight−line method over their estimated useful lives as follows:

| Office equipment | 5 years |
|---|---|
| Automobiles | 5 years |
| Furniture and fixtures | 5 − 7 years |
| Molds and tooling | 2 − 4 years |
| Leasehold improvements | Shorter of length of lease or 10 years |

*Shipping and handling costs*

The consolidated financial statements reflect, for all periods presented, the adoption of the classification or disclosure requirements pursuant to Emerging Issues Task Force ("EITF") 00−10, "Accounting for Shipping and Handling Fees and Costs," which was effective in the fourth quarter of fiscal 2000. Consistent with EITF 00−10, the Company has historically classified income from freight charges to customers in "Net sales." The Company classifies shipping and handling costs in "Selling, general and administrative expenses." Such costs amounted to approximately $8.1 million in 2002, $5.2 million in 2003 and $3.6 million in 2004.

Table of Contents

**JAKKS PACIFIC, INC. AND SUBSIDIARIES**
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)
DECEMBER 31, 2004

*Advertising*

Production costs of commercials and programming are charged to operations in the year during which the production is first aired. The costs of other advertising, promotion and marketing programs are charged to operations in the year incurred. Advertising expense for the years ended December 31, 2002, 2003 and 2004, was approximately $12.7 million, $12.4 million and $26.4 million, respectively.

The Company also participates in cooperative advertising arrangements with some customers, whereby it allows a discount from invoiced product amounts in exchange for customer purchased advertising that features the Company's products. Typically, theses discounts range from 1% to 5% of gross sales, and are generally based on product purchases or on specific advertising campaigns. Such amounts are accrued when the related revenue is recognized or when the advertising campaign is initiated. These cooperative advertising arrangements are accounted for as direct selling expenses.

*Income taxes*

The Company does not file a consolidated return with its foreign subsidiaries. The Company files Federal and state returns and its foreign subsidiaries each file Hong Kong returns and United Kingdom returns, as applicable. Deferred taxes are provided on a liability method whereby deferred tax assets are recognized as deductible temporary differences and operating loss and tax credit carry−forwards and deferred tax liabilities are recognized for taxable temporary differences. Temporary differences are the differences between the reported amounts of assets and liabilities and their tax basis. Deferred tax assets are reduced by a valuation allowance when, in the opinion of management, it is more likely than not that some portion or all of the deferred tax assets will not be realized. Deferred tax assets and liabilities are adjusted for the effects of changes in tax laws and rates on the date of enactment.

*Translation of foreign currencies*

Monetary assets and liabilities denominated in Hong Kong dollars or British Pounds Sterling are translated into United States dollars at the rate of exchange ruling at the balance sheet date. Transactions during the period are translated at the rates ruling at the dates of the transactions.

Profits and losses resulting from the above translation policy are recognized in the consolidated statements of operations and statements of other comprehensive income.

*Accounting for the impairment of long−lived assets*

Long−lived assets, which include property and equipment, goodwill and intangible assets other than goodwill, are evaluated at least annually for impairment when events or changes in circumstances indicate that the carrying amount of the assets may not be recoverable through the estimated undiscounted future cash flows from the use of these assets. When any such impairment exists, the related assets will be written down to fair value.

50

Table of Contents

**JAKKS PACIFIC, INC. AND SUBSIDIARIES**
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)
DECEMBER 31, 2004

*Goodwill and other intangible assets*

In July 2001, the Financial Accounting Standards Board ("FASB") issued Statement of Financial Accounting Standards "SFAS" No. 141, "Business Combinations" ("SFAS 141") and SFAS 142, "Goodwill and Other Intangible Assets" ("SFAS 142"). SFAS 141 is effective for business combinations initiated after June 30, 2001, and requires that all business combinations completed after its adoption be accounted for under the purchase method of accounting and establishes specific criteria for the recognition of intangible assets separately from goodwill. SFAS 142 was effective for the Company on January 1, 2002 and primarily addresses the accounting for goodwill and intangible assets subsequent to their acquisition. With the adoption of SFAS 142, goodwill and certain other intangible assets are no longer amortized and are tested for impairment at least annually at the reporting unit level. Losses in value are recorded when and as material impairment has occurred in the underlying assets or when the benefits of the identified intangible assets are realized. As of December 31, 2004, there was no impairment to the underlying value of goodwill or intangible assets other than goodwill.

The carrying value of goodwill is based on management's current assessment of recoverability. Management evaluates recoverability using both objective and subjective factors. Objective factors include management's best estimates of projected future earnings and cash flows and analysis of recent sales and earnings trends. Subjective factors include competitive analysis and the Company's strategic focus.

Intangible assets other than goodwill consist of product technology rights, trademarks, acquired backlog, customer relationships, product lines and license agreements. Intangible assets other than trademarks are amortized over the estimated economic lives of the related assets. Accumulated amortization as of December 31, 2003 and 2004 was $16.5 million and $30.2 million, respectively.

*Stock Option Plans*

In December 2002, the FASB issued SFAS 148 "Accounting for Stock−Based Compensation — Transition and Disclosure, an amendment of FASB Statement No. 123" ("SFAS 148"). SFAS 148 Statement amends SFAS 123, "Accounting for Stock−Based Compensation" ("SFAS 123"), to provide alternative methods of transition for an entity that voluntarily changes to the fair value based method of accounting for stock−based employee compensation. It also amends the disclosure provisions of that Statement to require prominent disclosure about the effects on reported net income of an entity's accounting policy decisions with respect to stock−based employee compensation. Finally, SFAS 148 amends APB Opinion No. 28, Interim Financial Reporting, to require disclosure about those effects in interim financial information.

At December 31, 2004, the Company had stock−based employee compensation plans, which are described more fully in Note 14. The Company accounts for those plans under the recognition and measurement principles of APB Opinion No. 25, Accounting for Stock Issued to Employees, and related Interpretations. No stock−based employee compensation cost is reflected in net income, as all options granted under those plans had an exercise price equal to the market value of the underlying common stock on the date of grant. However, certain options had been repriced resulting in compensation adjustments, which have been reflected in net income. The following table illustrates the effect on net income and earnings per share if the Company had applied the fair value recognition provisions of SFAS 123, to stock−based employee compensation.

51

Table of Contents

## JAKKS PACIFIC, INC. AND SUBSIDIARIES
### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)
#### DECEMBER 31, 2004

In 2002, 2003 and 2004 the fair value of each employee option grant was estimated on the date of grant using the Black−Scholes option−pricing model with the following assumptions used: risk−free rate of interest of 4%, 4% and 2.25%, respectively; dividend yield of 0%; with volatility of 87%, 82% and 136.9% respectively; and expected lives of five years.

|  | Year Ended December 31, | | |
|---|---|---|---|
|  | 2002 | 2003 | 2004 |
|  | (In thousands, except per share data) | | |
| Net income, as reported | $ 27,930 | $ 15,895 | $ 43,559 |
| Add (Deduct): Stock−based employee compensation expense (income) included in reported net income net of related tax effects | (1,061) | 5 | 3,970 |
| Deduct: Total stock−based employee compensation expense determined under fair value method for all awards net of related tax effects | (2,034) | (2,796) | (2,999) |
| Pro forma net income | $ 24,835 | $ 13,104 | $ 44,530 |
| Earnings per share: | | | |
| Basic — as reported | $ 1.27 | $ 0.66 | $ 1.69 |
| Basic — pro forma | $ 1.13 | $ 0.54 | $ 1.73 |
| Diluted — as reported | $ 1.23 | $ 0.66 | $ 1.49 |
| Diluted — pro forma | $ 1.09 | $ 0.55 | $ 1.52 |

### Earnings per share

The following table is a reconciliation of the weighted−average shares used in the computation of basic and diluted earnings per share ("EPS") for the periods presented (in thousands, except per share data):

|  | 2002 | | |
|---|---|---|---|
|  | Income | Weighted Average Shares | Per Share |
| Basic EPS | | | |
| Income available to common stockholders | $ 27,930 | 21,963 | $ 1.27 |
| Effect of dilutive securities | | | |
| Options and warrants | — | 784 | |
| Diluted EPS | | | |
| Income available to common stockholders plus assumed exercises | $ 27,930 | 22,747 | $ 1.23 |

52

Table of Contents

## JAKKS PACIFIC, INC. AND SUBSIDIARIES
### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)
#### DECEMBER 31, 2004

| | 2003 | | |
|---|---|---|---|
| | Income | Weighted Average Shares | Per Share |
| Basic EPS | | | |
| Income available to common stockholders | $   15,895 | 24,262 | $    0.66 |
| Effect of dilutive securities | | | |
| Convertible senior notes payable | 2,114 | 2,760 | |
| Options and warrants | — | 415 | |
| Diluted EPS | | | |
| Income available to common stockholders plus assumed exercises | $   18,009 | 27,437 | $    0.66 |

| | 2004 | | |
|---|---|---|---|
| | Income | Weighted Average Shares | Per Share |
| Basic EPS | | | |
| Income available to common stockholders | $   43,559 | 25,797 | $    1.69 |
| Effect of dilutive securities | | | |
| Convertible senior notes payable | 3,354 | 4,900 | |
| Options and warrants | — | 709 | |
| Diluted EPS | | | |
| Income available to common stockholders plus assumed exercises | $   46,913 | 31,406 | $    1.49 |

Included in diluted EPS in 2003 and 2004 is the assumed conversion of $98.0 million of convertible senior notes payable (note 8). In accordance with EITF Issue 04–8, "The Effect of Contingently Convertible Instruments on Diluted Earnings per Share", which the Company adopted in December 2004, diluted earnings per share for 2003 was restated to reflect the dilutive effect of the assumed conversion of the Company's convertible senior notes due 2023. The diluted earnings per share calculations for the two fiscal years ended December 31, 2004 include adjustments to add back to earnings the interest expense, net of tax, incurred on the convertible senior notes and to include in diluted weighted average shares the shares potentially issuable as if the contingent conversion features were met. There was no effect on 2003 diluted earnings per share.

*Recent Accounting Standards*

In January 2003 and as revised in December 2003, the FASB issued FASB Interpretation No. 46, "Consolidation of Variable Interest Entities" ("Interpretation 46") and FASB Interpretation No. 46R ("Interpretation 46R"). Interpretations 46 and 46R require companies with a variable interest in a variable interest entity to apply the guidance contained in such Interpretations as of the beginning of the first reporting period after December 15, 2003. If applicable, the application of the guidance could result in the consolidation of a variable interest entity. Interpretations 46 and 46R are not applicable to the Company, as it is not the beneficiary of any variable interest entities.

53

Table of Contents

**JAKKS PACIFIC, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**
**DECEMBER 31, 2004**

In May 2003, the FASB issued SFAS 150, "Accounting for Certain Financial Instruments with Characteristics of Both Liabilities and Equity" ("SFAS 150"). SFAS 150 establishes standards for how an issuer classifies and measures certain financial instruments with characteristics of both liabilities and equity. The provisions of SFAS 150 were adopted effective June 9, 2003. The adoption of SFAS 150 did not have a material effect on the Company's financial position or results of operations.

The Company uses the intrinsic–value method of accounting for stock options granted to employees. As required by the Company's existing stock plans, stock options are granted at, or above, the fair market value of the Company's stock, and, accordingly, no compensation expense is recognized for these grants in the consolidated statement of operations. The Company records compensation expense related to other stock–based awards, such as restricted stock grants, over the period the award vests. On December 16, 2004, the FASB issued SFAS 123 (revised 2004), "Share–Based Payment" ("SFAS 123(R)"), which amends SFAS 123, "Accounting for Stock–Based Compensation" and SFAS 95 "Statement of Cash Flows". SFAS 123(R) requires companies to measure all employee stock–based compensation awards using a fair value method and record such expense in its consolidated financial statements. In addition, the adoption of SFAS 123(R) requires additional accounting and disclosure related to the income tax and cash flow effects resulting from share–based payment arrangements. SFAS 123(R) is effective for the Company as of July 1, 2005. The adoption of SFAS 123(R)'s fair value method will have an impact on the Company's results of operations, although it will have no impact on its overall financial position. While the Company cannot estimate the level of share–based payments to be issued in the future, based on the stock options that are currently outstanding, the Company expects that the adoption of SFAS 123(R) will result in a charge to operations in the second half of 2005 of approximately $1.5 million.

In accordance with EITF Issue 04–8, "The Effect of Contingently Convertible Instruments on Diluted Earnings per Share", which the Company adopted in December 2004, diluted earnings per share for 2003 was restated to reflect the dilutive effect of the assumed conversion of the Company's convertible senior notes due in 2023. The diluted earnings per share calculations for the two fiscal years ended December 31, 2004 include adjustments to add back to earnings the interest expense, net of tax, incurred on the convertible senior notes and to include in diluted weighted average shares the shares potentially issuable as if the contingent conversion features were met. There was no effect on 2003 diluted earnings per share.

*Reclassifications*

Certain reclassifications have been made to prior year balances in order to conform to the current year presentation.

**Note 3—Business Segments, Geographic Data, Sales by Product Group, and Major Customers**

The Company is a worldwide producer and marketer of children's toys and related products, principally engaged in the design, development, production and marketing of traditional toys, including boys action figures, vehicles and playsets, craft and activity products, writing instruments, compounds, girls toys, and infant and preschool toys. The Company's reportable segments are North America Toys, International and Other.

54

Table of Contents

**JAKKS PACIFIC, INC. AND SUBSIDIARIES**
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)
DECEMBER 31, 2004

The North America Toys segment, which includes the United States and Canada, and the International toy segment, which includes sales to non–North American markets, include the design, development, production and marketing of children's toys and related products. The Company also has an additional segment classified as Other, which sells various products to the specialty markets in the United States.

Segment performance is measured at the operating income level. All sales are made to external customers, and general corporate expenses have been attributed to the North America Toy segment, which is a dominant segment. Segment assets are comprised of accounts receivable and inventories, net of applicable reserves and allowances.

The accounting policies of the segments are described in Note 2.

Results are not necessarily those that would be achieved were each segment an unaffiliated business enterprise. Information by segment and a reconciliation to reported amounts for the three years ended December 31, 2004 are as follows (in thousands):

|  | Year Ended December 31, | | |
|  | 2002 | 2003 | 2004 |
| --- | --- | --- | --- |
| **Net Sales** | | | |
| North America Toys | $   263,314 | $   272,317 | $   521,292 |
| International | 46,251 | 43,424 | 52,805 |
| Other | 451 | 35 | 169 |
|  | $   310,016 | $   315,776 | $   574,266 |

|  | Year Ended December 31, | | |
|  | 2002 | 2003 | 2004 |
| --- | --- | --- | --- |
| **Operating Income** | | | |
| North America Toys | $   21,246 | $   9,821 | $   48,770 |
| International | 3,732 | 1,566 | 4,940 |
| Other | 36 | 2 | 15 |
|  | $   25,014 | $   11,389 | $   53,725 |

|  | December 31, | |
|  | 2003 | 2004 |
| --- | --- | --- |
| **Assets** | | |
| North America Toys | $   457,056 | $   632,489 |
| International | 72,884 | 64,069 |
| Other | 57 | 204 |
|  | $   529,997 | $   696,762 |

55

Table of Contents

**JAKKS PACIFIC, INC. AND SUBSIDIARIES**
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)
DECEMBER 31, 2004

The following tables present information about the Company by geographic area as of and for the three years ended December 31, 2004 (in thousands):

|  | December 31, | |
|---|---|---|
|  | 2003 | 2004 |
| **Long-lived Assets** | | |
| United States | $ 197,751 | $ 278,734 |
| Hong Kong | 32,382 | 30,484 |
| Europe | 4,011 | 2,783 |
|  | $ 234,144 | $ 312,001 |

|  | Year Ended December 31, | | |
|---|---|---|---|
|  | 2002 | 2003 | 2004 |
| **Net Sales by Geographic Area** | | | |
| United States | $ 256,799 | $ 271,051 | $ 505,803 |
| Europe | 39,414 | 35,547 | 37,700 |
| Canada | 6,966 | 5,125 | 15,658 |
| Hong Kong | 324 | 1,275 | 4,410 |
| Other | 6,513 | 2,778 | 10,695 |
|  | $ 310,016 | $ 315,776 | $ 574,266 |

|  | Year Ended December 31, | | |
|---|---|---|---|
|  | 2002 | 2003 | 2004 |
| **Net Sales by Product Group** | | | |
| Traditional Toys | $ 103,429 | $ 106,963 | $ 406,023 |
| Craft/Activities/Writing Products | 153,370 | 164,087 | 99,779 |
| Seasonal Products | 53,217 | 44,726 | 68,464 |
|  | $ 310,016 | $ 315,776 | $ 574,266 |

**Major Customers**

Net sales to major customers, which are part of our North American Toys segment, were approximately as follows (in thousands, except for percentages):

|  | 2002 | | 2003 | | 2004 | |
|---|---|---|---|---|---|---|
|  | Amount | Percentage of Net Sales | Amount | Percentage of Net Sales | Amount | Percentage of Net Sales |
| Wal-Mart | $ 46,396 | 15.0% | $ 91,378 | 28.9% | $ 193,776 | 33.7% |
| Target | 34,018 | 11.0 | 30,371 | 9.6 | 74,429 | 13.0 |
| Toys 'R' Us | 41,506 | 13.4 | 30,009 | 9.5 | 68,279 | 11.9 |
| Kmart | 34,773 | 11.2 | 17,996 | 5.7 | 27,274 | 4.8 |
| Kay Bee Toys | 16,077 | 5.1 | 12,670 | 4.0 | 12,756 | 2.2 |
|  | $ 172,770 | 55.7% | $ 182,424 | 57.7% | $ 376,514 | 65.6% |

56

Table of Contents

**JAKKS PACIFIC, INC. AND SUBSIDIARIES**
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)
DECEMBER 31, 2004

Wal−Mart has increased its percentage of the toy industry's sales at retail and the increase in our sales to Wal−Mart is consistent with this change. No other customer accounted for more than 2% of our total net sales.

**Note 4 — Acquisitions and Joint Venture**

The Company owns a fifty percent interest in a joint venture with a company that develops, publishes and distributes interactive entertainment software for the leading hardware game platforms in the home video game market. The joint venture has entered into a license agreement with an initial license period expiring December 31, 2009 under which it acquired the exclusive worldwide right to publish video games on all hardware platforms. The Company's investment is accounted for using the cost method due to the financial and operating structure of the venture and our lack of control over the joint venture. The Company's basis consists primarily of organizational costs, license costs and recoupable advances and is being amortized over the term of the initial license period. The joint venture agreement provides for the Company to receive guaranteed preferred returns through June 30, 2006 at varying rates of the joint venture's net sales depending on the cumulative unit sales and platform of each particular game. For periods after June 30, 2006, the amount of the preferred return will be subject to renegotiation between the parties. The preferred return is accrued in the quarter in which the licensed games are sold and the preferred return is earned. The Company's joint venture partner retains the financial risk of the joint venture and is responsible for the day−to−day operations, including development, sales and distribution, for which they are entitled to any remaining profits. During 2002, 2003 and 2004, the Company earned $8.0 million, $7.4 million and $7.9 million, respectively, in profit from the joint venture.

In December 2001, the Company acquired all the outstanding stock of Kidz Biz Ltd., a United Kingdom company, and Kidz Biz Far East Limited, an affiliated Hong Kong corporation, (collectively "Kidz Biz"), for an aggregate purchase price of approximately $12.4 million, which was paid by the issuance of 308,992 shares of the Company's common stock at a value of $6.0 million and cash of $6.4 million. In addition, we agreed to pay an earn−out for each of 2002, 2003, 2004 and 2005, based on the year over year increase in Kidz Biz sales, payable by delivery of up to 25,749 shares of our common stock per year. In 2002, 2003 and 2004, no earn−outs were earned. However, the 2005 earn−out at a value of $0.5 million was paid during 2004 upon the termination of employment of a principal of the seller, which was charged to expense in 2004. Both the United Kingdom and Hong Kong based companies are distributors of toys and related products in the United Kingdom, Ireland and the Channel Islands.

The Company acquired the following entities to further enhance its existing product lines and to continue diversification into other toy categories and seasonal businesses.

In March 2002, the Company purchased a controlling interest in Toymax International, Inc. ("Toymax") and on October 25, 2002, the Company completed that acquisition by acquiring the remaining outstanding common shares in a merger transaction. This acquisition expanded the product offerings in the Company's traditional toy category. The total purchase price of approximately $62.8 million consisted of 1,166,360 shares of the Company's common stock, 598,697 options and approximately $41.0 million in cash. This transaction has been accounted for by the Company under the purchase method of accounting, and the Company's results of operations have included Toymax from March 12, 2002; however, for the period from March 12, 2002 through October 25, 2002, the minority interest's share of Toymax's earnings were excluded.

57

Table of Contents

**JAKKS PACIFIC, INC. AND SUBSIDIARIES**
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)
DECEMBER 31, 2004

In November 2002, the Company purchased certain product lines, assets and assumed certain specific liabilities from Trendmasters, Inc. ("Trendmasters"). This acquisition expanded the product offerings in the Company's seasonal business, including outdoor and holiday. The total purchase price of approximately $19.2 million consisted of all cash. This transaction has been accounted for by the Company under the purchase method of accounting, and the Company's results of operations have included Trendmasters from the date of acquisition.

In May 2003, the Company purchased the product lines and related assets and assumed certain liabilities from P&M Products USA, Inc. and an affiliated United Kingdom company, P&M Products Limited, (collectively "P&M"). The total purchase price of approximately $22.0 million consisted of cash paid in the amount of $20.7 million and liabilities assumed of $0.6 million and resulted in goodwill of $13.5 million. Additionally, the patent for Blopen, one of P&M's significant product lines, was purchased for $1.8 million in cash in a separate transaction with the patent owner that previously licensed Blopen to P&M. This acquisition expanded the product offerings in the Company's activities category. This transaction has been accounted for by the Company under the purchase method of accounting, and the Company's results of operations have included P&M from the date of acquisition.

In determining the purchase price allocation of the P&M acquisition, the Company considered the acquired intangible assets that arose from contractual or other legal rights, including trademarks, copyrights, patents and license agreements, as well as potential noncontractual intangible assets, including customer lists and customer−related relationships. The Company consummated this acquisition because of the additional value of the expected synergies that would result from combining the operations of P&M into the operations of the Company.

On June 10, 2004, the Company purchased substantially all of the assets and assumed certain liabilities of Play Along. The total purchase price of $85.7 million consisted of cash paid in the amount of $70.8 million and the issuance of 749,005 shares of the Company common stock valued at $14.9 million and resulted in goodwill of $67.8 million. In addition, the Company agreed to pay an earn−out of up to $10.0 million per year for the three calendar years following the acquisition up to an aggregate amount of $30.0 million based on the achievement of certain financial performance criteria which will be recorded as goodwill when and if earned. For the year ended December 31, 2004, $10.0 million of the earn−out was earned and recorded as goodwill as of December 31, 2004. Accordingly, the annual maximum earn−out for the remaining three years through December 31, 2007 is approximately $6.7 million, or an aggregate of $20.0 million. Play Along designs and produces traditional toys, which it distributes domestically and internationally. This acquisition expands our product offerings in the pre−school area and brings new product development and marketing talent to the Company. This transaction has been accounted for by the Company under the purchase method of accounting, and the Company's results of operations have included Play Along from the date of acquisition.

In determining the purchase price allocation of the Play Along acquisition, the Company considered the acquired intangible assets that arise from contractual or other legal rights, including trademarks, copyrights, patents and license agreements, potential noncontractual intangible assets, including customer lists and customer−related relationships, as well as the value of synergies that will result from combining the operations of Play Along into the operations of the Company.

58

Table of Contents

### JAKKS PACIFIC, INC. AND SUBSIDIARIES
#### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)
##### DECEMBER 31, 2004

The total purchase price of these acquisitions was allocated to the estimated fair value of assets acquired and liabilities assumed as set forth in the following table (in thousands):

|  | P&M | Play Along | Total |
|---|---|---|---|
| Estimated fair value: |  |  |  |
| Current assets | $ 5,616 | $ 24,063 | $ 29,679 |
| Property and equipment, net | 17 | 546 | 563 |
| Other assets | 11 | 3,184 | 3,195 |
| Liabilities assumed | (1,378) | (31,995) | (33,373) |
| Intangible assets other than goodwill | 2,900 | 22,100 | 25,000 |
| Goodwill | 13,541 | 67,788 | 81,329 |
|  | $ 20,707 | $ 85,686 | $ 106,393 |

Approximately $10.8 million of the Toymax goodwill, $23.2 million of Trendmasters goodwill, $14.1 million of the P&M goodwill and $67.8 million of the Play Along goodwill is expected to be deductible for tax purposes.

The following unaudited pro forma information represents the Company's consolidated results of operations as if the acquisitions of P&M and Play Along had occurred on January 1, 2003 and after giving effect to certain adjustments including the elimination of certain general and administrative expenses and other income and expense items not attributable to ongoing operations, interest expense, and related tax effects. Such pro forma information does not purport to be indicative of operating results that would have been reported had the acquisitions of P&M and Play Along actually occurred on January 1, 2003 or on future operating results.

|  | Year Ended December 31, | |
|---|---|---|
|  | 2003 | 2004 |
|  | (In thousands, except per share data) | |
| Net Sales | $ 326,105 | $ 618,952 |
| Net income | $ 13,693 | $ 44,391 |
| Basic earnings per share | $ 0.56 | $ 1.69 |
| Weighted average shares outstanding | 24,262 | 26,239 |
| Diluted earnings per share | $ 0.55 | $ 1.65 |
| Weighted average shares and equivalents outstanding | 24,677 | 26,947 |

### Note 5—Concentration of Credit Risk

Financial instruments that subject the Company to concentration of credit risk are cash and cash equivalents and accounts receivable. Cash equivalents consist principally of short–term money market funds. These instruments are short–term in nature and bear minimal risk. To date, the Company has not experienced losses on these instruments.

The Company performs ongoing credit evaluations of its customers' financial condition, but does not require collateral to support domestic customer accounts receivables. Most goods shipped FOB Hong Kong or China are secured with irrevocable letters of credit.

Table of Contents

### JAKKS PACIFIC, INC. AND SUBSIDIARIES
#### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)
##### DECEMBER 31, 2004

At December 31, 2004 and 2003, the Company's five largest customers accounted for approximately 65.1% and 74.6%, respectively, of net accounts receivable. The concentration of the Company's business with a relatively small number of customers may expose the Company to material adverse effects if one or more of its large customers were to experience financial difficulty. The Company performs ongoing credit evaluations of its top customers and maintains an allowance for potential credit losses.

#### Note 6—Accrued Expenses

Accrued expenses consist of the following (in thousands):

|  | 2003 | 2004 |
|---|---|---|
| Royalties and sales commissions | $ 5,043 | $ 20,527 |
| Bonuses | 1,357 | 9,720 |
| Acquisition earnout | — | 10,000 |
| Other | 4,405 | 15,086 |
|  | $ 10,805 | $ 55,333 |

#### Note 7—Related Party Transactions

A director of the Company is a partner in the law firm that acts as counsel to the Company. The Company incurred legal fees and expenses to the law firm in the amount of approximately $2.7 million in 2002, $4.6 million in 2003 and $3.3 million in 2004.

#### Note 8—Long-term Debt

Long-term debt consists of the following (in thousands):

|  | 2003 | 2004 |
|---|---|---|
| Convertible senior notes(1) | $ 98,000 | $ 98,000 |
| Loan payable, due in sixty monthly payments with the final payment due December 4, 2006, with interest at 6.7% per annum | 61 | — |
|  | 98,061 | 98,000 |
| Less current portion of long-term debt | (19) | — |
| Long-term debt, net of current portion | $ 98,042 | $ 98,000 |

(1) Pursuant to the terms of a Purchase Agreement, dated June 9, 2003, the Company sold an aggregate of $98.0 million of 4.625% Convertible Senior Notes due June 15, 2023. The holders of the notes may convert the notes into shares of the Company's common stock at any time at an initial conversion price of $20.00 per share, subject to certain circumstances described in the notes. The Company will pay cash interest on the notes at an annual rate of 4.625% of the principal amount at issuance, from the issue date to June 15, 2010, payable on June 15 and December 15 of each year, commencing on December 15, 2003. After June 15, 2010, the Company will not pay cash interest on the notes. At maturity, on June 15, 2023, the Company will redeem the notes at their accreted principal amount, which will be equal to $1,811.95 (181.195%) per $1,000 principal amount at issuance.

Table of Contents

**JAKKS PACIFIC, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**
**DECEMBER 31, 2004**

The Company may redeem the notes at its option in whole or in part beginning on June 15, 2010, at 100% of their accreted principal amount plus accrued and unpaid interest (including contingent interest and additional amounts), if any, payable in cash. Holders of the notes may also require the Company to repurchase all or part of their notes on June 15, 2010, for cash, at a repurchase price of 100% of the principal amount per note plus accrued and unpaid interest (including contingent interest and additional amounts), if any. Holders of the notes may also require the Company to repurchase all or part of their notes on June 15, 2013 and June 15, 2018 at a repurchase price of 100% of the accreted principal amount per note plus accrued and unpaid interest (including contingent interest and additional amounts), if any. Any repurchases at June 15, 2013 and June 15, 2018 may be paid in cash, in shares of common stock or a combination of cash and shares of common stock.

The following is a schedule of payments for the long–term debt (in thousands):

| | |
|---|---:|
| 2005 | $ — |
| 2006 | — |
| 2007 | — |
| 2008 | — |
| 2009 | — |
| Thereafter | 98,000 |
| | $ 98,000 |

**Note 9—Income Taxes**

The Company does not file a consolidated return with its foreign subsidiaries. The Company files Federal and state returns and its foreign subsidiaries file Hong Kong and United Kingdom returns. Income taxes reflected in the accompanying consolidated statements of operations are comprised of the following (in thousands):

| | 2002 | 2003 | 2004 |
|---|---:|---:|---:|
| Federal | $ 2,241 | $ 608 | $ 696 |
| State and local | 270 | 55 | 1,088 |
| Foreign | 6,105 | 3,017 | 12,954 |
| | 8,616 | 3,680 | 14,738 |
| Deferred | (2,150) | (2,240) | 795 |
| | $ 6,466 | $ 1,440 | $ 15,533 |

61

Table of Contents

## JAKKS PACIFIC, INC. AND SUBSIDIARIES
### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)
#### DECEMBER 31, 2004

The components of deferred tax assets/(liabilities) are as follows (in thousands):

| | 2003 | 2004 |
|---|---|---|
| Net deferred tax assets/(liabilities): | | |
| Current: | | |
| Reserve for sales allowances and possible losses | $ 1,114 | $ 1,940 |
| Accrued expenses | 182 | 1,044 |
| Restricted stock grant | 3,094 | 136 |
| Foreign tax credit, net of valuation | — | 2,166 |
| Other | 132 | 875 |
| | 4,522 | 6,161 |
| Long Term: | | |
| Undistributed earnings | (7,191) | (7,191) |
| Property and equipment | (1,088) | (983) |
| Original issue discount interest | (925) | (2,761) |
| Deductible goodwill | (2,783) | (2,004) |
| Other | 2,152 | 242 |
| Federal net operating loss carryforwards | 7,321 | 8,416 |
| State net operating loss carryforwards | 667 | — |
| | (1,847) | (4,281) |
| Total net deferred tax assets/(liabilities) | $ 2,675 | $ 1,880 |

The current portion of deferred tax assets is included in prepaid expenses and other.

Income tax expense varies from the U.S. Federal statutory rate. The following reconciliation shows the significant differences in the tax at statutory and effective rates:

| | 2002 | 2003 | 2004 |
|---|---|---|---|
| Federal income tax expense | 35% | 35% | 35% |
| State income tax expense, net of federal tax effect | 0.5 | 0.2 | 1.3 |
| Effect of differences in U.S. and Foreign statutory rates | (18.9) | (30.6) | (12.1) |
| Other | 2.3 | 3.7 | 1.8 |
| | 18.9% | 8.3% | 26% |

Deferred taxes result from temporary differences between tax bases of assets and liabilities and their reported amounts in the consolidated financial statements. The temporary differences result from costs required to be capitalized for tax purposes by the U.S. Internal Revenue Code ("IRC"), and certain items accrued for financial reporting purposes in the year incurred but not deductible for tax purposes until paid.

As of December 31, 2004, the Company has federal and state net operating loss carryforwards of $19.3 million and $20.4 million, respectively, expiring through 2023. These carryforwards resulted from the acquisitions of Pentech and Toymax. The utilization of these losses to offset future income is limited under IRC§382. The Company's management concluded that a deferred tax asset valuation allowance was not necessary.

62

Table of Contents

**JAKKS PACIFIC, INC. AND SUBSIDIARIES**
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)
DECEMBER 31, 2004

The components of income before provision for income taxes and minority interest are as follows (in thousands):

|  | 2002 | 2003 | 2004 |
|---|---|---|---|
| Domestic | $ (3,433) | $ (5,255) | $ (22,669) |
| Foreign | 37,592 | 22,590 | 81,761 |
|  | $ 34,159 | $ 17,335 | $ 59,092 |

On October 22, 2004, the American Jobs Creation Act of 2004 (the "AJC Act") was signed into law. The AJC Act creates a one-time incentive for U.S. corporations to repatriate undistributed earnings from their international subsidiaries by providing an 85% dividends-received deduction for certain international earnings. The deduction is available to corporations during the tax year that includes October 22, 2004 or in the immediately subsequent tax year. The Company is in the process of evaluating whether it will repatriate any international earnings under the provisions of the AJC Act.

**Note 10—Credit Facility**
In October 2001, the Company and all of its subsidiaries jointly and severally secured a syndicated line of credit totaling $50.0 million with a consortium of banks ("Line of Credit"). The Company terminated the Line of Credit effective August 13, 2004. There had never been any outstanding borrowings under the Line of Credit since its inception.

**Note 11—Leases**
The Company leases office, warehouse and showroom facilities and certain equipment under operating leases. Rent expense for the three years ended December 31, 2004 totaled $4.0 million, $5.2 million and $5.8 million, respectively. The following is a schedule of minimum annual lease payments (in thousands).

| 2005 | $ 6,543 |
|---|---|
| 2006 | 5,714 |
| 2007 | 4,723 |
| 2008 | 2,819 |
| 2009 | 2,804 |
| Thereafter | 6,603 |
|  | $ 29,206 |

**Note 12—Common Stock, Preferred Stock and Warrants**
The Company has 105,000,000 authorized shares of stock consisting of 100,000,000 shares of $.001 par value common stock and 5,000,000 shares of $.001 par value preferred stock. In February 2003, the Company's Board of Directors approved a buyback of up to $20.0 million of the Company's common stock. During 2003, the Company repurchased and retired 554,500 shares of its common stock at an aggregate cost of $6.1 million. No shares were repurchased during 2004.

During 2004, the Company issued 749,005 shares of common stock at a value of $14.9 million in connection with the Play Along acquisition, 25,749 shares of common stock at a value of

63

Table of Contents

## JAKKS PACIFIC, INC. AND SUBSIDIARIES
### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)
#### DECEMBER 31, 2004

$0.5 million in connection with the Kidz Biz acquisition, and 4,310 shares of restricted stock to five non−employee directors of the Company at a value of approximately $59,000. The Company also issued 192,129 shares of common stock on the exercise of options for a total of $1.7 million.

During 2003, the Company awarded 2,760,000 shares of restricted stock to four executive officers of the Company pursuant to its 2002 Stock Award and Incentive Plan, of which 636,000 were earned during 2003, 396,000 were earned during 2004, 288,000 were canceled upon the termination of employment of one of our executive officers in October 2004, and the balance may be earned through 2010 based upon the achievement of certain financial criteria and continuing employment. A charge of $8.4 million was recorded as of December 31, 2003 relating to this award. The Company also issued 312,491 shares of common stock on the exercise of options for a total of $1.8 million.

During 2002, the Company issued 954,770 shares of common stock on the exercise of options and warrants for a total of $5.9 million, 1,166,360 shares of common stock at a value of $18.1 million in connection with the Toymax acquisition and 3,525,000 shares of common stock in connection with an underwritten public offering for net proceeds of approximately $59.1 million.

During 2003, the Company issued 100,000 fully vested warrants, expiring in 2013, in connection with license costs relating to its investment in the joint venture. The fair market value of these warrants was approximately $1.1 million and has been included in the basis of the joint venture (Note 4). The Company also issued $98.0 million of convertible senior notes payable that may be converted into an aggregate of 4.9 million shares of the Company's common stock (Note 8).

Warrant activity is summarized as follows:

|  | Number of Shares | | Weighted Average Exercise Price |
|---|---|---|---|
| Outstanding, December 31, 2001 | 166,875 | $ | 6.67 |
| Exercised | (166,875) | | 6.67 |
| Outstanding, December 31, 2002 | — | | — |
| Granted | 100,000 | | 11.35 |
| Exercised | — | | — |
| Outstanding, December 31, 2003 and 2004 | 100,000 | $ | 11.35 |

### Note 13—Commitments

The Company has entered into various license agreements whereby the Company may use certain characters and properties in conjunction with its products. Such license agreements call for royalties to be paid at 1% to 18% of net sales with minimum guarantees and advance payments. Additionally, under three separate licenses, the Company has committed to spend 12.5% of related net sales up to $1.0 million, 8% of related net sales and 5% of related net sales on advertising per year on such licenses. We estimate that our minimum commitment for advertising in fiscal 2005 will be $7.4 million.

Table of Contents

**JAKKS PACIFIC, INC. AND SUBSIDIARIES**
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)
DECEMBER 31, 2004

Future annual minimum royalty guarantees as of December 31, 2004 are as follows (in thousands):

| | | |
|---|---|---:|
| 2005 | $ | 13,635 |
| 2006 | | 8,868 |
| 2007 | | 1,795 |
| 2008 | | 1,427 |
| 2009 | | 1,435 |
| Thereafter | | — |
| | $ | 27,160 |

The Company has entered into employment agreements with certain executives expiring through December 31, 2010. The aggregate future annual minimum guaranteed amounts due under those agreements as of December 31, 2004 are as follows (in thousands):

| | | |
|---|---|---:|
| 2005 | $ | 5,069 |
| 2006 | | 4,557 |
| 2007 | | 4,248 |
| 2008 | | 2,180 |
| 2009 | | 2,230 |
| Thereafter | | 2,280 |
| | $ | 20,564 |

**Note 14—Stock Award and Incentive Plan**

Under its 2002 Stock Award and Incentive Plan ("the Plan"), which incorporated its Third Amended and Restated 1995 Stock Option Plan, the Company has reserved 6,025,000 shares of its common stock for issuance upon the exercise of options granted under the Plan, as well as for the awarding of restricted stock. Under the Plan, employees (including officers), non-employee directors and independent consultants may be granted options to purchase shares of common stock and shares of restricted stock (Note 12).

65

Table of Contents

### JAKKS PACIFIC, INC. AND SUBSIDIARIES
#### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)
##### DECEMBER 31, 2004

As of December 31, 2004, 1,728,523 shares were available for future grant. Additional shares may become available to the extent that options presently outstanding under the Plan terminate or expire unexercised. Stock option activity pursuant to the Plan is summarized as follows:

| | Number of Shares | | Weighted Average Exercise Price |
|---|---|---|---|
| Outstanding, December 31, 2001 | 2,313,556 | $ | 9.97 |
| Granted | 1,124,197 | | 11.06 |
| Exercised | (787,836) | | 6.71 |
| Canceled | (42,030) | | 15.00 |
| Outstanding, December 31, 2002 | 2,607,887 | | 11.35 |
| Granted | 184,500 | | 13.31 |
| Exercised | (312,491) | | 11.78 |
| Canceled | (214,630) | | 12.71 |
| Outstanding, December 31, 2003 | 2,265,266 | | 12.15 |
| Granted | 287,644 | | 19.49 |
| Exercised | (192,129) | | 8.89 |
| Canceled | (287,775) | | 13.76 |
| Outstanding, December 31, 2004 | 2,073,006 | $ | 13.22 |

The weighted average fair value of options granted to employees in 2002, 2003 and 2004 was $10.65, $13.28 and $19.48 per share, respectively.

The following table summarizes information about stock options outstanding and exercisable at December 31, 2004:

| | Outstanding | | | Exercisable | | |
|---|---|---|---|---|---|---|
| Option Price Range | Number of Shares | Weighted Average Life in Years | Weighted Average Exercise Price | Number of Shares | Weighted Average Exercise Price | |
| $7.875 – $9.125 | 740,941 | 1.38 | $ 7.92 | 658,903 | $ 7.93 | |
| $11.35 – $16.25 | 998,925 | 4.38 | $ 14.29 | 489,600 | $ 13.93 | |
| $17.26 – $20.94 | 433,144 | 5.52 | $ 19.52 | 164,044 | $ 19.05 | |

#### Note 15—Employee Pension Plan

The Company sponsors for its U.S. employees, a defined contribution plan under Section 401(k) of the Internal Revenue Code. The plan provides that employees may defer up to 15% of their annual compensation, and that the Company will make a matching contribution equal to 50% of each employee's deferral, up to 5% of the employee's annual compensation. Company matching contributions, which vest equally over a five year period, totaled $0.3 million, $0.3 million and $0.4 million for 2002, 2003 and 2004, respectively.

Table of Contents

**JAKKS PACIFIC, INC. AND SUBSIDIARIES**
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)
DECEMBER 31, 2004

**Note 16—Supplemental Information to Consolidated Statements of Cash Flows**

In 2004, 749,005 shares of common stock valued at approximately $14.9 million were issued in connection with the acquisition of Play Along and 25,749 shares of common stock valued at approximately $0.5 million were issued in connection with the 2001 Kidz Biz acquisition (Note 4). Additionally, the Company recognized a $0.7 million tax benefit from the exercise of stock options.

In 2003, the Company issued 100,000 warrants valued at approximately $1.1 million in connection with license costs relating to its investment in the joint venture (Note 12).

In 2002, 1,166,360 shares of common stock valued at approximately $18.1 million and 598,697 options valued at $3.2 million were issued in connection with the acquisition of Toymax (Note 4).

**Note 17—Selected Quarterly Financial Data (Unaudited)**

Selected unaudited quarterly financial data for the years 2003 and 2004 are summarized below:

| | 2003 | | | | 2004 | | | |
|---|---|---|---|---|---|---|---|---|
| | First Quarter | Second Quarter | Third Quarter | Fourth Quarter | First Quarter | Second Quarter | Third Quarter | Fourth Quarter |
| | (in thousands, except per share data) | | | | | | | |
| Net sales | $ 67,759 | $ 73,290 | $ 90,308 | $ 84,419 | $ 73,986 | $ 109,395 | $ 206,083 | $ 184,802 |
| Gross profit | $ 27,442 | $ 27,906 | $ 36,226 | $ 34,868 | $ 30,466 | $ 41,281 | $ 81,801 | $ 72,459 |
| Income (loss) from operations | $ 5,960 | $ 2,522 | $ 10,480 | $ (7,573) | $ 4,885 | $ 8,321 | $ 29,915 | $ 10,604 |
| Income before income taxes and minority interest | $ 6,299 | $ 2,679 | $ 10,495 | $ (2,138) | $ 4,764 | $ 7,637 | $ 30,042 | $ 16,649 |
| Net income | $ 4,988 | $ 2,236 | $ 8,248 | $ 422 | $ 3,791 | $ 6,004 | $ 23,255 | $ 10,508 |
| Basic earnings per share | $ 0.20 | $ 0.09 | $ 0.34 | $ 0.02 | $ 0.15 | $ 0.24 | $ 0.89 | $ 0.40 |
| Weighted average shares outstanding | 24,430 | 24,175 | 24,177 | 24,304 | 25,276 | 25,502 | 26,167 | 26,232 |
| Diluted earnings per share | $ 0.20 | $ 0.09 | $ 0.28 | $ 0.01 | $ 0.15 | $ 0.22 | $ 0.75 | $ 0.36 |
| Weighted average shares and equivalents outstanding | 24,917 | 25,814 | 29,529 | 29,542 | 30,676 | 31,123 | 31,919 | 31,855 |

During the second quarter of 2003, the Company recorded a charge which impacted operating income by approximately $2.7 million relating to the recall of one of its products.

During the third quarter of 2003, we recovered $0.7 million of recall costs, recorded in the second quarter of 2003, from one of our factories.

During the fourth quarter of 2003, the Company recorded a non–cash charge of $8.4 million which impacted operating income relating to the grant of restricted stock and a charge of $2.1 million to provision for bad debt impacting operating income relating to the bankruptcy filing of several of its customers, including Kay Bee Toys.

During the fourth quarter of 2004, the Company recorded non–cash charges, which impacted operating income, of $5.6 million relating to the grant of restricted stock and $8.8 million relating to the amortization of short–lived intangible assets acquired in connection with the Play Along acquisition.

67

Table of Contents

**JAKKS PACIFIC, INC. AND SUBSIDIARIES**
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)
DECEMBER 31, 2004

**Note 18—Litigation**

On October 19, 2004, the Company was named as defendants in a lawsuit commenced by WWE in the U.S. District Court for the Southern District of New York concerning our toy licenses with WWE and the video game license between WWE and the joint venture company operated by THQ and the Company, encaptioned World Wrestling Entertainment, Inc. v. JAKKS Pacific, Inc., et al., 1:04−CV−08223−KMK (the "WWE Action"). The complaint also named as defendants THQ, the joint venture, certain of the Company's foreign subsidiaries, Jack Friedman (the Company's Chairman and Chief Executive Officer), Stephen Berman (the Company's Chief Operating Officer, President and Secretary and a member of the Company's Board of Directors), Joel Bennett (the Company's Chief Financial Officer), Stanley Shenker and Associates, Inc., Bell Licensing, LLC, Stanley Shenker and James Bell.

WWE sought treble, punitive and other damages (including disgorgement of profits) in an undisclosed amount and a declaration that the video game license with the joint venture, which is scheduled to expire in 2009 (subject to joint venture's right to extend that license for an additional five years), and an amendment to our toy licenses with WWE, which are scheduled to expire in 2009, are void and unenforceable. This action alleged violations by the defendants of the Racketeer Influenced and Corrupt Organization Act ("RICO") and the anti−bribery provisions of the Robinson−Patman Act, and various claims under state law.

On February 16, 2005, the Company filed a motion to dismiss the WWE Action. On March 30, 2005, the day before WWE's opposition to the Company's motion was due, WWE amended its complaint to, among other things, add the Chief Executive Officer of THQ as a defendant and to add a claim under the Sherman Act. On March 31, 2005, the WWE sent a letter to the Court proposing, *inter alia*, a briefing schedule for defendants' motions to dismiss the amended complaint.

In November 2004, several purported class action lawsuits were filed in the United States District Court for the Southern District of New York: (1) Garcia v. Jakks Pacific, Inc. et al., Civil Action No. 04−8807 (filed on November 5, 2004), (2) Jonco Investors, LLC v. Jakks Pacific, Inc. et al., Civil Action No. 04−9021 (filed on November 16, 2004), (3) Kahn v. JAKKS Pacific, Inc. et al., Civil Action No. 04−8910 (filed on November 10, 2004), (4) Quantum Equities L.L.C. v. Jakks Pacific, Inc. et al., Civil Action No. 04−8877 (filed on November 9, 2004), and (5) Irvine v. Jakks Pacific, Inc. et al., Civil Action No. 04−9078 (filed on November 16, 2004) (the "Class Actions"). The complaints in the Class Actions allege that defendants issued positive statements concerning increasing sales of our WWE licensed products which were false and misleading because the WWE licenses had allegedly been obtained through a pattern of commercial bribery, our relationship with the WWE was being negatively impacted by the WWE's contentions and there was an increased risk that the WWE would either seek modification or nullification of the licensing agreements with us. Plaintiffs also allege that we misleadingly failed to disclose the alleged fact that the WWE licenses were obtained through an unlawful bribery scheme. The plaintiffs in the Class Actions are described as purchasers of our common stock, who purchased from as early as October 26, 1999 to as late as October 19, 2004. The Class Actions seek compensatory and other damages in an undisclosed amount, alleging violations of Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b−5 promulgated thereunder by each of the defendants (namely the Company and Messrs. Friedman, Berman and Bennett), and violations of Section 20(a) of the

68

Table of Contents

## JAKKS PACIFIC, INC. AND SUBSIDIARIES
### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)
#### DECEMBER 31, 2004

Exchange Act by Messrs. Friedman, Berman and Bennett. On January 25, 2005, the Court consolidated the Class Actions under the caption In re JAKKS Pacific, Inc. Shareholders Class Action Litigation, Civil Action No. 04–8807.

The Company believes that the claims in the WWE Action and the Class Actions are without merit and we intend to defend vigorously against them. However, because these Actions are in their preliminary stages, the Company cannot assure you as to the outcome of the Actions, nor can we estimate the range of our potential losses.

On February 16, 2005, the Company filed a motion to dismiss WWE's Complaint in the WWE Action. The motion is currently scheduled to be fully briefed on April 14, 2005, with oral argument to be scheduled thereafter.

On December 2, 2004, a shareholder derivative action was filed in the Southern District of New York by Freeport Partner, LLC against the Company, nominally, and against Messrs. Friedman, Berman and Bennett, Freeport Partners v. Friedman, et al., Civil Action No. 04–9441 (the "Derivative Action"). The Derivative Action seeks to hold the individual defendants liable for damages allegedly caused to the Company by their actions and in particular to hold them liable on a contribution theory with respect to any liability the Company incurs in connection with the Class Actions. On or about February 10, 2005, a second shareholder derivative action was filed in the Southern District of New York by David Oppenheim against us, nominally, and against Messrs. Friedman, Berman, Bennett, Blatte, Glick, Miller and Skala, Civil Action 05–2046 (the "Second Derivative Action"). The Second Derivative Action seeks to hold the individual defendants liable for damages allegedly caused to the Company by their actions as a result of alleged breaches of their fiduciary duties. On or about March 16, 2005, a third shareholder derivative action was filed. It is captioned Warr v. Friedman, Berman, Bennett, Blatte, Glick, Miller, Skala, and Jakks (as a nominal defendant), and it was filed in the Superior Court of California, Los Angeles County (the "Third Derivative Action"). The Third Derivative Action seeks to hold the individual defendants liable for (1) damages allegedly caused to the Company by their alleged breaches of fiduciary duty, abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment; and (2) restitution to the Company of profits, benefits and other compensation obtained by them.

On March 1, 2005, the Company delivered a Notice of Breach of Settlement Agreement and Demand for Indemnification to WWE (the "Notification"). The Notification asserted that WWE's filing of the WWE Action violated A Covenant Not to Sue contained in a January 15, 2004 Settlement Agreement and General Release ("General Release") entered into between WWE and the Company and, therefore, that the Company was demanding indemnification, pursuant to the Indemnification provision contained in the General Release, for all losses that the WWE's actions have caused or will cause to the Company and its officers, including but not limited to any losses sustained by us in connection with the Class Actions. On March 4, 2005, in a letter from its outside counsel, WWE asserted that the General Release does not cover the claims in the WWE Action.

The Company is a party to, and certain of its property is the subject of, various other pending claims and legal proceedings that routinely arise in the ordinary course of its business, but the Company does not believe that any of these claims or proceedings will have a material effect on its business, financial condition or results of operations.

69

Table of Contents

### JAKKS PACIFIC, INC. AND SUBSIDIARIES
SCHEDULE II—VALUATION AND QUALIFYING ACCOUNTS
YEARS ENDED DECEMBER 31, 2002, 2003 and 2004

Allowances are deducted from the assets to which they apply, except for sales returns and allowances.

| | Balance at Beginning of Period | Charged to Costs and Expenses | Charged to Other Accounts (in thousands) | Deductions | Balance at End of Period |
|---|---|---|---|---|---|
| **Year ended December 31, 2002:** | | | | | |
| Allowance for: | | | | | |
| Uncollectible accounts | $  7,273 | $  2,373 | $  — | $  2,865 | $  6,781 |
| Reserve for potential product obsolescence | 2,590 | 4,085 | — | 1,893 | 4,782 |
| Reserve for sales returns and allowances | 4,953 | 31,917 | 7,500(a) | 30,790 | 13,580 |
| | $  14,816 | $  38,375 | $  7,500 | $  35,548 | $  25,143 |
| **Year ended December 31, 2003:** | | | | | |
| Allowance for: | | | | | |
| Uncollectible accounts | $  6,781 | $  2,896 | $  — | $  1,800 | $  7,877 |
| Reserve for potential product obsolescence | 4,782 | 4,288 | — | 4,045 | 5,025 |
| Reserve for sales returns and allowances | 13,580 | 27,064 | — | 32,891 | 7,753 |
| | $  25,143 | $  34,248 | $  0 | $  38,736 | $  20,655 |
| **Year ended December 31, 2004:** | | | | | |
| Allowance for: | | | | | |
| Uncollectible accounts | $  7,877 | $  2,903 | $  — | $  3,722 | $  7,058 |
| Reserve for potential product obsolescence | 5,025 | 5,342 | — | 2,325 | 8,042 |
| Reserve for sales returns and allowances | 7,753 | 49,956 | — | 34,536 | 23,173 |
| | $  20,655 | $  58,201 | $  — | $  40,583 | $  38,273 |

(a)  Obligations assumed in conjunction with the asset acquisitions of Trendmasters and Dragon Ball Franchise.

Item 9A.  *Controls and Procedures*

(a) Evaluation of disclosure controls and procedures.

Our Chief Executive Officer and Chief Financial Officer, after evaluating the effectiveness of our disclosure controls and procedures (as defined in Exchange Act Rules 13a−15(e) and 15d−15(e)) as of the end of the period covered by this Annual Report, have concluded that as of that date, our disclosure controls and procedures were adequate and effective to ensure that information required to be disclosed by us in the reports

Table of Contents

we file or submit with the Securities and Exchange Commission is recorded, processed, summarized and reported within the time periods specified in the Securities and Exchange Commission's rules and forms.

(b) Changes in internal control over financial reporting.

There were no changes in our internal control over financial reporting identified in connection with the evaluation required by Exchange Act Rules 13a−15(d) and 15d−15 that occurred during the period covered by this Annual Report that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

(c) Management's annual report on internal control over financial reporting.

Our management is responsible for establishing and maintaining adequate internal control over financial reporting. Our internal control system was designed to provide reasonable assurance to management and our board of directors regarding the preparation and fair presentation of published financial statements.

All internal control systems, no matter how well designed, have inherent limitations. Therefore, even those systems determined to be effective can provide only reasonable assurance with respect to financial statement preparation and presentation.

Our management assessed the effectiveness of our internal control over financial reporting as of December 31, 2004. In making this assessment, it used the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission (COSO) in *Internal Control — Integrated Framework*. We believe that, as of December 31, 2004, our internal control over financial reporting is effective based on those criteria.

On June 11, 2004, we completed an asset purchase of Play Along, Inc., PA Distribution, Inc. and Play Along (Hong Kong) Limited, collectively known as "Play Along". Management's assessment did not include the internal controls of Play Along, due to the limited time between the purchase date and management's assessment. Play Along, Inc. contributed $165.5 million in net sales and $32.6 million of net income to our consolidated operations during 2004.

Our independent auditors have issued an attestation report on management's assessment of our internal control over financial reporting. This report appears on page 41.

(d) Attestation report of the registered public accounting firm.

Refer to the Financial Statements (see Item 8).

71

Table of Contents

# PART III

**Item 10.** *Directors and Executive Officers of the Registrant*
**Directors and Executive Officers**

Our directors and executive officers are as follows:

| Name | Age | Positions with the Company |
|------|-----|----------------------------|
| Jack Friedman | 65 | Chairman and Chief Executive Officer |
| Stephen G. Berman | 40 | Chief Operating Officer, President, Secretary and Director |
| Joel M. Bennett | 43 | Executive Vice President and Chief Financial Officer |
| Dan Almagor | 51 | Director |
| David C. Blatte | 40 | Director |
| Robert E. Glick | 59 | Director |
| Michael G. Miller | 57 | Director |
| Murray L. Skala | 58 | Director |

*Jack Friedman* has been our Chairman and Chief Executive Officer since co–founding JAKKS with Mr. Berman in January 1995. Until December 31, 1998, he was also our President. From January 1989 until January 1995, Mr. Friedman was Chief Executive Officer, President and a director of THQ. From 1970 to 1989, Mr. Friedman was President and Chief Operating Officer of LJN Toys, Ltd., a toy and software company. After LJN was acquired by MCA/ Universal, Inc. in 1986, Mr. Friedman continued as President until his departure in late 1988.

*Stephen G. Berman* has been our Chief Operating Officer and Secretary and one of our directors since co–founding JAKKS with Mr. Friedman in January 1995. Since January 1, 1999, he has also served as our President. From our inception until December 31, 1998, Mr. Berman was also our Executive Vice President. From October 1991 to August 1995, Mr. Berman was a Vice President and Managing Director of THQ International, Inc., a subsidiary of THQ. From 1988 to 1991, he was President and an owner of Balanced Approach, Inc., a distributor of personal fitness products and services.

*Joel M. Bennett* joined us in September 1995 as Chief Financial Officer and was given the additional title of Executive Vice President in May 2000. From August 1993 to September 1995, he served in several financial management capacities at Time Warner Entertainment Company, L.P., including as Controller of Warner Brothers Consumer Products Worldwide Merchandising and Interactive Entertainment. From June 1991 to August 1993, Mr. Bennett was Vice President and Chief Financial Officer of TTI Technologies, Inc., a direct–mail computer hardware and software distribution company. From 1986 to June 1991, Mr. Bennett held various financial management positions at The Walt Disney Company, including Senior Manager of Finance for its international television syndication and production division. Mr. Bennett holds a Master of Business Administration degree and is a Certified Public Accountant.

*Dan Almagor* has been one of our directors since September 2004. Since March 1992, Mr. Almagor has served as the Chairman of ACG Inc., an advisory firm affiliated with First Chicago Bank One Equity Capital, a global private equity organization which provides equity capital financing primarily to private companies.

*David C. Blatte* has been one of our directors since January 2001. From January 1993 to May 2000, Mr. Blatte was a Senior Vice President in the specialty retail group of the investment banking division of Donaldson, Lufkin and Jenrette Securities Corporation. From May 2000 to January

72

Table of Contents

2004, Mr. Blatte was a partner in Catterton Partners, a private equity fund. Since February 2004, Mr. Blatte has been a partner in Centre Partners, a private equity fund.

*Robert E. Glick* has been one of our directors since October 1996. For more than 20 years, Mr. Glick has been an officer, director and principal stockholder in a number of privately−held companies which manufacture and market women's apparel.

*Michael G. Miller* has been one of our directors since February 1996. From 1979 until May 1998, Mr. Miller was President and a director of a group of privately−held companies, including a list brokerage and list management consulting firm, a database management consulting firm, and a direct mail graphic and creative design firm. Mr. Miller's interests in such companies were sold in May 1998. Since 1991, he has been President of an advertising company.

*Murray L. Skala* has been one of our directors since October 1995. Since 1976, Mr. Skala has been a partner of the law firm Feder, Kaszovitz, Isaacson, Weber, Skala, Bass & Rhine LLP, our general counsel. Mr. Skala is a director of Traffix, Inc., a publicly−held company in the business of internet media and marketing.

A majority of our directors are "independent," as defined under the rules of the Nasdaq Stock Market. Such independent directors are Messrs. Blatte, Glick, Miller and Almagor. Our directors hold office until the next annual meeting of stockholders and until their successors are elected and qualified. Our officers are elected annually by our Board of Directors and serve at its discretion.

## Committees of the Board of Directors

We have an Audit Committee, a Compensation Committee and a Nominating and Corporate Governance Committee.

*Audit Committee.* The primary functions of the Audit Committee are to select or to recommend to our Board the selection of outside auditors; to monitor our relationships with our outside auditors and their interaction with our management in order to ensure their independence and objectivity; to review, and to assess the scope and quality of, our outside auditor's services, including the audit of our annual financial statements; to review our financial management and accounting procedures; to review our financial statements with our management and outside auditors; and to review the adequacy of our system of internal accounting controls. Messrs. Blatte, Glick and Miller are the current members of the Audit Committee and are each "independent" (as that term is defined in NASD Rule 4200(a)(14)), and are each able to read and understand fundamental financial statements. Mr. Blatte is the Chairman of the Audit Committee and possesses the financial expertise required under Rule 401(h) of Regulation SK of the Act and NASD Rule 4350(d)(2). He is further "independent", as that term is defined under Item 7(d)(3)(iv) of Schedule 14A under the Exchange Act. We will, in the future, continue to have (i) an Audit Committee of at least three members comprised solely of independent directors, each of whom will be able to read and understand fundamental financial statements (or will become able to do so within a reasonable period of time after his or her appointment); and (ii) at least one member of the Audit Committee that will possess the financial expertise required under NASD Rule 4350(d)(2). Our Board has adopted a written charter for the Audit Committee and the Audit Committee reviews and reassesses the adequacy of that charter on an annual basis.

*Compensation Committee.* The functions of the Compensation Committee are to make recommendations to the Board regarding compensation of management employees and to administer plans and programs relating to employee benefits, incentives, compensation and awards under our 2002 Stock Award and Incentive Plan (the "2002 Plan"). Messrs. Glick (Chairman) and Miller are the current members of the Compensation Committee. The Board has determined that each of them are "independent," as defined under the applicable rules of the Nasdaq Stock Market.

73

Table of Contents

*Nominating and Corporate Governance Committee.* The functions of the Nominating and Corporate Governance Committee are to develop our corporate governance system and to review proposed new members of our board of directors, including those recommended by our stockholders. Messrs. Almagor (Chairman), Glick and Miller are the current members of our Nominating and Corporate Governance Committee. The Nominating and Corporate Governance Committee operates pursuant to a written charter adopted by the Board. The full text of the charter is available on our website at *www.jakkspacific.com.* The Board has determined that each member of this Committee is "independent," as defined under the applicable rules of the Nasdaq Stock Market.

**Attendance at Meetings**

From January 1, 2004 through December 31, 2004, the Board of Directors, Audit Committee, Compensation Committee and Nominating and Corporate Governance Committee each met or acted without a meeting pursuant to unanimous written consent ten times, seven times, one time and one time, respectively.

**Section 16(a) Beneficial Ownership Reporting Compliance**

Based solely upon a review of Forms 3 and 4 and amendments thereto furnished to us during 2004 and Forms 5 and amendments thereto furnished to us with respect to 2004, during 2004, (i) Michael Bianco, a former executive officer of our Company, untimely filed one report on Form 4 reporting four late transactions; and (ii) Dan Almagor, a member of our Board of Directors, untimely filed one report on Form 3 and untimely filed one report on Form 4 reporting one late transaction. Based solely upon a review of Forms 3 and 4 and amendments thereto furnished to us during 2004 and Forms 5 and amendments thereto furnished to us with respect to 2004, all other Forms 3, 4 and 5 required to be filed during 2004 were done so on a timely basis.

**Code of Ethics**

We have a Code of Ethics that applies to all our employees, officers and directors. This code was filed as an exhibit to our Annual Report on Form 10–K for the fiscal year ended December 31, 2003. We will disclose when there have been waivers of, or amendments to, such Code, as required by the rules and regulations promulgated by the Securities and Exchange Commission and/or Nasdaq.

74

Table of Contents

## Item 11. *Executive Compensation*

The following table sets forth the compensation we paid for our fiscal years ended December 31, 2004, 2003 and 2002 to (i) our Chief Executive Officer; (ii) each of our other executive officers whose compensation exceeded $100,000 on an annual basis; and (iii) up to two additional individuals for whom disclosure would have been provided under the forgoing clause (ii) but for the fact that the individual was not serving as an executive officer of our Company at the end of the last completed fiscal year (collectively, the "Named Officers").

### Summary Compensation Table

| | | Annual Compensation | | | Long−Term Compensation | |
| Name and Principal Position | Year | Salary ($) | Bonus ($) | Other Annual Compensation ($) | Restricted Stock Awards ($)(*) | Securities Underlying Options (#) |
|---|---|---|---|---|---|---|
| Jack Friedman | 2004 | 990,000 | 1,980,000 | 9,750(5) | 1,578,000(6) | — |
| Chairman and Chief | 2003 | 965,000 | 1,327,140(3 | ) 9,000(5) | 2,524,800(7) | — |
| Executive Officer | 2002 | 846,000 | 1,429,696(3 | ) 8,250(5) | — | — |
| Stephen G. Berman | 2004 | 990,000 | 1,980,000 | 6,500(5) | 1,578,000(6) | — |
| Chief Operating Officer, | 2003 | 965,000 | 1,327,140(3 | ) 6,000(5) | 2,524,800(7) | — |
| President and Secretary | 2002 | 821,000 | 1,429,696(3 | ) 5,500(5) | — | — |
| Joel M. Bennett | 2004 | 320,000 | 300,000 | 6,500(5) | — | — |
| Executive Vice President and | 2003 | 300,000 | — | 6,000(5) | 1,262,400(8) | — |
| Chief Financial Officer | 2002 | 272,500 | 495,000(4) | 5,500(5) | — | — |
| Michael Bianco, Jr.(1) | 2004 | 1,024,000(2) | — | 6,500(5) | 1,262,400(9) | — |
| Former Executive Vice President | 2003 | 700,000 | — | 6,000(5) | 1,009,920(10) | — |
| and Chief Merchandising Officer | 2002 | 575,000 | 600,000 | 5,500(5) | — | — |

\*    The shares of restricted stock referenced in this column were all issued pursuant to the 2002 Plan. The total number of restricted shares issued under the 2002 Plan that were outstanding at December 31, 2004 was 1,236,630 shares. Such shares had an aggregate value of $27,341,890, representing the product of (a) 1,236,630 shares, multiplied by (b) $22.11, the closing price of our common stock on December 31, 2004, as reported by Nasdaq.

(1)    Effective October 13, 2004, we entered into a Termination Agreement and General Release with Mr. Bianco (the "Bianco Agreement"), which had the effect of terminating Mr. Bianco's employment with us. The Bianco Agreement further (i) canceled all of the 222,279 unexercised stock options (vested and unvested) held by Mr. Bianco, (ii) included the waiver by Mr. Bianco of all claims by him for future compensation under his prior employment agreement with us, including the right to receive 288,000 shares of restricted stock to which he was otherwise entitled to receive between now and January 2007, (iii) revised the vesting schedule of the 96,000 shares of restricted stock he received in January 2004 to delay the vesting of 24,000 of those shares from January 1, 2006 to January 1, 2007 and (iv) provided for mutual general releases between us and Mr. Bianco for all matters arising from his prior employment agreement.

(2)    Consists of $544,000 in salary and $480,000 paid to Mr. Bianco under his consulting agreement with us, entered into simultaneously with the Bianco Agreement (the "Consulting Agreement"). Pursuant to the terms of the Consulting Agreement, which is effective until September 30, 2007, Mr. Bianco is to serve as a product development and marketing consultant for us, in particular with regard to our product and marketing activities at the

75

Table of Contents

annual Toy Fair held in New York City, for which he will be compensated in the amount of $1,280,000 in the aggregate (including the $480,000 paid him in 2004).

(3)  On March 31, 2005, we restated the financial statements included in our Annual Report on Form 10–K for the fiscal year ended December 31, 2003, which included our financial statements for 2003 and 2002, to account for the acquisition of Toymax, Trendmasters and P&M Products in accordance with paragraph 39 of SFAS 141 (the "Restatement"). Specifically, a portion of the purchase price for each of these transactions has now been allocated to acquired product rights and other intangible assets other than goodwill. The Restatement had the effect of reducing our income before provision for income taxes and minority interest ("pre–tax income") for both 2003 and 2002. The bonuses paid to Messrs. Friedman and Berman in 2003 and 2002 were determined based upon our pre–tax income for those periods. We are evaluating the impact that the Restatement and the attendant reduction in our pre–tax income for 2003 and 2002 may have on the bonuses paid to Messrs. Friedman and Berman for those years.

(4)  Includes the forgiveness of a note receivable and accrued interest in the aggregate amount of $285,000.

(5)  Represents matching contributions made by us to the Named Officer's 401(k) defined contribution plan. See "— Employee Pension Plan," infra.

(6)  Represents the product of (a) 120,000 shares of restricted stock multiplied by (b) $13.15, the last sales price of our common stock, as reported by Nasdaq on January 1, 2004, the date the shares were granted, all of which vested on January 1, 2005.

(7)  Represents the product of (a) 240,000 shares of restricted stock multiplied by (b) $10.52, the closing price of our common stock, as reported by Nasdaq, on March 27, 2003, the date the shares were granted, all of which vested on January 1, 2004.

(8)  Represents the product of (a) 120,000 shares of restricted stock multiplied by (b) $10.52, the closing price of our common stock, as reported by Nasdaq, on March 27, 2003, the date the shares were granted, which vested as follows: 60,000 shares on each of January 1, 2004 and 2005.

(9)  Represents the product of (a) 96,000 shares of restricted stock multiplied by (b) $13.15, the last sales price of our common stock, as reported by Nasdaq on January 1, 2004, the date the shares were granted, which vested or will vest as follows: 72,000 shares on January 1, 2005 and 24,000 shares on January 1, 2007 (see Note (1) to this table, above).

(10) Represents the product of (a) 96,000 shares of restricted stock multiplied by (b) $10.52, the closing price of our common stock, as reported by Nasdaq, on March 27, 2003, the date the shares were granted, all of which vested on January 1, 2004.

76

Table of Contents

The following table sets forth certain information regarding options exercised and exercisable during 2004, and the value of options held as of December 31, 2004 by the Named Officers:

### Aggregated Option/SAR Exercises in Last Fiscal Year and Fiscal Year End Option/SAR Values

| Name | Shares Acquired on Exercise (#) | Value Realized ($) | Number of Securities Underlying Unexercised Options/SARs at Fiscal Year End | | Value of Unexercised In–the–Money Options/SARs at Fiscal Year End(1) | |
| --- | --- | --- | --- | --- | --- | --- |
| | | | Exercisable | Unexercisable | Exercisable | Unexercisable |
| Jack Friedman | — | — | 255,318 | 101,936 | 2,974,920 | 644,965 |
| Stephen G. Berman | — | — | 349,102 | 101,936 | 4,309,936 | 644,965 |
| Joel M. Bennett | — | — | 57,176 | 33,894 | 738,525 | 390,356 |
| Michael Bianco, Jr. | — | — | — | — | — | — |

(1)  The product of (x) the difference between $22.11 (the closing sale price of the common stock on December 31, 2004) and the aggregate exercise price of such options, multiplied by (y) the number of unexercised options.

*Compensation of Directors*

Directors currently receive an annual cash stipend of $15,000 for serving on the Board, and are reimbursed for reasonable expenses incurred in attending meetings. In addition, the 2002 Plan provides for each newly elected non–employee director to receive at the commencement of his term an option to purchase 10,000 shares of our common stock at their then current fair market value, and for grants to our non–employee directors: (i) on January 1 and July 1 of each year of an option to purchase 7,500 shares of our common stock at their then current fair market value, and (ii) on January 1 of each year of 1,000 shares of restricted stock. Options granted to a non–employee director expire upon the termination of the director's services for cause, but may be exercised at any time during a one–year period after such person ceases to serve as a director for any other reason.

The Chairman of the Audit Committee further receives an annual cash stipend of $10,000 for serving in such capacity.

*Employment Agreements and Termination of Employment Arrangements*

In March 2003 we amended and restated our employment agreements with each of the Named Officers.

Mr. Friedman's amended and restated employment agreement, pursuant to which he serves as our Chairman and Chief Executive Officer, provides for an annual base salary in 2005 of $1,015,000. Mr. Friedman's agreement expires December 31, 2010. His base salary is subject to annual increases determined by our Board of Directors, but in an amount not less than $25,000 per annum. For our fiscal year ended December 31, 2004, Mr. Friedman received a bonus of $1,980,000. For each fiscal year between 2005 through 2010, Mr. Friedman's bonus will depend on our achieving certain earnings per share growth targets, with such earnings per share growth targets to be determined annually by the Compensation Committee of our Board of Directors. Depending on the levels of earnings per share growth that we achieve in each fiscal year, Mr. Friedman will receive an annual bonus from 0% to up to 200% of his base salary. This bonus will be paid in accordance with the terms and conditions of our 2002 Stock Award and Incentive Plan. In addition, in consideration for modifying and replacing the pre–tax income formula provided in his prior employment agreement for

77

Table of Contents

determining his annual bonus, and for entering into the amended employment agreement, Mr. Friedman was granted the right to be issued an aggregate of 1,080,000 shares of restricted stock. The first tranche of restricted stock, totaling 240,000 shares, was granted at the time the agreement became effective, and the second and third tranches of restricted stock, each totaling 120,000 shares (or 240,000 in the aggregate), were granted on each of January 1, 2004 and 2005. In each subsequent year of the employment agreement term, Mr. Friedman will receive 120,000 shares of restricted stock. The grant of these shares is in accordance with our 2002 Stock Award and Incentive Plan, and the vesting of each tranche of restricted stock is subject to our achieving pre-tax income in excess of $2,000,000 in the fiscal year that the grant is made. Each tranche of restricted stock granted or to be granted from January 1, 2004 through January 1, 2008 is subject to a two-year vesting period, which may be accelerated to one year if we achieve certain earnings per share growth targets. Each tranche of restricted stock to be granted thereafter through January 1, 2010, is subject to a one-year vesting period. Finally, the agreement provides Mr. Friedman with the opportunity, commencing at age 67, to retire and receive a single-life annuity retirement payment equal to $975,000 a year for a period of 10 years, or in the event of his death during such retirement period, his estate will receive a death benefit equal to the difference between $2,925,000 and any prior retirement benefits previously paid to him; provided, however, that Mr. Friedman must agree to serve as Chairman Emeritus of our Board of Directors, if requested to do so by such Board.

Mr. Berman's amended and restated employment agreement, pursuant to which he serves as our President and Chief Operating Officer, provides for an annual base salary in 2005 of $1,015,000. Mr. Berman's agreement expires December 31, 2010. His base salary is subject to annual increases determined by our Board of Directors, but in an amount not less than $25,000 per annum. For our fiscal year ended December 31, 2004, Mr. Berman received a bonus of $1,980,000. For each fiscal year between 2005 through 2010, Mr. Berman's bonus will depend on our achieving certain earnings per share growth targets, with such earnings per share growth targets to be determined annually by the Compensation Committee of our Board of Directors. Depending on the levels of earnings per share growth that we achieve in each fiscal year, Mr. Berman will receive an annual bonus of from 0% to up to 200% of his base salary. This bonus will be paid in accordance with the terms and conditions of our 2002 Stock Award and Incentive Plan. In addition, in consideration for modifying and replacing the pre-tax income formula provided in his prior employment agreement for determining his annual bonus, and for entering into the amended employment agreement, Mr. Berman was granted the right to be issued an aggregate of 1,080,000 shares of restricted stock. The first tranche of restricted stock, totaling 240,000 shares, was granted at the time the agreement became effective, and the second and third tranches of restricted stock, each totaling 120,000 shares (or 240,000 in the aggregate), were granted on each of January 1, 2004 and 2005. In each subsequent year of the employment agreement term, Mr. Berman will receive 120,000 shares of restricted stock. The grant of these shares is in accordance with our 2002 Stock Award and Incentive Plan, and the vesting of each tranche of restricted stock is subject to our achieving pre-tax income in excess of $2,000,000 in the fiscal year that the grant is made. Each tranche of restricted stock granted or to be granted from January 1, 2004 through January 1, 2008 is subject to a two-year vesting period, which may be accelerated to one year if we achieve certain earnings per share growth targets. Each tranche of restricted stock to be granted thereafter through January 1, 2010, is subject to a one-year vesting period.

Mr. Bennett's amended and restated employment agreement, pursuant to which Mr. Bennett serves as our Executive Vice President and Chief Financial Officer, expires December 31, 2006. Mr. Bennett's annual base salary in 2005 is $340,000 and is subject to annual increases in an amount, not less than $20,000, determined by our Board of Directors. In addition, as consideration

78

Table of Contents

for relinquishing the prior formula for determining his annual bonus, and for entering into the amended agreement, Mr. Bennett was awarded at the time his agreement became effective 120,000 shares of restricted stock, 60,000 of which vested on each of January 1, 2004 and January 1, 2005. This grant of restricted stock was in accordance with our 2002 Stock Award and Incentive Plan.

Mr. Bianco's amended and restated employment agreement, pursuant to which he served as our Executive Vice President and Chief Merchandising Officer, provided for an annual base salary in 2004 of $725,000. Effective October 13, 2004, we entered into a Termination Agreement and General Release with Mr. Bianco (the "Termination Agreement"), which had the effect of terminating such employment agreement. The Termination Agreement further (i) canceled all of the 222,279 unexercised stock options (vested and unvested) held by Mr. Bianco, (ii) included the waiver by Mr. Bianco of all claims by him for future compensation under his prior employment agreement, including the right to receive 288,000 shares of restricted stock to which he was otherwise entitled to receive between now and January 2007, (iii) revised the vesting schedule of the 96,000 shares of restricted stock he received in January 2004 to delay the vesting of 24,000 of those shares from January 1, 2006 to January 1, 2007 and (iv) provided for mutual general releases between us and Mr. Bianco for all matters arising from his prior employment agreement. Simultaneously with the Termination Agreement, we entered into a Consulting Agreement with Mr. Bianco (the "Consulting Agreement"). The Consulting Agreement is effective until September 30, 2007. Under the terms of the Consulting Agreement, Mr. Bianco is to serve as a product development and marketing consultant for us, in particular with regard to our product and marketing activities at the annual Toy Fair held in New York City, for which he will be compensated in the amount of $1,280,000 in the aggregate. The Consulting Agreement also contains restrictive covenants.

If we terminate Mr. Friedman's, Mr. Berman's or Mr. Bennett's employment other than "for cause" or if such Named Officer resigns because of our material breach of the employment agreement or because we cause a material change in his employment, we are required to make a lump-sum severance payment in an amount equal to his base salary and bonus during the balance of the term of the employment agreement, based on his then applicable annual base salary and bonus. In the event of the termination of his employment under certain circumstances after a "Change of Control" (as defined in each employment agreement), we are required to make a one-time payment of an amount equal to 2.99 times of the "base amount" of such Named Officer determined in accordance with the applicable provisions of the Internal Revenue Code.

The foregoing is only a summary of the material terms of our employment agreements with the Named Officers. For a complete description, copies of such agreements are annexed herein in their entirety as exhibits or are otherwise incorporated herein by reference.

*Impact of Restatement on Compensation of Executive Officers*

On March 31, 2005, we restated the financial statements included in our Annual Report on Form 10-K for the fiscal year ended December 31, 2003, which included our financial statements for 2003 and 2002, to account for the acquisition of Toymax, Trendmasters and P&M Products in accordance with paragraph 39 of SFAS 141 (the "Restatement"). Specifically, a portion of the purchase price for each of these transactions has now been allocated to acquired product rights and other intangible assets other than goodwill. The Restatement had the effect of reducing our income before provision for income taxes and minority interest ("pre-tax income") for both 2003 and 2002. The bonuses paid to Messrs. Friedman and Berman in 2003 and 2002 were determined based upon our pre-tax income for those periods. We are evaluating the impact that the Restatement and

79

Table of Contents

the attendant reduction in our pre–tax income for 2003 and 2002 may have on the bonuses paid to Messrs. Friedman and Berman for those years.

*Employee Pension Plan*

We sponsor for our U.S. employees (including the Named Officers), a defined contribution plan under Section 401(k) of the Internal Revenue Code. The plan provides that employees may defer up to 15% of their annual compensation, and that we will make a matching contribution equal to 50% of each employee's deferral, up to 5% of the employee's annual compensation. Our matching contributions, which vest equally over a five year period, totalled $0.3 million, $0.3 million and $0.4 million for 2002, 2003 and 2004, respectively.

*Compensation Committee Interlocks and Insider Participation*

None of our executive officers has served as a director or member of a compensation committee (or other board committee performing equivalent functions) of any other entity, one of whose executive officers served as a director or a member of our Compensation Committee.

**Item 12.** *Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters*

The following table sets forth certain information as of March 28, 2005 with respect to the beneficial ownership of our common stock by (1) each person known by us to own beneficially more than 5% of the outstanding shares of our common stock, (2) each of our directors, (3) each Named Officer, and (4) all our directors and executive officers as a group.

| Name and Address of Beneficial Owner(1)(2) | Amount and Nature of Beneficial Ownership(s)(3) | Percent of Outstanding Shares(4) |
|---|---|---|
| Third Avenue Management LLC | 3,685,321(5) | 13.8% |
| Dimensional Fund Advisors, Inc. | 2,050,711(6) | 7.7 |
| FMR Corp. | 1,800,238(7) | 6.8 |
| Barclays Global Investors, N.A. | 1,437,196(8) | 5.4 |
| Jack Friedman | 960,776(9) | 3.6 |
| Stephen G. Berman | 829,102(10) | 3.1 |
| Michael Bianco, Jr. | 232,050(11) | * |
| Joel M. Bennett | 174,937(12) | * |
| Dan Almagor | 23,454(13) | * |
| David C. Blatte | 77,000(14) | * |
| Robert E. Glick | 93,519(15) | * |
| Michael G. Miller | 84,144(16) | * |
| Murray L. Skala | 95,457(17) | * |
| All directors and executive officers as a group (8 persons) | 2,335,203(18) | 8.5% |

\*    Less than 1% of our outstanding shares.

(1)    Unless otherwise indicated, such person's address is c/o JAKKS Pacific, Inc., 22619 Pacific Coast Highway, Malibu, California 90265.

(2)    The number of shares of common stock beneficially owned by each person or entity is determined under the rules promulgated by the Securities and Exchange Commission. Under such rules, beneficial ownership includes any shares as to which the person or entity has sole or shared voting power or investment power. The percentage of our outstanding shares is

**Table of Contents**

calculated by including among the shares owned by such person any shares which such person or entity has the right to acquire within 60 days after March 28, 2005. The inclusion herein of any shares deemed beneficially owned does not constitute an admission of beneficial ownership of such shares.

(3)   Except as otherwise indicated, exercises sole voting power and sole investment power with respect to such shares.

(4)   Does not include any shares of common stock issuable upon the conversion of $98 million of our 4.625% convertible senior notes due 2023, initially convertible at the rate of 50 shares of common stock per $1,000 principal amount at issuance of the notes (but subject to adjustment under certain circumstances as described in the notes).

(5)   The address of Third Avenue Management LLC is 622 Third Avenue, New York, NY 10017. Possesses sole voting power with respect to 3,587,152 of such shares and sole dispositive power with respect to all of such 3,685,321 shares. All the information presented in this Item with respect to this beneficial owner was extracted solely from the Schedule 13G/ A filed on February 16, 2005.

(6)   The address of Dimensional Fund Advisors, Inc. is 1299 Ocean Avenue, 11th Floor, Santa Monica, CA 90401. All the information presented in this Item with respect to this beneficial owner was extracted solely from the Schedule 13G/ A filed on February 9, 2005.

(7)   The address of FMR Corp. is 82 Devonshire Street, Boston, Massachusetts 02109. All the information with respect to this beneficial owner was extracted solely from its Schedule 13G/A filed on March 10, 2005.

(8)   The address of Barclays Global Investors, N.A. is 45 Fremont Street, San Francisco, CA 94105. Possesses sole voting power with respect to 1,308,390 of such shares and sole dispositive power with respect to all of such 1,437,196 shares. All the information presented in this Item with respect to this beneficial owner was extracted solely from the Schedule 13G filed on February 14, 2005.

(9)   Includes 3,186 shares held in trusts for the benefit of children of Mr. Friedman. Also includes 255,318 shares of common stock issuable upon the conversion of options held by Mr. Friedman. Also includes 120,000 shares of common stock issued on January 1, 2005 pursuant to the terms of Mr. Friedman's January 1, 2003 Employment Agreement, which shares are further subject to the terms of our January 1, 2005 Restricted Stock Award Agreement with Mr. Friedman (the "Friedman Agreement"). The Friedman Agreement provides that Mr. Friedman will forfeit his rights to all 120,000 shares unless certain conditions precedent are met prior to January 1, 2006, including the condition that our Pre–Tax Income (as defined in the Friedman Agreement) for 2005 exceeds $2,000,000, whereupon the forfeited shares will become authorized but unissued shares of our common stock. The Friedman Agreement further prohibits Mr. Friedman from selling, assigning, transferring, pledging or otherwise encumbering (a) 60,000 of the 120,000 shares prior to January 1, 2006 and (b) the remaining 60,000 shares prior to January 1, 2007; provided, however, that if our Pre–Tax Income for 2005 exceeds $2,000,000 and our Adjusted EPS Growth (as defined in the Friedman Agreement) for 2005 increases by certain percentages as set forth in the Friedman Agreement, the vesting of some or all of the 60,000 shares that would otherwise vest on January 1, 2007 will be accelerated to the date the Adjusted EPS Growth is determined.

(10)  Includes 255,318 shares of common stock issuable upon the conversion of options held by Mr. Berman. Also includes 120,000 shares of common stock issued on January 1, 2005 pursuant to the terms of Mr. Berman's January 1, 2003 Employment Agreement, which shares

81

Table of Contents

are further subject to the terms of our January 1, 2005 Restricted Stock Award Agreement with Mr. Berman (the "Berman Agreement"). The Berman Agreement provides that Mr. Berman will forfeit his rights to all 120,000 shares unless certain conditions precedent are met prior to January 1, 2006, including the condition that our Pre−Tax Income (as defined in the Berman Agreement) for 2005 exceeds $2,000,000, whereupon the forfeited shares will become authorized but unissued shares of our common stock. The Berman Agreement further prohibits Mr. Berman from selling, assigning, transferring, pledging or otherwise encumbering (a) 60,000 of the 120,000 shares prior to January 1, 2006 and (b) the remaining 60,000 shares prior to January 1, 2007; provided, however, that if our Pre−Tax Income for 2005 exceeds $2,000,000 and our Adjusted EPS Growth (as defined in the Berman Agreement) for 2005 increases by certain percentages as set forth in the Berman Agreement, the vesting of some or all of the 60,000 shares that would otherwise vest on January 1, 2007 will be accelerated to the date the Adjusted EPS Growth is determined.

(11)   Such information was derived exclusively from Mr. Bianco's most recently filed Form 4. Includes 48,000 shares of common stock, 50% of which vest on each of January 1, 2006 and 2007, all in accordance with the terms of that October 13, 2004 Termination Agreement and October 13, 2004 Consulting Agreement by and between Mr. Bianco and us.

(12)   Includes 58,234 shares which Mr. Bennett may purchase upon the exercise of certain stock options.

(13)   Includes 22,144 shares which Mr. Almagor may purchase upon the exercise of certain stock options and 1,310 shares of common stock issued on January 1, 2004, to all of our non−employee directors pursuant to our 2002 Stock Award and Incentive Plan, pursuant to which such 310 and 1,000 shares may not be sold, mortgaged, transferred or otherwise encumbered prior to December 20, 2005 and January 1, 2006, respectively.

(14)   Includes 75,000 shares which Mr. Blatte may purchase upon the exercise of certain stock options and 2,000 shares of common stock issued pursuant to our 2002 Stock Award and Incentive Plan, pursuant to which 1,000 of such shares may not be sold, mortgaged, transferred or otherwise encumbered prior to January 1, 2006.

(15)   Includes 91,519 shares which Mr. Glick may purchase upon the exercise of certain stock options and 2,000 shares of Common Stock issued pursuant to our 2002 Stock Award and Incentive Plan, pursuant to which 1,000 of such shares may not be sold, mortgaged, transferred or otherwise encumbered prior to January 1, 2006.

(16)   Includes 82,144 shares which Mr. Miller may purchase upon the exercise of certain stock options and 2,000 shares of Common Stock issued pursuant to our 2002 Stock Award and Incentive Plan, pursuant to which 1,000 of such shares may not be sold, mortgaged, transferred or otherwise encumbered prior to January 1, 2006.

(17)   Includes 90,271 shares which Mr. Skala may purchase upon the exercise of certain stock options, 3,186 shares held by Mr. Skala as trustee under a trust for the benefit of Mr. Friedman's minor child and 2,000 shares of common stock issued pursuant to our 2002 Stock Award and Incentive Plan, pursuant to which 1,000 of such shares may not be sold, mortgaged, transferred or otherwise encumbered prior to January 1, 2006.

(18)   Includes 3,186 shares held in a trust for the benefit of Mr. Friedman's minor child and an aggregate of 929,948 shares which the directors and executive officers may purchase upon the exercise of certain stock options.

82

Table of Contents

## Item 13. *Certain Relationships and Related Transactions*

One of our directors, Murray L. Skala, is a partner in the law firm of Feder, Kaszovitz, Isaacson, Weber, Skala, Bass & Rhine LLP, which has performed, and is expected to continue to perform, legal services for us. In 2004, we incurred approximately $4,281,292 for legal fees and $584,648 for reimbursable expenses payable to that firm. As of December 31, 2003 and 2004, legal fees and reimbursable expenses of $721,837 and $1,309,829, respectively, were payable to this law firm.

## Item 14.    *Principal Accountant Fees and Services.*

Before PKF is engaged by us to render audit or non–audit services, where required by the rules and regulations promulgated by the Securities and Exchange Commission and/or Nasdaq, such engagement is approved by the Audit Committee. The following are the fees billed us by PKF for services rendered thereby during 2003 and 2004 (all of which having been pre–approved by the Audit Committee):

|  | 2003 | 2004 |
|---|---|---|
| Audit Fees | $ 656,792 | $ 415,635 |
| Audit Related Fees | $ 85,185 | $ 122,483 |
| Tax Fees | $ 205,673 | $ 260,949 |
| All Other Fees | $ 56,811 | $ 191,778 |

*Audit Fees* consist of the aggregate fees billed for professional services rendered for the audit of our annual financial statements and the reviews of the financial statements included in our Forms 10–Q and for any other services that are normally provided by PKF in connection with our statutory and regulatory filings or engagements.

*Audit Related Fees* consist of the aggregate fees billed for professional services rendered for assurance and related services that were reasonably related to the performance of the audit or review of our financial statements and were not otherwise included in Audit Fees.

*Tax Fees* consist of the aggregate fees billed for professional services rendered for tax compliance, tax advice and tax planning. Included in such Tax Fees were fees for preparation of our tax returns, consultancy and advice on international and domestic tax structures and tax planning relating to our acquisition efforts.

*All Other Fees* consist of the aggregate fees billed for products and services provided by PKF and not otherwise included in Audit Fees, Audit Related Fees or Tax Fees. Included in such Other Fees were fees for services rendered by PKF in connection with our private and public offerings conducted during such periods, as well as reviews related to our acquisition efforts.

Our Audit Committee has considered whether the provision of the non–audit services described above is compatible with maintaining PKF's independence and determined that such services are appropriate.

83

Table of Contents

# PART IV

## Item 15. *Exhibits, Financial Statement Schedules*

(a) The following documents are filed as part of this Annual Report on Form 10–K:

(1) Financial Statements (included in Item 8):

- Report of Independent Registered Public Accounting Firm

- Consolidated Balance Sheets as of December 31, 2003 and 2004

- Consolidated Statements of Operations for the years ended December 31, 2002, 2003 and 2004

- Consolidated Statements of Other Comprehensive Income for the years ended December 31, 2002, 2003 and 2004

- Consolidated Statements of Stockholders' Equity for the years ended December 31, 2002, 2003 and 2004

- Consolidated Statements of Cash Flows for the years ended December 31, 2002, 2003 and 2004

- Notes to Consolidated Financial Statements

(2) Financial Statement Schedules (included in Item 8)

- Schedule II — Valuation and Qualifying Accounts

(3) Exhibits

| Exhibit Number | Description |
|---|---|
| 3.1 | Amended and Restated Certificate of Incorporation of the Company (1) |
| 3.2.1 | By–Laws of the Company (2) |
| 3.2.2 | Amendment to By–Laws of the Company (3) |
| 10.1.1 | Third Amended and Restated 1995 Stock Option Plan (4) |
| 10.1.2 | 1999 Amendment to Third Amended and Restated 1995 Stock Option Plan (5) |
| 10.1.3 | 2000 Amendment to Third Amended and Restated 1995 Stock Option Plan (6) |
| 10.1.4 | 2001 Amendment to Third Amended and Restated 1995 Stock Option Plan (7) |
| 10.2 | 2002 Stock Award and Incentive Plan (8) |
| 10.3 | Amended and Restated Employment Agreement between the Company and Jack Friedman, dated as of March 26, 2003 (9) |
| 10.4 | Amended and Restated Employment Agreement between the Company and Stephen G. Berman dated as of March 26, 2003 (9) |
| 10.5 | Amended and Restated Employment Agreement between the Company and Joel M. Bennet, dated March 26, 2003 (9) |
| 10.6.1 | October 13, 2004 Termination Agreement and General Release between the Company and Michael Bianco (10) |
| 10.6.2 | October 13, 2004 Consulting Agreement between the Company and Michael Bianco (10) |
| 10.7 | Office Lease dated November 18, 1999 between the Company and Winco Maliview Partners (11) |
| 10.8 | Lease dated as of November 21, 2000 between Grand Avenue Venture, LLC and JP Ferrero Parkway, Inc. (12) |
| 10.9 | Form of Restricted Stock Agreement (9) |

84

Table of Contents

| Exhibit Number | Description |
|---|---|
| 14 | Code of Ethics (13) |
| 21 | Subsidiaries of the Company (*) |
| 31.1 | Rule 13a−14(a)/15d−14(a) Certification of Jack Friedman (*) |
| 31.2 | Rule 13a−14(a)/15d−14(a) Certification of Joel Bennett (*) |
| 32.1 | Section 1350 Certification of Jack Friedman (*) |
| 32.2 | Section 1350 Certification of Joel Bennett (*) |

(1) Filed previously as Appendix 2 to the Company's Schedule 14A Proxy Statement, filed August 23, 2002, and incorporated herein by reference.

(2) Filed previously as an exhibit to the Company's Registration Statement on Form SB−2 (Reg. No. 333−2048−LA), effective May 1, 1996, and incorporated herein by reference.

(3) Filed previously as an exhibit to the Company's Registration Statement on Form SB−2 (Reg. No. 333−22583), effective May 1, 1997, and incorporated herein by reference.

(4) Filed previously as Appendix A to the Company's Schedule 14A Proxy Statement, filed June 23, 1998, and incorporated herein by reference.

(5) Filed previously as an exhibit to the Company's Registration Statement on Form S−8 (Reg. No. 333−90055), filed November 1, 1999, and incorporated herein by reference.

(6) Filed previously as an exhibit to the Company's Registration Statement on Form S−8 (Reg. No. 333−40392), filed June 29, 2000, and incorporated herein by reference.

(7) Filed previously as Appendix B to the Company's Schedule 14A Proxy Statement, filed June 11, 2001, and incorporated herein by reference.

(8) Filed previously as an exhibit to the Company's Registration Statement on Form S−8 (Reg. No. 333−101665), filed December 5, 2002, and incorporated herein by reference.

(9) Filed previously as an exhibit to the Company's Annual Report on Form 10−K for its fiscal year ended December 31, 2002, filed March 31, 2003, and incorporated herein by reference.

(10) Filed previously as an exhibit to the Company's Current Report on Form 8−K, filed on October 15, 2004, and incorporated herein by reference.

(11) Filed previously as an exhibit to the Company's Annual Report on Form 10−K for its fiscal year ended December 31, 1999, filed March 30, 2000, and incorporated herein by reference.

(12) Filed previously as an exhibit to the Company's Annual Report on Form 10−K for its fiscal year ended December 31, 2000, filed April 2, 2001, and incorporated herein by reference.

(13) Filed previously as an exhibit to the Company's Annual Report on Form 10−K for its fiscal year ended December 31, 2003, filed March 15, 2004, and incorporated herein by reference.

(*) Filed herewith.

85

Table of Contents

## SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

Dated: May 12, 2005

JAKKS PACIFIC, INC.

By:                                    /s/ JACK FRIEDMAN

Jack Friedman
Chairman and
Chief Executive Officer

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the registrant and in the capacities and on the dates indicated.

| Signature | Title | Date |
| --- | --- | --- |
| /s/ JACK FRIEDMAN<br><br>Jack Friedman | Chairman of the Board<br>of Directors and<br>Chief Executive Officer<br>(Principal Executive Officer) | May 12, 2005 |
| /s/ JOEL M. BENNETT<br><br>Joel M. Bennett | Chief Financial Officer<br>(Principal Financial Officer and<br>Principal Accounting Officer) | May 12, 2005 |
| /s/ STEPHEN G. BERMAN<br><br>Stephen G. Berman | Director | May 12, 2005 |
| /s/ DAN ALMAGOR<br><br>Dan Almagor | Director | May 12, 2005 |
| /s/ DAVID C. BLATTE<br><br>David C. Blatte | Director | May 12, 2005 |
| /s/ ROBERT E. GLICK<br><br>Robert E. Glick | Director | May 12, 2005 |
| /s/ MICHAEL G. MILLER<br><br>Michael G. Miller | Director | May 12, 2005 |
| /s/ MURRAY L. SKALA<br><br>Murray L. Skala | Director | May 12, 2005 |

86

Table of Contents

# EXHIBIT INDEX

| Exhibit Number | Description |
|---|---|
| 3.1 | Amended and Restated Certificate of Incorporation of the Company (1) |
| 3.2.1 | By–Laws of the Company (2) |
| 3.2.2 | Amendment to By–Laws of the Company (3) |
| 10.1.1 | Third Amended and Restated 1995 Stock Option Plan (4) |
| 10.1.2 | 1999 Amendment to Third Amended and Restated 1995 Stock Option Plan (5) |
| 10.1.3 | 2000 Amendment to Third Amended and Restated 1995 Stock Option Plan (6) |
| 10.1.4 | 2001 Amendment to Third Amended and Restated 1995 Stock Option Plan (7) |
| 10.2 | 2002 Stock Award and Incentive Plan (8) |
| 10.3 | Amended and Restated Employment Agreement between the Company and Jack Friedman, dated as of March 26, 2003 (9) |
| 10.4 | Amended and Restated Employment Agreement between the Company and Stephen G. Berman dated as of March 26, 2003 (9) |
| 10.5 | Amended and Restated Employment Agreement between the Company and Joel M. Bennet, dated March 26, 2003 (9) |
| 10.6.1 | October 13, 2004 Termination Agreement and General Release between the Company and Michael Bianco (10) |
| 10.6.2 | October 13, 2004 Consulting Agreement between the Company and Michael Bianco (10) |
| 10.7 | Office Lease dated November 18, 1999 between the Company and Winco Maliview Partners (11) |
| 10.8 | Lease dated as of November 21, 2000 between Grand Avenue Venture, LLC and JP Ferrero Parkway, Inc. (12) |
| 10.9 | Form of Restricted Stock Agreement (9) |
| 14 | Code of Ethics (13) |
| 21 | Subsidiaries of the Company (*) |
| 31.1 | Rule 13a–14(a)/15d–14(a) Certification of Jack Friedman (*) |
| 31.2 | Rule 13a–14(a)/15d–14(a) Certification of Joel Bennett (*) |
| 32.1 | Section 1350 Certification of Jack Friedman (*) |
| 32.2 | Section 1350 Certification of Joel Bennett (*) |

(1) Filed previously as Appendix 2 to the Company's Schedule 14A Proxy Statement, filed August 23, 2002, and incorporated herein by reference.

(2) Filed previously as an exhibit to the Company's Registration Statement on Form SB–2 (Reg. No. 333–2048–LA), effective May 1, 1996, and incorporated herein by reference.

(3) Filed previously as an exhibit to the Company's Registration Statement on Form SB–2 (Reg. No. 333–22583), effective May 1, 1997, and incorporated herein by reference.

(4) Filed previously as Appendix A to the Company's Schedule 14A Proxy Statement, filed June 23, 1998, and incorporated herein by reference.

(5) Filed previously as an exhibit to the Company's Registration Statement on Form S–8 (Reg. No. 333–90055), filed November 1, 1999, and incorporated herein by reference.

(6) Filed previously as an exhibit to the Company's Registration Statement on Form S–8 (Reg. No. 333–40392), filed June 29, 2000, and incorporated herein by reference.

(7) Filed previously as Appendix B to the Company's Schedule 14A Proxy Statement, filed June 11, 2001, and incorporated herein by reference.

87

Table of Contents

(8)  Filed previously as an exhibit to the Company's Registration Statement on Form S−8 (Reg. No. 333−101665), filed December 5, 2002, and incorporated herein by reference.

(9)  Filed previously as an exhibit to the Company's Annual Report on Form 10−K for its fiscal year ended December 31, 2002, filed March 31, 2003, and incorporated herein by reference.

(10) Filed previously as an exhibit to the Company's Current Report on Form 8−K, filed on October 15, 2004, and incorporated herein by reference.

(11) Filed previously as an exhibit to the Company's Annual Report on Form 10−K for its fiscal year ended December 31, 1999, filed March 30, 2000, and incorporated herein by reference.

(12) Filed previously as an exhibit to the Company's Annual Report on Form 10−K for its fiscal year ended December 31, 2000, filed April 2, 2001, and incorporated herein by reference.

(13) Filed previously as an exhibit to the Company's Annual Report on Form 10−K for its fiscal year ended December 31, 2003, filed March 15, 2004, and incorporated herein by reference.

(*)  Filed herewith.

88

ORIGINAL

## SETTLEMENT AGREEMENT
### AND GENERAL RELEASE OF ALL CLAIMS

This Settlement Agreement and General Release of All Claims ("Agreement") is entered into this 15th day of January, 2004, by and between World Wrestling Entertainment, Inc., with its principal place of business at 1241 East Main Street, Stamford, CT 06902 ("WWE") and Jakks Pacific, Inc. with its principal place of business at 22619 Pacific Coast Highway, Malibu, CA 90265 ("Jakks") (hereinafter WWE and Jakks shall be referred to individually as a "Party" and collectively as the "Parties").

WHEREAS, WWE and Jakks entered into a Consumer Product License Agreement dated October 24, 1995 for the territory of the United States and Canada and a Consumer Product License Agreemenet dated February 10, 1999 for the territories of Australia, Bahrain, Cyprus, Egypt, France, Germany, Israel, Italy, Kuwait, Lebanon, Jordan, Morocco, New Zealand, Oman, Qatar, Saudi Arabia, South Africa, Spain, Syria, Tunisia, United Arab Emirates and United Kingdom for the right for Jakks to sell, among other products, WWE action figures (collectively defined as "License Agreements");

WHEREAS, pursuant the License Agreements WWE conducted an Audit of Jakks accounting records for the accounting period of the second quarter of 1996 through June 30, 2002 ("the Audit");

WHEREAS, a dispute exists between the Parties concerning the Audit in that WWE contends Jakks failed to report various sales and that Jakks took unsupported deductions and wherein Jakks contends that it overpaid WWE;

WHEREAS, the Parties, without admitting any liability, desire to resolve any and all disputes that may exist between them concerning the Audit;

NOW, THEREFORE, in consideration of the mutual promises and covenants set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties hereto agree as follows:

1.    **PAYMENT**: Subject to Paragraph 4 below, in exchange for the full and general release of all claims and the covenant not to sue set forth below, Jakks shall pay World Wrestling Entertainment, Inc., Two Hundred Thousand US Dollars, (US$200,000.00) within five (5) days of WWE's execution hereof.

2.    **RELEASE OF KNOWN AND UNKNOWN CLAIMS**: The Parties, their subsidiaries, affiliates, parent companies, employees, officers, directors, licensees, successors, contractors, agents, assigns, and any other person or entity claiming through them (hereinafter collectively referred to as "Releasors"), hereby fully and completely releases the other Party, its parent companies, subsidiaries, successors, assigns and its and their respective employees, officers, directors, licensees, representatives and agents ("Releasees") from any and all claims, causes of action, rights, obligations, debts, liabilities, accounts, liens, damages, losses and expenses of every kind and nature whatsoever, whether known or

unknown, foreseen or unforeseen, patent or latent, suspected or unsuspected, fixed or contingent, which Releasors have or may have against Releasees, arising from or relating to the Audit. Releasors acknowledge that it is aware and that it may hereafter discover facts different from or in addition to those it now knows or believes to be true with respect to the Audit and the claims, causes of action, rights, obligations, debts, liabilities, accounts, liens, damages, losses and expenses herein released, and Releasors agree that the within release shall be and remain in effect in all respects as a complete and general release as to all matters released herein, notwithstanding any such different or additional facts.

3. **COVENANT NOT TO SUE**: Releasors agree that it will not make, assert, or maintain against Releasees any claim, demand, action, suit or proceeding arising out of or relating in any way to the Audit including but not limited to the matters released in this Agreement.

4. **CONFIDENTIALITY**: Releasors acknowledge and agree that it shall not divulge the terms and conditions of this Agreement to any third Party other than to its attorneys, financial advisors and employees who have a need to know this information or as required by law.

5. **INDEMNIFICATION**: Releasors will indemnify, defend and hold Releasees, its parent and subsidiary companies, and their respective officers, directors, employees, successors, licensees, contractors and assigns harmless from and against all actions, suits, proceedings, judgments, claims, liabilities, losses or expenses whatsoever, including reasonable attorneys' fees (including an allocation for in-house counsel fees and expenses) arising from a breach of any of Releasors' obligations, representations or warranties under this Agreement.

6. **WAIVER**: The failure at any time of any Party to demand strict performance of the other Party of any of the terms, covenants or conditions set forth in this Agreement shall not be construed as a continuing waiver or relinquishment thereof, and such Party may, at any time, demand full, strict and complete performance by the other Party of such terms, covenants and conditions.

7. **SEVERABILITY**: If any provision of this Agreement, or any part thereof, is determined to be invalid or unenforceable by any court of competent jurisdiction, it is the intention of the Parties that the same shall be limited only to the minimum extent necessary to permit compliance with the minimum legal requirement and thereby remain in effect, that no other provision of this Agreement shall be affected thereby and that all such other provisions shall continue in full force and effect.

8. **SURVIVAL**: All representations, warranties and indemnities contained herein or made by either Party in connection herewith shall survive the execution, delivery, suspension, expiration and/or termination of this Agreement or any provision hereof.

**9.    GOVERNING LAW; JURISDICTION**:

       a.    Governing Law:  This Agreement shall be governed by, and construed in accordance with, the laws of the State of Connecticut applicable to contracts entered into and to be fully performed therein.

       b.    Jurisdiction:  In connection with entering an arbitration award as a final judgment only, the Parties hereto agree to submit to the jurisdiction of the United States District Court located in Bridgeport, Connecticut and the Fairfield County Superior Court, located in Stamford, Connecticut.  The Parties agree that service of process by mail shall be effective service of same and such service shall have the same effect as personal service within the State of Connecticut and result in personal jurisdiction over the Parties in the forum in the State of Connecticut.  The provisions contained in this Paragraph 9 shall survive the termination and/or expiration of this Agreement.

    **10.    FURTHER ASSURANCES**:  Both Parties agree to execute such other further documents and do such other acts as may be required to effectuate the purposes of this Agreement including the respective rights of the Parties hereunder.

    **11.    COMPLETE AGREEMENT**:  This Agreement constitutes the entire understanding of the Parties and replaces and supersedes as of the date of execution any and all prior agreements and understandings, whether oral or written, between the Parties relating to the Audit.  No change, modification, waiver or discharge of any or all of the terms and provisions of this Agreement shall be effective unless made in writing and executed by both of the Parties hereto.

    **12.    SECTION AND OTHER HEADINGS**:  The section and other headings contained in this Agreement are for reference purposes only and shall not be deemed to be part of this Agreement or to affect the meaning or interpretation of this Agreement.

    **13.    EXECUTION IN COUNTERPARTS**:  This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original and all of which together shall be deemed to be one and the same instrument.

    **14.    ASSIGNMENT**:  This Agreement is non-assignable either Party.

    **15.    NOTICES**:  All notices, statements, and other documents required to be given to each Party shall be given in writing and sent, either by personal delivery, by registered mail postage prepaid, or by facsimile to the following addresses:

    If to WWE:

               Edward L. Kaufman
               Executive Vice President, General Counsel
               World Wrestling Entertainment, Inc.
               1241 East Main Street
               Stamford, Connecticut 06902

If to Jakks to:

> Stephen Berman
> Jakks Pacific Inc.
> 22619 Pacific Coast Highway
> Malibu, CA 90265

or such address as may be designated in writing by either Party in a notice conforming with this Paragraph 15. The date of such mailing, personal delivery or facsimile shall be the date of delivery of such notice.

16.  **RELATIONSHIP OF PARTIES**:  Nothing contained in this Agreement shall be deemed or construed as creating any joint venture, partnership, employment, agency or other relationship between Jakks and WWE.

17.  **RESERVATION OF RIGHTS**:  Nothing however, contained herein shall limit any rights or remedies that the Parties may have in contract, by law or otherwise in respect of any claim not related to the Audit.

(Continued on the next page)

ORIGINAL

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement as of the date first above written.

WORLD WRESTLING
ENTERTAINMENT, INC.
("WWE")

By: _Donna Goldsmith_

Name: _Donna Goldsmith_

Title: _Sr. VP Consumer Products_

Date: _1/15/04_


JAKKS PACIFIC, INC.

By: _[signature]_

Name: _Joel M. Bennett_

Title: _EVP/CFO_

Date: _Jan. 16, 2004_

Eugene Licker (EL 0334)
KIRKPATRICK & LOCKHART LLP
599 Lexington Avenue
New York, New York 10022-6030
(212) 536-3900 (phone)
(212) 536-3901 (fax)

JUDGE KARAS

Jerry S. McDevitt
Curtis B. Krasik
Amy L. Barrette
KIRKPATRICK & LOCKHART LLP
Henry W. Oliver Building
535 Smithfield Street
Pittsburgh, Pennsylvania 15222
(412) 355-8608 (phone)
(412) 355-6501 (fax)

**04 CV    8223**

Attorneys for Plaintiff, World Wrestling Entertainment, Inc.

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X

WORLD WRESTLING ENTERTAINMENT, INC.,

                        Plaintiff,

       - against -

JAKKS PACIFIC, INC.; JAKKS PACIFIC (H.K.)
LIMITED; ROAD CHAMPS LIMITED; THQ, INC.;
THQ/JAKKS PACIFIC LLC, THE JOINT VENTURE
OF THQ, INC. and JAKKS PACIFIC, INC.;
STANLEY SHENKER AND ASSOCIATES, INC.;
STANLEY SHENKER; BELL LICENSING, LLC;
JAMES BELL; JACK FRIEDMAN; STEPHEN
BERMAN and JOEL BENNETT,

                      Defendants.

------------------------------------------------------------X



**JURY TRIAL DEMANDED**

**<u>COMPLAINT</u>**

PI-1187296 v2

Nature of the Action

1.      This action is brought to (a) recover damages caused to WWE by the pattern of multifaceted racketeering activities set forth herein in connection with a commercial bribery scheme to obtain a lucrative videogame license, and amendments to toy licenses, issued by World Wrestling Entertainment, Inc. ("WWE"); (b) obtain a declaratory judgment that the videogame license between WWE and THQ/Jakks, LLC ("THQ/Jakks") and amendments to toy licenses between WWE and Jakks Pacific, Inc. ("Jakks") are void as a result of the illegal activities of Defendants taken to secure the videogame license and amendments of the toy licenses; (c) recover as damages the financial losses which will be associated with voiding the licenses; (d) obtain disgorgement of all profits earned by Defendants as a result of the commercial bribery scheme and licensing rights obtained by their conduct; and (e) recover punitive and other damages for the conduct set forth herein.

2.      The two licenses at issue herein were and are extremely lucrative licenses which were expected to and did produce millions of dollars in profits to the licensees. THQ, Inc. ("THQ") and Jakks are two publicly traded companies whose stock valuation was expected to increase if the revenues from the videogame license and amendments to the toy licenses could be secured.

3.      At all times relevant hereto, Defendants Jack Friedman, Stephen Berman and Joel Bennett were the highest ranking executives of Jakks. Individually and collectively, they were and are in a position to control the affairs of Jakks and foreign subsidiaries owned by Jakks which were used to both implement and conceal the commercial bribery scheme set forth herein.

4.      Additionally, Friedman, Berman and Bennett were all agents of a joint venture between THQ and Jakks formed for the purpose of obtaining the videogame license ("the Joint

2

Venture"). All acts of Friedman, Berman, Bennett and Jakks set forth herein were committed in furtherance of the Joint Venture, which has also ratified and accepted the benefits of the videogame license.

5.     At all times relevant hereto, Defendants Friedman, Berman and Bennett realized they would recognize several million dollars in personal profits as a result of stock ownership and options in Jakks if the videogame license and the amendments to the toy licenses were secured.

6.     The Defendants have acted through the years in concert to conceal the unlawful scheme and commercial bribes set forth herein by a variety of tactics, including laundering the bribes through foreign corporations and bank accounts, falsification of corporate accounting records, collusive and serial perjury by certain of the Defendants in a state court proceeding, destruction of physical evidence, falsification of physical evidence, incomplete and knowingly false responses to subpoenas duces tecum and false denials that the payments were made when requested by WWE to disclose such payments.

The Parties

7.     Plaintiff, World Wrestling Entertainment, Inc. ("WWE"), is a Delaware corporation having its principal place of business at 1241 East Main Street, Stamford, Connecticut 06902. WWE is an integrated media and entertainment company principally engaged in the development, promotion and marketing of television programming, pay-per-view programming and live arena events. In the process, WWE creates colorful characters and personas whose names and likenesses can be licensed to third parties, such as Jakks and THQ.

8.     Defendant Jakks Pacific, Inc. ("Jakks") is a Delaware corporation with its principal place of business at 22619 Pacific Coast Highway, Suite 250, Malibu, California

3

90265. Jakks is in the business of action figures and toys. In connection with the unlawful scheme, Jakks acted on its own behalf and then on behalf of the Joint Venture, and has benefited greatly from the scheme. Jakks owns and/or controls Road Champs, Ltd. and Jakks Pacific, H.K., two entities utilized by Jakks to effectuate the commercial bribes set forth herein.

9.    Defendant Jakks Pacific (H.K.) Limited ("Jakks Pacific (H.K.))" is a corporation organized under the laws of Hong Kong. The owners of Jakks Pacific (H.K.) are Defendants Friedman, who owns 1 of 1000 outstanding shares, and Jakks Pacific, Inc., which owns 999 of 1000 outstanding shares. Defendants Friedman and Berman are directors of Jakks Pacific (H.K.).

10.    Road Champs Limited ("Road Champs, Ltd.") is a corporation organized under the laws of Hong Kong. The owners of Road Champs, Ltd. are Defendants Friedman, who owns 1 of 300 outstanding shares, and Road Champs, Inc., which owns 299 of 300 outstanding shares. Road Champs, Inc. is a wholly owned subsidiary of Jakks Pacific, Inc. Defendants Friedman and Berman are directors of Road Champs, Ltd.

11.    Defendant Jack Friedman ("Friedman") is an individual who resides at 6351 Kanan Dume Road, Malibu, California 90265. At all times relevant hereto, Friedman was the highest-ranking executive at Jakks and served, and continues to serve, as Chief Executive Officer and Chairman of the Board of Directors of Jakks. Together with Defendant Berman, Friedman co-founded Jakks in or about January 1995. Prior to co-founding Jakks, Friedman was CEO and a director of THQ.

12.    Defendant Stephen Berman ("Berman") is an individual who resides at 27465 East Winding Way, Malibu, California 90265. During the implementation of the unlawful scheme and bribery payments set forth herein, Berman served as an Executive Vice President of

4

Jakks. Since January 1, 1999, Berman has served as President, Secretary, and Chief Operating Officer of Jakks and served, and continues to serve, on the Board of Directors of Jakks. On information and belief, prior to co-founding Jakks with Friedman, Berman was a Vice President and Managing Director of THQ International, Inc., a subsidiary of THQ.

13.     Defendant Joel Bennett ("Bennett") is an individual who resides at 6791 Trevino Drive, Moorpark, California 93021. At all times relevant hereto, Bennett was the Chief Financial Officer of Jakks.

14.     Defendant THQ, Inc. ("THQ") is a Delaware corporation with its principal place of business at 27001 Agoura Road, Suite 325, Calabasas Hills, California 91301. THQ is in the business of videogame marketing and sales. THQ authorized its Joint Venture partner, Jakks, to act on its behalf and on behalf of the Joint Venture in order to secure the benefits of a videogame license with WWE and/or has ratified the actions of Jakks set forth herein. Together with Jakks, THQ jointly obtained the videogame license. THQ is in day-to-day control of the Joint Venture. THQ has benefited from the scheme set forth herein.

15.     Defendant THQ/Jakks Pacific LLC ("THQ/Jakks") is a Delaware limited liability corporation having its principal place of business at 22761 Pacific Coast Highway, Suite 226, Malibu, California 90265. THQ/Jakks was formed on June 10, 1998 as part of the scheme set forth herein by Jakks and THQ to be the official licensee for WWE's videogame license. Defendant Berman signed the Certificate of Formation as an authorized person on behalf of the Joint Venture. The Joint Venture has agreements in place detailing the manner in which revenues from the WWE videogame license will be accounted for and ultimately distributed between THQ and Jakks.

5

16.    Defendant Stanley Shenker & Associates, Inc. ("SSAI") is a New York corporation with its principal place of business at 25 VanZant Street, Norwalk, Connecticut. SSAI was WWE's licensing agent from in or around April 1995 through June 13, 2000.

17.    Defendant Stanley Shenker ("Shenker") is an individual who resides in New Canaan, Connecticut. Shenker is, and at all times relevant to this Complaint has been, the President and sole owner of SSAI. At all times relevant hereto, Shenker was also the sole owner and alter ego of a foreign corporation known as Stanfull Industrial, Ltd. ("Stanfull") in Hong Kong. Shenker utilized Stanfull for a variety of criminal and fraudulent purposes, including as a money-laundering device to conceal the receipt and payment of bribes and kickbacks, including commercial bribes made by Jakks utilizing foreign subsidiaries that Jakks owned and/or controlled.

18.    Defendant Bell Licensing, LLC ("Bell Licensing") is a limited liability company organized amidst the scheme set forth herein by Bell under the laws of Connecticut with its principal place of business located at 405 Silver Creek Lane, Norwalk, Connecticut 06850. Bell Licensing was formed to be a receptacle for bribes paid to Bell to influence him while serving as an executive and fiduciary of WWE, including, but not limited to, the bribes paid him in connection with the scheme described herein. Prior to July 18, 2002, Bell Licensing did business under the name of Bell Consulting, LLC.

19.    Defendant James Bell ("Bell) is an individual who resides in Norwalk, Connecticut. Bell is, and at all times relevant to this Complaint has been, the President and sole owner of Bell Licensing. At all times relevant hereto, Bell utilized Bell Licensing as a money-laundering device to conceal the receipt of bribes and kickbacks, including payments from SSAI, Shenker, Stanfull and Jakks.

6

<u>Jurisdiction and Venue</u>

20.     This Court has jurisdiction over the subject matter of this action pursuant to 28

U.S.C. § 1331 and 15 U.S.C. § 15(a) in that WWE has alleged claims arising under the

Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962 and the Robinson-

Patman Act, 15 U.S.C. § 13 *et seq.* This Court may exercise supplemental jurisdiction over

WWE's state law claims pursuant to 28 U.S.C. § 1367.

21.     Venue is proper under 28 U.S.C. § 1391(b)(3) because THQ and Jakks and SSAI

all may be found in this district.

<u>The Unlawful Scheme</u>

22.     In or around March 1995, WWE hired Bell as its Director of Domestic Licensing.

In October 1996, Bell became Senior Vice President of Licensing and Merchandising, a position

he held until his termination on March 24, 2000.

23.     As Senior Vice President of Licensing and Merchandising, Bell occupied a

fiduciary position and was responsible for, among other things: (i) procuring licensees for

WWE; (ii) negotiating license agreements between WWE and potential licensees; (iii) managing

WWE's licensing arrangements with its licensees; and (iv) all other activities necessary and/or

attendant to the development and maintenance of WWE's licensing program. Pursuant to

WWE's licensing program, licensees were granted the right to utilize WWE intellectual property

in connection with the licensees' own goods and/or services.

24.     Shortly after securing his position, Bell urged WWE to hire SSAI as an outside

licensing agent, touting to WWE Shenker's reported extensive experience and contacts in the

licensing business. For at least ten years prior to Bell's introduction of Shenker to WWE in

April 1995, Bell and Shenker had maintained both a business and personal relationship.

7

25.    On Bell's recommendation, WWE retained SSAI in or around April 1995 originally as a non-exclusive outside licensing agent. As such, SSAI was to procure and negotiate licensing contracts by utilizing Shenker's alleged contacts in the licensing business. Bell was responsible to supervise SSAI in its licensing endeavors and remained responsible to generate licenses for WWE using his own contacts and by negotiating with prospective licensees who contacted WWE directly.

26.    As a result of their respective positions, Bell, Shenker and SSAI occupied positions of trust and of a fiduciary nature to WWE. During the course of their relationship with WWE, SSAI and Bell both entered into agreements with WWE reflecting and acknowledging their fiduciary roles and unique positions of trust.

27.    On March 2, 1995, Bell executed a Code of Conduct Agreement wherein he agreed, among other things, that he would not:

          a.    accept fees, commissions, or property in connection with any transaction on behalf of WWE;

          b.    accept or offer unauthorized or illegal payments;

          c.    use his position directly or indirectly for personal or financial gain;

          d.    personally take advantage of business opportunities which might be of interest to WWE; and

          e.    serve as an officer, director, employee, consultant or promoter of for profit organizations without WWE's prior approval.

28.    After SSAI agreed to be WWE's nonexclusive licensing agent, Friedman approached both Bell and Shenker at a toy fair inquiring whether Jakks could obtain a toy license from WWE. Bell and Shenker subsequently presented a deal memo to WWE indicating SSAI

8

had procured and negotiated the terms of a toy license with Jakks. On or about October 24, 1995, WWE and Jakks entered into a domestic toy license with Jakks. The term of the original domestic license was to end on December 31, 1997 with a one-year right to renew if Jakks achieved certain financial requirements.

29.    Prior to becoming the Chairman of the Board of Jakks, Defendant Friedman had worked in the videogame business. At points in time prior to becoming Chairman of Jakks, Friedman had an ownership interest in, and was employed by, Defendant THQ.

30.    Unknown to WWE, and undisclosed by SSAI, Shenker, and Jakks, Shenker entered into financial transactions with Jakks after the domestic toy license was entered into wherein he agreed to represent Jakks' interests at the same time he was acting as WWE's agent.

31.    The first such transaction now known to have occurred, despite years of concealment, occurred in early 1996 when Berman entered into an agreement on behalf of Jakks with Shenker to act as their agent with respect to a toy product of perfumed dolls.

32.    Unknown to WWE, Jakks was paying Shenker as their agent at the same time they were ostensibly negotiating amendments to the WWE toy license with Shenker as WWE's agent.

33.    After Jakks and Shenker entered into a contract for Shenker to be Jakks' agent on the perfume doll toy, Friedman, Berman and Shenker discussed having Shenker serve as Jakks' agent with respect to other matters, including acting as Jakks' agent specifically on WWE matters notwithstanding that he was known to be an agent of WWE.

34.    The conversation discussing Jakks' desire to retain Shenker to act as their agent on WWE matters occurred at the New York Toy Fair in 1996.

35.    During the conversation regarding Shenker serving as Jakks' agent on WWE matters at the same time he was a WWE agent, a call was placed by Friedman, Berman and Shenker to Mr. Murray Skala, Jakks' outside legal counsel and a member of the Board of Directors of Jakks, regarding the proposed arrangement. Mr. Skala advised all participants in the call that it would be a conflict of interest for Shenker to serve as Jakks' agent on WWE matters at the same time Shenker was acting as WWE's agent and that such an arrangement could not be done without first making full disclosure to WWE and obtaining their consent.

36.    Following the conversation with Jakks' corporate counsel, neither Friedman, Berman, Shenker, nor Jakks disclosed the conversation to WWE nor sought their consent. On information and belief, all three men did not disclose the conversation because they knew WWE would not agree to such an obvious conflict of interest and because disclosure might also cause it to be revealed that Shenker was already acting as Jakks' agent. Instead, all three men kept the conversation secret and eventually implemented, in or around 1998, a plan whereby Shenker would accept and split bribes from Jakks with Bell to secure the videogame license and related amendments to the domestic toy license and an international toy license secured by Jakks following the aforementioned conversation. The plan devised and implemented by Jakks and its three highest executives utilized monies laundered through foreign corporations controlled by Jakks and bank accounts of those foreign corporations in Hong Kong. An essential part of the scheme was that the monies paid as commercial bribes were not recorded anywhere on the financial books and records of Jakks situated in America at the headquarters of the parent corporation.

37.    On or about February 10, 1997, WWE and Jakks entered into an international toy license having a term which was to end on December 31, 1999. At no time prior to entering into

this license did SSAI, Shenker or Jakks disclose that Shenker had performed services for Jakks. Likewise, none of the aforementioned parties disclosed to WWE the conversation about Shenker serving as Jakks' agent on WWE matters.

38.    On March 7, 1997, WWE and SSAI entered into an agreement (the "Agency Agreement") pursuant to which SSAI became WWE's exclusive outside licensing agent. The Agency Agreement provided that the services thereunder would be performed specifically and primarily by Shenker personally. At the time it entered into the March 7, 1997 Agency Agreement with SSAI, WWE did not know that Shenker had been serving as Jakks' agent or of the discussions between Jakks' executives and Shenker aimed at having him be Jakks' agent at the same time Jakks knew he was WWE's agent.

39.    Under the contract to be WWE's exclusive outside licensing agent, SSAI was responsible for, *inter alia*, procuring potential licensees and negotiating the terms of prospective licenses. SSAI was not, however, granted any right to accept licensing proposals or to execute particular agreements on behalf of WWE. Instead, SSAI was to present all licensing proposals it procured and negotiated in deal memo format to Bell, who in turn would recommend to WWE whether to accept the proposal.

40.    In consideration of the services rendered under the Agency Agreement, SSAI was to receive a commission of eleven percent (11%) of royalties and other consideration paid to WWE with respect to licensing deals specifically negotiated and procured by SSAI which were accepted by WWE. SSAI was not to receive commissions on licensing deals procured and negotiated by Bell, who remained responsible to generate licensing deals using his own contacts and with prospective licensees who contacted WWE.

11

41.     Under the March 7, 1997 contract, SSAI also was not entitled to commissions on royalties paid to WWE with respect to, *inter alia*, licenses granted by WWE prior to the commencement of the Agency Agreement. The licenses on which SSAI was not entitled to receive commissions were listed on an Exhibit A to the Agency Agreement. One such license on which SSAI was not entitled to receive commissions was WWE's preexisting videogame license with Acclaim. At the time SSAI entered into the March 7, 1997 Agency Agreement, Acclaim was WWE's exclusive licensee for the manufacture and sale of videogames utilizing WWE intellectual property.

42.     As an existing licensee of WWE, Acclaim was to and did conduct negotiations regarding a renewal of its videogame license with Bell, not SSAI. If the Acclaim license were renewed, SSAI would not receive any commission.

43.     In addition to Acclaim and Jakks, other companies desired to secure the WWE videogame license including THQ and Activision.

44.     In order to place Jakks in control of the videogame license, and with the intent to cause SSAI and Bell to breach their fiduciary duties, Defendants Friedman and/or Berman and/or Bennett devised and implemented a corrupt scheme to foreclose competition for the videogame license and to obtain it by the commercial bribery of Shenker and Bell. Pursuant to the scheme, Jakks agreed to pay monies to Shenker's alter ego—Stanfull—by a series of payments to Stanfull's foreign bank account with the understanding that Shenker would then serve as a conduit for the payment of bribes directly to Bell.

45.     An essential part of the corrupt scheme involved concealment of the payments, both as a necessary corollary of a commercial bribery scheme and as a result of the prior

12

conversation with Jakks' corporate counsel advising that Shenker could not serve as the agent of Jakks on WWE matters while at the same time acting as WWE's agent.

46.    The scheme was implemented in early 1998, while negotiations were ongoing regarding the videogame license.  At the direction of Defendants Friedman and/or Berman, Shenker caused to be delivered a handwritten invoice from his foreign corporation, Stanfull, to Jakks' corporate headquarters in California for $80,000.  The cursory description contained on the invoice stated it was "For Development of Possible Latex Based Soft Toys with Special Coating" and was dated January 2, 1998.  On the invoice, Shenker directed that the payment be made to Stanfull's account at the Hang Seng Bank in Hong Kong.  A true and correct copy of the invoice is attached hereto as Exhibit 1.

47.    The January 2, 1998 invoice was a false and fraudulent invoice, known to be by all concerned, and was merely a conduit to secure corporate funds to pay commercial bribes.  No contract existed between Jakks and Stanfull or Shenker for the development of latex based soft toys and neither Shenker nor Stanfull ever developed or delivered such toys to Jakks pursuant to the January 2, 1998 invoice.

48.    Upon receipt of the January 2, 1998 invoice, Jakks did not record the invoice, nor any of the ensuing steps it took to pay the invoice, on the financial books and records of the American parent company to which the invoice had been delivered even though the invoice purported to be, and was, payable by Jakks and not one of its foreign subsidiaries.

49.    In January of 1998, the internal financial controls of Jakks known to and implemented by Defendant Bennett as the CFO required the corporate official authorizing payment of an invoice to sign and approve the invoice.

13

50. The January 2, 1998 invoice of Stanfull was not signed by the corporate official authorizing payment in the first of many steps designed to conceal the involvement of Friedman and/or Berman in the scheme.

51. In violation of Jakks' own internal financial controls requiring a corporate official to sign an invoice approving payment, Defendant Bennett, upon receipt of the January 2, 1998 invoice from Defendant Friedman and/or Berman, took steps to have the invoice paid. Rather than pay the invoice on available funds of the American parent corporation, Defendant Bennett sent it by facsimile to Mr. Will Hons, a foreign agent of Jakks, in Hong Kong and instructed Hons to make arrangements to pay $40,000 of the invoice to Stanfull.

52. On or about January 14, 1998, acting upon the direction of Defendant Bennett, $40,000 was, in fact, paid to Stanfull via a series of transactions undertaken with the intent to conceal the transactions and bury them in fraudulent accounting of foreign corporations owned by Jakks and bank accounts of those foreign subsidiaries.

53. On January 14, 1998, $40,000 was withdrawn from an account at the Hang Seng Bank in Hong Kong of Road Champs, Ltd. ("Road Champs"), a foreign subsidiary owned and/or controlled by Jakks. The $40,000 was deposited that same day into Stanfull's bank account at the Hang Seng Bank.

54. On January 14, 1998, the same day as the Jakks' monies were deposited into Stanfull's account, Shenker, acting in concert with Jakks to conceal the disposition of the monies, and with the intent of inducing Bell to violate his fiduciary duties, obtained a demand draft for $20,000 payable to James Bell from the Hang Seng Bank, which he subsequently gave to Bell upon returning to the United States, thereby splitting the money equally with Bell.

55.    At or around the same time Road Champs paid the $40,000, another foreign subsidiary owned and/or controlled by Jakks known as Jakks Pacific, H.K. sent $40,000 by wire transfer to Road Champs to reimburse Road Champs for the $40,000 paid to Stanfull.

56.    The general ledgers of Road Champs were then falsified to conceal completely the payment to Stanfull. Instead of recording the payment to Stanfull on the general ledger of Road Champs, the accounting entries made it appear as if the transaction was simply the intercorporate transfer of monies from Jakks Pacific, H.K. to Road Champs, with no mention made on the ledger of the payment to Stanfull.

57.    Shortly after receiving his share of the $40,000 bribe, and without WWE's knowledge or consent or prior approval, Bell formed Bell Consulting, now known as Bell Licensing, as a for-profit organization and served as its President. At no time during his employment with WWE did Bell ever disclose to WWE either the formation or existence of Bell Licensing or Bell's own role as Bell Licensing's President.

58.    Bell formed Bell Licensing in order to serve as a vehicle for the receipt of illegal bribes and kickbacks he had received and expected to receive from Shenker, the first of which was the $20,000 in monies originating with Jakks laundered through the Hang Seng Bank on January 14, 1998.

59.    Upon receipt of the $20,000 from Stanfull on or about January 14, 1998 of monies originating with Jakks' foreign subsidiaries in the aforementioned series of transactions, Bell utilized his influence to steer WWE away from even considering the renewal of Acclaim as the videogame licensee. Prior to the payment of the aforementioned bribe, Bell had advised Acclaim that there would be no problem with the renewal of the existing license.

15

60.    On March 25, 1998, Bell advised Acclaim that he would not even listen to any proposal that Acclaim would make for the renewal of their license. After Acclaim complained to senior management at WWE that it was not being permitted to submit a renewal proposal, Acclaim was told it could do so.

61.    Before Acclaim's formal proposal was ever received, however, Bell initialed a deal memo on March 30, 1998 recommending to senior management at WWE that the videogame license be awarded to "Jakks Pacific-Electronic Game Division." The deal memo listed SSAI as the agent who had negotiated and procured the deal.

62.    As of March 30, 1998, Jakks did not even have a videogame division and had no ability to perform a videogame license.

63.    On March 31, 1998, the day after Bell had initialed the deal memo recommending that the videogame license be awarded to Jakks, Defendant Bennett again directed Will Hons to use Jakks' foreign subsidiaries to pay another $40,000 to Stanfull. Bennett advised Hons on the day after Bell had recommended to WWE management that it grant the videogame license to Jakks that it was "imperative" that the funds be available to Stanfull not later than April 2, 1998.

64.    On or about April 2, 1998, Jakks Pacific, H.K., a foreign subsidiary of Jakks acting on Bennett's direction, wire transferred another $40,000 into Stanfull's account at the Hang Seng Bank in Hong Kong.

65.    On or about April 7, 1998, as he had done following the first $40,000 payment from Jakks, Shenker once again split the money with Bell by obtaining a demand draft from the Hang Seng Bank for $20,000 payable to Bell Consulting, LLC.

66.    On April 8, 1998, WWE management approved the deal memo submitted by Bell and SSAI to grant the videogame license to Jakks. At that time, WWE was not aware of any of the aforementioned payments to its agents by Jakks.

67.    On or about April 15, 1998, principally based on Bell's influence, direction and advice, WWE advised Acclaim that it did not intend to renew Acclaim's videogame license.

68.    The actions of SSAI and Bell were in violation of their fiduciary duties, and were in direct response to being paid commercial bribes. Both SSAI and Bell recommended to WWE management that the videogame license be given to Jakks before even obtaining proposals from other videogame companies interested in independently securing the license.

69.    Following Bell's and SSAI's recommendation that the videogame license be given to Jakks, a series of events occurred which threatened to expose the illegal scheme.

70.    On April 16, 1998, representatives of THQ met with Bell and Shenker. On information and belief, both Bell and Shenker initially tried to steer THQ away from seeking the videogame license or making a proposal for it, telling THQ that it should consider making a proposal for arcade games and personal computers.

71.    On April 23, 1998, THQ directed a letter to both Bell and Shenker indicating its desire to obtain the videogame license. THQ indicated it would be willing to do a non-exclusive multi-year license with guarantees of several million dollars, competitive royalty rates, significant marketing commitments, and stock purchase warrants. THQ's proposal was clearly superior to the deal with Jakks which Bell and SSAI had already recommended to WWE management and which had been approved based on their recommendation.

72.    On April 27, 1998, after the aforementioned scheme was effectuated by Defendants, Activision also sent its initial informal proposal to SSAI for the videogame license

17

with WWE. The Activision offer was also clearly superior to the terms offered by Jakks and which had already been recommended by Bell and approved by WWE. Activision's offer included a higher guaranteed royalty than the Jakks proposal and included stock options in Activision.

73.     On information and belief, the receipt of the THQ and Activision proposals jeopardized the existing bribery scheme then in place since questions would be raised if WWE went forward with the Jakks proposed license and later learned that WWE agents, SSAI and Bell, had received clearly superior offers from THQ and Activision.

74.     In order to conceal the scheme and see it to fruition, SSAI and Bell did not provide WWE management with copies of the April 23, 1998 letter from THQ or the April 27, 1998 Activision informal proposal.

75.     On information and belief, Shenker and/or Bell advised Jakks of the terms of Activision's offer and of THQ's interest and the need to increase their offer so as to avoid detection of their scheme.

76.     Having obtained WWE's agreement to grant the videogame license to Jakks via the aforementioned scheme, and in order to get a cut of the anticipated revenues from the anticipated revenues associated with the videogame license, Jakks then solicited THQ to become a Joint Venture partner instead of submitting an independent proposal on behalf of THQ. THQ agreed to become a Joint Venture partner with Jakks on the videogame license instead of making its own formal and independent proposal, and agreed to pay Jakks monies which otherwise would have, and should have, been promised to WWE in an independent proposal. THQ did so as consideration for Jakks' role in securing the license. For all intents and purposes, Jakks and

THQ both knew that the videogame license would be performed by THQ as Jakks had no ability to perform a videogame license.

77.     The Joint Venture of THQ and Jakks then submitted a proposal designed to be competitive with the Activision proposal, including stock options in both Jakks and THQ.

78.     As additional inducement to Bell, Shenker, individually, as a corporate officer of SSAI, and/or while acting as an undisclosed agent of Jakks, promised Bell that SSAI would split equally with Bell all commissions and other considerations he would receive if Bell recommended the videogame license be given to the Joint Venture between THQ and Jakks.

79.     SSAI, Shenker and Bell agreed to the corrupt scheme of the joint venture knowing that Jakks would receive monies which otherwise would have went to their principal in a true competitive bidding situation, and agreed to take all action necessary to recommend to WWE management that the videogame license be awarded to the joint venture instead of the only remaining candidate for the license, Activision.

80.     As a result of the unlawful scheme, the joint venture proposed and SSAI, Shenker and Bell agreed to recommend to WWE that the videogame license be of the extraordinary length of ten years with a five-year right of renewal to be vested in the joint venture.

81.     By recommending a license of extraordinary length, SSAI, Shenker and Bell stood personally to make millions in illegal profits at the expense of their principal, WWE, as a result of the bribery scheme to give Jakks control of the license and to thereby generate a commission stream to SSAI to split equally with Bell for at least ten and potentially fifteen years.

82.     On May 12, 1998, Bell submitted a deal memorandum setting forth the revised proposal for a videogame license between WWE and the Joint Venture between THQ and Jakks. The deal memo listed SSAI as the procuring agent.

19

83.   Bell submitted the May 12, 1998 deal memo to WWE management before even receiving the more formal proposal of Activision, which was sent to Bell late in the day of May 12, 1998. Consistent with their scheme, neither Bell nor SSAI ever sent the formal Activision proposal of May 12, 1998 to WWE management.

84.   On June 10, 1998, the Joint Venture of THQ and Jakks caused to be filed a Certificate of Formation in Delaware forming THQ & Jakks Pacific LLC and on that same date executed a videogame license agreement with WWE.

85.   On June 23, 1998, WWE executed a videogame license agreement with THQ/Jakks effective as of June 10, 1998 (the "videogame license"). The term of the license was to end on December 31, 2009, subject to the right to renew for an additional five years in favor of THQ/Jakks.

86.   As another central aspect of the corrupt influence of SSAI, Shenker and Bell, which Jakks had obtained as a result of the aforementioned scheme, Jakks requested, and SSAI and Bell agreed to recommend, a lengthy extension to the toy licenses to make the term of the licenses coincide with the term of the videogame license. By Agreements dated June 24, 1998, the domestic and international toy licenses between WWE and Jakks were amended to make the toy licenses coterminous with the videogame license as a necessary and essential part of the commercial bribery scheme.

87.   On July 15, 1998, as a final payment of the bribery scheme, Shenker caused another phony invoice to be delivered to Jakks' corporate headquarters in Malibu, California for $20,000 with a false and fraudulent description for the charges. The fraudulent invoice dated July 15, 1998 was sent to the attention of Berman. As he had done before, Bennett directed an overseas agent of a Jakks' foreign subsidiary to make the payment.

20

88.    On April 3, 1998, Bennett was advised by overseas agents of a Jakks' subsidiary that the $20,000 had, in fact, been paid to Stanfull. The payment, once again, was made by Road Champs to Stanfull's account at the Hang Seng Bank.

89.    On October 8, 1998, Bell Licensing invoiced Stanfull for the $20,000. On October 9, 1998, Shenker caused the invoice to be paid to Bell Licensing on funds drawn from SSAI's account.

90.    At no time during the negotiation of the videogame license with the Joint Venture or the amendment to the toy licenses with Jakks did Defendants disclose the existence of the bribery scheme or the series of payments made by Jakks through foreign subsidiaries to Stanfull and to Bell.

### The Coverup

91.    Following the corruption of Shenker and Bell and the inducement to breach their fiduciary duties in connection with the videogame license and amendments to the toy licenses, Shenker and Bell expanded their criminal activity by agreements to split commissions on other licensing deals approved by Bell and/or assigned to SSAI by Bell. All the illegal activity was affirmatively concealed from WWE by SSAI, Shenker and Bell.

92.    On March 24, 2000, WWE terminated Bell's employment with WWE for reasons unrelated to Bell's receipt of bribes and kickbacks, none of which were known to WWE at the time.

93.    On June 13, 2000, WWE terminated the contract of SSAI pursuant to a provision which entitled it to do so for a change in business direction.

21

94.    In October of 2000, SSAI brought an action against WWE for breach of contract in Connecticut state court seeking to be paid commissions on licenses SSAI had allegedly procured, including the toy and videogame licenses (the "Shenker litigation").

95.    At various times following the initiation of the Shenker litigation, Shenker, Bell, Friedman, Berman and Bennett, individually and as agents of the corporations they each own and control, as well as Jakks, the Joint Venture, THQ/Jakks, have acted in concert to conceal the unlawful scheme and bribes. All involved first concealed and denied the fact of payments to Stanfull and the use of foreign accounts to do so. After WWE eventually learned about the payments during discovery in the Shenker litigation, the Defendants directly involved in the payments gave false and inconsistent explanations for the payments, none of which are corroborated by any evidence.

96.    In an early attempt to make sure the payments were never discovered in the Shenker litigation, Defendant Friedman telephoned Linda McMahon, the CEO of WWE, and made an unsolicited offer during the early phase of the Shenker litigation to use his good graces with Shenker to broker a settlement of the Shenker litigation. WWE declined his offer.

97.    In the early phases of the Shenker litigation, Bell and Shenker acted in concert and destroyed invoices Bell had sent to Shenker for the bribes he had been promised, including invoices related to the bribes promised him in connection with the unlawful scheme set forth herein. Bell and Shenker also destroyed contracts they had related to the bribery scheme at issue herein.

98.    As a further part of the conspiracy, Shenker committed perjury and failed to disclose the existence of Stanfull when asked if he owned any corporations other than SSAI.

22

Shenker committed perjury in order to conceal the payments originating with Jakks made to Stanfull's foreign bank account.

99.    To further the coverup and conceal their criminal conduct, Shenker and Bell both perjured themselves in the Shenker litigation and testified that neither SSAI nor Shenker had made any payments to Bell relating to WWE licenses. In actual fact, Shenker had made directly, or via money laundered through foreign accounts he controlled, payments in excess of $1,000,000 to Bell and/or Bell Licensing as commercial bribes, including payments of hundreds of thousands of dollars of bribes paid in connection with the scheme surrounding the videogame license and amendments to the toy licenses.

100.    During the same time Shenker and Bell were obstructing justice as set forth above, THQ and Jakks both represented that no payments had been made to Stanfull, SSAI, Shenker and/or Bell. In response to repeated requests by WWE, pursuant to (i) subpoenas duces tecum served in connection with the Shenker litigation; (ii) audits of both THQ and Jakks' books and records; and (iii) communications from their legal counsel, all uniformly denied making any payments to Stanfull, SSAI, Shenker and/or Bell.

101.    By subpoena dated June 11, 2002, Jakks was ordered to produce a variety of records relating to its dealings with Shenker and Bell, including all documents relating to any agreements between Jakks and Shenker and/or SSAI and all documents relating to any payments made to SSAI and/or Shenker.

102.    Jakks' production of records in response to the subpoena was done by letter dated October 30, 2002. Jakks concealed and did not produce either the $80,000 or the $20,000 invoice it paid to Stanfull in 1998 or any other documentation indicating such payments had been made. Jakks also concealed, and did not produce, documents which demonstrated Shenker had

23

acted as their agent. Jakks' response to the subpoena gave no indication that monies had, in fact, been paid to Shenker.

103.    In order to police Jakks' compliance with the license, WWE exercised its right to audit the books and records of Jakks in early 2003.

104.    On January 14, 2003, WWE's auditors formally requested, in writing, that Jakks provide the auditors with a complete listing of all payments made by Jakks to Shenker, SSAI, Bell and/or Stanfull.

105.    On January 17, 2003, Jakks provided yet another false and misleading response to the auditors request of January 14, 2003 by stating that they had already "provided any documents that may exist" in response to the June 11, 2002 subpoena. As Jakks knew, it had not produced any documents evidencing payments to Shenker, SSAI or Stanfull in response to the June 11, 2002 subpoena even though such records existed. Joel Bennett received a copy of Jakks' false response to WWE's auditors and did nothing to correct it despite his knowledge of the payments at issue, all of which he had personally directed and orchestrated.

106.    By email dated February 25, 2003, WWE's auditors responded to Jakks' January 17, 2003 misleading response by pointing out that Jakks had not provided any documents related to payments to Shenker, SSAI or Stanfull in response to the June 11, 2002 subpoena and again asked for copies of all invoices or a description of each transaction whereby payments were made by Jakks to Shenker, SSAI and/or Stanfull.

107.    On February 25, 2003, in an email response from employees working under the direct supervision of Joel Bennett, Jakks did not respond and disclose the payments but instead advised that the request had been forwarded to their attorney who would advise shortly.

24

108.    By March 14, 2003, no response had been received from Jakks' attorneys to the request for disclosure of payments to SSAI, Shenker and Stanfull. By letter dated March 14, 2003 sent to Jakks' corporate counsel, Mr. Murray Skala, WWE again requested an answer to the question of whether payments had been made to Shenker, SSAI and Stanfull.

109.    On March 19, 2003, Jakks, through its counsel, continued the practice of providing false and misleading information. By letter of that date, Jakks' counsel reiterated the false theme that "the specific information requested was provided months ago" in response to the subpoena. Such statements were false and known by Jakks to be false, as Jakks had not provided any information on the payments made to Shenker via Stanfull in 1998.

110.    On March 25, 2003, WWE once again informed Jakks, through its counsel, that the specific information requested had not been provided and again requested specific disclosure.

111.    On March 26, 2003, Jakks' counsel acknowledged that the documents provided in response to the June 2002 subpoena did not include documents reflecting payments to Shenker, SSAI or Stanfull, and then represented "there simply is no additional information of the type you seek." Like all previous statements by Jakks, that statement was false. Jakks had numerous documents evidencing the payments to Stanfull buried in the records of foreign subsidiaries of the payments.

112.    The repeated refusals to disclose the payments to Stanfull in 1998 were deliberate, in bad faith, and part of a plan to fraudulently conceal the unlawful scheme and commercial bribery set forth herein at all costs. The payments were known to and orchestrated by the highest-ranking executives of Jakks, who also serve in executive capacities for the Joint Venture. Instead of disclosing the payments, Jakks repeatedly provided false and misleading information to the effect that no such payments had been made.

25

113.    In the Shenker litigation, SSAI, Shenker and Bell also acted in concert to conceal both the existence and extent of the unlawful scheme and bribes and did so during the same time that Jakks, THQ, the Joint Venture, and Jakks/THQ were concealing the payments to Stanfull which Jakks had made via foreign subsidiaries. Bell and Shenker both initially denied that any payments had been made to Bell, and SSAI denied receiving any money from licensees of WWE. When discovery indicated that payments had been made to Bell by Shenker, both falsely claimed the payments were for "development projects" unrelated to WWE. As part of their scheme to conceal their illegal conduct, Bell and Shenker created and then produced in discovery numerous fabricated invoices relating to payments from SSAI and/or Shenker to Bell, and destroyed the true invoices reflecting their bribery scheme. The fabricated invoices were designed to make it appear as if the payments made to Bell were for "developmental projects" unrelated to WWE. In or around September 2002, however, SSAI inadvertently produced to WWE two authentic Bell Licensing invoices it had neglected to destroy and which revealed that Bell Licensing had in fact invoiced SSAI for what was described as "consulting services" with respect to specifically listed WWE licenses. Neither invoice produced at that time listed the videogame license as one of the licenses for which Bell was invoicing SSAI.

114.    In late December 2002, both Shenker and Bell committed serial perjury by testifying that the invoices they had fabricated were the actual and true invoices for the payments SSAI had made to Bell. Their serial perjury became manifest at the end of their respective depositions when the true invoices which had been inadvertently produced were shown to them.

115.    Evidence also surfaced at Bell's deposition in December 2002 that Shenker had paid Bell $20,000 in monies originating with Jakks. Bell falsely claimed at that time that the

payment was a "finder's fee" for a deal between Jakks and a company called Playmates, which was also a WWE licensee at one point in time.

116.    Following being caught in manifest perjury, SSAI, through its counsel, advised the Court that Shenker would be recanting his prior testimony. Shenker thereafter spent two months devising what in reality turned out to be just another round of perjury in which he continued to conceal the full extent and purpose of the payments he had received from Jakks.

117.    On March 3, 2003, Shenker served WWE with alleged formal recantations covering every material aspect of his testimony. The alleged recantations made clear that for months, Shenker had willfully perjured himself in deposition testimony and interrogatory answers. Throughout four days of post-recantation deposition testimony, Shenker repeatedly admitted to giving false and misleading testimony.

118.    In his post-recantation testimony, however, Shenker continued to provide false and incomplete evidence on the payments he had received from Jakks and split with Bell. He adopted the same story told by Bell in December of 2002 about the only payment known at that time, namely that a $40,000 payment from Jakks and split with Bell was for brokering a deal in which Playmates sold its inventory and equipment to Jakks. He did not, however, disclose or admit to receiving any additional monies from Jakks, and continued to conceal both that he had been paid another $60,000 in 1998 by Jakks and the details of when the payments were made.

119.    WWE presented the evidence of the foregoing and other dishonest and abusive discovery conduct to the Court in the Shenker Litigation in a motion for sanctions. The Court wrote an opinion dated October 16, 2003 detailing Shenker and Bell's perjurious and corrupt scheme, and substantively finding they committed fraud upon the court which warranted the dismissal with prejudice of SSAI's claims against WWE.

120.    The Court's opinion explicitly noted that Jakks was one of the WWE licensees that had paid Shenker and that Shenker perjured himself to conceal Stanfull's existence specifically to cover up its role as a conduit for payments to Shenker and Bell from WWE licensees, including specifically from Jakks.

121.    As of the time the Court issued its opinion dated October 16, 2003, which noted that Shenker had perjured himself about Stanfull in order to conceal payments from Jakks, neither THQ or Jakks had disclosed any payments to Stanfull or Shenker despite prior repeated requests that they do so.  Similarly, Jakks had not corrected the false information provided through its counsel on March 26, 2003 that there was no such information to provide.

122.    Jakks' failure to disclose such information by October 16, 2003, and correct its prior misrepresentations, was calculated, deliberate and part of a continuation of its plan to conceal the scheme at all costs.  Unknown to WWE as of October 16, 2003, Jakks, through Bennett, had retrieved specific documentary evidence of the payments to Stanfull from its foreign subsidiaries and had provided it to Jakks' outside counsel not later than the first week of September 2003.  Despite their certain knowledge by that time that both Jakks and its counsel had previously provided false and incorrect information to WWE, neither Jakks nor its counsel disclosed the information to WWE in September or October of 2003.

123.    After the court issued its October 16, 2003 opinion in the Shenker Litigation, and in violation of specific court orders of compulsion and his promise to do so, Shenker refused to obtain and produce the records of Stanfull's account at the Hang Seng Bank which were needed to determine the full extent of payments to Stanfull by Jakks.  As a result, WWE was compelled to incur considerable trouble and expense to go to Hong Kong in October 2003 to depose the records custodian of the Hang Seng Bank.

124.    In the course of that deposition, WWE confirmed that one $40,000 payment had been made to Stanfull's account by Jakks H.K. in April 1998—the very time that WWE was

28

considering to whom to award its videogame license. Records further confirmed that the $40,000 payment was then split equally by a demand draft to Bell a few days later. Based on other incomplete records produced in that deposition, it appeared Jakks had paid Stanfull another $40,000 in January 1998 and $20,000 in August 1998.

125.    Immediately following those discoveries, on November 5, 2003, WWE's counsel directed a letter to Jakks' counsel transmitting the Court's opinion in the Shenker Litigation on WWE's sanction motion and again requested that complete information regarding payments to SSAI, Shenker and/or Stanfull be provided to WWE. By reading the Court's opinion, Jakks would have known that, despite its consistent prior denials of such payments, WWE was in possession of evidence indicating that payments had been made to Stanfull by Jakks.

126.    On November 11, 2003, Defendant Friedman telephoned WWE's Chief Executive Officer, Linda McMahon, and told her that, in response to WWE's counsel's letter, Jakks had searched their files and found evidence of payments to Stanfull—the fundamental fact Jakks previously had outright denied. Defendant Friedman told Mrs. McMahon that the payments were for a perfume deal and $80,000 for "project development" for a mechanical dinosaur project, both of which supposedly were unrelated to WWE.

127.    Friedman's statements to Linda McMahon were neither accurate nor complete. Jakks had unquestionably forwarded the payment information to its outside counsel not later than the first week of September and had that information for two months before WWE's counsel's letter of November 5, 2003 and had not disclosed it. Additionally, the $80,000 in payments made in January and April of 1998 were not for project development, and Friedman completely failed to disclose the $20,000 payment made to Stanfull in August of 1998 after the videogame license and amendments to the toy licenses had been secured.

128.    On November 14, 2003, despite its previous repeated denials, Jakks' counsel wrote to WWE's counsel reaffirming Defendant Friedman's statements to Mrs. McMahon and

produced for the first time any records relating to the payments made by Jakks to Stanfull. Among other things, Jakks produced for the first time the January 2, 1998 $80,000 invoice from Stanfull in Shenker's own handwriting, which Shenker had never produced in the Shenker litigation. Jakks, through its counsel, did not disclose the $20,000 payment made in August 1998 or the phony invoice behind that payment.

129.    Jakks alleged explanation for the $80,000 in payments to Stanfull—a "project development" for a mechanical dinosaur project unrelated to WWE—was completely inconsistent with the purported explanation for those payments offered by Shenker and Bell that the payments were a finder's fee for a deal involving WWE licensees, Jakks and Playmates.

130.    The January 2, 1998 invoice in Shenker's own handwriting did not bill Jakks for a finder's fee on Playmates as he and Bell had claimed under oath, but rather for the "development of possible latex based soft toys with special coatings." On information and belief, Jakks concealed this invoice for as long as it could because they knew it was inconsistent with the testimonial positions taken by Shenker and Bell for the payments and because they knew Shenker would have no reason to split the monies with Bell, as he did, if in fact the payments were for a mechanical dinosaur project unrelated to WWE.

131.    Jakks produced the invoice only after it knew WWE was aware of the payments and because, as a publicly traded company, it would reasonably be expected to have some form of documentation for such payments.

132.    In January 2004, WWE again deposed representatives of the Hang Seng Bank and confirmed for the first time that in fact three payments had been made to Shenker's Stanfull account in 1998 totaling $100,000.

133.    Defendants have colluded during their coverup on several different occasions. On one occasion during the period he was planning his supposed recantation after being caught in

30

perjury, Shenker directed his legal counsel for SSAI to contact Jakks' counsel to advise that he would be disclosing that Jakks paid him money. SSAI's legal counsel did so. Thereafter, Shenker disclosed only what he knew WWE was already aware of – a single $40,000 payment – and, like Jakks, did not disclose the full range and dates of payments. On another occasion, he directed his counsel to notify Jakks' counsel that Shenker had provided information regarding statements made by Friedman reflecting Friedman's knowledge that SSAI was splitting his commissions with Bell.

134.    The fraudulent concealment of facts related to the payments continues to this date. Friedman, Berman and Bennett were all deposed in the Shenker litigation and none identified the person who negotiated the payments to Stanfull or authorized the payments. Jakks failed to produce a properly prepared corporate representative to testify on that and related subjects and refused to produce certain records, all of which required WWE to seek and obtain compulsion orders from the Court in the Shenker litigation.

**COUNT I**
**VIOLATION OF THE RACKETEER INFLUENCED AND CORRUPT**
**ORGANIZATIONS ACT ("RICO"), 18 U.S.C. § 1962(c)**
**(Against All Defendants)**

135.    Each and every one of the foregoing allegations is incorporated herein by reference and reasserted as though fully set forth at length.

**RICO Persons**

136.    The Joint Venture of THQ and Jakks, THQ/Jakks, Jakks, Jakks H.K., Road Champs, THQ, SSAI, Shenker, Bell Licensing, Bell, Friedman, Berman and Bennett are each a "person" within the meaning of 18 U.S.C. § 1961(3).

31

**RICO Enterprise**

137.    For the purpose of 18 U.S.C. § 1962(c), the Joint Venture of THQ and Jakks, THQ/Jakks, Jakks, Jakks H.K., Road Champs, THQ, SSAI, Shenker, Bell Licensing, Bell, Friedman, Berman and Bennett, acting in concert, comprised an association-in-fact enterprise within the meaning of 18 U.S.C. § 1961(4) through a pattern of racketeering activity as set forth below for the purpose of conducting the unlawful activities described herein.

138.    For the purpose of 18 U.S.C. § 1962(c), the Joint Venture of THQ and Jakks, THQ/Jakks, Jakks, Jakks H.K., Road Champs, THQ, SSAI, Shenker, Bell Licensing, Bell, Friedman, Berman and Bennett each had authority within the enterprise or enterprises described above and/or conducted or participated in the unlawful conduct set forth herein through the enterprise described above.

**Effect on Interstate Commerce**

139.    The association-in-fact of the Joint Venture of THQ and Jakks, THQ/Jakks, Jakks, Jakks H.K., Road Champs, THQ, SSAI, Shenker, Bell Licensing, Bell, Friedman, Berman and Bennett is an entity that engages in and affects interstate commerce by maintaining contacts and conducting economic and other activities throughout the United States and around the world.

**Predicate Acts of Racketeering Activity**

140.    Defendants conducted, engaged in and/or participated in a pattern of predicate acts through the enterprise described above, including the commission of numerous violations of the Federal Mail Fraud Statute, 18 U.S.C. § 1341, the Federal Wire Fraud Statute, 18 U.S.C. § 1343, the Federal Money Laundering Statute, 18 U.S.C. §§ 1956 and 1957, the Federal Travel Act, 18 U.S.C. § 1952, the National Stolen Property Act, 18 U.S.C. § 2314 and New York Penal Law § 180.03 concerning commercial bribery.  Such violations are "predicate acts" under 18 U.S.C. § 1961(1)(A) and (B).

141.    Specifically, Defendants' predicate acts included, but are not limited to, the following:

a.    In furtherance of a scheme or artifice to defraud, and with specific intent to defraud, Defendants knowingly used or caused to be used the mails or wire communications in violation of 18 U.S.C. § 1341 and/or 18 U.S.C. § 1343 to fraudulently secure the videogame license and the 1998 amendments to the toy licenses through the payment of unlawful bribes, and the use of phony and/or fraudulent invoices and documents to conceal the true nature of the bribes. Defendants' specific acts of mail and/or wire fraud include at least the following:

i.    In furtherance of a scheme or artifice to defraud, and with specific intent to defraud, on January 2, 1998, Defendant Bennett, individually and on behalf of Jakks, and upon authorization of Defendants Friedman and/or Berman, transmitted by facsimile Stanfull's January 2, 1998 invoice in the amount of $80,000 to Salina of Defendant Jakks H.K., with direction that she pay the invoice.

ii.    In furtherance of a scheme or artifice to defraud, and with specific intent to defraud, on January 12, 1998, Defendant Bennett, individually and on behalf of Jakks, and upon authorization of Defendants Friedman and/or Berman, transmitted by facsimile a direction to Will Hons of Defendant Jakks H.K. to make payment arrangements for Stanfull's January 2, 1998 invoice.

iii.    In furtherance of a scheme or artifice to defraud, and with specific intent to defraud, on January 14, 1998, pursuant to Defendant

Bennett's direction made on behalf of Defendants Jakks and which was authorized by Defendants Friedman and/or Berman, Defendant Road Champs wire-transferred $40,000 from its account at the Hang Seng Bank in Hong Kong in an intra-bank transfer to Stanfull's account at the Hang Seng Bank.

iv.    In furtherance of a scheme or artifice to defraud, and with specific intent to defraud, on January 14, 1998, pursuant to Defendant Bennett's direction made on behalf of Jakks and authorized by Defendants Friedman and/or Berman, Defendant Jakks H.K. transmitted by facsimile a request to Norwest Bank Minnesota, N.A. ("Norwest Bank") in Hong Kong for telegraphic transfer of $40,000 to Defendant Road Champs' account at the Hang Seng Bank.

v.    In furtherance of a scheme or artifice to defraud, and with specific intent to defraud, on January 14, 1998, pursuant to Defendant Bennett's direction made on behalf of Jakks and authorized by Defendants Friedman and/or Berman, Defendant Jakks H.K. wire-transferred $40,000 from Defendant Jakks H.K.'s account at Norwest Bank to Defendant Road Champs' account at the Hang Seng Bank.

vi.    As a reasonably foreseeable result of Defendants' fraudulent scheme, Norwest Bank transmitted by facsimile a letter to Defendant Jakks H.K. confirming that the $40,000 wire-transfer to Defendant Road Champs had been completed.

34

vii.   As a reasonably foreseeable result of Defendants' fraudulent scheme, Hang Seng Bank transmitted by facsimile a letter to Defendant Road Champs confirming that Defendant Road Champs' account at the Hang Seng Bank had been credited for $40,000 by order of Defendant Jakks H.K.

viii.   In furtherance of a scheme or artifice to defraud, and with specific intent to defraud, Defendant Road Champs falsified its corporate books and records to conceal its $40,000 payment to Stanfull by making it appear as an inter-company transfer between Defendant Jakks H.K. and Defendant Road Champs.

ix.   In furtherance of a scheme or artifice to defraud, and with specific intent to defraud, Defendant Bennett, individually and on behalf of Jakks, falsified Defendant Jakks' corporate books and records by failing to record the $40,000 payment to Stanfull.

x.   In furtherance of a scheme or artifice to defraud, and with specific intent to defraud, on March 31, 1998, Defendant Bennett, individually and on behalf of Jakks and upon authorization of Defendants Friedman and/or Berman, transmitted by facsimile a direction to Will Hons of Defendant Jakks H.K. to make payment arrangements for the second installment payment of Stanfull's January 2, 1998 invoice, specifically instructing Mr. Hon that it was "imperative" that the payment be made effective April 1, 1998.

xi.   As a reasonably foreseeable result of Defendants' fraudulent scheme, Norwest Bank transmitted by facsimile a letter to

Defendant Jakks H.K. confirming that Defendant Jakks H.K.'s account had been debited in the amount of $40,000.

xii.    In furtherance of a scheme or artifice to defraud, and with specific intent to defraud, on April 2, 1998, pursuant to Defendant Bennett's direction made on behalf of Jakks and authorized by Defendants Friedman and/or Berman, Defendant Jakks H.K. wire-transferred $40,000 from its account at Norwest Bank to Stanfull's account at the Hang Seng Bank.

xiii.    In furtherance of Defendants' scheme or artifice to defraud, and with specific intent to defraud, on May 7, 1998, Defendant Berman, on behalf of Jakks, THQ and the Joint Venture, transmitted by facsimile a letter to Defendant Bell regarding toy company strength in marketing vs. videogame strength in marketing, which Defendant Bell subsequently forwarded to Linda McMahon as part of an effort to deceive her that Jakks and THQ's Joint Venture was "right on target."

xiv.    As a reasonably foreseeable result of Defendants' fraudulent scheme, on May 28, 1998, Edward L. Kaufman, Esq., General Counsel of WWE ("Kaufman"), transmitted by Federal Express a letter to Murray Skala, Esq., counsel to Jakks, regarding a draft of the proposed videogame license agreement and attaching a copy of the videogame license deal memo.

xv.    As a reasonably foreseeable result of Defendants' fraudulent scheme, and in furtherance of Defendants' scheme or artifice to defraud, and with specific intent to defraud, on June 2, 1998,

Defendant Berman, individually and on behalf of Defendants Jakks, THQ and the Joint Venture, upon authorization of Defendant Friedman, transmitted by facsimile a letter to Defendant Shenker regarding, among other things, (i) comments regarding the proposed videogame license agreement, which was to be forwarded to Defendants Bell and Shenker on June 3, 1998; (ii) the third amendment to Jakks' domestic toy license with WWE; and (iii) the fifth amendment to Jakks' international toy license with WWE.

xvi.    As a reasonably foreseeable result of Defendants' fraudulent scheme, and in furtherance of Defendants' scheme or artifice to defraud, on June 3, 1998, Defendant Berman, individually and on behalf of Defendants Jakks, THQ and the Joint Venture transmitted by facsimile a letter to Defendants Bell and Shenker, and to Kaufman, enclosing comments regarding the proposed videogame license agreement.

xvii.    As a reasonably foreseeable result of Defendants' fraudulent scheme, and in furtherance of Defendants' scheme or artifice to defraud, on June 3, 1998, Defendant Berman, individually and on behalf of Defendants Jakks, THQ and the Joint Venture transmitted by facsimile a letter to Defendants Bell and Shenker, and to Kaufman, enclosing revised comments regarding the proposed videogame license agreement.

xviii.    As a reasonably foreseeable result of Defendants' fraudulent scheme, and in furtherance of Defendants' scheme or artifice to

defraud, on June 4, 1998, Daniel Offner, counsel to THQ, on behalf of THQ and the Joint Venture, transmitted by facsimile a letter to Kaufman, Geoffrey Bass, Esq., counsel for Jakks, Brian Farrell, President and CEO of THQ, and Defendant Berman enclosing revisions to the proposed videogame license agreement.

xix.    As a reasonably foreseeable result of Defendants' fraudulent scheme, and in furtherance of Defendants' scheme or artifice to defraud, on June 5, 1998, Defendant Berman, individually and on behalf of Defendants Jakks, THQ and the Joint Venture transmitted by facsimile a letter to Defendant Bell enclosing revisions to the proposed videogame license agreement.

xx.    As a reasonably foreseeable result of Defendants' fraudulent scheme, and in furtherance of Defendants' scheme or artifice to defraud, on June 9, 1998, Geoffrey Bass, Esq., counsel for Jakks, on behalf of Defendants Jakks and the Joint Venture, upon authorization of Defendants Friedman and/or Berman, transmitted by facsimile a letter to Kaufman enclosing comments to the revised proposed videogame license agreement.

xxi.    As a reasonably foreseeable result of Defendants' fraudulent scheme, on June 10, 1998, Kaufman transmitted by facsimile a redlined version of the proposed videogame license agreement to Geoffrey Bass, Esq., counsel to Jakks.

xxii.    As a reasonably foreseeable result of Defendants' fraudulent scheme, and in furtherance of Defendants' scheme or artifice to defraud, on June 17, 1998, Geoffrey Bass, Esq., counsel for Jakks,

on behalf of Defendants Jakks, THQ, the Joint Venture and THQ/Jakks, transmitted by facsimile a letter to Kaufman requesting copies of the videogame license agreement executed by WWE for Mr. Bass to provide to Defendants THQ and Jakks, and attaching a copy of the videogame license agreement executed by Brian Farrell, President and CEO of THQ.

xxiii.  As a reasonably foreseeable result of Defendants' fraudulent scheme, on June 24, 1998, Kaufman transmitted by Federal Express to Defendant Friedman, on behalf of Defendant Jakks, an unexecuted copy of the fifth amendment to Jakks' domestic toy license agreement with WWE.

xxiv.  As a reasonably foreseeable result of Defendants' fraudulent scheme, on June 24, 1998, Kaufman transmitted by Federal Express to Defendant Friedman, on behalf of Defendant Jakks, an unexecuted copy of the third amendment to Jakks' international toy license agreement with WWE.

xxv.  As a reasonably foreseeable result of Defendants' fraudulent scheme, and in furtherance of Defendants' scheme or artifice to defraud, on July 1, 1998, Defendant Berman, individually and on behalf of Defendant Jakks, upon authorization of Defendant Friedman, transmitted to WWE a copy of the fifth amendment to Jakks' domestic toy license with WWE executed by Defendant Berman.

xxvi.  As a reasonably foreseeable result of Defendants' fraudulent scheme, on June 24, 1998, Kaufman transmitted by Federal

39

Express to Defendant Bennett a fully executed copy of the fifth amendment to Jakks' domestic toy license agreement with WWE.

xxvii.   In furtherance of a scheme or artifice to defraud, and with specific intent to defraud, on July 27, 1998, Defendant SSAI transmitted by facsimile to Defendant Berman, a phony invoice directed to Jakks from Stanfull dated July 15, 1998 in the amount of $20,000 falsely purporting to invoice Defendant Jakks for alleged product development.

xxviii.  In furtherance of a scheme or artifice to defraud and with specific intent to defraud, on July 30, 1998, Defendant Bennett, individually and on behalf of or for the benefit of Defendants Jakks, THQ, the Joint Venture and THQ/Jakks, upon authorization of Defendants Friedman and/or Berman, transmitted by facsimile to Elmen Lai of Defendant Road Champs a copy of Stanfull's July 15, 1998 invoice, directing that payment be made.

xxix.    In furtherance of a scheme or artifice to defraud, and with specific intent to defraud, on August 3, 1998, pursuant to Defendant Bennett's direction made on behalf of and for the benefit of Defendants Jakks, THQ, the Joint Venture and THQ/Jakks, Elmen Lai of Defendant Road Champs transmitted an email communication to Defendant Bennett confirming that $20,000 was paid to Stanfull.

xxx.     In furtherance of a scheme or artifice to defraud, and with specific intent to defraud, on August 4, 1998, pursuant to Defendant Bennett's direction made on behalf of and for the benefit of

Defendants Jakks, THQ, the Joint Venture and THQ/Jakks,
Defendant Road Champs wire-transferred $20,000 from its account
at the Hang Seng Bank in an intra-bank transfer to Stanfull's
account at the Hang Seng Bank.

xxxi.    As a reasonably foreseeable result of Defendants' fraudulent acts
and in furtherance of Defendants' scheme or artifice to defraud, on
June 9, 1998, Brian Farrell, President and CEO of THQ, on behalf
of Defendants Jakks, THQ, the Joint Venture and THQ/Jakks,
transmitted by facsimile a letter to Defendant Bell regarding his
recent meeting with Bell in Stamford, Connecticut, and meetings
between Defendants THQ and Jakks to discuss the Joint Venture.

xxxii.   In furtherance of a scheme or artifice to defraud, and with specific
intent to defraud, on December 21, 1998, Defendant Shenker
caused Defendant SSAI to wire-transfer $280,616 from Defendant
SSAI's checking account at Fleet Bank, headquartered in Fort Lee,
New Jersey, to Stanfull's account at the Hang Seng Bank,
consisting of $165,000 of commissions Defendant SSAI was paid
by WWE on the videogame license.

xxxiii.  In furtherance of a scheme or artifice to defraud, and with specific
intent to defraud, on January 11, 1999, Defendant Shenker wire-
transferred $280,601 from Stanfull's account at the Hang Seng
Bank to Defendant Bell Licensing's money market account at
Hudson Bank, consisting of $165,000 in commissions Defendant
SSAI was paid by WWE on the videogame license.

41

b.     In violation of the Federal Money Laundering Statutes, 18 U.S.C. §§ 1956 & 1957, Defendants' payment and/or receipt of unlawful bribes and payments to secure the videogame license and the 1998 amendments to the toy licenses, and subsequent receipt of benefits as a result of the unlawful bribes, involved the proceeds of commercial bribery, an enumerated unlawful activity under 18 U.S.C. § 1956, and were designed to conceal the nature of the source of such unlawful activity. In addition and/or in the alternative, Defendants' payment and receipt of unlawful bribes and payments to secure the videogame license and the 1998 amendments to the toy licenses, and subsequent receipt of benefits as a result of the unlawful bribes, involved the deposit, withdrawal, transfer or exchange of funds through or to a financial institution of a value in excess of $10,000 and represented the proceeds from commercial bribery, an enumerated unlawful activity under 18 U.S.C. § 1957. Defendants' specific acts of money laundering in violation of 18 U.S.C. §§ 1956 & 1557 include at least the following:

i.     In furtherance of, and with the intent to conceal proceeds of the commercial bribery scheme, on January 14, 1998, pursuant to Defendant Bennett's direction made on behalf of Jakks and which was authorized by Defendants Friedman and/or Berman, Defendant Road Champs wire-transferred $40,000 from its account at the Hang Seng Bank in Hong Kong in an intra-bank transfer to Stanfull's account at the Hang Seng Bank.

ii.    In furtherance of, and with the intent to conceal proceeds of the commercial bribery scheme, on January 14, 1998, pursuant to Defendant Bennett's direction made on behalf of Jakks and

42

authorized by Defendants Friedman and/or Berman, Defendant
Jakks H.K. wire-transferred $40,000 from Defendant Jakks H.K.'s
account at Norwest Bank to Defendant Road Champs' account at
the Hang Seng Bank.

iii.   In furtherance of, and with the intent to conceal proceeds of the
commercial bribery scheme, by demand draft dated January 14,
1998 drawn on Stanfull's account at the Hang Seng Bank,
Defendant Shenker paid Defendant Bell $20,000 of the $40,000
paid to Stanfull from Defendant Road Champs.

iv.   In furtherance of, and with the intent to conceal proceeds of the
commercial bribery scheme, pursuant to Defendant Bennett's
direction made on behalf of Jakks and authorized by Defendants
Friedman and/or Berman, Defendant Jakks H.K. wire-transferred
$40,000 from its account at Norwest Bank to Stanfull's account at
the Hang Seng Bank.

v.   In furtherance of, and with the intent to conceal proceeds of the
commercial bribery scheme, by demand draft dated April 2, 1998
drawn on Stanfull's account at the Hang Seng Bank, Defendant
Shenker paid Defendant Bell Licensing $20,000 of the $40,000
paid to Stanfull from Defendant Jakks H.K.

vi.   In furtherance of, and with the intent to conceal proceeds of the
commercial bribery scheme, on April 7, 1998, Defendant Bell
deposited the Stanfull demand draft paid to Defendant Bell
Licensing into a MBNA money market account owned by

43

Defendant Bell, which cleared through Citibank located in New York.

vii.   In furtherance of Defendants' commercial bribery scheme, on July 3, 1998, Defendant Shenker deposited a check, dated July 3, 1998, from WWE in the amount of $301,751.54 into SSAI's Fleet Bank account, consisting of commissions related to the advance on the videogame license, which represented proceeds derived from Defendants' commercial bribery scheme. The total of SSAI's commission related to the videogame license was $330,000; however, due to an overpayment of commissions in a prior month, WWE deducted $28,248.46 from that amount, thereby SSAI only received $301,751.54 on July 3, 1998.

viii.  In furtherance of, and with the intent to conceal proceeds of the commercial bribery scheme, on August 4, 1998, pursuant to Defendant Bennett's direction made on behalf of and for the benefit of Defendants Jakks, THQ, the Joint Venture and THQ/Jakks, Defendant Road Champs wire-transferred $20,000 from its account at the Hang Seng Bank in an intra-bank transfer to Stanfull's account at the Hang Seng Bank.

ix.    In furtherance of, and with the intent to conceal proceeds of Defendants' commercial bribery scheme, by check no. 1881, dated October 8, 1998, Defendant Shenker caused Defendant SSAI to pay Defendant Bell Licensing $20,000, drawn on SSAI's checking account at Fleet Bank, headquartered in Fort Lee, New Jersey.

x.    In furtherance of, and with the intent to conceal proceeds of
Defendants' commercial bribery scheme, on October 9, 1998,
Defendant Bell deposited the October 8, 1998 check from
Defendant SSAI into Defendant Bell Licensing's Hudson Bank
money market account located in Darien, Connecticut, thereby
causing the check to clear at Hudson Bank's main office located in
Mahwah, New Jersey.

xi.    In furtherance of, and with the intent to conceal proceeds of the
commercial bribery scheme, on December 21, 1998, Defendant
Shenker caused Defendant SSAI to wire transfer $280,616 from
Defendant SSAI's checking account at Fleet Bank, headquartered
in Fort Lee, New Jersey, to Stanfull's account at the Hang Seng
Bank, consisting in part of $165,000 which was exactly 50% of the
advance Defendant SSAI was paid by WWE on the videogame
license. Defendant SSAI's transfer to Stanfull was the precursor to
Defendant Bell Licensing's receipt of the unlawful proceeds, as
Defendant Shenker elected to run the transaction through a foreign
bank account in order to conceal the nature and source of the
payments.

xii.    In furtherance of, and with the intent to conceal proceeds of the
commercial bribery scheme, on January 11, 1999, Defendant
Shenker wire-transferred $280,601 from Stanfull's account at the
Hang Seng Bank to Defendant Bell Licensing's money market
account at Hudson Bank, consisting of $165,000, exactly 50% of
the advance Defendant SSAI was paid by WWE on the videogame
license.

xiii.   In furtherance of Defendants' commercial bribery scheme, on
February 7, 2000 Defendant Shenker deposited a check dated
February 4, 2000 from WWE in the amount of $663,037.70 into
SSAI's Fleet Bank account, consisting of $165,000 in commissions
related to the videogame license, which represented proceeds
derived from Defendants' commercial bribery scheme.

xiv.    In furtherance of, and with the intent to conceal proceeds of the
commercial bribery scheme, by check no. 2595 dated February 22,
2000, drawn on SSAI's bank account at Fleet Bank, headquartered
in Fort Lee, New Jersey, Defendant SSAI paid $95,396.90 to
Defendant Bell Licensing, consisting of $82,500, exactly 50% of
the commissions paid to Defendant SSAI by WWE on the
videogame license.

xv.     In furtherance of, and with the intent to conceal proceeds of the
commercial bribery scheme, on February 23, 2000, Defendant Bell
deposited the February 22, 2000 check from Defendant SSAI into
Defendant Bell Licensing's Hudson Bank money market account
located in Darien, Connecticut, thereby causing the check to clear
at Hudson Bank's main office located in Mahwah, New Jersey.

xvi.    In furtherance of Defendants' commercial bribery scheme, on
June 12, 2000, Defendant SSAI deposited a check, dated June 9,
2000, from WWE, in the amount of $312,788.55 into SSAI's Fleet
Bank account, consisting of $247,180.90 of commissions related to
the videogame license, which represented proceeds derived from
Defendants' commercial bribery scheme.

46

xvii.  In furtherance of, and with the intent to conceal proceeds of the commercial bribery scheme, by check no. 2832 dated June 16, 2000 drawn on Defendant SSAI's bank account at Fleet Bank, headquartered in Fort Lee, New Jersey, Defendant SSAI paid $124,454 to Defendant Bell Licensing, consisting of $123,590.45, exactly 50% of commissions paid to Defendant SSAI by WWE on the videogame license.

xviii. In furtherance of, and with the intent to conceal proceeds of the commercial bribery scheme, on June 19, 2000, Defendant Bell deposited Defendant SSAI's June 16, 2000 check into Defendant Bell Licensing's Hudson Bank money market account located in Darien, Connecticut, thereby causing the check to clear at Hudson Bank's main office located in Mahwah, New Jersey.

xix.   In furtherance of Defendants' commercial bribery scheme, on August 25, 2000, Defendant Shenker deposited a check, dated August 18, 2000, in the amount of $324,540.66 into SSAI's Fleet Bank account, consisting of $132,735.44 of commissions related to the videogame license, which represented proceeds derived from Defendants' commercial bribery scheme.

xx.    In furtherance of, and with the intent to conceal proceeds of the commercial bribery scheme, by check no. 3016 dated September 10, 2000 drawn on Defendant SSAI's bank account at Fleet Bank, headquartered in Fort Lee, New Jersey, Defendant SSAI paid $84,525.29 to Defendant Bell Licensing, consisting of

47

  
$66,367.72, exactly 50% of commissions paid to Defendant SSAI by WWE on the videogame license.

xxi.    In furtherance of, and with the intent to conceal proceeds of the commercial bribery scheme, on September 12, 2000, Defendant Bell deposited Defendant SSAI's September 10, 2000 check into Defendant Bell Licensing's Hudson Bank money market account located in Darien, Connecticut, thereby causing the check to clear at Hudson Bank's main office located in Mahwah, New Jersey.

xxii.   In furtherance of, and with the intent to conceal proceeds of the commercial bribery scheme, by check no. 1846 dated September 14, 2001 drawn on Defendant Shenker's account at Fleet Bank headquartered in Fort Lee, New Jersey, Defendant Shenker paid Defendant Bell $52,948, representing a split of the proceeds from Defendant Shenker's sale of THQ and Jakks stock acquired pursuant to the videogame license.

xxiii.  In furtherance of, and with the intent to conceal proceeds of the commercial bribery scheme, on September 24, 2001, Defendant Bell deposited Defendant Shenker's September 14, 2001 check into Defendant Bell's Citibank preferred money market account, account no. 47507343, thereby causing the check to clear at Citibank in New York.

xxiv.   In furtherance of, and with the intent to conceal proceeds of the commercial bribery scheme, by check no. 1869 dated October 12, 2001 drawn on Defendant Shenker's account at Fleet Bank headquartered in Fort Lee, New Jersey, Defendant Shenker paid

Defendant Bell $26,994, representing a split of the proceeds of Defendant Shenker's sale of THQ and Jakks stock acquired pursuant to the videogame license.

xxv.    In furtherance of, and with the intent to conceal proceeds of the commercial bribery scheme, on October 13, 2001, Defendant Bell deposited Defendant Shenker's October 12, 2001 check into Defendant Bell's branch account at Hudson Bank located in Connecticut, thereby causing the check to clear at Hudson Bank's main office located in Mahwah, New Jersey.

xxvi.   In furtherance of, and with the intent to conceal proceeds of the commercial bribery scheme, by check no. 1894 dated December 11, 2001 drawn on Defendant Shenker's account at Fleet Bank headquartered in Fort Lee, New Jersey, Defendant Shenker paid Defendant Bell $26,944, representing a split of the proceeds of Defendant Shenker's sale of THQ and Jakks stock acquired pursuant to the videogame license.

xxvii.  In furtherance of, and with the intent to conceal proceeds of the commercial bribery scheme, on December 13, 2001, Defendant Bell deposited Defendant Shenker's December 11, 2001 check into Defendant Bell's branch account at Hudson Bank located in Connecticut, thereby causing the check to clear at Hudson Bank's main office located in Mahwah, New Jersey.

c.  In violation of the National Stolen Property Act, 18 U.S.C. § 2314, Defendants' payment and/or receipt of unlawful bribes and payments to secure the videogame license and the 1998 amendments to the toy licenses

involved the transmittal and/or transfer in interstate commerce of money having a value of at least $5,000 knowing such proceeds were obtained by fraud against WWE. Defendants' specific acts in violation of the National Stolen Property Act include at least the following:

i.  As a result of Defendants' commercial bribery scheme to secure the videogame license and the 1998 amendments to the toy licenses by fraudulent means, on July 3, 1998, Defendant Shenker deposited a check, dated July 3, 1998, from WWE, in the amount of $301,751.54 into SSAI's Fleet Bank account, consisting of commissions related to the advance on the videogame license which Defendants SSAI and Shenker knew had been acquired by fraud.

ii. As a result of Defendants' commercial bribery scheme to secure the videogame license and the 1998 amendments to the toy licenses by fraudulent means, on December 21, 1998, Defendant Shenker caused Defendant SSAI to wire transfer $280,616 from Defendant SSAI's checking account at Fleet Bank, headquartered in Fort Lee, New Jersey, to Stanfull's account at the Hang Seng Bank, consisting of $165,000, exactly 50% of the advance Defendant SSAI was paid by WWE on the videogame license which Defendants SSAI and Shenker knew had been acquired by fraud. Defendant SSAI's transfer of this money was the precursor to Defendant Bell Licensing's receipt of the unlawful proceeds as Defendant Shenker elected to run the transaction through a foreign bank account in order to conceal the nature and source of the payment.

50

iii.    As a result of Defendants' commercial bribery scheme to secure the videogame license and the 1998 amendments to the toy licenses by fraudulent means, on January 11, 1999, Defendant Shenker wire-transferred $280,601 from Stanfull's account at the Hang Seng Bank to Defendant Bell Licensing's money market account at Hudson Bank, consisting of $165,000, exactly 50% of the advance Defendant SSAI was paid by WWE on the videogame license which Defendants SSAI, Shenker, Bell and Bell Licensing knew had been acquired by fraud.

iv.    As a result of Defendants' commercial bribery scheme to secure the videogame license and the 1998 amendments to the toy licenses by fraudulent means, on February 7, 2000 Defendant Shenker deposited a check, dated February 4, 2000, from WWE, in the amount of $663,037.70 into SSAI's Fleet Bank account, consisting of $165,000 in commissions related to the videogame license, which Defendants SSAI and Shenker knew had been acquired by fraud.

v.    As a result of Defendants' commercial bribery scheme to secure the videogame license and the 1998 amendments to the toy licenses by fraudulent means, by check no. 2595 dated February 22, 2000, drawn on SSAI's bank account at Fleet Bank headquartered in Fort Lee, New Jersey, Defendant SSAI paid $95,396.90 to Defendant Bell Licensing, consisting of $82,500, exactly 50% of the commissions paid to Defendant SSAI on the videogame license which Defendants SSAI, Shenker, Bell and Bell Licensing knew had been acquired by fraud.

vi.   As a result of Defendants' commercial bribery scheme to secure the videogame license and the 1998 amendments to the toy licenses by fraudulent means, on February 23, 2000, Defendant Bell deposited the February 22, 2000 check from Defendant SSAI into Defendant Bell Licensing's Hudson Bank money market account located in Darien, Connecticut, thereby causing the check to clear at Hudson Bank's main office located in Mahwah, New Jersey.  Defendants SSAI, Shenker, Bell and Bell Licensing knew the proceeds of said check had been acquired by fraud.

vii.  As a result of Defendants' commercial bribery scheme to secure the videogame license and the 1998 amendments to the toy licenses by fraudulent means, on June 12, 2000, Defendant SSAI deposited a check, dated June 9, 2000, from WWE, in the amount of $312,788.55 into SSAI's Fleet Bank account, consisting of $247,180.90 of commissions related to the videogame license which Defendants SSAI and Shenker knew had been acquired by fraud.

viii. As a result of Defendants' commercial bribery scheme to secure the videogame license and the 1998 amendments to the toy licenses by fraudulent means, by check no. 2832 dated June 16, 2000 drawn on Defendant SSAI's bank account at Fleet Bank, headquartered in Fort Lee, New Jersey, Defendant SSAI paid $124,454 to Defendant Bell Licensing, consisting of $123,590.45, exactly 50% of the commissions Defendant SSAI was paid on the videogame license which Defendants SSAI, Shenker, Bell and Bell Licensing knew had been acquired by fraud.

ix.    As a result of Defendants' commercial bribery scheme to secure the videogame license and the 1998 amendments to the toy licenses by fraudulent means, on June 19, 2000, Defendant Bell deposited Defendant SSAI's June 16, 2000 check into Defendant Bell Licensing's Hudson Bank money market account located in Darien, Connecticut, thereby causing the check to clear at Hudson Bank's main office located in Mahwah, New Jersey. Defendants SSAI, Shenker, Bell and Bell Licensing knew the proceeds of said check had been acquired by fraud.

x.    As a result of Defendants' commercial bribery scheme to secure the videogame license and the 1998 amendments to the toy licenses by fraudulent means, on August 25, 2000, Defendant Shenker deposited a check, dated August 18, 2000, in the amount of $324,540.66 into SSAI's Fleet Bank account, consisting of $132,735.44 of commissions Defendant SSAI was paid on the videogame license which Defendants SSAI and Shenker knew had been acquired by fraud.

xi.    As a result of Defendants' commercial bribery scheme to secure the videogame license and the 1998 amendments to the toy licenses by fraudulent means, by check no. 3016 dated September 10, 2000 drawn on Defendant SSAI's bank account at Fleet Bank, headquartered in Fort Lee, New Jersey, Defendant SSAI paid $84,525.29 to Defendant Bell Licensing, consisting of $66,367.72, exactly 50% of the commissions Defendant SSAI was paid on the videogame license which Defendants SSAI, Shenker, Bell and Bell Licensing knew had been acquired by fraud.

53

xii.   As a result of Defendants' commercial bribery scheme to secure the videogame license and the 1998 amendments to the toy licenses by fraudulent means, on September 12, 2000, Defendant Bell deposited Defendant SSAI's September 10, 2000 check into Defendant Bell Licensing's Hudson Bank money market account located in Darien, Connecticut, thereby causing the check to clear at Hudson Bank's main office located in Mahwah, New Jersey. Defendants SSAI, Shenker, Bell and Bell Licensing knew the proceeds of said check had been acquired by fraud.

xiii.  As a result of Defendants' commercial bribery scheme to secure the videogame license and the 1998 amendments to the toy licenses by fraudulent means, by check no. 1846 dated September 14, 2001 drawn on Defendant Shenker's account at Fleet Bank headquartered in Fort Lee, New Jersey, Defendant Shenker paid Defendant Bell $52,948, representing a split of the proceeds from Defendant Shenker's sale of THQ and Jakks stock acquired pursuant to the videogame license which Defendants Shenker and Bell knew had been acquired by fraud.

xiv.   As a result of Defendants' commercial bribery scheme to secure the videogame license and the 1998 amendments to the toy licenses by fraudulent means, on September 24, 2001, Defendant Bell deposited Defendant Shenker's September 14, 2001 check into Defendant Bell's Citibank preferred money market account, account no. 47507343, thereby causing the check to clear at Citibank in New York.  Defendants Shenker and Bell knew the proceeds of said check had been acquired by fraud.

54

xv.     As a result of Defendants' commercial bribery scheme to secure
the videogame license and the 1998 amendments to the toy
licenses by fraudulent means, by check no. 1869 dated October 12,
2001 drawn on Defendant Shenker's account at Fleet Bank
headquartered in Fort Lee, New Jersey, Defendant Shenker paid
Defendant Bell $26,994, representing a split of the proceeds of
Defendant Shenker's sale of THQ and Jakks stock acquired
pursuant to the videogame license which Defendants Shenker and
Bell knew had been acquired by fraud.

xvi.    As a result of Defendants' commercial bribery scheme to secure
the videogame license and the 1998 amendments to the toy
licenses by fraudulent means, on October 13, 2001, Defendant Bell
deposited Defendant Shenker's October 12, 2001 check into
Defendant Bell's branch account at Hudson Bank located in
Connecticut, thereby causing the check to clear at Hudson Bank's
main office located in Mahwah, New Jersey.  Defendants Shenker
and Bell knew the proceeds of said check had been acquired by
fraud.

xvii.   As a result of Defendants' commercial bribery scheme to secure
the videogame license and the 1998 amendments to the toy
licenses by fraudulent means, by check no. 1894 dated
December 11, 2001 drawn on Defendant Shenker's account at
Fleet Bank headquartered in Fort Lee, New Jersey, Defendant
Shenker paid Defendant Bell $26,944, representing a split of the
proceeds of Defendant Shenker's sale of THQ and Jakks stock

acquired pursuant to the videogame license which Defendants Shenker and Bell knew had been acquired by fraud.

xviii.    As a result of Defendants' commercial bribery scheme to secure the videogame license and the 1998 amendments to the toy licenses by fraudulent means, on December 13, 2001, Defendant Bell deposited Defendant Shenker's December 11, 2001 check into Defendant Bell's branch account at Hudson Bank located in Connecticut, thereby causing the check to clear at Hudson Bank's main office located in Mahwah, New Jersey. Defendants Shenker and Bell knew the proceeds of said check had been acquired by fraud.

d.    In violation of the Federal Travel Act, 18 U.S.C. § 1952, Defendants' scheme to fraudulently secure the videogame license and the 1998 amendments to the toy licenses through the payment of unlawful bribes and payments and to the use of fraudulent conduct to conceal the true nature of the bribes and payments involved the unlawful use of the mail or a facility of interstate commerce with the intent to distribute the proceeds of, and/or facilitate the carrying on of, commercial bribery, an enumerated unlawful act under 18 U.S.C. § 1952 and, thereafter, the commission of an additional act in furtherance of such commercial bribery scheme. Each of the specific acts identified above in violation of the Federal Mail and Wire Fraud Statutes, 18 U.S.C. §§ 1341 & 1343, the Federal Money Laundering Statutes, 18 U.S.C. §§ 1956 & 1957, and the National Stolen Property Act, 18 U.S.C. § 2314, also constitutes separate violations of the Federal Travel Act, and therefore such allegations are incorporated herein by reference and reasserted as though fully set forth at length.

e.    In violation of New York Penal Law § 180.03, as described herein, certain Defendants made, authorized and/or participated in the payment of or agreement to pay unlawful bribes and payments in excess of one thousand dollars to SSAI, Shenker and/or Bell, who at all relevant times were employees, agents or fiduciaries of WWE, without WWE's consent, with the intent to influence their conduct in relation to WWE's affairs to secure the videogame license and the 1998 amendments to the toy licenses, and said acts inured to the benefit of and/or were ratified by the Joint Venture and THQ/Jakks. Pursuant to 18 U.S.C. § 1961(1)(A), Defendants' violations of New York Penal Law § 180.03, as described herein, constitutes separate predicate acts under RICO.

## Pattern of Racketeering Activity

142.    Defendants knowingly and repeatedly committed the above criminal acts in furtherance of and for the purpose of executing a fraudulent scheme to harm WWE's business.

143.    The predicate acts described herein were related to one another as part of a common scheme or plan.

144.    The unlawful conduct described herein constitutes a continuous pattern of racketeering activity. Such unlawful conduct, which began in or around 1998, continues through this date.

## Injury to WWE

145.    As a direct and proximate result of Defendants' violation of 18 U.S.C. § 1962(c) as described herein, WWE has been injured in its business and property.

### COUNT II
### CONSPIRACY TO VIOLATE RICO, 18 U.S.C. § 1962(d)
### (Against All Defendants)

146.    Each and every one of the foregoing allegations is incorporated herein by reference and reasserted as though fully set forth at length.

147.    THQ/Jakks, the Joint Venture, Jakks, THQ, SSAI, Shenker, Bell Licensing, Bell, Friedman, Berman and Bennett formed a conspiracy for the purpose of achieving and profiting from the racketeering activities described herein in violation of 18 U.S.C. § 1962(c).

148.    As described herein, each of the Defendants knowingly and intentionally agreed and conspired to commit at least two of the predicate acts set forth above and they did so with the knowledge and intent that such acts were in furtherance of the foregoing pattern of racketeering.

149.    As described herein, Defendants' conspiracy substantially affected interstate commerce as much of the conduct that formed the overt acts of the conspiracy involved interstate commerce and the damage caused by the conspiracy has harmed a corporation that itself substantially affects interstate commerce.

150.    As a direct and proximate result of the conspiracy in violation of 18 U.S.C. § 1962(d) as described herein, WWE has been injured in its business and property.

### COUNT III
### DECLARATORY JUDGMENT
### (Against THQ, THQ/Jakks, Jakks and the Joint Venture)

151.    Each and every one of the foregoing allegations is incorporated herein by reference and reasserted as though fully set forth at length.

58

152.    As described herein, the videogame license was formed or induced as a result of commercial bribery and/or illegal conduct in violation of New York law.

153.    As described herein, the 1998 amendments to the toy licenses were formed or induced as a result of commercial bribery and/or illegal conduct in violation of New York law.

154.    As described herein, the commercial bribery and/or illegal conduct was and remains central to the performance of the videogame license.

155.    As described herein, the commercial bribery and/or illegal conduct was and remains central to the performance of the 1998 amendments to the toy licenses.

156.    Under New York law a contract formed or induced as a result of commercial bribery is void.

157.    Thus, an actual dispute and controversy exists with respect to whether the videogame license and the 1998 amendments to the toy licenses are void as a result of the commercial bribery.

158.    A judicial declaration is, therefore, necessary pursuant to 28 U.S.C. § 2201 *et seq.* to determine the parties' rights and obligations under the videogame license and the 1998 amendments to the toy licenses.

## COUNT IV
## DECLARATORY JUDGMENT
### (Against Defendants THQ, THQ/Jakks, Jakks and the Joint Venture)

159.    Each and every one of the foregoing allegations is incorporated herein by reference and reasserted as though fully set forth at length.

160.    Prior to and during the time the videogame license and the 1998 amendments to the toy license were negotiated, Jakks knew of and created an undisclosed conflict of interest between SSAI and its principal, Stanley Shenker, and WWE.

161.    During the time Jakks knew SSAI was WWE's agent, Jakks began the practice of paying Shenker and using him as their agent, none of which was disclosed to WWE.

162.    At various times during their undisclosed relationship with Shenker, Jakks personnel would, in writing, direct and inquire of Shenker regarding matters being performed by Shenker on Jakks' behalf and at the same time request he secure modifications and/or amendments to the WWE toy licenses.

163.    Jakks personnel were acutely aware of the impropriety of doing so, and in particular were aware of the impropriety of doing so after being advised by corporate counsel that Jakks could not do so without WWE consent.

164.    With knowledge of the impropriety involved, Jakks continued to find ways to corrupt Shenker's loyalties by the payment of monies and/or promises of more contracts, including during and after the time Shenker and SSAI were negotiating with Jakks regarding the videogame license and amendments to the toy licenses.

165.    At all times relevant hereto, Jakks knew that it was dealing with a corrupt agent capable of, and actually engaging in, unethical conduct in violation of his fiduciary duties to WWE. Jakks not only concealed such conduct from WWE but also directly fostered it.

166.    The payment made at Jakks' direction to Stanfull in January 1998, which was subsequently split with Bell, was the first time Shenker paid Bell monies in what evolved into a corrupt, illegal and wide-ranging bribery and kickback scheme between SSAI, Shenker and Bell during the time both SSAI and Bell were agents and fiduciaries of WWE.

60

167.   In order to induce Bell to favor the issuance of the videogame license to the Joint Venture between THQ and Jakks over other prospective licensees, Shenker promised that he would split equally all commissions SSAI was paid, as well as profits from the sale of stock SSAI would also receive as compensation if Bell recommended that the videogame license be awarded to the Joint Venture between THQ and Jakks.

168.   Bell did recommend the license be granted to the Joint Venture between THQ and Jakks and further recommended amendments to the toy licenses at the same time. Thereafter, SSAI and Shenker did split commissions and profits from stock sales with Bell in amounts exceeding several hundred thousand dollars.

169.   As a direct result of and during the foregoing conduct, the videogame license issued to THQ/Jakks and the amendments to the toy licenses were executed.

170.   The issuance of the videogame license, and the 1998 amendments to the toy licenses executed in the same time frame, were tainted by the illegality of WWE's agents and the conflicts of interest which were known to and facilitated by Jakks for its own benefit, and for the benefit of the Joint Venture between THQ and Jakks.

171.   An actual dispute and controversy exists with respect to whether the videogame license and the 1998 amendments to the toy licenses are void for such illegality.

172.   A judicial declaration is, therefore, a necessary point to 28 U.S.C. §2201, et seq. to determine the parties rights and obligations under the videogame license and the 1998 amendments to the toy licenses.

## COUNT V
## VIOLATION OF THE ROBINSON-PATMAN ACT, 15 U.S.C. § 13(c)
### (Against THQ/Jakks, Jakks, THQ, the Joint Venture, Friedman, Berman, and Bennett)

173.    Each and every one of the foregoing allegations is incorporated herein by reference and reasserted as though fully set forth herein.

174.    Defendants THQ/Jakks, Jakks, THQ, the Joint Venture, Friedman, Berman and Bennett are engaged in interstate commerce and, in the course of such commerce, engaged in the course of commercial bribery described above.

175.    As described herein, Jakks, Friedman, Berman and/or Bennett paid unlawful bribes and/or payments, through Stanfull, to SSAI, Shenker, Bell Licensing and/or Bell of at least $100,000 to secure the WWE videogame license for the Joint Venture and the 1998 amendments to the toy licenses.  Defendants acted with the intent corruptly to influence the conduct of Shenker, SSAI and Bell in the performance of their duties for WWE, including inducing WWE to enter into the videogame license and amendments despite the fact that other competing opportunities were, or could be negotiated to be, more favorable for WWE.

176.    At all relevant times, SSAI, Shenker, and Bell were agents or employees of WWE and thus owed WWE fiduciary duties and obligations.

177.    The payment of unlawful bribes, through Stanfull, to SSAI, Shenker, Bell Licensing and/or Bell of at least $100,000 to secure the videogame license and the 1998 amendments to the toy licenses, as described herein, constitutes commercial bribery in violation of 15 U.S.C. § 13(c).

178.    By that aspect of the scheme related to the toy licenses, Jakks was able to foreclose competition for the rights covered by the toy licenses during and in the period those licenses would otherwise have expired but for the extended term granted by the amendments.

179.    As a direct and proximate result of Defendants' unlawful conduct described herein, WWE was deprived of the benefit of competition between and among Acclaim, Activision, THQ and the Joint Venture THQ/Jakks and Jakks, for the purchase of a videogame license for its intellectual property. Defendants the Joint Venture and THQ/Jakks, as a consequence of the commercial bribery alleged herein, obtained the videogame license from WWE upon terms less favorable to WWE than the terms which would have been available to WWE but for Defendants' foreclosure of such competition through the bribery of WWE's fiduciaries and the associated fraudulent withholding by those agents of material information regarding Defendants' offers and the competing offers available in a competitive market. WWE was thereby injured in its business and property and was deprived of a fair and competitive return on the innovation and creativity which gave rise to WWE's intellectual property.

## COUNT VI
## VIOLATION OF NEW YORK COMMERCIAL BRIBERY LAW
### (Against THQ/Jakks, Jakks, THQ, the Joint Venture, Friedman, Berman and Bennett)

180.    Each and every one of the foregoing allegations is incorporated herein by reference and reasserted as though fully set forth at length.

181.    As described herein, Jakks, Friedman, Berman and/or Bennett paid unlawful bribes and/or payments, through Stanfull, to SSAI, Shenker, Bell Licensing and/or Bell of at least $100,000 to secure the WWE videogame license and the 1998 amendments to the toy licenses.

182.    At all times relevant to the payment of such bribes and/or payments, as described herein, SSAI, Shenker, and Bell were agents or employees of WWE and thus owed WWE fiduciary duties and obligations.

63

183.    Jakks, Friedman, Berman and/or Bennett's payment of unlawful bribes and/or payments, through Stanfull, to SSAI, Shenker, Bell Licensing and/or Bell of at least $100,000 to secure the WWE videogame license and the 1998 amendments to the toy license, constitutes commercial bribery in violation of New York law.

184.    The bribery scheme inured not only to the benefit of Jakks, but also to the benefit of THQ, the Joint Venture, and THQ/Jakks, all of whom accepted the benefits and/or ratified the acts and/or are legally liable as joint ventures in any event.

185.    As a direct and proximate result of Defendants' unlawful conduct described herein, WWE has been injured in its business and property.

186.    In addition, because the videogame license and the 1998 amendments to the toy licenses were obtained by bribery, they should be declared void *ab initio*.

## COUNT VII
## FRAUDULENT INDUCEMENT
### (Against <u>THQ/Jakks, Jakks, THQ, the Joint Venture, Friedman, Berman and Bennett</u>)

187.    Each and every one of the foregoing allegations is incorporated herein by reference and reasserted as though fully set forth at length.

188.    As detailed herein, in connection with the discussions leading to execution of the videogame license and the 1998 amendments to the toy licenses and during the performance of those licenses, THQ/Jakks, Jakks, THQ, the Joint Venture, Friedman, Berman and/or Bennett knowingly or recklessly made false and misleading statements to, and also knowingly or recklessly concealed information from and did not disclose information to, WWE regarding (1) the payment of bribes, through Stanfull, to SSAI, Shenker, Bell Licensing and/or Bell of at least $100,000 to secure the WWE videogame license and the 1998 amendments to the toy licenses,

and/or (2) their use of SSAI or Shenker as its undisclosed agent to secure the videogame license and the 1998 amendments to the toy licenses.

189.    Under the circumstances, THQ/Jakks, Jakks, THQ, the Joint Venture, Friedman, Berman and/or Bennett had a duty not to make such false and misleading statements, a duty to disclose the concealed and omitted information, and a duty not to induce or otherwise aid and abet SSAI's, Shenker's and Bell's violation of fiduciary duties.

190.    As described herein, THQ/Jakks, Jakks, THQ, the Joint Venture, Friedman, Berman and/or Bennett engaged in such conduct with the intent and purpose of inducing reliance thereon by WWE and inducing WWE to enter into the videogame license and the 1998 amendments to the toy licenses.

191.    The false and misleading statements, and concealed information, were material to WWE's decision to enter into, induced WWE to enter into, and were reasonably and justifiably relied upon by WWE in entering into, the videogame license and the 1998 amendments to the toy licenses. As THQ/Jakks, Jakks, THQ, the Joint Venture, Friedman, Berman and/or Bennett knew, WWE would never have entered into the videogame license or the 1998 amendments to the toy licenses had WWE known the true state of affairs regarding the payment of bribes, through Stanfull, to SSAI, Shenker, Bell Licensing and/or Bell and/or the use of SSAI or Shenker as an undisclosed agent.

192.    In fraudulently inducing WWE to enter into the videogame license and the 1998 amendments to the toy licenses, as described herein, THQ/Jakks, Jakks, THQ, the Joint Venture, Friedman, Berman and/or Bennett acted with malicious purpose and/or dishonest, unfair or improper means to harm WWE.

193.    As a direct and proximate result of Defendants' fraudulent conduct, WWE has been injured in its business and property.

194.    In addition, because the videogame license and the 1998 amendments to the toy licenses were obtained on the basis of fraud, the videogame license and the 1998 amendments to the toy licenses should be declared void *ab initio*.

## COUNT VIII
## UNJUST ENRICHMENT
### (Against THQ/Jakks, Jakks, THQ, the Joint Venture, Friedman, Berman and Bennett Only)

195.    Each and every one of the foregoing allegations is incorporated herein by reference and reasserted as though fully set forth at length.

196.    As described herein, THQ/Jakks, Jakks, THQ, the Joint Venture, Friedman, Berman and/or Bennett have derived substantial benefits from the videogame license and the 1998 amendments to the toy license, to which they were not properly entitled.

197.    Accordingly, THQ/Jakks, Jakks, THQ, the Joint Venture, Friedman, Berman and/or Bennett have unfairly and unjustly enjoyed the benefits of monies to which they were not properly entitled.

198.    It would be unfair and unjust for THQ/Jakks, Jakks, THQ, the Joint Venture, Friedman, Berman and/or Bennett to retain the benefits of such monies, to which they were not properly entitled.

## COUNT IX
## INDUCING BREACH OF FIDUCIARY DUTY
### (Against THQ/Jakks, Jakks, THQ, the Joint Venture, Friedman, Berman and Bennett Only)

199.    Each and every one of the foregoing allegations is incorporated herein by reference and reasserted as though fully set forth at length.

200.    As described herein, Bell, SSAI and/or Shenker breached their fiduciary duties owed to WWE by, *inter alia,* accepting bribes of at least $100,000 to secure the WWE videogame license and the 1998 amendments to the toy licenses.

201.    As described herein, Defendants herein knowingly induced or participated in Bell, SSAI and/or Shenker's breach of their fiduciary duties by making bribes of at least $100,000, through Stanfull, to secure the WWE videogame license and the 1998 amendments to the toy licenses and by failing to disclose that Shenker was secretly acting as their agent.

202.    In seeking to induce SSAI, Shenker and/or Bell to breach their fiduciary duties owed to WWE, Defendants herein acted with malicious purpose and/or dishonest, unfair or improper means to harm WWE.

203.    As a direct and proximate result of Defendants' unlawful conduct, WWE has been injured in its business and property, including, but not limited to, by the corruption of the fair and honest services of its agents and fiduciaries.

## COUNT X
## INDUCING BREACH OF FIDUCIARY DUTY
### (Against THQ/Jakks, Jakks, THQ, the Joint Venture, Friedman, Berman and Bennett Only)

204.    Each and every one of the foregoing allegations is incorporated herein by reference and reasserted as though fully set forth at length.

205.    At all relevant times, SSAI and/or Shenker were agents of WWE and thus owed WWE fiduciary duties and obligations.

206.    As described herein, during the time SSAI and/or Shenker were agents of WWE, including, but not limited to, during the time the video game license and the 1998 amendments to

the toy licenses were negotiated, Jakks knew of and created an undisclosed conflict of interest between SSAI and/or Shenker, and WWE.

207.   As described herein, during the time Jakks knew SSAI and/or Shenker was WWE's agent, Jakks began the practice of paying Shenker and using him as their agent, none of which was disclosed to WWE.

208.   As described herein, at various times during their undisclosed agency relationship with Shenker, Jakks personnel would, in writing, direct and inquire of Shenker regarding matters being performed by Shenker on Jakks' behalf and at the same time request that he secure modifications and/or amendments to Jakks' toy license with WWE.

209.   As described herein, Jakks personnel were acutely aware of the impropriety of such conduct, and in particular were aware of the impropriety of such conduct after being advised by corporate counsel that Jakks could not do so without WWE's knowledge and consent.

210.   Jakks never disclosed to WWE its agency relationship with Shenker.

211.   As described herein, SSAI and/or Shenker breached its fiduciary duties to WWE through Shenker's undisclosed conflict of interest by virtue of his undisclosed agency relationship with Jakks.

212.   As described herein, Defendants herein knowingly induced or participated in SSAI and/or Shenker's breach of fiduciary duty by Jakks maintaining an agency relationship with Shenker despite knowing of Shenker and/or SSAI's agency relationship with WWE, and Jakks failing to disclose such agency relationship and conflict of interest to WWE at the same time that Jakks was conducing business with WWE, including, but not limited to, the negotiation of the videogame license and 1998 amendments to the toy licenses.

68

213.    In seeking to induce SSAI and/or Shenker to breach their fiduciary duties owed to WWE, Defendants herein acted with malicious purpose and/or dishonest, unfair or improper means to harm WWE.

214.    As a direct and proximate result of Defendants' unlawful conduct, WWE has been injured in its business and property, including, but not limited to, by the corruption of the fair and honest services of its agents and fiduciaries.

## COUNT XI
## CONSTRUCTIVE TRUST
### (Against Defendants THQ/Jakks, Jakks, the Joint Venture, Friedman, Berman and Bennett Only)

215.    Each and every one of the foregoing allegations is incorporated herein by reference and reasserted as though fully set forth at length.

216.    As described herein, Bell, SSAI and/or Shenker breached their fiduciary duties owed to WWE by, *inter alia,* accepting bribes of at least $100,000 to secure the WWE videogame license and the 1998 amendments to the toy license.

217.    As described herein, in violation of their fiduciary duties owed to WWE, Bell, SSAI and/or Shenker caused WWE to enter into the videogame license and the 1998 amendments to the toy licenses.

218.    As described herein, Defendants herein had notice or knowledge of Bell, SSAI and/or Shenker's breach of their fiduciary duties owed to WWE in causing WWE to enter into the videogame license and the 1998 amendments to the toy licenses.

219.    Accordingly, the videogame license and the 1998 amendments to the toy license, and all revenues and profits therefrom, are held by THQ/Jakks, Jakks, THQ, the Joint Venture, Friedman, Berman and/or Bennett in constructive trust for WWE.

69

## COUNT XII
## TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS
### (Against THQ/Jakks, Jakks, THQ, the Joint Venture, Friedman, Berman and Bennett Only)

220.    Each and every one of the foregoing allegations is incorporated herein by reference as though fully set forth at length.

221.    At all times relevant to the payment of unlawful bribes and/or payments, WWE maintained valid contracts with SSAI, Shenker and/or Bell.

222.    Defendants herein had knowledge of WWE's valid contracts with SSAI, Shenker and/or Bell.

223.    As described herein, Defendants herein intentionally sought to induce SSAI, Shenker and/or Bell to breach their contracts with WWE by making bribes, through Stanfull, to secure the WWE videogame license and the 1998 amendments to the toy licenses.

224.    In seeking to induce SSAI, Shenker and/or Bell to breach their contracts with Defendants acted with malicious purpose and/or dishonest, unfair or improper means to harm WWE.

225.    As a direct and proximate result of Defendants' unlawful conduct, WWE has been injured in its business and property.

## COUNT XIII
## PIERCING THE CORPORATE VEIL/ALTER EGO
### (Against THQ, Jakks, the Joint Venture and THQ/Jakks)

226.    Each and every one of the foregoing allegations is incorporated herein by reference as though fully set forth at length.

227. THQ and Jakks exercised complete domination of THQ/Jakks Pacific LLC with respect to the formation and operation of THQ/Jakks Pacific, LLC.

228. THQ/Jakks Pacific LLC was used to perpetrate and implement a fraud, specifically to be the formal signatory to the videogame license procured by the fraudulent and criminal schemes set forth herein.

229. As a result, any and all liability of THQ/Jakks LLC to WWE should be imposed upon THQ and Jakks, jointly and severally.

### COUNT XIV
### CONSPIRACY TO COMMIT COMMERCIAL BRIBERY; FRAUDULENT INDUCEMENT; INDUCING BREACH OF FIDUCIARY DUTY; AND TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS
### (Against THQ/Jakks, Jakks, THQ, the Joint Venture, Friedman, Berman and Bennett Only)

230. Each and every one of the foregoing allegations is incorporated herein by reference and reasserted as though fully set forth at length.

231. Defendants entered into an agreement to, *inter alia,* (i) commit commercial bribery; (ii) fraudulently induce WWE to execute the videogame license and the 1998 amendments to the toy licenses without knowledge of Defendants' unlawful bribes to SSAI, Shenker, Bell and/or Bell Licensing of at least $100,000 and Defendants' use of SSAI and/or Shenker as their undisclosed agent ; (iii) induce SSAI, Shenker and/or Bell to breach their fiduciary duties owed to WWE; and (iv) tortiously interefere with WWE's contractual relations with SSAI, Shenker and/or Bell, as described in the foregoing substantive Counts of this Complaint.

232. Each of the Defendants committed one or more overt acts pursuant to and in furtherance of Defendants' conspiracy to unlawfully harm WWE by the unlawful conduct described herein.

71

233.    Pursuant to and in furtherance of Defendants' conspiracy, Defendants have, among other things, committed the acts described in Count I above, which are overt acts in furtherance of the goals of the conspiracy and which are specifically incorporated herein by reference and made a part hereof.

234.    As a direct and proximate result of Defendants' unlawful conspiracy, WWE has been injured in its business and property.

## PRAYER FOR RELIEF

WHEREFORE, WWE respectfully requests that this Honorable Court enter judgment in favor of WWE and order the following relief:

(1)    All damages proven pursuant to RICO and Robinson-Patman Act, trebled as permitted by law;

(2)    A declaration that the videogame license and the 1998 amendments to the toy licenses, as well as all other amendments executed during the fraudulently-obtained term extension of the toy licenses, are void;

(3)    An accounting of all revenues and profits obtained pursuant to the videogame license and the 1998 amendments to the toy licenses;

(4)    Restitution and/or disgorgement of all revenues and profits obtained pursuant to the videogame license and the 1998 amendments to the toy licenses to which THQ/Jakks, Jakks, THQ, the Joint Venture, Friedman, Berman and/or Bennett were not properly entitled;

(5)    Restitution and/or disgorgement of all bribes and/or payments paid or received by Defendants;

(6)    All other actual damages sustained by WWE;

(7)     Punitive damages;

(8)     Attorneys' fees and costs; and

(9)     Such other and further relief as this Court deems just and appropriate.

JURY TRIAL DEMANDED

                                        Respectfully submitted,

                                        KIRKPATRICK & LOCKHART LLP

                                        By: Eugene Licker (EL 0334)

                                        KIRKPATRICK & LOCKHART LLP
                                        599 Lexington Avenue
                                        New York, New York 10022-6030
                                        (212) 536-3900 (phone)
                                        (212) 536-3901 (fax)

                                        and

                                        Jerry S. McDevitt
                                        Curtis B. Krasik
                                        Amy L. Barrette

                                        KIRKPATRICK & LOCKHART LLP
                                        Henry W. Oliver Building
                                        535 Smithfield Street
                                        Pittsburgh, Pennsylvania 15222
                                        (412) 355-8608 (phone)
                                        (412) 355-6501 (fax)

Dated: October 19, 2004                 Attorneys for Plaintiff, World Wrestling
                                        Entertainment, Inc.

73