UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

IN RE JAKKS PACIFIC, INC.  Civil Action No. 04-CV-8807
SHAREHOLDERS CLASS ACTION : (KMK)
LITIGATION  (ECF CASE)

           :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## DECLARATION OF JONATHAN J. LERNER

Pursuant to 28 U.S.C. § 1746, JONATHAN J. LERNER declares under penalty of perjury as follows:

  1.  I am a member of the Bar of this Court and a member of the firm of Skadden, Arps, Slate, Meagher & Flom, LLP, attorneys for defendants Jakks Pacific, Inc., Jack Friedman, Steven G. Berman and Joel M. Bennett (collectively, the "Defendants") in this action.

  2.  I respectfully submit this Declaration to place before the Court true and correct copies of the following documents referred to in Defendants' Memorandum of Law in Support Their Motion to Dismiss the Consolidated Amended Complaint:

| | |
|---|---|
| Exhibit A: | World Wrestling Entertainment, Inc. Annual Report on Form 10-K for the fiscal year ended April 30, 2004, filed with the SEC on July 13, 2004. |
| Exhibit B: | Amendment No. 1 to Jakks Pacific, Inc. Annual Report on Form 10-K/A for the fiscal year ended December 31, 2004, filed with the SEC on May 12, 2005. |
| Exhibit C: | Settlement Agreement and General Release of All Claims between World Wrestling Entertainment, Inc. and Jakks Pacific, Inc., dated January 15, 2004. |
| Exhibit D: | Complaint, World Wrestling Entertainment, Inc. v. Jakks Pacific, Inc., 04-CV-8223 (KMK) (S.D.N.Y.), filed October 19, 2004. |

Exhibit E:    Amended Complaint, World Wrestling Entertainment, Inc. v. Jakks Pacific, Inc., 04-CV-8223 (KMK) (S.D.N.Y.), filed March 30, 2005.

Exhibit F:    Certification of Lead Plaintiffs' purchase of shares of Jakks Pacific, Inc. during the putative class period, filed April 4, 2005.

Exhibit G:    Opinion, In re Comverse Technology, Inc. Securities Litigation, 01-CV-6972 (ARR) (S.D.N.Y. Oct. 2, 2002).

Exhibit H:    Daily closing price of Jakks Pacific, Inc. common stock during the putative class period (December 1, 1999 through October 19, 2004).

Dated: New York, New York
   September 9, 2005.

Jonathan J. Lerner

2

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

IN RE JAKKS PACIFIC, INC.
SHAREHOLDERS CLASS ACTION      :
LITIGATION
                               :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

Civil Action No. 04-CV-8807
(KMK)
(ECF CASE)

**EXHIBITS TO ACCOMPANY THE DECLARATION OF
JONATHAN J. LERNER**

Eugene Licker (EL 0334)
KIRKPATRICK & LOCKHART NICHOLSON GRAHAM LLP
599 Lexington Avenue
New York, New York 10022-6030
(212) 536-3900 (phone)
(212) 536-3901 (fax)

Jerry S. McDevitt
Curtis B. Krasik
Amy L. Barrette
KIRKPATRICK & LOCKHART NICHOLSON GRAHAM LLP
Henry W. Oliver Building
535 Smithfield Street
Pittsburgh, Pennsylvania 15222
(412) 355-6500 (phone)
(412) 355-6501 (fax)

Attorneys for Plaintiff, World Wrestling Entertainment, Inc.


UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------X  :
                                                                 :
WORLD WRESTLING ENTERTAINMENT, INC.,                             :
                                                                 :    04 CV 8223 (KMK)
                                        Plaintiff,               :
                                                                 :
                    - against -                                  :
                                                                 :    **JURY TRIAL DEMANDED**
JAKKS PACIFIC, INC.; JAKKS PACIFIC (H.K.)                        :
LIMITED; ROAD CHAMPS LIMITED; THQ, INC.;                         :
THQ/JAKKS PACIFIC LLC; STANLEY SHENKER                           :
AND ASSOCIATES, INC.; STANLEY SHENKER;                           :
BELL LICENSING, LLC; JAMES BELL; JACK                            :
FRIEDMAN; STEPHEN BERMAN; JOEL                                   :
BENNETT; and BRIAN FARRELL,                                      :
                                                                 :
                                        Defendants.              :
                                                                 :
--------------------------------------------------------------X  :


**AMENDED COMPLAINT**

Nature of the Action

1.    This action is brought to (a) recover damages caused to World Wrestling Entertainment, Inc. ("WWE") by the pattern of multifaceted racketeering activities set forth herein in connection with a scheme and artifice to defraud WWE by depriving WWE of the intangible right of honest services from WWE's intellectual property licensing agent and its management supervisor of that licensing agent, and to obtain thereby valuable toy licensing rights and a lucrative videogame license at lower than competitive royalty rates; (b) recover damages caused to WWE under the Sherman Act for the per se unlawful price fixing, bid rigging, and market allocation scheme set forth herein; (c) recover damages caused to WWE by the commercial bribery scheme set forth herein pursuant to the Robinson-Patman Act; (d) obtain a declaratory judgment that the videogame license between WWE and THQ/Jakks Pacific LLC ("THQ/Jakks") and toy licensing rights between WWE and Jakks Pacific, Inc. ("Jakks") are void as a result of the illegal activities set forth herein including, but not limited to, commercial bribery and/or inducing and participating in violations of fiduciary duties and the duty of honest services owed WWE by its licensing agent and supervising manager; (e) recover as damages the financial losses which will be associated with voiding the toy and videogame licenses; (f) obtain disgorgement of all profits earned by Defendants as a result of their illegal conduct set forth herein; and (g) recover punitive and other damages for the conduct set forth herein.

2.    The licenses at issue herein were and are extremely lucrative licenses which were expected to and did produce millions of dollars in profits to the licensees. THQ, Inc. ("THQ") and Jakks are two publicly traded companies whose stock valuations were expected to increase if the revenues from the videogame license and toy licensing rights could be secured.

3.    At all times relevant hereto, Defendants Jack Friedman, Stephen Berman and Joel Bennett were the highest ranking executives of Jakks. Individually and collectively, they were and are in a position to control the affairs of Jakks and foreign subsidiaries owned by Jakks which were used to both implement and conceal certain aspects of the illegal conduct set forth herein.

4.    At all times relevant hereto, Defendant Brian Farrell was the highest ranking executive of THQ and was and is in a position to control the affairs of THQ.

5.    At all times relevant hereto, Defendants Friedman, Berman, Bennett and Farrell were officers of THQ/Jakks and/or otherwise were and are in a position to control the affairs of THQ/Jakks.

6.    At all times relevant hereto, Defendants Friedman, Berman and Bennett realized they would recognize several million dollars in personal profits as a result of stock ownership and options in Jakks if the videogame license and toy licensing rights were secured.

7.    At all times relevant hereto, Defendant Farrell realized he would recognize several million dollars in personal profits as a result of stock ownership and options in THQ if the revenues associated with WWE's videogame license were secured.

8.    Defendants have acted in concert through the years to conceal the unlawful conduct set forth herein by a variety of tactics to prevent WWE from discovering their illegal conduct through reasonable diligence, including concealing the relationship between Jakks and WWE's licensing agent and management supervisor, laundering commercial bribes paid to WWE's licensing agent and management supervisor through foreign corporations and bank accounts, falsification of corporate accounting records, collusive and serial perjury by certain of the Defendants in a state court proceeding, destruction of physical evidence, falsification of

physical evidence, incomplete and knowingly false responses to subpoenas duces tecum, false denials that any payments had been made to WWE's licensing agents when requested by WWE to disclose such payments, and by agreements designed to prevent WWE from learning the true set of facts involved in the bidding process for the videogame license.

The Parties

9.     Plaintiff, World Wrestling Entertainment, Inc. ("WWE"), is a Delaware corporation having its principal place of business at 1241 East Main Street, Stamford, Connecticut 06902. WWE is an integrated media and entertainment company principally engaged in the development, promotion and marketing of television programming, pay-per-view programming and live arena events. In the process, WWE creates colorful characters and personas whose names and likenesses can be licensed to third parties, such as Jakks and THQ.

10.     Defendant Jakks Pacific, Inc. ("Jakks") is a Delaware corporation with its principal place of business at 22619 Pacific Coast Highway, Suite 250, Malibu, California 90265. Jakks is primarily in the business of selling action figures and toys. In connection with WWE's videogame license, Jakks was a competitor of several companies with an interest in obtaining that license, including Acclaim, THQ and Activision. In connection with that aspect of the illegal conduct set forth herein relating to the videogame license, Jakks acted on its own behalf and then also on behalf of THQ and THQ/Jakks, and has benefited greatly from the illegal conduct set forth herein. Jakks owns and/or controls Road Champs Limited and Jakks Pacific (H.K.) Limited, two entities utilized by Jakks to effectuate the commercial bribes set forth herein.

11.     Defendant Jakks Pacific (H.K.) Limited ("Jakks Pacific (H.K.)") is a corporation organized under the laws of Hong Kong. The owners of Jakks Pacific (H.K.) are Defendants

Friedman, who owns 1 of 1,000 outstanding shares, and Jakks Pacific, Inc., which owns 999 of

1,000 outstanding shares. Defendants Friedman and Berman are directors of Jakks Pacific

(H.K.).

12.    Road Champs Limited ("Road Champs Ltd.") is a corporation organized under

the laws of Hong Kong. The owners of Road Champs Ltd. are Defendants Friedman, who owns

1 of 300 outstanding shares, and Road Champs, Inc., which owns 299 of 300 outstanding shares.

Road Champs, Inc. is a wholly owned subsidiary of Jakks Pacific, Inc. Defendants Friedman

and Berman are directors of Road Champs Ltd.

13.    Defendant Jack Friedman ("Friedman") is an individual who resides at 6351

Kanan Dume Road, Malibu, California 90265. At all times relevant hereto, Friedman was the

highest-ranking executive at Jakks and served, and continues to serve, as Chief Executive Officer

and Chairman of the Board of Directors of Jakks. Together with Defendant Berman, Friedman

co-founded Jakks in or about January 1995.

14.    Until January 20, 1995, Friedman had served as President, Chief Executive

Officer and as a Director of THQ's predecessor. On January 20, 1995, in a document executed

on behalf of THQ's predecessor by Defendant Farrell, it was agreed that it was in the mutual best

interests of Friedman and THQ's predecessor that Friedman resign from each of the

aforementioned positions.

15.    Defendant Stephen Berman ("Berman") is an individual who resides at 27465

East Winding Way, Malibu, California 90265. During a portion of the period covered by this

Amended Complaint, Berman served as an Executive Vice President of Jakks. Since January 1,

1999, Berman has served as President, Secretary, and Chief Operating Officer of Jakks and

served, and continues to serve, on the Board of Directors of Jakks. On information and belief,

prior to co-founding Jakks with Friedman, Berman was a Vice President and Managing Director of THQ International, Inc., a subsidiary of THQ.

16.    Defendant Joel Bennett ("Bennett") is an individual who resides at 6791 Trevino Drive, Moorpark, California 93021. At all times relevant hereto, Bennett was the Chief Financial Officer of Jakks.

17.    Defendant THQ, Inc. ("THQ") is a Delaware corporation with its principal place of business at 27001 Agoura Road, Suite 325, Calabasas Hills, California 91301. THQ is in the business of videogame marketing and sales. THQ authorized Jakks to act on its behalf in order to secure the benefits of a videogame license with WWE and/or has ratified the actions of Jakks and its officers set forth herein. As a result of its knowing and willing participation in the illegal conduct set forth herein, THQ has benefited greatly from the illegal conduct set forth herein.

18.    Defendant Brian Farrell is an individual who resides at 474 Lake Sherwood Drive, Lake Sherwood, California 91361. At all times relevant hereto, Farrell was the President and Chief Executive Officer of THQ and a member of the Board of Directors of THQ. Farrell has served as Chairman of the Board of Directors of THQ since at least August 21, 2001.

19.    Defendant THQ/Jakks Pacific LLC ("THQ/Jakks") is a Delaware limited liability corporation having its principal place of business at 22761 Pacific Coast Highway, Suite 226, Malibu, California 90265. THQ/Jakks was formed on June 10, 1998 as part of the illegal conduct set forth herein by Jakks and THQ to be the official licensee for WWE's videogame license. Defendant Berman signed the Certificate of Formation as an authorized person on behalf of THQ/Jakks. THQ and Jakks each own 50% of THQ/Jakks and have agreements in place detailing the manner in which proceeds from the WWE videogame license will be accounted for and ultimately distributed between THQ and Jakks. All actions alleged herein

taken by Jakks and/or THQ after June 10, 1998 in regard to the videogame license were with the authority of THQ/Jakks, which has also ratified those actions.

20.    Defendant Stanley Shenker & Associates, Inc. ("SSAI") is a New York corporation with its principal place of business at 25 Van Zant Street, Norwalk, Connecticut 06855. SSAI was WWE's licensing agent from in or around April 1995 through June 13, 2000.

21.    Defendant Stanley Shenker ("Shenker") is an individual who resides in New Canaan, Connecticut. Shenker is, and at all times relevant hereto has been, the President and sole owner of SSAI. At all times relevant hereto, Shenker was also the sole owner and alter ego of a foreign corporation known as Stanfull Industrial, Ltd. ("Stanfull") in Hong Kong. Shenker utilized Stanfull for a variety of criminal and fraudulent purposes, including as a money-laundering device to conceal the receipt and payment of bribes and kickbacks, including commercial bribes paid by Jakks utilizing foreign subsidiaries that Jakks owned and/or controlled.

22.    Defendant Bell Licensing, LLC ("Bell Licensing") is a limited liability company under the laws of Connecticut with its principal place of business located at 405 Silver Creek Lane, Norwalk, Connecticut 06850. Bell Licensing was originally formed as Bell Consulting, LLC in or about March 6, 1998 to be a receptacle for bribes paid to Bell to influence him while serving as an executive and fiduciary of WWE, including, but not limited to, the bribes paid to him in connection with the illegal conduct described herein. On or about July 18, 2002, Bell Consulting, LLC changed its name to Bell Licensing, LLC.

23.    Defendant James Bell ("Bell") is an individual who resides in Norwalk, Connecticut. Bell is, and at all times relevant hereto has been, the President and sole owner of Bell Licensing. At all times relevant hereto, Bell utilized Bell Licensing as a money-laundering

device to conceal the receipt of bribes and kickbacks, including payments from SSAI, Shenker, Stanfull and Jakks.

24.    On February 10, 2005, after the original Complaint in this matter was filed, Bell waived indictment and plead guilty in an ongoing investigation to a Criminal Information in United States District Court for the District of Connecticut to a single count of mail fraud in violation of 18 U.S.C. § 1341 in connection with Bell's receipt of bribes relating to WWE's licensing program. In a Stipulation of Offense Conduct accompanying his plea, Bell admitted that "beginning in or before January 1998, and continuing through October 2000, in the District of Connecticut and elsewhere, JAMES K. BELL . . . and others known and unknown to the United States Attorney, did devise a scheme and artifice to defraud WWE, including depriving WWE of the intangible right of honest services, and to obtain money and property from WWE through materially false and fraudulent pretenses and representations."

25.    Bell's stipulation specifically inculpates SSAI and Shenker in the illegal scheme which began "in or before January 1998."

26.    The illegal conduct set forth herein with respect to Bell occurred in the time frame that Bell has now judicially admitted to being a corrupt fiduciary of WWE. Indeed, the very first illegal payment to Bell for violating his duty of honest services to WWE was a payment of monies originating with Jakks in January 1998. That first payment for corrupt services to Bell was laundered by Jakks through foreign subsidiaries and into a foreign bank account controlled by Shenker, who then split the money equally with Bell.

Jurisdiction and Venue

27.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1337 and 15 U.S.C. § 15(a) because WWE has alleged claims arising

under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962, the Robinson-Patman Act, 15 U.S.C. § 13 *et seq*, and the Sherman Act, 15 U.S.C. § 1. This Court may exercise supplemental jurisdiction over WWE's state law claims pursuant to 28 U.S.C. § 1367.

28.    Venue is proper under 28 U.S.C. § 1391(b)(2) and/or (b)(3), 15 U.S.C. § 15 and 15 U.S.C. § 22 because Defendants are found in this district, transact business in this district, are inhabitants of, and/or have an agent in this district.

THE ILLEGAL CONDUCT

WWE Hires Bell and SSAI

29.    In or around March 1995, WWE hired Bell as its Director of Domestic Licensing. In October 1996, Bell became Senior Vice President of Licensing and Merchandising, a position he held until his termination on March 24, 2000.

30.    As Senior Vice President of Licensing and Merchandising, Bell occupied a fiduciary position and was responsible for, among other things: (i) procuring licensees for WWE at competitive market royalty rates; (ii) negotiating license agreements between WWE and potential licensees to obtain for WWE, *inter alia*, the highest royalty rates available in a competitive market; (iii) managing WWE's licensing arrangements with its licensees; and (iv) all other activities necessary and/or attendant to the development and maintenance of WWE's licensing program. Pursuant to WWE's licensing program, licensees were granted the right to utilize WWE intellectual property in connection with the licensees' own goods and/or services.

31.    Shortly after securing his position, Bell urged WWE to hire SSAI as an outside licensing agent, touting to WWE Shenker's reported extensive experience and contacts in the licensing business. For at least ten years prior to Bell's introduction of Shenker to WWE in April 1995, Bell and Shenker had maintained both a business and personal relationship.

32.     On Bell's recommendation, WWE retained SSAI in or around April 1995 originally as a nonexclusive outside licensing agent. As such, SSAI was to procure and negotiate licensing contracts by utilizing Shenker's alleged contacts in the licensing business. Bell was responsible to supervise SSAI in its licensing endeavors and remained responsible to generate licenses for WWE using his own contacts and by negotiating with prospective licensees who contacted WWE directly.

33.     As a result of their respective positions, Bell, Shenker and SSAI occupied positions of trust and of a fiduciary nature to WWE. During the course of their relationship with WWE, SSAI and Bell both entered into agreements with WWE reflecting and acknowledging their fiduciary roles and unique positions of trust.

34.     On March 2, 1995, Bell executed a Code of Conduct Agreement wherein he agreed, among other things, that he would not:

     a.     accept fees, commissions, or property in connection with any transaction on behalf of WWE;

     b.     accept or offer unauthorized or illegal payments;

     c.     use his position directly or indirectly for personal or financial gain;

     d.     personally take advantage of business opportunities which might be of interest to WWE; and

     e.     serve as an officer, director, employee, consultant or promoter of for-profit organizations without WWE's prior approval.

### Jakks Obtains Domestic Toy License

35.     After SSAI agreed to be WWE's nonexclusive licensing agent, Friedman approached both Bell and Shenker at the annual New York Toy Fair inquiring whether Jakks

could obtain a toy license from WWE. Bell and Shenker subsequently presented a deal memo to WWE indicating SSAI had procured and negotiated the terms of a toy license with Jakks. On or about October 24, 1995, WWE entered into a domestic toy license with Jakks. The term of the original domestic license was to end on December 31, 1997 with a one-year right to renew if Jakks achieved certain financial requirements.

36.    Pursuant to the terms of the domestic toy license, WWE granted to Jakks the right to use the intellectual property of WWE on goods manufactured for sale to the public, specifically "6 [inch] action figures, rings for the action figures, playsets for action figures, [and] action figures with sound and microphone."

<u>SSAI's/Shenker's Undisclosed Agency Relationship with Jakks</u>

37.    Shortly after the domestic toy license was entered into, and unknown to WWE, but known to Jakks, Jakks personnel devised a plan to corrupt Shenker by trading on Shenker's lack of ethics and greed.

38.    Unknown to WWE, and undisclosed by SSAI, Shenker and Jakks, Shenker entered into financial transactions with Jakks soon after the domestic toy license was entered into wherein he agreed to represent Jakks' interests at the same time he continued to act as WWE's agent on licensing matters involving Jakks.

39.    Within a month of signing the domestic toy license, and fully recognizing that it would be seeking further and additional licensing rights from WWE through SSAI and Shenker, Jakks secretly began negotiations with Shenker to have him perform services on its behalf.

40.    Jakks' early efforts to corrupt Shenker as an agent were initiated by Berman on behalf of Jakks, who, as early as November 20, 1995, less than a month after the domestic toy license was executed, initiated discussions to have Shenker serve as Jakks' agent.

41.    Soon after letting Shenker know that there was money to be made working for Jakks, Berman told Shenker that Jakks desired to secure additional licensing rights from WWE through Shenker. Shenker agreed to seek such additional rights on behalf of Jakks from WWE.

42.    In late November 1995, Berman continued to link financial rewards from Jakks to its desire to secure additional rights from WWE through Shenker, telling Shenker that a contract would be forthcoming for Shenker to be Jakks' agent regarding a perfumed doll product to be developed. At the same time, Berman advised Shenker that he and Friedman wanted Shenker's assistance in securing additional WWE licensing rights.

43.    Unknown to WWE at the time, Shenker was neither a reputable man nor successful licensing agent. As of the time Jakks began its efforts to compromise Shenker's loyalties, he was on the verge of personal bankruptcy and willing to abandon ethical and legal standards governing his duties as an agent for money. On December 29, 1995, Shenker filed for bankruptcy in federal court in New Jersey without disclosing to WWE that he had done so. In his bankruptcy petition, Shenker indicated he had no cash on hand; no income; that he was 100% owner of SSAI; that SSAI had no assets and no receivables; that he was over $70,000 in debt to unsecured creditors; and he had approximately $30,000 in secured indebtedness.

44.    On January 3, 1996, Jakks, with the knowledge of Berman and others at Jakks, transmitted by mail to Shenker a proposed agreement whereby Shenker would, in fact, act as Jakks' agent with respect to the perfumed doll product. In the covering letter transmitting the contract, Jakks continued to trade on the undisclosed conflict of interest it was creating by asking Shenker how soon he could get the domestic toy license with WWE amended to include additional rights.

45.     At no time did Jakks, Friedman, Berman, Bennett, SSAI or Shenker ever disclose to WWE that Jakks was paying Shenker and using him as its agent during the time it was soliciting Shenker to use his status as WWE's licensing agent to obtain additional and valuable licensing rights for Jakks from WWE.

46.     On or about January 3, 1996, Jakks, through Berman, and SSAI entered into a formal contract whereby SSAI agreed to act as Jakks' agent on the perfumed doll deal. In the contract, Jakks promised Shenker a $5,000 nonrefundable advance against future royalties and a percentage of sales of the future product.

47.     In or around the same time that Jakks and SSAI entered into a contract for Shenker to be Jakks' agent on the perfumed doll toy, Friedman and Berman told Shenker that Jakks desired to secure other rights from WWE in the future, including the WWE videogame license. Friedman and/or Berman told Shenker that they wanted him to be Jakks' agent specifically to assist it in acquiring WWE's videogame license notwithstanding that he was known to be an agent of WWE.

48.     On or about February 12, 1996, Jakks paid SSAI $2,500 in connection with Shenker's work as its agent on the perfumed doll deal. The check was drawn on Jakks' corporate account at Bank of America.

49.     The conversation discussing Jakks' desire to retain Shenker to act as its agent on WWE matters occurred two days later at the annual New York Toy Fair on February 14, 1996.

50.     During the conversation regarding Shenker serving as Jakks' agent on WWE matters at the same time he was WWE's agent, a call was placed by Friedman, Berman and Shenker to Mr. Murray Skala, Jakks' outside legal counsel, a member of the Board of Directors of Jakks, and Friedman's personal friend and confidant, regarding the proposed arrangement.

Mr. Skala advised all participants in the call that it would be a conflict of interest for Shenker to serve as Jakks' agent on WWE matters at the same time Shenker was acting as WWE's agent and that such an arrangement could not be done legally without first making full disclosure to WWE and obtaining their consent.

51.    Following the conversation with Jakks' corporate counsel on February 14, 1996, neither Friedman, Berman, Shenker, SSAI nor Jakks disclosed the conversation, or Shenker's then existing position as an agent for Jakks, to WWE nor sought its consent to the relationship or the inherent conflict of interest. On information and belief, all three men did not disclose the conversation, or the then-existing relationship between Jakks and Shenker, because they knew WWE would not agree to such an obvious conflict of interest.

52.    During the time period that Jakks was corrupting Shenker, competition in the toy industry was intense between companies seeking valuable intellectual property licenses such as WWE. By corrupting WWE's licensing agent, Jakks knew it could avoid fairly competing for intellectual property rights by trading on the conflicting loyalties of Shenker and SSAI, a business method it utilized and refined thereafter as set forth herein.

53.    Despite knowledge of the impropriety of trading on conflicts of interest, Friedman, Berman and Jakks continued to do so.

54.    Indeed, on February 14, 1996, the same date as the aforementioned conversation with Mr. Skala, Friedman and Berman nonetheless solicited Shenker to obtain additional rights for Jakks from WWE in connection with the domestic toy license to permit Jakks to license disposable cameras and photo albums, as well as European distribution rights for certain WWE figures.

55.    On March 15, 1996, Friedman again solicited Shenker to have the Jakks domestic toy license amended as Shenker had agreed to do.

56.    On or about April 22, 1996, upon SSAI's and Shenker's recommendation, a First Amendment to the domestic toy license was signed granting Jakks the additional rights sought by Jakks. In what would become a pattern, Shenker made no attempt to negotiate better terms for WWE and recommended the additional rights be given to Jakks on the terms offered by Jakks and without determining if competitors of Jakks would pay more for the rights. At no time did Jakks, Berman, Friedman, SSAI or Shenker disclose to WWE that Jakks had sought the rights through Shenker while at the same time paying him monies to be its agent.

### Jakks' Utilization of Shenker to Eliminate Competition

57.    Having utilized Shenker to secure rights for Jakks on its terms while serving as an undisclosed agent of Jakks, Jakks then utilized Shenker to perform additional and further corrupt acts in violation of his fiduciary duties to WWE and obligation of honest services to WWE.

58.    In 1996, Playmates Toys, Inc. ("Playmates") was one of the top three competitors of Jakks with respect to action figures, and the competitive environment among toy companies seeking intellectual property licenses was intense. Rather than compete fairly, Jakks utilized its undisclosed relationship with Shenker to drive competition out of the WWE toy market and prevent competition for the videogame license it so fervently desired.

59.    In or around June 1996, WWE entered into an agreement with Playmates granting to Playmates the right to use WWE intellectual property in connection with the sale of goods, including for use in connection with action figures from 8 inches and up in size and mini-figures from 2 inches and under. As such, Playmates would be manufacturing goods competing with those made by Jakks and in fact had the only right to make miniature toy figures of WWE talent.

60.    Under the terms of the agreement, Playmates guaranteed WWE $750,000 payable on a schedule set forth in the agreement, with $150,000 of the guarantee payable upon execution of the agreement. Playmates made the $150,000 payment on or about June 20, 1996.

61.    The agreement with Playmates further provided that Playmates would have a right of first negotiation/last refusal to manufacture licensed products for distribution in countries outside the United States, its territories and possessions, Mexico and the U.K. As such, Playmates stood to become the first licensee of action figures in international markets. Jakks had no such right of first negotiation/last refusal in its domestic toy license.

62.    Jakks' officers, including Friedman and Berman, did not want competition in the domestic marketplace from others licensed to make WWE action figures, and were concerned that Playmates might be the first to be given international rights. Jakks' officers expressed their dissatisfaction with Shenker that Playmates had been given such rights, and devised a plan in concert with SSAI and Shenker, again trading on their undisclosed agency relationship, whereby SSAI and Shenker would (a) take all actions desired by Jakks to foreclose competition in licensing areas desired by Jakks, including action figures and the videogame license; (b) obtain licensing rights for Jakks which, when granted, would facilitate Jakks' desire to drive Playmates out of the business of WWE action figures; (c) accept monies for favorable treatment on licensing matters involving Jakks which would be laundered through foreign subsidiaries of Jakks to a foreign bank account controlled by Shenker; and (d) pay Bell if need be for his participation in the illegal conduct.

63.    After learning of the Playmates deal with WWE, and to implement their illicit agreement, Berman, as Chief Operating Officer of Jakks Pacific, Inc., on stationery of Jakks (H.K.) Limited, directed two memoranda to Shenker on October 19, 1996. The intent and

purpose of both memos was to have Shenker utilize his influence as WWE's agent to obtain rights in practical conflict with the domestic rights previously granted to Playmates in order to make it impossible for Playmates to effectively exploit the rights it had been granted and to gain rights in international markets before Playmates did so.

64.     In the first of his October 19, 1996 memos to Shenker, Berman instructed Shenker to obtain modifications to the domestic toy license to grant rights to Jakks to make 3-inch action figures and 7-inch action figures, an action which would allow Jakks to sell miniature action toys in direct competition with Playmates.

65.     In a second memo to Shenker of October 19, 1996, Berman instructed Shenker to obtain international rights for Jakks for 6-inch action figures, 3-inch action figures, and 7-inch action figures.

66.     In both October 19, 1996 memos, Berman advised Shenker of the terms Jakks desired for the grant of such additional rights.

<u>Jakks Obtains Second Amendment to Toy License and an International Toy License</u>

67.     On January 21, 1997, and on SSAI's and Shenker's recommendation made on the basis of his illicit agreement with Jakks, a Second Amendment to the domestic toy license was executed in the manner sought by Berman in one of his October 19, 1996 memos.  The term of the license was also extended through December 31, 1999.  Despite the increase in rights being granted to Jakks, Shenker once again made no attempt to negotiate better terms than the terms Berman established in his October 19, 1996 communication to Shenker and simply recommended those terms to WWE.  Neither the conflict of interest created by Jakks nor the true purpose of the amendment was disclosed to WWE.

68.    On January 29, 1997, Jakks issued a press release announcing what it termed the expansion of the product line covered by the domestic toy license. The additional products noted in the release included the miniatures.

69.    Upon reading Jakks' press release, Playmates immediately expressed concern with Shenker.

70.    On January 30, 1997, Playmates directed a letter to Bell, with a copy to Shenker, regarding Jakks' press release of January 29, 1997 and questioned the good faith of WWE for granting rights to Jakks to effectively make the same product as Playmates. Playmates accused WWE of not acting in good faith to allow two competing companies to market such similar toy lines.

71.    On or about February 10, 1997, and on the recommendation of Shenker and SSAI, WWE and Jakks entered into an international toy license having a term which was to end on December 31, 1999. As had been done with the Second Amendment to the domestic toy license, the terms were those sought by Jakks, and Shenker made no attempt to negotiate better terms than the terms indicated by Berman in his October 19, 1996 communication to Shenker. Once again, neither the conflict of interest nor the true purpose of the recommendation to grant international rights to Jakks was disclosed to WWE.

### WWE Retains SSAI as Exclusive Outside Licensing Agent

72.    On March 7, 1997, WWE and SSAI entered into an agreement (the "Agency Agreement") pursuant to which SSAI became WWE's exclusive outside licensing agent.

73.    WWE entered into the Agency Agreement with SSAI without knowledge of the acute improprieties between Jakks and SSAI and Shenker which had occurred and were then occurring, all of which was concealed from WWE.

74.    The Agency Agreement provided that the services thereunder would be performed specifically and primarily by Shenker personally.  At the time it entered into the March 7, 1997 Agency Agreement with SSAI, WWE did not know that Shenker had been serving as Jakks' agent, did not know of the discussions between Jakks' executives and Shenker aimed at having him be Jakks' agent on WWE matters at the same time Jakks knew he was WWE's agent, and did not know of Shenker's illicit agreement with Jakks to act favorably on Jakks licensing matters.  WWE also did not know that Shenker had already secured two amendments to the domestic toy license and the international toy license for Jakks while serving as their undisclosed agent, and did not know of the dishonest purpose of Shenker's recommendations.

75.    Under the contract to be WWE's exclusive outside licensing agent, SSAI was responsible for, *inter alia*, procuring potential licensees and negotiating the terms of prospective licenses to obtain for WWE, *inter alia*, the most favorable terms existing in the market.  SSAI was not, however, granted any right to accept licensing proposals or to execute particular agreements on behalf of WWE.  Instead, SSAI was to present all licensing proposals it procured and negotiated in deal memo format to Bell, who in turn would recommend to WWE whether to accept the proposal.

76.    In recognition of the fiduciary duties owed WWE by SSAI and Shenker, the Agency Agreement provided that WWE had the right to terminate the Agency Agreement if SSAI or Shenker "engages in any act of fraud, theft, deceit, [or] unethical conduct."  The Agency Agreement further provided that if SSAI were terminated for such reasons that it would not be entitled to any further commissions.

77.    In consideration of the services rendered under the Agency Agreement, SSAI was to receive a commission of eleven percent (11%) of royalties and other consideration paid to

WWE with respect to licensing deals specifically negotiated and procured by SSAI which were accepted by WWE. SSAI was not to receive commissions on licensing deals procured and negotiated by Bell, who remained responsible to generate licensing deals using his own contacts and with prospective licensees who contacted WWE.

78.     Under the March 7, 1997 Agency Agreement, SSAI also was not entitled to commissions on royalties paid to WWE with respect to, *inter alia*, licenses granted by WWE prior to the commencement of the Agency Agreement. The licenses on which SSAI was not entitled to receive commissions were listed on an Exhibit A to the Agency Agreement. One such license on which SSAI was not entitled to receive commissions was WWE's preexisting videogame license with Acclaim. At the time SSAI entered into the March 7, 1997 Agency Agreement, Acclaim was WWE's exclusive licensee for the manufacture and sale of videogames utilizing WWE intellectual property.

The Continuation of the Scheme to Eliminate Playmates and Obtain the Videogame License

79.     In response to the complaints of Playmates made in January of 1997 over the conflicting grant of rights to Jakks, Shenker, after securing the March 7, 1997 Agency Agreement, continued his efforts to assist Jakks in driving Playmates out of the business of WWE action figures. Pursuant to his secretive plan with Jakks, Shenker advised Bell on April 25, 1997 that Jakks was a preferable licensee to Playmates and suggested to Bell that the solution to Playmates' complaints was to have "Jakks buy them out" and shut Playmates out of any promotions or assistance.

80.     In 1997, and while the Playmates dispute was ongoing, Bell realized that his marriage was in trouble and at various times thereafter expressed concern to Shenker of potential financial ruin. Shenker, pursuant to his illicit plan with Jakks, advised Bell that there was money

to be made by Bell for favorable treatment of the licensing rights being sought for Jakks by SSAI and Shenker, including with respect to the plan to eliminate competition by having Jakks buy out Playmates, and for favorable treatment to Jakks in connection with its desire to obtain the videogame license.

81.     In order to induce Bell to violate his fiduciary duties and duty of honest services, and in furtherance of his illicit agreement with Jakks to obtain favorable treatment of licensing matters involving Jakks, Shenker promised Bell that monies would be forthcoming originating directly from Jakks for such favorable treatment which he would split with Bell, and that SSAI would split commissions with Bell on the videogame license if Bell went along with the illegal plan to see to it that it was awarded to Jakks.

82.     In response, Bell agreed to the corrupt plan to give favorable treatment to Jakks on licensing matters and to violate his fiduciary duties and duty of honest services to WWE in order to do so.

83.     On November 6, 1997, and without disclosure to WWE of the illegal plan and scheme then in place, Bell advised Playmates that WWE would absolve Playmates of the obligation of its guarantee to WWE if Playmates would give up its rights in order that those rights could be transferred to Jakks. The effect of this proposal, which was accepted by Playmates, was to deny WWE $376,391.64 left to be paid by Playmates to WWE on their guarantee, as well as royalties over and above the guarantee.

84.     In order to obtain the funds needed to pay the bribes it had agreed to pay for favorable treatment on licensing matters, Jakks, through Friedman and/or Berman and/or Bennett, together with Shenker, devised a scheme to conceal the true purpose of the payments, as well as the fact of the payments, by the artifice of a phony invoice which would be paid by

Jakks' foreign subsidiaries to Shenker's foreign bank account in the name of Stanfull. A central

aspect of the scheme was that no records of the payments would exist on Jakks financial records

in America.

85.    At the direction of Defendants Friedman and/or Berman, and pursuant to their

illicit agreement, Shenker caused to be delivered a handwritten invoice from his foreign

corporation, Stanfull, to Jakks' corporate headquarters in California for $80,000 on or about

January 2, 1998. The cursory description contained on the invoice stated that Jakks was being

billed "For Development of Possible Latex Based Soft Toys with Special Coatings," was dated

January 2, 1998, and stated it was "Payable Immediately." On the invoice, Shenker directed that

the payment be made to Stanfull's account at the Hang Seng Bank in Hong Kong. A true and

correct copy of the invoice is attached hereto as Exhibit 1.

86.    The January 2, 1998 invoice was a false and fraudulent invoice, known to be by

all concerned, and was merely a conduit to secure corporate funds for Jakks to pay commercial

bribes and otherwise continue to buy influence with and further corrupt WWE's agents. No

contract existed between Jakks and Stanfull or Shenker for the development of latex based soft

toys, and neither Shenker nor Stanfull ever developed or delivered any such toys to Jakks

pursuant to the January 2, 1998 invoice. Aside from the invoice itself, there is not a shred of

backup or documentary evidence supporting the charges nor any other evidence of any kind

verifying that Shenker ever developed latex based soft toys for Jakks paid for by the invoice.

87.    Upon receipt of the January 2, 1998 invoice, Jakks did not record the invoice, nor

any of the ensuing steps it took to pay the invoice, on the financial books and records of the

American parent company to which the invoice had been delivered, even though the invoice

purported to be, and was, payable by Jakks and not one of its foreign subsidiaries.

88.    In January of 1998, the internal financial controls of Jakks known to and implemented by Bennett as the Chief Financial Officer required the corporate official authorizing payment of an invoice to sign and approve the invoice.

89.    The January 2, 1998 invoice of Stanfull was not signed by the corporate official authorizing payment in the first of many steps designed to conceal the personal involvement of Friedman and/or Berman in the scheme.

90.    In January 1998, after delivering the $80,000 invoice to Jakks, Shenker attended the Hong Kong Toy Show. While there, he met with Berman and further discussed their illegal plan to obtain favorable treatment on Jakks licensing matters, including Bell's agreement to participate in it.

91.    During the Hong Kong Toy Show in early January 1998, Berman and Shenker telephoned Bell to confirm Bell's participation in the illegal plan and to inquire as to when the rights owned by Playmates would be transferred to Jakks.

92.    Bell confirmed his participation in the illegal plan and that he would convince WWE management to transfer the rights formerly held by Playmates to Jakks.

93.    On January 12, 1998, on the recommendation of Shenker, SSAI and Bell, Linda McMahon, President and Chief Executive Officer of WWE, executed the Third Amendment to the domestic toy license granting to Jakks the rights formerly held by Playmates.

94.    On that same date, January 12, 1998, acting on the direction of Friedman and/or Berman, Bennett, the Chief Financial Officer of Jakks, rather than paying the invoice from available funds of the American parent corporation, advised an overseas agent of Jakks to arrange for the payment of $40,000 to Stanfull pursuant to the $80,000 invoice Shenker had delivered on January 2, 1998.

95.    On or about January 14, 1998, acting upon the direction of Bennett, $40,000 was, in fact, paid to Stanfull via a series of transactions undertaken with the intent to conceal the transactions and bury them in fraudulent accounting of foreign corporations owned by Jakks and bank accounts of those foreign subsidiaries.

96.    On January 14, 1998, $40,000 was withdrawn from an account at the Hang Seng Bank in Hong Kong of Road Champs Ltd. The $40,000 was deposited that same day into Stanfull's bank account at the Hang Seng Bank.

97.    On January 14, 1998, the same day that the Jakks monies were deposited into Stanfull's account, Shenker, acting in concert with Jakks to conceal the disposition of the monies, and with the intent of carrying out the plan to induce Bell to violate his fiduciary duties and duty of honest services, obtained a demand draft for $20,000 payable to James Bell from the Hang Seng Bank, which he subsequently gave to Bell upon returning to the United States, thereby splitting the money from Jakks equally with Bell.

98.    At or around the same time Road Champs Ltd. paid the $40,000 to Stanfull, another foreign subsidiary owned and/or controlled by Jakks known as Jakks Pacific (H.K.) sent $40,000 by wire-transfer to Road Champs Ltd. to reimburse Road Champs Ltd. for the $40,000 paid to Stanfull.

99.    The general ledgers of Road Champs Ltd. were then falsified to conceal completely the payment to Stanfull. Instead of recording the payment to Stanfull on the general ledger of Road Champs Ltd., the accounting entries made it appear as if the transaction was simply the intercorporate transfer of monies from Jakks Pacific (H.K.) to Road Champs Ltd., with no mention made on the ledger of the payment to Stanfull.

### Shenker Returns from Hong Kong to Secure the Videogame License

100.    Upon Shenker's return to the United States and after Jakks had made its initial payments to Shenker and Bell in mid-January 1998, Berman, Shenker and Bell met at the annual New York Toy Fair in or around February 1998.

101.    At the New York Toy Fair of 1998, all three men discussed the WWE videogame license, the status of renewal negotiations on that license with Acclaim, and the plan to secure those rights to Jakks. When Bell inquired as to how Jakks would perform a videogame license, Shenker reminded Bell that Jakks had helped them both out and that the "favor" needed to be returned.

102.    At that time, Bell was in charge of discussing the possible renewal of the videogame license with Acclaim since it was the existing licensee. If the Acclaim license were renewed, SSAI would not receive any commission.

103.    In early 1998, competition for desirable character and product licenses remained intense, with entities such as Jakks and THQ having to pay increasingly higher royalties in order to secure the intellectual property rights from prospective licensors.

104.    In order to implement that aspect of the illegal conduct involving the videogame license, it was agreed and understood by Jakks, Shenker and Bell that Bell would act against renewing the existing videogame license with Acclaim; that neither Bell nor Shenker would discharge their fiduciary duties and duty of honest services to WWE by soliciting bids from other companies who would be interested in securing the videogame license; and that both Bell and Shenker would recommend that the videogame license be granted to Jakks on rates well below market value without ever seeking any competitive bids from any other videogame companies.

105.    After receiving his share of the initial $40,000 payment from Jakks for dishonest services, and without WWE's knowledge or consent or prior approval, Bell formed Bell

Consulting, LLC on March 6, 1998, now known as Bell Licensing, as a for-profit organization and served as its President. At no time during his employment with WWE did Bell ever disclose to WWE either the formation or existence of Bell Licensing or Bell's role as Bell Licensing's President.

106. Bell formed Bell Consulting during the time the videogame licensee was ostensibly being selected in order to serve as a vehicle for the receipt of illegal bribes and kickbacks he had received and expected to receive from Jakks and Shenker, the first of which was the $20,000 in monies originating with Jakks laundered through the Hang Seng Bank on January 14, 1998, and the next of which he knew he would receive upon formally recommending to WWE that Jakks be awarded the videogame license.

107. Following receipt of the $20,000 from Stanfull on or about January 14, 1998 of monies originating with Jakks' foreign subsidiaries in the aforementioned series of transactions and the conversations at the 1998 New York Toy Fair, Bell utilized his influence to steer WWE away from even considering the renewal of Acclaim as the videogame licensee. Prior to the payment of the aforementioned bribe by Jakks, Bell had advised Acclaim that there would be no problem with the renewal of its existing license.

108. After receiving the aforementioned $40,000 from Jakks in January 1998, and in violation of their fiduciary duties and duty of honest services, neither Shenker nor Bell contacted any other potential bidders for the videogame license to solicit bids before making a recommendation to WWE management.

109. Instead, on March 25, 1998, Bell advised Acclaim that he would not even listen to any proposal that Acclaim would make for the renewal of its license. After Acclaim went over

Bell's head and complained to senior management at WWE that it was not being permitted to submit a renewal proposal, Acclaim was told it could do so.

110. Before Acclaim's formal proposal was ever received, however, and without Shenker or Bell ever soliciting bids from any other videogame companies, Bell initialed a deal memo on March 30, 1998 recommending to senior management at WWE that the videogame license be awarded to "Jakks Pacific-Electronic Game Division" and indicated it was for a "new videogame division of Jakks Pacific." The deal memo listed SSAI as the agent who had negotiated and procured the deal. The terms recommended by Shenker and Bell without even attempting to secure any other bids were well below then prevailing market rates for a videogame license of the quality of WWE.

111. On March 31, 1998, the day after Bell had initialed the deal memo recommending that the videogame license be awarded to Jakks, Defendant Bennett again directed Mr. Wills Hon to use Jakks' foreign subsidiaries to pay another $40,000 to Stanfull. Bennett advised Mr. Hon on the day after Bell had recommended to WWE management that it grant the videogame license to Jakks that it was "imperative" that the funds be available to Stanfull not later than April 2, 1998.

112. On or about April 2, 1998, and at the direction of Friedman and/or Berman, Jakks Pacific (H.K.), a foreign subsidiary of Jakks acting on Bennett's instructions, wire-transferred another $40,000 into Stanfull's account at the Hang Seng Bank in Hong Kong.

113. On or about April 7, 1998, as he had done following the first $40,000 payment from Jakks, Shenker once again split the money from Jakks with Bell by obtaining a demand draft from the Hang Seng Bank for $20,000 payable to Bell Consulting, LLC.

114.    On April 8, 1998, WWE management approved the deal memo submitted by Bell and SSAI to grant the videogame license to Jakks.  At that time, WWE was not aware of any of the aforementioned payments to Shenker or Bell by Jakks.  Notwithstanding the internal approval of the Jakks deal memo, WWE remained legally free to accept other superior offers until such time as a definitive licensing agreement was executed.

115.    On or about April 15, 1998, principally based on Bell's influence, direction and advice, WWE advised Acclaim that it did not intend to renew Acclaim's videogame license.

116.    The actions of SSAI, Shenker and Bell described above relating to the videogame license were in violation of their fiduciary duties and duty of honest services, and were in direct response to being paid commercial bribes.  SSAI, Shenker and Bell recommended to WWE management that the videogame license be given to Jakks before even seeking or obtaining any proposals from any other videogame companies interested in independently securing the license.

117.    Following Bell's and SSAI's recommendation that the videogame license be given to Jakks, a series of events occurred which threatened to expose the illegal plan to obtain the videogame license at below-market rates by the corruption of WWE's agents.

### THQ's Desperate Condition

118.    In the years preceding 1998, THQ had a videogame license with WWE's principal competitor at the time, World Championship Wrestling, Inc. ("WCW").

119.    As a company, THQ's profitability as it entered calendar year 1998 was heavily dependent upon the WCW videogame license.  In fiscal year 1997, the WCW license accounted for 39% of THQ's sales.

120. THQ's videogame license with WCW was scheduled to expire, however, on December 29, 1998. If the WCW license was not renewed, THQ would lose what had become the principal economic driver of the company.

121. On March 3, 1998, Farrell, the President and Chief Executive Officer of THQ, sold 40,000 shares of THQ stock for $1,160,000.

122. On March 10, 1998, seven days after Farrell sold the aforementioned stock, THQ announced publicly that WCW had determined not to renew its license with THQ, and at the same time disclosed that WCW videogames accounted for 39% of its sales in 1997. In reality, as THQ and Farrell then knew in March of 1998, THQ's economic dependence on revenues associated with its WCW wrestling themed videogames had become almost complete during THQ's first fiscal quarter in 1998. Sales of WCW videogames accounted for 87% of the net sales of THQ in the first quarter of 1998.

123. THQ's stock tumbled 25% the day after it announced the loss of the WCW license on March 10, 1998. Thereafter, the Securities and Exchange Commission commenced an informal inquiry relating to trading by directors and officers of THQ prior to the public announcement that THQ had lost the WCW videogame license.

124. At the time, Defendant Farrell attempted to finesse the problems associated with the loss of the WCW license by stating publicly that nothing prevented THQ from making wrestling videogames using either another licensor or fictitious characters.

125. As a result of the foregoing factors, THQ and Farrell became desperate in March 1998 to secure the rights to produce wrestling videogames to replace its primary source of income which would be lost upon expiration of the WCW license.

126.    Farrell and THQ therefore decided to seek a videogame license from WWE to do so.

### Activision and THQ Emerge as Potential Bidders for Videogame License

127.    Shortly before THQ approached WWE to attempt to secure a videogame license from WWE, however, another competitor who had not been approached and asked to bid by Shenker or Bell due to their illicit agreement with Jakks emerged and expressed interest in securing the license—Activision.

128.    On April 7, 1998, just days after Shenker and Bell had recommended the videogame license be awarded to Jakks on terms well below-market rates, the chairman of Activision wrote to Bell advising that Activision was prepared to move promptly to secure the rights and indicated that Activision's financial strength would allow them to offer the most competitive financial terms.

129.    On April 16, 1998, and pursuant to an initiative undertaken by THQ, representatives of THQ, including Farrell, met with Bell and Shenker for the first time. On information and belief, both Bell and Shenker tried to steer THQ away from seeking the videogame license or even making a proposal for it, telling THQ that it should consider making a proposal instead for arcade games and personal computers. Shenker and Bell did so in order to effectuate their illicit agreement with Jakks and in order to prevent competing bids from ever being made.

130.    On April 17, 1998, the day after first meeting with THQ, Shenker met for the first time with Activision regarding the WWE videogame license. During the meeting, and in the hope Activision would be dissuaded from bidding, Shenker refused to give Activision any terms for a prospective license.

131.  On April 23, 1998, THQ directed a letter signed by Farrell to both Bell and Shenker expressing THQ's continuing desire to obtain the videogame license notwithstanding Shenker's and Bell's attempts to dissuade THQ from bidding. THQ indicated it would be willing to enter into a nonexclusive multi-year license with guarantees of several million dollars, competitive royalty rates, significant marketing commitments, and stock purchase warrants. The terms roughly outlined in THQ's letter were clearly superior to the deal with Jakks which Bell and SSAI had already recommended to WWE management and which had been approved based on their recommendation.

132.  On April 27, 1998, Activision sent an initial informal proposal to SSAI for the videogame license with WWE. The Activision informal proposal was only an opening offer but was still clearly superior to the terms offered by Jakks which had already been recommended by SSAI and Bell to WWE. Activision's initial informal proposal included a higher guaranteed royalty than the Jakks proposal and included stock options in Activision.

133.  On information and belief, the expression of interest from two competitors of Jakks for the videogame license jeopardized Jakks' illicit plan to obtain valuable licensing rights at below-market rates by corrupting Shenker and Bell since questions would be raised if WWE went forward with the Jakks proposed license and later learned that WWE agents, SSAI and Bell, had been told that clearly superior offers from THQ and Activision would be forthcoming.

134.  In order to conceal the illicit plan and see it to fruition, SSAI and Bell did not provide WWE management with copies of the April 23, 1998 letter from THQ or the April 27, 1998 Activision informal proposal.

135.  On information and belief, Shenker and/or Bell instead advised Jakks, through Friedman and/or Berman, of the terms of the two competing proposals, specifically Activision's

initial informal proposal and the terms set forth in THQ's April 23, 1998 letter. Shenker and/or

Bell also advised Jakks of the need to do something so as to avoid detection of the illicit plan.

<u>THQ Joins the Conspiracy to Secure the Videogame License</u>

136.    Jakks, through Friedman and/or Berman and/or Bennett, then engaged in further

and additional illegal conduct in order to deal with the threat of competition presented by the

undesired emergence of THQ and Activision as potential bidders for the videogame license.

137.    In direct response to the threat of competition, and in order to maintain control

over the videogame licensing process it had acquired by the corruption of WWE licensing

agents, Jakks, through Friedman and its other officers, secured the agreement of THQ, through

Farrell and other high ranking executives, not to make an independent bid to secure the

videogame license in its own right, as THQ had indicated it wanted to do and had every business

reason to do so. Instead, Friedman told Farrell that Jakks was in control of the videogame

license; had access to the terms Activision had informally proposed; and that THQ could

participate in the revenue stream from the videogame license at a lower-than-market royalty rate

if THQ did not independently bid but instead joined with Jakks to make a proposal which would

appear competitive to Activision's initial informal proposal.

138.    Jakks, through Friedman, further advised Farrell that certain considerations would

have to be paid to Jakks and agreed to by THQ in exchange for Jakks' inclusion of THQ in the

anticipated revenue stream associated with the WWE videogame license. Monies and

consideration which otherwise could have, and would have, been offered to WWE by THQ in an

independent, competitive process would have to be paid to Jakks instead.

139.    At the time, THQ had never before joined with Jakks to bid on a videogame

license, and THQ did not need Jakks to formulate or make a proposal for a videogame license.

THQ was completely able in its own right to perform a videogame license with WWE without any involvement by Jakks and had every legitimate business reason to do so given the circumstances existing at the time and had already told WWE it desired to do so.

140.   Farrell, and THQ, knew full well that Jakks was not even in the videogame business at that time; that Friedman had been effectively removed from the videogame business by THQ itself when his services at THQ were terminated years before; that no legitimate reason existed for Jakks to be discussing with THQ the terms by which THQ would gain rights in WWE's intellectual property; that WWE had licensing agents who were to be negotiating the license on behalf of WWE; and that the information being conveyed by Jakks was at odds with what Shenker and Bell had stated in their meeting with THQ on April 16, 1998.

141.   Despite Farrell's and THQ's knowledge of the improprieties involved in Jakks' role, and the impropriety associated with agreeing not to independently bid, Farrell, on behalf of THQ, never called WWE senior management or otherwise took action to alert WWE regarding the obvious irregularities in the bidding process known to him.  Instead, he agreed on behalf of THQ not to submit an independent bid but rather to accept the terms insisted upon by Jakks, including the royalty rates to be offered to WWE.

142.   After being contacted by Jakks and urged not to independently bid on the videogame license, neither THQ nor Farrell ever negotiated with WWE or its known authorized representatives regarding its previously stated desire to secure the videogame license for THQ independently.  Instead, it conducted all negotiations with its competitor, Jakks, regarding the WWE videogame license.

143.   Farrell and THQ either knew of, or were recklessly indifferent toward, the unlawful activity set forth herein but agreed to the illegal plan because they were desperate in

light of the loss of the WCW license and because the terms offered by Jakks to THQ to rig the bids, allocate the license among the conspirators, and fix the price to be offered WWE for its intellectual property were well below the then prevailing rates THQ would otherwise have had to pay to secure a license of the quality of the WWE videogame license. Farrell and THQ knew that THQ would benefit directly and substantially from the unlawful activity.

144.    Pursuant to its agreement with Jakks, THQ did not thereafter submit an independent proposal for the WWE videogame license.

145.    Utilizing the confidential information regarding Activision's initial informal proposal which Shenker and/or Bell had provided to Friedman and/or Berman, Jakks and THQ instead devised a proposal designed only to be comparable to Activision's initial informal proposal. On behalf of Jakks and THQ, Friedman thereafter conveyed the terms of the collusive bid to Shenker, who simply wrote down the collusive terms in a proposed deal memo and made no attempt to negotiate better or more substantial terms.

146.    On or about May 7, 1998, Shenker prepared a deal memo reflecting the terms provided to him by Friedman as a result of the collusion between Jakks and THQ. The deal memo indicated that the licensee would be "Jakks/THQ LLC" and listed SSAI as the procuring agent.

147.    SSAI, Shenker and Bell agreed to the corrupt scheme of Jakks and THQ knowing that Jakks would receive monies over the length of the license which otherwise would have been offered and paid to WWE in a true competitive bidding situation, and agreed to take all action necessary to recommend to WWE management that the videogame license be awarded to Jakks and THQ instead of the only remaining candidate for the license, Activision.

148.    Although the terms of Activision's initial informal proposal were provided to Friedman and/or Berman by Shenker and/or Bell and used by Jakks and THQ in formulating their collusive bid, and as an essential part of the conspiracy to foreclose competition, rig the bids, allocate the license to THQ and Jakks, and fix the price to be offered to WWE for the license, Shenker or Bell did not request Activision to increase its initial proposal after receiving the collusive bid of THQ and Jakks. On information and belief, Activision would have improved the terms offered to WWE if it had been permitted to participate in negotiations or bona fide biddings.

149.    As a result of the unlawful conspiracy, Jakks and THQ proposed, and SSAI, Shenker and Bell agreed to recommend to WWE, that the videogame license be of the extraordinary length of ten years with a five-year right of renewal to be vested in Jakks and THQ.

150.    A licensor of intellectual property, such as WWE with respect to the videogame license, typically receives royalties on the net sales from the licensees once each financial quarter. All Defendants knew that WWE would receive, for at least forty and potentially sixty fiscal quarters thereafter, below-market royalties and that Jakks would receive from THQ for that same period monies improperly diverted from WWE, as a result of the unlawful conduct described herein.

151.    By recommending a license of extraordinary length and advising WWE that SSAI had procured and negotiated the license, SSAI, Shenker and Bell also stood personally to make millions of dollars in illegal profits at the expense of their principal, WWE, as a result of the corrupt plan to give Jakks control of the license. By doing so, Shenker and Bell generated a commission stream to SSAI to split equally with Bell for at least ten and potentially fifteen years.

Under the terms of the bribe offered to Bell by Shenker, while acting on behalf of SSAI and as an agent of Jakks, both Shenker and Bell would split commissions each financial quarter for ten and possibly fifteen years in amounts ultimately dependent on sales.

152.    On May 12, 1998, Bell initialed his approval on the May 7, 1998 deal memo and submitted the deal memo to management of WWE, thereby recommending that WWE grant the license to Jakks and THQ.

153.    Late in the day of May 12, 1998, Activision also sent a more formalized version of their initial informal proposal to Shenker. Consistent with their scheme, neither Bell nor SSAI nor Shenker ever sent the formal Activision proposal of May 12, 1998 to WWE management, and neither contacted Activision to request that Activision increase its bid before recommending the Jakks/THQ deal to WWE management. On information and belief, the version of Activision's proposal still represented only an initial proposal and understated the amount Activision would have been willing to pay to obtain the videogame license.

154.    On June 10, 1998, THQ and Jakks caused to be filed a Certificate of Formation in Delaware forming THQ/Jakks Pacific LLC. On that same date, Farrell, as President and Chief Executive Officer of THQ/Jakks, signed the videogame license agreement with WWE on behalf of THQ/Jakks.

155.    THQ stock surged on news that it had obtained rights in a WWE videogame license with a trading volume more than three times its average.

156.    At all times relevant hereto, Jakks, THQ, and the highest ranking officers of each company knew that the THQ/Jakks LLC formed to be the ostensible signatory for the videogame license was a sham necessary to implement the scheme. By establishing a sham LLC to be the

nominal contracting party, Jakks and THQ hoped to create legal limitations on WWE's ability to seek redress against Jakks and THQ if the unlawful conduct were ever discovered by WWE.

157.    On June 23, 1998, WWE executed a videogame license agreement with THQ/Jakks effective as of June 10, 1998 (the "videogame license"). The term of the license was to end on December 31, 2009, subject to the right to renew for an additional five years in favor of THQ/Jakks.

158.    Both Jakks and THQ have held themselves out to the public and their respective shareholders as being in a "joint venture" or "partnership" with each other with respect to the WWE videogame license and have claimed that it was "jointly obtained." The "partnership" or "joint venture," however, had no legitimate business purpose and was merely intended to effectuate the bid-rigging and license-allocation scheme.

159.    In public announcements in the months following execution of the videogame license, both Jakks and THQ stated that they would share the profits of the videogame license equally.

160.    During the same period it had engaged in the illegal conduct with Jakks to obtain rights in the WWE videogame license, THQ anticipated that royalty rates paid to licensors would range between 19%-22% throughout 1998 in competitive situations untainted by collusion.

161.    In 1998, it was THQ's practice to pay the higher royalties to licensors with proven popularity. WWE was such a licensor and consistently has been one of the highest revenue producers in THQ's licensing portfolio.

162.    Under the terms of the license agreement with WWE resulting from the illegal conduct set forth herein, however, WWE was only promised royalties between 7%-8% for games

on Nintendo 64; Sony PSX and Sega Katana platforms; 6% on Nintendo Game Boy; and 10% on PC videogames.

163.    The royalty rates in fact promised to WWE were between 50%-66% lower than what THQ had paid, expected to pay during the relevant time period in 1998, and would have paid, in a truly competitive situation. Over the term of the license, the damages to WWE associated with being paid a below-market rate due to collusion instead of the free market rate exceeds hundreds of millions of dollars in revenues denied WWE.

164.    Another result of the illegal conduct orchestrated by the highest ranking executives of both Jakks and THQ was that millions of dollars would be paid by THQ to Jakks for its illegal conduct in securing and sharing the revenues from the videogame license with THQ instead of being offered to WWE, the true owner of the intellectual property. The monies diverted to Jakks from WWE were a direct result, and indeed the whole point, of the illegal activities set forth herein insofar as Jakks was concerned. THQ, conversely, obtained rights in one of the more lucrative videogame licenses at rates well below what THQ had paid for inferior licenses, and would have paid, in a competitive environment untainted by the multifaceted illegal conduct.

Extension of Toy License

165.    As another central aspect of the corruption of SSAI, Shenker and Bell, which Jakks had obtained as a result of the aforementioned illegal conduct, Jakks requested, and SSAI, Shenker and Bell agreed to recommend, lengthy extensions to the two toy licenses to make the terms of the licenses coincide with the term of the videogame license. By agreements dated June 24, 1998, the domestic and international toy licenses between WWE and Jakks were

amended to make the toy licenses coterminous with the videogame license as a necessary and essential part of the commercial bribery scheme.

Additional Payments Related to the Videogame License

166.    On information and belief, on or about June 30, 1998, one week after the videogame license was executed, THQ awarded Friedman 230,850 shares of THQ stock worth millions of dollars. On information and belief, the award of stock was payment by THQ to Friedman for his role in the improper and illegal conduct described herein that resulted in the videogame license being awarded to THQ/Jakks.

167.    On July 15, 1998, after the aforementioned licensing rights had been secured, Shenker caused another phony invoice to be delivered to Jakks' corporate headquarters in Malibu, California for $20,000 with a false and fraudulent description for the charges. The fraudulent invoice dated July 15, 1998 was sent to the attention of Berman. As he had done before, and at the direction of Friedman and/or Berman, Bennett directed an overseas agent of a Jakks' foreign subsidiary to make the payment.

168.    On August 3, 1998, Bennett was advised by an overseas agent of a Jakks' subsidiary that arrangements had been made as instructed for $20,000 to be paid to Stanfull. The payment, once again, was made by Road Champs Ltd. to Stanfull's account at the Hang Seng Bank.

169.    On October 8, 1998, Bell Licensing invoiced Stanfull for the $20,000. On October 8, 1998, Shenker caused the invoice to be paid to Bell Licensing on funds drawn from SSAI's account.

170.    The payment of $20,000 on August 4, 1998 to Stanfull was a further and additional payment of a bribe paid to Shenker, and then to Bell by Shenker, for their roles in the illegal conduct and the abandonment of fiduciary duties and honest services owed WWE.

### Defendants' Non-Disclosure

171.    At no time during the negotiation of the videogame license or the amendments to the toy licenses did any of the Defendants disclose the existence of the scheme to corrupt WWE's agents or the bribery scheme or the series of payments made by Jakks through foreign subsidiaries to Stanfull and to Bell.

172.    At no time during the negotiation of the videogame license did any of the Defendants disclose the existence of the bid rigging and market allocation scheme.

### Jakks and THQ Divide the Proceeds from the Illegally Obtained Videogame License

173.    Pursuant to the terms of the videogame license, THQ/Jakks was not authorized to ship any licensed products prior to the fourth quarter of 1999.

174.    After the videogame license was secured on June 10, 1998 as a result of the illegal conduct set forth herein, Jakks and THQ, through their highest ranking officers, utilized the time between execution of the license and the date they were authorized to first ship WWE products to establish how the proceeds of their illegal conduct would ultimately be divided among them, just as Shenker and Bell had done.

175.    Through agreements entered into before the first product was shipped in the fourth quarter of 1999, the true nature of the illicit arrangement was fleshed out in agreements between THQ and Jakks.

176.    On information and belief, the arrangements made between Jakks and THQ from June 10, 1998 through at least October 25, 1999 involved the highest ranking executives of both

companies, including the individual Defendants herein, and also involved numerous uses of the mails and wires, the full extent of which is known only to THQ, Jakks, and/or THQ/Jakks, the entities who have exclusive possession and control of that evidence.

177.    As a result of discussions involving the highest ranking officers of THQ and Jakks, by October 25, 1999, the month before they were authorized to ship products under the license, THQ and Jakks had entered into operating agreements relevant to the videogame license defining the true nature of their relationship and which served to define the manner in which the proceeds of their illegal conduct, including bribery, would be distributed.

178.    In the essential terms agreed upon by Jakks and THQ by at least October 25, 1999, THQ agreed to be responsible for funding all operations incidental to the WWE videogame license, including specifically all payments to WWE.  THQ also agreed to be exclusively responsible for development, manufacturing, distribution and sales of all WWE videogames, and for the day-to-day operations incidental to performing the videogame license.

179.    In consideration of Jakks' illicit role in obtaining the WWE's videogame license, THQ also agreed, and in fact guaranteed, that Jakks would be paid a "preferred return" quarterly equal to the greater of a specified dollar amount or specified percentages of the net sales of WWE videogames in amounts that varied based on platform.

180.    In other terms agreed to by THQ and insisted upon by Jakks to ensure that THQ did not disclose to WWE the facts and circumstances surrounding the issuance of the videogame license, THQ and Jakks agreed that Jakks would be the sole contact with WWE and that THQ would never initiate contact with WWE nor disclose the facts and circumstances surrounding the issuance of the videogame license known to it.

181.   As a result of the agreements negotiated between THQ and Jakks prior to the shipment of any WWE videogames, all financial risk to Jakks was eliminated and the videogame license became nothing but a guaranteed revenue stream to Jakks.

182.   As a direct result of the scheme to defraud WWE out of monies it was entitled to receive for the exploitation of its intellectual property, Jakks, which neither owns the intellectual property nor performs the videogame license, has been paid substantially more by THQ than WWE has been paid on the videogame license.

183.   In 1999, WWE was paid nothing by THQ, Jakks, or THQ/Jakks on the videogame license.  By contrast, THQ paid Jakks over $6,000,000 in 1999 related to the illicit deals between them relating to the videogame license.  The exact dates of these payments, which on information and belief utilized the mails and/or wires, are known to Jakks, THQ, THQ/Jakks and the individual defendants employed by Jakks and THQ.

184.   Through the year ended December 31, 2004, WWE has been paid approximately $54,000,000 in royalties by THQ on the videogame license.  Jakks, through the same period, was paid approximately $64,000,000 by THQ as a result of the illegal conduct set forth herein.

185.   THQ/Jakks has never performed any aspect of the videogame license.  From the first shipment of WWE product to today, the videogame license has been performed by THQ.

### The Coverup and Fraudulent Concealment

186.   Following the corruption of Shenker and Bell and the inducement to breach their fiduciary duties and duty of honest services in connection with the licensing rights being sought by Jakks, Shenker and Bell split commissions on other licensing deals recommended by SSAI and approved by Bell and/or assigned to SSAI by Bell.  All the illegal activity was affirmatively concealed from WWE by SSAI, Shenker and Bell.

187.   On March 24, 2000, WWE terminated Bell's employment with WWE for reasons unrelated to Bell's receipt of bribes and kickbacks, none of which were known to WWE at the time.

188.   Consistent with its practice of inducing Shenker to believe monies would be forthcoming from Jakks, on or about June 9, 2000, Jakks, through Berman, entered into an "Exclusive Agency Agreement" with SSAI to serve as the exclusive official licensing agent of Road Champs Ltd., promising SSAI 25% of all compensation actually received by Road Champs Ltd. and Jakks. This agreement, like all others, was not disclosed to WWE at the time.

189.   On June 13, 2000, WWE terminated the contract of SSAI pursuant to a provision which entitled it to do so for a change in business direction.

190.   In October of 2000, SSAI brought an action against WWE for breach of contract in Connecticut state court seeking to be paid commissions on licenses SSAI had allegedly procured, including the toy and videogame licenses (the "Shenker litigation").

191.   At various times following the initiation of the Shenker litigation, Shenker, Bell, Friedman, Berman and Bennett, individually and as agents of the corporations they each own, control, and/or operate, have acted in concert to conceal the illegal conduct, including the bribes. All involved first concealed and denied the fact of payments to Stanfull and the use of foreign accounts to do so. After WWE eventually learned about the payments during discovery in the Shenker litigation, the Defendants directly involved in the payments gave false and inconsistent explanations for the payments, none of which are corroborated by any evidence.

192.   In an early attempt to make sure the payments were never discovered in the Shenker litigation, Friedman telephoned Linda McMahon, the Chief Executive Officer of WWE,

and made an unsolicited offer during the early phase of the Shenker litigation to use his good graces with Shenker to broker a settlement of the Shenker litigation. WWE declined his offer.

193.    In the early phases of the Shenker litigation, Bell and Shenker acted in concert and destroyed invoices Bell had sent to Shenker for the bribes he had been promised to abandon his fiduciary duties to WWE. Bell and Shenker also destroyed contracts they had related to the bribery payments at issue herein.

194.    As a further part of the concealment, Shenker committed perjury and failed to disclose the existence of Stanfull when asked if he owned any corporations other than SSAI. Shenker committed perjury in order to conceal the payments originating with Jakks made to Stanfull's foreign bank account.

195.    To further the coverup and conceal their criminal conduct, Shenker and Bell both perjured themselves in the Shenker litigation and testified that neither SSAI nor Shenker had made any payments to Bell relating to WWE licenses. In actual fact, Shenker had made directly, or via money laundered through foreign accounts he controlled, payments in excess of $1,000,000 to Bell and/or Bell Licensing as commercial bribes, including payments of hundreds of thousands of dollars of bribes paid in connection with the agreement to give favorable treatment to Jakks' licensing matters.

196.    During the same time Shenker and Bell were obstructing justice as set forth above, THQ and Jakks both represented that no payments had been made to Stanfull, SSAI, Shenker and/or Bell. In response to repeated requests by WWE, all uniformly denied making any payments to Stanfull, SSAI, Shenker and/or Bell.

197.    By subpoena dated June 11, 2002, Jakks was ordered to produce a variety of records relating to its dealings with Shenker and Bell, including all documents relating to any

agreements between Jakks and Shenker and/or SSAI and all documents relating to any payments made to SSAI and/or Shenker.

198.    Jakks' production of records in response to the subpoena was done by letter dated October 30, 2002. Jakks concealed and did not produce either the $80,000 or the $20,000 invoice it paid to Stanfull in 1998 or any other documentation indicating such payments had been made. Jakks also concealed, and did not produce, documents which demonstrated Shenker had acted as their agent. Jakks' response to the subpoena gave no indication that monies had, in fact, ever been paid to Shenker.

199.    In order to police Jakks' compliance with the license, WWE exercised its right to audit the books and records of Jakks in early 2003.

200.    On January 14, 2003, WWE's auditors requested, in writing, that Jakks provide the auditors with a complete listing of all payments made by Jakks to Shenker, SSAI, Bell and/or Stanfull.

201.    On January 17, 2003, Jakks provided yet another false and misleading response to the auditors' request of January 14, 2003 by stating that they had already "provided any documents that may exist" in response to the June 11, 2002 subpoena. As Jakks knew, it had not produced any documents evidencing payments to Shenker, SSAI or Stanfull in response to the June 11, 2002 subpoena even though such records existed. Bennett received a copy of Jakks' false response to WWE's auditors and did nothing to correct it despite his knowledge of the payments at issue, all of which he had personally directed and orchestrated.

202.    By email dated February 25, 2003, WWE's auditors responded to Jakks' January 17, 2003 misleading response by pointing out that Jakks had not provided any documents related to payments to Shenker, SSAI or Stanfull in response to the June 11, 2002

subpoena and again asked for copies of all invoices or a description of each transaction whereby payments were made by Jakks to Shenker, SSAI and/or Stanfull.

203. On February 25, 2003, in an email response from employees working under the direct supervision of Bennett, Jakks did not respond and disclose the payments but instead advised that the request had been forwarded to their attorneys, who would advise shortly.

204. By March 14, 2003, no response had been received from Jakks' attorneys to the request for disclosure of payments to SSAI, Shenker and Stanfull. By letter dated March 14, 2003 sent to Jakks' corporate counsel, Mr. Murray Skala, WWE again requested an answer to the question of whether payments had been made to Shenker, SSAI and Stanfull.

205. On March 19, 2003, Jakks, through its counsel, continued the practice of providing false and misleading information. By letter of that date, Jakks' counsel reiterated the false theme that "the specific information requested was provided months ago" in response to the subpoena. Such statements were false and known by Jakks to be false, as Jakks had not provided any information on the payments made to Shenker via Stanfull in 1998.

206. On March 25, 2003, WWE once again informed Jakks, through its counsel, that the specific information requested had not been provided and again requested specific disclosure.

207. On March 26, 2003, Jakks' counsel acknowledged that the documents provided in response to the June 2002 subpoena did not include documents reflecting payments to Shenker, SSAI or Stanfull, and then represented "there simply is no additional information of the type you seek." Like all previous statements by Jakks, that statement was false. Jakks had numerous documents evidencing the payments to Stanfull buried in the records of foreign subsidiaries.

208. Jakks' repeated refusals to disclose documents showing the complete nature of its relationship to Shenker or the payments to Stanfull in 1998 were deliberate, in bad faith, and part

of a plan to fraudulently conceal the illegal conduct and commercial bribery set forth herein at all costs. The relationship between Shenker and Jakks, and the payments made to Stanfull, were known to and orchestrated by the highest-ranking executives of Jakks, at least one of whom serves in an executive capacity for Jakks/THQ. Instead of disclosing the relationships with Shenker or the payments, Jakks repeatedly provided false and misleading information to the effect that no such payments had been made and responses which failed to disclose the true nature of the relationship between Jakks and Shenker.

209.    In the Shenker litigation, SSAI, Shenker and Bell also acted in concert to conceal both the existence and extent of the unlawful conduct surrounding the videogame license and amendments to the toy licenses including, but not limited to, the bribes and did so during the same time that Jakks, THQ, and Jakks/THQ were concealing the payments to Stanfull which Jakks had made via foreign subsidiaries. Bell and Shenker both initially denied that any payments had been made to Bell by Shenker. SSAI and Shenker also denied receiving any money from licensees of WWE. When discovery indicated that payments had been made to Bell by Shenker, both falsely claimed the payments were for "developmental projects" unrelated to WWE. As part of their scheme to conceal their illegal conduct, Bell and Shenker created and then produced in discovery numerous fabricated invoices relating to payments from SSAI and/or Shenker to Bell, and destroyed the true invoices reflecting that aspect of the illegal conduct involving bribes and kickbacks. The fabricated invoices were designed to make it appear as if the payments made to Bell by Shenker were for "developmental projects" unrelated to WWE.

210.    In or around September 2002, however, SSAI inadvertently produced to WWE two authentic Bell Licensing invoices it had neglected to destroy which revealed that Bell Licensing had in fact invoiced SSAI for what was described as "consulting services" with respect

to specifically listed WWE licenses. Neither invoice produced at that time listed the videogame license as one of the licenses for which Bell was invoicing SSAI, and Shenker and Bell continued to conceal the improprieties involved in the videogame license.

211.    In late December 2002, both Shenker and Bell committed serial perjury by testifying that the invoices they had fabricated were the actual and true invoices for the payments SSAI had made to Bell. Their serial perjury became manifest at the end of their respective depositions when the true invoices which had been inadvertently produced were shown to them.

212.    At Bell's deposition in December 2002, he was confronted with the October 8, 1998 check of SSAI paying Bell Consulting $20,000. Bell falsely claimed at that time that the payment was a "finder's fee" for brokering a deal between Jakks and Playmates. Although Bell admitted to receiving the payment, he repeatedly and falsely suggested that the monies had come from Playmates, not Jakks.

213.    After being caught in manifest perjury in December 2002, SSAI, through its counsel, advised the Court that Shenker would be recanting his prior testimony. Shenker thereafter spent two months devising what in reality turned out to be just another round of perjury in which he continued to conceal the full extent and purpose of the payments he had received from Jakks as well as all other illegal conduct associated with the videogame license.

214.    On March 3, 2003, Shenker served WWE with alleged formal recantations covering every material aspect of his testimony. The alleged recantations made clear that for months, Shenker had willfully perjured himself in deposition testimony and interrogatory answers. Throughout four days of post-recantation deposition testimony, Shenker repeatedly admitted to giving false and misleading testimony and then provided equally false and misleading testimony.

215.    In his alleged recantations, Shenker continued to provide false and incomplete evidence on the payments he had received from Jakks and split with Bell. He adopted the same story told by Bell in December of 2002 about the only payment known at that time being a "finder's fee" for brokering a transaction between Jakks and Playmates. He testified that he had received a $40,000 payment from Jakks for a "finder's fee" and had split it with Bell. In his alleged recantation, Shenker admitted to and disclosed only a single $40,000 payment and, like Bell, claimed that amount was paid by Jakks for brokering a deal in which Playmates sold its inventory and equipment to Jakks. He did not, however, disclose or admit to receiving any additional monies from Jakks and continued to conceal both that he had been paid another $60,000 in 1998 by Jakks and the details of exactly when the payments were made. He likewise claimed he had no documentation regarding the only payment from Jakks he admitted to receiving at that time and continued to conceal the invoice for $80,000 containing a description for the payment at odds with his new perjury, just as Jakks was doing at the same time.

216.    In other proceedings in March of 2003, Shenker continued to conceal the true set of facts during his alleged "recantations." In briefings to the Court on March 5, 2003, Shenker again disclosed only one payment from Jakks of $40,000 and reiterated that it was for brokering the Playmates deal. In Shenker's words, "For brokering this deal between licensees, Jakks paid SSAI a $40,000 brokerage fee."

217.    In deposition testimony given on March 18, 2003, Shenker continued to use perjury as a tool to conceal the facts and misdirect WWE as to the timing and sequence of payments from Jakks so as to continue to conceal that additional payments were made during the exact time rights formerly held by Playmates were being transferred to Jakks and the videogame license was being negotiated.

218.    On March 18, 2003, Shenker, under the ruse of a recantation, again perjured himself and testified that a single $40,000 payment from Jakks was the only payment he received from a WWE licensee. To misdirect WWE further, Shenker testified that the invoice from Bell dated October 8, 1998, which was months after the videogame license was executed, was for Bell's split of the supposed "finder's fee" on the Playmates transaction. Shenker did not disclose all the payments to Bell from Jakks; all the splits he had made of Jakks money with Bell; or that all payments were related to the illicit plan to give favorable treatment to Jakks on licensing matters. Shenker further perjured himself and testified he had turned over all evidence of payments from Stanfull to Bell. As he well knew, he had neither disclosed, nor turned over, the evidence of payments made by Jakks to Stanfull which he had split with Bell in January 1998 and April 1998 during the videogame license negotiation period.

219.    On March 20, 2003, Shenker continued utilizing perjury as a tool of concealment under the ruse of a recantation. On that date, he falsely testified that there was only one $40,000 payment made to his foreign bank account which he split with Bell and continued to insist that payment was for brokering the Playmates deal. When asked directly if he received payments from anybody affiliated with Jakks or THQ in connection with the videogame license, Shenker falsely testified: "I don't remember receiving any payments—I don't remember. It could be. I just don't remember."

220.    On March 20, 2003, Shenker further perjured himself to make it appear as if he had worked long and hard putting together a videogame deal between WWE and Jakks and THQ, falsely claiming he had "worked on it for a long time." As Shenker well knew, his "work" on that license consisted of providing Jakks with the terms of Activision's initial offer, and no more, all as previously alleged. Shenker further concealed that aspect of the illegal activities by

testifying, falsely, that he could not remember if he told Berman or Friedman about Activision's initial proposal.

221. WWE presented the evidence of the dishonest and abusive discovery conduct to the Court in the Shenker litigation in a motion for sanctions. The Court wrote an opinion dated October 16, 2003 detailing Shenker and Bell's perjurious and corrupt scheme, and substantively finding they committed fraud upon the Court which warranted the dismissal with prejudice of SSAI's claims against WWE. The Court's opinion can be found at 48 Conn. Supp. 357, 844 A.2d 964 (2003).

222. The Court's opinion explicitly noted that Jakks was one of the WWE licensees that had paid Shenker and that Shenker perjured himself to conceal Stanfull's existence specifically to cover up its role as a conduit for payments to Shenker and Bell from WWE licensees, including specifically from Jakks.

223. As of the time the Court issued its opinion dated October 16, 2003, which noted that Shenker had perjured himself about Stanfull in order to conceal the payment of money by Jakks, neither THQ nor Jakks had disclosed any payments to Stanfull or Shenker despite prior repeated requests that they do so. Similarly, Jakks had not corrected the false information provided through its counsel on March 26, 2003 that there was no such information to provide.

224. Jakks' failure to disclose such information by October 16, 2003, and correct its prior misrepresentations, was calculated, deliberate and part of a continuation of its plan to conceal the illegal conduct at all costs. Unknown to WWE as of October 16, 2003, Jakks, through Bennett, had retrieved specific documentary evidence of the payments to Stanfull from its foreign subsidiaries and had provided it to Jakks' outside counsel not later than the first week of September 2003. Despite their certain knowledge by that time that both Jakks and its counsel

had previously provided false and incorrect information to WWE, neither Jakks nor its counsel disclosed the information to WWE in September or October of 2003.

225.    After the Court issued its October 16, 2003 opinion in the Shenker litigation, and in violation of specific court orders of compulsion and his promise to do so, Shenker refused to obtain and produce the records of Stanfull's account at the Hang Seng Bank which were needed to determine the full extent of payments to Stanfull by Jakks. As a result, WWE was compelled to incur considerable trouble and expense to go to Hong Kong in October 2003 to depose the records custodian of the Hang Seng Bank.

226.    In the course of that deposition, WWE confirmed that one $40,000 payment had been made to Stanfull's account by Jakks Pacific (H.K.) in April 1998—the very time that WWE was considering to whom to award its videogame license. Records further confirmed that the $40,000 payment was then split equally by a demand draft to Bell a few days later. Based on other incomplete records produced in that deposition, it appeared Jakks had paid Stanfull another $40,000 in January 1998 and $20,000 in August 1998.

227.    Immediately following those discoveries, on November 5, 2003, WWE's counsel directed a letter to Jakks' counsel transmitting the Court's opinion in the Shenker litigation on WWE's sanction motion and again requested that complete information regarding payments to SSAI, Shenker and/or Stanfull be provided to WWE. By reading the Court's opinion, Jakks would have known that, despite its consistent prior denials of such payments, WWE was in possession of evidence indicating that money had, in fact, been paid to Stanfull by Jakks.

228.    On November 11, 2003, Friedman telephoned WWE's Chief Executive Officer, Linda McMahon, and told her that, in response to WWE's counsel's letter to Jakks' counsel, Jakks had searched its files and found evidence of payments to Stanfull—the fundamental fact

Jakks previously had outright denied for months. Friedman told Mrs. McMahon that the payments were for a perfume deal and $80,000 for "project development" for a mechanical dinosaur project, both of which supposedly were unrelated to WWE.

229.    Friedman's statements to Mrs. McMahon were neither accurate nor complete and were a continuation of the concealment. Friedman knew all along that Jakks had paid Shenker, as he was one of the corporate officers who authorized the payments. His suggestion that Jakks had just located the information was also false, as Jakks had unquestionably forwarded the payment information to its outside counsel not later than the first week of September and had that information for two months before WWE's counsel's letter of November 5, 2003 and had not disclosed it. Additionally, the $80,000 in payments made in January and April of 1998 were not for project development as Jakks and Friedman knew, and Friedman completely failed to disclose the $20,000 payment made to Stanfull in August of 1998 after the videogame license and amendments to the toy licenses had been secured.

230.    On November 14, 2003, despite its previous repeated denials, Jakks' counsel wrote to WWE's counsel reaffirming Friedman's statements to Mrs. McMahon and produced for the first time any records relating to the payments made by Jakks to Stanfull. Among other things, Jakks produced for the first time the January 2, 1998 $80,000 invoice from Stanfull in Shenker's own handwriting, which Shenker had never produced in the Shenker litigation. Jakks, through its counsel, did not disclose the $20,000 payment made in August 1998 or the phony invoice behind that payment.

231.    Jakks' alleged explanation for the $80,000 in payments to Stanfull—"project development" costs for a mechanical dinosaur project unrelated to WWE—was completely

inconsistent with the purported explanation offered by Shenker and Bell that they had split a single $40,000 finder's fee for a deal involving WWE licensees, Jakks and Playmates.

232.    The January 2, 1998 invoice in Shenker's own handwriting did not bill Jakks for a finder's fee of $40,000 on Playmates as he and Bell had claimed under oath, but rather for $80,000 for the "development of possible latex based soft toys with special coatings." On information and belief, Jakks concealed this invoice for as long as it could because it knew it was inconsistent with the testimonial positions taken by Shenker and Bell for the payments and because it knew Shenker would have no reason to split the $80,000 paid on the invoice with Bell, as he did, if in fact the payments were for a mechanical dinosaur project unrelated to WWE.

233.    Jakks produced the invoice only after it knew WWE was aware of the payments and because, as a publicly traded company, it would reasonably be expected to have some form of documentation for such payments.

234.    In January 2004, WWE again deposed representatives of the Hang Seng Bank and confirmed for the first time that, in fact, three payments had been made to Shenker's Stanfull account in 1998 totaling $100,000 by the foreign subsidiaries of Jakks.

235.    In May of 2004, Bell filed a false affidavit in the Connecticut court continuing the tact of falsely denying any connection between the payments he had received in 1998 of monies originating with Jakks and the videogame license. Among other things, Bell claimed he had originally rejected the Jakks deal because Jakks was not then in the videogame business and that Jakks then came back with THQ as a partner.

236.    In actual fact, Bell had not originally rejected Jakks because they were not in the videogame business. As Bell well knew, he and Shenker had recommended the license be given

to Jakks on the day Jakks paid $40,000 to Shenker's foreign bank account, which was then split with Bell.

237.    Defendants have colluded during their coverup on several different occasions. On one occasion during the period he was planning his supposed recantation after being caught in perjury, Shenker directed his legal counsel for SSAI to contact Jakks' counsel to advise that he would be disclosing that Jakks paid him money. SSAI's legal counsel did so. Thereafter, Shenker disclosed only what he knew WWE was already aware of – a single $40,000 payment – and, like Jakks, did not disclose the full range and dates of payments. On another occasion, he directed his counsel to notify Jakks' counsel that Shenker had provided information regarding statements made by Friedman reflecting Friedman's knowledge that SSAI was splitting his commissions with Bell.

238.    Friedman, Berman and Bennett were all deposed in the Shenker litigation and none initially identified the person who negotiated the payments to Stanfull or authorized the payments. Friedman and Berman both under oath falsely denied being involved in the payments. Bennett initially falsely claimed under oath not to remember who had authorized the payments. As a result of their testimonial positions, the three highest ranking executives of Jakks hoped to obscure their involvement in the illegal conduct and avoid being questioned about their actions.

239.    In testimony given on July 28, 2004, Friedman also attempted to continue to conceal other aspects of the scheme he had orchestrated, falsely denying that he had been given the terms of Activision's initial offer by Shenker and otherwise failing to disclose the true set of facts and circumstances involved in the bid rigging and price fixing conspiracy he had orchestrated with THQ.

240.    In response to Jakks' officers not identifying the person(s) who authorized the payment, WWE moved the Connecticut Court to enter an order of compulsion requiring Jakks to identify the persons who authorized the payments. Jakks opposed being compelled to do so. After the Court ruled that Jakks must produce a knowledgeable witness, Bennett then appeared again and testified that, under any circumstances then existing in 1998, the payments had to have been authorized by Friedman, Berman, or both, thereby indicating that both men had provided false testimony about their involvement.

241.    Although both Jakks and THQ have derived, and continue to derive, material portions of their respective corporate revenues from the videogame license, neither has ever attached the actual operating agreements between them to filings made pursuant to the Securities and Exchange Act. On information and belief, those agreements, and Jakks' interpretation of those agreements, reflect terms designed to prevent disclosure of the facts and circumstances surrounding the videogame license by mandating that THQ is not allowed to initiate contact with WWE nor disclose any of the facts and circumstances involved in the bidding process for WWE's videogame license.

## COUNT I
### VIOLATION OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT ("RICO"), 18 U.S.C. § 1962(c)
#### (Against All Defendants)

242.    Each and every one of the foregoing allegations is incorporated herein by reference and reasserted as though fully set forth at length.

**RICO Persons**

243.    THQ/Jakks, Jakks, Jakks Pacific (H.K.), Road Champs Ltd., THQ, SSAI, Shenker, Bell Licensing, Bell, Friedman, Berman, Bennett and Farrell are each a "person" within the meaning of 18 U.S.C. § 1961(3).

**RICO Enterprise**

244.    For the purpose of 18 U.S.C. § 1962(c), THQ/Jakks, Jakks, Jakks Pacific (H.K.), Road Champs Ltd., THQ, SSAI, Shenker, Bell Licensing, Bell, Friedman, Berman, Bennett and Farrell, acting in concert, comprised an association-in-fact enterprise within the meaning of 18 U.S.C. § 1961(4) through a pattern of racketeering activity as set forth below for the purpose of conducting the unlawful activities described herein.

245.    For the purpose of 18 U.S.C. § 1962(c), THQ/Jakks, Jakks, Jakks Pacific (H.K.), Road Champs Ltd., THQ, SSAI, Shenker, Bell Licensing, Bell, Friedman, Berman, Bennett and Farrell each had authority within the enterprise described above and/or conducted or participated in the unlawful conduct set forth herein through the enterprise described above.

**Effect on Interstate Commerce**

246.    The association-in-fact of THQ/Jakks, Jakks, Jakks Pacific (H.K.), Road Champs Ltd., THQ, SSAI, Shenker, Bell Licensing, Bell, Friedman, Berman, Bennett and Farrell is an entity that engages in and affects interstate commerce by maintaining contacts and conducting economic and other activities throughout the United States and around the world.

**Predicate Acts of Racketeering Activity**

247.    Defendants conducted, engaged in and/or participated in a pattern of predicate acts through the enterprise described above, including the commission of numerous violations of the Federal Mail Fraud Statute, 18 U.S.C. § 1341, the Federal Wire Fraud Statute, 18 U.S.C. §

1343, the Federal Money Laundering Statutes, 18 U.S.C. §§ 1956 and 1957, the Federal Travel

Act, 18 U.S.C. § 1952, the National Stolen Property Act, 18 U.S.C. §§ 2314 and 2315 and New

York Penal Law § 180.03 concerning commercial bribery. Such violations are "predicate acts"

under 18 U.S.C. § 1961(1)(A) and (B).

      248.    Much of the evidence demonstrating the commission of predicate acts remains in

the exclusive possession and control of some and/or all of the Defendants.

      249.    Nevertheless, Defendants' predicate acts known at this time include, but are not

limited to, the following:

        a.    In furtherance of a scheme or artifice to defraud, and with specific intent
to defraud, Defendants knowingly used or caused to be used the mails or
wire communications in violation of 18 U.S.C. § 1341 and/or 18 U.S.C. §
1343 to deprive the WWE of its intangible right of honest services from
its licensing agent and supervising managerial employee to obtain thereby
valuable licensing rights from WWE including several amendments to the
domestic toy license, an international toy license, a videogame license,
and further amendments to the domestic and international toy licenses.
Defendants' specific acts of mail and/or wire fraud include at least the
following:

          i.    In furtherance of a scheme or artifice to defraud, and with specific
intent to defraud, on November 20, 1995, Defendant Berman,
individually and on behalf of Defendant Jakks, transmitted by
facsimile a letter to Shenker and SSAI requesting that Shenker
and SSAI perform specified services on behalf of Jakks knowing
that Jakks intended to seek further licensing rights from WWE

and with the intent to create and then trade on the undisclosed conflict of interest.

ii.     In furtherance of a scheme or artifice to defraud, and with specific intent to defraud, on November 29, 1995, Defendant Berman, individually and on behalf of Defendant Jakks, transmitted a memorandum to Shenker by facsimile confirming that an agreement would be sent to Shenker that week retaining Shenker as Jakks' agent regarding the perfumed dolls and, trading on the undisclosed conflict of interest being created, further advised that "Jack [Friedman] and I would appreciate any assistance from you regarding the Junior Kodak prospect," all in reference to WWE licensing rights.

iii.    In furtherance of a scheme or artifice to defraud, and with specific intent to defraud, on January 3, 1996, Defendant Berman, individually and on behalf of Defendant Jakks, authorized a facsimile transmission to SSAI and Shenker transmitting a revised agreement whereby SSAI and Shenker agreed to perform services for Jakks and, trading on the undisclosed conflict of interest, asked "Please advise how soon you can amend the [WWE] agreement to include the disposable cameras and photo albums."

iv.     In furtherance of a scheme or artifice to defraud, and with specific intent to defraud, on February 1, 1996, at the direction of Defendants Friedman and Berman, and on behalf of Defendant Jakks, a memorandum was sent by facsimile to Shenker and SSAI

confirming that all three would meet at the New York Toy Fair on February 14, 1996, the purpose of which was to discuss additional ways Shenker, while an undisclosed agent of Jakks, could assist Jakks in securing for Jakks valuable WWE licensing rights, including amendments to the domestic toy license and the videogame license.

v.    In furtherance of a scheme or artifice to defraud, and with specific intent to defraud, on February 28, 1996, Defendant Berman, individually and on behalf of Defendant Jakks, transmitted by facsimile a memorandum to Shenker confirming their conversation at the February 14, 1996 New York Toy Fair and requesting that Shenker, while acting as an undisclosed agent of Jakks, "forward the necessary amendment to our [WWE] agreement to include Licensed Disposable Cameras and Photo Albums, as well as Europe for distribution of [WWE] Figures as Microphones."

vi.    In furtherance of a scheme or artifice to defraud, and with specific intent to defraud, on March 15, 1996, Defendant Friedman, individually and on behalf of Defendant Jakks, transmitted by facsimile to Shenker stating that he would appreciate "having the amendments sent to [sic] in writing that you verbally agreed to with us. As it has been discussed, it should contain the following amendments:

1.    Amend the agreement for [WWE] to include the Thumb wrestling

      2.    Amend the agreement for [WWE] Cameras and Photo Albums."

vii.    In furtherance of a scheme or artifice to defraud, and with specific intent to defraud, on April 22, 1996, Defendant Jakks, on the authority of Defendants Berman and Friedman, transmitted by mail to WWE executed copies of the First Amendment to the domestic toy license granting Jakks the rights to make disposable cameras, photo albums and thumb-operated wrestling figures, all as had been requested of Shenker and SSAI by Jakks while Shenker was an undisclosed agent of Jakks. The terms of the First Amendment were exactly as directed by Jakks in its prior correspondence with Shenker, who did not attempt to obtain more favorable terms for WWE.

viii.    In furtherance of a scheme or artifice to defraud, and with specific intent to defraud, on October 19, 1996, Defendant Berman, individually and on behalf of Defendant Jakks, continued to trade on the undisclosed conflict of interest and transmitted by mail and/or wire a memorandum to Shenker advising that Jakks wanted to obtain the international licensing rights for Jakks' WWE products and specifying the terms Jakks wanted in the international license; all in connection with that aspect of the illicit plan to drive Playmates out of the business of WWE toys and to obtain the rights Playmates held at the time.

ix.    In furtherance of a scheme or artifice to defraud, and with specific intent to defraud, on October 19, 1996, Defendant Berman,

individually and on behalf of Defendant Jakks, continued to trade on the undisclosed conflict of interest and transmitted by mail and/or wire a memorandum specifying amendments to the domestic toy license desired by Jakks and the terms desired by Jakks, all in connection with that aspect of the illicit plan to drive Playmates out of the business of WWE toys and to obtain the rights Playmates held at the time.

x.      In furtherance of a scheme or artifice to defraud, and with specific intent to defraud, on December 30, 1996, Defendant Bennett, individually and on behalf of Defendant Jakks, mailed to WWE an executed copy of the Second Amendment to the domestic toy license, which had been recommended to WWE by Shenker and SSAI while undisclosed agents of Jakks following receipt of Berman's October 19, 1996 memorandum. The terms of the Second Amendment were exactly as directed by Jakks in its October 19, 1996 memoradum to Shenker, who did not attempt to obtain more favorable terms for WWE; all in connection with that aspect of the illicit plan to drive Playmates out of the business of WWE toys and to obtain the rights Playmates held at the time.

xi.     As a reasonably foreseeable result of the artifice to defraud, and in furtherance of it, on or about February 25, 1997, WWE transmitted by mail an executed copy of the International Toy License between Jakks and WWE which Berman, on behalf of Jakks, had sought from Shenker while an undisclosed agent of Jakks by his memorandum of October 19, 1996. The relevant financial terms recommended by Shenker and SSAI to WWE

were the same as proposed by Berman in his October 19, 1996
memorandum, as to the royalty rate, advance guarantee,
guaranteed royalty amount and length of term, and reflect no
attempt by Shenker to negotiate more favorable terms for WWE,
all in connection with that aspect of the illicit plan to drive
Playmates out of the business of WWE toys and to obtain the
rights Playmates held at the time.

xii.      In furtherance of the scheme or artifice to defraud, and with
specific intent to defraud, Bell transmitted by facsimile on
November 6, 1997 a letter to Playmates offering to absolve
Playmates of liability to WWE if it agreed to transfer its rights to
Jakks.

xiii.     In furtherance of the scheme or artifice to defraud, and with intent
to defraud, Bell, Shenker and Berman participated in a telephone
call during the Hong Kong Toy Show sometime between
January 7-10, 1998 to discuss Bell's participation in the scheme
to act favorably on licensing matters involving Jakks.

xiv.      On January 12, 1998, as a reasonably foreseeable result of the
artifice to defraud, WWE signed and sent by mail and/or
facsimile the Third Amendment to the domestic license
transferring to Jakks the rights formerly held by Playmates.

xv.       In furtherance of a scheme or artifice to defraud, and with specific
intent to defraud, on January 12, 1998, Defendant Bennett,
individually and on behalf of Defendant Jakks, and upon
authorization of Defendants Friedman and/or Berman, transmitted

by facsimile a direction to Wills Hon of Defendant Jakks Pacific (H.K.) to make payment arrangements for Stanfull's January 2, 1998 invoice.

xvi.    In furtherance of a scheme or artifice to defraud, and with specific intent to defraud, on January 14, 1998, pursuant to Defendant Bennett's direction made on behalf of Defendant Jakks and which was authorized by Defendants Friedman and/or Berman, Defendant Road Champs Ltd. wire-transferred $40,000 from its account at the Hang Seng Bank in Hong Kong in an intra-bank transfer to Stanfull's account at the Hang Seng Bank.

xvii.   In furtherance of a scheme or artifice to defraud, and with specific intent to defraud, on January 14, 1998, pursuant to Defendant Bennett's direction made on behalf of Defendant Jakks and authorized by Defendants Friedman and/or Berman, Defendant Jakks Pacific (H.K.) transmitted by facsimile a request to Norwest Bank Minnesota, N.A. ("Norwest Bank") in Hong Kong for telegraphic transfer of $40,000 to Defendant Road Champs Ltd.'s account at the Hang Seng Bank.

xviii.  In furtherance of a scheme or artifice to defraud, and with specific intent to defraud, on January 14, 1998, pursuant to Defendant Bennett's direction made on behalf of Defendant Jakks and authorized by Defendants Friedman and/or Berman, Defendant Jakks Pacific (H.K.) wire-transferred $40,000 from Defendant Jakks Pacific (H.K.)'s account at Norwest Bank to Defendant Road Champs Ltd.'s account at the Hang Seng Bank.

xix.   As a reasonably foreseeable result of Defendants' fraudulent scheme, Norwest Bank transmitted a letter dated January 14, 1998 to Defendant Jakks Pacific (H.K.) confirming that the $40,000 wire-transfer to Defendant Road Champs Ltd. had been completed.

xx.    As a reasonably foreseeable result of Defendants' fraudulent scheme, Hang Seng Bank transmitted a letter dated January 15, 1998 to Defendant Road Champs Ltd. confirming that Defendant Road Champs Ltd.'s account at the Hang Seng Bank had been credited for $40,000 by order of Defendant Jakks Pacific (H.K.)

xxi.   In furtherance of a scheme or artifice to defraud, and with specific intent to defraud, Defendant Road Champs Ltd. falsified its corporate books and records to conceal its $40,000 payment to Stanfull by making it appear as an inter-company transfer between Defendant Jakks Pacific (H.K.) and Defendant Road Champs Ltd.

xxii.  In furtherance of a scheme or artifice to defraud, and with specific intent to defraud, Defendant Bennett, individually and on behalf of Defendant Jakks, falsified Defendant Jakks' corporate books and records by failing to record the $40,000 payment to Stanfull.

xxiii. In furtherance of a scheme or artifice to defraud, and with specific intent to defraud, on March 31, 1998, Defendant Bennett, individually and on behalf of Defendant Jakks and upon authorization of Defendants Friedman and/or Berman, transmitted by facsimile a direction to Wills Hon of Defendant Jakks Pacific

(H.K.) to make payment arrangements for the second installment payment of Stanfull's January 2, 1998 invoice, specifically instructing Mr. Hon that it was "imperative" that the payment be made available April 2, 1998.

xxiv.    As a reasonably foreseeable result of Defendants' fraudulent scheme, Norwest Bank transmitted a letter dated April 1, 1998 to Defendant Jakks Pacific (H.K.) confirming that Defendant Jakks Pacific (H.K.)'s account had been debited in the amount of $40,000.

xxv.    In furtherance of a scheme or artifice to defraud, and with specific intent to defraud, on April 2, 1998, pursuant to Defendant Bennett's direction made on behalf of Defendant Jakks and authorized by Defendants Friedman and/or Berman, Defendant Jakks Pacific (H.K.) wire-transferred $40,000 from its account at Norwest Bank to Stanfull's account at the Hang Seng Bank.

xxvi.    In furtherance of a scheme to defraud, and with specific intent to defraud, Shenker, Friedman and/or Berman participated in telephone calls between April 27, 1998 and May 7, 1998 during which Shenker disclosed the terms of Activision's and THQ's expressions of interest in the videogame license.

xxvii.    In furtherance of a scheme to defraud, and with specific intent to defraud, Friedman and/or Berman and Farrell participated in telephone calls between April 27, 1998 and May 7, 1998 discussing the terms on which THQ would be included in the videogame license and other matters alleged herein.

xxviii.  In furtherance of a scheme to defraud, and with specific intent to defraud, Friedman, on behalf of Defendants Jakks and THQ, participated in a phone call on or about May 7, 1998 in which he provided to Shenker the terms to be offered to WWE for a videogame license to Jakks and THQ.

xxix.  In furtherance of Defendants' scheme or artifice to defraud, and with specific intent to defraud, on May 7, 1998, Defendant Berman, on behalf of Defendants Jakks and THQ, transmitted by facsimile a letter to Defendant Bell regarding toy company strength in marketing vs. videogame strength in marketing, which Defendant Bell subsequently forwarded to Linda McMahon as part of an effort to deceive her that Jakks' and THQ's participation in the videogame license was "right on target."

xxx.  As a reasonably foreseeable result of Defendants' fraudulent scheme, on May 28, 1998, Edward L. Kaufman, Esq., General Counsel of WWE ("Kaufman"), transmitted by Federal Express a letter to Murray Skala, Esq., counsel to Jakks, regarding a draft of the proposed videogame license agreement and attaching a copy of the videogame license deal memo.

xxxi.  As a reasonably foreseeable result of Defendants' fraudulent scheme, and in furtherance of Defendants' scheme or artifice to defraud, and with specific intent to defraud, on June 2, 1998, Defendant Berman, individually and on behalf of Defendants Jakks and THQ, upon authorization of Defendant Friedman, transmitted by facsimile a letter to Defendant Shenker regarding,

among other things, (i) comments regarding the proposed videogame license agreement, which was to be forwarded to Defendants Bell and Shenker on June 3, 1998; (ii) the fifth amendment to Jakks' domestic toy license with WWE; and (iii) the third amendment to Jakks' international toy license with WWE.

xxxii.    As a reasonably foreseeable result of Defendants' fraudulent scheme, and in furtherance of Defendants' scheme or artifice to defraud, on June 3, 1998, Defendant Berman, individually and on behalf of Defendants Jakks and THQ, transmitted by facsimile a letter to Defendants Bell and Shenker, and to Kaufman, enclosing comments regarding the proposed videogame license agreement.

xxxiii.   As a reasonably foreseeable result of Defendants' fraudulent scheme, and in furtherance of Defendants' scheme or artifice to defraud, on June 3, 1998, Defendant Berman, individually and on behalf of Defendants Jakks and THQ, transmitted by facsimile a letter to Defendants Bell and Shenker, and to Kaufman, enclosing revised comments regarding the proposed videogame license agreement.

xxxiv.    As a reasonably foreseeable result of Defendants' fraudulent scheme, and in furtherance of Defendants' scheme or artifice to defraud, on June 4, 1998, Daniel Offner, counsel to Defendant THQ, on behalf of Defendants THQ and Jakks, transmitted by facsimile a letter to Kaufman, Geoffrey Bass, Esq., counsel for

Defendant Jakks, Defendant Farrell and Defendant Berman
enclosing revisions to the proposed videogame license agreement.

xxxv.    As a reasonably foreseeable result of Defendants' fraudulent
scheme, and in furtherance of Defendants' scheme or artifice to
defraud, on June 5, 1998, Defendant Berman, individually and on
behalf of Defendants Jakks and THQ, transmitted by facsimile a
letter to Defendant Bell enclosing revisions to the proposed
videogame license agreement.

xxxvi.    As a reasonably foreseeable result of Defendants' fraudulent
scheme, and in furtherance of Defendants' scheme or artifice to
defraud, on June 9, 1998, Geoffrey Bass, Esq., counsel for
Defendant Jakks, on behalf of Defendants Jakks and THQ, upon
authorization of Defendants Friedman and/or Berman, transmitted
by facsimile a letter to Kaufman enclosing comments to the
revised proposed videogame license agreement.

xxxvii.    As a reasonably foreseeable result of Defendants' fraudulent
scheme, on June 10, 1998, Kaufman transmitted by facsimile a
redlined version of the proposed videogame license agreement to
Geoffrey Bass, Esq., counsel to Defendant Jakks.

xxxviii.    As a reasonably foreseeable result of Defendants' fraudulent
scheme, and in furtherance of Defendants' scheme or artifice to
defraud, on June 17, 1998, Geoffrey Bass, Esq., counsel for
Jakks, on behalf of Defendants Jakks, THQ, and THQ/Jakks,
transmitted by facsimile a letter to Kaufman requesting copies of
the videogame license agreement executed by WWE for Mr. Bass

to provide to Defendants THQ and Jakks, and attaching a copy of the videogame license agreement executed by Defendant Farrell, President and Chief Executive Officer of THQ/Jakks.

xxxix.    As a reasonably foreseeable result of Defendants' fraudulent scheme, on June 24, 1998, Kaufman transmitted by Federal Express to Defendant Friedman, on behalf of Defendant Jakks, an unexecuted copy of the fifth amendment to Jakks' domestic toy license agreement with WWE.

xl.    As a reasonably foreseeable result of Defendants' fraudulent scheme, on June 24, 1998, Kaufman transmitted by Federal Express to Defendant Friedman, on behalf of Defendant Jakks, an unexecuted copy of the third amendment to Jakks' international toy license agreement with WWE.

xli.    As a reasonably foreseeable result of Defendants' fraudulent scheme, and in furtherance of Defendants' scheme or artifice to defraud, on July 1, 1998, Defendant Bennett, individually and on behalf of Defendant Jakks, upon authorization of Defendant Friedman, transmitted to WWE a copy of the fifth amendment to Jakks' domestic toy license with WWE executed by Defendant Berman.

xlii.    As a reasonably foreseeable result of Defendants' fraudulent scheme, on or about July 2, 1998, Kaufman transmitted by Federal Express to Defendant Bennett a fully executed copy of the fifth amendment to Jakks' domestic toy license agreement with WWE.

xliii.    In furtherance of a scheme or artifice to defraud, and with specific
intent to defraud, on July 27, 1998, Defendant SSAI transmitted
by facsimile to Defendant Berman a phony invoice directed to
Jakks from Stanfull dated July 15, 1998 in the amount of $20,000
falsely purporting to invoice Defendant Jakks for alleged product
development.

xliv.    In furtherance of a scheme or artifice to defraud, and with specific
intent to defraud, on July 30, 1998, Defendant Bennett,
individually and on behalf of or for the benefit of Defendants
Jakks, THQ, and THQ/Jakks, upon authorization of Defendants
Friedman and/or Berman, transmitted by facsimile to Elmen Lai
of Defendant Road Champs Ltd. a copy of Stanfull's July 15,
1998 invoice, directing that payment be made.

xlv.    In furtherance of a scheme or artifice to defraud, and with specific
intent to defraud, on August 3, 1998, pursuant to Defendant
Bennett's direction made on behalf of and for the benefit of
Defendants Jakks, THQ, and THQ/Jakks, Elmen Lai of Defendant
Road Champs Ltd. transmitted an email communication to
Defendant Bennett confirming that $20,000 was paid to Stanfull.

xlvi.    In furtherance of a scheme or artifice to defraud, and with specific
intent to defraud, on August 4, 1998, pursuant to Defendant
Bennett's direction made on behalf of and for the benefit of
Defendants Jakks, THQ, and THQ/Jakks, Defendant Road
Champs Ltd. wire-transferred $20,000 from its account at the

Hang Seng Bank in an intra-bank transfer to Stanfull's account at the Hang Seng Bank.

xlvii.    As a reasonably foreseeable result of Defendants' fraudulent acts and in furtherance of Defendants' scheme or artifice to defraud, on June 9, 1998, Defendant Farrell, on behalf of Defendants Jakks, THQ, and THQ/Jakks, transmitted by facsimile a letter to Defendant Bell regarding his recent meeting with Bell in Stamford, Connecticut, and meetings between Defendants THQ and Jakks.

xlviii.    As a reasonably foreseeable result of Defendants' fraudulent acts and in furtherance of Defendants' artifice to defraud, on July 2, 1998, WWE transmitted by mail a check in the amount of $301,751.54 to SSAI, all of which reflected payments to SSAI on the videogame license with THQ/Jakks.

xlix.    In furtherance of a scheme or artifice to defraud, and with specific intent to defraud, on December 21, 1998, Defendant Shenker caused Defendant SSAI to wire-transfer $280,616 from Defendant SSAI's checking account at Fleet Bank, headquartered in Fort Lee, New Jersey, to Stanfull's account at the Hang Seng Bank, consisting of $165,000 of commissions Defendant SSAI was paid by WWE on the videogame license.

l.    In furtherance of a scheme or artifice to defraud, and with specific intent to defraud, on January 11, 1999, Defendant Shenker wire-transferred $280,601 from Stanfull's account at the Hang Seng Bank to Defendant Bell Licensing's money market account at

Hudson Bank, consisting of $165,000 in commissions Defendant

SSAI was paid by WWE on the videogame license.

li.    As a reasonably foreseeable result of Defendants' fraudulent acts

and in furtherance of Defendants' artifice to defraud, on

February 10, 2000 WWE transmitted by mail a check in the

amount of $663,037.70 to SSAI, of which $165,000 represented

payments to SSAI on the videogame license with THQ/Jakks.

lii.    As a reasonably foreseeable result of Defendants' fraudulent acts

and in furtherance of Defendants' artifice to defraud, on June 9,

2000, WWE transmitted by mail a check in the amount of

$312,788.55 to SSAI, of which $247,280.90 represented

payments to SSAI on the videogame license with THQ/Jakks.

liii.    As a reasonably foreseeable result of Defendants' fraudulent acts

and in furtherance of Defendants' artifice to defraud, on

August 24, 2000, WWE transmitted by mail a check in the

amount of $324,540.66 to SSAI, of which $132,735.44

represented payments to SSAI on the videogame license with

THQ/Jakks.

liv.    In furtherance of a scheme or artifice to defraud, and with specific

intent to defraud, Friedman in or around October 2000 telephoned

Linda McMahon offering to broker a settlement between Shenker

and WWE; said call being made in the hope that such a settlement

would serve to forever conceal the illegal conduct set forth herein.

lv.     In furtherance of a scheme or artifice to defraud, and with specific intent to defraud, Friedman on or about November 11, 2003 telephoned Linda McMahon and misrepresented the nature, extent and purpose of payments made to Shenker by Jakks.

lvi.    Various uses of the mails and wires between and among Defendants Jakks, Shenker, SSAI, THQ, and THQ/Jakks in furtherance of the scheme and artifice to defraud by denying WWE the benefits of honest services from its licensing agents, the evidence of which is in the exclusive possession of Jakks, THQ and/or THQ/Jakks.

b.      In violation of the Federal Money Laundering Statutes, 18 U.S.C. §§ 1956 and 1957, Defendants' payment and/or receipt of unlawful bribes and payments to secure the videogame license and the 1998 amendments to the toy licenses, and/or subsequent receipt of benefits as a result of the unlawful bribes, involved the proceeds of commercial bribery, an enumerated unlawful activity under 18 U.S.C. § 1956, and were designed to conceal or disguise the nature and the source of such proceeds.  In addition and/or in the alternative, Defendants' payment and receipt of unlawful bribes and payments to secure the videogame license and the 1998 amendments to the toy licenses, and/or Defendants' subsequent payment, receipt or transfer of the benefits obtained by commercial bribery, involved the knowing deposit, withdrawal, transfer or exchange of funds or a monetary instrument through or to a financial institution of a value in excess of $10,000, and constituted, represented or was derived from the proceeds obtained by commercial bribery, an enumerated unlawful activity under 18 U.S.C. § 1957.  Defendants' specific acts of

money laundering in violation of 18 U.S.C. §§ 1956 and 1957 include at least the following:

i.      In furtherance of, and with the intent to conceal proceeds of the commercial bribery scheme, on January 14, 1998, pursuant to Defendant Bennett's direction made on behalf of Defendant Jakks and which was authorized by Defendants Friedman and/or Berman, Defendant Road Champs Ltd. wire-transferred $40,000 from its account at the Hang Seng Bank in Hong Kong in an intra-bank transfer to Stanfull's account at the Hang Seng Bank.

ii.     In furtherance of, and with the intent to conceal proceeds of the commercial bribery scheme, on January 14, 1998, pursuant to Defendant Bennett's direction made on behalf of Defendant Jakks and authorized by Defendants Friedman and/or Berman, Defendant Jakks Pacific (H.K.) wire-transferred $40,000 from Defendant Jakks Pacific (H.K.)'s account at Norwest Bank to Defendant Road Champs Ltd.'s account at the Hang Seng Bank.

iii.    In furtherance of, and with the intent to conceal proceeds of the commercial bribery scheme, by demand draft dated January 14, 1998 drawn on Stanfull's account at the Hang Seng Bank, Defendant Shenker paid Defendant Bell $20,000 of the $40,000 paid to Stanfull from Defendant Road Champs Ltd.

iv.     In furtherance of, and with the intent to conceal proceeds of the commercial bribery scheme, on April 2, 1998, pursuant to Defendant Bennett's direction made on behalf of Defendant Jakks and authorized by Defendants Friedman and/or Berman,

Defendant Jakks Pacific (H.K.) wire-transferred $40,000 from its account at Norwest Bank to Stanfull's account at the Hang Seng Bank.

v.      In furtherance of, and with the intent to conceal proceeds of the commercial bribery scheme, by demand draft dated April 7, 1998 drawn on Stanfull's account at the Hang Seng Bank, Defendant Shenker paid Defendant Bell Licensing $20,000 of the $40,000 paid to Stanfull from Defendant Jakks Pacific (H.K.).

vi.     In furtherance of, and with the intent to conceal proceeds of the commercial bribery scheme, on or about April 7, 1998, Defendant Bell deposited the Stanfull demand draft paid to Defendant Bell Licensing into a MBNA money market account owned by Defendant Bell, which cleared through Citibank located in New York.

vii.    In furtherance of Defendants' commercial bribery scheme, on July 3, 1998, Defendant Shenker deposited a check, dated July 3, 1998, from WWE in the amount of $301,751.54 into SSAI's Fleet Bank account, consisting of commissions related to the advance on the videogame license, which represented proceeds derived from Defendants' commercial bribery scheme. The total of SSAI's commission related to the videogame license was $330,000; however, due to an overpayment of commissions in a prior month, WWE deducted $28,248.46 from that amount, thereby SSAI only received $301,751.54 on July 3, 1998.

viii.    In furtherance of, and with the intent to conceal proceeds of the commercial bribery scheme, on August 4, 1998, pursuant to Defendant Bennett's direction made on behalf of and for the benefit of Defendants Jakks, THQ, and THQ/Jakks, Defendant Road Champs Ltd. wire-transferred $20,000 from its account at the Hang Seng Bank in an intra-bank transfer to Stanfull's account at the Hang Seng Bank.

ix.    In furtherance of, and with the intent to conceal proceeds of Defendants' commercial bribery scheme, by check no. 1881, dated October 8, 1998, Defendant Shenker caused Defendant SSAI to pay Defendant Bell Licensing $20,000, drawn on SSAI's checking account at Fleet Bank, headquartered in Fort Lee, New Jersey.

x.    In furtherance of, and with the intent to conceal proceeds of Defendants' commercial bribery scheme, on October 9, 1998, Defendant Bell deposited the October 8, 1998 check from Defendant SSAI into Defendant Bell Licensing's Hudson Bank money market account located in Darien, Connecticut, thereby causing the check to clear at Hudson Bank's main office located in Mahwah, New Jersey.

xi.    In furtherance of, and with the intent to conceal proceeds of the commercial bribery scheme, on December 21, 1998, Defendant Shenker caused Defendant SSAI to wire-transfer $280,616 from Defendant SSAI's checking account at Fleet Bank, headquartered in Fort Lee, New Jersey, to Stanfull's account at the Hang Seng

Bank, consisting in part of $165,000 which was exactly 50% of the advance Defendant SSAI was paid by WWE on the videogame license. Defendant SSAI's transfer to Stanfull was the precursor to Defendant Bell Licensing's receipt of the unlawful proceeds, as Defendant Shenker elected to run the transaction through a foreign bank account in order to conceal the nature and source of the payments.

xii.     In furtherance of, and with the intent to conceal proceeds of the commercial bribery scheme, on January 11, 1999, Defendant Shenker wire-transferred $280,601 from Stanfull's account at the Hang Seng Bank to Defendant Bell Licensing's money market account at Hudson Bank, consisting of $165,000, exactly 50% of the advance Defendant SSAI was paid by WWE on the videogame license.

xiii.    In furtherance of Defendants' commercial bribery scheme, on February 7, 2000 Defendant Shenker deposited a check dated February 4, 2000 from WWE in the amount of $663,037.70 into SSAI's Fleet Bank account, consisting of $165,000 in commissions related to the videogame license, which represented proceeds derived from Defendants' commercial bribery scheme.

xiv.     In furtherance of, and with the intent to conceal proceeds of the commercial bribery scheme, by check no. 2595 dated February 22, 2000, drawn on SSAI's bank account at Fleet Bank, headquartered in Fort Lee, New Jersey, Defendant SSAI paid $95,396.90 to Defendant Bell Licensing, consisting of $82,500,

exactly 50% of the commissions paid to Defendant SSAI by WWE on the videogame license.

xv.    In furtherance of, and with the intent to conceal proceeds of the commercial bribery scheme, on February 23, 2000, Defendant Bell deposited the February 22, 2000 check from Defendant SSAI into Defendant Bell Licensing's Hudson Bank money market account located in Darien, Connecticut, thereby causing the check to clear at Hudson Bank's main office located in Mahwah, New Jersey.

xvi.    In furtherance of Defendants' commercial bribery scheme, on June 12, 2000, Defendant SSAI deposited a check, dated June 9, 2000, from WWE, in the amount of $312,788.55 into SSAI's Fleet Bank account, consisting of $247,180.90 of commissions related to the videogame license, which represented proceeds derived from Defendants' commercial bribery scheme.

xvii.    In furtherance of, and with the intent to conceal proceeds of the commercial bribery scheme, by check no. 2832 dated June 16, 2000 drawn on Defendant SSAI's bank account at Fleet Bank, headquartered in Fort Lee, New Jersey, Defendant SSAI paid $124,454 to Defendant Bell Licensing, consisting of $123,590.45, exactly 50% of commissions paid to Defendant SSAI by WWE on the videogame license.

xviii.    In furtherance of, and with the intent to conceal proceeds of the commercial bribery scheme, on June 19, 2000, Defendant Bell deposited Defendant SSAI's June 16, 2000 check into Defendant

Bell Licensing's Hudson Bank money market account located in Darien, Connecticut, thereby causing the check to clear at Hudson Bank's main office located in Mahwah, New Jersey.

xix.     In furtherance of Defendants' commercial bribery scheme, on August 25, 2000, Defendant Shenker deposited a check, dated August 18, 2000, in the amount of $324,540.66 into SSAI's Fleet Bank account, consisting of $132,735.44 of commissions related to the videogame license, which represented proceeds derived from Defendants' commercial bribery scheme.

xx.      In furtherance of, and with the intent to conceal proceeds of the commercial bribery scheme, by check no. 3016 dated September 10, 2000 drawn on Defendant SSAI's bank account at Fleet Bank, headquartered in Fort Lee, New Jersey, Defendant SSAI paid $84,525.29 to Defendant Bell Licensing, consisting of $66,367.72, exactly 50% of commissions paid to Defendant SSAI by WWE on the videogame license.

xxi.     In furtherance of, and with the intent to conceal proceeds of the commercial bribery scheme, on September 12, 2000, Defendant Bell deposited Defendant SSAI's September 10, 2000 check into Defendant Bell Licensing's Hudson Bank money market account located in Darien, Connecticut, thereby causing the check to clear at Hudson Bank's main office located in Mahwah, New Jersey.

xxii.    In furtherance of, and with the intent to conceal proceeds of the commercial bribery scheme, by check no. 1846 dated September 14, 2001 drawn on Defendant Shenker's account at

Fleet Bank headquartered in Fort Lee, New Jersey, Defendant Shenker paid Defendant Bell $52,948, representing a split of the proceeds from Defendant Shenker's sale of THQ and Jakks stock acquired pursuant to the videogame license.

xxiii.   In furtherance of, and with the intent to conceal proceeds of the commercial bribery scheme, on September 24, 2001, Defendant Bell deposited Defendant Shenker's September 14, 2001 check into Defendant Bell's Citibank preferred money market account, account no. 47507343, thereby causing the check to clear at Citibank in New York.

xxiv.   In furtherance of, and with the intent to conceal proceeds of the commercial bribery scheme, by check no. 1869 dated October 12, 2001 drawn on Defendant Shenker's account at Fleet Bank headquartered in Fort Lee, New Jersey, Defendant Shenker paid Defendant Bell $26,994, representing a split of the proceeds of Defendant Shenker's sale of THQ and Jakks stock acquired pursuant to the videogame license.

xxv.   In furtherance of, and with the intent to conceal proceeds of the commercial bribery scheme, on October 13, 2001, Defendant Bell deposited Defendant Shenker's October 12, 2001 check into Defendant Bell's branch account at Hudson Bank located in Connecticut, thereby causing the check to clear at Hudson Bank's main office located in Mahwah, New Jersey.

xxvi.   In furtherance of, and with the intent to conceal proceeds of the commercial bribery scheme, by check no. 1894 dated

December 11, 2001 drawn on Defendant Shenker's account at Fleet Bank headquartered in Fort Lee, New Jersey, Defendant Shenker paid Defendant Bell $26,944, representing a split of the proceeds of Defendant Shenker's sale of THQ and Jakks stock acquired pursuant to the videogame license.

xxvii.  In furtherance of, and with the intent to conceal proceeds of the commercial bribery scheme, on December 13, 2001, Defendant Bell deposited Defendant Shenker's December 11, 2001 check into Defendant Bell's branch account at Hudson Bank located in Connecticut, thereby causing the check to clear at Hudson Bank's main office located in Mahwah, New Jersey.

xxviii.  For the first quarter of 2000, on April 28, 2000, Defendant THQ/Jakks, on behalf of and with the authorization of Defendants THQ and/or Farrell and/or Jakks and/or Friedman and/or Berman, paid WWE $2,247,098.87, consisting of royalties related to the videogame license.

xxix.  For the first quarter of 2000, Defendant THQ, on behalf of and with the authorization of Defendants THQ/Jakks and/or Farrell, paid Defendant Jakks $5,303,000 in connection with the videogame license, and Defendant Jakks, with the authorization of Defendants Friedman and/or Berman and/or Bennett, engaged in monetary transactions related to the deposit and/or subsequent transfer of that payment.

xxx.  For the second quarter of 2000, on July 27, 2000, Defendant THQ/Jakks, on behalf of and with the authorization of Defendants

THQ and/or Farrell and/or Jakks and/or Friedman and/or Berman, paid WWE $1,206,685.84, consisting of royalties related to the videogame license.

xxxi.    For the second quarter of 2000, Defendant THQ, on behalf of and with the authorization of Defendants THQ/Jakks and/or Farrell, paid Defendant Jakks $1,600,000 in connection with the videogame license, and Defendant Jakks, with the authorization of Defendants Friedman and/or Berman and/or Bennett, engaged in monetary transactions related to the deposit and/or subsequent transfer of that payment.

xxxii.   For the third quarter of 2000, on October 24, 2000, Defendant THQ, on behalf of and with the authorization of Defendants THQ/Jakks and/or Farrell, paid WWE $1,593,798.96, consisting of royalties related to the videogame license.

xxxiii.  For the third quarter of 2000, on dates known only to Defendants, Defendant THQ, on behalf of and with the authorization of Defendants THQ/Jakks and/or Farrell, paid Defendant Jakks $1,343,000 in connection with the videogame license, and Defendant Jakks, with the authorization of Defendants Friedman and/or Berman and/or Bennett, engaged in monetary transactions related to the deposit and/or subsequent transfer of that payment.

xxxiv.   For the fourth quarter of 2000, on January 26, 2001, Defendant THQ, on behalf of and with the authorization of Defendants THQ/Jakks and/or Farrell, paid WWE $7,200,339.75, consisting of royalties related to the videogame license.

xxxv.    For the fourth quarter of 2000, on dates known only to
         Defendants, Defendant THQ, on behalf of and with the
         authorization of Defendants THQ/Jakks and/or Farrell, paid
         Defendant Jakks $9,461,000 in connection with the videogame
         license, and Defendant Jakks, with the authorization of
         Defendants Friedman and/or Berman and/or Bennett, engaged in
         monetary transactions related to the deposit and/or subsequent
         transfer of that payment.

xxxvi.   For the first quarter of 2001, on April 30, 2001, Defendant THQ,
         on behalf of and with the authorization of Defendants THQ/Jakks
         and/or Farrell, paid WWE $870,836.70, consisting of royalties
         related to the videogame license.

xxxvii.  For the first quarter of 2001, on dates known only to Defendants,
         Defendant THQ, on behalf of and with the authorization of
         Defendants THQ/Jakks and/or Farrell, paid Defendant Jakks
         $1,423,000 in connection with the videogame license, and
         Defendant Jakks, with the authorization of Defendants Friedman
         and/or Berman and/or Bennett, engaged in monetary transactions
         related to the deposit and/or subsequent transfer of that payment.

xxxviii. For the second quarter of 2001, on July 30, 2001, Defendant
         THQ, on behalf of and with the authorization of Defendants
         THQ/Jakks and/or Farrell, paid WWE $1,065,645.62, consisting
         of royalties related to the videogame license.

xxxix.   For the second quarter of 2001, on dates known only to
         Defendants, Defendant THQ, on behalf of and with the

authorization of Defendants THQ/Jakks and/or Farrell, paid Defendant Jakks $339,000 in connection with the videogame license, and Defendant Jakks, with the authorization of Defendants Friedman and/or Berman and/or Bennett, engaged in monetary transactions related to the deposit and/or subsequent transfer of that payment.

xl.    For the third quarter of 2001, on October 31, 2001, Defendant THQ, on behalf of and with the authorization of Defendants THQ/Jakks and/or Farrell, paid WWE $236,700.91, consisting of royalties related to the videogame license.

xli.    For the third quarter of 2001, on dates known only to Defendants, Defendant THQ, on behalf of and with the authorization of Defendants THQ/Jakks and/or Farrell, paid Defendant Jakks $342,000 in connection with the videogame license, and Defendant Jakks, with the authorization of Defendants Friedman and/or Berman and/or Bennett, engaged in monetary transactions related to the deposit and/or subsequent transfer of that payment.

xlii.    For the fourth quarter of 2001, on January 25, 2002, Defendant THQ, on behalf of and with the authorization of Defendants THQ/Jakks and/or Farrell, paid WWE $4,620,563.52, consisting of royalties related to the videogame license.

xliii.    For the fourth quarter of 2001, on dates known only to Defendants, Defendant THQ, on behalf of and with the authorization of Defendants THQ/Jakks and/or Farrell, paid Defendant Jakks $6,569,000 in connection with the videogame

license, and Defendant Jakks, with the authorization of
Defendants Friedman and/or Berman and/or Bennett, engaged in
monetary transactions related to the deposit and/or subsequent
transfer of that payment.

xliv.    For the fourth quarter of 2001, on February 1, 2002, Defendant
THQ, on behalf of and with the authorization of Defendants
THQ/Jakks and/or Farrell, paid WWE an additional $303,401.83,
consisting of royalties related to the videogame license.

xlv.    For the first quarter of 2002, on April 30, 2002, Defendant THQ,
on behalf of and with the authorization of Defendants THQ/Jakks
and/or Farrell, paid WWE $1,165,557.15, consisting of royalties
related to the videogame license.

xlvi.    For the first quarter of 2002, on dates known only to Defendants,
Defendant THQ, on behalf of and with the authorization of
Defendants THQ/Jakks and/or Farrell, paid Defendant Jakks
$1,572,000 in connection with the videogame license, and
Defendant Jakks, with the authorization of Defendants Friedman
and/or Berman and/or Bennett, engaged in monetary transactions
related to the deposit and/or subsequent transfer of that payment.

xlvii.    For the second quarter of 2002, on July 26, 2002, Defendant
THQ, on behalf of and with the authorization of Defendants
THQ/Jakks and/or Farrell, paid WWE $1,279,681.37, consisting
of royalties related to the videogame license.

xlviii.    For the second quarter of 2002, on dates known only to
           Defendants, Defendant THQ, on behalf of and with the
           authorization of Defendants THQ/Jakks and/or Farrell, paid
           Defendant Jakks $1,500,000 in connection with the videogame
           license, and Defendant Jakks, with the authorization of
           Defendants Friedman and/or Berman and/or Bennett, engaged in
           monetary transactions related to the deposit and/or subsequent
           transfer of that payment.

xlix.      For the third quarter of 2002, on October 25, 2002, Defendant
           THQ, on behalf of and with the authorization of Defendants
           THQ/Jakks and/or Farrell, paid WWE $1,106,996.17, consisting
           of royalties related to the videogame license.

l.         For the third quarter of 2002, on dates known only to Defendants,
           Defendant THQ, on behalf of and with the authorization of
           Defendants THQ/Jakks and/or Farrell, paid Defendant Jakks
           $1,044,000 in connection with the videogame license, and
           Defendant Jakks, with the authorization of Defendants Friedman
           and/or Berman and/or Bennett, engaged in monetary transactions
           related to the deposit and/or subsequent transfer of that payment.

li.        For the fourth quarter of 2002, on January 27, 2003, Defendant
           THQ, on behalf of and with the authorization of Defendants
           THQ/Jakks and/or Farrell, paid WWE $5,145,649.93, consisting
           of royalties related to the videogame license.

lii.       For the fourth quarter of 2002, on dates known only to
           Defendants, Defendant THQ, on behalf of and with the

authorization of Defendants THQ/Jakks and/or Farrell, paid
Defendant Jakks $6,030,000 in connection with the videogame
license, and Defendant Jakks, with the authorization of
Defendants Friedman and/or Berman and/or Bennett, engaged in
monetary transactions related to the deposit and/or subsequent
transfer of that payment.

liii.     For the first quarter of 2003, on April 30, 2003, Defendant THQ,
on behalf of and with the authorization of Defendants THQ/Jakks
and/or Farrell, paid WWE $875,404, consisting of royalties
related to the videogame license.

liv.      For the first quarter of 2003, on dates known only to Defendants,
Defendant THQ, on behalf of and with the authorization of
Defendants THQ/Jakks and/or Farrell, paid Defendant Jakks
$644,000 in connection with the videogame license, and
Defendant Jakks, with the authorization of Defendants Friedman
and/or Berman and/or Bennett, engaged in monetary transactions
related to the deposit and/or subsequent transfer of that payment.

lv.       For the second quarter of 2003, on July 28, 2003, Defendant
THQ, on behalf of and with the authorization of Defendants
THQ/Jakks and/or Farrell, paid WWE $950,918, consisting of
royalties related to the videogame license.

lvi.      For the second quarter of 2003, on dates known only to
Defendants, Defendant THQ, on behalf of and with the
authorization of Defendants THQ/Jakks and/or Farrell, paid
Defendant Jakks $465,000 in connection with the videogame

license, and Defendant Jakks, with the authorization of

Defendants Friedman and/or Berman and/or Bennett, engaged in

monetary transactions related to the deposit and/or subsequent

transfer of that payment.

lvii.    For the third quarter of 2003, on October 28, 2003, Defendant

THQ, on behalf of and with the authorization of Defendants

THQ/Jakks and/or Farrell, paid WWE $2,089,446, consisting of

royalties related to the videogame license.

lviii.   For the third quarter of 2003, on dates known only to Defendants,

Defendant THQ, on behalf of and with the authorization of

Defendants THQ/Jakks and/or Farrell, paid Defendant Jakks

$2,095,000 in connection with the videogame license, and

Defendant Jakks, with the authorization of Defendants Friedman

and/or Berman and/or Bennett, engaged in monetary transactions

related to the deposit and/or subsequent transfer of that payment.

lix.     For the fourth quarter of 2003, on January 23, 2004, Defendant

THQ, on behalf of and with the authorization of Defendants

THQ/Jakks and/or Farrell, paid WWE $5,460,091, consisting of

royalties related to the videogame license.

lx.      For the fourth quarter of 2003, on dates known only to

Defendants, Defendant THQ, on behalf of and with the

authorization of Defendants THQ/Jakks and/or Farrell, paid

Defendant Jakks $6,257,000 in connection with the videogame

license, and Defendant Jakks, with the authorization of

Defendants Friedman and/or Berman and/or Bennett, engaged in

monetary transactions related to the deposit and/or subsequent transfer of that payment.

lxi.     For the first quarter of 2004, on April 29, 2004, Defendant THQ, on behalf of and with the authorization of Defendants THQ/Jakks and/or Farrell, paid WWE $853,723, consisting of royalties related to the videogame license.

lxii.     For the first quarter of 2004, on dates known only to Defendants, Defendant THQ, on behalf of and with the authorization of Defendants THQ/Jakks and/or Farrell, paid Defendant Jakks $858,000 in connection with the videogame license, and Defendant Jakks, with the authorization of Defendants Friedman and/or Berman and/or Bennett, engaged in monetary transactions related to the deposit and/or subsequent transfer of that payment.

lxiii.     For the second quarter of 2004, on July 27, 2004, Defendant THQ, on behalf of and with the authorization of Defendants THQ/Jakks and/or Farrell, paid WWE $1,179,097, consisting of royalties related to the videogame license.

lxiv.     For the second quarter of 2004, on dates known only to Defendants, Defendant THQ, on behalf of and with the authorization of Defendants THQ/Jakks and/or Farrell, paid Defendant Jakks $524,000 in connection with the videogame license, and Defendant Jakks, with the authorization of Defendants Friedman and/or Berman and/or Bennett, engaged in monetary transactions related to the deposit and/or subsequent transfer of that payment.

lxv.    For the third quarter of 2004, on October 26, 2004, Defendant
        THQ, on behalf of and with the authorization of Defendants
        THQ/Jakks and/or Farrell, paid WWE $1,321,077, consisting of
        royalties related to the videogame license.

lxvi.   For the third quarter of 2004, on dates known only to Defendants,
        Defendant THQ, on behalf of and with the authorization of
        Defendants THQ/Jakks and/or Farrell, paid Defendant Jakks
        $1,512,000 in connection with the videogame license, and
        Defendant Jakks, with the authorization of Defendants Friedman
        and/or Berman and/or Bennett, engaged in monetary transactions
        related to the deposit and/or subsequent transfer of that payment.

lxvii.  For the fourth quarter of 2004, on January 26, 2005, Defendant
        THQ, on behalf of and with the authorization of Defendants
        THQ/Jakks and/or Farrell, paid WWE $6,632,006, consisting of
        royalties related to the videogame license.

lxviii. For the fourth quarter of 2004, on dates known only to
        Defendants, Defendant THQ, on behalf of and with the
        authorization of Defendants THQ/Jakks and/or Farrell, paid
        Defendant Jakks $7,050,000 in connection with the videogame
        license, and Defendant Jakks, with the authorization of
        Defendants Friedman and/or Berman and/or Bennett, engaged in
        monetary transactions related to the deposit and/or subsequent
        transfer of that payment.

lxix.   For the first quarter of 2000, on April 25, 2000, Defendant Jakks,
        with the authorization of Defendants Friedman and/or Berman

and/or Bennett, paid WWE $187,977.12, consisting of royalties related to the international toy license.

lxx.    For the second quarter of 2000, on July 27, 2000, Defendant Jakks, with the authorization of Defendants Friedman and/or Berman and/or Bennett, paid WWE $403,619.94, consisting of royalties related to the international toy license.

lxxi.    For the third quarter of 2000, on October 25, 2000, Defendant Jakks, with the authorization of Defendants Friedman and/or Berman and/or Bennett, paid WWE $290,236.78, consisting of royalties related to the international toy license.

lxxii.    For the fourth quarter of 2000, on January 25, 2001, Defendant Jakks, with the authorization of Defendants Friedman and/or Berman and/or Bennett, paid WWE $274,729.85, consisting of royalties related to the international toy license.

lxxiii.    For the first quarter of 2001, on April 26, 2001, Defendant Jakks, with the authorization of Defendants Friedman and/or Berman and/or Bennett, paid WWE $326,135, consisting of royalties related to the international toy license.

lxxiv.    For the second quarter of 2001, on July 27, 2001 Defendant Jakks, with the authorization of Defendants Friedman and/or Berman and/or Bennett, paid WWE $491,324.43, consisting of royalties related to the international toy license.

lxxv.    For the third quarter of 2001, on October 24, 2001, Defendant Jakks, with the authorization of Defendants Friedman and/or

Berman and/or Bennett, paid WWE $823,146.52, consisting of royalties related to the international toy license.

lxxvi.    For the fourth quarter of 2001, on January 16, 2002, Defendant Jakks, with the authorization of Defendants Friedman and/or Berman and/or Bennett, paid WWE $435,597.77, consisting of royalties related to the international toy license.

lxxvii.    For the first quarter of 2002, on April 19, 2002, Defendant Jakks, with the authorization of Defendants Friedman and/or Berman and/or Bennett, paid WWE $120,016.51, consisting of royalties related to the international toy license.

lxxviii.    For the second quarter of 2002, on July 23, 2002, Defendant Jakks, with the authorization of Defendants Friedman and/or Berman and/or Bennett, paid WWE $183,495.25, consisting of royalties related to the international toy license.

lxxix.    For the third quarter of 2002, on October 24, 2002, Defendant Jakks, with the authorization of Defendants Friedman and/or Berman and/or Bennett, paid WWE $1,196,258.28, consisting of royalties related to the international toy license.

lxxx.    For the fourth quarter of 2002, on January 31, 2003, Defendant Jakks, with the authorization of Defendants Friedman and/or Berman and/or Bennett, paid WWE $348,103.55, consisting of royalties related to the international toy license.

lxxxi.    For the first quarter of 2003, on April 22, 2003, Defendant Jakks, with the authorization of Defendants Friedman and/or Berman

and/or Bennett, paid WWE $465,465.16, consisting of royalties related to the domestic and international toy licenses.

lxxxii.   For the second quarter of 2003, on July 23, 2003, Defendant Jakks, with the authorization of Defendants Friedman and/or Berman and/or Bennett, paid WWE $517,836.95, consisting of royalties related to the domestic and international toy licenses.

lxxxiii.  For the third quarter of 2003, on October 24, 2003, Defendant Jakks, with the authorization of Defendants Friedman and/or Berman and/or Bennett, paid WWE $849,644.40, consisting of royalties related to the domestic and international toy licenses.

lxxxiv.   For the fourth quarter of 2003, on January 23, 2004, Defendant Jakks, with the authorization of Defendants Friedman and/or Berman and/or Bennett, paid WWE $738,139.48, consisting of royalties related to the domestic and international toy licenses.

lxxxv.    For the first quarter of 2004, on April 27, 2004, Defendant Jakks, with the authorization of Defendants Friedman and/or Berman and/or Bennett, paid WWE $704,629.57, consisting of royalties related to the domestic and international toy licenses.

lxxxvi.   For the second quarter of 2004, on July 26, 2004, Defendant Jakks, with the authorization of Defendants Friedman and/or Berman and/or Bennett, paid WWE $768,216.05, consisting of royalties related to the domestic and international toy licenses.

lxxxvii.  For the third quarter of 2004, on October 25, 2004, Defendant Jakks, with the authorization of Defendants Friedman and/or

Berman and/or Bennett, paid WWE $1,082,458.09, consisting of royalties related to the domestic and international toy licenses.

lxxxviii. For the fourth quarter of 2004, on January 25, 2005, Defendant Jakks, with the authorization of Defendants Friedman and/or Berman and/or Bennett, paid WWE $1,334,692.83, consisting of royalties related to the domestic and international toy licenses.

c.   In violation of the National Stolen Property Act, 18 U.S.C. §§ 2314 and 2315, Defendants' payment and/or receipt of unlawful bribes and payments to secure the videogame license and the 1998 amendments to the toy licenses involved the transmittal and/or transfer in interstate commerce of money having a value of at least $5,000, knowing such proceeds were obtained by fraud against WWE. Defendants' specific acts in violation of the National Stolen Property Act include at least the following:

i.   As a result of Defendants' unlawful conduct in connection with the videogame license and the 1998 amendments to the toy licenses by fraudulent means, on July 3, 1998, Defendant Shenker deposited a check dated July 3, 1998 from WWE in the amount of $301,751.54 into SSAI's Fleet Bank account, consisting of commissions related to the advance on the videogame license which Defendants SSAI and Shenker knew had been acquired by fraud.

ii.  As a result of Defendants' unlawful conduct in connection with the videogame license and the 1998 amendments to the toy licenses by fraudulent means, on December 21, 1998, Defendant

Shenker caused Defendant SSAI to wire-transfer $280,616 from Defendant SSAI's checking account at Fleet Bank, headquartered in Fort Lee, New Jersey, to Stanfull's account at the Hang Seng Bank, consisting of $165,000, exactly 50% of the advance Defendant SSAI was paid by WWE on the videogame license which Defendants SSAI and Shenker knew had been acquired by fraud. Defendant SSAI's transfer of this money was the precursor to Defendant Bell Licensing's receipt of the unlawful proceeds as Defendant Shenker elected to run the transaction through a foreign bank account in order to conceal the nature and source of the payment.

iii.   As a result of Defendants' unlawful conduct in connection with the videogame license and the 1998 amendments to the toy licenses by fraudulent means, on January 11, 1999, Defendant Shenker wire-transferred $280,601 from Stanfull's account at the Hang Seng Bank to Defendant Bell Licensing's money market account at Hudson Bank, consisting of $165,000, exactly 50% of the advance Defendant SSAI was paid by WWE on the videogame license which Defendants SSAI, Shenker, Bell and Bell Licensing knew had been acquired by fraud.

iv.    As a result of Defendants' unlawful conduct in connection with the videogame license and the 1998 amendments to the toy licenses by fraudulent means, on February 7, 2000 Defendant Shenker deposited a check, dated February 4, 2000, from WWE, in the amount of $663,037.70 into SSAI's Fleet Bank account, consisting of $165,000 in commissions related to the videogame

license, which Defendants SSAI and Shenker knew had been acquired by fraud.

v.     As a result of Defendants' unlawful conduct in connection with the videogame license and the 1998 amendments to the toy licenses by fraudulent means, by check no. 2595 dated February 22, 2000, drawn on SSAI's bank account at Fleet Bank headquartered in Fort Lee, New Jersey, Defendant SSAI paid $95,396.90 to Defendant Bell Licensing, consisting of $82,500, exactly 50% of the commissions paid to Defendant SSAI on the videogame license which Defendants SSAI, Shenker, Bell and Bell Licensing knew had been acquired by fraud.

vi.    As a result of Defendants' unlawful conduct in connection with the videogame license and the 1998 amendments to the toy licenses by fraudulent means, on February 23, 2000, Defendant Bell deposited the February 22, 2000 check from Defendant SSAI into Defendant Bell Licensing's Hudson Bank money market account located in Darien, Connecticut, thereby causing the check to clear at Hudson Bank's main office located in Mahwah, New Jersey. Defendants SSAI, Shenker, Bell and Bell Licensing knew the proceeds of said check had been acquired by fraud.

vii.   As a result of Defendants' unlawful conduct in connection with the videogame license and the 1998 amendments to the toy licenses by fraudulent means, on June 12, 2000, Defendant SSAI deposited a check, dated June 9, 2000, from WWE, in the amount of $312,788.55 into SSAI's Fleet Bank account, consisting of

$247,180.90 of commissions related to the videogame license which Defendants SSAI and Shenker knew had been acquired by fraud.

viii.    As a result of Defendants' unlawful conduct in connection with the videogame license and the 1998 amendments to the toy licenses by fraudulent means, by check no. 2832 dated June 16, 2000 drawn on Defendant SSAI's bank account at Fleet Bank, headquartered in Fort Lee, New Jersey, Defendant SSAI paid $124,454 to Defendant Bell Licensing, consisting of $123,590.45, exactly 50% of the commissions Defendant SSAI was paid on the videogame license which Defendants SSAI, Shenker, Bell and Bell Licensing knew had been acquired by fraud.

ix.    As a result of Defendants' unlawful conduct in connection with the videogame license and the 1998 amendments to the toy licenses by fraudulent means, on June 19, 2000, Defendant Bell deposited Defendant SSAI's June 16, 2000 check into Defendant Bell Licensing's Hudson Bank money market account located in Darien, Connecticut, thereby causing the check to clear at Hudson Bank's main office located in Mahwah, New Jersey. Defendants SSAI, Shenker, Bell and Bell Licensing knew the proceeds of said check had been acquired by fraud.

x.    As a result of Defendants' unlawful conduct in connection with the videogame license and the 1998 amendments to the toy licenses by fraudulent means, on August 25, 2000, Defendant Shenker deposited a check, dated August 18, 2000, in the amount

of $324,540.66 into SSAI's Fleet Bank account, consisting of $132,735.44 of commissions Defendant SSAI was paid on the videogame license which Defendants SSAI and Shenker knew had been acquired by fraud.

xi.  As a result of Defendants' unlawful conduct in connection with the videogame license and the 1998 amendments to the toy licenses by fraudulent means, by check no. 3016 dated September 10, 2000 drawn on Defendant SSAI's bank account at Fleet Bank, headquartered in Fort Lee, New Jersey, Defendant SSAI paid $84,525.29 to Defendant Bell Licensing, consisting of $66,367.72, exactly 50% of the commissions Defendant SSAI was paid on the videogame license which Defendants SSAI, Shenker, Bell and Bell Licensing knew had been acquired by fraud.

xii.  As a result of Defendants' unlawful conduct in connection with the videogame license and the 1998 amendments to the toy licenses by fraudulent means, on September 12, 2000, Defendant Bell deposited Defendant SSAI's September 10, 2000 check into Defendant Bell Licensing's Hudson Bank money market account located in Darien, Connecticut, thereby causing the check to clear at Hudson Bank's main office located in Mahwah, New Jersey. Defendants SSAI, Shenker, Bell and Bell Licensing knew the proceeds of said check had been acquired by fraud.

xiii.  As a result of Defendants' unlawful conduct in connection with the videogame license and the 1998 amendments to the toy

licenses by fraudulent means, by check no. 1846 dated
September 14, 2001 drawn on Defendant Shenker's account at
Fleet Bank headquartered in Fort Lee, New Jersey, Defendant
Shenker paid Defendant Bell $52,948, representing a split of the
proceeds from Defendant Shenker's sale of THQ and Jakks stock
acquired pursuant to the videogame license which Defendants
Shenker and Bell knew had been acquired by fraud.

xiv.    As a result of Defendants' unlawful conduct in connection with
the videogame license and the 1998 amendments to the toy
licenses by fraudulent means, on September 24, 2001, Defendant
Bell deposited Defendant Shenker's September 14, 2001 check
into Defendant Bell's Citibank preferred money market account,
account no. 47507343, thereby causing the check to clear at
Citibank in New York. Defendants Shenker and Bell knew the
proceeds of said check had been acquired by fraud.

xv.    As a result of Defendants' unlawful conduct in connection with
the videogame license and the 1998 amendments to the toy
licenses by fraudulent means, by check no. 1869 dated
October 12, 2001 drawn on Defendant Shenker's account at Fleet
Bank headquartered in Fort Lee, New Jersey, Defendant Shenker
paid Defendant Bell $26,994, representing a split of the proceeds
of Defendant Shenker's sale of THQ and Jakks stock acquired
pursuant to the videogame license which Defendants Shenker and
Bell knew had been acquired by fraud.

xvi.    As a result of Defendants' unlawful conduct in connection with
the videogame license and the 1998 amendments to the toy
licenses by fraudulent means, on October 13, 2001, Defendant
Bell deposited Defendant Shenker's October 12, 2001 check into
Defendant Bell's branch account at Hudson Bank located in
Connecticut, thereby causing the check to clear at Hudson Bank's
main office located in Mahwah, New Jersey. Defendants Shenker
and Bell knew the proceeds of said check had been acquired by
fraud.

xvii.   As a result of Defendants' unlawful conduct in connection with
the videogame license and the 1998 amendments to the toy
licenses by fraudulent means, by check no. 1894 dated
December 11, 2001 drawn on Defendant Shenker's account at
Fleet Bank headquartered in Fort Lee, New Jersey, Defendant
Shenker paid Defendant Bell $26,944, representing a split of the
proceeds of Defendant Shenker's sale of THQ and Jakks stock
acquired pursuant to the videogame license which Defendants
Shenker and Bell knew had been acquired by fraud.

xviii.  As a result of Defendants' unlawful conduct in connection with
the videogame license and the 1998 amendments to the toy
licenses by fraudulent means, on December 13, 2001, Defendant
Bell deposited Defendant Shenker's December 11, 2001 check
into Defendant Bell's branch account at Hudson Bank located in
Connecticut, thereby causing the check to clear at Hudson Bank's
main office located in Mahwah, New Jersey. Defendants Shenker

and Bell knew the proceeds of said check had been acquired by fraud.

d.      In violation of the Federal Travel Act, 18 U.S.C. § 1952, Defendants' scheme to fraudulently secure the videogame license and the 1998 amendments to the toy licenses through the payment of unlawful bribes and payments and to use fraudulent conduct to conceal the true nature of the bribes and payments involved the unlawful use of the mail or a facility of interstate commerce with the intent to distribute the proceeds of, and/or facilitate the carrying on of, commercial bribery, an enumerated unlawful act under 18 U.S.C. § 1952 and, thereafter, the commission of an additional act in furtherance of such commercial bribery scheme. Each of the specific acts identified above in violation of the Federal Mail and Wire Fraud Statutes, 18 U.S.C. §§ 1341 and 1343, the Federal Money Laundering Statutes, 18 U.S.C. §§ 1956 and 1957, and the National Stolen Property Act, 18 U.S.C. §§ 2314 and 2315, also constitute separate violations of the Federal Travel Act, and therefore such allegations are incorporated herein by reference and reasserted as though fully set forth at length.

e.      In violation of New York Penal Law § 180.03, as described herein, certain Defendants made, authorized and/or participated in the payment of or agreement to pay unlawful bribes and payments in excess of one thousand dollars to SSAI, Shenker and/or Bell, who at all relevant times were employees, agents or fiduciaries of WWE, without WWE's consent, with the intent to influence their conduct in relation to WWE's affairs to secure the videogame license and the 1998 amendments to the toy licenses, and said acts inured to the benefit of and/or were ratified by THQ and

THQ/Jakks. Pursuant to 18 U.S.C. § 1961(1)(A), Defendants' violations of New York Penal Law § 180.03, as set forth below, constitute separate predicate acts under RICO:

i.      In furtherance of, and with the intent to conceal proceeds of the commercial bribery scheme, on January 14, 1998, pursuant to Defendant Bennett's direction made on behalf of Defendant Jakks and which was authorized by Defendants Friedman and/or Berman, Defendant Road Champs Ltd. wire-transferred $40,000 from its account at the Hang Seng Bank in Hong Kong in an intra-bank transfer to Stanfull's account at the Hang Seng Bank.

ii.     In furtherance of, and with the intent to conceal proceeds of the commercial bribery scheme, by demand draft dated January 14, 1998 drawn on Stanfull's account at the Hang Seng Bank, Defendant Shenker paid Defendant Bell $20,000 of the $40,000 paid to Stanfull from Defendant Road Champs Ltd.

iii.    In furtherance of, and with the intent to conceal proceeds of the commercial bribery scheme, on April 2, 1998, pursuant to Defendant Bennett's direction made on behalf of Defendant Jakks and authorized by Defendants Friedman and/or Berman, Defendant Jakks Pacific (H.K.) wire-transferred $40,000 from its account at Norwest Bank to Stanfull's account at the Hang Seng Bank.

iv.     In furtherance of, and with the intent to conceal proceeds of the commercial bribery scheme, by demand draft dated April 7, 1998 drawn on Stanfull's account at the Hang Seng Bank, Defendant

Shenker paid Defendant Bell Licensing $20,000 of the $40,000 paid to Stanfull from Defendant Jakks Pacific (H.K.)

v.   In furtherance of, and with the intent to conceal proceeds of the commercial bribery scheme, on August 4, 1998, pursuant to Defendant Bennett's direction made on behalf of and for the benefit of Defendants Jakks, THQ, and THQ/Jakks, Defendant Road Champs Ltd. wire-transferred $20,000 from its account at the Hang Seng Bank in an intra-bank transfer to Stanfull's account at the Hang Seng Bank.

vi.   In furtherance of, and with the intent to conceal proceeds of Defendants' commercial bribery scheme, by check no. 1881, dated October 8, 1998, Defendant Shenker caused Defendant SSAI to pay Defendant Bell Licensing $20,000, drawn on SSAI's checking account at Fleet Bank, headquartered in Fort Lee, New Jersey.

vii.   In furtherance of, and with the intent to conceal proceeds of the commercial bribery scheme, on January 11, 1999, Defendant Shenker wire-transferred $280,601 from Stanfull's account at the Hang Seng Bank to Defendant Bell Licensing's money market account at Hudson Bank, consisting of $165,000, exactly 50% of the advance Defendant SSAI was paid by WWE on the videogame license.

viii.   In furtherance of, and with the intent to conceal proceeds of the commercial bribery scheme, by check no. 2595 dated February 22, 2000, drawn on SSAI's bank account at Fleet Bank,

headquartered in Fort Lee, New Jersey, Defendant SSAI paid $95,396.90 to Defendant Bell Licensing, consisting of $82,500, exactly 50% of the commissions paid to Defendant SSAI by WWE on the videogame license.

ix.  In furtherance of, and with the intent to conceal proceeds of the commercial bribery scheme, by check no. 2832 dated June 16, 2000 drawn on Defendant SSAI's bank account at Fleet Bank, headquartered in Fort Lee, New Jersey, Defendant SSAI paid $124,454 to Defendant Bell Licensing, consisting of $123,590.45, exactly 50% of commissions paid to Defendant SSAI by WWE on the videogame license.

x.  In furtherance of, and with the intent to conceal proceeds of the commercial bribery scheme, by check no. 3016 dated September 10, 2000 drawn on Defendant SSAI's bank account at Fleet Bank, headquartered in Fort Lee, New Jersey, Defendant SSAI paid $84,525.29 to Defendant Bell Licensing, consisting of $66,367.72, exactly 50% of commissions paid to Defendant SSAI by WWE on the videogame license.

xi.  In furtherance of, and with the intent to conceal proceeds of the commercial bribery scheme, by check no. 1846 dated September 14, 2001 drawn on Defendant Shenker's account at Fleet Bank headquartered in Fort Lee, New Jersey, Defendant Shenker paid Defendant Bell $52,948, representing a split of the proceeds from Defendant Shenker's sale of THQ and Jakks stock acquired pursuant to the videogame license.

xii.    In furtherance of, and with the intent to conceal proceeds of the commercial bribery scheme, by check no. 1869 dated October 12, 2001 drawn on Defendant Shenker's account at Fleet Bank headquartered in Fort Lee, New Jersey, Defendant Shenker paid Defendant Bell $26,994, representing a split of the proceeds of Defendant Shenker's sale of THQ and Jakks stock acquired pursuant to the videogame license.

xiii.    In furtherance of, and with the intent to conceal proceeds of the commercial bribery scheme, by check no. 1894 dated December 11, 2001 drawn on Defendant Shenker's account at Fleet Bank headquartered in Fort Lee, New Jersey, Defendant Shenker paid Defendant Bell $26,944, representing a split of the proceeds of Defendant Shenker's sale of THQ and Jakks stock acquired pursuant to the videogame license.

**Pattern of Racketeering Activity**

250.    Defendants knowingly and repeatedly committed the above criminal acts in furtherance of and for the purpose of executing a fraudulent scheme to harm WWE's business.

251.    The predicate acts described herein were related to one another as part of a common scheme or plan.

252.    The unlawful conduct described herein constitutes a continuous pattern of racketeering activity. Such unlawful conduct, which began in or around 1995, continues through this date.

**Injury to WWE**

253.   As a direct and proximate result of Defendants' violation of 18 U.S.C. § 1962(c) as described herein, WWE has been injured in its business and property.

### COUNT II
### CONSPIRACY TO VIOLATE RICO, 18 U.S.C. § 1962(d)
### (Against All Defendants)

254.   Each and every one of the foregoing allegations is incorporated herein by reference and reasserted as though fully set forth at length.

255.   THQ/Jakks, Jakks, THQ, Jakks Pacific (H.K.), Road Champs Ltd., SSAI, Shenker, Bell Licensing, Bell, Friedman, Berman, Bennett and Farrell formed a conspiracy for the purpose of achieving and profiting from the racketeering activities described herein in violation of 18 U.S.C. § 1962(c).

256.   As described herein, each of the Defendants knowingly and intentionally agreed and conspired to commit at least two of the predicate acts set forth above and they did so with the knowledge and intent that such acts were in furtherance of the foregoing pattern of racketeering.

257.   As described herein, Defendants' conspiracy substantially affected interstate commerce as much of the conduct that formed the overt acts of the conspiracy involved interstate commerce, and the damage caused by the conspiracy has harmed a corporation that itself substantially affects interstate commerce.

258.   As a direct and proximate result of the conspiracy in violation of 18 U.S.C. § 1962(d) as described herein, WWE has been injured in its business and property.

### COUNT III
### VIOLATION OF THE SHERMAN ACT, 15 U.S.C. § 1
### (Against All Defendants except Jakks Pacific (H.K.) and Road Champs Ltd.)

259. Each and every one of the foregoing allegations is incorporated herein by reference and reasserted as though fully set forth at length.

260. WWE produces and sells television programming, pay-per-view programming and live arena events in interstate commerce. It also licenses its intellectual property in interstate commerce.

261. Defendant THQ/Jakks markets and sells videogames in interstate commerce.

262. Defendant THQ markets and sells videogames in interstate commerce.

263. Defendant Jakks markets and sells action figures, toys and other products in interstate commerce.

264. Defendant SSAI markets and sells its services as a licensing agent in interstate commerce.

265. Acclaim and Activision market and sell videogames in interstate commerce.

266. At all relevant times, Jakks, THQ, Activision and Acclaim were competitors for the WWE videogame license in the national market for the licensing of intellectual property in characters for videogames.

267. All of the Defendants consciously agreed and conspired to unreasonably restrain trade, in a *per se* violation of Section 1 of the Sherman Act, 15 U.S.C. § 1 by, among other things, (a) agreeing and conspiring to rig the terms of the bid that would be offered by the conspiring competitors to WWE for the videogame license, including, but not limited to, agreeing to rig the royalty rate that would be offered for the rights under the videogame license, (b) conspiring to prevent THQ from submitting to WWE an independent bid for the videogame license in competition with Jakks, and (c) conspiring to allocate the WWE videogame license to THQ/Jakks to the mutual benefit of all the conspirators. Defendants intended that their

conspiratorial acts would, and their acts in fact did unreasonably restrain trade by foreclosing competition for the videogame license. Further, Defendants intended to, and did, cause the licensing terms offered to WWE to be less favorable to WWE than the terms that competitive bids would have been.

268.    As part of their conspiracy, Defendants conspired to foreclose WWE from receiving competitive, market-level bids for the videogame license from Activision.

269.    As a result of Defendants' conspiracy, WWE suffered antitrust injury in that it was deprived of the benefits of a competitive market for the videogame license. Section 1 of the Sherman Act was intended to ensure WWE's right to a competitive market for the videogame license, in which WWE would receive independent bids from each of the actual and potential videogame producers which were interested in a license from WWE.

270.    WWE was injured in its business or property by the conspiracy to rig the videogame license bid and to allocate the license to THQ/Jakks. As a direct and proximate result of the conspiracy, WWE received less favorable license terms (including, but not limited to, a lower than market royalty rate) than WWE would have received if the conspiracy had not foreclosed the competitive operation of the market.

271.    The conspiracy took place in, restrained the flow of and adversely affected interstate and foreign commerce in the marketing of videogame licensing rights, the marketing of intellectual property rights and the marketing of videogames.

272.    As detailed above, Defendants have actively and willfully concealed the existence of the conspiracy and its effects on WWE in the interstate marketing of WWE's intellectual property rights. For the reasons set forth herein previously, WWE did not know, and in the exercise of reasonable diligence could not have known, of the existence of the conspiracy to rig bids and to allocate the WWE videogame license until well after December 2002—well within the period of the statute of limitations.

## COUNT IV
## DECLARATORY JUDGMENT
### (Against THQ, THQ/Jakks and Jakks Only)

273.    Each and every one of the foregoing allegations is incorporated herein by reference and reasserted as though fully set forth at length.

274.    As described herein, the videogame license was formed or induced as a result of commercial bribery and/or illegal conduct in violation of New York law.

275.    As described herein, the 1998 amendments to the toy licenses were formed or induced as a result of commercial bribery and/or illegal conduct in violation of New York law.

276.    As described herein, the commercial bribery and/or illegal conduct was and remains central to the performance of the videogame license.

277.    As described herein, the commercial bribery and/or illegal conduct was and remains central to the performance of the 1998 amendments to the toy licenses.

278.    Under New York law a contract formed or induced as a result of commercial bribery is void *ab initio*.

279.    Thus, an actual dispute and controversy exists with respect to whether the videogame license and the 1998 amendments to the toy licenses are void *ab initio* as a result of the commercial bribery.

280.    A judicial declaration is, therefore, necessary pursuant to 28 U.S.C. § 2201 *et seq.* to determine the parties' rights and obligations under the aforementioned licenses and amendments thereto.

## COUNT V
## DECLARATORY JUDGMENT
### (Against Defendants THQ, THQ/Jakks and Jakks Only)

281.    Each and every one of the foregoing allegations is incorporated herein by reference and reasserted as though fully set forth at length.

282.    Prior to and during the time the videogame license and the 1998 amendments to the toy licenses were negotiated, Jakks knew of and created an undisclosed conflict of interest between SSAI and its principal, Stanley Shenker, and WWE.

283.    During the time Jakks knew SSAI was WWE's agent, Jakks began the practice of paying Shenker and using him as their agent, none of which was disclosed to WWE.

284.    At various times during their undisclosed relationship with Shenker, Jakks personnel would, in writing, direct and inquire of Shenker regarding matters being performed by Shenker on Jakks' behalf and at the same time request he secure modifications and/or amendments to the WWE toy licenses.

285.    Jakks traded on the undisclosed conflicts of interests and aided and abetted SSAI and Shenker to violate fiduciary obligations to WWE by seeking and obtaining licensing rights

from WWE through Shenker while he was, and remained, an undisclosed agent of Jakks, and did so detrimentally to WWE's interests.

286.    Jakks personnel were acutely aware of the impropriety of doing so, and in particular were aware of the impropriety of doing so after being advised by corporate counsel that Jakks could not do so without WWE consent.

287.    With knowledge of the impropriety involved, Jakks continued to find ways to corrupt Shenker's loyalties by the payment of monies and/or promises of more contracts, including before, during and after the time Shenker and SSAI were to be negotiating on behalf of WWE with Jakks regarding the videogame license and amendments to the toy licenses.

288.    At all times relevant hereto, Jakks knew that it was dealing with a corrupt agent capable of, and actually engaging in, unethical conduct in violation of his fiduciary duties to WWE to the detriment of WWE. Jakks not only concealed such conduct from WWE but also directly fostered it.

289.    The payment made at Jakks' direction to Stanfull in January 1998, which was subsequently split with Bell, was the first time Shenker paid Bell monies in what evolved into a corrupt, illegal and wide-ranging bribery and kickback scheme between SSAI, Shenker and Bell during the time both SSAI and Bell were agents and fiduciaries of WWE.

290.    In order to induce Bell to act favorably on the licensing initiatives he was pursuing for Jakks, Shenker, as an agent for Jakks, promised Bell that he would split equally all commissions SSAI was paid, as well as profits from the sale of stock SSAI would also receive as compensation, if Bell did as Shenker and SSAI requested and acted favorably on licensing matters involving Jakks.

291.    Bell did recommend the videogame license be granted to THQ and Jakks and further recommended amendments to the toy licenses at the same time. Thereafter, SSAI and Shenker did split commissions and profits from stock sales with Bell in amounts exceeding several hundred thousand dollars.

292.    As a direct result of and during the foregoing conduct, the videogame license issued to THQ/Jakks and the amendments to the toy licenses were executed.

293.    The amendments to the domestic toy license beginning with the First Amendment to that license, the international toy license, all amendments to the international toy license, the videogame license, and all amendments to the videogame license are tainted by the illegality of WWE's agents and the conflicts of interest which were known to and facilitated by Jakks for its own benefit and in connection with the videogame license for the benefit of and on behalf of THQ and Jakks.

294.    An actual dispute and controversy exists with respect to whether the aforementioned licensing rights are void for such illegality.

295.    A judicial declaration is, therefore, necessary pursuant to 28 U.S.C. § 2201 *et seq.* to determine the parties' rights and obligations under the aforementioned licenses and amendments thereto.

## COUNT VI
## VIOLATION OF THE ROBINSON-PATMAN ACT, 15 U.S.C. § 13(c)
### (Against THQ/Jakks, Jakks, THQ, Friedman, Berman and Bennett Only)

296.    Each and every one of the foregoing allegations is incorporated herein by reference and reasserted as though fully set forth herein.

297. Defendants THQ/Jakks, Jakks, THQ, Friedman, Berman and Bennett are engaged in interstate commerce and, in the course of such commerce, engaged in the course of commercial bribery described above.

298. As described herein, Jakks, Friedman, Berman and/or Bennett authorized and/or directly paid unlawful bribes and/or payments, through Stanfull, to SSAI, Shenker, Bell Licensing and/or Bell of at least $100,000 to secure favorable and dishonest services in regard to the Jakks licensing matters. Defendants acted with the intent to corruptly to influence the conduct of Shenker, SSAI and Bell in the performance of their duties for WWE, including inducing WWE to enter into the videogame license despite the fact that other competing opportunities were, or could be negotiated to be, more favorable for WWE.

299. At all relevant times, SSAI, Shenker, and Bell were agents or employees of WWE and thus owed WWE fiduciary duties and obligations.

300. The payment of unlawful bribes, through Stanfull, to SSAI, Shenker, Bell Licensing and/or Bell, of at least $100,000 as described herein constitutes commercial bribery in violation of 15 U.S.C. § 13(c).

301. By that aspect of the scheme related to the toy licenses, Jakks was also able to foreclose competition for the rights covered by the toy licenses during and in the period those licenses would otherwise have expired but for the extended term granted by the amendments and prevented competition from Playmates.

302. As a direct and proximate result of Defendants' unlawful conduct described herein, WWE was deprived of the benefit of competition between and among Acclaim, Activision, THQ and Jakks, for the purchase of a videogame license for its intellectual property. Jakks, THQ and THQ/Jakks, as a consequence of the commercial bribery alleged herein,

obtained the videogame license from WWE upon terms less favorable to WWE than the terms which would have been available to WWE but for Defendants' foreclosure of such competition through, among other things, the bribery of WWE's fiduciaries and the associated fraudulent withholding by those agents of material information regarding Defendants' offers and the competing offers available in a competitive market. WWE was thereby injured in its business and property and was deprived of a fair and competitive return on the innovation and creativity which gave rise to WWE's intellectual property.

## COUNT VII
### VIOLATION OF NEW YORK COMMERCIAL BRIBERY LAW
### (Against THQ/Jakks, Jakks, THQ, Friedman, Berman and Bennett Only)

303.    Each and every one of the foregoing allegations is incorporated herein by reference and reasserted as though fully set forth at length.

304.    As described herein, Jakks, Friedman, Berman and/or Bennett directly paid unlawful bribes and/or payments, through Stanfull, to SSAI, Shenker, Bell Licensing and/or Bell of at least $100,000 to secure favorable and dishonest services in regard to Jakks licensing matters.

305.    At all times relevant to the payment of such bribes and/or payments, as described herein, SSAI, Shenker, and Bell were agents or employees of WWE and thus owed WWE fiduciary duties and obligations.

306.    Jakks, Friedman, Berman and/or Bennett's payment of unlawful bribes and/or payments, through Stanfull, to SSAI, Shenker, Bell Licensing and/or Bell of at least $100,000 to secure the WWE videogame license and the 1998 amendments to the toy license, constitutes commercial bribery in violation of New York law.

307.    The bribery scheme inured not only to the benefit of Jakks, but also to the benefit of THQ and THQ/Jakks, all of whom accepted the benefits and/or ratified the acts and/or are legally liable in any event.

308.    As a direct and proximate result of Defendants' unlawful conduct described herein, WWE has been injured in its business and property.

309.    In addition, because the videogame license and the 1998 amendments to the toy licenses were obtained by bribery, they should be declared void *ab initio*.

**COUNT VIII**
**FRAUDULENT INDUCEMENT**
**(Against THQ/Jakks, Jakks, THQ, Friedman, Berman, Bennett and Farrell Only)**

310.    Each and every one of the foregoing allegations is incorporated herein by reference and reasserted as though fully set forth at length.

311.    As detailed herein, in connection with the discussions leading to execution of the videogame license and the 1998 amendments to the toy licenses and during the performance of those licenses, THQ/Jakks, Jakks, THQ, Friedman, Berman, Bennett and/or Farrell knowingly or recklessly made false and misleading statements to, and also knowingly or recklessly concealed information from and did not disclose information to, WWE regarding (1) the payment of bribes, through Stanfull, to SSAI, Shenker, Bell Licensing and/or Bell of at least $100,000 to secure favorable and dishonest services in regard to Jakks licensing matters, including with respect to the WWE videogame license and the 1998 amendments to the toy licenses, and/or (2) their use of SSAI or Shenker as an undisclosed agent to secure the videogame license and the 1998 amendments to the toy licenses, and/or (3) the collusive and illegal nature of the bidding process.

312.    Under the circumstances, THQ/Jakks, Jakks, THQ, Friedman, Berman, Bennett and Farrell had a duty not to make such false and misleading statements, a duty to disclose the

concealed and omitted information, and a duty not to induce or otherwise aid and abet SSAI's, Shenker's and Bell's violation of fiduciary duties.

313.    As described herein, THQ/Jakks, Jakks, THQ, Friedman, Berman, Bennett and Farrell engaged in such conduct with the intent and purpose of inducing reliance thereon by WWE and inducing WWE to enter into the videogame license and the 1998 amendments to the toy licenses.

314.    The false and misleading statements, and concealed information, were material to WWE's decision to enter into, induced WWE to enter into, and were reasonably and justifiably relied upon by WWE in entering into, the videogame license and the 1998 amendments to the toy licenses. As THQ/Jakks, Jakks, THQ, Friedman, Berman, Bennett and Farrell knew, WWE would never have entered into the videogame license or the 1998 amendments to the toy licenses had WWE known the true state of affairs regarding the payment of bribes, through Stanfull, to SSAI, Shenker, Bell Licensing and/or Bell and/or the use of SSAI or Shenker as an undisclosed agent and/or the collusive nature of the bidding process.

315.    In fraudulently inducing WWE to enter into the videogame license and the 1998 amendments to the toy licenses, as described herein, THQ/Jakks, Jakks, THQ, Friedman, Berman, Bennett and Farrell acted with malicious purpose and/or dishonest, unfair or improper means to harm WWE.

316.    As a direct and proximate result of Defendants' fraudulent conduct, WWE has been injured in its business and property.

317.    In addition, because the videogame license and the 1998 amendments to the toy licenses were obtained on the basis of fraud, the videogame license and the 1998 amendments to the toy licenses should be declared void *ab initio*.

## COUNT IX
## UNJUST ENRICHMENT
### (Against THQ/Jakks, Jakks, THQ, Friedman, Berman and Bennett Only)

318.    Each and every one of the foregoing allegations is incorporated herein by reference and reasserted as though fully set forth at length.

319.    As described herein, THQ/Jakks, Jakks, THQ, Friedman, Berman and Bennett have derived substantial benefits from the videogame license and/or the 1998 amendments to the toy license, to which they were not properly entitled.

320.    Accordingly, THQ/Jakks, Jakks, THQ, Friedman, Berman and Bennett have unfairly and unjustly enjoyed the benefits of monies to which they were not properly entitled.

321.    It would be unfair and unjust for THQ/Jakks, Jakks, THQ, Friedman, Berman and Bennett to retain the benefits of such monies, to which they were not properly entitled.

## COUNT X
## INDUCING BREACH OF FIDUCIARY DUTY
### (Against THQ/Jakks, Jakks, THQ, Friedman, Berman and Bennett Only)

322.    Each and every one of the foregoing allegations is incorporated herein by reference and reasserted as though fully set forth at length.

323.    As described herein, Bell, SSAI and/or Shenker breached their fiduciary duties owed to WWE by, *inter alia,* accepting bribes of at least $100,000 to secure the WWE videogame license and the 1998 amendments to the toy licenses, secretly acting as an agent of Jakks, participating in the bid rigging and price fixing alleged herein, and/or failing to disclose such conduct.

324.    As described herein, Defendants herein knowingly induced or participated in Bell, SSAI and/or Shenker's breach of their fiduciary duties by making bribes of at least $100,000,

through Stanfull, to secure the WWE videogame license and the 1998 amendments to the toy licenses, by failing to disclose that Shenker was secretly acting as their agent, and by inducing SSAI, Shenker and Bell to violate their fiduciary duties in connection with the bid rigging and price fixing scheme that resulted in the videogame license being awarded to THQ, Jakks and THQ/Jakks.

325.    In seeking to induce SSAI, Shenker and/or Bell to breach their fiduciary duties owed to WWE, Defendants herein acted with malicious purpose and/or dishonest, unfair or improper means to harm WWE.

326.    All actions of Jakks and/or Friedman and/or Berman and/or Bennett in regard to the videogame license were either authorized or ratified by THQ/Jakks and THQ.

327.    As a direct and proximate result of Defendants' unlawful conduct, WWE has been injured in its business and property.

## COUNT XI
## INDUCING BREACH OF FIDUCIARY DUTY
### (Against THQ/Jakks, Jakks, THQ, Friedman, Berman and Bennett Only)

328.    Each and every one of the foregoing allegations is incorporated herein by reference and reasserted as though fully set forth at length.

329.    At all relevant times, SSAI and/or Shenker were agents of WWE and thus owed WWE fiduciary duties and obligations.

330.    As described herein, during the time SSAI and/or Shenker were agents of WWE, including, but not limited to, during the time the videogame license and the 1998 amendments to the toy licenses were negotiated, Jakks and/or Friedman and/or Berman and/or Bennett knew of and created an undisclosed conflict of interest between SSAI and/or Shenker, and WWE.

331.    As described herein, during the time Jakks knew SSAI and/or Shenker was WWE's agent, Jakks began the practice of paying Shenker and using him as their agent, none of which was disclosed to WWE.

332.    As described herein, at various times during their undisclosed agency relationship with Shenker, Jakks personnel would, in writing, direct and inquire of Shenker regarding matters being performed by Shenker on Jakks' behalf and at the same time request that he secure modifications and/or amendments to Jakks' toy license with WWE on terms desired by Jakks. To the detriment of WWE, Shenker recommended such modifications and amendments without attempting to negotiate better terms from Jakks or other entities interested in such rights.

333.    As described herein, Jakks personnel were acutely aware of the impropriety of such conduct, and in particular were aware of the impropriety of such conduct after being advised by corporate counsel that Jakks could not do so without WWE's knowledge and consent.

334.    Jakks never disclosed to WWE its agency relationship with Shenker.

335.    As described herein, SSAI and/or Shenker breached their fiduciary duties to WWE through Shenker's undisclosed conflict of interest by virtue of his undisclosed agency relationship with Jakks and by acting contrary to the interests of WWE.

336.    As described herein, Defendants herein knowingly induced or participated in SSAI's and/or Shenker's breach of fiduciary duty by Jakks maintaining an agency relationship with Shenker despite knowing of Shenker's and/or SSAI's agency relationship with WWE, and Jakks failing to disclose such agency relationship and conflict of interest to WWE at the same time that Jakks was conducting business with WWE, including specifically with respect to the negotiation of valuable licensing rights sought by Jakks.

337.    Jakks induced Shenker to violate his fiduciary duties in connection with every licensing right it obtained following execution of the domestic toy license and, with the authority

of Friedman and/or Berman and/or Bennett, paid Shenker for favorable treatment with respect to

licensing matters being sought by Jakks, on its own behalf and/or on behalf of THQ and

THQ/Jakks, including in regard to obtaining the rights formerly held by Playmates and the

videogame license.

338.    All actions of Jakks and/or Freidman and/or Berman and/or Bennett in regard to

the videogame license were either authorized or ratified by THQ/Jakks and THQ.

339.    In seeking to induce SSAI and/or Shenker to breach their fiduciary duties owed to

WWE, Defendants herein acted with malicious purpose and/or dishonest, unfair or improper

means to harm WWE.

340.    As a direct and proximate result of Defendants' unlawful conduct, WWE has been

injured in its business and property.

**COUNT XII**
**CONSTRUCTIVE TRUST**
**(Against Defendants THQ/Jakks, Jakks, THQ,**
**Friedman, Berman and Bennett Only)**

343.    Each and every one of the foregoing allegations is incorporated herein by

reference and reasserted as though fully set forth at length.

344.    As described herein, Bell, SSAI and/or Shenker breached their fiduciary duties

owed to WWE by, *inter alia,* accepting bribes of at least $100,000 to secure the WWE

videogame license and the 1998 amendments to the toy license and/or by participating in the bid

rigging and price fixing scheme incidental to the videogame license.

345.    As described herein, in violation of their fiduciary duties owed to WWE, Bell,

SSAI and/or Shenker caused WWE to enter into the videogame license and the 1998

amendments to the toy licenses.

346. As described herein, Defendants herein had notice or knowledge of Bell, SSAI and/or Shenker's breach of their fiduciary duties owed to WWE in causing WWE to enter into the videogame license and the 1998 amendments to the toy licenses.

347. Accordingly, the videogame license and the 1998 amendments to the toy license, and all revenues and profits therefrom, are held by THQ/Jakks, Jakks, THQ, Friedman, Berman and Bennett in constructive trust for WWE.

## COUNT XIII
## TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS
### (Against THQ/Jakks, Jakks, THQ, Friedman, Berman and Bennett Only)

348. Each and every one of the foregoing allegations is incorporated herein by reference as though fully set forth at length.

349. At all times relevant hereto, WWE maintained valid contracts with SSAI, Shenker and/or Bell which required their faithful and honest services and which prohibited unethical conduct, fraud and deceit.

350. Defendants herein had knowledge of WWE's valid contracts with SSAI, Shenker and/or Bell and knew that SSAI, Shenker and Bell acted as fiduciaries of WWE.

351. As described herein, Defendants herein intentionally sought to and did induce SSAI, Shenker and/or Bell to breach their contracts with WWE.

352. In seeking to induce SSAI, Shenker and/or Bell to breach their contracts, Defendants acted with malicious purpose and/or dishonest, unfair or improper means to harm WWE.

353. As a direct and proximate result of Defendants' unlawful conduct, WWE has been injured in its business and property.

**COUNT XIV**
**PIERCING THE CORPORATE VEIL/ALTER EGO**
**(Against THQ, Jakks, and THQ/Jakks Only)**

354.    Each and every one of the foregoing allegations is incorporated herein by reference as though fully set forth at length.

355.    THQ and Jakks exercised complete domination of THQ/Jakks Pacific LLC with respect to the formation and operation of THQ/Jakks Pacific LLC.  From inception, Jakks and THQ have each owned 50% of THQ/Jakks.

356.    Since its formation, THQ/Jakks has continued to be an instrument of fraud. THQ/Jakks has never performed the videogame license and has authorized and otherwise been complicit in the scheme to distribute the proceeds of the commercial bribery and antitrust violations set forth herein.

357.    THQ/Jakks Pacific LLC was a sham used to perpetrate and implement a fraud, specifically to be the formal signatory to the videogame license procured by the fraudulent and criminal schemes set forth herein.

358.    As a result, any and all liability of THQ/Jakks Pacific LLC to WWE should be imposed upon THQ and Jakks, jointly and severally.

**COUNT XV**
**CONSPIRACY TO COMMIT COMMERCIAL BRIBERY; FRAUDULENT**
**INDUCEMENT; INDUCING BREACH OF FIDUCIARY DUTY; AND TORTIOUS**
**INTERFERENCE WITH CONTRACTUAL RELATIONS**
**(Against THQ/Jakks, Jakks, THQ,**
**Friedman, Berman and Bennett Only)**

359.    Each and every one of the foregoing allegations is incorporated herein by reference and reasserted as though fully set forth at length.

360.    Defendants entered into an agreement to, *inter alia,* (i) commit commercial bribery; (ii) fraudulently induce WWE to execute the videogame license and the 1998 amendments to the toy licenses without knowledge of Defendants' unlawful bribes to SSAI, Shenker, Bell and/or Bell Licensing of at least $100,000 and Defendants' use of SSAI and/or Shenker as their undisclosed agent; (iii) induce SSAI, Shenker and/or Bell to breach their fiduciary duties owed to WWE; and (iv) tortiously interfere with WWE's contractual relations with SSAI, Shenker and/or Bell, as described in the foregoing substantive Counts of this Amended Complaint.

361.    Each of the Defendants committed one or more overt acts pursuant to and in furtherance of Defendants' conspiracy to unlawfully harm WWE by the unlawful conduct described herein.

362.    Pursuant to and in furtherance of Defendants' conspiracy, Defendants have, among other things, committed the acts described in Count I above, which are overt acts in furtherance of the goals of the conspiracy and which are specifically incorporated herein by reference and made a part hereof.

363.    As a direct and proximate result of Defendants' unlawful conspiracy, WWE has been injured in its business and property.

## **PRAYER FOR RELIEF**

WHEREFORE, WWE respectfully requests that this Honorable Court enter judgment in favor of WWE and order the following relief:

1.    All damages proven pursuant to RICO, trebled as permitted by law;

2.    All damages proven pursuant to the Sherman Act, trebled as permitted by law;

3. All damages proven pursuant to the Robinson-Patman Act, trebled as permitted by law;

4. A declaration that the videogame license and the international toy license are void;

5. A declaration that all amendments to the domestic toy license, the international toy license, and the videogame license are void;

6. An accounting of all revenues and profits obtained from all licensing rights illegally obtained;

7. Restitution and/or disgorgement of all revenues and profits obtained from licensing rights illegally obtained to which THQ/Jakks, Jakks, THQ, Friedman, Berman and Bennett were not properly entitled;

8. Restitution and/or disgorgement of all bribes and/or payments paid or received by Defendants;

9. All other actual damages sustained by WWE;

10. Punitive damages;

11. Attorneys' fees and costs; and

12. Such other and further relief as this Court deems just and appropriate.

**JURY TRIAL DEMANDED**

Respectfully submitted,

KIRKPATRICK & LOCKHART NICHOLSON
    GRAHAM LLP


_____/s_____

By: Eugene Licker (EL 0334)

KIRKPATRICK & LOCKHART NICHOLSON
    GRAHAM LLP

599 Lexington Avenue
New York, New York 10022-6030
(212) 536-3900 (phone)
(212) 536-3901 (fax)

and

Jerry S. McDevitt
Curtis B. Krasik
Amy L. Barrette

KIRKPATRICK & LOCKHART NICHOLSON
    GRAHAM LLP

535 Smithfield Street
Pittsburgh, Pennsylvania 15222
(412) 355-6500 (phone)
(412) 355-6501 (fax)

Dated: March 30, 2005

Attorneys for Plaintiff, World Wrestling
Entertainment, Inc.

# STANFUL INDUSTRIAL LTD.

ROOM 1601-2, 16/F
CAUSEWAY BAY PLAZA I,
489 HENNESSY ROAD,
CAUSEWAY BAY, HONG KONG.

TEL:(852) 2891-7722
FAX:(852) 2891-6833

_INVOICE_

JAN. 2, 1998
PAYABLE IMMEDIATELY

TANKS PACIFIC
Room 1008   10/F
PENNESULA CENTRE
T.S.T. EAST
KOWLOON, HONG KONG

FOR DEVELOPMENT OF POSSIBLE
LATEX BASED SOFT TOYS WITH
SPECIAL COATINGS

US$80,000 00/XX

PLEASE PAY IMMEDIATELY TO
HANG SENG BANK LTD
BENEFICIARY A/C STANFULL INDUSTRIAL LTD
A/C No. 296-9-704122

NET U.S.D. $80,000 00/XX

SINCERELY

For and on behalf of
STANFULL INDUSTRIAL LIMITED
金富實業有限公司

Authorized Signature(s)

saline
pls handle

00080

3-JAN-1998  10:07              3103178527

EXHIBIT
1

P.02

ANALYSIS OF LEAD PLAINTIFF MOVANTS' FINANCIAL INTEREST APPLYING FOUR-FACTOR TEST

| Movant | Number of shares purchased during class period | Number of shares sold during class period | Net class period shares | Total value of purchases during class period | Total value of sales during class period | Net value expended during class period | Approximate Loss (Gain) [1] |
|---|---|---|---|---|---|---|---|
| Quantum Equities | 25,000 | 25,000 | 0 | $580,945 | $512,105 | $68,840 | $68,840 |
| Kenneth Tucker | 9,000 | 9,000 | 0 | $212,069 | $184,868 | $27,201 | $27,201 |
| Michael Kraus | 1,091 | 1,000 | 91 | $26,008 | $20,171 | $5,837 | $4,136 |
| Tonia R. Tucker Kraus | 1,000 | 1,000 | 0 | $23,826 | $20,265 | $3,561 | $3,561 |
| Indiana Electrical Workers Pension Trust Fund | 3,500 | 3,500 | 0 | $47,474 | $38,565 | $8,909 | $4,708 |

[1] Approximate loss (gain) was calculated on a LIFO basis. A Net/Net analysis would result in the same figures for all movants except Indiana Electrical Workers, who have a Net/Net loss is $8,909.30.

Class Perio.. ..J26/99 - 10/19/04

JAKKS PACIFIC, I... (NasdaqNM:JAKK)

Hold price: $18.5655

| PLAINTIFF | PURCHASE TRANSACTIONS | | | | SALES TRANSACTIONS (1) | | | | SHARES HELD | ESTIMATED VALUE (2) | ESTIMATED LOSSES |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | DATE | SHARES | SHARE COST | PURCHASE AMOUNT | DATE | SHARES | SHARE PRICE | SALES AMOUNT | | | |
| Indiana Electrical Workers (net/net) | 07/07/03 | 1,100 | 13.3060 | 14,636.60 | 07/28/03 | 1,000 | 11.6340 | 11,634.00 | 100 | 1,856.55 | (1,146.05) |
| | 07/08/03 | 400 | 13.3460 | 5,338.40 | 07/30/03 | 500 | 11.4060 | 5,703.00 | (100) | (1,856.55) | (1,491.95) |
| | 07/11/03 | 900 | 13.7000 | 12,330.00 | 07/31/03 | 500 | 11.4410 | 5,720.50 | 600 | 7,426.20 | 816.70 |
| | 07/11/03 | 1,100 | 13.7900 | 15,169.00 | 08/11/03 | 500 | 10.2740 | 5,137.00 | 600 | 11,139.30 | 1,107.30 |
| | | | | | 08/11/03 | 400 | 10.6810 | 4,272.40 | (400) | (7,426.20) | (3,153.80) |
| | | | | | 08/13/03 | 600 | 10.1630 | 6,097.80 | (600) | (11,139.30) | (5,041.50) |
| **Indiana Electrical Workers Totals** | | 3,500 | | 47,474.00 | | 3,500 | | 38,564.70 | | | (8,909.30) |
| Indiana Electrical Workers (LIFO) | Pre-class holdings | 500 | | | 08/13/03 | 500 | 10.1630 | | | | |
| | | | | | **Total** | 500 | | | | | |
| | 07/07/03 | 1,100 | 13.3060 | 14,636.60 | 07/28/03 | 1,000 | 11.6340 | 11,634.00 | 100 | 1,856.55 | (1,146.05) |
| | 07/08/03 | 400 | 13.3460 | 5,338.40 | 07/30/03 | 500 | 11.4060 | 5,703.00 | (100) | (1,856.55) | (1,491.95) |
| | 07/11/03 | 900 | 13.7000 | 12,330.00 | 07/31/03 | 500 | 11.4410 | 5,720.50 | 400 | 7,426.20 | 816.70 |
| | 07/11/03 | 1,100 | 13.7900 | 15,169.00 | 08/11/03 | 500 | 10.2740 | 5,137.00 | 600 | 11,139.30 | 1,107.30 |
| | | | | | 08/11/03 | 400 | 10.6810 | 4,272.40 | (400) | (7,426.20) | (3,153.80) |
| | | | | | 08/13/03 | 100 | 10.1630 | 1,016.30 | (100) | (1,856.55) | (840.25) |
| **Indiana Electrical Workers Totals** | | 3,500 | | 47,474.00 | | 3,000 | | 33,483.20 | 500 | 9,282.75 | (4,708.05) |
| Indiana Electrical Workers (FIFO) | Pre-class holdings | 500 | | | 07/28/03 | 500 | 11.6340 | | | | |
| | | | | | **Total** | 500 | | | | | |
| | 07/07/03 | 1,100 | 13.3060 | 14,636.60 | 07/28/03 | 500 | 11.6340 | 5,817.00 | 600 | 11,139.30 | 2,319.70 |
| | 07/08/03 | 400 | 13.3460 | 5,338.40 | 07/30/03 | 500 | 11.4060 | 5,703.00 | (100) | (1,856.55) | (1,491.95) |
| | 07/11/03 | 900 | 13.7000 | 12,330.00 | 07/31/03 | 500 | 11.4410 | 5,720.50 | 400 | 7,426.20 | 816.70 |
| | 07/11/03 | 1,100 | 13.7900 | 15,169.00 | 08/11/03 | 500 | 10.2740 | 5,137.00 | 600 | 11,139.30 | 1,107.30 |
| | | | | | 08/11/03 | 400 | 10.6810 | 4,272.40 | (400) | (7,426.20) | (3,153.80) |
| | | | | | 08/13/03 | 600 | 10.1630 | 6,097.80 | (600) | (11,139.30) | (5,041.50) |
| **Indiana Electrical Workers Totals** | | 3,500 | | 47,474.00 | | 3,000 | | 32,747.70 | 500 | 9,282.75 | (5,443.55) |

Class Period.   2/6/99 - 10/19/04

JAKKS PAC.. , INC. (NasdaqNM:JAKK)

Hold price:   $18.6875

| PLAINTIFF | PURCHASE TRANSACTIONS | | | | SALES TRANSACTIONS (1) | | | | SHARES HELD | ESTIMATED VALUE (2) | ESTIMATED LOSSES |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | DATE | SHARES | SHARE COST | PURCHASE AMOUNT | DATE | SHARES | SHARE PRICE | SALES AMOUNT | | | |
| Quantum Equities | 10/19/04 | 25,000 | 23.2378 | 580,945.00 | 10/19/04 | 25,000 | 20.4842 | 512,105.00 | 0 | | (68,840.00) |
| **Quantum Equities Totals** | | **25,000** | | **580,945.00** | | **25,000** | | **512,105.00** | **0** | **0.00** | **(68,840.00)** |
| Tucker, Kenneth J. | 10/11/04 | 3,000 | 23.8800 | 71,640.00 | 10/19/04 | 5,800 | 20.5400 | 119,132.00 | (2,800) | (52,325.13) | (4,833.13) |
| | 10/18/04 | 1,000 | 24.1700 | 24,170.00 | 10/19/04 | 200 | 20.5800 | 4,116.00 | 800 | 14,950.04 | (5,103.96) |
| | 10/19/04 | 600 | 24.2400 | 14,544.00 | 10/19/04 | 3,000 | 20.5400 | 61,620.00 | (2,400) | (44,850.11) | 2,225.89 |
| | 10/19/04 | 1,400 | 24.2500 | 33,950.00 | | | | 0.00 | 1,400 | 26,162.57 | (7,787.43) |
| | 10/19/04 | 100 | 22.5400 | 2,254.00 | | | | 0.00 | 100 | 1,868.75 | (385.25) |
| | 10/19/04 | 2,900 | 22.5900 | 65,511.00 | | | | 0.00 | 2,900 | 54,193.89 | (11,317.11) |
| **Tucker, Kenneth J. Totals** | | **9,000** | | **212,069.00** | | **9,000** | | **184,868.00** | **0** | **0.00** | **(27,201.00)** |
| Kraus, Tonia R. Tucker | 10/11/04 | 440 | 23.8200 | 10,480.80 | 10/19/04 | 700 | 20.2600 | 14,182.00 | (260) | (4,858.76) | (1,157.56) |
| | 10/11/04 | 560 | 23.8300 | 13,344.80 | 10/19/04 | 300 | 20.2750 | 6,082.50 | 280 | 4,858.76 | (2,403.54) |
| **Kraus, Tonia R. Tucker Totals** | | **1,000** | | **23,825.60** | | **1,000** | | **20,264.50** | **0** | **0.00** | **(3,561.10)** |
| Kraus, Michael | 10/11/04 | 1,000 | 23.8190 | 23,819.00 | 10/19/04 | 1,000 | 20.1710 | 20,171.00 | 0 | 0.00 | (3,648.00) |
| | 10/13/04 | 91 | 24.0500 | 2,188.55 | | | | 0.00 | 91 | 1,700.57 | (487.98) |
| **Kraus, Michael Totals** | | **1,091** | | **26,007.55** | | **1,000** | | **20,171.00** | **91** | **1,700.57** | **(4,135.98)** |
| **GRAND TOTAL** | | **36,091** | | **842,847.15** | | **36,000** | | **737,408.50** | **91** | **1,700.57** | **(103,738.08)** |

(1) Sales have been applied to purchases on a FIFO basis.
(2) Held shares have been valued using the average price of $18.6875 per share.

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---------------------------------------------------------- X
:
:                                           Master File No.
:                                           01 CV 6972 (ARR)
:
IN RE COMVERSE TECHNOLOGY, INC.,            :          **OPINION AND ORDER**
SECURITIES LITIGATION                       :
                                            **FILED**
---------------------------------------------------------- IN CLERK'S OFFICE **NOT FOR PUBLICATION**
                                            U.S. DISTRICT COURT, E.D.N.Y.

THIS DOCUMENT RELATES TO ALL ACTIONS  OCT 0 2 2002  ★

                                            BROOKLYN OFFICE
---------------------------------------------------------- X

ROSS, United States District Judge:

The lead plaintiffs in this action represent a proposed class of persons who purchased

common stock of defendant Comverse Technology, Inc. ("Comverse," or "the Company"), between

April 30, 2001, and July 10, 2001. By the Consolidated Amended Class Action Complaint ("the

complaint," or "AC"), filed March 4, 2002, plaintiffs allege that defendants, Comverse, Kobi

Alexander, and David Kreinberg, violated Section 10(b) of the Securities Exchange Act of 1934

("the Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5 of the regulations promulgated thereunder,

17 C.F.R. § 240.10b-5. Plaintiffs further allege that Alexander and Kreinberg, the CEO and CFO

of Comverse, respectively, violated Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

Defendants have moved to dismiss the complaint pursuant to Rules 9(b) and 12(b)(6) of the Federal

Rules of Civil Procedure and Section 21(D)(b) of the Exchange Act, as amended by the Private

Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4(b). For the reasons below,

the motion is granted and the complaint is dismissed without prejudice.

1

## BACKGROUND

Founded in 1984, Comverse makes computer and telecommunications software and systems for multimedia and information processing applications. Comverse primarily produces so-called enhanced service platform ("ESP") systems, which enable telecommunications operators to provide their customers with a wide range of revenue-generating services. These services include call answering, voicemail, faxmail, unified messaging ("UM") services, prepaid wireless calling services, short message service ("SMS"), wireless Internet access, interactive voice response ("IVR"), and Internet messaging and voice portal services. ESP systems account for approximately 84% of Comverse's total revenue; 80% of the ESP revenue comes from voicemail products.

Following its merger in 1998 with Boston Technology, Inc., the Company become a dominant player in the global ESP market. More than 360 telecommunications operators in more than 100 countries, including the majority of the 20 largest telecommunications companies in the world, use Comverse platforms. To stay competitive in this market, Comverse needed "to enhance its existing products and to introduce new products on a timely and cost-effective basis." AC ¶ 39. Doing so would require a significant increase in spending on research and development and on marketing and sales.

To raise this money, in June 1998 Comverse issued $300,000,000 worth of convertible subordinated debentures bearing 4.5% annual interest and maturing in 2005. A "convertible" debenture is one that the holder can convert into either cash or company stock at the time of redemption. The conversion price of such a debenture is the price per share of the stock at which a holder who so elects will have his debenture converted into stock at the time of redemption. The initial conversion price of the 4.5% debentures was $ 64.50. Comverse held a call option on the

2

debentures, which gave it the right to redeem them prior to maturity. According to the terms of the offering, the earliest date on which Comverse could exercise this right was July 10, 2001.

Comverse made biannual interest payments on the 4.5% debentures (as well as on $600 million worth of 1.5% debentures issued in January 2001). Soon after the debenture offering, Comverse's stock price rose, splitting twice before reaching its peak in January 2001. By April 2001, however, Comverse's stock had begun to fall, and the telecommunications sector as a whole was "rapidly cooling." AC ¶ 47. In addition, interest rates continued to fall during this period. "In this atmosphere, repaying the Company's outstanding debt became a paramount concern for defendants." AC ¶ 48. Although the 1.5% debentures were not callable until 2003, the 4.5% bonds, as mentioned, could be called in July 2001.

If the Company's stock price fell below the $64.50 conversion price, holders of the debentures would, at the time of redemption, elect to receive cash instead of stock. The converse is also true: if the stock price were greater than $64.50 per share, holders would elect to receive stock (which they could then sell at the higher price on the open market). Because the Company wanted to avoid depleting its cash reserves, it became "essential" for Comverse to "bolster[] and stabiliz[e]" its stock price until after the debentures were redeemed. AC ¶ 48. The complaint states that by April 30, 2001, the Company, "to further ensure that bond holders would redeem their investments in stock rather than cash," modified the terms of the 4.5% offering to reduce the conversion price to the more favorable price of $21.50 per share. Id. However, defendants point out in their motion, and plaintiffs concede in their response thereto, that the Company did not in fact "modify" the terms of the offering; rather, the offering itself provided for the automatic reduction of the conversion price, according to a formula, to reflect such events as stock splits and the issuance of dividends.

3

 

Defendants also point out, and plaintiffs do not contest, that the conversion price had been adjusted

to $21.50 per share by April 2000. Def. Mem. at 10; Declaration of John L. Lerner ("Lerner Decl.")

Ex. B at F-17 & F-18.[1]

     On April 30, 2001, the beginning of the class period, Comverse issued a press release

predicting that it would meet or exceed earnings and revenue expectations for the first quarter of

fiscal 2001. The press release announced that the Company was planning to lay off 6% of its staff

due to deteriorating macro-economic conditions. Notwithstanding these cuts, the release stated that

the Company expected to meet or exceed existing guidance levels for earnings for the remainder of

the fiscal year. In pertinent part, the release quoted defendant Kobi Alexander as follows:

> Recently, the macro-economic environment has deteriorated. As such, we are adjusting our
> employment base and overall cost structure to stay in alignment with our current level of
> growth. This reduction is designed to have no adverse impact on customer-focused
> activities, such as account management, service, support, product quality, and R&D. We
> will continue to invest aggressively in all these areas, as well as areas that fuel sales growth
> and new customer penetration.

> For the quarter ending April 30, 2001, we expect to meet or exceed existing guidance
> levels. Furthermore, we believe that based on our current outlook, we will continue to meet
> or exceed the existing guidance levels for the current fiscal year. We are the leader in our
> markets – markets with outstanding growth potential – and continue to achieve market
> share gains. Our recently announced wins, to enable unified messaging for AT&T Wireless
> and Deutsche Telekom's T-Mobil network and to provide wireless Internet gateways and
> applications for One 2 One, are examples of our competitive strength, our growing market
> share, and our excellent position within our new application areas.

Lerner Decl. Ex. E. at 2. The release also contained a paragraph-long disclaimer, stating that there

---

[1] Although a plaintiff's allegations are generally taken as true for the purposes of a motion
to dismiss, the court may consider the full text of documents partially quoted in the complaint if
such documents are "integral" to the plaintiff's allegations. See San Leandro Emergency Med.
Group Profit Sharing Plan v. Philip Morris Cos., 75 F.3d 801, 808 (2d Cir. 1996). The court may
also consider SEC filings, even when these are not referenced in the complaint. See Salinger v.
Projectavision, 972 F. Supp. 222, 226 (S.D.N.Y. 1997) (citing Kramer v. Time Warner, Inc., 937
F.2d 767, 773-74 (2d Cir. 1991)). In any event, plaintiffs do not object to defendants' reference
to these materials.

could be "no assurances that the forward-looking statements w[ould] be achieved," and that actual results might "differ materially" from those predicted. The disclaimer listed numerous "risks and uncertainties" that could affect the Company's performance.

After the issuance of the press release, Comverse's stock jumped amid a chorus of public praise for the Company from stock analysts. What the press release failed to mention, however, was that a number of factors were conspiring to render the Company's continued success far from certain. Alexander's "unqualified" (AC ¶ 50) statements concerning the Company's "excellent position within . . . new application areas," its "growing share" in "markets with outstanding growth potential," and its intention that the layoffs would have "no adverse impact on customer-focused activities" were therefore false and misleading. Specifically, Alexander knew of, or recklessly disregarded, the following adverse developments, which the press release failed to disclose: (1) according to a "former manager of voicemail systems" and a "former senior service engineer" who were employed by Comverse during the class period, the Company was abandoning its primary ESP system – the ANP voicemail system – in favor of the TRILOGUE voicemail system and the more advanced 2.5/3G multimedia messaging technology, "despite the fact that the ANP system had been the bedrock of the Company's strong financial performance," AC ¶ 52(a); (2) according to the former manager of voicemail systems, certain customers had begun to defer discretionary purchases until new features compatible with the advanced 2.5/3G multimedia messaging technology could be added to the product; (3) although second sourcing of voicemail systems had been an engine for past growth, carriers and suppliers had virtually ceased that activity by the first fiscal quarter; (4) according to a former manager of voicemail systems, Comverse's customers began to focus on the quality of their subscribers rather than their quantity, which had a negative impact on Comverse's

5



revenues, which derive from a "usage-based model," AC ¶ 52(d); (5) the Company's customers were beginning to experience a decline in subscriber growth from 50% per year from 1996 to 2000, to approximately 27% in 2001.

According to the complaint, Alexander's statement concerning the cause of the layoffs was also false and misleading. Although he attributed the layoffs to the deterioration of the macro-economic environment, many of the layoffs, according to a former senior R&D engineer, were in fact caused by the failure of the three major cellular telephone manufacturers -- Ericsson, Nokia, and Motorola -- to release advanced wireless 2.5/3G multimedia messaging technology. This delay prevented Comverse from releasing its own improved TRILOGUE or ANP products incorporating such technology. The Company therefore decided to lay off the employees working on these products. Alexander knew of, or recklessly disregarded, this development.

On June 4, 2001, the Company issued a press release announcing record results for the first fiscal quarter of 2001. The release quoted Kobi Alexander as stating, inter alia, "Our first quarter results reflect our leadership position in our major markets. We believe that we are expanding our market share in all three of our major areas of operation." Lerner Decl., Ex. G at 1. Alexander then specified many of the services that Comverse provided to its customers, which included more than 370 telecommunications network operators. Finally, Alexander stated that the Company's Comverse Infosys division was expanding its market share, and that its Ulticom division was benefiting from the growth of particular technologies. The press release contained the same disclaimer regarding future results as the April 30 release. On June 4, 2001, the Company also held a conference call with analysts, at which it stated its comfort with its previous earnings forecasts for the remainder of the year. Analysts were again impressed, as numerous subsequent news articles reveal.

6

Again, however, plaintiffs allege, defendants knowingly or recklessly misled the investing public. Defendants' statements "concerning market share growth and comfort with earnings guidance in the June 4, 2001 press release, conference call with analysts on the same date, and subsequent news articles" were false and misleading for the same reasons as those in the April 30 release were. AC ¶ 61. Moreover, although the Company reported an increase in backlog for the quarter, "just-in-time" purchasing had begun to cause a decline in the Company's backlog. "This change was significant because defendants could no longer use the Company's backlog to mask the continued softening of the telecom industry and the true impact" of the various negative conditions affecting the Company's operations. Id. Finally, the June 4 earnings guidance lacked a basis in fact because it failed to disclose "serious problems" with the Company's UM system product that were jeopardizing its contract with AT&T Wireless. AC ¶ 62. "Given the maturation of the Company's core voicemail products, the Company's UM product was considered by defendants and the Street as an area for growth, making this change a devastating one." Id.

On June 12, 2001, the Company called the 4.5% debentures for redemption on July 11, 2002, the first date permitted under the terms of the offering.[2] AC ¶ 63. The price of the stock declined immediately, falling from $65.91 per share on June 12 to $43.76 on July 9. Debenture holders overwhelmingly converted their debentures into stock at $21.50, "far lower than the then-current artificially inflated price," AC ¶ 64, and immediately sold their shares on the open market.

On July 11, 2001, the redemption date, the Company "shocked the market" by announcing that it was lowering its earnings estimates for the remaining quarters of fiscal 2001. AC ¶ 66. In a

---

[2] Although elsewhere the complaint alleges that July 10, 2001, was the first allowable date, AC ¶ 40, the discrepancy is immaterial.

7

ess release, Kobi Alexander explained that the diminished expectations resulted from, *inter alia*, the capital spending recession and macro-economic slowdown . . . throughout the developed world."

Id. Alexander further stated:

> Increasingly, customers have postponed discretionary purchases, such as the replacement of competitors' systems, and system and software upgrades. Furthermore, the delays in next-generation 2.5/3G wireless network launches have postponed the realization of several significant opportunities. In addition, more customers are buying 'just-in-time' and in smaller increments.
>
> . . . .
>
> In addition to the aforementioned estimates, for the current quarter, the Company expects significant reductions in orders backlog, higher DSO's (Days Sales Outstanding), and lower advance payments from customers, as a result of generally lower negotiated payment terms.

Id.

Immediately following the announcement, Comverse's stock plummeted, losing approximately one-third of its value. According to the complaint, defendants were aware of the factors negatively affecting its earnings well before the July 11 press release, but concealed these problems until after the 4.5% debentures had been redeemed. A July 19, 2001 article in the Jerusalem Post reported "analyst suspicions" that this was the case. AC ¶ 72.

On March 4, 2002, plaintiffs filed the Consolidated Amended Class Action Complaint, alleging violations of Section 10(b) of the Exchange Act and Rule 10b-5 against all defendants, and violations of Section 20(a) of the Exchange Act against the individual defendants, who are alleged to be "controlling persons" within the meaning of that section.

## DISCUSSION

I.    **Legal Standards**

A.    **Fed. R. Civ. P. 12(b)(6)**

Under Rule 12(b)(6), a case should be dismissed only if "it appears beyond doubt that the

8

plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Conley v. Gibson, 355 U.S. 41, 45-46 (1957). As it decides a defendant's motion to dismiss, "the court must accept as true all the factual allegations in the complaint and must draw all reasonable inferences in favor of the plaintiff." Hamilton Chapter of Alpha Delta Phi, Inc. v. Hamilton College, 128 F.2d 59, 63 (2d Cir. 1997). In reaching its decision, the court should give consideration "to documents attached to the complaint as an exhibit or incorporated in it by reference, to matters of which judicial notice may be taken, or to documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit." Brass v. American Film Tech., Inc., 987 F.2d 142, 150 (2d Cir. 1993). The central question is "not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." Scheuer v. Rhodes, 416 U.S. 232, 236 (1974).

B.    Section 10(b) and Rule 10b-5 of the Exchange Act and Fed. R. Civ. P. 9(b)

"To state a cause of action under Section 10(b) and Rule 10b-5, a plaintiff must plead that the defendant made a false statement or omitted a material fact, with scienter, and that plaintiff's reliance on defendant's action caused plaintiff injury." San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos., 75 F.3d 801, 808 (2d Cir. 1996); see also Ganino v. Citizens Utilities Co., 228 F.3d 154, 161 (2d Cir. 2000) ("Section 10(b) . . . bars conduct involving manipulation or deception, manipulation being practices . . . that are intended to mislead investors by artificially affecting market activity, and deception being misrepresentation, or nondisclosure intended to deceive.")(citation and internal quotation marks omitted).

Under the PSLRA, a plaintiff pleading a violation of Section 10(b) and Rule 10b-5 must "specify each statement alleged to have been misleading, the reason or reasons the statement is

9

misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which the belief is formed." 15 U.S.C. § 78u-4(b)(1). Rule 9(b) of the Federal Rules of Civil Procedure also requires that the circumstances of the alleged fraud be stated "with particularity." Fed. R. Civ. P. 9(b). In the securities fraud context, Rule 9(b) requires that "[t]he complaint must identify the statements plaintiff asserts were fraudulent and why, in plaintiff's view, they were fraudulent, specifying who made them, and where and when they were made." In re Scholastic Corp. Sec. Litig., 252 F.2d 63, 69-70 (2d Cir. 2001) (citing Mills v. Polar Molecular Corp., 12 F.3d 1170, 1175 (2d Cir. 1993)).

A plaintiff must also allege that the fraudulent statement or omission that the defendant had a duty to disclose was material. The Second Circuit recently summarized the standard for pleading materiality:

> At the pleading stage, a plaintiff satisfies the materiality requirement of Rule 10b-5 by alleging a statement or omission that a reasonable investor would have considered significant in making investment decisions. See Basic Inc. v. Levinson, 485 U.S. 224, 231, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988) (adopting the standard in TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 449, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976), for §§ 10(b) and Rule 10b-5 actions); Glazer v. Formica Corp., 964 F.2d 149, 154-55 (2d Cir.1992). "'[T]here must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available.'" Basic, 485 U.S. at 231-32, 108 S.Ct. 978 (quoting TSC Indus., 426 U.S. at 449, 96 S.Ct. 2126). It is not sufficient to allege that the investor might have considered the misrepresentation or omission important. On the other hand, it is not necessary to assert that the investor would have acted differently if an accurate disclosure was made. Cf. Folger Adam Co. v. PMI Indus., Inc., 938 F.2d 1529, 1533-34 (2d Cir.1991) (holding that jury charge which may have misled jury to believe that information is material only if it is outcome-determinative was error). An omitted fact may be immaterial if the information is trivial, see Basic, 485 U.S. at 231, 108 S.Ct. 978 (citation omitted), or is "so basic that any investor could be expected to know it," Levitin v. PaineWebber, Inc., 159 F.3d 698, 702 (2d Cir.1998) (internal quotation marks omitted), cert. denied, 525 U.S. 1144, 119 S.Ct. 1039, 143 L.Ed.2d 47 (1999). Therefore, whether an alleged misrepresentation or omission is material necessarily depends on all relevant circumstances of the particular case.

10

Materiality is a mixed question of law and fact. See TSC Indus., 426 U.S. at 450, 96 S.Ct. 2126. We have held that, when presented with a Rule 12(b)(6) motion, "a complaint may not properly be dismissed ... on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." Goldman v. Belden, 754 F.2d 1059, 1067 (2d Cir.1985); see Azrielli v. Cohen Law Offices, 21 F.3d 512, 518 (2d Cir.1994).

Ganino, 228 F.3d at 161-62.

Finally, even if the omitted information is material, "there is no liability under Rule 10b-5 unless there is a duty to disclose it." Glazer v. Formica Corp., 964 F.2d 149, 156 (2d Cir. 1992) (citation omitted); In re Symbol Techs. Class Action Litig., 950 F. Supp 1237, 1242 (E.D.N.Y. 1997); Bragger v. Trinity Capital Enter. Corp., No. 92 Civ. 2124 (LMM), 1994 WL 75239, at *3 (S.D.N.Y. Mar. 7, 1994). "Silence, absent a duty to disclose, is not misleading under Rule 10b-5." Basic Inc. v. Levinson, 485 U.S. 224, 239 n.17 (1988). Such a duty arises only in cases involving insider trading, a statute requiring disclosure, or other statements that would be rendered misleading without the undisclosed information. See In re Canandaigua, 944 F. Supp. 1202, 1208 (S.D.N.Y. 1996) (citing Glazer, 964 F.2d at 157); Symbol Techs., 950 F. Supp. at 1242. In the latter case, "a duty to disclose arises if a corporation's affirmative statement is manifestly incomplete or inaccurate in light of the undisclosed information." Bragger, 1994 WL 75239, at *3; see also 17 C.F.R. § 240.10-b5 (unlawful "to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading").

Defendants challenge the complaint on the grounds that (1) it fails to allege any actionable misrepresentation or omission, and (2) it fails to meet the heightened pleading requirements for scienter. As for the first ground, defendants argue that (1) the complaint fails to even identify any material misstatements or omissions; (2) in any event, the misrepresentations alleged in the

11

complaint are forward-looking statements, and therefore fall within the "safe harbor" provision of the PSLRA; (3) the statements are also insulated from liability under the "bespeaks caution" doctrine; and (4) the statements are mere expressions of corporate optimism, or "puffery," and as such, may not form the basis of a securities fraud claim. Because the court agrees with the first aspect of defendants' first ground for dismissal – that is, that the Complaint does not even identify a material misstatement or omission – the opinion does not address any of the other issues.

## II.    Application

Plaintiffs allege that the Company's April 30, 2001 statement that the cause of the layoffs was the "deteriorat[ion]" of the "macro-economic environment" was misleading because it failed to state the true cause of the layoffs. Plaintiffs contend that the layoffs were not caused "solely" by the macro-economic environment; rather, "many of the layoffs" resulted from the failure of three major cellular telephone companies to release improved messaging technology. AC ¶ 53. Because Ericsson, Nokia, and Motorola did not come out with this technology, plaintiffs allege, defendants could not design new products compatible with this technology. Consequently, the Company laid off employees working on these products.

The court is unpersuaded by plaintiffs' attempt to create a material inconsistency between the deteriorating macro-economic environment and the reduction of demand for Company products based on new technology. The Company's explanation that the layoffs resulted from a weak economy is not inconsistent with plaintiffs' explanation. It is logical to assume that one effect of a deteriorating macro-economic environment might be to make large customers reluctant to make significant investments in new technology. Further, the complaint alleges no facts suggesting that

12

the deteriorating macro-economic environment was not ultimately the cause of the layoffs. Nor does the complaint allege any facts suggesting that the Company made any assurances, much less false ones, as to the release of 2.5/3G technology or the demand of manufacturers for products employing this technology. Plaintiffs also fail to allege that the Company made any representation regarding the allocation of layoffs among its internal divisions. The gravamen of plaintiffs' allegation is simply that the Company was required to release more specific information concerning "many" of the layoffs. However, as explained, the Company was under no duty to release "every piece of information in its possession that could affect the price of its stock." In re Time Warner., Inc., Sec. Litig, 9 F.3d 259, 268 (2d Cir. 1993). Only if a reasonable investor would have been materially misled by the Company's explanation would such a duty have arisen. See id. Because the complaint alleges no facts that would give rise to such a duty, plaintiffs' claim fails.

Plaintiffs also allege that the following statements of defendant Alexander in the April 30, 2001 press release were false and misleading: (1) the statement that the layoffs were "designed to have no adverse impact on customer-focused activities, such as account management, service, support, product quality, and R&D"; (2) the statement that defendants would "continue to invest aggressively in all th[ose] areas, as well as areas that fuel sales growth and new customer protection"; (3) and the statements concerning the Company's "growing market share" in "markets with outstanding growth potential," and its "excellent position within new application areas." These allegations suffice to identify which statements are being challenged, who the speaker was, and when and where the statements were made.

As for why these statements are misleading, plaintiffs allege that the statements failed to disclose certain facts purportedly bearing on their accuracy. With one exception, each of the five

13

alleged material omissions concerns a reduction in demand for the Company's products. As described, the alleged omissions involved the postponement by customers of discretionary purchases until new technology became available; the virtual elimination by customers of second sourcing, which had been a "driver for past growth" for the Company, AC ¶ 52(e); the shift in emphasis by customers from quantity of subscriber to quality thereof, a shift that negatively affected Comverse's revenues; and the decline in subscriber growth experienced by Comverse's customers. The other alleged omission pertains to the Company's phasing out of its ANP voicemail in favor of the TRILOGUE voicemail product, despite the fact that the former had been "the bedrock of the Company's strong financial performance," AC ¶ 52(a).

As defendants point out, plaintiffs do not match particular undisclosed facts to particular misleading statements. Rather, plaintiffs simply list five disparate developments in the Company after a paragraph containing all of the alleged misrepresentations. Such shotgun pleading has rightfully been frowned on. See, e.g., In re First Union Corp. Sec. Litig., 128 F. Supp. 2d 871, 887 (W.D.N.C. 2001). Moreover, this mix-and-match approach strongly undermines plaintiffs' argument that the undisclosed facts "relate directly to the challenged statements." Pl. Mem. at 9 (emphasis in original). On the contrary, none of the challenged statements has more than a tenuous relationship to any of the undisclosed matters. Thus, as explained below, defendants had no duty to reveal any of the allegedly withheld information.

A.    Alexander's statement that the reduction in force was "designed to have no adverse impact on customer-focused activities, such as account management, service, support, product quality, and R&D"

The complaint alleges no facts that suggest that this statement is inaccurate. Nor does the plaintiffs' memorandum in opposition to the instant motion offer an explanation of how this

14

statement is false or misleading. Plaintiffs do not contend that the layoffs were designed to have a negative impact on "customer-focused activities," or even that this was their effect. In fact, plaintiffs make no allegation at all concerning the intended impact of the layoffs. Moreover, none of the alleged omissions bears any relation to the intended effect of the layoffs. With one exception, all of the omissions deal with market conditions affecting demand for Comverse products. The other alleged omission concerns the Company's shift in emphasis from one type of voicemail technology to another. None of these developments even arguably affects the truth of the challenged statements. As another court has said in language equally applicable here, "[p]laintiffs merely sound the familiar refrain that any comment by a corporation imposes an affirmative duty to disclose all marginally-related material information. There is no such obligation or duty." Canandaigua, 944 F. Supp. at 1209 (citing San Leandro, 75 F.3d at 810; Time Warner, 9 F.3d at 268).

**B.     Alexander's statement that the Company would "continue to invest aggressively in all ["customer-focused"] areas, as well as areas that fuel sales growth and new customer protection"**

Plaintiffs' claim that this statement is misleading fails for the same reasons as the claim concerning the previous statement. The vague, general comment about investment goals simply did not trigger a duty to disclose any of the unrelated information plaintiffs point to. Plaintiffs do not even attempt to connect this statement to any of the adverse market conditions the Company failed to disclose. Instead, plaintiffs claim that this statement obligated the Company to disclose its allegedly dramatic change in focus from its ANP voicemail product to the TRILOGUE product. According to plaintiffs, because the ANP product was the "bedrock" of the Company's financial performance, it was misleading of the Company to state that it would "continue to invest aggressively in . . . areas that fuel sales growth" when it had abandoned this product.

15

As defendants point out, the complaint fails to explain how the Company's general statement of its investment goals is at all rendered misleading by the omitted information. There is no claim that the alleged preference for the TRILOGUE system contradicts the statement of intent to invest in growth areas. Nor is there any allegation that the Company led the market to believe that it would pursue its core ESP business with the ANP product instead of the TRILOGUE product. Unlike <u>Time Warner</u>, relied on by plaintiffs, this case does not present a situation where a company's current strategy is at directly at odds with its having previously "publicly hyped" a different strategy. <u>Time Warner</u>, 9 F.3d at 268. In <u>Time Warner</u>, the Second Circuit held that "when a corporation is pursuing a specific business goal and announces that goal as well as an intended goal for reaching it, it may come under an obligation to disclose other approaches to reaching the goal when those approaches are under active and serious consideration." <u>Id.</u> Here, plaintiffs do not point to any prior statement by the Company "hyping" the ANP product. Moreover, even if there were such a statement, plaintiffs do not allege that the TRILOGUE product is so substantially different from the ANP product that the shift in emphasis from the latter "would have been viewed by the reasonable investor as having significantly altered the total mix of information available." <u>Id.</u> at 267-68 (quoting <u>TSC Indus.</u>, 426 U.S. at 449).[3] On the contrary, the only statement pointed to in the complaint – the Company's vague, general assertion that it would "continue to invest aggressively in . . . areas that

---

[3] For the same reasons, the case is distinguishable from <u>In re Quintel Entertainment Inc. Sec. Litig.</u>, 72 F. Supp. 2d 283, 294 (S.D.N.Y. 1999), and <u>In re Meridian Sec. Litig.</u>, 772 F. Supp. 223, 226-27 (E. D. Pa. 1991), also relied on by plaintiffs. In <u>Quintel</u>, the challenged statements specifically referred to certain areas as sources of financial strength despite the existence of significant problems in these areas. <u>See Quintel</u>, 72 F. Supp. 2d at 294. The failure to disclose these problems rendered the positive statements misleading. <u>See id.</u> In <u>Meridian</u>, the court found that the defendants had a duty to disclose the decline of its title insurance operations after having publicly differentiated itself from other companies by emphasizing the success its title insurance operations. <u>See Meridian</u>, 772 F. Supp. at 227.

16

fuel sales growth" – clearly makes no representation regarding any specific product development strategy. Accordingly, the failure of the Company to disclose its strategy with regard to TRILOGUE was immaterial.

**C.    The statements concerning the Company's "growing market share" in "markets with outstanding growth potential," and its "excellent position within new application areas"**

Plaintiffs contend that these statements were misleading because "certain customers" had begun to postpone discretionary purchases. Again, plaintiffs wholly fail to establish how this fact renders the Company's general statements misleading. That certain customers may have been postponing purchases has no bearing on the Company's market share, which by definition is a relative term. Whether or not the Company's absolute volume of sales was decreasing has nothing to do with whether or not the Company's volume of sales relative to its competitors was decreasing. As to the latter, the complaint is conspicuously silent; plaintiffs make no allegation whatsoever that the Company's statements regarding its market share were false. Accordingly, the unrelated allegations regarding customers' delay in discretionary purchases are simply irrelevant. See In re Nokia Corp. Sec. Litig., No. 96 Civ. 3752 (DC), 1998 WL 898334, at *5 (S.D.N.Y. Dec. 22, 1998) (company was under no obligation to discuss declining profit margins when making a statement about market share). Likewise, the statements about market share triggered no duty to comment on the unrelated matters of customers' elimination of second-sourcing, their focus on quality rather than quantity of subscriber, their decline in growth, their switch to just-in-time purchasing, or the Company's supposed contract problems with AT&T.

**D.    The Company's June 4, 2001 statements**

Plaintiffs allegations concerning these statements fall short of the requirements of Rule 9(b)

17

and the PSLRA. Rather than identify the challenged statements with particularity, plaintiffs merely contend that "[d]efendants' statements concerning market share growth and comfort with earnings guidance in the June 4, 2001 press release, conference call with analysts on the same date, and subsequent news articles, were knowingly and recklessly false and misleading." AC ¶ 61. As for why these statements were misleading, the complaint simply refers to the same bundle of omissions alleged to render the April 30 statements misleading (that is, the various market trends negatively affecting the Company's revenues). Plaintiffs' vague allegations hardly supply the who, what, and when with regard to the challenged statements, much less "'give particulars as to the respect in which plaintiff contends the statements were fraudulent.'" See Ressler v. Liz Claiborne, Inc., 75 F. Supp. 2d 43, 52 (E.D.N.Y. 1999) (citing Cosmas v. Hassett, 886 F.2d 8, 11 (2d Cir. 1989)). Furthermore, plaintiffs fail to allege with sufficient particularity any of the myriad problems the Company was experiencing. The complaint simply states that "certain customers" began to postpone discretionary purchases; "carriers and suppliers" had stopped second-sourcing of voicemail systems; "Comverse's customers" -- of whom but one example, Vodafone, is provided -- began to focus on quality of subscriber instead of quantity; and "the Company's customers" began to experience a decline in growth, and changed their purchasing habits to just-in-time. AC ¶ 52. Besides failing to identify the specific customers involved in these trends, these conclusory allegations do not specify when these various developments "began," or how these trends were materially significant either to statements concerning market share or to the earnings forecast. See In re Health Mgmt. Sys., Inc., Sec. Litig., No. 97 Civ. 1865 (HB), 1998 WL 283286, at *4 (S.D.N.Y. June 1, 1998) (conclusory allegations that company was having "problems receiving payments from unspecified customers" and was "suffering from 'increased competition,' lower margins, decreased profitability and 'fee erosion'" were "wholly

insufficient under Rule 9(b), let alone the PSLRA"). Plaintiffs have failed to show how any of the Company's statements triggered a duty to comment on the myriad problems plaintiffs identify. As explained above, none of the alleged material omissions has any bearing on the Company's market share. As for the earnings guidance, the plaintiffs do not point to any affirmative representations regarding the subject matter of the omissions, and therefore cannot show how investors were misled. As noted, the Company was under no general obligation to disclose every piece of information that might affect the performance of its stock.

The two additional reasons offered to explain why the statements were fraudulent fare no better. The first allegation, that the Company's statement that its backlog had increased was false because just-in-time purchasing had in fact "beg[u]n to cause a decline" in the backlog, AC ¶ 61, suffers from the same lack of specificity as the other allegations concerning problems defendants were having. "[T]he conclusory allegation that the opposite of a statement in a press release is true, without further factual elaboration, is insufficient." Health Mgmt. Sys., 1998 WL 283286, at *5. The second allegation, that the Company's earnings guidance lacked a basis in fact because the Company was experiencing "serious problems" with the UM system that were jeopardizing the Company's contract with AT&T, AC ¶ 62, also lacks sufficient specificity. The nature of these supposed problems is not described, nor is there any indication of how these problems contradict or otherwise undermine the truth of any statement made by the Company. The conclusory assertion that these problems were "devastating" does nothing to save the claim. Id. In sum, plaintiffs point to no statement that required mention of the UM problems, or the backlog situation, in order not to be misleading.

Finally, both of the additional allegations, as well as several of the allegations concerning

19



declining demand, are made on information and belief, but fail to state the facts that form the basis of this belief. This failure violates the PSLRA, which requires pleadings made on information and belief to state the foundation for the belief "with particularity." 15 U.S.C. § 78u-4(b)(1). The broad, general statement at the beginning of the complaint that the plaintiffs' allegations on information and belief were based on plaintiffs' investigations, such as review and analysis of public filings, press releases, and the like, does not provide a sufficient foundation to satisfy the PSLRA. See First Union, 128 F. Supp. 2d at 889 (finding such a boilerplate paragraph inadequate) (citing In re Silicon Graphics, Inc., Sec. Litig., 183 F.3d 970, 985 (9th Cir. 1999); Health Mgmt. Sys, 1998 WL 283286, at *3 (rejecting such a boilerplate paragraph, which "provide[s] little, if any, specificity about the foundation" for the plaintiff's allegations).

## III.    Plaintiffs' Claim under Section 20(a)

It is well-established that "[I]n the absence of a primary violation, a plaintiff cannot state a claim for controlling person liability under § 20(a) of the Securities Exchange Act." Salinger, 972 F. Supp. at 235; see also e.g., Rich v. Maidstone Fin., Inc., No. 98 Civ. 2569 (DAB), 2001 WL 286757, at *11 (S.D.N.Y, Mar. 23, 2001). "Thus, if a Section 10(b) and Rule 10b-5 claim fails, a claim for controlling person liability must also fail." Rich, 2001 WL 286757, at *11. Such is the case here.

## CONCLUSION

For the foregoing reasons, defendants motion to dismiss the Consolidated Amended Class Action Complaint is granted, except insofar as defendants seek dismissal with prejudice. Should they wish to, plaintiffs may file a second amended complaint within 30 days of this order.

Nevertheless, the court emphasizes that its focus in this opinion on only one of defendants'
challenges to the complaint is not meant to imply that defendants' other claims lack merit. To the
contrary, should plaintiffs choose to replead, they would be well-advised to consider all of
defendants' remaining contentions concerning the sufficiency of the complaint. In particular, even
a cursory review of the complaint leaves the court with little doubt that plaintiffs have not adequately
pled scienter. Finally, the court will not grant leave to replead if the second amended complaint is
dismissed, since plaintiffs are now fully on notice of the deficiencies in their pleadings.

SO ORDERED.



Allyne R. Ross
United States District Judge

Dated:      September 30, 2002
            Brooklyn, New York



& Lifshitz, LLP
22nd Floor
NY 10016

Suite
Los Angeles, CA 90024

New York, NY 10017

Limier
Arps, Slate, Meagher & Flom LLP
Square
NY 10036

22

JAKKS Equity

| Date | Px Last |
|------|---------|
| 12/1/1999 | 25.375 |
| 12/2/1999 | 25 |
| 12/3/1999 | 25.75 |
| 12/6/1999 | 26.3125 |
| 12/7/1999 | 25.5 |
| 12/8/1999 | 25.4375 |
| 12/9/1999 | 24.0625 |
| 12/10/1999 | 24.125 |
| 12/13/1999 | 23 |
| 12/14/1999 | 23.875 |
| 12/15/1999 | 23.25 |
| 12/16/1999 | 23.4375 |
| 12/17/1999 | 22.375 |
| 12/20/1999 | 22.5 |
| 12/21/1999 | 21.5 |
| 12/22/1999 | 20.0625 |
| 12/23/1999 | 18.625 |
| 12/27/1999 | 17.375 |
| 12/28/1999 | 19.3125 |
| 12/29/1999 | 19.75 |
| 12/30/1999 | 18.875 |
| 12/31/1999 | 18.6875 |
| 1/3/2000 | 18.8125 |
| 1/4/2000 | 18.625 |
| 1/5/2000 | 18.3125 |
| 1/6/2000 | 20.5 |
| 1/7/2000 | 24.625 |
| 1/10/2000 | 24.375 |
| 1/11/2000 | 22.25 |
| 1/12/2000 | 23.125 |
| 1/13/2000 | 23 |
| 1/14/2000 | 23.1875 |
| 1/18/2000 | 22 |
| 1/19/2000 | 20.0625 |
| 1/20/2000 | 19.125 |
| 1/21/2000 | 18.8125 |
| 1/24/2000 | 16.5 |
| 1/25/2000 | 17.3125 |
| 1/26/2000 | 17.6875 |
| 1/27/2000 | 17 |
| 1/28/2000 | 17 |
| 1/31/2000 | 16.3438 |
| 2/1/2000 | 16.125 |
| 2/2/2000 | 16 |
| 2/3/2000 | 14.125 |
| 2/4/2000 | 16.1875 |
| 2/7/2000 | 16.5625 |
| 2/8/2000 | 18 |
| 2/9/2000 | 18.625 |

| | |
|---|---|
| 2/10/2000 | 21.75 |
| 2/11/2000 | 21 |
| 2/14/2000 | 20.0938 |
| 2/15/2000 | 21.6563 |
| 2/16/2000 | 20 |
| 2/17/2000 | 17.1875 |
| 2/18/2000 | 16.375 |
| 2/22/2000 | 16.2188 |
| 2/23/2000 | 16.375 |
| 2/24/2000 | 16.625 |
| 2/25/2000 | 15.9063 |
| 2/28/2000 | 17.25 |
| 2/29/2000 | 16.5 |
| 3/1/2000 | 17.5938 |
| 3/2/2000 | 16.625 |
| 3/3/2000 | 17.5 |
| 3/6/2000 | 16.625 |
| 3/7/2000 | 15.9375 |
| 3/8/2000 | 16.8125 |
| 3/9/2000 | 17.75 |
| 3/10/2000 | 16.375 |
| 3/13/2000 | 16.5625 |
| 3/14/2000 | 16.5625 |
| 3/15/2000 | 18 |
| 3/16/2000 | 20.9375 |
| 3/17/2000 | 22.75 |
| 3/20/2000 | 22.125 |
| 3/21/2000 | 20.5625 |
| 3/22/2000 | 19.6875 |
| 3/23/2000 | 18.75 |
| 3/24/2000 | 18.4375 |
| 3/27/2000 | 20.0625 |
| 3/28/2000 | 18.625 |
| 3/29/2000 | 18.875 |
| 3/30/2000 | 19.75 |
| 3/31/2000 | 21.5625 |
| 4/3/2000 | 22.25 |
| 4/4/2000 | 21.25 |
| 4/5/2000 | 20.8125 |
| 4/6/2000 | 23.375 |
| 4/7/2000 | 23.875 |
| 4/10/2000 | 22.125 |
| 4/11/2000 | 22.4063 |
| 4/12/2000 | 22.4375 |
| 4/13/2000 | 21.875 |
| 4/14/2000 | 20.5625 |
| 4/17/2000 | 20.3125 |
| 4/18/2000 | 22.75 |
| 4/19/2000 | 22.0625 |
| 4/20/2000 | 23.75 |
| 4/24/2000 | 23 |
| 4/25/2000 | 20.4375 |

| | |
|---|---|
| 4/26/2000 | 18.9375 |
| 4/27/2000 | 17.5 |
| 4/28/2000 | 18.375 |
| 5/1/2000 | 17.75 |
| 5/2/2000 | 18.1875 |
| 5/3/2000 | 17.625 |
| 5/4/2000 | 17.375 |
| 5/5/2000 | 16.75 |
| 5/8/2000 | 17 |
| 5/9/2000 | 17.1875 |
| 5/10/2000 | 17.3125 |
| 5/11/2000 | 17 |
| 5/12/2000 | 16.75 |
| 5/15/2000 | 16.625 |
| 5/16/2000 | 16 |
| 5/17/2000 | 16.25 |
| 5/18/2000 | 17 |
| 5/19/2000 | 16.9375 |
| 5/22/2000 | 15.125 |
| 5/23/2000 | 15.375 |
| 5/24/2000 | 15.6875 |
| 5/25/2000 | 15.8125 |
| 5/26/2000 | 15.0625 |
| 5/30/2000 | 15.3125 |
| 5/31/2000 | 14.5 |
| 6/1/2000 | 13.625 |
| 6/2/2000 | 14.9219 |
| 6/5/2000 | 15.25 |
| 6/6/2000 | 16.8125 |
| 6/7/2000 | 16.5625 |
| 6/8/2000 | 16.75 |
| 6/9/2000 | 17.1875 |
| 6/12/2000 | 16.875 |
| 6/13/2000 | 16.75 |
| 6/14/2000 | 17 |
| 6/15/2000 | 16.1875 |
| 6/16/2000 | 16.125 |
| 6/19/2000 | 16 |
| 6/20/2000 | 15.8125 |
| 6/21/2000 | 15.5 |
| 6/22/2000 | 15.625 |
| 6/23/2000 | 15.25 |
| 6/26/2000 | 15.8125 |
| 6/27/2000 | 15.3125 |
| 6/28/2000 | 15.0625 |
| 6/29/2000 | 14.875 |
| 6/30/2000 | 14.75 |
| 7/3/2000 | 15.25 |
| 7/5/2000 | 15 |
| 7/6/2000 | 17.75 |
| 7/7/2000 | 19.4375 |
| 7/10/2000 | 18.1875 |

| | |
|---|---|
| 7/11/2000 | 17.9375 |
| 7/12/2000 | 18.3125 |
| 7/13/2000 | 17.625 |
| 7/14/2000 | 17.3125 |
| 7/17/2000 | 16.9375 |
| 7/18/2000 | 17.5 |
| 7/19/2000 | 16.875 |
| 7/20/2000 | 17.5625 |
| 7/21/2000 | 16.5 |
| 7/24/2000 | 15.875 |
| 7/25/2000 | 16.6406 |
| 7/26/2000 | 17.6875 |
| 7/27/2000 | 18 |
| 7/28/2000 | 17.5 |
| 7/31/2000 | 16.5 |
| 8/1/2000 | 16.9375 |
| 8/2/2000 | 17.375 |
| 8/3/2000 | 16.9375 |
| 8/4/2000 | 17.3125 |
| 8/7/2000 | 17.5 |
| 8/8/2000 | 17.5625 |
| 8/9/2000 | 17.3125 |
| 8/10/2000 | 17 |
| 8/11/2000 | 16.375 |
| 8/14/2000 | 17 |
| 8/15/2000 | 17 |
| 8/16/2000 | 16.375 |
| 8/17/2000 | 16.25 |
| 8/18/2000 | 15.875 |
| 8/21/2000 | 15.9375 |
| 8/22/2000 | 15.875 |
| 8/23/2000 | 16.4375 |
| 8/24/2000 | 15.9375 |
| 8/25/2000 | 16.125 |
| 8/28/2000 | 16.5 |
| 8/29/2000 | 17.25 |
| 8/30/2000 | 17.8125 |
| 8/31/2000 | 17.75 |
| 9/1/2000 | 18.875 |
| 9/5/2000 | 18.5625 |
| 9/6/2000 | 17.875 |
| 9/7/2000 | 18.125 |
| 9/8/2000 | 17.75 |
| 9/11/2000 | 17.625 |
| 9/12/2000 | 18.5 |
| 9/13/2000 | 18.0625 |
| 9/14/2000 | 18.875 |
| 9/15/2000 | 18.1875 |
| 9/18/2000 | 16.25 |
| 9/19/2000 | 12.25 |
| 9/20/2000 | 11.125 |
| 9/21/2000 | 10.9375 |

| | |
|---|---|
| 9/22/2000 | 10.9375 |
| 9/25/2000 | 10.5625 |
| 9/26/2000 | 10.75 |
| 9/27/2000 | 9.9375 |
| 9/28/2000 | 9.8125 |
| 9/29/2000 | 9.4063 |
| 10/2/2000 | 9.5 |
| 10/3/2000 | 9 |
| 10/4/2000 | 8.8125 |
| 10/5/2000 | 8.9375 |
| 10/6/2000 | 8.125 |
| 10/9/2000 | 7.75 |
| 10/10/2000 | 7.8125 |
| 10/11/2000 | 7.5625 |
| 10/12/2000 | 7.5625 |
| 10/13/2000 | 8.1875 |
| 10/16/2000 | 7.625 |
| 10/17/2000 | 7.125 |
| 10/18/2000 | 7.375 |
| 10/19/2000 | 7.8125 |
| 10/20/2000 | 8.4688 |
| 10/23/2000 | 9.25 |
| 10/24/2000 | 8.5625 |
| 10/25/2000 | 8.1875 |
| 10/26/2000 | 8.3125 |
| 10/27/2000 | 8.375 |
| 10/30/2000 | 7.875 |
| 10/31/2000 | 8.8125 |
| 11/1/2000 | 8.5625 |
| 11/2/2000 | 9.5625 |
| 11/3/2000 | 9.375 |
| 11/6/2000 | 9.5313 |
| 11/7/2000 | 9.6719 |
| 11/8/2000 | 9.5 |
| 11/9/2000 | 8.9688 |
| 11/10/2000 | 8.5625 |
| 11/13/2000 | 8.8438 |
| 11/14/2000 | 9.0938 |
| 11/15/2000 | 8.6875 |
| 11/16/2000 | 8.4688 |
| 11/17/2000 | 8.5625 |
| 11/20/2000 | 8.0625 |
| 11/21/2000 | 8 |
| 11/22/2000 | 7.9375 |
| 11/24/2000 | 8.25 |
| 11/27/2000 | 8.375 |
| 11/28/2000 | 7.7813 |
| 11/29/2000 | 7.5625 |
| 11/30/2000 | 7.625 |
| 12/1/2000 | 7.75 |
| 12/4/2000 | 8.3125 |
| 12/5/2000 | 8.9375 |

| | |
|---|---|
| 12/6/2000 | 9.5625 |
| 12/7/2000 | 8.75 |
| 12/8/2000 | 8.9375 |
| 12/11/2000 | 9.3125 |
| 12/12/2000 | 9.25 |
| 12/13/2000 | 9.0625 |
| 12/14/2000 | 9 |
| 12/15/2000 | 8.9063 |
| 12/18/2000 | 8.4688 |
| 12/19/2000 | 8.125 |
| 12/20/2000 | 7.875 |
| 12/21/2000 | 8.3125 |
| 12/22/2000 | 8.5938 |
| 12/26/2000 | 8.375 |
| 12/27/2000 | 8.5 |
| 12/28/2000 | 9.125 |
| 12/29/2000 | 9.125 |
| 1/2/2001 | 8.25 |
| 1/3/2001 | 8.5 |
| 1/4/2001 | 9.25 |
| 1/5/2001 | 9 |
| 1/8/2001 | 8.6875 |
| 1/9/2001 | 8.8125 |
| 1/10/2001 | 9.125 |
| 1/11/2001 | 9.125 |
| 1/12/2001 | 11.5625 |
| 1/16/2001 | 10.4375 |
| 1/17/2001 | 10.1875 |
| 1/18/2001 | 10.3125 |
| 1/19/2001 | 10.4375 |
| 1/22/2001 | 10.875 |
| 1/23/2001 | 11.5 |
| 1/24/2001 | 12.5625 |
| 1/25/2001 | 12.125 |
| 1/26/2001 | 11.75 |
| 1/29/2001 | 11.875 |
| 1/30/2001 | 11.9375 |
| 1/31/2001 | 11.9375 |
| 2/1/2001 | 11.6875 |
| 2/2/2001 | 11.4375 |
| 2/5/2001 | 12.25 |
| 2/6/2001 | 12.0625 |
| 2/7/2001 | 11.8125 |
| 2/8/2001 | 11.9375 |
| 2/9/2001 | 12.0625 |
| 2/12/2001 | 12.375 |
| 2/13/2001 | 12.9375 |
| 2/14/2001 | 14.125 |
| 2/15/2001 | 14.625 |
| 2/16/2001 | 14.6875 |
| 2/20/2001 | 14.0625 |
| 2/21/2001 | 13.9375 |

| | |
|---|---|
| 2/22/2001 | 13.375 |
| 2/23/2001 | 12.25 |
| 2/26/2001 | 13.4375 |
| 2/27/2001 | 12.5 |
| 2/28/2001 | 12.9375 |
| 3/1/2001 | 12.4375 |
| 3/2/2001 | 12 |
| 3/5/2001 | 12.0625 |
| 3/6/2001 | 11 |
| 3/7/2001 | 10.875 |
| 3/8/2001 | 11 |
| 3/9/2001 | 10.625 |
| 3/12/2001 | 10.3125 |
| 3/13/2001 | 10 |
| 3/14/2001 | 9.3125 |
| 3/15/2001 | 9.125 |
| 3/16/2001 | 8.9688 |
| 3/19/2001 | 8.9688 |
| 3/20/2001 | 8.9375 |
| 3/21/2001 | 8.8125 |
| 3/22/2001 | 9 |
| 3/23/2001 | 9.5625 |
| 3/26/2001 | 10.3125 |
| 3/27/2001 | 10.75 |
| 3/28/2001 | 10.5625 |
| 3/29/2001 | 10.5 |
| 3/30/2001 | 10.625 |
| 4/2/2001 | 9.9063 |
| 4/3/2001 | 9.3438 |
| 4/4/2001 | 9.3125 |
| 4/5/2001 | 9.8438 |
| 4/6/2001 | 9.6875 |
| 4/9/2001 | 9.96 |
| 4/10/2001 | 9.9 |
| 4/11/2001 | 9.74 |
| 4/12/2001 | 9.9 |
| 4/16/2001 | 9.71 |
| 4/17/2001 | 10.28 |
| 4/18/2001 | 10.78 |
| 4/19/2001 | 11.25 |
| 4/20/2001 | 11.4 |
| 4/23/2001 | 12.79 |
| 4/24/2001 | 12.11 |
| 4/25/2001 | 12.75 |
| 4/26/2001 | 13.02 |
| 4/27/2001 | 13.26 |
| 4/30/2001 | 14.33 |
| 5/1/2001 | 14.51 |
| 5/2/2001 | 14.6 |
| 5/3/2001 | 13.95 |
| 5/4/2001 | 14.02 |
| 5/7/2001 | 14 |

| | |
|---|---|
| 5/8/2001 | 13.65 |
| 5/9/2001 | 13.6 |
| 5/10/2001 | 13.82 |
| 5/11/2001 | 13.47 |
| 5/14/2001 | 13.44 |
| 5/15/2001 | 14.16 |
| 5/16/2001 | 14.05 |
| 5/17/2001 | 14.96 |
| 5/18/2001 | 16.49 |
| 5/21/2001 | 16.55 |
| 5/22/2001 | 17 |
| 5/23/2001 | 17.09 |
| 5/24/2001 | 16.89 |
| 5/25/2001 | 16.98 |
| 5/29/2001 | 16.33 |
| 5/30/2001 | 15.5 |
| 5/31/2001 | 15.74 |
| 6/1/2001 | 16 |
| 6/4/2001 | 16.13 |
| 6/5/2001 | 16.5 |
| 6/6/2001 | 16.62 |
| 6/7/2001 | 17.3 |
| 6/8/2001 | 17.55 |
| 6/11/2001 | 17.98 |
| 6/12/2001 | 17.42 |
| 6/13/2001 | 17.45 |
| 6/14/2001 | 16.43 |
| 6/15/2001 | 16.44 |
| 6/18/2001 | 17 |
| 6/19/2001 | 16.7 |
| 6/20/2001 | 17.05 |
| 6/21/2001 | 17.93 |
| 6/22/2001 | 17.1 |
| 6/25/2001 | 17 |
| 6/26/2001 | 16.95 |
| 6/27/2001 | 16.85 |
| 6/28/2001 | 18.7 |
| 6/29/2001 | 18.7 |
| 7/2/2001 | 18.36 |
| 7/3/2001 | 17.92 |
| 7/5/2001 | 18.46 |
| 7/6/2001 | 18.03 |
| 7/9/2001 | 17.88 |
| 7/10/2001 | 17 |
| 7/11/2001 | 16 |
| 7/12/2001 | 16.25 |
| 7/13/2001 | 15.9 |
| 7/16/2001 | 15.03 |
| 7/17/2001 | 14.5 |
| 7/18/2001 | 15.15 |
| 7/19/2001 | 17.5 |
| 7/20/2001 | 18.3 |

| | |
|---|---|
| 7/23/2001 | 18.35 |
| 7/24/2001 | 18.35 |
| 7/25/2001 | 18.47 |
| 7/26/2001 | 19.03 |
| 7/27/2001 | 19.55 |
| 7/30/2001 | 20.36 |
| 7/31/2001 | 20.03 |
| 8/1/2001 | 18.75 |
| 8/2/2001 | 19.85 |
| 8/3/2001 | 20.95 |
| 8/6/2001 | 20.7 |
| 8/7/2001 | 20.55 |
| 8/8/2001 | 20.5 |
| 8/9/2001 | 21 |
| 8/10/2001 | 19.54 |
| 8/13/2001 | 19.75 |
| 8/14/2001 | 19.85 |
| 8/15/2001 | 20.76 |
| 8/16/2001 | 20.8 |
| 8/17/2001 | 20.75 |
| 8/20/2001 | 21 |
| 8/21/2001 | 18.5 |
| 8/22/2001 | 19.02 |
| 8/23/2001 | 18.15 |
| 8/24/2001 | 18.15 |
| 8/27/2001 | 17.91 |
| 8/28/2001 | 18.72 |
| 8/29/2001 | 18.71 |
| 8/30/2001 | 18.05 |
| 8/31/2001 | 17.55 |
| 9/4/2001 | 17.3 |
| 9/5/2001 | 17.5 |
| 9/6/2001 | 17.81 |
| 9/7/2001 | 16.96 |
| 9/10/2001 | 16.2194 |
| 9/17/2001 | 15 |
| 9/18/2001 | 14.61 |
| 9/19/2001 | 13.4 |
| 9/20/2001 | 13.99 |
| 9/21/2001 | 13.91 |
| 9/24/2001 | 14.85 |
| 9/25/2001 | 14.77 |
| 9/26/2001 | 14.29 |
| 9/27/2001 | 13.79 |
| 9/28/2001 | 13.5 |
| 10/1/2001 | 13.09 |
| 10/2/2001 | 13.1 |
| 10/3/2001 | 13.9 |
| 10/4/2001 | 14.25 |
| 10/5/2001 | 14.49 |
| 10/8/2001 | 13.76 |
| 10/9/2001 | 14 |

| | |
|---|---|
| 10/10/2001 | 15.16 |
| 10/11/2001 | 16 |
| 10/12/2001 | 16.55 |
| 10/15/2001 | 17.1 |
| 10/16/2001 | 16.6 |
| 10/17/2001 | 16.1 |
| 10/18/2001 | 18.3 |
| 10/19/2001 | 18.97 |
| 10/22/2001 | 18.01 |
| 10/23/2001 | 18 |
| 10/24/2001 | 18.15 |
| 10/25/2001 | 18.65 |
| 10/26/2001 | 19.03 |
| 10/29/2001 | 19.31 |
| 10/30/2001 | 18.76 |
| 10/31/2001 | 18.85 |
| 11/1/2001 | 19.52 |
| 11/2/2001 | 19.87 |
| 11/5/2001 | 20.11 |
| 11/6/2001 | 20.06 |
| 11/7/2001 | 20.13 |
| 11/8/2001 | 19.47 |
| 11/9/2001 | 19.64 |
| 11/12/2001 | 19.79 |
| 11/13/2001 | 21.05 |
| 11/14/2001 | 22.99 |
| 11/15/2001 | 22.76 |
| 11/16/2001 | 22.9 |
| 11/19/2001 | 23.08 |
| 11/20/2001 | 22.55 |
| 11/21/2001 | 22.14 |
| 11/23/2001 | 23.11 |
| 11/26/2001 | 23.17 |
| 11/27/2001 | 23.25 |
| 11/28/2001 | 23.19 |
| 11/29/2001 | 25 |
| 11/30/2001 | 24.99 |
| 12/3/2001 | 23.89 |
| 12/4/2001 | 24.42 |
| 12/5/2001 | 24.39 |
| 12/6/2001 | 24.13 |
| 12/7/2001 | 24.4 |
| 12/10/2001 | 20.86 |
| 12/11/2001 | 17.7 |
| 12/12/2001 | 18.75 |
| 12/13/2001 | 18.91 |
| 12/14/2001 | 18.79 |
| 12/17/2001 | 19.83 |
| 12/18/2001 | 19.19 |
| 12/19/2001 | 19.01 |
| 12/20/2001 | 19.05 |
| 12/21/2001 | 19.75 |

| | |
|---|---|
| 12/24/2001 | 19.48 |
| 12/26/2001 | 19.8 |
| 12/27/2001 | 19.02 |
| 12/28/2001 | 18.96 |
| 12/31/2001 | 18.95 |
| 1/2/2002 | 19.31 |
| 1/3/2002 | 19.0617 |
| 1/4/2002 | 19.15 |
| 1/7/2002 | 19.05 |
| 1/8/2002 | 19.4 |
| 1/9/2002 | 19.26 |
| 1/10/2002 | 19.35 |
| 1/11/2002 | 18.95 |
| 1/14/2002 | 19.26 |
| 1/15/2002 | 18.99 |
| 1/16/2002 | 19.12 |
| 1/17/2002 | 19.05 |
| 1/18/2002 | 18.83 |
| 1/22/2002 | 18.75 |
| 1/23/2002 | 19.19 |
| 1/24/2002 | 19.56 |
| 1/25/2002 | 19.5 |
| 1/28/2002 | 19.35 |
| 1/29/2002 | 18.82 |
| 1/30/2002 | 19.6 |
| 1/31/2002 | 20.25 |
| 2/1/2002 | 19.04 |
| 2/4/2002 | 18.61 |
| 2/5/2002 | 18.79 |
| 2/6/2002 | 17.17 |
| 2/7/2002 | 17.53 |
| 2/8/2002 | 18.8 |
| 2/11/2002 | 18.25 |
| 2/12/2002 | 18.66 |
| 2/13/2002 | 18.73 |
| 2/14/2002 | 19.56 |
| 2/15/2002 | 19.26 |
| 2/19/2002 | 18.6 |
| 2/20/2002 | 19.51 |
| 2/21/2002 | 18.63 |
| 2/22/2002 | 19.3 |
| 2/25/2002 | 19.42 |
| 2/26/2002 | 19.7 |
| 2/27/2002 | 19.15 |
| 2/28/2002 | 18.8 |
| 3/1/2002 | 18.84 |
| 3/4/2002 | 19.09 |
| 3/5/2002 | 18.68 |
| 3/6/2002 | 18.75 |
| 3/7/2002 | 18.5 |
| 3/8/2002 | 18.85 |
| 3/11/2002 | 18.77 |

| | |
|---|---|
| 3/12/2002 | 18.75 |
| 3/13/2002 | 18.93 |
| 3/14/2002 | 19.52 |
| 3/15/2002 | 20.64 |
| 3/18/2002 | 22.2 |
| 3/19/2002 | 21.36 |
| 3/20/2002 | 21.63 |
| 3/21/2002 | 21.5 |
| 3/22/2002 | 21.45 |
| 3/25/2002 | 21.6 |
| 3/26/2002 | 22.2 |
| 3/27/2002 | 22.1 |
| 3/28/2002 | 22.75 |
| 4/1/2002 | 23.02 |
| 4/2/2002 | 20.75 |
| 4/3/2002 | 21.35 |
| 4/4/2002 | 21.67 |
| 4/5/2002 | 19.01 |
| 4/8/2002 | 18.88 |
| 4/9/2002 | 18.87 |
| 4/10/2002 | 19.74 |
| 4/11/2002 | 20.37 |
| 4/12/2002 | 19.96 |
| 4/15/2002 | 19.95 |
| 4/16/2002 | 20.1 |
| 4/17/2002 | 19.42 |
| 4/18/2002 | 20.88 |
| 4/19/2002 | 20.03 |
| 4/22/2002 | 19.51 |
| 4/23/2002 | 19.13 |
| 4/24/2002 | 18.401 |
| 4/25/2002 | 18.48 |
| 4/26/2002 | 18.5 |
| 4/29/2002 | 18.54 |
| 4/30/2002 | 19.27 |
| 5/1/2002 | 18.98 |
| 5/2/2002 | 17.67 |
| 5/3/2002 | 17.47 |
| 5/6/2002 | 17.34 |
| 5/7/2002 | 16.43 |
| 5/8/2002 | 16.7 |
| 5/9/2002 | 17.6 |
| 5/10/2002 | 17.7 |
| 5/13/2002 | 17.7 |
| 5/14/2002 | 17.93 |
| 5/15/2002 | 18.29 |
| 5/16/2002 | 18.29 |
| 5/17/2002 | 18.6 |
| 5/20/2002 | 18.22 |
| 5/21/2002 | 18.11 |
| 5/22/2002 | 18 |
| 5/23/2002 | 17.88 |

| | |
|---|---|
| 5/24/2002 | 17.86 |
| 5/28/2002 | 18.37 |
| 5/29/2002 | 17.87 |
| 5/30/2002 | 18.08 |
| 5/31/2002 | 18.25 |
| 6/3/2002 | 17.95 |
| 6/4/2002 | 18.03 |
| 6/5/2002 | 18.09 |
| 6/6/2002 | 17.21 |
| 6/7/2002 | 18.02 |
| 6/10/2002 | 17.8 |
| 6/11/2002 | 17.62 |
| 6/12/2002 | 18.08 |
| 6/13/2002 | 17.73 |
| 6/14/2002 | 17.29 |
| 6/17/2002 | 17.48 |
| 6/18/2002 | 17.18 |
| 6/19/2002 | 17.17 |
| 6/20/2002 | 16.69 |
| 6/21/2002 | 17.0299 |
| 6/24/2002 | 17.48 |
| 6/25/2002 | 17 |
| 6/26/2002 | 16.89 |
| 6/27/2002 | 17.3 |
| 6/28/2002 | 17.71 |
| 7/1/2002 | 17.26 |
| 7/2/2002 | 16.45 |
| 7/3/2002 | 14.94 |
| 7/5/2002 | 15.54 |
| 7/8/2002 | 15.85 |
| 7/9/2002 | 15.71 |
| 7/10/2002 | 16.17 |
| 7/11/2002 | 15.99 |
| 7/12/2002 | 16.03 |
| 7/15/2002 | 15.8 |
| 7/16/2002 | 15.1 |
| 7/17/2002 | 15 |
| 7/18/2002 | 15 |
| 7/19/2002 | 14.8 |
| 7/22/2002 | 12.97 |
| 7/23/2002 | 11.48 |
| 7/24/2002 | 11.35 |
| 7/25/2002 | 10.09 |
| 7/26/2002 | 10.8 |
| 7/29/2002 | 11.98 |
| 7/30/2002 | 12.36 |
| 7/31/2002 | 11.55 |
| 8/1/2002 | 11.24 |
| 8/2/2002 | 10.7 |
| 8/5/2002 | 10.5 |
| 8/6/2002 | 10.98 |
| 8/7/2002 | 10.89 |

| | |
|---|---|
| 8/8/2002 | 10.97 |
| 8/9/2002 | 11.249 |
| 8/12/2002 | 10.76 |
| 8/13/2002 | 10.64 |
| 8/14/2002 | 11.01 |
| 8/15/2002 | 11.1 |
| 8/16/2002 | 10.96 |
| 8/19/2002 | 11.19 |
| 8/20/2002 | 10.81 |
| 8/21/2002 | 11.15 |
| 8/22/2002 | 11.84 |
| 8/23/2002 | 12.052 |
| 8/26/2002 | 11.75 |
| 8/27/2002 | 11.8 |
| 8/28/2002 | 11.55 |
| 8/29/2002 | 11.8 |
| 8/30/2002 | 11.3099 |
| 9/3/2002 | 11.392 |
| 9/4/2002 | 11.81 |
| 9/5/2002 | 11.26 |
| 9/6/2002 | 11.42 |
| 9/9/2002 | 11.29 |
| 9/10/2002 | 11.26 |
| 9/11/2002 | 11.47 |
| 9/12/2002 | 11.5 |
| 9/13/2002 | 11.37 |
| 9/16/2002 | 11.02 |
| 9/17/2002 | 11.06 |
| 9/18/2002 | 10.79 |
| 9/19/2002 | 10.46 |
| 9/20/2002 | 10.88 |
| 9/23/2002 | 9.98 |
| 9/24/2002 | 10.13 |
| 9/25/2002 | 11.07 |
| 9/26/2002 | 11.27 |
| 9/27/2002 | 11.2 |
| 9/30/2002 | 11.119 |
| 10/1/2002 | 11.22 |
| 10/2/2002 | 11.002 |
| 10/3/2002 | 11.18 |
| 10/4/2002 | 11.03 |
| 10/7/2002 | 10.31 |
| 10/8/2002 | 10.13 |
| 10/9/2002 | 9.52 |
| 10/10/2002 | 9.628 |
| 10/11/2002 | 10.42 |
| 10/14/2002 | 10.591 |
| 10/15/2002 | 10.8 |
| 10/16/2002 | 10.33 |
| 10/17/2002 | 10.91 |
| 10/18/2002 | 11.01 |
| 10/21/2002 | 10.93 |

| | |
|---|---|
| 10/22/2002 | 11.41 |
| 10/23/2002 | 11.289 |
| 10/24/2002 | 11.4 |
| 10/25/2002 | 11.44 |
| 10/28/2002 | 11.63 |
| 10/29/2002 | 11.44 |
| 10/30/2002 | 12.39 |
| 10/31/2002 | 13.24 |
| 11/1/2002 | 13.76 |
| 11/4/2002 | 13.83 |
| 11/5/2002 | 13.3 |
| 11/6/2002 | 13.839 |
| 11/7/2002 | 14.16 |
| 11/8/2002 | 14.1 |
| 11/11/2002 | 13.2 |
| 11/12/2002 | 13.8 |
| 11/13/2002 | 14.071 |
| 11/14/2002 | 13.9 |
| 11/15/2002 | 13.98 |
| 11/18/2002 | 14.58 |
| 11/19/2002 | 14.88 |
| 11/20/2002 | 14.89 |
| 11/21/2002 | 15.23 |
| 11/22/2002 | 15.28 |
| 11/25/2002 | 14.9 |
| 11/26/2002 | 14.46 |
| 11/27/2002 | 15.09 |
| 11/29/2002 | 15.4 |
| 12/2/2002 | 16.05 |
| 12/3/2002 | 16.5 |
| 12/4/2002 | 16.2 |
| 12/5/2002 | 15.75 |
| 12/6/2002 | 15.57 |
| 12/9/2002 | 14.9 |
| 12/10/2002 | 15.24 |
| 12/11/2002 | 15.34 |
| 12/12/2002 | 15.31 |
| 12/13/2002 | 15.12 |
| 12/16/2002 | 15.15 |
| 12/17/2002 | 15.08 |
| 12/18/2002 | 14.96 |
| 12/19/2002 | 13.75 |
| 12/20/2002 | 13.36 |
| 12/23/2002 | 13.85 |
| 12/24/2002 | 13.86 |
| 12/26/2002 | 13.8 |
| 12/27/2002 | 13.7 |
| 12/30/2002 | 13.46 |
| 12/31/2002 | 13.47 |
| 1/2/2003 | 13.781 |
| 1/3/2003 | 13.811 |
| 1/6/2003 | 13.88 |

| | |
|---|---|
| 1/7/2003 | 13.86 |
| 1/8/2003 | 13.991 |
| 1/9/2003 | 14.299 |
| 1/10/2003 | 13.81 |
| 1/13/2003 | 13.67 |
| 1/14/2003 | 13.15 |
| 1/15/2003 | 13.18 |
| 1/16/2003 | 12.78 |
| 1/17/2003 | 12.46 |
| 1/21/2003 | 11.87 |
| 1/22/2003 | 11.82 |
| 1/23/2003 | 12.25 |
| 1/24/2003 | 12.2 |
| 1/27/2003 | 11.81 |
| 1/28/2003 | 12.3 |
| 1/29/2003 | 12.2 |
| 1/30/2003 | 12.2 |
| 1/31/2003 | 12.26 |
| 2/3/2003 | 12.17 |
| 2/4/2003 | 12.374 |
| 2/5/2003 | 12.5 |
| 2/6/2003 | 12.58 |
| 2/7/2003 | 12.42 |
| 2/10/2003 | 12.64 |
| 2/11/2003 | 12.4 |
| 2/12/2003 | 11.389 |
| 2/13/2003 | 11.21 |
| 2/14/2003 | 11.48 |
| 2/18/2003 | 11.54 |
| 2/19/2003 | 11.25 |
| 2/20/2003 | 11.23 |
| 2/21/2003 | 10.999 |
| 2/24/2003 | 10.75 |
| 2/25/2003 | 10.9 |
| 2/26/2003 | 11 |
| 2/27/2003 | 10.98 |
| 2/28/2003 | 10.95 |
| 3/3/2003 | 10.82 |
| 3/4/2003 | 10.6 |
| 3/5/2003 | 10.05 |
| 3/6/2003 | 9.97 |
| 3/7/2003 | 9.82 |
| 3/10/2003 | 9.78 |
| 3/11/2003 | 9.72 |
| 3/12/2003 | 9.71 |
| 3/13/2003 | 9.72 |
| 3/14/2003 | 9.77 |
| 3/17/2003 | 10.18 |
| 3/18/2003 | 10.21 |
| 3/19/2003 | 10.53 |
| 3/20/2003 | 10.65 |
| 3/21/2003 | 10.91 |

| | |
|---|---|
| 3/24/2003 | 10.54 |
| 3/25/2003 | 10.71 |
| 3/26/2003 | 10.4 |
| 3/27/2003 | 10.52 |
| 3/28/2003 | 10.46 |
| 3/31/2003 | 10.36 |
| 4/1/2003 | 10.66 |
| 4/2/2003 | 11.21 |
| 4/3/2003 | 10.991 |
| 4/4/2003 | 12.3 |
| 4/7/2003 | 12.88 |
| 4/8/2003 | 12.79 |
| 4/9/2003 | 12.3 |
| 4/10/2003 | 12.2 |
| 4/11/2003 | 12.35 |
| 4/14/2003 | 12.3 |
| 4/15/2003 | 12.329 |
| 4/16/2003 | 12.03 |
| 4/17/2003 | 12.09 |
| 4/21/2003 | 13 |
| 4/22/2003 | 12.2 |
| 4/23/2003 | 12.47 |
| 4/24/2003 | 12.581 |
| 4/25/2003 | 12.45 |
| 4/28/2003 | 12.85 |
| 4/29/2003 | 12.65 |
| 4/30/2003 | 12.95 |
| 5/1/2003 | 12.86 |
| 5/2/2003 | 13.4 |
| 5/5/2003 | 13.62 |
| 5/6/2003 | 14.18 |
| 5/7/2003 | 14.08 |
| 5/8/2003 | 13.88 |
| 5/9/2003 | 13.91 |
| 5/12/2003 | 13.84 |
| 5/13/2003 | 13.82 |
| 5/14/2003 | 13.957 |
| 5/15/2003 | 13.84 |
| 5/16/2003 | 13.39 |
| 5/19/2003 | 12.76 |
| 5/20/2003 | 12.68 |
| 5/21/2003 | 12.82 |
| 5/22/2003 | 12.75 |
| 5/23/2003 | 12.75 |
| 5/27/2003 | 12.81 |
| 5/28/2003 | 13.08 |
| 5/29/2003 | 13.6 |
| 5/30/2003 | 14.18 |
| 6/2/2003 | 14.171 |
| 6/3/2003 | 12.29 |
| 6/4/2003 | 12.8 |
| 6/5/2003 | 12.77 |

| Date | Value |
|------|-------|
| 6/6/2003 | 12.89 |
| 6/9/2003 | 13.11 |
| 6/10/2003 | 13.24 |
| 6/11/2003 | 13.28 |
| 6/12/2003 | 13.35 |
| 6/13/2003 | 13.35 |
| 6/16/2003 | 13.75 |
| 6/17/2003 | 13.53 |
| 6/18/2003 | 13.39 |
| 6/19/2003 | 13.34 |
| 6/20/2003 | 13.6 |
| 6/23/2003 | 13.18 |
| 6/24/2003 | 13.17 |
| 6/25/2003 | 13.13 |
| 6/26/2003 | 13.47 |
| 6/27/2003 | 13.21 |
| 6/30/2003 | 13.32 |
| 7/1/2003 | 13.39 |
| 7/2/2003 | 13.47 |
| 7/3/2003 | 13.36 |
| 7/7/2003 | 13.68 |
| 7/8/2003 | 13.81 |
| 7/9/2003 | 14 |
| 7/10/2003 | 13.47 |
| 7/11/2003 | 13.71 |
| 7/14/2003 | 13.5 |
| 7/15/2003 | 13.54 |
| 7/16/2003 | 13.52 |
| 7/17/2003 | 13.32 |
| 7/18/2003 | 13.25 |
| 7/21/2003 | 12.87 |
| 7/22/2003 | 12.69 |
| 7/23/2003 | 11.28 |
| 7/24/2003 | 11.52 |
| 7/25/2003 | 11.53 |
| 7/28/2003 | 11.59 |
| 7/29/2003 | 11.72 |
| 7/30/2003 | 11.57 |
| 7/31/2003 | 11.42 |
| 8/1/2003 | 11.26 |
| 8/4/2003 | 11.05 |
| 8/5/2003 | 10.76 |
| 8/6/2003 | 10.59 |
| 8/7/2003 | 10.281 |
| 8/8/2003 | 10.1 |
| 8/11/2003 | 10.44 |
| 8/12/2003 | 10.74 |
| 8/13/2003 | 11.01 |
| 8/14/2003 | 11.48 |
| 8/15/2003 | 11.35 |
| 8/18/2003 | 11.47 |
| 8/19/2003 | 11.66 |

| | |
|---|---|
| 8/20/2003 | 11.69 |
| 8/21/2003 | 11.9 |
| 8/22/2003 | 11.69 |
| 8/25/2003 | 11.52 |
| 8/26/2003 | 11.72 |
| 8/27/2003 | 11.76 |
| 8/28/2003 | 11.83 |
| 8/29/2003 | 12 |
| 9/2/2003 | 12.4 |
| 9/3/2003 | 12.91 |
| 9/4/2003 | 12.8 |
| 9/5/2003 | 12.81 |
| 9/8/2003 | 12.8 |
| 9/9/2003 | 12.76 |
| 9/10/2003 | 12.36 |
| 9/11/2003 | 12.35 |
| 9/12/2003 | 12.35 |
| 9/15/2003 | 12.8 |
| 9/16/2003 | 12.69 |
| 9/17/2003 | 13.23 |
| 9/18/2003 | 12.99 |
| 9/19/2003 | 12.74 |
| 9/22/2003 | 13.04 |
| 9/23/2003 | 12.9 |
| 9/24/2003 | 12.8 |
| 9/25/2003 | 12.4 |
| 9/26/2003 | 12.46 |
| 9/29/2003 | 12.3 |
| 9/30/2003 | 12.29 |
| 10/1/2003 | 12.92 |
| 10/2/2003 | 12.46 |
| 10/3/2003 | 12.75 |
| 10/6/2003 | 12.61 |
| 10/7/2003 | 12.7 |
| 10/8/2003 | 12.63 |
| 10/9/2003 | 12.62 |
| 10/10/2003 | 12.72 |
| 10/13/2003 | 13.22 |
| 10/14/2003 | 13.37 |
| 10/15/2003 | 13.27 |
| 10/16/2003 | 13.35 |
| 10/17/2003 | 13.09 |
| 10/20/2003 | 12.65 |
| 10/21/2003 | 12.92 |
| 10/22/2003 | 12.5 |
| 10/23/2003 | 12.51 |
| 10/24/2003 | 12.5 |
| 10/27/2003 | 12.59 |
| 10/28/2003 | 12.79 |
| 10/29/2003 | 12.88 |
| 10/30/2003 | 13.06 |
| 10/31/2003 | 13 |

| | |
|---|---|
| 11/3/2003 | 13.21 |
| 11/4/2003 | 13.29 |
| 11/5/2003 | 12.92 |
| 11/6/2003 | 13.21 |
| 11/7/2003 | 13.49 |
| 11/10/2003 | 13.3 |
| 11/11/2003 | 13.19 |
| 11/12/2003 | 13.3 |
| 11/13/2003 | 13.5 |
| 11/14/2003 | 13.56 |
| 11/17/2003 | 13.04 |
| 11/18/2003 | 13.08 |
| 11/19/2003 | 13 |
| 11/20/2003 | 13.12 |
| 11/21/2003 | 13 |
| 11/24/2003 | 13.48 |
| 11/25/2003 | 13.34 |
| 11/26/2003 | 13.49 |
| 11/28/2003 | 13.59 |
| 12/1/2003 | 13.66 |
| 12/2/2003 | 13.42 |
| 12/3/2003 | 12.95 |
| 12/4/2003 | 13.14 |
| 12/5/2003 | 12.97 |
| 12/8/2003 | 13.01 |
| 12/9/2003 | 12.9 |
| 12/10/2003 | 12.81 |
| 12/11/2003 | 12.84 |
| 12/12/2003 | 12.84 |
| 12/15/2003 | 12.51 |
| 12/16/2003 | 12.54 |
| 12/17/2003 | 12.48 |
| 12/18/2003 | 12.89 |
| 12/19/2003 | 12.94 |
| 12/22/2003 | 13.23 |
| 12/23/2003 | 13.54 |
| 12/24/2003 | 13.18 |
| 12/26/2003 | 13.27 |
| 12/29/2003 | 13.65 |
| 12/30/2003 | 13.4 |
| 12/31/2003 | 13.15 |
| 1/2/2004 | 13.05 |
| 1/5/2004 | 12.99 |
| 1/6/2004 | 13.05 |
| 1/7/2004 | 13.08 |
| 1/8/2004 | 13.05 |
| 1/9/2004 | 12.89 |
| 1/12/2004 | 13.12 |
| 1/13/2004 | 13.24 |
| 1/14/2004 | 13.22 |
| 1/15/2004 | 13.48 |
| 1/16/2004 | 13.85 |

| | |
|---|---|
| 1/20/2004 | 13.95 |
| 1/21/2004 | 14.5 |
| 1/22/2004 | 14.97 |
| 1/23/2004 | 14.97 |
| 1/26/2004 | 15.69 |
| 1/27/2004 | 15.68 |
| 1/28/2004 | 14.97 |
| 1/29/2004 | 14.25 |
| 1/30/2004 | 14.16 |
| 2/2/2004 | 14.06 |
| 2/3/2004 | 14.3 |
| 2/4/2004 | 14.3 |
| 2/5/2004 | 14.07 |
| 2/6/2004 | 14.47 |
| 2/9/2004 | 14.8 |
| 2/10/2004 | 15.05 |
| 2/11/2004 | 15.04 |
| 2/12/2004 | 14.98 |
| 2/13/2004 | 14.57 |
| 2/17/2004 | 13.88 |
| 2/18/2004 | 14.25 |
| 2/19/2004 | 14.45 |
| 2/20/2004 | 14.25 |
| 2/23/2004 | 14.09 |
| 2/24/2004 | 14.11 |
| 2/25/2004 | 14.46 |
| 2/26/2004 | 14.52 |
| 2/27/2004 | 14.44 |
| 3/1/2004 | 15 |
| 3/2/2004 | 14.8 |
| 3/3/2004 | 14.82 |
| 3/4/2004 | 14.97 |
| 3/5/2004 | 15.4 |
| 3/8/2004 | 15.3 |
| 3/9/2004 | 15.55 |
| 3/10/2004 | 15.85 |
| 3/11/2004 | 15.03 |
| 3/12/2004 | 15.25 |
| 3/15/2004 | 14.45 |
| 3/16/2004 | 14.6 |
| 3/17/2004 | 14.75 |
| 3/18/2004 | 14.64 |
| 3/19/2004 | 14.68 |
| 3/22/2004 | 14.42 |
| 3/23/2004 | 14.58 |
| 3/24/2004 | 14.37 |
| 3/25/2004 | 14.65 |
| 3/26/2004 | 14.99 |
| 3/29/2004 | 15.18 |
| 3/30/2004 | 15.18 |
| 3/31/2004 | 14.99 |
| 4/1/2004 | 15.02 |

| | |
|---|---|
| 4/2/2004 | 15 |
| 4/5/2004 | 15.25 |
| 4/6/2004 | 14.88 |
| 4/7/2004 | 14.95 |
| 4/8/2004 | 14.86 |
| 4/12/2004 | 14.96 |
| 4/13/2004 | 14.64 |
| 4/14/2004 | 14.71 |
| 4/15/2004 | 14.9 |
| 4/16/2004 | 15.08 |
| 4/19/2004 | 15.14 |
| 4/20/2004 | 15.12 |
| 4/21/2004 | 17.5 |
| 4/22/2004 | 18.254 |
| 4/23/2004 | 18.12 |
| 4/26/2004 | 18.39 |
| 4/27/2004 | 18.42 |
| 4/28/2004 | 17.75 |
| 4/29/2004 | 17.53 |
| 4/30/2004 | 17.37 |
| 5/3/2004 | 17.23 |
| 5/4/2004 | 17.19 |
| 5/5/2004 | 17.35 |
| 5/6/2004 | 17.5 |
| 5/7/2004 | 17.01 |
| 5/10/2004 | 16.55 |
| 5/11/2004 | 16.78 |
| 5/12/2004 | 16.92 |
| 5/13/2004 | 16.79 |
| 5/14/2004 | 16.75 |
| 5/17/2004 | 16.75 |
| 5/18/2004 | 16.89 |
| 5/19/2004 | 16.82 |
| 5/20/2004 | 16.81 |
| 5/21/2004 | 17.16 |
| 5/24/2004 | 17.56 |
| 5/25/2004 | 17.5 |
| 5/26/2004 | 17.5 |
| 5/27/2004 | 17.88 |
| 5/28/2004 | 17.78 |
| 6/1/2004 | 18.09 |
| 6/2/2004 | 18.18 |
| 6/3/2004 | 17.91 |
| 6/4/2004 | 17.83 |
| 6/7/2004 | 18.21 |
| 6/8/2004 | 18.75 |
| 6/9/2004 | 19.9 |
| 6/10/2004 | 19.85 |
| 6/14/2004 | 19.65 |
| 6/15/2004 | 20 |
| 6/16/2004 | 19.86 |
| 6/17/2004 | 20.15 |

| | |
|---|---|
| 6/18/2004 | 20 |
| 6/21/2004 | 19.89 |
| 6/22/2004 | 19.75 |
| 6/23/2004 | 20.03 |
| 6/24/2004 | 19.91 |
| 6/25/2004 | 19.81 |
| 6/28/2004 | 20.9 |
| 6/29/2004 | 20.8 |
| 6/30/2004 | 20.79 |
| 7/1/2004 | 20.55 |
| 7/2/2004 | 20.47 |
| 7/6/2004 | 20.07 |
| 7/7/2004 | 20 |
| 7/8/2004 | 19.41 |
| 7/9/2004 | 19.65 |
| 7/12/2004 | 19.63 |
| 7/13/2004 | 19.39 |
| 7/14/2004 | 19.13 |
| 7/15/2004 | 19.06 |
| 7/16/2004 | 18.72 |
| 7/19/2004 | 19.14 |
| 7/20/2004 | 19.97 |
| 7/21/2004 | 20.12 |
| 7/22/2004 | 19.2 |
| 7/23/2004 | 19.89 |
| 7/26/2004 | 19.76 |
| 7/27/2004 | 20.13 |
| 7/28/2004 | 19.71 |
| 7/29/2004 | 19.99 |
| 7/30/2004 | 20.07 |
| 8/2/2004 | 20.19 |
| 8/3/2004 | 19.96 |
| 8/4/2004 | 20.2 |
| 8/5/2004 | 19.62 |
| 8/6/2004 | 19.08 |
| 8/9/2004 | 19.07 |
| 8/10/2004 | 19.54 |
| 8/11/2004 | 19.31 |
| 8/12/2004 | 18.83 |
| 8/13/2004 | 19.82 |
| 8/16/2004 | 19.58 |
| 8/17/2004 | 19.2 |
| 8/18/2004 | 19.57 |
| 8/19/2004 | 19.49 |
| 8/20/2004 | 19.8 |
| 8/23/2004 | 19.07 |
| 8/24/2004 | 18.98 |
| 8/25/2004 | 18.9 |
| 8/26/2004 | 18.94 |
| 8/27/2004 | 19.45 |
| 8/30/2004 | 19.5 |
| 8/31/2004 | 19.58 |

| | |
|---|---|
| 9/1/2004 | 19.56 |
| 9/2/2004 | 19.76 |
| 9/3/2004 | 20 |
| 9/7/2004 | 21.31 |
| 9/8/2004 | 20.99 |
| 9/9/2004 | 20.49 |
| 9/10/2004 | 20.45 |
| 9/13/2004 | 20.82 |
| 9/14/2004 | 21.11 |
| 9/15/2004 | 21.92 |
| 9/16/2004 | 22.47 |
| 9/17/2004 | 22.66 |
| 9/20/2004 | 22.55 |
| 9/21/2004 | 23.08 |
| 9/22/2004 | 22.73 |
| 9/23/2004 | 22.86 |
| 9/24/2004 | 22.77 |
| 9/27/2004 | 22.28 |
| 9/28/2004 | 22.68 |
| 9/29/2004 | 22.87 |
| 9/30/2004 | 23 |
| 10/1/2004 | 23.53 |
| 10/4/2004 | 23.79 |
| 10/5/2004 | 23.93 |
| 10/6/2004 | 24.24 |
| 10/7/2004 | 23.79 |
| 10/8/2004 | 23.66 |
| 10/11/2004 | 23.74 |
| 10/12/2004 | 23.96 |
| 10/13/2004 | 24.07 |
| 10/14/2004 | 24.16 |
| 10/15/2004 | 23.95 |
| 10/18/2004 | 24.15 |
| 10/19/2004 | 18.81 |



