UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————— x

In re JAKKS PACIFIC, INC.
SHAREHOLDERS CLASS ACTION
LITIGATION

————————————————————

This Document Relates To:

    ALL ACTIONS.

———————————————————— x

:
:
:
:
:
:
:
:
:
:
:
:

Civil Action No. 04-CV-8807 (KMK)

**ELECTRONICALLY FILED**

CLASS ACTION

MEMORANDUM OF LAW IN
OPPOSITION TO DEFENDANTS' MOTION
TO DISMISS THE CONSOLIDATED
AMENDED COMPLAINT

# TABLE OF CONTENTS

Page

I.    PRELIMINARY STATEMENT ............................................................................1

II.   STATEMENT OF FACTS ...............................................................................3

      A.    The Company and the WWE ...........................................................3

      B.    Defendants Friedman, Berman and Bennett Bribe a Licensing Agent in
            Order to Expand the Company's Toy License with WWE and to Acquire
            the WWE Videogame License...............................................................3

      C.    The Truth About the WWE Licenses Is Revealed to the Market ...........................6

      D.    The WWE Action ...............................................................................7

III.  ARGUMENT......................................................................................10

      A.    Standards on a Motion to Dismiss ...........................................................10

      B.    Defendants' Failure to Disclose the Commercial Bribery Scheme and the
            Problems with WWE Violated Section 10(b) and Rule 10b-5 Thereunder..........11

            1.    Defendants' Positive Statements About the WWE Licenses
                  Created a Duty to Disclose the Commercial Bribery Scheme...................11

            2.    Defendants' Positive Statements About the WWE Licenses
                  Created a Duty To Disclose That WWE Was Raising Issues As To
                  the Validity Of the Licenses .....................................................18

      C.    The Complaint Adequately Alleges Scienter........................................................19

            1.    Legal Standard ..........................................................................19

            2.    The Complaint Adequately Alleges Conscious Misbehavior and
                  Recklessness Through Defendants' Knowledge of and
                  Participation in the Bribery Scheme .........................................................20

            3.    Motive and Opportunity..........................................................................22

                  a.    Defendants' Insider Stock Sales of $37.5 Million Support a
                        Strong Inference of Scienter .....................................................22

                  b.    The Individual Defendants' Receipt of Performance-Based
                        Compensation Supports a Finding of Motive ...............................25

**Page**

       c.     Defendants' Secondary Stock Offerings Support a Strong Inference of Scienter ...................................................................26

D.    The Complaint Pleads Fraud With Particularity .....................................27

E.    The Complaint Adequately Alleges a Violation of Section 20(a) ........................28

IV.    CONCLUSION.............................................................................................31

# TABLE OF AUTHORITIES

**Page**

## CASES

*Ballan v. Wilfred Am. Educ. Corp.*,
 720 F. Supp. 241 (E.D.N.Y. 1989) ................................................................................16

*Cortec Indus., Inc. v. Sum Holdings L.P.*,
 949 F.2d 42 (2d Cir. 1991) .........................................................................................31

*Cosmas v. Hassett*,
 886 F.2d 8 (2d Cir. 1989) ...........................................................................................22

*Crowell v. Ionics, Inc.*,
 No. 03-10393-WGY, 2004 U.S. Dist. LEXIS 22254
 (D. Mass. Nov. 3, 2004) .......................................................................................23, 24

*Duncan v. Pencer*,
 No. 94 Civ. 0321, 1996 U.S. Dist. LEXIS 401
 (S.D.N.Y. Jan. 18, 1996) .............................................................................................26

*Ferber v. Travelers Corp.*,
 785 F. Supp. 1101 (D. Conn. 1991) ............................................................................27

*Fla. State Bd. of Admin. v. Green Tree Fin. Corp.*,
 270 F.3d 645 (8th Cir. 2001) ......................................................................................25

*Ganino v. Citizens Utilities Co.*,
 228 F.3d 154 (2d Cir. 2000) ...................................................................................19, 20

*Garr v. U.S. Healthcare, Inc.*,
 22 F.3d 1274 (3d Cir. 1994) ........................................................................................27

*Hamilton Chapter of Alpha  Delta Phi Inc. v. Hamilton College*,
 128 F.3d 59 (2d Cir. 1997) ..........................................................................................10

*Helwig v. Vencor*,
 251 F.3d 540 (6th Cir. 2001) .......................................................................................16

*Howard v. Everex Sys. Inc.*,
 228 F.3d 1057 (9th Cir. 2000) .....................................................................................26

*In re Allaire Corp. Sec. Litig.*,
 224 F. Supp. 2d 319 (D. Mass. 2002)..........................................................................16

**Page**

*In re Carter-Wallace Inc. Sec. Litig.*
  220 F. 3d 36 (2d Cir. 2000) ...........................................................................16

*In re Citigroup, Inc. Securities Litigation,*
  330 F. Supp. 2d 367 (S.D.N.Y. 2004) ............................................................13

*In re Complete Mgmt. Inc. Sec. Litig.,*
  153 F. Supp. 2d 314 (S.D.N.Y. 2001) ............................................................26

*In re Enron Corp. Sec. Litig. Derivative & ERISA Litig.,*
  235 F. Supp. 2d 549 (S.D. Tex. 2002) ...........................................................28

*In re IPO Sec. Litig.,*
  241 F. Supp. 2d 281 (S.D.N.Y. 2003) .........................................10, 26, 29, 30

*In re Mercator Software, Inc. Sec. Litig.,*
  161 F.Supp. 2d 143 (D. Conn. 2001).........................................................11, 19

*In re MicroStrategy Inc. Sec. Litig.,*
  115 F. Supp. 2d 620 (E.D. Va. 2000) .......................................................19, 26

*In re Nortel Networks Corp. Sec. Litig.,*
  238 F. Supp. 2d 613 (S.D.N.Y. 2003) .....................................................10, 11, 20

*In re Par Pharm., Inc. Sec. Litig.,*
  733 F. Supp. 668 (S.D.N.Y. 1990) ........................................................13, 14, 16

*In re Parmalat Sec. Litig.,*
  375 F. Supp. 2d 278 (S.D.N.Y. 2005) ........................................................28, 30

*In re Providian Fin. Corp. Sec. Litig.,*
  152 F. Supp. 2d 814 (E.D. Pa. 2001) .............................................................14

*In re Razorfish, Inc. Sec. Litig.,*
  143 F. Supp. 2d 304 (S.D.N.Y. 2001) ............................................................27

*In re Scholastic Corp. Sec. Litig.,*
  252 F.3d 63 (2d. Cir. 2001) ...................................................11, 22, 23, 29

*In re Sirrom Capital Corp. Sec. Litig.,*
  84 F. Supp. 2d 933 (M.D. Tenn. 1999)...........................................................12

- iv -

**Page**

*In re Sofamor Danek Group, Inc.*,
  123 F.3d 394 (6th Cir. 1997) ..................................................................................17

*In re Sotheby's Holdings, Inc. Sec. Litig.*,
  No. 00 Civ. 1041 (DLC), 2000 U.S. Dist. LEXIS 12504
  (S.D.N.Y. Aug. 31, 2000) ...............................................................................13, 17

*In re Time Warner, Inc. Sec. Litig.*,
  9 F.3d at 259 (2d. Cir. 1993) ...........................................................................26, 27

*In re Twinlab Corp. Sec. Litig.*,
  103 F. Supp. 2d 193 (E.D.N.Y. 2000) ....................................................................26

*In re Vivendi Universal, S.A.*,
  381 F. Supp. 2d 158 (S.D.N.Y. 2003) ....................................................................30

*In re Vivendi Universal, S.A. Sec. Litig.*,
  2004 U.S. Dist. LEXIS 7015 (S.D.N.Y. April 22, 2004) .........................................30

*In re Wellcare Mgmt. Group Inc., Sec. Litig.*,
  964 F. Supp. 632 (N.D.N.Y. 1997)..........................................................................25

*In re Xerox Corp. Sec. Litig.*,
  165 F. Supp. 2d 208 (D.Conn. 2001)........................................................................22

*Irvine v. Imclone Sys. Inc.*,
  02-Civ.-109  2003 U.S. Dist. LEXIS 9342
  (S.D.N.Y. June 4, 2003) .........................................................................................19

*Kalnit v. Eichler*,
  264 F.3d 131 (2d Cir. 2001) ...................................................................................26

*Klein ex rel. Ira v. PDG Remediation Inc.*,
  937 F. Supp. 323 (S.D.N.Y. 1996) ..........................................................................15

*McMahan & Co. v. Wherehouse Entm't. Inc.*,
  900 F. 2d 576 (2d Cir. 1990) ..................................................................................19

*Menkes v. Stolt-Nielsen S.A.*,
  No. 3:03CV409 (D. Conn. Nov. 10, 2005) .............................................................13

*No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. W. Holding Corp.*,
  320 F.3d 920 (9th Cir. 2003) ..................................................................................25

**Page**

*Novak v. Kasaks*,
216 F.3d 300 (2d Cir. 2000) ........................................................................10, 20, 21

*Nursing Home Pension Fund, Local 144 v. Oracle Corp.*,
380 F.3d 1226 (9th Cir. 2004) ..............................................................................24

*Ottmann v. Hanger Orthopedic Group, Inc.*,
353 F.3d 338 (4th Cir. 2003) ................................................................................11

*Phelps v. Kapnolas*,
308 F.3d 180 (2d Cir. 2002) ..................................................................................11

*Roeder v. Alpha Indus., Inc.*,
814 F.2d 22 (1st Cir. 1987).....................................................................................16

*Rubinstein v. Collins*,
20 F.3d 160 (5th Cir. 1994) ....................................................................................24

*SEC v. Texas Gulf Sulphur Co.*,
401 F.2d 833 (2d Cir. 1968) ..................................................................................11

*SEC v. U.S. Envtl., Inc.*,
155 F.3d 107 (2d Cir. 1998) ..................................................................................20

*Schnall v. Annuity & Life Re (Holdings), Ltd.*,
No. 02-CV-2133 (GLG), 2004 U.S. Dist. LEXIS 4643
(D. Conn. Mar. 9, 2004) .........................................................................................29

*Shapiro v. UJB Fin. Corp.*,
964 F.2d 272 (3d Cir. 1992) ..................................................................................12

*Stevelman v. Alias Research Inc.*,
174 F.3d 79 (2d Cir. 1999) ....................................................................................24

*Suez Equity Investors, L.P. v. Toronto-Dominion Bank*,
250 F.3d 87 (2d Cir. 2001) ....................................................................................29

*United Paperworkers Int'l Union v. International Paper Co.*,
801 F. Supp. 1134 (S.D.N.Y. 1992) ......................................................................12

**STATUTES**

15 U.S.C.

**Page**

§78t(a)...........................................................................................................................................29

§78u-4(b)(2)...............................................................................................................................19

Lead Plaintiffs Indiana Electrical Workers Pension Trust Fund IBEW, Kenneth J. Tucker, Tonia R. Tucker-Kraus and Michael Kraus ("Lead Plaintiffs") respectfully submit this memorandum of law in opposition to Defendants JAKKS Pacific, Inc. ("Jakks" or the "Company"), Jack Friedman, Steven G. Berman and Joel M. Bennett's (collectively, the "Individual Defendants") motion to dismiss the Consolidated Amended Complaint (the "Complaint"), dated September 9, 2005.

## I.    PRELIMINARY STATEMENT

This is a federal securities fraud class action brought on behalf of the purchasers of the common stock of Jakks between December 3, 1999 and October 19, 2004 (the "Class Period"), alleging violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder.

In 1998, Jakks, which designs, develops and markets toys, acquired various product licenses from World Wrestling Entertainment, Inc. ("WWE") by bribing WWE's licensing agent. As detailed in the Complaint, Defendants Jack Friedman ("Friedman") Steven G. Berman ("Berman") and Joel M. Bennett ("Bennett") bribed WWE's licensing agent in order to expand the Company's toy license with the WWE and in order to acquire the WWE videogame license (collectively the "WWE Licenses"). James K. Bell ("Bell"), who was Senior Vice President of Licensing and Merchandising for WWE and a central figure in the commercial bribery scheme, has plead guilty to mail fraud and admitted that he defrauded WWE. WWE has sued Jakks alleging that the WWE Licenses were acquired through commercial bribery and seeking, among other things, to rescind the WWE Licenses.

Throughout the Class Period, Defendants repeatedly stressed the positive contributions that the WWE Licenses were making to the Company's financial results. And when Defendants Berman and Friedman were seeking shareholder approval for their compensation packages, they cited the

- 1 -

acquisition of the WWE Licenses as a primary justification. Despite their repeated references to the WWE Licenses and the importance of those licenses to the Company, Defendants never disclosed the circumstances under which the licenses were obtained. Furthermore, as detailed in the Complaint, WWE eventually learned of the commercial bribery scheme and started to raise questions concerning the validity of WWE Licenses. Even though this was clearly material information, Defendants concealed the problems with WWE from investors. When the market learned the true facts about the WWE Licenses and the problems with WWE, the price of Jakks stock declined 46%, falling from $24.14 per share to $12.96 per share.

Although extremely long, Defendants' motion to dismiss makes one primary argument: that they were not required to disclose the commercial bribery scheme. Stated another way, Defendants' position is that they were not required to disclose that one of Jakks' key assets was obtained through commercial bribery orchestrated by the Company's CEO and President. Defendants' efforts aside, this argument is simply not supportable. The federal securities laws are premised on full and complete disclosure – once Defendants spoke about the WWE Licenses, they had to speak fully and truthfully. Despite Defendants' efforts to characterize the commercial bribery allegations as immaterial, it cannot reasonably be disputed that investors would have considered the information material and that it is exactly the type of hard information that investors would want to know. While in the possession of the true facts about the Company and the WWE Licenses, Defendants sold millions of dollars worth of Jakks common stock to the public and Jakks' insiders, including Defendants Friedman and Berman, collectively sold $37.5 million of their personally-held Jakks common stock to the unsuspecting public.

For the reasons set forth herein, it is respectfully submitted that Defendants' motion to dismiss be denied in its entirety.

II.    **STATEMENT OF FACTS**

A.    **The Company and the WWE**

Defendant Jakks designs, develops, produces and markets toys.  The Company focuses its business on acquiring or licensing well-recognized trademarks and brand names, such as Nickelodeon, Rugrats, Dora the Explorer, Blue's Clues, Mickey Mouse and others.  The Company also develops proprietary brands and marks.  ¶2.[1]

In October 1995, Jakks and WWE entered into a license agreement granting Jakks the right to manufacture and market WWE toys in the United States.  ¶¶4, 32, 34.  WWE promotes "professional wrestling" and is an integrated media and entertainment company engaged in the development, production and marketing of television and live events and the licensing and sale of products featuring its WWE brands.  The domestic toy license was set to expire in December 2007 with a one-year right to renew.  ¶34.  In connection with the negotiations for the domestic toy license, WWE used its licensing agent, Stanley Shenker & Associates Inc. ("SSAI") and Stanley Shenker ("Shenker").  ¶34.

B.    **Defendants Friedman, Berman and Bennett Bribe a Licensing Agent in Order to Expand the Company's Toy License with WWE and to Acquire the WWE Videogame License**

After the domestic toy license was negotiated, Defendants entered into an undisclosed agency agreement with Shenker and/or SSAI despite the fact that Shenker already had an agency relationship with WWE.  ¶34-35.  Defendants Friedman and Berman knew that Shenker worked for WWE, that hiring him created a material conflict of interest and that WWE did not know that Jakks had hired Shenker.  *Id*.

---

[1]    "¶__" refers to paragraphs in the Consolidated Amended Complaint, dated July 11, 2005.

On February 10, 1997, WWE -- per the recommendation of SSAI and Bell[2] -- entered into an international toy license with Jakks, which was set to expire on December 31, 1999.  At that time, Friedman and Berman failed to disclose Shenker's representation of Jakks to WWE.  ¶¶5, 37, 149.

Thereafter, on March 7, 1997, WWE expanded its relationship with Shenker and SSAI, and entered into an agency agreement (the "Agency Agreement") with SSAI, whereby SSAI became the exclusive outside licensing agent for WWE.  ¶37.  Under the terms of the Agency Agreement, SSAI was responsible for procuring potential licenses and presenting all license proposals to WWE.  The procedure for presenting such license proposals was for SSAI to present a potential deal memo to Bell, the Senior Vice President of Licensing and Merchandising for WWE.  Bell, a long-time friend and business associate of Shenker, was responsible for reviewing the licensing proposals and advising WWE senior management whether to accept or reject the proposed licensing offers.  *Id.*

The bribery scheme also extended to WWE's videogame license, which at this time belonged to Acclaim Entertainment, Inc. ("Acclaim").  In or around 1998, Friedman, Berman and Shenker implemented a scheme and illegal course of conduct whereby defendants arranged to pay bribes and kickbacks to Shenker, which Shenker agreed to split with Bell, in exchange for their assistance in helping Jakks procure the WWE videogame licenses that were up for renewal.  These illegal payments, which were directed by Bennett, the Company's Chief Financial Officer, enabled Jakks to gain the license to WWE's valuable videogame franchise, as well as to make valuable amendments to, and expand the scope of, the Company's toy licenses.  ¶40.

In order to perpetrate this scheme and illegal course of conduct, the illegal bribes and kickback payments were not recorded anywhere on the financial reports or records of Jakks.  Rather,

---

[2]    Bell was responsible for negotiating and managing WWE's license agreements.

to accomplish this bribery scheme, Defendants "laundered" a series of clandestine payments through foreign corporations controlled by Jakks and by Shenker and/or entities subject to his control, located primarily in Hong Kong, including an entity called Stanfull Industrial, Ltd. ("Stanfull").

¶41. The Complaint describes in detail an extensive series of payments made by Jakks, as directed by Bennett, to Shenker as payment for the WWE Licenses. ¶¶43-47.

In June 1998, SSAI and Bell influenced WWE management to enter into a videogame license agreement with THQ & Jakks Pacific LLC ("THQ/Jakks"). ¶¶5, 40-55. THQ/Jakks was a joint venture formed by Jakks and THQ, Inc. ("THQ"), a company that manufactures videogames. The Complaint specifically alleges that fictitious invoices were created and issued to facilitate payment for the bribes. ¶¶42-43, 58.[3]

The videogame license agreement had a ten-year term, scheduled to expire on December 31, 2009, and contained an additional five year renewal option in favor of THQ/Jakks. ¶¶5, 50. In June 1998, SSAI and Bell persuaded WWE to extend the term of Jakks' domestic and international toy licenses. ¶¶5, 51.

The WWE videogame license and toy licenses proved to be very lucrative for Jakks. Throughout the Class Period, Jakks repeatedly reported positive results, which Defendants consistently attributed to the Company's WWE product line. Despite crediting Jakks' success to the

---

[3]     In connection with the bribery scheme to procure the WWE Licenses, the Complaint specifically identifies a January 2, 1998 invoice that was generated in the amount of $80,000. ¶¶42-43. Defendants repeatedly argue that this factual assertion is incorrect on the basis that an amended complaint filed in the *WWE* Action "abandoned" the contention that the January 1998 invoice was created in connection with the bribe to procure the WWE videogame licensing. Def. Mem. at 7. ("Def. Mem. at ____" refers to Defendants' Memorandum of Law in Support of their Motion to Dismiss the Consolidated Amended Complaint, dated Sept. 9, 2005). Contrary to Defendants' claim, WWE's Amended Complaint did not abandon the claim that the bribery scheme included the procurement of the videogame license. WWE's Amended Complaint simply broadened the scheme to include additional WWE licenses awarded to Jakks.

WWE's licensing, Defendants failed to disclose that the licensing was obtained through improper bribes.

By early 2004, if not earlier, Defendants were aware that WWE was contending that the WWE Licenses had been obtained through a pattern of commercial bribery. Furthermore, Defendants knew or recklessly disregarded that the fact that WWE was contending that the WWE Licenses had been obtained through commercial bribery exposed the Company to the heightened risk that WWE would seek some modification to the WWE licensing agreements or complete nullification of those agreements. ¶53.

C.     **The Truth About the WWE Licenses Is Revealed to the Market**

On the morning of October 19, 2004, the truth began to emerge. ¶¶7, 146. That morning, prior to the opening of the market, Jakks announced its third-quarter 2004 financial results. *Id.* In its corresponding press release, Jakks stunned investors when it revealed that the Company was "engaged in discussions with WWE over the validity of its toy and video games license." *Id.*

This press release stated, in relevant part, the following:

> ***The Company also announced that it is engaged in discussions with WWE concerning the restructuring of its toy license and with WWE and THQ with respect to the restructuring of the JAKKS THQ Joint Venture video games license agreement with WWE***. The discussions are an outgrowth of certain litigation that has been pending between WWE and a former licensing consultant to WWE and a former employee of WWE, to which the Company is not a party. ***WWE has raised questions about the validity of the licenses as a result of certain transactions between the Company and that licensing consultant that occurred more than six years ago. The Company has denied any wrongdoing in connection with the transactions with the licensing consultant and maintains that they were unrelated to either the toy or video game license***. If the discussions are satisfactorily concluded, the restructuring of the licenses may have an impact on the Company's future revenues and net income to an extent that is presently unknown. ***If the discussions with WWE and THQ are not satisfactorily concluded, the Company anticipates that litigation is likely to be commenced by WWE challenging the validity of the licenses and seeking compensatory and punitive damages, in which event the Company intends to vigorously defend itself against claims which it believes are without merit.*** [Emphasis added.]

¶¶7, 146.  In direct reaction to this news, the price of Jakks' common stock steeply declined.  ¶147.

Specifically, on October 19, 2004, Jakks' stock price dropped $5.34 per share, or 22%, from its

previous day's closing price.  *Id.*

That same afternoon, news sources reported that WWE had filed a complaint against Jakks

and the Individual Defendants (the "WWE Action"), alleging that the Defendants had obtained

lucrative WWE licensing agreements for Jakks through a large-scale bribery scheme.  ¶149.  The

following trading day, October 20, 2004, the price of Jakks' stock again dropped in reaction to this

news.  The stock price fell $5.85 per share, or 31% from its previous closing price.  ¶151.  In total,

the price of Jakks' common stock declined from $24.15 per share to $12.96 per share once investors

learned of the problems with WWE and the WWE Licenses.  ¶¶147 and 149.

### D.    The WWE Action

On October 19, 2004, WWE filed a complaint against Jakks and others in this Court.  On

March 30, 2005, WWE amended its complaint broadening the scope of the bribery scheme and

further elaborating on the payment scheme.

WWE's original and amended complaints seek the same relief and, in effect, allege the

identical set of facts leading up to the bribery scheme.[4]  Bell, as Senior Vice President, convinced

WWE to retain SSAI -- which is controlled by Shenker -- as its exclusive outside licensing agent.

Shenker simultaneously represented Jakks' interests in obtaining licensing of various products.

---

[4]    Defendants misleadingly advised this Court that "[i]n its amended complaint, WWE <u>recanted</u> its allegations that the allegedly illicit payments in 1998 were a <u>quid</u> <u>pro</u> <u>quo</u> for the videogame license and the extension of the toy licenses.  Instead, as expressly summarized in the comparison of the WWE complaints above, WWE alleged that the January 2, 1998 'soft toy' invoice for $80,000 and corresponding payments in 1998 were to acquire rights and inventory of wrestling action figures manufactured by a company named Playmates."  Def. Mem. at 9.

Shenker did not disclose to WWE, however, of his business relationship with Jakks. WWE Complaint, ¶¶22-46; WWE Amended Complaint, ¶¶29-61.[5]

With respect to the bribery scheme and corresponding payments to Shenker and Bell, the WWE Complaint and the WWE Amended Complaint are virtually identical. The first complaint alleged that, in early 1998, Shenker, Bell, Friedman, Berman and Bennett implemented a bribery scheme that would enable Jakks to obtain the WWE videogame license. WWE Complaint, ¶¶42-46. The WWE Amended Complaint *added* allegations that Shenker and Bell agreed to negotiate a deal to allow Jakks to buy out the WWE license held by Playmates -- a domestic manufacturer and wholesalers of WWE toys. WWE Amended Complaint, ¶¶79-83. The WWE Amended Complaint did not allege that the scheme to obtain the licensing held by Playmates was *in lieu of* the scheme to obtain the videogame license. Rather, the Playmates facet of the scheme was alleged *in addition to* the improper procurement of the videogame license.

Both complaints alleged that the Individual Defendants went to great lengths to mask the bribery payments to Shenker and Bell. Specifically, the complaints alleged that Shenker issued an invoice, dated January 2, 1998, from Stanfull to Jakks. WWE Complaint, ¶46; WWE Amended Complaint, ¶85. The invoice sought payment in the amount of $80,000, "For Development of Possible Latex based Soft Toys with Special Coating." *Id.* Bennett arranged for payment of half of the invoice through two of Jakks' foreign subsidiaries, which was received by Shenker and Bell on January 14, 1998. WWE Complaint, ¶¶48-55; WWE Amended Complaint, ¶¶87-89, 94-95, 98-99. In March 1998, Bell used his influence at WWE to recommend the awarding of the videogame

---

[5]    "WWE Complaint" refers to the initial complaint filed in the WWE action, dated October 19, 2004. "WWE Amended Complaint" refers to the Amended Complaint in that action, dated March 30, 2005. Paragraph references to those complaints are identified as "WWE Complaint ¶___" and "WWE Amended Complaint ¶___," respectively.

licensing to Jakks and to purge all competing bids.  WWE Complaint, ¶¶59-62; WWE Amended Complaint, ¶¶109-111.[6]  On March 31, 1998, Bennett completed the payment of the January 2, 1998 invoice to Shenker and Bell.  WWE Complaint, ¶¶63, 65; WWE Amended Complaint, ¶111.  On June 23, 1998, WWE executed a videogame license agreement with Jakks, with an effective date of June 10, 1998 and an expiration date of December 31, 2009, with a right of renewal for five additional years in favor of Jakks.  WWE Complaint, ¶85; WWE Amended Complaint, ¶157.  As part of the scheme, the WWE Complaint alleges that Bell and Shenker arranged for the already existing domestic and international license agreements between Jakks and WWE to be extended for the term of the videogame license.  WWE Complaint, ¶86; WWE Amended Complaint, ¶165.  Following the execution of all agreements, Shenker issued another phony invoice to Jakks.  WWE Complaint, ¶87; WWE Amended Complaint, ¶167.  Bennett arranged for the payment of the $20,000 invoice.  WWE, ¶¶88-89; WWE Amended Complaint, ¶¶168-169.

Bell later plead guilty to accepting bribes from companies to facilitate their procurement of WWE licensing.  Complaint, ¶153; WWE Amended Complaint, ¶24.  In entering his plea, Bell acknowledged that he abused his position at WWE to award licensing of WWE products to Shenker.[7]

---

[6]     In this regard, the WWE Amended Complaint clearly alleged the following: "Following the receipt of the $20,000 [] on or about January 14, 1998 of monies originating with Jakks' foreign subsidiaries in the aforementioned series of transactions . . . Bell utilized his influence to steer WWE away from even considering the renewal of Acclaim as the videogame licensee.  Prior to payment of the aforementioned bribe by Jakks, Bell had advised Acclaim that there would be no problem with the renewal of its existing license."  WWE Amended Complaint, ¶107.  This allegation clearly evidences the fact that the WWE Amended Complaint does not abandon or recant the bribery scheme alleged in the WWE Complaint.

[7]     The WWE Amended Complaint quoted the language of Bell's plea agreement and stated the following:

The Individual Defendants were aware of the issuance of the bribery payments as they were personally responsible for their issuance. Further, Defendants had direct knowledge that, beginning in early 2002, WWE conducted an investigation into the nature of those payments. ¶¶101, 109, 112, 115, 126, 130; WWE Complaint, ¶¶98-115; WWE Amended Complaint, ¶¶197-207, 210. In fact, in the Fall of 2003, Defendants were notified that WWE confirmed the existence of bribery payments. ¶126, WWE Complaint, ¶¶125, 133; WWE Amended Complaint, ¶¶226-227.

## III.   ARGUMENT

### A.   Standards on a Motion to Dismiss

A motion to dismiss imposes a heavy burden on the movant, as the defendants must demonstrate that the plaintiffs either failed to state claims as a matter of law under Rule 12(b)(6) or that the plaintiffs have failed to properly plead those claims under the Federal Rules of Civil Procedure or the Private Securities Litigation Reform Act ("PSLRA"). *See In re IPO Sec. Litig.*, 241 F. Supp. 2d 281, 321-31 (S.D.N.Y. 2003) (Scheindlin, J.). In reviewing the complaint, the Court draws all reasonable inferences in Plaintiffs' favor and accepts as true the factual allegations in the Complaint. *See Novak v. Kasaks*, 216 F.3d 300, 305 (2d Cir. 2000); *In re Nortel Networks Corp. Sec. Litig.*, 238 F. Supp. 2d 613, 621 (S.D.N.Y. 2003) (Berman, J.); *Hamilton Chapter of Alpha*

---

"On February 10, 2005, after the original Complaint in this matter was filed, Bell waived indictment and plead guilty in an ongoing investigation to a Criminal Information in United States District Court for the District of Connecticut to a single count of mail fraud in violation of 18 U.S.C. §1341 in connection with Bell's receipt of bribes relating to WWE's licensing program. In a Stipulation of Offense Conduct accompanying his plea, Bell admitted that '[b]eginning in or before January 1998, and continuing through October 2000, in the District of Connecticut and elsewhere, JAMES K. BELL . . . and others known and unknown to the United States Attorney, did devise a scheme and artifice to defraud WWE, including depriving WWE of the intangible right of honest services, and to obtain money and property from WWE through materially false and fraudulent pretenses and representations.'" WWE Amended Complaint, ¶24.

*Delta Phi Inc. v. Hamilton College*, 128 F.3d 59, 63 (2d Cir. 1997) ("[T]he court must accept as true all the factual allegations in the complaint and must draw all reasonable inferences in favor of the plaintiff."). Because the Court is merely reviewing the complaint, the issue "is not whether a plaintiff is likely to ultimately prevail, but whether the claimant is entitled to offer evidence to support the claims." *Phelps v. Kapnolas,* 308 F.3d 180, 184-185 (2d Cir. 2002). The purpose of a pleading is to state a claim and provide adequate notice of that claim. In essence, "[a] pleading is not a trial and plaintiffs are not required to marshal their evidence and sustain a verdict at this stage." *Nortel*, 238 F. Supp. 2d at 621; *see also In re Scholastic Corp. Sec. Litig*., 252 F.3d 63, 72 (2d. Cir. 2001). Furthermore, all allegations must be read in their totality, not in isolation. *See In re Mercator Software, Inc. Sec. Litig*., 161 F.Supp. 2d 143, 150 (D. Conn. 2001).

**B.      Defendants' Failure to Disclose the Commercial Bribery Scheme and the Problems with WWE Violated Section 10(b) and Rule 10b-5 Thereunder**

**1.      Defendants' Positive Statements About the WWE Licenses Created a Duty to Disclose the Commercial Bribery Scheme**

As detailed in the Complaint, Defendants engaged in a commercial bribery scheme in order to acquire the WWE licenses, but in their numerous Class Period Statements failed to disclose the existence of the scheme or that one of the Company's greatest sources of revenue was procured improperly and/or may be in jeopardy. ¶¶32-55. Defendants repeated positive statements about the WWE Licenses created a duty to disclose material facts regarding those agreements and, in particular, that the WWE licenses -- one of the Company's most valued assets -- had been acquired through a series of improper payments to a licensing agent who was simultaneously representing WWE. *See SEC v. Texas Gulf Sulphur Co.*, 401 F.2d 833, 962 (2d Cir. 1968) (holding that where a defendant voluntarily chooses to make a statement that is reasonably calculated to influence the investing public, defendant has a duty to disclose sufficient information so that the statement is not "so incomplete as to mislead."); *Ottmann v. Hanger Orthopedic Group*, *Inc.*, 353 F.3d 338, 352 (4th

- 11 -

Cir. 2003) (finding that defendants' positive statements about the integration of two businesses

created a duty to disclose that the combined company was experiencing a loss of referral business).[8]

For example, on May 22, 2000, Jakks filed a Proxy Statement with the SEC in connection

with the election of directors for 2000-2001.  ¶68.  Among other things, the Proxy Statement made

direct statements about the WWE Licenses and Defendants Friedman's and Berman's roles in

helping Jakks acquire the WWE licenses, stating, in pertinent part, as follows:

> We believe that our success to date has been to a significant extent attributable to the
> personal efforts of Mr. Friedman and Mr. Berman.  They founded the Company,
> established its business philosophy and operating structure and were the driving force
> behind our central theme of focusing our business on "evergreen" products.  ***Mr.
> Friedman's long-term relationship with Titan Sports was instrumental in our
> acquiring our successful World Wrestling Federation licenses*** . . . .  In addition to
> their general supervisory functions, they are directly involved in license acquisition,
> product design and development, production, and sales and marketing, as well as our
> financing and acquisition efforts.  ***Their efforts have resulted in our identifying and
> securing the World Wrestling Federation licenses and other desirable licenses and
> properties***, the rapid expansion of our product lines, our achieving significant
> production efficiencies and the development of a loyal and growing customer base.
> In 1999, they guided us through two significant acquisitions, the implementation of
> our video game joint venture with THQ Inc. and two public offerings.  [Emphasis
> added.]

---

[8]    *See also In re Sirrom Capital Corp. Sec. Litig.*, 84 F. Supp. 2d 933, 942 (M.D. Tenn. 1999)
(holding that where the company chose to make affirmative statements concerning its financial
viability, thereby putting such statements "in play", the company was bound to be forthcoming and
truthful to shareholders and prospective investors); *Shapiro v. UJB Fin. Corp.*, 964 F.2d 272, 282
(3d Cir. 1992) (holding that where a bank characterizes its management practices as "conservative"
and "cautious," the bank puts the issue of management practices "in play" and is bound to speak
truthfully about the practices.); *see also United Paperworkers Int'l Union v. International Paper Co*.,
801 F. Supp. 1134, 1143 (S.D.N.Y. 1992) (Where "the company chose to offer specific
representations about its environmental record and policies, it was obligated to portray that record
fairly.").

These statements were materially false and misleading[9] because they misrepresented and failed to disclose the true facts regarding the acquisition of the WWE Licenses – that Defendants Friedman, Berman and Bennett had made improper payments to WWE's licensing agent in order to secure the WWE Licenses.[10] *See Menkes v. Stolt-Nielsen S.A.*, No. 3:03CV409 (D. Conn. Nov. 10, 2005) (Order) (attached hereto as Exhibit A) (holding that statements about a Company's financial performance were rendered materially false and misleading by failing to disclose that the results were achieved as a result of price-fixing and anti-competitive conduct); *In re Sotheby's Holdings, Inc. Sec. Litig.*, No. 00 Civ. 1041 (DLC), 2000 U.S. Dist. LEXIS 12504 (S.D.N.Y. Aug. 31, 2000) (denying motion to dismiss and holding that failure to disclose illegal antitrust activities rendered statements about earnings and business developments materially false and misleading); *In re Par Pharm., Inc. Sec. Litig.*, 733 F. Supp. 668, 675 (S.D.N.Y. 1990) ("*Par*") (court found that failure to

---

[9]     Defendants reliance on *In re Citigroup, Inc. Securities Litigation*, 330 F. Supp. 2d 367 (S.D.N.Y. 2004), is inapposite to the facts at issue before this Court. Defendants argue that, in *Citigroup*, the Court held that company statements concerning its risk management and procedures did not create a duty to disclose revenues that were sustained from unsustainable and illegitimate sources. (Def. Motion, at 33) This argument has no bearing whatsoever on the allegations in the Complaint. Plaintiffs do not assert reliance on Jakks' risk management statements or procedures as a basis for their securities claim. Rather, the Complaint relies upon Defendants' statements regarding the WWE licensing, the manner in which the licensing was procured, the value of the licensing to the Company, and the ongoing and future success of the Company derived from the WWE licensing.

Further, the court in *Citigroup* reasoned that the allegation against Citigroup amounted "to nothing more than a charge that Citigroup's business was mismanaged." 330 F. Supp. 2d at 375. In this regard, the Court likewise stated that the complaint does not focus "on specific factual or opinion disclosures alleged to have been false or misleading, or on omissions of specific facts, but rather on Plaintiff's contention that Citigroup's business would have been conducted differently had the company adhered to the management principles disclosed in its public filings." *Id.* at 376. Here, the Complaint *does* focus on omission of material facts, including that a strong bases of the Company's revenue was procured through illegal means.

[10]     Plaintiffs' analysis is the same for all of the other statements in the Complaint – each of those statements generally mentioned or referred to the WWE Licenses or the contribution that the WWE product line was making to the Company's financial results, but failed to disclose that the WWE licenses were obtained as the result of improper payments.

disclose scheme to bribe FDA to receive expedited review of company's drug applications properly

stated a claim under Section 10(b) and Rule 10b-5).[11]

This case is strikingly similar to *Par*.  In *Par*, plaintiffs alleged that Par Pharmaceutical, Inc.

("Par"), which manufactured and marketed prescription and over the counter drugs, engaged in a

bribery scheme, whereby it made a series of illegal payments to the Food and Drug Administration

("FDA") in order to secure expedited approval of its products.  *Id.*  Par did not disclose the bribery

scheme in any of its disclosure statements or public filings during the class period.  As here,

defendants in *Par* argued that they had complied with their disclosure obligations.  Judge Patterson

rejected this contention holding that "the matter must go to the jury unless the Court, drawing all

reasonable inferences in favor of the plaintiff, determines that reasonable minds could not differ on

the question of whether the statements alleged in the complaint were misleading in light of the

circumstances under which they were made."  *Id*. at 677.  Judge Patterson specifically concluded:

> A reasonable jury could find that, by extolling Par's ability to obtain FDA approvals,
> by comparing Par's success in this regard to other companies in the industry and to
> its own previous performance, and by projecting continued success in obtaining rapid
> approvals, ***the statements conveyed to a reasonable investor the false impression
> that Par had a particular expertise in obtaining FDA approvals constituting a
> legitimate competitive advantage over other companies and that this advantageous
> expertise was responsible for its success in obtaining FDA approvals***.

*Id*. at 677-78.  [Emphasis added.]  *See also In re Providian Fin. Corp. Sec. Litig.*, 152 F. Supp. 2d

814, 824-825 (E.D. Pa. 2001) (holding that allegations of failure to disclose a series of illegal or

---

[11]    Defendants rely heavily on *Par* for the proposition that Jakks was under no obligation to
disclose illegal conduct or to speculate about possible litigation.  Def. Mem at 14-21.  In *Par*,
however, the Court dismissed only the portion of the complaint alleging that defendant corporation
had a duty to disclose speculative effects. 733 F. Supp at 679.  The portion of the complaint alleging
that defendant corporation failed to disclose or omitted information regarding its improper business
practices and the company's financial performance based upon those practices -- the very allegations
of the Company here -- were actually sustained.

fraudulent business practices which artificially inflated the company's financial results stated a claim under Section 10(b)).

In their motion to dismiss, Defendants contend that, for a variety of reasons, they were under no duty to disclose the commercial bribery scheme. Def. Mem. at 13-37.[12] Although spread over twenty-four (24) pages, Defendants' arguments can be distilled down to one principle argument – their statements did not create a duty to disclose the commercial bribery scheme.[13] Before turning to their specific arguments, it should be noted that Defendants do not seriously contend (nor could they) that the fact that Jakks obtained the WWE Licenses through a pattern of commercial bribery was not material. *See Klein ex rel. Ira v. PDG Remediation Inc.*, 937 F. Supp. 323, 327 (S.D.N.Y. 1996) (Batts, J.) (finding a program which represented "a large source of [the company's] income" to be material).

---

[12]     In their motion, Defendants improperly rely on documents that are not attached to, quoted or referenced in the Complaint. For example, Defendants' motion improperly relies on a "Settlement Agreement and General Release of all Claims" (the "Release") between Jakks and WWE, apparently entered into in January 2004. The Release and Defendants' use of the Release in their motion, as well as other referenced documents improperly utilized Defendants, should be disregarded as improper for the reasons set forth in Plaintiffs' corresponding "Motion to Strike Certain Exhibit." Moreover, Defendants' use of the Release in a vacuum is misleading and inappropriate. Defendants cannot ask this Court to conjecture as to the nature of the Release and the subsequent communications and relationship between Jakks and WWE.

[13]     For reasons known only to them, Defendants ramble on about theories of liability that are clearly not the focus of Plaintiffs' claims. The Complaint plainly asserts that Defendants issued statements that were materially false and misleading because they failed to disclose the commercial bribery scheme, among other things. The other theories addressed by Defendants -- SEC regulations, Def. Mem. at 18-21, whether Defendants' insider trading created a duty to disclose the commercial bribery scheme, Def. Mem. at 14, n.6, and whether Jakks' reporting of accurate financial results, Def. Mem. at 23-26 -- are beside the point. In the interests of brevity, and without conceding that Defendants are correct in their analysis (which they are not), Plaintiffs have chosen to focus on the core issues in this case.

First, Defendants spend five pages arguing that they were not required to disclose uncharged illegal conduct or speculate about possible litigation. Def. Mem. at 14-18. Plaintiffs, however, are not claiming that Defendants were required to disclose uncharged illegal conduct or speculate about possible litigation absent some duty to speak. Rather, Plaintiffs contend that when Defendants spoke about the WWE Licenses, which they did repeatedly, they had an obligation to speak truthfully. *See In re Allaire Corp. Sec. Litig.*, 224 F. Supp. 2d 319, 327 (D. Mass. 2002) (holding that "having elected to comment on financial and product sales performance" defendants were "required to make full and accurate disclosures"); *Helwig v. Vencor*, 251 F.3d 540, 561 (6th Cir. 2001) *citing Rubin v. Schottenstein*, 143 F.3d 263, 268 (6th Cir. 1998) ("Even absent a duty to speak, a party who discloses material facts in connection with securities transactions 'assumes a duty to speak fully and truthfully on those subjects.'").

The fact that the commercial bribery scheme is arguably illegal does not mean that Defendants had a right to conceal its existence. Contrary to Defendants' argument, the "illegality of corporate behavior is not a justification for withholding information that the corporation is otherwise obligated to disclose." *Par*, 733 F. Supp. at 675; *see also Ballan v. Wilfred Am. Educ. Corp.*, 720 F. Supp. 241, 249 (E.D.N.Y. 1989) ("The fact that a defendant's act may be a crime does not justify its concealment."). In fact, "[t]his duty to disclose exists even where the omitted information relates to allegedly illegal conduct." *Sotheby's*, 2000 U.S. Dist. LEXIS 12504, at *13[14]; *see also Roeder v. Alpha Indus., Inc.*, 814 F.2d 22, 25 (1st Cir. 1987) ("The securities laws do not operate under the

---

[14]     Defendants' contention that it is well settled in the Second Circuit "that the federal securities laws do not impose any obligation that a corporation disclose uncharged illegal conduct", Def. Mem. at 14-15, is wrong. In *Sotheby's*, Judge Cote denied defendants' motion to dismiss holding that the issuance of statements about Sotheby's business and its operations created a duty to disclose that the Company was engaged in allegedly improper antitrust activities. 2000 U.S. Dist. LEXIS 12504 at *12-13. Although the conduct here is commercial bribery, the analysis here is exactly the same.

assumption that material information need not be disclosed if management has reason to suppress it.").

In this same vein, Defendants argue that the commercial bribery scheme did not have to be disclosed because it was soft information, citing the Sixth Circuit's decision in *In re Sofamor Danek Group, Inc.*, 123 F.3d 394 (6th Cir. 1997) ("*Sofamor*"). Def. Mem. at 24-25. *Sofamor*, however is readily distinguishable from this case. In *Sofamor*, the Sixth Circuit simply found that the issue of whether the company was illegally promoting its products was a "matter of opinion" and, therefore, not objectively verifiable. By contrast, the facts here are much more pronounced and definitive – Defendants knew that they had hired SSAI, knew that Shenker was simultaneously serving as an an agent for WWE, knew that they had paid him and Bell for their help in securing the WWE Licenses, and knew that WWE was unaware of any of these facts.[15]

The balance of Defendants' arguments in their motion ignore Plaintiffs' core contention – that Defendants' statements about the WWE Licenses mandated disclosure about the commercial bribery scheme.[16] Indeed, this is not a situation where disclosure of information would have inundated investors with needless information, as Defendants repeatedly suggest. In essence, Defendants' arguments equate to converting the broad disclosure mandates of the federal securities

---

[15]     In the midst of their discussion of *Sofamor*, Defendants cite scores of cases for the proposition that accurate reporting of financial results do not create a duty to disclose alleged misconduct. Def. Mem. 23-28. Those authorities are simply not relevant to the issues presented in this case and, therefore, Plaintiffs have not distinguished each and every authority.

[16]     For example, Defendants contend that their earnings projections are not actionable and did not create a duty to disclose the commercial bribery scheme. Def. Mem. at 28-31. Again, Defendants miss the point. When Defendants spoke positively about the WWE Licenses and the contribution that they were making to the Company's financial results they had a duty to disclose the commercial bribery scheme. *See Sotheby's*, 2000 U.S. Dist. LEXIS 12504. The issue of whether or not those earnings projections are actionable is beside the point.

laws into a shield for the disclosure of plainly material information, *i.e.*, the disclosure was not required because investors would get too much information.  To the contrary, Jakks' Chief Executive Officer and co-founder (Friedman), President, Chief Operating Officer, Secretary and co-founder (Berman), and Executive Vice President and Chief Financial Officer (Bennett) acquired one of the Company's core and most valuable licenses through improper practices and investors should have been told that simple fact and been able to base their decisions to buy Jakks stock on full and complete information.

> **2.    Defendants' Positive Statements About the WWE Licenses Created a Duty To Disclose That WWE Was Raising Issues As To the Validity Of the Licenses**

By early 2004, if not earlier, Defendants were aware that WWE was contending that the WWE licenses had been obtained through a pattern of commercial bribery.  Furthermore, Defendants knew or recklessly disregarded the fact that WWE was contending that the WWE Licenses had been obtained through commercial bribery exposed the Company to the heightened risk that WWE would seek some modification to the WWE licensing agreements or complete nullification of those agreements.  ¶¶101, 109, 112, 115, 126, 130.  Notwithstanding these facts, Defendants continued to issue positive statements about the WWE Licenses.  ¶¶102, 103, 105, 108, 110, 116-117, 127, 129, 132-133, 136, 141, 143.  The nature of these statements certainly imposed a duty on Defendants to disclose the brewing controversy with WWE.

In response to these allegations, Defendants twist Plaintiffs' claim around and argue that Plaintiffs are alleging that Defendants should have speculated that the WWE was going to sue them.  Def. Mem. at 14-18.  This is not Plaintiffs' claim and, therefore, all of Defendants' authorities in this regard are inapposite.  Rather, Plaintiffs are alleging that when the WWE started to raise issues as to the validity of the WWE Licenses, which was clear by early 2004, Defendants had an obligation to disclose these material facts to investors when they spoke about the positive contributions the WWE

- 18 -

Licenses were making to the Company's financial results.  *See McMahan & Co. v. Wherehouse Entm't. Inc.*, 900 F. 2d 576, 579 (2d Cir. 1990) ("the disclosure required by the securities laws is measured not by literal truth, but by the ability of the material to accurately inform rather than mislead prospective buyers").  Indeed, Defendants were able to make this disclosure when they issued their third quarter 2004 financial results at the end of the Class Period – that disclosure, however, should have been made much earlier.  ¶146.

### C.    The Complaint Adequately Alleges Scienter

#### 1.    Legal Standard

The PSLRA directs that a complaint alleging violations of Section 10(b) of the Exchange Act must state "facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. §78u-4(b)(2).  Under the Second Circuit's standard, a plaintiff may establish a "strong inference" of scienter either: (i) by alleging facts which demonstrate that defendants had both motive and opportunity to commit fraud; *or* (ii) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness.  *Ganino v. Citizens Utilities Co.*, 228 F.3d 154, 170 (2d Cir. 2000); *see also Irvine v. Imclone Sys. Inc.*, 02-Civ.-109 (RO), 2003 U.S. Dist. LEXIS 9342, at *6-7 (S.D.N.Y. June 4, 2003) (Owen, J.).

In consideration of whether the allegations of the Complaint give rise to a strong inference of scienter, the Court should not consider the Complaint's allegations in isolation, but rather in their entirety.  *See Mercator*, 161 F. Supp. 2d at 150 (holding that when determining whether scienter has been sufficiently pleaded the complaint's allegations should be "read in their totality"); *see also In re MicroStrategy Inc. Sec. Litig.*, 115 F. Supp. 2d 620, 631(E.D. Va. 2000) (same).  The Second Circuit

does not require "'great specificity' provided the plaintiff alleges enough facts to support 'a strong inference of fraudulent intent.'"  *Ganino*, 228 F.3d at 169.[17]

> **2.     The Complaint Adequately Alleges Conscious Misbehavior
> and Recklessness Through Defendants' Knowledge of and
> Participation in the Bribery Scheme**

In order "to survive dismissal under the 'conscious misbehavior' theory, [Plaintiffs] must show that they alleged reckless conduct by the [Defendants], which is at the least, conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it."  *Nortel*, 238 F. Supp. 2d at 631 (*quoting In re Carter-Wallace Inc. Sec. Litig.*, 220 F. 3d 36, 39 (2d Cir. 2000)).  In fact, "securities fraud claims typically have sufficed to state a claim based on recklessness when they have specifically alleged defendants' knowledge of facts or access to information contradicting their public statements.  Under such circumstances, defendants knew or, more importantly, should have known that they were misrepresenting material facts related to the corporation."  *Novak*, 216 F.3d at 308; *see also SEC v. U.S. Envtl., Inc.*, 155 F.3d 107, 111 (2d Cir. 1998) ("It is well-settled that knowledge of the proscribed activity is sufficient scienter under §10(b).").

---

[17]     Any argument that the allegations of the Complaint constitute group pleading is inapplicable. Here, the Complaint specifically alleges how the Individual Defendants -- Friedman, Bennett and Berman -- were directly involved in the day-to-day operation of the Company, were directly involved in the fraudulent activity at issue, prepared or signed the Company's disclosure statements, and/or had direct knowledge of the false or misleading statements being issued to the public. ¶¶36, 40, 42, 43, 62, 64-66, 69, 70, 71, 75, 77, 78, 80, 82, 85, 87, 89, 91, 95, 98, 102, 116-120, 125-131, 134, 141, 142.

A plaintiff may sufficiently plead scienter under the conscious misbehavior or recklessness prong by "specifically alleg[ing] defendants' knowledge of facts or access to information contradicting their public statements." *Novak*, 216 F.3d at 308. The Complaint alleges that Defendants actively participated in implementing the bribery scheme to deceive WWE. Moreover, the Complaint further alleges that Defendants actively concealed evidence of the bribery scheme and thwarted WWE's efforts to obtain the accuracy of payments made in connection with the scheme. Clearly, the allegations in the Complaint adequately meet this standard outlined in *Novak*.

The Complaint also includes detailed allegations concerning the role of each of the Individual Defendants in the meticulously planned and executed bribery scheme, which included concealing past associations between the Individual Defendants, Shenker and Bell, concealing rival bids for the WWE licensing, concealing the forged invoicing generated to foster the scheme, and concealing the source and delivery of the bribery payments. ¶¶32-35.

The Individual Defendants include the Company's Chairman, Chief Executive Officer and co-founder (Friedman), President, Chief Operating Officer, Secretary and co-founder (Berman), and Executive Vice President and Chief Financial Officer (Bennett). Thus, in addition to their direct involvement in the fraud, the Individual Defendants were upper executives at Jakks. The Individual Defendants likewise participated in the preparation of Jakks' SEC filings and public statements and related communications with investors and the public. ¶¶22-25, 56-59, 64, 66, 71, 77, 80, 85, 95, 102, 116, 141. Throughout the Class Period, the Individual Defendants personally and publicly certified that Jakks' reporting fairly presented the financial condition and operations of the Company. ¶¶78, 82, 87, 91, 98, 118, 125, 134, 142. In essence, the Individual Defendants assured Jakks' investors that the Company's financial reports were complete and accurate and that they were actively aware of all material information. Notwithstanding these assertions, Defendants now

disingenuously ask this Court to allow them to be shielded by declarations of ignorance, claiming they were either unaware of the information or did not know the information should have been disclosed. Def. Mem. at 18-23. The allegations of the Complaint, coupled with the instant brief, elicit the transparency of Defendants' attempt to blur the issues before this Court. Quite simply, Defendants had firsthand knowledge of the facts they were obligated to disclose. Plaintiffs have, therefore, sufficiently stated a claim for recklessness and adequately pleaded scienter under §10(b).[18]

### 3.     Motive and Opportunity

Defendants clearly had the opportunity to commit the fraudulent acts alleged by Plaintiffs and Defendants do not contest this allegation. The Complaint also alleges Defendant's motive to commit the alleged fraud. In this regard the Complaint alleges a number of the classic motives in a securities fraud case -- unusual and suspicious insider trading, major public stock offerings and excessive compensation and bonuses.

### a.     Defendants' Insider Stock Sales of $37.5 Million Support a Strong Inference of Scienter

Stock sales by insiders contribute to a strong inference of scienter when those sales are "unusual." *Scholastic*, 252 F.3d at 74. The "[f]actors considered in determining whether insider

---

[18]     Moreover, the sheer importance of the WWE licensing, standing alone, substantiates Defendants' knowledge -- or recklessness in not knowing -- of the ongoing fraud. Defendants do not contest the fact that the licensing of WWE products was a central component of Jakks' business and represents a considerable source of the Company's success. In this regard, knowledge concerning developments affecting a company's core businesses is imputed to its officers and directors. *Cosmas v. Hassett*, 886 F.2d 8, 13 (2d Cir. 1989) (finding that directors are rightfully imputed with knowledge of elimination of a "potentially significant source of income for the company"); *In re Xerox Corp. Sec. Litig.*, 165 F. Supp. 2d 208, 223 (D.Conn. 2001) (finding conscious misbehavior sufficiently alleged based upon allegations that defendants were aware of problems affecting the company's core operations "by virtue of their responsibilities within the company, and must have either intentionally or recklessly have failed to report the company's true condition to the investing public").

trading activity is unusual include the amount of profit from the sales, the portion of stockholdings sold, the change in volume of insider sales, and the number of insiders selling." *Id.* at 75 (citing *Rothman* 220 F.3d at 94). Here, Defendants sold significant amounts -- in excess of $37.5 million -- of their Jakks holdings with the knowledge that the undisclosed bribery scheme was the driving force behind the Company's growth. ¶54, 163, 165. The sale of tens of millions of dollars near the Class period high is certainly unusual.

Defendants argue that the sales of Jakks' stock do not demonstrate motive because there was nothing suspicious about the "timing" or "size" of those sales. Def. Mem. at 42-43. With regard to "timing," Defendants argue that the sales of stock took place "years before the disclosure of 'adverse facts'" and were therefore not suspicious. *Id.* [Emphasis added.] Defendants' argument, however, does not refute Plaintiffs' allegations because the "disclosure of the adverse facts" was never intended to be disclosed by Defendants. Specifically, Defendants issued the bribery payments to acquire the WWE licensing with the hope that the bribery scheme would ***never*** be exposed. Essentially, Defendants endeavored to accomplish a perpetual fraud.[19] *See Crowell v. Ionics, Inc.*, No. 03-10393-WGY, 2004 U.S. Dist. LEXIS 22254, *15 (D. Mass. Nov. 3, 2004) (finding scienter to be adequately plead where "[d]efendants could have commenced a fraudulent scheme, in hopes of profiting from insider trading, but simply have waited too long to sell, such that by the time it became apparent that full disclosure would be necessary, massive trades would expose them to potential criminal liability").

---

[19]    Until WWE conducted its investigation into the payments made in connection with the bribery scheme, Defendants presumably hoped the improper nature of licensing agreements would remain concealed so that Jakks' shares could continue to trade at inflated prices.

At the outset of the fraud, Defendants could not predict if and when WWE would discover the bribery scheme and, in turn, challenge the validity of the licensing agreements between Jakks and WWE. As the Complaint alleges, Defendants knew that Jakks' positive financial performance was the result of the WWE licensing, which was obtained by Jakks through improper payments. ¶23, 53. Given the fact that Defendants did not originally know that WWE would discover the bribery payments and thereby challenge the legitimacy of the licensing agreements, the Individual Defendants may have expected that they would be able to maintain the artificially inflated Jakks' stock price and sell additional shares at a later date. *See Crowell*, 2004 U.S. Dist. LEXIS 22254. As a result, the suspicious timing of the stock sales encompasses a broader time frame, which would include any period in which Individual Defendants knew that the Company was benefiting from the ill-gotten WWE Licenses. Thus, the timing of the sales of stock by the Individual Defendants is certainly suspicious.

With regard to "size," the amount of stock sold by Defendants -- in excess of $37.5 million -- is plainly significant and clearly contributes to a strong inference of scienter. Indeed, courts have supported a finding of scienter for sales amounts significantly smaller than those alleged in this litigation. *See Stevelman v. Alias Research Inc.*, 174 F.3d 79, 82, 85-86 (2d Cir. 1999) (finding insider sales by several officers sufficient to establish motive even without alleging the percentage of holdings or shares retained); *see also Rubinstein v. Collins*, 20 F.3d 160, 169 (5th Cir. 1994) (collective sales of only $760,599 sufficient to support scienter); Also, the amount of stock sold by the Individual Defendants at the inception of the fraud further supports the already strong showing of scienter. *See Nursing Home Pension Fund, Local 144 v. Oracle Corp.*, 380 F.3d 1226, 1232 (9th Cir. 2004).

As alleged in the Complaint, immediately following the Company's press release concerning Jakks' first series of WWE-licensed videogames, the Company conducted a secondary offering of 3 million shares of common stock, followed up by an additional secondary offering in April 2002. ¶¶56-57, 60, 97-100. In connection with these two offerings alone, insiders -- including Individual Defendants Friedman and Berman -- sold shares valued in excess of $21.5 million. ¶¶59, 100, 163.

> **b.    The Individual Defendants' Receipt of Performance-Based Compensation Supports a Finding of Motive**

Defendants also received significant compensation during the Class Period as a result of the fraud. The compensation and bonuses provided to the Individual Defendants, when considered with the totality of Plaintiffs' allegations, further supports a strong inference of scienter. *In re Wellcare Mgmt. Group Inc., Sec. Litig.*, 964 F. Supp. 632, 639 (N.D.N.Y. 1997) (holding that a "Court will not disregard, as irrelevant, allegations that incentive compensation was affected by the alleged fraudulent conduct"); *Fla. State Bd. of Admin. v. Green Tree Fin. Corp.*, 270 F.3d 645, 661 (8th Cir. 2001) (stating that the magnitude of defendant's compensation package, together with other factors, provided "an unusual, heightened showing of motive to commit fraud"); *No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. W. Holding Corp.,* 320 F.3d 920, 944 (9th Cir. 2003) (finding a strong inference of scienter for even non-selling defendants where their eligibility for stock options and executive bonuses were based principally on the company's financial performance).

The Complaint alleges that the Individual Defendants were given increased base salaries, cash bonuses and Jakks' stock options due largely to their direct involvement in the acquisition of WWE licensing and the important relationship between the Individual Defendants and WWE. ¶¶68, 83, 106 and 144. In fact, as alleged in the Complaint, the Company was criticized by Wall Street analysts over the compensation and unusual perks afforded Defendants Friedman and Berman.

¶¶122-124. Defendants were in a position to profit as Jakks' stock price increased and, more specifically, by preserving the WWE licensing and concealing the bribery scheme. Thus, the Individual Defendants' personal wealth was entwined with the positive performance of Jakks and with the success of the fraud. ¶¶68, 83, 106, 122-124, 144. These allegations further contribute to a finding of motive and support a strong inference of scienter. *Kalnit v. Eichler*, 264 F.3d 131, 139 (2d Cir. 2001).

### c. Defendants' Secondary Stock Offerings Support a Strong Inference of Scienter

Defendants were further motivated to commit the fraud alleged in the Complaint in order to raise millions of dollars in capital. Indeed, the inflation of a stock price to maximize revenue from secondary offerings is a sufficient allegation of motive. *In re Twinlab Corp. Sec. Litig.*, 103 F. Supp. 2d 193, 206 (E.D.N.Y. 2000); *see also In re Complete Mgmt. Inc. Sec. Litig.*, 153 F. Supp. 2d 314, 328 (S.D.N.Y. 2001) (Buchwald, J.); *Howard v. Everex Sys. Inc.*, 228 F.3d 1057, 1064 (9th Cir. 2000); *MicroStrategy*, 115 F. Supp. 2d at 648. Indeed, Judge Scheindlin, in *In re Initial Public Offering Sec. Litig.*, 241 F. Supp. 2d 281 (S.D.N.Y. 2003), also concluded that motive is established when a complaint alleges that the company conducted a secondary offering of its shares, as Jakks has done here:

> The motive allegations are also sufficient in twenty-nine cases which. . . contain allegations of add-on offerings . . . . Plaintiffs have alleged that these Issuers used the inflated value of their shares to support a secondary or tertiary offering to raise additional funds.

*Id*. at 370; *see also Duncan v. Pencer*, No. 94 Civ. 0321, 1996 U.S. Dist. LEXIS 401, at *12 (S.D.N.Y. Jan. 18, 1996) (Preska, J.) (denying motion to dismiss and holding that issuer's public offering to raise capital sufficiently stated a theory for motive).

Similarly, in *Time Warner*, the Second Circuit held that insiders had a motive to manipulate the stock price "to set the rights offering price somewhat higher than would have been possible

without the misleading statements and to lessen the dilutive effect of the offering." *In re Time Warner, Inc. Sec. Litig.*, 9 F.3d at 259, 269 (2d. Cir. 1993).  The motive to fulfill and command a higher price in a securities transaction raises a strong inference of scienter.  As alleged in the Complaint, the Company filed for a secondary offering of 3 million shares of Jakks' stock in December 1999. ¶¶56-57, 60.  Defendants took advantage of and touted the Company's videogame licensing with WWE in an effort to influence investors to purchase shares from this offering. ¶56.  In connection with this offering alone, the Company raised $75 million. ¶¶59-60.  Next, in April 2002, Defendants filed for an offering of an additional 3.5 million shares of Jakks' stock.  ¶¶97-100.  Again, Defendants capitalized on the WWE licensing as a way to attract investors to purchase Jakks' shares.  ¶98.  In connection with this offering, the Company raised over $62 million. ¶¶100, 163.

Accordingly, the allegations of the Complaint, stating that Defendants took advantage of Jakks' inflated stock price -- selling 3 million shares of Jakks' stock in December 1999 at $25.00 per share (¶¶56-58) and 3.5 million shares of Jakks' stock in May 2002 at $17.75 per share (¶¶97-100) -- support a finding of motive and contribute to a strong inference of scienter.

### D.    The Complaint Pleads Fraud With Particularity

The Complaint sufficiently pleads fraud with particularity as required by Rule 9(b) of the Fed. R. Civ. P. and the PSLRA.[20]  In this regard, the Complaint sets forth the date and time the

---

[20]    Defendants contend that the allegations of the Complaint are improper to the extent they plead information regarding the action filed by WWE against Jakks.  In doing so, Defendants rely on *Ferber v. Travelers Corp.*, 785 F. Supp. 1101 (D. Conn. 1991), *In re Razorfish, Inc. Sec. Litig.*, 143 F. Supp. 2d 304 (S.D.N.Y. 2001) (Rakoff, J.), and *Garr v. U.S. Healthcare, Inc.*, 22 F.3d 1274 (3d Cir. 1994), and essentially ask this Court to consider Plaintiffs' Complaint a copycat pleading. *See* Def. Mem. at 1, 52-53).  Contrary to Defendants' claim, those decisions have no bearing on this lawsuit whatsoever.

In *Ferber, Razorfish* and *Garr*, the complaints at issue contained identical allegations, asserted identical causes of action and sought the same remedy.  The findings by those courts that

statements were made, who made the statements and why the statements were materially false and misleading when issued. Defendants' sole particularity attack is that, in their view, the Complaint does not "specify the exact" portion of the cited statements that were materially false and misleading. Def. Mem. at 38. Again, Defendants ignore the allegations of the Complaint.

As previously stated, the Complaint alleges that Defendants' Class Period statements were materially false and misleading because they failed to disclose, among other things, the commercial bribery scheme. ¶145. This sufficiently particularizes Plaintiffs' allegations of fraud and describes "why" the statements are false. *See, for example,* ¶¶68, 82-83, 87, 91, 99, 106, 131. Defendants appear to be arguing that Plaintiffs should repeat ¶145 throughout the Complaint. All this would accomplish would be to lengthen the Complaint.

The Complaint plainly alleges fraud with particularity and Defendants' argument to the contrary should, therefore, be rejected.

### E.    The Complaint Adequately Alleges a Violation of Section 20(a)

To state a claim under Section 20(a), a plaintiff must plead: (1) a primary violation by a controlled person; and (2) control of the primary violator by the defendant. *In re Parmalat Sec. Litig.*, 375 F. Supp. 2d 278, 310 (S.D.N.Y. 2005) (Kaplan, J.). Aside from arguing that Plaintiffs have failed to allege the necessary underlying violation, Defendants also argue that in order to plead

---

the complaints were copycat pleadings, were an indication of the Courts' distaste for the filing of either form securities complaints lacking specific facts or complaints that mirror other securities actions against the same defendants, which had already been filed by another plaintiff. Here, however, the *WWE* Action is not a securities action. Further, the *WWE* Action and the instant litigation do not seek the same remedy. Plaintiffs' use of the complaint in the *WWE* Action was, therefore, entirely appropriate for the purposes of pleading the instant securities action. *See In re Enron Corp. Sec. Litig. Derivative & ERISA Litig.*, 235 F. Supp. 2d 549 (S.D. Tex. 2002) (holding that a class action complaint may point to the allegations of another complaint to show the practices held or implemented by defendant corporation.).

a Section 20(a) claim plaintiffs must plead "culpable participation" by the Individual Defendants. Def. Mem. at 54. Defendants are wrong.[21]

As set forth herein, Plaintiffs have pleaded a claim of primary liability against all Defendants. Furthermore, Plaintiffs are not required to plead culpable participation and, in any event, have sufficiently alleged that the Individual Defendants were culpable participants. ¶¶164-175.

To begin with, the plain language of Section 20(a) makes clear that Plaintiffs are not required to plead culpable participation. Section 20(a) states in pertinent part as follows:

> Every person who, directly or indirectly, controls any person liable under any provision of this title or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. §78t(a). Notably, the text of the statute does not designate that a state of mind is required to plead or prove a control person claim.

Judge Scheindlin followed this exact line of reasoning in *IPO*. After examining the history of Section 20(a) and its application by the Second Circuit, the court held that plaintiffs did not have to plead culpable participation stating in pertinent part as follows:

> The holding that Section 20(a) has no scienter element is also commanded by the congressional intent underlying Section 20(a), namely the desire to hold "a person who controls a person subject to the act or a rule or regulation thereunder . . . liable

---

[21] Defendants concede that the Individual Defendants are control persons as that term is defined by Section 20(a) of the Exchange Act. Def. Mem. at 54. *See Suez Equity Investors, L.P. v. Toronto-Dominion Bank*, 250 F.3d 87, 101 (2d Cir. 2001) (control person liability is sufficiently plead where the complaint alleges that defendant was an officer of the company and that he had primary responsibility for the dealings of the company); *Schnall v. Annuity & Life Re (Holdings), Ltd.*, No. 02-CV-2133 (GLG), 2004 U.S. Dist. LEXIS 4643, at *28 (D. Conn. Mar. 9, 2004) ("If Plaintiffs have adequately pleaded a Section 10(b) claim, the first or primary violation element of a Section 20(a) claim is sufficiently pled." *citing Scholastic*, 252 F.3d at 77-78).

> to the same extent as the person controlled unless the controlling person acted in
> good faith and did not induce the act in question."

241 F. Supp. 2d at 395.  Likewise, Judge Kaplan recently analyzed the relevant Second Circuit case

law and concluded that fraud and scienter are not required elements of a claim of control person

liability. *Parmalat I,* 375 F. Supp. 2d 278.  Specifically, Judge Kaplan stated, in pertinent part:

> In sum, if the Second Circuit had held that a Section 20(a) claim is insufficient absent
> an allegation of culpable participation, this Court of course would follow it. But it
> has not.  With the plain language of the statute unambiguous, this Court holds that
> plaintiffs state a legally sufficient claim under this statute if they plead (1) a primary
> violation by a controlled person and (2) control of the primary violator by the
> defendant.

*Id.* at 310; *see also In re Vivendi Universal, S.A.*, 381 F. Supp. 2d 158, 187 (S.D.N.Y. 2003) (Baer,

J.) ("The heightened pleading standard under Rule 9(b) or the PSLRA does not apply [to allegations

of control person liability] because fraud and scienter are not necessary elements of the claim").

Thus, culpable participation is not required to plead a violation of Section 20(a).

In any event, the Complaint alleges the culpable participation of the Individual Defendants.

In this regard, the Complaint pleads participation by each Individual Defendant in the planning,

execution and completion of the bribery scheme.  The Complaint likewise pleads participation by

each Individual Defendant in issuing false and misleading statements to the public by failing to

disclose the bribery scheme. *See In re Vivendi Universal, S.A. Sec. Litig.*, 02 Civ 5571 (RJH), 03

Civ. 2175 (RJH), 2004 U.S. Dist. LEXIS 7015, at *34 (S.D.N.Y. April 22, 2004) (finding culpable

participation adequately alleged when "plaintiffs have done more than make merely conclusory

allegations of participation").

## IV.    CONCLUSION

For the reasons set forth herein, Defendants' motion to dismiss should be denied in its

entirety.[22]

DATED: November 15, 2005                LERACH COUGHLIN STOIA GELLER
                                          RUDMAN & ROBBINS LLP
                                        SAMUEL H. RUDMAN (SR-7957)
                                        DAVID A. ROSENFELD (DR-7564)
                                        MARK S. REICH (MR-4166)


                                        _____
                                                /s/ Samuel H. Rudman
                                              SAMUEL H. RUDMAN

                                        200 Broadhollow Road, Suite 406
                                        Melville, NY  11747
                                        Telephone:  631/367-7100
                                        631/367-1173 (fax)

                                        MILBERG WEISS BERSHAD
                                          & SCHULMAN LLP
                                        STEVEN G. SCHULMAN (SS-2561)
                                        DANIEL B. SCOTTI (DS-4139)


                                        _____
                                                /s/ Daniel B. Scotti
                                              DANIEL B. SCOTTI

                                        One Pennsylvania Plaza
                                        New York, NY  10119
                                        Telephone:  212/594-5300
                                        212/868-1229 (fax)

                                        Co-Lead Counsel for Plaintiffs

---

[22]     In the event that the Court deems any of the claims against Defendants insufficiently pleaded, Plaintiffs request an opportunity to amend the Complaint, pursuant to Federal Rule of Civil Procedure 15.  *See Cortec Indus., Inc. v. Sum Holdings L.P.*, 949 F.2d 42, 48 (2d Cir. 1991) ("It is the usual practice upon granting a motion to dismiss to allow leave to replead.").

**CERTIFICATE OF SERVICE**

I, Mark S. Reich, hereby certify that on November 15, 2005, I caused a true and correct copy

of the attached:

Memorandum of Law In Opposition To Defendant's Motion To Dismiss The
Consolidated Complaint;

Notice of Motion To Strike Certain Exhibits; and

Memorandum of Law In Support Of Plaintiffs' Motion To Strike Certain Exhibits

to be served: (i) electronically on all counsel registered for electronic service for this case; and (ii) by

first-class mail to all additional counsel on the attached service list.


                         /s/ Mark S. Reich
                         Mark S. Reich

## JAKKS SERVICE LIST

**Plaintiff's Counsel**

Samuel H. Rudman
David A. Rosenfeld
Mark S. Reich
**Lerach Coughlin Stoia Geller Rudman &
Robbins LLP**
200 Broadhollow Road, Suite 406
Melville, NY  11747
Phone 631/367-7100
631/367-1173 (fax)

Steven G. Schulman
Daniel B. Scotti
**Milberg Weiss Bershad & Schulman, LLP**
One Pennsylvania Plaza, 49th Floor
New York, NY  10119
Phone 212/594-5300
212/868-1229 (fax)

**Defendant's Counsel**

Isaac S. Greaney
**Sidley, Austin, Brown, & Wood, LLP**
787 Seventh Avenue, 22nd Floor
New York, NY  10019
Phone 212/839-5300
212/839-5599 (fax)

John R. Williams
**Schweitzer Cornman Gross & Bondell, LLP**
292 Madison Avenue
New York, NY  10017
Phone 646/424-0770
646/424-0880 (fax)

Michael H. Gruenglas
**Skadden, Arps, Slate, Meagher & Flom LLP**
Four Times Square
New York, New York  10036
Phone 212/735-3000
212/735-2000 (fax)

Murray L. Skala
Jonathan D. Honig
**Feder, Kaszovitz, Isaacson, Weber, Skala,
        Bass & Rhine, LLP**
750 Lexington Avenue
New York, NY  10022
Phone 212/888-8200
212/888-5968 (fax)

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

JOEL MENKES, Individually and     :
on behalf of all others           :
similarly situated,               :
                                  :
        Plaintiffs,               :     No. 3:03CV409(DJS)
                                  :
v.                                :
                                  :
STOLT-NIELSEN S.A., JACOB         :
STOLT-NIELSEN, NIELS G. STOLT-    :
NIELSEN, SAMUEL COOPERMAN, and    :
REGINALD JR. LEE,                 :
                                  :
        Defendants.               :

## MEMORANDUM OF DECISION

Lead plaintiffs, Irene Rucker and Gustav Rucker, bring this action on behalf of a putative class of purchasers of defendant Stolt-Nielsen S.A.'s ("SNSA") American Depository Receipts ("ADRs") for the period of May 31, 2000 through February 20, 2003 pursuant to Sections 10(b), 15 U.S.C. § 78j(b), and 20(a), 15 U.S.C. § 78t, of the Securities Exchange Act of 1934 ("the Exchange Act"), as amended by the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. §§ 78a-78mm, and Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated thereunder, against Stolt-Nielsen S.A., Jacob Stolt-Nielsen, Niels G. Stolt-Nielsen, Samuel Cooperman, and Reginald J.R. Lee. Defendants have filed a motion to dismiss (dkt. # 29) all counts of the Consolidated Amended Class Action Complaint. For the reasons set forth herein, defendants' motion (dkt. # 29) is **GRANTED**.

### I. FACTS

The following facts are alleged in the Consolidated Amended Class Action Complaint (hereinafter "complaint" or cited as "Dkt. # 28, ¶ ___"), are set forth in documents incorporated by reference into the complaint, or are found in Stolt's public disclosure documents, or in other materials properly considered because plaintiffs have relied upon them in crafting their allegations. See <u>Rothman v. Gregor</u>, 220 F.3d 81, 88-89 (2d Cir. 2000); <u>In re Hunter Environmental Services, Inc. Securities Litigation</u>, 921 F. Supp. 914, 917-18 (D. Conn. 1996).

SNSA is a holding company that, through its subsidiaries, engages in worldwide transportation, storage, and distribution of bulk liquid chemicals and other similar materials. Greenwich, Connecticut based Stolt-Nielsen Transportation Group, Inc. ("SNTG") is a subsidiary wholly owned by Stolt that engages in Stolt's business of liquid chemical transportation on worldwide seaborne trade routes. Jacob Stolt-Nielsen is the founder and current Chairman of SNSA, and Niels G. Stolt-Nielsen is the Chief Executive Officer of SNSA. Samuel Cooperman has been the Chairman of SNTG and Reginald J.R. Lee has been SNTG's Chief Executive Officer during the time period relevant to plaintiffs' claims.

-2-

At issue in this case is Stolt's[1] transportation of bulk liquid chemicals.  SNTG is one of the largest parcel tanker operators in the world, and several of SNTG's largest customers are among the world's major chemical companies.  As described by Stolt,

> [t]he parcel tanker industry occupies a market niche in the worldwide tanker trade and represents only about 5% of the [deadweight tons] of the international tanker fleet.  Unlike crude oil tankers which generally load a full cargo at one port for one customer and discharge at one destination, parcel tankers, as the name implies, carry many cargoes (as many as 58 parcels) for many customers on the same voyage and load and discharge cargo at many ports.  A parcel tanker may carry a wide range of bulk liquids shipped in parcels of several hundred to several thousand tons each.

(Dkt. # 33 Ex. B at 4).  SNTG's parcel tankers typically transport lots greater than 150 metric tons in size.  SNTG also transports bulk liquid chemicals by using tank containers, which are smaller (24,000 liter maximum capacity) than the parcels used in SNTG's parcel tankers (100,000 liter minimum capacity) and can be transported by ship, rail car, or truck.

Plaintiffs allege that, for the period of May 31, 2000[2] through February 20, 2003, Stolt engaged in a scheme to fix shipping rates, rig bids, and allocate customers.  According to

---

[1] Where the distinction between SNSA and SNTG serves no purpose, the court will refer to SNSA and SNTG collectively as "Stolt."

[2] Plaintiffs also allege that Stolt may have begun its anti-competitive conduct as early as 1998.

newspaper articles and the affidavit of Special Agent John Sharp
of the Federal Bureau of Investigation submitted in support of a
criminal complaint filed against Richard Wingfield, SNTG's
Managing Director, Tanker Trading Division, certain Stolt
employees made agreements with major competitors of Stolt to
coordinate bidding and divide customer contracts between
themselves.  Stolt employees allegedly met with employees of
Stolt's competitors for this purpose on several different
occasions, exchanged customer lists, and either purposefully did
not bid on contracts to allow its competitors to gain the
business or submitted artificially high bids to drive the
contract price upward for the benefit of other parties to this
anti-competitive arrangement.

Plaintiffs also allege that, for the period of May 31, 2000
through February 20, 2003, Stolt illegally shipped goods to and
from countries such as Iran, Sudan, and Cuba that are subject to
a U.S. trade embargo.  Plaintiffs allege that Stolt, through
U.S.-based SNTG employees, was actively involved in trade to
these countries in violation of U.S. embargoes.

The value of Stolt's ADRs[3] was adversely effected after news

---

[3] An ADR is a "financial instrument[] that allow[s]
investors in the United States to purchase and sell stock in
foreign corporations in a simpler and more secure manner than
trading in the underlying security in a foreign market."  Pinker
v. Roche Holdings Ltd., 292 F.3d 361, 365 (3rd Cir. 2002).  "ADRs
are tradeable in the same manner as any other registered American
security, may be listed on any of the major exchanges in the

of these allegations became public.  On November 22, 2002,
published reports stated that the U.S. Department of the Treasury
had been investigating SNTG to determine if SNTG had engaged in
trade with certain nations in violation of U.S. trade embargoes.
Stolt's ADRs dropped from the price of $7.62 per share to $6.50
per share after the publication of these reports.  On February
20, 2003, published reports recounted the allegations of price-
fixing and anti-competitive conduct, and the price of Stolt's
ADRs dropped from $7.10 per share to $5.94 per share.

Plaintiffs claim that a number of statements made by
defendants during the class period were false or misleading
because of these undisclosed illegal activities.  Specifically,
plaintiffs claim that the following statements were false or
misleading in light of Stolt's clandestine illegal conduct:

- "[t]he Company's businesses are subject to
  international conventions and U.S. and other
  governmental regulations which strictly regulate
  various aspects of the Company's operations," (dkt. #
  28, ¶ 61 (May 31, 2000, May 31, 2001, and May 31,
  2002); see also id., ¶ 67 (October 26, 2001));

- "[s]hipments in the year 2000 increased from the
  downturn encountered in 1999.  Increases were primarily
  the result of improved demand in three main operating
  regions of Asia Pacific, Europe and the United States.
  Shipment levels in 2001 continue to reflect improved
  demand particularly from the United States and Asia,"
  (id., ¶¶ 63 & 65 (October 26, 2001));

- "[g]rowth of 5% is anticipated in 2002 as a result of

United States or traded over the counter, and are subject to the
Securities Act and the Exchange Act."  Id. at 367.

-5-

increased marketing and sales efforts in all regions,"
(id., ¶¶ 64 & 72 (May 31, 2002));

- "[t]he market for the integrated transportation and
  logistics services provided by SNTG is in its infancy.
  In providing such services, SNTG competes primarily
  with a few other terminal and transport companies who
  are developing such services. . . .  SNTG's tanker
  operations compete with operators based primarily in
  Europe and the Asia Pacific region. . . .  The
  competition in the tank container market is fragmented,
  although the relative size of the competition is
  increasing on a worldwide basis.  SNTG also competes,
  to a lesser extent, with tank container leasing
  companies," (id., ¶ 66 (October 26, 2001));

- "[e]xcluding the restructuring charges, the Stolt-
  Nielsen Transportation Group reported results on par
  with the first quarter of last year.  Income from
  operations for SNTG's parcel tanker division was $20.5
  million in the first quarter of 2002 compared to $20.3
  million in the first quarter of 2001. . . .  Contracts
  of affreightment continue to be renewed at higher
  levels and SNTG recently renewed a multi-year contract
  for one of its largest customers.  We are anticipating
  a pickup in rates in the second half of the year and
  throughout 2003 as the world economies continue their
  recovery[.] . . . SNTG's tank container operations
  income improved to $4.7 million in the first quarter of
  2002 compared to $2.7 million in the first quarter of
  last year.  While shipments in the first quarter were
  similar to the comparable quarter last year,
  utilization rose to 71.1% compared to 67.7% last year.
  For the remainder of the year we anticipate seeing
  continued pressure on pricing while utilization should
  be similar to what we saw in the first quarter.  We
  still see shipments for the year growing 5% compared to
  2001," (id., ¶ 68 (March 27, 2002));

- "[d]uring 2000, SNTG entered into co-service agreements
  with two Parcel tanker companies, Tokyo Marine and
  Seatrans, to improve the scheduling of SNTG's fleets,
  and increase operational efficiency and customer
  service.  In January 2002, SNTG announced an additional
  co-service agreement with Jo Tankers.***SNTG personnel
  coordinate most of the marketing and sales efforts
  directly with SNTG's parcel tanker customers," (id., ¶
  70 (May 31, 2002));

- "SNTG's strategy is to build a global network to take care of our customers' every bulk liquid logistic need from door to door throughout the world and to be the low cost provider of such services," (id., ¶ 73 (May 31, 2002));

- "[w]hile the results in the second quarter for the Stolt-Nielsen Transportation Group were down compared to last year, our core contract business, particularly for specialty chemicals, remains healthy.  We continue to see improvements in Stolt Offshore's results," (id., ¶ 74 (June 26, 2002));

- "SNTG's tank container division's income from operations improved significantly to $6.3 million in the second quarter of 2002 compared to $4.0 million in the same quarter of 2001.  Utilization in the second quarter compared to the same period last year rose 7.0% to 74.4%.  Shipments are up some 6% although pricing continues to be tight," (id. (June 26, 2002)); and

- "[t]he Stolt-Nielsen Transportation Group posted a solid quarter[.] . . . SNTG's tank container division delivered another strong result with income from operations rising to $6.2 million from $5.6 million in the comparable quarter of 2001.  Year-to-date shipments are up some 10% compared to last year and utilization in the third quarter hit a record level of 77.7% although the business continues to see a tight pricing environment," (id., ¶ 76 (October 8, 2002)).

Plaintiffs claim that defendants' failure to disclose Stolt's alleged anti-competitive conduct or its alleged actions taken in violation of U.S. trade embargoes rendered these statements misleading.

## II. DISCUSSION

Plaintiffs set forth two counts in their complaint: (1) violation of 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5 promulgated thereunder against Stolt and the individual

defendants; and (2) violation of 15 U.S.C. § 78t against the
individual defendants.  Defendants seek dismissal of each count
pursuant to Rule 12(b)(6) of the Federal Rules of Civil
Procedure.

## A. STANDARD

When considering a Rule 12(b)(6) motion to dismiss, the
court accepts as true all factual allegations in the complaint
and draws inferences from these allegations in the light most
favorable to the plaintiff.  See Scheur v. Rhodes, 416 U.S. 232,
236 (1974); Bernheim v. Litt, 79 F.3d 318, 321 (2d Cir. 1996).
Dismissal is warranted only if, under any set of facts that the
plaintiff can prove consistent with the allegations, it is clear
that no relief can be granted.  See Hishon v. King & Spaulding,
467 U.S. 69, 73 (1984); Cooper v. Parsky, 140 F.3d 433, 440 (2d
Cir. 1998).  "The issue on a motion to dismiss is not whether the
plaintiff will prevail, but whether the plaintiff is entitled to
offer evidence to support his or her claims."  United States v.
Yale New Haven Hosp., 727 F. Supp. 784, 786 (D. Conn. 1990)
(citing Scheuer, 416 U.S. at 232).  In its review of a motion to
dismiss, the court may consider "only the facts alleged in the
pleadings, documents attached as exhibits or incorporated by
reference in the pleadings and matters of which judicial notice
may be taken."  Samuels v. Air Transport Local 504, 992 F.2d 12,
15 (2d Cir. 1993).

B. SECTION 10(b) CLAIM

Plaintiffs allege that defendants engaged in fraudulent conduct that affected the purchase or sale of Stolt's ADRs. Specifically, plaintiffs claim that defendants had a duty to disclose to the investing public the nature and scope of their anti-competitive agreements with other parcel tanker companies and the extent of its operations in nations subject to U.S. trade embargo, such as Cuba, Iran, and Sudan. Defendants argue that they had no such duty to disclose this information, and that, even if a duty did arise, plaintiffs have not alleged that defendants acted with the requisite state of mind.

Section 10 of the Securities Exchange Act of 1934 provides, in pertinent part, that

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange-

> * * *

> (b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, or any securities-based swap agreement (as defined in section 206B of the Gramm-Leach-Bliley Act), any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j. Rule 10b-5, which was promulgated under the authority of Section 10, provides the following:

> It shall be unlawful for any person, directly or

-9-

indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5. "For a plaintiff to state a viable cause of action for securities fraud under § 10(b), 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5(b), the complaint must allege that in connection with the purchase or sale of securities, defendant, acting with scienter, either made a false material representation or omitted to disclose material information so that plaintiff--acting in reliance either on defendant's false representation or its failure to disclose material information--suffered injury and damages." In re Scholastic Corp. Sec. Litig., 252 F.3d 63, 69 (2d Cir. 2001).

In order to adequately establish the substantive elements of a violation of Rule 10b-5, plaintiffs must meet the pleading standard set forth in Rule 9(b) of the Federal Rules of Civil Procedure, the PSLRA, and precedent from the Court of Appeals for the Second Circuit. With respect to the existence of false or

-10-

misleading statements, in order to meet Rule 9(b)'s requirement that "[i]n all averments of fraud or mistake, the circumstances of fraud or mistake shall be stated with particularity," Fed. R. Civ. P. 9(b), "[t]he complaint must identify the statements plaintiff asserts were fraudulent and why, in plaintiff's view, they were fraudulent, specifying who made them, and where and when they were made." In re Scholastic Corp. Sec. Litig., 252 F.3d at 69-70.[4]

With respect to scienter, under the PSLRA, and prior Second Circuit precedent, a plaintiff must "state facts with particularity that give rise to a strong inference of the required state of mind." Novak v. Kasaks, 216 F.3d 300, 312 (2d Cir. 2000); see 15 U.S.C. § 78u-4(b)(2) ("In any private action arising under this chapter in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."). The Court of Appeals for the Second Circuit has "recognized two distinct ways

---

[4] The court finds that, at this stage of the proceedings, plaintiffs have complied with Rule 9 of the Federal Rules of Civil Procedure even though certain actionable statements reference SNTG's tank container operations rather than its parcel tanker operations. Defendants' argument draws a nice distinction more properly reserved for the time when presentation of evidence is appropriate.

in which a plaintiff may plead scienter without direct knowledge
of the defendant's state of mind.  The first approach is to
allege facts establishing a motive to commit fraud and an
opportunity to do so.  The second approach is to allege facts
constituting circumstantial evidence of either reckless or
conscious behavior."  In re Time Warner Inc. Sec. Litig., 9 F.3d
259, 268-69 (2d Cir. 1993).

i. Material Omissions

In order for an omission to be actionable, the omission must
be material.  "A statement is material only if there is a
'substantial likelihood that the disclosure of the omitted fact
would have been viewed by the reasonable investor as having
significantly altered the "total mix" of information made
available.'"  In re Int'l Bus. Machines Corporate Sec. Litig.,
163 F.3d 102, 106-7 (2d Cir. 1998) (quoting Basic Inc. v.
Levinson, 485 U.S. 224, 231-32 (1988)).  "Material facts include
those that 'affect the probable future of the company and [that]
may affect the desire of investors to buy, sell, or hold the
company's securities.'"  Castellano v. Young & Rubicam, Inc., 257
F.3d 171, 180 (2d Cir. 2001) (quoting  SEC v. Texas Gulf Sulphur
Co., 401 F.2d 833, 849 (2d Cir. 1968)).  "At the pleading stage,
a plaintiff satisfies the materiality requirement of Rule 10b-5
by alleging a statement or omission that a reasonable investor
would have considered significant in making investment

-12-

decisions." Ganino v. Citizens Utilities Co., 228 F.3d 154, 161
(2d Cir. 2000). Because materiality is a mixed question of law
and fact, judgment as a matter of law "may not be granted on the
ground that alleged omissions are immaterial 'unless they are so
obviously unimportant to a reasonable investor that reasonable
minds could not differ on the question of their importance.'"
Castellano, 257 F.3d at 180 (quoting Goldman v. Belden, 754 F.2d
1059, 1067 (2d Cir. 1985)); see Halperin v. eBanker USA.com,
Inc., 295 F.3d 352, 357 (2d Cir. 2002) ("Recognizing that the
materiality of an omission is a mixed question of law and fact,
courts often will not dismiss a securities fraud complaint at the
pleading stage of the proceedings, unless reasonable minds could
not differ on the importance of the omission."); Ganino, 228 F.3d
at 162.

The trier of fact could find that the omissions alleged by
plaintiffs were material. The allegations of Stolt's agreement
to rig bids and fix prices are, as set forth in the complaint,
sweeping in their scope, and the potential sanctions therefor
could significantly impact Stolt's future operations and
earnings. There is a "substantial likelihood that a reasonable
shareholder" would consider this information important in
deciding whether to conduct a transaction involving Stolt's ADRs.
TSC Industries, Inc. v. Northway, Inc., 426 U.S. 438, 449 (1976).

ii. Duty to Disclose

Although the omissions alleged by plaintiffs could be material, defendants must have had a duty to disclose this information in order to be liable under Rule 10b-5.  See Chiarella v. U.S., 445 U.S. 222, 228 (1980) ("[O]ne who fails to disclose material information prior to the consummation of a transaction commits fraud only when he is under a duty to do so."); In re Time Warner Sec. Litig., 9 F.3d at 267 ("[A] corporation is not required to disclose a fact merely because a reasonable investor would very much like to know that fact. Rather, an omission is actionable under the securities laws only when the corporation is subject to a duty to disclose the omitted facts.").  Although Rule 10b-5 generally does not "require management to accuse itself of antisocial or illegal policies," Amalgamated Clothing and Textile Workers Union, AFL-CIO v. J.P. Stevens & Co., Inc., 475 F. Supp. 328, 331 (S.D.N.Y. 1979), judgment vacated as moot 638 F.2d 7 (2d Cir. 1980), management may be compelled to disclose uncharged[5] illegal conduct when there is insider trading, when a statute or regulation requires disclosure, or when disclosure is necessary to prevent another statement from misleading the public.  See Roeder v. Alpha

---

[5] Regulation S-K, which is discussed at a later point in this memorandum, mandates the disclosure of "any material pending legal proceedings" and "any such proceedings known to be contemplated by governmental authorities."  17 C.F.R. § 229.103.

-14-

Indus., Inc., 814 F.2d 22, 27 (1st Cir. 1987) ("Roeder claims

that a corporation has an affirmative duty to disclose all

material information even if there is no insider trading, no

statute or regulation requiring disclosure, and no inaccurate,

incomplete, or misleading prior disclosures. The prevailing view,

however, is that there is no such affirmative duty of

disclosure."); see also Glazer v. Formica Corp., 964 F.2d 149,

156-57 (2d Cir. 1992) (adopting the Court of Appeals for the

First Circuit's analysis of the duty to disclose set forth in

Roeder).

     In other words, the fact that a corporation's employees

engaged in illegal conduct may well be material to the reasonable

investor for several obvious reasons, but the obligation to

disclose uncharged illegal conduct does not arise from the

materiality of this information alone.  Rather, in the present

context, a duty to disclose uncharged illegal conduct arises when

it is necessary to disclose this conduct under the terms of a

statute or regulation, or when it is necessary to disclose this

conduct in order to prevent statements the corporation does make

from misleading the public.  Courts that have determined that

corporations had a duty to disclose uncharged illegal conduct in

order to prevent other statements from misleading the public have

required a connection between the illegal conduct and the

statements beyond the simple fact that a criminal conviction

-15-

would have an adverse impact upon the corporation's operations in
general or bottom line.  See, e.g., In re Sotheby's Holdings,
Inc., No. 00Civ.1041(DLC); 2000 WL 1234601, at *4 (S.D.N.Y. Aug.
31, 2000) (denying motion to dismiss securities fraud claims
based upon an anti-competitive agreement and finding that
defendants had a duty to disclose the anti-competitive conduct
because the corporation stated that competition was "intense"
with its "primary auction competitor," which was a party to the
anti-competitive agreement); In re Par Pharma., Inc. Sec. Litig.,
733 F. Supp. 668, 677-78 (S.D.N.Y. 1990) (denying motion to
dismiss securities fraud claims based upon failure to disclose a
scheme to bribe Food and Drug Administration officials for the
purpose of obtaining expedited approval of new drug applications
because defendants compared the corporation's success to other
corporations, projected similar results in the future, and
conveyed the impression that defendants's success was due to a
particular expertise); Ballan v. Wilfred Am. Educ. Corp., 720 F.
Supp. 241, 249-50 (E.D.N.Y. 1989) (denying motion to dismiss
securities fraud claims based upon a school's failure to disclose
the extent of the school's abuse of the federal higher education
loan system and finding that a duty to disclose the extent of the
misconduct existed because the school minimized the potential
consequences of the pending investigation in its public
statements); but see Greenfield v. Prof'l Care, Inc., 677 F.

-16-

Supp. 110, 113 (E.D.N.Y. 1987) (denying motion to dismiss
securities fraud claims based upon falsification of patient
eligibility for Medicaid reimbursement and finding that a duty to
disclose the illegal conduct existed because "[i]nformation going
directly to the financial condition of the company" is material).
In other words, a corporation has a duty to disclose uncharged
criminal conduct to prevent conveying, through its own public
statements, a false impression to an investor and not for the
sake of merely improving an investor's perspective.

Certain statements set forth in the complaint obligate Stolt
to disclose its alleged uncharged anti-competitive activity
because disclosure of this conduct was necessary to prevent
misleading the investing public. "A duty to disclose arises
whenever secret information renders prior public statements
materially misleading. . . ." In re Time Warner Sec. Litig., 9
F.3d at 268. Here, Stolt's public statements set forth in
paragraphs 66, 68, 74, and 76 do not disclose Stolt's alleged
anti-competitive behavior and therefore could have misled a
reasonable investor. Each of these statements directly
references the uncharged anti-competitive conduct alleged in the
complaint by stating that "SNTG's tanker operations compete with
operators based primarily in Europe and the Asia Pacific region,"
(dkt. # 28 ¶ 66), touting the fact that SNTG "recently renewed a
multi-year contract for one of its largest customers," which

-17-

plaintiffs allege was the direct result of a conspiracy with Odfjell (id. ¶ 68), and describing the pricing environment in the market as "tight" (id. ¶ 74) and subject to continued "pressure" (id. ¶ 68).

The case before the court is indistinguishable from the other cases in which district courts within the Second Circuit have found a duty to disclose uncharged illegal conduct arising from the corporation's own misleading statements.  In In re Sotheby's Holdings, Inc., Sotheby's explicitly referenced its anti-competitive agreement with Christie's when it characterized competition between the two firms as "intense."  Sotheby's statements could have misled the investing public because it fostered an inaccurate view of the relationship between Sotheby's and Christie's: competition was not "intense" with respect to commissions.  Here, Stolt describes the pricing environment as "tight" and subject to continued "pressure," which is no different than stating that there is "intense" competition between its business rivals in that the statement conveys the false impression to investors that Stolt achieved success in a competitive pricing environment.  Similarly, touting the renewal of a major contract that could have been the result of an illegal agreement conveys the false impression that this particular contract was procured through sound business practices.

In contrast, a trier of fact could not find Stolt's

-18-

statements cited in paragraphs 61, 63, 64, 65, 67, 70, 72, and 73
materially misleading because the "subject matter of [each]
statement is so attenuated from [the uncharged illegal conduct]
that it could not reasonably be found to have created a false
impression in a reasonable investor." In re Par Pharm. Sec.
Litig., 733 F. Supp. at 678; cf. In re Time Warner Sec. Litig., 9
F.3d at 268 ("[W]e hold that when a corporation is pursuing a
specific business goal and announces that goal as well as an
intended approach for reaching it, it may come under an
obligation to disclose other approaches to reaching the goal when
those approaches are under active and serious consideration.").
In these public statements, Stolt did not discuss competition
between other companies such that the failure to disclose Stolt's
illegal circumvention of competition rendered Stolt's statements
misleading.  Unlike other cases decided by district courts within
the Second Circuit, Stolt did not flout its ability to expedite
regulatory approval of new drugs when in fact a bribery scheme
was the direct cause of this ability to expedite, see In re Par
Pharm. Sec. Litig., 733 F. Supp. at 677-78, nor did Stolt
describe competition as "intense" and list "the amount of
commission" as a factor in competition when in fact there was an
illegal agreement to fix commissions with its only major
competitor, see In re Sotheby's Holdings, Inc., 2000 WL 1234601,
at *4 & n.2.  Not one of these statements has any direct

-19-

connection to agreements to allocate customers, agreements to
refrain from bidding, agreements to submit inflated bids, or
actions taken in violation of U.S. trade embargoes; instead, each
statement is a generic description of the state of the market as
a whole, a recitation of historical facts about Stolt's
operations, or vague forecasts of future success, which are too
remote from Stolt's alleged illegal conduct to compel disclosure
of this conduct.

Plaintiffs also contend that disclosure of Stolt's alleged
criminal conduct was required under Regulation S-K and the SEC's
instructions to Form 20-K. Regulation S-K "states the
requirements applicable to the content of the non-financial
statement portions" of registration statements and annual reports
that must be filed pursuant to federal securities law. 17 C.F.R.
§ 229.10(a). Item 101 of Regulation S-K provides that "[a]
registrant shall describe any risks attendant to the foreign
operations and any dependence on one or more of the registrant's
segments upon such foreign operations." 17 C.F.R. §
229.101(d)(3). The SEC's instructions for completing Form 20-F,
which Stolt must follow when filing its annual report, state that
Stolt must provide the following three items: (1) "[a]
description of the material effect of government regulations on
the company's business, identifying the regulatory body," (dkt. #
33, Ex. A at 9); (2)

-20-

> information regarding significant factors, including
> unusual or infrequent events or new developments,
> materially affecting the company's income from
> operations, indicating the extent to which income was
> so affected.  Describe any other significant component
> of revenue or expenses necessary to understand the
> company's results of operations. . . .  Provide
> information regarding any governmental economic,
> fiscal, monetary or political policies or factors that
> have materially affected, or could materially affect,
> directly or indirectly, the company's operations or
> investments by host country shareholders.

(id. at 11); and (3) "a summary of each material contract, other

than contracts entered into in the ordinary course of business,

to which the company or any member of the group is a party for

the two years immediately preceding publication of the document.

. . .," (id. at 24).

Neither Regulation S-K nor the SEC's instructions for

completing Form 20-F mandates the disclosure of the conduct at

issue in this case.  To construe the disclosure requirements

cited by plaintiffs to compel disclosure of Stolt's alleged

criminal actions in this case would eviscerate the well-

established principle that Rule 10b-5 generally does not "require

management to accuse itself of antisocial or illegal policies."

Amalgamated Clothing and Textile Workers Union, AFL-CIO, 475 F.

Supp. at 331; see U.S. v. Matthews, 787 F.2d 38, 49 (2d Cir.

1986) ("[A]t least so long as uncharged criminal conduct is not

required to be disclosed by any rule lawfully promulgated by the

SEC, nondisclosure of such conduct cannot be the basis of a

criminal prosecution.").  For example, the "risk attendant to

-21-

[Stolt's] foreign operation" referenced in Regulation S-K is no different than the risk inherent in any of the corporation's activities: the possibility that an employee will break the law while conducting the business of the corporation. Likewise, the "material contract[s]" referenced in the instructions for completing Form 20-F are in this case an agreement, or conspiracy, to perform a criminal act, which is conceptually no different than any other criminal act. If the regulation and instructions were read as plaintiffs advocate, a corporation would have to warn the investing public of the "risk" that an employee would break the law, or disclose the existence of a "material contract" that is actually an uncharged criminal conspiracy. There is simply no authority supporting plaintiffs' broad reading of Regulation S-K; a much more specific and decisive statement from the SEC is necessary to overcome the proposition, emphatically stated by the Court of Appeals for the Second Circuit in Matthews, that Rule 10b-5 does not mandate the disclosure of uncharged criminal conduct.

    Defendants' motion must therefore be denied with respect to the statements set forth in paragraphs 66, 68, 74, and 76, because Stolt had a duty to disclose its alleged anti-competitive conduct arising from these statements. Defendants' motion is granted with respect to the statements set forth in paragraphs 61, 63, 64, 65, 67, 70, 72, and 73, as plaintiffs cannot prove

that any defendant had a duty to disclose the uncharged criminal
conduct alleged in the complaint arising from these statements.
The court finds that defendants did not have a duty to disclose
alleged uncharged violations of U.S. trade embargoes.  Because
the court concludes that plaintiffs have failed to state a claim
for relief under the Exchange Act based upon its holding that
defendants did not have a duty to disclose the information
plaintiffs claim should not have been omitted, the court renders
no opinion regarding plaintiffs' allegations of scienter with
respect to any defendant as to paragraphs 61, 63, 64, 65, 67, 70,
72, and 73 of the complaint.

### iii. Scienter

Having determined that certain statements made by defendants
could be found to be false or misleading because defendants
omitted information regarding SNTG's anti-competitive conduct,
the court must determine whether plaintiffs have adequately
alleged that the speaker of each false or misleading statement
acted with the required scienter.  Here, each statement was
spoken by SNSA or by SNSA's agent on behalf of SNSA, while SNTG
employees actually engaged in the anti-competitive activity.
Plaintiffs must therefore allege that SNSA offered these
potentially false of misleading statements with scienter.

In order to successfully plead scienter, plaintiffs must
"allege facts that give rise to a strong inference of fraudulent

-23-

intent." <u>Shields v. Citytrust Bancorp., Inc.</u>, 25 F.3d 1124, 1128
(2d Cir. 1994). "The requisite 'strong inference' of fraud may
be established either (a) by alleging facts to show that
defendants had both motive and opportunity to commit fraud, or
(b) by alleging facts that constitute strong circumstantial
evidence of conscious misbehavior or recklessness." <u>Id.</u>

Plaintiffs attempt to meet their pleading burden by way of
the latter method.[6] "[S]ecurities fraud claims typically have
sufficed to state a claim based on recklessness when they have
specifically alleged defendants' knowledge of facts or access to
information contradicting their public statements. Under such
circumstances, defendants knew or, more importantly, should have
known that they were misrepresenting material facts related to
the corporation." <u>Novak v. Kasaks</u>, 216 F.3d 300, 308 (2d Cir.
2000). Mindful of the admonition that "there are limits to the
scope of liability for failure to adequately monitor the
allegedly fraudulent behavior of others," <u>id.</u> at 309, plaintiffs
attempt to establish the sufficiency of their allegations against
SNSA as follows.

First, plaintiffs contend that, because SNTG's operations
were so critical to SNSA's financial health, the trier of fact

_____

[6] To the extent plaintiffs have alleged motive and
opportunity to commit fraud, their attempt fails because they
allege only "a generalized motive, one which could be imputed to
any publicly-owned, for-profit endeavor. . . ." <u>Chill v. General
Electric Co.</u>, 101 F.3d 263, 268 (2d Cir. 1996).

could infer that SNSA management must have known of SNTG's anti-
competitive conduct. Plaintiffs point out that SNTG's business
"represented approximately 43% of [SNSA's] net operating revenue
[and] about 87% of 2000 income from operations," (dkt. # 33 at 19
(quoting dkt. # 33, Ex. B at 5) (alterations in original,
internal quotation marks omitted)), and that "parcel tanker
operations 'remain SNTG's single largest activity,'" (id.
(quoting dkt. # 33, Ex. B at 5)).  Plaintiffs also contend that
Cooperman, who served as SNTG's chairman, must have been aware of
SNTG's anti-competitive conduct and was in a position to relay
this knowledge to SNSA.

       Plaintiffs also allege that SNSA employees were or should
have been aware of SNTG's anti-competitive conduct.  Plaintiffs
allege that the primary perpetrator of the alleged anti-
competitive conduct was Richard Wingfield, SNTG's Managing
Director of its Tanker Trading Division.  They allege that,
during late 2000 through 2001, Wingfield met with Odfjell, which
was one of SNTG's primary competitors in the parcel tanker
business, to agree on pricing and allocate contracts and routes.
Plaintiffs also allege that Wingfield discussed agreement about
shipping rates with Tokyo Marine.  Plaintiffs contend that
Wingfield shared information about his anti-competitive activity
as follows: an e-mail to "colleagues in Greenwich," (dkt. # 28 ¶
39(a)), a fax to Wingfield consisting of "a cost-benefit analysis

-25-

prepared by Stolt regarding the profitability of conspiring with Odfjell versus 'going to war' with Odfjell," (id. ¶ 39(c)), and an announcement to "the SNTG management board," (id. ¶ 40). Plaintiffs allege that Paul O'Brien, SNTG's general counsel, was aware of Wingfield's activities, that O'Brien asked Cooperman to suspend Wingfield and investigate his anti-competitive activities in February of 2002, that Cooperman declined to do so, and that O'Brien resigned on March 1, 2002.

Plaintiffs also allege that SNTG's "vice-president for SNTG's tanker trading," identified as Pickering, stated, in a meeting between SNSA and SNTG employees, that "Odfjell and Stolt had reached an agreement that certain customers belonged to Stolt and others to Odfjell. They had 'carved up the world.'" (Dkt. # 28 ¶ 33). They further allege that Kenneth Bloom, a SNSA "vice-president for logistics," "expressed his concerns [about Pickering's statement] to Cooperman, then SNTG's Chairman." (Id. ¶ 34).

As currently constituted, the complaint does not establish a clear link between those who were involved in the anti-competitive arrangements at SNTG and SNSA management. Although they do allege that word of anti-competitive activities reached the highest level of SNTG management in Cooperman, plaintiffs do not allege any facts supporting the conclusion that Cooperman relayed this information to SNSA management. See In re Alpharma

-26-

Inc. Sec. Litig., 372 F.3d 137, 150 (3rd Cir. 2004) (holding that allegations that an executive's subordinate knew of corporate misconduct was "an insufficient basis upon which to impute knowledge" to the executive); Kushner v. Beverly Enterprises, Inc., 317 F.3d 820, 828 (8th Cir. 2003) (same).  Further, the relative importance of SNTG's operations to SNSA's overall well-being, which should not be minimized, does not fill this factual void.  Even though SNTG is far more critical to SNSA than Kidder Peabody & Co. was to General Electric Company in Chill because Kidder Peabody & Co. was one of twenty-four subsidiaries of GE Capital Services, Inc., which was one of twelve subsidiaries of General Electric Company, the court cannot, without any information in the complaint as to the manner by which information flowed from SNTG to SNSA and how involved SNSA was in monitoring SNTG's activities from which the anti-competitive conduct originated complete the link from those with knowledge of the anti-competitive conduct to SNSA's management.  Without facts such as these, the court can only assume, and not infer, that SNSA's management knew about the illegal activity.  Because plaintiffs have not alleged scienter on the part of SNSA and Niels G. Stolt-Nielsen, defendants' motion must be granted with respect to plaintiff's Section 10(b) claims.

### III. CONCLUSION

For the reasons set forth herein, defendants' motion to dismiss (dkt. # 29) is **GRANTED**.  To summarize, the court finds as follows.  First, defendants did not have a duty to disclose alleged uncharged illegal conduct with respect to the statements set forth in paragraphs 61, 63, 64, 65, 67, 70, 72, and 73 of the complaint.  Second, defendants did have a duty to disclose the alleged uncharged anti-competitive conduct with respect to the statements set forth in paragraphs 66, 68, 74, and 76 of the complaint due to the nature of the statements themselves.  Third, plaintiffs did not sufficiently allege that defendants made the statements set forth in paragraphs 66, 68, 74, and 76 of the complaint with the required scienter.  Fourth, because plaintiffs' Section 20(a) claims are derived from their Section 10(b) claims, which fail as a matter of law, these claims also fail as a matter of law.  Each count of the Consolidated Amended Class Action Complaint is **DISMISSED with prejudice.**  The Clerk of the Court shall close this file.

So ordered this 10th day of November, 2005.

/s/DJS
_____
**DOMINIC J. SQUATRITO**
**UNITED STATES DISTRICT JUDGE**

-28-