UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

— — — — — — — — — — — — — — — — — — —    x

IN RE JAKKS PACIFIC, INC.                    Civil Action No. 04-CV-8807
SHAREHOLDERS CLASS ACTION          :    (KMK)
LITIGATION                                         (ECF CASE)

                                                      :

— — — — — — — — — — — — — — — — — — — —    x


**DEFENDANTS' REPLY MEMORANDUM OF LAW IN FURTHER
SUPPORT OF THEIR MOTION TO DISMISS THE
CONSOLIDATED AMENDED COMPLAINT**


FEDER, KASZOVITZ, ISAACSON, WEBER,         SKADDEN, ARPS, SLATE,
  SKALA, BASS & RHINE LLP                              MEAGHER & FLOM LLP
Murray L. Skala (MS 9354)                           Jonathan J. Lerner (JL 7117)
Jonathan D. Honig (JH 7577)                         Michael H. Gruenglas (MG 8705)
750 Lexington Avenue                                 Maura B. Grinalds (MG 2836)
New York, New York 10022                           Sharon Garb (SG 7928)
Phone: (212) 888-8200                                Four Times Square
Fax: (212) 888-5968                                  New York, New York 10036
                                                     Phone: (212) 735-3000
                                                     Fax: (212) 735-2000


December 22, 2005

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ................................................................................................1

ARGUMENT...........................................................................................................................7

I.      DEFENDANTS HAD NO DUTY TO DISCLOSE THE 1998 TRANSACTIONS ...........7

    A.      Plaintiffs' Concessions Significantly Narrow This Case .........................................7

    B.      Defendants' Truthful Statements Were Not Rendered Misleading By the
        Alleged 1998 Transactions ....................................................................................7

    C.      The Challenged Statements Are Too Attenuated From the Alleged 1998
        Transactions to Compel Disclosure .........................................................................9

    D.      The Uncharged, Unverified Allegations Were Not A "Material Fact" That
        Was Required To Be Disclosed ............................................................................11

    E.      Plaintiffs' Authorities Do Not Mandate A Different Result ...................................15

II.     DEFENDANTS WERE NOT REQUIRED TO DISCLOSE THAT WWE WAS
        CHALLENGING THE LICENSES EARLIER THAN THEY ALLEGEDLY DID........19

III.    THE COMPLAINT FAILS ADEQUATELY TO ALLEGE SCIENTER .........................20

    A.      Plaintiffs Fail to Allege Sufficient Motive.............................................................20

        1.      The Insider Stock Sales Were Not Suspicious or Unusual. ........................20

        2.      The Compensation of the Individual Defendants Is Insufficient to
            Establish Motive to Commit Fraud............................................................22

        3.      The Secondary Offerings Are Not A Sufficient Motive.............................23

    B.      Plaintiffs Fail to Allege Conscious Misbehavior or Recklessness..........................25

        1.      Plaintiffs Do Not Plead that Defendants Possessed or Had Access
            to Information Contradicting Their Public Statements...............................25

        2.      Plaintiffs Fail to Plead Facts to Suggest that Defendants Knew
            They Had a Duty to Disclose the Alleged 1998 Transactions...................26

IV.     PLAINTIFFS' UNPRECEDENTED THEORY OF LIABILITY DIRECTLY
        CONTRAVENES THE PSLRA .................................................................................28

CONCLUSION......................................................................................................................29

## TABLE OF AUTHORITIES

### CASES

Acito v. IMCERA Group, Inc., 47 F.3d 47 (2d Cir. 1995)................................................22

In re Allaire Corp. Securities Litigation, 224 F. Supp. 2d 319 (D. Mass. 2002)...............15

Amalgamated Clothing & Textile Workers Union v. J.P. Stevens & Co., 475 F.
    Supp. 328 (S.D.N.Y. 1979).......................................................................................1

In re American Express Co. Shareholder Litigation, 840 F. Supp. 260 (S.D.N.Y.
    1993), aff'd, 39 F.3d 395 (2d Cir. 1994).........................................................12

Ballan v. Wilfred America Education Corp., 720 F. Supp. 241 (E.D.N.Y. 1989) ......14, 19

Bolger v. First State Finance Services, 759 F. Supp. 182 (D.N.J. 1991)...........................12

Bragger v. Trinity Capital Enter. Corp., No. 92 CIV. 2124 (LMM), 1994 WL
    75239 (S.D.N.Y. Mar. 7, 1994) ...............................................................................9

In re Canandaigua Securities Litigation, 944 F. Supp. 1202 (S.D.N.Y. 1996)........9, 26, 27

In re Carter-Wallace, Inc. Securities Litig., No. 94 CIV. 5704(KTD), 1999 WL
    1029713 (S.D.N.Y. Nov. 10, 1999), aff'd, 220 F.3d 36 (2d Cir. 2000).......................20

Ciresi v. Citicorp, 782 F. Supp. 819 (S.D.N.Y. 1991).......................................................12

In re Citigroup, Inc. Securities Litigation, 330 F. Supp. 2d 367
    (S.D.N.Y. 2004) ..............................................................................9, 10, 11, 19

In re Complete Management, Inc. Securities Litigation, 153 F. Supp. 2d 314
    (S.D.N.Y. 2001) ..................................................................................................24

In re Corning Securities Litigation, No. 01-CV-6580-CJS, 2004 WL 1056063
    (W.D.N.Y. Apr. 9, 2004), aff'd, No. 04-2845-CV, 2005 WL 714352 (2d Cir.
    Mar. 30, 2005)..................................................................................................24

Cosmas v. Hassett, 886 F.2d 8 (2d Cir. 1989) ..................................................................26

Crowell v. Ionics, Inc., 343 F. Supp. 2d 1 (D. Mass. 2004) .............................................22

In re Duane Reade, Inc. Securities Litigation, No. 02 Civ. 6478(NRB), 2003 WL
    22801416 (S.D.N.Y. Nov. 25, 2003), aff'd sub nom. Nadoff v. Duane Reade,
    Inc., 107 F. App'x 250 (2d Cir. 2004)..................................................................25

Duncan v. Pencer, No. 94 Civ. 0321(LAP), 1996 WL 19043 (S.D.N.Y. Jan. 18, 1996) ...................................................................................................................24

In re Enron Corp. Securities Derivative & ERISA Litigation, 235 F. Supp. 2d 549 (S.D. Tex. 2002)...........................................................................................28

Florida State Board of Administration v. Green Tree Financial Corp., 270 F.3d 645 (8th Cir. 2001)..............................................................................................23

Frazier v. VitalWorks, Inc., 341 F. Supp. 2d 142 (D. Conn. 2004)...................................14

GAF Corp. v. Heyman, 724 F.2d 727 (2d Cir. 1983)....................................................1, 12

Greenstone v. Cambex Corp., 777 F. Supp. 88 (D. Mass. 1991), aff'd, 975 F.2d 22 (1st Cir. 1992) ...................................................................................9, 10, 17

In re Health Management System, Inc. Securities Litigation, No. 97 CIV. 1865(HB), 1998 WL 283286 (S.D.N.Y. June 1, 1998) ................................................22

Helwig v. Vencor, Inc., 251 F.3d 540 (6th Cir. 2001)........................................................15

Howard v. Everex System, Inc., 228 F.3d 1057 (9th Cir. 2000) .......................................24

In re Initial Public Offering Securities Litigation, 241 F. Supp. 2d 281 (S.D.N.Y. 2003) ..................................................................................................24

In re JPMorgan Chase Securities Litigation, 363 F. Supp. 2d 595 (S.D.N.Y. 2005) ..................................................................................................25

Johnson v. NYFIX, Inc., No. Civ.A. 3:04-CV-0802, 2005 WL 2931823 (D. Conn. Oct. 27, 2005)...........................................................................................26

Kahn v. Wien, 842 F. Supp. 667 (E.D.N.Y.), aff'd mem., 41 F.3d 1501 (2d Cir. 1994)...................................................................................................1, 11

Kalnit v. Eichler, 264 F.3d 131 (2d Cir. 2001)...........................................6, 20, 23, 25, 27

Menkes v. Stolt-Nielsen S.A., No. 3:03CV409(DJS), 2005 WL 3050970 (D. Conn. Nov. 10, 2005) .............................................................9, 10, 14, 17, 18, 19

In re MicroStrategy, Inc. Securities Litigation, 115 F. Supp. 2d 620 (E.D. Va. 2000)..................................................................................................24

Missouri Portland Cement Co. v. Cargill, Inc., 498 F.2d 851 (2d Cir. 1974) ..................14

No. 84 Employer-Teamster Joint Council Pension Trust Fund v. America West
 Holding Corp., 320 F.3d 920 (9th Cir. 2003) ..................................................23

Novak v. Kasaks, 216 F.3d 300 (2d Cir. 2000) ........................................6, 25, 26

Nursing Home Pension Fund, Local 144 v. Oracle Corp., 380 F.3d 1226
 (9th Cir. 2004).................................................................................................21

Ottmann v. Hanger Orthopedic Group, Inc., 353 F.3d 338 (4th Cir. 2003) ......................15

In re Par Pharmaceutical, Inc. Securities Litigation, 733 F. Supp. 668
 (S.D.N.Y. 1990) ...................................................................4, 9, 13, 16, 17

In re Providian Finance Corp. Securities Litigation, 152 F. Supp. 2d 814
 (E.D. Pa. 2001)...............................................................................................15

Reiss v. Pan American World Airways, Inc., 711 F.2d 11 (2d Cir. 1983) ........................27

Rombach v. Chang, 355 F.3d 164 (2d Cir. 2004).................................................................14

Rothman v. Gregor, 220 F.3d 81 (2d Cir. 2000)..........................................................20, 27

Rubinstein v. Collins, 20 F.3d 160 (5th Cir. 1994)..............................................................21

San Leandro Emergency Medical Group Profit Sharing Plan v. Philip Morris Cos.,
 75 F.3d 801 (2d Cir. 1996)...............................................................14, 22, 24

Shapiro v. UJB Finance Corp., 964 F.2d 272 (3d Cir. 1992) ............................................15

Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124 (2d Cir. 1994) ......................................26

In re Sirrom Capital Corp. Securities Litigation, 84 F. Supp. 2d 933 (M.D. Tenn.
 1999) ...............................................................................................................15

In re Sofamor Danek Group, Inc., 123 F.3d 394 (6th Cir. 1997) ................................13, 14

In re Sotheby's Holdings, Inc.Securities Litig., No. 00 Civ. 1041(DLC), 2000 WL
 1234601 (S.D.N.Y. Aug. 31, 2000) ..........................................................14, 15, 16, 17

Stevelman v. Alias Research Inc., 174 F.3d 79 (2d Cir. 1999) ........................................21

In re Teledyne Defense Contracting Derivative. Litigation, 849 F. Supp. 1369
 (C.D. Cal. 1993)..................................................................................12, 14

In re Time Warner Inc. Securities Litigation, 9 F.3d 259 (2d Cir. 1993)....................11, 24

In re Twinlab Corp. Securities Litigation, 103 F. Supp. 2d 193 (E.D.N.Y. 2000) ............24

United Paperworks International Union v. International Paper Co., 801 F. Supp.
    1134 (S.D.N.Y. 1992), aff'd, modified in part on other grounds, 985 F.2d 1190
    (2d Cir.1993).......................................................................................................................15

In re Vantive Corp. Securities Litigation, 283 F.3d 1079 (9th Cir. 2002).........................21

In re Wellcare Management Group, Inc. Securities Litigation, 964 F. Supp. 632
    (N.D.N.Y. 1997) ................................................................................................................23

In re Xerox Corp. Securities Litigation, 165 F. Supp. 2d 208 (D. Conn. 2001)................26

Zuckerman v. Harnischfeger Corp., 591 F. Supp. 112 (S.D.N.Y. 1984)............................27

Defendants respectfully submit this reply memorandum of law in further support of their motion to dismiss the Consolidated Amended Complaint (the "Complaint" or "AC").[1]

## PRELIMINARY STATEMENT

A review of Plaintiffs' opposition brief confirms that their Section 10(b) claims rest exclusively on Jakks' failure to confess -- in its public filings dating back to 1999 -- to the unverified, unadjudicated and everchanging allegations, which Jakks <u>continues to deny</u> today, contained in a civil complaint filed in 2004 by WWE to extricate itself from licensing agreements. Plaintiffs' attempt to parlay the WWE Action into a federal securities class action not only is completely unprecedented, but flouts the Second Circuit's unequivocal pronouncements that the federal securities laws "'simply do not require management to accuse itself of antisocial or illegal policies.'" <u>GAF Corp. v. Heyman</u>, 724 F.2d 727, 740 (2d Cir. 1983) (citation omitted). As this Court has held, imposing such a rite of confession "would make a silly, unworkable rule. It would not promote increased disclosure, but would serve only to support vexatious litigation and abusive discovery." <u>Amalgamated Clothing & Textile Workers Union v. J.P. Stevens & Co.</u>, 475 F. Supp. 328, 332 (S.D.N.Y. 1979). Thus, "[t]he Second Circuit has cautioned against placing 'much stock in the bald, untested allegations in a civil complaint' in 'a society as litigious as ours, where plaintiffs are permitted great latitude in their pleadings.'" <u>Kahn v. Wien</u>, 842 F. Supp. 667, 678 (E.D.N.Y.) (quotation omitted), <u>aff'd mem.</u>, 41 F.3d 1501 (2d Cir. 1994).

Faced with these bedrock principles of federal securities law, Plaintiffs glibly protest that they are "not claiming that Defendants were required to disclose illegal conduct or speculate

---

[1]    Defendants' Memorandum of Law in support of their Motion to Dismiss the Consolidated Amended Complaint, dated September 9, 2005, is referred to herein as "Def. Br." Defined terms therein are incorporated herein. Plaintiffs' memorandum of law in opposition to Defendants' Motion to Dismiss the Consolidated Amended Complaint, dated November 15, 2005, is referred to herein as "Pl. Br."

about possible litigation absent some duty to speak." Pl. Br. at 16. In the next breath, however, Plaintiffs do just that by contending that a disclosure duty arose "when Defendants spoke about the WWE licenses, which they did repeatedly." Id. According to Plaintiffs, once Jakks made any comments about the WWE Licenses, no matter how attenuated, generic or historical, it was required to confess to the untested allegations made years later by WWE.[2] As Defendants' opening brief demonstrated, courts have decisively rejected this precise argument. See Def. Br. at 21-37. The vast scope of the disclosure duty posited by Plaintiffs is vividly illustrated by their 76 page complaint, which challenges as false and misleading over 40 separate public filings by Jakks over a five year period solely because they refer in some way to WWE and the licenses and fail to confess to wrongdoing alleged years later in WWE's cynical and meritless lawsuit.

Not surprisingly, Plaintiffs cannot cite a single case that has ever required a defendant to confess to unadjudicated civil allegations that were adamantly denied by the defendants, much less that imposed such an obligation whenever defendants addressed a subject tangentially related to the alleged wrongdoing. In sharp contrast to this case, every one of the cases referred to by Plaintiffs sustaining a securities law claim based on a nondisclosure of wrongdoing alleged in litigation involved admitted or adjudicated allegations of criminal wrongdoing, coupled with statements by the defendants that were diametrically inconsistent with that undisclosed established wrongdoing.

---

[2]    In response to JAKKS' systematic refutation of the several separate purported bases vaguely advanced by Plaintiffs in their attempt to impose a disclosure duty – from purported SEC regulations to insider trading – Plaintiffs offer no rebuttal. Instead they feign bemusement at JAKKS' refutation of each of these theories, which Plaintiffs now claim are "beside the point." Pl. Br. at 15, n.13. Of course, Plaintiffs' own shotgun pleading necessitated JAKKS' legal response. See, e.g., AC ¶ 167 (asserting that disclosure duties arose under "the integrated disclosure provisions of the SEC as embodied in SEC Regulation S-X . . . and Regulation S-K . . . and other SEC regulations"). In all events, Plaintiffs have indisputably abandoned any other basis for asserting a disclosure duty, making this motion simple to decide.

Despite the scores of disclosures that were challenged initially in the unwieldy Complaint – necessitating extensive briefing by Defendants – in their opposition Plaintiffs now only specifically press <u>one</u> <u>disclosure</u> as false and misleading.[3] Effectively conceding, as they must, that they have failed to properly plead any other misleading statements, Plaintiffs assert that a duty to confess to the wrongdoing later alleged by WWE was triggered by the following indisputably accurate statement made in Jakks' proxy materials in 2000-2002 in the context of the discussion of executive compensation:

> We believe that our success to date has been to a significant extent attributable to the personal efforts of Mr. Friedman and Mr. Berman. They founded the Company, established its business philosophy and operating structure and were the driving force behind our central theme of focusing our business on "evergreen" products. Mr. Friedman's long-term relationship with Titan Sports was instrumental in our acquiring our successful World Wrestling Federation licenses. In his nearly four-decade-long career in the toy industry, he has established an important network of relationships that we have been able to exploit in product acquisition, production and sales. Both Mr. Berman and Mr. Friedman embody our management philosophy with a "hands on" approach in all areas of our business. In addition to their general supervisory functions, they are directly involved in license acquisition, product design and development, production, and sales and marketing, as well as our financing and acquisition efforts. Their efforts have resulted in our identifying and securing the World Wrestling Federation licenses and other desirable licenses and properties, the rapid expansion of our product lines, our achieving significant production efficiencies and the development of a loyal and growing customer base. In 1999, they guided us through two significant acquisitions, the implementation of our video game joint venture with THQ Inc. and two public offerings.

AC ¶ 68 (emphasis omitted); <u>see also</u> AC ¶¶ 83, 106 (subsequent proxy statements repeating same discussion). On its face, the accurate, general retrospective acknowledgement of (1) the significant contributions of Messrs. Friedman and Berman to the Company or (2) the importance of Mr. Friedman's long term relationship with WWE – going back to 1995, years before <u>any</u>

---

[3]  Plaintiffs' perfunctory attempt to preserve their challenge to other statements by asserting that their "analysis is the same for all of the other statements in this Complaint" (Pl. Br. at 13, n.10) falls woefully short of the PSLRA's particularity requirements, <u>see</u> Def. Br. at 37-40, <u>and</u> fails to respond to, much less overcome, the several independent arguments raised by Defendants establishing that such statements cannot support a securities law claim. <u>See</u> <u>id.</u> at 21-37.

3

wrongdoing allegedly occurred − to the acquisition of licenses from WWE, cannot possibly trigger a duty to confess all uncharged wrongdoing that may later be alleged, much less give rise to a cognizable securities law claim.

Plaintiffs now concede, as they must, that Defendants were under no duty to speculate that, years later, WWE might accuse them of alleged misconduct in connection with the 1998 Transactions. Pl. Br. at 18. Despite this admission, Plaintiffs persist in seeking to predicate liability on precisely such speculation by arguing that Jakks was required to disclose that "by early 2004" Defendants were aware that WWE was challenging the validity of the WWE licenses. Pl. Br. at 18; AC ¶ 53. First, Plaintiffs do not and cannot establish any duty to disclose an inchoate "challenge" to the Licenses, short of actual litigation, even if such a challenge had been pled. See Def. Br. at 16-18. In any event, the Complaint is devoid of any factual allegations to suggest that WWE challenged Jakks' actions relating to the WWE licenses before October 2004, when it was disclosed by Jakks. To suggest that Jakks "knew" that it would be sued by WWE based on its receipt of a third party document subpoena in WWE's litigation against third-parties is the very type of rank speculation rejected in In re Par Pharmaceutical, Inc. Securities Litigation, 733 F. Supp. 668 (S.D.N.Y. 1990) ("[T]he company was not obligated to speculate as to the myriad of consequences, ranging from minor setbacks to complete ruin, that might have befallen the company if the bribery scheme was discovered, disclosed or terminated.") Id. at 678 (hereafter "Par"). Indeed, Plaintiffs cannot dispute that the SEC filings of WWE − who would be in the best position to know and disclose to its shareholders its own intentions − provide no hint, much less probability, of litigation against Jakks, and continued to praise Jakks' ability to generate future "substantial revenues" for WWE as late as July 2004. Any doubt that

Jakks had no duty to speculate that WWE would sue is dispelled by the "General Release" WWE gave Jakks in 2004. See Def. Br. at 3, 12.

Plaintiffs also fail to overcome Defendants' showing that the Complaint fails adequately to plead scienter by alleging either motive or recklessness. It cannot be gainsaid that Plaintiffs have failed to establish motive because the Individual Defendants' stock sales were not unusual in scope or timing − especially since virtually all of these sales occurred in or before May 2002 − years before Jakks disclosed the "adverse facts" of WWE's allegations and before WWE even served its first subpoena on Jakks. The lack of sales by insiders prior to the announcement is compelling evidence negating any inference of fraudulent intent. See Point III.A.1., infra. Unable to rebut this showing, Plaintiffs ignore controlling authority, and manufacture from whole cloth their own new legal standard which asserts that in a case of a "perpetual fraud," all company and insider sales during the five year class period, even sales by insiders who are not named as defendants, should be considered suspicious. Pl. Br. at 23. There is not a scintilla of legal support for Plaintiffs' preposterous argument which flies in the face of controlling Second Circuit legal authority requiring them to allege specific facts showing that trading by insiders was unusual in timing and as a percentage of the named defendants' holdings − allegations entirely absent here. See Point III.A.1., infra.

Nor can Plaintiffs surmount the controlling legal authority rejecting the sufficiency of their other overly generalized "motive" allegations, such as executive compensation tied to the stock price and the alleged "motive" to make secondary offerings in December 1999 and April

2002[4] (Pl. Br. at 26-27), which are generalized motives possessed by most, if not all, corporate executives. Def. Br. at 45-46.

Lacking adequate motive allegations, the Complaint can only plead scienter by alleging facts giving rise to a strong inference of conscious misbehavior or recklessness, "'though the strength of the circumstantial allegations must be correspondingly greater.'" Kalnit v. Eichler, 264 F.3d 131, 142 (2d Cir. 2001) (citation omitted). Plaintiffs contend that the Individual Defendants' alleged knowledge of alleged 1998 Transactions alone is sufficient to establish a strong inference of fraudulent intent. Pl. Br. at 21. But knowledge of an underlying transaction cannot be transformed into an intentional effort to defraud investors under Section 10(b). The Complaint must allege some factual basis – but conspicuously does not – to demonstrate that the Defendants knew that their public statements were misleading in violation of Section 10(b). See Def. Br. at 48; see also Point III.B., infra. Further, where, as here, the alleged duty to disclose is doubtful, the Second Circuit has held that "defendants' recklessness cannot be inferred from the [alleged] failure to disclose." Kalnit, 263 F. 3d at 143.

Finally, Plaintiffs admit that they rely lock, stock and barrel on the untested hearsay allegations of another party's complaint – despite the rigors of Rule 11 and the PSLRA.[5] This admission underscores the infirmity of the Complaint under Novak v. Kasaks, 216 F.3d 300 (2d Cir. 2000), which requires that plaintiffs plead a specific factual basis for finding that defendants' statements were false. See id. at 313-14. Unlike Plaintiffs' cases that involve adjudicated or

---

[4]    On its face, Plaintiffs' contrived argument defies logic because many of the alleged misstatements and omissions long postdate the December 1999 and the April 2002 secondary offerings. See AC ¶¶ 61-144. The offerings thus could not have motivated Defendants to issue subsequent misstatements. See Point III.A.3., infra.

[5]    The danger of permitting a securities fraud case to proceed upon the unverified hearsay extracted from an untested civil complaint is vividly illustrated by Plaintiffs' undisputed reliance here on an outdated complaint that was radically altered on March 30, 2005, when WWE filed its amended complaint and which abandons Plaintiffs' central claim – that the January 1998 Transactions were a quid pro quo to obtain the videogame license and extensions of the toy licenses. See Def. Br. at 8-9.

admitted allegations of wrongdoing, this case rests solely on hearsay from an untested, vehemently denied civil complaint by WWE, which has an obvious economic motivation to pursue a baseless case − to obtain a more lucrative deal. As such, it exemplifies the type of unreliable source condemned in Novak, and illustrates why the theory of liability proposed by Plaintiffs is both unworkable and unprecedented.

## ARGUMENT

### I. DEFENDANTS HAD NO DUTY TO DISCLOSE THE 1998 TRANSACTIONS

#### A. Plaintiffs' Concessions Significantly Narrow This Case

After unleashing a blunderbuss Complaint indiscriminately attacking virtually every public statement by Jakks over a five-year period, Plaintiffs now admit, in response to Jakks' brief, that they are not challenging the accuracy of Jakks' historical disclosures or the truth of Defendants' public statements. Pl. Br. at 15 n. 13. Plaintiffs also do not claim to allege that a disclosure duty arose by virtue of insider trading or any SEC regulation. Id. Plaintiffs further concede that Defendants were not required to disclose uncharged illegal conduct absent a duty to speak, nor were they required to speculate about possible litigation. Id. at 16. Plaintiffs' entire case now rests on the claim that a duty to disclose the uncharged 1998 Transactions was triggered by Defendants' alleged affirmative misstatements.

#### B. Defendants' Truthful Statements Were Not Rendered Misleading By the Alleged 1998 Transactions

Retreating from their overblown pleading, Plaintiffs' brief takes its "best shot" and specifically cites as misleading only one statement (see p.3, supra) from Defendants' annual proxy materials from 2000-2002 acknowledging the historical contribution of Messrs. Friedman and Berman to the Company's success. Specifically, Plaintiffs contend that the Jakks' 2000 proxy statements that "Mr. Friedman's long-term relationship with WWE was instrumental in our

acquiring our successful WWE licenses," and that the efforts of Messrs. Friedman and Berman

"have resulted in our identifying and securing the WWE licenses and other desirable licenses and

properties," (Pl. Br. at 12; AC ¶¶ 68, 83, 106), were misleading "because they failed to disclose

the true facts regarding the acquisition of the WWE Licenses – that Defendants Friedman,

Berman and Bennett had made improper payments to WWE's licensing agent in order the secure

the WWE Licenses." Pl. Br. at 13.

Of course, there is nothing false, incomplete or misleading about the description of

invaluable contributions of Messrs. Friedman and Berman toward the success of the Company or

the acquisition of the licenses, including the WWE Licenses.  Plaintiffs do not contend that the

success of the Company was not largely attributable to the personal efforts of these founders.

Nor can Plaintiffs dispute that Mr. Friedman's long-term relationship with WWE's predecessor

Titan Sports was instrumental in acquiring licenses from WWE.  It bears emphasis that the

bedrock license, the toy license upon which the WWE relationship was founded, was secured in

1995, long before the 1998 Transactions.  Indeed, the Complaint itself acknowledges that on

October 24, 1995, under Mr. Friedman's direction, Jakks successfully secured the first WWE

domestic toy license and that Jakks entered into its first international toy license on February 10,

1997.  AC ¶¶ 16, 34, 37.  Plaintiffs do not allege any facts to suggest that Messrs. Friedman,

Berman and Bennett engaged in any wrongdoing or made any improper payments in securing

these licenses upon which the relationship was founded.  Accordingly, the Complaint pleads no

factual basis for Plaintiffs' conclusory assertion that the general reference in the 2000 and

subsequent proxy statements to the founding of Jakks' relationship with WWE in 1995 was

rendered false and misleading by the non-disclosure of the alleged 1998 Transactions.  Where, as

here, the challenged statements are not rendered misleading or contradicted by the undisclosed

information, no disclosure duty arises. See Canandaigua, 944 F. Supp. at 1208-09.

**C.    The Challenged Statements Are Too Attenuated**
**From the Alleged 1998 Transactions to Compel Disclosure**

In their opening brief, Defendants demonstrated that courts have consistently rejected

attempts to bootstrap disclosure obligations on a company's general statements, where, as here,

the alleged omitted information is too attenuated to have misled any reasonable investor. See

Bragger v. Trinity Capital Enter. Corp., No. 92 CIV. 2124 (LMM), 1994 WL 75239, (S.D.N.Y.

Mar. 7, 1994); In re Citigroup, Inc. Sec. Litig., 330 F. Supp. 2d 367 (S.D.N.Y. 2004); Greenstone

v. Cambex Corp., 777 F. Supp. 88 (D. Mass. 1991), aff'd, 975 F.2d 22 (1st Cir. 1992); see also

Par., 733 F. Supp. at 678 (no duty to disclose based on statement whose subject matter was "so

attenuated from the bribery scheme that it could not reasonably be found to have created a false

impression in a reasonable investor"); Menkes v. Stolt-Nielsen S.A., No. 3:03CV409(DJS), 2005

WL 3050970, at *8 (D. Conn. Nov. 10, 2005) (same).  Because the challenged proxy statements

− commending the historical contributions of Messrs. Friedman and Berman to the Company's

success and license acquisitions, including those from WWE (Pl. Br. at 12; AC ¶¶ 68, 83, 106) −

are far too attenuated from the alleged 1998 Transactions, no investor could be misled and no

duty to disclose could arise.

In Bragger, 1994 WL 75239, plaintiffs alleged that a press release containing a general

description of the business of a pharmaceutical company was misleading for failure to disclose

the Company's violations of FDA regulations and a pending FDA investigation.  See id. at *2.  In

language squarely applicable here, Judge McKenna held that the description of the company's

business did not require disclosure of the regulatory non-compliance:

> Plaintiff, in effect, contends that anytime an entity proffers any information about
> itself to the public, the proffer, in order to be "complete," must include any and all

> material information about the entity. . . .   Even the broadest reading of
> "complete" in this context cannot rationally stretch to compel disclosure on such a
> grand scale in order to avoid the conclusion that anything less is misleading for
> the purposes of Rule 10b-5.

Id. at *4.  Plaintiffs' authorities also recognize that recitations of historical facts of the kind made

in the Jakks' proxy statements do not trigger a duty to confess alleged wrongdoing that is not

directly connected to the subject of the challenged conduct.  See Menkes, 2005 WL 3050970, at

*8 (recitation of historical facts about defendants' operations and other statements were not

misleading where there was no direct connection between subject of statements and alleged

illegal conduct).  Because Plaintiffs here are attempting to bootstrap the general historical

reference to the contribution of Messrs. Friedman and Berman to the Company (including the

founding of the WWE relationship) to manufacture a duty to disclose unrelated Transactions in

1998, years after the relationship was established, their claim fails under Bragger and Menkes.[6]

In Citigroup (see Def. Br. at 32), Judge Swain held that statements concerning credit

policies – such as, "review of the risk profile covers . . . credit risk ratings, including trends in

client creditworthiness," were not rendered misleading by defendants' alleged failure to disclose

illegal loan transactions that exposed the defendants to undue credit risk.  330 F. Supp. 2d at 371,

375-77.  Unable to address this authority which is on "all fours," Plaintiffs contend that their

securities claim is not based on "Jakks' risk management statements or procedures."  Pl. Br. at 13

n.9.  In advancing this irrelevant factual distinction, Plaintiffs ignore the point of Citigroup,

---

[6]   Plaintiffs also conspicuously ignore Greenstone, 777 F. Supp. at 91 (see Def. Br. 34-25), where plaintiffs based
a securities fraud complaint on the allegations in a civil action by IBM against Cambex, accusing Cambex of
converting IBM's computer components.  Plaintiffs claimed that Cambex's financial statements fraudulently failed to
disclose that revenue was derived from allegedly illegal practices, i.e., the converted IBM components, (id. at 89-90),
and that defendants' financial disclosures would have been more accurate and complete if they revealed the illegal
activities that allegedly affected their revenues.  Id. at 91.  Dismissing the complaint as a matter of law, the
Greenstone court held that "[r]egardless of how plaintiff purports to characterize the undisclosed information . . . she
is, in reality, asserting that the defendants had an independent and affirmative duty to disclose the improper activity
simply because it was material.  Such a duty does not exist."  Id.

which is that a general reference to historical facts, such as "WWE licenses," does not trigger a duty to disclose all other possible information about the subject.[7]

Like plaintiffs in the foregoing cases, Plaintiffs here do not contend that there was anything literally untruthful or false about any of the Company's statements. As in those cases, dismissal is warranted here because the challenged statements are not directly related to the allegedly undisclosed information. Indeed, to require disclosure of all conceivably related information based on any general comments that are not contradicted by the underlying undisclosed information would lead to unprecedented expansion of civil liability under the federal securities laws. Accordingly, this is not the law. See Def. Br. at 33. See also In re Time Warner Inc. Sec. Litig., 9 F.3d 259, 268 (2d Cir. 1993) ("[W]e do not hold that whenever a corporation speaks, it must disclose every piece of information in its possession that could affect the price of its stock.").

### D.    The Uncharged, Unverified Allegations Were Not A "Material Fact" That Was Required To Be Disclosed

In their opposition brief, Plaintiffs erroneously argue that Defendants do not contest the materiality of the allegedly omitted information. Pl. Br. at 15. In advancing this contention, Plaintiffs have misread Defendants' brief and ignore our reliance on Kahn, 842 F. Supp. 667, which held that unproven civil allegations were not material in the context of a proxy disclosure. See Def. Br. at 17 & n. 8. Plaintiffs' opposition brief – which focuses exclusively on statements

---

[7]    Plaintiffs also attempt to distinguish Citigroup as a case involving mere mismanagement. Pl. Br. at 13 n.9. While plaintiffs' claims there – like here – may also be subject to dismissal on that basis (see Def. Br. at 4), the decision in Citigroup also turned precisely on the alleged nondisclosure of wrongdoing. Just as Plaintiffs attempt to do here, in Citigroup, plaintiffs alleged "that Citigroup's failure to disclose that its revenues were derived from 'unsustainable and illegitimate sources,'" stated a claim under section 10(b), 330 F. Supp. 2d at 377. The court in Citigroup rejected plaintiffs' allegations because, as here, plaintiffs failed to point to any false or misleading statement that would trigger a duty to disclose that the company's revenues were allegedly procured by illegal means. See id. at 377-78. Likewise here, Plaintiffs' failure to point to any statement that could arguably be rendered misleading by the failure to disclose the alleged 1998 Transactions mandates dismissal.

in Jakks' proxy disclosures – confirms that those statements fall squarely within the long line of

Second Circuit cases holding that <u>uncharged allegations</u> are not material "facts" whose disclosure

is required in the context of proxy solicitations. <u>See, e.g.</u>, <u>Ciresi v. Citicorp</u>, 782 F. Supp. 819,

823, (S.D.N.Y. 1991) (no duty to disclose untested, uncharged allegation that director-nominees

established inadequate reserves for loan losses and made high risk loans because "the law does

not impose a duty to disclose uncharged, unadjudicated wrongdoing or mismanagement" in

proxy solicitations), <u>aff'd</u> <u>mem.</u>, 956 F.2d 1161 2d Cir. 1994).[8]

The rationale for this rule was cogently explained in <u>In re Teledyne</u>, 849 F. Supp. at 1383:

> The wisdom of limiting disclosure to pending or adjudicated actions is evident in
> the instant factual and procedural setting. Because this is a motion to dismiss, the
> Court must assume that what Plaintiffs allege – i.e., Defendants' involvement in
> the criminal conduct of the Teledyne subsidiaries – is true. However, the fact
> remains that Defendants will presumably deny, and neither Plaintiffs nor anyone
> else has yet proven, that the Defendants had any culpable involvement which they
> might have been obligated to disclose. Put another way, § 14(b) requires
> disclosure of material facts, and the Defendants' culpability – under the case law
> and the SEC regulations – does not become a <u>fact</u> that must be disclosed until it is
> at least charged . . . .

<u>Id.</u> (emphasis added). Endorsing this logic, the Second Circuit has squarely held that untested,

unadjudicated allegations in a pending civil action need not be disclosed in proxy materials. <u>See</u>

<u>GAF Corp.</u>, 724 F.2d at 739-40 (holding that unproven allegations in pending civil action were

not material in context of proxy disclosure statement: "[i]n a society as litigious as ours, where

plaintiffs are permitted great latitude in their pleadings, a reasonable shareholder would not place

much stock in the bald, untested allegations in a civil complaint").

---

[8]    Accord, e.g., <u>In re American Express Co. S'holder Litig.</u>, 840 F. Supp. 260, 268-70 (S.D.N.Y. 1993) (dismissing
complaint where plaintiffs alleged that defendants failed to disclose potentially illegal conduct but there was no
actual or threatened litigation at the time of the proxy statements), <u>aff'd</u>, 39 F.3d 395 (2d Cir. 1994); <u>J.P. Stevens</u>,
475 F. Supp. at 332 (proxy rules do not require "disclosure of illegal intentions or even of crimes committed which
have not been the subject of legal proceedings"); <u>see also</u> <u>Bolger v. First State Fin. Servs.</u>, 759 F. Supp. 182, 194
(D.N.J. 1991) (holding that because company was under no obligation to disclose plaintiff's mere uncharged,
unproven allegations as to illegality of conduct of officers and directors, company was not obligated to disclose
whatever steps it took in response to his allegations); Def. Br. at 15.

Moreover, Defendants established that the uncharged alleged conduct was, at most, "soft" information" that was not required to be disclosed. See Def. Br. at 15-16, 24-25 (discussing In re Sofamor Danek Group, Inc., 123 F.3d 394, 397-98 (6th Cir. 1997) (despite company's affirmative statement that it was not encouraging use of its spinal products for applications unapproved by the FDA, which was later contested in patients' suit claiming that the company's spinal products were "illegally" used unlawful procedures, the Court of Appeals dismissed section 10(b) suit claiming company falsely attributed its success to increased sales volume without disclosing that sales resulted from promoting the company's products for illegal use because the alleged illegal promotion of company's products was "soft" information, not "hard" factual information that was objectively verifiable).

Unable to distinguish Sofamor Danek, Plaintiffs' claim, based on ipse dixit, that the unadjudicated, and until 2004 unasserted alleged allegations of illegal payments in this case constitute "hard" information. Pl. Br. at 17. In fact, the illegal conduct in Sofamor Danek was far more concrete than the alleged payments here because there defendants had been warned by the FDA that their marketing of spinal devices for certain medical procedures was illegal. See 123 F.3d at 398, 402. Yet, because the FDA had not commenced formal regulatory action, the Sixth Circuit held that the allegedly illegal promotion of the company's products was only "soft" information that did not need to be disclosed unless it was "'virtually as certain as hard facts.'" Id. at 402 (citation omitted). Here, the 1998 Transactions were never sued upon until the end of the Class Period, nor made the subject of a government warning, and continue to be vigorously denied.[9]

---

[9]    Indeed, conspicuously absent here are any factual allegations to suggest that there were any verifiable red flags challenging the legality of the 1998 Transactions at any time before 2004, such as government investigations, grand jury subpoenas, guilty pleas by the defendants, or even warning letters, which are present in all of Plaintiffs' cases. See, e.g., Par 733 F. Supp. at 673-74 (involving guilty pleas of executives, contemporaneous congressional and

13

Accordingly, if the legality of practices that were the subject of a FDA violation warning letter is "soft" information that need not be disclosed, then, a fortiori, the uncharged, unverified and disputed alleged transactions here were also "soft" information that did not need not be disclosed unless and until litigation was virtually certain to occur. There are no "hard" facts even indicating that Defendants engaged in any improper activity.[10] Thus, the alleged conduct in connection with the 1998 Transactions is nothing more than an untested allegation of illegality, or the type of "soft information" that were not required to be disclosed in Sofamor Danek.[11] Accord In re Teledyne Defense Contracting Derivative. Litig., 849 F. Supp. 1369, 1383 (C.D. Cal. 1993) (defendants' alleged involvement in criminal conduct of Teledyne subsidiaries was not "fact" requiring disclosure until at least charged or proven).[12]

---

grand jury investigations); In re Sotheby's Holdings, Inc. Sec. Litig., No. 00 Civ. 1041(DLC), 2000 WL 1234601, at *2 (S.D.N.Y. Aug. 31, 2000) (conditional amnesty plea of co-conspirator, contemporaneous government investigation, grand jury panel, and grand jury subpoenas); Menkes, 2005 WL 3050970, at *2 (confession of antitrust violations under DOJ amnesty program and contemporaneous FBI investigation and criminal complaint). To this very day, all that exist are WWE's cynical, unverified and ever-changing accusations.

[10]    It bears emphasis that the guilty plea of former WWE employee, James Bell in the third-party litigation partially quoted in Plaintiffs opposition brief has nothing to do with Jakks. It does not even mention, let alone implicate, Jakks. See Pl. Br. at 9 n.7. See Lerner Supp. Decl. Ex. B.

[11]    Significantly, WWE did not commence any action until October 19, 2004. Had Jakks publicly predicted from July 2002 onwards that WWE would sue, "the opinion would have come to look increasingly questionable with the passage of time," (Sofamor Danek, 123 F.3d at 402), and would have served no purpose other than needless "self-flagellation." See Missouri Portland Cement Co. v. Cargill, Inc., 498 F.2d 851, 873 (2d Cir. 1974) (corporations not required to engage in "self-flagellation"); cf., Ballan v. Wilfred Am. Educ. Corp., 720 F. Supp. 241, 248 (E.D.N.Y. 1989) (noting that "imminent" indictments of officers of defendant did not materialize until a year and a half after government investigation and that defendants were not bound to predict likely or "imminent" indictments would follow investigation).

[12]    Further, as demonstrated in Defendants' opening brief – and not disputed by Plaintiffs – the Complaint fails to identify any actionable misrepresentation because the proxy disclosures generally commending Messrs. Friedman and Berman for their contributions to the Company's success are classic expressions of puffery which are immaterial as a matter of law. Def. Br. at 31. "[E]xpressions of puffery and corporate optimism do not give rise to securities violations." Rombach v. Chang, 355 F.3d 164, 174 (2d Cir. 2004). Because the statements were not the type of fact-based statements upon which investors reasonably rely, see Frazier v. VitalWorks, Inc., 341 F. Supp. 2d 142, 153-54 (D. Conn. 2004), they cannot, as a matter of law, trigger a duty to disclose. See San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos., 75 F. 3d 801, 811 (2d Cir. 1996).

14

### E.    Plaintiffs' Authorities Do Not Mandate A Different Result

The readily distinguishable cases relied on by Plaintiffs do not mandate a different result. In every case finding a duty to disclose allegedly illegal conduct, there was an admitted or adjudicated finding of liability. Consequently, the courts in those cases were not required to speculate about disclosure duties pertaining to unadjudicated and unasserted underlying allegations. Moreover, unlike the general historical statements at issue in this case, the cases cited by Plaintiffs involve <u>affirmative misstatements that were expressly contradicted or directly undermined by the undisclosed facts</u>.

<u>In re Sotheby's Holdings, Inc. Sec. Litig.</u>, No. 00 Civ. 1041(DLC), 2000 WL 1234601 (S.D.N.Y. Aug. 31, 2000) ("<u>Sotheby's</u>") highlights the infirmity of Plaintiffs' Complaint here. In <u>Sotheby's</u>, the company's public filings directly referred to "'intense' competition with its 'primary auction competitor,' Christie's'" that was <u>directly contradicted</u> by the undisclosed fact that it had entered into a price-fixing agreement with Christie's that eliminated the "intense competition" between these two supposedly "primary competitors," <u>id.</u> at *4, triggering a criminal investigation by the Department of Justice. <u>Id.</u> at *2.[13] The illegality of the underlying

---

[13]    The remaining cases cited by Plaintiffs in their opposition brief are inapposite because (1) none involved the disclosure of unadjudicated allegations of civil wrongdoing and (2) unlike here, all involved affirmative misrepresentations <u>directly contradicted by undisclosed facts</u>. <u>See, e.g.</u>, <u>Ottmann v. Hanger Orthopedic Group, Inc.</u>, 353 F.3d 338, 346-50 (4th Cir. 2003) (defendants understated number of practitioners that departed from target after acquisition and reason for their departure); <u>In re Sirrom Capital Corp. Sec. Litig.</u>, 84 F. Supp. 2d 933, 941-42 (M.D. Tenn. 1999) (affirmative misstatements about its income and the value of loan portfolio); <u>Shapiro v. UJB Fin. Corp.</u>, 964 F.2d 272, 276, 282-83 (3d Cir. 1992) (defendant affirmatively mischaracterized its lending practices as conservative and its collateralization as adequate but concealed that its loan loss reserves were inadequate and that many loans were not properly collateralized); <u>United Paperworks Int'l Union v. Int'l Paper Co.</u>, 801 F. Supp. 1134, 1142-43 (S.D.N.Y. 1992) (company made affirmative misstatements about its environmental policy and record when in fact it was experiencing ongoing and serious environmental compliance problems), <u>aff'd, modified in part on other grounds</u>, 985 F.2d 1190 (2d Cir.1993); <u>In re Providian Fin. Corp. Sec. Litig.</u>, 152 F. Supp. 2d 814, 824-25 (E.D. Pa. 2001) (affirmative misrepresentation that company's success was due to customer-based approach when in fact cause of success was due to fraudulent profit-inflating sales practices); <u>In re Allaire Corp. Sec. Litig.</u>, 224 F. Supp. 2d 319, 323-24, 327 (D. Mass. 2002) (affirmative statements – that new product worked wonderfully and sales would be excellent – were directly contradicted by concealed information that product did not work and that sales would therefore be doomed); <u>Helwig v. Vencor, Inc.</u>, 251 F.3d 540, 545-46, 558 (6th Cir. 2001) (en banc) (defendants predicted earnings knowing that their knowing that their prediction was false because the Medicare Budget Act would negatively impact earnings).

collusive conduct at issue in <u>Sotheby's</u> was objectively verifiable – not left to speculation – because a "conditional amnesty" plea was granted to Christie's in exchange for its admission of wrongdoing, a grand jury had been empanelled, and subpoenas issued. <u>Id.</u>

Plaintiffs also rely heavily and erroneously on <u>Par</u>, 733 F. Supp. 668. In <u>Par</u>, however, unlike here, the statements that escaped dismissal <u>directly referenced</u>, and were <u>directly undermined by</u>, the undisclosed misconduct in a manner that conveyed a misleading impression to a reasonable investor. <u>See id.</u> at 675-78. In <u>Par</u>, the company "extoll[ed]" its ability to obtain FDA approvals and "conveyed to a reasonable investor the false impression that Par had a <u>particular expertise</u> in obtaining FDA approvals," <u>id.</u> at 677-78 – which was inconsistent with the fact that Par's success was actually the product of a long-term and ongoing admitted pattern of illegal bribes. Specifically, the challenged statements in <u>Par</u> – that the company "'led the industry in obtaining approvals from the FDA,'" <u>id.</u> at 676, and that "'our number of approvals was almost double that of our nearest competitor. This is an achievement in which we take great pride and we will do our best to repeat it in 1987,'" <u>id.</u> at 676, 678 – deliberately created the false impression that Par's past and continued ability to get speedy FDA approval was due to business expertise, rather than illegal payments which were the undisclosed, actual, and obviously unsustainable, reason.[14]

Indeed, unlike here, the alleged misstatements in <u>Par</u> involved non-disclosure of <u>continuous and contemporaneous admitted</u> bribery payments throughout the class period which rendered misleading the contemporaneous references to defendants' expertise in obtaining speedy drug approvals – the lifeblood of Par's business. Here, by contrast, Plaintiffs' allegations are

---

[14]    Indeed, unlike the vague corporate puffery challenged here, Par involved precisely the type of affirmative misrepresentations about a company's business performance upon which investors do rely, especially since Par's success was entirely dependant upon its ability to obtain speedy drug approval from the FDA. Id. at 672 & n.4.

premised on a single, hotly disputed, uncorroborated non-recurring alleged payment dating back to 1998 that predates by years the challenged proxy statements. Moreover, unlike Par, even if WWE's allegations were admitted, which they are not, the historical reference to Messrs. Friedman and Berman's contributions did not misrepresent the fundamentals of the Company's continued or future performance at the time of the proxies.[15]

Finally, the alleged illegality of the conduct in Par was objectively verifiable. The individual defendants in Par had pled guilty to bribing FDA officials throughout the class period and defendants were the target of a congressional investigation and a grand jury indictment. Id. at 673-74 & n. 6.[16] By contrast, this case involves vague statements made in the context of a proxy solicitation with no corresponding government investigation of Jakks, let alone criminal indictments and guilty pleas. In short, Plaintiffs' entire claim boils down to a classic – and impermissible – fraud by hindsight pleading based solely on the untested self-serving allegations in WWE's (original) civil complaint filed more than four years after the alleged omission, and more than six years after the alleged 1998 Transactions. See, e.g., Greenstone, 975 F.2d at 25-27 (declaring that hindsight "involves inferring, from a later lawsuit, earlier knowledge that such a lawsuit was likely," unless the facts support a conclusion that knowledge was likely).

---

[15]    Significantly, none of the generic statements in Jakks' proxy materials challenged by Plaintiffs even mentions, much less hypes, the acquisition of the WWE videogame license in 1998 that is the subject of the Complaint. Indeed, Defendants did not "hype" any particular ability to obtain WWE licenses when they made the vague, general reference to WWE licenses in their proxy statements. Further, the Complaint nowhere alleges, nor could it, that any of the initial licenses upon which Jakks' relationship with WWE was founded were procured by improper means. Nor is there a single factual allegation in the Complaint that suggests that the videogame license or the extension of the toy licenses was the core of Jakks' business or the cause of its financial success, as in Par.

[16]    Straining to bring this case within the holdings of Par, Menkes and Sotheby's, which involved undisputed criminal wrongdoing by defendants, Plaintiffs deliberately distort the guilty plea of former WWE employee, James Bell to suggest he pled guilty to accepting bribes from Jakks. Pl. Br. at 9 n. 7. In truth, Jakks is not mentioned, much less implicated, in Bell's plea. The only scheme to which Bell pled guilty involved an improper payment scheme with SSAI. As Bell's plea makes clear, "Bell did arrange for SSAI to receive commission on certain WWE licensing agreement to which SSAI was not entitled; Bell received kickbacks from SSAI relating to those licensing agreements." Lerner Supp. Decl. Ex. B at 9. Bell admitted receiving payments from only one licensee, "a certain licensee who manufactured T-shirts." Id. at 10.

Plaintiffs also place great reliance on <u>Menkes</u>, 2005 WL 3050970, to claim a duty to disclose the 1998 Transactions, but that case only demonstrates the deficiencies of Plaintiffs' claims. In <u>Menkes</u>, the defendant shipping company had entered into collusive bid-rigging and anti-competitive agreements with its competitors to coordinate bidding and divide contracts, reported these violations of the antitrust laws to the Department of Justice under its voluntary amnesty program, <u>and</u> was subject to a pending criminal complaint filed by the FBI relating to these allegedly illegal activities. <u>See Menkes</u>, 2005 WL 3050970, at *2. [17] Despite these admitted bid-rigging schemes, the defendant made several affirmative misstatements misrepresenting that it was subject to rigorous "competition" even though it was actively negating competition through a bid-rigging scheme.[18] Recognizing that courts "have required <u>a connection between the illegal conduct and the statements</u> beyond the simple fact that a criminal conviction would have an adverse impact upon the corporation's operations or bottom line," <u>id.</u> at *7 (emphasis added), the court found a duty to disclose the omitted collusive arrangements because defendants' affirmative statements misleadingly "<u>directly reference[d] the uncharged anti-competitive conduct alleged in the complaint</u>." <u>Id.</u> (emphasis added).

More relevant here is the <u>Menkes</u> court's <u>rejection</u> of plaintiffs' contention that other challenged statements which did not specifically "discuss competition between other companies" also triggered a disclosure obligation. <u>Id.</u> at *8. In <u>Menkes</u>, the court held that these statements were "a generic description of the state of the market as a whole, a recitation of historical facts

---

[17]    <u>See</u> Defendants' Memorandum of Law in <u>Menkes v. Stolt-Nielsen</u> at 6, attached as Exhibit A to the accompanying Supplemental Declaration of Jonathan J. Lerner ("Lerner Supp. Decl. Ex. A").

[18]    The false statements in <u>Menkes</u> included claims that "[defendant] competes primarily with a few other terminal and transport companies who are developing such services," <u>id.</u> at *3; "we anticipate seeing continued pressure on pricing," <u>id.</u>; and that shipments were up "although the business continues to see a tight pricing environment." <u>Id.</u> at *4. Plaintiffs alleged that all of these statements were rendered false and misleading by the undisclosed fact that defendants were engaged in collusive price fixing and bid-rigging agreements with competitors. <u>Id.</u>

about Stolt's operations, or vague forecasts of future success," which were "too remote from Stolt's alleged illegal conduct to compel disclosure of this conduct." Id. Here, unlike the affirmative statements that were directly contrary to the undisclosed collusion in Menkes, the general statements in the proxies noting Messrs. Berman's and Friedman's historic contributions are "too remote from the alleged illegal conduct to support a securities fraud claim."[19]

## II.    DEFENDANTS WERE NOT REQUIRED TO DISCLOSE THAT WWE WAS CHALLENGING THE LICENSES EARLIER THAN THEY ALLEGEDLY DID

Plaintiffs concede – as they must – that Defendants were not required under the securities laws to disclose uncharged illegal conduct or speculate about possible litigation. Pl. Br. at 16. Despite this admission, relying on the conclusory allegation in the Complaint that Defendants were aware "by early 2004" that WWE was contesting the validity of certain WWE licenses (AC ¶ 53), Plaintiffs argue that Defendants' disclosure should have been made earlier than October 19, 2004. Pl. Br. at 18-19. As a matter of law, even if WWE had raised issues about the licenses before October 2004 (which has not been alleged), Jakks had no duty to speculate about the consequences of, much less disclose, this fact. See Def. Br. at 18-21.

Even if such a duty did exist – which it does not – the vague allegation that WWE was "contesting the validity of certain licenses" is inherently speculative and falls far short of stating a claim for relief. See Citigroup, 330 F. Supp. 2d at 377 (no duty to disclose litigation risks where litigation is not substantially certain). Moreover, Plaintiffs' refrain that allegations that Defendants "were aware" by early 2004 that WWE was challenging the validity of certain licenses fall far short of the particularity requirements of Rule 9(b)). Plaintiffs fail to allege any

---

[19]    Ballan v. Wilfred American Educational Corp., 720 F. Supp. 241 (E.D.N.Y. 1989), merely found a duty to disclose, where, unlike here, the challenged statements specifically referenced the undisclosed information in a misleading way. In Ballan, defendants disclosed indictments of seven former school admissions representatives on charges of aiding, abetting and counseling students to submit false applications for federal grants, but failed to disclose that the government investigation was expanding, that the grand jury had issued a subpoena, or that an admissions representative had been indicted for perjury. See id. at 245.

factual basis from which to infer Defendants' alleged knowledge that WWE was challenging the validity of their licenses by the beginning of 2004.[20]  See Rothman v. Gregor, 220 F.3d 81, 91 (2d Cir. 2000) (plaintiffs "'must supply some factual basis for the allegation that the defendants had reached this conclusion at some point during the time period alleged'") (citation omitted).

## III.    THE COMPLAINT FAILS ADEQUATELY TO ALLEGE SCIENTER

### A.    Plaintiffs Fail to Allege Sufficient Motive

Plaintiffs now try to dissuade the Court from scrutinizing the insufficiency of their allegations of motive and recklessness by urging the Court to assess the allegations of motive and recklessness in the aggregate – as if two insufficient theories of scienter could add up to an adequate one. Pl. Br. at 19. In the Second Circuit, however, where scienter can be established by alleging sufficient motive alone, a plaintiff may not "combine inadequate allegations of motive with inadequate allegations of recklessness . . . to demonstrate scienter." See Kalnit, 264 F.3d at 141. Nor may several insufficient allegations of motive be aggregated to create one specific and concrete motive. See In re Carter-Wallace, Inc. Sec. Litig., No. 94 CIV. 5704(KTD), 1999 WL 1029713, at *5 (S.D.N.Y. Nov. 10, 1999) ("Four cubic zirconias will never add up to one real diamond and neither will four generic motives add up to one or more specific motives."), aff'd, 220 F.3d 36 (2d Cir. 2000). Here, the several alleged motives fail to plead fraudulent intent because they are generic motives possessed by most corporate executives. See Def. Br. at 42-46.

### 1.    The Insider Stock Sales Were Not Suspicious or Unusual.

---

[20]    The Complaint does not contain a single factual allegation to suggest that WWE was "contesting" the validity of the videogame licenses by early 2004, or that WWE ever threatened to sue Jakks in connection with its ongoing litigation with third-parties. To the contrary, both Jakks' SEC filings and the record in the WWE Litigation establish that WWE entered into a covenant not to sue and general release of all claims involving the audit. See Lerner Decl. Ex B at 29; Ex. C. Indeed, WWE's own SEC filings give no hint of any impending challenge to Jakks' licenses before suit was filed. The utter lack of factual basis for Plaintiffs' conclusory allegation demolishes their claim that Jakks could have, or should have, disclosed its dispute with WWE any earlier than it did.

Straining to show that insider stock sales were unusual so as to constitute motive, Plaintiffs improperly aggregate the dollar value of all trading activity over a five year period, including trading by five executives who are not named as defendants.[21] Pl. Br. at 23. As Defendants previously established, merely alleging to the value of stock sales without the percentage of holdings represented by the sale is legally insufficient to establish motive. Def. Br. at 42-43. Plaintiffs' authorities do not refute this principle; rather, in each of those cases – unlike here – the sales activity was unusual both in terms of scope and in terms of timing.[22]

Plaintiffs fail to overcome Jakks' showing that the timing of the alleged stock sales, the last of which occurred more than two years before the disclosure of adverse facts, is the antithesis of suspicious and negates a strong inference of scienter.[23] Instead, Plaintiffs advance the novel theory that because Defendants could not predict if and when the alleged bribery would be uncovered, all insider stock sales during the entire five year class period should be considered

---

[21]   Furthermore, Plaintiffs' citation to "$37.5 million" of stock-sales is highly misleading because it spans an artificially elongated five year class period. Cf. In re Vantive Corp. Sec. Litig., 283 F.3d 1079, 1092 (9th Cir. 2002) ("It is obvious why [plaintiffs have selected an unusually long class period of sixty-three weeks]; it is not because the allegations found elsewhere in the complaint support an inference of fraud throughout the class period, but because lengthening the class period has allowed the plaintiffs to sweep as many stock sales into their totals as possible, thereby making the stock sales appear more suspicious than they would be with a shorter class period.").

[22]   See Nursing Home Pension Fund, Local 144 v. Oracle Corp., 380 F.3d 1226, 1232 (9th Cir. 2004) (defendant who had not sold any shares for five years, sold $900 million worth of stock one month prior to announcement of adverse information); Stevelman v. Alias Research Inc., 174 F.3d 79, 81-81, 85-86 (2d Cir. 1999) (allegation that sales represented 40% of defendant's total holdings and were suspicious in terms of timing); Rubinstein v. Collins, 20 F.3d 160, 164, 169-70 & n.39 (5th Cir. 1994) (defendants sold most of their newly acquired holdings nineteen days prior to disclosure of adverse information). Indeed, as the Second Circuit recognized in Stevelman, the failure to allege the percentage of holdings sold and retained, as Plaintiffs fail to do here, renders the pleading too indefinite to support adequate scienter based on unusual stock sales. See 174 F.3d at 85.

[23]   As explained in Defendants' opening brief, and undisputed by Plaintiffs, Messrs. Friedman's and Berman's last trades occurred on May 29, 2002, more than two years before the October 19, 2004 announcement. Likewise, the five non-defendant executives' last trades occurred between November 1, 2001 and May 29, 2002. Only one insider is alleged to have sold shares in 2004, more than two months before disclosure of the adverse information. AC ¶ 163. These facts further militate against a finding of fraudulent intent. See Acito, 47 F.3d at 54. See cases cited in Def. Br. at 42-45.

suspicious <u>regardless of their timing or amount</u>. Pl. Br. at 24.[24] Plaintiffs' theory directly

conflicts with controlling authority requiring particularized allegations explaining how specific

trades at a particular time by a specific defendant were unusual and suspicious. <u>See</u> <u>Acito v.</u>

<u>IMCERA Group, Inc.</u>, 47 F.3d 47, 54 (2d Cir. 1995) (sales of 384,000 shares, without more,

insufficient to establish inference of scienter); <u>see</u> <u>also</u> cases in Def. Br. at 42-44.

Plaintiffs' newly minted scienter theory also collides with their own allegations that

Defendants knew "[b]y early 2004, if not earlier" that WWE was challenging the validity of the

licenses and there was a risk that WWE would sue. (AC ¶ 53). Plaintiffs cannot have it both

ways. If, as Plaintiffs claim, the Individual Defendants <u>knew</u> by "early 2004" that WWE was

challenging the licenses, the failure of seven of the eight executives, including the CEO and the

CFO, to sell <u>any</u> shares during 2004, prior to disclosure, <u>negates</u> an inference of fraud. <u>See</u> <u>In re</u>

<u>Health Mgmt. Sys., Inc. Sec. Litig.</u>, No. 97 CIV. 1865(HB), 1998 WL 283286, at *6 (S.D.N.Y.

June 1, 1998) (no inference of scienter based on stock sales where chief financial officer sold no

shares and actually purchased shares during class period); <u>San Leandro</u>, 75 F.3d at 813-14

(where insiders retained shares, sales did not support inference of scienter).

### 2.    The Compensation of the Individual Defendants Is Insufficient to Establish Motive to Commit Fraud

Despite controlling Second Circuit authority unequivocally holding that performance-

based compensation is a generic motive possessed by most corporate insiders and is therefore

legally insufficient to establish motive, Plaintiffs stubbornly insist that the allegations of

executive compensation in the Complaint support a finding of motive. Pl. Br. at 25. In

---

[24]    Plaintiffs' reliance on <u>Crowell v. Ionics, Inc.</u>, 343 F. Supp. 2d 1 (D. Mass. 2004), is wholly misplaced. In <u>Crowell</u>, the court recognized that the "absence of insider trading <u>does</u> weaken a case for scienter," 343 F. Supp. 2d at 15 (emphasis added), but noted that plaintiffs alleged many alternative theories of scienter, <u>see id.</u> at 16, "and a recklessness argument by definition would not require a motive in any event." <u>Id.</u> at 15. In stark contrast, the Complaint in this action fails to allege any viable alternative theories of motive and fails to allege a strong inference of conscious misbehavior or recklessness. <u>See</u> Def. Br. at 47-49.

22

advancing this discredited position, Plaintiffs also distort the allegations of their own Complaint, arguing that they have alleged that Messrs. Friedman's and Berman's compensation was "due largely to their direct involvement in the acquisition of WWE licensing and the important relationship between the Individual Defendants and WWE." Pl. Br. at 25 (citing AC ¶¶ 68, 83, 106, 144). In actuality, the allegations cited by Plaintiffs do not substantiate this assertion; they merely disclose that Messrs. Friedman and Berman contributed to the overall financial performance of the Company. See AC ¶¶ 68, 83, 106. That a defendant's compensation and bonuses are tied to the company's overall financial performance − as here − is precisely the type of generic circumstance that has been consistently rejected as legally insufficient to establish motive. See Def. Br. at 46.[25]

### 3.    The Secondary Offerings Are Not A Sufficient Motive

A desire to maximize capital is insufficient to give rise to a strong inference of scienter. Def. Br. at 45. Without addressing this point, and ignoring controlling authority cited by Defendants, Plaintiffs argue that the desire to raise capital in connection with the Company's December 1999 and May 2002 secondary offerings establishes motive to defraud. Pl. Br. at 26-27. Plaintiffs' assertions are legally and factually flawed.

---

[25]    The cases cited by Plaintiffs are inapposite. In both Florida State Board of Administration v. Green Tree Financial Corp., 270 F.3d 645 (8th Cir. 2001) and In re Wellcare Management Group, Inc. Sec. Litig., 964 F. Supp. 632 (N.D.N.Y. 1997), the defendants' compensation was directly tied to company earnings, which, unlike here, were allegedly misrepresented by the defendants. See Green Tree, 270 F.3d at 661-62; Wellcare Mgmt., 964 F. Supp. at 639. Further, the allegations tying defendants' compensation to the company's earnings in those cases were far more specific than the vague allegations in the Complaint. See, e.g., Green Tree, 270 F.3d at 661(finding relevant fact that "the amount of [defendant's] compensation was based on a percentage of [the company's] pre-tax earnings, and [defendant's] contract was set to expire at the end of 1996, making it urgent for [defendant] to maximize [the company's] earnings for that year"); Wellcare Mgmt., 964 F. Supp. at 638; see also No. 84 Employer-Teamster Joint Council Pension Trust Fund v. America West Holding Corp., 320 F.3d 920, 944 (9th Cir. 2003) (finding relevant to scienter analysis allegation that no options were awarded to executive officers year before class period, but that during class period when they made misstatements, they received significant option awards). Further, in both America West and Green Tree, the motive allegations were considered relevant, but not dispositive, of scienter. See America West, 320 F.3d at 944-45; Green Tree, 270 F.3d at 664-65. In the Second Circuit, where scienter can be established by alleging sufficient motive alone, plaintiff may not combine inadequate motive allegations with the alternative scienter element of conscious misbehavior and recklessness. See Kalnit, 262 F.3d at 141.

As shown in Defendants' opening brief, it is well established that an alleged desire to maximize capital is a generalized assertion that has been routinely rejected as a legally insufficient motive. See San Leandro, 75 F.3d at 813-14 (allegation that company delayed disclosure of adverse information to maximize the marketability of an offering was insufficient to establish necessary motive); In re Corning Sec. Litig., No. 01-CV-6580-CJS, 2004 WL 1056063, at *27 (W.D.N.Y. Apr. 9, 2004) (an "attempt to boost stock proceeds to maximize proceeds of [an] offering falls into the category of a generalized motive to maximize profitability, and is, therefore, insufficient to meet the requirements of the PSLRA to raise a strong inference of scienter"), aff'd, No. 04-2845-CV, 2005 WL 714352 (2d Cir. Mar. 30, 2005). None of the cases cited by Plaintiffs holds otherwise. In those cases, unlike here, plaintiffs alleged that defendants derived a specific and concrete benefit from the fraud.[26]

Further, Plaintiffs' argument that the December 1999 offering served as a motive for the purported false statements is belied by Plaintiffs' own Complaint, which alleges that the vast majority of alleged misstatements took place after the December 1999 offering was completed, and that half of the alleged misstatements took place after the April 2002 offering was completed. See AC ¶¶ 61-144. These offerings, therefore, could not have logically motivated defendants to

---

[26]    See, e.g., Time Warner, 9 F.3d at 270 (a pre-PSLRA case finding sufficient defendants' motive to inflate stock price to lessen the dilutive effect of outstanding shares in a rights offering); In re Complete Mgmt., Inc. Sec. Litig., 153 F. Supp. 2d 314, 328 (S.D.N.Y. 2001) (motive to raise capital for acquisitions specifically to leverage uncollectible receivables found to be sufficient); In re Twinlab Corp. Sec. Litig., 103 F. Supp. 2d 193, 206 (E.D.N.Y. 2000) (finding that motive to provide capital to retire an existing debt, to complete previously arranged corporate acquisition, and to make additional acquisition was sufficiently concrete); see also In re Initial Public Offering Sec. Litig., 241 F. Supp. 2d 281, 369-70 (S.D.N.Y. 2003) (motive to implement scheme, including tie-in arrangements to complete add-on offerings in the immediate aftermarket of IPOs at an inflated stock price, was sufficiently concrete); Duncan v. Pencer, No. 94 Civ. 0321(LAP), 1996 WL 19043, at *14 (S.D.N.Y. Jan. 18, 1996) (motive to raise capital to fund specific planned expansion by company was sufficiently concrete). But see In re MicroStrategy, Inc. Sec. Litig., 115 F. Supp. 2d 620, 647-48 (E.D. Va. 2000) (desire to meet expectations and obtain more capital through stock offerings is not sufficient; these are motives possessed by every corporate officer; sufficient motive must take a more concrete form). Other cases cited by Plaintiffs are also wholly inapposite. See, e.g., Howard v. Everex Sys., Inc., 228 F.3d 1057, 1063-64 (9th Cir. 2000) (desire to avoid violation of loan covenants, coupled with allegations showing recklessness, sufficient to state scienter).

make <u>subsequent</u> misrepresentations. See <u>In re Duane Reade, Inc. Sec. Litig.</u>, No. 02 Civ.
6478(NRB), 2003 WL 22801416, at *9 (S.D.N.Y. Nov. 25, 2003) (no motive where vast
majority of acquisitions, the alleged motive, took place before alleged misdeeds), <u>aff'd sub nom.</u>
<u>Nadoff v. Duane Reade, Inc.</u>, 107 F. App'x 250 (2d Cir. 2004).[27]  The Court is not required to
adopt illogical inferences of motive. See <u>Kalnit</u>, 264 F.3d at 140-41 (where "'plaintiff's view of
the facts defies economic reason, . . . [it] does not yield a reasonable inference of fraudulent
intent.'") (citation omitted).

### B.    Plaintiffs Fail to Allege Conscious Misbehavior or Recklessness

#### 1.    Plaintiffs Do Not Plead that Defendants Possessed or Had Access to Information Contradicting Their Public Statements

In the alternative, Plaintiffs contend that the Complaint alleges strong circumstantial
evidence of recklessness or conscious misbehavior. Pl. Br. at 20-22.  However, Plaintiffs
acknowledge, as they must, that securities fraud claims based on recklessness "typically" have
"specifically alleged defendants' knowledge of facts or access to information <u>contradicting their</u>
<u>public statements</u>." Pl. Br. at 20, 21 (quoting <u>Novak v. Kasaks,</u> 216 F.3d 300, 308 (2d Cir.
2000)). As shown in Defendants' opening brief, Plaintiffs have not pled a single fact
demonstrating Defendants' knowledge of, or access to, information <u>contradicting</u> any of their
public statements. Def. Br. at 47-52. On this ground alone, Plaintiffs fall woefully short of
meeting the conscious misbehavior or recklessness standard articulated in <u>Novak</u>.[28]

---

[27]    Furthermore, the purported "direct statements about the WWE licenses" in the proxy statements about which
Plaintiffs now specifically complain (Pl. Br. at 12) were first made on May 22, 2000, almost two years before the
April 2002 offering.  Plaintiffs' assertion that the Defendants published false statements to inflate the stock price in
contemplation of an offering that might occur almost two years later is, quite simply, preposterous. See <u>In re</u>
<u>JPMorgan Chase Sec. Litig.</u>, 363 F. Supp. 2d 595, 620 (S.D.N.Y. 2005) ("The unstated presumption that [defendant]
began defrauding its own shareholders in contemplation of entering into merger talks is too nebulous to raise a
strong inference of scienter.").

[28]    The cases on which Plaintiffs rely are inapposite. See <u>Cosmas v. Hassett</u>, 886 F.2d 8 12-13 (2d Cir. 1989)
(plaintiffs alleged that defendants issued positive reports of projected sales to China while on notice of new import
restrictions that made these assertions <u>impossible</u>); <u>In re Xerox Corp. Securities Litigation</u>, 165 F. Supp. 2d 208, 219,

### 2.    Plaintiffs Fail to Plead Facts to Suggest that Defendants Knew They Had a Duty to Disclose the Alleged 1998 Transactions

Plaintiffs also erroneously argue that recklessness can be inferred because Defendants "had firsthand knowledge of the facts they were obligated to disclose." Pl. Br. at 22. Plaintiffs ignore that scienter is an intent to deceive, manipulate or defraud and that knowledge of an omitted fact alone is not by itself enough to support a strong inference of fraudulent intent: "Absent some allegation that defendants knew or were highly unreasonable in not knowing that they were doing something illicit, the complaint fails to adequately plead scienter." Canandaigua, 944 F. Supp. at 1213-14 (citation omitted) (quoting Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124, 1128 (2d Cir. 1994)).

Johnson v. NYFIX, Inc., No. Civ.A. 3:04-CV-0802, 2005 WL 2931823 (D. Conn. Oct. 27, 2005), further illustrates the need to plead contemporaneous knowledge that public statements are false to show recklessness. Johnson involved the restatement of the company's financial results due to improper accounting for a subsidiary, so the existence of a material misstatement was undisputed. See id. at *2-3. Like here, Plaintiffs attempted to satisfy the recklessness prong of scienter by alleging that defendants (including the company's CFO) knew of the underlying transactions that rendered the financial statements false and misleading. See id. at *8. Finding that plaintiffs did not allege conscious misbehavior or recklessness, the court reasoned that although defendants were alleged to have knowledge of the underlying transactions, plaintiffs failed to plead specific facts demonstrating that they were aware of the false and misleading nature of the company's public statements regarding the subsidiary's financial results. See id. at *8-10.

---

222-23 (D. Conn. 2001) (complaint pled facts that directly contradicted the statements made by the defendants that their reorganization was successful).

> Where, as here, plaintiffs allege that defendant corporate officers or directors are liable for a company's misleading financial statements, plaintiffs "must supply some factual basis for the allegation that the defendants had reached this conclusion [that the statements were misleading] at some point during the time period alleged."

Id. at *7 (alteration in original) (quoting Rothman, 220 F.3d at 91). Indeed, it is well settled in this Circuit that "defendants' knowledge [of information that was not disclosed] cannot be transmuted into an intentional effort to defraud investors for § 10(b) purposes. 'To prove scienter, more than a conscious failure to disclose must be shown. Rather, there must be proof that the non-disclosure was intended to mislead.'" Zuckerman v. Harnischfeger Corp., 591 F. Supp. 112, 117 (S.D.N.Y. 1984) (quoting Reiss v. Pan American World Airways, Inc., 711 F.2d 11, 14 (2d Cir. 1983)). Plaintiffs wholly fail to allege such intent. Where, as here, the existence of duty to disclose is especially doubtful, the Second Circuit has unequivocally held that "defendants' recklessness cannot be inferred from the [alleged] failure to disclose." Kalnit, 263 F.3d at 143; accord Canandaigua, 944 F. Supp. at 1213-14 (plaintiffs failed to establish scienter because there were no facts alleged to suggest that defendants knew they had a duty to disclose marketing strategy they were accused of not disclosing).

Here, the Complaint fails to allege any facts suggesting that at the time of the contested proxy statements – or any other statement in the Complaint – Defendants knew or should have known that they had a duty to disclose untested civil charges of illegal conduct that later surfaced in the WWE Action, for which no disclosure duty exists and about which Defendants are not alleged to have made any contradictory public statements. Accordingly, Plaintiffs have made no showing, let alone the requisite strong inference, that Defendants' failure to disclose the 1998 Transactions constitutes conscious misbehavior or recklessness.

## IV.    PLAINTIFFS' UNPRECEDENTED THEORY OF LIABILITY DIRECTLY CONTRAVENES THE PSLRA

In their opening brief, Defendants established that separate and apart from the pleading deficiencies, dismissal is warranted because Plaintiffs have simply adopted wholesale the untested allegations in the WWE Complaint without conducting any independent inquiry into the validity of those allegations as mandated by Rule 11(b) and the PSLRA.  Def. Br. at 52-53.[29]

In response, Plaintiffs do not dispute that they have no independent basis for their allegations and rely entirely on the pleading drafted by the attorneys for WWE in the pending WWE Action.  Not surprisingly, Plaintiffs are unable to cite a single authority that approves the practice of adopting wholesale the unverified, unadjudicated hearsay pleadings from a pending civil case as the sole basis for filing a complaint alleging violation of the securities laws.  The sole authority upon which they rely, In re Enron Corp. Securities Derivative & ERISA Litigation, 235 F. Supp. 2d 549 (S.D. Tex. 2002) (Pl. Br. at 28 n. 20), does not sanction this conduct. Rather, there, in addition to their detailed independent investigation, plaintiffs simply referred to adjudicated findings of Arthur Andersen's liability in other cases, such as the consent decree imposed in Waste Management, to show its long track record of failed audits, conflicts of interest and document destruction.  See Enron, 235 F. Supp. 2d at 674-76 & n. 108-13, 706-07.

Accordingly, to permit a securities fraud action to proceed solely upon the untested hearsay allegations contained in a civil lawsuit and classic fraud by hindsight allegations at issue here would not only be unprecedented, but would ride roughshod over the legion of post-PSLRA jurisprudence mandating that plaintiffs allege with particularity a concrete factual basis for their

---

[29]    Indeed, Plaintiffs' failure to discharge their duty under Rule 11(b) to conduct a reasonable inquiry into the facts underlying their lawsuit is further evidenced by their admission that they "had no notice of and were unaware of the existence of the Release when preparing the Complaint."  Pl. Mem. In Support of Motion to Strike at 4.  Had they paid close attention to Jakks' public disclosures, or the full court files upon which they blindly rely for "facts," they would have noticed that Jakks expressly referenced the release and its impact on the WWE litigation in its 2004 SEC Form 10-K/A.  See Lerner Decl. Ex. B. at 29, 39.

fraud allegations.  Sanctioning such complaints will open the floodgates to vexatious "place-saver" securities fraud actions whenever a significant civil action is filed against an issuer, and promote the very type of frivolous strike suits the PLSRA was enacted to prevent.

### CONCLUSION

Accordingly, for the foregoing reasons, the Consolidated Amended Complaint should be dismissed with prejudice.

Respectfully submitted,

FEDER, KASZOVITZ, ISAACSON,
  WEBER, SKALA, BASS & RHINE LLP
Murray L. Skala (MS 9354)
Jonathan D. Honig (JH 7577)
750 Lexington Avenue
New York, New York 10022
Phone:  (212) 888-8200
Fax:  (212) 888-5968

SKADDEN, ARPS, SLATE,
MEAGHER & FLOM LLP

By:    /s/ Michael H. Gruenglas
       Jonathan J. Lerner (JL 7117)
       Michael H. Gruenglas (MG 8705)
       Maura B. Grinalds (MG 2836)
       Sharon Garb (SG 7928)
       Four Times Square
       New York, New York  10036
       (212) 735-3000

Attorneys for Defendants