UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - x

IN RE JAKKS PACIFIC, INC.               Civil Action No. 04-CV-8807
SHAREHOLDERS CLASS ACTION     :    (KMK)
LITIGATION                       (ECF CASE)

                                   :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## SUPPLEMENTAL DECLARATION OF JONATHAN J. LERNER

Pursuant to 28 U.S.C. § 1746, JONATHAN J. LERNER declares under penalty of perjury as follows:

     1.     I am a member of the Bar of this Court and a member of the firm of Skadden, Arps, Slate, Meagher & Flom, LLP, attorneys for defendants Jakks Pacific, Inc., Jack Friedman, Steven G. Berman and Joel M. Bennett (collectively, the "Defendants") in this action.

     2.     I respectfully submit this Supplemental Declaration to place before the Court true and correct copies of the following documents referred to in Defendants' Reply Memorandum of Law in Further Support of Their Motion to Dismiss the Consolidated Amended Complaint:

     Exhibit A:     Defendants' Memorandum of Law in Support of Their Motion to Dismiss the Consolidated Amended Class Complaint in Menkes v. Stolt-Nielsen S.A., No. 3:03CV409 (D. Conn. Nov. 10, 2005).

     Exhibit B:     Plea Agreement entered into between James K. Bell and the United States Attorney's office in United States v. James K. Bell, No. 3:05-cr-00029-SRU (D. Conn. Feb. 10, 2005)

Dated:  New York, New York
       December 22, 2005

                                  Jonathan J. Lerner

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

FILED

2003 OCT 27 P 1: 09

US DISTRICT COURT
HARTFORD CT

Joel Menkes, *et al.*,

   *Plaintiffs,*

   *v.*

Stolt-Nielsen S.A., *et al.*,

   *Defendants.*

Civ. Action No. 3:03 CV 409 (DJS)

October 27, 2003

## DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO DISMISS THE CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

The Complaint in this action rests upon the flawed assumption that the federal securities laws impose upon publicly held companies a duty to disclose violations of federal antitrust laws and other regulations even before any violation has ever been alleged. In fact, no such duty exists. The absence of such duty precludes each of the Plaintiffs' claims for securities fraud. Indeed, were such duty to exist, it would automatically expose every publicly held corporation to securities fraud actions any time any law or regulation were violated by that corporation.

Moreover, the Complaint must be dismissed for the independent reason that it fails to satisfy the heightened pleading requirements of the Private Securities Litigation Reform Act of 1995 ("PSLRA"). The PSLRA greatly tightened the pleading standards both for scienter and fraud. The Complaint falls well short of satisfying these heightened pleading standards. For these reasons, the Complaint must be dismissed in its entirety.

## I.   DEFENDANTS HAD NO DUTY TO DISCLOSE ALLEGEDLY UNLAWFUL CONDUCT

Every one of the Plaintiffs' claims rests on their contention that the securities laws bound the Defendants to disclose potential liability for uncharged crimes, even before governmental

authorities initiated any investigations or enforcement proceedings. *See, e.g.*, Compl. ¶¶ 3, 31-42, 44-46 (antitrust); *id.* at ¶ 5 (embargo violations). It is well established, however, that "[s]ilence, absent a duty to disclose, is not misleading under Rule 10b-5." *Basic, Inc. v. Levinson*, 485 U.S. 224, 239 n.17 (1988). As the Second Circuit made clear in *Data Probe Acquisition Corp. v. Datatab, Inc.*, 722 F.2d 1, 5-6 (2d Cir. 1983), the securities laws are "not a rite of confession."

Because "[s]ilence, absent a duty to disclose" is not actionable under Rule 10b-5, courts have relied on the expertise of the Securities and Exchange Commission ("SEC") to determine the scope of a company's disclosure obligations. Thus, in *United States v. Matthews*, 787 F.2d 38 (2d Cir. 1986), the Second Circuit looked to SEC regulations and reversed the criminal conviction of a defendant charged with violating the securities laws for failing to disclose that he was a bribery co-conspirator. Deferring to the SEC, the Second Circuit explained: "We take cognizance of [the SEC's] 'expert view' as disclosed in the Commission's Rules, knowing that it was arrived at in general compliance with the provisions of the Administrative Procedure Act, 5 U.S.C. § 551 *et seq.*, and only after every feasible effort has been made to secure the views of the persons affected." 787 F.2d at 47. Although a criminal case, the court relied on the SEC's rules and found — "in the field of federal securities law" — no duty to confess to uncharged criminal wrongdoing:

> The issue with the most far-reaching implications in the field of federal securities law, however, is not what "true" facts Matthews should have disclosed, but whether section 14a of the Exchange Act and the SEC rules enacted pursuant thereto required Matthews to state to all the world that he was guilty of the uncharged crime of conspiracy. This query, we are satisfied, must be answered in the negative.

*Id.* at 46-47.

In *Bolger v. First State Financial Services*, 759 F. Supp. 182 (D.N.J. 1991), the plaintiff tried to enjoin the defendant company from holding its annual meeting until the company amended proxy statements to disclose that a majority block of the shareholders, led by the plaintiff, had been threatening to sue the corporation for alleged breaches of the defendant company's fiduciary duty, and for mismanagement. The court, however, held that the defendant company had no duty under the securities laws to disclose unadjudicated allegations of wrongdoing. Looking to SEC regulations, the court declared that "companies have no duty to disclose legal theories as to how a given transaction violated the law." *Id.* at 194. The court continued: "[E]ven after allegations have become the subject of a lawsuit, *Regulation S-K requires disclosure only of non-routine pending litigation*." *Id.* (citing 17 C.F.R. § 229.103; *GAF Corp. v. Heyman*, 724 F.2d 727 (2d Cir. 1983)) (emphasis added).

Similarly, in *Amalgamated Clothing and Textile Workers Union, AFL-CIO v. J.P. Stevens and Company, Inc.*, 475 F. Supp. 328, 331 (S.D.N.Y 1979), *vacated as moot*, 638 F.2d 7 (2d Cir. 1980), the court dismissed the complaint, finding that the plaintiffs had not properly alleged a violation of Section 10(b) or Rule 10b-5. Guided by the SEC's disclosure requirements under Regulation S-K, the court held:

> [Regulation S-K] does not require disclosure of illegal intentions or *even of crimes committed which have not been the subject of legal proceedings*. This is not because shareholders would not be interested in such information; rather it is a realistic recognition . . . In my view a requirement that illegal intentions be disclosed would make a silly, unworkable rule. It would not promote increased disclosure, but would serve only to support vexatious litigation and abusive discovery.

*Id.* at 332 (emphasis added); *see also In re Teledyne Def. Contracting Derivative Litig.*, 849 F. Supp. 1369 (C.D. Cal. 1993) (citing *Amalgamated Clothing*, and other cases, and holding that SEC Section 14(b)'s disclosure obligation "requires disclosure of material facts, and the

Defendants' culpability — under the case law and the SEC regulations — does not become a fact that must be disclosed until it is at least charged . . . or proven . . . .").

As in *Bolger* and *Amalgamated Clothing*, Regulation S-K is the relevant SEC regulation to determine the Defendants' disclosure obligations. That regulation only requires companies to periodically disclose "material ***pending*** legal proceedings," as well as "***proceedings known*** to be contemplated by government authorities." Regulation S-K, Item 103, 17 C.F.R. § 229.103 (emphasis added).    With respect to directors and high-level corporate management, the regulation only requires the disclosure of pending legal proceedings, but not uncharged violations. Regulation S-K, Item 401(f)(2), 17 C.F.R. § 229.401(f)(2). And as in *Amalgamated Clothing*, Regulation S-K imposed no duty on Stolt-Nielsen S.A. ("SNSA") or Stolt-Nielsen Transportation Group, Ltd. ("SNTG") to disclose alleged wrongdoing before legal proceedings either were pending, or were known to be contemplated by the Government; and no duty on the individual Defendants to disclose alleged wrongdoing until legal proceedings were pending. In this case, the Complaint does not allege — nor could it — that SNSA failed to promptly disclose the initiation of governmental investigations, consistent with Regulation S-K.

Other cases also make clear that Section 10(b) and Rule 10b-5 do not independently impose a duty to self-report legal wrongdoing. One post-PSLRA case — dealing with antitrust claims — is particularly instructive. In *In re Miller Industries, Inc. Securities Litigation*, 12 F. Supp. 2d 1323 (N.D. Ga. 1998), the corporate defendant became the target of an antitrust investigation by the U.S. Department of Justice. *Id.* at 1331. Investor plaintiffs sued the corporate defendant and its directors, alleging among other things, that the defendants omitted to disclose in their pre-antitrust-investigation SEC filings that their activities could expose the company to antitrust liability. The court, however, quickly dismissed those portions of the

complaint stating: "'Silence, absent a duty to disclose, is not misleading under Rule 10b-5.' Materiality alone is not sufficient to place a company under a duty of disclosure. The Federal securities laws do not impose a duty upon parties to admit publicly they may be violating the law." *Id.* at 1331 (internal citations omitted). Consequently, the court ruled: "[T]he Plaintiffs' Rule 10b-5 claim . . . referring to the omission of potential antitrust culpability should be dismissed because *the Defendants were under no duty to disclose potential but conjectural antitrust liability*." *Id.* (emphasis added).

*Roeder v. Alpha Industries, Inc.*, 814 F.2d 22 (1st Cir. 1987) — a pre-PSLRA case — is also instructive. There, the plaintiffs alleged that executives of the defendant company illegally bribed a defense contractor. *Id.* at 23-24. The plaintiffs also alleged that the defendant company knew about the bribe, as well as a federal investigation, months before they publicly disclosed the alleged wrongdoing. *Id.* at 24. Like the Plaintiffs in this case, the plaintiff in *Roeder* filed a class action complaint under a "fraud on the market" theory, alleging that the defendant company's failure to disclose its wrongdoing when it occurred artificially inflated the defendant company's stock value. *Id.* The First Circuit, however, found that the corporate defendant had no duty under the securities laws to disclose its illegal conduct. The court held: "What is important for our purposes is that the fraud on the market theory does not dispense with the requirement that there must be a duty to disclose before there can be liability." *Id.* at 27. The plaintiff's complaint was dismissed as it did "not allege facts that, if proved would establish [defendant] had a duty to disclose the alleged illegal payments." *Id.* at 28.

Both *Miller Industries* and *Roeder* are applicable here. As in *Miller Industries*, the Plaintiffs are alleging — without support — that the Defendants had a duty to report allegedly illegal antitrust and other conduct *before* the authorities commenced an investigation of SNSA or



SNTG.  But as *Miller Industries* makes clear, "the Defendants were under no duty to disclose **potential** but **conjectural** antitrust liability."  12 F. Supp. 2d at 1331.  And like the plaintiffs in *Roeder*, the Plaintiffs here do "not allege facts that, if proved would establish [Defendants] had a duty to disclose the allegedly illegal [conduct.]"  814 F.2d at 28.

As this Court knows, SNSA entered the Antitrust Amnesty Program of the U.S. Department of Justice ("DOJ") earlier this year by reporting certain conduct in SNTG's parcel tanker operations.  SNSA's entry into the program resulted in extensive media reporting in February 2003. The Plaintiffs' novel theory would revolutionize the duties of corporations under the federal securities laws and other laws and regulations.  Today, there is no duty under federal antitrust laws, or under most federal regulatory statutes, to self-report violations.  "A corporation and its directors generally have no affirmative duty to report or disclose evidence of criminal conduct or the results of internal investigations to law enforcement authorities." Dan K. Webb *et al.*, *Corporate Internal Investigations*, § 3.02[3][a] (2003); *see also Internal Corporate Investigations* 281 (Brad D. Brian & Barry F. McNeil, eds., 2d ed. 2003) ("The general rule is that a company is not required to report knowledge of criminal conduct to authorities or to disclose evidence of that conduct voluntarily") (citations omitted); Stuart J. Baskin, *Corporate Governance, Compliance and Accountability: Performing the Investigation, Caremark and Year 2000 Issues*, 1070 PLI/Corp 261, 269, Sept.-Oct. 1998 ("Absent a mandatory disclosure obligation, neither corporations or individuals have a general affirmative duty to acknowledge improprieties or wrongdoing").

Precisely because there is no duty to self-report an antitrust crime, DOJ created a voluntary amnesty program for reports of antitrust violations.  *See* James M. Griffin, Deputy Assistant Attorney General, Antitrust Division, United States Department of Justice, Speech: *An*



*Inside Look At A Cartel: Common Characteristics Of International Cartels* (Apr. 5, 2000) ("In August 1993, the Antitrust Division expanded its Amnesty Program to increase the opportunities and raise the incentives for companies to self-report and cooperate with the Division;" "No other U.S. governmental voluntary disclosure program offers as great an opportunity or incentive for companies to self-report and cooperate"). Not all corporations avail themselves of this program. There can be instances where the potential violations are sufficiently borderline, the facts murky, or when other sound business judgment leads management to conclude that it is prudent to let the statute of limitations run, rather than to expose the corporation to certain treble damage private actions (and failing the granting of this motion, a separate violation of federal securities laws). In fact, permitting this case to move forward would create a further disincentive to report potential antitrust violations to the Antitrust Division.

The breathtaking scope of new liability that the Plaintiffs seek to create here is not limited to violations of federal antitrust laws, but extends to all violations of federal statutes and regulations of various embargo statutes and regulations. *See* Compl. ¶¶ 5, 43, 47-60 (describing alleged trading with nations subject to various embargo statutes and regulations). In short, were this Complaint to be sustained, any violation of federal statutes or regulations by a corporation would create not only the express liability for that statute or regulation envisioned by Congress, but also a new, corresponding, overarching securities law liability.

The Plaintiffs seek to create a new duty that any significant violation of any federal law gives rise automatically to a duty by the corporation to speak. This novel securities law liability would transform a company's financial statements into a warranty that no federal statute has been violated during the reporting period. Such a breathtaking extension of the Exchange Act certainly requires Congressional debate and enactment.

Case 1:04-cv-08807-RJS    Document 77    Filed 12/22/2005    Page 10 of 33

Because the Plaintiffs have failed to allege an SEC rule affirmatively requiring the Defendants to disclose their alleged legal wrongdoing before governmental investigations were initiated, and because Section 10(b) and Rule 10b-5 do not independently require such disclosures, the Complaint must be dismissed.

## II.    THE COMPLAINT MUST BE DISMISSED BECAUSE IT FAILS TO ALLEGE A VIOLATION OF THE EXCHANGE ACT

Even if the Defendants had a legal duty to disclose to shareholder antitrust violations and other conduct, the Complaint still would have to be dismissed for failing to properly allege the "strong inference" of fraudulent intent, or "scienter" required by the PSLRA's heightened pleading standards. *See* 15 U.S.C. § 78u-4(b)(2). A plaintiff can establish such "strong inference" either: "(a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Shields v. Citytrust Bancorp., Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994) (the PSLRA later essentially codified this Second Circuit standard). As in the pleading context generally, securities-fraud "[p]laintiffs do not, however, enjoy a license to base claims of fraud on speculation and conclusory allegations." *San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos.*, 75 F.3d 801, 813-14 (2d Cir. 1996) (quotation omitted).

Contrary to *San Leandro*'s admonition, however, the Complaint offers nothing but conclusory allegations regarding scienter. Indeed, Paragraphs 87-90 of the Complaint merely mimic the PSLRA's language and generically lump all the Defendants together. Although these conclusory allegations are contained in a section of the Complaint entitled "***Additional*** Scienter Allegations," the Complaint's other averments put no flesh on these bare-boned scienter

allegations. In short, the Complaint merely restates the legal standard for scienter, but alleges no facts supporting scienter beyond formulaic recitations.

### A.    The Complaint Does Not Properly Allege Scienter As To Stolt-Nielsen S.A. Or Its Officers

The Plaintiffs allege that SNSA and its officials had the requisite scienter, but only for acts and schemes allegedly planned and conducted by officers of SNSA's subsidiary, SNTG. The Complaint, however, alleges no fact to establish that SNSA, or any SNSA officer (Defendants Jacob Stolt-Nielsen and Niels G. Stolt-Nielsen), either knew or became aware of the allegedly illegal conduct at SNTG, while such conduct was occurring. While the series of *Wall Street Journal* articles referenced in the Complaint discuss "Stolt" liberally, the "Stolt" to which the articles refer is not SNSA, but SNTG. The Government affidavit quoted in the Complaint also relates to SNTG. Compl. ¶ 45. Moreover, of the two SNSA Defendants, only Defendant Niels G. Stolt-Nielsen is substantively mentioned in the Complaint — and then only to recite the allegedly fraudulent statements he made in SNSA press releases. But the Complaint alleges no fact tying him to the alleged wrongdoing at SNTG, establishing that he was aware of the alleged wrongdoing at SNTG when it was occurring, or establishing that he made the statements attributed to him knowing of SNTG's alleged misconduct. Even more astonishing, the Complaint never mentions Defendant Jacob Stolt-Nielsen, except in the caption, and to identify him as a defendant.[1]

The Second Circuit is clear that in circumstances such as these, the separate legal identities of related corporate defendants should be preserved. In *Chill v. General Electric Corp.*, 101 F.3d 263 (2d Cir. 1996), the Second Circuit affirmed the dismissal of a complaint, and declined to impute scienter to a corporate parent notwithstanding extensive allegations

---

[1] As noted below, the allegations regarding SNTG officers Cooperman and Lee are also fatally deficient.

regarding the relationship between the parent and its subsidiary, which had engaged in fraudulent conduct. *See id.* at 268. In *Chill*, the plaintiff had alleged several "specific" facts regarding the parent's culpability, including memoranda between the parent and its subsidiary detailing "unprecedented and dramatically increasing profitability" at the subsidiary. *See id.* at 269. But these allegations were not sufficient as a matter of law.

The Complaint's allegations against SNSA blur the juridical distinction between SNSA and SNTG. The Complaint in this case is even weaker than the one in *Chill* because in *Chill*, unlike here, the plaintiff at least alleged "specific" facts and attempted to establish a direct factual link (inter-company memoranda) between the parent and its subsidiary. Here, the Plaintiffs allege no factual link beyond their insufficient allegation that the officers of SNSA must have known (by virtue of their positions) of SNTG's misconduct. As the Second Circuit has made clear, however, this is insufficient to sustain an action against a parent and its officers.

**B.    The Complaint Does Not Properly Allege Motive And Opportunity**

In addition, the Complaint must be dismissed as to all the Defendants because the Complaint offers no factual predicate establishing any Defendant's "motive and opportunity" to commit fraud. *See, e.g., Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1130 (2d Cir. 1994) ("motive would entail *concrete benefits*") (emphasis added). Second Circuit law is pellucidly clear that "generalized" motives shared by "every" company or executive do not suffice to plead motive. *See, e.g., San Leandro*, 75 F.3d at 813-14 (rejecting allegations of motive by way of a purported desire to maintain the company's credit rating); *In re Crystal Brands Sec. Litig.*, 862 F. Supp. 745, 749 (D. Conn. 1994) (rejecting generalized motive allegations).

Contrary to the admonitions of the Second Circuit and this Court, the Complaint's only mention of motive alleges that "defendants had the motivation to misrepresent and conceal the facts about [SNTG's] anti-trust and embargo violations to keep the Companies' earnings high

-10-

enough to not breach key debt covenants." Compl. ¶ 88. But *San Leandro* makes clear that such motive allegation is insufficient to establish scienter. Simply put, the Complaint abjectly fails to establish any Defendant's motive and opportunity to commit fraud.

### C.    The Complaint Does Not Properly Allege Circumstantial Evidence of Recklessness

To allege scienter through recklessness, a defendant's conduct must "approximate an actual intent to aid in the fraud being perpetrated." *Decker v. Massey-Ferguson, Ltd.*, 681 F.2d 111, 121 (2d Cir. 1982). This standard, and the PSLRA's admonition that plaintiffs plead with particularity facts giving rise to a "strong inference" of fraudulent intent, have sown numerous opinions regarding the factual showing of recklessness that a plaintiff must plead under the PSLRA. *See, e.g.*, *Kalnit v. Eichler*, 264 F.3d 131, 143-44 (2d Cir. 2001) (holding that plaintiff had not alleged facts demonstrating circumstantial evidence of conscious misbehavior or recklessness); *Stevelman v. Alias Research Inc.*, 174 F.3d 79, 85 (2d Cir. 1999) (holding that defendant was not reckless, and that plaintiff's arguments "appear to amount to allegations of fraud by hindsight"); *Chill*, 101 F.3d at 270-71 (holding that allegations against defendant parent company were insufficient to constitute recklessness); *San Leandro*, 75 F.3d at 813 (holding that "the Complaint obviously fails to allege facts constituting circumstantial evidence of reckless or conscious misbehavior on the part of defendants in making the statements").

In this case, the Plaintiffs state repeatedly that SNSA and SNTG officials were "reckless," but they allege no *facts* to support this conclusion — thereby failing to meet the *Shields* test. As noted above, the factual allegations against Jacob Stolt-Nielsen and Niels G. Stolt-Nielsen are so bare as to be meaningless.

The allegations against the other individual Defendants are also deficient. For example, while the Complaint asserts that Defendant Cooperman did nothing after learning that SNTG



employees might be engaged in antitrust violations, the Complaint acknowledges that "Cooperman held an antitrust-law seminar" for the alleged violators — hardly supportive of "actual intent to aid in the fraud being perpetrated." *Decker*, 681 F.2d at 121. And the ***only*** time Defendant Lee's name is mentioned in the Complaint — other than in the caption or to identify him as a defendant — is to allege that SNTG's U.S. operation's insulation from the Iran trade "ended when Stolt appointed Defendant Lee, a Briton, to run SNTG" — nothing more. Compl. ¶ 52. These conclusory allegations are not pleadings of ***fact***, and are simply insufficient to allege recklessness.

## III.   THE COMPLAINT MUST BE DISMISSED BECAUSE IT FAILS TO ALLEGE MATERIAL MISSTATEMENTS WITH SUFFICIENT PARTICULARITY

Even if the Complaint presented an actionable case under Section 10(b) and Rule 10b-5, the Complaint would still have to be dismissed for failure to satisfy heightened pleading standards for securities fraud claims. Rule 9(b) of the Federal Rules of Civil Procedure provides that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Fed. R. Civ. P. 9(b); *see also Leventhal v. Tow*, 48 F. Supp. 2d 104, 111-12 (D. Conn. 1999). In addition, the PSLRA also imposes a heightened pleading standard, requiring Plaintiffs who allege violation of Section 10(b) to "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading" and to the extent a claim is based on information and belief, "to state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). To adequately plead a securities law violation, plaintiffs have no "license to base claims of fraud on speculation and conclusory allegations." *Chill*, 101 F.3d at 267. Here, the Plaintiffs claim that the Defendants "issued materially false and misleading statements about the Companies' revenues, earnings and business practices," not through the affirmative misstatements of any Defendant, but because the Defendants failed to

confess that SNTG was engaging in legal wrongdoing. Compl. ¶ 3. The Plaintiffs, however, have failed to plead any violation of U.S. embargo laws, and "fail to specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading" because the alleged fraudulent statements relate to the wrong operational unit.

One of the Complaint's most fatal flaws goes to the core of Plaintiffs' claim — the allegedly fraudulent statements by SNSA and Niels G. Stolt-Nielsen. Most of the allegedly fraudulent statements identified in the Complaint relate to SNTG's tank container operations, rather than the parcel tanker operations. Indeed, the Complaint's reliance on statements unrelated to parcel tankers is so pervasive that the Complaint fails to state fraud with any particularity required either by Rule 9(b) or the PSLRA.

In the section of their Complaint relating to embargo violations, the Plaintiffs allege that in annual reports filed May 31, 2000 (Exh. 1), May 31, 2001 (Exh. 2), and May 31, 2002 (Exh. 3), SNSA represented:

> The Company's businesses are *subject to* international conventions and U.S. and other governmental regulations which *strictly regulate* various aspects of the Company's operations.

Compl. ¶ 61 (emphasis added). Citing to SNSA's 2000 Form 20-F/A (Exh. 4), the Plaintiffs make the same allegation in the section of the Complaint relating to antitrust violations. Compl. ¶ 67.[2] These statements were misleading, according to the Plaintiffs, because they somehow "led investors to believe" that SNTG was "in compliance" with those "international conventions" and "governmental regulations." Compl. ¶¶ 62, 67. These statements, however, plainly represent that SNSA and its subsidiaries are *subject to* different "international conventions" and

---

[2] The Plaintiffs incorrectly attribute the statement here to SNSA's 2000 Form 20-F/A. Compl. ¶ 67. The language they quote, however, is actually from SNSA's 2001 Form 20-F. The language from SNSA's 2000 Form 20-F/A is similar, but not identical, to the language quoted in the Complaint.

"governmental regulations." The statements, however, do not represent that SNSA or SNTG are fully "in compliance" with those "international conventions" and "governmental regulations" — the words "in compliance" do not appear in the financial filings. Indeed, it would be foolhardy for SNSA or SNTG — or any company — to render such warranty. The statements actually put investors on notice that SNSA and SNTG risk violating such "international conventions" and "governmental regulations" precisely because of their pervasiveness and because they *"strictly regulate."*

Notably, the Plaintiffs ignore SNSA's straightforward warnings explaining the perils that exposure to multiple laws and regulations may create. For example, in the 2000 Form 20-F/A that the Plaintiffs quote in paragraph 67 of the Complaint, SNSA pointedly warned investors that "Our failure to comply with environmental and other regulations may result in significant fines, penalties, or the loss of revenue." Moreover, each of SNSA's annual filings made clear that "[a]ctual and future results and trends could differ materially from those set forth in such statements due to various factors," including "changes in, or the failure or inability to comply with, government regulations." 1999 Form 20-F (Exh. 1) at 29; 2000 Form 20-F (Exh. 2) at 21; 2001 Form 20-F (Exh. 3) at iii. The Plaintiffs' contention — that SNSA and SNTG "led investors to believe that, in fact, SNTG was in compliance with governmental regulations when, in fact, STNG was violating" U.S. embargo regulations and antitrust laws (Compl. ¶¶ 62, 67) — is undermined by the very same filings the Plaintiffs claim warranted full compliance. SNSA was very clear about the risks, and nothing in its statements could have "led" investors to believe that SNSA and its subsidiaries were warranting full compliance with all laws and regulations.

The Complaint also alleges that the Defendants misled investors by claiming that "[s]hipments in the year 2000 increased from the downturn encountered in 1999. Increases were

primarily the result of improved demand in three main operating regions of Asia Pacific, Europe and the United States. Shipment levels in 2001 continue to reflect improved demand particularly from the United States and Asia." Compl. ¶ 63 (quoting statement from SNSA's 2000 Form 20-F/A); ¶ 65 (same). The Plaintiffs claim that this statement was "materially false and misleading" because the increases were caused by the Defendants' embargo and antitrust violations. Compl. ¶¶ 63, 65. This allegation is nonsensical. As explained above, the Plaintiffs' allegations of legal wrongdoing relate to SNTG's *parcel tanker operations*. This statement, however, relates to SNTG's *tank container operations*, as to which there are no allegations of wrongdoing. As reflected in the filing upon which the Plaintiffs rely, the quoted statement comes from the third paragraph of a section entitled: "Tank Container Operations." *See* 2000 Form 20-F/A at 7. (Exh. 4.) Alleging legal wrongdoing in one operational unit, and then asserting material misstatements in an unrelated operational unit does not explain "why the statement is misleading," (Rule 9(b)), and provides no "reason or reasons why the statement is misleading" (15 U.S.C. § 78 v-4(b)(1)).

The Complaint is replete with allegedly fraudulent statements relating to SNTG's *tank container* operations, rather than parcel tanker operations. Thus, the Plaintiffs claim that SNSA made another "material [sic] false and misleading statement" when it stated in its May 31, 2002 annual report: "Growth of 5% is *anticipated* in 2002 as a result of increased marketing and sales efforts in all regions." Compl. ¶¶ 64, 72 (quoting 2001 Form 20-F) (emphasis added). But the quote relates to growth in SNTG's tank container operations — not parcel tanker operations. In fact, the quote comes from the third paragraph of a section entitled "Tank Container Operations" contained in SNSA's 2001 Form 20-F. *See* 2001 Form 20-F at 16-17.[3]

---

[3] Even if the statement did relate to the correct operational unit, the statement — as well as those in paragraphs 68, 72 and 73 — is a non-actionable forward-looking statement. First, the statement is not

Many other alleged misstatements arise from the Plaintiffs' misreading of SNSA's filings and their misunderstanding of the industry. *See, e.g.*, Compl. ¶ 66 (quoting SNSA 2001 annual report: "competition in the **tank container** market is fragmented") (emphasis added). Statements attributed to Defendant Niels G. Stolt-Nielsen from SNSA press releases also relate to tank container operations, not parcel tanker operations. *See* Compl. ¶ 68 ( "SNTG's **tank container** operations income improved . . . .") (emphasis added); *id* at ¶ 74 ( "SNTG's **tank container** division's income from operations improved significantly . . . .") (emphasis added); *id.* at ¶ 76 ("SNTG's **tank container** division delivered another strong result . . . .") (emphasis added). Because nearly all the allegedly fraudulent statements relate to tank container operations, not parcel tanker operations, the Complaint fails to satisfy the heightened pleading standards of Rule 9(b) or the PSLRA.

## IV.    THE COMPLAINT FAILS TO PROPERLY ALLEGE CONTROLLING PERSON LIABILITY

Finally, the Complaint alleges that the "Individual Defendants" — Defendants Jacob Stolt-Nielsen, Niels G. Stolt-Nielsen, Cooperman and Lee— should face both primary liability for direct violations of Section 10(b) and Rule 10b-5, and secondary liability as "controlling persons" for violations of Section 20(a) of the Exchange Act. Compl. ¶¶ 13-17, 19, 94-106. But

---

actionable because it is "accompanied by meaningful cautionary statements." 15 U.S.C. § 78u-5(c)(1)(A)(i). In fact, in the 2001 Form 20-F referenced in paragraph 64 of the Complaint, those cautionary statements are found on the third page of the report, and clearly state that the report contains statements relating to SNSA's "expectations, beliefs, intentions or strategies regarding that future." 2001 Form 20-F at iii. Moreover, the cautionary language also makes clear that forward-looking statements "may be identified by the use of words like '**anticipate**,' . . . ." *Id.*; *see In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1091 (9th Cir. 2002) (noting that financial forecasts are "unquestionably forward-looking statements"). Second, the statement is not actionable because the Plaintiffs have not alleged — nor can they — that the statement was made by a corporate officer "with actual knowledge . . . that the statement was false or misleading." 15 U.S.C. § 78u-5(c)(1)(B). Here, the Plaintiffs have alleged no facts establishing that any Defendant had such "actual knowledge." *See, e.g., Fellman v. Electro Optical Sys. Corp.*, 2000 WL 489713, at *4 (S.D.N.Y. 2000) (concluding that "[a]lthough Plaintiffs allege in a general manner that [defendant] had actual knowledge of the falsity . . . they allege no specific facts from which such actual knowledge can be inferred").

because the Plaintiffs have failed to establish any liability under Section 10(b), and the Plaintiffs'

Section 20(a) claims derive from the Section 10(b) claims, the Complaint must be dismissed as

to the Section 20(a) claims as well. *See, e.g., Kalnit v. Eichler*, 85 F. Supp. 2d 232, 246

(S.D.N.Y. 1999), *aff'd* 264 F.3d 131 (2d Cir. 2001) (dismissing Section 20(a) claims because

complaint failed to adequately plead a primary violation under Section 10(b) or Rule 10b-5);

*Friedman v. Wheat First Sec. Inc.*, 64 F. Supp. 2d 338, 347 (S.D.N.Y. 1999) (same).

## CONCLUSION

For the foregoing reasons, the Court should grant the Defendants' Motion to Dismiss the

Consolidated Amended Class Action Complaint, and dismiss the Complaint in its entirety as to

all Defendants.

> DEFENDANTS STOLT-NIELSEN S.A.,
> STOLT-NIELSEN TRANSPORTATION
> GROUP LTD., JACOB STOLT-NIELSEN,
> NIELS G. STOLT-NIELSEN, SAMUEL
> COOPERMAN AND REGINALD J.R. LEE
>
> By: _____
> Donna Nelson Heller (ct06854)
> Patrick J. McHugh (ct14072)
> Finn Dixon & Herling LLP
> One Landmark Square
> Suite 1400
> Stamford, CT 06901-2689
> Tel:  (203) 325-5000
> Fax:  (203) 348-5777
> Email: dheller@fdh.com
> Email: pmchugh@fdh.com

*Of Counsel*
J. Mark Gidley
Christopher M. Curran
Jaime M. Crowe
Peter J. Carney
**WHITE & CASE LLP**
601 Thirteenth Street, N.W.
Washington, DC 20005
Tel: (202) 626-3600
Fax: (202) 639-9355

Exhibit B

RECYCLED



**U.S. Department of Justice**

United States Attorney
District of Connecticut

Brien McMahon Federal Building                     (203) 696-3000
915 Lafayette Boulevard, Room 309              Fax (203) 579-5575
Bridgeport, Connecticut 06604          www.usdoj.gov/usao/ct

February 10, 2005

John Williams, Esquire
51 Elm Street, Suite 409
New Haven, Connecticut 06510

Re: <u>United States v. James K. Bell</u>

3:05cr029 (SRU)

Dear Mr. Williams:

This letter confirms the plea agreement entered into between your client, James K. Bell (the "defendant"), and the United States Attorney's Office for the District of Connecticut (the "Government") concerning the referenced criminal matter.

<u>The Plea and Offense</u>

The defendant agrees to waive his right to be indicted and to plead guilty to a one-count information charging him with mail fraud, in violation of Title 18 U.S.C. § 1341. He understands that to be guilty of this offense the following essential elements of the offense must be satisfied:

1. There was a scheme and artifice to defraud World Wrestling Entertainment, Inc. (hereinafter WWE) (including a scheme to deprive WWE of the intangible right of honest services) by means of means of materially false and fraudulent pretenses, representations and promises.

2. Defendant, knowingly and willfully and with the intent to defraud, participated in the scheme.

3. Money and property were the objects of the scheme.

4. In the execution of the scheme, the defendant knowingly caused the use of the United States mails (or private or commercial interstate carrier), namely, the WWE's mailing of commission checks.

<u>The Penalties</u>

This offense carries a maximum penalty of 5 years imprisonment and a $250,000 fine. In addition, under 18 U.S.C. § 3583, the Court may impose a term of supervised release of not more than three years, to begin at the expiration of any term of imprisonment imposed. The defendant understands that should he violate any condition of the supervised release during its term, he may be required to serve

John Williams, Esquire
– Page 2 –

a further term of imprisonment of up to two years with no credit for the time already spent on supervised release.

The defendant also is subject to the alternative fine provision of 18 U.S.C. § 3571. Under this section, the maximum fine that may be imposed on the defendant is the greatest of the following amounts: (1) twice the gross gain to the defendant (namely $3,893,268) resulting from the offense; (2) twice the gross loss resulting from the offense; or (3) $250,000.

In addition, the defendant is obligated by 18 U.S.C. § 3013 to pay a special assessment of $100 on the count of conviction. The defendant agrees to pay the special assessment to the Clerk of the Court on the day the guilty plea is accepted.

Finally, unless otherwise ordered, should the Court impose a fine of more than $2,500 as part of the sentence, interest will be charged on the unpaid balance of a fine amount not paid within 15 days after the judgment date. 18 U.S.C. § 3612(f). Other penalties and fines may be assessed on the unpaid balance of a fine pursuant to 18 U.S.C. §§3572 (h), (i) and § 3612(g).

### Restitution

In addition to the other penalties provided by law, the Court must also order that the defendant make restitution under 18 U.S.C. §3663A. The scope and effect of the order of restitution are set forth in the attached Rider Concerning Restitution. Restitution is payable immediately unless ordered otherwise by the Court. The defendant acknowledges and agrees to make restitution to the WWE in the amount of $1,946,634.

### The Sentencing Guidelines

#### 1.    Applicability

The defendant understands that, although the application of the United States Sentencing Guidelines is not mandatory, they are advisory, and the Court is required to consider any applicable Sentencing Guidelines as well as other factors enumerated in 18 U.S.C. § 3553(a) to tailor an appropriate sentence in this case. See United States v. Booker, 543 U.S. ___ (2005). The defendant expressly understands that the Sentencing Guidelines determinations will be made by the Court, by a preponderance of evidence, based upon input from the defendant, the Government, and the United States Probation Officer who prepares the presentence investigation report. The defendant further understands that he has no right to withdraw his guilty plea if his sentence or the Guideline application is other than he anticipated.

#### 2.    Acceptance of Responsibility

At this time, the Government agrees to recommend that the Court reduce by three levels the defendant's Adjusted Offense Level under section §3E1.1 of the Sentencing Guidelines, based on the defendant's prompt recognition and affirmative acceptance of personal responsibility for the offense. This recommendation is conditioned upon the defendant's full, complete, and truthful disclosure to the

John Williams, Esquire
– Page 3 –

Probation Office of information requested, of the circumstances surrounding his commission of the offense, of his criminal history, and of his financial condition. In addition, this recommendation is conditioned upon the defendant timely providing complete information to the Government concerning his involvement in the offense to which he is pleading guilty. The defendant expressly understands that the Court is not obligated to accept the Government's recommendation on the reduction.

The Government will not make this recommendation if the defendant engages in any acts which (1) indicate that the defendant has not terminated or withdrawn from criminal conduct or associations (Sentencing Guideline section §3E1.1); (2) could provide a basis for an adjustment for obstructing or impeding the administration of justice (Sentencing Guideline §3C1.1); or (3) constitute a violation of any condition of release. Moreover, the Government will not make this recommendation if the defendant seeks to withdraw his plea of guilty. The defendant expressly understands that he may not withdraw his plea of guilty if, for the reasons explained above, the Government does not make this recommendation.

> iii    Stipulation

Pursuant to section 6B1.4 of the Sentencing Guidelines, the defendant and the Government have entered into a stipulation which is attached to and made a part of this plea agreement. The defendant understands that this stipulation does not purport to set forth all of the relevant conduct and characteristics that may be considered by the Court for purposes of sentencing. The defendant expressly understands that this stipulation is not binding on the Court. The defendant also understands that the Government and the United States Probation Office are obligated to advise the Court of any additional relevant facts that subsequently come to their attention.

> iv.    Guideline Stipulation and Calculation

The Government and the defendant stipulate the defendant's applicable Sentencing Guidelines to be calculated as follows (Guidelines Manual effective Nov. 1, 1998) and that such a sentence is reasonable:

| | |
|---|---|
| Base offense level under § 2F1.1(a) | 6 |
| Adjust for loss in excess of $1.5 million but less than $2.5 million under § 2F1.1(b)(1)(M) | +12 |
| Adjust for more than minimal planning under § 2F1.1(b)(2) | + 2 |
| Adjust for Abuse of Position of Trust under § 3B1.3 | + 2 |

John Williams, Esquire
– Page 4 –

| Adjust for Acceptance of Responsibility under § 3E1.1 | - 3 |
| Total offense level | <u>19</u> |

An offense level of 19, with a criminal history Category I, which the parties calculate the defendant to be based on the representation of the defendant, results in an applicable guideline range of 30-37 months incarceration and a fine range of $6,000 - $60,000. (The Government reserves the right to recalculate the defendant's criminal history if the defendant's representation is not accurate.)

The defendant expressly understands that the Court is not bound by this agreement on the Guideline and fine ranges specified above. The defendant further expressly understands that he will not be permitted to withdraw the plea of guilty if the Court imposes a sentence outside the Guideline range or fine range set forth in this agreement.

In the event the Probation Office or the Court contemplates any sentencing calculations different from those stipulated by the parties, the parties reserve the right to respond to any inquiries and make appropriate legal arguments regarding the proposed alternate calculations. Moreover, the Government expressly reserves the right to challenge or defend any sentencing determination, other than that stipulated by the parties, in any post-sentencing proceeding.

### v. Waiver of Right to Appeal
### or Collaterally Attack Sentence

The defendant acknowledges that under certain circumstances he is entitled to appeal his conviction and sentence. 18 U.S.C. § 3742. It is specifically agreed that the defendant will not appeal or collaterally attack in any proceeding, including but not limited to a motion under 28 U.S.C. § 2255 and/or §2241, the conviction or sentence of imprisonment imposed by the Court if that sentence does not exceed 37 months incarceration, a fine range of $60,000, and a three year term of supervised release, even if the Court imposes such a sentence based on an analysis differed from that specified above. Similarly, the Government will not appeal a sentence imposed within or above the stipulated sentencing range. The defendant expressly acknowledges that he is knowingly and intelligently waiving his appellate rights.

### vi. Information to the Court

The Government expressly reserves its right to address the Court with respect to an appropriate sentence to be imposed in this case. Moreover, it is expressly understood that the Government will discuss the facts of this case, including information regarding the defendant's background and character, 18 U.S.C. § 3661, with the United States Probation Office and will provide the Probation Officer with access to its file, with the exception of grand jury material.

John Williams, Esquire
– Page 5 –

Waiver of Rights

### Waiver of Right to Indictment

The defendant understands that he has the right to have the facts of this case presented to a federal grand jury, consisting of between sixteen and twenty-three citizens, twelve of whom would have to find probable cause to believe that he committed the offense set forth in the information before an indictment could be returned. The defendant expressly acknowledges that he is knowingly and intelligently waiving his right to be indicted.

### Waiver of Trial Rights and Consequences of Plea

The defendant understands that he has the right to be represented by an attorney at every stage of the proceeding and, if necessary, one will be appointed to represent him.

The defendant understands that he has the right to plead not guilty or to persist in that plea if it has already been made, the right to a public trial, the right to be tried by a jury with the assistance of counsel, the right to confront and cross-examine the witnesses against him, the right not to be compelled to incriminate himself, and the right to compulsory process for the attendance of witnesses to testify in his defense. The defendant understands that by pleading guilty he waives and gives up those rights and that, if the plea of guilty is accepted by the Court, there will not be a further trial of any kind.

The defendant understands that if he pleads guilty, the Court may ask him questions about each offense to which he pleads guilty, and if he answers those questions falsely under oath, on the record, and in the presence of counsel, his answers may later be used against him in a prosecution for perjury or making false statements.

### Waiver of Statute of Limitations

The defendant understands and agrees that should the conviction following the defendant's plea of guilty pursuant to this plea agreement be vacated for any reason, then any prosecution that is not time-barred by the applicable statute of limitations on the date of the signing of this plea agreement may be commenced or reinstated against the defendant, notwithstanding the expiration of the statute of limitations between the signing of this plea agreement and the commencement or reinstatement of such prosecution. The defendant agrees to waive all defenses based on the statute of limitations with respect to any prosecution that is not time-barred on the date the plea agreement is signed.

### Waiver of Right To Post-Conviction DNA Testing of Physical Evidence

The defendant understands that the Government has various items of physical evidence in its possession in connection with this case that could be subjected to DNA testing. The defendant further understands that following conviction in this case, he could file a motion with the Court to require DNA testing of physical evidence pursuant to 18 U.S.C. § 3600 and § 3600A in an attempt to prove his innocence. The defendant fully understands his right to have all the physical evidence in this case tested for DNA, has discussed this right with his counsel, and knowingly and voluntarily waives his right to

John Williams, Esquire
-- Page 6 --

have such DNA testing performed on the physical evidence in this case. Defendant fully understands that because he is waiving this right, the physical evidence in this case will likely be destroyed or will otherwise be unavailable for DNA testing in the future.

## Acknowledgement of Guilt; Voluntariness of Plea

The defendant acknowledges that he is entering into this agreement and is pleading guilty freely and voluntarily because he is guilty. The defendant further acknowledges that he is entering into this agreement without reliance upon any discussions between the Government and him (other than those described in the plea agreement letter), without promise of benefit of any kind (other than the concessions contained in the plea agreement letter), and without threats, force, intimidation, or coercion of any kind. The defendant further acknowledges his understanding of the nature of the offense to which he is pleading guilty, including the penalties provided by law. The defendant also acknowledges his complete satisfaction with the representation and advice received from his undersigned attorney. The defendant and his undersigned counsel are unaware of any conflict of interest concerning counsel's representation of the defendant in the case.

## Scope of the Agreement

The defendant acknowledges and understands that this agreement is limited to the undersigned parties and cannot bind any other federal authority, or any state or local authority. The defendant acknowledges that no representations have been made to him with respect to any civil or administrative consequences that may result from this plea of guilty because such matters are solely within the province and discretion of the specific administrative or governmental entity involved. Finally, the defendant understands and acknowledges that this agreement has been reached without regard to any civil tax matters that may be pending or which may arise involving him.

## Collateral Consequences

The defendant further understands that he will be adjudicated guilty of each offense to which he has pleaded guilty and will be deprived of certain rights, such as the right to vote, to hold public office, to serve on a jury, or to possess firearms. The defendant understands that the Government reserves the right to notify any state or federal agency by which he is licensed, or with which he does business, as well as any current or future employer of the fact of his conviction.

## Satisfaction of Federal Criminal Liability; Breach

The defendant's guilty plea, if accepted by the Court, will satisfy the federal criminal liability of the defendant in the District of Connecticut as a result of his participation in the kickback scheme involving WWE licensing agreements, which forms the basis of the Information in this case.

The defendant understands that if, before sentencing, he violates any term or condition of this agreement, engages in any criminal activity, or fails to appear for sentencing, the Government may void all or part of this agreement. If the agreement is voided in whole or in part, defendant will not be permitted to withdraw his plea of guilty.

John Williams, Esquire
– Page 7 –

No Other Promises

      The defendant acknowledges that no other promises, agreements, or conditions have been entered into other than those set forth in this plea agreement, and none will be entered into unless set forth in writing, signed by all the parties.

      This letter shall be presented to the Court, in open court, and filed in this case.

                  Very truly yours,

                  JOHN H. DURHAM
                  DEPUTY UNITED STATES ATTORNEY

                  CHRISTOPHER W. SCHMEISSER
                  ASSISTANT UNITED STATES ATTORNEY

      The defendant certifies that he has read this plea agreement letter and its attachment, that he has had ample time to discuss this agreement and its attachment with counsel and that he fully understands and accepts its terms.

JAMES K. BELL                2/10/05
The Defendant               Date

      I have thoroughly read, reviewed and explained this plea agreement and its attachment(s) to my client who advises me that he understands and accepts its terms.

JOHN WILLIAMS, ESQ.        2/10/05
Attorney for the Defendant     Date

John Williams, Esquire
– Page 8 –

## STIPULATION OF OFFENSE CONDUCT

The defendant James K. Bell and the Government stipulate and agree to the following offense conduct that gives rise to the defendant's agreement to plead guilty to the information:

At all times relevant to this Information, World Wrestling Entertainment, Inc. (formerly World Wrestling Federation, Inc.), (hereinafter "WWE") was a Delaware Corporation with its principal place of business in Stamford, Connecticut. WWE, among other things, creates, produces and markets entertainment for both live and television audiences featuring professional wrestlers for whom WWE has developed a character profile, a storyline, and a role in the WWE productions.

During all times relevant hereto, JAMES K. BELL, the defendant herein, was employed by WWE with responsibilities for, among other things, overseeing the licensing of WWE intellectual property. It was part of his job description to identify potential licensees, negotiate licensing agreements, and develop new licensing strategies in order to benefit WWE. BELL also owned and operated Bell Consulting, LLC.

During all times relevant hereto, another individual, referred to herein as SS, was an acquaintance of BELL. BELL arranged for this individual, through SS's wholly owned entity, "SS and Associates, Inc." (SSAI), to become a licensing agent for WWE.

As a result of its creation and promotion of the professional wrestlers' characters, WWE owns as part of its intellectual property the use of the characters' likeness, name, storyline, and related features. WWE's intellectual property also includes its logo and related production titles.

It is part of the business of WWE to enter into licensing agreements with manufacturers who wish to create and sell products which utilize WWE's intellectual property. Such manufacturers include garment makers, toy makers, videogame manufacturers, and others. Generally, a licensing agreement permits the manufacturer to produce items for sale that include WWE intellectual property and in exchange require the payment of a fee or royalty to WWE by the manufacturer. The royalty is generally determined by a percentage of the total sales of the licensed items.

Licensing agreements entered into with WWE also required the manufacturer to keep track of and report sales of items utilizing WWE intellectual property on a periodic basis. It was common practice during the relevant period for licensees to report sales and submit royalty payments simultaneously.

After receiving royalty payments, WWE would determine whether and to what extent the professional wrestlers' characters were featured in the products manufactured so that a portion of the royalties received by WWE could be in turn passed on to the individual wrestler.

During the time relevant hereto, JAMES K. BELL, the defendant herein, an employee of WWE, identified potential licensees, negotiated licensing agreements and developed new licensing strategies in order to benefit WWE.

John Williams, Esquire
– Page 9 –

In approximately 1994, BELL arranged for SS, through his wholly owned entity SSAI to become a licensing agent for WWE. As a licensing agent, it was among SS's responsibilities to identify potential licensing opportunities for WWE, negotiate new licensing agreements and otherwise promote WWE licensing for the benefit of WWE. WWE retained authority for final approval of all licensing agreements. This approval was usually sought from and given by BELL.

As compensation for SS's efforts as a licensing agent, WWE agreed to pay SSAI a commission based upon a percentage of total revenue generated by each licensee procured by SSAI.

Thereafter, when WWE received periodic sales reports and royalty payments from licensees, WWE first determined whether the licensee was one that had been procured by SSAI, and, if it was such a licensee, then the amount of commission due to SSAI would be calculated and a check sent, usually by mail, to SSAI.

Beginning in or before January 1998, and continuing through October 2000, in the District of Connecticut and elsewhere, JAMES K. BELL, the defendant herein, and others known and unknown to the United States Attorney, did devise a scheme and artifice to defraud WWE, including depriving WWE of the intangible right of honest services, and to obtain money and property from WWE through materially false and fraudulent pretenses and representations. Specifically, BELL did arrange for SSAI to receive commissions on certain WWE licensing agreements to which SSAI was not entitled; BELL received kickbacks from SSAI relating to these licensing agreements, monies to which he was not entitled; and BELL thereby deprived WWE of its intangible right to honest services from BELL and caused financial loss to WWE.

It was part of this scheme and artifice to defraud that the following occurred in the District of Connecticut and elsewhere:

When potential licensees approached or contacted BELL at WWE, rather than negotiate a licensing agreement "in house," BELL would advise SS of the contacts so that SS could arrange the licensing agreements and receive commissions on those agreements.

Similarly, BELL would advise SS that he was going to add SSAI to a pre-existing licensing agreement as the licensing agent so that SSAI would begin to receive commission payments from those agreements, even though BELL knew SSAI had no entitlement to such commissions.

BELL and SS agreed that the commissions paid by WWE to SSAI as a result of the above-described licensing agreements would be evenly split between SS and BELL. Similarly, on occasion, BELL arranged with SSAI to receive 50% of SSAI's commission on a particular licensing agreement notwithstanding that SSAI may not have procured or negotiated the licensing agreement. Thereafter, BELL completed internal documentation at WWE reflecting that SSAI should be paid a commission on a pre-existing licensing agreement notwithstanding that SSAI had no role in the procurement of the licensing agreement. Thereafter, BELL completed and provided to the accounting department at WWE documents which reflected that SSAI was to receive commissions under the licensing agreements.

As a result of the licensing agreements, WWE received royalties and sales reports on a periodic basis and thereafter sent to SSAI commission checks for commissions purportedly due thereon. At or

John Williams, Esquire
– Page 10 –

about the time SSAI received the commission checks from WWE, BELL created an "invoice" for services rendered by Bell Consulting, LLC and submitted the invoice to SSAI. The amount reflected in the invoice was for an amount equal to 50% of the commission paid by WWE to SSAI on the licensing agreements. SSAI then prepared a check payable to Bell Consulting, LLC representing the 50% kickback for commissions paid to SSAI on the licensing agreements.

It was further part of the scheme to defraud WWE that BELL and SSAI agreed to receive and did receive a kickback from a certain licensee who manufactured T-shirts (the "T Shirt licensee"). The T-Shirt licensee agreed to pay and did pay SSAI 2% of its sales of WWE apparel in exchange for favorable terms in its licensing agreement with WWE. BELL and SSAI split this 2% payment evenly.

On or about the dates set forth below, for the purpose of executing the scheme and artifice, the defendant knowingly caused to be mailed and reasonably could have foreseen the mailing of the items identified below:

| DATE | DESCRIPTION OF ITEM MAILED |
|------|---------------------------|
| March 3, 2000 | Check from WWE in the amount of $122,154.69 payable to SSAI representing payment of commissions due on one or more of the licensing agreements |
| May 15, 2000 | Check from WWE in the amount of $439,240.43 payable to SSAI representing payment of commissions due on one or more of the licensing agreements |
| June 9, 2000 | Check from WWE in the amount of $312,788.55 payable to SSAI representing payment of commissions due on one or more of the licensing agreements |
| July 17, 2000 | Check from WWE in the amount of $2,675.73 payable to SSAI representing payment of commissions due on one or more of the licensing agreements |
| October 24, 2000 | Check from WWE in the amount of $38,214.63 payable to SSAI representing payment of commissions due on one or more of the licensing agreements |

The defendant stipulates and agrees that the relevant guidelines loss is $1,946,634.

John Williams, Esquire
– Page 11 –

The written stipulation above is incorporated into the preceding plea agreement. It is understood, however, that the defendant and the Government reserve their right to present additional relevant offense conduct to the attention of the Court in connection with sentencing.


JAMES K. BELL
The Defendant


CHRISTOPHER W. SCHMEISSER
Assistant U.S. Attorney


JOHN WILLIAMS, ESQ.
Attorney for the Defendant

## RIDER CONCERNING RESTITUTION

The Court shall order that the defendant make restitution under 18 U.S.C. § §3663A. The order of restitution may include:

1.    If the offense resulted in damage to or loss or destruction of property of a victim of the offense, the order of restitution shall require the defendant to:

> A. Return the property to the owner of the property or someone designated by the owner; or
>
> B. If return of the property is impossible, impracticable, or inadequate, pay an amount equal to:
>
>> The greater of -
>>
>> (I)    the value of the property on the date of the damage, loss, or destruction;  or
>>
>> (II)    the value of the property on the date of sentencing, less the value as of the date the property is returned.

2. In any case, reimburse the victim for lost income and necessary child care, transportation, and other expenses incurred during participation in the investigation or prosecution of the offense or attendance at proceedings related to the offense.

The order of restitution has the effect of a civil judgment against the defendant. In addition to the court ordered restitution, the court may order that the conditions of its order of restitution be made a condition of probation or supervised release. Failure to make restitution as ordered may result in a revocation of probation, or a modification of the conditions of supervised release, or in the defendant being held in contempt under 18 U.S.C. § 3583(e). Failure to pay restitution may also result in the defendant's re-sentencing to any sentence which might originally have been imposed by the Court. See 18 U.S.C. §3614. The Court may also order that the defendant give notice to any victim(s) of his offense under 18 U.S.C. § 3555.