UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE JAKKS PACIFIC INC., SHAREHOLDERS CLASS ACTION LITIGATION | Case No. 04-CV-8807 (KMK)<br><br>OPINION & ORDER |

Appearances:

Kirk E. Chapman, Esq.
Peter Edward Seidman, Esq.
Sharon Maine Lee, Esq.
Milberg Weiss Bershad & Schulman, LLP
New York, New York
*Counsel for Plaintiffs*

David Avi Rosenfeld, Esq.
Samuel Howard Rudman, Esq.
Mario Alba, Jr., Esq.
Coughlin, Stoia, Geller, Rudman & Robbins, LLP
Melville, New York
*Counsel for Plaintiff Lydia Garcia and others similarly situated*

William Edward Bernarduci, Esq.
Schatz and Nobel PC
Hartford, Connecticut
*Counsel for Plaintiff Allan Schrager*

Ken H. Chang, Esq.
Marian P. Rosner, Esq.
Michael Adam Schwartz, Esq.
Wolf Popper LLP
New York, New York
*Counsel for Plaintiff James T. Kahn and others similarly situated*

Frederick Taylor Isquith, Sr., Esq.
Gustavo Fabian Bruckner, Esq.
Wolf, Haldenstein, Adler, Freeman & Herz L.L.P.
New York, New York
*Counsel for Plaintiff Quantum Equities L.L.C. and others similarly situated*

Alfred G. Yates, Jr., Esq.
Gerald L. Rutledge, Esq.
Pittsburgh, Pennsylvania
*Counsel for Plaintiff James Irvine and others similarly situated*

Eric James Belfi, Esq.
Labaton Sucharow, LLP
New York, New York
*Counsel for Plaintiff James Irvine and others similarly situated*

Marc A. Topaz, Esq.
Richard A. Maniskas, Esq.
Schiffrin & Barroway, L.L.P.
Bala Cynwyd, Pennsylvania
*Counsel for Plaintiff James Irvine and others similarly situated*

Jonathan Honig, Esq.
Feder, Kaszovitz, Isaacson, Weber, Skala, Bass & Rhine LLP
New York, New York
*Counsel for Defendants*

Jonathan J. Lerner, Esq.
Michael H. Gruenglas, Esq.
Maura B. Grinalds, Esq.
Skadden, Arps, Slate, Meagher & Flom LLP
New York, New York
*Counsel for Defendants*

KENNETH M. KARAS, District Judge:

This consolidated class action arises from an alleged commercial bribery scheme. Plaintiffs, who purchased shares of Jakks Pacific, Inc. ("Jakks") between December 3, 1999 and October 19, 2004 (the "Class Period"), allege that, in order to secure a videogame license and favorable amendments to a toy license, Jakks paid bribes to a senior executive at World Wrestling Entertainment, Inc. ("WWE"), as well as to WWE's marketing licensing agent. As a result of this scheme, Plaintiffs contend that shares of Jakks's common stock were artificially overvalued at the time that Plaintiffs purchased them.

Named Plaintiffs, Indiana Electrical Workers Pension Trust Fund, Kenneth J. Tucker, Tonia R. Tucker-Kraus and Michael Kraus, filed this putative class action on behalf of themselves and all those who purchased common stock shares of Jakks securities during the Class Period.  Plaintiffs bring this action pursuant to Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated thereunder.  Plaintiffs also allege that Defendants Jack Friedman ("Friedman"), Steven G. Berman ("Berman"), and Joel M. Bennett ("Bennett") (collectively the "Individual Defendants") violated Section 20(a) of the Exchange Act by acting as controlling persons of Jakks.  15 U.S.C. § 78t(a).

Defendants move to dismiss the Consolidated Amended Complaint ("CAC") pursuant to Rules 12(b)(6) and 9(b) of the Federal Rules of Civil Procedure and Section 21D of the Exchange Act.  For the reasons stated herein, Defendants' Motion to Dismiss the CAC is GRANTED, without prejudice to amend.

## I.  Background

Except as otherwise noted, the following facts alleged in the CAC are presumed true for the purposes of this Motion.  Jakks is a Delaware corporation that produces and markets toys and other related products.  (Consolidated Am. Compl. for Violations of the Fed. Securities Laws ¶¶ 2, 32 ("CAC").)  WWE is a media and entertainment company that develops, produces and markets entertainment events.  (*Id.* ¶¶ 3, 33.)  In October 1995, Jakks and WWE entered into a licensing agreement under which Jakks received the right to manufacture and market WWE toys in the United States.  (*Id.* ¶ 4.)  This licensing agreement was presented to WWE through WWE's licensing agent, Stanley Shenker ("Shenker") of Stanley Shenker & Associates, Inc.

3

("SSAI"). (*Id.* ¶ 34.) Plaintiffs make no allegations that Jakks entered into the 1995 licensing agreement fraudulently.

After Jakks and WWE finalized the 1995 licensing agreement, Plaintiffs allege that Jakks and SSAI (through Shenker) entered into an undisclosed agency agreement. (*Id.* ¶ 35.) According to Plaintiffs, SSAI's simultaneous agency relationships with Jakks and WWE "constituted a clear conflict of interest." (*Id.*) Plaintiffs allege that Defendants Friedman and Berman, both senior executives at Jakks,[1] knew of Shenker's obligations to WWE and had been advised by Jakks's outside legal counsel that Jakks's agency relationship with Shenker and SSAI was improper absent the informed consent of WWE. (*Id.* ¶ 36.)

On February 10, 1997, after Jakks had formed its undisclosed agency relationship with Shenker and SSAI, Jakks built upon its domestic licensing agreement by entering into an international toy licensing agreement with WWE. (*Id.* ¶ 37.) In March 1997, SSAI expanded its relationship with WWE to become WWE's exclusive outside licencing agent. (*Id.*)

In 1998, Friedman, Berman and Shenker allegedly began to implement a scheme to fraudulently procure WWE's videogame licenses for Jakks. (*Id.* ¶ 40.) Under the alleged scheme, Friedman and Berman agreed to pay bribes to Shenker, which Shenker would split with James Bell ("Bell"), the Senior Vice President of Licensing and Merchandising at WWE and the person responsible for the allocation of WWE's licenses. (*Id.*) The bribes were allegedly "laundered" through foreign companies, including a company named Stanfull Industrial, Ltd. ("Stanfull"), which was controlled by Shenker. (*Id.* ¶ 41.) According to Plaintiffs, these bribes

---

[1]During the Class Period, Friedman was Jakks's Chairman and Chief Executive Officer, and Berman was Jakks's President, Chief Operating Officer, and Secretary. (CAC ¶¶ 16-17.)

"ultimately allowed JAKKS to gain the license to WWE's valuable video game franchise, as well as to make valuable amendments to, and expand the scope of, [Jakks's existing] toy licenses."  (*Id.* ¶ 40.)

The CAC describes in detail one such alleged bribe.  In early 1998, Shenker sent Jakks an invoice of $80,000 for the development of "Possible Latex Based Soft Toys With Special Coating."  (*Id.* ¶ 42.)  The invoice directed that the money be paid to a Stanfull account at the Hang Seng Bank in Hong Kong.  Plaintiffs allege that there was never any contract between Jakks and Stanfull to develop toys and that Jakks never provided, and never intended to provide, any services to Stanfull in exchange for this payment.  (*Id.*)

Plaintiffs allege that Defendants Berman, Friedman, and Bennett arranged for the fraudulent invoice to be sent to Jakks's foreign subsidiary, Road Champs, Ltd., and that they instructed that $40,000 be sent immediately from Road Champs to Stanfull.  (*Id.* ¶ 43.)  That same day, Shenker paid $20,000 from the Stanfull account to Bell, "representing his equal split of the illegal bribe and kickback paid to Shenker and Stanfull."  (*Id.*)  Allegedly in return for the $20,000, Bell caused WWE not to renew its videogame license with one of Jakks's competitors and instead recommended that the license be awarded to Jakks, despite the fact that Jakks had no ability to design or manufacture videogames.  (*Id.* ¶ 45.)  The following day, another $40,000 was paid from Road Champs to Stanfull, half of which was eventually given to Bell.  (*Id.* ¶ 46.)  WWE ultimately granted the videogame license to Jakks, rejecting allegedly superior offers from experienced videogame developers.  (*Id.* ¶ 47.)

On June 24, 1998, following the recommendations of Shenker and Bell, WWE extended its toy licensing agreement with Jakks.  (*Id.* ¶ 51.)  Within a month of winning this extension,

Jakks received another invoice from Shenker and made another "clandestine" payment through Road Champs to Stanfull at Hang Seng Bank in Hong Kong. (*Id.*) Jakks made no record of this payment or of the invoice that it received from Shenker. (*Id.*)

Throughout the Class Period, Jakks made numerous public statements, many of which Plaintiffs allege were false and misleading. (*Id.* ¶¶ 56-145.) Plaintiffs further allege that, by early 2004, Defendants were aware that WWE was contending that the WWE licenses had been obtained through commercial bribery. (*Id.* ¶ 53.) However, at no point during the Class Period did Defendants disclose that Jakks had obtained the WWE videogame and toy licenses illegally or that WWE was contesting the validity of Jakks's licenses. (*Id.* ¶ 52.) As a result, Plaintiffs allege that the price of Jakks shares was artificially inflated during the Class Period. (*Id.* ¶ 54.) On October 19, 2004, Jakks revealed publicly that WWE had filed suit against Jakks to rescind the videogame and toy licenses and to recover damages. (*Id.* ¶ 55.) In response, the price of Jakks's shares dropped significantly. (*Id.*)

Finally, Plaintiffs allege that certain of the Individual Defendants "were able to sell millions of dollars of their personally held Jakks common stock . . . while in possession of material adverse non-public information" about Jakks. (*Id.* ¶ 54.) Specifically, Plaintiffs allege that Defendants and other Jakks executives made as much as $37.68 million through these insider trades. (*Id.*)

## II. Discussion

### A. Standard of Review

The Supreme Court has recently held that "[w]hile a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to

provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do[.]" *Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 1964-65 (2007) (citations omitted and second alteration in original). In *Twombly*, the Supreme Court also abandoned reliance on the oft-quoted refrain from *Conley v. Gibson* that, "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief[,]" 355 U.S. 41, 45-46 (1957). *Id.* at 1964-69. As the Court explained, a literal application of *Conley*'s "no set of facts" rationale is improper because "a wholly conclusory statement of claim would survive a motion to dismiss whenever the pleadings left open the possibility that a plaintiff might later establish some 'set of [undisclosed] facts' to support recovery." *Id.* at 1968. Instead, the Court emphasized that "[f]actual allegations must be enough to raise a right to relief above the speculative level[,]" *id.* at 1965 (citation omitted), and "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint[,]" *id.* at 1969. Plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Id.* at 1974; *see also Iqbal v. Hasty*, 490 F.3d 143, 157-58 (2d Cir. 2007) ("After careful consideration of the Court's opinion and the conflicting signals from it that we have identified, we believe the Court is not requiring a universal standard of heightened fact pleading, but is instead requiring a flexible 'plausibility standard,' which obliges a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim *plausible*."). If Plaintiff "ha[s] not nudged its claims across the line from conceivable to plausible, [its] complaint must be dismissed." *Twombly,* 127 S. Ct. at 1974.

When considering a Rule 12(b)(6) motion, a court must limit itself to facts stated in the complaint, documents attached to the complaint, and documents incorporated into the complaint. *See Newman & Schwartz v. Asplundh Tree Expert Co.*, 102 F.3d 660, 662 (2d Cir. 1996). The Court will accept as true Plaintiff's allegations, and draw all inferences in Plaintiff's favor. *See Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1174 (2d Cir. 1993); *Blimpie Int'l, Inc. v. Blimpie of the Keys*, 371 F. Supp. 2d 469, 470-71 (S.D.N.Y. 2005). At this stage, the Court is not concerned with weighing the evidence that would be presented at trial. *See Chosun Int'l, Inc. v. Chrisha Creations, Ltd.*, 413 F.3d 324, 327 (2d Cir. 2005).

Rule 10b-5 states, in part, that it is "unlawful for any person . . . [t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5. To state a claim for relief under Section 10(b) and Rule 10b-5, Plaintiffs must adequately allege that Defendants: "'(1) made misstatements or omissions of material fact; (2) with scienter; (3) in connection with the purchase or sale of securities; (4) upon which [P]laintiffs relied; and (5) that [P]laintiffs' reliance was the proximate cause of their injury.'" *See Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 172 (2d Cir. 2005) (quoting *In re IBM Corporate Sec. Litig.*, 163 F.3d 102, 106 (2d Cir. 1998)); *see also Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 341 (2005). The requisite state of mind, or scienter, in a securities fraud action is "'an intent to deceive, manipulate or defraud.'" *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 168 (2d Cir. 2000) (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976)).

B.  Defendants' Failure to Disclose the Alleged Bribery Scheme

Here, Plaintiffs allege that Defendants failed to disclose material facts about the

8

underlying alleged bribery scheme and about the threat of litigation to which the alleged scheme

exposed them.  According to Plaintiffs, when Defendants made positive statements about the

WWE licenses, Defendants created a duty to disclose the illegal activities through which the

licenses were allegedly obtained, as well as the increased likelihood of litigation caused by those

activities.  (Mem. of Law in Opp'n to Defs.' Mot. to Dismiss the Consolidated Am. Compl. 11-

18 ("Pls.' Mem.").)  Defendants argue that any public statements about the WWE licenses were

"too attenuated" to the alleged illegal activity and to the threat of litigation to trigger a duty to

disclose.  (Defs.' Reply Mem. of Law in Further Supp. of Their Mot. to Dismiss the

Consolidated Am. Compl. 9 ("Reply Mem.").)

       1.  Materiality

The initial inquiry in a claim for relief under Section 10(b) and Rule 10b-5 is whether the

allegedly omitted information is material.  "To fulfill the materiality requirement 'there must be

a substantial likelihood that the disclosure of the omitted fact would have been viewed by the

reasonable investor as having significantly altered the 'total mix' of information made

available.'"  *Caiola v. Citibank, N.A.*, 295 F.3d 312, 329 (2d Cir. 2002) (quoting *Basic, Inc. v.

Levinson*, 485 U.S. 224, 231-32 (1988)); *see also Halperin v. eBanker USA.com, Inc.*, 295 F.3d

352, 357 (2d Cir. 2002) ("The touchstone of the inquiry is not whether isolated statements within

a document were true, but whether defendants' representations or omissions, considered together

and in context, would affect the total mix of information and thereby mislead a reasonable

investor regarding the nature of the securities offered.").  "At the pleading stage, a plaintiff

satisfies the materiality requirement . . . by alleging a statement or omission that a reasonable

investor would have considered significant in making investment decisions."  *Ganino*, 228 F.3d

at 161.  Because materiality is a mixed question of law and fact, a motion to dismiss will not be granted unless the alleged misstatements or omissions "are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *Castellano v. Young & Rubicam, Inc.*, 257 F.3d 171, 180 (2d Cir. 2001) (internal quotation marks omitted).  Therefore, "a complaint fails to state a claim of securities fraud if *no reasonable investor* could have been misled about the nature of the risk when he invested."  *Halperin,* 295 F.3d at 359.

Here, the Court cannot say that no reasonable investor would find the information regarding the alleged bribery scheme material.  In deciding whether to invest in Jakks, a reasonable investor might have viewed information about the bribery as "significantly alter[ing] the 'total mix' of information made available."  *Caiola*, 295 F.3d at 329.  Jakks's own public statements make clear that the WWE licenses generated, and were expected to continue to generate, significant revenue for the company.  (*See, e.g.*, CAC ¶¶ 95-96, 102.)  An investor might reasonably want to know if that source of revenue was threatened because it was improperly or illegally derived.  *See In re Marsh & Mclennan Cos. Sec. Litig.*, 501 F. Supp. 2d 452, 468-69 (S.D.N.Y. 2006) ("A rational jury could conclude that a reasonable investor would find it significant that [defendant] was generating substantial earnings from its improper business practices . . . ."); *accord Roeder v. Alpha Indus., Inc.*, 814 F.2d 22, 25-26 (1st Cir. 1987) (noting that corporate bribery, even if small in amount, is material to an investor because it is relevant to competency of management and could hurt the business).  Thus, it cannot be said that, given Jakks's public statements regarding the WWE licenses, "*no reasonable investor* could have been misled about the nature of the risk when he invested."  *Halperin*, 295 F.3d at 359.

10

2.  Duty to Disclose Alleged Bribery Scheme

In additional to materiality, Plaintiffs must establish that there existed a duty to disclose the withheld information, as the fact that information is material, without more, does not mandate its disclosure.  *Glazer v. Formica Corp.*, 964 F.2d 149, 156 (2d Cir. 1992) ("Even if information is material, there is no liability under Rule 10b-5 unless there is a duty to disclose it." (citing *Backman v. Polaroid Corp.*, 910 F.2d 10, 12 (1st Cir. 1990))).  A duty may arise in the context of an affirmative misrepresentation or an omission.  Here, Plaintiffs argue that Defendants' omissions created the duty to disclose.

A material omission is actionable under the federal securities laws "only when the [defendant] is subject to a duty to disclose the omitted facts."  *In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 267 (2d Cir. 1993).  The "'duty to speak' arises in only limited situations."  *Marsh & Mclennan*, 501 F. Supp. 2d at 469.  These situations may arise when there is insider trading, where there is a statute or regulation requiring disclosure, or where there was an inadequate, incomplete or misleading prior disclosure that needs correction.  *See In re PDI Sec. Litig.*, No. 02-CV-211, 2006 WL 3350461, at *9 (D. N.J. Nov. 16, 2006); *accord Glazer*, 964 F.2d at 157; *Menkes v. Stolt-Nielsen S.A.*, 03-CV-409, 2005 WL 3050970, *6 (D. Conn. Nov. 10, 2005).  Plaintiffs do not claim that Defendants had a duty to speak because of any insider trading or any statute or regulation.  Thus, the only question is whether Defendants have made any statements that required corrections.

Plaintiffs argue that Defendants had a duty to disclose the commercial bribery because Defendants made extensive public statements about the acquisition and profitability of the WWE licenses:  "[O]nce Defendants spoke about the WWE Licenses, they had to speak fully and

11

truthfully." (Pls.' Mem. 2.) The CAC quotes numerous statements made during the Class Period

that purportedly gave rise to a duty to disclose the alleged commercial bribery scheme. For the

purposes of this Motion, these statements can be grouped into three categories: 1) general

statements about Jakks's success and Jakks's products, (*see, e.g.*, CAC ¶¶ 62, 76, 79, 88-89, 108,

113); 2) statements about the past and projected performance of WWE-licensed videogames and

toys, (*see, e.g.*, *id.* ¶¶ 57, 61, 63, 65, 67, 72-73, 76, 89, 95-96, 102, 120, 129, 136); and 3)

statements specifically about the acquisition of the WWE licenses, (*see, e.g.*, *id.* ¶¶ 58, 64, 68,

80, 83, 99, 106, 132).

As Defendants note, the law generally does not "require management to accuse itself of

antisocial or illegal policies." *Amalgamated Clothing & Textile Workers Union v. J.P. Stevens

& Co.*, 475 F. Supp. 328, 331 (S.D.N.Y. 1979), *vacated as moot*, 638 F.2d 7 (2d Cir. 1980); *see

also GAF Corp. v. Heyman*, 724 F.2d 727, 740 (2d Cir. 1983) (noting that proxy rules generally

do not require management to self-report illegal conduct). While such information may be

material, the law, as previously discussed, generally treats questions of materiality and duty to

speak differently. However, "where the disclosure duty arises from the combination of a prior

statement and a subsequent event, which, if not disclosed, renders the prior statement false or

misleading, the inquiries as to duty and materiality coalesce." *Time Warner*, 9 F.3d at 267. Put

another way, a "duty to disclose arises whenever secret information renders prior public

statements materially misleading, not merely when that information completely negates the

public statements." *Id.* at 268.

The duty to speak "applies to the disclosure of criminal conduct to the same extent it

applies to the disclosure of any other information." *Marsh & Mclennan*, 501 F. Supp. 2d at 469;

*see also Menkes*, 2005 WL 3050970, at *7; *Par Pharm.*, 733 F. Supp. at 675.  To determine

when the duty is triggered, "the key consideration[] of the Court's inquiry [is] whether . . . the

alleged omission[]. . . grounded in . . . criminal conduct [is] sufficiently connected to

Defendants' existing disclosures to make those public statements misleading . . . ."  *Marsh &*

*Mclennan*, 501 F. Supp. 2d at 469.  In particular, to find the duty to exist, the courts have

"required a connection between the illegal conduct and the statements beyond the simple fact

that a criminal conviction would have an adverse impact upon the corporation's operations in

general . . . ."  *Menkes*, 2005 WL 3050970, at *7.  "In other words, a corporation has a duty to

disclose uncharged criminal conduct to prevent conveying, through its own public statements, a

false impression to an investor and not for the sake of merely improving an investor's

perspective."  *Id.*; *see also Par Pharm.*, 733 F. Supp. at 675 ("[E]ven though no duty to make a

statement on a particular matter has arisen, once corporate officers undertake to make

statements, they are obligated to speak truthfully and to make such additional disclosures as are

necessary to avoid rendering the statements misleading.").  With these principles in mind, the

Court now turns to the three categories of statements that Plaintiffs claim were fraudulent.[2]

---

[2]Naturally, each side argues for radically different and self-serving standards of review. Defendants, for example, suggest that a claim of material omission only arises when the "affirmative statements [are] expressly contradicted or directly undermined by the undisclosed facts."  (Reply Mem. 15.)  But that is not the law in the Second Circuit.  *See Time Warner*, 9 F.3d at 268 ("A duty to disclose arises whenever secret information renders prior public statements materially misleading, not merely when that information completely negates the public statements.").  Similarly, Plaintiffs suggested at oral argument that the duty to disclose arises when public statements "touch upon" omitted information.  While the Court is aware of one decision adopting this language, *see In re Ramp Corp. Sec. Litig.*, No. 05-CV-6521, 2006 WL 2037913, at *13 (S.D.N.Y. July 21, 2006) (noting that once defendant "made a representation that touched on the subject, he was required to speak accurately"), the balance of authority requires a connection between the omitted information and the affirmative statements. *See Menkes*, 2005 WL 3050970, at *7 (collecting cases).

The first group of statements, which address Jakks's general performance and provide basic information about its WWE products, did not give rise to a duty to disclose the alleged bribery scheme. These statements discussed general business issues, such as Jakks's "excellent top line and bottom line growth[,]" (CAC ¶ 62), and its "proven business model that continues to serve [it] well[,]" (*id.* ¶ 88). The alleged omitted information simply does not "render[ these] public statements materially misleading . . . ." *Time Warner*, 9 F.3d at 268; *see also Par Pharm.*, 733 F. Supp at 678 ("The subject matter of the statement is so attenuated from the bribery scheme that it could not reasonably be found to have created a false impression in a reasonable investor."). As such, these general statements about Jakks's corporate model or its overall success do not trigger a duty to reveal all potentially damaging information such as that alleged here. *See Bragger v. Trinity Capital Enter. Corp.*, No. 92-CV-2124, 1994 WL 75239, at *4 (S.D.N.Y. Mar. 7, 1994) (granting motion to dismiss and holding that no duty to disclose regulatory compliance problems of subsidiary when general statements about subsidiary were made). Indeed, if such unspecific statements of corporate well-being gave rise to a duty to disclose the alleged bribery scheme here, courts would find a duty in virtually every case where the defendant is alleged to have engaged in illegal activity. This is not the law. *See Ciresi v. Citicorp*, 782 F. Supp. 819, 823 (S.D.N.Y. 1991) ("[T]he law does not impose a duty to disclose uncharged, unadjudicated wrongdoing or mismanagement."); *Bragger*, 1994 WL 75239, at *4 ("[A] corporation is under no duty to announce publicly that it or its officers are guilty of uncharged criminal behavior, or to accuse itself of antisocial or illegal policies . . . .").[3]

---

[3]Of course, the fact that undisclosed information relates to illegal activity does not by itself immunize that information from other disclosure requirements. *See In re Sotheby's Holdings, Inc.*, No. 00-CV-1041, 2000 WL 1234601, *4 (S.D.N.Y. Aug. 31, 2000) ("[The] duty

The second category of statements comprises the bulk of the statements cited in the CAC. In these statements, Jakks makes claims about the performance of its WWE-licensed products. These statements include claims such as: "The significant growth in net sales . . . was due primarily to the continuing growth of the World Wrestling Federation action figure product line[,]" (CAC ¶ 57); "earnings attributable to the sales of wresling video games . . . remain in line with the Company's projections and the Company is optimistic about the upcoming releases of new WWF wrestling games[,]" (*id.* ¶ 73); and "with the industy's transition to new video game hardware essentially complete, and with several exciting new titles due for release, we anticipate substantially higher profits from JAKKS' World Wrestling Federation video game joint venture with THQ Inc.[,]" (*id.* ¶ 94).

The Court finds that, like the first group of statements, the statements falling into this second group created no duty to disclose the alleged bribery scheme. These statements discuss the beneficial effect (both past and future) of the WWE licenses on Jakks's business; however, they do not discuss the acquisition of those licenses and they make no representations, implied or otherwise, as to the whether they were acquired legally. Further, Plaintiffs make no claim that these statements are on their face inaccurate. As such, these statements are akin to the type of historical statements about a company's revenues from one of its product lines and prognostications for growth in profits from these products that the courts regularly find do not trigger a duty to disclose illegal conduct. For example, in *Marsh & Mclennan*, the court held that "[b]ecause the securities laws do not impose a general duty to disclose corporate

---

to disclose exists even where the omitted information relates to allegedly illegal conduct."); *Par Pharm.*, 733 F. Supp at 675 ("The illegality of corporate behavior is not a justification for withholding information that the corporation is otherwise obligated to disclose.").

mismanagement or uncharged criminal conduct, the allegation that [defendant] misstated its earnings merely by failing to disclose the misconduct at its . . . subsidiary is not actionable."  501 F. Supp. 2d at 469; *see also In re Sofamor Danek Group*, 123 F.3d 394, 401 & n.3 (6th Cir. 1997) ("It is clear that a violation of federal securities laws cannot be premised upon a company's disclosure of accurate historical data."); *Greenstone v. Cambex Corp.*, 777 F. Supp. 88, 91 (D. Mass. 1991) (granting motion to dismiss where plaintiff did not claim "that the revenues actually received by [defendant] differed from those reported to SEC[,]" but instead claimed "that the reports would have been more accurate and complete if the defendants had revealed their improper activities because such activities allegedly influenced the financial success of [defendant]"), *aff'd*, 975 F.2d 22 (1st Cir. 1992).  *But see Greenfield v. Prof'l Care, Inc.*, 677 F. Supp. 110, 113 (E.D.N.Y. 1987) (denying motion to dismiss and finding duty to disclose illegal conduct because "[i]nformation going directly to the financial condition of the company" was material).

Statements falling into this second group would only trigger a duty to disclose the bribery scheme if there existed a broader duty to speculate as to how exposure of that scheme would impact that aspect of Jakks's business.  No such duty exists:  "[A] company [is] not obligated to speculate as to the myriad of consequences, ranging from minor setbacks to complete ruin, that might . . . befall[] the company" if illegal activity is discovered.  *Par Pharm.*, 733 F. Supp. at 678.  At bottom, these statements are no more actionable than the first group of statements discussing Jakks's "excellent . . . growth," except that these statements specifically identify the WWE licenses as one source of that growth.  *See Marsh & Mclennan*, 501 F. Supp. 2d at 469 ("Absent an allegation that [defendant] reported income that it did not actually receive, the

allegation that a corporation properly reported income that is alleged to have been, in part, improperly obtained is insufficient to impose Section 10(b) liability.").

However, when Jakks made the claims that constitute the third group of statements discussed above, it created a duty to disclose the alleged bribery scheme. These statements directly discuss the acquisition of the WWE licenses and, without an accompanying disclosure of the alleged bribery scheme, they are misleading, if not outright false. Specifically, Jakks repeatedly made statements indicating that it obtained its WWE licenses as a result of its "long-term relationship" with WWE. (*See, e.g.,* CAC ¶¶ 68, 83, 99.) For example, on May 23, 2002, Jakks issued a press release stating that, "[w]e have capitalized on our relationship with [WWE] by obtaining an exclusive worldwide license for our joint venture with THQ Inc." (*Id.* ¶ 99.) This statement, and others like it, are more specific to the *source* of the revenues from the WWE licenses, and not just a representation of the amount of such revenues. As such, these statements could have led a reasonable investor to believe that Jakks obtained the valuable licenses through a competitive process, taking advantage of its special (but legal) relationship with WWE. *See Sotheby's Holdings*, 2000 WL 1234601, at *4 ("A jury could conclude that these statements could have led reasonable investors to believe that Sotheby's and Christie's were competing with each other in the usual manner, that is, through price."); *accord In re Providian Fin. Corp. Sec. Litig.*, 152 F. Supp. 2d 814, 824-25 (E.D. Pa. 2001) (holding that once defendant put the company's success "in play," defendant was "obligated to disclose information concerning the source of its success, since reasonable investors would find that such information would significantly alter the mix of available information"). Indeed, even the statements that discuss the acquisition of the licenses without specifically discussing how those licenses were acquired

17

are misleading in the absence of the undisclosed information regarding the alleged bribery scheme. *See Menkes*, 2005 WL 3050970, at *8 ("[T]outing the renewal of a major contract that could have been the result of an illegal agreement conveys the false impression that this particular contract was procured through sound business practices.").

In other words, the law recognizes a duty to disclose when the corporate speaker crosses the line between boasting about revenues and discussing the methods used to generate those revenues. For example, in *Par Pharm.*, the defendant pharmaceutical company was alleged to have bribed government regulators to acquire expedited federal approval for the sale of generic drugs. 733 F. Supp. at 672-73. In light of the bribery, the court held that the company's "statements conveyed to a reasonable investor the false impression that Par had a particular expertise in obtaining FDA approvals constituting a legitimate competitive advantage over other companies . . . ." *Id.* at 677-78. Similarly, in *Marsh & Mclennan*, the court held that while allegations about defendant's "earning figures" and "risk disclosures" were insufficient, it denied the motion to dismiss as to plaintiff's allegations about defendant's "disclosures regarding the nature of the services provided in exchange for" certain commissions. 501 F. Supp. 2d at 473-74. In particular, because plaintiffs alleged that defendants had received these commissions "as kickbacks," defendant's statements about the nature of the commissions "put the source of contingent commission revenues at issue without disclosing information necessary to explain the true nature of the business practices employed to enhance those revenues." *Id.* at 474.

Similarly, here, statements discussing Jakks's acquisition of the WWE licenses and statements touting Jakks's long-term relationship with WWE as the means by which it procured and renewed those licenses conveyed that Jakks had a particular ability to obtain valuable

licenses from WWE. Once Jakks opened this door, it was required to walk through it with complete and accurate information about the true means used to procure and renew these licenses. *See In re Van der Moolen Holding N.V. Sec. Litig.*, 405 F. Supp. 2d 388, 400-01 (S.D.N.Y. 2005) (holding that statements giving reasons for profitability put the "sources of . . . revenue at issue" and that "alleged failure to disclose the true sources of such revenue could give rise to liability under Section 10(b)"); *see also Shapiro v. UJB Fin. Corp.*, 964 F.2d 272, 281-82 (3d Cir. 1992) (noting that while there is no duty to disclose management practices, statements describing management practices as "conservative" and "cautious" trigger a duty to disclose truthful information about such practices); *Providian*, 152 F. Supp. 2d at 824-25. ("Having put the issue in play, [defendant] is obligated to disclose information concerning the source of its success . . . ."). This information might be considered material by a reasonable investor who was trying to assess the likelihood that Jakks's licenses would be renewed upon expiration.

Defendants attempt to avoid this line of authority by claiming that its duty to speak about the alleged bribery is triggered only when such conduct is formally charged or adjudicated. (Reply Mem. 11-15.) For example, Defendants cite *In re Teledyne Defense Contracting Deriv. Litig.*, 849 F. Supp. 1369 (C.D. Cal. 1993), for the proposition that while the Court is to accept as true Plaintiffs' allegations of criminal wrongdoing, "[Section] 14(b) requires disclosure of material facts, and the Defendants' culpability . . . does not become a fact that must be disclosed until it is at least charged . . . ." *Id.* at 1383. However, this and the other cases cited by Defendants merely stand for the above-discussed proposition that there is no general duty to self-report misconduct – whether under the proxy rules or otherwise. And Plaintiffs' allegations depend on no different view of the law. Instead, Plaintiffs' claim is that Defendants' duty to

19

speak the complete truth about their actions in procuring and extending certain of the WWE

licenses was triggered when Defendants made statements about the reasons they succeeded in

acquiring the licenses, i.e., the long-term relationships Defendants had with WWE.  Because this

is Plaintiffs' theory and because the Court must assume the truth of Plaintiffs' allegations for

purposes of deciding this Motion, Plaintiffs have stated a claim as to the statements in the third

category.  *See Marsh & Mclennan,* 501 F. Supp. 2d at 475 ("The Court will not dismiss the

Complaint merely because [defendant] contests a factual allegation that, if true, would be

actionable.  [Defendant] will have the opportunity to rebut Plaintiffs' contentions at trial or on

summary judgment, but factual disputes are not properly decided at this stage of the

proceedings."); *Providian*, 152 F. Supp. 2d at 825 ("Given that the court must assume the truth

of the allegations and draw all inferences in the plaintiffs' favor, it is plain that the plaintiff

makes out a claim of material omission.").  Accordingly, the statements set forth in paragraphs

58, 64, 68, 80, 83, 99, 106, and 132 of the CAC sufficiently allege actionable public disclosures.

### 3.  Duty to Disclose Potential Litigation

Plaintiffs also base their fraud claims on Defendants' alleged failure to disclose the threat

of litigation initiated by WWE.  However, a company has no general obligation to disclose the

risk of litigation unless that litigation is "substantially certain to occur."  *In re Citigroup, Inc.

Sec. Litig.*, 330 F. Supp. 2d 367, 377 (S.D.N.Y. 2004).  Any other rule would create an end-run

around the rule that "the law does not impose a duty to disclose uncharged, unadjudicated

wrongdoing or mismanagement."  *Ciresi*, 782 F. Supp. at 823.

Plaintiffs allege, in conclusory fashion, that by early 2004, Defendants "were . . . aware

that . . . WWE was contending that the WWE licenses had been obtained through a pattern of

20

commercial bribery." (CAC ¶ 53; *accord* Pls.' Mem. 18.) From this, Plaintiffs argue that Jakks knew, or should have known, that it faced the heightened risk that WWE would seek to modify or rescind the licenses through litigation. (Pls.' Mem. 18.) Accordingly, Plaintiffs argue that when Jakks "spoke about the positive contributions [of] the WWE licenses," it had a duty to disclose the potential for litigation. (*Id.* at 18-19.) The Court is unpersuaded.

Plaintiffs do not plead sufficient facts from which to conclude that Defendants knew that litigation was "substantially certain to occur." *In re Citigroup*, 330 F. Supp. 2d at 377; *see also Marsh & Mclennan*, 501 F. Supp. 2d at 471; *Par Pharm.*, 733 F. Supp. at 678. As Defendants point out, "[t]he Complaint does not contain a single factual allegation to suggest that WWE was 'contesting' the validity of the videogame licenses by early 2004, or that WWE ever threatened to sue Jakks in connection with its ongoing litigation with third-parties." (Reply Mem. 20 n.20.) Plaintiffs' strongest allegation in this regard is the conclusory claim that Defendants should have known that the bribery scheme exposed the company to "heightened risk" of litigation. (CAC ¶ 53.) But Defendants had no "duty to speculate about the effects of discovery of the [illegal] scheme on the company's future prospects." *Marsh & Mclennan*, 501 F. Supp. 2d at 471 (internal quotation marks omitted); *see also Par Pharm.*, 733 F. Supp. at 678. Thus, Defendants' Motion to Dismiss as to all of the statements set forth in the CAC, except those contained in paragraphs 58, 64, 68, 80, 83, 99, 106, and 132, is granted.[4]

---

[4]Because the Court dismisses Plaintiffs' fraud claims, which are based on Defendants' failure to disclose potential litigation, and because the Court does so without relying on Defendants' Exhibits A and C to the Declaration of Jonathan J. Lerner, the Court need not address Plaintiffs' Motion to Strike, as those exhibits were relevant only to that cause of action.

C.  The CAC Fails to Satisfy the Pleading Requirements of 9(b) and the PSLRA

Securities fraud claims brought under Section 10(b) and Rule 10b-5 are subject to the

heightened pleading standards required by Federal Rule of Civil Procedure 9(b).  *See Rombach*,

355 F.3d at 170 (citing *Ganino*, 228 F.3d at 168).  Rule 9(b) requires that, "[i]n alleging fraud or

mistake, a party must state with particularity the circumstances constituting fraud or mistake."

Fed. R. Civ. P. 9(b).  The Second Circuit has established that to state a claim for relief under

Section 10(b) and Rule 10b-5, Rule 9(b) requires a complaint to:  "(1) specify the statements that

the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the

statements were made, and (4) explain why the statements were fraudulent."  *Lerner v. Fleet*

*Bank, N.A.*, 459 F.3d 273, 290 (2d Cir. 2006) (internal quotation marks omitted); *accord*

*Rombach*, 355 F.3d at 170.

The Private Securities Litigation Reform Act of 1995 ("PSLRA") further modifies the

Rule 12(b)(6) analysis when reviewing a complaint in a securities fraud action.  Under the

PSLRA, the complaint must "specify each statement alleged to have been misleading, the reason

or reasons why the statement is misleading, and, if an allegation regarding the statement or

omission is made on information and belief, the complaint shall state with particularity all facts

on which that belief is formed."  15 U.S.C. § 78u-4(b)(1)(B).  The heightened pleading

requirements of Rule 9(b) and the PSLRA aim at "deterring groundless suits and providing

defendants with sufficient information in the complaint to enable them to prepare a defense."  5A

Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1296 (3d ed. 2004);

*see also Novak v. Kasaks*, 216 F.3d 300, 314 (2d Cir. 2000) ("The primary purpose of Rule 9(b)

is to afford defendant fair notice of the plaintiff's claim and the factual ground upon which it is

based." (internal quotation marks omitted)).

Defendants argue that Plaintiffs fail to appropriately specify the statements that Plaintiffs allege to be fraudulent. In support of their argument, Defendants cite *In re Alcatel Securities Litigation*, 382 F. Supp. 2d 513 (S.D.N.Y. 2005). In *Alcatel*, Plaintiffs submitted a 250-paragraph complaint, "list[ing] various statements – often setting forth lengthy quotations from various releases by Defendants' officers and securities analysts – then follow[ing] each with a similar (in most cases identical) laundry list of 'specific' reasons why the statements are allegedly false." *Id.* at 534. The *Alcatel* court found that such shotgun-type pleading was insufficient and dismissed plaintiffs' Section 10(b) and Rule 10b-5 claims without prejudice to amend. *Id.* at 536.

Similarly, the 179-paragraph CAC here sets forth quotations from over fifty separate statements by Defendants. (*See* CAC ¶¶ 56-58, 61-73, 76-89, 91, 93-99, 102-108, 110-111, 113, 116-120, 125, 127-129, 131-137, 139-144.) Following the long list of quotations is a *single paragraph* listing four reasons purporting to explain why *all* of the quoted statements are "materially false and misleading." (CAC ¶ 145.)[5] In this regard, Plaintiffs' CAC is

---

[5]Paragraph 145 of the CAC states:

> The statements referenced above in ¶¶ 56-58, 61-73, 76-89, 91, 93-99, 102-108, 110-111, 113, 116-120, 125, 127-129, 131-137, and 139-144 were each materially false and misleading . . . because they failed to disclose and misrepresented the following adverse facts:
>
> (a) that JAKKS had obtained the WWE toy and videogame licenses as a result of an illegal commercial bribery scheme;
>
> (b) that JAKKS relationship with the WWE was being negatively impacted by the WWE's contention that the licenses it had granted to the Company were improperly obtained;

indistinguishable from the complaint in *Alcatel*, and thus is insufficient to "explain why the statements were fraudulent," *Rombach*, 355 F.3d at 170, with the "particularity" required by the plain language of Rule 9(b) and the PSLRA, *see Stevelman v. Alias Research Inc.*, 174 F.3d 79, 84 (2d Cir. 1999) ("A complaint alleging fraudulent violations of section 10(b) and Rule 10b-5 must satisfy the particularity requirement of Rule 9(b)."); *Endovasc, Ltd. v. J.P. Turner & Co.*, No. 02-CV-7313, 2004 WL 634171, at *5 (S.D.N.Y. Mar. 30, 2004) (same), *vacated in part on other grounds*, 169 Fed. App'x 655 (2d Cir. 2006).

Accordingly, Plaintiffs' Section 10(b) and Rule 10b-5 claims are dismissed for failure to plead with sufficient particularity. This defect, however, strikes the Court as eminently curable. Therefore, dismissal is without prejudice to permit Plaintiffs to file an amended complaint within thirty (30) days of this Order. *See Alcatel*, 382 F. Supp. 2d at 536 (dismissing Section 10(b) and Rule 10b-5 claims without prejudice).

D.  Scienter

Having alleged that Defendants misled investors, Plaintiffs must also adequately plead scienter. While Rule 9(b) requires that allegations of fraud be "state[d] with particularity," allegations regarding scienter may be "alleged generally." Fed. R. Civ. P. 9(b). "In order to avoid abuse of this relaxed specificity requirement, however, plaintiffs are required to 'allege

---

> (c) given the foregoing, the Company was subject to the heightened risk that the WWE would seek some modification to the WWE licensing agreements or complete nullification of those agreements which would negatively impact the Company's future financial results; and

> (d) based on the foregoing, Defendants' positive statements about the Company's earnings and prospects were lacking in a reasonable basis at all times.

facts that give rise to a strong inference of fraudulent intent.'" *In re Canandaigua Sec. Litig.*, 944 F. Supp. 1202, 1213 (S.D.N.Y. 1996) (quoting *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994)). To do so, Plaintiffs are required to allege facts that give rise to a strong inference of intent to "deceive, manipulate or defraud." *Ganino*, 228 F.3d at 168 (internal quotation marks omitted). That intent can be established either by: (1) alleging facts showing Defendants had both motive and opportunity to commit fraud; or (2) alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness. *See Rombach*, 355 F.3d at 176; *Ganino*, 228 F.3d at 168-69; *Shields*, 25 F.3d at 1128.

### 1.  Motive and Opportunity to Defraud

Looking first at Plaintiffs' allegations of "motive and opportunity," Defendants do not dispute that they had the opportunity to commit the fraudulent acts alleged in the CAC. Indeed, it is difficult to imagine that Defendants could dispute opportunity, given the positions the Individual Defendants held at Jakks. *See San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos.*, 75 F.3d 801, 813 (2d Cir. 1996) ("There is no doubt that defendants as a group had the opportunity to manipulate the price of [defendant's] stock. The individual defendants held the highest positions of power and authority within the company." (internal citation omitted)); *In re Complete Mgmt. Inc. Sec. Litig.*, 153 F. Supp. 2d 314, 327 (S.D.N.Y. 2001) ("[O]pportunity . . . is apparent for all the named individual defendants by virtue of the positions they held at [the company.] Each plausibly had the opportunity to report false and misleading information . . . ."). Defendants argue, however, that Plaintiffs have failed to sufficiently plead motive.

The Second Circuit defines motive as "the stimulus that causes a person or entity to act or

fail to act . . . . [and which] ordinarily anticipates a concrete benefit defendant would realize by his conduct." *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 74 (2d Cir. 2001).  Here, Plaintiffs argue that the CAC alleges three separate bases for motive: 1) Defendants' insider stock sales, (Pls.' Mem. 22-25); 2) Defendants' receipt of performance-based compensation, (*id.* at 25-26); and 3) Defendants' secondary stock offerings, (*id.* at 26-27).  The Court addresses each of these in turn.

### a.  Defendants' Alleged Insider Stock Trades

Insider stock sales will only satisfy the motive requirement if those sales are "unusual."  *See Scholastic Corp.*, 252 F.3d at 74-75.  "[P]laintiffs bear the burden of showing that any such sales are in fact unusual."  *In re Health Mgmt. Sys., Inc.*, No. 97-CV-1865, 1998 WL 283286, at *6 (S.D.N.Y. June 1, 1998) (citing *Acito v. IMCERA Group*, 47 F.3d 47, 54 (2d Cir. 1995)).  "Factors considered in determining whether insider trading activity is unusual include the amount of profit from the sales, the portion of stockholdings sold, the change in volume of insider sales, and the number of insiders selling."  *Scholastic Corp.*, 252 F.3d at 74-75.

Plaintiffs allege that "Defendants sold significant amounts – in excess of $37.5 million – of their Jakks holdings . . . ."  (Pls.' Mem. 23.)  From this, Plaintiffs assert that the "sale of tens of millions of dollars near the Class period high is certainly unusual."  (*Id.*)   However, standing alone, such allegations are insufficient to establish motive of fraudulent intent.  First, Plaintiffs do not allege that any of the Individual Defendants sold an unusual *percentage* of their shares during the Class Period.  The Second Circuit has consistently looked to the percentage of shares sold by a defendant when determining whether such sales were unusual.  *See, e.g., Scholastic Corp.*, 252 F.3d at 75 ("[D]ollar amount *cannot be considered in isolation*.  Rather the

percentage of stock holdings sold may be indicative of unusual trading." (emphasis added));
*Rothman v. Gregor*, 220 F.3d 81, 95 (2d Cir. 2000) (finding no motive where a single defendant sold shares worth $20 million where those shares constituted less than 10 percent of his holdings); *Stevelman*, 174 F.3d at 82, 85 (finding motive where defendant "sold a large[] portion of his stock").[6] This approach makes sense, as dollar amounts alone do not indicate the relative significance of a particular trade to an individual defendant.

Second, Plaintiffs fail to allege that these trades constituted a "change in volume of insider sales." *Scholastic Corp.*, 252 F.3d at 74-75. As with the percentage of shares sold, this information might put the alleged insider trades in perspective, by indicating the *relative* size of the trades that are identified in the CAC. Because the CAC is silent as to the percentage and the change in volume of the shares sold during the Class Period, there is no way to assess whether those trades were in fact "unusual," and not merely consistent with past trades made by the Individual Defendants. Accordingly, Plaintiffs have failed to meet their "burden of showing that any such sales are in fact unusual[,]" *Health Mgmt. Sys.*, 1998 WL 283286, at *6, and thus Plaintiffs' motive claims cannot rest on the Individual Defendants' alleged insider trades.

### b. Performance-Based Compensation

Plaintiffs also argue that motive is established because the Individual Defendants were compensated in part based on Jakks's performance. (CAC ¶¶ 68, 83, 106, 144.) In support of this argument, Plaintiffs allege that "the Individual Defendants were given increased base salaries, cash bonuses and Jakks' stock options due largely to their direct involvement in the

---

[6]In their Opposition Brief, Plaintiffs misstate the holding in *Stevelman*, by stating that the complaint in *Stevelman* did not allege "the percentage of holdings or shares retained." (Pls.' Mem. 24.) This is incorrect. In support of its finding of scienter, the *Stevelman* court found that the individual defendant sold 40% of his stock holdings. *Stevelman*, 174 F.3d at 82.

acquisition of WWE licensing and the important relationship between the Individual Defendants and WWE." (Pls.' Mem. 25.) However, incentive-based executive compensation is insufficient to establish motive, as "[m]otives that are generally possessed by most corporate directors and officers do not suffice; instead, plaintiffs must assert a concrete and personal benefit to individual defendants resulting from the fraud." *Kalnit v. Eichler*, 264 F.3d 131, 139 (2d Cir. 2001).

In fact, the Second Circuit has held that executive compensation alone will not establish motive: "If scienter could be pleaded [based on executive compensation] alone, virtually every company in the United States that experiences a downturn in stock price could be forced to defend securities fraud actions." *Acito*, 47 F.3d at 54; *see also Kalnit*, 264 F.3d at 139 ("Insufficient motives, we have held, can include . . . the desire to keep stock prices high to increase officer compensation."); *Ferber v. Travelers Corp.*, 785 F. Supp. 1101, 1107 (D. Conn. 1991) ("[I]ncentive compensation can hardly be the basis on which an allegation of fraud is predicated."). Plaintiffs' attempt to establish motive based on allegations of incentive-based compensation therefore fails.

### c.  Defendants' Secondary Stock Offerings

Finally, Plaintiffs argue that Defendants were "motivated to commit the fraud alleged in the Complaint in order to raise millions of dollars in capital." (Pls.' Mem. 26.) Plaintiffs point to two secondary stock offerings by Jakks, which took place in December 1999 and in April 2002. According to Plaintiffs, Defendants fraudulently withheld material information regarding the bribery scheme in order "to influence investors to purchase shares" from these offerings. (*Id.* at 27.)

28

As an initial matter, this motive cannot be applied to the Individual Defendants. *See In re Twinlab Corp. Sec. Litig.*, 103 F. Supp. 2d 193, 207 (E.D.N.Y. 2000) (holding that increasing stock value in advance of a public offering is "not clearly in the *individual defendants'* economic self-interest[,]" but accepting that motive as applied to the corporate defendant); *In re Health Mgmt., Inc. Sec. Litig.*, 970 F. Supp. 192, 204 (E.D.N.Y. 1997) ("The plaintiffs do not expressly or even inferentially explain how [this motive] is in the informed economic self-interest of the Individual Defendants . . . .").

This motive also is insufficiently pled as to Defendant Jakks. As Plaintiffs describe their claim, "Defendants were . . . motivated to commit the fraud alleged in the Complaint in order to raise millions of dollars in capital." (Pls.' Mem. at 26.) According to Plaintiffs, this is adequate as the "inflation of a stock price to maximize revenue from secondary offerings is a sufficient allegation of motive." (*Id.*) However, the "Second Circuirt has specifically held that the motive of keeping the corporation's stock price high . . . . is not sufficient to sustain a plaintiff['s] pleading burden." *In re Duane Reade Inc. Sec. Litig.*, No. 02-CV-6478, 2003 WL 22801416, at *8 (S.D.N.Y. Nov. 25, 2003) (citing *Novak*, 216 F.3d at 307); *see also In re Corning Sec. Litig.*, No. 01-CV-6580, 2004 WL 1056063, at *27 (W.D.N.Y. Apr. 9, 2004) (noting an "attempt to boost stock prices to maximize the proceeds of [an] offering falls into the category of a generalized motive to maximize profitability and is, therefore, insufficient to meet the requirements of the PSLRA to raise a strong inference of scienter"), *aff'd*, No. 04-CV-2845, 2005 WL 714352 (2d Cir. Mar. 30, 2005). Thus, for example, general allegations that a company "wanted to maintain a higher stock price in order to pay down debt are insufficient to sustain its claims." *Duane Reade*, 2003 WL 22801416, at *9; *see also Kalnit*, 264 F.3d at 139.

29

Moreover, while "'in some circumstances, the artificial inflation of stock price in the acquisition context may be sufficient for securities fraud scienter[,]' . . . [g]eneralized allegations of a desire to achieve favorable terms in a merger or acquisition are insufficient." *In re JP Morgan Chase Sec. Litig.*, 363 F. Supp. 2d 595, 620 (S.D.N.Y. 2005) (quoting *Rothman*, 220 F.2d at 93); *see also In re AOL Time Warner, Inc. Sec. and "ERISA" Litig.*, 381 F. Supp. 2d 192, 218 (S.D.N.Y. 2004) (holding insufficient allegations that defendants sought to inflate stock price because they were "obsessed" with corporate merger). "If scienter could be pleaded on [such generalized claims], virtually every company in the United States that experiences a downturn in stock price could be forced to defend securities fraud actions." *San Leandro Emergency Med. Group*, 75 F.3d at 814; *see also Leventhal v. Tow*, 48 F. Supp. 2d 104, 115 (D. Conn. 1999). Instead, plaintiffs may satisfy the motive requirement by alleging that the stock price inflation was motivated by a desire to "achieve some more specific goal." *Complete Mgmt.*, 153 F. Supp. 2d at 328.

Plaintiffs attempt to avoid the reach of these principles by citing several cases for the proposition that it is sufficient to allege motive based on the profits derived from secondary stock offerings. These cases, however, are distinguishable as they involved specific allegations regarding the use of the proceeds from the secondary offerings that were sufficient to demonstrate that defendants derived a specific and concrete benefit from the fraud. For example, in *Twinlab Corp.*, the court held that plaintiffs had sufficiently alleged that defendants made fraudulent representations to "maximize the value of Twinlab stock in the stock-for-stock trade with [another company], thus minimizing the actual number of Twinlab shares to be tendered." 103 F. Supp. 2d at 206. Similarly, in *Time Warner*, the court found sufficient allegations that

defendants had committed fraud to maintain a high stock price prior to the announcement of a new rights offering and to lessen the dilutive impact of that offering. 9 F.3d at 269-70.[7]

Here, Plaintiffs make no specific allegation that Defendants were motivated to artificially inflate the stock price of Jakks shares for any specific, concrete purpose. For example, there is no particular acquisition or capital plan that Plaintiffs allege took place or was even on the horizon when Defendants allegedly committed fraud. Moreover, even if Plaintiffs alleged that Jakks might use the proceeds of the secondary offerings to acquire another company, the lack of specificity about the target or timing of any such transaction would be fatal to Plaintiffs' claim here. *See Keeney v. Larkin*, 306 F. Supp. 2d 522, 536 (D. Md. 2003) (noting that there was no allegation that defendant "acquired any specific company in a majority-stock deal where the stock value had been inflated artificially").

Finally, Plaintiffs' general allegations fail to account for the sequence of events they allege. In particular, most of the allegedly false statements made by Defendants post-date the December 1999 offering and approximately half of the statements followed the April 2002 offering. (CAC ¶¶ 61-144.) And, those that preceded April 2002 – for example, the proxy statements regarding the WWE licenses – did so by nearly two years. Thus, as alleged by Plaintiffs, there is simply an insufficient connection between most of the allegedly false statements and the secondary stock offerings to substantiate any reasonable finding that Jakks

---

[7]Similarly concrete motives were found to be alleged in other cases cited by Plaintiffs. *See, e.g.*, *Complete Mgmt.*, 153 F. Supp. at 328 (denying motion to dismiss where plaintiffs' allegation that defendants sought to artificially inflate stock price "as currency for acquisitions that would leverage what the defendants knew were ultimately uncollectible receivable," and finding such allegation to be "an extremely contextual one"); *Duncan v. Pencer*, No. 94-CV-0321, 1996 WL 19043, at *14 (S.D.N.Y. Jan. 18, 1996) (finding allegation that defendant engaged in fraudulent conduct to complete two large offerings in order to finance planned capital expansion plan to be sufficient).

31

was motivated to misspeak in order to profit from these offerings.  *See JP Morgan Chase*, 363 F.

Supp. 2d at 620 ("A number of the allegedly deceptive representations thus occurred before

Chase and JP Morgan were even actively discussing the possibility of merging.  The unstated

presumption that Chase began defrauding its own shareholders in contemplation of entering into

merger talks is too nebulous to raise a strong inference of scienter."); *Duane Reade*, 2003 WL

22801416, at *9 (noting that majority of acquisitions partly financed by stock offerings preceded

the allegedly false statements).

Accordingly, the Court finds that Plaintiffs have not adequately pled scienter based on

allegations of motive and opportunity to commit fraud.

## 2.  Conscious Misbehavior or Recklessness

While the Court finds that Plaintiffs have failed to adequately allege motive, "it is still

possible to plead scienter by identifying circumstances indicating conscious behavior by the

defendant, though the strength of the circumstantial allegations must be correspondingly

greater." *Kalnit*, 264 F.3d at 142 (internal quotation marks omitted).  "Reckless conduct is, at the

least, conduct which is highly unreasonable and which represents an extreme departure from the

standards of ordinary care." *Canandaigua*, 944 F. Supp. at 1213 (internal quotation marks and

citations omitted).  To state a claim based on recklessness, a plaintiff can either "specifically

allege[ ] defendants' knowledge of facts or access to information contradicting their public

statements[,]" or allege that defendants "failed to check information they had a duty to monitor."

*Novak*, 216 F.3d at 308, 311.  "Under such circumstances, defendants knew or, more

importantly, should have known that they were misrepresenting material facts . . . ."  *Kalnit*, 264

F.3d at 142.  More particularly,

> [t]o establish scienter in misrepresentation cases, facts must be alleged which particularize how and why each defendant actually knew, or was reckless in not knowing, that the statements were false at the time made.  To establish scienter in omission cases, facts must be alleged which show that each defendant knew, or was reckless in not knowing, the information the plaintiff alleges the defendant failed to disclose.

*Silva Run Worldwide Ltd. v. Bear Stearns & Co.*, No. 96-CV-5102, 2000 WL 1672324, at *4 (S.D.N.Y. Nov. 6, 2000) (internal citations omitted); *see also In re Initial Public Offering Sec. Litig.*, 358 F. Supp. 2d 189, 214 (S.D.N.Y. 2004).  Generally, "[w]here plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information."  *Novak*, 216 F.3d at 309.  "In determining whether a strong inference of scienter has been pleaded, the Court must read the complaint *in toto* and most favorably to plaintiff."  *In re Regeneron Pharm., Inc. Sec. Litig.*, No. 03-CV-3111, 2005 WL 225288, at *24 (S.D.N.Y. Feb. 1, 2005) (internal quotation marks and citations omitted).

Applying this recklessness standard, courts in the Second Circuit have consistently found conscious misbehavior or recklessness where defendants were aware of information that directly contradicted their public statements.[8]  For example, in *Novak*, the Second Circuit held that defendants acted with scienter in making fraudulent statements about their inventory management practices where they "offer[ed] *false* reassurances that inventory was under control or [gave] *false* explanations for its growth."  216 F.3d at 311-12 (emphases added).  Similarly, in *Buxbaum v. Deutsche Bank, A.G.*, No. 98-CV-8460, 2000 WL 33912712 (S.D.N.Y. Mar. 7, 2000), Judge Koetl found evidence of conscious misbehavior where "[t]he facts alleged clearly

---

[8]Defendants argue that *only* statements that directly contradict their knowledge can rise to the level of conscious misbehavior or recklessness.  (Reply Mem. 25.)  But under that standard *no* omission would ever constitute recklessness, as an omission, by definition, does not directly contradict a statement, but rather otherwise renders that statement misleading.

suggest[ed] that takeover talks were well under way . . . , that [defendant] was personally involved in those talks, and that [defendant] falsely and knowingly denied the existence of those talks." *Id.* at *19. Other courts in the Second Circuit have similarly found conscious misbehavior or recklessness where defendants' public statements directly contradicted information known to them. *See, e.g., Cosmas v. Hassett*, 886 F.2d 8, 12-13 (2d Cir. 1989) (finding conscious misbehavior where defendants' statements cited sales to China as "an important new source of revenue" when they knew that Chinese import restrictions would limit such sales); *In re MCI Worldcom, Inc. Sec. Litig.*, 93 F. Supp. 2d 276, 285 (E.D.N.Y. 2000) (finding conscious misbehavior where company spokesperson defendant "falsely denied any 'official company intention'" to initiate a merger when merger talks were in fact underway).

As noted, however, courts within the Second Circuit have examined scienter in omission cases differently, focusing on the defendants' intent in failing to disclose certain information. *See, e.g.*, *Kalnit*, 264 F.3d at 144 (finding no recklessness where defendants failed to disclose that one section of a publicly-announced merger agreement had been modified by letter); *Canandaigua*, 944 F. Supp. at 1213-14 (finding no recklessness where defendants failed to disclose potential price discounting scheme).[9] To begin, these courts have recognized that mere nondisclosure, even if intentional, does not amount to securities fraud. *See Kalnit*, 264 F.3d at 143 (noting that "defendants' recklessness cannot be inferred from the failure to disclose"); *Canandaigua*, 944 F. Supp. at 1213 ("Scienter in 10b-5 actions is more than simple conscious

_____

[9]*Kalnit* and *Canandaigua*, however, are distinguishable from this case. In *Kalnit*, the court found that there was no clear duty to disclose the omitted information. 264 F.3d at 144. Here, as discussed above, Defendants' public statements about the acquisition of the licenses created such a duty. In *Canandaigua*, "plaintiffs . . . failed to show particularized facts that [defendant] made any false or misleading statement or omission." 944 F. Supp. at 1213. Again, that is not the case here.

nondisclosure."); *Zuckerman v. Harnischfeger Corp.*, 591 F. Supp. 112, 117 (S.D.N.Y. 1984)

("To prove scienter, more than a conscious failure to disclose must be shown." (internal

quotation marks omitted)).  "Rather, there must be proof that the non-disclosure was intended to

mislead." *Zuckerman*, 591 F. Supp. at 117; *see also In re Geopharma, Inc. Sec. Litig.*, 411 F.

Supp. 2d 434, 446 (S.D.N.Y. 2006) (noting that "a failure to disclose particular information, by

itself, can only constitute recklessness if there was an obvious duty to disclose that

information").        From these and other cases, Defendants argue that "there must be some

allegation that Defendants <u>knew</u> that the information [about the alleged bribery scheme] should

have been disclosed <u>and consciously</u> failed to do so."  (Defs.' Mem. of Law in Supp. of Their

Mot. to Dismiss the Consolidated Am. Compl. 48 ("Defs.' Mem.").)  Here, Defendants insist that

a duty to disclose the uncharged bribery scheme (which they deny) did not arise merely because

they made statements about the WWE licenses that were literally true.  However, taking

Plaintiffs' allegations as true, Defendants engaged in acts of illegal commercial bribery that

directly resulted in the acquisition and/or extension of the lucrative WWE licenses.

Furthermore, if Plaintiffs' allegations are true, Defendants knew that the bribery scheme was

illegal, as evidenced by the extensive measures they took to prevent its discovery.  (CAC ¶¶ 42-

49 (discussing the alleged "laundering" of money to conceal the alleged bribery payments), ¶¶

101, 109, 112, 115, 126 (noting Defendants' false responses to subpoena and letter requests from

WWE seeking documents and information).)  Indeed, Friedman and Berman allegedly received a

legal opinion from Jakks's outside counsel indicating that payments to SSAI, while it was acting

as WWE's non-exclusive licensing representative, constituted a "material conflict of interest."

(*Id*. ¶ 36.)  Thus, there can be no claim, as is often made, that the Individual Defendants were

unaware of the alleged undisclosed misconduct.

The only question, then, is whether Plaintiffs have sufficiently alleged facts demonstrating that Defendants acted recklessly in not disclosing what they knew about the actual circumstances surrounding the acquisition of the WWE licenses. The Court finds that Plaintiffs have met their burden. Given Defendants' alleged clear knowledge of, and indeed participation in, the illegal bribes, and given the direct nexus between those bribes and the acquisition of the WWE licenses, Defendants' public statements regarding the acquisition and renewal of those licenses and the statements as to *how* Jakks acquired the licenses – namely, by leveraging Jakks's long-term relationship with WWE, (*see, e.g.*, *id.* ¶¶ 68, 99) – were at least recklessly misleading. Moreover, given the combination of Defendants' role in the alleged bribery and in issuing the allegedly misleading statements, the Court finds that Plaintiffs have adequately alleged facts circumstantially demonstrating that "[D]efendants knew or, more importantly, should have known that they were misrepresenting material facts . . . ." *Kalnit*, 264 F.3d at 142. Under the circumstances, and drawing all reasonable inferences in Plaintiffs' favor, the Court finds that these allegations are sufficient to plead that Defendants acted with the intent to deceive. *See Sotheby's Holdings*, 2000 WL 1234601, at *8 (finding scienter adequately pled and denying motion to dismiss where complaint alleged individually named defendants "were directly involved in arranging the illegal price-fixing agreement, and that each of them signed 10-Ks that, in light of the illegal agreement, they knew were false or misleading"). Moreover, "read[ing] the complaint *in toto* and most favorably to plaintiff[,]" *Regeneron Pharm.*, 2005 WL 225288, at *24 (internal quotation marks omitted), Defendants' failure to disclose the alleged bribery scheme, even as they publicly trumpeted the acquisition and renewal of the WWE

licenses, was "highly unreasonable and . . . represent[ed] an extreme departure from the standards of ordinary care." *Canandaigua*, 944 F. Supp. at 1213 (internal quotation marks omitted).

Accordingly, the Court finds that Defendants "knew or were highly unreasonable in not knowing that they were doing something illicit" when they withheld material information regarding the commercial bribery scheme while making public statements about the acquisition and renewal of the WWE licenses.[10]  *Id.* at 1213-14.

F.  Control Person Liability

Plaintiffs have also asserted that the Individual Defendants were liable for Jakks's alleged Section 10(b) and Rule 10b-5 violations as controlling persons under Section 20(a) of the 1934 Act.  Section 20(a) provides:

> [e]very person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a).  "In order to establish a *prima facie* case of liability under § 20(a) [in the Second Circuit], a plaintiff must show:  (1) a primary violation by a controlled person; (2)

---

[10]In support of their argument that they did not act recklessly, Defendants rely heavily on *Johnson v. NYFIX, Inc.*, 399 F. Supp. 2d 105 (D. Conn. 2005), in which the court found no recklessness in defendants' accounting omissions.  But *NYFIX* is readily distinguishable.  The plaintiffs in *NYFLIX* did not adequately allege that defendants knew that their accounting statements contained flaws.  *See id.* at 115.  Indeed, "the financial statements in question were approved by accounting firms not alleged to have been involved in wrongdoing[.]"  *Id.* at 117. In other words, the *NYFLIX* court found that the complaint did not sufficiently allege that defendants were aware of the challenged omission.  That is not the case here, as the CAC sufficiently pleads that Defendants were aware of the alleged bribery scheme.

control of the primary violator by the defendant; and (3) 'that the controlling person was in some meaningful sense a culpable participant' in the primary violation." *Boguslavsky v. Kaplan*, 159 F.3d 715, 720 (2d Cir. 1998) (quoting *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1472 (2d Cir. 1996)).

Here, the Section 20(a) control person claims asserted against the Individual Defendants are premised on primary violations by Jakks of Section 10(b) and Rule 10b-5. Because the Court found those primary liability claims sufficient to survive Defendants' Motion to Dismiss, the Section 20(a) claims have the requisite primary violation foundation. Defendants do not deny that Plaintiffs have pled facts sufficient to satisfy the second element of a prima facie claim, that the Individual Defendants, as high-ranking executives at Jakks, possessed control over the alleged primary violator. *See First Jersey Sec.*, 101 F.3d at 1472-73 ("Control over a primary violator may be established by showing that the defendant possessed 'the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise.'" (quoting 17 C.F.R. § 240.12b-2)). Thus, the sufficiency of this claim turns on the question of each Individual Defendant's "culpable participation."

In *First Jersey Securities*, the Second Circuit held that a prima facie case of liability under Section 20(a) requires a plaintiff to show, *inter alia*, that "the controlling person was in some meaningful sense a culpable participant in the fraud perpetrated by the controlled person . . . ." 101 F.3d at 1472 (internal quotation marks, citations and alterations omitted). Subsequently, a number of Second Circuit cases have cited *First Jersey Securities* for the proposition that a plaintiff must show some level of culpable participation to establish a prima facie case of Section

20(a) liability.  *See, e.g., Suez Equity Investors, L.P. v. Toronto-Dominion Bank*, 250 F.3d 87,

101 (2d Cir. 2001) ("Controlling-person liability is a form of secondary liability, under which a

plaintiff may allege a primary § 10(b) violation by a person controlled by the defendant and

culpable participation by the defendant in the perpetration of the fraud." (citing *First Jersey Sec.*,

101 F.3d at 1472)); *Scholastic Corp.*, 252 F.3d at 77-78 (citing *First Jersey Sec.*, 101 F.3d at

1472)); *Ganino*, 228 F.3d at 170 (adopting *First Jersey Securities*' requirement that a plaintiff

show "that the controlling person was in some meaningful sense a culpable participant in the

fraud"); *Boguslavsky*, 159 F.3d at 720 ("In particular, we note that a determination of § 20(a)

liability requires an individualized determination of a defendant's control of the primary violator

as well as a defendant's particular culpability.").[11]  While the Court recognizes that there is

disagreement in the Second Circuit as to whether culpable participation must in fact be pled, the

Court agrees with the line of cases that holds that "culpable participation" is a pleading

requirement to state a Section 20(a) claim, and that it must be pled with the same particularity as

scienter under Section 10(b).  *See Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611, 660-61 (S.D.N.Y.

2007) ("[A] heightened pleading requirement applies to the 'culpable participation' element; the

plaintiff must plead with particularity facts giving rise to a strong inference that the controlling

person knew or should have known that the primary violator, over whom that person had control,

was engaging in fraudulent conduct." (internal quotation marks omitted)); *Kalin v. Xanboo, Inc.*,

No. 04-CV-5931, 2007 WL 273546, at *12 (S.D.N.Y. Jan. 31, 2007) ("Having surveyed the

---

[11] The Second Circuit first recognized the "culpable participation" component of Section 20(a) liability in *Lanza v. Drexel & Co.*, 479 F.2d 1277 (2d Cir. 1973), when it observed that the "intent of Congress in adding this section, passed at the same time as the amendment to Section 15 of the 1933 Act, was obviously to impose liability only on those directors who fall within its definition of control and who are in some meaningful sense culpable participants in the fraud perpetrated by controlled persons."  *Id.* at 1299.

relevant cases, the Court finds that the weight of Second Circuit precedent favors the view that a

Plaintiff plead 'culpable participation' to state a section 20(a) claim, and that such participation

must be plead with particularity."); *Lapin v. Goldman Sachs Group*, No. 04-CV-2236, 2006 WL

2850226, at \*17-21 (S.D.N.Y. Sept. 29, 2006) (discussing the divide in the Second Circuit and

holding that culpable participation must be pled with particularity).  Accordingly, in order to

withstand Defendants' Motion to Dismiss, Plaintiffs' Section 20(a) claim must allege, at a

minimum, particularized facts of each controlling person's conscious misbehavior or

recklessness.

 At this stage in the proceedings, Plaintiffs' allegations are sufficient to establish culpable

participation.  First, the CAC specifically contends that each of the Individual Defendants knew

of – and in fact participated in – the alleged commercial bribery scheme.  (*See, e.g.*, CAC ¶¶ 35-

36, 40, 42-43, 46.)  Second, Plaintiffs adequately allege that, by virtue of their executive

positions at Jakks, each Individual Defendant was responsible for statements that gave rise to the

duty to disclose the bribery scheme.  (*See, e.g.*, *id.* ¶¶ 16-18, 23-24.)  Indeed, at least some of the

allegedly fraudulent statements were signed by each of the Individual Defendants.  (*See, e.g.*, *id.*

¶¶ 64, 80.)  The Individual Defendants' knowledge of the alleged omitted information, coupled

with their control over and participation in the misleading statements that gave rise to the duty to

disclose that information, is sufficient to establish culpable participation.  Control person

liability with respect to the Individual Defendants is therefore adequately pled.

 G.  Defendants' "Strike Suit" Allegations

 Defendants also argue that Plaintiffs' CAC should be dismissed as an unacceptable

"strike suit."  (Defs.' Mem. 2.)  According to Defendants, Plaintiffs' admitted reliance on the

initial complaint filed in the related *WWE* case was improper.  (*Id.* 1 n.1, 52-53.)  In support of

this argument, Defendants point the Court to several cases criticizing what Defendants

characterize as similar suits:  *Garr v. U.S. Healthcare, Inc.*, 22 F.3d 1274 (3d Cir. 1994); *In re

Razorfish, Inc. Sec. Litig.*, 143 F. Supp. 2d 304 (S.D.N.Y. 2001); *Ferber v. Travelers Corp.*, 785

F. Supp. 1101 (D. Conn. 1991).

        If counsel for Plaintiffs had conducted no investigation beyond reading the complaint

filed in the *WWE* action, Defendants might prevail on this argument.  But that is not the case

here.  The CAC makes clear that counsel also read extensive "regulatory filings and reports,

securities analysts' reports and advisories about the Company, press releases, and media reports

about the Company . . . ."  (CAC 1.)  Such additional investigative steps are sufficient.  For

example, in *Garr*, counsel for plaintiff read a *Wall Street Journal* ("*WSJ*") article accusing

defendant of insider trading.  After reading the article, plaintiff's counsel examined other articles

about defendant, "as well as a report on background information on the company."  *Garr*, 22

F.3d at 1275.  Counsel also "obtained considerable other information about [defendant],

including filings it had made with the Securities and Exchange Commission."  *Id.*  In light of this

additional investigation, the court found counsel's partial reliance on the *WSJ* article to be

proper.  *See id.* at 1277, 1281.  The same holds true here, and the other authority cited by

Defendants is not to the contrary.[12]

_____

        [12]As noted above, Defendants cite *Ferber* and *Razorfish*.  In *Ferber*, although the court,
in dicta, criticized the action as a "strike suit," it ultimately dismissed the complaint not on those
grounds, but rather for failure to adequately plead fraud with particularity.  785 F. Supp. at 1106,
1109.  The adequacy of Plaintiffs' fraud allegations here have already been discussed in Part II.C
*supra*.  Similarly, the *Razorfish* court criticized plaintiffs' copycat pleadings in a footnote, but
the opinion cited by Defendants addressed an entirely unrelated issue and did not dismiss the
complaint.  143 F. Supp. 2d 306 n.1.

### III. Conclusion

For the foregoing reasons, Defendants' Motion to Dismiss is GRANTED without

prejudice.  Plaintiffs are given thirty (30) days from the date of this Opinion and Order to seek

leave to amend the CAC.  The Clerk of Court is respectfully directed to terminate the Motions

(Docket No. 65 and 71).


SO ORDERED.

Dated:          January 25, 2008
                White Plains, New York

                                              KENNETH M. KARAS
                                              UNITED STATES DISTRICT JUDGE

42

Service List:

Kirk E. Chapman, Esq.
Peter Edward Seidman, Esq.
Sharon Maine Lee, Esq.
Milberg Weiss Bershad & Schulman, LLP
One Pennsylvania Plaza
New York, New York 10119
*Counsel for Plaintiffs*

David Avi Rosenfeld, Esq.
Samuel Howard Rudman, Esq.
Mario Alba, Jr., Esq.
Coughlin, Stoia, Geller, Rudman & Robbins, LLP
58 South Service Road, Suite 200
Melville, New York 11747
*Counsel for Plaintiff Lydia Garcia and others similarly situated*

William Edward Bernarduci, Esq.
Schatz and Nobel PC
20 Church Street, Suite 1700
Hartford, Connecticut 06103
*Counsel for Plaintiff Allan Schrager*

Ken H. Chang, Esq.
Marian P. Rosner, Esq.
Michael Adam Schwartz, Esq.
Wolf Popper LLP
845 Third Avenue
New York, New York 10022-6689
*Counsel for Plaintiff James T. Kahn and others similarly situated*

Frederick Taylor Isquith, Sr., Esq.
Gustavo Fabian Bruckner, Esq.
Wolf, Haldenstein, Adler, Freeman & Herz L.L.P.
270 Madison Avenue
New York, New York 10016
*Counsel for Plaintiff Quantum Equities L.L.C. and others similarly situated*

Alfred G. Yates, Jr., Esq.
Gerald L. Rutledge, Esq.
519 Allegheny Building
429 Forbes Avenue
Pittsburgh, Pennsylvania 15219
*Counsel for Plaintiff James Irvine and others similarly situated*

Eric James Belfi, Esq.
Labaton Sucharow, LLP
140 Broadway
New York, New York 10005
*Counsel for Plaintiff James Irvine and others similarly situated*

Marc A. Topaz, Esq.
Richard A. Maniskas, Esq.
Schiffrin & Barroway, L.L.P.
Three Bala Plaza East
Bala Cynwyd, Pennsylvania 19004
*Counsel for Plaintiff James Irvine and others similarly situated*

Jonathan Honig, Esq.
Feder, Kaszovitz, Isaacson, Weber, Skala, Bass & Rhine LLP
750 Lexington Avenue
New York, New York 10022
*Counsel for Defendants*

Jonathan J. Lerner, Esq.
Michael H. Gruenglas, Esq.
Maura B. Grinalds, Esq.
Skadden, Arps, Slate, Meagher & Flom LLP
Four Times Square
New York, New York 10036
*Counsel for Defendants*