UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ———————————————— x | |
| In re JAKKS PACIFIC, INC. SHAREHOLDERS CLASS ACTION LITIGATION | : Civil Action No. 04-CV-8807 (KMK) |
| | : **ELECTRONICALLY FILED** |
| ———————————————— | : |
| | : CLASS ACTION |
| This Document Relates To: | : |
| | : NOTICE OF PLAINTIFFS' MOTION FOR |
| ALL ACTIONS. | : LEAVE TO FILE A SECOND AMENDED |
| | : COMPLAINT |
| ———————————————— x | |

**PLEASE TAKE NOTICE** that, upon the accompanying memorandum of law and all prior proceedings herein, Lead Plaintiffs Kenneth J. Tucker, Tonia R. Tucker-Kraus, Michael Kraus (the "Tucker Group") and Indiana Electrical Workers Pension Trust Fund IBEW (collectively, "Plaintiffs") respectfully move this Court before the Honorable Kenneth M. Karas at the United States Courthouse for the Southern District of New York, 300 Quarropas Street, White Plains, New York 10601, on a date and time to be designated by the Court, for an Order pursuant to Rule 15(a) of the Federal Rules of Civil Procedure granting Plaintiffs leave to file a second amended complaint in the form attached as Exhibit A hereto.

DATED: February 25, 2008

COUGHLIN STOIA GELLER
   RUDMAN & ROBBINS LLP
SAMUEL H. RUDMAN
DAVID A. ROSENFELD
MARK S. REICH

_____
            */s/ Samuel H. Rudman*
            SAMUEL H. RUDMAN

58 South Service Road, Suite 200
Melville, NY 11747
Telephone: 631/367-7100
631/367-1173 (fax)

MILBERG WEISS LLP
KIRK E. CHAPMAN
MATTHEW A. KUPILLAS
TODD KAMMERMAN

_____
            */s/ Matthew A. Kupillas*
            MATTHEW A. KUPILLAS

One Pennsylvania Plaza
New York, NY 10119-0165
Telephone: 212/946-9377
212/868-1229 (fax)
Email: mkupillas@milbergweiss.com

*Attorneys for Lead Plaintiffs and the Class*

- 1 -

## <u>CERTIFICATE OF SERVICE</u>

I, Samuel H. Rudman, hereby certify that on February 25, 2008, I caused a true and correct copy of the attached NOTICE OF PLAINTIFFS' MOTION FOR LEAVE TO FILE A SECOND AMENDED COMPLAINT to be served: (i) electronically on all counsel registered for electronic service for this case; and (ii) by first-class mail to all additional counsel on the attached service list.

*/s/ Samuel H. Rudman*

SAMUEL H. RUDMAN
Attorney for Lead Plaintiffs and the Class
COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)
Email: srudman@csgrr.com

**IN RE JAKKS PACIFIC, INC. SHAREHOLDERS CLASS ACTION LITIGATION**

## SERVICE LIST

**Plaintiffs' Counsel**

| | |
|---|---|
| Kirk E. Chapman<br>Matthew A. Kupillas<br>Todd Kammerman<br>**Milberg Weiss LLP**<br>One Pennsylvania Plaza<br>New York, NY  10119<br>Tel: (212) 594-5300<br>Fax: (212) 868-1229 | Samuel H. Rudman<br>David A. Rosenfeld<br>Mark S. Reich<br>**Coughlin Stoia Geller Rudman &**<br>**Robbins LLP**<br>58 South Service Road, Suite 200<br>Melville, NY  11747<br>Tel: (631) 367-7100<br>Fax: (631) 367-1173 |

**Defendants' Counsel**

| | |
|---|---|
| Isaac S. Greaney<br>**Sidley Austin LLP**<br>787 7th Avenue, 22nd Floor<br>New York, NY  10019<br>Tel.: (212) 906-2000<br>Fax: (212) 839-5599 | Michael H. Gruenglas<br>**Skadden, Arps, Slate, Meagher & Flom LLP**<br>Four Times Square<br>New York, NY  10036<br>Tel.: (212) 735-3000<br>Fax: (212) 735-2000 |
| John R. Williams<br>**Williams & Pattis, LLC**<br>51 Elm Street, Suite 409<br>New Haven, CT  06510<br>Tel.: (203) 562-9931<br>Fax: (203) 776-9494 | Murray L. Skala<br>Jonathan D. Honig<br>**Feder, Kaszovitz, Isaacson, Weber, Skala,**<br>**Bass & Rhine, LLP**<br>750 Lexington Avenue<br>New York, NY  10022<br>Tel. (212) 888-8200<br>Fax: (212) 888-5968 |

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————— x

In re JAKKS PACIFIC, INC.
SHAREHOLDERS CLASS ACTION
LITIGATION

———————————————————— x

:   Civil Action No. 04-CV-8807 (KMK)
:
:   [PROPOSED] SECOND CONSOLIDATED
:   AMENDED COMPLAINT FOR
:   VIOLATIONS OF THE FEDERAL
:   SECURITIES LAWS

Plaintiffs have alleged the following based upon the investigation of plaintiffs' counsel, which included a review of United States Securities and Exchange Commission ("SEC") filings by JAKKS Pacific, Inc. ("JAKKS" or the "Company"), as well as regulatory filings and reports, securities analysts' reports and advisories about the Company, press releases, and media reports about the Company, a review of the Complaint filed in the case captioned *World Wrestling Entertainment v. JAKKS Pacific, Inc. et al.*, 04cv8223 (S.D.N.Y.) and plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This consolidated class action is filed on behalf of all persons and entities who purchased or otherwise acquired the securities of JAKKS between December 3, 1999, and October 19, 2004, inclusive, (the "Class Period") and who were damaged thereby, seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2.     Defendant JAKKS designs, develops, produces and markets toys and related products. The Company focuses its business on acquiring or licensing well-recognized trademarks and brand names, such as Nickelodeon, Rugrats, Dora the Explorer, Blue's Clues, SpongeBob Squarepants, Mickey Mouse, Winnie the Pooh, Kim Possible, Finding Nemo and Hello Kitty. JAKKS also develops proprietary brands and marks.

3.     JAKKS also licensed certain intellectual property from World Wrestling Entertainment, Inc. ("WWE"). WWE is an integrated media and entertainment company engaged in the development, production and marketing of television and live events, and the licensing and sale of products featuring its WWE brands.

4.     On or about October 24, 1995, JAKKS and WWE entered into a license agreement whereby JAKKS had the right to manufacture and market WWE toys in the United States. Later,

however, in an effort to expand its lucrative WWE licenses, JAKKS bribed a senior WWE executive, James Bell ("Bell"), who was responsible for negotiating and managing license agreements, and WWE's licensing agent, Stanely Shenker & Associates, Inc. ("SSAI"), among others. In exchange for the bribes from JAKKS, laundered through foreign corporations, Bell and SSAI agreed to assist JAKKS in securing a WWE videogame license and favorable amendments to the toy license.

5.    The scheme worked and, on or about February 10, 1997, WWE, at the recommendation of SSAI and Bell, entered into an international toy license agreement with JAKKS. Then, in June 1998, SSAI and Bell convinced WWE management to enter into a video game license agreement with THQ & JAKKS Pacific LLC ("THQ/JAKKS"), a joint venture formed by JAKKS and video game maker THQ Inc. The ten year video game license expires on December 31, 2009, with an additional five year renewal option in favor of THQ/JAKKS. In June 1998, SSAI and Bell also directed WWE to extend the term of the JAKKS' domestic and international toy licenses to make them conterminous with the long-term video game license.

6.    The WWE videogame license and toy licenses were extremely lucrative for JAKKS. Throughout the Class Period, JAKKS publicly reported quarter after quarter of positive results which it attributed, in material part, to its WWE product line. At all relevant times, however, defendants failed to disclose that in order to get the licenses, they had bribed SSAI and Bell, among others.

7.    The truth began to emerge on October 19, 2004. On that day, before the market opened, JAKKS issued a press release announcing its third-quarter 2004 financial results. At that time, JAKKS stunned investors when it revealed that the Company was "engaged in discussions with WWE over the validity of its toy and video games license." This press release stated, in relevant part, the following:

- 2 -

*The Company also announced that it is engaged in discussions with WWE concerning the restructuring of its toy license and with WWE and THQ with respect to the restructuring of the JAKKS THQ Joint Venture video games license agreement with WWE*. The discussions are an outgrowth of certain litigation that has been pending between WWE and a former licensing consultant to WWE and a former employee of WWE, to which the Company is not a party. *WWE has raised questions about the validity of the licenses as a result of certain transactions between the Company and that licensing consultant that occurred more than six years ago. The Company has denied any wrongdoing in connection with the transactions with the licensing consultant and maintains that they were unrelated to either the toy or video game license*. If the discussions are satisfactorily concluded, the restructuring of the licenses may have an impact on the Company's future revenues and net income to an extent that is presently unknown. *If the discussions with WWE and THQ are not satisfactorily concluded, the Company anticipates that litigation is likely to be commenced by WWE challenging the validity of the licenses and seeking compensatory and punitive damages, in which event the Company intends to vigorously defend itself against claims which it believes are without merit*. [Emphasis added.]

8.    In reaction to this news, the price of JAKKS common stock declined precipitously, falling $5.34 per share, or 22%, from its previous day's closing price of $24.15, to close at $18.81.

9.    Later that same day, also on October 19, 2004, news reports indicated that the WWE had filed a complaint against JAKKS and the Individual Defendants, among others ("WWE Action"), alleging that they had perpetrated a massive bribery scheme involving lucrative licensing deals, in violation of the Racketeer Influenced and Corrupt Organization Act ("RICO") and anti-bribery laws. On the following trading day, October 20, 2004, the price of JAKKS stock again dropped in reaction to this news: falling $5.85 per share, or 31 % from its closing price on October 19, 2004, to close at $12.96 per share. In total, the price of JAKKS common stock declined from $24.15 per share to $12.96 per share in reaction to the news of the problems with the WWE and the WWE licenses.

## JURISDICTION AND VENUE

10.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act [15 U.S.C. §§78j(b) and 78t(a)], and Rule 10-5 promulgated thereunder by the SEC [17 C.F.R. §240.10b-51].

11.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331 and 1337 and Section 27 of the Exchange Act [15 U.S.C. §78aa].

12.     Venue is proper in this District pursuant to Section 27 of the Exchange Act, and 28 U.S.C. §1391(b).  Many of the acts charged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District.

13.     In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the NASDAQ National Market.

## PARTIES

14.     Lead Plaintiffs Indiana Electrical Workers Pension Trust Fund IBEW, Kenneth J. Tucker, Tonia R. Tucker-Kraus and Michael Kraus purchased JAKKS common stock during the Class Period, as set forth in their respective certifications, filed previously with this Court which are incorporated herein by reference, and were damaged thereby.

15.     Defendant JAKKS is a Delaware corporation which maintains its corporate headquarters at 22619 Pacific Coast Highway, Malibu, CA 90265.

16.     Defendant Jack Friedman ("Friedman") was, at all relevant times, Chairman and Chief Executive Officer of the Company.  Prior to co-founding JAKKS, defendant Friedman was CEO and a director of THQ, Inc.

17.     Defendant Steven G. Berman ("Berman") was, at all relevant times, President, Chief Operating Officer, and Secretary of the Company.  Prior to co-founding JAKKS, defendant Berman was Vice President and Managing Director of THQ International, a subsidiary of THQ, Inc.

18.     Defendant Joel M. Bennett ("Bennett") was, at all relevant times, Chief Financial Officer and an Executive Vice President of the Company.

19.     Defendants Friedman, Berman, and Bennett are collectively referred to herein as the "Individual Defendants."

20.     Because of the Individual Defendants' positions with the Company, they had access to the adverse undisclosed information about its business, operations, products, operational trends, financial statements, markets and present and future business prospects, access to internal corporate documents (including the Company's operating plans, budgets and forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof and via reports and other information provided to them in connection therewith.

21.     It is appropriate to treat the Individual Defendants as a group for pleading purposes and to presume that the false, misleading and incomplete information conveyed in the Company's public filings, press releases and other publications as alleged herein are the collective actions of the narrowly defined group of defendants identified above.  Each of the above officers of JAKKS, by virtue of their high-level positions with the Company, directly participated in the management of the Company, was directly involved in the day-to-day operations of the Company at the highest levels and was privy to confidential proprietary information concerning the Company and its business, operations, products, growth, financial statements, and financial condition, as alleged herein.  Said defendants were involved in drafting, producing, reviewing and/or disseminating the false and

- 5 -

misleading statements and information alleged herein, were aware or recklessly disregarded, that the false and misleading statements were being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.

22.     As officers and controlling persons of a publicly-held company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, traded on the NASDAQ National Market during the Class Period, and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to disseminate promptly, accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings and present and future business prospects, and to correct any previously-issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly-traded securities would be based upon truthful and accurate information.  The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

23.     The Individual Defendants participated in the drafting, preparation, and/or approval of the various public reports and other communications complained of herein and were aware of, or recklessly disregarded, the misstatements contained therein and omissions therefrom, and were aware of their materially false and misleading nature.  Because of their Board membership and/or executive and managerial positions with JAKKS, each of the Individual Defendants had access to the adverse undisclosed information about JAKKS' business prospects and financial condition and performance as particularized herein and knew (or recklessly disregarded) that these adverse facts rendered the positive representations made by or about JAKKS and its business issued or adopted by the Company materially false and misleading.

24.     The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to and did control the content of the various SEC filings, press releases and other public statements pertaining to the Company during the Class Period.  Each Individual Defendant was provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected.  Accordingly, each of the Individual Defendants is responsible for the accuracy of the public reports and press releases detailed herein and is therefore primarily liable for the representations contained therein.

25.     Each of the defendants is liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of JAKKS common stock by disseminating materially false and misleading statements and/or concealing material adverse facts.  The scheme: (i) deceived the investing public regarding JAKKS business, finances, financial statements and the intrinsic value of JAKKS common stock; and (ii) caused plaintiffs and other members of the Class to purchase JAKKS securities at artificially inflated prices.

## CLASS ACTION ALLEGATIONS

26.     Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired the securities of JAKKS between December 3, 1999 and October 19, 2004, inclusive (the "Class"), and who were damaged thereby.  Excluded from the Class are defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

27.     The members of the Class are so numerous that joinder of all members is impracticable.  As of November 9, 2004, there were approximately 26.2 million shares of JAKKS

common stock outstanding that were actively traded on the NASDAQ. While the exact number of

Class members is unknown to plaintiffs at this time and can only be ascertained through appropriate

discovery, plaintiffs believe that there are hundreds or thousands of members in the proposed Class.

Record owners and other members of the Class may be identified from records maintained by

JAKKS or its transfer agent and may be notified of the pendency of this action by mail, using the

form of notice similar to that customarily used in securities class actions.

28.     Plaintiffs' claims are typical of the claims of the members of the Class as all members

of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is

complained of herein.

29.     Plaintiffs will fairly and adequately protect the interests of the members of the Class

and has retained counsel competent and experienced in class and securities litigation.

30.     Common questions of law and fact exist as to all members of the Class and

predominate over any questions solely affecting individual members of the Class. Among the

questions of law and fact common to the Class are:

        (a)     whether the federal securities laws were violated by defendants' acts as

alleged herein;

        (b)     whether statements made by defendants to the investing public during the

Class Period misrepresented material facts about the business, operations and financial statements of

JAKKS; and

        (c)     to what extent the members of the Class have sustained damages and the

proper measure of damages.

31.     A class action is superior to all other available methods for the fair and efficient

adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the

damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## SUBSTANTIVE ALLEGATIONS

### Background

32.    JAKKS was formed as a Delaware corporation in January 1995 and began operations as of April 1, 1995. Since its inception, the Company has operated as a multi-line, multi-brand toy company that designs, develops, produces and markets toys and related products. At the start of the Class Period, the Company's principal products were: (i) action figures and accessories featuring licensed characters, principally from WWE; (ii) Flying Colors molded plastic activity sets, clay compound playsets and lunch boxes; (iii) Wheels division products, including Road Champs die-cast collectible and toy vehicles and Remco toy vehicles and role-play toys and accessories; (iv) Child Guidance infant and pre-school electronic toys, toy foam puzzle mats and blocks, activity sets and outdoor products; and (v) fashion and mini dolls and related accessories.

33.    WWE is an integrated media and entertainment company, engaged in the development, production, and marketing of television and pay-per-view programming, and live events; and the licensing and sale of branded consumer products. WWE has a worldwide licensing program using its WWE marks and logos, copyrighted works, and characters on a variety of retail products, including toys, video games, apparel, and books. Its direct merchandise operations consist of the design, sourcing, marketing, and distribution of various WWE-branded products, such as T-shirts, caps, and other novelty items, all of which feature its superstars and/or its logo. WWE also publishes two magazines, RAW and SmackDown! The company has offices in New York City, Los Angeles, Toronto, and London. WWE was founded by Vincent and Linda McMahon, and is headquartered in Stamford, Connecticut.

- 9 -

34.     On or about October 24, 1995, WWE and JAKKS entered into a domestic toy license, the term of which was to end on December 31, 2007, with a one-year right to renew if JAKKS achieved certain requirements.  In obtaining this license, the JAKKS toy license proposal was presented to WWE through its licensing agent, Stanley Shenker and/or Stanley Shenker & Associates Inc. ("SSAI").  Previously, in or about April 1995, WWE had retained Shenker and SSAI as the Company's non-exclusive licensing agent.

35.     Unbeknownst to WWE and investors, however, after such time as the original JAKKS/WWE toy license was negotiated, defendants entered into an undisclosed agency agreement with Shenker and/or SSAI.  Defendants' failure to disclose the relationship with Shenker and/or entities he controlled was material at that time, because Shenker already had an agency relationship with WWE.  The simultaneous representation of WWE by Shenker and/or SSAI, and of JAKKS by Shenker and/or SSAI, constituted a clear conflict of interest.

36.     Moreover, having previously acted as the non-exclusive agent who negotiated the WWE/JAKKS domestic toy license, Friedman and Berman were well aware of Shenker's agency relationship with WWE at the time he was hired by the Company to act as JAKKS agent related to WWE products, at the 1996 New York Toy Fair.  Moreover, as early as 1996, Friedman and Berman had received a legal opinion from Murray Skala, JAKKS outside legal counsel and a member of the Board of the Company, that the Company's retention of Shenker and/or SSAI to represent it in negotiating with WWE resulted in a material conflict of interest.  According to Skala, at that time, an arrangement between Shenker, SSAI and JAKKS would *not* be legal absent WWE's informed consent.

37.     Unaware of the undisclosed relationship between Shenker, SSAI and JAKKS, however, on or about February 10, 1997, WWE and JAKKS entered into an international toy license

having a term which was to end December 31, 1999. At that time, no disclosure was made regarding Shenker's representation of JAKKS. Additionally, on March 7, 1997, WWE expanded its relationship with Shenker and SSAI, and entered into an Agency Agreement with SSAI, whereby SSAI became the *exclusive* outside licensing agent for WWE.

38.     Under the Agency Agreement, SSAI was responsible for procuring potential licenses and presenting all license proposals to WWE. The procedure for presenting such license proposals was for SSAI to present a deal memo to James Bell, Senior Vice President of Licensing and Merchandising for WWE. Bell, a long-time friend and business associate of Shenker, was responsible for reviewing the licensing proposals, and advising WWE senior management whether to accept or reject the proposed licensing offers.

39.     Pursuant to the SSAI Agency Agreement, however, SSAI was not entitled to any commissions for licenses independently procured by Bell and/or WWE. In addition, SSAI was also *not* entitled to commissions for licenses between WWE and third parties that pre-existed the formation of the SSAI Agency Agreement. Accordingly, SSAI was *not* entitled to any commissions relating to WWE's preexisting video game license with Acclaim Entertainment, Inc. ("Acclaim") which was, at that time, the exclusive licensee for the manufacture and sale of video games using WWE intellectual property. In the event that the Acclaim video game license was renewed, SSAI and Shenker would also *not* receive any commission on the preexisting license renewal.

40.     Thus, in order for Shenker to gain commissions on WWE video games, and in order for JAKKS to take this license from Acclaim, in or around 1998, Friedman, Berman and Shenker implemented a scheme and illegal course of conduct whereby defendants arranged to pay bribes and kickbacks to Shenker, which Shenker agreed to split with Bell, in exchange for their assistance in helping JAKKS procure the WWE video game licenses. These illegal payments ultimately allowed

JAKKS to gain the license to WWE's valuable video game franchise, as well as to make valuable amendments to, and expand the scope of, the Company's toy licenses.

41.    In order to perpetrate this scheme and illegal course of conduct, the illegal bribes and kickback payments were not recorded anywhere on the financial reports or records of JAKKS. Rather, to accomplish this bribery scheme, defendants "laundered" a series of clandestine payments through foreign corporations controlled by JAKKS and by Shenker and/or entities subject to his control, located primarily in Hong Kong, including an entity called Stanfull Industrial, Ltd. ("Stanfull").

42.    In early 1998, as negotiations were ongoing concerning WWE's video game license, at the direction of defendants Friedman and/or Berman, Shenker caused to be delivered to JAKKS, a handwritten $80,000 invoice from Stanfull.  This invoice, dated January 2, 1998, stated that this request for payment related to the development of "Possible Latex Based Soft Toys With Special Coating."  This invoice also directed that such payment be made to a Stanfull account at the Hang Seng Bank in Hong Kong.  At that time, no contract existed between JAKKS and Stanfull or any other Shenker entity to develop any "Soft Toys," and no such toys were ever developed by JAKKS for Shenker or Stanfull.

43.    Regardless of the fact that invoices submitted to the Company needed the signature of JAKKS CFO, defendant Bennett, the $80,000 Soft Toy invoice was paid without any signature. Rather, at the direction of defendants Berman and Friedman, this invoice was sent by defendant Bennett to JAKKS foreign agent in Hong Kong, with the instruction that $40,000 immediately be transferred to Stanfull, which payment was made on or about January 14, 1998.  Apparently, the $40,000 payment was withdrawn from an account at the Hang Seng Bank in Hong Kong, of Road Champs, Ltd., a foreign subsidiary owned and controlled by JAKKS.  The same day, Shenker

obtained a demand draft for $20,000 from the Hang Seng Bank, payable to James Bell, representing his equal split of the illegal bribe and kickback paid to Shenker and Stanfull.

44.    At or about the time that Road Champs paid the $40,000 to Stanfull, another foreign subsidiary of the Company, JAKKS Pacific, H.K., sent $40,000 via wire transfer to Road Champs to reimburse it for making the prior illegal kickback payment.  Road Champs did not record the payment to Stanfull, and recorded the $40,000 debit and credit as inter-company transfers.  In connection with these payments, the general ledgers of Road Champs were falsified to conceal the payment to Stanfull.  In addition, JAKKS did not record the invoice, nor any ensuing steps it took to pay the invoice, and this payment was not recorded anywhere on the financial reports or records of JAKKS.

45.    After receiving his split of the $40,000 bribe, Bell used his influence with WWE to cause it *not* to renew the Acclaim video game license.  Thus, before Acclaim could even submit its proposal, on or about March 30, 1998, Bell initialed a deal memo recommending to senior management of WWE that this valuable license be awarded to "JAKKS Pacific-Electronic Game Division," and identifying SSAI as the agent that had negotiated and procured the deal.  At that time, JAKKS did not maintain an "Electronic Game Division" and the Company had no ability to create or manufacture video games.

46.    On March 31, 1998, the day immediately after Bell had initialed the deal memo recommending the WWE video game license be awarded to JAKKS, defendant Bennett again directed JAKKS Hong Kong subsidiary to pay another $40,000 to Stanfull.  On or about April 2, 1998, JAKKS Pacific, H.K. wire transferred $40,000 to the Stanfull account at the Hang Seng Bank in Hong Kong.  That money was eventually split evenly with Bell.  This payment was also not recorded anywhere on the financial reports or records of JAKKS.

47.    On or about April 8, 1998, WWE management approved the deal memo submitted by Bell and SSAI, favoring grant of the WWE video game license to JAKKS.  Following this time, both THQ and Activision sent SSAI and/or Bell licensing proposals which were both superior to the JAKKS proposal.  These proposals were not provided to WWE management but, rather, were shared with defendants Friedman and/or Berman.

48.    Following this time, JAKKS was able to convince THQ, a company at which both Friedman and Berman previously held senior management positions, to become its partner in the video game business.  Since JAKKS had no ability to manufacture or develop video games, the partnership was nothing more than a tax on a deal which may otherwise have gone solely to THQ.  Regardless of the fact that JAKKS had no Electronic Games Division, SSAI, Shenker and Bell recommended to WWE management that the video game license be awarded to JAKKS for an unprecedented 10 year term, with a five-year renewal right.

49.    Having been convinced that JAKKS would receive the WWE video game license, and rather than risk losing the opportunity to participate entirely in this valuable license opportunity, in June 1998, THQ formed a joint venture with JAKKS.  The purpose of this joint venture was to develop, manufacture and market, under an exclusive license with World Wrestling Federation Entertainment ("WWF"), video games based on WWF characters and themes.

50.    Thereafter, on June 23, 1998, WWE executed a video game license agreement with JAKKS and THQ.  By this time, Shenker had also promised Bell that SSAI would split equally *all* commissions or payments that SSAI would receive as a result of the JAKKS/WWE video game license.  Also, at that time, SSAI, Shenker and Bell recommended to WWE that the JAKKS toy license be extended such that the terms of this license coincided with the terms of the video game license.

51.     The following day, June 24, 1998, the toy licenses granted to JAKKS by WWE were extended.  By July 15, 1998, another fake invoice requesting payment of $20,000 was sent to the attention of Berman at JAKKS, by Shenker.  Clandestine payment was achieved in a manner similar to that as had been done previously, Bennett directed JAKKS' Hong Kong subsidiary, Road Champs, to make payment to Stanfull at the Hang Seng Bank.  In addition, JAKKS did not record this invoice, nor any ensuing steps it took to pay this invoice, and this payment was not recorded anywhere on the financial reports or records of JAKKS.

52.     At no time prior to or during the Class Period did Defendants ever disclose that JAKKS had engaged in this scheme and illegal course of conduct in obtaining the WWE video games license or in extending or procuring the WWE toys licenses.  When repeatedly questioned by WWE, throughout the Class Period, as to whether the Company had ever made payments to Shenker, SSAI and/or Bell or any entities controlled thereby, Defendants repeatedly lied to WWE.  In fact, rather than disclose Defendants' scheme and illegal course of conduct, throughout the Class Period, Defendants repeatedly cited their success in obtaining the WWE licenses and used this purported success to justify multi-million dollar bonuses.

53.     By early 2004, if not earlier, Defendants were further aware that the WWE was contending that the WWE licenses had been obtained through a pattern of commercial bribery.  Furthermore, Defendants knew or recklessly disregarded that the fact that the WWE was contending that the WWE licenses had been obtained through commercial bribery exposed the Company to the heightened risk that the WWE would seek some modification to the WWE licensing agreements or complete nullification of those agreements.

54.     As a result of Defendants' materially false and misleading statements and material omissions, throughout the Class Period, Defendants also caused the price of JAKKS shares to be

- 15 -

artificially inflated.  Defendants were then able to take advantage of the fraud that they had caused, by directing the Company to issue millions of shares of Company stock and almost $100 million in debt convertible into shares of the Company.  In connection with these offerings, Company Insiders, including certain defendants named herein were able to sell millions of dollars of their personally held JAKKS common stock to the public while in possession of material adverse non-public information about the Company.  In addition, throughout the Class Period, Company insiders including certain of the defendants named herein, also routinely sold significant amounts of their privately held JAKKS common shares directly into the open market while in possession of material adverse non-public information about the Company.  In total, during the Class Period, JAKKS insiders were able to reap over $37.68 million in illicit proceeds from the sale of their personally held JAKKS shares.

55.     It was only at the end of the Class Period, however, on or about October 19, 2004, that investors learned the truth about JAKKS.  At that time, Defendants shocked investors after it was revealed that WWE had filed suit against the Company, seeking to rescind the WWE video game and toy licenses, and to recover damages, because such licenses were procured pursuant to a fraudulent scheme and illegal course of conduct which the WWE had since uncovered.  These belated disclosures also had a sudden dramatic effect on the price of JAKKS shares, causing the stock to fall in price precipitously and resulting in significant damages to plaintiffs and the Class.

**Materially False and Misleading
Statements Issued During the Class Period**

56.     The Class Period begins on December 3, 1999, immediately following the November 1999 press release of the Company's first series of WWF video games.  At that time, JAKKS filed a prospectus with the SEC on a Form 424B 1 ("Prospectus") in connection with a public offering of 3 million shares of common stock priced at $25.00 per share.  In the Prospectus, Defendants

highlighted the Company's strong product line of licensed and proprietary toys and products,

including the WWE branded products, stating in pertinent part as follows:

> We are a multi-line, multi-brand toy company that designs, develops, produces and
> markets licensed and proprietary toys and related products. . . . *We believe that our
> growth results from our well-known brand names, the breadth, quality and
> innovation of our product offerings and our strong relationships with retailers and
> suppliers*. Our net sales have increased from $41.9 million in 1997 to $85.3 million
> in 1998, representing a growth rate of 103.2%. Our net income has increased from
> $2.8 million in 1997 to $6.4 million in 1998, representing a growth rate of 128.8%.
> Our pro forma net sales and net income for the nine months ended September 30,
> 1999 were $158.0 million and $13.8 million, respectively, representing growth rates
> of 68.0% and 118.5% over the prior period. [Emphasis added.]

57.    As a result of the significance of the WWE video game and toy licenses to the future

growth and prosperity of the Company, the Prospectus provided significant detail about JAKKS

WWE video game development, its relationship with WWE and its agreement with THQ, stating, in

pertinent part, as follows:

WORLD WRESTLING FEDERATION VIDEO GAMES

> In June 1998, we formed a joint venture with THQ, a developer, publisher and
> distributor of interactive entertainment software for the leading hardware game
> platforms in the home video game market. *The joint venture entered into a license
> agreement with World Wrestling Federation Entertainment under which it
> acquired the exclusive worldwide right to publish World Wrestling Federation
> video games on all hardware platforms*. The games will be designed, developed,
> manufactured and marketed by the joint venture. We are entitled to receive a
> guaranteed preferred return, based on sales of the video games, and THQ is entitled
> to receive the balance of the profits. The term of the license agreement expires on
> December 31, 2009, subject to a right of the joint venture to renew the license for an
> additional five years under various conditions.

> *    *    *

> Wrestling video games have demonstrated consistent popularity, with two wrestling-
> theme video games among the top 10 video games, in terms of unit sales volumes, in
> 1998. Approximately 2.3 million units of these two games were sold in 1998, at
> retail prices ranging from approximately $42 to $60. . . . *We believe that as a
> franchise property, the World Wrestling Federation titles will have brand
> recognition and sustainable consumer appeal, which may allow the joint venture to
> use titles over an extended period of time through the release of sequels and*

*extensions and to re-release such products at different price points in the future*. . . . [Emphasis added.]

58.     The statements referenced above in ¶57 were materially false and misleading, and were known by defendants to be false at that time, or were recklessly disregarded as such thereby, because the statements failed to disclose the adverse fact that JAKKS had obtained the "exclusive right" to publish WWE video games as a result of the commercial bribery scheme set forth at ¶¶35-51 above.  In the absence of that adverse information, the discussion of the acquisition of the WWE video game license in ¶57 conveyed the false impression that the license was procured through sound and legal business practices.  The statements referenced in ¶57 above, as well as other public statements by JAKKS, made clear that the WWE video game license was expected to generate significant revenues for the Company "over an extended period of time" into the future.  The undisclosed information concerning the bribery scheme is material because a reasonable investor would have wanted to know if that source of revenue was threatened or unsustainable because it was improperly or illegally obtained.

59.     In connection with this Offering, certain "Selling Stockholders" liquidated hundreds of thousands of shares of their personally held JAKKS stock, as follows:

PRINCIPAL AND SELLING STOCKHOLDERS

| Name | Number of Shares Offered | Estimated Gross Proceeds |
|---|---|---|
| Jack Friedman (*)………… | 289,683 | $  7,242,075.00 |
| Stephen G. Berman(*)……. | 115,873 | $  2,896,825.00 |
| Robert E. Glick................... | 45,000 | $  1,125,000.00 |
| Michael G. Miller............... | 45,000 | $  1,124,000.00 |
| Murray L. Skala.................. | 60,000 | $  1,500.000.00 |
| Total | 555,556 | $ 13,396,900.00 |

(*) If the underwriters' over-allotment option is exercised in full, Mr. Friedman will sell 355,635 shares and will beneficially own 757,230 shares (4.0% of the outstanding shares) after this offering

and Mr. Berman will sell 133,254 shares and will beneficially own
62,516 shares (0.3% of the outstanding shares) after this offering.

60.     On December 8, 1999, following the exercise by the underwriters of their over-subscription allotment option, JAKKS announced that, in total, 2.811 million shares were sold by the Company, for gross proceeds of approximately $70 million, and 638,889 shares were sold by insiders, for gross proceeds of approximately $16 million.  At that time, shares of the Company traded above $25.00 per share, trading as high as $27.00 per share on December 8, 1999.

61.     On or March 30, 2000, JAKKS filed its Annual Report on Form 10-K, with the SEC which was signed by defendants Friedman, Berman and Bennett, among others.  In addition to reiterating the results announced in the February 16, 2000 press release, the Company's 2000 Form 10-K again described JAKKS video game licensing agreement with WWE and it joint venture with THQ, in part, as follows:

### WORLD WRESTLING FEDERATION VIDEO GAMES

In June 1998, we formed a joint venture with THQ, a developer, publisher and distributor of interactive entertainment software for the leading hardware game platforms in the home video game market.  ***The joint venture entered into a license agreement with World Wrestling Federation Entertainment under which it acquired the exclusive worldwide right to publish World Wrestling Federation video games on all hardware platforms***.  The games will be designed, developed, manufactured and marketed by the joint venture.  We are entitled to receive a guaranteed preferred return, based on sales of the video games, and THQ is entitled to receive the balance of the profits.  The term of the license agreement expires on December 31, 2009, subject to a right of the joint venture to renew the license for an additional five years under various conditions.

*        *        *

Wrestling video games have demonstrated consistent popularity, with two wrestling-theme video games among the top 10 video games, in terms of unit sales volumes, in 1998.  Approximately 2.3 million units of these two games were sold in 1998, at retail prices ranging from approximately $42 to $60.  We believe that the success of the World Wrestling Federation titles is dependent on the graphic look and feel of the software, the depth and variation of game play and the popularity of the World Wrestling Federation.  ***We believe that as a franchise property, the World Wrestling Federation titles will have brand recognition and sustainable consumer appeal,***

*which may allow the joint venture to use titles over an extended period of time through the release of sequels and extensions and to re-release such products at different price points in the future*.  Also, as new hardware platforms are introduced, software for these platforms requires new standards of design and technology to fully exploit these platforms' capabilities and requires that software developers devote substantial resources to product design and development.  [Emphasis added.]

62.     The statements referenced above in ¶61 were materially false and misleading, and were known by defendants to be false at that time, or were recklessly disregarded as such thereby, because the statements failed to disclose the adverse fact that JAKKS had obtained the "exclusive right" to publish WWE video games as a result of the commercial bribery scheme set forth at ¶¶35-51 above.  In the absence of that adverse information, the discussion of the acquisition of the WWE video game license in ¶61 conveyed the false impression that the license was procured through sound and legal business practices.  The statements referenced in ¶61 above, as well as other public statements by JAKKS, made clear that the WWE video game license generated, and was expected to continue to generate, significant revenues for the Company "over an extended period of time" into the future.  The undisclosed information concerning the bribery scheme is material because a reasonable investor would have wanted to know if that source of revenue was threatened or unsustainable because it was improperly or illegally obtained.

63.     On May 22, 2000, JAKKS filed the Company's Proxy Statement in connection with the election of directors for 2000-2001 with the SEC.  According to the Proxy, for 1999, defendant Friedman received a base salary of $521,000, a bonus of $1.75 million and 232,500 options, and defendant Berman received a base salary of $496,000, a bonus of $1.75 million and 394,500 options.  According to the Proxy, such payments were justified because of the following:

*We believe that our success to date has been to a significant extent attributable to the personal efforts of Mr. Friedman and Mr. Berman*.  They founded the Company, established its business philosophy and operating structure and were the driving force behind our central theme of focusing our business on "evergreen" products.  *Mr. Friedman's long-term relationship with Titan Sports was instrumental in our acquiring our successful World Wrestling Federation licenses*.

In his nearly four-decade-long career in the toy industry, he has established an important network of relationships that we have been able to exploit in product acquisition, production and sales. Both Mr. Berman and Mr. Friedman embody our management philosophy with a "hands on" approach in all areas of our business. In addition to their general supervisory functions, *they are directly involved in license acquisition*, product design and development, production, and sales and marketing, as well as our financing and acquisition efforts. *Their efforts have resulted in our identifying and securing the World Wrestling Federation licenses and other desirable licenses and properties*, the rapid expansion of our product lines, our achieving significant production efficiencies and the development of a loyal and growing customer base. *In 1999, they guided us through two significant acquisitions, the implementation of our video game joint venture with THQ Inc. and two public offerings*.

*Based on their contributions to our outstanding performance in 1999*, which witnessed a 116% increase in net sales, 245% increase in net income, 136% increase in earnings per share and 160% increase in the market price of our common stock, *the Board determined that it would be appropriate to award Mr. Friedman and Mr. Berman a substantial discretionary bonus with respect to 1999*. Our Compensation Committee commissioned a report from an independent consulting firm to advise it on the appropriate level of compensation for Mr. Friedman and Mr. Berman. Based on this report, *our Compensation Committee recommended to the Board that we give Mr. Friedman and Mr. Berman a bonus of $750,000, in addition to the 4% Bonus, and the Board approved this recommendation. At the same time, we also increased the cap on the 4% Bonus from $1,000,000 to $2,000,000 effective in 2000*. [Emphasis added.]

64.    The statements referenced above in ¶63 were materially false and misleading, and were known by defendants to be false at that time, or were recklessly disregarded as such thereby, because the statements failed to disclose the adverse fact that JAKKS had obtained and renewed the WWE licenses as a result of the commercial bribery scheme set forth at ¶¶35-51 above. In the absence of that adverse information, the statements in ¶63 indicating that JAKKS had obtained its licenses as a result of its "long-term relationship" with WWE conveyed the false impression that JAKKS obtained those valuable licenses through a competitive process, taking advantage of its special (but legal) relationship with WWE. JAKKS' own public statements made clear that the "successful" WWE licenses generated, and were expected to continue to generate, significant revenues for the Company. The undisclosed information concerning the bribery scheme is material

because a reasonable investor would have wanted to know if that source of revenue was threatened

or unsustainable because it was improperly or illegally obtained.

65.    In addition to the foregoing, the Proxy also summarized defendant Friedman and

Berman's new and augmented Employment Agreements, which compensated them as follows:

EMPLOYMENT AGREEMENTS

*We entered into 10-year employment agreements with Mr. Friedman and Mr. Berman, pursuant to which Mr. Friedman serves as our Chairman and Chief Executive Officer and Mr. Berman serves as our President and Chief Operating Officer*. Mr. Friedman's annual base salary in 2000 is $771,000 and Mr. Berman's is $746,000. Their annual base salaries are subject to annual increases in an amount, not less than $25,000, determined by our Board of Directors. *Each of them is also entitled to receive an annual bonus equal to 4% of our pre-tax income, but not more than $2,000,000, if our pre-tax earnings are at least $2,000,000*. . . . [Emphasis added.]

66.    By mid-October 2000, SSAI had been terminated as WWE's licensing agent and it

had actually initiated suit against WWE for breach of contract. Realizing that discovery in that

action put Defendants at risk of their fraudulent scheme being discovered, Defendant Friedman

telephoned Linda McMahon, CEO of WWE, and made the unsolicited offer to use his connections to

attempt to broker a settlement with Shenker. At that time, Friedman did not disclose his or JAKKS'

prior agency relationship with Shenker or SSAI. WWE declined his offer of assistance.

67.    On April 2, 2001, JAKKS filed its 2000 Annual Report on Form 10-K with the SEC,

which was signed by defendants Bennett, Friedman and Berman, among others. In addition to

reiterating the results announced in the March 7, 2001 press release, the Company's 2000 Form 10-K

also contained statements concerning the Company's "key strategy" and its agreement with WWE

and joint venture with THQ, similar to or the same as those statements contained in JAKKS prior

SEC filings, reproduced herein, *supra*. In addition, the 2000 Form 10-K also reported that, during

2000, the JAKKS/THQ joint venture had earned over $15.9 million in profits, versus total net

income of $28.6 million for JAKKS, as follows:

> In June 1998, the Company formed a joint venture with a company that develops, publishes and distributes interactive entertainment software for the leading hardware game platforms in the home video game market. The joint venture has entered into a license agreement under which it acquired the exclusive worldwide right to publish video games on all hardware platforms. . . . ***During 2000 the Company earned $15,905,860 in profit from the joint venture***. [Emphasis added.]

68.     The statements referenced above in ¶67 were materially false and misleading, and were known by defendants to be false at that time, or were recklessly disregarded as such thereby, because the statements failed to disclose the adverse fact that JAKKS had obtained the "exclusive worldwide right" to publish WWE video games as a result of the commercial bribery scheme set forth at ¶¶35-51 above. In the absence of that adverse information, the discussion of the acquisition of the WWE video game license in ¶67 conveyed the false impression that the license was procured through sound and legal business practices. The statements referenced in ¶67 above, as well as other public statements by JAKKS, made clear that the WWE video game license generated, and was expected to continue to generate, significant revenues for the Company. The undisclosed information concerning the bribery scheme is material because a reasonable investor would have wanted to know if that source of revenue was threatened or unsustainable because it was improperly or illegally obtained.

69.     On June 12, 2001, JAKKS filed its Proxy Statement in connection with the election of directors for 2001-2002 with the SEC. According to the Proxy, for 2000, defendant Friedman received a base salary of $771,000, a bonus of $1.613 million and 207,254 options, and defendant Berman received a base salary of $746,000, a bonus of $1.613 million and 345,024 options. According to the Proxy, such payments were justified because of the following:

> ***We believe that our success to date has been to a significant extent attributable to the personal efforts of Mr. Friedman and Mr. Berman***. They founded the Company, established its business philosophy and operating structure and were the driving force behind our central theme of focusing our business on "evergreen" products. ***Mr. Friedman's long-term relationship with World Wrestling Federation Entertainment, Inc. was instrumental in our acquiring our successful World***

- 23 -

*Wrestling Federation licenses. In his nearly four-decade-long career in the toy industry, he has established an important network of relationships that we have been able to exploit in product acquisition, production and sales*. Both Mr. Berman and Mr. Friedman embody our management philosophy with a "hands on" approach in all areas of our business. *In addition to their general supervisory functions, they are directly involved in license acquisition*, product design and development, production, and sales and marketing, as well as our financing and acquisition efforts. *Their efforts have resulted in our identifying and securing the World Wrestling Federation licenses and other desirable licenses and properties, the rapid expansion of our product lines*, our achieving significant production efficiencies and the development of a loyal and growing customer base. [Emphasis added.]

70.     The statements referenced above in ¶69 were materially false and misleading, and were known by defendants to be false at that time, or were recklessly disregarded as such thereby, because the statements failed to disclose the adverse fact that JAKKS had obtained and renewed the WWE licenses as a result of the commercial bribery scheme set forth at ¶¶35-51 above. In the absence of that adverse information, the statements in ¶69 indicating that JAKKS had obtained its licenses as a result of its "long-term relationship" with WWE conveyed the false impression that JAKKS obtained those valuable licenses through a competitive process, taking advantage of its special (but legal) relationship with WWE. JAKKS' own public statements made clear that the "successful" WWE licenses generated, and were expected to continue to generate, significant revenues for the Company. The undisclosed information concerning the bribery scheme is material because a reasonable investor would have wanted to know if that source of revenue was threatened or unsustainable because it was improperly or illegally obtained.

71.     Taking advantage of the artificial inflation in the price of JAKKS shares caused in significant part by defendants' materially false and misleading statements and omissions, on February 10, 2002, defendants announced the proposed acquisition of Toymax International Inc., a New York-based toy designer and marketer. This deal, valued at approximately $55 million, consisted primarily of payment of $3.00 per Toymax share in cash, plus an additional $1.50 per share payable in JAKKS common stock to Toymax's three principal shareholders who together held

a 64% stake in Toymax.  The remainder of Toymax's shareholders would receive $4.50 per share in cash.

72.    On May 23, 2002, JAKKS issued a press release announcing that the Company had completed the sale of 3.5 million shares of common stock priced at $17.75 per share.  These shares were sold pursuant to a registration statement filed with the SEC and declared effective on or about May 22, 2002.  In addition to repeating many of the same or substantially similar statements concerning the financial and operational condition of the Company as had been previously filed with the SEC, this registration statement stated, in part, the following:

> ***We have capitalized on our relationship with World Wrestling Entertainment, Inc. (WWE) by obtaining an exclusive worldwide license for our joint venture with THQ Inc*** . (THQ), which develops, produces, manufactures and markets video games based on World Wrestling Entertainment characters and themes.  Since the joint venture's first title release in 1999, it has released 11 new titles.  ***We have received $27.5 million as our share of the joint venture's profit through March 31, 2002*** .

> *    *    *

> World Wrestling Entertainment Video Games

> In June 1998, we formed a joint venture with THQ, a developer, publisher and distributor of interactive entertainment software for the leading hardware game platforms in the home video game market.  The joint venture entered into a license agreement with the WWE under which it acquired the exclusive worldwide right to publish World Wrestling Entertainment video games on all hardware platforms.  The term of the license agreement expires on December 31, 2009, and the joint venture has a right to renew the license for an additional five years under various conditions. [Emphasis added.]

73.    The statements referenced above in ¶72 were materially false and misleading, and were known by defendants to be false at that time, or were recklessly disregarded as such thereby, because the statements failed to disclose the adverse fact that JAKKS had obtained the "exclusive worldwide license" to publish WWE video games as a result of the commercial bribery scheme set forth at ¶¶35-51 above.  In the absence of that adverse information, the statements in ¶72 indicating that JAKKS had obtained its license by "capitalizing" on its "relationship" with WWE conveyed the

- 25 -

false impression that JAKKS obtained that valuable license through a competitive process, taking advantage of its special (but legal) relationship with WWE. The statements referenced in ¶72 above, as well as other public statements by JAKKS, made clear that the WWE video game license generated, and was expected to continue to generate, significant revenues for the Company. The undisclosed information concerning the bribery scheme is material because a reasonable investor would have wanted to know if that source of revenue was threatened or unsustainable because it was improperly or illegally obtained.

74. In addition to the foregoing, the Registration Statement also identified the Selling Shareholders, who together sold 500,000 shares of stock in this offering priced at $17.75 per share, including: Jack Friedman – 300,000 shares; Stephen Berman – 150,000 shares; and Murray Skala – 30,000 shares.

75. Unbeknownst to investors, on or about June 11, 2002, JAKKS received a subpoena in connection with WWE's then on-going litigation with Bell and Shenker, ordering JAKKS to produce a variety of records relating to the Company's dealings with them. This subpoena included all documents related to any agreements between JAKKS, Shenker and/or SSAI and all documents related to any payments to Shenker or SSAI.

76. On August 21, 2002, JAKKS filed its Proxy Statement in connection with the election of directors for 2002-2003 with the SEC. According to the Proxy, for 2001, defendant Friedman received a base salary of $821,000, a bonus of $1.706 million and 175,000 options, and defendant Berman received a received a base salary of $796,000, a bonus of $1.706 million and 175,000 options. According to the Proxy, such payments were justified because:

> ***We believe that our success to date has been to a significant extent attributable to the personal efforts of Mr. Friedman and Mr. Berman***. They founded the Company, established its business philosophy and operating structure and were the driving force behind our central theme of focusing our business on "evergreen"

products.  *Mr. Friedman's long-term relationship with World Wrestling Federation Entertainment, Inc. was instrumental in our acquiring our successful World Wrestling Federation licenses*.  In his nearly four-decade-long career in the toy industry, he has established an important network of relationships that we have been able to exploit in product acquisition, production and sales.  *Both Mr. Berman and Mr. Friedman embody our management philosophy with a "hands on" approach in all areas of our business.  In addition to their general supervisory functions, they are directly involved in license acquisition, product design and development, production, and sales and marketing, as well as our financing and acquisition efforts.  Their efforts have resulted in our identifying and securing the World Wrestling Federation licenses and other desirable licenses and properties*, the rapid expansion of our product lines, our achieving significant production efficiencies and the development of a loyal and growing customer base.  [Emphasis added.]

77.    The statements referenced above in ¶76 were materially false and misleading, and were known by defendants to be false at that time, or were recklessly disregarded as such thereby, because the statements failed to disclose the adverse fact that JAKKS had obtained and renewed the WWE licenses as a result of the commercial bribery scheme set forth at ¶¶35-51 above.  In the absence of that adverse information, the statements in ¶76 indicating that JAKKS had obtained its licenses as a result of its "long term relationship" with WWE conveyed the false impression that JAKKS obtained those valuable licenses through a competitive process, taking advantage of its special (but legal) relationship with WWE.  JAKKS' own public statements made clear that the "successful" WWE licenses generated, and were expected to continue to generate, significant revenues for the Company.  The undisclosed information concerning the bribery scheme is material because a reasonable investor would have wanted to know if that source of revenue was threatened or unsustainable because it was improperly or illegally obtained.

78.    Unbeknownst to investors, on or about October 30, 2002, JAKKS responded by letter to WWE's June 11, 2002 subpoena.  At that time defendants concealed and did not reveal either the $80,000 or $20,000 invoice paid to Stanfull in 1998, nor any payments made to Shenker or SSAI, nor any documents or invoices indicating that such payments had been made.  At that time, JAKKS had also failed to disclose that Shenker had acted as agent for the Company.

- 27 -

79.     Unbeknownst to investors, on January 14, 2003, pursuant to its right under the licensing agreement WWE's auditors formally requested, in writing, that JAKKS provide a complete list of any and all payments made to Shenker, SSAI, Bell and/or any entity controlled by them.  On January 17, 2003, JAKKS provided yet another false and misleading response, stating that it had *already* "provided any documents that may exist," in response to the June 11, 2002 subpoena.  At that time, defendant Bennett received a copy of JAKKS false response and did nothing to correct it, despite his personal knowledge of the fake invoices presented to the Company by Shenker and/or SSAI and the subsequent payments at issue, all of which he personally directed and orchestrated.

80.     Unbeknownst to investors, on February 25, 2003, WWE auditors again sent a letter to JAKKS requesting copies of all invoices or a description of each transaction whereby payments were made by the Company to Shenker, SSAI or Stanfull.  Later, on March 14, 2003, by letter to JAKKS' corporate counsel, WWE again requested an answer as to whether payments had been made by JAKKS to Shenker, Stanfull or SSAI.  On March 19, 2003, JAKKS' corporate counsel, Murray Skala, ultimately responded to WWE.  Despite the fact that JAKKS had provided no information about its relationship with, or payments to, Shenker and/or SSAI, Skala falsely stated that JAKKS had *already* responded to the June 11, 2002 subpoena "months ago."  Later, on March 26, 2003, JAKKS' counsel again informed WWF that there was "***no additional information***" of the type requested pursuant to the June 11, 2002 subpoena.

81.     At the end of July 2004, JAKKS came under fire from Wall Street analysts over the pay to defendants Berman and Freidman.  On July 31, 2003, the Los Angeles Times reported, in part, the following:

> ***The top two executives at Jakks Pacific Inc.***, under fire from Wall Street analysts over their pay and the company's performance, received ***salary increases this year of 14% and 17.5%***, according to a regulatory filing Wednesday.

- 28 -

*The raises, which exceeded the Malibu-based toy maker's 2002 profit and stock performance, came after a tough year for shareholders*. The company's earnings per share fell 5.5% last year, and its stock lost 29%, as the firm struggled to integrate acquisitions and increase the market share of its core brands, including World Wrestling Entertainment action figures.

                                *        *        *

*For 2003, Friedman and Berman each will take home a salary of $965,000, a 14% increase for Friedman and a 17.5% boost for Berman*.

*Under the bonus plan that is in effect through the end of this year, the two will receive 4% of pretax profit, not to exceed $2 million. Jakks has said its pre-tax profit this year would be flat; if that is the case, each would get a bonus of about $1.4 million*. [Emphasis added.]

82.    According to the *LA Times*, compensation experts said that the Company's filing revealed several "unusual perks" for defendants Friedman and Berman, including:

- Guaranteed annual raises of $25,000 each.

- Restricted stock grants totaling 1.08 million shares over the life of their newly signed eight-year employment contracts, provided only that annual profit at Jakks exceeds $2 million. *At the stock's then current value, those grants were worth $12.5 million*.

- When they signed the new contracts in March, Friedman and Berman received 240,000 shares apiece. Each will get an additional 120,000 shares every year "in consideration for modifying and replacing the pretax income formula for determining his annual bonus and for entering into the amended agreement," according to the filing. *Compensation experts said the two officers didn't need any consideration because the two probably would have little to lose from the new bonus plan*.

- *The length of the new employment contracts was unusual*. Todd Meyer, an independent compensation consultant based in Los Angeles, called eight years "a bit excessive." "*The board is locking the two top executives in for a long time, and they're locking them in at very high total compensation levels*," he said. Of the companies that make up the Standard & Poor's 500 index, only about two dozen offer executives contracts longer than three years, Hodgson said.

83.    In addition to the foregoing, the LA Times reported that the Company had also failed to elaborate on how JAKKS would determine bonuses for the top two officers. While defendants stated that, under the new bonus plan, which would go into effect during 2004, JAKKS would base

- 29 -

bonuses on earnings-per-share growth targets, defendants did not say what the targets would be. According to the *LA Times*, Paul Hodgson, senior research analyst with Corporate Library, a corporate-governance information service, complained that "Unless they tell us what the targets are – and the analysts and the stockholders are satisfied that they're sufficiently challenging – then we're never going to find out whether the incentive pay is aligned with stockholder interests.  They could be setting themselves meaningless [targets] of a couple of percent a year."  Arvind Bhatia, an analyst with Southwest Securities in Dallas, said the "meagerness" of the information shared by JAKKS "raised questions."

84.     Unbeknownst to investors, during the first week of September, JAKKS, through defendant Bennett, had provided to the Company's outside counsel documentary evidence of the illegal payments to the Standfull entity controlled by Shenker.  Again, at that time, Defendants made no disclosure to WWE or to investors of the clandestine payments to Shenker and/or SSAI, or the documentary evidence of such payments.

85.     Unbeknownst to investors, on or about November 11, 2003, after WWE made it known that it had independently discovered an $80,000.00 payment to Shenker and/or entities controlled by him, defendant Friedman telephoned WWE's Chief Executive Officer, Linda McMahon.  During this telephone call, defendant Friedman again misrepresented the true cause of this payment, and told WWE's CEO that such payment related to a "project development" for a mechanical dinosaur project unrelated to the WWE licenses.  In addition, at that time, Defendant Friedman also continued to fail to disclose the additional $20,000 payment to Shenker which was paid immediately after the WWE video game license was secured.  On or about November 14, 2003, Defendants presented to WWE a copy of an $80,000 invoice payable to an entity controlled by

Shenker, which stated that such payment was for "development of possible latex based soft toys with special coatings."

86. Following the placement of $98 million in convertible notes during the second quarter of 2003, on or about December 23, 2003, Defendants filed a registration statement, registering such notes for sale. In addition to making many of the same or substantially similar representations concerning the financial and operational condition of the Company, this registration statement stated, in part, the following:

> *We have capitalized on our relationship with World Wrestling Entertainment, Inc. (WWE) by obtaining an exclusive worldwide license for our joint venture with THQ Inc. (THQ), which develops, produces, manufactures and markets video games based on World Wrestling Entertainment characters and themes*. Since the joint venture's first title release in 1999, it has released 15 new titles. We have received $34.6 million in preferred returns as our profit from the joint venture through June 30, 2003. [Emphasis added.]

87. The statements referenced above in ¶86 were materially false and misleading, and were known by defendants to be false at that time, or were recklessly disregarded as such thereby, because the statements failed to disclose the adverse facts that: (a) JAKKS had obtained the "exclusive worldwide license" to publish WWE video games as a result of the commercial bribery scheme set forth at ¶¶35-51 above; and (b) JAKKS' relationship with WWE was being negatively impacted by WWE's contention that the licenses it had granted to JAKKS were improperly obtained, as set forth at ¶¶75, 78, 79, 80, 84 and 85 above. In the absence of that adverse information, the statements in ¶86 indicating that JAKKS had obtained its license by "capitalizing" on its "relationship" with WWE conveyed the false impression that JAKKS obtained that valuable license through a competitive process, taking advantage of its special (but legal) relationship with WWE. The statements referenced in ¶86 above, as well as other public statements by JAKKS, made clear that the WWE video game license generated, and was expected to continue to generate, significant revenues for the Company. The undisclosed information concerning the bribery scheme and

- 31 -

WWE's discovery of that scheme is material because a reasonable investor would have wanted to know if that source of revenue was threatened or unsustainable because it was improperly or illegally obtained.

## THE TRUTH EMERGES

88.     The truth about the Company began to emerge on October 19, 2004.  On that date, before the market opened, Defendants shocked investors when JAKKS published a press release reporting third quarter 2004 results, in which JAKKS first revealed that the Company was "engaged in discussions with the WWE" concerning the "validity of the licenses as a result of certain transactions between the Company and that licensing consultant that occurred more than six years ago."  This press release stated, in relevant part, the following:

> *The Company also announced that it is engaged in discussions with WWE concerning the restructuring of its toy license and with WWE and THQ with respect to the restructuring of the JAKKS THQ Joint Venture video games license agreement with WWE*.  The discussions are an outgrowth of certain litigation that has been pending between WWE and a former licensing consultant to WWE and a former employee of WWE, to which the Company is not a party.  *WWE has raised questions about the validity of the licenses as a result of certain transactions between the Company and that licensing consultant that occurred more than six years ago.  The Company has denied any wrongdoing in connection with the transactions with the licensing consultant and maintains that they are unrelated to either the toy or video game license*.  If the discussions are satisfactorily concluded, the restructuring of the licenses may have an impact on the Company's future revenues and net income to an extent that is presently unknown.  *If the discussions with WWE and THQ are not satisfactorily concluded, the Company anticipates that litigation is likely to be commenced by WWE, challenging the validity of the licenses and seeking compensatory and punitive damages, in which event the Company intends to vigorously defend itself against claims which it believes are without merit*.  [Emphasis added]

89.     In reaction to this news, the price of JAKKS common stock declined precipitously, falling $5.34 per share, or 22% from its previous day's closing price of $24.15, to close at $18.81. After the close of trading, shares continued to fall in after-hours trading, dropping to $17.85 per share.

90.     Later that day, defendants hosted a conference call for analysts and investors.  When asked about the WWE dispute, however, defendants refused to answer questions or provide more information.  Accordingly, when asked what sort of impact the dispute would have on JAKKS toy and video game sales, defendant Friedman stated, "Until our discussions are completed, we cannot comment about this subject at all."  Similarly, when defendant Bennett was asked if he could provide "more color" on the WWE dispute, he stated that "we cannot make any further comments."

91.     Later that same day, also on October 19, 2004, news reports indicated that the WWE had filed a complaint against JAKKS and the Individual Defendants, among others, alleging that they had perpetrated a massive bribery scheme involving lucrative license deals.  WWE alleged that in order to obtain the WWE videogame license and favorable amendments to the toy licenses, JAKKS made substantial bribery payments to Stanley Shenker, president and sole owner of SSAI, and James Bell, WWE's former licensing and merchandising senior vice president.  To conceal the payments, JAKKS laundered monies through its foreign bank accounts and corporations to pay Shenker via Shenker's Hong Kong corporation.  Shenker then split the payments with Bell.  The details of JAKKS' corrupt scheme were set forth in the WWE complaint which alleged as follows, in relevant part:

*During the conversation regarding Shenker serving as Jakks' agent on WWE matters at the same time he was a WWE agent, a call was placed by Friedman, Berman and Shenker to Mr. Murray Skala, Jakks' outside legal counsel and a member of the Board of Directors of Jakks, regarding the proposed arrangement. Mr. Skala advised all participants in the call that it would be a conflict of interest for Shenker to serve as Jakks' agent on WWE matters at the same time Shenker was acting as WWE's agent* and that such an arrangement could not be done without first making full disclosure to WWE and obtaining their consent.*

*Following the conversation with Jakks' corporate counsel, neither Friedman, Berman, Shenker, nor Jakks disclosed the conversation to WWE nor sought their consent*. On information and belief, all three men did not disclose the conversation because they knew WWE would not agree to such an obvious conflict of interest and because disclosure might also cause it to be revealed that Shenker was already acting as Jakks' agent. Instead, *all three men kept the conversation secret and eventually*

- 33 -

*implemented, in or around 1998, a plan whereby Shenker would accept and split bribes from Jakks with Bell to secure the videogame license and related amendments to the domestic toy license and an international toy license secured by Jakks following the aforementioned conversation*.  The plan devised and implemented *by Jakks and its three highest executives utilized monies laundered through foreign corporations controlled by Jakks and bank accounts of those foreign corporations in Hong Kong*.  An essential part of the scheme was that the monies paid as commercial bribes were *not recorded anywhere on the financial books and records of Jakks* situated in America at the headquarters of the parent corporation.

On or about February 10, 1997, WWE and Jakks entered into an international toy license having a term which was to end on December 31, 1999.  *At no time prior to entering into the license did SSAI, Shenker or Jakks disclose that Shenker had performed services for Jakks*.  Likewise none of the aforementioned parties disclosed to WWE the conversation about Shenker serving as Jakks' agent on WWE matters.

*      *      *

*In order to place Jakks in control of the videogame license*, and with the intent to cause SSAI and Bell to breach their fiduciary duties, Defendants *Friedman and/or Berman and/or Bennett devised and implemented a corrupt scheme to foreclose competition for the videogame license and to obtain it by the commercial bribery of Shenker and Bell*.  Pursuant to the scheme, Jakks agreed to pay monies to Shenker's alter ego – Stanfull – by *a series of payments to Stanfull's foreign bank account with the understanding that Shenker would then serve as a conduit for the payment of bribes directly to Bell*.

*      *      *

*On or about January 14, 1998*, acting upon the direction of Defendant Bennett, *$40,000 was, in fact, paid to Stanfull via a series of transactions undertaken with the intent to conceal the transactions and bury them in fraudulent accounting* of foreign corporations owned by Jakks and bank accounts of those foreign subsidiaries.

*On January 14, 1998, $40,000 was withdrawn from an account at the Hang Seng Bank in Hong Kong of Road Champs, Ltd.* ("Road Champs"), a foreign subsidiary owned and/or controlled by Jakks.  The $40,000 was deposited that same day into Stanfull's bank account at the Hang Seng Bank.

*On January 14, 1998*, the same day as the Jakks' monies were deposited into Stanfull's account, *Shenker, acting in concert with Jakks to conceal the disposition of the monies, and with the intent of inducing Bell to violate his fiduciary duties, obtained a demand draft for $20,000 payable to James Bell from the Hang Seng Bank*, which he subsequently gave to Bell upon returning to the United States, thereby splitting the money equally with Bell.

- 34 -

\*    \*    \*

**On March 31, 1998, the day after Bell had initialed the deal memo recommending that the videogame license be awarded to Jakks, Defendant Bennett again directed Will Hons to use Jakks' foreign subsidiaries to pay another $40,000 to Stanfull.** Bennett advised Hons on the day after Bell had recommended to WWE management that it grant the videogame license to Jakks that it was "imperative" that the funds be available to Stanfull not later than April 2, 1998.

\*    \*    \*

Having obtained WWE's agreement to grant the videogame license to Jakks *via* the aforementioned scheme, and in order to get a cut of the anticipated revenues from the anticipated revenues associated with the videogame license, **Jakks then solicited THQ to become a Joint Venture partner instead of submitting an independent proposal on behalf of THQ.  THQ agreed to become a Joint Venture partner** with Jakks on the videogame license instead of making its own formal and independent proposal, **and agreed to pay Jakks monies which otherwise would have, and should have, been promised to WWE in an independent proposal**.  THQ did so as consideration for Jakks' role in securing the license. **For all intents and purposes, Jakks and THQ both knew that the videogame license would be performed by THQ as Jakks had no ability to perform a videogame license**.  [Emphasis added.]

92.    In response to the WWE Action, JAKKS published a press release on October 19, 2004, at 9:51pm, stating, in relevant part, the following:

> JAKKS Pacific, Inc. announced that a civil lawsuit was filed in the United States District Court for the Southern District of New York yesterday afternoon by World Wrestling Entertainment, Inc. ("WWE") concerning the video game license between WWE and the joint venture company operated by the Company and THQ, Inc. and the toy license between the Company and WWE.  The Company denies any allegations of wrongdoing and believes that it will be completely vindicated in the litigation, and looks forward to having the claims against it dismissed.  The Company will continue to devote its full energies and resources to bringing its outstanding products to market during the busy holiday season and beyond.

93.    The following trading day, October 20, 2004, the price of JAKKS stock fell an additional $5.85 per share, or 31% from its regular session closing price on October 19, 2004, to close at $12.96.  The Daily News of Los Angeles reported at least one analysts' reaction who stated, "**If this gets carried through and it gets into a nasty court fight, it could hurt their relationship with other licenses.  You'd think, if they really did this to WWE, why would I want to do business**

- 35 -

*with them*?"  In addition, investors were also concerned by reports that WWE was seeking to make

the JAKKS license "void and unenforceable" due to commercial bribery as well as indications that

WWE is asking for treble and punitive damages.

94.    As a result of the foregoing, that day, analysts at Whitaker Securities downgraded the

Company to "SELL" from "BUY."  Likewise, Southwest Securities lowered its rating to

"NEUTRAL" from "STRONG BUY."  Monarch Research also adopted a "SELL" rating on shares

of the Company.

95.    As a prologue to these events, on February 12, 2005, the Ventura County Star

(California) reported that James Bell had pleaded guilty to taking kickbacks in connection with

WWE's licensing deal with JAKKS.  According to this report, Bell pleaded guilty to mail fraud in

U.S. District Court in Bridgeport, Connecticut.  According to a statement by the state attorney

general, Bell will face a maximum sentence of five years and a fine of $3.8 million for defrauding

WWE.

## UNDISCLOSED ADVERSE INFORMATION

96.    The market for JAKKS' securities was open, well-developed and efficient at all

relevant times.  As a result of these materially false and misleading statements and failures to

disclose, JAKKS' common stock traded at artificially inflated prices during the Class Period.  The

artificial inflation continued until at least October 19, 2004.  Plaintiff and other members of the Class

purchased or otherwise acquired JAKKS securities relying upon the integrity of the market price of

JAKKS' securities and market information relating to JAKKS, and have been damaged thereby.

97.    During the Class Period, defendants materially misled the investing public, thereby

inflating the price of JAKKS' securities, by publicly issuing false and misleading statements and

omitting to disclose material facts necessary to make defendants' statements, as set forth herein, not

false and misleading.  Said statements and omissions were materially false and misleading in that

they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations.

98.     At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by plaintiff and other members of the Class.  As described herein, during the Class Period, defendants made or caused to be made a series of materially false or misleading statements about JAKKS' business, prospects and operations.  These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of JAKKS and its business, prospects and operations, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times.  Defendants' materially false and misleading statements during the Class Period resulted in plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein.

## LOSS CAUSATION/ECONOMIC LOSS

99.     During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated JAKKS' stock price and operated as a fraud or deceit on Plaintiffs and Class Period purchasers of JAKKS securities by failing to disclose that the Company had obtained the WWE licenses through commercial bribery, that the Company's relationship with the WWE was being negatively impacted by the WWE's contention that the licenses it had granted the Company were improperly obtained and that the Company was subject to the heightened risk that the WWE would seek some modification to the WWE licensing agreements as complete nullification of those agreements.   When Defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the price of JAKKS securities fell precipitously as the prior artificial inflation came out of JAKKS'

stock price. As a result of their purchases of JAKKS stock during the Class Period, Plaintiffs and the other Class members suffered economic loss, *i.e.*, damages under the federal securities laws.

100. By improperly concealing the problems with the WWE licenses, Defendants presented a misleading picture of JAKKS' business and prospects. Thus, instead of truthfully disclosing during the Class Period the true risks that JAKKS was exposed to, Defendants caused JAKKS to conceal the problems with the WWE licenses.

101. Defendants' false and misleading statements had the intended effect and caused JAKKS securities to trade at artificially inflated levels throughout the Class Period.

102. As a direct result of Defendants' admissions and the public revelations regarding the problems with the WWE licenses, JAKKS stock price plummeted approximately 46%, falling from $24.15 per share to $12.96 per share. This drop removed the inflation from JAKKS stock price, causing real economic loss to investors who had purchased the Company's securities during the Class Period.

103. The approximate 46% decline in JAKKS stock price at the end of the Class Period was a direct result of the nature and extent of Defendants' fraud finally being revealed to investors and the market. The timing and magnitude of JAKKS stock price declines negate any inference that the loss suffered by Plaintiffs and the other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to the defendants' fraudulent conduct. The economic loss, *i.e.*, damages, suffered by Plaintiffs and the other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate JAKKS stock price and the subsequent significant decline in the value of JAKKS stock when Defendants' prior misrepresentations and other fraudulent conduct was revealed.

## ADDITIONAL SCIENTER ALLEGATIONS

104.    As alleged herein, Defendants acted with scienter in that defendants knew that the

public documents and statements issued or disseminated in the name of the Company were

materially false and misleading; knew that such statements or documents would be issued or

disseminated to the investing public; and knowingly and substantially participated or acquiesced in

the issuance or dissemination of such statements or documents as primary violations of the federal

securities laws.  As set forth elsewhere herein in detail, defendants, by virtue of their receipt of

information reflecting the true facts regarding JAKKS, their control over, and/or receipt and/or

modification of JAKKS' allegedly materially misleading misstatements and/or their associations

with the Company which made them privy to confidential proprietary information concerning

JAKKS, participated in the fraudulent scheme alleged herein.

105.    In addition, defendants were motivated to engage in the fraudulent scheme in order

for Company insiders, including the Individual Defendants, to sell hundreds of thousands of their

personally-held JAKKS securities and reap millions of dollars in proceeds, as follows:

| Insider | Date of Sales | # of Shares Sold | Price ($) | Value of Sales ($) |
|---|---|---|---|---|
| Jack Friedman (Chairman and Chief Executive Officer) | 12/08/1999 | 355,635 | 23.62 | 8,400,098.70 |
| | 06/29/2001 | 135,000 | 18.81 | 2,538,675.00 |
| | 10/22/2001 | 57,800 | 19.20 | 1,109,760.00 |
| | 10/23/2001 | 86,700 | 18.06 | 1,565,802.00 |
| | 10/24/2001 | 25,500 | 18.00 | 459,000.00 |
| | 05/29/2002 | 150,078 | 17.75 | 2,663,884.50 |
| | 05/29/2002 | 149,922 | 17.75 | 2,661,115.50 |
| **Total Friedman:** | | **960,635** | | **19,398,335.70** |
| Stephen G. Berman (President, Chief Operating Officer, | 12/08/1999 | 133,254 | 23.62 | 3,147,459.48 |

| Insider | Date of Sales | # of Shares Sold | Price ($) | Value of Sales ($) |
|---|---|---|---|---|
| and Secretary) | | | | |
| | 06/29/2001 | 63,260 | 18.80 | 1,189,288.00 |
| | 06/29/2001 | 1,740 | 18.80 | 32,712.00 |
| | 10/22/2001 | 27,200 | 19.20 | 522,240.00 |
| | 10/23/2001 | 40,800 | 18.06 | 736,848.00 |
| | 10/24/2001 | 12,000 | 18.00 | 216,000.00 |
| | 05/29/2002 | 42,514 | 17.75 | 754,623.50 |
| | 05/29/2002 | 44,986 | 17.75 | 798,501.50 |
| | 05/29/2002 | 62,500 | 17.75 | 1,109,375.00 |
| **Total Berman:** | | **428,254** | | **8,507,047.48** |
| Joel M. Bennett (Chief Financial Officer and an Executive Vice President) | 07/27/2001 | 20,000 | 19.93 | 398,600.00 |
| | 07/27/2001 | 7,710 | 19.93 | 153,660.30 |
| | 07/27/2001 | 39 | 19.93 | 777.27 |
| | 07/27/2001 | 1 | 19.93 | 19.93 |
| | 08/03/2001 | 5,148 | 20.60 | 106,048.80 |
| | 08/03/2001 | 5,148 | 20.60 | 106,048.80 |
| | 08/03/2001 | 3,523 | 20.60 | 72,573.80 |
| | 08/03/2001 | 1,328 | 20.60 | 27,356.80 |
| | 08/03/2001 | 1,328 | 20.60 | 27,356.80 |
| | 08/20/2001 | 5,770 | 20.63 | 119,035.10 |
| | 08/20/2001 | 5,770 | 20.63 | 119,035.10 |
| | 08/20/2001 | 530 | 20.63 | 10,933.90 |
| | 08/20/2001 | 530 | 20.63 | 10,933.90 |
| | 02/27/2002 | 3,855 | 19.33 | 74,517.15 |
| | 02/27/2002 | 1,329 | 19.33 | 25,689.57 |
| | 08/10/2004 | 1,000 | 19.50 | 19,500.00 |
| | 08/11/2004 | 29,510 | 19.25 | 568,067.50 |
| | 08/13/2004 | 4,680 | 19.50 | 91,260.00 |
| **Total Bennett:** | | **97,199** | | **1,931,414.72** |
| Michael Bianco (Executive Vice President) | 08/07/2001 | 4,059 | 20.55 | 83,412.45 |
| | 08/07/2001 | 1,466 | 20.55 | 30,126.30 |
| | 08/08/2001 | 5,687 | 20.70 | 117,720.90 |
| | 08/08/2001 | 1,544 | 20.70 | 31,960.80 |
| | 08/10/2001 | 4,600 | 21.55 | 99,130.00 |
| | 08/16/2001 | 1,000 | 21.00 | 21,000.00 |
| | 11/06/2001 | 7,500 | 19.51 | 146,325.00 |

| Insider | Date of Sales | # of Shares Sold | Price ($) | Value of Sales ($) |
|---|---|---|---|---|
| | 11/06/2001 | 100 | 19.52 | 1,952.00 |
| | 11/07/2001 | 16,500 | 20.00 | 330,000.00 |
| | 11/07/2001 | 12,150 | 19.75 | 239,962.50 |
| | 11/07/2001 | 7,800 | 19.77 | 154,206.00 |
| | 11/07/2001 | 6,850 | 20.90 | 143,165.00 |
| | 11/07/2001 | 2,500 | 20.02 | 50,050.00 |
| | 11/07/2001 | 2,300 | 20.91 | 48,093.00 |
| | 11/07/2001 | 1,850 | 19.76 | 36,556.00 |
| | 11/07/2001 | 900 | 20.01 | 18,009.00 |
| | 11/07/2001 | 600 | 20.94 | 12,564.00 |
| | 11/07/2001 | 100 | 19.78 | 1,978.00 |
| | 11/07/2001 | 100 | 19.79 | 1,979.00 |
| | 11/07/2001 | 100 | 20.05 | 2,005.00 |
| **Total Bianco:** | | **77,706** | | **1,570,194.95** |
| David C. Blatte (Director) | 03/08/2002 | 2,000 | 18.85 | 37,700.00 |
| | 03/12/2002 | 2,000 | 18.75 | 37,500.00 |
| | 03/14/2002 | 6,000 | 19.07 | 114,420.00 |
| | 03/14/2002 | 2,000 | 19.60 | 39,200.00 |
| | 03/15/2002 | 2,000 | 20.00 | 40,000.00 |
| | 03/15/2002 | 1,000 | 20.60 | 20,600.00 |
| **Total Blatte:** | | **15,000** | | **289,420.00** |
| Robert E. Glick (Director) | 12/08/1999 | 45,000 | 23.62 | 1,062,900.00 |
| | 07/26/2001 | 9,375 | 18.76 | 175,875.00 |
| | 07/26/2001 | 9,375 | 18.76 | 175,875.00 |
| | 07/26/2001 | 8,662 | 18.76 | 162,499.12 |
| | 05/29/2002 | 9,375 | 17.75 | 166,406.25 |
| | 05/29/2002 | 625 | 17.75 | 11,093.75 |
| **Total Glick:** | | **82,412** | | **1,754,649.12** |
| Michael G. Miller (Director) | 12/08/1999 | 45,000 | 23.62 | 1,062,900.00 |
| | 07/26/2001 | 9,375 | 18.77 | 175,922.81 |
| | 07/26/2001 | 9,375 | 18.77 | 175,922.81 |
| | 07/26/2001 | 7,537 | 18.77 | 141,432.56 |
| | 05/29/2002 | 9,302 | 17.75 | 165,110.50 |
| | 05/29/2002 | 698 | 17.75 | 12,389.50 |
| **Total Miller:** | | **81,l287** | | **1,733,678.18** |
| Michael L. Skala (Director) | 12/08/1999 | 60,000 | 23.62 | 1,417,200.00 |
| | 07/23/2001 | 9,375 | 18.00 | 168,783.75 |
| | 07/23/2001 | 9,375 | 18.00 | 168,783.75 |

| Insider | Date of Sales | # of Shares Sold | Price ($) | Value of Sales ($) |
|---|---|---|---|---|
|  | 07/23/2001 | 8,137 | 18.00 | 146,495.29 |
|  | 07/23/2001 | 3,598 | 18.00 | 64,776.95 |
|  | 05/29/2002 | 9,375 | 17.75 | 166,406.25 |
|  | 05/29/2002 | 9,375 | 17.75 | 166,406.25 |
|  | 05/29/2002 | 9,375 | 17.75 | 166,406.25 |
|  | 05/29/2002 | 1,875 | 17.75 | 33,281.25 |
| **Total Skala:** |  | **120,485** |  | **2,498,539.74** |
| **Total Insiders:** |  | **1,862,978** |  | **$37,683,279.89** |

## COUNT I

### Violation of Section 10(b) of
### the Exchange Act and Rule 10b-5
### Promulgated Thereunder Against All Defendants

106.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

107.    During the Class Period, JAKKS and the Individual Defendants, and each of them, carried out a plan, scheme and course of conduct which was intended to aid, throughout the Class Period, did: (i) deceive the investing public, including plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of JAKKS' securities; (iii) allow Company Insiders, including defendants herein, to sell over $37.68 million of their privately held Company stock and to facilitate the offering of millions of more shares of JAKKS stock and almost $100 million of convertible debt during the Class Period, and (iv) cause Plaintiffs and other members of the Class to purchase JAKKS' securities at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

108.    Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not

misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for JAKKS' securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5.  All defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

109.    In addition to the duties of full disclosure imposed on defendants as a result of their making of affirmative statements and reports, or participation in the making of affirmative statements and reports to the investing public, defendants had a duty to promptly disseminate truthful information that would be material to investors in compliance with the integrated disclosure provisions of the SEC as embodied in SEC Regulation S-X (17 C.F.R. Sections 210.01 et seq.) and Regulation S-K (17 C.F.R. Sections 229.10 et seq.) and other SEC regulations, including accurate and truthful information with respect to the Company's operations, financial condition and earnings so that the market price of the Company's securities would be based on truthful, complete and accurate information.

110.    JAKKS and the Individual Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of JAKKS as specified herein.

111.    These defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of JAKKS' value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the

statements made about JAKKS and its business operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of JAKKS' securities during the Class Period.

112.    Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of his responsibilities and activities as a senior officer and/or director of the Company was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of and had access to other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

113.    The defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.  Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing JAKKS' operating condition and future business prospects from the investing public and supporting the artificially inflated price of its securities.  As demonstrated by defendants' overstatements and misstatements of the Company's business, operations and

earnings throughout the Class Period, defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

114.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of JAKKS' securities was artificially inflated during the Class Period.  In ignorance of the fact that market prices of JAKKS' publicly-traded securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by defendants, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was know to or recklessly disregarded by defendants but not disclosed in public statements by defendants during the Class Period, Plaintiffs and the other members of the Class acquired JAKKS securities during the Class Period at artificially high prices and were damaged thereby.

115.    At the time of said misrepresentations and omissions, Plaintiffs and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiffs and the other members of the Class and the marketplace known of the true financial condition and business prospects of JAKKS, which were not disclosed by defendants, Plaintiffs and other members of the Class would not have purchased or otherwise acquired their JAKKS securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

116.    By virtue of the foregoing, defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

117.    As a direct and proximate result of defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## COUNT II

### Violation of Section 20(A) of
### the Exchange Act Against the Individuals Defendants

118.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

119.    The Individual Defendants acted as controlling persons of JAKKS within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the  Company with the SEC and disseminated to the investing public, the individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which plaintiff contends are false and misleading.  The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

120.    In particular, each of these defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

- 46 -

121.    As set forth above, JAKKS and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

A.    Determining that this action is a proper class action and appointing Plaintiffs as class representatives under Rule 23 of the Federal Rules of Civil Procedure;

B.    Awarding compensatory damages in favor of Plaintiffs and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.    Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

DATED: February 25, 2008                    COUGHLIN STOIA GELLER
                                              RUDMAN & ROBBINS LLP
                                            SAMUEL H. RUDMAN
                                            DAVID A. ROSENFELD
                                            MARK S. REICH


                                                  /S/ Samuel H. Rudman
                                            _____
                                            SAMUEL H. RUDMAN

58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)

MILBERG WEISS LLP
KIRK E. CHAPMAN
MATTHEW A. KUPILLAS
TODD KAMMERMAN


　　　　　/S/Matthew A. Kupillas
　　　　MATTHEW A. KUPILLAS

One Pennsylvania Plaza
New York, NY  10119-0165
Telephone:  212/594-5300
212/868-1229 (fax)

Lead Counsel for Lead Plaintiffs and the Class

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **IN RE JAKKS PACIFIC, INC. SHAREHOLDERS CLASS ACTION LITIGATION** | Case No. 04-CV-8807 (KMK)<br><br>(ECF CASE) |

## ORDER GRANTING PLAINTIFFS' MOTION
## FOR LEAVE TO FILE A SECOND AMENDED COMPLAINT

KENNETH M. KARAS, District Judge:

      The Court, having considered Plaintiffs' Motion for Leave to File a Second Amended

Complaint pursuant to Federal Rule of Civil Procedure 15(a); it is hereby

      ORDERED that Plaintiffs' Motion for Leave to File a Second Amended Complaint is

GRANTED.  Plaintiffs shall file their Second Amended Complaint within 14 days of the date of

this order.

SO ORDERED.

Dated: _____, 2008
          White Plains, New York

                              _____
                              KENNETH M. KARAS
                              UNITED STATES DISTRICT JUDGE