UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------x

IN RE JAKKS PACIFIC, INC.
SHAREHOLDERS CLASS ACTION          :          Civil Action No. 04-CV-8807 (RJS)
LITIGATION

                                    :                    Electronically Filed

                                    :

                                    :

-------------------------------------------------------x


**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR
MOTION TO DISMISS THE SECOND AMENDED CONSOLIDATED COMPLAINT**


FEDER, KASZOVITZ, ISAACSON, WEBER,          SKADDEN, ARPS, SLATE,
  SKALA, BASS & RHINE LLP                      MEAGHER & FLOM LLP
Murray L. Skala (MS-9354)                   Jonathan J. Lerner (JL-7117)
Jonathan D. Honig (JH-7577)                 Michael H. Gruenglas (MG-8705)
750 Lexington Avenue                        Maura B. Grinalds (MG-2836)
New York, New York 10022                    Robert A. Fumerton (RF-3556)
Phone: (212) 888-8200                       Four Times Square
Fax: (212) 888-5968                         New York, New York 10036
                                            Phone: (212) 735-3000
                                            Fax: (212) 735-2000

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ..........................................................................................1

STATEMENT OF FACTS ..............................................................................................6

    A.    The Parties ........................................................................................6

           1.    Plaintiffs ............................................................................6

           2.    Defendants ..........................................................................6

    B.    The WWE Action ...............................................................................7

    C.    Plaintiffs' First Consolidated Amended Complaint in this Action .........................8

    D.    The WWE Action is Dismissed With Prejudice.........................................8

           1.    The Court Found WWE's Claims Time-Barred Because WWE Was on Notice of Its Claims No Later Than June 1998............................8

           2.    The Court's Determination that WWE Failed to Plead Actionable Injury .............................................................................9

    E.    The Court Grants Defendants' Motion to Dismiss the CAC ..............................10

           1.    The Court Held that Defendants Had No Duty to Disclose the Threat of Litigation ...............................................................10

           2.    JAKKS' Alleged Statements Concerning the Past and Projected Performance of WWE-Licensed Products Were Not Actionable.............11

           3.    The Court Found That the Alleged 1998 Bribery Scheme Could Be Material If It Threatened the Source of Revenue from the Licenses ........11

           4.    The Court Dismissed the Entire Complaint, Holding That Plaintiffs Failed to Satisfy Rule 9(b) and the PSLRA..............................................12

    F.    Plaintiffs File the Second Amended Complaint in this Action ...........................12

           1.    Plaintiffs' Attempt to Satisfy Rule 9(b) and the PSLRA .........................13

           2.    The Purported "Corrected Disclosures" ....................................13

ARGUMENT ..............................................................................................14

THE SAC SHOULD BE DISMISSED IN ITS ENTIRETY ................................................14

I.    PLAINTIFFS HAVE NOT ALLEGED LOSS CAUSATION.......................................14

A.    Plaintiffs Must Allege That the Fraud Was Disclosed to the Market and That the Corrective Disclosure, As Opposed to Any Other Factors or Circumstances, Negatively Affected the Stock Price ........................................... 14

B.    Plaintiffs Have Not Alleged That Any Portion of the Stock Price Drop Was Caused by the Disclosure of the Alleged Bribery Scheme ......................... 15

II.  THE ALLEGED BRIBERY SCHEME WAS IMMATERIAL AS A MATTER OF LAW BECAUSE IT HAS BEEN JUDICIALLY DETERMINED THAT THERE WAS NO THREAT TO THE CONTINUED VIABILITY OF THE LICENSES .................................................................................................. 19

A.    Any Threat to the Continued Viability of the Licenses Ceased Once the Statutes of Limitations Expired on All WWE's Claims ...................................... 20

B.    The Determination That WWE Suffered No Legally Cognizable Injury Further Establishes That There Was No Threat to the Licenses ......................... 21

C.    As a Matter of Law, the Potential Renewal of the Licenses in 2009 Was Too Speculative To Be Material ........................................................................ 22

III. GIVEN THAT THE ALLEGED BRIBERY SCHEME WAS IMMATERIAL, PLAINTIFFS' SCIENTER ALLEGATIONS FAIL AS A MATTER OF LAW ............. 23

IV. PLAINTIFFS STILL FAIL TO SATISFY RULE 9(B) AND THE PSLRA ................... 24

A.    Section 10(b) Claims Are Subject to the Heightened Pleading Standards Required by Rule 9(b) and the PSLRA ............................................................... 24

B.    The Court Held that Plaintiffs Cannot Satisfy These Heightened Standards Merely By Setting Forth a Laundry List of General Reasons Explaining Why the Alleged Misstatements Were False or Misleading .............. 25

C.    The SAC Fails to Cure Plaintiffs' Rule 9(b) and PSLRA Defects ...................... 26

V.  PLAINTIFFS SHOULD NOT BE GRANTED A THIRD OPPORTUNITY TO AMEND THEIR DEFECTIVE COMPLAINT ............................................................. 29

CONCLUSION ....................................................................................................... 32

# TABLE OF AUTHORITIES

## CASES

In re AOL Time Warner, Inc. Securities Litigation,
  503 F. Supp. 2d 666 (S.D.N.Y. 2007) .................................................................. 18, 19

ATSI Communications, Inc. v. Shaar Fund, Ltd.,
  493 F.3d 87 (2d Cir. 2007).................................................................................. 25, 29

In re AXIS Capital Holdings Ltd. Securities Litigation,
  456 F. Supp. 2d 576 (S.D.N.Y. 2006) .................................................................. 23, 24

In re Alcatel Securities Litigation,
  382 F. Supp. 2d 513 (S.D.N.Y. 2005) .................................................... 5, 12, 25, 27-30

Amron v. Morgan Stanley Investment Advisors Inc.,
  464 F.3d 338 (2d Cir. 2006)........................................................................................ 6

Aurigemma v. Arco Petroleum Products Co.,
  734 F. Supp. 1025 (D. Conn. 1990) ......................................................................... 21

In re Bristol-Myers Squibb Securities Litigation, 228 F.R.D. 221 (D.N.J. 2005) ............ 29

California Public Employees' Retirement System v. Chubb Corporation,
  394 F.3d 126 (3d Cir. 2004).................................................................................... 30

In re Canadaigua Securities Litigation, 944 F. Supp. 1202 (S.D.N.Y. 1996) .................. 24

In re Citigroup, Inc. Securities Litigation, 330 F. Supp. 2d 367 (S.D.N.Y. 2004) ....... 2, 11

In re Cornerstone Propane Partners, L.P. Securities Litigation,
  355 F. Supp. 2d 1069 (N.D. Cal. 2005).................................................................... 28

Dunlop v. City of New York, No. 06 Civ 0433, 2008 WL 1970002
  (S.D.N.Y. May 6, 2008)............................................................................................. 6

Dura Pharmaceuticals, Inc. v. Broudo, 544 U.S. 336 (2005) ............................ 2, 4, 14-17

Endovasc Ltd., Inc. v. J.P. Turner & Co., No. 02 Civ 7313,
  2004 WL 634171 (S.D.N.Y. Mar. 30, 2004) ............................................................ 27

In re GeoPharma, Inc. Securities Litigation,
  411 F. Supp. 2d 434 (S.D.N.Y. 2006) .................................................................. 24, 29

In re Global Crossing Securities Litigation, 322 F. Supp. 2d 319 (S.D.N.Y. 2004)........... 6

Klein v. General Nutrition Companies, 186 F.3d 338 (3d Cir. 1999)................................23

Kramer & Frank, P.C. v. Wibbenmeyer, No. 4:05CV2395,
    2006 WL 1134479 (E.D. Mo. Apr. 26,  2006)...........................................................28

Krantz v. Prudential Investments Fund Management LLC, 305 F.3d 140
    (3d Cir. 2002)..............................................................................................................30

Lattanzio v. Deloitte & Touche LLP, 476 F.3d 147 (2d Cir. 2007)............3, 15, 17, 18, 19

Lenel System International, Inc. v. Smith, 10 Misc. 3d 890, 810 N.Y.S.2d 792
    (Sup. Ct. Monroe County 2005)................................................................................22

Lentell v. Merrill Lynch & Co., 396 F.3d 161 (2d Cir. 2005).............................. 14, 15, 16

Lerner v. Fleet Bank, N.A., 459 F.3d 273 (2d Cir. 2006) ................................................24

In re Marsh & McLennan Companies, Inc. Securities Litigation,
    501 F. Supp. 2d 452 (S.D.N.Y. 2006) ......................................................................23

In re Merrill Lynch & Co., Inc., 273 F. Supp. 2d 351 (S.D.N.Y. 2003) ..........................30

In re Merrill Lynch & Co. Research Reports Securities Litigation,
    Nos. 02 MDL 1484, 07 CIV 6677, 2008 WL 2019680
    (S.D.N.Y. May 8, 2008)................................................................................ 3, 18, 19

In re Merrill Lynch Ltd. Partnerships Litigation, 154 F.3d 56 (2d Cir. 1998) ............. 8, 20

In re Metropolitan Securities Litigation, 532 F. Supp. 2d 1260
    (E.D. Wash. 2007)......................................................................................................28

Miller v. Champion Enterprises, Inc., 346 F.3d 660 (6th Cir. 2003)...............................29

Moran v. Kidder Peabody & Co., 617 F. Supp. 1065 (S.D.N.Y. 1985)...........................30

In re NAHC, Inc. Securities Litigation, 306 F.3d 1314 (3d Cir. 2002)...........................29

New Shows, S.A. de C.V. v. Don King Productions, Inc., 210 F.3d 355
    (2d Cir. 2000)..............................................................................................................22

Novak v. Kasaks, 216 F.3d 300 (2d Cir. 2000) ......................................................25, 28

In re Omnicom Group, Inc. Securities Litigation,
    541 F. Supp. 2d 546 (S.D.N.Y. 2008) ........................................................ 15, 18, 19

In re Par Pharmaceutical, Inc. Securities Litigation,
    733 F. Supp. 668 (S.D.N.Y. 1990) .............................................................................. 23

Podany v. Robertson Stephens, Inc., 318 F. Supp. 2d 146 (S.D.N.Y. 2004) .................... 6

Rombach v. Chang, 355 F.3d 164 (2d Cir. 2004) ............................................................ 29

Rudman v. Cowles Communications, Inc.,
    30 N.Y.2d 1, 280 N.E.2d 867 (1972) ........................................................................ 22

Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124 (2d Cir. 1994) ..................................... 29

Singh v. Carrington, 18 A.D.3d 855, 796 N.Y.S.2d 668 (2d Dep't 2005) ........................ 22

Solomon v. WMN Associates, Inc., No. 391793, 1994 WL 597390 (Conn. Super.
    Ct. Oct. 20, 1994) ...................................................................................................... 21

In re StarGas Securities Litigation, 241 F.R.D. 428 (D. Conn. 2007) ............................. 31

Tallmadge Brothers, Inc. v. Iroquois Gas Transmission System, No. CV92
    0124088 S, 1993 WL 57597 (Conn. Super. Ct. Feb. 26, 1993) .................................. 22

Tarleton Building Corp. v. Spider Staging Sales Co., 26 A.D.2d 809,
    274 N.Y.S.2d 43 (1st Dep't 1966) .............................................................................. 22

Tellabs, Inc. v. Makor Issues & Rights, Ltd., 127 S. Ct. 2499 (2007) ............................. 24

Valentine v. LaBow, 95 Conn. App. 436, 897 A.2d 624 (2007) ....................................... 20

## STATUTES

15 U.S.C. § 78u-4 ............................................................................................................... 1

15 U.S.C. § 78u-4(b)(4) .................................................................................................... 14

15 U.S.C. § 78u-4(b)(1)(B) ............................................................................................... 25

Fed. R. Civ. P. 9(b) .......................................................................... 1, 5, 10, 12, 13, 24-30

Fed. R. Civ. P. 12(b)(6) ............................................................................................... 1, 19

Defendants Jakks Pacific, Inc., ("JAKKS"), Jack Friedman, Steven G. Berman, and Joel M. Bennett (collectively, "Defendants") respectfully submit this memorandum of law in support of their motion, pursuant to Rules 12(b)(6) and 9(b) of the Federal Rules of Civil Procedure and Section 21D of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78u-4, for an Order dismissing Plaintiffs' Second Amended Consolidated Complaint (the "SAC").[1]

## PRELIMINARY STATEMENT

This action was commenced on November 5, 2004, when Plaintiffs seized upon the announcement of civil litigation between World Wrestling Entertainment, Inc. ("WWE") and JAKKS (the "WWE Action") concerning, inter alia, JAKKS' procurement of WWE's toy and videogame licenses (the "Licenses") to launch a federal securities class action alleging violations of Sections 10(b) and 20(a) of the Exchange Act.  Judge Karas dismissed the first Consolidated Amended Complaint ("CAC"; Ex. B) in this action based on Plaintiffs' failure to satisfy the heightened pleading standards contained in Fed. R. Civ. P. 9(b) and the Private Securities Litigation Reform Act of 1995 ("PSLRA") (see Opinion and Order dated January 25, 2008 ("Dismissal Order"; Ex. C) at 22-24) – defects which Plaintiffs have not even come close to curing in the SAC.  As set forth in Sections I and II below, however, the Court's holdings in (a) the Dismissal Order itself and (b) its Opinion dismissing the WWE Action with prejudice (the "WWE Dismissal Order"; Ex. D) also preclude Plaintiffs' Sections 10(b) and 20(a) claims as a matter of law.

---

[1]    A copy of the Second Consolidated Amended Complaint dated March 14, 2008, is attached as Exhibit A to the accompanying Declaration of Robert A. Fumerton, exhibits to which are cited as "Ex. __."

First, in dismissing the CAC, Judge Karas held that "a company has no general obligation to disclose the risk of litigation unless that litigation is 'substantially certain to occur,'" and that "Plaintiffs do not plead sufficient facts from which to conclude that Defendants knew that litigation was 'substantially certain to occur.'" (Dismissal Order at 20-21 (quoting In re Citigroup, Inc. Sec. Litig., 330 F. Supp. 2d 367, 377 (S.D.N.Y. 2004)). This holding is fatal to Plaintiffs' attempt to allege loss causation, an essential element of any Section 10(b) claim.

Under Dura Pharmaceuticals, Inc. v. Broudo, 544 U.S. 336 (2005) and recent Second Circuit authority, to plead loss causation, a plaintiff must allege that a corrective disclosure revealing the alleged fraud negatively affected the price of the security. See id. at 341-42. However, because Judge Karas squarely held Defendants were under no duty to disclose the threat of litigation initiated by WWE, Plaintiffs cannot predicate loss causation on the disclosure of the WWE litigation. Rather, Plaintiffs must plead facts demonstrating that some portion of the stock price drop was caused by the disclosure of the alleged bribery scheme – the only information Judge Karas held Defendants could have been under a duty to disclose (Dismissal Order at 17) – as opposed to the litigation or any other factors.

The SAC is devoid of any such factual allegations of causation. The SAC refers to only three purported "corrective disclosures": (i) JAKKS' initial disclosure in an October 19, 2004 press release that litigation may be imminent, which made no mention whatsoever of any bribery allegations (SAC ¶ 88); (ii) unidentified "news reports" later that same day disclosing the actual filing of the WWE litigation and the underlying bribery allegations asserted by WWE (id. ¶ 91); and (iii) a JAKKS press release later that same day announcing the filing of the WWE litigation. (Id. ¶ 92.) According to the SAC, JAKKS' stock price began its decline after the first alleged disclosure – before any disclosure of the underlying bribery allegations. Indeed, the only

purported mention of the alleged bribery allegations in any of these disclosures appeared in the unspecified "news reports" that simultaneously disclosed the filing of the litigation.

In cases, like this one, involving "mixed disclosures," i.e., disclosures of alleged fraud coupled with other "bad news" affecting the company, courts in the Second Circuit routinely dismiss Section 10(b) claims for failing to plead loss causation where plaintiffs fail to plead facts specifically establishing that any stock price drop was caused by the disclosure of the actionable fraud – and not the other bad news. Just last month, in In re Merrill Lynch & Co. Research Reports Securities Litigation, Nos. 02 MDL 1484, 07 CIV 6677, 2008 WL 2019680 (S.D.N.Y. May 8, 2008), Judge Keenan dismissed a complaint similar to the SAC where, as here, plaintiff tried to plead loss causation by alleging a "mixed disclosure" of the alleged fraud and other non-actionable adverse information. The Court held, in language equally applicable here, that "the Complaint does not account for the fact that the October 4, 2000 report contained other 'bad news,' apart from the concern about [the alleged fraud], that was likely to cause a drop in the company's share price." Id. at *14 (emphasis added). Accordingly, Judge Keenan held that plaintiff's "attempt to plead loss causation fails because he has not alleged facts that lead to the inference that all, or even some, of his losses are due to the alleged fraud, rather than to intervening events and/or the disclosure of other information." Id. (emphasis added); accord Lattanzio v. Deloitte & Touche LLP, 476 F.3d 147, 158 (2d Cir. 2007) ("Plaintiffs have not alleged facts to show that [defendant]'s misstatements, among others . . . that were much more consequential and numerous, were the proximate cause of plaintiffs' loss; nor have they alleged facts that would allow a factfinder to ascribe some rough proportion of the whole loss to [defendant]'s misstatements. Accordingly, plaintiffs have not alleged loss causation."); see cases cited at § I.B., infra. Here, as a matter of law, Plaintiffs' failure (and inability) to allege that any

portion of the stock price drop was caused by the disclosure of the alleged bribery scheme, <u>as opposed to the disclosure of the litigation</u>, mandates dismissal of their claims under <u>Dura</u>. (<u>See infra</u> at § I.)[2]

        <u>Second</u>, in dismissing the WWE Action, Judge Karas explicitly determined that (i) WWE suffered its last alleged injury on June 24, 1998 and was on inquiry notice of its claims by no later than that date, and (ii) WWE suffered no legally-cognizable injury. Each of these two determinations – standing alone – conclusively demonstrates that the alleged bribery scheme could not have represented <u>any actual threat to the continued viability of the Licenses</u> and thus could not be material <u>under Judge Karas' opinion dismissing the CAC in this action</u>. In the Dismissal Order, Judge Karas specifically held that the <u>only</u> material aspect of the alleged bribery scheme was that "Jakks's own public statements make clear that the WWE licenses generated, and were expected to continue to generate, significant revenue for the company" and thus "[a]n investor might reasonably want to know if that <u>source of revenue was threatened</u> because it was improperly or illegally derived." (Dismissal Order at 10 (emphasis added).) Now that it has been judicially determined that (i) WWE suffered its last alleged injury and was on inquiry notice of its claims by June 1998, thereby rendering all of its claims time-barred, and (ii) WWE never suffered an ascertainable injury, <u>it has also been judicially determined that there was no actual threat to the continued viability of the Licenses</u> and that, as a matter of law, the

---

[2]    In their response to Defendants pre-motion letter on this issue, Plaintiffs admit that "[t]<u>he filing of the suit and the allegations are intertwined</u> and it was the market learning of the suit and its allegations that caused the price decline thereby causing Plaintiffs' loss." (Plaintiffs' Apr. 7, 2008 Ltr. at 3.)

alleged bribery scheme was immaterial.  Accordingly, Plaintiffs' Section 10(b) claims fail for this additional and independent reason.  (<u>See</u> <u>infra</u> at § II.)[3]

## Plaintiffs Have Also Failed to Cure the Rule 9(b) and PSLRA Defects in the CAC

Citing Judge Casey's recent decision in <u>In re Alcatel Securities Litigation</u>, 382 F. Supp. 2d 513 (S.D.N.Y. 2005), Judge Karas held that the CAC did not satisfy the heightened pleading standards mandated by Rule 9(b) and the PSLRA because Plaintiffs did no more than set forth a single paragraph listing generic reasons purporting to explain why all of the alleged misstatements were "materially false and misleading."  (Dismissal Order at 22-24.)  Rather than attempt to cure this defect in the SAC, Plaintiffs have essentially cut this same deficient paragraph from their earlier complaint (CAC ¶ 145) and pasted it in substantially similar form after each alleged misstatement or omission in the SAC.  The only other difference between the boilerplate paragraphs that now follow each alleged misstatement in the SAC and paragraph 145 of the CAC is that Plaintiffs have added <u>direct quotes</u> from pages 10 and 17 of the Dismissal Order in their new boilerplate paragraph.  (<u>See</u> <u>infra</u> at § IV.)

Plaintiffs' word-processing exercise wholly fails to satisfy the unequivocal requirements of Rule 9(b), the PSLRA, or the Court's Dismissal Order.  Indeed, the pleading that Judge Casey held to be legally defective in <u>Alcatel</u> did precisely what Plaintiffs have now done here – <u>i.e.</u>, it simply took the same laundry list of reasons why the challenged statements were fraudulent and pasted it after <u>each</u> alleged misstatement.  (<u>See</u> <u>infra</u> at § IV.)

After having <u>three</u> opportunities to try to state a cognizable claim in this action, Plaintiffs' inevitable request to file yet another complaint should be denied, especially

---

[3]    The Dismissal Order in this action makes no reference at all to the WWE Dismissal Order, which was decided independently after briefing on both motions was completed.  Accordingly, the impact of the holdings in these decisions on Plaintiffs' claims could not have been previously briefed or argued.

considering that Plaintiffs' counsel declined this Court's invitation to seek leave for further

amendment at the April 18, 2008 Pre-Motion Conference.  Granting Plaintiffs yet another bite at

the apple would fly directly in the face of the PSLRA and well-settled Second Circuit authority.

(See infra at § V.)

## STATEMENT OF FACTS[4]

### A.    The Parties

#### 1.    Plaintiffs

Lead plaintiffs ("Plaintiffs") allegedly purchased JAKKS common stock between

December 3, 1999 and October 19, 2004 (the "Class Period") on the dates set forth in their class

certifications.  (SAC ¶¶ 14, 26.)

#### 2.    Defendants

JAKKS Pacific, Inc. ("JAKKS") is a publicly-traded Delaware corporation whose

principal place of business is in California.  (Id. ¶ 15.)  JAKKS is a multi-brand company that

designs, develops, produces and markets toys, leisure products and writing instruments for

children and adults around the world.  The other Defendants are officers of JAKKS:  Jack

Friedman is the Chief Executive Officer and Chairman of the Board of Directors; Stephen

Berman is the President, Secretary and Chief Operating Officer and serves on the Board of

---

[4]    This statement of facts is drawn from the allegations of the complaint and from the documents to which the complaint refers.  See In re Global Crossing Sec. Litig., 322 F. Supp. 2d 319, 327-28 (S.D.N.Y. 2004) ("When deciding a motion to dismiss pursuant to Rule 12(b)(6), the Court may consider documents attached to the complaint as exhibits or incorporated in it by reference.").  Although when deciding a motion to dismiss under Rule 12(b)(6) "the Court must accept as true all well-pleaded factual allegations in the complaint," Podany v. Robertson Stephens, Inc., 318 F. Supp. 2d 146, 152 (S.D.N.Y. 2004), it must dismiss a complaint where "'plaintiff's allegations are doomed to fail under any available legal theory.'"  Amron v. Morgan Stanley Inv. Advisors Inc., 464 F.3d 338, 343 (2d Cir. 2006) (citation omitted).  In addition, to survive a motion to dismiss, a plaintiff must allege "facts necessary to a finding of liability . . . bald assertions and conclusions of law will not suffice."  Id. at 343-44 (emphasis in original) (citation omitted).  Further, "in order to withstand [a Rule 12(b)(6) motion to dismiss] the '[f]actual allegations' contained in the complaint 'must be enough to raise a right to relief above the speculative level.'"  Dunlop v. City of New York, No. 06 Civ. 0433, 2008 WL 1970002, at *4 (S.D.N.Y. May 6, 2008) (Sullivan, J.) (quoting Bell Atl. Corp. v. Twombly, 127 S. Ct. 1955, 1965 (2007)).

Directors; and Joel Bennett is the Chief Financial Officer (collectively, the "Individual Defendants."). (<u>Id.</u> ¶ 16-18.) The Individual Defendants are alleged to have signed certain financial reports during the Class Period. (<u>Id.</u> ¶¶ 61, 67.)

### B.    <u>The WWE Action</u>

On October 19, 2004, JAKKS and the Individual Defendants were named as defendants in a complaint filed by WWE in this Court, captioned <u>World Wrestling Entertainment, Inc. v. JAKKS Pacific, Inc.</u>, No. 1:04-CV-08223-KMK (the "Initial WWE Complaint"). In its Initial Complaint, WWE alleged that certain payments relating to a January 2, 1998 invoice for "soft toys" were directed solely towards "secur[ing] the WWE videogame license and the 1998 amendments to the toy licenses." (Initial WWE Compl. ¶ 188; <u>see also</u> SAC ¶¶ 40, 42.)

On March 30, 2005, WWE abruptly filed an amended complaint that radically altered the core factual allegations underlying WWE's claims. In its amended complaint, WWE <u>recanted</u> its allegations that the allegedly illicit payments in 1998 were a <u>quid</u> <u>pro</u> <u>quo</u> for the videogame license and the extension of the toy licenses. Instead, WWE alleged that the January 2, 1998 "soft toy" invoice for $80,000 and corresponding payments in 1998 were to acquire rights of wrestling action figures manufactured by a company named Playmates, which is not a party to any of these actions. (<u>Compare</u> Initial WWE Compl., ¶¶ 42-46, 59, <u>with</u> WWE AC ¶¶ 58, 61, 79, 83-94, 101.) Moreover, WWE's amended complaint now admits that procurement of the videogame license and extension of the toy licenses was not even discussed until <u>after</u> January 1998 – thus divorcing them from the January 2, 1998 invoice. (WWE AC ¶¶ 58, 61, 79, 83, 90-101.) Accordingly, the source of Plaintiffs' allegations – WWE – has now specifically refuted Plaintiffs' core allegation that the January 1998 payment was a bribe to obtain the videogame license and an extension of the toy license.

C.    **Plaintiffs' First Consolidated Amended Complaint in this Action**

This Action was initially commenced on November 5, 2004.  On July 11, 2005, Plaintiffs filed their Consolidated Amended Complaint (the "CAC").  Relying blindly on the allegations of WWE's <u>initial</u> complaint and the January 2, 1998 invoice, Plaintiffs alleged that after entering into a domestic toy license agreement with WWE on October 24, 1995 and an international toy license agreement on February 10, 1997 (CAC ¶¶ 34, 37), JAKKS procured a videogame license and an extension of the toy license from WWE by paying an $80,000 bribe to agents of WWE.  (CAC ¶¶ 4-6, 40, 145.)  The CAC purported to assert claims under Section 10(b) and Rule 10b-5 based on Defendants' alleged failure to disclose in JAKKS' public filings during the five-year Class Period the threat of litigation ultimately initiated by WWE and the underlying bribery allegations.

D.    **The WWE Action is Dismissed With Prejudice**

On December 21, 2007, Judge Karas issued an 81-page Opinion and Order dismissing WWE's complaint with prejudice, on the grounds that (i) it was barred by the statute of limitations and (ii) WWE had failed to plead actionable injury.

1.    **The Court Found WWE's Claims Time-Barred**
      **Because WWE Was on Notice of Its Claims No Later Than June 1998**

The Court found WWE's RICO claim to be time-barred under the applicable four-year statute of limitations which begins to run "when the plaintiff discovers or should have discovered the RICO injury."  (WWE Dismissal Order at 63 (quoting <u>In re Merrill Lynch Ltd. P'ships Litig.</u>, 154 F.3d 56, 58 (2d Cir. 1998) (citation omitted)).  The Court explicitly determined that WWE's alleged injuries occurred <u>no later than June 24, 1998</u> (<u>id.</u> at 63-64), and that WWE's allegations that it continued to receive below-market royalty payments after the license agreements were executed did <u>not</u> constitute new and independent injuries that create a

8

separate accrual for the statute of limitations.  (See id. at 69.)

The Court further determined that "[f]rom Plaintiff's own, detailed allegations, the Court has little difficulty in finding that a reasonable person would have been on inquiry notice of the injury Plaintiff is alleged to have suffered by no later than June 1998." (Id. at 68.)  The Court also found that WWE could not equitably toll its time-barred claims because it failed to allege any exercise of due diligence to discover its claims at any time during the four-year period following June 1998.  (Id. at 73.)  Specifically, Judge Karas concluded that WWE had not pled "that it exercised due diligence until well after the statute of limitations had expired," and that "Plaintiff fails to cite anything in its lengthy Amended Complaint that remotely demonstrates due diligence at any point during the granting of the licenses, let alone that it exercised due diligence throughout the period to be tolled." (Id.)

### 2.    The Court's Determination that
### WWE Failed to Plead Actionable Injury

The Court also determined that WWE had failed to allege any actionable injury because it had pled no facts which would enable a court to determine the amount of any loss suffered by WWE.  Regarding the toy license and amendments, Judge Karas determined that "[n]othing substantial is said about the range of lost royalties from the toy licenses" (id. at 57) and thus WWE had failed to allege any facts that could establish loss in connection with those licenses.  (Id. at 60.)  With respect to the videogame license, the Court determined that WWE's injury allegations were "doom[ed]" (id. at 58), as a matter of law, for two reasons: (i) "Plaintiff does not have a crystal ball or any plausible way to allege facts that would establish the outcome of the bidding process" (id. at 61); and (ii) even if it could, "Plaintiff has no apparent way of assessing the profits any winning licensee could have produced for Plaintiff, as a more favorable royalty rate would only benefit Plaintiff if the vendor could manufacture and market the

9

videogames and toys on a mass scale equal to or better than the Jakks/LLC bids."  (Id. at 61-62.)

Rather, as the Court found, "the net profits to Plaintiff from a corruption-free bidding process would depend on a number of factors that could not be projected."  (Id.) Accordingly, the court determined, "there is no plausible set of facts, consistent with Plaintiff's allegations, that makes the alleged injury sufficiently concrete to state a RICO claim."  (Id. at 58 (emphasis added).)[5]

### E.    The Court Grants Defendants' Motion to Dismiss the CAC

In an Opinion and Order dated January 25, 2008 (the "Dismissal Order"), the Court granted Defendants' Motion to Dismiss the CAC.  In the Dismissal Order, Judge Karas held that several of Plaintiffs' Section 10(b) allegations failed as a matter of law and that all of Plaintiffs' fraud allegations failed to satisfy the heightened pleading standards required by Rule 9(b) and the PSLRA.  The Court gave Plaintiffs 30 days to seek leave to amend the CAC.

#### 1.    The Court Held that Defendants Had No Duty to Disclose the Threat of Litigation

In the Dismissal Order, Judge Karas explicitly held that Defendants were under no duty to disclose the threat of litigation initiated by WWE and that Plaintiffs' fraud claims based on Defendants' alleged failure to disclose the threat of such litigation failed as a matter of law.  As the Court held, "a company has no general obligation to disclose the risk of litigation unless that litigation is 'substantially certain to occur,'" and "Plaintiffs do not plead sufficient facts from which to conclude that Defendants knew that litigation was 'substantially certain to

---

[5]    After dismissing WWE's federal claims, Judge Karas declined to exercise supplemental jurisdiction over WWE's state law claims (WWE Dismissal Order at 78), which are currently pending in the Connecticut Superior Court (the "Connecticut Action").  On March 13, 2008, Defendants moved for summary judgment dismissing the Connecticut Action on the basis of the collateral estoppel effect of Judge Karas' determinations that WWE's claims were time-barred and that it suffered no legally-cognizable injury.  (See infra at § II, n. 6.) Defendants' motion is sub judice.

occur.'" (Dismissal Order at 20-21 (quoting Citigroup, 330 F. Supp. 2d at 377).  These holdings
are law of the case.

> **2.**  **JAKKS' Alleged Statements Concerning the Past and Projected
> Performance of WWE-Licensed Products Were Not Actionable**

The Court further held that Plaintiffs could not state a Section 10(b) claim
against Defendants based upon "1) general statements about Jakks's success and Jakks's products,
(see, e.g., CAC ¶¶ 62, 76, 79, 88-89, 108, 113); [or] 2) statements about the past and projected
performance of WWE-licensed videogames and toys, (see, e.g., id. ¶¶ 57, 61, 63, 65, 67, 72-73,
76, 89, 95-96, 102, 120, 129, 136)."  (Dismissal Order at 12.)  With respect to the former, the
Court held that "these general statements about Jakks' corporate model or its overall success do
not trigger a duty to reveal all potentially damaging information such as that alleged here."  (Id.
at 14.)  With respect to the second category of statements, which the Court noted "comprises the
bulk of the statements cited in the CAC," the Court held:

> [L]ike the first group of statements, the statements falling into this second group
> created no duty to disclose the alleged bribery scheme.  These statements discuss the
> beneficial effect (both past and future) of the WWE licenses on Jakks's business;
> however, they do not discuss the acquisition of those licenses and they make no
> representations, implied or otherwise, as to whether they were acquired legally.
> Further, Plaintiffs make no claim that these statements are on their face inaccurate.
> As such, these statements are akin to the type of historical statements about a
> company's revenues from one of its product lines and prognostications for growth in
> profits from these products that the courts regularly find do not trigger a duty to
> disclose illegal conduct.

(Id. at 15.)

> **3.**  **The Court Found That the Alleged 1998 Bribery Scheme Could Be
> Material If It Threatened the Source of Revenue from the Licenses**

The Court held that "statements specifically about the acquisition of the WWE
licenses" could create a duty to disclose the alleged bribery scheme because "[a]n investor might
reasonably want to know if that source of revenue was threatened because it was improperly or

11

illegally derived." (Dismissal Order at 10, 12, 17.) Accordingly, the Court held that unlike all of the other alleged misstatements in the CAC, which failed as a matter of law under Section 10(b), the statements contained in paragraphs 58, 64, 68, 80, 83, 99, 106, and 132 of the CAC could state a claim under Section 10(b) if Plaintiffs could satisfy the heightened pleading requirements contained in Rule 9(b) and the PSLRA. (Id. at 12.)

### 4. The Court Dismissed the Entire Complaint, Holding That Plaintiffs Failed to Satisfy Rule 9(b) and the PSLRA

Finally, Judge Karas held that Plaintiffs failed to satisfy the heightened pleading standards required by Rule 9(b) and the PSLRA because Plaintiffs merely set forth a "single paragraph listing four reasons purporting to explain why all of the quoted statements are 'materially false or misleading.'" (Dismissal Order at 23.) The Court held that "Plaintiffs' CAC is indistinguishable from the complaint in Alcatel, and thus is insufficient to 'explain why the statements were fraudulent,' with the 'particularity' required by the plain language of Rule 9(b) and the PSLRA." (Dismissal Order at 23-24 (citations omitted).)[6]

### F. Plaintiffs File the Second Amended Complaint in this Action

After Defendants did not oppose Plaintiffs' motion for leave to amend, Plaintiffs filed the SAC on March 14, 2008. The substantive allegations contained in the SAC are materially identical to those contained in the CAC. Plaintiffs merely deleted from the SAC certain statements that the Court held were not actionable under Section 10(b).

---

[6]  In moving to dismiss both the WWE Action and the first CAC in this action, Defendants argued that a General Release and Covenant Not to Sue (the "General Release") executed by WWE and Defendants in January 2004 barred all of WWE's claims and, necessarily, the securities claims in this action. See Defendants' September 9, 2005 Memorandum of Law in Support of their Motion to Dismiss the CAC at 16-18. The General Release is presently the subject of a motion for reconsideration before Judge Karas in the WWE Action. If that motion is granted, Defendants reserve the right to renew the Release argument set forth in their prior Memorandum.

12

1.    **Plaintiffs' Attempt to Satisfy Rule 9(b) and the PSLRA**

In a token and failed effort to satisfy the heightened pleading requirements of Rule 9(b) and the PLSRA, Plaintiffs took essentially the same deficient paragraph from their earlier complaint (CAC ¶ 145) and simply pasted it in substantially similar form after each alleged misstatement or omission in the SAC. (Compare SAC ¶¶ 58, 62, 64, 68, 70, 73, 77, 87 with CAC ¶ 145.) Plaintiffs still fail to specify, inter alia, exactly which portion of each quoted SEC filing or press release constitutes a false representation, as required by both Rule 9(b), the PSLRA, and this Court's Dismissal Order. (See infra at § IV.)

2.    **The Purported "Corrected Disclosures"**

The SAC alleges only the following three purported "corrective disclosures," all of which allegedly occurred on October 19, 2004: (i) JAKKS' press release announcing third quarter earnings results and, with no mention of any bribery allegations, stating that unless the parties can come to a resolution, "litigation is likely to be commenced by WWE, challenging the validity of the licenses and seeking compensatory and punitive damages, in which event the Company intends to vigorously defend itself against claims which it believes are without merit" (SAC ¶ 88); (ii) news reports later that same day indicating that WWE had indeed filed a complaint against Defendants and referring to the underlying bribery allegations contained therein (id. ¶ 91); and (iii) a JAKKS press release later that same day disclosing the fact that the lawsuit had been commenced. (Id. ¶ 92.)

The SAC alleges that in reaction to JAKKS' initial disclosure that litigation may be imminent – before any disclosure of the underlying bribery allegations – "the price of JAKKS common stock declined precipitously, falling $5.34 per share, or 22% from its previous day's closing price of $24.15, to close at $18.81. After the close of trading, shares continued to fall in

13

after-hours trading, dropping to $17.85 per share." (SAC ¶ 89.) The only other information the SAC alleges about the reaction of the stock price to the disclosures is that "[t]he following trading day, October 20, 2004, the price of JAKKS stock fell an additional $5.85 per share, or 31% from its regular session closing price on October 19, 2004, to close at $12.96." (SAC ¶ 93.) The SAC does not contain a <u>single factual allegation</u> demonstrating that any stock price drop was caused by the disclosure of the underlying bribery allegations, as opposed to the disclosure of the litigation itself, or any other factors.

<u>**ARGUMENT**</u>

<u>**THE SAC SHOULD BE DISMISSED IN ITS ENTIRETY**</u>

**I.    <u>PLAINTIFFS HAVE NOT ALLEGED LOSS CAUSATION</u>**

Plaintiffs' Section 10(b) claim fails as a matter of law because Plaintiffs have not alleged loss causation, a necessary element of any Section 10(b) claim.  See <u>Dura</u>, 544 U.S. at 341-42 (one of the essential elements of a Section 10(b) claim is "'loss causation,' <u>i.e.</u>, a causal connection between the material misrepresentation and the loss") (citation omitted); <u>Lentell v. Merrill Lynch & Co.</u>, 396 F.3d 161, 172 (2d Cir. 2005) ("Loss causation 'is the causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff.'") (citing <u>Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc.</u>, 343 F.3d 189, 197 (2d Cir. 2003)); <u>see also</u> 15 U.S.C. § 78u-4(b)(4) (a private plaintiff who claims securities fraud has "the burden of proving" that the defendant's misrepresentation "caused the loss for which the plaintiff seeks to recover damages").

**A.    Plaintiffs Must Allege That the Fraud Was Disclosed to the Market and That the Corrective Disclosure, As Opposed to Any <u>Other Factors or Circumstances, Negatively Affected the Stock Price</u>**

In <u>Dura</u>, the Supreme Court held that a plaintiff could not plead loss causation merely by alleging that the price of the security on the date of purchase was inflated as a result of

14

the alleged fraud.  See 544 U.S. at 340-46.  Rather, a plaintiff must allege that a corrective

disclosure was made revealing the specific alleged fraud and that the specific corrective

disclosure, not any other factors or circumstances, negatively affected the price of the security.

See id. at 342-44; accord Lentell, 396 F.3d at 173 ("Thus to establish loss causation, 'a plaintiff

must allege . . . that the subject of the fraudulent statement or omission was the cause of the

actual loss suffered,' . . . i.e., that the misstatement or omission concealed something from the

market that, when disclosed, negatively affected the value of the security." (emphasis in original)

(citation omitted); id. at 174 ("plaintiff's claim fails when 'it has not adequately pl[e]d facts

which, if proven, would show that its loss was caused by the alleged misstatements as opposed to

intervening events'") (citation omitted) (emphasis added) (alteration in original); Lattanzio v.

Deloitte & Touche LLP, 476 F.3d 147, 158 (2d Cir. 2007) (plaintiff must "allege[] facts that

would allow a factfinder to ascribe some rough proportion of the whole loss to [defendant]'s

misstatements."); In re Omnicom Group, Inc. Sec. Litig., 541 F. Supp. 2d 546 (S.D.N.Y. 2008)

("To prove loss causation, plaintiffs must distinguish the alleged fraud from the tangle of [other]

factors that affect a stock's price.") (citation omitted).

> **B.    Plaintiffs Have Not Alleged That Any Portion of the Stock Price
> Drop Was Caused by the Disclosure of the Alleged Bribery Scheme**

Here, Plaintiffs do not – because they cannot – allege that any portion of the

decline in JAKKS' stock price was caused by the disclosure of the alleged bribery scheme, as

opposed to disclosure of the litigation or any other factors.  Given that Judge Karas already held

that Defendants were under no duty to disclose the threat of litigation initiated by WWE (see

supra at 10-11), Plaintiffs cannot allege loss causation based on the disclosure of such litigation

because Plaintiffs cannot recover for any drop in the stock price attributable to the revelation of

information Defendants were under no duty to disclose.  See, e.g., Dura, 544 U.S. at 342-344;

Lentell, 396 F.3d at 175.  Accordingly, unless Plaintiffs plead facts demonstrating that a stock price drop was caused by the disclosure of the alleged bribery scheme, the SAC must be dismissed under Dura.  As shown below, the SAC is devoid of any such factual allegations.

First, the SAC alleges that the stock price began its decline after JAKKS' initial disclosure that litigation may be imminent – and, significantly, before any disclosure of the underlying bribery allegations.  Specifically, in its October 19, 2004 press release, JAKKS announced third quarter earnings results and stated that unless the parties could come to a resolution, "litigation [was] likely to be commenced by WWE, challenging the validity of the licenses and seeking compensatory and punitive damages, in which event the Company intend[ed] to vigorously defend itself against claims which it believe[d] [were] without merit." (SAC ¶ 88)  Given that this disclosure did not even mention the alleged bribery scheme but rather pertained exclusively to the potential filing of litigation this Court has held JAKKS had no duty to disclose, there can be no dispute that Plaintiffs' reliance on the first alleged corrective disclosure is insufficient, as a matter of law, to plead loss causation.

The SAC does not allege that the underlying bribery allegations were disclosed until "later that same day" when unidentified news reports indicated that the complaint had actually been filed.  (See SAC ¶ 91 ("Later that same day, also on October 19, 2004, news reports indicated that the WWE had filed a complaint against JAKKS and the Individual Defendants, among others, alleging that they had perpetrated a massive bribery scheme involving lucrative licensing deals.").)  But Plaintiffs do not even allege that JAKKS' stock price reacted negatively to these "news reports," much less that any decline in the stock price was caused by the disclosure of the underlying bribery allegations, as opposed to the non-actionable disclosure that the litigation had been commenced.

Finally, the last corrective disclosure alleged by Plaintiffs – the press release purportedly published by JAKKS at 9:51 p.m. that same day – also contained no information whatsoever concerning the underlying bribery allegations. According to the portion quoted in the SAC, JAKKS merely stated the following:

> JAKKS Pacific, Inc. announced that a civil lawsuit was filed in the United States District Court for the Southern District of New York yesterday afternoon by World Wrestling Entertainment, Inc. ("WWE") concerning the video game license between WWE and the joint venture company operated by the Company and THQ, Inc. and the toy license between the Company and WWE. The Company denies any allegations of wrongdoing and believes that it will be completely vindicated in the litigation, and looks forward to having the claims against it dismissed. The Company will continue to devote its full energies and resources to bringing its outstanding products to market during the busy holiday season and beyond.

(SAC ¶ 92.) This disclosure did not even mention the bribery allegations, let alone provide new material information about them. Rather, the only new information contained in this release was that "the Company denies any allegations of wrongdoing and believes that it will be completely vindicated in the litigation, and looks forward to having the claims against it dismissed" – a statement which proved to be prophetic.

Accordingly, Plaintiffs have failed to plead any facts, much less specific facts, demonstrating that any stock price drop was caused by the disclosure of the underlying bribery allegations, as opposed to the disclosure of the litigation itself, or any other factors. Under Dura, courts in the Second Circuit routinely dismiss complaints where, as here, plaintiffs fail to plead facts demonstrating that their losses were caused by the disclosure of the alleged fraud and not any other factors. See, e.g., Lattanzio, 476 F.3d at 158 (dismissing 10(b) claims for failure to plead loss causation, holding that "[p]laintiffs have not alleged facts to show that [defendant]'s misstatements, among others . . . that were much more consequential and numerous, were the proximate cause of plaintiffs' loss; nor have they alleged facts that would allow a factfinder to

17

ascribe some rough proportion of the whole loss to [defendant]'s misstatements. Accordingly, plaintiffs have not alleged loss causation."); Merrill Lynch, 2008 WL 2019680, at *14 ("[Plaintiff]'s attempt to plead loss causation fails because he has not alleged facts that lead to the inference that all, or even some, of his losses are due to the alleged fraud, rather than to intervening events and/or to the disclosure of other information."); Omnicom Group, 541 F. Supp. 2d at 546 ("Plaintiffs . . . cannot demonstrate that the market reacted negatively to the disclosures, rather than to other information simultaneously released to the market. To prove loss causation, plaintiffs must distinguish the alleged fraud from the 'tangle of [other] factors' that affect a stock's price.") (citation omitted); In re AOL Time Warner, Inc. Sec. Litig., 503 F. Supp. 2d 666, 680 (S.D.N.Y. 2007) (plaintiffs "'have not alleged facts to show that [E & Y]'s misstatements among others (made by [AOL and AOLTW]) that were much more consequential and numerous, were the proximate cause of plaintiffs' loss; nor have they alleged facts that would allow a factfinder to ascribe some rough proportion of the whole loss to [E & Y]'s misstatements'") (quoting Lattanzio, 476 F.3d at 158).

       This authority directly forecloses Plaintiffs' claims here. The only corrective disclosure even alleged to have mentioned the underlying bribery allegations was the second disclosure contained in unidentified "news reports" that simultaneously announced the filing of the litigation itself. (SAC ¶ 91.)[7] It is well-settled that in cases involving "mixed" disclosures revealing the alleged fraud and other "bad news" affecting the company, plaintiffs must plead

---

[7] Plaintiffs do not even identify what specific "news reports" to which they are referring, or the specific information concerning the alleged bribery scheme that such reports purportedly contained. Further, the SAC does not allege the time of day these "news reports" came out – let alone whether they were even released before market close. (See SAC ¶ 91.) Accordingly, even if Plaintiffs could distinguish between the effect on the stock price of the disclosure of the non-actionable information concerning the litigation and the disclosure of the underlying bribery allegations, which they cannot, the absence of any such factual allegations renders this disclosure inadequate, as a matter of law, to establish loss causation.

facts demonstrating that any resulting stock price drop was caused by the fraud and not the other bad news.  In dismissing plaintiff's complaint under Rule 12(b)(6) in <u>Merrill Lynch</u>, Judge Keenan relied on the fact that "the Complaint does not account for the fact that the [alleged corrective disclosure] contained other 'bad news,' apart from the concern about [the alleged fraud], that was likely to cause a drop in the company's share price."  <u>Merrill Lynch</u>, 2008 WL 2019680, at *14.  Relying on established Second Circuit precedent, the court held that plaintiff's "attempt to plead loss causation fails because <u>he has not alleged facts that lead to the inference that all, or even some, of his losses are due to the alleged fraud, rather than to intervening events and/or the disclosure of other information</u>."  <u>Id.</u> (emphasis added); <u>accord</u> <u>Lattanzio</u>, 476 F.3d at 158; <u>Omnicom Group</u>, 541 F. Supp. 2d at 546; <u>AOL</u>, 503 F. Supp. 2d at 680.

On its face, the SAC suffers from this same fatal defect.  Accordingly, the Court should apply this well-settled Second Circuit authority here to dismiss the SAC based on Plaintiffs' failure to plead loss causation.

## II.    THE ALLEGED BRIBERY SCHEME WAS IMMATERIAL AS A MATTER OF LAW BECAUSE IT HAS BEEN JUDICIALLY DETERMINED THAT THERE WAS NO THREAT TO THE CONTINUED VIABILITY OF THE LICENSES

In the Dismissal Order, Judge Karas explicitly held that while Defendants were under no duty to disclose the threat of litigation or general bad acts of its management, the alleged bribery scheme could be material because "Jakks's own public statements make clear that the WWE licenses generated, and were expected to continue to generate, significant revenue for the company."  (Dismissal Order at 10.)  Judge Karas stated "[a]n investor might reasonably want to know if that <u>source of revenue was threatened</u> because it was improperly or illegally derived."  (<u>Id.</u> (emphasis added).)  Now that it has been judicially determined in the WWE Dismissal Order that (i) WWE suffered its last alleged injury and was on inquiry notice of its

claims by June 1998, thereby rendering all of its claims time-barred, and (ii) WWE suffered no legally-cognizable injury, <u>it has also been judicially determined that there was never any actual threat to the continued viability of the Licenses</u> and thus the alleged bribery scheme was immaterial as a matter of law.

### A.    Any Threat to the Continued Viability of the Licenses Ceased Once the Statutes of Limitations Expired on All WWE's Claims

As set forth above, the Court explicitly determined that WWE suffered its last alleged injury on June 24, 1998 and that WWE was on inquiry notice of its claims by that date. Accordingly, the Court held that the applicable four-year federal statute of limitations began running on WWE's RICO claims on this date and expired no later than June 2002. (WWE Dismissal Order at 68-69.)[8]  Given that WWE could no longer challenge the validity of any of the Licenses after the statute of limitations expired on the last of WWE's claims in June 2002, any threat to the continued viability of the Licenses also ended by no later than that date.  As a result, the alleged bribery scheme ceased to be material – thus terminating Defendants' duty to disclose it – long before the alleged "corrective disclosures" on October 19, 2004 that were alleged to have caused Plaintiffs losses.[9]

---

[8]    The Federal Court's determination that WWE's claims were time-barred under the four-year RICO statute of limitations, which does not begin running until the "plaintiff discovers or should have discovered the RICO injury," (WWE Dismissal Order at 63 (quoting <u>In re Merrill Lynch Ltd. P'ships Litig.</u>, 154 F.3d 56, 58 (2d Cir. 1998), collaterally estops WWE from contending that any of its claims in the Connecticut Action are timely because the shorter and more stringent Connecticut three-year statutes of limitations governing all of WWE's Connecticut claims begin running on the <u>occurrence</u> of the act causing the alleged injury – whether or not the plaintiff has discovered or even sustained such injury.  <u>See, e.g.</u>, Conn. Gen. Stat. § 52-577 (tort claims and equitable claims grounded in tort) ("No action founded upon a tort shall be brought but within three years from the date of the act or omission complained of."); <u>Valentine v. LaBow</u>, 95 Conn. App. 436, 445 n.8 , 897 A.2d 624, 631 n.8 (2007) ("'our case law clearly dictates § 52-577 is an occurrence statute and that its limitation period does not begin 'when the plaintiff first discovers an injury.'").

[9]    As discussed above, in order to establish loss causation, plaintiffs must allege corrective disclosures revealing new, material information about the alleged fraud that negatively affects the stock price (<u>see</u> <u>supra</u> at § I (citing

*(cont'd)*

**B.    The Determination That WWE Suffered No Legally Cognizable Injury Further Establishes That There Was No Threat to the Licenses**

Even absent the Court's determination that WWE's claims were time-barred, the Court's finding that WWE could not demonstrate any legally cognizable injury – because the loss alleged by WWE attributable to the Licenses is speculative and unascertainable – also establishes that the alleged bribery scheme did not represent an actual threat to the continued viability of the Licenses.  Not only is an ascertainable injury a necessary element of all of WWE's legal claims, the ability to measure the diminution of the value of the Licenses WWE granted to JAKKS is also a prerequisite to a claim to void – or rescind – the Licenses.

"Under Connecticut law, the remedy of rescission and restitution is simply the unmaking of an agreement, i.e., 'a renouncement of the contract and any property obtained pursuant to the contract . . . .'" Aurigemma v. Arco Petroleum Prods. Co., 734 F. Supp. 1025, 1033 (D. Conn. 1990) (citation omitted).  An essential element of any rescission claim is the ability to restore both parties to the status quo ante, which requires that each party be able to return the physical consideration received under the contract or in the case of intangible property, the ability to measure the value of the consideration each party has received.  See, e.g., id. ("It would be extremely difficult to unravel each relationship and place a reasonable monetary value on the benefits rendered to plaintiffs by [the defendant]."); Solomon v. WMN Assocs., Inc., No. 391793, 1994 WL 597390, at *7 (Conn. Super. Ct. Oct. 20, 1994) (denying rescission because "it would be difficult, if not impossible, to place the parties in the same situation as existed just prior to the execution of the contract"), aff'd, 41 Conn. App. 907, 675 A.2d 11 (1996); Tallmadge Bros., Inc. v. Iroquois Gas Transmission Sys., No. CV92 0124088 S, 1993 WL 57597, at *2

---

*(cont'd from previous page)*

cases)).  Given that the alleged bribery scheme ceased to be material by no later than June 2002, the disclosure of such information on October 19, 2004 cannot be said to have proximately caused Plaintiffs' loss.

(Conn. Super. Ct. Feb. 26, 1993) (rescission was inappropriate where "the plaintiff could return the consideration they received but they could not be restored to the status quo as it existed prior to the Agreement because the undisturbed shellfish beds could not be restored to them"); New Shows, S.A. de C.V. v. Don King Prods., Inc., 210 F.3d 355 (2d Cir. 2000) ("Not only would it be 'impracticable' to restore the status quo; it would be nearly impossible. This fact alone, and independently, renders rescission inappropriate.").[10]

Here, because it has been judicially determined in the WWE Action that WWE's alleged loss relating to the Licenses is speculative and unascertainable (see supra at 9-10), WWE did not have the ability to validly rescind the Licenses and thus the alleged bribery scheme did not pose any actual threat to their continued viability. Accordingly, this judicial determination also establishes that the alleged bribery scheme was immaterial as a matter of law.

**C.    As a Matter of Law, the Potential Renewal of the Licenses in 2009 Was Too Speculative To Be Material**

Finally, after having already concluded his analysis of materiality, which he stressed must be "the initial inquiry in a claim for relief under Section 10(b)" (Dismissal Order at 9), Judge Karas also noted (in considering the separate and distinct issue of whether Defendants had made any statements triggering a duty to disclose the alleged bribery scheme) that the alleged bribery scheme "might be considered material by a reasonable investor who was trying to assess the likelihood that Jakks's licenses would be renewed upon expiration." Id. at 19. While Plaintiffs never even contended that the issue of whether the Licenses would be renewed could

---

[10]    See also Singh v. Carrington, 18 A.D.3d 855, 857, 796 N.Y.S.2d 668, 669 (2d Dep't 2005) ("Rescission is not appropriate where, as here, the status quo cannot be 'substantially restored.'") (citations omitted); Rudman v. Cowles Comms., Inc., 30 N.Y.2d 1, 13-14, 280 N.E.2d 867, 874 (1972) (plaintiff was not entitled to rescission where it is "impracticable to restore the status quo"); Tarleton Bldg. Corp. v. Spider Staging Sales Co., 26 A.D.2d 809, 809, 274 N.Y.S.2d 43, 44 (1st Dep't 1966) (same); Lenel Sys. Int'l., Inc. v. Smith, 10 Misc. 3d 890, 897, 810 N.Y.S.2d 792, 797 (Sup. Ct. Monroe County 2005) (finding rescission would be "impossible because of Smith's long service record with Lenel"), aff'd, 34 A.D.3d 1284, 824 N.Y.S.2d 553 (4th Dep't 2006).

be material, and neither party briefed this issue, as a matter of law, the potential <u>renewal</u> of the Licenses in <u>2009</u> (SAC ¶ 72) – more than ten years after the beginning of Plaintiffs' class period – was too speculative to be material.  <u>See, e.g.</u>, <u>In re AXIS Capital Holdings Ltd. Sec. Litig.</u>, 456 F. Supp. 2d 576, 586 (S.D.N.Y. 2006) ("defendants were under no duty to disclose the risk that contingent commission agreements might be discontinued."); <u>In re Marsh & McLennan Cos. Sec. Litig.</u>, 501 F. Supp. 2d 452, 471 (S.D.N.Y. 2006) (same); <u>In re Par Pharm., Inc. Sec. Litig.</u>, 733 F. Supp. 668, 678 (S.D.N.Y. 1990) ("Defendants cannot be held liable for failing to 'disclose' what would have been pure speculation."); <u>Klein v. Gen. Nutrition Cos.</u>, 186 F.3d 338, 342-43 (3d Cir. 1999) (failure to disclose defendants' concern about a potential loss of third party advertising support was immaterial since "'[w]here an event is contingent or speculative in nature, it is difficult to ascertain whether the reasonable investor would have considered the omitted information significant at the time.'") (citation omitted).

This authority is directly applicable here.  Indeed, in <u>Marsh & McLennan</u>, which Judge Karas relied on elsewhere in the Dismissal Order, the court specifically held that defendants had no duty to disclose information concerning the possibility that contingent commission agreements might some day be discontinued.  <u>Marsh & McLennan</u>, 501 F. Supp. 2d at 471 ("Defendants can not be held liable for failing to make . . . speculative disclosures regarding the possibility that its contingent commission revenues may some day be discontinued."); <u>accord</u> <u>Axis</u>, 456 F. Supp. 2d at 586.

## III.    GIVEN THAT THE ALLEGED BRIBERY SCHEME WAS IMMATERIAL, <u>PLAINTIFFS' SCIENTER ALLEGATIONS FAIL AS A MATTER OF LAW</u>

Because it has been judicially determined that there was no actual threat to the continued viability of the Licenses, and thus the alleged bribery scheme could not have been material, Plaintiffs also cannot allege that Defendants acted with scienter – <u>i.e.</u>, "a mental state

23

embracing an intent to deceive, manipulate, or defraud" – which is an additional necessary element for any Section 10(b) claim.  See, e.g., Tellabs, Inc. v. Makor Issues & Rights, Ltd., 127 S. Ct. 2499, 2507, 2510 (2007) ("A complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any plausible opposing inference one could draw from the facts alleged.")  Here, the absence of any materiality of the legally stale alleged bribery scheme negates, ipso facto, any possible claim that Defendants knew they had a duty to disclose these alleged payments and consciously or recklessly failed to do so. See, e.g., In re Canadaigua Sec. Litig., 944 F. Supp. 1202, 1213 (S.D.N.Y. 1996) (Pollack, J.); In re GeoPharma, Inc., Sec. Litig., 411 F. Supp. 2d 434, 446 (S.D.N.Y. 2006) ("a failure to disclose particular information, by itself, can only constitute recklessness if there was an obvious duty to disclose that information").

## IV.     PLAINTIFFS STILL FAIL TO SATISFY RULE 9(B) AND THE PSLRA

### A.     Section 10(b) Claims Are Subject to the Heightened Pleading Standards Required by Rule 9(b) and the PSLRA

As Judge Karas held in dismissing the CAC, "the Second Circuit has established that to state a claim for relief under Section 10(b) and Rule 10b-5, Rule 9(b) requires a complaint to: '(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.'"  (Dismissal Order at 22 (quoting Lerner v. Fleet Bank, N.A., 459 F.3d 273, 290 (2d Cir. 2006) (citation omitted)); see also ATSI Comms., Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 99 (2d Cir. 2007) (these requirements serve "to provide a defendant with fair notice of a plaintiff's claim, safeguard his reputation from improvident charges of wrongdoing, and protect him against strike suits"); Novak v. Kasaks, 216 F.3d 300, 314 (2d Cir. 2000) ("The primary purpose of Rule

9(b) is to afford defendant fair notice of the plaintiff's claim and the factual ground upon which it is based.") (citation omitted).

The Court further held that "[u]nder the PSLRA, the complaint must 'specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.'" (Dismissal Order at 22 (quoting 15 U.S.C. § 78u-4(b)(1)(B)).

**B.    The Court Held that Plaintiffs Cannot Satisfy These Heightened Standards Merely By Setting Forth a Laundry List of General Reasons Explaining Why the Alleged Misstatements Were False or Misleading**

Citing Judge Casey's recent decision in In re Alcatel Securities Litigation, 382 F. Supp. 2d 513 (S.D.N.Y. 2005), Judge Karas held that Plaintiffs failed to satisfy the heightened pleading standards required by Rule 9(b) and the PSLRA because Plaintiffs merely set forth a single paragraph explaining why all of the alleged misstatements were "materially false and misleading." (Dismissal Order at 22-24.)  As Judge Karas held:

> In Alcatel, Plaintiffs submitted a 250-paragraph complaint, 'list[ing] various statements – often setting forth lengthy quotations from various releases by Defendants' officers and securities analysts – then follow[ing] each with a similar (in most cases identical) laundry list of 'specific' reasons why the statements are allegedly false.'  The Alcatel court found that such shotgun-type pleading was insufficient . . . . Similarly, the 179-paragraph CAC here sets forth quotations from over fifty separate statements by Defendants.  Following the long list of quotations is a single paragraph listing four reasons purporting to explain why all of the quoted statements are 'materially false and misleading.'  In this regard, Plaintiffs' CAC is indistinguishable from the complaint in Alcatel, and thus is insufficient to 'explain why the statements were fraudulent,' with the 'particularity' required by the plain language of Rule 9(b) and the PSLRA.

(Dismissal Order at 23-24 (emphasis added) (citations omitted).)

C.     **The SAC Fails to Cure Plaintiffs' Rule 9(b) and PSLRA Defects**

The SAC does nothing to cure the defects upon which Judge Karas dismissed the

CAC and only serves to highlight Plaintiffs' inability to satisfy these heightened pleading

standards.   Plaintiffs have essentially taken the same deficient paragraph from their earlier

complaint (CAC ¶ 145) and pasted it in substantially similar form after each alleged

misstatement or omission in the SAC.   Specifically, the laundry list contained in paragraph 145

of the CAC provided:

> The statements referenced above in 56-58; 61-73; 76-89; 91; 93-99; 102-108; 110-111;
> 113; 116-120; 125; 127-129; 131-137; and 139-144 were each materially false and
> misleading; and were known by defendants to be false at that time; or were recklessly
> disregarded as such thereby; because they failed to disclose and misrepresented the
> following adverse facts: (a) that JAKKS had obtained the WWE toy and videogame
> licenses as a result of an illegal commercial bribery scheme;  (b) that JAKKS
> relationship with the WWE was being negatively impacted by the WWE's contention
> that the licenses it had granted to the Company were improperly obtained; (c) given
> the foregoing; the Company was subject to the heightened risk that the WWE would
> seek some modification to the WWE licensing agreements or complete nullification of
> those agreements which would negatively impact the Company's future financial
> results; and (d) based on the foregoing, Defendants' positive statements about the
> Company's earnings and prospects were lacking in a reasonable basis at all times.

(CAC ¶ 145.)  In the SAC, Plaintiffs have deleted part (d) of this paragraph, in accordance with

the Court's holding that Defendants' statements about the Company's earnings and prospects

were not actionable (see supra at 11), and simply pasted the rest of this paragraph in identical or

substantially identical form after each of the alleged misstatements.   The only other difference

between the boilerplate paragraphs that follow each alleged misstatement in the SAC and

paragraph 145 of the CAC is that Plaintiffs also quote passages verbatim from the Dismissal

Order in their new boilerplate paragraph.  For example, paragraph 87 of the SAC provides:

> *The statements referenced above in ¶86 were materially false and misleading, and*
> *were known by defendants to be false at that time, or were recklessly disregarded as*
> *such thereby, because the statements failed to disclose adverse facts that: (a) JAKKS*
> *had obtained the "exclusive worldwide license" to publish WWE video games as a*

26

> *result of the commercial bribery scheme set forth at ¶¶35-51 above; and (b) JAKKS'*
> *relationship with WWE was being negatively impacted by WWE's contention that the*
> *licenses it had granted to JAKKS were improperly obtained, as set forth at ¶¶75, 78,*
> *79, 80, 84 and 85 above.* In the absence of that adverse information, the statements in
> ¶86 indicating that JAKKS had obtained its license by "capitalizing" on its
> "relationship" with WWE conveyed the false impression that **JAKKS obtained that**
> **valuable license through a competitive process, taking advantage of its special**
> **(but legal) relationship with WWE**. The statements referenced in ¶86 above, as well
> as other **public statements by JAKKS, made clear that the WWE video game**
> **license generated, and was expected to continue to generate, significant revenues**
> **for the Company**. The undisclosed information concerning the bribery scheme and
> WWE's discovery of that scheme is material because **a reasonable investor would**
> **have wanted to know if that source of revenue was threatened or unsustainable**
> **because it was improperly or illegally obtained**.

(SAC ¶ 87.)  The first half of this paragraph (in italics) is taken in <u>hace</u> <u>verba</u> from the old

paragraph 145 and the second half of this paragraph (in bold) is lifted verbatim or nearly

verbatim from pages 10 and 17 of the Dismissal Order.  (<u>See</u> Dismissal Order at 17 ("As such,

these statements could have led a reasonable investor to believe that Jakks obtained the valuable

licenses through a competitive process, taking advantage of its special (but legal) relationship

with WWE."); <u>id.</u> at 10 ("Jakks's own public statements make clear that the WWE licenses

generated, and were expected to continue to generate, significant revenue for the company.  An

investor might reasonably want to know if that source of revenue was threatened because it was

improperly or illegally derived.").)[11]

       Plaintiffs' word-processing efforts do nothing to cure the defects identified in the

Dismissal Order.  First, the pleading that Judge Casey held to be legally defective in <u>Alcatel</u>, 382

F. Supp. 2d 513, did precisely what Plaintiffs have now done here – <u>i.e.</u>, it simply took the same

laundry list of reasons why the challenged statements were fraudulent and pasted it after each

---

[11] SAC ¶ 87 is virtually indistinguishable from ¶¶ 58, 62, 64, 68, 70, 73, 77, all which are also taken verbatim or
nearly verbatim from CAC ¶ 145 and pages 10 and 17 of the Dismissal Order.

alleged misstatement.  See id. at 534 ("Plaintiffs list various statements . . . then follow each with a similar (in most cases identical) laundry list of 'specific' reasons why the statements are allegedly false."); see also Endovasc Ltd., Inc. v. J.P. Turner & Co., No. 02 Civ. 7313, 2004 WL 634171, at *9 (S.D.N.Y. Mar. 30, 2004) (dismissing laundry list of allegations "'long on innuendo but lacking in factual assertions or specificity'") (citation omitted), aff'd in part, vacated in part on other grounds, 169 F. App'x 655 (2d Cir. 2006); Kramer & Frank, P.C. v. Wibbenmeyer, No. 4:05CV2395, 2006 WL 1134479, at *5 (E.D. Mo. Apr. 26, 2006) (dismissing amended counterclaim that merely reformulated conclusory laundry list of allegations).  As the Alcatel court and several other courts have recognized, "'court[s] should not have to play connect-the-dots in order to identify the facts and trends upon which plaintiffs base their claim.'" Alcatel, 382 F. Supp. 2d at 535 (citation omitted); In re Cornerstone Propane Partners, L.P. Sec. Litig., 355 F. Supp. 2d 1069, 1081 (N.D. Cal. 2005) (noting that the "evasive, non-committal style" of "puzzle-style pleadings" "significantly increases the burdens to both the defendants and the court in evaluating a complaint's satisfaction of the PSLRA pleading requirements"); In re Metro. Sec. Litig., 532 F. Supp. 2d 1260, 1279 (E.D. Wash. 2007) (same).

Further, Plaintiffs' inclusion of direct quotations from the Dismissal Order in their boilerplate paragraphs does not provide Defendants with fair notice of Plaintiffs' claims nor protect them against strike suits – two of the primary policies behind the heightened pleading standards contained in Rule 9(b) and the PSLRA.  See ATSI, 493 F.3d at 99; Novak, 216 F.3d at 314.  Indeed, if Judge Karas had believed that language from the Dismissal Order itself were sufficient to satisfy the policies behind Rule 9(b) and the PSLRA, he would not have dismissed the CAC.  Judge Karas dismissed the CAC because Plaintiffs failed to specify, inter alia, exactly which portion of each lengthy quoted SEC filing or press release constitutes a false

representation, as required by both Rule 9(b) and the PSLRA, see, e.g., Alcatel, 382 F. Supp. 2d at 536, and the SAC does nothing to remedy these fatal defects. Accordingly, Plaintiffs' failure to satisfy both standards mandates dismissal of their claims.[12]

## V.  PLAINTIFFS SHOULD NOT BE GRANTED A THIRD OPPORTUNITY TO AMEND THEIR DEFECTIVE COMPLAINT

Even where plaintiffs have only had one opportunity to amend their complaint, courts will not countenance further bites at the apple in quixotic attempts to state a claim. See, e.g., GeoPharma., 411 F. Supp. 2d at 452-53 ("Although plaintiffs again request leave to amend, further amendment would be pointless. Having already been given the opportunity to replead, plaintiffs, who are represented by highly experienced counsel, have surely presented all relevant facts by now, and have twice failed to plead scienter."). Indeed, as courts have emphasized, "the purpose of the PSLRA would be frustrated if district courts were required to allow repeated amendments to complaints filed under the PSLRA." Miller v. Champion Enters., Inc., 346 F.3d 660, 692 (6th Cir. 2003); see also In re NAHC, Inc. Sec. Litig., 306 F.3d 1314, 1333 (3d Cir. 2002) (affirming district court's finding that the objective of the PSLRA "'would be thwarted if, considering the history of this case, plaintiffs were liberally permitted leave to amend again'"); In re Bristol-Myers Squibb Sec. Litig., 228 F.R.D. 221, 229 (D.N.J. 2005) (same).

Moreover, courts are particularly reluctant to allow repeated attempts to amend a complaint where plaintiff fails to cure its defects after having received precise instructions from the Court, as was the case here. See In re Merrill Lynch & Co., Inc., 273 F. Supp. 2d 351, 390-91 (S.D.N.Y. 2003) (refusing to allow plaintiffs a second opportunity to amend where the court

---

[12]    Finally, because Plaintiffs have failed to plead a primary violation of the Exchange Act, their claim for control person liability under Section 20(a) must likewise be dismissed. See, e.g., Rombach v. Chang, 355 F.3d 164, 177-78 (2d Cir. 2004); Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124, 1132 (2d Cir. 1994); Alcatel, 382 F. Supp. 2d at 535.

"was explicit in its instructions to plaintiffs concerning the pleading of loss causation and pleading with the particularity required by Fed. R. Civ. P. 9(b) and Section 21D(b)(1) & (2) of the PSLRA, and plaintiffs 'failed to heed' these instructions"), aff'd sub nom. Lentell v. Merrill Lynch & Co., 396 F.3d 161 (2d Cir. 2005); Cal. Pub. Employees' Ret. Sys. v. Chubb Corp., 394 F.3d 126, 164-65 (3d Cir. 2004) ("In light of the clear guidance the District Court afforded to Plaintiffs, Plaintiffs' disregard of that advice, and Plaintiffs' failure to propose additional amendments that would remedy the pleading deficiencies of the Second Amended Complaint, the District Court did not abuse its discretion in denying Plaintiffs leave to amend their deficient complaint."); Krantz v. Prudential Invs. Fund. Mgmt. LLC, 305 F.3d 140, 144 (3d Cir. 2002) ("A District Court has discretion to deny a plaintiff leave to amend where the plaintiff was put on notice as to the deficiencies in his complaint, but chose not to resolve them."); Moran v. Kidder Peabody & Co., 617 F. Supp. 1065, 1068 (S.D.N.Y. 1985) ("where a district court judge puts plaintiff's counsel 'on the plainest notice of what was required,' justice does not require the court to 'engage in still a third go-around'") (citation omitted), aff'd mem., 788 F.2d 3 (2d Cir. 1986).

Here, Plaintiffs, represented by "highly experienced counsel," have already had three bites at the apple and a Third Amended Complaint would be Plaintiffs' fourth attempt to state a claim in this action.  Plaintiffs "have surely presented all relevant facts by now," especially considering Judge Karas' explicit admonishment that their "shotgun-type pleading" ran afoul of Alcatel.  Further, when presented with the opportunity to seek an additional amendment during the April 18, 2008 Pre-Motion Conference, Plaintiffs' counsel stated: "We're very happy to stick by our second amended complaint."  (4/18 Trans. at 20:23-25; Ex. E.)  Indeed, the Court specifically asked Plaintiffs whether they wanted another chance to amend:

The Court: So I guess what I'm really asking you, Mr. Reich: Are you asking for an opportunity to amend the complaint again, or are you saying that you are confident with this complaint? (Id. at 21: 7-9.)

Mr. Reich: We're comfortable with this complaint… (Id. at 21:10.)

The Court: I am less inclined to give you another shot if we brief this thing, we argue this thing and resolve it and then you say, well, OK, I guess we misunderstood Judge Karas, let me have another shot. So that is what I'm asking you. (Id. at 21:19-23.)

Mr. Reich: … we are comfortable with moving forward with the complaint as it stands.

The Court: It is the second amended complaint. (Id. at 22:14-17 (emphasis added).)

Accordingly, it would be inequitable and contrary to the PSLRA to allow Plaintiffs to file yet another amended complaint, especially after Plaintiffs turned down the opportunity to seek leave for further amendment before Defendants were forced to undertake the costly burden of moving to dismiss the SAC. See, e.g., In re StarGas Sec. Litig., 241 F.R.D. 428, 432 (D. Conn. 2007) (denying plaintiffs' leave to amend complaint where plaintiffs' counsel stated his satisfaction with the complaint at a pre-filing conference and only sought leave to amend after judgment was rendered in defendants' favor). Allowing further amendment in this action would only serve to frustrate the purposes of the PSLRA and waste judicial resources.[13]

---

[13]    While Defendants believe that the Court should grant this Motion based on all of the fatal defects described above, in the event that the Motion is denied, Defendants reserve the right to move for a stay of this action pending the outcome of the Connecticut Action because Plaintiffs' securities fraud claim is premised on Defendants non-disclosure of the exact same purported payment scheme that forms the basis of all of WWE's claims in the Connecticut Action.

## **CONCLUSION**

Accordingly, the SAC should be dismissed with prejudice.

Dated: New York, New York
     June 5, 2008

Respectfully submitted,

FEDER, KASZOVITZ, ISAACSON, WEBER,     SKADDEN, ARPS, SLATE,
  SKALA, BASS & RHINE LLP            MEAGHER & FLOM LLP
Murray L. Skala (MS-9354)
Jonathan D. Honig (JH-7577)          By:    /s/ Jonathan J. Lerner
750 Lexington Avenue                 Jonathan J. Lerner (JL-7117)
New York, New York 10022             Michael H. Gruenglas (MG-8705)
Phone:  (212) 888-8200                Maura B. Grinalds (MG-2836)
Fax:  (212) 888-5968                  Robert A. Fumerton (RF-3556)
                                 Four Times Square
                                 New York, New York  10036
                                 Phone:  (212) 735-3000
                                 Fax:  (212) 735-2000

Attorneys for Defendants

CERTIFICATE OF SERVICE

The undersigned, an attorney duly admitted to practice law before this Court,

hereby certifies under penalty of perjury, that on June 5, 2008, I caused a true copy of the

- ***Notice Of Motion,***

- ***Declaration of Robert A. Fumerton*** and

- ***Defendants' Memorandum of Law in Support of Their Motion to Dismiss the Second Amended Consolidated Complaint***

to be served upon the following party as indicated:


By Federal Express, overnight delivery:

Richard A. Maniskas, Esq.
Marc A. Topaz, Esq.
Schiffrin & Barroway, L.L.P.
Three Bala Plaza East
Bala Cynwyd, PA 19004

Gerald L Rutledge, Esq.
Alfred G. Yates, Esq.
519 Allegheny Building
429 Forbes Avenue
Pittsburgh, PA 15219


Dated:  New York, New York
        June 5, 2008

Steven Ray Katzenstein

1