UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x

IN RE JAKKS PACIFIC, INC.
SHAREHOLDERS CLASS ACTION          :          Civil Action No. 04-CV-8807 (RJS)
LITIGATION

                                             :          Electronically Filed

                                             :

                                             :

------------------------------------------------------------x

## DECLARATION OF ROBERT A. FUMERTON

Pursuant to 28 U.S.C. § 1746, ROBERT A. FUMERTON declares under penalty of perjury as follows:

1.    I am a member of the Bar of this Court and a member of the firm of Skadden, Arps, Slate, Meagher & Flom, LLP, attorneys for defendants Jakks Pacific, Inc., Jack Friedman, Steven G. Berman and Joel M. Bennett (collectively the "Defendants") in this action.

2.    I respectfully submit this Declaration to place before the Court true and correct copies of the following documents referred to in Defendants' Memorandum of Law in Support Their Motion to Dismiss the Second Consolidated Amended Complaint:

Exhibit A:    Second Consolidated Amended Complaint, In re Jakks Pacific, Inc. Shareholders Class Action Litigation, No. 04-CV-8807 (KMK) (S.D.N.Y.), dated March 14, 2008.

Exhibit B:    First Consolidated Amended Complaint, In re Jakks Pacific, Inc. Shareholders Class Action Litigation, No. 04-CV-8807 (KMK) (S.D.N.Y.), dated July 11, 2005.

Exhibit C:     United States District Court for the Southern District of New York
               Opinion and Order, In re Jakks Pacific, Inc. Shareholders Class
               Action Litigation, No. 04-CV-8807 (KMK) (S.D.N.Y.), dated
               January 25, 2008.

Exhibit D:     United States District Court for the Southern District of New York
               Opinion and Order, World Wrestling Entertainment, Inc. v.
               JAKKS Pacific, Inc., No. 1:04-CV-08223-KMK (S.D.N.Y.), dated
               December 21, 2007.

Exhibit E:     United States District Court for the Southern District of New York
               Pre-Motion Conference Transcript, In re Jakks Pacific, Inc.
               Shareholders Class Action Litigation, No. 04-CV-8807 (RJS)
               (S.D.N.Y.), dated April 18, 2008.

Dated: New York, New York
       June 5, 2008

_____
            Robert A. Fumerton

2

Exhibit A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------x
                                                   :   Civil Action No. 04-CV-8807 (KMK)
                                                   :
In re JAKKS PACIFIC, INC.                          :   SECOND CONSOLIDATED AMENDED
SHAREHOLDERS CLASS ACTION                          :   COMPLAINT FOR VIOLATIONS OF THE
LITIGATION                                         :   FEDERAL SECURITIES LAWS
                                                   :
                                                   :
---------------------------------------------------x

Plaintiffs have alleged the following based upon the investigation of plaintiffs' counsel, which included a review of United States Securities and Exchange Commission ("SEC") filings by JAKKS Pacific, Inc. ("JAKKS" or the "Company"), as well as regulatory filings and reports, securities analysts' reports and advisories about the Company, press releases, and media reports about the Company, a review of the Complaint filed in the case captioned *World Wrestling Entertainment v. JAKKS Pacific, Inc. et al.,* 04cv8223 (S.D.N.Y.) and plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This consolidated class action is filed on behalf of all persons and entities who purchased or otherwise acquired the securities of JAKKS between December 3, 1999, and October 19, 2004, inclusive, (the "Class Period") and who were damaged thereby, seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2.      Defendant JAKKS designs, develops, produces and markets toys and related products. The Company focuses its business on acquiring or licensing well-recognized trademarks and brand names, such as Nickelodeon, Rugrats, Dora the Explorer, Blue's Clues, SpongeBob Squarepants, Mickey Mouse, Winnie the Pooh, Kim Possible, Finding Nemo and Hello Kitty. JAKKS also develops proprietary brands and marks.

3.      JAKKS also licensed certain intellectual property from World Wrestling Entertainment, Inc. ("WWE"). WWE is an integrated media and entertainment company engaged in the development, production and marketing of television and live events, and the licensing and sale of products featuring its WWE brands.

4.      On or about October 24, 1995, JAKKS and WWE entered into a license agreement whereby JAKKS had the right to manufacture and market WWE toys in the United States. Later,

however, in an effort to expand its lucrative WWE licenses, JAKKS bribed a senior WWE executive, James Bell ("Bell"), who was responsible for negotiating and managing license agreements, and WWE's licensing agent, Stanely Shenker & Associates, Inc. ("SSAI"), among others. In exchange for the bribes from JAKKS, laundered through foreign corporations, Bell and SSAI agreed to assist JAKKS in securing a WWE videogame license and favorable amendments to the toy license.

5.      The scheme worked and, on or about February 10, 1997, WWE, at the recommendation of SSAI and Bell, entered into an international toy license agreement with JAKKS. Then, in June 1998, SSAI and Bell convinced WWE management to enter into a video game license agreement with THQ & JAKKS Pacific LLC ("THQ/JAKKS"), a joint venture formed by JAKKS and video game maker THQ Inc. The ten year video game license expires on December 31, 2009, with an additional five year renewal option in favor of THQ/JAKKS. In June 1998, SSAI and Bell also directed WWE to extend the term of the JAKKS' domestic and international toy licenses to make them conterminous with the long-term video game license.

6.      The WWE videogame license and toy licenses were extremely lucrative for JAKKS. Throughout the Class Period, JAKKS publicly reported quarter after quarter of positive results which it attributed, in material part, to its WWE product line. At all relevant times, however, defendants failed to disclose that in order to get the licenses, they had bribed SSAI and Bell, among others.

7.      The truth began to emerge on October 19, 2004. On that day, before the market opened, JAKKS issued a press release announcing its third-quarter 2004 financial results. At that time, JAKKS stunned investors when it revealed that the Company was "engaged in discussions with WWE over the validity of its toy and video games license." This press release stated, in relevant part, the following:

- 2 -

*The Company also announced that it is engaged in discussions with WWE concerning the restructuring of its toy license and with WWE and THQ with respect to the restructuring of the JAKKS THQ Joint Venture video games license agreement with WWE.* The discussions are an outgrowth of certain litigation that has been pending between WWE and a former licensing consultant to WWE and a former employee of WWE, to which the Company is not a party. *WWE has raised questions about the validity of the licenses as a result of certain transactions between the Company and that licensing consultant that occurred more than six years ago. The Company has denied any wrongdoing in connection with the transactions with the licensing consultant and maintains that they were unrelated to either the toy or video game license.* If the discussions are satisfactorily concluded, the restructuring of the licenses may have an impact on the Company's future revenues and net income to an extent that is presently unknown. *If the discussions with WWE and THQ are not satisfactorily concluded, the Company anticipates that litigation is likely to be commenced by WWE challenging the validity of the licenses and seeking compensatory and punitive damages, in which event the Company intends to vigorously defend itself against claims which it believes are without merit.* [Emphasis added.]

8.    In reaction to this news, the price of JAKKS common stock declined precipitously, falling $5.34 per share, or 22%, from its previous day's closing price of $24.15, to close at $18.81.

9.    Later that same day, also on October 19, 2004, news reports indicated that the WWE had filed a complaint against JAKKS and the Individual Defendants, among others ("WWE Action"), alleging that they had perpetrated a massive bribery scheme involving lucrative licensing deals, in violation of the Racketeer Influenced and Corrupt Organization Act ("RICO") and anti-bribery laws. On the following trading day, October 20, 2004, the price of JAKKS stock again dropped in reaction to this news: falling $5.85 per share, or 31 % from its closing price on October 19, 2004, to close at $12.96 per share. In total, the price of JAKKS common stock declined from $24.15 per share to $12.96 per share in reaction to the news of the problems with the WWE and the WWE licenses.

## JURISDICTION AND VENUE

10.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act [15 U.S.C. §§78j(b) and 78t(a)], and Rule 10-5 promulgated thereunder by the SEC [17 C.F.R. §240.10b-51].

11.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331 and 1337 and Section 27 of the Exchange Act [15 U.S.C. §78aa].

12.     Venue is proper in this District pursuant to Section 27 of the Exchange Act, and 28 U.S.C. §1391(b). Many of the acts charged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District.

13.     In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the NASDAQ National Market.

## PARTIES

14.     Lead Plaintiffs Indiana Electrical Workers Pension Trust Fund IBEW, Kenneth J. Tucker, Tonia R. Tucker-Kraus and Michael Kraus purchased JAKKS common stock during the Class Period, as set forth in their respective certifications, filed previously with this Court which are incorporated herein by reference, and were damaged thereby.

15.     Defendant JAKKS is a Delaware corporation which maintains its corporate headquarters at 22619 Pacific Coast Highway, Malibu, CA 90265.

16.     Defendant Jack Friedman ("Friedman") was, at all relevant times, Chairman and Chief Executive Officer of the Company. Prior to co-founding JAKKS, defendant Friedman was CEO and a director of THQ, Inc.

17.    Defendant Steven G. Berman ("Berman") was, at all relevant times, President, Chief Operating Officer, and Secretary of the Company. Prior to co-founding JAKKS, defendant Berman was Vice President and Managing Director of THQ International, a subsidiary of THQ, Inc.

18.    Defendant Joel M. Bennett ("Bennett") was, at all relevant times, Chief Financial Officer and an Executive Vice President of the Company.

19.    Defendants Friedman, Berman, and Bennett are collectively referred to herein as the "Individual Defendants."

20.    Because of the Individual Defendants' positions with the Company, they had access to the adverse undisclosed information about its business, operations, products, operational trends, financial statements, markets and present and future business prospects, access to internal corporate documents (including the Company's operating plans, budgets and forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof and via reports and other information provided to them in connection therewith.

21.    It is appropriate to treat the Individual Defendants as a group for pleading purposes and to presume that the false, misleading and incomplete information conveyed in the Company's public filings, press releases and other publications as alleged herein are the collective actions of the narrowly defined group of defendants identified above. Each of the above officers of JAKKS, by virtue of their high-level positions with the Company, directly participated in the management of the Company, was directly involved in the day-to-day operations of the Company at the highest levels and was privy to confidential proprietary information concerning the Company and its business, operations, products, growth, financial statements, and financial condition, as alleged herein. Said defendants were involved in drafting, producing, reviewing and/or disseminating the false and

misleading statements and information alleged herein, were aware or recklessly disregarded, that the false and misleading statements were being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.

22.    As officers and controlling persons of a publicly-held company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, traded on the NASDAQ National Market during the Class Period, and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to disseminate promptly, accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings and present and future business prospects, and to correct any previously-issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly-traded securities would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

23.    The Individual Defendants participated in the drafting, preparation, and/or approval of the various public reports and other communications complained of herein and were aware of, or recklessly disregarded, the misstatements contained therein and omissions therefrom, and were aware of their materially false and misleading nature. Because of their Board membership and/or executive and managerial positions with JAKKS, each of the Individual Defendants had access to the adverse undisclosed information about JAKKS' business prospects and financial condition and performance as particularized herein and knew (or recklessly disregarded) that these adverse facts rendered the positive representations made by or about JAKKS and its business issued or adopted by the Company materially false and misleading.

- 6 -

24.     The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to and did control the content of the various SEC filings, press releases and other public statements pertaining to the Company during the Class Period. Each Individual Defendant was provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected. Accordingly, each of the Individual Defendants is responsible for the accuracy of the public reports and press releases detailed herein and is therefore primarily liable for the representations contained therein.

25.     Each of the defendants is liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of JAKKS common stock by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme: (i) deceived the investing public regarding JAKKS business, finances, financial statements and the intrinsic value of JAKKS common stock; and (ii) caused plaintiffs and other members of the Class to purchase JAKKS securities at artificially inflated prices.

## CLASS ACTION ALLEGATIONS

26.     Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired the securities of JAKKS between December 3, 1999 and October 19, 2004, inclusive (the "Class"), and who were damaged thereby. Excluded from the Class are defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

27.     The members of the Class are so numerous that joinder of all members is impracticable. As of November 9, 2004, there were approximately 26.2 million shares of JAKKS

common stock outstanding that were actively traded on the NASDAQ. While the exact number of

Class members is unknown to plaintiffs at this time and can only be ascertained through appropriate

discovery, plaintiffs believe that there are hundreds or thousands of members in the proposed Class.

Record owners and other members of the Class may be identified from records maintained by

JAKKS or its transfer agent and may be notified of the pendency of this action by mail, using the

form of notice similar to that customarily used in securities class actions.

28.    Plaintiffs' claims are typical of the claims of the members of the Class as all members

of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is

complained of herein.

29.    Plaintiffs will fairly and adequately protect the interests of the members of the Class

and has retained counsel competent and experienced in class and securities litigation.

30.    Common questions of law and fact exist as to all members of the Class and

predominate over any questions solely affecting individual members of the Class. Among the

questions of law and fact common to the Class are:

(a)    whether the federal securities laws were violated by defendants' acts as

alleged herein;

(b)    whether statements made by defendants to the investing public during the

Class Period misrepresented material facts about the business, operations and financial statements of

JAKKS; and

(c)    to what extent the members of the Class have sustained damages and the

proper measure of damages.

31.    A class action is superior to all other available methods for the fair and efficient

adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the

- 8 -

damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## SUBSTANTIVE ALLEGATIONS

### Background

32.    JAKKS was formed as a Delaware corporation in January 1995 and began operations as of April 1, 1995. Since its inception, the Company has operated as a multi-line, multi-brand toy company that designs, develops, produces and markets toys and related products. At the start of the Class Period, the Company's principal products were: (i) action figures and accessories featuring licensed characters, principally from WWE; (ii) Flying Colors molded plastic activity sets, clay compound playsets and lunch boxes; (iii) Wheels division products, including Road Champs die-cast collectible and toy vehicles and Remco toy vehicles and role-play toys and accessories; (iv) Child Guidance infant and pre-school electronic toys, toy-foam puzzle mats and blocks, activity sets and outdoor products; and (v) fashion and mini dolls and related accessories.

33.    WWE is an integrated media and entertainment company, engaged in the development, production, and marketing of television and pay-per-view programming, and live events; and the licensing and sale of branded consumer products. WWE has a worldwide licensing program using its WWE marks and logos, copyrighted works, and characters on a variety of retail products, including toys, video games, apparel, and books. Its direct merchandise operations consist of the design, sourcing, marketing, and distribution of various WWE-branded products, such as T-shirts, caps, and other novelty items, all of which feature its superstars and/or its logo. WWE also publishes two magazines, RAW and SmackDown! The company has offices in New York City, Los Angeles, Toronto, and London. WWE was founded by Vincent and Linda McMahon, and is headquartered in Stamford, Connecticut.

- 9 -

34.    On or about October 24, 1995, WWE and JAKKS entered into a domestic toy license, the term of which was to end on December 31, 2007, with a one-year right to renew if JAKKS achieved certain requirements. In obtaining this license, the JAKKS toy license proposal was presented to WWE through its licensing agent, Stanley Shenker and/or Stanley Shenker & Associates Inc. ("SSAI"). Previously, in or about April 1995, WWE had retained Shenker and SSAI as the Company's non-exclusive licensing agent.

35.    Unbeknownst to WWE and investors, however, after such time as the original JAKKS/WWE toy license was negotiated, defendants entered into an undisclosed agency agreement with Shenker and/or SSAI. Defendants' failure to disclose the relationship with Shenker and/or entities he controlled was material at that time, because Shenker already had an agency relationship with WWE. The simultaneous representation of WWE by Shenker and/or SSAI, and of JAKKS by Shenker and/or SSAI, constituted a clear conflict of interest.

36.    Moreover, having previously acted as the non-exclusive agent who negotiated the WWE/JAKKS domestic toy license, Friedman and Berman were well aware of Shenker's agency relationship with WWE at the time he was hired by the Company to act as JAKKS agent related to WWE products, at the 1996 New York Toy Fair. Moreover, as early as 1996, Friedman and Berman had received a legal opinion from Murray Skala, JAKKS outside legal counsel and a member of the Board of the Company, that the Company's retention of Shenker and/or SSAI to represent it in negotiating with WWE resulted in a material conflict of interest. According to Skala, at that time, an arrangement between Shenker, SSAI and JAKKS would *not* be legal absent WWE's informed consent.

37.    Unaware of the undisclosed relationship between Shenker, SSAI and JAKKS, however, on or about February 10, 1997, WWE and JAKKS entered into an international toy license

- 10 -

having a term which was to end December 31, 1999. At that time, no disclosure was made regarding Shenker's representation of JAKKS. Additionally, on March 7, 1997, WWE expanded its relationship with Shenker and SSAI, and entered into an Agency Agreement with SSAI, whereby SSAI became the *exclusive* outside licensing agent for WWE.

38.    Under the Agency Agreement, SSAI was responsible for procuring potential licenses and presenting all license proposals to WWE. The procedure for presenting such license proposals was for SSAI to present a deal memo to James Bell, Senior Vice President of Licensing and Merchandising for WWE. Bell, a long-time friend and business associate of Shenker, was responsible for reviewing the licensing proposals, and advising WWE senior management whether to accept or reject the proposed licensing offers.

39.    Pursuant to the SSAI Agency Agreement, however, SSAI was not entitled to any commissions for licenses independently procured by Bell and/or WWE. In addition, SSAI was also *not* entitled to commissions for licenses between WWE and third parties that pre-existed the formation of the SSAI Agency Agreement. Accordingly, SSAI was *not* entitled to any commissions relating to WWE's preexisting video game license with Acclaim Entertainment, Inc. ("Acclaim") which was, at that time, the exclusive licensee for the manufacture and sale of video games using WWE intellectual property. In the event that the Acclaim video game license was renewed, SSAI and Shenker would also *not* receive any commission on the preexisting license renewal.

40.    Thus, in order for Shenker to gain commissions on WWE video games, and in order for JAKKS to take this license from Acclaim, in or around 1998, Friedman, Berman and Shenker implemented a scheme and illegal course of conduct whereby defendants arranged to pay bribes and kickbacks to Shenker, which Shenker agreed to split with Bell, in exchange for their assistance in helping JAKKS procure the WWE video game licenses. These illegal payments ultimately allowed

- 11 -

JAKKS to gain the license to WWE's valuable video game franchise, as well as to make valuable amendments to, and expand the scope of, the Company's toy licenses.

41.    In order to perpetrate this scheme and illegal course of conduct, the illegal bribes and kickback payments were not recorded anywhere on the financial reports or records of JAKKS. Rather, to accomplish this bribery scheme, defendants "laundered" a series of clandestine payments through foreign corporations controlled by JAKKS and by Shenker and/or entities subject to his control, located primarily in Hong Kong, including an entity called Stanfull Industrial, Ltd. ("Stanfull").

42.    In early 1998, as negotiations were ongoing concerning WWE's video game license, at the direction of defendants Friedman and/or Berman, Shenker caused to be delivered to JAKKS, a handwritten $80,000 invoice from Stanfull. This invoice, dated January 2, 1998, stated that this request for payment related to the development of "Possible Latex Based Soft Toys With Special Coating." This invoice also directed that such payment be made to a Stanfull account at the Hang Seng Bank in Hong Kong. At that time, no contract existed between JAKKS and Stanfull or any other Shenker entity to develop any "Soft Toys," and no such toys were ever developed by JAKKS for Shenker or Stanfull.

43.    Regardless of the fact that invoices submitted to the Company needed the signature of JAKKS CFO, defendant Bennett, the $80,000 Soft Toy invoice was paid without any signature. Rather, at the direction of defendants Berman and Friedman, this invoice was sent by defendant Bennett to JAKKS foreign agent in Hong Kong, with the instruction that $40,000 immediately be transferred to Stanfull, which payment was made on or about January 14, 1998. Apparently, the $40,000 payment was withdrawn from an account at the Hang Seng Bank in Hong Kong, of Road Champs, Ltd., a foreign subsidiary owned and controlled by JAKKS. The same day, Shenker

- 12 -

obtained a demand draft for $20,000 from the Hang Seng Bank, payable to James Bell, representing his equal split of the illegal bribe and kickback paid to Shenker and Stanfull.

44.    At or about the time that Road Champs paid the $40,000 to Stanfull, another foreign subsidiary of the Company, JAKKS Pacific, H.K., sent $40,000 via wire transfer to Road Champs to reimburse it for making the prior illegal kickback payment. Road Champs did not record the payment to Stanfull, and recorded the $40,000 debit and credit as inter-company transfers. In connection with these payments, the general ledgers of Road Champs were falsified to conceal the payment to Stanfull. In addition, JAKKS did not record the invoice, nor any ensuing steps it took to pay the invoice, and this payment was not recorded anywhere on the financial reports or records of JAKKS.

45.    After receiving his split of the $40,000 bribe, Bell used his influence with WWE to cause it *not* to renew the Acclaim video game license. Thus, before Acclaim could even submit its proposal, on or about March 30, 1998, Bell initialed a deal memo recommending to senior management of WWE that this valuable license be awarded to "JAKKS Pacific-Electronic Game Division," and identifying SSAI as the agent that had negotiated and procured the deal. At that time, JAKKS did not maintain an "Electronic Game Division" and the Company had no ability to create or manufacture video games.

46.    On March 31, 1998, the day immediately after Bell had initialed the deal memo recommending the WWE video game license be awarded to JAKKS, defendant Bennett again directed JAKKS Hong Kong subsidiary to pay another $40,000 to Stanfull. On or about April 2, 1998, JAKKS Pacific, H.K. wire transferred $40,000 to the Stanfull account at the Hang Seng Bank in Hong Kong. That money was eventually split evenly with Bell. This payment was also not recorded anywhere on the financial reports or records of JAKKS.

- 13 -

47.    On or about April 8, 1998, WWE management approved the deal memo submitted by Bell and SSAI, favoring grant of the WWE video game license to JAKKS. Following this time, both THQ and Activision sent SSAI and/or Bell licensing proposals which were both superior to the JAKKS proposal. These proposals were not provided to WWE management but, rather, were shared with defendants Friedman and/or Berman.

48.    Following this time, JAKKS was able to convince THQ, a company at which both Friedman and Berman previously held senior management positions, to become its partner in the video game business. Since JAKKS had no ability to manufacture or develop video games, the partnership was nothing more than a tax on a deal which may otherwise have gone solely to THQ. Regardless of the fact that JAKKS had no Electronic Games Division, SSAI, Shenker and Bell recommended to WWE management that the video game license be awarded to JAKKS for an unprecedented 10 year term, with a five-year renewal right.

49.    Having been convinced that JAKKS would receive the WWE video game license, and rather than risk losing the opportunity to participate entirely in this valuable license opportunity, in June 1998, THQ formed a joint venture with JAKKS. The purpose of this joint venture was to develop, manufacture and market, under an exclusive license with World Wrestling Federation Entertainment ("WWF"), video games based on WWF characters and themes.

50.    Thereafter, on June 23, 1998, WWE executed a video game license agreement with JAKKS and THQ. By this time, Shenker had also promised Bell that SSAI would split equally *all* commissions or payments that SSAI would receive as a result of the JAKKS/WWE video game license. Also, at that time, SSAI, Shenker and Bell recommended to WWE that the JAKKS toy license be extended such that the terms of this license coincided with the terms of the video game license.

- 14 -

51.    The following day, June 24, 1998, the toy licenses granted to JAKKS by WWE were extended.  By July 15, 1998, another fake invoice requesting payment of $20,000 was sent to the attention of Berman at JAKKS, by Shenker.  Clandestine payment was achieved in a manner similar to that as had been done previously, Bennett directed JAKKS' Hong Kong subsidiary, Road Champs, to make payment to Stanfull at the Hang Seng Bank.  In addition, JAKKS did not record this invoice, nor any ensuing steps it took to pay this invoice, and this payment was not recorded anywhere on the financial reports or records of JAKKS.

52.    At no time prior to or during the Class Period did Defendants ever disclose that JAKKS had engaged in this scheme and illegal course of conduct in obtaining the WWE video games license or in extending or procuring the WWE toys licenses.  When repeatedly questioned by WWE, throughout the Class Period, as to whether the Company had ever made payments to Shenker, SSAI and/or Bell or any entities controlled thereby, Defendants repeatedly lied to WWE.  In fact, rather than disclose Defendants' scheme and illegal course of conduct, throughout the Class Period, Defendants repeatedly cited their success in obtaining the WWE licenses and used this purported success to justify multi-million dollar bonuses.

53.    By early 2004, if not earlier, Defendants were further aware that the WWE was contending that the WWE licenses had been obtained through a pattern of commercial bribery.  Furthermore, Defendants knew or recklessly disregarded that the fact that the WWE was contending that the WWE licenses had been obtained through commercial bribery exposed the Company to the heightened risk that the WWE would seek some modification to the WWE licensing agreements or complete nullification of those agreements.

54.    As a result of Defendants' materially false and misleading statements and material omissions, throughout the Class Period, Defendants also caused the price of JAKKS shares to be

- 15 -

artificially inflated. Defendants were then able to take advantage of the fraud that they had caused, by directing the Company to issue millions of shares of Company stock and almost $100 million in debt convertible into shares of the Company. In connection with these offerings, Company Insiders, including certain defendants named herein were able to sell millions of dollars of their personally held JAKKS common stock to the public while in possession of material adverse non-public information about the Company. In addition, throughout the Class Period, Company insiders including certain of the defendants named herein, also routinely sold significant amounts of their privately held JAKKS common shares directly into the open market while in possession of material adverse non-public information about the Company. In total, during the Class Period, JAKKS insiders were able to reap over $37.68 million in illicit proceeds from the sale of their personally held JAKKS shares.

55.     It was only at the end of the Class Period, however, on or about October 19, 2004, that investors learned the truth about JAKKS. At that time, Defendants shocked investors after it was revealed that WWE had filed suit against the Company, seeking to rescind the WWE video game and toy licenses, and to recover damages, because such licenses were procured pursuant to a fraudulent scheme and illegal course of conduct which the WWE had since uncovered. These belated disclosures also had a sudden dramatic effect on the price of JAKKS shares, causing the stock to fall in price precipitously and resulting in significant damages to plaintiffs and the Class.

**Materially False and Misleading**
**Statements Issued During the Class Period**

56.     The Class Period begins on December 3, 1999, immediately following the November 1999 press release of the Company's first series of WWF video games. At that time, JAKKS filed a prospectus with the SEC on a Form 424B 1 ("Prospectus") in connection with a public offering of 3 million shares of common stock priced at $25.00 per share. In the Prospectus, Defendants

- 16 -

highlighted the Company's strong product line of licensed and proprietary toys and products,

including the WWE branded products, stating in pertinent part as follows:

> We are a multi-line, multi-brand toy company that designs, develops, produces and
> markets licensed and proprietary toys and related products. . . . *We believe that our*
> *growth results from our well-known brand names, the breadth, quality and*
> *innovation of our product offerings and our strong relationships with retailers and*
> *suppliers.* Our net sales have increased from $41.9 million in 1997 to $85.3 million
> in 1998, representing a growth rate of 103.2%. Our net income has increased from
> $2.8 million in 1997 to $6.4 million in 1998, representing a growth rate of 128.8%.
> Our pro forma net sales and net income for the nine months ended September 30,
> 1999 were $158.0 million and $13.8 million, respectively, representing growth rates
> of 68.0% and 118.5% over the prior period.  [Emphasis added.]

57.    As a result of the significance of the WWE video game and toy licenses to the future

growth and prosperity of the Company, the Prospectus provided significant detail about JAKKS

WWE video game development, its relationship with WWE and its agreement with THQ, stating, in

pertinent part, as follows:

### WORLD WRESTLING FEDERATION VIDEO GAMES

> In June 1998, we formed a joint venture with THQ, a developer, publisher and
> distributor of interactive entertainment software for the leading hardware game
> platforms in the home video game market. *The joint venture entered into a license*
> *agreement with World Wrestling Federation Entertainment under which it*
> *acquired the exclusive worldwide right to publish World Wrestling Federation*
> *video games on all hardware platforms.* The games will be designed, developed,
> manufactured and marketed by the joint venture.  We are entitled to receive a
> guaranteed preferred return, based on sales of the video games, and THQ is entitled
> to receive the balance of the profits.  The term of the license agreement expires on
> December 31, 2009, subject to a right of the joint venture to renew the license for an
> additional five years under various conditions.
>
>                    *        *        *
>
> Wrestling video games have demonstrated consistent popularity, with two wrestling-
> theme video games among the top 10 video games, in terms of unit sales volumes, in
> 1998.  Approximately 2.3 million units of these two games were sold in 1998, at
> retail prices ranging from approximately $42 to $60. . . . *We believe that as a*
> *franchise property, the World Wrestling Federation titles will have brand*
> *recognition and sustainable consumer appeal, which may allow the joint venture to*
> *use titles over an extended period of time through the release of sequels and*

- 17 -

*extensions and to re-release such products at different price points in the future. . . . [Emphasis added.]*

58.    The statements referenced above in ¶57 were materially false and misleading, and were known by defendants to be false at that time, or were recklessly disregarded as such thereby, because the statements failed to disclose the adverse fact that JAKKS had obtained the "exclusive right" to publish WWE video games as a result of the commercial bribery scheme set forth at ¶¶35-51 above. In the absence of that adverse information, the discussion of the acquisition of the WWE video game license in ¶57 conveyed the false impression that the license was procured through sound and legal business practices. The statements referenced in ¶57 above, as well as other public statements by JAKKS, made clear that the WWE video game license was expected to generate significant revenues for the Company "over an extended period of time" into the future. The undisclosed information concerning the bribery scheme is material because a reasonable investor would have wanted to know if that source of revenue was threatened or unsustainable because it was improperly or illegally obtained.

59.    In connection with this Offering, certain "Selling Stockholders" liquidated hundreds of thousands of shares of their personally held JAKKS stock, as follows:

PRINCIPAL AND SELLING STOCKHOLDERS

| Name | Number of Shares Offered | Estimated Gross Proceeds |
|---|---|---|
| Jack Friedman (*)............ | 289,683 | $ 7,242,075.00 |
| Stephen G. Berman(*)....... | 115,873 | $ 2,896,825.00 |
| Robert E. Glick.................... | 45,000 | $ 1,125,000.00 |
| Michael G. Miller................ | 45,000 | $ 1,124,000.00 |
| Murray L. Skala.................. | 60,000 | $ 1,500,000.00 |
| Total | 555,556 | $ 13,396,900.00 |

(*) If the underwriters' over-allotment option is exercised in full, Mr. Friedman will sell 355,635 shares and will beneficially own 757,230 shares (4.0% of the outstanding shares) after this offering

- 18 -

and Mr. Berman will sell 133,254 shares and will beneficially own
62,516 shares (0.3% of the outstanding shares) after this offering.

60.    On December 8, 1999, following the exercise by the underwriters of their over-
subscription allotment option, JAKKS announced that, in total, 2.811 million shares were sold by the
Company, for gross proceeds of approximately $70 million, and 638,889 shares were sold by
insiders, for gross proceeds of approximately $16 million. At that time, shares of the Company
traded above $25.00 per share, trading as high as $27.00 per share on December 8, 1999.

61.    On or March 30, 2000, JAKKS filed its Annual Report on Form 10-K, with the SEC
which was signed by defendants Friedman, Berman and Bennett, among others. In addition to
reiterating the results announced in the February 16, 2000 press release, the Company's 2000 Form
10-K again described JAKKS video game licensing agreement with WWE and it joint venture with
THQ, in part, as follows:

### WORLD WRESTLING FEDERATION VIDEO GAMES

In June 1998, we formed a joint venture with THQ, a developer, publisher and
distributor of interactive entertainment software for the leading hardware game
platforms in the home video game market. *The joint venture entered into a license
agreement with World Wrestling Federation Entertainment under which it
acquired the exclusive worldwide right to publish World Wrestling Federation
video games on all hardware platforms.* The games will be designed, developed,
manufactured and marketed by the joint venture. We are entitled to receive a
guaranteed preferred return, based on sales of the video games, and THQ is entitled
to receive the balance of the profits. The term of the license agreement expires on
December 31, 2009, subject to a right of the joint venture to renew the license for an
additional five years under various conditions.

\*      \*      \*

Wrestling video games have demonstrated consistent popularity, with two wrestling-
theme video games among the top 10 video games, in terms of unit sales volumes, in
1998. Approximately 2.3 million units of these two games were sold in 1998, at
retail prices ranging from approximately $42 to $60. We believe that the success of
the World Wrestling Federation titles is dependent on the graphic look and feel of the
software, the depth and variation of game play and the popularity of the World
Wrestling Federation. *We believe that as a franchise property, the World Wrestling
Federation titles will have brand recognition and sustainable consumer appeal,*

- 19 -

*which may allow the joint venture to use titles over an extended period of time through the release of sequels and extensions and to re-release such products at different price points in the future.* Also, as new hardware platforms are introduced, software for these platforms requires new standards of design and technology to fully exploit these platforms' capabilities and requires that software developers devote substantial resources to product design and development. [Emphasis added.]

62.     The statements referenced above in ¶61 were materially false and misleading, and were known by defendants to be false at that time, or were recklessly disregarded as such thereby, because the statements failed to disclose the adverse fact that JAKKS had obtained the "exclusive right" to publish WWE video games as a result of the commercial bribery scheme set forth at ¶¶35-51 above. In the absence of that adverse information, the discussion of the acquisition of the WWE video game license in ¶61 conveyed the false impression that the license was procured through sound and legal business practices. The statements referenced in ¶61 above, as well as other public statements by JAKKS, made clear that the WWE video game license generated, and was expected to continue to generate, significant revenues for the Company "over an extended period of time" into the future. The undisclosed information concerning the bribery scheme is material because a reasonable investor would have wanted to know if that source of revenue was threatened or unsustainable because it was improperly or illegally obtained.

63.     On May 22, 2000, JAKKS filed the Company's Proxy Statement in connection with the election of directors for 2000-2001 with the SEC. According to the Proxy, for 1999, defendant Friedman received a base salary of $521,000, a bonus of $1.75 million and 232,500 options, and defendant Berman received a base salary of $496,000, a bonus of $1.75 million and 394,500 options. According to the Proxy, such payments were justified because of the following:

*We believe that our success to date has been to a significant extent attributable to the personal efforts of Mr. Friedman and Mr. Berman.* They founded the Company, established its business philosophy and operating structure and were the driving force behind our central theme of focusing our business on "evergreen" products. *Mr. Friedman's long-term relationship with Titan Sports was instrumental in our acquiring our successful World Wrestling Federation licenses.*

- 20 -

In his nearly four-decade-long career in the toy industry, he has established an important network of relationships that we have been able to exploit in product acquisition, production and sales. Both Mr. Berman and Mr. Friedman embody our management philosophy with a "hands on" approach in all areas of our business. In addition to their general supervisory functions, *they are directly involved in license acquisition*, product design and development, production, and sales and marketing, as well as our financing and acquisition efforts. *Their efforts have resulted in our identifying and securing the World Wrestling Federation licenses and other desirable licenses and properties,* the rapid expansion of our product lines, our achieving significant production efficiencies and the development of a loyal and growing customer base. *In 1999, they guided us through two significant acquisitions, the implementation of our video game joint venture with THQ Inc. and two public offerings.*

*Based on their contributions to our outstanding performance in 1999,* which witnessed a 116% increase in net sales, 245% increase in net income, 136% increase in earnings per share and 160% increase in the market price of our common stock, *the Board determined that it would be appropriate to award Mr. Friedman and Mr. Berman a substantial discretionary bonus with respect to 1999.* Our Compensation Committee commissioned a report from an independent consulting firm to advise it on the appropriate level of compensation for Mr. Friedman and Mr. Berman. Based on this report, *our Compensation Committee recommended to the Board that we give Mr. Friedman and Mr. Berman a bonus of $750,000, in addition to the 4% Bonus, and the Board approved this recommendation. At the same time, we also increased the cap on the 4% Bonus from $1,000,000 to $2,000,000 effective in 2000.* [Emphasis added.]

64.    The statements referenced above in ¶63 were materially false and misleading, and were known by defendants to be false at that time, or were recklessly disregarded as such thereby, because the statements failed to disclose the adverse fact that JAKKS had obtained and renewed the WWE licenses as a result of the commercial bribery scheme set forth at ¶¶35-51 above. In the absence of that adverse information, the statements in ¶63 indicating that JAKKS had obtained its licenses as a result of its "long-term relationship" with WWE conveyed the false impression that JAKKS obtained those valuable licenses through a competitive process, taking advantage of its special (but legal) relationship with WWE. JAKKS' own public statements made clear that the "successful" WWE licenses generated, and were expected to continue to generate, significant revenues for the Company. The undisclosed information concerning the bribery scheme is material

- 21 -

because a reasonable investor would have wanted to know if that source of revenue was threatened or unsustainable because it was improperly or illegally obtained.

65.    In addition to the foregoing, the Proxy also summarized defendant Friedman and Berman's new and augmented Employment Agreements, which compensated them as follows:

EMPLOYMENT AGREEMENTS

*We entered into 10-year employment agreements with Mr. Friedman and Mr. Berman, pursuant to which Mr. Friedman serves as our Chairman and Chief Executive Officer and Mr. Berman serves as our President and Chief Operating Officer.* Mr. Friedman's annual base salary in 2000 is $771,000 and Mr. Berman's is $746,000. Their annual base salaries are subject to annual increases in an amount, not less than $25,000, determined by our Board of Directors. *Each of them is also entitled to receive an annual bonus equal to 4% of our pre-tax income, but not more than $2,000,000, if our pre-tax earnings are at least $2,000,000.* . . . [Emphasis added.]

66.    By mid-October 2000, SSAI had been terminated as WWE's licensing agent and it had actually initiated suit against WWE for breach of contract. Realizing that discovery in that action put Defendants at risk of their fraudulent scheme being discovered, Defendant Friedman telephoned Linda McMahon, CEO of WWE, and made the unsolicited offer to use his connections to attempt to broker a settlement with Shenker. At that time, Friedman did not disclose his or JAKKS' prior agency relationship with Shenker or SSAI. WWE declined his offer of assistance.

67.    On April 2, 2001, JAKKS filed its 2000 Annual Report on Form 10-K with the SEC, which was signed by defendants Bennett, Friedman and Berman, among others. In addition to reiterating the results announced in the March 7, 2001 press release, the Company's 2000 Form 10-K also contained statements concerning the Company's "key strategy" and its agreement with WWE and joint venture with THQ, similar to or the same as those statements contained in JAKKS prior SEC filings, reproduced herein, *supra*. In addition, the 2000 Form 10-K also reported that, during 2000, the JAKKS/THQ joint venture had earned over $15.9 million in profits, versus total net income of $28.6 million for JAKKS, as follows:

- 22 -

In June 1998, the Company formed a joint venture with a company that develops, publishes and distributes interactive entertainment software for the leading hardware game platforms in the home video game market. The joint venture has entered into a license agreement under which it acquired the exclusive worldwide right to publish video games on all hardware platforms. . . . *During 2000 the Company earned $15,905,860 in profit from the joint venture.* [Emphasis added.]

68.    The statements referenced above in ¶67 were materially false and misleading, and were known by defendants to be false at that time, or were recklessly disregarded as such thereby, because the statements failed to disclose the adverse fact that JAKKS had obtained the "exclusive worldwide right" to publish WWE video games as a result of the commercial bribery scheme set forth at ¶¶35-51 above. In the absence of that adverse information, the discussion of the acquisition of the WWE video game license in ¶67 conveyed the false impression that the license was procured through sound and legal business practices. The statements referenced in ¶67 above, as well as other public statements by JAKKS, made clear that the WWE video game license generated, and was expected to continue to generate, significant revenues for the Company. The undisclosed information concerning the bribery scheme is material because a reasonable investor would have wanted to know if that source of revenue was threatened or unsustainable because it was improperly or illegally obtained.

69.    On June 12, 2001, JAKKS filed its Proxy Statement in connection with the election of directors for 2001-2002 with the SEC. According to the Proxy, for 2000, defendant Friedman received a base salary of $771,000, a bonus of $1.613 million and 207,254 options, and defendant Berman received a base salary of $746,000, a bonus of $1.613 million and 345,024 options. According to the Proxy, such payments were justified because of the following:

> *We believe that our success to date has been to a significant extent attributable to the personal efforts of Mr. Friedman and Mr. Berman.* They founded the Company, established its business philosophy and operating structure and were the driving force behind our central theme of focusing our business on "evergreen" products. *Mr. Friedman's long-term relationship with World Wrestling Federation Entertainment, Inc. was instrumental in our acquiring our successful World*

- 23 -

*Wrestling Federation licenses. In his nearly four-decade-long career in the toy industry, he has established an important network of relationships that we have been able to exploit in product acquisition, production and sales.* Both Mr. Berman and Mr. Friedman embody our management philosophy with a "hands on" approach in all areas of our business. *In addition to their general supervisory functions, they are directly involved in license acquisition,* product design and development, production, and sales and marketing, as well as our financing and acquisition efforts. *Their efforts have resulted in our identifying and securing the World Wrestling Federation licenses and other desirable licenses and properties, the rapid expansion of our product lines,* our achieving significant production efficiencies and the development of a loyal and growing customer base. [Emphasis added.]

70.    The statements referenced above in ¶69 were materially false and misleading, and were known by defendants to be false at that time, or were recklessly disregarded as such thereby, because the statements failed to disclose the adverse fact that JAKKS had obtained and renewed the WWE licenses as a result of the commercial bribery scheme set forth at ¶¶35-51 above. In the absence of that adverse information, the statements in ¶69 indicating that JAKKS had obtained its licenses as a result of its "long-term relationship" with WWE conveyed the false impression that JAKKS obtained those valuable licenses through a competitive process, taking advantage of its special (but legal) relationship with WWE. JAKKS' own public statements made clear that the "successful" WWE licenses generated, and were expected to continue to generate, significant revenues for the Company. The undisclosed information concerning the bribery scheme is material because a reasonable investor would have wanted to know if that source of revenue was threatened or unsustainable because it was improperly or illegally obtained.

71.    Taking advantage of the artificial inflation in the price of JAKKS shares caused in significant part by defendants' materially false and misleading statements and omissions, on February 10, 2002, defendants announced the proposed acquisition of Toymax International Inc., a New York-based toy designer and marketer. This deal, valued at approximately $55 million, consisted primarily of payment of $3.00 per Toymax share in cash, plus an additional $1.50 per share payable in JAKKS common stock to Toymax's three principal shareholders who together held

- 24 -

a 64% stake in Toymax. The remainder of Toymax's shareholders would receive $4.50 per share in cash.

72.    On May 23, 2002, JAKKS issued a press release announcing that the Company had completed the sale of 3.5 million shares of common stock priced at $17.75 per share. These shares were sold pursuant to a registration statement filed with the SEC and declared effective on or about May 22, 2002. In addition to repeating many of the same or substantially similar statements concerning the financial and operational condition of the Company as had been previously filed with the SEC, this registration statement stated, in part, the following:

> *We have capitalized on our relationship with World Wrestling Entertainment, Inc.* *(WWE) by obtaining an exclusive worldwide license for our joint venture with* *THQ Inc.* (THQ), which develops, produces, manufactures and markets video games based on World Wrestling Entertainment characters and themes. Since the joint venture's first title release in 1999, it has released 11 new titles. *We have received* *$27.5 million as our share of the joint venture's profit through March 31, 2002.*
>
> *           *          *
>
> World Wrestling Entertainment Video Games
>
> In June 1998, we formed a joint venture with THQ, a developer, publisher and distributor of interactive entertainment software for the leading hardware game platforms in the home video game market. The joint venture entered into a license agreement with the WWE under which it acquired the exclusive worldwide right to publish World Wrestling Entertainment video games on all hardware platforms. The term of the license agreement expires on December 31, 2009, and the joint venture has a right to renew the license for an additional five years under various conditions. [Emphasis added.]

73.    The statements referenced above in ¶72 were materially false and misleading, and were known by defendants to be false at that time, or were recklessly disregarded as such thereby, because the statements failed to disclose the adverse fact that JAKKS had obtained the "exclusive worldwide license" to publish WWE video games as a result of the commercial bribery scheme set forth at ¶¶35-51 above. In the absence of that adverse information, the statements in ¶72 indicating that JAKKS had obtained its license by "capitalizing" on its "relationship" with WWE conveyed the

- 25 -

false impression that JAKKS obtained that valuable license through a competitive process, taking advantage of its special (but legal) relationship with WWE. The statements referenced in ¶72 above, as well as other public statements by JAKKS, made clear that the WWE video game license generated, and was expected to continue to generate, significant revenues for the Company. The undisclosed information concerning the bribery scheme is material because a reasonable investor would have wanted to know if that source of revenue was threatened or unsustainable because it was improperly or illegally obtained.

74.    In addition to the foregoing, the Registration Statement also identified the Selling Shareholders, who together sold 500,000 shares of stock in this offering priced at $17.75 per share, including: Jack Friedman – 300,000 shares; Stephen Berman – 150,000 shares; and Murray Skala – 30,000 shares.

75.    Unbeknownst to investors, on or about June 11, 2002, JAKKS received a subpoena in connection with WWE's then on-going litigation with Bell and Shenker, ordering JAKKS to produce a variety of records relating to the Company's dealings with them. This subpoena included all documents related to any agreements between JAKKS, Shenker and/or SSAI and all documents related to any payments to Shenker or SSAI.

76.    On August 21, 2002, JAKKS filed its Proxy Statement in connection with the election of directors for 2002-2003 with the SEC. According to the Proxy, for 2001, defendant Friedman received a base salary of $821,000, a bonus of $1.706 million and 175,000 options, and defendant Berman received a received a base salary of $796,000, a bonus of $1.706 million and 175,000 options. According to the Proxy, such payments were justified because:

> *We believe that our success to date has been to a significant extent attributable to the personal efforts of Mr. Friedman and Mr. Berman.* They founded the Company, established its business philosophy and operating structure and were the driving force behind our central theme of focusing our business on "evergreen"

- 26 -

products. *Mr. Friedman's long-term relationship with World Wrestling Federation Entertainment, Inc. was instrumental in our acquiring our successful World Wrestling Federation licenses.* In his nearly four-decade-long career in the toy industry, he has established an important network of relationships that we have been able to exploit in product acquisition, production and sales. *Both Mr. Berman and Mr. Friedman embody our management philosophy with a "hands on" approach in all areas of our business. In addition to their general supervisory functions, they are directly involved in license acquisition, product design and development, production, and sales and marketing, as well as our financing and acquisition efforts. Their efforts have resulted in our identifying and securing the World Wrestling Federation licenses and other desirable licenses and properties,* the rapid expansion of our product lines, our achieving significant production efficiencies and the development of a loyal and growing customer base. [Emphasis added.]

77.    The statements referenced above in ¶76 were materially false and misleading, and were known by defendants to be false at that time, or were recklessly disregarded as such thereby, because the statements failed to disclose the adverse fact that JAKKS had obtained and renewed the WWE licenses as a result of the commercial bribery scheme set forth at ¶¶35-51 above. In the absence of that adverse information, the statements in ¶76 indicating that JAKKS had obtained its licenses as a result of its "long-term relationship" with WWE conveyed the false impression that JAKKS obtained those valuable licenses through a competitive process, taking advantage of its special (but legal) relationship with WWE. JAKKS' own public statements made clear that the "successful" WWE licenses generated, and were expected to continue to generate, significant revenues for the Company. The undisclosed information concerning the bribery scheme is material because a reasonable investor would have wanted to know if that source of revenue was threatened or unsustainable because it was improperly or illegally obtained.

78.    Unbeknownst to investors, on or about October 30, 2002, JAKKS responded by letter to WWE's June 11, 2002 subpoena. At that time defendants concealed and did not reveal either the $80,000 or $20,000 invoice paid to Stanfull in 1998, nor any payments made to Shenker or SSAI, nor any documents or invoices indicating that such payments had been made. At that time, JAKKS had also failed to disclose that Shenker had acted as agent for the Company.

- 27 -

79.    Unbeknownst to investors, on January 14, 2003, pursuant to its right under the licensing agreement WWE's auditors formally requested, in writing, that JAKKS provide a complete list of any and all payments made to Shenker, SSAI, Bell and/or any entity controlled by them. On January 17, 2003, JAKKS provided yet another false and misleading response, stating that it had *already* "provided any documents that may exist," in response to the June 11, 2002 subpoena. At that time, defendant Bennett received a copy of JAKKS false response and did nothing to correct it, despite his personal knowledge of the fake invoices presented to the Company by Shenker and/or SSAI and the subsequent payments at issue, all of which he personally directed and orchestrated.

80.    Unbeknownst to investors, on February 25, 2003, WWE auditors again sent a letter to JAKKS requesting copies of all invoices or a description of each transaction whereby payments were made by the Company to Shenker, SSAI or Stanfull. Later, on March 14, 2003, by letter to JAKKS' corporate counsel, WWE again requested an answer as to whether payments had been made by JAKKS to Shenker, Stanfull or SSAI. On March 19, 2003, JAKKS' corporate counsel, Murray Skala, ultimately responded to WWE. Despite the fact that JAKKS had provided no information about its relationship with, or payments to, Shenker and/or SSAI, Skala falsely stated that JAKKS had *already* responded to the June 11, 2002 subpoena "months ago." Later, on March 26, 2003, JAKKS' counsel again informed WWF that there was "*no additional information*" of the type requested pursuant to the June 11, 2002 subpoena.

81.    At the end of July 2004, JAKKS came under fire from Wall Street analysts over the pay to defendants Berman and Freidman. On July 31, 2003, the Los Angeles Times reported, in part, the following:

> *The top two executives at Jakks Pacific Inc.*, under fire from Wall Street analysts over their pay and the company's performance, received *salary increases this year of 14% and 17.5%*, according to a regulatory filing Wednesday.

- 28 -

*The raises, which exceeded the Malibu-based toy maker's 2002 profit and stock performance, came after a tough year for shareholders.* The company's earnings per share fell 5.5% last year, and its stock lost 29%, as the firm struggled to integrate acquisitions and increase the market share of its core brands, including World Wrestling Entertainment action figures.

*    *    *

*For 2003, Friedman and Berman each will take home a salary of $965,000, a 14% increase for Friedman and a 17.5% boost for Berman.*

*Under the bonus plan that is in effect through the end of this year, the two will receive 4% of pretax profit, not to exceed $2 million. Jakks has said its pre-tax profit this year would be flat; if that is the case, each would get a bonus of about $1.4 million.* [Emphasis added.]

82.    According to the *LA Times*, compensation experts said that the Company's filing revealed several "unusual perks" for defendants Friedman and Berman, including:

- Guaranteed annual raises of $25,000 each.

- Restricted stock grants totaling 1.08 million shares over the life of their newly signed eight-year employment contracts, provided only that annual profit at Jakks exceeds $2 million. *At the stock's then current value, those grants were worth $12.5 million.*

- When they signed the new contracts in March, Friedman and Berman received 240,000 shares apiece. Each will get an additional 120,000 shares every year "in consideration for modifying and replacing the pretax income formula for determining his annual bonus and for entering into the amended agreement," according to the filing. *Compensation experts said the two officers didn't need any consideration because the two probably would have little to lose from the new bonus plan.*

- *The length of the new employment contracts was unusual.* Todd Meyer, an independent compensation consultant based in Los Angeles, called eight years "a bit excessive." *"The board is locking the two top executives in for a long time, and they're locking them in at very high total compensation levels,"* he said. Of the companies that make up the Standard & Poor's 500 index, only about two dozen offer executives contracts longer than three years, Hodgson said.

83.    In addition to the foregoing, the LA Times reported that the Company had also failed to elaborate on how JAKKS would determine bonuses for the top two officers. While defendants stated that, under the new bonus plan, which would go into effect during 2004, JAKKS would base

- 29 -

bonuses on earnings-per-share growth targets, defendants did not say what the targets would be. According to the *LA Times*, Paul Hodgson, senior research analyst with Corporate Library, a corporate-governance information service, complained that "Unless they tell us what the targets are – and the analysts and the stockholders are satisfied that they're sufficiently challenging – then we're never going to find out whether the incentive pay is aligned with stockholder interests. They could be setting themselves meaningless [targets] of a couple of percent a year." Arvind Bhatia, an analyst with Southwest Securities in Dallas, said the "meagerness" of the information shared by JAKKS "raised questions."

84.     Unbeknownst to investors, during the first week of September, JAKKS, through defendant Bennett, had provided to the Company's outside counsel documentary evidence of the illegal payments to the Standfull entity controlled by Shenker. Again, at that time, Defendants made no disclosure to WWE or to investors of the clandestine payments to Shenker and/or SSAI, or the documentary evidence of such payments.

85.     Unbeknownst to investors, on or about November 11, 2003, after WWE made it known that it had independently discovered an $80,000.00 payment to Shenker and/or entities controlled by him, defendant Friedman telephoned WWE's Chief Executive Officer, Linda McMahon. During this telephone call, defendant Friedman again misrepresented the true cause of this payment, and told WWE's CEO that such payment related to a "project development" for a mechanical dinosaur project unrelated to the WWE licenses. In addition, at that time, Defendant Friedman also continued to fail to disclose the additional $20,000 payment to Shenker which was paid immediately after the WWE video game license was secured. On or about November 14, 2003, Defendants presented to WWE a copy of an $80,000 invoice payable to an entity controlled by

Shenker, which stated that such payment was for "development of possible latex based soft toys with special coatings."

86.     Following the placement of $98 million in convertible notes during the second quarter of 2003, on or about December 23, 2003, Defendants filed a registration statement, registering such notes for sale. In addition to making many of the same or substantially similar representations concerning the financial and operational condition of the Company, this registration statement stated, in part, the following:

> *We have capitalized on our relationship with World Wrestling Entertainment, Inc.*
> *(WWE) by obtaining an exclusive worldwide license for our joint venture with*
> *THQ Inc. (THQ), which develops, produces, manufactures and markets video*
> *games based on World Wrestling Entertainment characters and themes.* Since the
> joint venture's first title release in 1999, it has released 15 new titles. We have
> received $34.6 million in preferred returns as our profit from the joint venture
> through June 30, 2003. [Emphasis added.]

87.     The statements referenced above in ¶86 were materially false and misleading, and were known by defendants to be false at that time, or were recklessly disregarded as such thereby, because the statements failed to disclose the adverse facts that: (a) JAKKS had obtained the "exclusive worldwide license" to publish WWE video games as a result of the commercial bribery scheme set forth at ¶¶35-51 above; and (b) JAKKS' relationship with WWE was being negatively impacted by WWE's contention that the licenses it had granted to JAKKS were improperly obtained, as set forth at ¶¶75, 78, 79, 80, 84 and 85 above. In the absence of that adverse information, the statements in ¶86 indicating that JAKKS had obtained its license by "capitalizing" on its "relationship" with WWE conveyed the false impression that JAKKS obtained that valuable license through a competitive process, taking advantage of its special (but legal) relationship with WWE. The statements referenced in ¶86 above, as well as other public statements by JAKKS, made clear that the WWE video game license generated, and was expected to continue to generate, significant revenues for the Company. The undisclosed information concerning the bribery scheme and

- 31 -

WWE's discovery of that scheme is material because a reasonable investor would have wanted to know if that source of revenue was threatened or unsustainable because it was improperly or illegally obtained.

## THE TRUTH EMERGES

88.    The truth about the Company began to emerge on October 19, 2004. On that date, before the market opened, Defendants shocked investors when JAKKS published a press release reporting third quarter 2004 results, in which JAKKS first revealed that the Company was "engaged in discussions with the WWE" concerning the "validity of the licenses as a result of certain transactions between the Company and that licensing consultant that occurred more than six years ago." This press release stated, in relevant part, the following:

> *The Company also announced that it is engaged in discussions with WWE concerning the restructuring of its toy license and with WWE and THQ with respect to the restructuring of the JAKKS THQ Joint Venture video games license agreement with WWE.* The discussions are an outgrowth of certain litigation that has been pending between WWE and a former licensing consultant to WWE and a former employee of WWE, to which the Company is not a party. *WWE has raised questions about the validity of the licenses as a result of certain transactions between the Company and that licensing consultant that occurred more than six years ago.  The Company has denied any wrongdoing in connection with the transactions with the licensing consultant and maintains that they are unrelated to either the toy or video game license.* If the discussions are satisfactorily concluded, the restructuring of the licenses may have an impact on the Company's future revenues and net income to an extent that is presently unknown. *If the discussions with WWE and THQ are not satisfactorily concluded, the Company anticipates that litigation is likely to be commenced by WWE, challenging the validity of the licenses and seeking compensatory and punitive damages, in which event the Company intends to vigorously defend itself against claims which it believes are without merit.* [Emphasis added]

89.    In reaction to this news, the price of JAKKS common stock declined precipitously, falling $5.34 per share, or 22% from its previous day's closing price of $24.15, to close at $18.81. After the close of trading, shares continued to fall in after-hours trading, dropping to $17.85 per share.

90.     Later that day, defendants hosted a conference call for analysts and investors. When asked about the WWE dispute, however, defendants refused to answer questions or provide more information. Accordingly, when asked what sort of impact the dispute would have on JAKKS toy and video game sales, defendant Friedman stated, "Until our discussions are completed, we cannot comment about this subject at all." Similarly, when defendant Bennett was asked if he could provide "more color" on the WWE dispute, he stated that "we cannot make any further comments."

91.     Later that same day, also on October 19, 2004, news reports indicated that the WWE had filed a complaint against JAKKS and the Individual Defendants, among others, alleging that they had perpetrated a massive bribery scheme involving lucrative license deals. WWE alleged that in order to obtain the WWE videogame license and favorable amendments to the toy licenses, JAKKS made substantial bribery payments to Stanley Shenker, president and sole owner of SSAI, and James Bell, WWE's former licensing and merchandising senior vice president. To conceal the payments, JAKKS laundered monies through its foreign bank accounts and corporations to pay Shenker via Shenker's Hong Kong corporation. Shenker then split the payments with Bell. The details of JAKKS' corrupt scheme were set forth in the WWE complaint which alleged as follows, in relevant part:

> *During the conversation regarding Shenker serving as Jakks' agent on WWE matters at the same time he was a WWE agent, a call was placed by Friedman, Berman and Shenker to Mr. Murray Skala, Jakks' outside legal counsel and a member of the Board of Directors of Jakks, regarding the proposed arrangement. Mr. Skala advised all participants in the call that it would be a conflict of interest for Shenker to serve as Jakks' agent on WWE matters at the same time Shenker was acting as WWE's agent* and that such an arrangement could not be done without first making full disclosure to WWE and obtaining their consent.*
>
> *Following the conversation with Jakks' corporate counsel, neither Friedman, Berman, Shenker, nor Jakks disclosed the conversation to WWE nor sought their consent.* On information and belief, all three men did not disclose the conversation because they knew WWE would not agree to such an obvious conflict of interest and because disclosure might also cause it to be revealed that Shenker was already acting as Jakks' agent. Instead, *all three men kept the conversation secret and eventually*

- 33 -

*implemented, in or around 1998, a plan whereby Shenker would accept and split bribes from Jakks with Bell to secure the videogame license and related amendments to the domestic toy license and an international toy license secured by Jakks following the aforementioned conversation.* The plan devised and implemented *by Jakks and its three highest executives utilized monies laundered through foreign corporations controlled by Jakks and bank accounts of those foreign corporations in Hong Kong.* An essential part of the scheme was that the monies paid as commercial bribes were *not recorded anywhere on the financial books and records of Jakks* situated in America at the headquarters of the parent corporation.

On or about February 10, 1997, WWE and Jakks entered into an international toy license having a term which was to end on December 31, 1999. *At no time prior to entering into the license did SSAI, Shenker or Jakks disclose that Shenker had performed services for Jakks.* Likewise none of the aforementioned parties disclosed to WWE the conversation about Shenker serving as Jakks' agent on WWE matters.

*       *       *

*In order to place Jakks in control of the videogame license,* and with the intent to cause SSAI and Bell to breach their fiduciary duties, Defendants *Friedman and/or Berman and/or Bennett devised and implemented a corrupt scheme to foreclose competition for the videogame license and to obtain it by the commercial bribery of Shenker and Bell.* Pursuant to the scheme, Jakks agreed to pay monies to Shenker's alter ego – Stanfull – by *a series of payments to Stanfull's foreign bank account with the understanding that Shenker would then serve as a conduit for the payment of bribes directly to Bell.*

*       *       *

*On or about January 14, 1998,* acting upon the direction of Defendant Bennett, *$40,000 was, in fact, paid to Stanfull via a series of transactions undertaken with the intent to conceal the transactions and bury them in fraudulent accounting of* foreign corporations owned by Jakks and bank accounts of those foreign subsidiaries.

*On January 14, 1998, $40,000 was withdrawn from an account at the Hang Seng Bank in Hong Kong of Road Champs, Ltd.* ("Road Champs"), a foreign subsidiary owned and/or controlled by Jakks. The $40,000 was deposited that same day into Stanfull's bank account at the Hang Seng Bank.

*On January 14, 1998,* the same day as the Jakks' monies were deposited into Stanfull's account, *Shenker, acting in concert with Jakks to conceal the disposition of the monies, and with the intent of inducing Bell to violate his fiduciary duties, obtained a demand draft for $20,000 payable to James Bell from the Hang Seng Bank,* which he subsequently gave to Bell upon returning to the United States, thereby splitting the money equally with Bell.

- 34 -

*       *       *

*On March 31, 1998, the day after Bell had initialed the deal memo recommending that the videogame license be awarded to Jakks, Defendant Bennett again directed Will Hons to use Jakks' foreign subsidiaries to pay another $40,000 to Stanfull.* Bennett advised Hons on the day after Bell had recommended to WWE management that it grant the videogame license to Jakks that it was "imperative" that the funds be available to Stanfull not later than April 2, 1998.

*       *       *

Having obtained WWE's agreement to grant the videogame license to Jakks *via* the aforementioned scheme, and in order to get a cut of the anticipated revenues from the anticipated revenues associated with the videogame license, *Jakks then solicited THQ to become a Joint Venture partner instead of submitting an independent proposal on behalf of THQ. THQ agreed to become a Joint Venture partner* with Jakks on the videogame license instead of making its own formal and independent proposal, *and agreed to pay Jakks monies which otherwise would have, and should have, been promised to WWE in an independent proposal.* THQ did so as consideration for Jakks' role in securing the license. *For all intents and purposes, Jakks and THQ both knew that the videogame license would be performed by THQ as Jakks had no ability to perform a videogame license.* [Emphasis added.]

92.    In response to the WWE Action, JAKKS published a press release on October 19, 2004, at 9:51pm, stating, in relevant part, the following:

JAKKS Pacific, Inc. announced that a civil lawsuit was filed in the United States District Court for the Southern District of New York yesterday afternoon by World Wrestling Entertainment, Inc. ("WWE") concerning the video game license between WWE and the joint venture company operated by the Company and THQ, Inc. and the toy license between the Company and WWE. The Company denies any allegations of wrongdoing and believes that it will be completely vindicated in the litigation, and looks forward to having the claims against it dismissed. The Company will continue to devote its full energies and resources to bringing its outstanding products to market during the busy holiday season and beyond.

93.    The following trading day, October 20, 2004, the price of JAKKS stock fell an additional $5.85 per share, or 31% from its regular session closing price on October 19, 2004, to close at $12.96. The Daily News of Los Angeles reported at least one analysts' reaction who stated, *"If this gets carried through and it gets into a nasty court fight, it could hurt their relationship with other licenses. You'd think, if they really did this to WWE, why would I want to do business*

- 35 -

*with them*?" In addition, investors were also concerned by reports that WWE was seeking to make the JAKKS license "void and unenforceable" due to commercial bribery as well as indications that WWE is asking for treble and punitive damages.

94.    As a result of the foregoing, that day, analysts at Whitaker Securities downgraded the Company to "SELL" from "BUY." Likewise, Southwest Securities lowered its rating to "NEUTRAL" from "STRONG BUY." Monarch Research also adopted a "SELL" rating on shares of the Company.

95.    As a prologue to these events, on February 12, 2005, the Ventura County Star (California) reported that James Bell had pleaded guilty to taking kickbacks in connection with WWE's licensing deal with JAKKS. According to this report, Bell pleaded guilty to mail fraud in U.S. District Court in Bridgeport, Connecticut. According to a statement by the state attorney general, Bell will face a maximum sentence of five years and a fine of $3.8 million for defrauding WWE.

## UNDISCLOSED ADVERSE INFORMATION

96.    The market for JAKKS' securities was open, well-developed and efficient at all relevant times. As a result of these materially false and misleading statements and failures to disclose, JAKKS' common stock traded at artificially inflated prices during the Class Period. The artificial inflation continued until at least October 19, 2004. Plaintiff and other members of the Class purchased or otherwise acquired JAKKS securities relying upon the integrity of the market price of JAKKS' securities and market information relating to JAKKS, and have been damaged thereby.

97.    During the Class Period, defendants materially misled the investing public, thereby inflating the price of JAKKS' securities, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make defendants' statements, as set forth herein, not false and misleading. Said statements and omissions were materially false and misleading in that

- 36 -

they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations.

98.    At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by plaintiff and other members of the Class. As described herein, during the Class Period, defendants made or caused to be made a series of materially false or misleading statements about JAKKS' business, prospects and operations. These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of JAKKS and its business, prospects and operations, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times. Defendants' materially false and misleading statements during the Class Period resulted in plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein.

## LOSS CAUSATION/ECONOMIC LOSS

99.    During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated JAKKS' stock price and operated as a fraud or deceit on Plaintiffs and Class Period purchasers of JAKKS securities by failing to disclose that the Company had obtained the WWE licenses through commercial bribery, that the Company's relationship with the WWE was being negatively impacted by the WWE's contention that the licenses it had granted the Company were improperly obtained and that the Company was subject to the heightened risk that the WWE would seek some modification to the WWE licensing agreements as complete nullification of those agreements.    When Defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the price of JAKKS securities fell precipitously as the prior artificial inflation came out of JAKKS'

- 37 -

stock price. As a result of their purchases of JAKKS stock during the Class Period, Plaintiffs and the other Class members suffered economic loss, *i.e.*, damages under the federal securities laws.

100.    By improperly concealing the problems with the WWE licenses, Defendants presented a misleading picture of JAKKS' business and prospects. Thus, instead of truthfully disclosing during the Class Period the true risks that JAKKS was exposed to, Defendants caused JAKKS to conceal the problems with the WWE licenses.

101.    Defendants' false and misleading statements had the intended effect and caused JAKKS securities to trade at artificially inflated levels throughout the Class Period.

102.    As a direct result of Defendants' admissions and the public revelations regarding the problems with the WWE licenses, JAKKS stock price plummeted approximately 46%, falling from $24.15 per share to $12.96 per share. This drop removed the inflation from JAKKS stock price, causing real economic loss to investors who had purchased the Company's securities during the Class Period.

103.    The approximate 46% decline in JAKKS stock price at the end of the Class Period was a direct result of the nature and extent of Defendants' fraud finally being revealed to investors and the market. The timing and magnitude of JAKKS stock price declines negate any inference that the loss suffered by Plaintiffs and the other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to the defendants' fraudulent conduct. The economic loss, *i.e.*, damages, suffered by Plaintiffs and the other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate JAKKS stock price and the subsequent significant decline in the value of JAKKS stock when Defendants' prior misrepresentations and other fraudulent conduct was revealed.

## ADDITIONAL SCIENTER ALLEGATIONS

104.    As alleged herein, Defendants acted with scienter in that defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, defendants, by virtue of their receipt of information reflecting the true facts regarding JAKKS, their control over, and/or receipt and/or modification of JAKKS' allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning JAKKS, participated in the fraudulent scheme alleged herein.

105.    In addition, defendants were motivated to engage in the fraudulent scheme in order for Company insiders, including the Individual Defendants, to sell hundreds of thousands of their personally-held JAKKS securities and reap millions of dollars in proceeds, as follows:

| Insider | Date of Sales | # of Shares Sold | Price ($) | Value of Sales ($) |
|---|---|---|---|---|
| Jack Friedman (Chairman and Chief Executive Officer) | 12/08/1999 | 355,635 | 23.62 | 8,400,098.70 |
| | 06/29/2001 | 135,000 | 18.81 | 2,538,675.00 |
| | 10/22/2001 | 57,800 | 19.20 | 1,109,760.00 |
| | 10/23/2001 | 86,700 | 18.06 | 1,565,802.00 |
| | 10/24/2001 | 25,500 | 18.00 | 459,000.00 |
| | 05/29/2002 | 150,078 | 17.75 | 2,663,884.50 |
| | 05/29/2002 | 149,922 | 17.75 | 2,661,115.50 |
| Total Friedman: | | 960,635 | | 19,398,335.70 |
| Stephen G. Berman (President, Chief Operating Officer, | 12/08/1999 | 133,254 | 23.62 | 3,147,459.48 |

| Insider | Date of Sales | # of Shares Sold | Price ($) | Value of Sales ($) |
|---|---|---|---|---|
| and Secretary) | 06/29/2001 | 63,260 | 18.80 | 1,189,288.00 |
|  | 06/29/2001 | 1,740 | 18.80 | 32,712.00 |
|  | 10/22/2001 | 27,200 | 19.20 | 522,240.00 |
|  | 10/23/2001 | 40,800 | 18.06 | 736,848.00 |
|  | 10/24/2001 | 12,000 | 18.00 | 216,000.00 |
|  | 05/29/2002 | 42,514 | 17.75 | 754,623.50 |
|  | 05/29/2002 | 44,986 | 17.75 | 798,501.50 |
|  | 05/29/2002 | 62,500 | 17.75 | 1,109,375.00 |
| **Total Berman:** |  | **428,254** |  | **8,507,047.48** |
| Joel M. Bennett (Chief Financial Officer and an Executive Vice President) | 07/27/2001 | 20,000 | 19.93 | 398,600.00 |
|  | 07/27/2001 | 7,710 | 19.93 | 153,660.30 |
|  | 07/27/2001 | 39 | 19.93 | 777.27 |
|  | 07/27/2001 | 1 | 19.93 | 19.93 |
|  | 08/03/2001 | 5,148 | 20.60 | 106,048.80 |
|  | 08/03/2001 | 5,148 | 20.60 | 106,048.80 |
|  | 08/03/2001 | 3,523 | 20.60 | 72,573.80 |
|  | 08/03/2001 | 1,328 | 20.60 | 27,356.80 |
|  | 08/03/2001 | 1,328 | 20.60 | 27,356.80 |
|  | 08/20/2001 | 5,770 | 20.63 | 119,035.10 |
|  | 08/20/2001 | 5,770 | 20.63 | 119,035.10 |
|  | 08/20/2001 | 530 | 20.63 | 10,933.90 |
|  | 08/20/2001 | 530 | 20.63 | 10,933.90 |
|  | 02/27/2002 | 3,855 | 19.33 | 74,517.15 |
|  | 02/27/2002 | 1,329 | 19.33 | 25,689.57 |
|  | 08/10/2004 | 1,000 | 19.50 | 19,500.00 |
|  | 08/11/2004 | 29,510 | 19.25 | 568,067.50 |
|  | 08/13/2004 | 4,680 | 19.50 | 91,260.00 |
| **Total Bennett:** |  | **97,199** |  | **1,931,414.72** |
| Michael Bianco (Executive Vice President) | 08/07/2001 | 4,059 | 20.55 | 83,412.45 |
|  | 08/07/2001 | 1,466 | 20.55 | 30,126.30 |
|  | 08/08/2001 | 5,687 | 20.70 | 117,720.90 |
|  | 08/08/2001 | 1,544 | 20.70 | 31,960.80 |
|  | 08/10/2001 | 4,600 | 21.55 | 99,130.00 |
|  | 08/16/2001 | 1,000 | 21.00 | 21,000.00 |
|  | 11/06/2001 | 7,500 | 19.51 | 146,325.00 |

| Insider | Date of Sales | # of Shares Sold | Price ($) | Value of Sales ($) |
|---|---|---|---|---|
| | 11/06/2001 | 100 | 19.52 | 1,952.00 |
| | 11/07/2001 | 16,500 | 20.00 | 330,000.00 |
| | 11/07/2001 | 12,150 | 19.75 | 239,962.50 |
| | 11/07/2001 | 7,800 | 19.77 | 154,206.00 |
| | 11/07/2001 | 6,850 | 20.90 | 143,165.00 |
| | 11/07/2001 | 2,500 | 20.02 | 50,050.00 |
| | 11/07/2001 | 2,300 | 20.91 | 48,093.00 |
| | 11/07/2001 | 1,850 | 19.76 | 36,556.00 |
| | 11/07/2001 | 900 | 20.01 | 18,009.00 |
| | 11/07/2001 | 600 | 20.94 | 12,564.00 |
| | 11/07/2001 | 100 | 19.78 | 1,978.00 |
| | 11/07/2001 | 100 | 19.79 | 1,979.00 |
| | 11/07/2001 | 100 | 20.05 | 2,005.00 |
| **Total Bianco:** | | **77,706** | | **1,570,194.95** |
| David C. Blatte (Director) | 03/08/2002 | 2,000 | 18.85 | 37,700.00 |
| | 03/12/2002 | 2,000 | 18.75 | 37,500.00 |
| | 03/14/2002 | 6,000 | 19.07 | 114,420.00 |
| | 03/14/2002 | 2,000 | 19.60 | 39,200.00 |
| | 03/15/2002 | 2,000 | 20.00 | 40,000.00 |
| | 03/15/2002 | 1,000 | 20.60 | 20,600.00 |
| **Total Blatte:** | | **15,000** | | **289,420.00** |
| Robert E. Glick (Director) | 12/08/1999 | 45,000 | 23.62 | 1,062,900.00 |
| | 07/26/2001 | 9,375 | 18.76 | 175,875.00 |
| | 07/26/2001 | 9,375 | 18.76 | 175,875.00 |
| | 07/26/2001 | 8,662 | 18.76 | 162,499.12 |
| | 05/29/2002 | 9,375 | 17.75 | 166,406.25 |
| | 05/29/2002 | 625 | 17.75 | 11,093.75 |
| **Total Glick:** | | **82,412** | | **1,754,649.12** |
| Michael G. Miller (Director) | 12/08/1999 | 45,000 | 23.62 | 1,062,900.00 |
| | 07/26/2001 | 9,375 | 18.77 | 175,922.81 |
| | 07/26/2001 | 9,375 | 18.77 | 175,922.81 |
| | 07/26/2001 | 7,537 | 18.77 | 141,432.56 |
| | 05/29/2002 | 9,302 | 17.75 | 165,110.50 |
| | 05/29/2002 | 698 | 17.75 | 12,389.50 |
| **Total Miller:** | | **81,1287** | | **1,733,678.18** |
| Michael L. Skala (Director) | 12/08/1999 | 60,000 | 23.62 | 1,417,200.00 |
| | 07/23/2001 | 9,375 | 18.00 | 168,783.75 |
| | 07/23/2001 | 9,375 | 18.00 | 168,783.75 |

- 41 -

| Insider | Date of Sales | # of Shares Sold | Price ($) | Value of Sales ($) |
|---------|---------------|------------------|-----------|---------------------|
| | 07/23/2001 | 8,137 | 18.00 | 146,495.29 |
| | 07/23/2001 | 3,598 | 18.00 | 64,776.95 |
| | 05/29/2002 | 9,375 | 17.75 | 166,406.25 |
| | 05/29/2002 | 9,375 | 17.75 | 166,406.25 |
| | 05/29/2002 | 9,375 | 17.75 | 166,406.25 |
| | 05/29/2002 | 1,875 | 17.75 | 33,281.25 |
| **Total Skala:** | | **120,485** | | **2,498,539.74** |
| **Total Insiders:** | | **1,862,978** | | **$37,683,279.89** |

## COUNT I

### Violation of Section 10(b) of
### the Exchange Act and Rule 10b-5
### Promulgated Thereunder Against All Defendants

106.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

107.    During the Class Period, JAKKS and the Individual Defendants, and each of them, carried out a plan, scheme and course of conduct which was intended to aid, throughout the Class Period, did: (i) deceive the investing public, including plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of JAKKS' securities; (iii) allow Company Insiders, including defendants herein, to sell over $37.68 million of their privately held Company stock and to facilitate the offering of millions of more shares of JAKKS stock and almost $100 million of convertible debt during the Class Period, and (iv) cause Plaintiffs and other members of the Class to purchase JAKKS' securities at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

108.    Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not

- 42 -

misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for JAKKS' securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

109.    In addition to the duties of full disclosure imposed on defendants as a result of their making of affirmative statements and reports, or participation in the making of affirmative statements and reports to the investing public, defendants had a duty to promptly disseminate truthful information that would be material to investors in compliance with the integrated disclosure provisions of the SEC as embodied in SEC Regulation S-X (17 C.F.R. Sections 210.01 et seq.) and Regulation S-K (17 C.F.R. Sections 229.10 et seq.) and other SEC regulations, including accurate and truthful information with respect to the Company's operations, financial condition and earnings so that the market price of the Company's securities would be based on truthful, complete and accurate information.

110.    JAKKS and the Individual Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of JAKKS as specified herein.

111.    These defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of JAKKS' value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the

- 43 -

statements made about JAKKS and its business operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of JAKKS' securities during the Class Period.

112.    Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of his responsibilities and activities as a senior officer and/or director of the Company was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of and had access to other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

113.    The defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.    Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing JAKKS' operating condition and future business prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by defendants' overstatements and misstatements of the Company's business, operations and

earnings throughout the Class Period, defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

114.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of JAKKS' securities was artificially inflated during the Class Period.  In ignorance of the fact that market prices of JAKKS' publicly-traded securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by defendants, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was know to or recklessly disregarded by defendants but not disclosed in public statements by defendants during the Class Period, Plaintiffs and the other members of the Class acquired JAKKS securities during the Class Period at artificially high prices and were damaged thereby.

115.    At the time of said misrepresentations and omissions, Plaintiffs and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiffs and the other members of the Class and the marketplace known of the true financial condition and business prospects of JAKKS, which were not disclosed by defendants, Plaintiffs and other members of the Class would not have purchased or otherwise acquired their JAKKS securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

116.    By virtue of the foregoing, defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

117.   As a direct and proximate result of defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## COUNT II

### Violation of Section 20(A) of the Exchange Act Against the Individuals Defendants

118.   Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

119.   The Individual Defendants acted as controlling persons of JAKKS within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which plaintiff contends are false and misleading.  The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

120.   In particular, each of these defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

- 46 -

121.    As set forth above, JAKKS and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

A.    Determining that this action is a proper class action and appointing Plaintiffs as class representatives under Rule 23 of the Federal Rules of Civil Procedure;

B.    Awarding compensatory damages in favor of Plaintiffs and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.    Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

DATED: March 14, 2008                COUGHLIN STOIA GELLER
                                       RUDMAN & ROBBINS LLP
                                     SAMUEL H. RUDMAN
                                     DAVID A. ROSENFELD
                                     MARK S. REICH


                                     _____
                                     SAMUEL H. RUDMAN

- 47 -

58 South Service Road, Suite 200
Melville, NY 11747
Telephone: 631/367-7100
631/367-1173 (fax)

MILBERG WEISS LLP
KIRK E. CHAPMAN
MATTHEW A. KUPILLAS
TODD KAMMERMAN


_____
MATTHEW A. KUPILLAS

One Pennsylvania Plaza
New York, NY 10119-0165
Telephone: 212/594-5300
212/868-1229 (fax)

Lead Counsel for Lead Plaintiffs and the Class

- 48 -

## CERTIFICATE OF SERVICE

I, David A. Rosenfeld, hereby certify that on March 14, 2008, I caused a true and

correct copy of the attached:

Second Consolidated Amended Complaint For Violations Of The Federal
Securities Laws

to be served, via first class mail, on all counsel on the attached service list.

David A. Rosenfeld

JAKKS PACIFIC (LEAD)
Service List – 2/20/2008    (04-0446)
Page 1 of 1

**Counsel For Defendant(s)**

Murray L. Skala
Jonathan D. Honig
Feder, Kaszovitz, Isaacson, Weber, Skala, Bass
& Rhine LLP
750 Lexington Avenue
New York, NY 10022
   212/888-8200
   212/888-5968 (Fax)

Michael H. Gruenglas
Skadden, Arps, Slate, Meagher & Flom LLP
Four Times Square
New York, NY 10036
   212/735-3000
   212/735-2000 (Fax)

**Counsel For Plaintiff(s)**

Samuel H. Rudman
David A. Rosenfeld
Coughlin Stoia Geller Rudman & Robbins LLP
58 South Service Road, Suite 200
Melville, NY 11747
   631/367-7100
   631/367-1173 (Fax)

Kirk E. Chapman
Matthew A. Kupillas
Todd Kammerman
Milberg Weiss LLP
One Pennsylvania Plaza
New York, NY 10119
   212/594-5300
   212/868-1229 (Fax)

Exhibit B

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

—————————————————— x

In re JAKKS PACIFIC, INC.
SHAREHOLDERS CLASS ACTION
LITIGATION

—————————————————— x

:    Civil Action No. 04-CV-8807 (KMK)
:
:
:    CONSOLIDATED AMENDED
:    COMPLAINT FOR VIOLATIONS OF THE
:    FEDERAL SECURITIES LAWS
:
:
:

Plaintiffs have alleged the following based upon the investigation of plaintiffs' counsel, which included a review of United States Securities and Exchange Commission ("SEC") filings by JAKKS Pacific, Inc. ("JAKKS" or the "Company"), as well as regulatory filings and reports, securities analysts' reports and advisories about the Company, press releases, and media reports about the Company, a review of the Complaint filed in the case captioned *World Wrestling Entertainment v. JAKKS Pacific, Inc. et al.*, 04cv8223 (S.D.N.Y.) and plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This consolidated class action is filed on behalf of all persons and entities who purchased or otherwise acquired the securities of JAKKS between December 3, 1999, and October 19, 2004, inclusive, and who were damaged thereby, seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2.      Defendant JAKKS designs, develops, produces and markets toys and related products. The Company focuses its business on acquiring or licensing well-recognized trademarks and brand names, such as Nickelodeon, Rugrats, Dora the Explorer, Blue's Clues, SpongeBob Squarepants, Mickey Mouse, Winnie the Pooh, Kim Possible, Finding Nemo and Hello Kitty. JAKKS also develops proprietary brands and marks.

3.      JAKKS also licensed certain intellectual property from World Wrestling Entertainment, Inc. ("WWE"). WWE is an integrated media and entertainment company engaged in the development, production and marketing of television and live events, and the licensing and sale of products featuring its WWE brands.

4.      On or about October 24, 1995, JAKKS and WWE entered into a license agreement whereby JAKKS had the right to manufacture and market WWE toys in the United States. Later,

- 1 -

however, in an effort to expand its lucrative WWE licenses, JAKKS bribed a senior WWE executive, James Bell ("Bell"), who was responsible for negotiating and managing license agreements, and WWE's licensing agent, Stanely Shenker & Associates, Inc. ("SSAI"), among others. In exchange for the bribes from JAKKS, laundered through foreign corporations, Bell and SSAI agreed to assist JAKKS in securing a WWE videogame license and favorable amendments to the toy license.

5.      The scheme worked and, on or about February 10, 1997, WWE, at the recommendation of SSAI and Bell, entered into an international toy license agreement with JAKKS. Then, in June 1998, SSAI and Bell convinced WWE management to enter into a video game license agreement with THQ & JAKKS Pacific LLC ("THQ/JAKKS"), a joint venture formed by JAKKS and video game maker THQ Inc. The ten year video game license expires December 31, 2009, with an additional five year renewal option in favor of THQ/JAKKS. In June 1998, SSAI and Bell also directed WWE to extend the term of the JAKKS' domestic and international toy licenses to make them conterminous with the long-term video game license.

6.      The WWE videogame license and toy licenses were extremely lucrative for JAKKS. Throughout the Class Period, JAKKS publicly reported quarter after quarter of positive results which it attributed, in material part, to its WWE product line. At all relevant times, however, defendants failed to disclose that in order to get the licenses, they had bribed SSAI and Bell, among others.

7.      The truth began to emerge on October 19, 2004. On that day, before the market opened, JAKKS issued a press release announcing its third-quarter 2004 financial results. At that time, JAKKS stunned investors when it revealed that the Company was "engaged in discussions with WWE over the validity of its toy and video games license." This press release stated, in relevant part, the following:

*The Company also announced that it is engaged in discussions with WWE concerning the restructuring of its toy license and with WWE and THQ with respect to the restructuring of the JAKKS THQ Joint Venture video games license agreement with WWE.* The discussions are an outgrowth of certain litigation that has been pending between WWE and a former licensing consultant to WWE and a former employee of WWE, to which the Company is not a party. *WWE has raised questions about the validity of the licenses as a result of certain transactions between the Company and that licensing consultant that occurred more than six years ago. The Company has denied any wrongdoing in connection with the transactions with the licensing consultant and maintains that they were unrelated to either the toy or video game license.* If the discussions are satisfactorily concluded, the restructuring of the licenses may have an impact on the Company's future revenues and net income to an extent that is presently unknown. *If the discussions with WWE and THQ are not satisfactorily concluded, the Company anticipates that litigation is likely to be commenced by WWE challenging the validity of the licenses and seeking compensatory and punitive damages, in which event the Company intends to vigorously defend itself against claims which it believes are without merit.* [Emphasis added.]

8.      In reaction to this news, the price of JAKKS common stock declined precipitously, falling $5.34 per share, or 22%, from its previous day's closing price of $24.15, to close at $18.81.

9.      Later that same day, also on October 19, 2004, news reports indicated that the WWE had filed a complaint against JAKKS and the Individual Defendants, among others ("WWE Action"), alleging that they had perpetrated a massive bribery scheme involving lucrative licensing deals, in violation of the Racketeer Influenced and Corrupt Organization Act ("RICO") and anti-bribery laws. On the following trading day, October 20, 2004, the price of JAKKS stock again dropped in reaction to this news: falling $5.85 per share, or 31 % from its closing price on October 19, 2004, to close at $12.96 per share. In total, the price of JAKKS common stock declined from $24.15 per share to $12.96 per share in reaction to the news of the problems with the WWE and the WWE licenses.

## JURISDICTION AND VENUE

10.      The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act [15 U.S.C. §§78j(b) and 78t(a)], and Rule 10-5 promulgated thereunder by the SEC

[17 C.F.R. §240.10b-51].

11.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331 and 1337 and Section 27 of the Exchange Act [15 U.S.C. §78aa].

12.    Venue is proper in this District pursuant to Section 27 of the Exchange Act, and 28 U.S.C. §1391(b).  Many of the acts charged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District.

13.    In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the NASDAQ National Market.

## PARTIES

14.    Lead Plaintiffs Indiana Electrical Workers Pension Trust Fund IBEW, Kenneth J. Tucker, Tonia R. Tucker-Kraus and Michael Kraus purchased JAKKS common stock during the Class Period, as set forth in their respective certifications, filed previously with this Court which are incorporated herein by reference, and were damaged thereby.

15.    Defendant JAKKS is a Delaware corporation which maintains its corporate headquarters at 22619 Pacific Coast Highway, Malibu, CA 90265.

16.    Defendant Jack Friedman ("Friedman") was, at all relevant times, Chairman and Chief Executive Officer of the Company.  Prior to co-founding JAKKS, defendant Friedman was CEO and a director of THQ, Inc.

17.    Defendant Steven G. Berman ("Berman") was, at all relevant times, President, Chief Operating Officer, and Secretary of the Company.  Prior to co-founding JAKKS, defendant Berman was Vice President and Managing Director of THQ International, a subsidiary of THQ, Inc.

- 4 -

18.     Defendant Joel M. Bennett ("Bennett") was, at all relevant times, Chief Financial Officer and an Executive Vice President of the Company.

19.     Defendants Friedman, Berman, and Bennett are collectively referred to herein as the "Individual Defendants."

20.     Because of the Individual Defendants' positions with the Company, they had access to the adverse undisclosed information about its business, operations, products, operational trends, financial statements, markets and present and future business prospects, access to internal corporate documents (including the Company's operating plans, budgets and forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof and via reports and other information provided to them in connection therewith.

21.     It is appropriate to treat the Individual Defendants as a group for pleading purposes and to presume that the false, misleading and incomplete information conveyed in the Company's public filings, press releases and other publications as alleged herein are the collective actions of the narrowly defined group of defendants identified above. Each of the above officers of JAKKS, by virtue of their high-level positions with the Company, directly participated in the management of the Company, was directly involved in the day-to-day operations of the Company at the highest levels and was privy to confidential proprietary information concerning the Company and its business, operations, products, growth, financial statements, and financial condition, as alleged herein. Said defendants were involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein, were aware or recklessly disregarded, that the false and misleading statements were being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.

22.    As officers and controlling persons of a publicly-held company whose common stock

was, and is, registered with the SEC pursuant to the Exchange Act, traded on the NASDAQ National

Market during the Class Period, and governed by the provisions of the federal securities laws, the

Individual Defendants each had a duty to disseminate promptly, accurate and truthful information

with respect to the Company's financial condition and performance, growth, operations, financial

statements, business, products, markets, management, earnings and present and future business

prospects, and to correct any previously-issued statements that had become materially misleading or

untrue, so that the market price of the Company's publicly-traded securities would be based upon

truthful and accurate information. The Individual Defendants' misrepresentations and omissions

during the Class Period violated these specific requirements and obligations.

23.    The Individual Defendants participated in the drafting, preparation, and/or approval

of the various public reports and other communications complained of herein and were aware of, or

recklessly disregarded, the misstatements contained therein and omissions therefrom, and were

aware of their materially false and misleading nature. Because of their Board membership and/or

executive and managerial positions with JAKKS, each of the Individual Defendants had access to the

adverse undisclosed information about JAKKS' business prospects and financial condition and

performance as particularized herein and knew (or recklessly disregarded) that these adverse facts

rendered the positive representations made by or about JAKKS and its business issued or adopted by

the Company materially false and misleading.

24.    The Individual Defendants, because of their positions of control and authority as

officers and/or directors of the Company, were able to and did control the content of the various SEC

filings, press releases and other public statements pertaining to the Company during the Class

Period. Each Individual Defendant was provided with copies of the documents alleged herein to be

misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected. Accordingly, each of the Individual Defendants is responsible for the accuracy of the public reports and press releases detailed herein and is therefore primarily liable for the representations contained therein.

25.    Each of the defendants is liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of JAKKS common stock by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme: (i) deceived the investing public regarding JAKKS business, finances, financial statements and the intrinsic value of JAKKS common stock; and (ii) caused plaintiffs and other members of the Class to purchase JAKKS securities at artificially inflated prices.

## CLASS ACTION ALLEGATIONS

26.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired the securities of JAKKS between December 3, 1999 and October 19, 2004, inclusive, and who were damaged thereby. Excluded from the Class are defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

27.    The members of the Class are so numerous that joinder of all members is impracticable. As of November 9, 2004, there were approximately 26.2 million shares of JAKKS common stock outstanding that were actively traded on the NASDAQ. While the exact number of Class members is unknown to plaintiffs at this time and can only be ascertained through appropriate discovery, plaintiffs believe that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by

JAKKS or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

28.    Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

29.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

30.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)    whether the federal securities laws were violated by defendants' acts as alleged herein;

(b)    whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business, operations and financial statements of JAKKS; and

(c)    to what extent the members of the Class have sustained damages and the proper measure of damages.

31.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

- 8 -

## SUBSTANTIVE ALLEGATIONS

### Background

32.    JAKKS was formed as a Delaware corporation in January 1995 and began operations as of April 1, 1995. Since its inception, the Company has operated as a multi-line, multi-brand toy company that designs, develops, produces and markets toys and related products. At the start of the Class Period, the Company's principal products were: (i) action figures and accessories featuring licensed characters, principally from WWE; (ii) Flying Colors molded plastic activity sets, clay compound playsets and lunch boxes; (iii) Wheels division products, including Road Champs die-cast collectible and toy vehicles and Remco toy vehicles and role-play toys and accessories; (iv) Child Guidance infant and pre-school electronic toys, toy foam puzzle mats and blocks, activity sets and outdoor products; and (v) fashion and mini dolls and related accessories.

33.    WWE is an integrated media and entertainment company, engaged in the development, production, and marketing of television and pay-per-view programming, and live events; and the licensing and sale of branded consumer products. WWE has a worldwide licensing program using its WWE marks and logos, copyrighted works, and characters on a variety of retail products, including toys, video games, apparel, and books. Its direct merchandise operations consist of the design, sourcing, marketing, and distribution of various WWE-branded products, such as T-shirts, caps, and other novelty items, all of which feature its superstars and/or its logo. WWE also publishes two magazines, RAW and SmackDown! The company has offices in New York City, Los Angeles, Toronto, and London. WWE was founded by Vincent and Linda McMahon, and is headquartered in Stamford, Connecticut.

34.    On or about October 24, 1995, WWE and JAKKS entered into a domestic toy license, the term of which was to end on December 31, 2007, with a one-year right to renew if JAKKS achieved certain requirements. In obtaining this license, the JAKKS toy license proposal was

- 9 -

presented to WWE through its licensing agent, Stanley Shenker and/or Stanley Shenker & Associates Inc. ("SSAI"). Previously, in or about April 1995, WWE had retained Shenker and SSAI as the Company's non-exclusive licensing agent.

35.     Unbeknownst to WWE and investors, however, after such time as the original JAKKS/WWE toy license was negotiated, defendants entered into an undisclosed agency agreement with Shenker and/or SSAI. Defendants' failure to disclose the relationship with Shenker and/or entities he controlled was material at that time, because Shenker already had an agency relationship with WWE. The simultaneous representation of WWE by Shenker and/or SSAI, and of JAKKS by Shenker and/or SSAI, constituted a clear conflict of interest.

36.     Moreover, having previously acted as the non-exclusive agent who negotiated the WWE/JAKKS domestic toy license, Friedman and Berman were well aware of Shenker's agency relationship with WWE at the time he was hired by the Company to act as JAKKS agent related to WWE products, at the 1996 New York Toy Fair. Moreover, as early as 1996, Friedman and Berman had received a legal opinion from Murray Skala, JAKKS outside legal counsel and a member of the Board of the Company, that the Company's retention of Shenker and/or SSAI to represent it in negotiating with WWE resulted in a material conflict of interest. According to Skala, at that time, an arrangement between Shenker, SSAI and JAKKS would *not* be legal absent WWE's informed consent.

37.     Unaware of the undisclosed relationship between Shenker, SSAI and JAKKS, however, on or about February 10, 1997, WWE and JAKKS entered into an international toy license having a term which was to end December 31, 1999. At that time, no disclosure was made regarding Shenker's representation of JAKKS. Additionally, on March 7, 1997, WWE expanded its

- 10 -

relationship with Shenker and SSAI, and entered into an Agency Agreement with SSAI, whereby SSAI became the *exclusive* outside licensing agent for WWE.

38.    Under the Agency Agreement, SSAI was responsible for procuring potential licenses and presenting all license proposals to WWE. The procedure for presenting such license proposals was for SSAI to present a deal memo to James Bell, Senior Vice President of Licensing and Merchandising for WWE. Bell, a long-time friend and business associate of Shenker, was responsible for reviewing the licensing proposals, and advising WWE senior management whether to accept or reject the proposed licensing offers.

39.    Pursuant to the SSAI Agency Agreement, however, SSAI was not entitled to any commissions for licenses independently procured by Bell and/or WWE. In addition, SSAI was also *not* entitled to commissions for licenses between WWE and third parties that pre-existed the formation of the SSAI Agency Agreement. Accordingly, SSAI was *not* entitled to any commissions relating to WWE's preexisting video game license with Acclaim Entertainment, Inc. ("Acclaim") which was, at that time, the exclusive licensee for the manufacture and sale of video games using WWE intellectual property. In the event that the Acclaim video game license was renewed, SSAI and Shenker would also *not* receive any commission on the preexisting license renewal.

40.    Thus, in order for Shenker to gain commissions on WWE video games, and in order for JAKKS to take this license from Acclaim, in or around 1998, Friedman, Berman and Shenker implemented a scheme and illegal course of conduct whereby defendants arranged to pay bribes and kickbacks to Shenker, which Shenker agreed to split with Bell, in exchange for their assistance in helping JAKKS procure the WWE video game licenses. These illegal payments ultimately allowed JAKKS to gain the license to WWE's valuable video game franchise, as well as to make valuable amendments to, and expand the scope of, the Company's toy licenses.

- 11 -

41.    In order to perpetrate this scheme and illegal course of conduct, the illegal bribes and kickback payments were not recorded anywhere on the financial reports or records of JAKKS. Rather, to accomplish this bribery scheme, defendants "laundered" a series of clandestine payments through foreign corporations controlled by JAKKS and by Shenker and/or entities subject to his control, located primarily in Hong Kong, including an entity called Stanfull Industrial, Ltd. ("Stanfull").

42.    In early 1998, as negotiations were ongoing concerning WWE's video game license, at the direction of defendants Friedman and/or Berman, Shenker caused to be delivered to JAKKS, a handwritten $80,000 invoice from Stanfull. This invoice, dated January 2, 1998, stated that this request for payment related to the development of "Possible Latex Based Soft Toys With Special Coating." This invoice also directed that such payment be made to a Stanfull account at the Hang Seng Bank in Hong Kong. At that time, no contract existed between JAKKS and Stanfull or any other Shenker entity to develop any "Soft Toys," and no such toys were ever developed by JAKKS for Shenker or Stanfull.

43.    Regardless of the fact that invoices submitted to the Company needed the signature of JAKKS CFO, defendant Bennett, the $80,000 Soft Toy invoice was paid without any signature. Rather, at the direction of defendants Berman and Friedman, this invoice was sent by defendant Bennett to JAKKS foreign agent in Hong Kong, with the instruction that $40,000 immediately be transferred to Stanfull, which payment was made on or about January 14, 1998. Apparently, the $40,000 payment was withdrawn from an account at the Hang Seng Bank in Hong Kong, of Road Champs, Ltd., a foreign subsidiary owned and controlled by JAKKS. The same day, Shenker obtained a demand draft for $20,000 from the Hang Seng Bank, payable to James Bell, representing his equal split of the illegal bribe and kickback paid to Shenker and Stanfull.

- 12 -

44.    At or about the time that Road Champs paid the $40,000 to Stanfull, another foreign subsidiary of the Company, JAKKS Pacific, H.K., sent $40,000 via wire transfer to Road Champs to reimburse it for making the prior illegal kickback payment. Road Champs did not record the payment to Stanfull, and recorded the $40,000 debit and credit as inter-company transfers. In connection with these payments, the general ledgers of Road Champs were falsified to conceal the payment to Stanfull. In addition, JAKKS did not record the invoice, nor any ensuing steps it took to pay the invoice, and this payment was not recorded anywhere on the financial reports or records of JAKKS.

45.    After receiving his split of the $40,000 bribe, Bell used his influence with WWE to cause it *not* to renew the Acclaim video game license. Thus, before Acclaim could even submit its proposal, on or about March 30, 1998, Bell initialed a deal memo recommending to senior management of WWE that this valuable license be awarded to "JAKKS Pacific-Electronic Game Division," and identifying SSAI as the agent that had negotiated and procured the deal. At that time, JAKKS did not maintain an "Electronic Game Division" and the Company had no ability to create or manufacture video games.

46.    On March 31, 1998, the day immediately after Bell had initialed the deal memo recommending the WWE video game license be awarded to JAKKS, defendant Bennett again directed JAKKS Hong Kong subsidiary to pay another $40,000 to Stanfull. On or about April 2, 1998, JAKKS Pacific, H.K. wire transferred $40,000 to the Stanfull account at the Hang Seng Bank in Hong Kong. That money was eventually split evenly with Bell. This payment was also not recorded anywhere on the financial reports or records of JAKKS.

47.    On or about April 8, 1998, WWE management approved the deal memo submitted by Bell and SSAI, favoring grant of the WWE video game license to JAKKS. Following this time, both

THQ and Activision sent SSAI and/or Bell licensing proposals which were both superior to the JAKKS proposal. These proposals were not provided to WWE management but, rather, were shared with defendants Friedman and/or Berman.

48.    Following this time, JAKKS was able to convince THQ, a company at which both Friedman and Berman previously held senior management positions, to become its partner in the video game business. Since JAKKS had no ability to manufacture or develop video games, the partnership was nothing more than a tax on a deal which may otherwise have gone solely to THQ. Regardless of the fact that JAKKS had no Electronic Games Division, SSAI, Shenker and Bell recommended to WWE management that the video game license be awarded to JAKKS for an unprecedented 10 year term, with a five-year renewal right.

49.    Having been convinced that JAKKS would receive the WWE video game license, and rather than risk losing the opportunity to participate entirely in this valuable license opportunity, in June 1998, THQ formed a joint venture with JAKKS. The purpose of this joint venture was to develop, manufacture and market, under an exclusive license with World Wrestling Federation Entertainment ("WWF"), video games based on WWF characters and themes.

50.    Thereafter, on June 23, 1998, WWE executed a video game license agreement with JAKKS and THQ. By this time, Shenker had also promised Bell that SSAI would split equally *all* commissions or payments that SSAI would receive as a result of the JAKKS/WWE video game license. Also, at that time, SSAI, Shenker and Bell recommended to WWE that the JAKKS toy license be extended such that the terms of this license coincided with the terms of the video game license.

51.    The following day, June 24, 1998, the toy licenses granted to JAKKS by WWE were extended. By July 15, 1998, another fake invoice requesting payment of $20,000 was sent to the

- 14 -

attention of Berman at JAKKS, by Shenker. Clandestine payment was achieved in a manner similar to that as had been done previously, Bennett directed JAKKS' Hong Kong subsidiary, Road Champs, to make payment to Stanfull at the Hang Seng Bank. In addition, JAKKS did not record this invoice, nor any ensuing steps it took to pay this invoice, and this payment was not recorded anywhere on the financial reports or records of JAKKS.

52.     At no time prior to or during the Class Period did Defendants ever disclose that JAKKS had engaged in this scheme and illegal course of conduct in obtaining the WWE video games license or in extending or procuring the WWE toys licenses. When repeatedly questioned by WWE, throughout the Class Period, as to whether the Company had ever made payments to Shenker, SSAI and/or Bell or any entities controlled thereby, Defendants repeatedly lied to WWE. In fact, rather than disclose Defendants' scheme and illegal course of conduct, throughout the Class Period, Defendants repeatedly cited their success in obtaining the WWE licenses and used this purported success to justify multi-million dollar bonuses.

53.     By early 2004, if not earlier, Defendants were further aware that the WWE was contending that the WWE licenses had been obtained through a pattern of commercial bribery. Furthermore, Defendants knew or recklessly disregarded that the fact that the WWE was contending that the WWE licenses had been obtained through commercial bribery exposed the Company to the heightened risk that the WWE would seek some modification to the WWE licensing agreements or complete nullification of those agreements.

54.     As a result of Defendants' materially false and misleading statements and material omissions, throughout the Class Period, Defendants also caused the price of JAKKS shares to be artificially inflated. Defendants were then able to take advantage of the fraud that they had caused, by directing the Company to issue millions of shares of Company stock and almost $100 million in

- 15 -

debt convertible into shares of the Company. In connection with these offerings, Company Insiders, including certain defendants named herein were able to sell millions of dollars of their personally held JAKKS common stock to the public while in possession of material adverse non-public information about the Company. In addition, throughout the Class Period, Company insiders including certain of the defendants named herein, also routinely sold significant amounts of their privately held JAKKS common shares directly into the open market while in possession of material adverse non-public information about the Company. In total, during the Class Period, JAKKS insiders were able to reap over $37.68 million in illicit proceeds from the sale of their personally held JAKKS shares.

55.    It was only at the end of the Class Period, however, on or about October 19, 2004, that investors learned the truth about JAKKS. At that time, Defendants shocked investors after it was revealed that WWE had filed suit against the Company, seeking to rescind the WWE video game and toy licenses, and to recover damages, because such licenses were procured pursuant to a fraudulent scheme and illegal course of conduct which the WWE had since uncovered. These belated disclosures also had a sudden dramatic effect on the price of JAKKS shares, causing the stock to fall in price precipitously and resulting in significant damages to plaintiffs and the Class.

### Materially False and Misleading
### Statements Issued During the Class Period

56.    The Class Period begins on December 3, 1999, immediately following the November 1999 press release of the Company's first series of WWF video games. At that time, JAKKS filed a prospectus with the SEC on a Form 424B 1 ("Prospectus") in connection with a public offering of 3 million shares of common stock priced at $25.00 per share. In part, to convince investors to purchase these shares, Defendants highlighted the Company's strong product line of licensed and proprietary toys and products, including the WWE branded products, as follows:

- 16 -

We are a multi-line, multi-brand toy company that designs, develops, produces and markets licensed and proprietary toys and related products . . . . *We believe that our growth results from our well-known brand names, the breadth, quality and innovation of our product offerings and our strong relationships with retailers and suppliers.* Our net sales have increased from $41.9 million in 1997 to $85.3 million in 1998, representing a growth rate of 103.2%. Our net income has increased from $2.8 million in 1997 to $6.4 million in 1998, representing a growth rate of 128.8%. Our pro forma net sales and net income for the nine months ended September 30, 1999 were $158.0 million and $13.8 million, respectively, representing growth rates of 68.0% and 118.5% over the prior period. [Emphasis added.]

57.    The Prospectus also identified action figures and accessories featuring licensed characters, primarily from the WWF, among JAKKS "principal produce categories." In addition the Prospectus represented that one of the Company's "key strategies" was to "grow through the acquisition or licensing of product lines, concepts and characters." For investors, this "key strategy" was demonstrated by the November 1999 launch of WWF video games, following the Company's success in the sale of WWF action figures. In this regard, the Prospectus stated, in pertinent part, as follows:

> *[W]e have entered the video game market through our participation in a joint venture with THQ Inc.* The joint venture launched its line of World Wrestling Federation licensed video games in November 1999.

> \*       \*       \*

> Net sales increased $59.8 million, or 97.4%, to $121.2 million in 1999 from $61.4 million in 1998. *The significant growth in net sales [in the first three quarters of 1999] was due primarily to the continuing growth of the World Wrestling Federation action figure product line* with its expanded product offerings and frequent character releases . . . ." [Emphasis added.]

58.    As a result of the significance of the WWE video game and toy licenses to the future growth and prosperity of the Company, the Prospectus provided significant detail about JAKKS WWF video game development, its relationship with WWE and its agreement with THQ, stating, in pertinent part, as follows:

- 17 -

## WORLD WRESTLING FEDERATION VIDEO GAMES

In June 1998, we formed a joint venture with THQ, a developer, publisher and distributor of interactive entertainment software for the leading hardware game platforms in the home video game market. *The joint venture entered into a license agreement with World Wrestling Federation Entertainment under which it acquired the exclusive worldwide right to publish World Wrestling Federation video games on all hardware platforms.* The games will be designed, developed, manufactured and marketed by the joint venture. We are entitled to receive a guaranteed preferred return, based on sales of the video games, and THQ is entitled to receive the balance of the profits. The term of the license agreement expires on December 31, 2009, subject to a right of the joint venture to renew the license for an additional five years under various conditions.

*    *    *

Wrestling video games have demonstrated consistent popularity, with two wrestling-theme video games among the top 10 video games, in terms of unit sales volumes, in 1998. Approximately 2.3 million units of these two games were sold in 1998, at retail prices ranging from approximately $42 to $60 . . . . *We believe that as a franchise property, the World Wrestling Federation titles will have brand recognition and sustainable consumer appeal, which may allow the joint venture to use titles over an extended period of time through the release of sequels and extensions and to re-release such products at different price points in the future . . . .* [Emphasis added.]

59.    In connection with this Offering, certain "Selling Stockholders" liquidated hundreds of thousands of shares of their personally held JAKKS stock, as follows:

### PRINCIPAL AND SELLING STOCKHOLDERS

| Name | Number of Shares Offered | Estimated Gross Proceeds |
|------|---|---|
| Jack Friedman (*)............ | 289,683 | $  7,242,075.00 |
| Stephen G. Berman(*)....... | 115,873 | $  2,896,825.00 |
| Robert E. Glick................. | 45,000 | $  1,125,000.00 |
| Michael G. Miller.............. | 45,000 | $  1,124,000.00 |
| Murray L. Skala................. | 60,000 | $  1,500,000.00 |
| Total | 555,556 | $ 13,396,900.00 |

(*) If the underwriters' over-allotment option is exercised in full, Mr. Friedman will sell 355,635 shares and will beneficially own 757,230 shares (4.0% of the outstanding shares) after this offering and Mr. Berman will sell 133,254 shares and will beneficially own

62,516 shares (0.3% of the outstanding shares) after this offering.

60.    On December 8, 1999, following the exercise by the underwriters of their over-subscription allotment option, JAKKS announced that, in total, 2.811 million shares were sold by the Company, for gross proceeds of approximately $70 million, and 638,889 shares were sold by insiders, for gross proceeds of approximately $16 million. At that time, shares of the Company traded above $25.00 per share, trading as high as $27.00 per share on December 8, 1999.

61.    Following the completion of the Company's Offering, on January 20, 2000, Defendants also published a press release announcing the successful launch of its WWF licensed video games, in part, as follows:

> *"WWF WrestleMania 2000" for Nintendo 64 Exceeds 1 Million Units in Less Than Two Months At Retail; Holiday Sell-Out* Back on Store Shelves Nationwide This Week
>
> "WWF WrestleMania 2000" Game Boy Color is also enjoying tremendous sales success in the hand held arena . . . .
>
>                   *        *        *
>
> *"We're delighted with the ongoing success of our first joint-venture release and look forward to our second release, WWF(R) SmackDown!(tm)' for PlayStation, in early March,"* said Maureen Kassel, vice president of sales and marketing, Jakks Pacific. [Emphasis added.]

62.    On February 16, 2000, JAKKS issued a press release announcing its financial results for the fourth quarter and year-ended December 31, 1999. Defendant Friedman commented on the results stating, in pertinent part, as follows:

> *"We are delighted with the results of operations for our fourth quarter and year end. We expect to continue our excellent top line and bottom line growth,"* said Jack Friedman, chief executive officer of JAKKS Pacific Inc. "In 1999, JAKKS Pacific emerged as one of the leading and fastest growing toy companies in North America and *we remain committed to our growth strategy of developing and acquiring brands and product lines that will continue to strengthen our Company."*
>
> *"This marks our fourteenth consecutive quarter of record year-over-year financial results. Going into the year 2000, we believe that we are better positioned than*

*ever to continue our growth,*" said Stephen Berman, president and chief operating officer of JAKKS Pacific Inc. "*Our WWF product line, which was recently ranked the number one product in the overall action figure category, continues to be a stellar performer* as evidenced by its recently having been designated 'Boys' Toy of Year' by British Association of Toy Retailers and by *the huge success of our WWF WrestlemaniaQ 2000TM . . . which achieved sales in excess of one million units within two months of its November 18th launch*." [Emphasis added.]

63.    On March 1, 2000, JAKKS issued a press release announcing the launch of the "WWF SmackDown!" video game for the PlayStation game console. In the press release Company spokesperson, Maurine Kassal, as well as WWE Sr. V.P. of Licensing, James Bell, were also quoted, in pertinent part, as follows:

"*The momentum hasn't waned since the release of the first THQ/JAKKS Pacific joint venture hit, WWF WrestleMania 2000' for Nintendo 64,*" stated Maureen Kassal, senior vice president of sales and marketing, JAKKS Pacific. "*The World Wrestling Federation remains one of the hottest names in both the game and toy industries* and continues to provide exciting media content for all of our interactive and action figure releases."

"A major part of WWFE's overall corporate strategy includes building extensions of our most popular brands. WWF SmackDown!' has an extremely loyal following as well as tremendous brand recognition among our fans. *THQ and JAKKS have done an excellent job at capturing the feel of the show and implementing it into this video game. They truly understand our unique product,* and I believe that our fans will be excited with the end result," said Jim Bell, senior vice president of licensing and merchandising, WWFE. [Emphasis added.]

64.    On or about March 30, 2000, JAKKS filed its Annual Report on Form 10-K, with the SEC which was signed by defendants Friedman, Berman and Bennett, among others. In addition to reiterating the results announced in the February 16, 2000 press release, the Company's 2000 Form 10-K again described JAKKS video game licensing agreement with WWE and it joint venture with THQ, in part, as follows:

## WORLD WRESTLING FEDERATION VIDEO GAMES

In June 1998, we formed a joint venture with THQ, a developer, publisher and distributor of interactive entertainment software for the leading hardware game platforms in the home video game market. *The joint venture entered into a license agreement with World Wrestling Federation Entertainment under which it*

- 20 -

*acquired the exclusive worldwide right to publish World Wrestling Federation video games on all hardware platforms.* The games will be designed, developed, manufactured and marketed by the joint venture. We are entitled to receive a guaranteed preferred return, based on sales of the video games, and THQ is entitled to receive the balance of the profits. The term of the license agreement expires on December 31, 2009, subject to a right of the joint venture to renew the license for an additional five years under various conditions.

*    *    *

Wrestling video games have demonstrated consistent popularity, with two wrestling-theme video games among the top 10 video games, in terms of unit sales volumes, in 1998. Approximately 2.3 million units of these two games were sold in 1998, at retail prices ranging from approximately $42 to $60. We believe that the success of the World Wrestling Federation titles is dependent on the graphic look and feel of the software, the depth and variation of game play and the popularity of the World Wrestling Federation. *We believe that as a franchise property, the World Wrestling Federation titles will have brand recognition and sustainable consumer appeal, which may allow the joint venture to use titles over an extended period of time through the release of sequels and extensions and to re-release such products at different price points in the future.* Also, as new hardware platforms are introduced, software for these platforms requires new standards of design and technology to fully exploit these platforms' capabilities and requires that software developers devote substantial resources to product design and development. [Emphasis added.]

65.     On April 25, 2000, JAKKS issued a press release announcing its financial results for the first quarter ended March 31, 2000. According to the press release, JAKKS achieved another quarter of purported "Record" setting revenues and profits, driven in substantial part by the success of its WWF products. In pertinent part, the press release quoted Defendants, as follows:

"*This marks the fifteenth consecutive quarter in which we have reported record year-over-year financial results,*" said Jack Friedman, chairman and chief executive officer of JAKKS Pacific Inc. "Some of this incremental growth has come from the successful assimilation of our 1999 acquisitions, *while core products such as WWF wrestling products . . . continued their solid performances.* Our balance sheet – with over $96 million in cash and marketable securities, $118 million in working capital and only nominal long-term debt - remains exceptionally strong. *Our solid balance sheet and our history of successful acquisitions positions us well to take further advantage of acquisition opportunities and to continue to execute our growth strategy.*" [Emphasis added.]

66.     On May 10, 2000, JAKKS filed its quarterly report on Form 10-Q with the SEC, signed by defendant Bennett. The Company's 1Q:00 Form 10-Q represented that JAKKS "key

- 21 -

strategies" continued to depend upon licensing.    Because the credibility of JAKKS senior

management and the Company's representations about its financial and operational strength and

stability were of critical importance to JAKKS licensing partners as well as its investors, JAKKS

Form 10-Q also stated that the Company's public disclosures were true, accurate and correct, as

follows:

> Note 1 - Basis of presentation
>
> The accompanying 1999 and 2000 unaudited interim condensed *consolidated financial statements included herein have been prepared by the Company, without audit, pursuant to the rules and regulations of the Securities and Exchange Commission (the "SEC")*. Certain information and footnote disclosures normally included in financial statements prepared in accordance with generally accepted accounting principles have been condensed or omitted pursuant to such rules and regulations. However, *the Company believes that the disclosures are adequate to prevent the information presented from being misleading*. [Emphasis added.]

In addition to the foregoing, the Company's 1Q:00 Form 10-Q also described the THQ joint venture

and WWE license in a manner substantially similar or the same as was previously disclosed in the

Company's prior SEC filings, reproduced herein *supra*.

> 67.     On May 12, 2000, JAKKS issued a press release announcing the debut of the "WWF

SmackDown! 2 Know Your Role" video game for the PlayStation game console.    In this press

release Company spokesperson, Jennifer Richmond, as well as WWE Sr. V.P of Licensing, Jim

Byrne, were also quoted, in relevant part, as follows:

> *"From the success of the first THQ/JAKKS Pacific joint venture hit, WWF Wrestlemania 2000' for Nintendo 64, through this year's WWF SmackDown!,' the popularity just keeps intensifying,"* stated Jennifer Richmond, vice president of marketing, JAKKS Pacific Inc . . . .
>
> *"A major part of WWFE's overall corporate strategy includes building extensions of our most popular brands*. WWF SmackDown! 2 Know Your Role' will benefit from an extremely loyal following as well as tremendous brand recognition among WWF fans. *THQ and JAKKS have again done an outstanding job at capturing the spirit of the show* for PlayStation gamers. As with the original game, they have shown that *they truly understand the unique personality and subtleties of our*

- 22 -

*product* and I believe our fans will be very excited with the end result," said Jim Byrne, senior vice president of marketing, WWFE. [Emphasis added.]

68.    On or about May 22, 2000, JAKKS filed the Company's Proxy Statement in connection with the election of directors for 2000-2001 with the SEC. According to the Proxy, for 1999, defendant Friedman received a base salary of $521,000, a bonus of $1.75 million and 232,500 options, and defendant Berman received a base salary of $496,000, a bonus of $1.75 million and 394,500 options. According to the Proxy, such payments were justified because of the following:

> *We believe that our success to date has been to a significant extent attributable to the personal efforts of Mr. Friedman and Mr. Berman.* They founded the Company, established its business philosophy and operating structure and were the driving force behind our central theme of focusing our business on "evergreen" products. *Mr. Friedman's long-term relationship with Titan Sports was instrumental in our acquiring our successful World Wrestling Federation licenses.* In his nearly four-decade-long career in the toy industry, he has established an important network of relationships that we have been able to exploit in product acquisition, production and sales. Both Mr. Berman and Mr. Friedman embody our management philosophy with a "hands on" approach in all areas of our business. In addition to their general supervisory functions, *they are directly involved in license acquisition*, product design and development, production, and sales and marketing, as well as our financing and acquisition efforts. *Their efforts have resulted in our identifying and securing the World Wrestling Federation licenses and other desirable licenses and properties*, the rapid expansion of our product lines, our achieving significant production efficiencies and the development of a loyal and growing customer base. *In 1999, they guided us through two significant acquisitions, the implementation of our video game joint venture with THQ Inc. and two public offerings.*
>
> *Based on their contributions to our outstanding performance in 1999*, which witnessed a 116% increase in net sales, 245% increase in net income, 136% increase in earnings per share and 160% increase in the market price of our common stock, *the Board determined that it would be appropriate to award Mr. Friedman and Mr. Berman a substantial discretionary bonus with respect to 1999.* Our Compensation Committee commissioned a report from an independent consulting firm to advise it on the appropriate level of compensation for Mr. Friedman and Mr. Berman. Based on this report, *our Compensation Committee recommended to the Board that we give Mr. Friedman and Mr. Berman a bonus of $750,000, in addition to the 4% Bonus, and the Board approved this recommendation. At the same time, we also increased the cap on the 4% Bonus from $1,000,000 to $2,000,000 effective in 2000.* [Emphasis added.]

- 23 -

69.    In addition to the foregoing, the Proxy also summarized defendant Friedman and

Berman's new and augmented Employment Agreements, which compensated them as follows:

EMPLOYMENT AGREEMENTS

*We entered into 10-year employment agreements with Mr. Friedman and Mr. Berman, pursuant to which Mr. Friedman serves as our Chairman and Chief Executive Officer and Mr. Berman serves as our President and Chief Operating Officer.* Mr. Friedman's annual base salary in 2000 is $771,000 and Mr. Berman's is $746,000. Their annual base salaries are subject to annual increases in an amount, not less than $25,000, determined by our Board of Directors. *Each of them is also entitled to receive an annual bonus equal to 4% of our pre-tax income, but not more than $2,000,000, if our pre-tax earnings are at least $2,000,000 . . . .* [Emphasis added.]

70.    On July 25, 2000, JAKKS issued a press release announcing its results for the second

quarter ended June 30, 2000. According to the press release, JAKKS achieved another quarter of

purported "Record" setting revenues and profits, driven in substantial part by the success of its

licensed WWF products. In relevant part, the press release quoted Defendants, as follows:

*"Our strong growth and emergence as a leading toy company reflects the Company's three-pronged strategy of generating new products through internal development, acquisition and marketing alliances, and licensing agreements,"* said Friedman. "This strategy has enabled us to dramatically expand the Company's product offerings *while building on the strength of such core businesses as Road Champs(R), WWF* and Flying Colors(R), which continue to turn in solid results . . . .

*"We continue to remain focused on executing our growth strategy and capitalizing and expanding on existing and new product lines,"* added Stephen Berman, president and chief operating officer of JAKKS . . . . [Emphasis added.]

71.    On August 14, 2000, JAKKS filed its quarterly report for the second quarter of 2000

on Form 10-Q with the SEC, which was signed by defendant Bennett. The Company's 2Q:00 Form

10-Q also contained statements concerning the Company's "key strategies" and its "Basis of

Presentation," similar to or the same as those statements contained in JAKKS previous SEC filings,

reproduced herein, *supra.*

- 24 -

72.     On August 14, 2000, JAKKS issued a press release announcing the debut of the "WWF Royal Rumble" video game for the Sega Dreamcast game platform. Company spokesperson Jennifer Richmond was quoted therein as stating that, *"The hottest license in interactive entertainment just got hotter."* [Emphasis added.]

73.     On September 19, 2000, JAKKS issued a press release that purported to provide updated guidance for the third quarter ended September 30, 2000. At that time, Defendants represented that, "earnings attributable to the sales of wrestling video games . . . remain in line with the Company's projections *and the Company is optimistic about the upcoming releases of new WWF wrestling games*" in the fourth quarter of 2000 and continuing into 2001. Defendants, however, lowered earnings and revenue projections at that time, in part, as a result of the "general softness in the toy industry."

74.     The following day, the price of JAKKS common stock declined 25%. Financial commentators, however, were quick to point out that this share price decline was due, in part, to the fact that only days before Defendants issued the quarterly update, defendant Friedman appeared in front of 80 analysts and investors at a Donaldson Jufkin & Jenrette conference during which he stated that, while there was some softness in the market, that he was still comfortable with third quarter estimates. Accordingly, on September 20, 2000, TheStreet.com reported, in part, the following:

> *So, what happened between then and Tuesday morning, when Jakks lowered the boom*? Did an order suddenly get canceled? Is the CEO out of the loop on financials? Did everybody misunderstand what he said? Hard to say, though it clearly wasn't the latter.
>
> Jakks officials haven't returned my call, but this much we know: Analyst Arvind Bhatia of Southwest Securities, which has provided investment banking services to Jakks, lowered his estimates for the quarter before Jakks issued its warning. How'd he know? *He told me that in his conversations with the company on Monday "their body language was not convincing," and upon further questioning the company conceded to him that his prior forecasts were too aggressive. When he*

- 25 -

> *asked whether the company would miss the numbers, Bhatia says, "they didn't say*
> *no*." That was all Bhatia needed to know. [Emphasis added.]

75.    By mid-October 2000, SSAI had been terminated as WWE's licensing agent and it

had actually initiated suit against WWE for breach of contract.  Realizing that discovery in that

action put Defendants at risk of their fraudulent scheme being discovered, Defendant Friedman

telephoned Linda McMahon, CEO of WWE, and made the unsolicited offer to use his connections to

attempt to broker a settlement with Shenker.  At that time, Friedman did not disclose his or JAKKS'

prior agency relationship with Shenker or SSAI.  WWE declined his offer of assistance.

76.    On October 25, 2000, JAKKS issued a press release announcing its financial results

for the third quarter ended September 30, 2000.  According to the press release, JAKKS achieved

another quarter of purported "Record" setting revenues and profits, driven in substantial part by the

success of its WWF licensed products.  Defendants commented on the results stating, in pertinent

part, as follows:

> Jack Friedman, chairman and chief executive officer of JAKKS Pacific Inc., said, *"In*
> *a relatively soft year for the toy industry overall, we believe it is a great*
> *accomplishment for us to have sustained our strong top-line and bottom-line*
> *growth*."
>
> *"Sales of WWF video games through our joint venture with THQ Inc. did well, and*
> *we look forward to very strong sales of our video games in the fourth quarter*."
>
> "With a wealth of talent, exciting new products due for release over the next several
> months, and a balance sheet that will support further acquisitions, *we are clearly*
> *poised for further growth*," added Stephen Berman, president and chief operating
> officer of JAKKS." . . . . [Emphasis added.]

77.    On November 8, 2000, JAKKS filed its quarterly report for the third quarter of 2000

on Form 10-Q with the SEC, which was signed by defendant Bennett.  The Company's 3Q:00 Form

10-Q also contained statements concerning the Company's "key strategies" and its "Basis of

Presentation," similar to or the same as those statements contained in JAKKS previous SEC filings,

reproduced herein, *supra*.

78.    On February 21, 2001, JAKKS issued a press release announcing the debut of the

Company's two newest WWF video games for PlayStation 2. In addition to the foregoing, this press

release stated, in relevant part, the following:

> *"These additional games and platforms will strongly compliment the previously announced 'WWF Raw Is War(TM)' for Xbox(TM), as well as our other World Wrestling Federation videogames already on the market,"* said Jamie Wood, senior vice president Action Toys, JAKKS Pacific, Inc. [Emphasis added.]

79.    On March 7, 2001, JAKKS issued a press release announcing its financial results for

the fourth quarter and year-ended December 31, 2000. According to the press release, the

Company's net income in fiscal 2000 rose 30.3% compared to the prior year. In the press release,

defendant Friedman credited the Company's WWE product line for JAKKS' purported success in

2000:

> *"Overall, 2000 was a most satisfying one for our company,"* said Jack Friedman, chairman and chief executive officer of JAKKS Pacific. *"In what was a relatively tough year for the toy industry, JAKKS was able to continue both its internal and external growth and strengthen its position* with retailers and consumers in the toy and crafts industries."

> Looking to the current year, Friedman reiterated the company's previously announced sales and earnings forecast: *"The company looks forward to another record year in 2001, when we expect net sales to increase to the range of $290 to $310 million,* with net income increasing to a range of $30 to $32 million, or $1.61 to $1.71 per diluted share."

> *"The company expects to continue to derive substantial earnings from its video game joint venture with THQ,* although the WWF video games, due to the hardware transition, are anticipated to make considerably less of a contribution to net income in the year 2001 than in the prior year. However, we expect this to be more than offset by our other product lines." [Emphasis added.]

80.    On April 2, 2001, JAKKS filed its 2000 Annual Report on Form 10-K with the SEC,

which was signed by defendants Bennett, Friedman and Berman, among others. In addition to

reiterating the results announced in the March 7, 2001 press release, the Company's 2000 Form 10-K

also contained statements concerning the Company's "key strategy" and its agreement with WWE

- 27 -

and joint venture with THQ, similar to or the same as those statements contained in JAKKS prior

SEC filings, reproduced herein, *supra*. In addition, the 2000 Form 10-K also reported that, during

2000, the JAKKS/THQ joint venture had earned over $15.9 million in profits, versus total net

income of $28.6 million for JAKKS, as follows:

> In June 1998, the Company formed a joint venture with a company that develops, publishes and distributes interactive entertainment software for the leading hardware game platforms in the home video game market. The joint venture has entered into a license agreement under which it acquired the exclusive worldwide right to publish video games on all hardware platforms . . . . *During 2000 the Company earned $15,905,860 in profit from the joint venture.* [Emphasis added.]

81.     On April 23, 2001, JAKKS issued a press release announcing its financial results for

the first quarter ended March 30, 2001, and reaffirming guidance for the remainder of the year. This

press release also announced a one million share buy-back, in addition to stating, in pertinent part, as

follows:

> "*We are very pleased with the first-quarter results*," said Jack Friedman, chairman and CEO of JAKKS Pacific. "*Our core businesses are doing extremely well, and 2001 is clearly off to a good start*, consistent with our forecast. *We remain comfortable with our earlier forecast for second quarter net sales and earnings per diluted share in the range of $63 to $66 million and $0.34 to $0.37, respectively*, compared to second quarter 2000 results of $50.6 million and $0.31 respectively.
>
> "*With strong demand for our core products as we had anticipated, we continue to expect revenue growth in 2001 of 15% to 23%, and earnings growth of 5% to 12% over the prior year's results*, notwithstanding the fact that we are expecting a lesser contribution from our video game joint venture this year. *This should translate to full year sales of $290 to $310 million, with net income of $30 to $32 million, or $1.61 to $1.71 per diluted share*, compared to 2000 results of $252.3 million, $28.6 million and $1.41, respectively. And, *for 2002 we are expecting a significantly greater contribution from the joint venture as new hardware platforms, like Nintendo 'GameCube', are introduced and as the penetration of Sony 'PlayStation 2' and Microsoft 'Xbox' increases*."

*     *     *

> Commenting on the strength of the Company's core businesses, Stephen Berman, president and COO of JAKKS Pacific, noted: "As a multi-brand and diverse company with a broad array of products, many of which sell for less than $10, *we believe we are exceptionally well-positioned to weather the economic slowdown*

- 28 -

*that some are anticipating at retail.* Our diverse product line, including action figures, toy vehicles and collectibles, craft and activity sets, school-related products, including writing instruments, dolls and infant toys, provides the Company with stability, while at the same time presenting broad opportunities for growth."

Berman continued, *"Also, the fact that we have the unique opportunity to be involved in the software business for WWF video games through our joint venture with THQ gives us additional balance and further opportunities to profit from the popularity of such games, particularly as new hardware platforms, like Microsoft 'Xbox' and Nintendo 'GameCube' and 'GameBoy Advance', are introduced.* Based on industry reports, these new hardware platforms are expected to be introduced toward the end of this year or the beginning of the next, and we believe that the Company will achieve substantial earnings growth from its joint venture in 2002 . . . ." [Emphasis added.]

82.    On May 15, 2001, JAKKS filed its quarterly report for the first quarter of 2001 on

Form 10-Q with the SEC, which was signed by defendant Bennett. The Company's 1Q:01 Form 10-

Q also contained statements concerning the Company's "key strategies," its "Basis of Presentation,"

and its relationship with THQ and WWE, similar to or the same as those statements as were made in

JAKKS previous SEC filings, reproduced herein, *supra.*

83.    On or about June 12, 2001, JAKKS filed its Proxy Statement in connection with the

election of directors for 2001-2002 with the SEC. According to the Proxy, for 2000, defendant

Friedman received a base salary of $771,000, a bonus of $1.613 million and 207,254 options, and

defendant Berman received a base salary of $746,000, a bonus of $1.613 million and 345,024

options. According to the Proxy, such payments were justified because of the following:

> *We believe that our success to date has been to a significant extent attributable to the personal efforts of Mr. Friedman and Mr. Berman.* They founded the Company, established its business philosophy and operating structure and were the driving force behind our central theme of focusing our business on "evergreen" products. *Mr. Friedman's long-term relationship with World Wrestling Federation Entertainment, Inc. was instrumental in our acquiring our successful World Wrestling Federation licenses. In his nearly four-decade-long career in the toy industry, he has established an important network of relationships that we have been able to exploit in product acquisition, production and sales.* Both Mr. Berman and Mr. Friedman embody our management philosophy with a "hands on" approach in all areas of our business. *In addition to their general supervisory functions, they are directly involved in license acquisition,* product design and development,

- 29 -

production, and sales and marketing, as well as our financing and acquisition efforts. *Their efforts have resulted in our identifying and securing the World Wrestling Federation licenses and other desirable licenses and properties, the rapid expansion of our product lines,* our achieving significant production efficiencies and the development of a loyal and growing customer base. [Emphasis added.]

84.    Attached as Exhibit A of this Proxy was the Charter of the Audit Committee of the

Board of Directors of the Company which outlined the functions and responsibilities of the Audit

Committee – including the duty oversee the integrity of the Company's management – in part, as

follows:

> *The Committee shall monitor the Company's management's compliance with legal requirements and ethical standards applicable to their conduct at the Company.* For this purpose, the Committee may approve and adopt *appropriate rules or policies for the Company and its personnel, including without limitation with respect to conflicts of interest* and the use of corporate assets, or recommend such rules or policies for approval and adoption by the Board. *The Committee shall review and investigate any actions or matters pertaining to the integrity of the Company's management and their compliance with such legal requirements and ethical standards,* and, if appropriate, recommend remedial action to be taken by the Board. [Emphasis added.]

85.    On or about July 11, 2001, JAKKS disseminated its year-end 2000 Annual Report to

shareholders. The 2000 Annual Report also contained a Letter to Shareholders signed by defendants

Berman and Friedman which stated, in part, the following:

> *In 2000, we remained true to the formula that has fueled our company's strength and growth from inception:* strong brands, savvy management, diversified product lines, speed-to-market, and a *disciplined acquisition strategy.*
>
> \*        \*        \*
>
> Perhaps *most central to our success is our ability to maximize our licensed categories.* We do this by encouraging innovation, extending product lines and building merchandizing programs . . . .
>
> \*        \*        \*
>
> Meanwhile, our WWF video games for the Sony PlayStation, Nintendo 64, and Nintendo GameBoy Color hardware platforms, developed through our joint venture with THQ Inc., sold extremely well throughout the year. *We expect WWF software*

- 30 -

*products in 2001 to continue to sell well, followed by robust growth in 2002 as consumers migrate to the next generation of platforms.* [Emphasis added.]

86.    On July 19, 2001, JAKKS issued a press release announcing its financial results for the second quarter ended June 30, 2001. In addition to the foregoing, defendant Berman used this press release to condition investors to believe that lower sales of WWF video games in the second quarter were the result of the "industry's transition to new [game] platforms," which was not expected to have a long-term negative impact on the Company. Accordingly, defendant Berman maintained a positive outlook for the Company's performance for the remainder of 2001, in part, as follows:

> Stephen Bennan, the company's president and COO, noted that as in the first quarter, lower joint venture profits from the company's WWF video games during the industry's transition to new platforms – notably Microsoft's "Xbox" and Nintendo's "GameCube" – that are not expected to be available at retail until the fourth quarter at the earliest. "Accordingly," said Berman, "joint venture profits for the balance of the year are expected to be substantially below those of the comparable period of 2000, but will not impact our 2001 forecast of $1.61 to $1.71 per share.

87.    On July 31, 2001, JAKKS filed its quarterly report on Form 10-Q for the second quarter of 2001 with the SEC which was signed by defendant Bennett. The Company's 2Q:01 Form 10-Q also contained statements concerning the Company's "key strategies," "Basis of Presentation," and its relationship with THQ and WWE, similar to or the same as those statements as were made in JAKKS previous SEC filings, reproduced herein, *supra*.

88.    On August 20, 2001, JAKKS issued a press release announcing that the Company had been named to *Fortune* Magazine's list of 100 Fastest-Growing companies for the third consecutive year. This press release also quoted defendant Berman, in part, as follows:

> Stephen Berman, president and COO of JAKKS Pacific, noted that among the factors in JAKKS' ranking were an earnings per share growth rate of 67%, revenue growth of 85%, and a total return of 32%, over the past three years. "We are extremely proud to have once again made FORTUNE's Fastest-Growing Companies list," said Berman. *"We are fortunate to have developed a proven business model that continues to serve us well."* [Emphasis added.]

- 31 -

89.    On October 18, 2001, JAKKS issued a press release announcing its financial results for the third quarter ended September 30, 2001.  In the press release, Defendants highlighted the strong sales of WWE video games stating, in relevant part, the following:

"Our JAKKS Pacific/THQ World Wrestling Federation(R) video game joint venture is highly anticipating three new titles during the fourth quarter, including games for the Sony Playstation 2, new Microsoft Xbox and Game Boy Advance platforms," continued Friedman.  *"As the installed base for the new hardware systems increases, it bodes extremely well for sales of our World Wrestling Federation video games for the fourth quarter, fiscal 2002 and beyond."*

\*        \*        \*

*"We continue to anticipate that results for this year will reflect net sales of $290 to $300 million and earnings per diluted share of $1.61 to $1.71 on net income of $30 to $32 million.*  This represents midrange percentage growth in 2001 of 17%, 18% and 8%, respectively, over fiscal 2000 net sales of $252.3 million and earnings per diluted share of $1.41 on net income of $28.6 million," Berman continued. [Emphasis added.]

In part, based on the continued success of JAKKS' WWE licensed products, defendant Friedman stated that the Company was well-positioned going into 2002, as follows:

"Given our current environment, for 2002 our outlook remains positive," concluded Friedman.  *"With World Wrestling Federation action figures, accessories and video games*; stationery and activity products from Flying Colors (for assorted properties including Nickelodeon(R) programs, Cubix(TM), and other top licenses); BattleBots(TM), Junkyard Wars(TM) and extreme sports lines from Road Champs(R); our growing stable of writing instruments; and a number of items from our other divisions, *we believe we have a solid product base going into 2002. This coupled with our strong financial position and depth of management position us well to continue our business strategies."*  [Emphasis added.]

90.    Following the press release of these strong financial results, shares of the Company rallied over $2.00 per share, to close trading that day at $18.30 per share.

91.    On November 14, 2001, JAKKS filed its quarterly report for the third quarter of 2001 on Form 10-Q with the SEC, which was signed by defendant Bennett.  The Company's 3Q:01 Form 10-Q also contained statements concerning the Company's "key strategies," its "Basis of

Presentation," and its relationship with THQ and WWE, similar to or the same as those statements as were made in JAKKS' previous SEC filings, reproduced herein, *supra*.

92.    Taking further advantage in the artificial inflation in the price of JAKKS shares caused in significant part by defendants' materially false and misleading statements and omissions, on February 10, 2002, defendants announced the proposed acquisition of Toymax International Inc., a New York-based toy designer and marketer. This deal, valued at approximately $55 million, consisted primarily of payment of $3.00 per Toymax share in cash, plus an additional $1.50 per share payable in JAKKS common stock to Toymax's three principal shareholders who together held a 64% stake in Toymax. The remainder of Toymax's shareholders would receive $4.50 per share in cash.

93.    On February 12, 2002, JAKKS issued a press release announcing that the Company had begun shipping the "WWF Raw" video game, the first WWF licensed title for the Microsoft Xbox game platform. The press release stated, in pertinent part, as follows:

> "WWF Raw" marks the 10th THQ/JAKKS Pacific World Wrestling Federation video game release; *a franchise that now boasts sales in excess of $250 million (see note) at retail nationwide.*
>
> \*       \*       \*
>
> "Bringing an exclusively licensed World Wrestling Federation title to Xbox is a continuing example of our commitment to delivering exciting and unique games to new platforms," stated Michael Rubinelli, vice president, product development, THQ. "'WWF Raw' utilizes all of the technology of the Xbox by bringing realistically depicted models, authentic signature moves and smooth character animations to one of the most powerful gaming systems available." [Emphasis added.]

94.    On February 12, 2002, JAKKS issued a press release announcing its financial results for the fourth quarter and year-ended December 31, 2001 results. The press release stated, in pertinent part, as follows:

- 33 -

For the year, net sales were a record $284.4 million compared to $252.3 million in 2000, an increase of 12.7%. Net income on a pro forma basis increased 11.5% to $32.0 million, or $1.65 per diluted share, from $28.7 million, or $1.41 per diluted share, in the prior year. Including a special reserve of $5.0 million relating to Kmart Corporation's recent bankruptcy filing, net income was $28.2 million, or $1.45 per diluted share. Also included in the full year net income are non-cash charges of $2.6 million and $0.1 million for 2001 and 2000, respectively, relating to the 2000 price reset of certain of the Company's outstanding stock options. *In 2001, the THQ/JAKKS joint venture contributed profit of $6.7 million* compared to $15.9 million in 2000. Fully diluted shares outstanding were 19.4 million in 2001 and 20.3 million in 2000.

Fourth-quarter net sales were $61.4 million compared to $59.1 million a year ago, and net income on a pro forma basis was $8.1 million, or $0.42 per diluted share, compared to net income of $6.0 million, or $0.32 per diluted share, in the fourth quarter of 2000. Including the special reserve of $5.0 million, net income was $4.4 million, or $0.22 per diluted share. Also included in the fourth quarter results were non-cash charges of $1.1 million and $0.1 million for 2001 and 2000, respectively, relating to the 2000 stock option price reset. *In the fourth quarter of 2001, the THQ/JAKKS joint venture contributed profit of $5.7 million* compared to $7.7 million in 2000. Fully diluted shares outstanding were 19.8 million in 2001 and 18.6 million in 2000. [Emphasis added.]

Defendant Berman projected another "record year" in 2002, driven by the introduction of new products, including WWE video games and accessories, as follows:

*"We expect 2002 will be another record year for JAKKS*, with new introductions expected in all segments," said Stephen Bennan, President and Chief Operating Officer of JAKKS Pacific. 'New introductions this year include new writing instruments using gel ink technologies, extensions to our extreme sports toy lines with gyros, and *new World Wrestling Federation(R) action figures and accessories scheduled for release this year. Likewise, with the industry's transition to new video game hardware essentially complete, and with several exciting new titles due for release, we anticipate substantially higher profits from JAKKS' World Wrestling Federation video game joint venture with THQ Inc.* [Emphasis added.]

95.    On April 1, 2002, JAKKS filed its 2001 Annual Report on Form 10-K with the SEC, which was signed by defendants Bennett, Friedman and Berman, among others. In addition to reiterating the results announced in the February 12, 2002 press release, the Company's 2001 Form 10-K also contained statements concerning the Company's "key strategy" and agreements with WWE and THQ, similar to or the same as those statements contained in JAKKS previous SEC

- 34 -

filing, reproduced herein, *supra*. In addition, regarding the THQ/WWE license, the Company's

2001 Form 10-K also stated, in part, the following:

> *We have a fifty percent interest in a joint venture with THQ, a developer, publisher and distributor of interactive entertainment software, and the joint venture licensed the rights from World Wrestling Federation Entertainment to publish World Wrestling Federation electronic video games on all platforms.* The first games produced under this license, which expires initially December 31, 2009 and has a five-year renewal option, were released in November 1999. Through June 30, 2006, we are entitled to receive a guaranteed preferred return at varying rates of net sales of the video games depending on the cumulative unit sales and platform of each particular game, which we accrue in the quarter the games are sold. *THQ retains the financial risk of the joint venture and is responsible for the day-to-day operations, including the development, sales and distribution of the licensed games for which they are entitled to receive the balance of any profits.* For periods after June 30, 2006, the amount of the preferred return will be subject to renegotiation between THQ and us. Distributions of the preferred return from the joint venture contributed significantly to our pre-tax income, representing 11.9% of pre-tax income in 1999, 39.4% in 2000 and 17.6% in 2001. The annual minimum preferred return to be distributed to us by the joint venture during each of the years in the period ending December 31, 2003 is $2.6 million per year. *We expect our aggregate return over this period to be significantly in excess of this amount, although we cannot predict with certainty that expected levels of return will be achieved* and, in any case, we anticipate substantial fluctuations in the amount of the preferred return distributed to us from year to year. *The amount of our preferred return in any year will be subject to various factors, including the number of games released, life cycle of hardware platforms, market conditions and changes in consumer interests.* [Emphasis added.]

96.    On April 23, 2002, JAKKS issued a press release announcing its financial results for

the first quarter ended March 31, 2002. Defendant Friedman reiterated the importance of the WWE

product line in terms of its contribution to the Company's operations, stating, in pertinent part, as

follows:

> *"With the continuing increase in penetration of the new video game platforms, our joint venture is on track to increase significantly its contribution to our profitability and cash flow through the remainder of the current hardware cycle.* Our video game joint venture is excited about our first Nintendo GameCube(TM) title, WWF Wrestlemania X8, slated for a June launch, and continued sales of WWF Raw(TM) for Microsoft Xbox(TM) and WWF Smackdown! Just Bring It(TM) for PlayStation 2."

- 35 -

*"We continue to be excited about 2002 and reiterate our sales forecast, which anticipates $360 million to $380 million of sales for the year*, and our forecast for diluted earnings per share to be $1.90 to $2.01 (excluding restructuring charges)," stated Mr. Friedman.

Mr. Friedman continued, "The response to our products has been strong and reinforces our expectations for another record sales year. We believe we have our broadest and best product line across our different product segments. Sales have been extremely promising for our first-quarter new product introductions, which include Liqualoons, our new bubble solution from Flying Colors, as well as our Nickelodeon-branded products – Smatter, Gak Splat and Skweeez, which has already won the Oppenheim Toy Portfolio Gold Seal Award. *As always, our World Wrestling Federation product line continues to make significant contributions to our operations as it evolves along with the ever-changing themes in the story lines, including the distinction of the two leagues, Raw and Smackdown.*" [Emphasis added.]

97.    Also, on April 23, 2002, Defendants issued a press release announcing that JAKKS had filed a registration statement with the SEC, in connection with the public offering of an additional 3.5 million shares of common stock – 3 million shares of which were to be sold by the Company and the remaining 500,000 shares of which were to be sold by certain Selling Shareholders, including certain of the defendants named herein. This press release also stated that defendants granted underwriters an over-subscription option to purchase an additional 525,000 shares of JAKKS common stock to cover over-allotments.

98.    On May 3, 2002, JAKKS filed its quarterly report for the first quarter of 2002 on Form 10-Q with the SEC, which was signed by defendant Bennett. The Company's 1Q:02 Form 10-Q also contained statements concerning the Company's "key strategies," its "Basis of Presentation" and its joint venture with THQ regarding the WWE video game development and toy sales, and similar to or the same as those statements contained in JAKKS previous SEC filings, reproduced herein, *supra.*

99.    On May 23, 2002, JAKKS issued a press release announcing that the Company had completed the sale of 3.5 million shares of common stock priced at $17.75 per share. These shares

were sold pursuant to a registration statement filed with the SEC and declared effective on or about

May 22, 2002.  In addition to repeating many of the same or substantially similar statements

concerning the financial and operational condition of the Company as had been previously filed with

the SEC, this registration statement stated, in part, the following:

> *We have capitalized on our relationship with World Wrestling Entertainment, Inc.*
> *(WWE) by obtaining an exclusive worldwide license for our joint venture with*
> *THQ Inc.* (THQ), which develops, produces, manufactures and markets video games
> based on World Wrestling Entertainment characters and themes.  Since the joint
> venture's first title release in 1999, it has released 11 new titles.  *We have received*
> *$27.5 million as our share of the joint venture's profit through March 31, 2002.*
>
> *        *        *
>
> World Wrestling Entertainment Video Games
>
> In June 1998, we formed a joint venture with THQ, a developer, publisher and
> distributor of interactive entertainment software for the leading hardware game
> platforms in the home video game market.  The joint venture entered into a license
> agreement with the WWE under which it acquired the exclusive worldwide right to
> publish World Wrestling Entertainment video games on all hardware platforms.  The
> term of the license agreement expires on December 31, 2009, and the joint venture
> has a right to renew the license for an additional five years under various conditions.
> [Emphasis added.]

100.    In addition to the foregoing, the Registration Statement also identified the Selling

Shareholders, who together sold 500,000 shares of stock in this offering priced at $17.75 per share,

including: Jack Friedman – 300,000 shares; Stephen Berman – 150,000 shares; and Murray Skala –

30,000 shares.

101.    Unbeknownst to investors, on or about June 11, 2002, JAKKS received a subpoena in

connection with WWE's then on-going litigation with Bell and Shenker, ordering JAKKS to produce

a variety of records relating to the Company's dealings with them.  This subpoena included all

documents related to any agreements between JAKKS, Shenker and/or SSAI and all documents

related to any payments to Shenker or SSAI.

102.    In or about July 2002, Defendants disseminated the Company's year-end 2001 Annual Report to shareholders. In addition to reiterating many of the same materially false and misleading statements as had been made previously and reproduced herein, the 2001 ARS also contained a Letter to Shareholders signed by defendants Berman and Friedman which stated, in part, the following:

> This time a year ago, we said JAKKS Pacific would act decisively on strategic opportunities, enter new partnerships and reinforce existing ones. *We promised you that we would remain true to our philosophy, developing products and acquiring licenses with the potential for significant success*. And we stated that we would remain operationally lean and financially healthy, even as we pursued new initiatives.
>
> *JAKKS Pacific has faithfully and effectively implemented its successful business strategy from day one*. And 2001 was no different, in spite of a turbulent global economic climate and a challenging retail environment. In short, we kept true to our word.

*     *     *

> *Our World Wrestling Federation actions figures, playsets and accessories, along with the World Wrestling Federation video games created through our joint venture with THQ, just keep getting better*. The World Wrestling Federation brand continues to dominate the action figure category and this product line has positioned JAKKS Pacific as a leader in boys action toys. We consistently challenge our product development teams to use the most advanced technology possible, and they continue to meet those challenges.

*     *     *

> *Additionally, the highly anticipated new video game platform transition is well underway*. With our next generation World Wrestling Federation video game titles for Microsoft Xbox, Nintendo Game Cube, Sony PlaysStation 2, Nintendo GameBoy Advance and several additional platforms, *we are well positioned for explosive growth, and we anticipate substantial profits from our World Wrestling Federation joint venture with video game developer THQ over at least the next eight years*. [Emphasis added.]

103.    On July 22, 2002, JAKKS issued a press release announcing its financial results for the second quarter ended June 30, 2002. Defendant Friedman used this press release to condition investors to believe that the Company's performance was "resilient," and attributed JAKKS'

- 38 -

purported stellar results to its diverse product lines, including WWE toys and video games, as

follows:

> Jack Friedman, Chairman and Chief Executive Officer of JAKKS Pacific
> commented, "*Our operations and financial results have proven resilient*, even
> considering a challenging economy and a lackluster toy retail environment. *This is a
> tribute to our company, its dedicated employees worldwide and our business
> strategy. Through our broad, expanding and diverse product lines, which include
> Flying Colors, Pentech, World Wrestling Entertainment action figures, accessories
> and video games, Funnoodle and Go Fly a Kite, amongst others, we have been able
> to continue our strategy of providing great value to our retailers and our
> consumers*." [Emphasis added.]

104.    On August 14, 2002, JAKKS filed its quarterly report for the second quarter of 2002

on Form 10-Q with the SEC, which was signed by defendant Bennett. The Company's 2Q:02 Form

10-Q also contained statements concerning the Company's "key strategies," its "Basis of

Presentation," and its joint venture with THQ regarding the WWE video game and toy development

similar to or the same as those statements contained in JAKKS previous SEC filings, reproduced

herein, *supra*. In addition, the Company's 2Q:02 Form 10-Q also contained Certifications by

defendants Friedman and Bennett which purported to certify the veracity and completeness of

JAKKS' regulatory disclosures, as follows:

EXHIBIT 99.1

### CERTIFICATION OF CHIEF EXECUTIVE OFFICER

Pursuant to 18 U.S.C. Section 1350, the undersigned officer of JAKKS Pacific, Inc.
("JAKKS"), *hereby certifies that JAKKS' Quarterly Report on Form 10-Q for the
quarter ended June 30, 2002 (the "Report") fully complies with the requirements
of Section 13(a) or 15(d), as applicable, of the Securities Exchange Act of 1934
and that the information contained in the Report fairly presents, in all material
respects, the financial condition and results of operations of JAKKS*. [Emphasis
added.]

/s/ Jack Friedman                    Dated: August 14, 2002

-------------

Jack Friedman
Chairman and Chief Executive Officer
Principal Executive Officer

EXHIBIT 99.2

## CERTIFICATION OF CHIEF FINANCIAL OFFICER

Pursuant to 18 U.S.C. Section 1350, the undersigned officer of JAKKS Pacific, Inc. ("JAKKS"), *hereby certifies that JAKKS' Quarterly Report on Form 10-Q for the quarter ended June 30, 2002 (the "Report") fully complies with the requirements of Section 13(a) or 15(d), as applicable, of the Securities Exchange Act of 1934 and that the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of JAKKS.* [Emphasis added.]

/s/ Joel M. Bennett                    Dated: August 14, 2002

-----------------

Joel M. Bennett
Chief Financial Officer
Principal Financial Officer

105.    On October 14, 2002, in connection with the press release of the Company's newest WWE licensed video game "WWE Raw" for PC, JAKKS issued a press release which stated, in part, that this new game introduction *allowed JAKKS to bring "one of the most successful software licenses in the interactive entertainment market to the personal computer."* Similarly, on October 17, 2002, when defendants announced the re-launch of WWE SmackDown! Under PlayStation 2 "Greatest Hits" collection, Company spokesman Nelo Lucich, Director of Interactive at JAKKS stated, *"Our inclusion in Sony's Greatest Hits' collection is a testament to the success of the video game franchise,* and we are extremely proud to have WWE SmackDown! Just Bring It included in this prestigious line-up." [Emphasis added.]

106.    On or about August 21, 2002, JAKKS filed its Proxy Statement in connection with the election of directors for 2002-2003 with the SEC. According to the Proxy, for 2001, defendant Friedman received a base salary of $821,000, a bonus of $1.706 million and 175,000 options, and

- 40 -

defendant Berman received a received a base salary of $796,000, a bonus of $1.706 million and

175,000 options. According to the Proxy, such payments were justified because:

> *We believe that our success to date has been to a significant extent attributable to the personal efforts of Mr. Friedman and Mr. Berman.* They founded the Company, established its business philosophy and operating structure and were the driving force behind our central theme of focusing our business on "evergreen" products. *Mr. Friedman's long-term relationship with World Wrestling Federation Entertainment, Inc. was instrumental in our acquiring our successful World Wrestling Federation licenses.* In his nearly four-decade-long career in the toy industry, he has established an important network of relationships that we have been able to exploit in product acquisition, production and sales. *Both Mr. Berman and Mr. Friedman embody our management philosophy with a "hands on" approach in all areas of our business. In addition to their general supervisory functions, they are directly involved in license acquisition, product design and development, production, and sales and marketing, as well as our financing and acquisition efforts. Their efforts have resulted in our identifying and securing the World Wrestling Federation licenses and other desirable licenses and properties,* the rapid expansion of our product lines, our achieving significant production efficiencies and the development of a loyal and growing customer base. [Emphasis added.]

107.    In addition to the foregoing, this Proxy also reported certain "Related Transactions"

between insiders and/or defendants herein and the Company, including the following:

> One of our directors, Murray L. Skala, is a partner in the law firm of Feder, Kaszovitz, Isaacson, Weber, Skala, Bass & Rhine LLP, which has performed, and is expected to continue to perform, legal services for us. In 2001, *we incurred approximately $1,129,000 for legal fees and reimbursable expenses payable to that firm. [Compared to $975,000 for legal fees and reimbursable expenses payable to that firm in 2000, and $1,000,000 in 1999.]*

> *In April 2000, we loaned $1,500,000 to each of Jack Friedman and Stephen G. Berman.* The entire principal amount of each loan is due on April 28, 2003 and, until repaid, interest thereon is payable semi-annually at the rate of 6.5% per annum. Mr. Berman's indebtedness to us under his loan is secured by a deed of trust on certain real property. As of May 7, 2002, the outstanding principal balances of Mr. Friedman's and Berman's loans were $975,000 and $995,000, respectively. *In May 2000, we loaned $250,000 to Joel M. Bennett.* The entire principal amount of his loan, together with interest accrued thereon at the rate of 7.0% per annum, was due on May 12, 2002. *Pursuant to our agreement with Mr Bennet, we agreed to forgive all of his indebtedness to us under his loan if he continued to be employed by us on such date.* As of May 12, 2002, accrued interest to date on Mr. Bennett's loan was $35,000.00. All three loans were made to assist our executive officers in meeting certain personal financial obligations. [Emphasis added.]

- 41 -

108.    On October 22, 2002, JAKKS issued a press release titled, "JAKKS Pacific Reports Record Sales and Earnings," for the third quarter ended June 30, 2002. In part, based on the success of the Company's WWE licenses and its joint venture with THQ, defendant Berman again used the Company's press release to assure investors of JAKKS' purported strong operational condition and anticipated growth prospects, as follows:

> "*Our financial position remains strong* with $156.2 million of working capital, cash in excess of $10 1 million and net stockholder's equity of $14.47 per share. Given the strength of our balance sheet and $50 million bank line, *we are well positioned to continue to grow our business through strategic acquisitions and internal development that will further diversify our product offerings to our existing and new retail customers*." [Emphasis added.]

In addition, defendant Friedman predicted the successful launch of two new WWE videogames in the fourth quarter:

> Mr. Friedman continued, "We also have had nice sell-in of our Nickelodeon lines for the holidays, as well as a number of new WWE items and the first shipments of our Disney Princess craft and activity toys. In the fourth quarter, we with our joint venture partner, THQ, will see the launch of two new World Wrestling Entertainment games, WWE(TM) SmackDown!(TM) Shut Your Mouth(TM) for the PlayStation(R) 2 and WWE(TM) Road to WrestleMania(R) X8 for Game Boy(R) Advance, and have recently shipped the new WWE(TM) Raw(TM)(R)for the PC, which we believe will appeal to a new group of gamers."

109.    Unbeknownst to investors, on or about October 30, 2002, JAKKS responded by letter to WWE's June 11, 2002 subpoena. At that time defendants concealed and did not reveal either the $80,000 or $20,000 invoice paid to Stanfull in 1998, nor any payments made to Shenker or SSAI, nor any documents or invoices indicating that such payments had been made. At that time, JAKKS had also failed to disclose that Shenker had acted as agent for the Company.

110.    On November 8, 2002, Company spokesperson Geena Goldberg granted a widely-reported interview on Minnesota Public Radio's Marketplace. During this interview, Goldberg reiterated defendants' growth strategy of becoming a "billion-dollar toy company" within the next three to five years. During the Goldberg interview, it was again revealed that defendants had built

the Company upon the strength of JAKKS' WWE licenses, which had allowed defendants to acquire

other assets and diversify JAKKS' revenue mix.  While Goldberg stated that JAKKS had by then

grown beyond the WWE licenses, she clearly stated that both *"internally and externally [we] still

remain loyal to and count on WWE very much*." [Emphasis added.]

111.    On November 14, 2002, JAKKS filed its quarterly report for the third quarter of 2002

on Form 10-Q with the SEC, which was signed by defendant Bennett.  The Company's 3Q:02 Form

10-Q also contained statements concerning the Company's "key strategies," its "Basis of

Presentation," and its joint venture with THQ regarding the WWE video game development, similar

to or the same as those statements contained in JAKKS previous SEC filings, reproduced herein,

*supra*.  In addition, the Company's 3Q:02 Form 10-Q also contained expanded Certifications signed

by defendants Friedman and Bennett which purported to certify the veracity and completeness of

JAKKS disclosures, as follows:

### CERTIFICATIONS

1.    I have reviewed this quarterly report on Form 10-Q of JAKKS Pacific, Inc.;

2.    *Based on my knowledge, this quarterly report does not contain any untrue
statement of a material fact or omit to state a material fact necessary to make the
statements made, in light of the circumstances under which such statements were
made, not misleading with respect to the period covered by this quarterly report*;

3.    *Based on my knowledge, the financial statements, and other financial
information included in this quarterly report, fairly present in all material respects
the financial condition, results of operations and cash flows of the registrant as of,
and for, the periods presented in this quarterly report*;

4.    The registrant's other certifying officer and I are responsible for establishing
and maintaining disclosure controls and procedures (as defined in Exchange Act
Rules 13a-14 and 15d-14) for the registrant and we have:

a)    *designed such disclosure controls and procedures to ensure that material
information relating to the registrant, including its consolidated subsidiaries, is
made known to us by others within those entities, particularly during the period in
which this quarterly report is being prepared*;

- 43 -

b)    evaluated the effectiveness of the registrant's disclosure controls and procedures as of a date within 90 days prior to the filing date of this quarterly report (the "Evaluation Date"); and

c)    presented in this quarterly report our conclusions about the effectiveness of the disclosure controls and procedures based on our evaluation as of the Evaluation Date;

5.    The registrant's other certifying officer and I have disclosed, based on our most recent evaluation, to the registrant's auditors and the audit committee of the registrant's board of directors:

a)    all significant deficiencies in the design or operation of internal controls which could adversely affect the registrant's ability to record, process, summarize and report financial data and have identified for the registrant's auditors any material weaknesses in internal controls; and

b)    any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal controls; and

6.    The registrant's other certifying officer and I have indicated in this quarterly report whether or not there were significant changes in internal controls or in other factors that could significantly affect internal controls subsequent to the date of our most recent evaluation, including any corrective actions with regard to significant deficiencies and material weaknesses. [Emphasis added.]

Date: November 14, 2002

112.    Unbeknownst to investors, on January 14, 2003, pursuant to its right under the licensing agreement WWE's auditors formally requested, in writing, that JAKKS provide a complete list of any and all payments made to Shenker, SSAI, Bell and/or any entity controlled by them. On January 17, 2003, JAKKS provided yet another false and misleading response, stating that it had *already* "provided any documents that may exist," in response to the June 11, 2002 subpoena. At that time, defendant Bennett received a copy of JAKKS false response and did nothing to correct it, despite his personal knowledge of the fake invoices presented to the Company by Shenker and/or SSAI and the subsequent payments at issue, all of which he personally directed and orchestrated.

113.    On February 11, 2003, JAKKS issued a press release announcing its financial results

for the fourth quarter and year-ended December 31, 2002. The press release stated, in pertinent part,

as follows:

> For the fourth quarter of 2002, the Company's net sales increased 11.5% to $68.5 million compared to $61.4 million for the corresponding period last year. Net income for the quarter was $7.3 million, or $0.30 per diluted share, compared to $4.4 million, or $0.22 per diluted share for the same period last year . . . .
>
> The Company's net sales for the year increased to a record $3 10 million, compared to $284.3 million for 2001, an increase of 9%. Net income for the year was $31.3 million, or $1.37 per diluted share, compared to $28.2 million or $1.45 per diluted share in 2001 . . . .
>
> Jack Friedman, Chairman and Chief Executive Officer of JAKKS Pacific, offered his perspective on 2002 and the business outlook for 2003, "*Increased sales and earnings, continued diversification of our product lines, expanded distribution channels, and a continuing strong balance sheet, give us much to be pleased with in 2002* – a year that presented overall economic and retail challenges. *These strengths and accomplishments, together with our dedicated employees, and new and exciting licenses and products, give us cause to be optimistic about our prospects for continued growth in 2003 and beyond*."
>
> *               *               *
>
> *Based on current initiatives and economic conditions, the Company is targeted to achieve sales and earnings growth of at least 10% in 2003*, excluding non-recurring charges. [Emphasis added.]

114.    Despite what the *Los Angeles Times* reported as a 65% "jump" in fourth quarter

profits, after releasing these results shares of the Company fell more than 14%. According to *CBS*

*MarketWatch*, on February 12, 2003, JAKKS earnings of $6.2 million, or $0.25 per share, were shy

of analysts' consensus estimate for a profit of $0.33 per share. Partly in response to this share price

decline, on February 16, 2003, JAKKS announced that the Board of the Company had authorized a

$20 million JAKKS share buy-back.

115.    Only weeks after the JAKKS Board authorized this share support, unbeknownst to

investors, on February 25, 2003, WWE auditors again sent a letter to JAKKS requesting copies of all

invoices or a description of each transaction whereby payments were made by the Company to Shenker, SSAI or Stanfull. Later, on March 14, 2003, by letter to JAKKS corporate counsel, WWE again requested an answer as to whether payments had been made by JAKKS to Shenker, Stanfull or SSAI. On March 19, 2003, JAKKS corporate counsel, Murray Skala, ultimately responded to WWE. Despite the fact that JAKKS had provided no information about its relationship with, or payments to, Shenker and/or SSAI, Skala falsely stated that JAKKS had *already* responded to the June 11, 2002 subpoena "months ago." Later, on March 26, 2003, JAKKS counsel again informed WWF that there was "*no additional information*" of the type requested pursuant to the June 11, 2002 subpoena.

116.    On March 31, 2003, JAKKS filed its 2002 Annual Report on Form 10-K with the SEC, which was signed by defendants Bennett, Friedman and Berman, among others. In addition to stating that the Company had "capitalized" on its relationship with the WWE "by obtaining an exclusive worldwide license for [its] joint venture with THQ" to develop and market video games, the 2002 Form 10-K also reiterated the results announced in JAKKS' February 11, 2003 press release. In addition, the Company's 2002 Form 10-K also contained Certifications by defendants Bennett and Friedman as well as statements concerning the Company's "critical accounting policies," its "key strategy" and the agreement with WWE and THQ, similar to or the same as those statements contained in JAKKS previous annual SEC filing, reproduced herein, *supra*.

117.    On April 22, 2003, JAKKS issued a press release announcing its financial results for the first quarter ended March 31, 2003. According to the press release:

> First quarter net sales increased 13.1 % to $67.8 million, compared to $59.9 million in the comparable period last year. Net income for the period increased to $6.0 million, or $0.24 per diluted share, compared to $2.2 million, or $0.11 per diluted share for the first quarter of last year. The Company had 24.9 million diluted shares outstanding in the first quarter of 2003, 23% more than the 20.2 million diluted

- 46 -

shares outstanding in the first quarter of 2002. First quarter 2002 net income excluding one-time acquisition charges was $7.0 million, or $0.35 per diluted share.

Defendant Berman attributed the Company's purportedly positive results to JAKKS' WWE video games and toys, among other products, and stated that the Company is well positioned for continued growth:

> Mr. Berman added, "We are seeing solid inttial (sic) results from our new licenses for the Dragon Ball(R) franchise and Yu Yu Hakusho(R) and retailers are already looking forward to new introductions of these products. And, *relative to our video game joint venture, we are encouraged by the initial feedback for our new video game Wrestlemania XIX, and other WWE(TM) wrestling titles slated for release later this year.*"

> Mr. Berman concluded, "Our financial position remains strong with $135.9 million of working capital, cash in excess of $71 million, or $2.97 per share, and net stockholder's equity of $362 million, or $14.97 per share. Given the strength of our balance sheet and $50 million bank line, *we remain well positioned to continue to grow our business through strategic acquisitions and internal development that will further diversify our product offerings to our existing and new retail customers.*" [Emphasis added.]

118.    On May 15, 2003, JAKKS filed its quarterly report for the first quarter of 2003 on Form 10-Q with the SEC, which was signed by defendant Bennett. The 1Q:03 Form 10-Q reiterated the results announced in the April 22, 2003 press release. The 1Q:03 Form 10-Q also contained Certifications by defendants Friedman and Bennett, as well as statements concerning the Company's "key strategies," its Controls and Procedures, its "Basis of Presentation" and its joint venture with THQ regarding the WWE video game development, similar to or the same as those statements contained in JAKKS previous SEC filings, reproduced herein, *supra*.

119.    On July 22, 2003, JAKKS issued a press release announcing its financial results for the second quarter ended June 30, 2003. In the press release, Defendants stated, in pertinent part, as follows:

> Second quarter net sales were $73.3 million, compared to $79.0 million in the comparable period last year. Excluding one-time charges, net income for the period

was $5.3 million, or $0.21 per diluted share, compared to $8.9 million, or $0.41 per diluted share, for the second quarter of last year . . . .

The Company's net sales for the six months ended June 30, 2003 were $141.0 million compared to $138.9 million during the same period in 2002. Excluding one-time charges, net income during the period was $11.2 million, or $0.45 per diluted share, compared to $15.9 million, or $0.76 per diluted share, for the comparable period last year . . . .

*"The second quarter was a challenging one for JAKKS Pacific, as well as for many of our peers,"* said Jack Friedman, Chairman and Chief Executive Officer. "As a result of general economic conditions and unusually poor weather, particularly in the Northeast section of the United States, cutbacks in orders from some of our customers in late June had an adverse effect on our performance for the quarter as a whole. This included sales of seasonal products, including kites from our Go Fly a Kite line and water products from our Funnoodle and Trendmaster/Storm brands. In addition, due to strict labor constraints in factories throughout China as a result of the SARS epidemic, production continued but was somewhat slowed during the second quarter, causing a delay in the initial shipping of our NASCAR(R) line, as well as a key SpongeBob Squarepants item, which we had expected to ship in June. As a result, we first began to ship these items during the third quarter. [Emphasis added.]

120.    Following the release of these results, defendants hosted a conference call for analysts and investors during which one analyst referred to the quarter as "Quite a train wreck." Defendant Friedman again characterized it merely as "challenging," and stated, in part, the following:

*The second quarter was a challenging one for JAKKS Pacific as well as our peers.* Sales for the second quarter from $73.3 million due the a challenging retail and economic environment, as well as unusually cool weather throughout the U.S., which adversely affected sales of our seasonal products from Go Fly A Kite to Storm(ph) and Funnoodle.

Our top line was also impacted in the second quarter, by the strict work force constraints due to mandated labor quarantines in factories throughout China as a result of SARS epidemic . . . .

Our bottom line earnings were directly affected by lower sales in the second quarter, and by lower margins due to shifts in product mix. Additionally, we saw a lesser contribution from our World Wrestling (inaudible) with THQ, (inaudible) during the second quarter as compared to the last quarter last year, due to fewer game introductions during this time period.

*We are, however, expecting to release three new WWE games through our joint venture during the second half of this year, and we believe joint venture profits for*

- 48 -

*the balance of this year will be well above those during the first six months of 2003.*

*We continue to be excited about the future prospects for our WWE video games . . . .* [Emphasis added.]

121.    Following the announcement of these results, shares of the Company again declined, falling in after-hour trading to just above $10.50 per share. At that time, analysts and investors were very concerned over the fact that Defendants had unexpectedly scaled back JAKKS' growth projections so shortly after selling the $98 million in convertible debt. As Bear Stearns & Co. analyst Joseph Yourman wrote at that time, "we are more troubled by the fact that the Company was marketing a $98 million convertible bond offering in early July if such a dramatic miss was even a remote possibility." Bear Stearns acted as lead underwriter of JAKKS' convertible bond offering.

122.    Adding pressure to the Company's stock price, at the end of July, JAKKS also came under fire from Wall Street analysts over the pay to defendants Berman and Freidman. On July 31, 2003, the Los Angeles Times reported, in part, the following:

*The top two executives at Jakks Pacific Inc.,* under fire from Wall Street analysts over their pay and the company's performance, received *salary increases this year of 14% and 17.5%,* according to a regulatory filing Wednesday.

*The raises, which exceeded the Malibu-based toy maker's 2002 profit and stock performance, came after a tough year for shareholders.* The company's earnings per share fell 5.5% last year, and its stock lost 29%, as the firm struggled to integrate acquisitions and increase the market share of its core brands, including World Wrestling Entertainment action figures.

\*        \*        \*

*For 2003, Friedman and Berman each will take home a salary of $965,000, a 14% increase for Friedman and a 17.5% boost for Berman.*

*Under the bonus plan that is in effect through the end of this year, the two will receive 4% of pretax profit, not to exceed $2 million. Jakks has said its pre-tax profit this year would be flat; if that is the case, each would get a bonus of about $1.4 million.* [Emphasis added.]

- 49 -

123.    According to the *LA Times*, compensation experts said that the Company's filing revealed several "unusual perks" for defendants Friedman and Berman, including:

- Guaranteed annual raises of $25,000 each.

- Restricted stock grants totaling 1.08 million shares over the life of their newly signed eight-year employment contracts, provided only that annual profit at Jakks exceeds $2 million. *At the stock's then current value, those grants were worth $12.5 million.*

- When they signed the new contracts in March, Friedman and Berman received 240,000 shares apiece. Each will get an additional 120,000 shares every year "in consideration for modifying and replacing the pretax income formula for determining his annual bonus and for entering into the amended agreement," according to the filing. *Compensation experts said the two officers didn't need any consideration because the two probably would have little to lose from the new bonus plan.*

- *The length of the new employment contracts was unusual.* Todd Meyer, an independent compensation consultant based in Los Angeles, called eight years "a bit excessive." "*The board is locking the two top executives in for a long time, and they're locking them in at very high total compensation levels,*" he said. Of the companies that make up the Standard & Poor's 500 index, only about two dozen offer executives contracts longer than three years, Hodgson said.

124.    In addition to the foregoing, the LA Times reported that the Company had also failed to elaborate on how JAKKS would determine bonuses for the top two officers. While defendants stated that, under the new bonus plan, which would go into effect during 2004, JAKKS would base bonuses on earnings-per-share growth targets, defendants did not say what the targets would be. According to the *LA Times*, Paul Hodgson, senior research analyst with Corporate Library, a corporate-governance information service, complained that "Unless they tell us what the targets are – and the analysts and the stockholders are satisfied that they're sufficiently challenging – then we're never going to find out whether the incentive pay is aligned with stockholder interests. They could be setting themselves meaningless [targets] of a couple of percent a year." Arvind Bhatia, an analyst with Southwest Securities in Dallas, said the "meagerness" of the information shared by JAKKS "raised questions."

- 50 -

125.    On August 14, 2003, JAKKS filed its quarterly report for the second quarter of 2003 on Form 10-Q with the SEC, which was signed by defendant Bennett. The 2Q:03 Form 10-Q reiterated the results announced in the July 22, 2003 press release. The 2Q:03 Form 10-Q also contained Certifications by defendants Friedman and Bennett which attested to the purported veracity and completeness of the Company's statements. In addition, the 2Q:03 Form 10-Q also contained statements concerning the Company's "key strategies," its "Basis of Presentation," its Controls and Procedures, and  its joint venture with THQ regarding the WWE video game development, similar to or the same as those statements contained in JAKKS previous SEC filings, reproduced herein, *supra*.

126.    Unbeknownst to investors, during the first week of September, JAKKS, through defendant Bennett, had provided to the Company's outside counsel documentary evidence of the illegal payments to the Standfull entity controlled by Shenker. Again, at that time, Defendants made no disclosure to WWE or to investors of the clandestine payments to Shenker and/or SSAI, or the documentary evidence of such payments.

127.    On October 9, 2003, JAKKS issued a press release announcing the launch of the WWE "SmackDown! Here Comes the Pain" video game for the PlayStation 2 game platform. In this press release, defendants again described WWE "SmackDown! Here Comes the Pain" as *the next installment in one of the most successful video game franchises of all time*."

128.    On October 21, 2003, JAKKS issued a press release entitled, "JAKKS Pacific Reports Third Quarter 2003 Financial Results." In this press release defendants stated, in pertinent part, the following:

> Third quarter net sales were $90.3 million, compared to $102.6 million in the comparable period last year. Net income for the period was $9.6 million, or $0.39 per diluted share, compared to $14.0 million, or $0.58 per diluted share, for the third quarter of last year . . . .

- 51 -

The Company's net sales for the nine months ended September 30, 2003 were $231.4 million, compared to $241.5 million during the same period in 2002. Excluding one-time net charges, net income during the period was $20.3 million, or $0.82 per diluted share, compared to $29.9 million, or $1.35 per diluted share, for the comparable period last year . . . .

In addition to reporting what the *Midnight Trader* described as "consensus beating" net income of $0.82 per share, excluding special charges – well above First Call consensus estimates of $0.58 per share – this press release also quoted defendant Friedman, in part, as follows:

> *We remain committed to building long-term growth and profitability for JAKKS Pacific.* Looking ahead, we intend to devote more attention and resources to internal development, building evergreen lines, and building brand identity while providing retailers and consumers with the high quality product lines at reasonable prices they have come to expect from JAKKS since our inception." [Emphasis added.]

129.    The same day, JAKKS also hosted a conference call for analysts and investors during which defendant Friedman made the following remarks about the Company's WWE license:

> *The contribution from our WWE video game joint venture with THQ was modestly up during the third quarter compared to last year.* And recently, (technical difficulty) joint venture announced the release of three new WWE games for Q4. Two games were released at the end of the third quarter, and the other will be released during the fourth quarter of this year. *We believe these new releases will generate joint venture profits comparable to that during the fourth quarter of 2002. We continue to be greatly excited about our WWE video game joint venture.* [Emphasis added.]

130.    Unbeknownst to investors, on or about November 11, 2003, after WWE made it known that it had independently discovered an $80,000.00 payment to Shenker and/or entities controlled by him, defendant Friedman telephoned WWE's Chief Executive Officer, Linda McMahon. During this telephone call, defendant Friedman again misrepresented the true cause of this payment, and told WWE's CEO that such payment related to a "project development" for a mechanical dinosaur project unrelated to the WWE licenses. In addition, at that time, Defendant Friedman also continued to fail to disclose the additional $20,000 payment to Shenker which was paid immediately after the WWE video game license was secured. On or about November 14, 2003,

- 52 -

Defendants presented to WWE a copy of an $80,000 invoice payable to an entity controlled by Shenker, which stated that such payment was for "development of possible latex based soft toys with special coatings."

131.    On November 14, 2003, JAKKS filed its quarterly report for the third quarter of 2003 on Form 10-Q with the SEC, which was signed by defendant Bennett. JAKKS 3Q:03 Form 10-Q reiterated the results announced in the October 21, 2003 press release. The Company's 3Q:03 Form 10-Q also contained Certifications by defendants Friedman and Bennett which attested to the purported veracity and completeness of the Company's statements. In addition, this Form 10-Q also contained statements concerning the Company's "key strategies," its Controls and Procedures, its "Basis of Presentation," and its joint venture with THQ and relationship with WWE, similar to or the same as those statements contained in JAKKS previous SEC filings, reproduced herein, *supra*.

132.    Following the placement of $98 million in convertible notes during the second quarter of 2003, on or about December 23, 2003, Defendants filed a registration statement, registering such notes for sale. In addition to making many of the same or substantially similar representations concerning the financial and operational condition of the Company, this registration statement stated, in part, the following:

> *We have capitalized on our relationship with World Wrestling Entertainment, Inc. (WWE) by obtaining an exclusive worldwide license for our joint venture with THQ Inc. (THQ), which develops, produces, manufactures and markets video games based on World Wrestling Entertainment characters and themes.* Since the joint venture's first title release in 1999, it has released 15 new titles. We have received $34.6 million in preferred returns as our profit from the joint venture through June 30, 2003. [Emphasis added.]

133.    On February 17, 2004, JAKKS issued a press release announcing "record" fourth quarter and year-ended December 31, 2003 results, as follows:

> For the fourth quarter of 2003, net sales increased to $84.4 million from $68.5 million in the comparable period last year. Excluding a pre-tax charge of $2.1 million, or $0.07 per diluted share, for the accounts receivable write-offs attributable

- 53 -

to recent customer bankruptcies, net income for the fourth quarter of 2003 was $8.9 million, or $0.36 per diluted share, as compared to net income of $6.2 million, or $0.25 per diluted share, in the fourth quarter of 2002, which excludes a one-time pre-tax restructuring and recall benefit of $1.4 million. Reported net income for the fourth quarter of 2003 was $7.1 million, or $0.29 per diluted share, as compared to $7.3 million, or $0.30 per diluted share, for the fourth quarter of last year.

The Company's net sales for the year increased to $315.8 million, as compared to $310.0 million in 2002. Excluding the one-time charge of $2.0 million for a product recall earlier in the year, the $2.1 million charge for the customer bankruptcies in 2003, and the net restructuring and recall charges of $6.7 million in 2002, net income for the year was $29.2 million, or $1.18 per diluted share, as compared to $36.5 million, or $1.6 1 per diluted share in 2002. Reported net income for 2003 was $25.9 million, or $1.05 per diluted share, as compared to $31.3 million, or $1.37 per diluted share in 2002.

In "blowing past" Wall Street consensus revenue estimate of $66 million and earnings per share of $0.29, defendant Friedman credited the solid results to the sale of the Company's products featuring key licenses, including its WWE toy and videogame licenses, in part, as follows:

> Jack Friedman, Chairman and Chief Executive Officer, said, *"We are pleased to report another year of solid sales for 2003 including robust growth in the fourth quarter, with strong sell-through in our mass merchant and other retail distribution channels.* While we continue to be affected by a challenging industry environment, including the recent bankruptcies of KB Toys, FAO Schwarz and others, we believe that with our diverse product offerings and categories, *we are well positioned for growth in 2004.* As the number of stores in our primary channel base has declined, we are working to place more SKUs on these shelves, while at the same time concentrating on expanding sales of our products beyond traditional toy retailers to other retail channels, including electronics, drug, convenience and office supply stores.
>
> *We are pleased with sales of our products featuring key licenses during the quarter, including WWE and Dragon Ball figure assortments, and our Atari and Nanmco TV Games.* We have announced a number of new key licenses that we are adding to our TV Games line of product, including Ms. Pac-Man(R) and SpiderMan(R), and are pleased with strong initial sales of our two newest titles: a relaunch of Activision TV Games and a version based on SpongeBob SquarePants."
>
> *JAKKS Pacific is forecasting 2004 net sales, excluding acquisitions, to be in the range of $330 to $340 million and diluted earnings per share of $1.20 to $1.30,* excluding non-cash stock-based compensation expense of $9.3 million, of which $8.3 million is related to restricted stock grants, which the Company expects to incur in the first quarter. [Emphasis added]

- 54 -

134. On March 15, 2004, JAKKS filed its 2003 Annual Report on Form 10-K with the SEC, which was signed by defendants Bennett, Friedman and Berman, among others. In addition to again stating that the Company had "capitalized" on its relationship with the WWE, "by obtaining an exclusive worldwide license for [its] joint venture with THQ" to develop and market video games, the 2003 Form 10-K also reiterated the results announced in JAKKS' February 17, 2004, press release. In addition, the Company's 2003 Form 10-K also contained Certifications by defendants Bennett and Friedman, as well as statements concerning the Company's "critical accounting policies," Controls and Procedures, its "key strategy" and the agreement with WWE and THQ, similar to or the same as those statements contained in JAKKS previous SEC filing, reproduced herein, *supra*.

135. The 2003 Form 10-K also contained a "Code of Ethics" which applies to all employees and executives of the Company. This Code stated, in part, the following:

> *As a public company, it is of critical importance that filings with the Securities and Exchange Commission and others be accurate and timely.* The Subject Parties bear a special responsibility for promoting integrity throughout the Company, with responsibilities to stakeholders both inside and outside of the Company. The Subject Parties have a special role both to adhere to these principles themselves, and also to ensure that a culture exists throughout the Company as a whole that ensures the fair, timely and accurate reporting of the Company's financial results and condition.

> Because of this special role, the Subject Parties are bound by this Code to:

> *act with honesty and integrity, practice and promote ethical conduct, and disclose to the Company's General Counsel, the Board or any committee established by the Company for the purpose of receiving such disclosures (the "Committee"), any material transaction or relationship that reasonably could be expected to give rise to actual or apparent conflicts of interest between any Subject Party's personal and professional relationships*;

> *provide information in the Subject Party's possession that is complete, objective, relevant, and otherwise necessary to ensure the Company provides full, fair, accurate, timely and understandable disclosure in the reports and documents that the Company files with, or submits, to, the Securities and Exchange Commission* or others, and in other public communications made by the Company;

- 55 -

*comply with applicable laws, rules, standards, best practices and regulations of federal, state, provincial and local governments*, and other appropriate private and public regulatory, listing and standard-setting agencies; and

*avoid any breach of fiduciary duty*, any self-interested transactions with the Company without full disclosure to the Board or Committee, and promptly report to the Company's General Counsel, the Board or the Committee any conduct *that he or she believes is or may be in violation of law, regulations, business ethics or of any provision of this Code*, including any transaction or relationship that reasonably could be expected to give rise to such a violation.

*Any waiver of or amendment to this Code may only be made by the Board and will be promptly disclosed in accordance with applicable laws, rules and regulations.* Requests for waivers of any provision of this Code must be made in writing to the Board. [Emphasis added.]

136.    On April 20, 2004, JAKKS issued a press release announcing its financial results for

the first quarter ended March 31, 2004. In the press release, Defendants stated, in relevant part, the

following:

First quarter net sales increased 9.2% to $74.0 million in 2004, from $67.8 million in the comparable period last year. Excluding the impact of noncash stock-based compensation, and additional bad debt related to the prior bankruptcy filing of a major customer in 2004, net income for the period was $6.0 million, or $0.23 per diluted share, compared to $5.2 million, or $0.21 per diluted share for the first quarter of last year. Reported net income for first quarter 2004, including pre-tax charges of $1.7 million for non-cash stock-based compensation and $0.4 million for bad debt, was $4.3 million, or $0.17 per diluted share, compared to $6.0 million, or $0.24 per diluted share in 2003.

Again, defendant Berman used this press release to condition investors to believe that sales of the

Company's successful WWE licensed toys and games had driven, and foreseeably would continue to

drive, strong financial results at JAKKS. Defendants Berman was quoted, in part, as follows:

"*We are also pleased with sales of our World Wrestling Entertainment(TM)*, Dragon Ball(R) and Mucha Lucha(TM) action figures and Road Champs(R) vehicles. Some additions to our product offerings include toys based on Universal Studios' Classic Monsters and new monsters based on the feature film Van Helsing(TM), which is scheduled for a May release. We expect these new licenses, combined with our core business, will contribute to our top and bottom line growth in 2004 and beyond."

- 56 -

Mr. Berman concluded, "*Our financial position remains strong* with $248.9 million of working capital, including cash of $156.6 million as of March 31, 2004. Given the strength of our balance sheet and positive cash flow, *we remain well positioned to continue to grow our business by actively pursuing additional complementary and accretive acquisitions, executing on internal growth initiatives and securing new licenses* that provide both near term and long-term growth potential and market share expansion opportunities." [Emphasis added.]

137.    The same day, April 20, 2004, JAKKS also issued a press release announcing the proposed acquisition of Play Along, a privately held toy company based in Florida and Hong Kong. Consideration for the acquisition was anticipated to be up to $116 million, consisting of $75 million in cash, approximately $11 million in JAKKS stock and an earn-out provision of approximately $30 million.

138.    Based on the Company's purported strong financial and operational results and also based, in part, on the announcement that JAKKS was acquiring Play Along, shares of the Company rallied. The following day, April 21, 2004, shares of JAKKS were trading up over $2.25 per share, to close at $17.50 per share.

139.    On April 26, 2004, JAKKS filed its quarterly report for the first quarter of 2004 on Form 10-Q with the SEC, which was signed by defendant Bennett. The 1Q:05 Form 10-Q reiterated the results announced in the April 20, 2004 press release. The Company's 1Q:04 Form 10-Q also contained Certifications by defendants Friedman and Bennett, as well as statements concerning the Company's strategies, its Controls and Procedures, its "Basis of Presentation," and its joint venture with THQ and relationship to WWE, similar to or the same as those statements contained in JAKKS previous SEC filings, reproduced herein, *supra*.

140.    On May 6, 2004, JAKKS issued a press release titled, "World Wrestling Entertainment Line-up Set to Enter the Ring." The press release announced the Company's 2005 WWE licensed video game line-up and guided investors to believe that these games would, foreseeably, continue to drive revenues and earnings in the near-term, in part, as follows:

- 57 -

THQ Inc. (Nasdaq:THQI) and JAKKS Pacific, Inc. (Nasdaq:JAKK) today announced their fiscal 2005 World Wrestling Entertainment(R) (NYSE:WWE) licensed videogame line-up. In addition to the previously announced WWE(TM) Day of Reckoning(TM), which is scheduled for release for the Nintendo(R) GameCube(TM) in Fall 2004, THQ plans to release WWE(TM) licensed videogames for the PlayStation(R) 2 computer entertainment system, Xbox(TM) video game system from Microsoft and Nintendo(R)'s Game Boy(R) Advance.

WWE(TM) SmackDown!(TM) Vs. Raw(TM) -- Scheduled for release exclusively on PlayStation 2 for holiday 2004 -- Two of the biggest brands in Sports Entertainment will face-off this holiday season. Developed by Yukes, WWE SmackDown! Vs. *Raw takes the top-selling, critically acclaimed SmackDown! franchise to the next level* with added features and improved graphics. [Emphasis added.]

141.    On July 20, 2004, JAKKS issued a press release entitled, "JAKKS Pacific Reports Second Quarter 2004 Financial Results; Company Achieves Record Sales and Earnings; Revenue Increased 49% to $109AM and Net Income Increased 62% to $9.9M." In the press release, Defendants stated, in relevant part, the following:

Second quarter net sales increased 49% to $109.4 million in 2004, compared to $73.3 million in the comparable period last year. Excluding non-cash stock-based compensation and restricted stock charges and also a one-time charge in 2003, net income for the period increased 62% to $9.9 million, or $0.38 per diluted share, compared to $6.1 million, or $0.25 per diluted share, for the second quarter of last year. Reported net income for the second quarter of 2004, including pre-tax non-cash stock-based compensation and restricted stock charges of $4.3 million, was $6.6 million, or $0.25 per diluted share, in 2004, compared to $3.2 million, or $0.13 per diluted share, for the same period last year, after a charge of $1.1 million for stock-based compensation and a one-time pre-tax charge of $2.7 million relating to a voluntary product recall.

\*        \*        \*

*"We are very excited to report record revenue and net income for the second quarter and believe that we are on track to achieve the upper range of our increased 2004 guidance,"* said Jack Friedman, Chairman and Chief Executive Officer of JAKKS Pacific . . . .

\*        \*        \*

Mr. Berman continued, "Despite the record results, we continue to focus on areas of our business that can be improved . . . ."

"*We are enthusiastic about the opportunity to grow our business and are very encouraged about the upcoming holiday season based on early responses from our retailer partners.* We believe that we will have prime placement for our TV Games line in the third and fourth quarters of this year, and expect our Dragon Ball, *World Wrestling Entertainment and extreme sports product lines, as well as other lines to also do well*." [Emphasis added.]

142.    On August 9, 2004, JAKKS filed its quarterly report for the second quarter of 2004 on Form 10-Q with the SEC, which was signed by defendant Bennett. The 2Q:04 Form 10-Q reiterated the results announced in the July 20, 2004 press release. The Company's 2Q:04 Form 10-Q also contained Certifications by defendants Friedman and Bennett, as well as statements concerning the Company's strategies, its Controls and Procedures, its "Basis of Presentation," and its joint venture with THQ and relationship to WWE, similar to or the same as those statements contained in JAKKS' previous SEC filings, reproduced herein, *supra*.

143.    On August 30, 2004, JAKKS issued a press release announcing that the Company had begun shipping WWE "Day of Reckoning" video games for the Nintendo GameCube platform. At that time, Company spokesman Nelo Lucich, Vice President of Interactive for JAKKS stated, "*WWE licensed videogames are becoming deeper than ever,* and we're pleased to give GameCube fans a solid addition to their library with WWE Day of Reckoning."

144.    On or about September 10, 2004, JAKKS filed its Proxy Statement in connection with the election of directors for 2004-2005 with the SEC. According to the Proxy, for 2003 under the terms of their modified employment agreements, both defendants Friedman and Berman received base salaries of $965,000, bonuses of $1.327 million and restricted stock awards of 2.524 million shares. In addition, the Proxy also reported that the law firm of Feder, Kaszovitz, Isaacson, Weber, Skala *et al.*, had earned legal fees and expenses related to the Company in excess of $3.682 million during 2003.

- 59 -

145.    The statements referenced above in ¶¶56-58, 61-73, 76-89, 91, 93-99, 102-108, 110-111, 113, 116-120, 125, 127-129, 131-137, and 139-144 were each materially false and misleading, and were known by defendants to be false at that time, or were recklessly disregarded as such thereby, because they failed to disclose and misrepresented the following adverse facts:

(a)    that JAKKS had obtained the WWE toy and videogame licenses as a result of an illegal commercial bribery scheme;

(b)    that JAKKS relationship with the WWE was being negatively impacted by the WWE's contention that the licenses it had granted to the Company were improperly obtained;

(c)    given the foregoing, the Company was subject to the heightened risk that the WWE would seek some modification to the WWE licensing agreements or complete nullification of those agreements which would negatively impact the Company's future financial results; and

(d)    based on the foregoing, Defendants' positive statements about the Company's earnings and prospects were lacking in a reasonable basis at all times.

**THE TRUTH EMERGES**

146.    The truth about the Company began to emerge on October 19, 2004.  On that date, before the market opened, Defendants shocked investors when JAKKS published a press release reporting third quarter 2004 results, in which JAKKS first revealed that the Company was "engaged in discussions with the WWE" concerning the "validity of the licenses as a result of certain transactions between the Company and that licensing consultant that occurred more than six years ago." This press release stated, in relevant part, the following:

> *The Company also announced that it is engaged in discussions with WWE concerning the restructuring of its toy license and with WWE and THQ with respect to the restructuring of the JAKKS THQ Joint Venture video games license agreement with WWE.* The discussions are an outgrowth of certain litigation that has been pending between WWE and a former licensing consultant to WWE and a former employee of WWE, to which the Company is not a party. *WWE has raised questions about the validity of the licenses as a result of certain transactions*

- 60 -

*between the Company and that licensing consultant that occurred more than six years ago. The Company has denied any wrongdoing in connection with the transactions with the licensing consultant and maintains that they are unrelated to either the toy or video game license.* If the discussions are satisfactorily concluded, the restructuring of the licenses may have an impact on the Company's future revenues and net income to an extent that is presently unknown. *If the discussions with WWE and THQ are not satisfactorily concluded, the Company anticipates that litigation is likely to be commenced by WWE, challenging the validity of the licenses and seeking compensatory and punitive damages, in which event the Company intends to vigorously defend itself against claims which it believes are without merit.* [Emphasis added]

147. In reaction to this news, the price of JAKKS common stock declined precipitously, falling $5.34 per share, or 22% from its previous day's closing price of $24.15, to close at $18.81. After the close of trading, shares continued to fall in after-hours trading, dropping to $17.85 per share.

148. Later that day, defendants hosted a conference call for analysts and investors. When asked about the WWE dispute, however, defendants refused to answer questions or provide more information. Accordingly, when asked what sort of impact the dispute would have on JAKKS toy and video game sales, defendant Friedman stated, "Until our discussions are completed, we cannot comment about this subject at all." Similarly, when defendant Bennett was asked if he could provide "more color" on the WWE dispute, he stated that "we cannot make any further comments."

149. Later that same day, also on October 19, 2004, news reports indicated that the WWE had filed a complaint against JAKKS and the Individual Defendants, among others, alleging that they had perpetrated a massive bribery scheme involving lucrative license deals. WWE alleged that in order to obtain the WWE videogame license and favorable amendments to the toy licenses, JAKKS made substantial bribery payments to Stanley Shenker, president and sole owner of SSAI, and James Bell, WWE's former licensing and merchandising senior vice president. To conceal the payments, JAKKS laundered monies through its foreign bank accounts and corporations to pay Shenker via Shenker's Hong Kong corporation. Shenker then split the payments with Bell. The

- 61 -

details of JAKKS' corrupt scheme were set forth in the WWE complaint which alleged as follows, in relevant part:

> *During the conversation regarding Shenker serving as Jakks' agent on WWE matters at the same time he was a WWE agent, a call was placed by Friedman, Berman and Shenker to Mr. Murray Skala, Jakks' outside legal counsel and a member of the Board of Directors of Jakks, regarding the proposed arrangement. Mr. Skala advised all participants in the call that it would be a conflict of interest for Shenker to serve as Jakks' agent on WWE matters at the same time Shenker was acting as WWE's agent* and that such an arrangement could not be done without first making full disclosure to WWE and obtaining their consent.

> *Following the conversation with Jakks' corporate counsel, neither Friedman, Berman, Shenker, nor Jakks disclosed the conversation to WWE nor sought their consent.* On information and belief, all three men did not disclose the conversation because they knew WWE would not agree to such an obvious conflict of interest and because disclosure might also cause it to be revealed that Shenker was already acting as Jakks' agent. Instead, *all three men kept the conversation secret and eventually implemented, in or around 1998, a plan whereby Shenker would accept and split bribes from Jakks with Bell to secure the videogame license and related amendments to the domestic toy license and an international toy license secured by Jakks following the aforementioned conversation.* The plan devised and implemented *by Jakks and its three highest executives utilized monies laundered through foreign corporations controlled by Jakks and bank accounts of those foreign corporations in Hong Kong.* An essential part of the scheme was that the monies paid as commercial bribes were *not recorded anywhere on the financial books and records of Jakks* situated in America at the headquarters of the parent corporation.

> On or about February 10, 1997, WWE and Jakks entered into an international toy license having a term which was to end on December 31, 1999. *At no time prior to entering into the license did SSAI, Shenker or Jakks disclose that Shenker had performed services for Jakks.* Likewise none of the aforementioned parties disclosed to WWE the conversation about Shenker serving as Jakks' agent on WWE matters.

*    *    *

> *In order to place Jakks in control of the videogame license,* and with the intent to cause SSAI and Bell to breach their fiduciary duties, Defendants *Friedman and/or Berman and/or Bennett devised and implemented a corrupt scheme to foreclose competition for the videogame license and to obtain it by the commercial bribery of Shenker and Bell.* Pursuant to the scheme, Jakks agreed to pay monies to Shenker's alter ego – Stanfull – by *a series of payments to Stanfull's foreign bank account with the understanding that Shenker would then serve as a conduit for the payment of bribes directly to Bell.*

- 62 -

\*        \*        \*

*On or about January 14, 1998,* acting upon the direction of Defendant Bennett, *$40,000 was, in fact, paid to Stanfull via a series of transactions undertaken with the intent to conceal the transactions and bury them in fraudulent accounting* of foreign corporations owned by Jakks and bank accounts of those foreign subsidiaries.

*On January 14, 1998, $40,000 was withdrawn from an account at the Hang Seng Bank in Hong Kong of Road Champs, Ltd.* ("Road Champs"), a foreign subsidiary owned and/or controlled by Jakks. The $40,000 was deposited that same day into Stanfull's bank account at the Hang Seng Bank.

*On January 14, 1998,* the same day as the Jakks' monies were deposited into Stanfull's account, *Shenker, acting in concert with Jakks to conceal the disposition of the monies, and with the intent of inducing Bell to violate his fiduciary duties, obtained a demand draft for $20,000 payable to James Bell from the Hang Seng Bank,* which he subsequently gave to Bell upon returning to the United States, thereby splitting the money equally with Bell.

\*        \*        \*

*On March 31, 1998, the day after Bell had initialed the deal memo recommending that the videogame license be awarded to Jakks, Defendant Bennett again directed Will Hons to use Jakks' foreign subsidiaries to pay another $40,000 to Stanfull.* Bennett advised Hons on the day after Bell had recommended to WWE management that it grant the videogame license to Jakks that it was "imperative" that the funds be available to Stanfull not later than April 2, 1998.

\*        \*        \*

Having obtained WWE's agreement to grant the videogame license to Jakks *via* the aforementioned scheme, and in order to get a cut of the anticipated revenues from the anticipated revenues associated with the videogame license, *Jakks then solicited THQ to become a Joint Venture partner instead of submitting an independent proposal on behalf of THQ. THQ agreed to become a Joint Venture partner* with Jakks on the videogame license instead of making its own formal and independent proposal, *and agreed to pay Jakks monies which otherwise would have, and should have, been promised to WWE in an independent proposal.* THQ did so as consideration for Jakks' role in securing the license. *For all intents and purposes, Jakks and THQ both knew that the videogame license would be performed by THQ as Jakks had no ability to perform a videogame license.* [Emphasis added.]

150.    In response to the WWE Action, JAKKS published a press release on October 19, 2004, at 9:51pm, stating, in relevant part, the following:

JAKKS Pacific, Inc. announced that a civil lawsuit was filed in the United States District Court for the Southern District of New York yesterday afternoon by World

Wrestling Entertainment, Inc. ("WWE") concerning the video game license between WWE and the joint venture company operated by the Company and THQ, Inc. and the toy license between the Company and WWE. The Company denies any allegations of wrongdoing and believes that it will be completely vindicated in the litigation, and looks forward to having the claims against it dismissed. The Company will continue to devote its full energies and resources to bringing its outstanding products to market during the busy holiday season and beyond.

151. The following trading day, October 20, 2004, the price of JAKKS stock fell an additional $5.85 per share, or 31% from its regular session closing price on October 19, 2004, to close at $12.96. The Daily News of Los Angeles reported at least one analysts' reaction who stated, *"If this gets carried through and it gets into a nasty court fight, it could hurt their relationship with other licenses. You'd think, if they really did this to WWE, why would I want to do business with them?"* In addition, investors were also concerned by reports that WWE was seeking to make the JAKKS license "void and unenforceable" due to commercial bribery as well as indications that WWE is asking for treble and punitive damages.

152. As a result of the foregoing, that day, analysts at Whitaker Securities downgraded the Company to "SELL" from "BUY." Likewise, Southwest Securities lowered its rating to "NEUTRAL" from "STRONG BUY." Monarch Research also adopted a "SELL" rating on shares of the Company.

153. As a prologue to these events, on February 12, 2005, the Ventura County Star (California) reported that James Bell had pleaded guilty to taking kickbacks in connection with WWE's licensing deal with JAKKS. According to this report, Bell pleaded guilty to mail fraud in U.S. District Court in Bridgeport, Connecticut. According to a statement by the state attorney general, Bell will face a maximum sentence of five years and a fine of $3.8 million for defrauding WWE.

- 64 -

## UNDISCLOSED ADVERSE INFORMATION

154.    The market for JAKKS' securities was open, well-developed and efficient at all relevant times.  As a result of these materially false and misleading statements and failures to disclose, JAKKS' common stock traded at artificially inflated prices during the Class Period.  The artificial inflation continued until at least October 19, 2004.  Plaintiff and other members of the Class purchased or otherwise acquired JAKKS securities relying upon the integrity of the market price of JAKKS' securities and market information relating to JAKKS, and have been damaged thereby.

155.    During the Class Period, defendants materially misled the investing public, thereby inflating the price of JAKKS' securities, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make defendants' statements, as set forth herein, not false and misleading.  Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations.

156.    At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by plaintiff and other members of the Class.  As described herein, during the Class Period, defendants made or caused to be made a series of materially false or misleading statements about JAKKS' business, prospects and operations.  These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of JAKKS and its business, prospects and operations, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times.  Defendants' materially false and misleading statements during the Class Period resulted in plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein.

- 65 -

## LOSS CAUSATION/ECONOMIC LOSS

157.    During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated JAKKS' stock price and operated as a fraud or deceit on Plaintiffs and Class Period purchasers of JAKKS securities by failing to disclose that the Company had obtained the WWE licenses through commercial bribery, that the Company's relationship with the WWE was being negatively impacted by the WWE's contention that the licenses it had granted the Company were improperly obtained and that the Company was subject to the heightened risk that the WWE would seek some modification to the WWE licensing agreements as complete nullification of those agreements.    When Defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the price of JAKKS securities fell precipitously as the prior artificial inflation came out of JAKKS' stock price. As a result of their purchases of JAKKS stock during the Class Period, Plaintiffs and the other Class members suffered economic loss, *i.e.*, damages under the federal securities laws.

158.    By improperly concealing the problems with the WWE licenses, Defendants presented a misleading picture of JAKKS' business and prospects. Thus, instead of truthfully disclosing during the Class Period the true risks that JAKKS was exposed to, Defendants caused JAKKS to conceal the problems with the WWE licenses.

159.    Defendants' false and misleading statements had the intended effect and caused JAKKS securities to trade at artificially inflated levels throughout the Class Period.

160.    As a direct result of Defendants' admissions and the public revelations regarding the problems with the WWE licenses, JAKKS stock price plummeted approximately 46%, falling from $24.15 per share to $12.96 per share. This drop removed the inflation from JAKKS stock price,

causing real economic loss to investors who had purchased the Company's securities during the Class Period.

161.    The approximate 46% decline in JAKKS stock price at the end of the Class Period was a direct result of the nature and extent of Defendants' fraud finally being revealed to investors and the market. The timing and magnitude of JAKKS stock price declines negate any inference that the loss suffered by Plaintiffs and the other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to the defendants' fraudulent conduct. The economic loss, *i.e.*, damages, suffered by Plaintiffs and the other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate JAKKS stock price and the subsequent significant decline in the value of JAKKS stock when Defendants' prior misrepresentations and other fraudulent conduct was revealed.

## ADDITIONAL SCIENTER ALLEGATIONS

162.    As alleged herein, Defendants acted with scienter in that defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, defendants, by virtue of their receipt of information reflecting the true facts regarding JAKKS, their control over, and/or receipt and/or modification of JAKKS' allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning JAKKS, participated in the fraudulent scheme alleged herein.

- 67 -

163.    In addition, defendants were motivated to engage in the fraudulent scheme in order for Company insiders, including the Individual Defendants, to sell hundreds of thousands of their personally-held JAKKS securities and reap millions of dollars in proceeds, as follows:

| Insider | Date of Sales | # of Shares Sold | Price ($) | Value of Sales ($) |
|---|---|---|---|---|
| Jack Friedman (Chairman and Chief Executive Officer) | 12/08/1999 | 355,635 | 23.62 | 8,400,098.70 |
| | 06/29/2001 | 135,000 | 18.81 | 2,538,675.00 |
| | 10/22/2001 | 57,800 | 19.20 | 1,109,760.00 |
| | 10/23/2001 | 86,700 | 18.06 | 1,565,802.00 |
| | 10/24/2001 | 25,500 | 18.00 | 459,000.00 |
| | 05/29/2002 | 150,078 | 17.75 | 2,663,884.50 |
| | 05/29/2002 | 149,922 | 17.75 | 2,661,115.50 |
| **Total Friedman:** | | **960,635** | | **19,398,335.70** |
| Stephen G. Berman (President, Chief Operating Officer, and Secretary) | 12/08/1999 | 133,254 | 23.62 | 3,147,459.48 |
| | 06/29/2001 | 63,260 | 18.80 | 1,189,288.00 |
| | 06/29/2001 | 1,740 | 18.80 | 32,712.00 |
| | 10/22/2001 | 27,200 | 19.20 | 522,240.00 |
| | 10/23/2001 | 40,800 | 18.06 | 736,848.00 |
| | 10/24/2001 | 12,000 | 18.00 | 216,000.00 |
| | 05/29/2002 | 42,514 | 17.75 | 754,623.50 |
| | 05/29/2002 | 44,986 | 17.75 | 798,501.50 |
| | 05/29/2002 | 62,500 | 17.75 | 1,109,375.00 |
| **Total Berman:** | | **428,254** | | **8,507,047.48** |
| Joel M. Bennett (Chief Financial Officer and an Executive Vice President) | 07/27/2001 | 20,000 | 19.93 | 398,600.00 |
| | 07/27/2001 | 7,710 | 19.93 | 153,660.30 |
| | 07/27/2001 | 39 | 19.93 | 777.27 |
| | 07/27/2001 | 1 | 19.93 | 19.93 |
| | 08/03/2001 | 5,148 | 20.60 | 106,048.80 |

- 68 -

| Insider | Date of Sales | # of Shares Sold | Price ($) | Value of Sales ($) |
|---|---|---|---|---|
| | 08/03/2001 | 5,148 | 20.60 | 106,048.80 |
| | 08/03/2001 | 3,523 | 20.60 | 72,573.80 |
| | 08/03/2001 | 1,328 | 20.60 | 27,356.80 |
| | 08/03/2001 | 1,328 | 20.60 | 27,356.80 |
| | 08/20/2001 | 5,770 | 20.63 | 119,035.10 |
| | 08/20/2001 | 5,770 | 20.63 | 119,035.10 |
| | 08/20/2001 | 530 | 20.63 | 10,933.90 |
| | 08/20/2001 | 530 | 20.63 | 10,933.90 |
| | 02/27/2002 | 3,855 | 19.33 | 74,517.15 |
| | 02/27/2002 | 1,329 | 19.33 | 25,689.57 |
| | 08/10/2004 | 1,000 | 19.50 | 19,500.00 |
| | 08/11/2004 | 29,510 | 19.25 | 568,067.50 |
| | 08/13/2004 | 4,680 | 19.50 | 91,260.00 |
| **Total Bennett:** | | **97,199** | | **1,931,414.72** |
| Michael Bianco (Executive Vice President) | 08/07/2001 | 4,059 | 20.55 | 83,412.45 |
| | 08/07/2001 | 1,466 | 20.55 | 30,126.30 |
| | 08/08/2001 | 5,687 | 20.70 | 117,720.90 |
| | 08/08/2001 | 1,544 | 20.70 | 31,960.80 |
| | 08/10/2001 | 4,600 | 21.55 | 99,130.00 |
| | 08/16/2001 | 1,000 | 21.00 | 21,000.00 |
| | 11/06/2001 | 7,500 | 19.51 | 146,325.00 |
| | 11/06/2001 | 100 | 19.52 | 1,952.00 |
| | 11/07/2001 | 16,500 | 20.00 | 330,000.00 |
| | 11/07/2001 | 12,150 | 19.75 | 239,962.50 |
| | 11/07/2001 | 7,800 | 19.77 | 154,206.00 |
| | 11/07/2001 | 6,850 | 20.90 | 143,165.00 |
| | 11/07/2001 | 2,500 | 20.02 | 50,050.00 |
| | 11/07/2001 | 2,300 | 20.91 | 48,093.00 |
| | 11/07/2001 | 1,850 | 19.76 | 36,556.00 |
| | 11/07/2001 | 900 | 20.01 | 18,009.00 |
| | 11/07/2001 | 600 | 20.94 | 12,564.00 |
| | 11/07/2001 | 100 | 19.78 | 1,978.00 |
| | 11/07/2001 | 100 | 19.79 | 1,979.00 |
| | 11/07/2001 | 100 | 20.05 | 2,005.00 |
| **Total Bianco:** | | **77,706** | | **1,570,194.95** |

- 69 -

| Insider | Date of Sales | # of Shares Sold | Price ($) | Value of Sales ($) |
|---|---|---|---|---|
| David C. Blatte (Director) | 03/08/2002 | 2,000 | 18.85 | 37,700.00 |
| | 03/12/2002 | 2,000 | 18.75 | 37,500.00 |
| | 03/14/2002 | 6,000 | 19.07 | 114,420.00 |
| | 03/14/2002 | 2,000 | 19.60 | 39,200.00 |
| | 03/15/2002 | 2,000 | 20.00 | 40,000.00 |
| | 03/15/2002 | 1,000 | 20.60 | 20,600.00 |
| **Total Blatte:** | | **15,000** | | **289,420.00** |
| Robert E. Glick (Director) | 12/08/1999 | 45,000 | 23.62 | 1,062,900.00 |
| | 07/26/2001 | 9,375 | 18.76 | 175,875.00 |
| | 07/26/2001 | 9,375 | 18.76 | 175,875.00 |
| | 07/26/2001 | 8,662 | 18.76 | 162,499.12 |
| | 05/29/2002 | 9,375 | 17.75 | 166,406.25 |
| | 05/29/2002 | 625 | 17.75 | 11,093.75 |
| **Total Glick:** | | **82,412** | | **1,754,649.12** |
| Michael G. Miller (Director) | 12/08/1999 | 45,000 | 23.62 | 1,062,900.00 |
| | 07/26/2001 | 9,375 | 18.77 | 175,922.81 |
| | 07/26/2001 | 9,375 | 18.77 | 175,922.81 |
| | 07/26/2001 | 7,537 | 18.77 | 141,432.56 |
| | 05/29/2002 | 9,302 | 17.75 | 165,110.50 |
| | 05/29/2002 | 698 | 17.75 | 12,389.50 |
| **Total Miller:** | | **81,1287** | | **1,733,678.18** |
| Michael L. Skala (Director) | 12/08/1999 | 60,000 | 23.62 | 1,417,200.00 |
| | 07/23/2001 | 9,375 | 18.00 | 168,783.75 |
| | 07/23/2001 | 9,375 | 18.00 | 168,783.75 |
| | 07/23/2001 | 8,137 | 18.00 | 146,495.29 |
| | 07/23/2001 | 3,598 | 18.00 | 64,776.95 |
| | 05/29/2002 | 9,375 | 17.75 | 166,406.25 |
| | 05/29/2002 | 9,375 | 17.75 | 166,406.25 |
| | 05/29/2002 | 9,375 | 17.75 | 166,406.25 |
| | 05/29/2002 | 1,875 | 17.75 | 33,281.25 |
| **Total Skala:** | | **120,485** | | **2,498,539.74** |
| **Total Insiders:** | | **1,862,978** | | **$37,683,279.89** |

- 70 -

## FIRST CLAIM

### VIOLATION OF SECTION 10(b) OF
### THE EXCHANGE ACT AND RULE 10b-5
### PROMULGATED THEREUNDER AGAINST ALL DEFENDANTS

164.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

165.    During the Class Period, JAKKS and the Individual Defendants, and each of them, carried out a plan, scheme and course of conduct which was intended to aid, throughout the Class Period, did: (i) deceive the investing public, including plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of JAKKS' securities; (iii) allow Company Insiders, including defendants herein, to sell over $37.68 million of their privately held Company stock and to facilitate the offering of millions of more shares of JAKKS stock and almost $100 million of convertible debt during the Class Period, and (iv) cause Plaintiffs and other members of the Class to purchase JAKKS' securities at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

166.    Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for JAKKS' securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

167.    In addition to the duties of full disclosure imposed on defendants as a result of their making of affirmative statements and reports, or participation in the making of affirmative

- 71 -

statements and reports to the investing public, defendants had a duty to promptly disseminate truthful information that would be material to investors in compliance with the integrated disclosure provisions of the SEC as embodied in SEC Regulation S-X (17 C.F.R. Sections 210.01 et seq.) and Regulation S-K (17 C.F.R. Sections 229.10 et seq.) and other SEC regulations, including accurate and truthful information with respect to the Company's operations, financial condition and earnings so that the market price of the Company's securities would be based on truthful, complete and accurate information.

168.    JAKKS and the Individual Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of JAKKS as specified herein.

169.    These defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of JAKKS' value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about JAKKS and its business operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of JAKKS' securities during the Class Period.

170.    Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team

- 72 -

or had control thereof; (ii) each of these defendants, by virtue of his responsibilities and activities as a senior officer and/or director of the Company was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of and had access to other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

171.    The defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.  Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing JAKKS' operating condition and future business prospects from the investing public and supporting the artificially inflated price of its securities.  As demonstrated by defendants' overstatements and misstatements of the Company's business, operations and earnings throughout the Class Period, defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

172.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of JAKKS' securities was artificially inflated during the Class Period.  In ignorance of the fact that market prices of JAKKS'

publicly-traded securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by defendants, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was know to or recklessly disregarded by defendants but not disclosed in public statements by defendants during the Class Period, Plaintiffs and the other members of the Class acquired JAKKS securities during the Class Period at artificially high prices and were damaged thereby.

173. At the time of said misrepresentations and omissions, Plaintiffs and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiffs and the other members of the Class and the marketplace known of the true financial condition and business prospects of JAKKS, which were not disclosed by defendants, Plaintiffs and other members of the Class would not have purchased or otherwise acquired their JAKKS securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

174. By virtue of the foregoing, defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

175. As a direct and proximate result of defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## SECOND CLAIM

### VIOLATION OF SECTION 20(a) OF
### THE EXCHANGE ACT AGAINST THE INDIVIDUALS DEFENDANTS

176. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

- 74 -

177.   The Individual Defendants acted as controlling persons of JAKKS within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which plaintiff contends are false and misleading.  The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

178.   In particular, each of these defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

179.   As set forth above, JAKKS and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

1.      Determining that this action is a proper class action and appointing Plaintiffs as class representatives under Rule 23 of the Federal Rules of Civil Procedure;

2.      Awarding compensatory damages in favor of Plaintiffs and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

3.      Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

4.      Such other and further relief as the Court may deem just and proper.

### JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

DATED: July 11, 2005               LERACH COUGHLIN STOIA GELLER
                                      RUDMAN & ROBBINS LLP
                                   SAMUEL H. RUDMAN (SR-7957)
                                   DAVID A. ROSENFELD (DR-7564)
                                   MARIO ALBA, JR. (MA-7240)


                                   _____
                                          SAMUEL H. RUDMAN

                                   200 Broadhollow Road, Suite 406
                                   Melville, NY  11747
                                   Telephone: 631/367-7100
                                   631/367-1173 (fax)

- 76 -

MILBERG WEISS BERSHAD
  & SCHULMAN LLP
STEVEN G. SCHULMAN (SS-2561)
DANIEL B. SCOTTI (DS-4139)

_____

DANIEL B. SCOTTI

One Pennsylvania Plaza
New York, NY 10119-0165
Telephone: 212/594-5300
212/868-1229 (fax)

Lead Counsel for Lead Plaintiffs and the Class

I:\Jakks\Pleadings\050711 Consolidated Complaint.doc

Exhibit C

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

IN RE JAKKS PACIFIC INC.,
SHAREHOLDERS CLASS ACTION
LITIGATION

Case No. 04-CV-8807 (KMK)

<u>OPINION & ORDER</u>

<u>Appearances</u>:

Kirk E. Chapman, Esq.
Peter Edward Seidman, Esq.
Sharon Maine Lee, Esq.
Milberg Weiss Bershad & Schulman, LLP
New York, New York
*Counsel for Plaintiffs*

David Avi Rosenfeld, Esq.
Samuel Howard Rudman, Esq.
Mario Alba, Jr., Esq.
Coughlin, Stoia, Geller, Rudman & Robbins, LLP
Melville, New York
*Counsel for Plaintiff Lydia Garcia and others similarly situated*

William Edward Bernarduci, Esq.
Schatz and Nobel PC
Hartford, Connecticut
*Counsel for Plaintiff Allan Schrager*

Ken H. Chang, Esq.
Marian P. Rosner, Esq.
Michael Adam Schwartz, Esq.
Wolf Popper LLP
New York, New York
*Counsel for Plaintiff James T. Kahn and others similarly situated*

Frederick Taylor Isquith, Sr., Esq.
Gustavo Fabian Bruckner, Esq.
Wolf, Haldenstein, Adler, Freeman & Herz L.L.P.
New York, New York
*Counsel for Plaintiff Quantum Equities L.L.C. and others similarly situated*

Alfred G. Yates, Jr., Esq.
Gerald L. Rutledge, Esq.
Pittsburgh, Pennsylvania
*Counsel for Plaintiff James Irvine and others similarly situated*

Eric James Belfi, Esq.
Labaton Sucharow, LLP
New York, New York
*Counsel for Plaintiff James Irvine and others similarly situated*

Marc A. Topaz, Esq.
Richard A. Maniskas, Esq.
Schiffrin & Barroway, L.L.P.
Bala Cynwyd, Pennsylvania
*Counsel for Plaintiff James Irvine and others similarly situated*

Jonathan Honig, Esq.
Feder, Kaszovitz, Isaacson, Weber, Skala, Bass & Rhine LLP
New York, New York
*Counsel for Defendants*

Jonathan J. Lerner, Esq.
Michael H. Gruenglas, Esq.
Maura B. Grinalds, Esq.
Skadden, Arps, Slate, Meagher & Flom LLP
New York, New York
*Counsel for Defendants*

KENNETH M. KARAS, District Judge:

This consolidated class action arises from an alleged commercial bribery scheme. Plaintiffs, who purchased shares of Jakks Pacific, Inc. ("Jakks") between December 3, 1999 and October 19, 2004 (the "Class Period"), allege that, in order to secure a videogame license and favorable amendments to a toy license, Jakks paid bribes to a senior executive at World Wrestling Entertainment, Inc. ("WWE"), as well as to WWE's marketing licensing agent. As a result of this scheme, Plaintiffs contend that shares of Jakks's common stock were artificially overvalued at the time that Plaintiffs purchased them.

2

Named Plaintiffs, Indiana Electrical Workers Pension Trust Fund, Kenneth J. Tucker, Tonia R. Tucker-Kraus and Michael Kraus, filed this putative class action on behalf of themselves and all those who purchased common stock shares of Jakks securities during the Class Period. Plaintiffs bring this action pursuant to Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated thereunder. Plaintiffs also allege that Defendants Jack Friedman ("Friedman"), Steven G. Berman ("Berman"), and Joel M. Bennett ("Bennett") (collectively the "Individual Defendants") violated Section 20(a) of the Exchange Act by acting as controlling persons of Jakks. 15 U.S.C. § 78t(a).

Defendants move to dismiss the Consolidated Amended Complaint ("CAC") pursuant to Rules 12(b)(6) and 9(b) of the Federal Rules of Civil Procedure and Section 21D of the Exchange Act. For the reasons stated herein, Defendants' Motion to Dismiss the CAC is GRANTED, without prejudice to amend.

## I. Background

Except as otherwise noted, the following facts alleged in the CAC are presumed true for the purposes of this Motion. Jakks is a Delaware corporation that produces and markets toys and other related products. (Consolidated Am. Compl. for Violations of the Fed. Securities Laws ¶¶ 2, 32 ("CAC").) WWE is a media and entertainment company that develops, produces and markets entertainment events. (*Id.* ¶¶ 3, 33.) In October 1995, Jakks and WWE entered into a licensing agreement under which Jakks received the right to manufacture and market WWE toys in the United States. (*Id.* ¶ 4.) This licensing agreement was presented to WWE through WWE's licensing agent, Stanley Shenker ("Shenker") of Stanley Shenker & Associates, Inc.

3

("SSAI"). (*Id.* ¶ 34.) Plaintiffs make no allegations that Jakks entered into the 1995 licensing agreement fraudulently.

After Jakks and WWE finalized the 1995 licensing agreement, Plaintiffs allege that Jakks and SSAI (through Shenker) entered into an undisclosed agency agreement. (*Id.* ¶ 35.) According to Plaintiffs, SSAI's simultaneous agency relationships with Jakks and WWE "constituted a clear conflict of interest." (*Id.*) Plaintiffs allege that Defendants Friedman and Berman, both senior executives at Jakks,[1] knew of Shenker's obligations to WWE and had been advised by Jakks's outside legal counsel that Jakks's agency relationship with Shenker and SSAI was improper absent the informed consent of WWE. (*Id.* ¶ 36.)

On February 10, 1997, after Jakks had formed its undisclosed agency relationship with Shenker and SSAI, Jakks built upon its domestic licensing agreement by entering into an international toy licensing agreement with WWE. (*Id.* ¶ 37.) In March 1997, SSAI expanded its relationship with WWE to become WWE's exclusive outside licencing agent. (*Id.*)

In 1998, Friedman, Berman and Shenker allegedly began to implement a scheme to fraudulently procure WWE's videogame licenses for Jakks. (*Id.* ¶ 40.) Under the alleged scheme, Friedman and Berman agreed to pay bribes to Shenker, which Shenker would split with James Bell ("Bell"), the Senior Vice President of Licensing and Merchandising at WWE and the person responsible for the allocation of WWE's licenses. (*Id.*) The bribes were allegedly "laundered" through foreign companies, including a company named Stanfull Industrial, Ltd. ("Stanfull"), which was controlled by Shenker. (*Id.* ¶ 41.) According to Plaintiffs, these bribes

---

[1]During the Class Period, Friedman was Jakks's Chairman and Chief Executive Officer, and Berman was Jakks's President, Chief Operating Officer, and Secretary. (CAC ¶¶ 16-17.)

"ultimately allowed JAKKS to gain the license to WWE's valuable video game franchise, as well as to make valuable amendments to, and expand the scope of, [Jakks's existing] toy licenses." (*Id.* ¶ 40.)

The CAC describes in detail one such alleged bribe. In early 1998, Shenker sent Jakks an invoice of $80,000 for the development of "Possible Latex Based Soft Toys With Special Coating." (*Id.* ¶ 42.) The invoice directed that the money be paid to a Stanfull account at the Hang Seng Bank in Hong Kong. Plaintiffs allege that there was never any contract between Jakks and Stanfull to develop toys and that Jakks never provided, and never intended to provide, any services to Stanfull in exchange for this payment. (*Id.*)

Plaintiffs allege that Defendants Berman, Friedman, and Bennett arranged for the fraudulent invoice to be sent to Jakks's foreign subsidiary, Road Champs, Ltd., and that they instructed that $40,000 be sent immediately from Road Champs to Stanfull. (*Id.* ¶ 43.) That same day, Shenker paid $20,000 from the Stanfull account to Bell, "representing his equal split of the illegal bribe and kickback paid to Shenker and Stanfull." (*Id.*) Allegedly in return for the $20,000, Bell caused WWE not to renew its videogame license with one of Jakks's competitors and instead recommended that the license be awarded to Jakks, despite the fact that Jakks had no ability to design or manufacture videogames. (*Id.* ¶ 45.) The following day, another $40,000 was paid from Road Champs to Stanfull, half of which was eventually given to Bell. (*Id.* ¶ 46.) WWE ultimately granted the videogame license to Jakks, rejecting allegedly superior offers from experienced videogame developers. (*Id.* ¶ 47.)

On June 24, 1998, following the recommendations of Shenker and Bell, WWE extended its toy licensing agreement with Jakks. (*Id.* ¶ 51.) Within a month of winning this extension,

Jakks received another invoice from Shenker and made another "clandestine" payment through Road Champs to Stanfull at Hang Seng Bank in Hong Kong. (*Id.*) Jakks made no record of this payment or of the invoice that it received from Shenker. (*Id.*)

Throughout the Class Period, Jakks made numerous public statements, many of which Plaintiffs allege were false and misleading. (*Id.* ¶¶ 56-145.) Plaintiffs further allege that, by early 2004, Defendants were aware that WWE was contending that the WWE licenses had been obtained through commercial bribery. (*Id.* ¶ 53.) However, at no point during the Class Period did Defendants disclose that Jakks had obtained the WWE videogame and toy licenses illegally or that WWE was contesting the validity of Jakks's licenses. (*Id.* ¶ 52.) As a result, Plaintiffs allege that the price of Jakks shares was artificially inflated during the Class Period. (*Id.* ¶ 54.) On October 19, 2004, Jakks revealed publicly that WWE had filed suit against Jakks to rescind the videogame and toy licenses and to recover damages. (*Id.* ¶ 55.) In response, the price of Jakks's shares dropped significantly. (*Id.*)

Finally, Plaintiffs allege that certain of the Individual Defendants "were able to sell millions of dollars of their personally held Jakks common stock . . . while in possession of material adverse non-public information" about Jakks. (*Id.* ¶ 54.) Specifically, Plaintiffs allege that Defendants and other Jakks executives made as much as $37.68 million through these insider trades. (*Id.*)

<u>II. Discussion</u>

<u>A. Standard of Review</u>

The Supreme Court has recently held that "[w]hile a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to

6

provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do[.]" *Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 1964-65 (2007) (citations omitted and second alteration in original). In *Twombly*, the Supreme Court also abandoned reliance on the oft-quoted refrain from *Conley v. Gibson* that, "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief[,]" 355 U.S. 41, 45-46 (1957). *Id.* at 1964-69. As the Court explained, a literal application of *Conley*'s "no set of facts" rationale is improper because "a wholly conclusory statement of claim would survive a motion to dismiss whenever the pleadings left open the possibility that a plaintiff might later establish some 'set of [undisclosed] facts' to support recovery." *Id.* at 1968. Instead, the Court emphasized that "[f]actual allegations must be enough to raise a right to relief above the speculative level[,]" *id.* at 1965 (citation omitted), and "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint[,]" *id.* at 1969. Plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Id.* at 1974; *see also Iqbal v. Hasty*, 490 F.3d 143, 157-58 (2d Cir. 2007) ("After careful consideration of the Court's opinion and the conflicting signals from it that we have identified, we believe the Court is not requiring a universal standard of heightened fact pleading, but is instead requiring a flexible 'plausibility standard,' which obliges a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim *plausible*."). If Plaintiff "ha[s] not nudged its claims across the line from conceivable to plausible, [its] complaint must be dismissed." *Twombly*, 127 S. Ct. at 1974.

7

When considering a Rule 12(b)(6) motion, a court must limit itself to facts stated in the complaint, documents attached to the complaint, and documents incorporated into the complaint. *See Newman & Schwartz v. Asplundh Tree Expert Co.*, 102 F.3d 660, 662 (2d Cir. 1996). The Court will accept as true Plaintiff's allegations, and draw all inferences in Plaintiff's favor. *See Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1174 (2d Cir. 1993); *Blimpie Int'l, Inc. v. Blimpie of the Keys*, 371 F. Supp. 2d 469, 470-71 (S.D.N.Y. 2005). At this stage, the Court is not concerned with weighing the evidence that would be presented at trial. *See Chosun Int'l, Inc. v. Chrisha Creations, Ltd.*, 413 F.3d 324, 327 (2d Cir. 2005).

Rule 10b-5 states, in part, that it is "unlawful for any person . . . [t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5. To state a claim for relief under Section 10(b) and Rule 10b-5, Plaintiffs must adequately allege that Defendants: "'(1) made misstatements or omissions of material fact; (2) with scienter; (3) in connection with the purchase or sale of securities; (4) upon which [P]laintiffs relied; and (5) that [P]laintiffs' reliance was the proximate cause of their injury.'" *See Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 172 (2d Cir. 2005) (quoting *In re IBM Corporate Sec. Litig.*, 163 F.3d 102, 106 (2d Cir. 1998)); *see also Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 341 (2005). The requisite state of mind, or scienter, in a securities fraud action is "'an intent to deceive, manipulate or defraud.'" *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 168 (2d Cir. 2000) (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976)).

B. Defendants' Failure to Disclose the Alleged Bribery Scheme

Here, Plaintiffs allege that Defendants failed to disclose material facts about the

8

underlying alleged bribery scheme and about the threat of litigation to which the alleged scheme

exposed them.  According to Plaintiffs, when Defendants made positive statements about the

WWE licenses, Defendants created a duty to disclose the illegal activities through which the

licenses were allegedly obtained, as well as the increased likelihood of litigation caused by those

activities.  (Mem. of Law in Opp'n to Defs.' Mot. to Dismiss the Consolidated Am. Compl. 11-

18 ("Pls.' Mem.").)  Defendants argue that any public statements about the WWE licenses were

"too attenuated" to the alleged illegal activity and to the threat of litigation to trigger a duty to

disclose.  (Defs.' Reply Mem. of Law in Further Supp. of Their Mot. to Dismiss the

Consolidated Am. Compl. 9 ("Reply Mem.").)

1. Materiality

The initial inquiry in a claim for relief under Section 10(b) and Rule 10b-5 is whether the

allegedly omitted information is material.  "To fulfill the materiality requirement 'there must be

a substantial likelihood that the disclosure of the omitted fact would have been viewed by the

reasonable investor as having significantly altered the 'total mix' of information made

available.'"  *Caiola v. Citibank, N.A.*, 295 F.3d 312, 329 (2d Cir. 2002) (quoting *Basic, Inc. v.*

*Levinson*, 485 U.S. 224, 231-32 (1988)); *see also Halperin v. eBanker USA.com, Inc.*, 295 F.3d

352, 357 (2d Cir. 2002) ("The touchstone of the inquiry is not whether isolated statements within

a document were true, but whether defendants' representations or omissions, considered together

and in context, would affect the total mix of information and thereby mislead a reasonable

investor regarding the nature of the securities offered.").  "At the pleading stage, a plaintiff

satisfies the materiality requirement . . . by alleging a statement or omission that a reasonable

investor would have considered significant in making investment decisions."  *Ganino*, 228 F.3d

9

at 161. Because materiality is a mixed question of law and fact, a motion to dismiss will not be granted unless the alleged misstatements or omissions "are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *Castellano v. Young & Rubicam, Inc.*, 257 F.3d 171, 180 (2d Cir. 2001) (internal quotation marks omitted). Therefore, "a complaint fails to state a claim of securities fraud if *no reasonable investor* could have been misled about the nature of the risk when he invested." *Halperin*, 295 F.3d at 359.

Here, the Court cannot say that no reasonable investor would find the information regarding the alleged bribery scheme material. In deciding whether to invest in Jakks, a reasonable investor might have viewed information about the bribery as "significantly alter[ing] the 'total mix' of information made available." *Caiola*, 295 F.3d at 329. Jakks's own public statements make clear that the WWE licenses generated, and were expected to continue to generate, significant revenue for the company. (*See, e.g.*, CAC ¶¶ 95-96, 102.) An investor might reasonably want to know if that source of revenue was threatened because it was improperly or illegally derived. *See In re Marsh & Mclennan Cos. Sec. Litig.*, 501 F. Supp. 2d 452, 468-69 (S.D.N.Y. 2006) ("A rational jury could conclude that a reasonable investor would find it significant that [defendant] was generating substantial earnings from its improper business practices . . . ."); *accord Roeder v. Alpha Indus., Inc.*, 814 F.2d 22, 25-26 (1st Cir. 1987) (noting that corporate bribery, even if small in amount, is material to an investor because it is relevant to competency of management and could hurt the business). Thus, it cannot be said that, given Jakks's public statements regarding the WWE licenses, "*no reasonable investor* could have been misled about the nature of the risk when he invested." *Halperin*, 295 F.3d at 359.

### 2. Duty to Disclose Alleged Bribery Scheme

In additional to materiality, Plaintiffs must establish that there existed a duty to disclose the withheld information, as the fact that information is material, without more, does not mandate its disclosure. *Glazer v. Formica Corp.*, 964 F.2d 149, 156 (2d Cir. 1992) ("Even if information is material, there is no liability under Rule 10b-5 unless there is a duty to disclose it." (citing *Backman v. Polaroid Corp.*, 910 F.2d 10, 12 (1st Cir. 1990))). A duty may arise in the context of an affirmative misrepresentation or an omission. Here, Plaintiffs argue that Defendants' omissions created the duty to disclose.

A material omission is actionable under the federal securities laws "only when the [defendant] is subject to a duty to disclose the omitted facts." *In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 267 (2d Cir. 1993). The "'duty to speak' arises in only limited situations." *Marsh & Mclennan*, 501 F. Supp. 2d at 469. These situations may arise when there is insider trading, where there is a statute or regulation requiring disclosure, or where there was an inadequate, incomplete or misleading prior disclosure that needs correction. *See In re PDI Sec. Litig.*, No. 02-CV-211, 2006 WL 3350461, at *9 (D. N.J. Nov. 16, 2006); *accord Glazer*, 964 F.2d at 157; *Menkes v. Stolt-Nielsen S.A.*, 03-CV-409, 2005 WL 3050970, *6 (D. Conn. Nov. 10, 2005). Plaintiffs do not claim that Defendants had a duty to speak because of any insider trading or any statute or regulation. Thus, the only question is whether Defendants have made any statements that required corrections.

Plaintiffs argue that Defendants had a duty to disclose the commercial bribery because Defendants made extensive public statements about the acquisition and profitability of the WWE licenses: "[O]nce Defendants spoke about the WWE Licenses, they had to speak fully and

11

truthfully." (Pls.' Mem. 2.)  The CAC quotes numerous statements made during the Class Period

that purportedly gave rise to a duty to disclose the alleged commercial bribery scheme.  For the

purposes of this Motion, these statements can be grouped into three categories:  1) general

statements about Jakks's success and Jakks's products, (*see, e.g.,* CAC ¶¶ 62, 76, 79, 88-89, 108,

113); 2) statements about the past and projected performance of WWE-licensed videogames and

toys, (*see, e.g., id.* ¶¶ 57, 61, 63, 65, 67, 72-73, 76, 89, 95-96, 102, 120, 129, 136); and 3)

statements specifically about the acquisition of the WWE licenses, (*see, e.g., id.* ¶¶ 58, 64, 68,

80, 83, 99, 106, 132).

     As Defendants note, the law generally does not "require management to accuse itself of

antisocial or illegal policies."  *Amalgamated Clothing & Textile Workers Union v. J.P. Stevens*

*& Co.*, 475 F. Supp. 328, 331 (S.D.N.Y. 1979), *vacated as moot*, 638 F.2d 7 (2d Cir. 1980); *see*

*also GAF Corp. v. Heyman*, 724 F.2d 727, 740 (2d Cir. 1983) (noting that proxy rules generally

do not require management to self-report illegal conduct).  While such information may be

material, the law, as previously discussed, generally treats questions of materiality and duty to

speak differently.  However, "where the disclosure duty arises from the combination of a prior

statement and a subsequent event, which, if not disclosed, renders the prior statement false or

misleading, the inquiries as to duty and materiality coalesce." *Time Warner*, 9 F.3d at 267.  Put

another way, a "duty to disclose arises whenever secret information renders prior public

statements materially misleading, not merely when that information completely negates the

public statements." *Id.* at 268.

     The duty to speak "applies to the disclosure of criminal conduct to the same extent it

applies to the disclosure of any other information." *Marsh & Mclennan*, 501 F. Supp. 2d at 469;

*see also Menkes*, 2005 WL 3050970, at *7; *Par Pharm.*, 733 F. Supp. at 675. To determine when the duty is triggered, "the key consideration[] of the Court's inquiry [is] whether . . . the alleged omission[]. . . grounded in . . . criminal conduct [is] sufficiently connected to Defendants' existing disclosures to make those public statements misleading . . . ." *Marsh & Mclennan*, 501 F. Supp. 2d at 469. In particular, to find the duty to exist, the courts have "required a connection between the illegal conduct and the statements beyond the simple fact that a criminal conviction would have an adverse impact upon the corporation's operations in general . . . ." *Menkes*, 2005 WL 3050970, at *7. "In other words, a corporation has a duty to disclose uncharged criminal conduct to prevent conveying, through its own public statements, a false impression to an investor and not for the sake of merely improving an investor's perspective." *Id.*; *see also Par Pharm.*, 733 F. Supp. at 675 ("[E]ven though no duty to make a statement on a particular matter has arisen, once corporate officers undertake to make statements, they are obligated to speak truthfully and to make such additional disclosures as are necessary to avoid rendering the statements misleading."). With these principles in mind, the Court now turns to the three categories of statements that Plaintiffs claim were fraudulent.[2]

---

[2]Naturally, each side argues for radically different and self-serving standards of review. Defendants, for example, suggest that a claim of material omission only arises when the "affirmative statements [are] expressly contradicted or directly undermined by the undisclosed facts." (Reply Mem. 15.) But that is not the law in the Second Circuit. *See Time Warner*, 9 F.3d at 268 ("A duty to disclose arises whenever secret information renders prior public statements materially misleading, not merely when that information completely negates the public statements."). Similarly, Plaintiffs suggested at oral argument that the duty to disclose arises when public statements "touch upon" omitted information. While the Court is aware of one decision adopting this language, *see In re Ramp Corp. Sec. Litig.*, No. 05-CV-6521, 2006 WL 2037913, at *13 (S.D.N.Y. July 21, 2006) (noting that once defendant "made a representation that touched on the subject, he was required to speak accurately"), the balance of authority requires a connection between the omitted information and the affirmative statements. *See Menkes*, 2005 WL 3050970, at *7 (collecting cases).

The first group of statements, which address Jakks's general performance and provide basic information about its WWE products, did not give rise to a duty to disclose the alleged bribery scheme. These statements discussed general business issues, such as Jakks's "excellent top line and bottom line growth[,]" (CAC ¶ 62), and its "proven business model that continues to serve [it] well[,]" (*id.* ¶ 88). The alleged omitted information simply does not "render[ these] public statements materially misleading . . . ." *Time Warner*, 9 F.3d at 268; *see also Par Pharm.*, 733 F. Supp at 678 ("The subject matter of the statement is so attenuated from the bribery scheme that it could not reasonably be found to have created a false impression in a reasonable investor."). As such, these general statements about Jakks's corporate model or its overall success do not trigger a duty to reveal all potentially damaging information such as that alleged here. *See Bragger v. Trinity Capital Enter. Corp.*, No. 92-CV-2124, 1994 WL 75239, at *4 (S.D.N.Y. Mar. 7, 1994) (granting motion to dismiss and holding that no duty to disclose regulatory compliance problems of subsidiary when general statements about subsidiary were made). Indeed, if such unspecific statements of corporate well-being gave rise to a duty to disclose the alleged bribery scheme here, courts would find a duty in virtually every case where the defendant is alleged to have engaged in illegal activity. This is not the law. *See Ciresi v. Citicorp*, 782 F. Supp. 819, 823 (S.D.N.Y. 1991) ("[T]he law does not impose a duty to disclose uncharged, unadjudicated wrongdoing or mismanagement."); *Bragger*, 1994 WL 75239, at *4 ("[A] corporation is under no duty to announce publicly that it or its officers are guilty of uncharged criminal behavior, or to accuse itself of antisocial or illegal policies . . . .").[3]

---

[3]Of course, the fact that undisclosed information relates to illegal activity does not by itself immunize that information from other disclosure requirements. *See In re Sotheby's Holdings, Inc.*, No. 00-CV-1041, 2000 WL 1234601, *4 (S.D.N.Y. Aug. 31, 2000) ("[The] duty

14

The second category of statements comprises the bulk of the statements cited in the CAC. In these statements, Jakks makes claims about the performance of its WWE-licensed products. These statements include claims such as: "The significant growth in net sales . . . was due primarily to the continuing growth of the World Wrestling Federation action figure product line[,]" (CAC ¶ 57); "earnings attributable to the sales of wresling video games . . . remain in line with the Company's projections and the Company is optimistic about the upcoming releases of new WWF wrestling games[,]" (*id.* ¶ 73); and "with the industy's transition to new video game hardware essentially complete, and with several exciting new titles due for release, we anticipate substantially higher profits from JAKKS' World Wrestling Federation video game joint venture with THQ Inc.[,]" (*id.* ¶ 94).

The Court finds that, like the first group of statements, the statements falling into this second group created no duty to disclose the alleged bribery scheme. These statements discuss the beneficial effect (both past and future) of the WWE licenses on Jakks's business; however, they do not discuss the acquisition of those licenses and they make no representations, implied or otherwise, as to the whether they were acquired legally. Further, Plaintiffs make no claim that these statements are on their face inaccurate. As such, these statements are akin to the type of historical statements about a company's revenues from one of its product lines and prognostications for growth in profits from these products that the courts regularly find do not trigger a duty to disclose illegal conduct. For example, in *Marsh & Mclennan*, the court held that "[b]ecause the securities laws do not impose a general duty to disclose corporate

---

to disclose exists even where the omitted information relates to allegedly illegal conduct."); *Par Pharm.*, 733 F. Supp at 675 ("The illegality of corporate behavior is not a justification for withholding information that the corporation is otherwise obligated to disclose.").

15

mismanagement or uncharged criminal conduct, the allegation that [defendant] misstated its earnings merely by failing to disclose the misconduct at its . . . subsidiary is not actionable." 501 F. Supp. 2d at 469; *see also In re Sofamor Danek Group*, 123 F.3d 394, 401 & n.3 (6th Cir. 1997) ("It is clear that a violation of federal securities laws cannot be premised upon a company's disclosure of accurate historical data."); *Greenstone v. Cambex Corp.*, 777 F. Supp. 88, 91 (D. Mass. 1991) (granting motion to dismiss where plaintiff did not claim "that the revenues actually received by [defendant] differed from those reported to SEC[,]" but instead claimed "that the reports would have been more accurate and complete if the defendants had revealed their improper activities because such activities allegedly influenced the financial success of [defendant]"), *aff'd*, 975 F.2d 22 (1st Cir. 1992). *But see Greenfield v. Prof'l Care, Inc.*, 677 F. Supp. 110, 113 (E.D.N.Y. 1987) (denying motion to dismiss and finding duty to disclose illegal conduct because "[i]nformation going directly to the financial condition of the company" was material).

Statements falling into this second group would only trigger a duty to disclose the bribery scheme if there existed a broader duty to speculate as to how exposure of that scheme would impact that aspect of Jakks's business. No such duty exists: "[A] company [is] not obligated to speculate as to the myriad of consequences, ranging from minor setbacks to complete ruin, that might . . . befall[] the company" if illegal activity is discovered. *Par Pharm.*, 733 F. Supp. at 678. At bottom, these statements are no more actionable than the first group of statements discussing Jakks's "excellent . . . growth," except that these statements specifically identify the WWE licenses as one source of that growth. *See Marsh & Mclennan*, 501 F. Supp. 2d at 469 ("Absent an allegation that [defendant] reported income that it did not actually receive, the

allegation that a corporation properly reported income that is alleged to have been, in part, improperly obtained is insufficient to impose Section 10(b) liability.").

However, when Jakks made the claims that constitute the third group of statements discussed above, it created a duty to disclose the alleged bribery scheme. These statements directly discuss the acquisition of the WWE licenses and, without an accompanying disclosure of the alleged bribery scheme, they are misleading, if not outright false. Specifically, Jakks repeatedly made statements indicating that it obtained its WWE licenses as a result of its "long-term relationship" with WWE. (*See, e.g.,* CAC ¶¶ 68, 83, 99.) For example, on May 23, 2002, Jakks issued a press release stating that, "[w]e have capitalized on our relationship with [WWE] by obtaining an exclusive worldwide license for our joint venture with THQ Inc." (*Id.* ¶ 99.) This statement, and others like it, are more specific to the *source* of the revenues from the WWE licenses, and not just a representation of the amount of such revenues. As such, these statements could have led a reasonable investor to believe that Jakks obtained the valuable licenses through a competitive process, taking advantage of its special (but legal) relationship with WWE. *See Sotheby's Holdings*, 2000 WL 1234601, at *4 ("A jury could conclude that these statements could have led reasonable investors to believe that Sotheby's and Christie's were competing with each other in the usual manner, that is, through price."); *accord In re Providian Fin. Corp. Sec. Litig.*, 152 F. Supp. 2d 814, 824-25 (E.D. Pa. 2001) (holding that once defendant put the company's success "in play," defendant was "obligated to disclose information concerning the source of its success, since reasonable investors would find that such information would significantly alter the mix of available information"). Indeed, even the statements that discuss the acquisition of the licenses without specifically discussing how those licenses were acquired

17

are misleading in the absence of the undisclosed information regarding the alleged bribery scheme. *See Menkes*, 2005 WL 3050970, at *8 ("[T]outing the renewal of a major contract that could have been the result of an illegal agreement conveys the false impression that this particular contract was procured through sound business practices.").

In other words, the law recognizes a duty to disclose when the corporate speaker crosses the line between boasting about revenues and discussing the methods used to generate those revenues. For example, in *Par Pharm.*, the defendant pharmaceutical company was alleged to have bribed government regulators to acquire expedited federal approval for the sale of generic drugs. 733 F. Supp. at 672-73. In light of the bribery, the court held that the company's "statements conveyed to a reasonable investor the false impression that Par had a particular expertise in obtaining FDA approvals constituting a legitimate competitive advantage over other companies . . . ." *Id.* at 677-78. Similarly, in *Marsh & Mclennan*, the court held that while allegations about defendant's "earning figures" and "risk disclosures" were insufficient, it denied the motion to dismiss as to plaintiff's allegations about defendant's "disclosures regarding the nature of the services provided in exchange for" certain commissions. 501 F. Supp. 2d at 473-74. In particular, because plaintiffs alleged that defendants had received these commissions "as kickbacks," defendant's statements about the nature of the commissions "put the source of contingent commission revenues at issue without disclosing information necessary to explain the true nature of the business practices employed to enhance those revenues." *Id.* at 474.

Similarly, here, statements discussing Jakks's acquisition of the WWE licenses and statements touting Jakks's long-term relationship with WWE as the means by which it procured and renewed those licenses conveyed that Jakks had a particular ability to obtain valuable

licenses from WWE. Once Jakks opened this door, it was required to walk through it with complete and accurate information about the true means used to procure and renew these licenses. *See In re Van der Moolen Holding N.V. Sec. Litig.*, 405 F. Supp. 2d 388, 400-01 (S.D.N.Y. 2005) (holding that statements giving reasons for profitability put the "sources of . . . revenue at issue" and that "alleged failure to disclose the true sources of such revenue could give rise to liability under Section 10(b)"); *see also Shapiro v. UJB Fin. Corp.*, 964 F.2d 272, 281-82 (3d Cir. 1992) (noting that while there is no duty to disclose management practices, statements describing management practices as "conservative" and "cautious" trigger a duty to disclose truthful information about such practices); *Providian*, 152 F. Supp. 2d at 824-25. ("Having put the issue in play, [defendant] is obligated to disclose information concerning the source of its success . . . ."). This information might be considered material by a reasonable investor who was trying to assess the likelihood that Jakks's licenses would be renewed upon expiration.

Defendants attempt to avoid this line of authority by claiming that its duty to speak about the alleged bribery is triggered only when such conduct is formally charged or adjudicated. (Reply Mem. 11-15.) For example, Defendants cite *In re Teledyne Defense Contracting Deriv. Litig.*, 849 F. Supp. 1369 (C.D. Cal. 1993), for the proposition that while the Court is to accept as true Plaintiffs' allegations of criminal wrongdoing, "[Section] 14(b) requires disclosure of material facts, and the Defendants' culpability . . . does not become a fact that must be disclosed until it is at least charged . . . ." *Id.* at 1383. However, this and the other cases cited by Defendants merely stand for the above-discussed proposition that there is no general duty to self-report misconduct – whether under the proxy rules or otherwise. And Plaintiffs' allegations depend on no different view of the law. Instead, Plaintiffs' claim is that Defendants' duty to

19

speak the complete truth about their actions in procuring and extending certain of the WWE

licenses was triggered when Defendants made statements about the reasons they succeeded in

acquiring the licenses, i.e., the long-term relationships Defendants had with WWE. Because this

is Plaintiffs' theory and because the Court must assume the truth of Plaintiffs' allegations for

purposes of deciding this Motion, Plaintiffs have stated a claim as to the statements in the third

category. *See Marsh & Mclennan,* 501 F. Supp. 2d at 475 ("The Court will not dismiss the

Complaint merely because [defendant] contests a factual allegation that, if true, would be

actionable. [Defendant] will have the opportunity to rebut Plaintiffs' contentions at trial or on

summary judgment, but factual disputes are not properly decided at this stage of the

proceedings."); *Providian,* 152 F. Supp. 2d at 825 ("Given that the court must assume the truth

of the allegations and draw all inferences in the plaintiffs' favor, it is plain that the plaintiff

makes out a claim of material omission."). Accordingly, the statements set forth in paragraphs

58, 64, 68, 80, 83, 99, 106, and 132 of the CAC sufficiently allege actionable public disclosures.

### 3. Duty to Disclose Potential Litigation

Plaintiffs also base their fraud claims on Defendants' alleged failure to disclose the threat

of litigation initiated by WWE. However, a company has no general obligation to disclose the

risk of litigation unless that litigation is "substantially certain to occur." *In re Citigroup, Inc.*

*Sec. Litig.,* 330 F. Supp. 2d 367, 377 (S.D.N.Y. 2004). Any other rule would create an end-run

around the rule that "the law does not impose a duty to disclose uncharged, unadjudicated

wrongdoing or mismanagement." *Ciresi,* 782 F. Supp. at 823.

Plaintiffs allege, in conclusory fashion, that by early 2004, Defendants "were . . . aware

that . . . WWE was contending that the WWE licenses had been obtained through a pattern of

commercial bribery." (CAC ¶ 53; *accord* Pls.' Mem. 18.) From this, Plaintiffs argue that Jakks

knew, or should have known, that it faced the heightened risk that WWE would seek to modify

or rescind the licenses through litigation. (Pls.' Mem. 18.) Accordingly, Plaintiffs argue that

when Jakks "spoke about the positive contributions [of] the WWE licenses," it had a duty to

disclose the potential for litigation. (*Id.* at 18-19.) The Court is unpersuaded.

Plaintiffs do not plead sufficient facts from which to conclude that Defendants knew that

litigation was "substantially certain to occur." *In re Citigroup*, 330 F. Supp. 2d at 377; *see also*

*Marsh & Mclennan*, 501 F. Supp. 2d at 471; *Par Pharm.*, 733 F. Supp. at 678. As Defendants

point out, "[t]he Complaint does not contain a single factual allegation to suggest that WWE was

'contesting' the validity of the videogame licenses by early 2004, or that WWE ever threatened

to sue Jakks in connection with its ongoing litigation with third-parties." (Reply Mem. 20 n.20.)

Plaintiffs' strongest allegation in this regard is the conclusory claim that Defendants should have

known that the bribery scheme exposed the company to "heightened risk" of litigation. (CAC ¶

53.) But Defendants had no "duty to speculate about the effects of discovery of the [illegal]

scheme on the company's future prospects." *Marsh & Mclennan*, 501 F. Supp. 2d at 471

(internal quotation marks omitted); *see also Par Pharm.*, 733 F. Supp. at 678. Thus, Defendants'

Motion to Dismiss as to all of the statements set forth in the CAC, except those contained in

paragraphs 58, 64, 68, 80, 83, 99, 106, and 132, is granted.[4]

---

[4]Because the Court dismisses Plaintiffs' fraud claims, which are based on Defendants'
failure to disclose potential litigation, and because the Court does so without relying on
Defendants' Exhibits A and C to the Declaration of Jonathan J. Lerner, the Court need not
address Plaintiffs' Motion to Strike, as those exhibits were relevant only to that cause of action.

## C. The CAC Fails to Satisfy the Pleading Requirements of 9(b) and the PSLRA

Securities fraud claims brought under Section 10(b) and Rule 10b-5 are subject to the heightened pleading standards required by Federal Rule of Civil Procedure 9(b). *See Rombach*, 355 F.3d at 170 (citing *Ganino*, 228 F.3d at 168). Rule 9(b) requires that, "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). The Second Circuit has established that to state a claim for relief under Section 10(b) and Rule 10b-5, Rule 9(b) requires a complaint to: "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 290 (2d Cir. 2006) (internal quotation marks omitted); *accord Rombach*, 355 F.3d at 170.

The Private Securities Litigation Reform Act of 1995 ("PSLRA") further modifies the Rule 12(b)(6) analysis when reviewing a complaint in a securities fraud action. Under the PSLRA, the complaint must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1)(B). The heightened pleading requirements of Rule 9(b) and the PSLRA aim at "deterring groundless suits and providing defendants with sufficient information in the complaint to enable them to prepare a defense." 5A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1296 (3d ed. 2004); *see also Novak v. Kasaks*, 216 F.3d 300, 314 (2d Cir. 2000) ("The primary purpose of Rule 9(b) is to afford defendant fair notice of the plaintiff's claim and the factual ground upon which it is

22

based." (internal quotation marks omitted)).

Defendants argue that Plaintiffs fail to appropriately specify the statements that Plaintiffs allege to be fraudulent. In support of their argument, Defendants cite *In re Alcatel Securities Litigation*, 382 F. Supp. 2d 513 (S.D.N.Y. 2005). In *Alcatel*, Plaintiffs submitted a 250-paragraph complaint, "list[ing] various statements – often setting forth lengthy quotations from various releases by Defendants' officers and securities analysts – then follow[ing] each with a similar (in most cases identical) laundry list of 'specific' reasons why the statements are allegedly false." *Id.* at 534. The *Alcatel* court found that such shotgun-type pleading was insufficient and dismissed plaintiffs' Section 10(b) and Rule 10b-5 claims without prejudice to amend. *Id.* at 536.

Similarly, the 179-paragraph CAC here sets forth quotations from over fifty separate statements by Defendants. (*See* CAC ¶¶ 56-58, 61-73, 76-89, 91, 93-99, 102-108, 110-111, 113, 116-120, 125, 127-129, 131-137, 139-144.) Following the long list of quotations is a *single paragraph* listing four reasons purporting to explain why *all* of the quoted statements are "materially false and misleading." (CAC ¶ 145.)[5] In this regard, Plaintiffs' CAC is

---

[5]Paragraph 145 of the CAC states:

The statements referenced above in ¶¶ 56-58, 61-73, 76-89, 91, 93-99, 102-108, 110-111, 113, 116-120, 125, 127-129, 131-137, and 139-144 were each materially false and misleading . . . because they failed to disclose and misrepresented the following adverse facts:

(a) that JAKKS had obtained the WWE toy and videogame licenses as a result of an illegal commercial bribery scheme;

(b) that JAKKS relationship with the WWE was being negatively impacted by the WWE's contention that the licenses it had granted to the Company were improperly obtained;

23

indistinguishable from the complaint in *Alcatel*, and thus is insufficient to "explain why the statements were fraudulent," *Rombach*, 355 F.3d at 170, with the "particularity" required by the plain language of Rule 9(b) and the PSLRA, *see Stevelman v. Alias Research Inc.*, 174 F.3d 79, 84 (2d Cir. 1999) ("A complaint alleging fraudulent violations of section 10(b) and Rule 10b-5 must satisfy the particularity requirement of Rule 9(b)."); *Endovasc, Ltd. v. J.P. Turner & Co.*, No. 02-CV-7313, 2004 WL 634171, at *5 (S.D.N.Y. Mar. 30, 2004) (same), *vacated in part on other grounds*, 169 Fed. App'x 655 (2d Cir. 2006).

Accordingly, Plaintiffs' Section 10(b) and Rule 10b-5 claims are dismissed for failure to plead with sufficient particularity. This defect, however, strikes the Court as eminently curable. Therefore, dismissal is without prejudice to permit Plaintiffs to file an amended complaint within thirty (30) days of this Order. *See Alcatel*, 382 F. Supp. 2d at 536 (dismissing Section 10(b) and Rule 10b-5 claims without prejudice).

D. Scienter

Having alleged that Defendants misled investors, Plaintiffs must also adequately plead scienter. While Rule 9(b) requires that allegations of fraud be "state[d] with particularity," allegations regarding scienter may be "alleged generally." Fed. R. Civ. P. 9(b). "In order to avoid abuse of this relaxed specificity requirement, however, plaintiffs are required to 'allege

---

(c) given the foregoing, the Company was subject to the heightened risk that the WWE would seek some modification to the WWE licensing agreements or complete nullification of those agreements which would negatively impact the Company's future financial results; and

(d) based on the foregoing, Defendants' positive statements about the Company's earnings and prospects were lacking in a reasonable basis at all times.

facts that give rise to a strong inference of fraudulent intent.'" *In re Canandaigua Sec. Litig.*, 944 F. Supp. 1202, 1213 (S.D.N.Y. 1996) (quoting *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994)). To do so, Plaintiffs are required to allege facts that give rise to a strong inference of intent to "deceive, manipulate or defraud." *Ganino*, 228 F.3d at 168 (internal quotation marks omitted). That intent can be established either by: (1) alleging facts showing Defendants had both motive and opportunity to commit fraud; or (2) alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness. *See Rombach*, 355 F.3d at 176; *Ganino*, 228 F.3d at 168-69; *Shields*, 25 F.3d at 1128.

### 1. Motive and Opportunity to Defraud

Looking first at Plaintiffs' allegations of "motive and opportunity," Defendants do not dispute that they had the opportunity to commit the fraudulent acts alleged in the CAC. Indeed, it is difficult to imagine that Defendants could dispute opportunity, given the positions the Individual Defendants held at Jakks. *See San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos.*, 75 F.3d 801, 813 (2d Cir. 1996) ("There is no doubt that defendants as a group had the opportunity to manipulate the price of [defendant's] stock. The individual defendants held the highest positions of power and authority within the company." (internal citation omitted)); *In re Complete Mgmt. Inc. Sec. Litig.*, 153 F. Supp. 2d 314, 327 (S.D.N.Y. 2001) ("[O]pportunity . . . is apparent for all the named individual defendants by virtue of the positions they held at [the company.] Each plausibly had the opportunity to report false and misleading information . . . ."). Defendants argue, however, that Plaintiffs have failed to sufficiently plead motive.

The Second Circuit defines motive as "the stimulus that causes a person or entity to act or

25

fail to act . . . . [and which] ordinarily anticipates a concrete benefit defendant would realize by

his conduct." *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 74 (2d Cir. 2001). Here, Plaintiffs

argue that the CAC alleges three separate bases for motive: 1) Defendants' insider stock sales,

(Pls.' Mem. 22-25); 2) Defendants' receipt of performance-based compensation, (*id.* at 25-26);

and 3) Defendants' secondary stock offerings, (*id.* at 26-27). The Court addresses each of these

in turn.

### a. Defendants' Alleged Insider Stock Trades

Insider stock sales will only satisfy the motive requirement if those sales are "unusual."

*See Scholastic Corp.*, 252 F.3d at 74-75. "[P]laintiffs bear the burden of showing that any such

sales are in fact unusual." *In re Health Mgmt. Sys., Inc.*, No. 97-CV-1865, 1998 WL 283286, at

*6 (S.D.N.Y. June 1, 1998) (citing *Acito v. IMCERA Group*, 47 F.3d 47, 54 (2d Cir. 1995)).

"Factors considered in determining whether insider trading activity is unusual include the

amount of profit from the sales, the portion of stockholdings sold, the change in volume of

insider sales, and the number of insiders selling." *Scholastic Corp.*, 252 F.3d at 74-75.

Plaintiffs allege that "Defendants sold significant amounts – in excess of $37.5 million –

of their Jakks holdings . . . ." (Pls.' Mem. 23.) From this, Plaintiffs assert that the "sale of tens

of millions of dollars near the Class period high is certainly unusual." (*Id.*) However, standing

alone, such allegations are insufficient to establish motive of fraudulent intent. First, Plaintiffs

do not allege that any of the Individual Defendants sold an unusual *percentage* of their shares

during the Class Period. The Second Circuit has consistently looked to the percentage of shares

sold by a defendant when determining whether such sales were unusual. *See, e.g., Scholastic*

*Corp.*, 252 F.3d at 75 ("[D]ollar amount *cannot be considered in isolation*. Rather the

26

percentage of stock holdings sold may be indicative of unusual trading." (emphasis added));

*Rothman v. Gregor*, 220 F.3d 81, 95 (2d Cir. 2000) (finding no motive where a single defendant

sold shares worth $20 million where those shares constituted less than 10 percent of his

holdings); *Stevelman*, 174 F.3d at 82, 85 (finding motive where defendant "sold a large[] portion

of his stock").[6] This approach makes sense, as dollar amounts alone do not indicate the relative

significance of a particular trade to an individual defendant.

Second, Plaintiffs fail to allege that these trades constituted a "change in volume of

insider sales." *Scholastic Corp.*, 252 F.3d at 74-75. As with the percentage of shares sold, this

information might put the alleged insider trades in perspective, by indicating the *relative* size of

the trades that are identified in the CAC. Because the CAC is silent as to the percentage and the

change in volume of the shares sold during the Class Period, there is no way to assess whether

those trades were in fact "unusual," and not merely consistent with past trades made by the

Individual Defendants. Accordingly, Plaintiffs have failed to meet their "burden of showing that

any such sales are in fact unusual[,]" *Health Mgmt. Sys.*, 1998 WL 283286, at *6, and thus

Plaintiffs' motive claims cannot rest on the Individual Defendants' alleged insider trades.

### b. Performance-Based Compensation

Plaintiffs also argue that motive is established because the Individual Defendants were

compensated in part based on Jakks's performance. (CAC ¶¶ 68, 83, 106, 144.) In support of

this argument, Plaintiffs allege that "the Individual Defendants were given increased base

salaries, cash bonuses and Jakks' stock options due largely to their direct involvement in the

---

[6] In their Opposition Brief, Plaintiffs misstate the holding in *Stevelman*, by stating that the complaint in *Stevelman* did not allege "the percentage of holdings or shares retained." (Pls.' Mem. 24.) This is incorrect. In support of its finding of scienter, the *Stevelman* court found that the individual defendant sold 40% of his stock holdings. *Stevelman*, 174 F.3d at 82.

acquisition of WWE licensing and the important relationship between the Individual Defendants

and WWE." (Pls.' Mem. 25.)  However, incentive-based executive compensation is insufficient

to establish motive, as "[m]otives that are generally possessed by most corporate directors and

officers do not suffice; instead, plaintiffs must assert a concrete and personal benefit to

individual defendants resulting from the fraud." *Kalnit v. Eichler*, 264 F.3d 131, 139 (2d Cir.

2001).

     In fact, the Second Circuit has held that executive compensation alone will not establish

motive: "If scienter could be pleaded [based on executive compensation] alone, virtually every

company in the United States that experiences a downturn in stock price could be forced to

defend securities fraud actions." *Acito*, 47 F.3d at 54; *see also Kalnit*, 264 F.3d at 139

("Insufficient motives, we have held, can include . . . the desire to keep stock prices high to

increase officer compensation."); *Ferber v. Travelers Corp.*, 785 F. Supp. 1101, 1107 (D. Conn.

1991) ("[I]ncentive compensation can hardly be the basis on which an allegation of fraud is

predicated.").  Plaintiffs' attempt to establish motive based on allegations of incentive-based

compensation therefore fails.

### c.  Defendants' Secondary Stock Offerings

     Finally, Plaintiffs argue that Defendants were "motivated to commit the fraud alleged in

the Complaint in order to raise millions of dollars in capital." (Pls.' Mem. 26.)  Plaintiffs point

to two secondary stock offerings by Jakks, which took place in December 1999 and in April

2002.  According to Plaintiffs, Defendants fraudulently withheld material information regarding

the bribery scheme in order "to influence investors to purchase shares" from these offerings.  (*Id.*

at 27.)

As an initial matter, this motive cannot be applied to the Individual Defendants. *See In re Twinlab Corp. Sec. Litig.*, 103 F. Supp. 2d 193, 207 (E.D.N.Y. 2000) (holding that increasing stock value in advance of a public offering is "not clearly in the *individual defendants'* economic self-interest[,]" but accepting that motive as applied to the corporate defendant); *In re Health Mgmt., Inc. Sec. Litig.*, 970 F. Supp. 192, 204 (E.D.N.Y. 1997) ("The plaintiffs do not expressly or even inferentially explain how [this motive] is in the informed economic self-interest of the Individual Defendants . . . .").

This motive also is insufficiently pled as to Defendant Jakks. As Plaintiffs describe their claim, "Defendants were . . . motivated to commit the fraud alleged in the Complaint in order to raise millions of dollars in capital." (Pls.' Mem. at 26.) According to Plaintiffs, this is adequate as the "inflation of a stock price to maximize revenue from secondary offerings is a sufficient allegation of motive." (*Id.*) However, the "Second Circuirt has specifically held that the motive of keeping the corporation's stock price high . . . . is not sufficient to sustain a plaintiff['s] pleading burden." *In re Duane Reade Inc. Sec. Litig.*, No. 02-CV-6478, 2003 WL 22801416, at *8 (S.D.N.Y. Nov. 25, 2003) (citing *Novak*, 216 F.3d at 307); *see also In re Corning Sec. Litig.*, No. 01-CV-6580, 2004 WL 1056063, at *27 (W.D.N.Y. Apr. 9, 2004) (noting an "attempt to boost stock prices to maximize the proceeds of [an] offering falls into the category of a generalized motive to maximize profitability and is, therefore, insufficient to meet the requirements of the PSLRA to raise a strong inference of scienter"), *aff'd*, No. 04-CV-2845, 2005 WL 714352 (2d Cir. Mar. 30, 2005). Thus, for example, general allegations that a company "wanted to maintain a higher stock price in order to pay down debt are insufficient to sustain its claims." *Duane Reade*, 2003 WL 22801416, at *9; *see also Kalnit*, 264 F.3d at 139.

29

Moreover, while "'in some circumstances, the artificial inflation of stock price in the acquisition context may be sufficient for securities fraud scienter[,]' . . . [g]eneralized allegations of a desire to achieve favorable terms in a merger or acquisition are insufficient." *In re JP Morgan Chase Sec. Litig.*, 363 F. Supp. 2d 595, 620 (S.D.N.Y. 2005) (quoting *Rothman*, 220 F.2d at 93); *see also In re AOL Time Warner, Inc. Sec. and "ERISA" Litig.*, 381 F. Supp. 2d 192, 218 (S.D.N.Y. 2004) (holding insufficient allegations that defendants sought to inflate stock price because they were "obsessed" with corporate merger). "If scienter could be pleaded on [such generalized claims], virtually every company in the United States that experiences a downturn in stock price could be forced to defend securities fraud actions." *San Leandro Emergency Med. Group*, 75 F.3d at 814; *see also Leventhal v. Tow*, 48 F. Supp. 2d 104, 115 (D. Conn. 1999). Instead, plaintiffs may satisfy the motive requirement by alleging that the stock price inflation was motivated by a desire to "achieve some more specific goal." *Complete Mgmt.*, 153 F. Supp. 2d at 328.

Plaintiffs attempt to avoid the reach of these principles by citing several cases for the proposition that it is sufficient to allege motive based on the profits derived from secondary stock offerings. These cases, however, are distinguishable as they involved specific allegations regarding the use of the proceeds from the secondary offerings that were sufficient to demonstrate that defendants derived a specific and concrete benefit from the fraud. For example, in *Twinlab Corp.*, the court held that plaintiffs had sufficiently alleged that defendants made fraudulent representations to "maximize the value of Twinlab stock in the stock-for-stock trade with [another company], thus minimizing the actual number of Twinlab shares to be tendered." 103 F. Supp. 2d at 206. Similarly, in *Time Warner*, the court found sufficient allegations that

defendants had committed fraud to maintain a high stock price prior to the announcement of a new rights offering and to lessen the dilutive impact of that offering. 9 F.3d at 269-70.[7]

Here, Plaintiffs make no specific allegation that Defendants were motivated to artificially inflate the stock price of Jakks shares for any specific, concrete purpose. For example, there is no particular acquisition or capital plan that Plaintiffs allege took place or was even on the horizon when Defendants allegedly committed fraud. Moreover, even if Plaintiffs alleged that Jakks might use the proceeds of the secondary offerings to acquire another company, the lack of specificity about the target or timing of any such transaction would be fatal to Plaintiffs' claim here. *See Keeney v. Larkin*, 306 F. Supp. 2d 522, 536 (D. Md. 2003) (noting that there was no allegation that defendant "acquired any specific company in a majority-stock deal where the stock value had been inflated artificially").

Finally, Plaintiffs' general allegations fail to account for the sequence of events they allege. In particular, most of the allegedly false statements made by Defendants post-date the December 1999 offering and approximately half of the statements followed the April 2002 offering. (CAC ¶¶ 61-144.) And, those that preceded April 2002 – for example, the proxy statements regarding the WWE licenses – did so by nearly two years. Thus, as alleged by Plaintiffs, there is simply an insufficient connection between most of the allegedly false statements and the secondary stock offerings to substantiate any reasonable finding that Jakks

---

[7]Similarly concrete motives were found to be alleged in other cases cited by Plaintiffs. *See, e.g., Complete Mgmt.*, 153 F. Supp. at 328 (denying motion to dismiss where plaintiffs' allegation that defendants sought to artificially inflate stock price "as currency for acquisitions that would leverage what the defendants knew were ultimately uncollectible receivable," and finding such allegation to be "an extremely contextual one"); *Duncan v. Pencer*, No. 94-CV-0321, 1996 WL 19043, at *14 (S.D.N.Y. Jan. 18, 1996) (finding allegation that defendant engaged in fraudulent conduct to complete two large offerings in order to finance planned capital expansion plan to be sufficient).

was motivated to misspeak in order to profit from these offerings. *See JP Morgan Chase*, 363 F.

Supp. 2d at 620 ("A number of the allegedly deceptive representations thus occurred before

Chase and JP Morgan were even actively discussing the possibility of merging. The unstated

presumption that Chase began defrauding its own shareholders in contemplation of entering into

merger talks is too nebulous to raise a strong inference of scienter."); *Duane Reade*, 2003 WL

22801416, at *9 (noting that majority of acquisitions partly financed by stock offerings preceded

the allegedly false statements).

     Accordingly, the Court finds that Plaintiffs have not adequately pled scienter based on

allegations of motive and opportunity to commit fraud.

### 2. Conscious Misbehavior or Recklessness

     While the Court finds that Plaintiffs have failed to adequately allege motive, "it is still

possible to plead scienter by identifying circumstances indicating conscious behavior by the

defendant, though the strength of the circumstantial allegations must be correspondingly

greater." *Kalnit*, 264 F.3d at 142 (internal quotation marks omitted). "Reckless conduct is, at the

least, conduct which is highly unreasonable and which represents an extreme departure from the

standards of ordinary care." *Canandaigua*, 944 F. Supp. at 1213 (internal quotation marks and

citations omitted). To state a claim based on recklessness, a plaintiff can either "specifically

allege[ ] defendants' knowledge of facts or access to information contradicting their public

statements[,]" or allege that defendants "failed to check information they had a duty to monitor."

*Novak*, 216 F.3d at 308, 311. "Under such circumstances, defendants knew or, more

importantly, should have known that they were misrepresenting material facts . . . ." *Kalnit*, 264

F.3d at 142. More particularly,

> [t]o establish scienter in misrepresentation cases, facts must be alleged which particularize how and why each defendant actually knew, or was reckless in not knowing, that the statements were false at the time made. To establish scienter in omission cases, facts must be alleged which show that each defendant knew, or was reckless in not knowing, the information the plaintiff alleges the defendant failed to disclose.

*Silva Run Worldwide Ltd. v. Bear Stearns & Co.*, No. 96-CV-5102, 2000 WL 1672324, at *4 (S.D.N.Y. Nov. 6, 2000) (internal citations omitted); *see also In re Initial Public Offering Sec. Litig.*, 358 F. Supp. 2d 189, 214 (S.D.N.Y. 2004). Generally, "[w]here plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information." *Novak*, 216 F.3d at 309. "In determining whether a strong inference of scienter has been pleaded, the Court must read the complaint *in toto* and most favorably to plaintiff." *In re Regeneron Pharm., Inc. Sec. Litig.*, No. 03-CV-3111, 2005 WL 225288, at *24 (S.D.N.Y. Feb. 1, 2005) (internal quotation marks and citations omitted).

Applying this recklessness standard, courts in the Second Circuit have consistently found conscious misbehavior or recklessness where defendants were aware of information that directly contradicted their public statements.[8] For example, in *Novak*, the Second Circuit held that defendants acted with scienter in making fraudulent statements about their inventory management practices where they "offer[ed] *false* reassurances that inventory was under control or [gave] *false* explanations for its growth." 216 F.3d at 311-12 (emphases added). Similarly, in *Buxbaum v. Deutsche Bank, A.G.*, No. 98-CV-8460, 2000 WL 33912712 (S.D.N.Y. Mar. 7, 2000), Judge Koetl found evidence of conscious misbehavior where "[t]he facts alleged clearly

---

[8]Defendants argue that *only* statements that directly contradict their knowledge can rise to the level of conscious misbehavior or recklessness. (Reply Mem. 25.) But under that standard *no* omission would ever constitute recklessness, as an omission, by definition, does not directly contradict a statement, but rather otherwise renders that statement misleading.

33

suggest[ed] that takeover talks were well under way . . . , that [defendant] was personally involved in those talks, and that [defendant] falsely and knowingly denied the existence of those talks." *Id.* at *19. Other courts in the Second Circuit have similarly found conscious misbehavior or recklessness where defendants' public statements directly contradicted information known to them. *See, e.g., Cosmas v. Hassett*, 886 F.2d 8, 12-13 (2d Cir. 1989) (finding conscious misbehavior where defendants' statements cited sales to China as "an important new source of revenue" when they knew that Chinese import restrictions would limit such sales); *In re MCI Worldcom, Inc. Sec. Litig.*, 93 F. Supp. 2d 276, 285 (E.D.N.Y. 2000) (finding conscious misbehavior where company spokesperson defendant "falsely denied any 'official company intention'" to initiate a merger when merger talks were in fact underway).

As noted, however, courts within the Second Circuit have examined scienter in omission cases differently, focusing on the defendants' intent in failing to disclose certain information. *See, e.g., Kalnit*, 264 F.3d at 144 (finding no recklessness where defendants failed to disclose that one section of a publicly-announced merger agreement had been modified by letter); *Canandaigua*, 944 F. Supp. at 1213-14 (finding no recklessness where defendants failed to disclose potential price discounting scheme).[9] To begin, these courts have recognized that mere nondisclosure, even if intentional, does not amount to securities fraud. *See Kalnit*, 264 F.3d at 143 (noting that "defendants' recklessness cannot be inferred from the failure to disclose"); *Canandaigua*, 944 F. Supp. at 1213 ("Scienter in 10b-5 actions is more than simple conscious

---

[9]*Kalnit* and *Canandaigua*, however, are distinguishable from this case. In *Kalnit*, the court found that there was no clear duty to disclose the omitted information. 264 F.3d at 144. Here, as discussed above, Defendants' public statements about the acquisition of the licenses created such a duty. In *Canandaigua*, "plaintiffs . . . failed to show particularized facts that [defendant] made any false or misleading statement or omission." 944 F. Supp. at 1213. Again, that is not the case here.

34

nondisclosure."); *Zuckerman v. Harnischfeger Corp.*, 591 F. Supp. 112, 117 (S.D.N.Y. 1984)

("To prove scienter, more than a conscious failure to disclose must be shown." (internal

quotation marks omitted)). "Rather, there must be proof that the non-disclosure was intended to

mislead." *Zuckerman*, 591 F. Supp. at 117; *see also In re Geopharma, Inc. Sec. Litig.*, 411 F.

Supp. 2d 434, 446 (S.D.N.Y. 2006) (noting that "a failure to disclose particular information, by

itself, can only constitute recklessness if there was an obvious duty to disclose that

information").      From these and other cases, Defendants argue that "there must be some

allegation that Defendants <u>knew</u> that the information [about the alleged bribery scheme] should

have been disclosed <u>and consciously</u> failed to do so." (Defs.' Mem. of Law in Supp. of Their

Mot. to Dismiss the Consolidated Am. Compl. 48 ("Defs.' Mem.").) Here, Defendants insist that

a duty to disclose the uncharged bribery scheme (which they deny) did not arise merely because

they made statements about the WWE licenses that were literally true.  However, taking

Plaintiffs' allegations as true, Defendants engaged in acts of illegal commercial bribery that

directly resulted in the acquisition and/or extension of the lucrative WWE licenses.

Furthermore, if Plaintiffs' allegations are true, Defendants knew that the bribery scheme was

illegal, as evidenced by the extensive measures they took to prevent its discovery. (CAC ¶¶ 42-

49 (discussing the alleged "laundering" of money to conceal the alleged bribery payments), ¶¶

101, 109, 112, 115, 126 (noting Defendants' false responses to subpoena and letter requests from

WWE seeking documents and information).)  Indeed, Friedman and Berman allegedly received a

legal opinion from Jakks's outside counsel indicating that payments to SSAI, while it was acting

as WWE's non-exclusive licensing representative, constituted a "material conflict of interest."

(*Id.* ¶ 36.) Thus, there can be no claim, as is often made, that the Individual Defendants were

35

unaware of the alleged undisclosed misconduct.

The only question, then, is whether Plaintiffs have sufficiently alleged facts demonstrating that Defendants acted recklessly in not disclosing what they knew about the actual circumstances surrounding the acquisition of the WWE licenses. The Court finds that Plaintiffs have met their burden. Given Defendants' alleged clear knowledge of, and indeed participation in, the illegal bribes, and given the direct nexus between those bribes and the acquisition of the WWE licenses, Defendants' public statements regarding the acquisition and renewal of those licenses and the statements as to *how* Jakks acquired the licenses – namely, by leveraging Jakks's long-term relationship with WWE, (*see, e.g., id.* ¶¶ 68, 99) – were at least recklessly misleading. Moreover, given the combination of Defendants' role in the alleged bribery and in issuing the allegedly misleading statements, the Court finds that Plaintiffs have adequately alleged facts circumstantially demonstrating that "[D]efendants knew or, more importantly, should have known that they were misrepresenting material facts . . . ." *Kalnit*, 264 F.3d at 142. Under the circumstances, and drawing all reasonable inferences in Plaintiffs' favor, the Court finds that these allegations are sufficient to plead that Defendants acted with the intent to deceive. *See Sotheby's Holdings*, 2000 WL 1234601, at *8 (finding scienter adequately pled and denying motion to dismiss where complaint alleged individually named defendants "were directly involved in arranging the illegal price-fixing agreement, and that each of them signed 10-Ks that, in light of the illegal agreement, they knew were false or misleading"). Moreover, "read[ing] the complaint *in toto* and most favorably to plaintiff[,]" *Regeneron Pharm.*, 2005 WL 225288, at *24 (internal quotation marks omitted), Defendants' failure to disclose the alleged bribery scheme, even as they publicly trumpeted the acquisition and renewal of the WWE

licenses, was "highly unreasonable and . . . represent[ed] an extreme departure from the standards of ordinary care." *Canandaigua*, 944 F. Supp. at 1213 (internal quotation marks omitted).

Accordingly, the Court finds that Defendants "knew or were highly unreasonable in not knowing that they were doing something illicit" when they withheld material information regarding the commercial bribery scheme while making public statements about the acquisition and renewal of the WWE licenses.[10]  *Id.* at 1213-14.

F.  Control Person Liability

Plaintiffs have also asserted that the Individual Defendants were liable for Jakks's alleged Section 10(b) and Rule 10b-5 violations as controlling persons under Section 20(a) of the 1934 Act.  Section 20(a) provides:

> [e]very person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a).  "In order to establish a *prima facie* case of liability under § 20(a) [in the Second Circuit], a plaintiff must show:  (1) a primary violation by a controlled person; (2)

---

[10]In support of their argument that they did not act recklessly, Defendants rely heavily on *Johnson v. NYFIX, Inc.*, 399 F. Supp. 2d 105 (D. Conn. 2005), in which the court found no recklessness in defendants' accounting omissions.  But *NYFIX* is readily distinguishable.  The plaintiffs in *NYFLIX* did not adequately allege that defendants knew that their accounting statements contained flaws.  *See id.* at 115.  Indeed, "the financial statements in question were approved by accounting firms not alleged to have been involved in wrongdoing[.]"  *Id.* at 117.  In other words, the *NYFLIX* court found that the complaint did not sufficiently allege that defendants were aware of the challenged omission.  That is not the case here, as the CAC sufficiently pleads that Defendants were aware of the alleged bribery scheme.

control of the primary violator by the defendant; and (3) 'that the controlling person was in some meaningful sense a culpable participant' in the primary violation." *Boguslavsky v. Kaplan*, 159 F.3d 715, 720 (2d Cir. 1998) (quoting *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1472 (2d Cir. 1996)).

Here, the Section 20(a) control person claims asserted against the Individual Defendants are premised on primary violations by Jakks of Section 10(b) and Rule 10b-5. Because the Court found those primary liability claims sufficient to survive Defendants' Motion to Dismiss, the Section 20(a) claims have the requisite primary violation foundation. Defendants do not deny that Plaintiffs have pled facts sufficient to satisfy the second element of a prima facie claim, that the Individual Defendants, as high-ranking executives at Jakks, possessed control over the alleged primary violator. *See First Jersey Sec.*, 101 F.3d at 1472-73 ("Control over a primary violator may be established by showing that the defendant possessed 'the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise.'" (quoting 17 C.F.R. § 240.12b-2)). Thus, the sufficiency of this claim turns on the question of each Individual Defendant's "culpable participation."

In *First Jersey Securities*, the Second Circuit held that a prima facie case of liability under Section 20(a) requires a plaintiff to show, *inter alia*, that "the controlling person was in some meaningful sense a culpable participant in the fraud perpetrated by the controlled person . . . ." 101 F.3d at 1472 (internal quotation marks, citations and alterations omitted). Subsequently, a number of Second Circuit cases have cited *First Jersey Securities* for the proposition that a plaintiff must show some level of culpable participation to establish a prima facie case of Section

38

20(a) liability. *See, e.g., Suez Equity Investors, L.P. v. Toronto-Dominion Bank*, 250 F.3d 87,

101 (2d Cir. 2001) ("Controlling-person liability is a form of secondary liability, under which a

plaintiff may allege a primary § 10(b) violation by a person controlled by the defendant and

culpable participation by the defendant in the perpetration of the fraud." (citing *First Jersey Sec.*,

101 F.3d at 1472)); *Scholastic Corp.*, 252 F.3d at 77-78 (citing *First Jersey Sec.*, 101 F.3d at

1472)); *Ganino*, 228 F.3d at 170 (adopting *First Jersey Securities'* requirement that a plaintiff

show "that the controlling person was in some meaningful sense a culpable participant in the

fraud"); *Boguslavsky*, 159 F.3d at 720 ("In particular, we note that a determination of § 20(a)

liability requires an individualized determination of a defendant's control of the primary violator

as well as a defendant's particular culpability.").[11] While the Court recognizes that there is

disagreement in the Second Circuit as to whether culpable participation must in fact be pled, the

Court agrees with the line of cases that holds that "culpable participation" is a pleading

requirement to state a Section 20(a) claim, and that it must be pled with the same particularity as

scienter under Section 10(b). *See Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611, 660-61 (S.D.N.Y.

2007) ("[A] heightened pleading requirement applies to the 'culpable participation' element; the

plaintiff must plead with particularity facts giving rise to a strong inference that the controlling

person knew or should have known that the primary violator, over whom that person had control,

was engaging in fraudulent conduct." (internal quotation marks omitted)); *Kalin v. Xanboo, Inc.*,

No. 04-CV-5931, 2007 WL 273546, at *12 (S.D.N.Y. Jan. 31, 2007) ("Having surveyed the

---

[11] The Second Circuit first recognized the "culpable participation" component of Section 20(a) liability in *Lanza v. Drexel & Co.*, 479 F.2d 1277 (2d Cir. 1973), when it observed that the "intent of Congress in adding this section, passed at the same time as the amendment to Section 15 of the 1933 Act, was obviously to impose liability only on those directors who fall within its definition of control and who are in some meaningful sense culpable participants in the fraud perpetrated by controlled persons." *Id.* at 1299.

relevant cases, the Court finds that the weight of Second Circuit precedent favors the view that a Plaintiff plead 'culpable participation' to state a section 20(a) claim, and that such participation must be plead with particularity."); *Lapin v. Goldman Sachs Group*, No. 04-CV-2236, 2006 WL 2850226, at *17-21 (S.D.N.Y. Sept. 29, 2006) (discussing the divide in the Second Circuit and holding that culpable participation must be pled with particularity). Accordingly, in order to withstand Defendants' Motion to Dismiss, Plaintiffs' Section 20(a) claim must allege, at a minimum, particularized facts of each controlling person's conscious misbehavior or recklessness.

At this stage in the proceedings, Plaintiffs' allegations are sufficient to establish culpable participation. First, the CAC specifically contends that each of the Individual Defendants knew of – and in fact participated in – the alleged commercial bribery scheme. (*See, e.g.*, CAC ¶¶ 35-36, 40, 42-43, 46.) Second, Plaintiffs adequately allege that, by virtue of their executive positions at Jakks, each Individual Defendant was responsible for statements that gave rise to the duty to disclose the bribery scheme. (*See, e.g., id.* ¶¶ 16-18, 23-24.) Indeed, at least some of the allegedly fraudulent statements were signed by each of the Individual Defendants. (*See, e.g., id.* ¶¶ 64, 80.) The Individual Defendants' knowledge of the alleged omitted information, coupled with their control over and participation in the misleading statements that gave rise to the duty to disclose that information, is sufficient to establish culpable participation. Control person liability with respect to the Individual Defendants is therefore adequately pled.

### G. Defendants' "Strike Suit" Allegations

Defendants also argue that Plaintiffs' CAC should be dismissed as an unacceptable "strike suit." (Defs.' Mem. 2.) According to Defendants, Plaintiffs' admitted reliance on the

initial complaint filed in the related *WWE* case was improper. (*Id.* 1 n.1, 52-53.) In support of this argument, Defendants point the Court to several cases criticizing what Defendants characterize as similar suits: *Garr v. U.S. Healthcare, Inc.*, 22 F.3d 1274 (3d Cir. 1994); *In re Razorfish, Inc. Sec. Litig.*, 143 F. Supp. 2d 304 (S.D.N.Y. 2001); *Ferber v. Travelers Corp.*, 785 F. Supp. 1101 (D. Conn. 1991).

If counsel for Plaintiffs had conducted no investigation beyond reading the complaint filed in the *WWE* action, Defendants might prevail on this argument. But that is not the case here. The CAC makes clear that counsel also read extensive "regulatory filings and reports, securities analysts' reports and advisories about the Company, press releases, and media reports about the Company . . . ." (CAC 1.) Such additional investigative steps are sufficient. For example, in *Garr*, counsel for plaintiff read a *Wall Street Journal* ("*WSJ*") article accusing defendant of insider trading. After reading the article, plaintiff's counsel examined other articles about defendant, "as well as a report on background information on the company." *Garr*, 22 F.3d at 1275. Counsel also "obtained considerable other information about [defendant], including filings it had made with the Securities and Exchange Commission." *Id.* In light of this additional investigation, the court found counsel's partial reliance on the *WSJ* article to be proper. *See id.* at 1277, 1281. The same holds true here, and the other authority cited by Defendants is not to the contrary.[12]

---

[12]As noted above, Defendants cite *Ferber* and *Razorfish*. In *Ferber*, although the court, in dicta, criticized the action as a "strike suit," it ultimately dismissed the complaint not on those grounds, but rather for failure to adequately plead fraud with particularity. 785 F. Supp. at 1106, 1109. The adequacy of Plaintiffs' fraud allegations here have already been discussed in Part II.C *supra*. Similarly, the *Razorfish* court criticized plaintiffs' copycat pleadings in a footnote, but the opinion cited by Defendants addressed an entirely unrelated issue and did not dismiss the complaint. 143 F. Supp. 2d 306 n.1.

III. Conclusion

For the foregoing reasons, Defendants' Motion to Dismiss is GRANTED without prejudice. Plaintiffs are given thirty (30) days from the date of this Opinion and Order to seek leave to amend the CAC. The Clerk of Court is respectfully directed to terminate the Motions (Docket No. 65 and 71).

SO ORDERED.

Dated:      January 25, 2008
            White Plains, New York

                                        KENNETH M. KARAS
                                        UNITED STATES DISTRICT JUDGE

Service List:

Kirk E. Chapman, Esq.
Peter Edward Seidman, Esq.
Sharon Maine Lee, Esq.
Milberg Weiss Bershad & Schulman, LLP
One Pennsylvania Plaza
New York, New York 10119
*Counsel for Plaintiffs*

David Avi Rosenfeld, Esq.
Samuel Howard Rudman, Esq.
Mario Alba, Jr., Esq.
Coughlin, Stoia, Geller, Rudman & Robbins, LLP
58 South Service Road, Suite 200
Melville, New York 11747
*Counsel for Plaintiff Lydia Garcia and others similarly situated*

William Edward Bernarduci, Esq.
Schatz and Nobel PC
20 Church Street, Suite 1700
Hartford, Connecticut 06103
*Counsel for Plaintiff Allan Schrager*

Ken H. Chang, Esq.
Marian P. Rosner, Esq.
Michael Adam Schwartz, Esq.
Wolf Popper LLP
845 Third Avenue
New York, New York 10022-6689
*Counsel for Plaintiff James T. Kahn and others similarly situated*

Frederick Taylor Isquith, Sr., Esq.
Gustavo Fabian Bruckner, Esq.
Wolf, Haldenstein, Adler, Freeman & Herz L.L.P.
270 Madison Avenue
New York, New York 10016
*Counsel for Plaintiff Quantum Equities L.L.C. and others similarly situated*

Alfred G. Yates, Jr., Esq.
Gerald L. Rutledge, Esq.
519 Allegheny Building
429 Forbes Avenue
Pittsburgh, Pennsylvania 15219
*Counsel for Plaintiff James Irvine and others similarly situated*

Eric James Belfi, Esq.
Labaton Sucharow, LLP
140 Broadway
New York, New York 10005
*Counsel for Plaintiff James Irvine and others similarly situated*

Marc A. Topaz, Esq.
Richard A. Maniskas, Esq.
Schiffrin & Barroway, L.L.P.
Three Bala Plaza East
Bala Cynwyd, Pennsylvania 19004
*Counsel for Plaintiff James Irvine and others similarly situated*

Jonathan Honig, Esq.
Feder, Kaszovitz, Isaacson, Weber, Skala, Bass & Rhine LLP
750 Lexington Avenue
New York, New York 10022
*Counsel for Defendants*

Jonathan J. Lerner, Esq.
Michael H. Gruenglas, Esq.
Maura B. Grinalds, Esq.
Skadden, Arps, Slate, Meagher & Flom LLP
Four Times Square
New York, New York 10036
*Counsel for Defendants*

# Exhibit D

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| WORLD WRESTLING ENTERTAINMENT, INC., | |
| Plaintiff, | Case No. 04-CV-8223 (KMK) |
| -v- | OPINION AND ORDER |
| JAKKS PACIFIC, INC., JAKKS PACIFIC (H.K.) LTD., ROAD CHAMPS LTD., THQ, INC., THQ/JAKKS PACIFIC LLC, STANLEY SHENKER & ASSOCS., INC., BELL LICENSING, L.L.C., JACK FRIEDMAN, STEPHEN BERMAN, JOEL BENNETT, BRIAN FARRELL, STANLEY SHENKER, AND JAMES BELL, | |
| Defendants. | |

Appearances:

Jerry Scott McDevitt, Esq.
Amy Lyn Barrette, Esq.
Peter Nicholas Flocos, Esq.
William O. Purcell, Esq.
Curtis B. Krasik, Esq.
Kirkpatrick & Lockhart Preston Gates Ellis, LLP
Pittsburgh, PA
*Counsel for Plaintiff*

Jonathan J. Lerner, Esq.
Maura Barry Grinalds, Esq.
Michael Gruenglas, Esq.
Skadden, Arps, Slate, Meagher & Flom, LLP
New York, NY
Jonathan Honig, Esq.
Feder, Kaszovitz, Isaacson, Weber, Skala, Bass & Rhine LLP
New York, NY
*Counsel for Defendants Jakks Pacific, Inc.,*
*Jakks Pacific (H.K.) Limited, Jack Friedman,*
*Stephen Berman, and Joel Bennett*

Steven A. Marenberg, Esq.
Philip M. Kelly, Esq.
Irell & Manella LLP
Los Angeles, CA
*Counsel for Defendant THQ, Inc.*
*and Brian Farrell*

Richard Schaeffer, Esq.
Bruce Handler, Esq.
Dornbush, Mensch, Mandelstam & Schaeffer, L.L.P.
New York, NY
*Counsel for THQ/Jakks Pacific L.L.C.*

Michael Alan Freeman, Esq.
Greenberg Freeman, L.L.P.
New York, NY
*Counsel for Defendants Stanley Shenker*
*and Stanley Shenker & Assocs., Inc.*

KENNETH M. KARAS, District Judge:

Plaintiff World Wrestling Entertainment, Inc. ("WWE") filed this action against

Defendants Jakks Pacific, Inc. ("Jakks"), Jakks Pacific H.K. Ltd. ("Jakks H.K."), Road Champs,

Ltd. ("Road Champs"), THQ, Inc. ("THQ"), THQ/Jakks Pacific LLC ("the LLC"), Stanley

Shenker & Associates, Inc. ("SSAI"), Bell Licensing, LLC ("Bell Licensing"), Stanley Shenker

("Shenker"), James Bell ("Bell"), Jack Friedman ("Friedman"), Stephen Berman ("Berman"),

Joel Bennett ("Bennett"), and Brian Farrell ("Farrell"). In its first Complaint, Plaintiff alleged

violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§

1962(c), (d), the Robinson-Patman Act, 15 U.S.C. § 13(c), and causes of action under New York

state law for commercial bribery, fraudulent inducement, unjust enrichment, breach of fiduciary

duty, inducement of breach of fiduciary duty, tortious interference with contractual relations, and

conspiracy to engage in each of the above acts. In an Amended Complaint, Plaintiff refined its

factual allegations of wrongdoing by Defendants and also added a Sherman Act cause of action.

2

Plaintiff seeks compensatory, statutory, and punitive damages, a declaration that the licensing agreements entered into or extended as a result of the alleged bribery are void, an accounting of all revenues and profits obtained by Defendants under the licenses, disgorgement and/or restitution for any improper revenues and/or profits obtained under the agreements, disgorgement and/or restitution of any amounts allegedly paid to Defendants as bribes, and attorneys' fees and costs.

Because of the delayed timing of the filing of Plaintiff's Amended Complaint, the Court ordered bifurcated briefing. In the first stage, the Parties briefed three threshold issues raised in Defendants' motions to dismiss the first Complaint, which remained applicable to the Amended Complaint and were potentially dispositive. Those three issues were: (1) whether Plaintiff has sufficiently alleged the existence of a RICO enterprise pursuant to 18 U.S.C. § 1962(c); (2) whether Plaintiff has pled a cause of action under the Robinson-Patman Act, 15 U.S.C. § 13(c); and (3) whether Plaintiff is estopped from pursuing its RICO claim against Defendants Shenker and SSAI because it is duplicative of litigation commenced in Connecticut state court. The Parties also briefed the Plaintiff's Sherman Act claim, which was included for the first time in the Amended Complaint.

On March 31, 2006, the Court issued an Opinion and Order granting in part and denying in part Defendants' motions to dismiss. *See World Wrestling Entm't, Inc. v. Jakks Pacific, Inc.*, 425 F. Supp. 2d 484 (S.D.N.Y. 2006) (*"WWE I"*). The Court granted Defendants' Motion to Dismiss the Robinson-Patman and Sherman Act claims, but denied the Defendants' motions to dismiss for failure to properly plead an enterprise pursuant to § 1962(c), and denied the Shenker Defendants' Motion to Dismiss based on res judicata and abstention principles.

3

Now, in the second stage, all Defendants briefed the remaining issues pertaining to

Plaintiff's RICO causes of action against them. For the reasons discussed herein, Defendants'

motions to dismiss the RICO causes of action are granted.

<u>I. Background</u>

For purposes of this Motion, the Court accepts as true the allegations in the Amended

Complaint. The salient facts and procedural history are fully discussed in *WWE I*, and

familiarity is presumed. *See WWE I*, 425 F. Supp. 2d at 488-93. Further, a detailed recitation of

the facts relevant to each issue is discussed below. What follows here is a summary of the basic

facts necessary to put Defendants' motions into context.

Plaintiff WWE is principally engaged in the development, promotion, and marketing of

television and pay-per-view programming and live arena events related to professional wrestling.

(Am. Compl. ¶ 9.) As part of its business, WWE also creates characters whose names and

likenesses may be licensed to third parties. (*Id.*) The licenses provide a separate stream of

profits for WWE, in the form of royalties, that is a percentage from the sale of the licensed

products.

Defendant Jakks principally sells action figures and toys. (*Id.* ¶ 10.) Defendant Jack

Friedman is the Chief Executive Officer and Chairman of Jakks. (*Id.* ¶ 13.) He co-founded

Jakks with Defendant Berman. (*Id.*) Prior to founding Jakks, Friedman was the CEO of

Defendant THQ. (*Id.* ¶ 14.) Jakks and Friedman also own Jakks H.K. and Road Champs, both

Hong Kong Corporations. (*Id.* ¶¶ 11-12.) During the times relevant to the Amended Complaint,

Defendant Berman was the Executive Vice President of Jakks. (*Id.* ¶ 15.) Berman also served at

times as Jakks' President, Secretary, and Chief Operating Officer. (*Id.*)

4

Defendant THQ markets and sells videogames. (*Id.* ¶ 17.) Defendant Farrell is the President, the Chief Executive Officer, and a member of the Board of Directors of THQ. (*Id.* ¶ 18.)

THQ and Jakks formed the LLC as a joint venture on June 10, 1998. (*Id.* ¶ 19.) The LLC was formed in order to be the official licensee for WWE's videogame license. (*Id.*) Defendant Berman was authorized to act on behalf of the joint venture. (*Id.*)

Defendant SSAI served as WWE's licensing agent from approximately April 1995 through June 13, 2000. (*Id.* ¶ 20.) Defendant Shenker is the sole owner and President of SSAI. (*Id.* ¶ 21.)

Defendant Bell is a former WWE executive and is the President and sole owner of Bell Licensing, a limited liability company allegedly formed to launder bribes paid to Bell while he was an executive at WWE. (*Id.* ¶¶ 22-23.) On February 10, 2005, Bell pled guilty in the United States District Court for the District of Connecticut to one count of mail fraud, in violation of 18 U.S.C. § 1342, in connection with his receipt of bribes relating to WWE's licensing program. (*Id.* ¶ 24.) WWE hired Bell to negotiate and procure licenses for its intellectual property. (*Id.* ¶ 30.) From October 1996 to his termination on March 24, 2000, Bell served as WWE's Senior Vice President of Licensing and Merchandising. (*Id.*)

In 1995, Friedman asked Bell and Shenker about obtaining a license on behalf of Jakks to make WWE toys. (*Id.* ¶ 35.) Thereafter, on October 24, 1995, WWE and Jakks entered into a domestic toy license. (*Id.*) Nothing improper is alleged as to this license. However, one month later, in November 1995, Jakks proposed that Shenker act as its agent on a perfumed doll deal that did not involve any WWE licenses. (*Id.* ¶ 42.) On January 3, 1996, Jakks and Shenker

entered into an agency agreement for the perfumed doll deal. (*Id.* ¶ 46.) At around the same

time, Jakks asked Shenker to act on its behalf to seek an amendment to the domestic toy license

it originally obtained in October 1995. (*Id.* ¶ 47.) Shenker never told WWE about its efforts on

behalf of Jakks. Approximately three months later, Jakks obtained the first amendment to the

domestic toy license, which granted Jakks additional rights under the WWE domestic toy

license. (*Id.* ¶ 56.)

Later in 1996, Jakks sought Shenker's assistance in driving Playmates, a competitor in

the action figure market, from its WWE license. (*Id.* ¶¶ 57-68.) Using his influence, in January

1997, Shenker recommended that WWE grant Jakks a second amendment to its domestic toy

license that conflicted with a license previously granted to Playmates. (*Id.* ¶¶ 67-71.) WWE

accepted Shenker's recommendation, and granted Jakks a second amendment to the domestic toy

license. In February 1997, WWE also granted Jakks an international toy license. (*Id.* ¶ 71.)

Before Bell had been brought into the scheme, Playmates complained to him about WWE's bad

faith in allowing competition with its products but to no avail. (*Id.* ¶ 70.) Eventually, Playmates

was bought out by WWE. (*Id.* ¶ 83.) Shenker's dual role in these negotiations was never

disclosed to WWE. On March 17, 1997, WWE hired SSAI as its exclusive outside licensing

agent. (*Id.* ¶ 72.)

By November 1997, Bell was induced to join the bribery/fraud scheme based on

Shenker's promises of payments. (*Id.* ¶¶ 81-83.) Shenker delivered on these payments, which

are alleged to have been provided by the Jakks Defendants[1], using a variety of covert means. (*Id.*

---

[1] The Jakks Defendants are comprised of Jakks, Jakks H.K., Road Champs, Friedman, Berman, and Bennett.

6

¶¶ 85-90, 94-99.) With Shenker and Bell in the fold, the Jakks Defendants sought and obtained a

third amendment to the domestic toy license in January 1998, granting to Jakks the rights

formerly held by Playmates. (*Id.* ¶ 93.)

Beginning in January 1998, Jakks set its sights on the videogame license. (*Id.* ¶ 101.)

The license was coming up for renewal and was held at the time by a company known as

Acclaim. (*Id.* ¶ 102.) In March 1998, Bell told Acclaim that WWE "would not even listen to

any proposal that Acclaim would make for the renewal of its license." (*Id.* ¶ 109.) Not

surprisingly, Acclaim "went over Bell's head and complained to senior management at WWE

that it was not being permitted to submit a renewal proposal." (*Id.*) WWE told Acclaim that it

would be permitted to make such a proposal. (*Id.*) Nonetheless, within a week, Bell, without

waiting for Acclaim's proposal, recommended that WWE grant the videogame license to Jakks.

(*Id.* ¶ 110.) WWE acted on this recommendation. Soon thereafter, other companies informally

expressed an interest in the license. (*Id.* ¶¶ 127-29.) In order to protect the bribery scheme,

Shenker and/or Bell concealed the informal proposals from WWE senior management, but

advised Jakks of the terms of these other proposals. (*Id.* ¶ 134-35, 145.) One of these other

bidders was Defendant THQ.

Jakks thereafter approached THQ with an offer to act as joint venture partners in securing

the videogame license. As part of this approach, Defendant Friedman told Defendant Farrell that

Jakks was "in control of the videogame license." (*Id.* ¶ 137.) THQ would be required to pay

both Jakks and WWE for the license, while also funding and managing the licensed operations.

(*Id.* ¶¶ 137, 178-79, 182-85.) According to WWE, THQ accepted the offer because it was in

desperate financial straits after the cancellation of one of its most lucrative licenses. (*Id.* ¶¶ 119-

25.) In early May 1998, Bell submitted a deal memo recommending that the videogame license be granted to THQ and Jakks as a joint venture. (*Id.* ¶ 152.) Shortly thereafter, the other potential bidder (Activision) sent a more formalized version of its earlier informal proposal, but Bell and Shenker did not forward the Activision proposal to WWE management. (*Id.* ¶ 153.)

Jakks and THQ agreed to form a joint venture, the LLC, on June 10, 1998. (*Id.* ¶ 154.) Effective that same day, WWE and the LLC executed a videogame licensing agreement, with an "extraordinary length" of ten years and a five-year right of renewal for the LLC. (*Id.* ¶ 149.) The terms of the domestic and international toy licenses, which Jakks already had with WWE, were extended to coincide with the length of the videogame license. (*Id.* ¶ 165.)

On March 24, 2000, WWE terminated Bell's employment for reasons unrelated to the bribery scheme (which, at the time, WWE did not know about). (*Id.* ¶ 187.) On June 13, 2000, WWE terminated its contract with SSAI based on a change of business direction. (*Id.* ¶ 189.) In October 2000, SSAI brought a breach of contract claim against WWE in Connecticut state court, seeking to be paid commissions on licenses SSAI had allegedly procured for WWE. (*Id.* ¶ 190.) Through the litigation in Connecticut, WWE discovered the purportedly unlawful scheme, despite Defendants' alleged attempts to conceal it. (*Id.* ¶¶ 210-12.)

On October 16, 2003, the Connecticut state court dismissed with prejudice SSAI's action against WWE and entered a default judgment in favor of WWE as a sanction for Shenker's concealment of critical documents and perjured deposition testimony. (*Id.* ¶ 221.) *See also Stanley Shenker and Assocs., Inc. v. World Wrestling Fed'n Entm't, Inc.*, 844 A.2d 964, 978 (Conn. Super. Ct. 2003). WWE alleges that Defendants continued concealing documents and giving perjured testimony even after Shenker was sanctioned. (Am. Compl. ¶¶ 228-30, 235,

239.)

From the summer of 1998 until today, Jakks continues to receive royalties from the

various licenses granted to it (or the LLC) by WWE, all as a result of allegedly fraudulent and

corrupt conduct by Defendants.  (Am. Compl. ¶¶ 149-64, 173-85, 249(b)(lxvii).)

<u>II.  Discussion</u>

<u>A.  Standard of Review</u>

Defendants seek dismissal of the Amended Complaint under Fed. R. Civ. P. 12(b)(6) on

the grounds that it fails to state a claim.  The Supreme Court has recently held that "[w]hile a

complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual

allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief'

requires more than labels and conclusions, and a formulaic recitation of the elements of a cause

of action will not do[.]" *Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 1964-65 (2007) (citations

omitted and second alteration in original).  In *Bell Atlantic*, the Supreme Court also abandoned

reliance on the oft-quoted refrain from *Conley v. Gibson* that, "a complaint should not be

dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove

no set of facts in support of his claim which would entitle him to relief[,]" 355 U.S. 41, 45-46

(1957).  *Id.* at 1964-69.  As the Court explained, a literal application of *Conley*'s "no set of facts"

rationale is improper because "a wholly conclusory statement of claim would survive a motion to

dismiss whenever the pleadings left open the possibility that a plaintiff might later establish

some 'set of [undisclosed] facts' to support recovery." *Bell Atl.*, 127 S. Ct. at 1968.  Instead, the

Court emphasized that "[f]actual allegations must be enough to raise a right to relief above the

speculative level[,]" *id.* at 1965 (citation omitted), and "once a claim has been stated adequately,

it may be supported by showing any set of facts consistent with the allegations in the complaint[,]" *id.* at 1969. Plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Id.* at 1974; *see also Iqbal v. Hasty*, 490 F.3d 143, 157-58 (2d Cir. 2007) ("After careful consideration of the Court's opinion and the conflicting signals from it that we have identified, we believe the Court is not requiring a universal standard of heightened fact pleading, but is instead requiring a flexible 'plausibility standard,' which obliges a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim *plausible*."). If Plaintiff "ha[s] not nudged its claims across the line from conceivable to plausible, [its] complaint must be dismissed." *Bell Atl.*, 127 S. Ct. at 1974.

When considering a Rule 12(b)(6) motion, a court must limit itself to facts stated in the complaint, documents attached to the complaint, and documents incorporated into the complaint. *See Newman & Schwartz v. Asplundh Tree Expert Co.*, 102 F.3d 660, 662 (2d Cir. 1996). The Court will accept as true Plaintiff's allegations, and draw all inferences in Plaintiff's favor. *See Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1174 (2d Cir. 1993); *Blimpie Int'l, Inc. v. Blimpie of the Keys*, 371 F. Supp. 2d 469, 470-71 (S.D.N.Y. 2005). At this stage, the Court is not concerned with weighing the evidence that would be presented at trial. *See Chosun Int'l, Inc. v. Chrisha Creations, Ltd.*, 413 F.3d 324, 327 (2d Cir. 2005).

## B. Plaintiff's RICO Allegations

The crux of Plaintiff's allegations is that, through a "scheme and artifice to defraud," Defendants "depriv[ed] WWE of the intangible right of honest services from WWE's intellectual property licensing agent [Shenker] and its management supervisor of that licensing agent [Bell], . . . to obtain thereby valuable toy licensing rights and a lucrative videogame license at lower

10

than competitive royalty rates[.]" (Am. Compl. ¶ 1.) Plaintiff's substantive RICO cause of

action is brought pursuant to 18 U.S.C. § 1962(c). Under Section 1962(c), it is "unlawful for any

person employed by or associated with any enterprise engaged in, or the activities of which

affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the

conduct of such enterprise's affairs through a pattern of racketeering activity[.]" *See* 18 U.S.C. §

1962(c). "To establish a claim for a civil violation of section 1962(c), 'a plaintiff must show that

he was injured by defendants' (1) conduct (2) of an enterprise (3) through a pattern (4) of

racketeering activity.'" *Cofacredit, S.A. v. Windsor Plumbing Supply Co., Inc.*, 187 F.3d 229,

242 (2d Cir. 1999) (quoting *Azrielli v. Cohen Law Offices*, 21 F.3d 512, 520 (2d Cir. 1994)).

      "Civil RICO is an unusually potent weapon – the litigation equivalent of a thermonuclear

device." *Bell v. Hubbert*, No. 95-CV-10456, 2007 WL 60513, at *5 (S.D.N.Y. Jan. 8, 2007)

(quoting *Miranda v. Ponce Fed. Bank*, 948 F.2d 41, 44 (1st Cir. 1991)) (internal quotation marks

omitted). "Because the 'mere assertion of a RICO claim . . . has an almost inevitable

stigmatizing effect on those named as defendants, . . . courts should strive to flush out frivolous

RICO allegations at an early stage of the litigation.'" *Katzman v. Victoria's Secret Catalogue*,

167 F.R.D. 649, 655 (S.D.N.Y. 1996) (quoting *Figueroa Ruiz v. Alegria*, 896 F.2d 645, 650 (1st

Cir. 1990)). However, while meritless RICO suits should be weeded out, *see Schlaifer Nance &

Co. v. Estate of Warhol*, 119 F.3d 91, 98 (2d Cir. 1997), a RICO plaintiff normally need only

satisfy the general notice pleading requirements, *see Spinale v. United States*, No. 03-CV-1704,

2004 WL 50873, at *5 (S.D.N.Y. Jan. 9, 2004) ("Claims for violations of RICO generally need

only meet the notice pleading requirements of Rule 8(a) of the Federal Rules of Civil

Procedure.").

In *WWE I*, the Court found that Plaintiff has properly alleged a RICO enterprise. Therefore, the remaining questions are whether Plaintiff has sufficiently alleged that: (i) each Defendant conducted the alleged enterprise through a pattern of racketeering activity; (ii) the THQ Defendants[2] and the LLC directly or vicariously participated in the operation or management of the RICO enterprise; (iii) Plaintiff suffered a cognizable injury as a result of Defendants' alleged RICO violations; (iv) Plaintiff's RICO allegations are timely; (v) Defendants engaged in a conspiracy to violate RICO; and (vi) the 2004 Release does not bar Plaintiff's RICO claims against the Jakks Defendants, (*see* Decl. of Jonathan J. Lerner, Ex. B ("Lerner Decl.")).

"RICO defines 'racketeering activity' to include a host of criminal offenses, which are in turn defined by federal and state law." *Cofacredit*, 187 F.3d at 242 (citing 18 U.S.C. § 1961(1)). Here, Plaintiff charges Defendants with committing mail fraud under 18 U.S.C. § 1341, wire fraud under 18 U.S.C. § 1343, money laundering under 18 U.S.C. §§ 1956, 1957, as well as violating the Travel Act, 18 U.S.C. § 1952, the National Stolen Property Act, 18 U.S.C. §§ 2314, 2315, and New York Penal Law § 180.03, which proscribes commercial bribery. (Am. Compl. ¶ 247.)

C. Pattern of Racketeering Activity

To plead a pattern of racketeering activity, the RICO statute requires that – at a minimum – a complaint set forth two predicate acts occurring within ten years of each other. *See* 18 U.S.C. § 1961(5); *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 238 (1989). A RICO plaintiff must show that *each* defendant participated in the RICO enterprise by engaging in at least two

---

[2] The THQ Defendants are comprised of THQ and Farrell.

predicate acts. *See Hoatson v. N.Y. Archdiocese,* No. 05-CV-10467, 2007 WL 431098, at *4

(S.D.N.Y. Feb. 8, 2007) ("A complaint alleging RICO violations based on mail or wire fraud

must allege that the defendant participated in at least two acts of mail or wire fraud."); *USA*

*Certified Merchs., LLC v. Koebel,* 262 F. Supp. 2d 319, 332 (S.D.N.Y. 2003). The Supreme

Court has held that "to prove a pattern of racketeering activity a plaintiff or prosecutor must

show that the racketeering predicates are related, and that they amount to or pose a threat of

continued criminal activity." *H.J. Inc.,* 492 U.S. at 239. The Second Circuit has described the

pattern requirement as involving "multiple racketeering predicates – which can be part of a

single 'scheme' – that are related and that amount to, or threaten the likelihood of, continued

criminal activity[.]" *United States v. Reifler,* 446 F.3d 65, 91 (2d Cir. 2006) (quoting *United*

*States v. Coiro,* 922 F.2d 1008, 1016 (2d Cir. 1991)) (internal quotation marks omitted).

       "When seeking to satisfy the continuity requirement, a plaintiff must show that the

defendants' activities were 'neither isolated or sporadic.'" *SKS Constructors, Inc. v. Drinkwine,*

458 F. Supp. 2d 68, 77 (E.D.N.Y. 2006) (quoting *GICC Capital Corp. v. Tech. Fin. Group, Inc.,*

67 F.3d 463, 467 (2d Cir. 1995)). "The continuity necessary to prove a pattern can be either

'closed-ended continuity,' or 'open-ended continuity.'" *Cofacredit,* 187 F.3d at 242. "In

determining whether continuity exists the court should not limit its consideration to the duration

of the scheme, but should also look at the overall context in which the acts took place." *Pier*

*Connection, Inc. v. Lakhani,* 907 F. Supp. 72, 75 (S.D.N.Y. 1995) (quoting *Deem v. Lockheed*

*Corp.,* No. 87-CV-7017, 1991 WL 196171, at *9 (S.D.N.Y. Sept. 25, 1991) (internal quotation

marks omitted). At the pleading stage, the hurdle is relatively low. *See Procter & Gamble Co.*

*v. Big Apple Indus. Bldgs., Inc.,* 879 F.2d 10, 18 (2d Cir. 1989) ("Whether defendants' actions

are continuing in nature or isolated or sporadic will be the subject of proof at trial.").

    <u>1. Closed-End Continuity</u>

    "A party alleging a RICO violation may demonstrate continuity over a closed period by proving a series of related predicates extending over a substantial period of time." *H.J. Inc.*, 492 U.S. at 242. "Predicate acts are 'related' when they 'have the same or similar purposes, results, participants, victims, methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events.'" *Weizmann Inst. of Sci. v. Neschis*, 421 F. Supp. 2d 654, 688 (S.D.N.Y. 2005) (quoting *H.J. Inc.*, 492 U.S. at 240) (finding predicate acts unrelated where the only connection was that they involved the same parties); *accord Jacobson v. Cooper*, 882 F.2d 717, 720 (2d Cir. 1989) (finding separate acts related where they involved the same alleged purpose, victim, and effect). "Although closed-ended continuity is primarily a temporal concept, other factors such as the number and variety of predicate acts, the number of both participants and victims, and the presence of separate schemes are also relevant in determining whether closed-ended continuity exists." *Cofacredit*, 187 F.3d at 242. Since the Supreme Court's 1989 decision in *H.J. Inc.*, however, the Second Circuit "has never found a closed-ended pattern where the predicate acts spanned fewer than two years." *First Capital Asset Mgmt., Inc. v. Satinwood, Inc.*, 385 F.3d 159, 181 (2d Cir. 2004); *see also DeFalco v. Bernas*, 244 F.3d 286, 321-22 (2d Cir. 2001) (declining to find closed-ended continuity where plaintiff alleged predicates committed over a period of less than a year and a half); *Fresh Meadows Food Servs., LLC v. RB 175 Corp.*, No. 04-CV-4767, 2006 WL 2728935, at *6 (E.D.N.Y. Sept. 25, 2006) ("The Second Circuit generally requires a showing that the alleged racketeering activity lasted for over two years.").

Where, as here, a RICO plaintiff alleges mail or wire fraud, the plaintiff "must prove that the defendants engaged in '(i) a scheme to defraud (ii) to get money or property, (iii) furthered by the use of the mail or wires.'" *USA Certified Merchs.*, 262 F. Supp. 2d at 332 (citing *United States v. Autuori*, 212 F.3d 105, 115 (2d Cir. 2000)). "The predicate mail or wire communications need not themselves contain fraudulent communications," but they must be material to a scheme that has a fraudulent and deceptive purpose. *See id.* at 332 (citing *Schmuck v. United States*, 489 U.S. 705, 711 (1989)). "Allegations of mail and wire fraud must . . . be pled with particularity in accordance with Rule 9(b)." *M'Baye v. N.J. Sports Prod., Inc.*, No. 06-CV-3439, 2007 WL 431881, at *7 (S.D.N.Y. Feb. 7, 2007); *see also Hoatson*, 2007 WL 431098, at *4 (noting that mail and wire fraud RICO predicates "must meet the rigorous pleading requirements of Federal Rule of Civil Procedure 9(b)"). "Thus, if plaintiff claims that the mail or wire transmissions 'were themselves fraudulent, i.e., themselves contained false or misleading information, the complaint should specify the fraud involved, identify the parties responsible for the fraud, and where and when the fraud occurred.'" *M'Baye*, 2007 WL 431881, at *7 (quoting *Evercrete Corp. v. H-Cap Ltd.*, 429 F. Supp. 2d 612, 624 (S.D.N.Y. 2006)). "If, however, the plaintiff claims that the mail or wire fraud was only used in furtherance of a scheme to defraud, then the complaint does not have to be as specific with respect to each allegation of mail or wire fraud, so long as the RICO scheme is sufficiently pled to give notice to the defendants." *Id.*

Plaintiff alleges that Defendants committed numerous racketeering acts with the purpose of depriving WWE of the honest services of one or both of its licensing agents – Defendants Shenker/SSAI and Bell – in order to procure valuable licensing rights, and then Defendants covered up their scheme. These allegations can be broken down into five categories: (i) initial

15

efforts by the Jakks Defendants to corrupt Shenker and SSAI, conduct that allegedly took place between November 1995 and November 1997, all to procure toy licenses from WWE and all before the purported corruption of Bell; (ii) conduct by the Jakks Defendants and Shenker/SSAI to corruptly use Bell to procure additional WWE toy licenses between November 1997 and June 1998; (iii) efforts by the Jakks Defendants, the THQ Defendants, the LLC, Shenker, SSAI, and Bell to corruptly procure the license for WWE videogames, conduct that spans from January 1998 through August 1998, just after the LLC obtained the videogame license from WWE and when some Jakks Defendants are alleged to have arranged for bribery payments; (iv) surreptitious payments from Shenker/SSAI to Bell from January 1998 until December 2001, and royalty payments, which arose from various licenses, paid to Jakks Defendants by the THQ Defendants and the LLC from 1999 until at least January 2005 and beyond; and (v) efforts by Shenker, Bell, and some of the THQ and Jakks Defendants, after Bell's termination from WWE in March 2000 and the termination of the WWE/SSAI contract in June 2000, to conceal their purportedly corrupt activities, all of which occurred between October 2000, when SSAI initiated a lawsuit against WWE in Connecticut, and July 2004.

Turning to the first category of alleged misconduct, which the Jakks Defendants have described as the "front end" of the alleged RICO scheme, Plaintiff claims that the scheme began after Jakks secured the domestic toy license from WWE on October 24, 1995 ("the domestic toy license"). (Am. Compl. ¶ 35.) The initial acquisition of the domestic toy license is not alleged to have been the result of any self-dealing by or corruption of Shenker/SSAI. Indeed, as described in the Amended Complaint, the license was granted after Jakks made an approach to Shenker and Bell at a toy convention and merely asked if it could obtain such a license. (*Id.*)

16

Thereafter, according to Plaintiff, Bell and Shenker presented a "deal memo" to WWE, which

resulted in WWE agreeing to grant the license to Jakks. (*Id.*) The absence of any illicit conduct

in connection with the domestic toy license is highlighted by the subsequent allegation in the

Amended Complaint that "after the domestic toy license was entered into [between WWE and

Jakks,]" Jakks "devised a plan to corrupt Shenker by trading on Shenker's lack of ethics and

greed." (*Id.* ¶ 37.)

The first step in this corruption plan, according to Plaintiff, was for Jakks to engage

Shenker/SSAI to represent its interests in connection with a perfumed doll deal that did not

involve any WWE licensing rights. (*Id.* ¶ 42.) These discussions began in November 1995, just

one month after Jakks obtained the domestic toy license, and took place at the same time that

SSAI was acting as one of WWE's nonexclusive outside licensing agents. (*Id.* ¶¶ 38-40, 42.)

According to Plaintiff, Defendant Berman linked the perfumed doll deal with Jakks' interest in

using Shenker/SSAI to procure additional licensing rights from WWE. (*Id.* ¶ 42.) On January 3,

1996, Jakks and Shenker entered into an agency agreement for the perfumed doll deal. (*Id.* ¶

44.) In the cover letter transmitting the contract, Jakks is alleged to have asked Shenker how

soon he could get an amended domestic toy license from WWE. (*Id.*) On February 12, 1996,

Jakks paid Shenker an advance of $2500 for the perfumed doll deal. (*Id.* ¶¶ 46, 48.)

According to the Amended Complaint, just two days after Jakks advanced the $2500 to

SSAI for its work on the perfumed doll deal, Jakks officials discussed their desire to retain SSAI

to act as Jakks' agent in obtaining additional WWE licensing rights. (*Id.* ¶ 49.) This allegedly

was done against the advice of outside legal counsel for Jakks, who supposedly told Jakks that it

would be a conflict of interest for SSAI to simultaneously represent WWE and Jakks in

connection with WWE's licenses and that no such arrangement could be made without notice to WWE. (*Id.* ¶ 50.) That notice apparently was never given. (*Id.* ¶ 51.) Three months later, SSAI recommended to WWE that it grant Jakks the additional licensing rights sought by Jakks in the domestic toy deal. (*Id.* ¶ 56.) According to Plaintiff, "Shenker made no attempt to negotiate better terms for WWE and recommended the additional rights be given to Jakks on the terms offered by Jakks and without determining if competitors of Jakks would pay more for the rights." (*Id.*)[3] Further, the Amended Complaint alleges that Jakks used its relationship with Shenker/SSAI to obtain a second amendment to the domestic toy license in January 1997 and an international toy license in February 1997. (*Id.* ¶¶ 62-67, 71.)

SSAI became WWE's exclusive outside licensing agent on March 7, 1997, whereby SSAI would earn a portion of the royalties paid to WWE stemming from licenses SSAI procured. (*Id.* ¶¶ 72, 77) Thereafter, Jakks' alleged scheme evolved and grew when Shenker approached Bell in or around November 1997 to bring him into the scheme. (*Id.* ¶¶ 80-82.) This begins the second category of conduct. During this time, the Jakks Defendants allegedly made a series of bribery payments to Shenker, some of which Shenker subsequently shared with Bell. (*Id.* ¶¶ 84-97.) According to Plaintiff, these payments resulted in a third amendment to the domestic toy license that Jakks originally procured in 1995. The third amendment was granted in January 1998, and it gave Jakks the rights to certain action figures. (*Id.* ¶¶ 93, 249(a)(xiv).)

At the same time it was pursuing amendments to the WWE toy licenses in 1997 and early 1998, Jakks was pursuing the lucrative videogame license. (*Id.* ¶ 104.) This is the third category

---

[3]This transaction was the first amendment to the domestic toy license that Jakks had negotiated in 1995.

of racketeering conduct. When the illicit arrangement was threatened with exposure in April

1998, as a result of competition by THQ and Acitivision for the videogame license, Jakks

allegedly secured THQ's agreement not to submit an independent bid. (*Id.* ¶¶ 136-38.) Instead,

on June 10, 1998, Jakks and THQ furtively formed the LLC, which obtained the videogame

license from WWE as of that day. (*Id.* ¶ 154.) At the same time, Jakks secured an extension of

its domestic and international toy licenses, which were coterminous with the videogame license.

(*Id.* ¶ 165.)

Plaintiff's Amended Complaint alleges that the scheme extended at least until January

2005 (when the Amended Complaint was presumably drafted) and lives on to this day because

Jakks, THQ, and the LLC continue to share the proceeds from the allegedly fraudulently

obtained videogame license. (*Id.* ¶¶ 149-64, 173-85, 249(b)(lxvii).) Plaintiff also claims

Shenker/SSAI made covert payments to Bell until December 2001. (*Id.* ¶ 249(b)(xxvi).) Both of

these series of payments, according to Plaintiff, qualify as money laundering predicates, and

collectively comprise the fourth category of racketeering acts.[4] The fifth category involves

allegations that the Jakks Defendants, Shenker, and Bell concealed their fraudulent activities

from late 2000 until at least 2004, all in connection with litigation between SSAI and WWE in

Connecticut. (*Id.* ¶¶ 186-241.) Thus, from Plaintiff's vantage point, Defendants' pattern of

racketeering activity began in late 1995 and continues until this day.

Defendants argue that the alleged scheme could not have started in 1995 because Bell did

not receive his first bribe until January 1998. (Mem. of Law in Supp. of the Jakks Defs.' Mot. to

---

[4]Plaintiff also alleges that the Shenker/SSAI/Bell payments were made in violation of the
National Stolen Property Act, 18 U.S.C. §§ 2314, 2315.

Dismiss the Am. Compl. 8 ("Jakks. Mem.").) According to Defendants, the alleged efforts by

the Jakks Defendants to deprive WWE of the honest services of Shenker and SSAI prior to the

corruption of Bell are of no import because Bell was the gatekeeper for the licensing process.

(*Id.* at 9.) Without Bell's corrupt influence, according to Defendants, all the bribery in the world

of Shenker and SSAI would be worthless as Bell was the WWE official responsible for

recommending to WWE which licenses to grant. For example, the Jakks Defendants argue that

the 1995 perfumed doll deal did not involve any racketeering acts and that even if it did, the deal

was unrelated to the later bribery scheme involving Shenker and Bell. Thus, in the view of the

Jakks Defendants, the alleged RICO scheme could not have begun until January 1998, when Bell

allegedly was first brought into the scheme.[5]

Defendants also challenge the two categories that make up the back end of the scheme.

They argue that mere royalty payments on the licensing agreements, even if those agreements

were fraudulently obtained, collectively do not constitute money laundering and, therefore, are

not racketeering acts as a matter of law. Similarly, Defendants claim that any false statements

given during the Connecticut litigation between WWE and Shenker/SSAI are not racketeering

acts, as they were not intended to cover up an on-going scheme, but instead were made years

after the alleged scheme had been completed and after Bell and Shenker no longer worked for or

---

[5]Defendants argue that Bell's involvement did not begin until he received his first bribe
in January 1998. There is support for this claim in the Amended Complaint which, citing Bell's
guilty plea to mail fraud, in violation of 18 U.S.C. § 1341, alleges that Bell's involvement began
"in or before January 1998." (Am. Compl. ¶ 24.) However, the Amended Complaint also
alleges that even before he received his first bribe, Bell agreed to be a part of Jakks' corrupt
effort to obtain WWE licenses, (*id.* ¶ 82), and that as part of that plan, in November 1997, Bell
sought to buy off Playmates, a competitor of Jakks for certain toy licenses, (*id.* ¶ 83). Solely for
the purpose of deciding the instant motion, the Court finds that the November 1997 date is the
appropriate starting point for the second category of alleged misconduct.

on behalf of WWE. Thus, from Defendants' standpoint, the alleged RICO scheme lasted at most

from January 1998 (when Bell purportedly was brought into the scheme) to June 1998 (when the

videogame license was granted to the LLC), far less than the two years normally required in the

Second Circuit. For reasons that are explained below, Defendants are correct in their objections

to the two back-end categories of alleged racketeering acts. Thus, to survive, Plaintiff must

prevail in its claims regarding the first, front-end category of conduct.

Plaintiff insists that although allegedly having Bell in Defendants' pocket made it easier

for the Jakks Defendants to obtain the licensing rights they sought, the corruption of Bell was

only part of a scheme that involved broader efforts to persuade Shenker/SSAI to corruptly

represent Jakks' interests in obtaining WWE licenses. According to Plaintiff, as one of WWE's

nonexclusive licensing agents, SSAI had a duty to avoid self-dealing, or at least to disclose its

self-dealing. Thus, in Plaintiff's view, when Shenker agreed to have SSAI represent Jakks in the

perfumed doll deal while he was being pitched to represent Jakks in its efforts to obtain

additional WWE licenses, he breached his duty of loyalty to WWE. And, according to Plaintiff,

Jakks' deliberate effort to tie the payments on the perfumed doll deal to its efforts to procure,

through SSAI, the additional WWE licenses was a fraud aimed at depriving WWE of the honest

services of its agent. In Plaintiff's view, the self-dealing was even more problematic when SSAI

agreed to become Jakks' agent in all future deals with WWE without notice to WWE.

In *United States v. Rybicki*, 354 F.3d 124 (2d Cir. 2003), the Second Circuit confirmed

that a scheme or artifice to defraud under 18 U.S.C. § 1341 (mail fraud) and § 1343 (wire fraud)

includes a scheme or artifice to deprive another of the intangible right of honest services under

18 U.S.C. § 1346. 354 F.3d at 134. According to the Second Circuit:

> [T]he term "scheme or artifice to deprive another of the intangible
> right to honest services" in section 1346, when applied to private
> actors, means a scheme or artifice to use the mails or wires to
> enable an officer or employee of a private entity (or a person in a
> relationship that gives rise to a duty of loyalty comparable to that
> owed by employees to employers) purporting to act for and in the
> interests of his or her employer (or of the other person to whom the
> duty of loyalty is owed) secretly to act in his or her or the
> defendant's own interests instead, accompanied by a material
> misrepresentation made or omission of information disclosed to
> the employer or other person.

*Id.* at 141-42.  The en banc Court further noted that a "scheme or artifice to defraud" in private-

sector honest services cases falls into two categories – bribes/kickbacks and self-dealing.  *Id.* at

139.  "In the bribery or kickback cases, a defendant who has or seeks some sort of business

relationship or transaction with the victim secretly pays the victim's employee (or causes such a

payment to be made) in exchange for favored treatment."  *Id.*  "In the self-dealing cases, the

defendant typically causes his or her employer to do business with a corporation or other

enterprise in which the defendant has a secret interest, undisclosed to the employer."  *Id.* at 140.

The difference between the two is that in the bribery/kickback case, "the undisclosed bribery

itself is sufficient to make out the crime, but in self-dealing cases, the existence of a conflict of

interest alone is not sufficient to do so."  *Id.* at 141.  Instead, the self-dealing is actionable only

if the defendant's actions "cause, or [are] at least capable of causing, some detriment – perhaps

some economic or pecuniary detriment – to the employer."  *Id.*[6]

---

[6]Defendants dismiss Plaintiff's citation to *Rybicki* as a "red herring," claiming that
*Rybicki* "concerned whether the statute extending the mail and wire fraud statutes to cover
honest services fraud was unconstitutionally vague." (Reply Mem. of Law in Further Supp. of
the Jakks Defs.' Mot. to Dismiss the Am. Compl. 4 ("Jakks Reply Mem.").)  Defendants are
correct that the question in *Rybicki* was whether Section 1346 was unconstitutionally vague.
But, in rejecting the vagueness claim, the Second Circuit construed Section 1346 to cover
certain, well-defined misconduct, the description of which in that opinion provided guidance as

Therefore, in order to show that a mail or wire fraud has occurred under Section 1346, a plaintiff must demonstrate at least that there was: "(1) a scheme or artifice to defraud; (2) for the purpose of knowingly and intentionally depriving another of the intangible right of honest services as thus defined; (3) where the misrepresentations (or omissions) made by the defendants are material in that they have the natural tendency to influence or are capable of influencing the employer to change its behavior; and (4) use of the mails or wires in furtherance of the scheme." *Id.* at 147. In self-dealing cases, "there may also be a requirement of proof that the conflict caused, or at least was capable of causing, some detriment" to the entity to which the defendant owed a duty of loyalty on par with what an employee owes an employer. *Id.* at 142.

In light of *Rybicki*, one pertinent question here is whether, at the time of the perfumed doll deal, SSAI was in a relationship with WWE such that SSAI owed WWE a duty of loyalty comparable to what an employee owes an employer. The Amended Complaint is stingy with the details regarding the relationship between WWE and SSAI from April 1995 to March 1997.

---

to the elements of a violation of that mail fraud statute. Thus, for example, the majority in *Rybicki* noted that its holding meant that a panel's decision in *United States v. Handakas*, 286 F.3d 92 (2d Cir. 2002), an earlier case declaring Section 1346 unconstitutionally vague, was neutered because, under the construction of Section 1346 adopted in *Rybicki*, it was "clear that the defendant's conduct in that case was not within the scope of behavior proscribed by section 1346[.]" *Rybicki*, 354 F.3d at 144.

It also bears noting that in rejecting the vagueness challenge in *Rybicki*, the Second Circuit held that it was proper to consider cases that pre-dated both the enactment of section 1346, and the Supreme Court's decision in *McNally v. United States*, 483 U.S. 350 (1987), in which the Court held that the mail fraud statute (18 U.S.C. § 1341) did not criminalize schemes "designed to deprive individuals, the people, or the government of intangible rights, such as the right to have public officials perform their duties honestly[.]" *See Rybicki*, 354 F.3d at 134 (citing *McNally*, 483 U.S. at 358). "Under *McNally*, all schemes or artifices to defraud relating to intangible rights[,]" such as "honest services," were "beyond the mail-fraud proscriptions." *Id.*

According to the Amended Complaint, WWE retained SSAI as a "nonexclusive outside licensing agent" in or around 1995. (Am. Compl. ¶ 32.) As a nonexclusive licensing agent, SSAI was able to "procure and negotiate licensing contracts[,]" which would then be reviewed by Bell and others at WWE. (*Id.* ¶ 32.) While the Amended Complaint alleges that "[d]uring the course of their relationship with WWE, SSAI and Bell both entered into agreements with WWE reflecting and acknowledging their fiduciary roles and unique positions of trust," it is clear that there is no allegation regarding the execution of any such agreement by SSAI until March 1997, when SSAI signed a contract making it the "exclusive outside licensing agent" for WWE. (*Id.* ¶¶ 33, 72.) This is in contrast to Bell, who in March 1995 executed a Code of Conduct Agreement, wherein he agreed, among other things, that he would not accept fees in connection with any transaction on behalf of WWE.

It is curious that the Amended Complaint provides no specifics about the contract between WWE and SSAI in April 1995. In fact, there is no allegation that there even was a written contract between WWE and SSAI. Nonetheless, it is clear that while SSAI had no power to bind WWE to any licensing agreement, it was authorized to negotiate licensing agreements that it would present to WWE. WWE reviewed and had to approve all licensing deals that SSAI, or any of its other licensing agents, proposed to WWE. Even when SSAI became WWE's exclusive licensing agent in March 1997, the contract did not grant SSAI "any right to accept licensing proposals or to execute particular agreements on behalf of WWE." (*Id.* ¶ 75.) Rather, SSAI "was to present all licensing proposals it procured and negotiated in deal memo format to Bell, who in turn would recommend to WWE whether to accept the proposal." (*Id.*) SSAI only received payments for those deals that were executed by WWE.

24

Notwithstanding the lack of specific allegations about the contractual relationship between WWE and SSAI, the Amended Complaint avers that SSAI owed a fiduciary duty to WWE. A "fiduciary duty arises when one has reposed trust or confidence in the integrity or fidelity or another who thereby gains a resulting superiority of influence over the first, or when one assumes control and responsibility over another." *Tex. Liquids Holdings, LLC v. Key Bank Nat'l Ass'n*, No. 05-CV-5070, 2007 WL 950136, at *2 (S.D.N.Y. Mar. 27, 2007) (quoting *Reuben H. Donnelly Corp. v. Mark I Mktg. Corp.*, 893 F. Supp. 285, 289 (S.D.N.Y. 1995)) (applying New York law); *accord United States v. Chestman*, 947 F.2d 551, 568 (2d Cir. 1991) (noting that a fiduciary relationship "exists when confidence is reposed on one side and there is resulting superiority and influence on the other"). In general, a "fiduciary relationship involves discretionary authority and dependency[,]" and involves "reliance, and de facto control and dominance." *Chestman*, 947 F.2d at 568-69. "Attorney/client or doctor/patient relationships 'are sufficiently rooted in trust and confidence to trigger super-contractual fiduciary duties.'" *Ross v. FSG PrivatAir Inc.*, No. 03-CV-7292, 2004 WL 1837366, at *5 (S.D.N.Y. Aug. 17, 2004) (quoting *Reuben H. Donnelly Corp.*, 893 F. Supp. at 289); *see also Wilson-Rich v. Don Aux Assocs., Inc.*, 524 F. Supp. 1226, 1234 (S.D.N.Y. 1981) ("Examples of fiduciary relationships include the relationships between trustee and beneficiary, guardian and ward, agent and principal, and attorney and client.").

"[F]iduciary relationships typically do not arise between parties engaging in arms length business transactions[.]" *Abercrombie v. Andrew Coll.*, 438 F. Supp. 2d 243, 274 (S.D.N.Y. 2006); *see also Tex. Liquids Holdings*, 2007 WL 950136, at *2 (noting that a conventional business relationship normally does not create a fiduciary relationship); *Ross*, 2004 WL

25

1837366, at *5 (same). In fact, where a contract governs the relationship between two commercial parties, the assumption is that there is no fiduciary relationship unless the contract provides otherwise. *See Calvin Klein Trademark Trust v. Wachner*, 123 F. Supp. 2d 731, 733-34 (S.D.N.Y. 2000). Instead, "where the parties' contract forms both the foundation and boundary of their relationship, fiduciary responsibilities have not attached." *Ross*, 2004 WL 1837366, at *6. This is not to say that parties in contract are never in a fiduciary relationship, *see Fyrdman & Co. v. Credit Suisse First Boston Corp.*, 708 N.Y.S.2d 77, 79 (App. Div. 2000), but the fact that a plaintiff and defendant "'worked together' is insufficient to establish a relationship of a 'mutual and confidential nature.'" *Argent Elec., Inc. v. Cooper Lighting, Inc.*, No. 03-CV-9794, 2005 WL 2105591, at *9 (S.D.N.Y. Aug. 31, 2005); *see also United States v. Cassese*, 273 F. Supp. 2d 481, 486 (S.D.N.Y. 2003) (noting fiduciary duty did not exist where parties were "arms-length business partners"). In fact, even a "slightly dominant business position does not operate to turn a formal contractual relationship into a confidential or fiduciary relationship." *Better Benefits, Inc. v. Protective Life Ins. Co.*, No. 03-CV-2820, 2004 WL 633730, at *3 (S.D.N.Y. Mar. 30, 2004) (internal quotation marks omitted).

The Court fully recognizes that the existence of a fiduciary relationship "normally depends on the facts of a particular relationship, [and] therefore a claim alleging the existence of a fiduciary duty usually is not subject to dismissal under Rule 12(b)(6)." *Abercrombie*, 438 F. Supp. 2d at 274. However, the Court is not required to credit mere legal conclusions that are dressed up as factual allegations that a defendant was in a fiduciary relationship with a plaintiff. *See Ross*, 2004 WL 1837366, at *1 n.2 (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)). For example, "the dispositive issue of fiduciary-like duty or no such duty is determined not by

the nomenclature 'finder' or 'broker' or even 'agent,' but instead by the services agreed to under the contract between the parties." *Ne. Gen. Corp. v. Wellington Adver., Inc.*, 624 N.E.2d 129, 132 (N.Y. 1993). "Moreover, the elements of a breach of fiduciary duty based in fraud must be plead with particularity." *Abercrombie*, 438 F. Supp. 2d at 274. Therefore, "[i]n order to survive a motion to dismiss a claim for breach of fiduciary duty, the plaintiff must set forth specific facts constituting the alleged relationship with sufficient particularity to enable the court to determine whether, if true, such facts could give rise to a fiduciary relationship." *Diamond Phoenix Corp. v. Small*, No. 05-CV-79, 2005 WL 1530264, at * 6 (D. Me. June 28, 2005). Finally, even allegations that a plaintiff relied on a defendant's expertise in a particular field are insufficient by themselves to survive dismissal. *See Boley v. Pineloch Assocs., Ltd.*, 700 F. Supp. 673, 681 (S.D.N.Y. 1988); *Mechigian v. Art Capital Corp.*, 612 F. Supp. 1421, 1431 (S.D.N.Y. 1985).

Ultimately, the Amended Complaint fails to allege that SSAI was empowered to act on behalf of WWE, or otherwise dominated or controlled WWE between April 1995 and February 1997. In fact, even after SSAI became WWE's exclusive licensing agent, it was never empowered to bind WWE to a licensing agreement. Instead, between April 1995 and February 1997, SSAI was merely among those businesses with which WWE contracted to find potential licensees and to propose to WWE the terms of a potential agreement between that licensee and WWE.[7] If a deal proposed by SSAI was not in WWE's best interests to execute, WWE was

---

[7]This is not to say that beginning in March 1997, after SSAI contractually agreed to be WWE's *exclusive* licensing agent, a fiduciary relationship was not born. *See Vill. on Canon v. Bankers Trust Co.*, 920 F. Supp. 520, 532 (S.D.N.Y. 1996) ("It is true that an exclusive agency gives rise to a fiduciary duty between principal and agent under New York law.").

under no obligation to accept it. Indeed, according to the Amended Complaint, the market for

these licenses was intensely competitive, (Am. Compl. ¶ 52), so any conflict of interest that

allegedly caused SSAI's proposal to be less lucrative presumably would lead WWE to reject it.

While SSAI and each of the other nonexclusive agents no doubt had an implicit duty to exercise

good faith toward WWE, the contractual relationship described in the Amended Complaint is

not alleged to include provisions that suggest the existence of a fiduciary relationship. *See Vill.*

*on Canon*, 920 F. Supp. at 533 (granting motion to dismiss, court noted: "Bankers Trust had no

authority to commit VOC to any proposal or to negotiate on VOC's behalf, as the terms of the

agreement make clear. Bankers Trust could only evaluate the proposals and make

recommendations. For these services Bankers Trust would earn a fee based on a percentage of

the value of a deal struck with the investor." (internal citations omitted)); *Ne. Gen. Corp.*, 624

N.E.2d at 132 ("We note . . . that while agents in New York are bound to exercise the utmost

good faith toward their principals, the plaintiff finder in this case was also not an agent in the

actual or functional meaning of that term and relationship. This finder had no explicit or

implied power to bind Wellington. This finder did not have the power to negotiate the

transaction. This finder did not have the power to do anything except find and introduce

prospects[.]"). Thus, if WWE wanted to sue SSAI for breach of the implied duty of good faith,

in addition to for breach of any of the explicit terms of the contract, perhaps it could do so.

However, if WWE wanted to make SSAI its fiduciary in 1995, it could have negotiated and paid

for that degree of loyalty, as it arguably did in a subsequent contract in March 1997. *See Ne.*

*Gen. Corp.*, 624 N.E.2d at 132 ("If Wellington wanted fiduciary-like relationships or

responsibilities, it could have bargained for and specified for them in the contract."). Having

failed to strike that bargain in 1995, the Court, sympathetic as WWE's plight may be, finds that the Amended Complaint does not contain allegations sufficient to state a claim that a fiduciary relationship existed between SSAI and WWE. *See id.* ("This Court may sense a sympathetic impulse to balance what it may view as the equities of a situation such as this. The hard judicial obligation, however, is to be intellectually disciplined against that tug. Instead, courts must focus on the precise law function reposed in them in such circumstances, which is to construe and enforce the meaning and thrust of the contract of the parties, not to purify their efforts.").

Jakks argues that the absence of a fiduciary relationship between WWE and SSAI between 1995 and 1997 prevents Plaintiff from nudging its case across the goal line. If this case had been filed outside the Second Circuit, Jakks might be right. For example, the Tenth Circuit has noted that the Section 1346 "right to honest services is not violated by every breach of contract, breach of duty, conflict of interest, or misstatement made in the course of dealing." *United States v. Welch*, 327 F.3d 1081, 1107 (10th Cir. 2003); *see also United States v. Cochran*, 109 F.3d 660, 667 (10th Cir. 1997) ("[I]t would give us great pause if a right to honest services is violated by every breach of contract or every misstatement made in the course of dealing."). The Eleventh Circuit has held that "a private sector violation of § 1346 honest services fraud involves a breach of fiduciary duty and reasonably foreseeable economic harm." *United States v. Devegter*, 198 F.3d 1324, 1330 (11th Cir. 1999); *see also United States v. Bradley*, 428 F. Supp. 2d 1365, 1368 (S.D. Ga. 2006) ("This Court simply finds no case upholding a § 1346 intangible right charge in which the alleged 'fiduciary relationship' arises from an arm's length transaction between two sophisticated parties, where the party allegedly owing the duty was *not* an employee or agent of the victim and performed *no services* for the

29

victim.").

The Second Circuit, however, has not yet adopted the same view. If anything, strong currents run against Defendants' position on this point. Five years before the Second Circuit's en banc decision in *Rybicki*, a panel of the Circuit held in *United States v. Sancho* that Section 1346 "does not require the existence of a fiduciary relationship" and therefore upheld the conviction of a defendant who sought to bribe an undercover agent posing as a consultant to another company. *See* 157 F.3d 918, 921 (2d Cir. 1998). *Sancho*, however, earned a red flag for its rejection of the use of pre-*McNally* caselaw to construe Section 1346. In *Rybicki*, the Court rejected "that *dictum* in *Sancho*," and held that it was proper to consider pre-*McNally* caselaw in determining the contours of Section 1346. 354 F.3d at 144.[8]

Neither *Rybicki* nor its treatment of *Sancho*, however, should be viewed as embracing Defendants' view that Section 1346 applies only where there is a breach of fiduciary duty. This point is made evident by a concurrence in *Rybicki*, and the majority's reaction to that concurrence. In her opinion concurring in the judgment, Judge Raggi observed that, "[w]hile a particular relationship may shed light on whether one person owes another honest services, the language of § 1346 indicates that the critical factor is the type of service at issue, not the relationship of the parties." *Rybicki*, 354 F.3d at 155 (Raggi, J., concurring in judgment) (citing *Sancho*, 157 F.3d at 921). In Judge Raggi's view:

> [A] future case may require us to consider whether there is any principled reason
> to distinguish between an employee and an arms-length contractor when they
> engage in identical fraud schemes with the specific intent to deprive a victim of

---

[8] In a footnote, the *Rybicki* majority observed that the dissent "insist[ed] that the statement in *Sancho* that we address was not a dictum. If so, to that extent, *Sancho* is overruled." *Rybicki*, 354 F.3d at 144 n.19.

> services whose value depends upon honest performance – for example, providing
> a due diligence report, a compliance certification, or an environmental
> assessment.

*Id.* Judge Raggi therefore elected not to join in the majority's decision to re-affirm the Second

Circuit's decision in *Handakas* to the extent it could be "interpreted to foreclose the prosecution

of a contractor for fraudulently depriving a person of . . . honest services." *Id.*

Judge Sack, writing for the *Rybicki* majority, limited his comment about *Handakas* to

stating that the defendant in that case "was not an employee of a private entity purporting to act

for and in the interests of his or her employer; neither was he rendering services in which the

relationship between him and the person to whom the service was rendered gave rise to a duty

of loyalty comparable to that owed by employees to employers." *Id.* at 144. Thus, "only . . .

because of the nature of the services to be rendered in *Handakas*, [did] an intangible right to

honest services . . . not arise out of the contract at issue in that case." *Id.* In a footnote, Judge

Sack observed that the majority did "not consider the application of section 1346 to the

contractual situations discussed by Judge Raggi in her concurrence." *Id.* at 144 n.18. In the

wake of *Rybicki*, therefore, Section 1346 may well protect the right of honest services derived

from certain arms-length contracts, even if neither party to such a contract owes a fiduciary duty

to the other party. As long as it can be said that the services rendered by one party to the other

under the contract give "rise to a duty of loyalty comparable to that owed by employees to

employers," then Section 1346 may apply. *See id.* at 144.

Applying *Rybicki* to this case, the Court concludes that Plaintiff has made sufficient

allegations to state a claim that, as of April 1995, SSAI owed Plaintiff a right of honest services

under Section 1346. Even though WWE did not make SSAI its exclusive licensing agent until

March 1997, it did employ SSAI to negotiate licensing agreements that would maximize

WWE's profit. In this capacity, SSAI performed a role similar to that of Bell, who was an

employee of WWE. *See* RESTATEMENT (THIRD) OF AGENCY § 8.03 (2006) ("An agent has a

duty not to deal with the principal as or on behalf of an adverse party in a transaction connected

with the agency relationship."). Both were to negotiate and propose to WWE potential

licensing deals. While Bell was bound by the terms of his employment contract not to accept

fees or payment from any potential licensees, it cannot be said at this stage that SSAI did not

owe WWE a similar duty, either to refuse payment by a prospective licensee or to report to

WWE the acceptance of any such payments. Moreover, while Plaintiff alleges that economic

harm resulted from the corruption of SSAI's honest services (more on that below), it is enough

to say at this stage of the case that WWE has sufficiently alleged that there was at least the

potential for some economic harm as result of SSAI's double-dealing. *See United States v.*

*Gotti*, 459 F.3d 296, 331 (2d Cir. 2006) ("[I]t is clear that the defendants' commission of this

conduct was at least *capable* of causing some detriment (economic and otherwise) to the

[allegedly-defrauded labor union] members."); *United States v. Vinyard*, 266 F.3d 320, 329 (4th

Cir. 2001) ("[T]he reasonably foreseeable harm test is met whenever, at the time of the

fraud[ulent] scheme, the employee could foresee that the scheme potentially might be

detrimental to the employer's economic well-being."); *United States v. Coffey*, 361 F. Supp. 2d

102, 117 (E.D.N.Y. 2005) ("Corrupting the process by which this [bond underwriting]

recommendation was made poses a reasonably foreseeable risk of economic harm to [the bond

issuer] because *the best underwriter might not be recommended.*" (emphasis added)). Thus, the

bottom line is that WWE has sufficiently alleged a scheme to deprive it of the honest services of

SSAI as far back as November 1995, when the Jakks Defendants allegedly adopted a scheme to tie the payments on the perfumed doll deal to its efforts to retain SSAI as its agent in future license deals with WWE.

The Jakks Defendants further claim, however, that even if this first category of conduct (encompassing the time between November 1995, the date of the perfumed doll deal, and November 1997, the period during which Bell allegedly joined the corruption scheme) constituted a scheme to deprive WWE of the honest services of its brokers, the conduct involving the perfumed doll deal is insufficiently related to other allegedly unlawful acts to constitute a pattern of racketeering activity. "Relatedness may be established by proof of 'criminal acts that have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events.'" *Lavian v. Haghnazari*, 884 F. Supp. 670, 682 (E.D.N.Y. 1995) (quoting *H.J. Inc.*, 492 U.S. at 240); *see also City of New York v. Pollock*, No. 03-CV-0253, 2006 WL 522462, at *9 (S.D.N.Y. Mar. 3, 2006) (stating "relatedness is established by the similarity in methods, purposes, participants, results, and victims"). To be related, the alleged predicate acts must be connected, even if indirectly, to each other, as well as to the purported enterprise. *See United States v. Locascio*, 6 F.3d 924, 943 (2d Cir. 1993). The "interrelationship between acts, suggesting the existence of a pattern, may be established in a number of ways. These include proof of their temporal proximity, or common goals, or similarity of methods, or repetitions." *United States v. Indelicato*, 865 F.2d 1370, 1382 (2d Cir. 1989); *see also Azrielli v. Cohen Law Offices*, 21 F.3d 512, 520 (2d Cir. 1994).

Defendants contend that the perfumed doll deal is unrelated because it predates Bell's

involvement in the alleged scheme by two years and does not involve the Jakks Defendants'

efforts to procure WWE licenses. The first claim is irrelevant; the second is inaccurate, at least

under the facts assumed at this stage of the case. As noted, Plaintiff has adequately alleged that

the Jakks Defendants deprived WWE of the honest services of SSAI/Shenker, and that their

efforts predated the corruption of Bell. While the allegedly sordid cooption of Bell may have

significantly improved the chances that the scheme to illegally obtain the WWE licenses would

succeed, the alleged conduct antedating Bell's involvement is enough to support the claim that

the Jakks Defendants contravened Section 1346. This includes the alleged actions of the Jakks

Defendants to convince SSAI to act on their behalf in obtaining WWE licenses, even though

SSAI had contracted to represent WWE's interests. One of the ways the Jakks Defendants

allegedly sought to entice SSAI to represent their interests was to provide SSAI an advance on

the perfumed doll deal at the same time that they expressed their desire to have SSAI help them

obtain certain other WWE licenses. Thus, the perfumed doll deal smells of a RICO violation

precisely because, as alleged, the Jakks Defendants themselves linked that deal to their efforts

to corruptly persuade SSAI/Shenker that it was in their financial interests to act on the Jakks

Defendants' behalf in procuring the WWE licenses without informing WWE of that

relationship. More particularly, the perfumed doll deal properly is deemed a racketeering act

because it involved the same or similar purposes, results, participants, victims, and methods as

the rest of the alleged scheme, all of which purportedly amounted to an effort to corrupt WWE's

agents and thereby to procure the lucrative licenses. It is true, of course, that the scheme had

not been fully developed, either in terms of participants or results, but, as alleged, it adequately

marks the starting point of the efforts by the core members of the alleged enterprise to obtain

those licenses. *See Procter & Gamble Co.*, 879 F.2d at 19 (holding complaint to sufficiently allege racketeering where predicate acts "had the same purpose, that is, fleecing the same victims . . . and employing similar unlawful methods of commission").

The Jakks Defendants further attack the adequacy of the front-end allegations by stating that Plaintiff has improperly recast a single, narrow scheme into a pattern of racketeering. It is true, as the Jakks Defendants note, that the temporal life of an alleged pattern of racketeering is only one factor in assessing the validity of a RICO claim. The continuity requirement also imposes on a RICO plaintiff the obligation of alleging more than a scheme with a "single, narrow purpose" that is "directed toward[] a single victim." *Lefkowitz v. Bank of N.Y.*, No. 01-CV-6252, 2003 WL 22480049, at *8 (S.D.N.Y. Oct. 31, 2003), *rev'd in part on other grounds*, No. 04-CV-0435, 2007 WL 1839756 (2d Cir. June 28, 2007); *see also Stein v. N.Y. Stair Cushion Co.*, No. 04-CV-4741, 2006 WL 319300, at *8 (E.D.N.Y. Feb. 10, 2006) (finding inadequate a complaint where plaintiff alleged "a pattern involving a single scheme of narrow scope, including one victim and a limited number of related participants" (footnote omitted)). However, while the courts may look somewhat suspiciously on RICO schemes directed at one victim, the courts have allowed complaints alleging multiple economic injuries to the same victim to survive. *See, e.g., Sathianathan v. Smith Barney, Inc.*, No. 04-CV-7122, 2007 WL 576097, at *3 (S.D.N.Y. Feb. 21, 2007) ("For a single-victim RICO claim to survive, . . . a plaintiff must allege a pattern of separate economic injuries."); *State Wide Photocopy, Inc. v. Tokai Fin. Servs., Inc.*, 909 F. Supp. 137, 140-41 (S.D.N.Y. 1995) ("While, generally, plaintiff was the only victim of the alleged scheme, defendants' repeated, related and continuous acts during the course of four years formed a RICO pattern."); *accord Uniroyal Goodrich Tire Co.*

35

*v. Mut. Trading Corp.*, 63 F.3d 516, 523-24 (7th Cir. 1995) (noting RICO complaint was proper

where predicate acts related to different economic harms to single victim).  Moreover, the

Second Circuit has expressly noted that Congress did not intend "to exclude from the reach of

RICO multiple acts of racketeering simply because . . . they further but a single scheme."

*Indelicato*, 865 F.2d at 1383; *see also Procter & Gamble Co.*, 879 F.2d at 16 ("We have

explicitly eschewed any multiple scheme or episode requirement to demonstrate the continuity

of the pattern of racketeering activity.").  This line of authority, however, does not permit a

plaintiff to claim cumulative injuries from a single transaction or contract.  *See Schlaifer Nance*,

119 F.3d at 97-98 (affirming dismissal of RICO claim that involved a single contract); *Ray*

*Larsen Assocs. v. Nikko Am., Inc.*, No. 89-CV-2809, 1996 WL 442799, at *9 (S.D.N.Y. Aug. 6,

1996) (finding inadequate an allegation of RICO scheme that "involves only one group of

perpetrators . . . who directed their acts toward one victim . . . with the singular goal of

defrauding [the victim] out of commissions due under a single distribution contract").

　　　　In this case, Plaintiff's Amended Complaint alleges racketeering acts that involve

several different contracts – the domestic toy license, the international toy license, and the

videogame license – each of which, according to Plaintiff, resulted in cognizable injury.  As

alleged, Plaintiff's claim is that there were separate, albeit related, efforts to procure these

different licenses between November 1995 and June 1998.  Thus, Defendants fail in their

valiant efforts to recast Plaintiff's Amended Complaint as involving only a single scheme that

involves one victim suffering from cumulative injuries.  *See Uniroyal*, 63 F.3d at 524 ("Taken

in a light most favorable to Uniroyal, proven at trial were the existence of at least four separate

schemes all of which were designed to swindle money from Uniroyal and all of which utilized

the mails and wires to further their ends."); *Panix Promotions, Ltd. v. Lewis*, No. 01-CV-2709, 2002 WL 72932, at *7 (S.D.N.Y. Jan. 17, 2002) (finding closed-ended continuity where allegations involved "a series of frauds, involving numerous fight contracts").

Further, Plaintiff's allegations establish that, beginning in 1996, the victim, purpose, and methods of commission of the scheme were the same, and the alleged front-end racketeering acts were not isolated. *See Jacobson v. Cooper*, 882 F.2d 717, 720 (2d Cir. 1989) (noting that complaint adequately pled a pattern where the alleged racketeering acts related to a scheme to harm single victim); *Procter & Gamble*, 879 F.2d at 16-17 (same). Without repeating all of the allegations described above, the Court finds that the racketeering acts extend from November 1995, when the Jakks Defendants first linked the perfumed doll deal to SSAI's assistance in Jakks obtaining additional WWE licenses, and continued until August 3, 1998, when Jakks made its last bribery payment to Shenker and Bell. (Am. Compl. ¶ 168.) Thus, Plaintiff barely clears the hurdle, but grazes it on the way down, as Plaintiff's other allegations do not suffice to extend the scheme beyond August 3, 1998.

The back-end of the alleged racketeering acts includes the fourth and fifth categories of conduct described above. The fourth category involves two types of financial transactions: (i) the collection of royalty payments on the licenses involving the LLC, the THQ Defendants, and the Jakks Defendants; and (ii) the secret payments from Shenker/SSAI to Bell until December 2001. Plaintiff claims that each type of payment is an example of money laundering. *(Id.* ¶ 249(b); Pl.'s Mem. of Law. in Opp'n to Defs.' Mots. to Dismiss 18 ("Pl.'s Opp'n").) In particular, Plaintiff asserts that the racketeering acts continue to this day because the LLC still pays royalties to Jakks each quarter. (Am. Compl. ¶ 252.) The fifth category involves the

37

alleged efforts by Bell and Shenker, well after they were terminated by WWE, to conceal the bribery scheme through perjury and other false statements during the Connecticut state court litigation.

As to the Shenker/SSAI/Bell payments, there can be little dispute that Plaintiff's allegations properly state racketeering acts and thus extend each of Shenker's, SSAI's, and Bell's involvement in the enterprise until December 2001. Simply put, to state a money laundering violation under 18 U.S.C. § 1956(a)(1)(B)(i), a plaintiff need only allege that there are proceeds from specified unlawful activity, known by the accused defendant, and that the defendant conducted or attempted to conduct a financial transaction knowing the transaction was intended to conceal or disguise the nature or source of the funds. *See United States v. Szur*, 289 F.3d 200, 213 (2d Cir. 2002). Here, Plaintiff, tracking the language of Section 1956, explicitly alleges that the various payments from Shenker/SSAI to Bell between January 1998 and December 2001 were the proceeds of specified unlawful conduct and were designed to hide the source of the funds. As alleged, these claims survive. *See Leung v. Law*, 387 F. Supp. 2d 105, 119-20 (E.D.N.Y. 2005) (denying motion to dismiss where plaintiff's complaint tracked language of money laundering statute and holding that plaintiff need not plead money laundering "with any degree of heightened particularity").

While Plaintiff's allegations regarding the Shenker/SSAI/Bell payments extend their racketeering acts until December 2001 (only as to those defendants), the claims regarding the royalty payments fail as a matter of law to extend the predicate acts. Though money laundering is a racketeering act, *see* 18 U.S.C. § 1961(1)(B), Plaintiff's claim that the THQ Defendants, the LLC and the Jakks Defendants engaged in money laundering is wanting. Behind Plaintiff's

38

conclusory claims of money laundering is the simple allegation that, in the years following its

acquisition of the WWE videogame license, Jakks was paid millions of dollars in royalties on

the license. (Am. Compl. ¶ 184.) However, "[o]nce an allegedly fraudulent transaction is

complete, a plaintiff may not rely on the defendants' retention or use of his assets to establish

open-ended continuity." *Plater-Zyberk v. Abraham*, No. 97-CV-3322, 1998 WL 67545, at *10

(E.D. Pa. Feb. 17, 1998). In the instant case, there was nothing illegal about selling videogames

or paying (or receiving) royalties pursuant to a contract. Nor is there a plausible allegation that

these royalty payments were intended to conceal or disguise the supposedly corrupt means

Defendants used to procure the videogame license. Indeed, WWE knew what payments the

licensees would be entitled to under the licensing agreement, even if it did not know the precise

split of the proceeds among the joint venture parties. Therefore, the post-bribery royalty

payments from the LLC to Jakks do not constitute predicate acts and cannot extend the pattern

of racketeering activity. *See Vemco, Inc. v. Camardella*, 23 F.3d 129, 134 (6th Cir. 1994)

("[Defendant's] conduct in sending out billing notices from 1991 through 1992 pursuant to an

allegedly fraudulent contract cannot be cited by plaintiffs to extend the duration of the

fraudulent scheme."); *Pier Connection, Inc. v. Lakhani*, 907 F. Supp. 72, 76 (S.D.N.Y. 1995)

(noting that "continuing to reap . . . benefits [from wire fraud] is not itself a predicate act; it is

only an effect of the alleged acts of wire fraud"); *Gotham Print, Inc. v. Am. Speedy Printing

Ctrs., Inc.*, 863 F. Supp. 447, 460 (E.D. Mich. 1994) ("When the Supreme Court spoke of the

threat of repetition, it was referring to the threat of repeated *victimization* . . . , not merely the

retention of the ill-gotten fruits of previous crimes."). "Plaintiff's interpretation . . . would

permit any plaintiff once defrauded to state a RICO claim if the defendants continued to derive

a benefit from the property they obtained." *Plater-Zyberk*, 1998 WL 67545, at *10; *see also*

*Bingham v. Zolt*, 683 F. Supp. 965, 970 (S.D.N.Y. 1988) ("To say that [defendants'] continuing

control of the music companies constituted ongoing criminal activity would allow plaintiffs to

turn every finite scheme – or at least those involving economic crimes – into an enterprise

simply by characterizing the defendant's subsequent enjoyment of the proceeds of the scheme

as continuous criminal activity.").[9] Thus, the pattern of racketeering acts for the THQ

Defendants, the LLC, and the Jakks Defendants ends in August 1998, just after the LLC is

formed and the videogame license is granted.

As an additional argument for extending the racketeering acts into this decade, Plaintiff

cites concealment by Shenker, Bell, the Jakks Defendants, and the THQ Defendants in

connection with the civil litigation in Connecticut state court. (Am. Compl. ¶ 195.)

Specifically, Plaintiff alleges that these defendants destroyed evidence of the bribery, provided

---

[9] After this motion was fully submitted, Shenker pled guilty to a federal charge of conspiracy to transport money obtained by fraud in interstate commerce and wire fraud. (Letter of Jerry S. McDevitt, Esq. to the Ct., January 30, 2007.) Combined with Bell's earlier guilty plea, Plaintiff argues that it has conclusively established a conspiracy to deny Plaintiff of the honest services of Bell and Shenker, that this conspiracy involved money laundering through at least July 2002, and that this conspiracy involved bribes. (*Id.*) Pivoting from there, Plaintiff contends both that these defendants are estopped from challenging the civil action issues decided by these guilty pleas, and that, because these pleas establish a conspiracy to deny WWE the honest services of its agents, Plaintiff needs little more to establish the remaining defendants' participation in the conspiracy. (*Id.*)

This argument is unpersuasive. First, Shenker and Bell did not plead guilty to either a substantive RICO charge or a RICO conspiracy charge. Second, neither defendant's plea makes any mention of the allegedly culpable conduct of the Jakks or the THQ defendants (or the LLC). In fact, neither plea mentions any illegal conduct before 1998, such as the perfumed doll deal or the earlier toy licenses granted to Jakks. Instead, the plea only reflects an illegal arrangement between Bell and Shenker, and the improper sharing of Shenker's commissions with Bell. Thus, the plea, while compelling evidence against Bell and Shenker of the conduct they have admitted to engaging in, does nothing to extend the life of the racketeering acts as to the remaining defendants.

perjured testimony, made false statements to auditors, and concealed documents. (*Id.* ¶¶ 191-239.) These allegations, however, fail as a matter of law to extend the pattern of racketeering acts. It is true that acts of concealment may sometimes constitute a predicate act for the purposes of RICO. *See United States v. Coiro*, 922 F.2d 1008, 1017 (2d Cir. 1991) ("[T]he evidence established that . . . [the defendant's] activities designed to prevent detection and prosecution of the organization's illegal activities were part of a consistent pattern that was likely to continue for the indefinite future, absent outside intervention."). The alleged coverup here, however, does not qualify because it post-dates – by a couple of years – the underlying and completed bribery scheme. It is a cardinal rule of criminal law that "acts of concealment may have significance in lengthening the life of a criminal conspiracy only when these acts are done in furtherance of the main criminal objectives of the conspiracy – such as when the conspirators in a kidnaping conspiracy hide while waiting for the delivery of ransom." *United States v. Eppolito*, 436 F. Supp. 2d 532, 573 (E.D.N.Y. 2006) (internal quotation marks omitted); *see also Grunewald v. United States*, 353 U.S. 391, 405-06 (1957) (noting that post-crime concealment "indicate[s] nothing more than that the conspirators do not wish to be apprehended – a concomitant, certainly, of every crime since Cain attempted to conceal the murder of Abel from the Lord").

Here, some defendants allegedly lied to Plaintiff and withheld documents to cover up an already-completed scheme. In fact, these acts were allegedly done long after Bell and Shenker were terminated in 2000, for reasons unrelated to their alleged criminal conduct at issue in this case. Because no bribery activities were alleged to be ongoing by 2000, any alleged coverup could not have been intended or designed to further the still-alive scheme, but instead only to

cover up past misconduct. Therefore, the alleged obstruction, perjury and false statements in

2000 and beyond – shocking as they may be – do not extend the pattern of racketeering activity.

*See Ray Larsen Assocs.*, 1996 WL 442799, at *7 n.8 ("Plaintiff also alleges acts of obstruction

of justice during the pendency of this lawsuit as predicate acts for the RICO scheme. These

allegations must be excluded because efforts by a defendant to cover up the underlying conduct

are inadequate to satisfy the continuity requirement of the RICO statute."); *Barsam v. Pure*

*Tech Int'l, Inc.*, 864 F. Supp. 1440, 1450 (S.D.N.Y. 1994) *vacated in aid of settlement*, 907 F.

Supp. 79 (S.D.N.Y. 1995) ("In 'closed-ended' allegations of RICO violations . . . efforts at

covering up the initial fraudulent act are inadequate to satisfy the continuity requirement of the

RICO statute."); *Phil. Reserve Supply Co. v. Nowalk & Assocs., Inc.*, No. 91-CV-0449, 1992

WL 210590, at *6 (E.D. Pa. Aug. 25, 1992) ("Attempting to hide one's involvement in a

scheme after . . . it has been exposed in order to limit liability should not be confused with

concealing the scheme itself in furtherance of its perpetration. While the [latter] may be a

predicate act within the meaning of RICO the former is not.").[10]

Accordingly, as to the Jakks Defendants, Shenker, and SSAI, the scheme began in

November 1995, when the Jakks Defendants proposed to Shenker, at the time he was paid for

the perfumed doll deal, that Shenker serve as Jakks' agent in procuring the WWE toy license.

---

[10]Additionally, Shenker's perjury in the Connecticut action does not constitute a predicate act. *See* 18 U.S.C. § 1961(1); *United States v. Eisen*, 974 F.2d 246, 254 (2d Cir. 1992) ("Congress did not wish to permit instances of federal or state court perjury as such to constitute a pattern of RICO racketeering acts."); *Rand v. Anaconda-Ericsson, Inc.*, 623 F. Supp. 176, 182 (E.D.N.Y. 1985) ("Perjury, however, is not a RICO predicate act."), *aff'd*, 794 F.2d 843 (2d Cir. 1986).

(Am. Compl. ¶ 42.) For Bell, the scheme began in November 1997, and for the THQ

Defendants and the LLC, it began in April 1998. As discussed above, neither the coverup nor

the continued royalty payments constitute predicate acts in furtherance of the scheme, but the

Shenker/SSAI payments to Bell do qualify as money laundering/stolen property predicates.

Thus, for the Jakks Defendants, the scheme lasted slightly less than three years, ending with the

last bribery payment allegedly from them on August 3, 1998. For Shenker and SSAI, the

pattern of racketeering conduct lasted for more than six years, from November 1995 until

December 2001, while for Bell, the racketeering conduct extended from November 1997 until

December 2001. For the LLC and the THQ Defendants, however, the racketeering conduct

lasted approximately four months (at most). Therefore, the Second Circuit's two-year temporal

guideline is met as to Shenker, SSAI, Bell, and the Jakks Defendants. *See Lavian v.*

*Haghnazari*, 884 F. Supp. 670, 683 (E.D.N.Y. 1995) (finding closed-ended continuity where

pattern of racketeering activity extended over twenty-nine months).

The Amended Complaint's failure to allege legally-sufficient racketeering acts lasting

for more than four months by the THQ Defendants and the LLC is fatal to Plaintiff's efforts to

keep them in the substantive RICO cause of action under Section 1962(c) on a claim of closed-

ended continuity. "The focus of section 1962(c) is on the individual patterns of racketeering

activity engaged in by a defendant, rather than on the collective activities of the members of the

enterprise." *Jerome M. Sobel & Co. v. Fleck*, No. 03-CV-1041, 2003 WL 22839799, at *6

(S.D.N.Y. Dec. 1, 2003) (quoting *United States v. Persico*, 832 F.2d 705, 714 (2d Cir. 1987))

(internal quotation marks omitted). Thus, "the requirements of section 1962(c) must be

established as to each defendant." *DeFalco*, 244 F.3d at 322 n.22; *see also First Capital Asset*

*Mgmt.*, 385 F.3d at 180 ("In analyzing the issue of continuity, assuming arguendo that the alleged predicate acts constituting the pattern were adequately pled, we evaluate the RICO allegations with respect to each defendant individually."); *Jones v. Nat'l Commc'n and Surveillance Networks*, 409 F. Supp. 2d 456, 473 (S.D.N.Y. 2006) ("The duration, frequency, and substance of the purported racketeering activity are measured independently for each individual defendant."). "Accordingly, regardless of the point in time at which [P]laintiff[] allege[s] the overall [bribery scheme] began, to determine whether [P]laintiff[] satisfied the requisite period of closed-ended continuity for the [THQ Defendants and the LLC], the duration of the pattern of racketeering activity must be measured by the RICO predicate acts that" Plaintiff has sufficiently alleged. *DeFalco*, 244 F.3d at 322 n.22.

The THQ Defendants allegedly joined the RICO enterprise in or shortly after April 1998, when they agreed to submit a joint bid with the Jakks Defendants for the videogame license. (Am. Compl. ¶ 137.) The LLC joined no earlier than April 1998, and arguably not until June 10, 1998, upon its incorporation in Delaware. (*Id.* ¶ 154.) On August 3, 1998, the last bribe payment was allegedly made in connection with the videogame license. (*Id.* ¶ 168.) And, for reasons explained above, because the royalty payments derived from the videogame license do not qualify as racketeering acts, there is no basis to conclude that the pattern of racketeering activity for either the THQ Defendants or the LLC lasted for more than a few months. Accordingly, their Motion to Dismiss the cause of action under Section 1962(c) should be granted, unless Plaintiff has alleged open-ended continuity as to these defendants. *See Cofacredit*, 187 F.3d at 244 (holding that allegations of a pattern of racketeering activity spanning less than a year reflected "a period of insufficient length to demonstrate closed-ended

continuity under our precedents").

The temporal analysis, however, does not end the story for the remaining defendants, as "the court [also] must examine the overall context in which the acts took place." *Pier Connection, Inc.*, 907 F. Supp. at 78 (internal quotation marks omitted). This includes consideration of factors such as, "the number and variety of predicate acts, the number of both participants and victims, and the presence of separate schemes[.]" *Cofacredit*, 187 F.3d at 242. Defendants argue that Plaintiff cannot satisfy the continuity requirement because there was only one scheme directed at one narrow goal and one victim. However, as already noted, the Second Circuit has "rejected any need to allege multiple schemes." *Procter & Gamble Co.*, 879 F.2d at 18; *see also USA Certified Merchs.*, 262 F. Supp. 2d at 338-39 (finding plaintiffs sufficiently alleged that defendants engaged in scheme to deprive them of the honest services of their agents). Plaintiff also need not allege that there were multiple victims to satisfy continuity. *See Lavian*, 884 F. Supp. at 684; *Metro. Transp. Auth. v. Contini*, No. 04-CV-0104, 2005 WL 1565524, at *2-3 (E.D.N.Y. July 6, 2005) (finding irrelevant the fact that there was only one victim and a one-year scheme where there were many acts of fraud threatening to continue into the future); *Panix Promotions, Ltd.*, 2002 WL 72932, at *7 (finding continuity established where scheme involved one victim but several contracts). Here, as discussed above, Defendants' goal of obtaining the various licenses from WWE, as alleged by Plaintiff, was finite but not overly narrow. Specifically, Plaintiff alleges multiple economic harms related to the various licenses, so the fact that there is only one victim is not dispositive. Therefore, Plaintiff has sufficiently pled closed-ended continuity as to the Jakks Defendants, Shenker, SSAI, and Bell.

### 2. Open-Ended Continuity

A party alleging open-ended continuity must show that "the racketeering acts themselves include a specific threat of repetition extending indefinitely into the future [or] . . . are part of an ongoing entity's regular way of doing business." *H.J. Inc.*, 492 U.S. at 242. "[W]hether or not the plaintiff has shown open-ended continuity, the nature of the RICO enterprise and of the predicate acts are relevant." *DeFalco*, 244 F.3d at 323. For example, "an inherently unlawful act performed at the behest of an enterprise whose business is racketeering activity would automatically give rise to the requisite threat of continuity." *GICC Capital Corp.*, 67 F.3d at 466 (finding no open-ended continuity where scheme was inherently terminable once all assets had been looted) (citation omitted); *accord H.J. Inc.*, 492 U.S. at 242-43 ("[T]he threat of continuity is sufficiently established where the predicates can be attributed to a defendant operating as part of a long-term association that exists for criminal purposes."). But, "where the enterprise primarily conducts a legitimate business, there must be some evidence from which it may be inferred that the predicate acts were the regular way of operating that business, or that the nature of the predicate acts themselves implies a threat of continued criminal activity." *Cofacredit*, 187 F.3d at 243; *see also United States v. Aulicino*, 44 F.3d 1102, 1111 (2d Cir. 1995) (noting distinction between "cases where the acts of the defendant or the enterprise were inherently unlawful, . . . and were in pursuit of inherently unlawful goals," and cases "concerning alleged racketeering activity in furtherance of endeavors that are not inherently unlawful," and that "the courts generally have found no threat of continuing criminal activity arising from conduct" in the latter category); *Marcoux v. Am. Airlines, Inc.*, No. 04-CV-1376, 2006 WL 842888, at *12 (E.D.N.Y. Mar. 28, 2006) ("Where, as here, defendants are

operating legitimate businesses, plaintiffs are required to plead facts indicating that there

existed the threat of continued criminal activity in furtherance of defendants' plans."). In the

end, the "the Second Circuit advised . . . [that the Court] must consider the 'overall context in

which the [racketeering] acts took place' to determine whether sufficient continuity is alleged."

*Sumitomo Corp. v. Chase Manhattan Bank*, No. 99-CV-4004, 2000 WL 1616960, at *1

(S.D.N.Y. Oct. 30, 2000) (quoting *United States v. Kaplan*, 886 F.2d 536, 542 (2d Cir. 1989));

*see also United States v. Busacca*, 936 F.2d 232, 238 (6th Cir. 1991) (citing *Kaplan*); *Liberty

Mut. Ins. Co. v. Blessinger*, No. 06-CV-391, 2007 WL 951905, at *12 (E.D.N.Y. Mar. 27,

2007).

　　　　Plaintiff offers two arguments in support of its claim that it has adequately pled open-

ended continuity. Initially, Plaintiff contends that the enterprise's business is racketeering, and

therefore it is an inherently unlawful organization. In particular, according to Plaintiff, because

"[t]his Court has already held that [Plaintiff] has adequately pleaded that Defendants engaged in

an association-in-fact RICO enterprise, which was formed solely for the purpose of committing

the predicate acts alleged in [Plaintiff's] Amended Complaint," it has sufficiently alleged that

Defendants' business "is clearly 'an enterprise whose business is racketeering activity.'" (Pl.'s

Opp'n 25.) This reasoning is circular, as it suggests that once a RICO plaintiff has adequately

pled a RICO enterprise, it has automatically pled open-ended continuity.[11] In fact, courts

regularly distinguish between "a long-term association that exists for criminal purposes" and a

legitimate business that conducts its business through unlawful acts. *See H.J. Inc*, 492 U.S. at

---

[11]Moreover, this argument may only highlight the need to reexamine whether, in fact, RICO should be interpreted to require allegations of an enterprise that is more than just the sum of its racketeering acts.

243; *Aulicino*, 44 F.3d at 1111. Where the collective business and other entities that comprise

the enterprise "primarily conduct[] a legitimate business," there has to be some allegation that

the predicate acts reflected "the regular way of operating that business." *Cofacredit*, 187 F.3d

at 243.

In this case, the enterprise is made up of several businesses (among others, Jakks, SSAI,

and THQ), none of which is alleged to conduct itself primarily through racketeering activity. In

fact, for example, Plaintiff avers that "Jakks is primarily in the business of selling action figures

and toys[,]" (Am. Compl. ¶ 10), while THQ is said to be "in the business of videogame

marketing and sales[,]" (*Id.* ¶ 17). According to Plaintiff, these businesses and the other

individually-named defendants operated their businesses together to form an enterprise, the

principal goal of which was to procure, through fraud and corruption, certain licenses from

Plaintiff. But, this is not the same as saying that Jakks, THQ, SSAI and the other components

of the alleged enterprise normally did business via racketeering. On this point, for example, the

allegations regarding the *legitimate* perfumed doll deal and THQ's initially-*legitimate* efforts to

procure the videogame license critically undermine Plaintiff's position. Therefore, Plaintiff

must allege, but does not, that the racketeering acts are Defendants' "regular way of conducting

[their otherwise] ongoing legitimate business[es]." *H.J. Inc.*, 492 U.S. at 242.

Plaintiff has a fall-back position, however, which is that because the enterprise engaged

in bribery and money laundering, which are inherently unlawful acts, it has established open-

ended continuity. (*See* Pl.'s Opp'n 25-26.) While embezzlement, extortion, bribery, and money

laundering are in pursuit of inherently unlawful goals, *see United States v. Coiro*, 922 F.2d

1008, 1017 (2d Cir. 1991) (finding bribery and money laundering in context of long-term

organized crime organization to be in pursuant of inherently unlawful goal); *Metro. Transp. Auth.*, 2005 WL 1565524, at *4 (determining money laundering activity to be in pursuit of inherently unlawful goal), fraud is not, *see Aulicino*, 44 F.3d at 1111-13; *Int'l Bhd. of Teamsters v. Carey*, 297 F. Supp. 2d 706, 715 (S.D.N.Y. 2004) (finding fraud committed by union with finite goal not to be in pursuit of inherently unlawful goal); *Boucher v. Sears*, No. 89-CV-1353, 1995 WL 283742, at *7 (N.D.N.Y. May 8, 1995) (finding that frauds, particularly those which are inherently terminable, are not inherently in pursuit of unlawful goals).

Additionally, Plaintiff ignores the axiom that "the totality of the circumstances surrounding the commission of the predicate acts are considered to determine whether those acts pose a threat of continuing criminal activity." *Busacca*, 936 F.2d at 238 (citing *Kaplan*, 886 F.2d at 542-43). In other words, a RICO plaintiff does not adequately plead open-ended continuity by simply alleging bribery. Instead, the key issue is the context in which the bribery is alleged to have taken place, with a particular view to whether it can be said that the conduct involved constituted a threat of continuing wrongful activity. *See Watral v. Silvernails Farms, LLC*, 177 F. Supp. 2d 141, 150 (E.D.N.Y. 2001) (noting three ways to establish threat of continuing criminal activity: (i) where the alleged enterprise primarily is engaged in racketeering activity; (ii) where the predicate acts are the "regular way" of conducting business activity; and (iii) where the nature of the predicate acts themselves suggest a threat of continuing racketeering activity).

Here, as noted, the enterprise is comprised of mostly legitimate businesses. Moreover, at oral argument, Plaintiff conceded that Defendants' goal was to obtain a limited number of licenses, and "that's it." In other words, what Plaintiff has alleged, even taking all of its claims

as true, is an inherently terminable scheme that was focused on illegally obtaining two types of licenses: one for action figures and one for videogames. Moreover, Plaintiff's own Amended Complaint makes clear that this scheme came to an end by June 1998, when the videogame license was granted to the LLC by WWE. (Am. Compl. ¶ 149.) The domestic and international toy licenses all had been amended to extend them to the same time frame granted in the videogame license, which was for ten years from June 1998, with a five-year renewal at the option of Jakks. (*Id.* ¶ 165.) Thus, even though the Amended Complaint details Defendants' alleged misconduct for six years after the granting of the videogame license, there is no allegation that Defendants schemed to pursue any other licenses from WWE or any other vendor. This undercuts Plaintiff's attempt to plead open-ended continuity, as the courts have rejected attempts at open-ended claims involving a terminable scheme, such as the one alleged by Plaintiff here. *See, e.g., First Capital Asset Mgmt.*, 385 F.3d at 180-81 (noting that claims of open-ended continuity in case involving terminable scheme of asset conveyance in bankruptcy proceedings "defie[d] logic," even though defendants' mail fraud and perjury continued after filing of bankruptcy petition). This is true, even in cases where bribery is alleged to have been part of the enterprise's arsenal of racketeering acts. *See United States v. Spadoni*, No. 00-CR-217, 2005 WL 2275938, at *11 (D. Conn. Sept. 16, 2005) (holding that there was no open-ended continuity in public corruption cases involving allegations of bribery because scheme was "inherently terminable"); *Watral*, 177 F. Supp. 2d at 147, 150 (rejecting claim of open-ended continuity where plaintiff alleged mail and wire fraud, interstate transportation of stolen goods, obstruction of justice, sale or receipt of stolen goods, money laundering and commercial bribery as racketeering acts, because asset diversion scheme was "limited scheme aimed only at

Plaintiff and his horses").[12]  Moreover, Plaintiff's claims of open-ended continuity particularly

fail for the THQ Defendants and the LLC, which are not even alleged to have directly

participated in any bribery of Bell or Shenker.  Thus, even if Plaintiff had sufficiently pled open

ended-continuity as to Bell, Shenker, SSAI, and the Jakks Defendants, it has not come close to

pleading open-ended continuity as to the THQ Defendants and the LLC.  *See First Capital*

*Asset Mgmt.*, 385 F.3d at 180 ("In analyzing the issue of continuity, . . . we evaluate the RICO

allegations with respect to each defendant individually.").[13]  Accordingly, the substantive RICO

_____

[12]Plaintiff attempts to avoid this fate by claiming that the threat of continuity from a
defendant's alleged racketeering activities is to be viewed at the time the activities are alleged to
have occurred.  This effort fails for two reasons.  First, the cases Plaintiff cites do not stand for
the proposition tendered by Plaintiff.  In *Welch Foods, Inc. v. Gilchrist*, No. 93-CV-0641, 1996
WL 607059, at *6 (W.D.N.Y. Oct. 18, 1996), the "kickback scheme had been ongoing for years
and would have continued but for its discovery[,]" something that cannot be said about the
scheme alleged by Plaintiff here.  *Aulicino* is no more helpful, as the quote cited by Plaintiff is
not from the *Aulicino* court, but merely that court's discussion of another decision in another
circuit, 44 F.3d at 1112 (quoting *Busacca*, 936 F.2d at 238).  Moreover, the circuit quoted by the
*Aulicino* court had ruled in another case that there was no threat of continuity from a fraud
scheme that lasted 17 months, because the scheme was inherently terminable.  *Id.* (citing *Vemco*,
23 F.3d at 134-35).  Second, while it may be that in certain cases the nature of the racketeering
act can be viewed as itself representing a threat of continuing, the allegations *in this case* show
that the scheme reached its conclusion by June 1998, particularly given the lack of any
allegations that Defendants sought any other licenses from Plaintiff or any other entity.

Plaintiff's claim that the scheme continues today because Defendants receive revenue
from the allegedly unlawfully procured licenses is no more persuasive in establishing open-
ended continuity than it is in establishing closed-ended continuity.  "Plaintiff[] cannot establish
open-ended continuity by alleging that the *effects* of predicate acts extend into the future.
Rather, there must be a threat that the acts themselves will be repeated."  *Pier Connection, Inc.*,
907 F. Supp. at 76 (finding no open-ended continuity where defendants would reap the benefits
of defaming plaintiff and stealing customers); *see also Rini v. Zwirn*, 886 F. Supp. 270, 300
(E.D.N.Y. 1995) (holding no open-ended continuity where threat of repercussions from past acts,
but not acts themselves, threatened to occur in the future).

[13]Because the Court determines that Plaintiff has not made a case for finding that the
THQ Defendants and the LLC have engaged in a pattern of racketeering, it need not, and
therefore will not, address their arguments regarding operation and management of the alleged

cause of action against each of the THQ Defendants and the LLC is dismissed.

### D. Injury

Shenker, SSAI, and the Jakks Defendants argue that Plaintiff lacks standing to bring a RICO claim under 18 U.S.C. § 1962(c), because it "fails to allege any pecuniary injury to its 'business or property by reason of a violation of' the RICO statute." (Jakks Mem. 19 (citing 18 U.S.C. § 1964(c)).) Specifically, these defendants contend that (i) any lost profits injury suffered by Plaintiff is not cognizable under New York law; and (ii) Plaintiff's alleged injury, even if permissible under New York law, is too speculative under RICO.[14]

Plaintiff alleges that as a proximate result of Defendants' racketeering acts, it was deprived of the intangible right of honest services from Shenker and Bell, and as a further result, it received lower royalty rates from its toy and videogame licenses. Specifically, Plaintiff claims that because of Defendants' alleged misconduct, Plaintiff was denied the business opportunity of between 50-66% more in royalties from a non-corrupt licensing arrangement. (Am. Compl. ¶ 163.)[15] This, Plaintiff claims, is sufficient to plead a RICO injury.

"The RICO civil liability provision confers standing on [a]ny person injured in his business or property by reason of a violation of section 1962." *Hecht v. Commerce Clearing*

---

enterprise.

[14]Plaintiff also seeks disgorgement of revenues earned through the allegedly illegally-obtained licenses. Plaintiff argues that the receipt of revenues from those licenses constitutes an ongoing injury. As discussed above, payments under the licenses do not constitute predicate acts. Therefore, Plaintiff is seeking disgorgement of past ill-gotten gains, which is not permitted under RICO. *See United States v. Carson*, 52 F.3d 1173, 1182 (2d Cir. 1995) (holding that "we do not see how it serves any civil RICO purpose to order disgorgement of gains ill-gotten long ago").

[15]This estimate relates only to the videogame license. No such estimate is alleged as to the domestic and international toy licenses.

*House, Inc.*, 897 F.2d 21, 23 (2d Cir. 1990) (internal quotation marks omitted).  Thus, "[i]n

order to bring a civil RICO claim, a plaintiff must allege: (1) a violation of Section 1962; (2) an

injury to business or property; and (3) causation of the injury by the violation." *Am. Buying Ins.*

*Servs., Inc. v. S. Kornreich & Sons, Inc.*, 944 F. Supp. 240, 243-44 (S.D.N.Y. 1996) (citing

*Hecht*, 897 F.2d at 23).  In other words, a plaintiff must show that its "injury is to its property,

and not, for example, physical, emotional or reputational harm, and that plaintiff's injury is

proximately caused by the acts constituting the RICO violation." *State Farm Mut. Auto. Ins.*

*Co. v. CPT Med. Servs., P.C.*, 375 F. Supp. 2d 141, 152 (E.D.N.Y. 2005).  Where a plaintiff

bases its RICO claim on predicate acts of fraud, the plaintiff "must allege detrimental reliance

on the fraud." *Cougar Audio, Inc. v. Reich*, No. 99-CV-4498, 2000 WL 420546, at *4

(S.D.N.Y. Apr. 18, 2000).  In evaluating a RICO injury claim, it bears remembering that "RICO

should be 'liberally construed to effectuate its remedial purposes[.]'" *Allen v. Berenson Pari-*

*Mutuel of N.Y.*, No. 95-CV-10289, 1998 WL 80168, at *3 (S.D.N.Y. Feb. 25, 1998) (quoting

*Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 497 (1985)).  However, "a RICO plaintiff may not

recover for speculative losses or where the amount of damages is unprovable." *Trs. of*

*Plumbers and Pipefitters Nat'l Pension Fund v. Transworld Mech., Inc.*, 886 F. Supp. 1134,

1146 (S.D.N.Y. 1995).

  As discussed above, Plaintiff alleges violations of section 1962(c), satisfying the first

factor.  As to the second factor, Plaintiff alleges that it suffered an injury to its business or

property in the form of the loss of the honest services of its agents Shenker and Bell due to the

bribes allegedly paid by some defendants, and in the form of lost opportunity to pursue

competitive licensing offers.  The moving defendants contend that if Plaintiff suffered an injury,

it is in the form of lost profits, and that under New York law, a plaintiff cannot recover lost

profits in a fraud action. *See First Nationwide Bank v. Gelt Funding Corp.*, 820 F. Supp. 89, 95

(S.D.N.Y. 1993). However, Plaintiff alleges that it lost the business opportunity to obtain more

lucrative royalties on its licenses because Shenker, Bell, and THQ had been coopted, and

consequently, the competitive bidding process resulted in calculably lower royalties. In

particular, Plaintiff alleges that Shenker and Bell were responsible for seeking competitive bids

and negotiating the terms of each license. (Am. Compl. ¶¶ 30, 75, 110, 148.) Plaintiff further

claims that Activision and THQ expressed concrete interest in the videogame license, which

likely would have resulted in a licensing agreement superior to the one ultimately offered to the

LLC. (*Id.* ¶¶ 131-32, 153.) In other words, Plaintiff relied upon the misrepresentations made

by Shenker and Bell that it was receiving the best offer as determined by a competitive bidding

process. As a result of Defendants' alleged fraud, Plaintiff claims it was denied the opportunity

to consider more favorable bids from other vendors, including THQ (before it was allegedly

coopted). (*Id.* ¶¶ 127-45, 153.)

　　　As pled, Plaintiff alleges a cognizable injury resulting from Defendants' alleged fraud in

the form of lost business opportunities, which New York law recognizes as a remedy for fraud.

It is true that in New York a fraud victim may not recover lost future profits. *See Lama Holding*

*Co. v. Smith Barney Inc.*, 668 N.E.2d 1370, 1373 (N.Y. 1996) (holding that "[d]amages are to

be calculated to compensate plaintiffs for what they lost because of the fraud, not to compensate

them for what they might have gained," thus, "there can be no recovery of profits which would

have been realized in the absence of fraud"); *Three Crown Ltd. P'ship v. Salomon Bros., Inc.*,

906 F. Supp. 876, 891 (S.D.N.Y. 1995) ("New York law, however, allows plaintiffs in common

law fraud actions to recover only for actual pecuniary losses (out-of-pocket losses and

consequential damages) and not for future profits."). This includes attempts to "recover the

benefit of an alternative agreement overlooked in favor of the fraudulent one." *Alpert v. Shea*

*Gould Climenko & Casey*, 559 N.Y.S.2d 312, 315 (App. Div. 1990). The basis for this rule is

the view that lost profits are inherently speculative and uncertain. *See Geary v. Hunton &*

*Williams*, 684 N.Y.S.2d 207, 207 (App. Div. 1999) ("The damages plaintiff seeks are not

recoverable under the out-of-pocket rule, which bars recovery of profits that would have been

realized in the absence of fraud, including the loss of an alternative bargain overlooked in favor

of the fraudulent one, as inherently speculative and undeterminable."). However, the Second

Circuit has recognized a distinction between a claim of lost profits and a claim for other

consequential damages, such as lost business opportunities. Thus, "[i]n the Second Circuit,

'damages for fraud include the costs incurred in preparing for, performing, or passing up other

business opportunities,' so long as plaintiff can 'establish the causal nexus with a good deal of

certainty.'" *I.M. Oberman Assocs., Inc. v. Republic Fin. Servs., Inc.*, No. 92-CV-1843, 1993

WL 88209, at *5 (S.D.N.Y. Mar. 25, 1993) (internal citations omitted); *see also Schonfeld v.*

*Hilliard*, 218 F.3d 164, 183 (2d Cir. 2000) (citing *Fort Howard Paper Co. v. William D. Witter,*

*Inc.*, 787 F.2d 784, 793 n.6 (2d Cir. 1986))[16] "Although the line between lost profits and

---

[16]The lineage of this point is worth noting, only because it does not trace back to any
New York authority. The district court cases cited by Plaintiff (*I.M. Oberman* and *Academic*
*Indus., Inc. v. Untermeyer Mace Partners, Ltd.*, No. 90-CV-1052, 1992 WL 73473, at *2
(S.D.N.Y. Apr. 1, 1992)), rely on the Second Circuit's decision in *Ostano Commerzanstalt v.*
*Telewide Sys.*, 880 F.2d 642, 649 (2d Cir. 1989). That decision, in turn, cites a footnote in *Fort*
*Howard Paper Co.*, 787 F.2d at 793 n.6, as the sole authority regarding the inclusion of "lost
business opportunities" as a form of consequential damages for fraud. *Fort Howard* cites, as the
sole authority for the same point, the district court decision in *Soper v. Simmons, Int'l, Ltd.*, Nos.
84-CV-70, 84-CV-71, 84-CV-72, 1984 WL 426, at *4 (S.D.N.Y. May 30, 1984). In *Soper*, the

consequential damages is sometimes blurry, courts try to limit the recovery of consequential damages from a fraud 'to that which is necessary to restore a party to the position occupied before commission of the fraud.'" *Imaging Int'l. v. Hell Graphic Sys., Inc.*, 2007 WL 3227245, at *7 (N.Y. Sup. Ct. Oct. 29, 2007) (quoting *Alpert v. Shea Gould Climenko & Casey*, 559 N.Y.S.2d 312, 314 (App. Div. 1990)). Plaintiff's injury claim is not limited to an assertion of lost future profits. Rather, Plaintiff alleges that it already has lost business opportunities, in the form of licenses that could have been granted to other vendors, and the royalties that would have accompanied these other licenses.

However, Defendants further argue that even if Plaintiff's injury is of a kind cognizable under New York law, its claims of injury are legally deficient under RICO because they are speculative and unquantifiable. Indeed, as a general matter, even if a plaintiff sufficiently pleads an injury compensable under New York law, it does not mean that plaintiff has satisfied its pleading obligations under RICO. *See Cougar Audio*, 2000 WL 420546, at *8 (holding that while the "abstract form of harm suffered by one who loses the chance to bargain with all the facts may be sufficient to sustain a bare allegation of commercial bribery under New York law, . . . it is not sufficient to sustain a RICO allegation with commercial bribery predicates"). In particular, "Defendants are correct in asserting that a RICO plaintiff may not recover for speculative losses or where the amount of damages is unprovable." *Transworld Mech., Inc.*, 886 F. Supp. at 1146; *accord Imagineering, Inc. v. Keiwit Pac. Co.*, 976 F.2d 1303, 1310 (9th

---

court noted that "the only permissible recovery [for fraudulent representation] is the plaintiff's 'reliance interest' -- i.e., the costs incurred by the plaintiff in reliance on the promise by incurring expenses in preparation or in performance or in passing up other business opportunities." *Id.* The only authority cited in support of that proposition is Professor Farnsworth's Contracts Treatise. *See id.* (citing FARNSWORTH, CONTRACTS, § 12.1 at 812-14 (1982)).

Cir. 1992) ("A showing of 'injury' requires proof of concrete financial loss."); *Sheperd v. Am. Honda Motor Co.*, 822 F. Supp. 625, 629 (N.D. Cal. 1993) (noting that "the requirement of a concrete financial loss proximately caused by the wrongful conduct of RICO defendants is not easily met"). The remedial purpose of RICO is to put the injured plaintiff in the same financial position it would have been in absent the misconduct. *See Bankers Trust Co. v. Rhoades*, 859 F.2d 1096, 1106 (2d Cir. 1988). If the damages cannot be ascertained, then there is no lawful way to compensate the plaintiff. Thus, the courts regularly have held that a plaintiff who alleges injuries that are "indefinite and unprovable" does not have standing under, and cannot recover damages pursuant to, RICO. *See First Nationwide Bank*, 27 F.3d at 768; *Allen*, 1998 WL 80168, at *3.

Here, Defendants contend that Plaintiff's allegations involve an unquantifiable "potential opportunity to earn . . . profits." (Jakks Mem. 20.) Plaintiff counters by claiming that based on other competitive licenses, the royalty rates it is receiving under its videogame license are 50% to 66% lower than what it could have earned from a competitive bid, thus costing Plaintiff millions of dollars. (Am. Compl. ¶¶ 163-64.) From this and other allegations, Plaintiff boldly asserts that the "calculation of damages on this branch is remarkably simple." (Pl.'s Opp'n 31.) This is a curious claim, because Plaintiff does not make such a calculation in its Amended Complaint. In fact, it proffers a noticeably wide range of potentially higher royalty rates (50%-66%) it could have earned in a non-corrupt bidding process, and only regarding the videogame license. Nothing substantial is said about the range of lost royalties from the toy licenses. Moreover, Plaintiff's estimate regarding the videogame license, as discussed below, causes Plaintiff all kinds of trouble in rebutting Defendants' statute of limitations claims. In

any event, and to be clear, the problem with Plaintiff's claim of RICO injury is not that it cannot

claim lost business opportunities as a result of Defendants' alleged misconduct. Instead, the

legal infirmity derives from the fact that there is no plausible set of facts, consistent with

Plaintiff's allegations, that makes the alleged injury sufficiently concrete to state a RICO claim.

The calculation of damages from any lost business opportunities in connection with the

licenses will necessarily require some proof as to what a non-corrupt bidding process would

have yielded. Regarding the videogame license, Plaintiff's only argument is that it might be

able to establish some quantifiable royalty stream from the preliminary interest expressed in the

license by THQ, and that dismissal is inappropriate because the information about what THQ

might have done is uniquely in its possession. However, Plaintiff's own allegations merely

suggest that THQ had aspired generally to provide licensors with royalty rates higher than what

the LLC paid to WWE (19%-22%). Indeed, the Amended Complaint provides few details about

any proposal that THQ discussed with Plaintiff before being approached by Jakks, including

what the terms of that deal would have been, whether that deal would have been superior to the

bid given to the LLC, what the length of any deal would have been, or what THQ's capacity

was to perform under any such deal. The capacity to perform is critical because any licensing

agreement that THQ (or any other bidder) might have signed would only guarantee royalties on

sales made by the licensee. Thus, a bidder that might have guaranteed less of a royalty rate

might still have been better for WWE's bottom line than anything that THQ might have

guaranteed, because of superior technology, marketing, and overall business efficiency. All of

these variables, given the allegations in the Amended Complaint, doom Plaintiff's efforts to

establish a cognizable RICO injury.

Moreover, in its response to Defendants' Motion, Plaintiff ignores its own allegations that there were other potential bidders for the videogame license. This omission, perhaps done to avoid further damaging Plaintiff's response to the statute of limitations argument, serves only to complicate Plaintiff's efforts to establish RICO standing. For example, in late March 1998, a corrupt Bell is alleged to have told a company called Acclaim that he would not even entertain a proposal to renew the videogame license then in place. (Am. Compl. ¶ 109.) Acclaim appealed this move to WWE senior management, who advised Acclaim that it could submit a bid. However, before the Acclaim bid was submitted, Bell recommended to senior management that the license be given to Jakks. (Id. ¶ 110.) Unfortunately, the Amended Complaint says nothing about the terms of the Jakks bid, and, in particular, whether it provided royalty rates that were better than what WWE had been receiving from Acclaim. This omission is inexplicable since WWE presumably has access to that information. Instead of providing this available information, Plaintiff only alleges that the terms of the proposal "were well below then prevailing market rates for a videogame license of the quality of WWE." (Id.) Apparently, WWE management ignored the obviously low royalty rates to be paid by Jakks (we still do not know if they were above or below what Acclaim had paid or had offered to pay) and approved the deal. (Id. ¶ 114.)

At about the time WWE senior management approved the Jakks proposal, two other bidders (Activision and THQ) entered the scene. Though ignored or stiff-armed by Shenker and/or Bell, both Activision and THQ are alleged to have submitted informal proposals that were "clearly superior" to the deal WWE had already accepted from Jakks (how superior we are not told). (Id. ¶¶ 131-32.) These proposals never made it to WWE senior management, though,

thanks to the alleged efforts of Bell and Shenker, who instead shared the bid information with Jakks. (*Id.* ¶ 134-35.) Eventually, to hide the bribery scheme and protect its interest in obtaining the bid, Jakks reached out to THQ and persuaded THQ to submit a joint bid for the videogame license, a bid that concededly was "comparable to Activision's initial informal proposal." (*Id.* ¶ 145.) It was this proposal that Bell and Shenker submitted to WWE senior management for approval. (*Id.* ¶¶ 146, 151.) Apparently, while this revised bid was being considered, Activision submitted a "more formalized version of [its] initial informal proposal to Shenker." (*Id.* ¶ 153.) Again, no specifics about the royalties in this proposal are discussed in the Amended Complaint, and, in particular, there is no allegation that this bid was superior, let alone of how superior it was, to the joint Jakks-THQ bid. All that is alleged is that, "upon information and belief" the bid "understated the amount Activision would have been willing to pay to obtain the videogame license." (*Id.*)

It bears emphasizing that in its Amended Complaint and in its Memorandum of Law, Plaintiff's only claim regarding the injury from the bidding process for the videogame license is that it was cheated out of a royalty rate that could have been 50% to 66% higher. This is not based not on anything that Activision or Acclaim are alleged to have bid, let alone might have been able to deliver, but instead on what THQ is alleged to have thought it might have to pay, not to WWE, but generally to "licensors." (*Id.* ¶ 160.) It also bears emphasizing that the entirety of Plaintiff's defense of its RICO injury claim focuses on the videogame license. There is nothing described about the bidding process regarding the domestic and international toy licenses that offers any plausible way to quantify the alleged RICO injury to WWE from those deals. While Plaintiff does not make this point, it might have argued that the license granted to,

and later taken from, Playmates could establish a benchmark for lost business opportunities. No such argument is made, however, and no allegation in the Amended Complaint describes either the differences in the royalty rates between the competing Jakks and Playmates deals, or what the bidding process might have brought in for the international toy license or the extensions of the domestic toy licenses.

From the collection of Plaintiff's allegations, voluminous as they may be, the Court finds that Plaintiff has not alleged an injury sufficiently quantifiable to establish standing under RICO. First, essential to Plaintiff's injury claims is some ability to project what would have come out of the bidding processes for the various licenses. Yet, even taking the allegations and all reasonable inferences from them as true, Plaintiff does not have a crystal ball or any plausible way to allege facts that would establish the outcome of the bidding process. While it may be, for example, that Activision had made a preliminary offer, and might have intended to make other offers, there is no way to predict what would have happened if Activision, Acclaim, THQ and even others, had engaged in a full and fair bidding process. *See Imagineering*, 976 F.2d at 1311 (affirming dismissal where complaint did "not allege specific bids submitted by the MWBE plaintiffs that were accepted by the prime contractors"); *Bonavitacola Elec. Contractor, Inc. v. Boro Developers, Inc.*, No. 01-CV-5508, 2003 WL 329145, at *12 (E.D. Pa. Feb. 12, 2003) (holding that plaintiff failed to allege RICO injury from fraudulent bidding process because "it does not necessarily follow that Plaintiff . . . would have been awarded the contract if Defendant . . . had not bid, or had not been the low bidder, just because it was the next lower bidder"), *aff'd* 87 Fed. App'x 227 (3d Cir. 2003).

Second, Plaintiff has no apparent way of assessing the profits any winning licensee

could have produced for Plaintiff, as a more favorable royalty *rate* would only benefit Plaintiff

if the vendor could manufacture and market the videogames and toys on a mass scale equal to

or better than the Jakks/LLC bids. This is not a situation where the facts necessary to plead

injury are peculiarly within defendants' knowledge. *See Transworld Mech., Inc.*, 886 F. Supp.

at 1146 (finding injury not speculative where information to ascertain precise amount of

plaintiff's loss was peculiarly within the defendants' knowledge). Rather, the facts needed to

quantify the actual loss to Plaintiff would not be in the unique possession of any party (or non-

party). Instead, the net profits to Plaintiff from a corruption-free bidding process would depend

on a number of factors that could not be projected. *See Anza v. Ideal Steel Supply Corp.*, 126 S.

Ct. 1991, 1997 (2006) (noting that plaintiff's "lost sales could have resulted from factors other

than [defendants'] alleged acts of fraud," as "[b]usinesses lose and gain customers for many

reasons, and it would require a complex assessment to establish what portion of [plaintiff's] lost

sales were the product of [defendant's misconduct]"); *C.B. & D.M. Entm't, Inc. v. Galardi*, No.

03-CV-2112, 2007 WL 4219409, at *3 (N.D. Cal. Nov. 28, 2007) (noting speculative nature of

alleged RICO injury "confirms" the absence of proximate causation). Here, it is important to

distinguish the likelihood that Plaintiff would have received more favorable licensing terms

from a non-corrupt bidding process (which the Court assumes to be true), and the unlikelihood

that Plaintiff could reasonably quantify how much more favorable the licensing agreements

would have been. Establishing the former does not mean that Plaintiff can substantiate the

latter. *See Sheperd*, 822 F. Supp. at 630 (dismissing RICO complaint for failure to allege

injury, even though "[t]here can be no doubt that the alleged diversion tactics and reduced

allocations would have been likely to have some adverse effect on the profitability on the

[Plaintiffs'] dealership, and consequently affect the market value of the dealership"). Thus, the Court finds that there is no plausible set of facts, consistent with the allegations in the Amended Complaint, that would demonstrate that Plaintiff has suffered a quantifiable and cognizable injury under RICO.

### E. Statute of Limitations

Defendants argue that Plaintiff's RICO claim is time-barred. RICO does not provide for a statute of limitations, but the Supreme Court has held that civil RICO claims are subject to a four-year statute of limitations. *See Agency Holding Corp. v. Malley-Duff & Assocs., Inc.*, 483 U.S. 143, 156 (1987); *accord Bankers Trust Co.*, 859 F.2d at 1101. The statute of limitations begins to run "when the plaintiff discovers or should have discovered the RICO injury." *In re Merrill Lynch Ltd. P'ships Litig.*, 154 F.3d 56, 58 (2d Cir. 1998); *see also DLT Res. v. Credit Lyonnais Rouse, Ltd.*, No. 00-CV-3560, 2001 WL 25695, at *4 (S.D.N.Y. Jan. 10, 2001) (noting that the limitations period accrues when plaintiff "knew or should have known of his injury").[17] As a corollary, the Second Circuit also has adopted a "separate accrual rule," under which a "new claim accrues and the four-year limitation period begins anew each time a plaintiff discovers or should have discovered a new and independent injury." *Merrill Lynch*, 154 F.3d at 59. "Pursuant to this rule, a plaintiff who is continuously injured by an underlying RICO violation may only recover for injuries discovered or discoverable within four years of the time suit is brought." *Nat'l Group for Commc'ns and Computers Ltd. v. Lucent Techs. Inc.*, 420 F. Supp. 2d 253, 265 (S.D.N.Y. 2006) (citing *Bingham v. Zolt*, 66 F.3d 553, 560 (2d

---

[17]This is true even if the "amount of the damage is not certain." *In re Merrill Lynch Ltd P'ships Litig.*, 7 F. Supp. 2d 256, 264 (S.D.N.Y. 1997), *aff'd*, 154 F.3d 56 (2d Cir. 1998).

Cir.1995)). "The Second Circuit, however, has made clear that allegations of 'new and independent' injuries cannot depend on injuries that are derivative of the core injury sustained." *Eno Farms Coop. Assoc., Inc. v. Corp. for Indep. Living*, No. 06-CV-1983, 2007 WL 3308016, at *8 (D. Conn. Nov. 5, 2007); *see also Bankers Trust*, 859 F.2d at 1103 (announcing new and independent injury rule).

The first step in the statute of limitations analysis is to determine when Plaintiff sustained the alleged injuries for which it seeks redress. *See Merrill Lynch*, 154 F.3d at 59. From there, the Court is to determine when Plaintiff discovered or should have discovered each injury, which establishes when the four-year statute of limitations period begins. *See id.* Here, the Complaint was filed on October 19, 2004. If Plaintiff was or should have been on notice of the injuries it alleges prior to October 19, 2000, then its claims may be time-barred.

Plaintiff alleges that it was injured by the seven licenses granted to Jakks and/or the LLC between April 22, 1996 and June 24, 1998, because they provided for below-market royalty rates and/or profits, all due to the allegedly unlawful activities of Defendants, which denied Plaintiff the honest services of its agents.[18] Plaintiff claims that, in the absence of the

---

[18]The seven licenses include: (1) the first amendment to the domestic toy license, April 22, 1996, (Am. Compl. ¶¶ 54-56, 249(a)(vii)); (2) the second amendment to the domestic toy license, January 21, 1997, (*id.* ¶¶ 64, 67, 249(a)(x)); (3) the international toy license, February 10, 1997, (*id.* ¶¶ 65, 71, 249(a)(xi)); (4) the third amendment to the domestic toy license, January 12, 1998, (*id.* ¶¶ 93, 249(a)(xiv)); (5) the videogame license, June 10, 1998, (*id.* ¶¶ 136-64); (6) the extension of the domestic toy license, June 24, 1998, (*id.* ¶¶ 149, 165); (7) the extension of the international toy license, June 24, 1998, (*id.* ¶¶ 149, 165). According to Plaintiff, the last extensions of the domestic and international toy licenses were to be coterminous with the videogame license, which itself is described to be of the "extraordinary length" of ten years, with a five-year renewal right at the option of Jakks. (*Id.* ¶¶ 149, 165.)

corrupt bidding process, each license invariably would have been more lucrative, as more

bidders could and would have participated in the process, thus driving up financial gains for

Plaintiff.

Defendant argues that Plaintiff should have discovered the injuries Plaintiff allegedly

suffered because of the alleged racketeering acts. "An injury is 'discoverable' when a plaintiff

has constructive notice of facts sufficient to create a duty to investigate further into the matter."

*Congregacion de la Mision Provincia de Venezuela v. Curi*, 978 F. Supp. 435, 444 (E.D.N.Y.

1997) (citation and internal quotation marks omitted); *see also Dodds v. Cigna Secs. Inc.*, 12

F.3d 346, 352 (2d Cir. 1993). "In essence, knowledge of the fraud will be imputed to a plaintiff

if there are circumstances sufficient to alert a reasonable person to the probability that he or she

has been defrauded." *Curi*, 978 F. Supp. at 444. "The question of constructive knowledge and

inquiry notice may be one for the trier of fact and therefore ill-suited for determination on a

motion to dismiss . . . . Nonetheless, the test is an objective one and dismissal is appropriate

when the facts from which knowledge may be imputed are clear from the pleadings." *Salinger*

*v. Projectavision, Inc.*, 934 F. Supp. 1402, 1408 (S.D.N.Y. 1996).

Regarding the toy licenses granted to Jakks, Plaintiff alleges the following in its

Amended Complaint: (i) as of 1996, the "competitive environment among toy companies

seeking intellectual property licenses was intense[,]" (Am. Compl. ¶ 58); (ii) Playmates was

one of the three top competitors in this intensely competitive market, (*id.*); (iii) in June 1996,

Playmates was granted a license by WWE for certain domestic action figures and a right of first

negotiation/last refusal to manufacture and distribute these action figures internationally, (*id.* ¶¶

59, 61); (iv) on January 21, 1997, approximately seven months after granting certain licensing

rights to Playmates, WWE granted – upon Shenker's allegedly corrupt recommendation –
conflicting licensing rights to Jakks, (*id.* ¶¶ 59, 62-69); (v) on January 30, 1997, Playmates
complained in a letter to Bell – who Plaintiff alleges had not yet joined the scheme – about the
grant of conflicting rights to Jakks, (*id.* ¶¶ 70, 79-80); (vi) on February 10, 1997, WWE and
Jakks entered into an agreement granting Jakks an international toy license, with no apparent
notice to Playmates to exercise its right to negotiate for such a license, (*id.* ¶ 71); (vii) on
November 6, 1997, Bell absolved Playmates of the obligation of its guarantee to WWE, denying
WWE the substantial sum still left to be paid on the guarantee, as well as the associated
royalties, (*id.* ¶ 83); (viii) on January 12, 1998, Jakks was granted a third amendment to the
domestic toy license, which granted Jakks rights to the action figures previously held by
Playmates, (*id.* ¶ 93); and (ix) the domestic and international toy licenses were extended to be
coterminous with the terms of the videogame license, which itself was described as being
"extraordinary" in length, (*id.* ¶¶ 149, 165).

 Regarding the videogame license, the Amended Complaint contains the following
allegations: (i) as of January 1998, Acclaim was granted the videogame license, which Bell
previously told Acclaim would be renewed with "no problem[,]" (*id.* ¶¶ 101, 107); (ii) on
March 25, 1998, Bell "advised Acclaim that he would not even listen to any proposal that
Acclaim would make for the renewal of its license[,]" (*id.* ¶ 109); (iii) upon hearing this news
from Bell, Acclaim "went over Bell's head and complained to senior management at WWE that
it was not being permitted to submit a renewal proposal[,]" (*id.*); (iv) WWE senior management
advised Acclaim that it could submit a renewal proposal, (*id.*); (v) on March 30, 1998, five days

after Acclaim complained to senior management and was told it could submit a proposal for the

videogame license, Bell sent senior management a memorandum recommending that the license

be granted to Jakks on terms "well below then prevailing market rates for a videogame license

of the quality of WWE[,]" (*id.* ¶ 110); (vi) on April 7, 1998, Activision wrote Bell to express its

interest to "move promptly to secure the" license on "the most competitive terms[,]" (*id.* ¶ 128);

(vii) on April 8, 1998, WWE senior management approved the deal memo granting the

videogame license to Jakks, (*id.* ¶ 114), apparently not asking about Acclaim's bid; (viii) on

April 16, 1998, THQ met with Bell and Shenker to express an interest in making a bid for the

videogame license, (*id.* ¶ 129); (ix) on April 17, 1998, hoping to dissuade Activision from

bidding, Shenker met with Activision representatives, but he refused to give them any terms for

the videogame license, (*id.* ¶ 130); (x) Activision and THQ both continued their pursuit of the

license, (*id.* ¶¶ 131-32); (xi) to protect its bribery scheme, and ensure that it would get the

license, Jakks approached THQ and corruptly persuaded it to join in a bid for the license, (*id.*

¶¶ 133-145); (xii) in another memorandum on May 12, 1998, Bell recommended to WWE

senior management that it accept the Jakks/THQ joint bid, which contained terms more

favorable to WWE, (*id.* ¶ 152); (xiii) even though WWE management had not been made aware

of any other bid, it accepted the revised bid (which still included Jakks), and executed the

licensing agreement on June 23, 1998, which was to be in effect as of June 10, 1998, (*id.* ¶

157); and (xiv) the videogame license WWE approved was of "extraordinary length" (10 years

with a five-year right of renewal) and guaranteed "below-market" royalties for 40-60 fiscal

quarters, (*id.* ¶ 150).

From Plaintiff's own, detailed allegations, the Court has little difficulty in finding that a reasonable person would have been on inquiry notice of the injury Plaintiff is alleged to have suffered by no later than June 1998. The totality of Plaintiff's allegations is that within less than two years, WWE granted to Jakks, a company that apparently had none of WWE's valuable, lucrative and market-rate licenses until 1996, seven toy and videogame licenses, all of which provided grossly unfavorable terms for WWE. In the course of granting these licenses, WWE chased away two incumbent licensees, thereby foregoing hundreds of thousands of dollars of guaranteed payments, and/or sacrificing royalty rates far below what an "intensely competitive" market would bear. WWE gave these licenses to Jakks without even permitting the incumbent bidder to compete with the newcomer. In fact, in both instances, WWE officials received directly from the incumbent licensee a complaint that it was being blocked from the bidding process. In connection with the toy license, Playmates complained to Bell, *before he was brought into the scheme,* and in connection with the videogame license, Acclaim "went over Bell's head" and straight to WWE senior management to complain. Upon hearing the latter complaint from Acclaim, WWE senior management gave that licensee explicit permission to make a bid. Yet, just days later, this same management was advised by Bell to grant the license, on terms that apparently were well below market rates, to who else but Jakks, and senior management did not even ask what happened to Acclaim's invited bid. And, if that were not enough, within a month, WWE management then was advised by Bell, with no mention of any other competing bids, that Jakks (this time teamed with THQ) should be granted the videogame license on terms that were more favorable to WWE than the original Jakks bid, but apparently still well below market royalty rates and for an unusually lengthy period of time.

68

And, for the dénouement, WWE then agreed to extend the domestic and international toy licenses for the same extraordinarily lengthy period as the videogame license, apparently without any competitive bidding process or precedent. Given these alleged facts, a reasonable person would have been on notice that WWE might have been the victim of a corrupted bidding process.

As Plaintiff makes clear in the opening paragraph of its Amended Complaint, the injury it suffered from the corrupt bidding process was being stuck with licenses that provided "lower than competitive royalty rates." (*Id.* ¶ 1.) Even taking each of the seven licenses as a separate injury, as the Court must under the separate accrual rule, the last three of these corruptly-granted licenses were granted in June 1998, well over six years before Plaintiff initiated this lawsuit. Moreover, while it is true that Plaintiff alleges that it continues to receive the below-market royalties from these licenses to this day, these payments are not the type of "new *and* independent" injury Plaintiff must allege to make its case current. Instead, the receipt of these substandard royalties is linked to the injuries Plaintiff alleges it suffered when it granted these licenses. *See Lucent Techs.*, 420 F. Supp. 2d at 266 (noting that injuries are not "'new and independent' when they are attributable to a common scheme"). Put more succinctly, the courts have refused to extend the life span of a RICO plaintiff's injuries when they merely involve subsequent costs associated with the initial injury. *See Merrill Lynch*, 154 F.3d at 59-60 (holding that because injury occurred when plaintiffs made their investment, action did not accrue later due to subsequent collection of annual fees related to these same investments); *Eno Farms*, 2007 WL 3308016, at *9 (holding that rents collected on a monthly basis after fraud scheme was executed were not new and independent injuries); *Pharr v. Evergreen Gardens,*

*Inc.*, No. 03-CV-5520, 2004 WL 42262, at *2 (S.D.N.Y. Jan. 7, 2004) ("The injury the plaintiffs allegedly suffered due to the rent bills mailed within the four-year statute of limitations is identical to the injury they suffered when the defendants allegedly unlawfully increased the room count.").[19]

Plaintiff has three additional responses to Defendants' argument. First, Plaintiff argues that courts rarely grant motions to dismiss on statute of limitations grounds. Second, Plaintiff contends that the Court must apply a heightened standard of inquiry notice because the instant case involves corrupt fiduciaries. Third, Plaintiff asserts that the Amended Complaint adequately pleads fraudulent concealment.

As to Plaintiff's first argument, the case law does not support the argument that the Court cannot dismiss the Amended Complaint on statute of limitations grounds. "Where . . . the facts needed for determination of when a reasonable [person] of ordinary intelligence would have been aware of the existence of fraud can be gleaned from the complaint and papers . . . integral to the complaint, resolution of the issue on a motion to dismiss is appropriate." *LC Capital Partners v. Frontier Ins. Group*, 318 F.3d 148, 156 (2d Cir. 2003) (internal quotation marks omitted) (ellipses in original). Indeed, the Second Circuit has noted that courts have granted motions to dismiss under those circumstances in "a vast number of cases." *Id.* (internal quotation marks omitted); *see also Merrill Lynch*, 154 F.3d at 60 ("We have held that the question of inquiry notice need not be left to a finder of fact.").

Plaintiff's second argument, regarding a heightened standard for fiduciaries, also fails.

---

[19]Plaintiff's reliance on *Bingham v. Zolt*, 66 F.3d 553 (2d Cir. 1995), is misplaced, as the court there held that there were new and independent injuries that resulted from separate fraudulent schemes. *See* 66 F.3d at 561.

Plaintiff cites a series of cases from other circuits in which the courts seemingly articulate a relaxed standard of inquiry notice when insiders or fiduciaries are involved. (*See* Pl.'s Opp'n 37 n.15)  In the Second Circuit, however, courts agree that a party has a right to rely upon the representations of its fiduciary, but "only to a point." *Addeo v. Braver*, 956 F. Supp. 443, 451-52 (S.D.N.Y. 1997) ("Once plaintiffs were thereby left with reason to be suspicious of [their fiduciary], it was no longer reasonable for them to defer to his representations."); *see also Butala v. Agashiwala*, 916 F. Supp. 314, 320 (S.D.N.Y. 1996) ("Whatever duties the defendants owed to the plaintiffs, their alleged failure to disclose facts would not excuse the plaintiffs' lack of diligence in investigating the facts of which they were unquestionably aware." (internal citations omitted)).  Thus, it is not reasonable to rely on fiduciaries once the plaintiff is aware of facts that would lead a reasonable person to no longer trust its fiduciary.  "While the doctrine takes into account the information that a plaintiff did not have as a result of defendants' misconduct, a court must still determine whether the information plaintiff did receive sufficed to trigger a duty to inquire." *Lenz v. Assoc. Inns and Rests. Co.*, 833 F. Supp. 362, 373 (S.D.N.Y. 1993); *see also Town of Poughkeepsie v. Espie*, 402 F. Supp. 2d 443, 455-57 (S.D.N.Y. 2005) (finding RICO claim time-barred where Town Board was on inquiry notice of fraud by board members who owed fiduciary duty to the Town).

Here, as early as January 1997 and as late as April/May 1998, WWE reasonably should have been suspicious of its alleged fiduciaries.  Bell, before he was part of the scheme, was told by Playmates of its "concern" about the granting of a competing license to Jakks.  Because of Bell's position at WWE and because he was not yet part of the scheme, it is difficult to understand how WWE can claim to not have been on notice of a problem with granting the toy

licenses to Jakks, particularly given Plaintiff's consistent claim that these licenses were all below well-established market rates in an intensely competitive market. Any doubt that WWE management had reason to inquire about the bidding process for its licenses was eliminated when Acclaim complained directly to WWE senior management about being excluded from bidding to extend the videogame license it already had been granted. This, combined with the oddity of Jakks bidding against itself (and not against Acclaim) for the license, and WWE ultimately agreeing to a licensing agreement that supposedly was well below market rates and covered an unusually long period of time, pins WWE's claim that it can evade the limitations period by relying on its fiduciaries. *See DLT Res., Inc.*, 2001 WL 25695, at *6 ("There are others who can tell him if he has been wronged, and he need only ask.").

Finally, Plaintiff argues that it has adequately pled active fraudulent concealment by Defendants, and, therefore, the statute of limitations should be tolled. "The Second Circuit has held that the 'standard tolling exceptions apply' to civil RICO actions." *Merrill Lynch*, 7 F. Supp. 2d at 274 (quoting *Bankers Trust*, 859 F.2d at 1105). Under the doctrine of fraudulent concealment, the statute of limitations will be tolled if the plaintiff proves three elements: "(1) the defendant wrongfully concealed material facts relating to defendant's wrongdoing; (2) the concealment prevented plaintiff's discovery of the nature of the claim within the limitations period; and (3) plaintiff exercised due diligence in pursuing the discovery of the claim during the period plaintiff seeks to have tolled." *Corcoran v. N.Y. Power Auth.*, 202 F.3d 530, 543 (2d Cir. 1999) (internal quotation marks omitted). "The burden of demonstrating the appropriateness of equitable tolling . . . lies with the plaintiff." *Boos v. Runyon*, 201 F.3d 178, 185 (2d Cir. 2000). Further, a "[p]laintiff must plead each of these elements with particularity

72

as required by Rule 9(b) of the Federal Rules of Civil Procedure." *Lucent Techs.*, 420 F. Supp.

2d at 265. Thus, "even when a plaintiff pleads active concealment by the defendant, the

plaintiff must still demonstrate that he exercised due diligence in trying to discover the fraud."

*Merrill Lynch*, 7 F. Supp. 2d at 274. Or, as the Supreme Court has succinctly warned, "a

plaintiff who is not reasonably diligent may not assert 'fraudulent concealment.'" *Klehr v. A.O.

Smith Corp.*, 521 U.S. 179, 194 (1997).

    Even assuming Plaintiff has adequately pled fraudulent concealment that prevented it

from discovering the scheme within the limitations period, which is dubious, it has not pled that

it exercised due diligence until well after the statute of limitations had expired. *See Lucent

Techs.*, 420 F. Supp. 2d at 268 (granting motion to dismiss and declining to equitably toll statute

of limitations where plaintiff pled that it had "aggressively sought out evidence" during later

contract litigation but did not plead "any investigative efforts" during the period to be equitably

tolled). In fact, Plaintiff fails to cite anything in its lengthy Amended Complaint that remotely

demonstrates due diligence at any point during the granting of the licenses, let alone that it

exercised due diligence throughout the period to be tolled. *See Lucent Techs.*, 420 F. Supp. 2d

at 268. Nor does Plaintiff even attempt to demonstrate that it has met the stringent requirements

of Rule 9(b) in pleading this element of fraudulent concealment. In fact, from the Amended

Complaint, it is clear that Plaintiff did nothing to inquire of the suspicious bidding process, even

though incumbent licensees had complained directly to senior management about being boxed

out of the bidding process, even though the royalty rates were well below market rates, even

though Jakks made bids against itself, and even though the licensing agreements were extended

several times for unusually long periods without any bidding process. And, because the Court

73

finds that Plaintiff was on inquiry notice as of no later than June 1998, Plaintiff's failure to

plead that it engaged in any due diligence is fatal to its fraudulent concealment claims. *See*

*Klehr*, 521 U.S. at 194; *Butala*, 916 F. Supp. at 320 (rejecting fraudulent concealment claim

where "[c]omplaint is utterly lacking in the details of what steps the plaintiffs took to

investigate the condition of their investment once they were on inquiry notice of the probability

they had been defrauded").[20] Accordingly, Plaintiff's civil RICO claims are time-barred.

F.   Conspiracy to Violate RICO

Plaintiff also alleges that Defendants formed a conspiracy to violate RICO, in violation

of 18 U.S.C. § 1962(d).  However, this cause of action fails to state a claim, both because

Plaintiff has not adequately alleged a RICO injury, and because Plaintiff's claim is untimely.

*See First Capital Asset Mgmt.*, 385 F.3d at 182 (upholding district court's dismissal of

plaintiff's RICO conspiracy claim on the ground that plaintiff failed to properly allege

substantive RICO violation); *Allen v. New World Coffee, Inc.*, No. 00-CV-2610, 2002 WL

432685, at *6 (S.D.N.Y. March 19, 2002) ("The dismissal of all of plaintiffs' RICO claims

leaves the conspiracy cause of action without a leg to stand on. 'Any claim under § 1962(d)

based on conspiracy to violate the other subsections of section 1962 must fail if the substantive

---

[20]Plaintiff claims that its diligence in uncovering the scheme after the 2000 Connecticut litigation began, and the difficulty it had in overcoming some of the defendants' efforts to conceal the plot, makes the dispute over Plaintiff's diligence a fact question that cannot be resolved through these motions.  However, a plaintiff who fails to adequately allege due diligence throughout the time to be tolled is imputed to be aware of the misconduct at the time of the injury as if he had been reasonably diligent. *See also Merrill Lynch*, 7 F. Supp. 2d at 265 ("[W]hen a plaintiff is placed on notice of the probability of fraud, he has a duty to inquire, and he will be charged with all knowledge that he would have obtained had he exercised reasonable diligence."). Here, Plaintiff fails to allege any due diligence between June 1998 and 2000. Thus, this argument misses its mark.

claims are themselves deficient.'" (quoting *Discon, Inc. v. NYNEX Corp.*, 93 F.3d 1055, 1064 (2d Cir. 1996), *vacated on other grounds*, 525 U.S. 128 (1996))). "Like the statute of limitations under the other civil RICO provisions, the statute of limitations for civil RICO conspiracy claims is four years." *Bendzak v. Midland Nat'l Life Ins. Co.*, 440 F. Supp. 2d 970, 983 (S.D. Iowa 2006). "Moreover, the [statute of limitations] analysis for civil RICO conspiracy claims is the same as that for civil RICO claims brought under" the substantive RICO provision. *Id.* Because the Court already has found that Plaintiff's action accrued no later than June 1998, over six years before the lawsuit was initiated, Plaintiff's RICO conspiracy claim is dismissed.

G. Release/Motion to Strike

The Jakks Defendants argue that Plaintiff's claims are precluded by a General Release and Settlement Agreement ("the Release"), which was executed by WWE in 2004 in association with the completion of an audit of Jakks' financial records ("the Audit"). The Jakks Defendants assert that the Release bars "any and all claims" "arising from or relating to the Audit," including the present claims which "spring from the very payments [Plaintiff] admits were targeted in the Audit." (Jakks. Mem. 35.) Plaintiff contests this interpretation of the Release, arguing that it was intended only to bar claims pertaining to Jakks' accounting records for the period from the second quarter of 1996 to June 30, 2002. (Mem. of Law in Supp. of Pl.'s Mot. to Strike Ex. B to Decl. of Jonathan J. Lerner 1-2 ("Pl.'s Mot. to Strike").) Plaintiff also moves to strike the Lerner Declaration and any of the Jakks' Defendants' arguments relating to the Release on the grounds that: this Release is not attached to, referenced in, relied upon, or integral to Plaintiff's Amended Complaint; it is not a document of which the Court may take

judicial notice; and Mr. Lerner does not have first-hand knowledge of the Release.

Where the question is one of contract interpretation, a court must begin by examining the language of the contract. *See Maryland Cas. Co. v. W.R. Grace and Co.*, 23 F.3d 617, 624 (2d Cir. 1993). Here, the Release states that "WWE conducted an Audit of Jakks [sic] accounting records for the accounting period of the second quarter of 1996 through June 30, 2002," because "WWE contends that Jakks failed to report various sales and that Jakks took unsupported deductions and . . . Jakks contends that it overpaid WWE." (Lerner Decl. Ex. B 1.) The Release was signed in order to "resolve any and all disputes that may exist between them concerning the Audit." (*Id.*) Therefore, each Party released the other "from any and all claims . . . of every kind and nature whatsoever, whether known or unknown, . . . arising from or relating to the Audit." (*Id.* 1-2.) The Parties acknowledged that they may "hereafter discover facts different from . . . those it now knows . . . with respect to the Audit." (*Id.* 2.)

It is clear from the language of the Release that the Parties intended to bar claims arising out of the Audit itself. The purpose of the Audit was to determine whether Jakks had reported all of its sales or taken unsupported deductions, and whether Jakks had overpaid WWE. The language of the Release does not remotely suggest that the Audit was intended to investigate potential bribes paid by Jakks to WWE's agents in an effort to procure licenses at below-market rates, or to reach alleged misrepresentations made via mail and wire in an effort to allegedly deprive WWE of the honest services of its agents. Given the clear language of the Release, the Court may not consider outside evidence. *See Chevron TCI, Inc. v. Talleyrand Assocs., LLC*, No. 03-CV-4043, 2003 WL 22977498, at *5 (S.D.N.Y. Dec. 19, 2003) ("Where the terms of an agreement are clear and unambiguous, the Court will not look beyond the 'four corners' of the

76

agreement, and parol evidence of the parties' intentions is inadmissible."). The instant claims do not pertain to the Audit. They pertain to an alleged fraud and commercial bribery scheme, unrelated to any sales payments or deductions, allegedly perpetrated by Defendants. Therefore, the Release does not bar the claims at issue here.[21]

H.  Supplemental Jurisdiction

In this and the prior opinion and order, the Court has dismissed the federal causes of action.[22] In addition to the federal causes of action, Plaintiff has brought several causes of action under state law. Because Plaintiff and at least some of the defendants are citizens of Connecticut, there is not complete diversity. However, the Court has the authority to hear the state law claims under its supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a). In considering whether to maintain supplemental jurisdiction, the Court must exercise its discretion under 28 U.S.C. § 1367(c) to determine whether to adjudicate such claims.[23]

---

[21]Because the Court rejects Defendants' interpretation of the Release, it need not address Plaintiff's Motion to Strike the Lerner Declaration used to introduce the Release.

[22]The Court finds that it is appropriate to dismiss the federal causes of action with prejudice as Plaintiff has had ample time to amend its Complaint, and, in fact, has done so once already. Moreover, in opposing Defendants' Motion, Plaintiff never suggested or proposed that it would seek leave to file a second amended complaint to cure any defects in Plaintiff's pleadings. Accordingly, dismissal here is with prejudice. *See Clark v. County of Nassau*, No. 06-CV-8041, 2007 WL 1988811, at *2 (E.D.N.Y. July 5, 2007) (holding dismissal with prejudice was appropriate when plaintiff already had two opportunities to state a cause of action).

[23]Section 1367(c) provides that a district court may decline to exercise supplemental jurisdiction over a state law claim if:

(1) the claim raises a novel or complex issue of State law,
(2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,
(3) the district court has dismissed all claims over which it has original jurisdiction, or

In the exercise of a district court's discretion under Section 1367(c)(3), the court is to balance the traditional "values of judicial economy, convenience, fairness, and comity." *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988). In balancing these values, the Court is mindful of the Supreme Court's guidance that "when the federal-law claims have dropped out of the lawsuit in its early stages and only state-law claims remain, the federal court should decline the exercise of jurisdiction by dismissing the case without prejudice." *Id.* As indicated by the Supreme Court, however, this is not a mandatory rule, but rather recognizes that in the "usual case" in which all federal-law claims have been eliminated prior to trial, the balance of factors will weigh in favor of declining to exercise jurisdiction. *See id.* at 350 n.7.

In this instance, the Court finds that this is the "usual case" where the federal claims have dropped out well before discovery, let alone before any trial of this case. Moreover, the Court is aware that Plaintiff has filed an action against Defendants in Connecticut state court involving similar allegations as those in this case, thus highlighting the efficiency and comity interests that support the Court's non-involvement in the state law causes of action. Accordingly, the Court will exercise its discretion and decline to keep the state law causes of action.

---

> (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

28 U.S.C. § 1367(c).

## IV. Conclusion

For the reasons stated herein, Defendants' Motions to Dismiss are GRANTED with prejudice. Additionally, Plaintiff's Motion to Strike is DENIED as moot. The Clerk of Court is respectfully directed to terminate the Motions (Dkt. Nos. 144, 146, 150, 155, 161), enter judgment in favor of Defendants, and close this case.

SO ORDERED.

Dated:    December 21, 2007
          White Plains, New York


                                        _____
                                        KENNETH M. KARAS
                                        UNITED STATES DISTRICT JUDGE

79

Service List:

Jerry McDevitt, Esq.
Amy Lyn Barrette, Esq.
Peter Nicholas Flocos, Esq.
William Purcell, Esq.
Curtis B. Krasik, Esq.
Kirkpatrick & Lockhart Preston Gates Ellis, LLP
535 Smithfield Street
Pittsburgh, PA 15222

Jonathan Lerner, Esq.
Maura Barry Grinalds, Esq.
Michael Gruenglas, Esq.
Skadden, Arps, Slate, Meacher & Flom LLP
Four Times Square
New York, NY 10036-6522
*Counsel for Jakks Pacific, Inc.*
*Jakks Pacific (H.K.) Limited, Jack Friedman,*
*Stephen Berman, and Joel Bennett*

Jonathan Honig, Esq.
Feder, Kaszovitz, Isaacson, Weber, Skala, Bass & Rhine LLP
750 Lexington Avenue
New York, NY 10022
*Counsel for Jakks Pacific, Inc.,*
*Jakks Pacific (H.K.) Limited, Jack Friedman,*
*Stephen Berman, and Joel Bennett*

Steven A. Marenberg, Esq.
Philip M. Kelly, Esq.
Irell & Manella LLP
1800 Avenue of the Stars
Los Angeles, CA 90067
*Counsel for Defendant THQ, Inc.*
*and Brian Farrell*

Richard Schaeffer, Esq.
Bruce Handler, Esq.
Dornbush, Mensch, Mandelstam & Schaeffer, LLP
747 Third Avenue
New York, NY 10017
*Counsel for THQ/Jakks Pacific LLC*

Michael Alan Freeman, Esq.
Greenberg Freeman, L.L.P.
24 W. 40th St., 17th Floor
New York, NY 10018
*Counsel for Defendants Stanley Shenker*
*and Stanley Shenker & Assocs., Inc.*

Exhibit E

84IDJAKC.txt

1

4idjakc
                         CONFERENCE
 1   UNITED STATES DISTRICT COURT
 1   SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x
 2
 3   IN RE:  JAKKS PACIFIC, INC.
 3   SHAREHOLDERS CLASS ACTION            04 Civ. 8807 (RJS)
 4   LITIGATION
 4
 5   ------------------------------x
 5
 6                                        April 18, 2008
 6                                        11:35 a.m.
 7
 7   Before:
 8
 8                  HON. RICHARD J. SULLIVAN,
 9
 9                                        District Judge
10
10                        APPEARANCES
11
11   MILBERG LLP
12        Attorneys for Plaintiffs
12   BY:  MATTHEW A. KUPILLAS
13
13   COUGHLIN STOIA GELLER RUDMAN ROBBINS LLP
14        Attorneys for Plaintiffs
14   BY:  MARK S. REICH
15
15   SKADDEN, ARPS, SLATE, MEAGHER & FLOM
16        Attorneys for Defendant
16        Jakks Pacific, Inc.
17   BY:  MICHAEL H. GRUENGLAS
17        ROBERT FUMERTON
18        DANIEL SUSSNER
18
19
20
21
22
23
24
25

                   SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300
                                                              2
4idjakc
                         CONFERENCE
 1        THE CLERK:  In Re:  Jakks Pacific, Inc. Shareholders
 2   Class Action, civil cause for conference.
 3        Parties, state their appearances please.
 4        MR. KUPILLAS:  Matthew Kupillas, for Milberg LLP, for
 5   the plaintiffs.
 6        THE COURT:  OK.  Mr. Kupillas, good morning.
 7        MR. REICH:  Good morning, your Honor.  Mark Reich, of
 8   Coughlin Stoia, also for the plaintiffs.
 9        THE COURT:  All right, Mr. Reich.  Have a seat.
10        MR. GRUENGLAS:  Michael Gruenglas, Skadden, Arps, for
11   the Jakks defendants.
12        I'm joined by my colleagues, Robert Fumerton, and our

                           Page 1

84IDJAKC.txt

13  law clerk, Daniel Sussner.
14          THE COURT:  Good morning to all of you.
15          I have seen your letters, and I guess my first
16  reaction is certainly at first blush, without prejudging it, it
17  seems to me that the plaintiffs basically did what Judge Karas
18  told them to do.  That is not to say I am going to prevent
19  anybody from making a motion, but it might be worth just sort
20  of -- I mean, I have seen your letters.  I could see the
21  argument that it is not sufficient for the same reasons that it
22  wasn't sufficient for the first time and it hasn't risen to the
23  level we need to plead, but, in essence, isn't this really what
24  Judge Karas told these guys to do?
25          MR. GRUENGLAS:  Actually, your Honor, if nothing had
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                                3

4idjakc
                            CONFERENCE
1   happened between the time of the first amended complaint and
2   the second amended complaint, that might be an argument.  We
3   don't think they have satisfied 9(b), and, as you mentioned,
4   we'll have a chance to brief that, because we think that
5   they've gone into the laundry list that Alcatel forbids.  But,
6   more importantly, there has been a massive sea change under us
7   that has occurred between the time of the first amended
8   complaint and the second amended complaint in that the heart of
9   their claim, which is essentially they've taken a civil dispute
10  between WWE and Jakks Pacific in which WWE has tried for quite
11  a while to invalidate these licenses, and WWE brought three
12  co-claims, a whole bunch of federal claims and some pendant
13  state claims, and they brought these claims in the federal
14  district court.  And the class action was filed just on the
15  heels of that complaint.  After the date the complaint was
16  filed, the stock dropped.  And what their allegations were, and
17  have always been, that essentially the litigation caused the
18  stock drop.
19          Now, Judge Karas has said in his ruling, the
20  litigation -- there was no obligation to disclose that
21  litigation.  So right away there are massive problems.  But
22  what's happened between now and then is that the actual claims
23  that WWE has brought, and not just their federal claims -- and
24  I'll get to that in a moment -- have all been dismissed with
25  prejudice as time-barred by Judge Karas.
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                                4

4idjakc
                            CONFERENCE
1           So you have a situation here which is sort of
2   extraordinary, which is everything that their complaint is
3   based on, the underlying litigation which is in turn based on
4   ten-year-old, stale, time-barred claims dating back to 1998
5   that could not possibly have an effect on the market price of
6   the stock in 2004, which is when the litigation was filed by
7   WWE.  Now, what's happened here is, you know, I think sort of
8   back-peddling, plaintiffs have said, oh, no, we were never
9   saying that the litigation is what caused the drop, we were
10  saying that it's the bribery that caused the drop.  But what's
11  really important is that is not remotely what they pled.  They
12  have pled that the litigation caused the drop.
13          In fact, if you look at paragraph 88 of
14  their complaint, they talk about the fact -- let me just
15  confirm that I am not giving you -- yeah, it is paragraph 88.

                            Page 2

84IDJAKC.txt

```
16   They talk about the fact that the litigation was disclosed and
17   the stock dropped, and there is no mention whatsoever in the
18   disclosure of any underlying bribery allegation.  And what you
19   get into, essentially, is a massive loss causation problem,
20   because under Dura you have to plead that the misrepresentation
21   or omission in question caused the drop.  You can't say it led
22   to litigation that caused the drop.
23            And the problem is when you have time-barred claims
24   that are completely stale, that have no bearing, and that allow
25   no action to be taken, you know, on the part of WWE or anybody
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

5

4idjakc
CONFERENCE

```
1    else, you can't then come to the court and say that's what
2    caused the drop, especially when you have pled the opposite,
3    when you pled that the litigation caused the drop.
4            Now, before, you know, before this ruling occurred, we
5    really had trouble raising this issue on a motion to dismiss.
6    We always thought that these claims were stale and time-barred.
7    We always thought that the litigation itself was a frivolous
8    move by WWE to try to pressure a settlement with no basis
9    whatsoever.
10           Now, one thing they've talked about, to try to get
11   around this problem in a letter, they drop a footnote and they
12   say that Judge Karas has said that viable state claims exist.
13   He hasn't said that viable state claims exist, all he said is I
14   am not reaching the pendent claims after getting rid of the
15   RICO claims, the Robinson-Patman claims, the Sherman Act
16   claims, and finding very specifically that WWE was on notice of
17   any claim they had no later than the summer of 1998.  So now
18   what you have are ancient, sale allegations that, as a matter
19   of law, as a matter of practicality, can't have a material
20   impact upon anything that's happening in 2004.
21           So you have a massive Dura problem and what they've
22   come back with -- they wait until the last paragraph in their
23   letter to address the Dura issue and they say Dura only
24   requires a short statement.  Well, Rule 8 doesn't require a
25   short statement and Dura does cite to that, but they completely
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

6

4idjakc
CONFERENCE

```
1    ignore the entire point of Dura, which is that you have to
2    plead that a specific representation or omission caused the
3    loss.  They haven't done that at all.  In fact, they've done
4    the exact opposite.
5            And that really does change the entire playing field,
6    and it leaves us with essentially three primary arguments, and
7    there are more that we can fit everything into a three-page
8    letter, but the three primary arguments that we report in our
9    letter are, one, their failure for 9(b); two, their completely
10   fatal Dura problem; and, three, the fact that time-barred
11   allegations that cannot possibly have an impact upon the
12   market, that's not the basis for materiality.
13           The idea that, well, maybe they did something bad and
14   they were keeping it to themselves, this has been litigated
15   over and over again in dozens and dozens of courts.  Acts of
16   mismanagement, you know, acts of incompetence are not something
17   you have to disclose.  And the real question is in 2004, why
18   did the stock drop.  They have to plead that the stock dropped
```

Page 3

84IDJAKC.txt

19    because of these sale bribery claims.  They can't, and they
20    haven't, and for both of those reasons this complaint has to
21    fail.
22            This is really, you know, miles away from the ordinary
23    securities litigation where somebody does something and
24    something is exposed.  What you have here, essentially, are
25    defendants who have denied that there was any wrongdoing in the
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                                    7

4idjakc
                            CONFERENCE
1     first place and a court who said, you know something, even if
2     there was any wrongdoing, this was over years and years ago.
3            THE COURT:  All right.  I am going to give you another
4     chance, but let me hear from plaintiffs' counsel.
5            Who is speaking willing for plaintiffs?
6            MR. REICH:  I will, your Honor.
7            THE COURT:  So respond to those points and I want to
8     make sure I understand what Judge Karas was saying when he
9     found that the defects in the initial complaint were eminently
10    curable.
11            MR. REICH:  First of all, with respect to the 9(b)
12    aspect of it, I think that plaintiffs did precisely what Judge
13    Karas asked them to do because he made the statement that it
14    was eminently curable.  Rather than revamping the entire
15    complaint and filing a totally separate complaint, we decided
16    to follow the Court's orders and take out the specific
17    paragraphs and specific statements that he found not to be
18    false and misleading and not to be actionable and stayed with
19    the ones with the categories that he found to be actionable,
20    meaning the statements that Judge Karas found actionable, the
21    acquisition of the licenses, where they pro-actively made the
22    statements about the benefits of the acquisition of the
23    licenses.
24            As for Alcatel, there the Court was talking about
25    laundry lists, where all the reasons for all the statements
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                                    8

4idjakc
                            CONFERENCE
1     were put into play in one paragraph.  It could have been four
2     different statements put in there where they said one and three
3     or two and four were applicable to state false and misleading,
4     and this is on page 23 and 24 of the Alcatel decision.  Here
5     all the reasons were set forth in one paragraph, because all
6     the reasons for the false and misleading statement are for the
7     same reason, for their failure to disclose the bribery scheme.
8            Moving on to loss causation, defense counsel has
9     argued that loss causation only applies to the WWE action.  In
10    fact, if we look at our complaint, which perhaps is outlined
11    better in paragraph 7 than later on when we discuss it in
12    paragraph 88, we talk about the fact that the truth began to
13    emerge on October 19th.  And on that day, the specific quote
14    was that they were engaged in discussions with WWE over the
15    validity of its toy and video games license.  It was only later
16    in the day that the WWE action was actually filed, and then the
17    stock continued to drop.  But it was clearly a drop based on
18    the discussions of the fact that they were having a conflict
19    with WWE, that there were issues regarding their business
20    relationship, and the bribery scheme was coming into play.
21            Now, yes, the WWE action helped and bolstered our

                            Page 4

84IDJAKC.txt

22   complaint because it provided fodder.  It provided facts for us
23   to use.  Just as in other cases, plaintiffs would utilize
24   articles from newspapers as part of their pleading and so on.
25   But it's not the overriding part of our claim, it's not the
                   SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

                                                                      9

4idjakc
                            CONFERENCE
1    only part of our claim, it's just part of the facts that we
2    used to bolster it.  The main part of it, as paragraph 7
3    states, is about the bribery scheme, and that is how all of
4    this came into play.
5              In fact, if you look later on in our complaint, in
6    paragraph 93, an analyst starts discussing not specifically
7    about the complaint itself but the analyst says if this gets
8    carried into a nasty court fight, it could hurt their
9    relationship with other licenses.  That's with relation to the
10   complaint.  But he says, you'd think if they really did this
11   with WWE, why would I want to do business with them?  He is
12   discussing the conflict itself.  He is not talking about the
13   success of the case.  He is talking about how WWE perceives
14   them and how the market should perceive them, and that goes to
15   the materiality.
16             This is clearly going to be material to investors if
17   they know that this is the type of company that will do this to
18   one of the vendors that they are working with, to one of the
19   companies that they are dealing with.  This is the type of
20   personality that the company is trying to take on.
21             And, yes, will the licenses come into -- be
22   jeopardized.  And the licenses are expiring in a couple of
23   years, 2009, I believe.  There is no telling if they are going
24   to extend those licenses at that point.  Investors could have
25   taken that into play for the reason for the drop.  There
                   SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

                                                                     10

4idjakc
                            CONFERENCE
1    clearly was a problem that was separate and apart from the WWE
2    action in and of itself.
3              THE COURT:  Let me hear from Mr. Gruenglas again.
4    Am I pronouncing your name correctly?
5              MR. GRUENGLAS:  Gruenglas, your Honor.
6              THE COURT:  Gruenglas.  I mean, Judge Karas' opinion
7    in this -- on the first motion to dismiss, the motion to
8    dismiss the consolidated complaint, the amended complaint, was
9    in January of '08, right?
10             MR. GRUENGLAS:  Yes.
11             THE COURT:  And the dismissal on the statute of
12   limitations grounds was a month before that, in December,
13   right?
14             MR. GRUENGLAS:  That's true.
15             THE COURT:  So isn't it implicit that Judge Karas sort
16   of understood or would have anticipated some of the arguments
17   you are making now at the time he issued his opinion in
18   January?
19             MR. GRUENGLAS:  We are sort of in a little bit of an
20   awkward spot in that Judge Karas is obviously transferring some
21   of these cases.  I think Judge Karas would absolutely have
22   anticipated this argument, and I think he specifically knows
23   what he's doing and he understands completely that --
24             THE COURT:  Well, I mean, so is there anything about

                            Page 5

84IDJAKC.txt
25    the January opinion that suggests that Judge Karas is
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

11

4idjakc
CONFERENCE
1    recognizing this as a fatal problem?
2        MR. GRUENGLAS: No, Judge Karas decided -- and he has
3    done this in both actions. In other words, in the other action
4    there were issues about the state claims that he could have
5    reached. In that case, too, judge Karas said I am deciding
6    what's before me. I am not going to reach out into other cases
7    and bring inferences from other cases and other decisions and
8    bring them into this case. He decided what was briefed,
9    nothing else.
10        And I suggest that he had the option, I suppose, of
11    having another round of briefing to address these very
12    significant developments and elected not to do so.
13        Let me point out that there is --
14        THE COURT: I'm sorry to interrupt you.
15        But the amended complaint didn't alter any of those
16    arguments, really, right?
17        MR. GRUENGLAS: Well, the amended complaint -- the
18    second amended complaint -- Judge Karas' decision and the
19    second amended complaint both made no mention whatsoever of
20    Judge Karas' findings dismissing all of WWE's claims. There is
21    not a mention there at all.
22        Now, Judge Karas was doing what is absolutely proper.
23    He was deciding what was before him and he was not reaching
24    into another case and importing holdings from another case into
25    that action.
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

12

4idjakc
CONFERENCE
1        He was deciding what was briefed and what the parties
2    argued. But, you know, let me suggest that if Judge Karas had
3    thought that there was something there that would have, you
4    know, settled this issue or something that would have benefited
5    the plaintiffs in some way, he would have mentioned it. It is
6    a conscious decision that Judge Karas made not to -- and I
7    think it would have been very improper -- not to take arguments
8    and decisions out of the WWE case and import them.
9        Now, that said, there are still issues of collateral
10    estoppel, and Judge Karas, when he dealt with, for instance,
11    the pendent state claims, understood completely that when he
12    found inquiry and notice that got rid of the RICO claims and he
13    found lack of injury that got rid of the RICO claims and he
14    dismissed the antitrust claims, Judge Karas plainly understood
15    that that would be the basis for getting rid of all of the
16    pendent state claims.
17        The statute of limitations argument, the fact that
18    Judge Karas did not even take those arguments and try to
19    resolve the Connecticut action and the fact that he didn't take
20    those arguments and try to resolve the class action I think is
21    wholly proper. It doesn't change the fact that there is a
22    finding in that WWE decision that actually bears on the second
23    amended complaint.
24        THE COURT: Except that Judge Karas went further than
25    that, didn't he? He basically directed plaintiffs that they
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

Page 6

84IDJAKC.txt

13

4idjakc
CONFERENCE

1  could amend their complaint, that the problems he had
2  identified in the January order were eminently curable in --
3  they could be eminently cured in an amended complaint. Isn't
4  this all a silly exercise?
5          MR. GRUENGLAS:  Your Honor, there are two
6  possibilities, and this puts me in a little bit of an awkward
7  spot.  Either Judge Karas consciously made that decision not to
8  keep those issues separately and to address that, or -- and I
9  think this is unlikely -- it is possible that Judge Karas, in
10 deciding, in writing the class action opinion, did not fully
11 appreciate the import of the fact that the underlying claims
12 had been dismissed.  After all, both of these things were
13 pending before him for a long time, and I imagine that -- in
14 fact, I think the class action was actually briefed well in
15 advance of the underlying WWE claim.  There was a very extended
16 briefing period in the WWE claim.  And the fact that, you know,
17 it's entirely possible that the class action decision was
18 drafted well in advance of the much more recently briefed
19 underlying claim.
20         THE COURT:  All right.  Look, I am not asking you to
21 speculate, it is probably not fair.
22         MR. GRUENGLAS:  But this I can say without any
23 hesitation at all, which is there is no way that Judge Karas'
24 decision, which says that the underlying claim which was copied
25 almost in haec verba into the first amended complaint and the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

14

4idjakc
CONFERENCE

1  second amended complaint, the fact that those claims were
2  dismissed and the fact that Judge Karas found that the
3  underlying allegations were time-barred, that plainly does have
4  a dramatic impact and that is unquestionable.
5          And if I could address, with your Honor's indulgence,
6  two quick points from Mr. Reich?
7          THE COURT:  OK.
8          MR. GRUENGLAS:  The first, you know, on the 9(b)
9  issue, this is a long complaint, I'm not going to go back and
10 forth.  But I think Mr. Reich said exactly what plaintiffs did,
11 which is they took what Judge Karas said was wrong and
12 offensive and they pulled it out of the complaint.  What they
13 didn't do was cure the problem, which is to explain what
14 misrepresentation and omission was actually false and untrue.
15 That's still not there.
16         And I would suggest that if all Judge Karas wanted
17 them to do was to remove things from the complaint, Judge Karas
18 wouldn't have had to have a need for a second amended
19 complaint.  He could have said this is sufficient, you pled
20 this, and I am going to disregard this.  He told them that the
21 first amended complaint was eminently curable, the 9(b) defects
22 were curable; they haven't been cured.
23         But as far as the second point goes, the loss
24 causation, Mr. Reich directed you to paragraph 7.  And I would
25 direct you to that same paragraph because, frankly, Mr. Reich

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

15

4idjakc
CONFERENCE

Page 7

84IDJAKC.txt

1   made my argument almost as well as I was trying to, which is if
2   you look at the quote in paragraph 7, there is not a word in
3   that quote about any bribery allegation.  All you have there is
4   there is a dispute between WWE and Jakks about a video game and
5   toy license.
6            But Judge Karas has expressly held that the
7   litigation, the dispute between WWE and Jakks, is not
8   actionable.  You don't have to disclose that somebody might sue
9   you, especially -- and there is plenty of law on this --
10  especially when there is no valid basis or you have no reason
11  to think there is a valid basis for the suit.  So what they're
12  left with essentially is having pled everything they pled in
13  paragraph 7, which is that the disclosure of a dispute between
14  WWE and Jakks -- which, you know, as we now know, had no
15  validity clause in it -- they can't say that it was the bribery
16  that caused it, and that's something that Judge Karas has
17  explicitly carved out.
18           He said there is a distinction between the dispute and
19  the fact of a bribery eight years ago.  But they have pled, and
20  they do it in paragraph 7, that the dispute caused the stock
21  drop.  And since we know, after Judge Karas' decision, that
22  that is completely insupportable as a securities class action,
23  all you have left is the bribery, which they haven't pled.  In
24  fact, as you can see in paragraph 7, they've actually pled the
25  opposite.

                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                            16
4idjakc
                          CONFERENCE
1            Thank you, your Honor.
2            THE COURT:  I am going to give you another opportunity
3   to argue this once it is briefed, but I think we should set a
4   briefing schedule.  Anybody disagree about setting a briefing
5   schedule?
6            MR. GRUENGLAS:  If I may, your Honor, I would propose
7   the same briefing schedule we had for the first go round, which
8   was 60/60/30.  This is something we negotiated before Judge
9   Karas.  I would think that would be appropriate.
10           THE COURT:  Let me hear from the plaintiffs.  They may
11  have a different view in light of the changed circumstances.
12           So, Mr. Reich.
13           MR. REICH:  First of all, can I address some of the
14  arguments or are we --
15           THE COURT:  I'll give you a shot, but, look, I am not
16  resolving anything today.  You don't have to worry about
17  priming the pump.  I am going to read the briefs and give you
18  another chance to argue it.
19           MR. REICH:  If we are going to do that, in light of
20  the perhaps, you know, change from Judge Karas to your Honor,
21  and based on the fact that we were couching our amended
22  complaint based specifically on how Judge Karas had instructed
23  us -- and that is how plaintiffs viewed it, as an instruction,
24  an instruction that many judges do with plaintiffs' counsel,
25  and we specifically tailored the complaint in a certain way so

                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                            17
4idjakc
                          CONFERENCE
1   that way those types of complaints follow in subsequent actions
2   and they show plaintiffs exactly how to draft these complaints,
3   now that it's moving on, we are looking at a briefing schedule.

                          Page 8

84IDJAKC.txt

4    Plaintiffs would like the opportunity prior to a briefing
5    schedule to take a look at the pleading and amend it.  There is
6    ample information out there for us to amend this, and I would
7    like the opportunity to do so before we enter into another
8    briefing schedule, if that's what your Honor decides.
9         THE COURT:  And the reason for that is the argument
10   would be that you have done everything Karas asked you to do
11   but who knows what Sullivan is going to do so let us amend it
12   again in light of some of the statements that have been made
13   here today by Mr. Gruenglas?
14        MR. REICH:  I wouldn't couch it exactly like that but
15   I think your Honor understands our arguments.
16        THE COURT:  Certainly, there is law of the case and I
17   am not looking to undo what Judge Karas has done; far from it.
18   We are all prejudiced a little bit by the fact that I'm coming
19   in in the seventh inning.  But at the same time, I think I am
20   going to try to fairly interpret what Judge Karas did and abide
21   by his prior rulings.  So I am not going to be allowing anybody
22   to go back and reargue things that Judge Karas has already
23   resolved.
24        MR. REICH:  The reason we're saying that is because
25   the whole -- the validity of the licensing, or I'm sorry, the
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                              18

4idjakc
                        CONFERENCE
1    validity of the agreements are not in question.  The bribery
2    has been admitted.  The procedural dismissal of these cases and
3    whether or not the Connecticut case, for that matter, gets
4    dismissed also for technicalities, for procedural basis, really
5    has no bearing on our case at all.  The bribery scheme still
6    existed, the market reacted to it, and the question fact as to
7    whether the market reacted more or less to the bribery scheme
8    or more or less to the WWE action is really not something
9    that's to be addressed on a motion to dismiss.
10        MR. GRUENGLAS:  If I may, your Honor?
11        THE COURT:  Sure, Mr. Gruenglas.
12        MR. GRUENGLAS:  First of all, let me just address the
13   last thing, that the bribery scheme has been admitted, that's
14   just plainly not true.  It's been denied repeatedly in public
15   filings and in court proceedings.  But that's not the point.
16        What I'm really, you know, taking umbrage at is the
17   idea that after -- this is third complaint in this case we've
18   had already and now they are seeking essentially, you know,
19   another amended complaint based on the fact that we have
20   written a already pointing out the defects in their complaint
21   so that the letter then serves as sort of a motion to dismiss
22   that gives them yet another chance to cure, you know, there is
23   a rule on reason to these proceedings and you don't get endless
24   amendments to try to constantly dance around the allegations.
25        Judge Karas laid out their complaint.  They have
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                              19

4idjakc
                        CONFERENCE
1    taken, you know, endless opportunities to draft, you know,
2    everything that they have in their claim.  They were aware of
3    all of the facts as well as we are, you know, and I would take
4    strong exception to the notion that they now get another
5    amended complaint and we have to go through this dance again.
6    This is causing --

                        Page 9

84IDJAKC.txt

```
 7          THE COURT:  The dance, it hasn't been a real long
 8   dance, right?  I mean, the dance consisted of a three-page
 9   letter.
10          MR. GRUENGLAS:  Well, a three-page letter here but we
11   have also been through this on the first round.
12          THE COURT:  The first round Karas has already decided
13   they get another dance.  So what you are saying is that I
14   either keep them locked into this complaint and this is the
15   last dance, or the other issue is do I let them change the
16   record because we haven't gotten very far into this dance.
17          MR. GRUENGLAS:  That's exactly it.  And the idea that
18   they would use premotion letters as a basis for changing their
19   complaint and then we go through this again I think is wrong.
20   They put out their complaint.  They had every chance, just like
21   every plaintiff.  They have had an opportunity to amend.  If by
22   this time they haven't been able to, you know, set forth their
23   claims as they think they should be, they shouldn't get another
24   chance to do it.
25          Now, I here Mr. Reich here saying we want another
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300
```

                                                                    20
4idjakc
                              CONFERENCE
```
 1   chance to amend, which I take it means that he believes he has
 2   got serious problems with his complaint -- we agree -- but
 3   having serious problems with his second amended complaint is
 4   not a basis to get a third amended complaint or a fourth
 5   amended complaint.
 6          THE COURT:  Mr. Reich, do you agree?
 7          MR. REICH:  We are very comfortable with going forward
 8   with our second amended complaint.  The reason this has come up
 9   is because based on Judge Karas' decision, the issue of
10   particularity is what he asked us to replead.  The issue of
11   loss causation was ultimately resolved, it is the law of the
12   case, and as is the issue of materiality.  He made specific
13   references to materiality other than the WWE action itself.
14   So, therefore --
15          THE COURT:  He sure did.
16          MR. REICH:  So there are now three issues that are
17   being brought up in defendants' letter, only one issue of which
18   Judge Karas asked us to eminently cure, which we believe we
19   did.  So we are going to move forward with a briefing schedule,
20   and it is going to be on issues other than what Judge Karas had
21   recommended and advised us to fix in our complaint.  That is
22   the only reason that we're having this discussion about having
23   an additional amended complaint.  we're very happy to stick by
24   our second amended complaint and brief the issues solely on
25   particularity, as Judge Karas has stated.
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300
```

                                                                    21
4idjakc
                              CONFERENCE
```
 1          THE COURT:  To accept law of the case in response to
 2   any of the arguments Mr. Gruenglas has made, that is going to
 3   be the most powerful argument.
 4          MR. GRUENGLAS:  We're prepared to deal with that, your
 5   Honor.
 6          THE COURT:  I assume so.
 7          So I guess what I'm really asking you, Mr. Reich:  Are
 8   you asking for an opportunity to amend the complaint again, or
 9   are you saying that you are confident with this complaint?
```

                              Page 10

84IDJAKC.txt

10        MR. REICH:  We're comfortable with this complaint.  I
11  put it out there for your Honor so that we have, you know,
12  everything in front of you in terms of what our position is
13  with the three different legal defenses that have now come into
14  play and the fact that our second amended complaint was based
15  on Judge Karas.  I am going to leave it in the Court's hand in
16  terms of the direction of how we should proceed going forward.
17        THE COURT:  I am going to defer to you as to whether
18  you think your complaint as written is going to stand or
19  whether you think you need to take another shot at it.  I am
20  less inclined to give you another shot if we brief this thing,
21  we argue this thing and we resolve it and then you say, well,
22  OK, I guess we misunderstood Judge Karas, let me have another
23  shot.  So that is what I am asking you.
24        MR. REICH:  Again, that goes to the issue of are we --
25  are defendant being directed to brief specific issues, or are
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

22

4idjakc
CONFERENCE
1  we opening this up again to an entire, you know, briefing of
2  any defenses or any merit defenses?  That is I guess the
3  question.
4        THE COURT:  The premotion conference is designed so
5  that we can take a look at what are the bases for the motions
6  that are contemplated by the defendants.  You have seen those.
7        If your response to at least one or some of them is
8  that it is the law of the case, Judge Karas has already
9  resolved it, there is nothing different in the second amended
10  complaint that wasn't already addressed by Judge Karas, then
11  there is your argument.  But if there is something new that's
12  being argued based on the second amended complaint, then I
13  don't know.  Then you are free to argue that, I think, right?
14        MR. REICH:  That is right.  So in that case we are
15  comfortable with moving forward with the complaint as it
16  stands.
17        THE COURT:  It is the second amended complaint.  So
18  that makes it easy.  So then we are really just setting a
19  schedule.
20        MR. REICH:  Yes.
21        THE COURT:  60/60/30, do you really need as much time
22  as you needed for the first set of briefs?  Aren't they
23  supposed to be getting smaller as you go along?
24        MR. GRUENGLAS:  Respectfully, your Honor, we do need
25  the 60.  It also has to do with the fact that there is briefing
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

23

4idjakc
CONFERENCE
1  going on with the same people in the next month in the
2  Connecticut court.  Respectfully, I am not saying that if you
3  told us 45, we couldn't do it, but 60 would be a help to us.
4        THE COURT:  Plaintiffs.
5        MR. REICH:  We don't have an objection.  We prefer
6  45/45 and whatever it would be for reply, but understanding
7  defendants' position on scheduling with the other case, we are
8  fine with 60/60/30.
9        THE COURT:  60/60/30 puts us at five months.
10        MR. GRUENGLAS:  It is a big action, your Honor.  There
11  is a lot at stake.
12        THE COURT:  I know that, but what you are arguing is

Page 11

84IDJAKC.txt
```
13   basically that the amended complaint doesn't cure the problems
14   that had existed before, that were in the first amended
15   complaint.  It has already been fully briefed and it took them
16   a long time.
17           MR. GRUENGLAS:  That is true, but the unusual posture
18   of some of the issues that we have discussed and that it means
19   that it's more than this.
20           THE COURT:  Most of that posture existed certainly
21   before Judge Karas decided case.  It may not have existed at
22   the time of the briefing, I can understand that, but, still --
23           MR. GRUENGLAS:  This is our first chance to address
24   any of it, sir.
25           MR. REICH:  In light of the court's concern about the
```
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

24

4idjakc
CONFERENCE
```
1    length of the briefing, perhaps we could move fact discovery
2    forward during the briefing schedule.
3            THE COURT:  What do you think of that, Mr. Gruenglas?
4            MR. GRUENGLAS:  I strongly oppose that.  I can give
5    you 25 cases that talk about how improper that is.  You tell me
6    if you want to hear them.
7            THE COURT:  A generous offer but I guess they are not
8    buying.
9            MR. GRUENGLAS:  Your Honor, if I may, just in the same
10   lines, I know that your Honor has a default of 25 pages.  We'll
11   try to keep it as tight as possible.  But if we could have 60
12   pages, which I think is roughly what we did the first go-round,
13   we would appreciate that.
14           THE COURT:  Again, we are not starting on a blank
15   slate here.  It is supposed to be getting narrower.  Otherwise,
16   I am going to have to send a thank you note to Judge Karas.
17           MR. GRUENGLAS:  Respectfully, there are nuances here
18   that we are not just arguing 9(b).  So, you know, they may
19   argue the law of the case and there may be debates about what
20   is law of the case or what is not law of the case, all of that
21   takes briefing.
22           There are also, you know, other issues that may come
23   up that we haven't, you know, managed to jam into three pages,
24   which was a bit of a task for us.  We just don't want to be in
25   a situation where we have to spend most our time cutting.
```
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

25

4idjakc
CONFERENCE
```
1            If we can get it done in less than 60 pages, it is
2    very, very possible.  We certainly will try; I write tight
3    briefs.  But the problem is that I don't want to now say 60
4    days from now we're going to need an extension.  We're going to
5    need a few extra pages, I would just rather adapt it now.  It
6    is the same thing that we had the last time.
7            MR. REICH:  Your Honor, we just will have to object.
8    Just to get into a full briefing again means that we are
9    opening this to probably more than just the three issues that
10   have been in this letter or expounding upon the three issues
11   beyond what is absolutely necessary here.  25 pages seems like
12   more than enough.  If anything, that page number should be
13   reduced for this round of briefing.  It is just completely
14   unnecessary.
15           THE COURT:  Reduced below 25 pages or reduced --
```
Page 12

84IDJAKC.txt

16        MR. REICH:  I would think it should be reduced below
17   25 pages.  25 pages is the Court's position.  we will be fine
18   with that limitation, but anything beyond that is unreasonable
19   now.
20        THE COURT:  I am going to take a look at the prior
21   briefs because maybe that will enlighten me.  So I am going to
22   reserve on the schedule.  I will issue an order that sets forth
23   what the schedule and the pages are.
24        MR. GRUENGLAS:  Thank you, your Honor.
25        THE COURT:  And I will do that in there.  I won't drag
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300
                                                                 26
4idjakc
                         CONFERENCE
1    it out but I just think that while I have read Judge Karas'
2    order, I have really not read the briefs that you submitted the
3    first time around.  So I am not sure I am going to read them
4    all the way through, but I am going to take a look at them and
5    I am going to inform my judgment as to both the length of time
6    of the schedule and the amount of pages for the briefs.  I
7    won't delay it but I will take a look.
8         Anything else we should discuss today?
9         MR. REICH:  No.  Obviously, if your Honor doesn't
10   decide to give an extension of the page limits, I will be
11   forced to write an expansive brief that goes beyond 25 pages as
12   well in length --
13        THE COURT:  Is that a threat, Mr. Rich?
14        MR. REICH:  No, it is a request that we be provided
15   the same courtesy --
16        THE COURT:  I might like it better if you tell me in
17   25.
18        MR. GRUENGLAS:  We certainly agree to all mutuality.
19        THE COURT:  I'm not presuming otherwise.  So I will
20   set a page limit that treats everybody equally.
21        MR. REICH:  Thank you, your Honor.
22        THE COURT:  OK.  Thank you, counsel.
23        MR. GRUENGLAS:  Thank you.
24        THE COURT:  Good to see you.  Have a nice weekend.
25                            -  -  -
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300
                                                                 27
4idjakc
                         CONFERENCE
1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18


                          Page 13

84IDJAKC.txt
```
19
20
21
22
23
24
25
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

CERTIFICATE OF SERVICE

The undersigned, an attorney duly admitted to practice law before this Court,

hereby certifies under penalty of perjury, that on June 5, 2008, I caused a true copy of the

- ***Notice Of Motion,***

- ***Declaration of Robert A. Fumerton*** and

- ***Defendants' Memorandum of Law in Support of Their Motion to Dismiss the Second Amended Consolidated Complaint***

to be served upon the following party as indicated:

By Federal Express, overnight delivery:

Richard A. Maniskas, Esq.
Marc A. Topaz, Esq.
Schiffrin & Barroway, L.L.P.
Three Bala Plaza East
Bala Cynwyd, PA 19004

Gerald L Rutledge, Esq.
Alfred G. Yates, Esq.
519 Allegheny Building
429 Forbes Avenue
Pittsburgh, PA 15219

Dated:  New York, New York
        June 5, 2008

Steven Ray Katzenstein