**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

**IN RE JAKKS PACIFIC, INC. SHAREHOLDERS**
**CLASS ACTION LITIGATION**

Case No. 04-CV-8807 (RJS)

<u>ECF CASE - Electronically Filed</u>

---

**LEAD PLAINTIFFS' MEMORANDUM OF LAW**
**IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**
<u>**THE SECOND CONSOLIDATED AMENDED COMPLAINT**</u>

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................................... ii

PRELIMINARY STATEMENT .......................................................................................1

PERTINENT PROCEDURAL HISTORY AND FACTS.............................................3

       A.     The Court's Ruling on Defendants' Motion to Dismiss the CAC .............4

       B.     The Second Amended Complaint ................................................5

       C.     The WWE Action .......................................................................7

ARGUMENT .....................................................................................................................9

    I.     Legal Standards For Motions to Dismiss.................................................9

    II.    The SAC Satisifies the Pleading Requirements of Rule 9(b) and the
           PSLRA ......................................................................................10

    III.   The SAC Adequately Pleads Loss Causation .......................................13

       A.     Legal Standards for Alleging Loss Causation ...........................14

       B.     The Corrective Disclosures Identified in the SAC Disclosed the
           Existence of the Alleged Bribery Scheme .................................16

       C.     The SAC Alleges That Investors' Losses Were Caused by the
           Disclosure of the Alleged Commercial Bribery Scheme, Not by
           Any Other Disclosure .................................................................17

       D.     Defendants' Argument That JAKKS' Stock Price Drop Was
           Caused by "Other Bad News" Should Be Rejected....................19

    IV.   The Alleged Bribery Scheme Was Material To Investors .....................22

       A.     The Corporate Bribery Scheme Was Material to Investors
           Concerned About the Potential Loss of Revenues From the WWE
           Licenses, Regardless of the Ultimate Outcome of the WWE Action ........23

       B.     The Corporate Bribery Scheme Was Also Material to Investors For
           Reasons Other Than the Potential Loss of Revenues From the
           WWE Licenses..........................................................................27

    V.    The SAC Adequately Alleges Scienter.................................................30

CONCLUSION................................................................................................................31

# TABLE OF AUTHORITIES

## FEDERAL CASES

*A.I. Trade Finance, Inc. v. Petra Bank*,
  989 F.2d 76 (2d Cir. 1993)......................................................................................9, 15

*In re AOL Time Warner, Inc. Sec. Litig.*,
  503 F. Supp. 2d 666 (S.D.N.Y. 2007)............................................................................21

*In re Alcatel Sec. Litig.*,
  382 F. Supp. 2d 513 (S.D.N.Y. 2005)............................................................................11

*In re Alliance Pharm. Corp. Sec. Litig.*,
  279 F. Supp. 2d 171 (S.D.N.Y. 2003)............................................................................24

*In re AstraZeneca Sec. Litig.*,
  No. 05 Civ. 2688, 2008 U.S. Dist. LEXIS 43680 (S.D.N.Y. June 3, 2008)..........................9

*Basic Inc. v. Levinson*,
  485 U.S. 224 (1988)......................................................................................................22

*In re Bradley Pharms., Inc. Sec. Litig.*,
  421 F. Supp. 2d 822 (D.N.J. 2006) ..........................................................................16, 20

*In re Bristol-Meyers Squibb Sec. Litig.*,
  No. 00-1990, 2005 U.S. Dist. LEXIS 18448 (D.N.J. Aug. 17, 2005) ..................................16

*Castellano v. Young & Rubicam, Inc.*,
  257 F.3d 171 (2d Cir. 2001)....................................................................................24, 26

*City of Sterling Heights Police & Fire Ret. Sys. v. Abbey Nat'l., PLC*,
  423 F. Supp. 2d 348 (S.D.N.Y. 2006)............................................................................19

*Conley v. Gibson*,
  355 U.S. 41 (1957)........................................................................................................9

*Danis v. USN Communs., Inc.*,
  73 F. Supp. 2d 923 (N.D. Ill. 1999) ..............................................................................13

*Dura Pharms., Inc. v. Broudo*,
  544 U.S. 336 (2005)................................................................................................14, 15

*E.E.O.C. v. Staten Island Sav. Bank*,
  207 F.3d 144 (2d Cir. 2000)............................................................................................9

*Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc.,*
  343 F.3d 189 (2d Cir. 2003)......................................................................14, 15

*Fogarazzo v. Lehman Brothers, Inc.,*
  341 F. Supp. 2d 274 (S.D.N.Y. 2004).......................................................17

*Ganino v. Citizens Utils. Co.,*
  228 F.3d 154 (2d Cir. 2000)...............................................................9, 24, 30

*Gebhardt v. ConAgra Foods, Inc.,*
  335 F.3d 824 (8th Cir. 2003) .......................................................................24

*In re Geopharma, Inc. Sec. Litig.,*
  411 F. Supp. 2d 434 (S.D.N.Y. 2006)........................................................31

*German v. Univ. Oil Prods. Co.,*
  77 F.2d 70 (8th Cir. 1935) ..........................................................................29

*In re ICG Communs. Sec. Litig.,*
  No. 00-RB-1864 (BNB), 2006 U.S. Dist. LEXIS 6695 (D. Colo. Feb. 7, 2006) ...................13

*In re Initial Public Offering Sec. Litig.,*
  241 F. Supp. 2d 281 (S.D.N.Y. 2003)........................................................31

*Lapin v. Goldman Sachs Group, Inc.,*
  506 F. Supp. 2d 221 (S.D.N.Y. 2006)........................................................20

*Lattanzio v. Deloitte & Touche LLP,*
  476 F.3d 147 (2d Cir. 2007).......................................................................21

*Lee v. Bankers Trust Co.,*
  166 F.3d 540 (2d Cir. 1999)..........................................................................9

*Lentell v. Merrill Lynch & Co.,*
  396 F.3d 161 (2d Cir. 2005).......................................................................15

*Lerner v. Fleet Bank, N.A.,*
  459 F.3d 273 (2d Cir. 2006)........................................................................10

*In re MTC Electronic Techs. S'holder Litig.,*
  74 F. Supp. 2d 276 (E.D.N.Y. 1999) .........................................................29

*In re Mercator Software, Inc. Sec. Litig.,*
  161 F. Supp. 2d 143 (D. Conn. 2001).........................................................18

*In re Merrill Lynch & Co. Research Reports Sec. Litig.,*
No. 02 MDL 1484, 07 Civ. 6677 (JFK), 2008 U.S. Dist. LEXIS 37993
(S.D.N.Y. May 8, 2008)................................................................................21

*In re NTL, Inc. Sec. Litig.,*
No. 02-3013, 2006 U.S. Dist. LEXIS 5346 (S.D.N.Y. Feb. 14, 2006)....................16

*In re Omnicom Group, Inc. Sec. Litig.,*
541 F. Supp. 2d 546 (S.D.N.Y. 2008)...................................................................20

*In re Openwave System Sec. Litig.,*
528 F. Supp. 2d 236 (S.D.N.Y. 2007)...................................................................20

*In re Par Pharm., Inc. Sec. Litig.,*
733 F. Supp. 668 (S.D.N.Y. 1990).........................................................................28

*Press v. Chemical Inv. Services Corp.,*
166 F.3d 529 (2d Cir. 1999)...........................................................................22, 30

*In re Rhodia S.A. Sec. Litig.,*
531 F. Supp. 2d 527 (S.D.N.Y. 2007)...................................................................13

*Roeder v. Alpha Indutries, Inc.,*
814 F.2d 22 (1st Cir. 1987)...................................................................................29

*Rombach v. Chang,*
355 F.3d 164 (2d Cir. 2004).........................................................................10, 13

*Ronzani v. Sanofi S.A.,*
899 F.2d 195, 198 (2d Cir. 1990)..........................................................................31

*SEC v. Texas Gulf Sulphur Co.,*
401 F.2d 833 (2d Cir. 1968).................................................................................22

*Schleicher v. Wendt,*
529 F. Supp. 2d 959 (S.D. Ind. 2007) ..................................................................13

*Spielman v. General Host Corp.,*
402 F. Supp. 190 (S.D.N.Y. 1975).......................................................................24

*In re Stac Electronics Sec. Litig.,*
89 F.3d 1399, 1405 (9th Cir. 1996) ......................................................................22

*Suez Equity Investors, L.P. v. Toronto-Dominion Bank,*
250 F.3d 87, 95 (2d Cir. 2001)..............................................................................25

*TSC Indus. v. Northway, Inc.,*
 426 U.S. 438 (1976)........................................................................................22

*In re Take-Two Interactive Sec. Litig.,*
 No. 06 Civ. 803 (SWK), 2008 U.S. Dist. LEXIS 31463 (S.D.N.Y. Apr. 16, 2008) .........16, 19

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.,*
 127 S. Ct. 2499 (2007)....................................................................................31

*United States v. Stanley,*
 54 F.3d 103 (2d Cir. 1995)..............................................................................29

*United States v. Tenzer,*
 213 F.3d 34 (2d Cir. 2000)..........................................................................29, 30

*Wagner v. Barrick Gold Corp.,*
 No. 03 Civ. 4302 (RMB), 2006 U.S. Dist. LEXIS 3854 (S.D.N.Y. Jan. 31, 2006) ...............15

## FEDERAL STATUTES

15 U.S.C. § 78u-4(b)(1)(B)..............................................................................10

15 U.S.C. § 78u-4(b)(4) ....................................................................................15

17 C.F.R. 229.103 ............................................................................................26

Fed. R. Civ. P. 9(b) ............................................................................... *passim*

Fed. R. Civ. P. 12(b)(6)..................................................................................9, 22

Fed. R. Civ. P. 15(a)(2)...................................................................................9, 31

Lead Plaintiffs Kenneth J. Tucker, Tonia R. Tucker-Kraus, Michael Kraus (the "Tucker Group") and Indiana Electrical Workers Pension Trust Fund IBEW (collectively, "Plaintiffs") respectfully submit this memorandum in opposition to Defendants JAKKS Pacific, Inc. ("JAKKS" or the "Company"), Jack Friedman, Steven G. Berman and Joel Bennett's (collectively, the "Individual Defendants") motion to dismiss the Second Consolidated Amended Complaint (the "SAC").

Plaintiffs' opposition is further supported by the Declaration of Matthew A. Kupillas in Opposition to Defendants' Motion to Dismiss the Second Consolidated Amended Complaint (the "Kupillas Declaration" or "Kupillas Decl.") and the exhibits thereto.

## PRELIMINARY STATEMENT

On January 25, 2008, the Honorable Kenneth J. Karas issued an extensive forty-two (42) page Opinion & Order (the "Order") addressing Defendants' motion to dismiss Plaintiffs' Consolidated Amended Complaint (the "CAC"). Judge Karas held that Plaintiffs had sufficiently alleged that Defendants made materially false and misleading statements concerning JAKKS' acquisition and renewal of certain video game and toy licenses (the "Licenses") from World Wrestling Entertainment, Inc. ("WWE") without an accompanying disclosure of the alleged bribery scheme through which JAKKS improperly acquired and renewed those Licenses. Order at 17. Specifically, Judge Karas held that Plaintiffs had sufficiently alleged that Defendants had acquired certain licenses from WWE through a pattern of commercial bribery and that Defendants had a duty to disclose those material facts when they spoke about the acquisition of the WWE licenses. Judge Karas also found that Plaintiffs had sufficiently alleged scienter as "Defendants knew or were highly unreasonable in not knowing that they were doing something illicit when they withheld material information regarding the commercial bribery scheme while making public statements about the acquisition and renewal of the WWE

licenses." Order at 37. Finally, Judge Karas dismissed certain statements as non-actionable and held that Plaintiffs had failed to allege fraud with particularity while noting that this defect was "eminently curable." Order at 24.

In response to the Order, Plaintiffs filed the SAC, which addresses and completely satisfies the deficiencies cited by Judge Karas in his opinion. The SAC no longer contains the statements that Judge Karas found inactionable and sets forth with particularity the reasons that Defendants' statements were false when made. It is respectfully submitted that, as corrected, the SAC sufficiently states a claim for violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 and Rule 10b-5 thereunder.

Nonetheless, Defendants have filed their motion to dismiss contending that "new" facts require this Court to arrive at a different conclusion than Judge Karas. Putting aside Plaintiffs' strong "law of the case" arguments, Defendants have not cited any "new" facts. Instead, Defendants contend that Judge Karas' dismissal of WWE's federal action against JAKKS, captioned *World Wrestling Entertainment, Inc. v. JAKKS Pacific, Inc., et al.*, Case No. 04-CV-8223 (KMK) (S.D.N.Y.) (the "WWE Action"), as time-barred renders the failure to disclose the alleged commercial bribery scheme immaterial. In making this argument, Defendants conveniently overlook the fact that Judge Karas -- who himself dismissed the WWE Action prior to issuing the Order in this case -- said <u>nothing</u> in his Order about the dismissal of the WWE Action or its potential effect on this case. It is unreasonable to think that Judge Karas would require the Court to waste its time and resources in analyzing another iteration of the complaint, and writing a second opinion on the sufficiency of Plaintiffs' claims, if he believed that the dismissal of the WWE Action required the dismissal of the present Action.

Furthermore, the dismissal of the WWE Action does nothing to the allegations in this case, as Plaintiffs have never contended that Defendants were required to disclose the WWE Action as that litigation did not even exist until the end of the Class Period. This case is about the failure to disclose a commercial bribery scheme that was at issue in the WWE Action. Judge Karas' dismissal of the WWE Action as time-barred does nothing to those allegations.

Plaintiffs respectfully submit that the balance of Defendants' arguments are similarly without merit and should be rejected, and this case should proceed to discovery.

## PERTINENT PROCEDURAL HISTORY AND FACTS

This is a federal securities class action brought on behalf of the purchasers of the common stock of JAKKS between December 3, 1999 and October 19, 2004 (the "Class Period"). This action was initiated in November 2004 by the filing of five class action complaints asserting similar claims against JAKKS and other defendants. By Order dated January 26, 2005, the Court ordered the consolidation of the related actions under the caption *In re JAKKS Pacific, Inc. Shareholders Class Action Litigation*, Case No. 04-CV-8807 (KMK). *See* Dkt. # 29. In an Order dated May 11, 2005, the Court appointed the Tucker Group and Indiana Electrical Workers Pension Trust Fund IBEW as Co-Lead Plaintiffs for the consolidated action, and appointed the firms now known as Milberg LLP and Coughlin Stoia Geller Rudman & Robbins LLP to serve as Co-Lead Counsel for Plaintiffs and the putative class. *See* Dkt. # 58.

Plaintiffs filed the CAC on July 11, 2005. *See* Dkt. # 62. The CAC asserted claims under Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder against JAKKS, Jack Friedman (JAKKS' former Chairman and Chief Executive Officer), Steven G. Berman (JAKKS' former Chief Operating Officer), and Joel M. Bennett (JAKKS' former Chief Financial Officer). The CAC also asserted "control person" claims under Section 20(a) of the Exchange Act against the Individual Defendants.

3

The CAC alleged that JAKKS, which designs, develops, produces and markets toys and related products, engaged in a bribery scheme with an executive and licensing agent of WWE in an effort to expand its lucrative WWE Licenses. *See* CAC ¶¶ 2, 4. As a result of this scheme, WWE management entered into a video game license agreement with JAKKS, and also extended the terms of JAKKS' domestic and international toy Licenses. *Id.* at ¶ 5. Those Licenses were extremely lucrative for JAKKS. *Id.* at ¶ 6. However, at all relevant times, Defendants failed to disclose that they had obtained those Licenses through bribes paid to WWE's agents. *Id.* When the truth was disclosed concerning this scheme on October 19, 2004, the price of JAKKS stock fell from a closing price of $24.15 on October 18, 2004 to a closing price of $12.96 on October 20, 2004 -- a loss of almost 50% of the stock's value in just two days. *Id.* at ¶¶ 7-9.

On September 9, 2005, Defendants filed a motion to dismiss the CAC. *See* Dkt. # 65. Plaintiffs filed their opposition to the motion to dismiss on November 15, 2005, and Defendants filed their reply papers on December 22, 2005. *See* Dkt. # 70, 76. The Court held oral argument on the Defendants' motion to dismiss on November 30, 2006. *See* Dkt. # 84.

**A.    The Court's Ruling on Defendants' Motion to Dismiss the CAC**

On January 25, 2008, the Honorable Kenneth J. Karas issued a comprehensive forty-two page Order addressing Defendants' motion to dismiss the CAC. *See* Dkt. # 87. Among other things, the Court ruled that:

- The omitted information concerning the bribery scheme through which JAKKS obtained certain of its merchandising Licenses with WWE was potentially material to JAKKS' investors. *See* Order at 10 ("Here, the Court cannot say that no reasonable investor would find the information regarding the alleged bribery scheme material.");

- When Defendants made public statements discussing JAKKS' acquisition of the WWE Licenses and JAKKS' long-term relationship with WWE, those statements triggered Defendants' duty to disclose the complete truth about their actions in procuring and extending those WWE Licenses. *Id.* at 18-19 ("[S]tatements discussing Jakks's acquisition of the WWE Licenses and

4

statements touting Jakks's long-term relationship with WWE as the means by which it procured and renewed those Licenses conveyed that Jakks had a particular ability to obtain valuable licenses from WWE. Once Jakks opened this door, it was required to walk through it with complete and accurate information about the true means used to procure and renew these licenses.");

- Plaintiffs adequately alleged that Defendants acted with the requisite scienter when Defendants failed to disclose the material facts concerning their improper acquisition of the WWE Licenses. *Id.* at 37 ("Accordingly, the Court finds that Defendants 'knew or were highly unreasonable in not knowing that they were doing something illicit' when they withheld material information regarding the commercial bribery scheme while making public statements about the acquisition and renewal of the WWE licenses.") (citation omitted); and

- Plaintiffs adequately alleged their claims of control person liability against the Individual Defendants. *Id.* at 40 ("The Individual Defendants' knowledge of the alleged omitted information, coupled with their control over and participation in the misleading statements that gave rise to the duty to disclose that information, is sufficient to establish culpable participation. Control person liability with respect to the Individual Defendants is therefore adequately pled.").

Finally, Judge Karas found certain public statements by JAKKS to be non-actionable, and ultimately dismissed the CAC without prejudice for failure to be plead with sufficient particularity. The Court found that because the CAC only contained a single paragraph explaining why all of the statements quoted in the CAC were materially false and misleading, the CAC did not explain why each of the quoted statements was fraudulent with the particularity required by Fed. R. Civ. P. 9(b) and the Private Securities Litigation Reform Act of 1995 (the "PSLRA"). *Id.* at 22-24. The Court stated in its Order that this defect in the CAC was "eminently curable"; therefore, the Court dismissed the CAC without prejudice to permit Plaintiffs to file an amended complaint. *Id.* at 24, 42.

### B.    The Second Amended Complaint

On March 12, 2008, this Court issued an order granting Plaintiffs' motion for leave to file a second amended complaint. *See* Dkt. # 94. On March 14, 2003, Plaintiffs filed the SAC. Like

the CAC, the SAC asserts claims under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder against JAKKS and the Individual Defendants, and asserts "control person" claims under Section 20(a) of the Exchange Act against the Individual Defendants.

The SAC completely satisfies the pleading deficiency cited by Judge Karas in his Order and follows the proscription for curing the pleading based on Judge Karas' guidance.  As discussed above, the Court found that the CAC was not pled with sufficient particularity because it contained only a single paragraph explaining why all of the public statements by Defendants quoted in the CAC were materially false and misleading.  The SAC corrects that defect by setting forth, following *each* statement that Plaintiffs allege to have been materially false and misleading, the reasons why *that* specific statement was materially false and misleading.  *See*, *e.g.*, SAC ¶ 58 (explaining why the public statement quoted in SAC ¶ 57 was materially false and misleading); SAC at ¶ 62 (explaining why the public statement quoted in SAC ¶ 61 was materially false and misleading).

The SAC also conforms to the Court's Order by clarifying the statements made by Defendants that Plaintiffs now allege were false or misleading.  In the Order, the Court identified eight public statements made by Defendants during the Class Period that were properly alleged to have been materially false and/or misleading.  The Court held that when Defendants made public statements discussing JAKKS' acquisition of the WWE Licenses and JAKKS' long-term relationship with WWE, those statements triggered Defendants' duty to disclose the complete truth about their actions in procuring and extending those WWE Licenses.  *See* Order at 18-19. Accordingly, the Court found that the following eight public statements made by Defendants were properly alleged to have been materially false and misleading: CAC ¶ 58 (statements in JAKKS' Prospectus dated December 3, 1999); *Id.* at ¶ 64 (statements in JAKKS' Form 10-K for

the period ended December 31, 1999); *Id.* at ¶ 68 (statements in JAKKS' Proxy Statement dated May 22, 2000); *Id.* at ¶ 80 (statements in JAKKS' Form 10-K for the period ended December 31, 2000); *Id.* at ¶ 83 (statements in JAKKS' Proxy Statement dated on or around June 12, 2001); *Id.* at ¶ 99 (statements in JAKKS' press release dated May 23, 2002); *Id.* at ¶ 106 (statements in JAKKS' Proxy Statement dated on or around August 21, 2002); *Id.* at ¶ 132 (statements in JAKKS' registration statement dated on or around December 23, 2003).

The SAC conforms Plaintiffs' claims to the Court's Order, in that it now alleges that only the eight public statements identified by the Court as actionable were materially false and misleading. In light of the Court's Order, the SAC does not allege that other public statements made by Defendants during the Class Period were materially false and misleading.

In paragraphs 34 through 52, the SAC sets forth the specific factual details of the corporate bribery scheme through which JAKKS obtained and renewed its valuable Licenses with WWE. These detailed allegations are more than sufficient to provide Defendants and the Court with the factual basis for Plaintiffs' claims. The allegations of the bribery scheme have already been summarized by Judge Karas in the Order. *See* Order at 3-6. Because the factual allegations about the bribery scheme in the SAC are identical to those in the CAC, Judge Karas' summary of those allegations in the Order remains accurate, and those allegations will not be repeated here.

### C.    The WWE Action

In their recitation of "Facts," Defendants give a highly misleading description of the amendments to the complaint in the WWE Action. Defendants assert that, by amending certain of the allegations in its complaint, WWE "specifically refuted Plaintiffs' core allegation that a January 1998 payment by JAKKS was a bribe to obtain the videogame license and an extension of the toy license"; Defendants infer that the January 1998 payment was instead used as a bribe

7

to obtain licensing rights that were completely unrelated to WWE.  *See* Def. Br. at 7 (the January 1998 payment was used to acquire "rights of wrestling action figures manufactured by a company called Playmates, which is not a party to any of these actions").

However, while Defendants would like the Court to believe that WWE completely abandoned its bribery scheme allegations against JAKKS, the truth is just the opposite -- it expanded those allegations to include JAKKS' improper acquisition of WWE's action figure licenses.[1]  In its amended complaint, WWE modified its allegations to plead that the January 1998 payment from JAKKS was intended (in part) to improperly influence WWE's agents to convince WWE to transfer its action figure licenses, which were then held by a company called Playmates, from Playmates to JAKKS through an amendment to the WWE toy license.[2] Moreover, rather than "recanting" its previous allegations (as Defendants assert), the amended complaint in the WWE Action continues to connect the January 1998 payment by JAKKS to JAKKS' improper acquisition of the WWE videogame license, alleging that the January 1998 payment to WWE's agents played a significant role in the steering of the videogame license to JAKKS.[3]  Thus, contrary to Defendants' misleading assertions, WWE's allegations concerning the videogame license are not "divorced" from the January 1998 bribery payment by JAKKS.

---

[1]  *See* Kupillas Decl. Exh. A (WWE Amended Complaint) at ¶¶ 85-99 (discussing JAKKS' improper acquisition of WWE action figure license); *Id.* at 104-164 (discussing JAKKS' improper acquisition of the videogame license); *Id.* at ¶¶ 165 (discussing the renewal of the toy license as "another central aspect" of the corrupt bribery scheme).

[2] *See* Kupillas Decl. Exh. A (WWE Amended Complaint) at ¶ 86 ("The January 2, 1998 invoice was a false and fraudulent invoice, known to be by all concerned, and was merely a conduit to secure corporate funds for Jakks to pay commercial bribes and otherwise continue to buy influence with and further corrupt WWE's agents."); *Id.* at ¶ 92 ("Bell confirmed his participation in the illegal plan and that he would convince WWE management to transfer the rights formerly held by Playmates to Jakks."); *see generally Id.* at ¶¶ 85-99.

[3] *See* Kupillas Decl. Exh. A (WWE Amended Complaint) at ¶¶ 106-110, especially at ¶ 106, ¶ 108 ("After receiving the aforementioned $40,000 from Jakks in January 1998, ... neither

So, while WWE did amend its allegations somewhat, WWE's amended complaint continues to allege that JAKKS acquired the WWE videogame license and renewed the WWE toy license as a result of an illicit corporate bribery scheme, and expanded that bribery scheme to include the improper acquisition of WWE's action figure license. Defendants' mischaracterization of the amended complaint filed by WWE should be rejected.[4]

## ARGUMENT

## I.    LEGAL STANDARDS FOR MOTIONS TO DISMISS

A Court can grant a motion to dismiss a complaint pursuant to Fed. R. Civ. P. 12(b)(6) only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *EEOC v. Staten Island Sav. Bank*, 207 F.3d 144, 148 (2d Cir. 2000) (quoting *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957)) (internal quotation marks omitted).

In reviewing a motion to dismiss, the court must treat all factual allegations in the complaint as true and must draw all reasonable inferences in favor of the non-moving party. *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 161 (2d Cir. 2000); *Lee v. Bankers Trust Co.*, 166 F.3d 540 (2d Cir. 1999). At the motion to dismiss stage, "all allegations are construed in the light most favorable to the plaintiff and doubts are resolved in the plaintiff's favor." *A.I. Trade Fin., Inc. v. Petra Bank*, 989 F.2d 76, 79-80 (2d Cir. 1993); *see also In re AstraZeneca Sec. Litig.*, 05 Civ. 2688 (TPG), 2008 U.S. Dist. LEXIS 43680, at *40 (S.D.N.Y. June 3, 2008)

---

Shenker or Bell contacted any other potential bidders for the videogame license before making a recommendation to WWE management.").

[4] In fact, Defendants gave the <u>same</u> misleading description of WWE's amended complaint in their previous motion to dismiss the CAC. *See* Dkt. # 66 at 8-9. Plaintiffs, in their opposition to that motion, thoroughly refuted Defendants' misleading description of WWE's amended complaint (*see* Dkt. # 70 at 5 fn. 3; *Id*. at 7-8), and Defendants offered no response to that refutation in their reply brief (*see* Dkt. # 76). Given that their description has already been shown to be false, Defendants' <u>repeated</u> misrepresentation of the allegations in WWE's amended complaint is even more egregious.

("[B]ecause this is a motion to dismiss, the Court must view the facts in the light most favorable to plaintiffs.").

## II.    THE SAC SATISIFIES THE PLEADING REQUIREMENTS OF RULE 9(B) AND THE PSLRA

Claims for securities fraud brought under Section 10(b) of the Exchange Act are subject to the heightened pleading requirements set forth in Federal Rule of Civil Procedure 9(b).  *See Rombach v. Chang*, 355 F.3d 164, 170 (2d Cir. 2004) (citing *Ganino*, 228 F.3d at 168).  Rule 9(b) requires that, "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."  Fed. R. Civ. P. 9(b).  The Second Circuit has established that to state a claim for relief under Section 10(b), Rule 9(b) requires a complaint to: "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent."  *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 290 (2d Cir. 2006) (internal quotation marks omitted); *accord Rombach*, 355 F.3d at 170.  The PSLRA further requires that a complaint in a securities fraud action must "specify each statement [that is] alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed."  15 U.S.C. § 78u-4(b)(1)(B).

The SAC sets forth the exact reasons why Defendants' public statements were materially false and misleading when made and, notably, does so as instructed by Judge Karas in the Order. The SAC clearly specifies the eight statements that Plaintiffs contend were fraudulent, identifies the speakers of those statements, and identifies where and when those false and misleading statements were made.  *See* SAC ¶¶ 57, 61, 63, 67, 69, 72, 76 and 86.  As discussed above, the only pleading defect in the CAC identified by the Court in its Order was that the CAC failed to

separately set forth, for each public statement that is alleged to be false and misleading, the specific reasons why that particular statement was allegedly false and misleading. The SAC cures the pleading defect identified by the Court: following each statement that is alleged to be materially false and misleading, the SAC sets forth the specific reasons why that particular statement was materially false and misleading. *See*, *e.g.*, SAC ¶ 58 (explaining why the public statement quoted in SAC ¶ 57 was materially false and misleading); SAC ¶ 62 (explaining why the public statement quoted in SAC ¶ 61 was materially false and misleading). Accordingly, the SAC is pled with the level of particularity required by Rule 9(b) and the PSLRA. [5]

Defendants argue that the SAC is insufficiently particular because it sets forth "identical or substantially identical" reasons why each of the eight statements identified in the SAC were materially false and misleading. Def. Br. at 26. However, it is entirely logical for the SAC to allege that the eight statements were false and misleading for the same or similar reasons. First, many of the allegedly false and misleading statements use <u>exactly the same language</u>.[6] Unsurprisingly, the SAC alleges that those identical statements were false and misleading for

---

[5] The case of *In re Alcatel Sec. Litig.*, 382 F. Supp. 2d 513, 532-33 (S.D.N.Y. 2005), cited by Defendants, is inapposite because in that case, the Court could not find sufficient particularity where the plaintiffs did "not adequately explain why" the defendants' statements were false and misleading, and where the plaintiffs did not link their allegations to the allegedly false statements. Here, however, Judge Karas has already decided that Plaintiffs have sufficiently alleged why certain statements by Defendants were false and misleading. His conclusions are the law of the case. Judge Karas merely asked that Plaintiffs apply the precise bases to each applicable false statement. The SAC sufficiently does so.

[6] Compare SAC ¶ 57 to ¶ 61 (both stating that "[t]he joint venture entered into a license agreement with World Wrestling Federation Entertainment under which it acquired the exclusive worldwide right to publish World Wrestling Federation video games on all market platforms"); SAC ¶ 63 to ¶ 69 (both stating that "Mr. Friedman's long-term relationship[s]" were "instrumental in [JAKKS'] acquiring our successful World Wrestling Federation licenses," and that the efforts of Friedman and Berman "have resulted in our identifying and securing the World Wrestling Federation licenses and other desirable licenses and properties"); and SAC ¶ 72 to ¶ 86 (both stating that "We have capitalized on our relationship with World Wrestling Federation, Inc. (WWE) by obtaining an exclusive worldwide license for our joint venture with THQ Inc.").

exactly the same reasons. Second, and more importantly, all of the eight statements were materially false and misleading for <u>the same overarching reason</u>: by failing to disclose the commercial bribery scheme used to procure and renew the WWE Licenses, the statements misrepresented JAKKS' ability to procure and renew those valuable Licenses. This is not a case that involves many different courses of allegedly fraudulent conduct; instead, the SAC focuses on JAKKS' failure to disclose the commercial bribery scheme by which it acquired and renewed its Licenses with WWE. Because Plaintiffs' claims are focused on this single fraudulent scheme, it is appropriate for the SAC to allege that the eight challenged statements were all misleading for essentially similar reasons.

Defendants also bizarrely criticize Plaintiffs for incorporating the text of Judge Karas' rulings into the allegations of the SAC. *See* Def. Br. at 26-28. That criticism is complete nonsense. Judge Karas undertook a comprehensive review of Plaintiffs' claims in the CAC, and set forth a lengthy opinion in which he identified the actionable misstatements alleged in the CAC and explained why each of those statements was properly alleged to have been materially false and misleading when made. Instead of ignoring those rulings (as Defendants apparently believe is proper, since they do so throughout their motion), Plaintiffs incorporated the substance of Judge Karas' rulings into the allegations of the SAC to ensure that the revised allegations conform to Judge Karas' rulings. Defendants also argue that "if Judge Karas had believed that language from the Dismissal Order itself were sufficient to satisfy the policies behind Rule 9(b) and the PSLRA, he would not have dismissed the CAC." Def. Br. at 28. However, Judge Karas did not rule on the sufficiency of his own Order; instead, he provided specific instructions to Plaintiffs on how to correct the "eminently curable" pleading deficiencies in the CAC. Plaintiffs,

in turn, followed that guidance in amending their allegations to incorporate and reflect the substance of Judge Karas' rulings.

The fundamental purpose of the "particularity" requirement is to ensure that opposing parties have fair notice of the claims against them. *See Rombach*, 355 F.3d at 171. Here, Defendants cannot credibly argue that they do not have fair notice of Plaintiffs' claims. Defendants know precisely what this case is about: their failure to disclose the illegal and improper commercial bribery scheme by which JAKKS obtained and renewed its valuable Licenses with WWE, the specific facts of which are described in extensive detail in ¶¶ 34-52 of the SAC. Any argument by Defendants that they do not have fair notice of the claims against them is wholly disingenuous and should be rejected.

## III.    THE SAC ADEQUATELY PLEADS LOSS CAUSATION

Plaintiffs' loss causation allegations in this Action are straightforward and uncontroversial. This case does not present a novel legal theory of loss causation or damages. Instead, the loss causation allegations in this case fit the "classic" fact pattern in securities fraud litigation: material information is concealed from shareholders; that concealed information is revealed to the public; and the company's stock price drops immediately and significantly in reaction to that information, causing investors' losses.[7]

---

[7] *See In re Rhodia S.A. Sec. Litig.*, 531 F. Supp. 2d 527, 545 (S.D.N.Y. 2007) ("[C]ourts in this District generally have found that a public disclosure, when alleged properly, is the incident which satisfies the loss causation requirement."); *Schleicher v. Wendt*, 529 F. Supp. 2d 959, 966 (S.D. Ind. 2007) ("The typical PSLRA plaintiff shows loss causation by first showing that a company's stock price was artificially inflated when fraudulently rosy information was released to the public, and by then showing that a drop in the stock price followed shortly after the truthful bad news was released to the market."); *In re ICG Communs. Sec. Litig.*, No. 00-RB-1864 (BNB), 2006 U.S. Dist. LEXIS 6695, at *29 (D. Colo. Feb. 7, 2006) ("[T]his case presents a 'typical loss causation situation, [in which] the plaintiff alleges inflation of the stock price due to defendants' painting the company in a favorable, albeit untruthful, light, disclosure of the true state of the company at some later point, and an immediate decline in the stock price as a result of the marked reaction to the belated disclosure.'"); *Danis v. USN Communs., Inc.*, 73 F. Supp.

In support of their motion, Defendants argue that the loss causation allegations in the SAC are insufficient because: (1) the disclosures released to the public on October 19, 2004 did not disclose the existence of the alleged commercial bribery scheme, but instead only disclosed the possibility that WWE would file a lawsuit against JAKKS; and (2) the SAC fails to allege that JAKKS' stock price fell in reaction to the disclosure of the alleged bribery scheme rather than in reaction to the disclosure of the possible lawsuit.  Defendants are wrong on both points.

As discussed below, the SAC alleges that the concealment of the alleged bribery scheme resulted in the artificial inflation of JAKKS' stock price[8]; it identifies specific disclosures that informed investors of the alleged bribery scheme by which JAKKS procured its WWE Licenses; and it alleges that it was those disclosures of the alleged bribery scheme -- not the disclosure of the filing of the WWE Action or any other information -- that caused JAKKS' stock price to drop dramatically and caused investors' losses.  Taking the allegations in the SAC in a light most favorable to Plaintiffs, there is no doubt that Plaintiffs have provided "sufficient allegations of a causal connection between the subject matter of [the] omissions and the ultimate decline in [JAKKS'] stock value, that is, loss causation."  *Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc.*, 343 F.3d 189, 192 (2d Cir. 2003).

### A.    Legal Standards for Alleging Loss Causation

To allege loss causation, "the Federal Rules of Civil Procedure require only 'a short and plain statement of the claim showing that the pleader is entitled to relief.'"  *Dura Pharms., Inc. v.*

---

2d 923, 943 (N.D. Ill. 1999) ("In the typical loss causation situation, the plaintiff alleges inflation of the stock price due to defendants' painting the company in a favorable, albeit untruthful, light, disclosure of the true state of the company at some later point, and an immediate decline in the stock price as a result of market reaction to the belated disclosure.").

[8] Defendants' motion does not challenge the sufficiency of the SAC's allegations regarding this first part of the loss causation requirement, often called "transaction causation."

*Broudo*, 544 U.S. 336, 346 (2005) (quoting Fed. R. Civ. P. 8(a)(2)).  That statement must provide the defendant with "'fair notice of what the plaintiff's claim is and the grounds upon which it rests.'"  *Id.* (quoting *Conley*, 355 U.S. at 47).[9]

"[T]o establish loss causation, 'a plaintiff must allege . . . that the subject of the fraudulent statement or omission was the cause of the actual loss suffered,' *Suez Equity Investors, L.P. v. Toronto-Dominion Bank*, 250 F.3d 87, 95 (2d Cir. 2001) (emphasis added), *i.e.*, that the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security." *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 173 (2d Cir. 2005).  In *Dura*, the Supreme Court expressly endorsed the Second Circuit standard for loss causation under *Emergent Capital*, 343 F.3d at 197.  *See Dura*, 544 U.S. at 343 (citing *Emergent Capital*).  For pleading purposes under *Emergent*, a plaintiff must allege that the loss suffered was "a foreseeable consequence of any misrepresentation or material omission." *Emergent Capital*, 343 F.3d at 197.  A complaint need only make "sufficient allegations of a causal connection between the subject matter of [the] omissions and the ultimate decline in [the company's] stock value, that is, loss causation." *Id.* at 192.

As stated above, at the motion to dismiss stage, "all allegations are construed in the light most favorable to the plaintiff and doubts are resolved in the plaintiff's favor." *Petra Bank*, 989 F.2d at 79-80; *see also In re AstraZeneca*, 2008 U.S. Dist. LEXIS 43680, at *40.  Allegations of loss causation must be read in the same light.  *See Wagner v. Barrick Gold Corp.*, No. 03 Civ. 4302 (RMB), 2006 U.S. Dist. LEXIS 3854, at *11 (S.D.N.Y. Jan. 31, 2006).

---

[9] *Dura* confirmed that the element of loss causation, a requirement found in a separate section of the PSLRA, is not subject to the heightened pleading requirement of 15 U.S.C. § 78u-4(b)(4). *See Dura*, 544 U.S. at 346.

**B.    The Corrective Disclosures Identified in the SAC Disclosed the Existence of the Alleged Bribery Scheme**

Contrary to Defendants' arguments, news articles and press releases issued prior to the close of trading on October 19, 2004 did, in fact, disclose the existence of JAKKS' commercial bribery scheme to JAKKS' investors.

The first corrective disclosure cited in the SAC occurred before the opening of trading on October 19, 2004, when JAKKS issued a press release reporting positive results from operations in the third quarter of 2004. *See* SAC ¶ 88. In that press release, JAKKS disclosed that WWE had "raised questions about the validity of the licenses" between WWE and JAKKS, and disclosed that JAKKS had to defend itself against charges of "wrongdoing" in connection with the acquisition and/or renewal of those Licenses. *Id.* Although this disclosure did not spell out the details of the alleged bribery scheme, it provided sufficient information for investors to conclude that there was a dispute over "the validity of the licenses" due to JAKKS' possible "wrongdoing" or illegal conduct, and that due to that dispute, JAKKS stood to potentially lose the revenues it received from those valuable Licenses. *See*, *e.g.*, *In re Take-Two Interactive Sec. Litig.*, No. 06 Civ. 803 (SWK), 2008 U.S. Dist. LEXIS 31463, at *100 (S.D.N.Y. Apr. 16, 2008) ("To be sure, a plaintiff may plead loss causation without alleging a disclosure that precisely mirrors the substance of a prior undisclosed fraud. . . . [A disclosure need only] somehow reveal to the market <u>some part</u> of the truth regarding the alleged fraud.") (emphasis added). [10]

---

[10] The law does not require a single "mirror image" disclosure that reveals all aspects of the alleged fraud in order to adequately allege loss causation. *See In re NTL, Inc. Sec. Litig.*, No. 02-3013, 2006 U.S. Dist. LEXIS 5346, at *32 (S.D.N.Y. Feb. 14, 2006) (loss causation properly alleged where a series of disclosures and events "gradually alerted investors to the truth about NTL's underlying problems"); *In re Bristol-Myers Squibb Sec. Litig.*, No. 00-1990, 2005 U.S. Dist. LEXIS 18448, at *57 (D.N.J. Aug. 17, 2005) (rejecting defendants' argument that "an alleged corrective disclosure must be the linguistic mirror image of the alleged fraud"); *In re Bradley Pharms., Inc. Sec. Litig.*, 421 F. Supp. 2d 822, 828 (D.N.J. 2006) (rejecting defendants' "rigid and dogmatic interpretation" that there must be a "true corrective disclosure" and

The second set of corrective disclosures alleged in the SAC took place later in the day on
October 19, 2004. As the SAC alleges, news reports issued later that day informed investors that
WWE had, in fact, filed a lawsuit against JAKKS over the validity of the Licenses, and those
news reports (as well as the complaint filed by WWE) provided details of the alleged bribery
scheme perpetrated by JAKKS. *See* SAC ¶ 91. In their brief, Defendants <u>concede</u> that these
news reports disclosed the existence of the alleged bribery scheme. *See* Def. Br. at 18.
Defendants criticize the SAC for failing to specifically identify these news reports or the
information about JAKKS' bribery scheme that was disclosed in each such report. *See* Def. Br.
at 18 fn.7. For the Court's convenience, examples of such news articles are submitted as exhibits
B-D to the Kupillas Declaration. As shown on the printouts of these articles (obtained from the
Lexis database), many of these articles were released before the close of trading (4:30 Eastern
Time) on October 19, 2004, and may have caused at least part of the drop in JAKKS' stock price
on that date.

Thus, the SAC identifies specific disclosures that informed investors about the existence
of the alleged bribery scheme perpetrated by JAKKS. As shown directly below, the SAC alleges
that it was these disclosures of the potential commercial bribery scheme, not any other
disclosures, that caused JAKKS' stock price to drop.

### C.     The SAC Alleges That Investors' Losses Were Caused by the Disclosure of the Alleged Commercial Bribery Scheme, Not by Any Other Disclosure

Contrary to Defendants' arguments, the SAC specifically alleges that it was the
disclosure of JAKKS' alleged commercial bribery scheme, <u>not</u> the disclosure of any other

---

concluding that "*Dura* did not address what type of events or disclosures may reveal the truth" or
"how specific such [a] disclosure must be"); *Fogarazzo v. Lehman Bros., Inc.*, 341 F. Supp. 2d
274, 292 (S.D.N.Y. 2004) ("Plaintiffs here have alleged a number of events that operated,
essentially, as disclosures or market corrections" before complete disclosure was eventually
made by defendants.).

information, that caused JAKKS' stock price to drop, and consequentially, caused investors to suffer losses. In their brief, Defendants argue that "unless Plaintiffs plead facts demonstrating that a stock price drop was caused by the disclosure of the <u>alleged bribery scheme</u>, the SAC must be dismissed under *Dura*." Def. Br. at 16 (emphasis in original). The SAC makes this necessary connection between the disclosure of the alleged bribery scheme and investors' losses.

For example, the SAC alleges that "[w]hen <u>Defendants' prior misrepresentations and fraudulent conduct</u> were disclosed and became apparent to the market, the price of JAKKS securities fell precipitously as the prior artificial inflation came out of JAKKS' stock price." SAC ¶ 99 (emphasis added). Thus, contrary to Defendants' arguments, the SAC properly alleges that it was the disclosure of the bribery scheme itself ("Defendants' prior misrepresentations and fraudulent conduct"), <u>not</u> the fact of the filing of the WWE Action, that caused investors' losses. The SAC also specifically alleges that "[a]s a result of Defendants' admissions and the public revelations regarding <u>the problems with the WWE Licenses</u>, JAKKS stock price plummeted approximately 46%, falling from $24.15 per share to $12.96 per share." SAC ¶ 102 (emphasis added). Again, this allegation shows that JAKKS' stock price fell and investors suffered losses as a result of the disclosure of "the problems with the WWE licenses" (that is to say, JAKKS' improper acquisition and renewal of the Licenses through its commercial bribery scheme), <u>not</u> the disclosure of the filing of the WWE Action. *See also* SAC ¶ 9 (same).[11]

---

[11] The SAC further alleges that JAKKS' stock price fell in reaction to concerns by analysts and investors that the disclosure of the bribery scheme could result in the Licenses becoming "void and unenforceable" and could make other companies reluctant to do business with JAKKS. SAC ¶ 93. Defendants' Motion completely ignores this paragraph of the SAC and the others cited above, instead citing to other paragraphs which (they assert) support their contorted description of Plaintiffs' claims. However, in assessing a motion to dismiss, all allegations of a complaint must be read in their totality, not in isolation. *See In re Mercator Software, Inc. Sec. Litig.*, 161 F. Supp. 2d 143, 150 (D. Conn. 2001).

Thus, "[u]nlike the plaintiffs in *Dura Pharmaceuticals*, plaintiff here sets out a claim that defendants' 'share price fell significantly after the truth became known' . . . . This allegation sufficiently establishes the causal connection between that economic loss and the misrepresentation at the pleading stage." *City of Sterling Heights Police & Fire Ret. Sys. v. Abbey Nat'l, PLC*, 423 F. Supp. 2d 348, 362 (S.D.N.Y. 2006) (citing *Dura*, 544 U.S. at 346).

### D. Defendants' Argument That JAKKS' Stock Price Drop Was Caused by "Other Bad News" Should Be Rejected

Contrary to Defendants' arguments, the disclosures at issue were not "mixed disclosures" reporting many pieces of bad news. *See* Def. Br. at 18-19. Rather, all of the "bad news" in those reports stemmed from the bribery scheme. Defendants attempt to parse the news released on October 19, 2004 into two distinct pieces of information: (1) the alleged commercial bribery scheme, and (2) the commencement of litigation by WWE against JAKKS. They make this argument as if the WWE Action was completely unrelated to the alleged bribery scheme. However, as the corrective disclosures discussed above made clear, the filing of the WWE Action was a direct result of JAKKS' alleged "wrongdoing" over "the validity of the licenses" -- that is, the bribery scheme perpetrated by JAKKS -- not some unrelated, intervening event. Thus, because the corrective disclosures issued on October 19 clearly informed investors that the WWE Action was the result of an alleged bribery scheme, it is unnecessary to parse the effect of the disclosure of the filing of the WWE Action from the effect of the disclosure of the bribery scheme itself.[12]

---

[12] Moreover, even if JAKKS' stock price did drop in reaction to the mere disclosure of an possible lawsuit by WWE, that disclosure and stock price drop would nevertheless be sufficient to allege loss causation, because, like the announcement of a government investigation into a corporation's possibly improper conduct, the filing of the WWE Action represented a partial disclosure of the truth regarding the potential invalidity of the Licenses. *See, e.g.*, *In re Take-Two Interactive*, 2008 U.S. Dist. LEXIS 31463, at *109 ("[V]arious courts have found that the announcement of an SEC investigation into alleged fraudulent conduct may, for pleading

Defendants appear to be arguing that Plaintiffs are required to meet a higher standard for pleading loss causation than the Rule 8 standard confirmed in *Dura*. Defendants repeatedly cite to the decision in *In re Omnicom Group, Inc. Sec. Litig.*, 541 F. Supp. 2d 546 (S.D.N.Y. 2008), in their attempt to do so. *See* Def. Br. at 15, 18, 19. However, the decision in *Omnicom* is a ruling on a motion for summary judgment, where a plaintiff is required to present evidence that she can *prove* loss causation at trial, and where a plaintiff may be required to submit evidence (such as expert testimony) showing the exact amount of a day's stock price drop that was caused by each piece of new company-specific information released on that day. Here, in contrast, Plaintiffs are required only to plead "a short and plain statement of the claim showing that the pleader is entitled to relief." *Dura*, 544 U.S. at 337 (quoting Fed. R. Civ. P. 8(a)(2)). Therefore, Defendants' citation of language from *Omnicom* that "[t]o <u>prove</u> loss causation, plaintiffs must distinguish the alleged fraud from the 'tangle of [other] factors' that affect a stock's price" (Def.

---

purposes, constitute at least a partial disclosure of such fraudulent conduct"); *In re Openwave Sys. Sec. Litig.*, 528 F. Supp. 2d 236, 252 (S.D.N.Y. 2007) (upholding loss causation allegations based, in part, on an "announcement that the SEC was investigating Openwave's stock option grant practices"); *Lapin v. Goldman Sachs Group, Inc.*, 506 F. Supp. 2d 221, 243 (S.D.N.Y. 2006) (announcements by "the New York Attorney General, and subsequently the Justice Department and the SEC, [that] they were investigating conflicts of interest at Wall Street firms," even without disclosure of the underlying evidence of the defendants' improper conduct, were sufficiently corrective to support a finding of loss causation); *Bradley Pharms.*, 421 F. Supp. 2d at 828 (rejecting the defendants' argument that an announcement of an informal SEC investigation disclosure was not genuinely "corrective" because it did not disclose the underlying subject of the investigation: "Our securities laws do not operate in a vacuum. Defendants' contention that the announcement of the SEC inquiry did not satisfy *Dura*'s 'revelation of the truth' requirement fails to acknowledge the significance of the market reaction to the February 28, 2005 disclosure [of the SEC investigation]").

Further, like the disclosure of an SEC investigation into a corporation's financial misconduct, the possible initiation of litigation by WWE against JAKKS was "a foreseeable consequence" of the bribery scheme. *See Emergent*, 343 F.3d at 197 (loss causation has been analogized to the tort law concept of proximate cause in that the injury sustained by the plaintiff must be a foreseeable result of a material misrepresentation or omission).

Br. at 18 (quoting *Omnicom*) (emphasis added)) is not relevant to the analysis of whether Plaintiffs have adequately <u>alleged</u> loss causation.[13]

As demonstrated above, Plaintiffs have properly alleged that (i) JAKKS' stock price was artificially inflated by the failure to disclose the existence of the bribery scheme; (ii) the

---

[13] The other cases relied upon by Defendant also do not support their position. Defendants rely on *In re Merrill Lynch & Co. Research Reports Sec. Litig.*, No. 02 MDL 1484, 07 CIV 6677 (JFK), 2008 U.S. Dist. LEXIS 37993 (S.D.N.Y. May 8, 2008) for the proposition that a plaintiff's attempt to plead loss causation is inadequate where "he has not alleged facts that lead to the inference that all, or even some, of his losses are due to the alleged fraud, rather than to intervening events and/or the disclosure of other information." Def. Br. at 18. However, Defendants fail to point out several distinguishing facts between *Merrill Lynch* and the instant case that make that citation inapplicable to the instant case. For example, in *Merrill Lynch*, the company had experienced a long, protracted stock price decline which coincided with a "market-wide collapse of Internet stocks"; the court found that such a market-wide collapse could have been an "intervening event" that caused investors' losses, and the plaintiffs' failure to even address that market-wide decline severely undercut their loss causation allegations. *Merrill Lynch*, 2008 U.S. Dist. LEXIS 37993, at *40-*43. In contrast, JAKKS' stock price did not experience any long decline that coincided with a broader market downturn which could be interpreted as an intervening event sufficient to break the chain of causation. Further, in *Merrill Lynch*, the court found that certain allegedly concealed risks had been properly disclosed by the defendants while other risks remained undisclosed, and the complaint failed to allege that the revelation of a previously-concealed liquidity crisis was the result of the undisclosed risks rather than the disclosed risks. *Id.* at *44-45 ("[Plaintiff] has failed to explain how the losses that occurred . . . resulted from the materialization of the purportedly undisclosed risk, as opposed to materialization of the aforementioned, clearly disclosed risks."). Here, neither the bribery scheme nor the risks that arose out of JAKKS' fraudulent scheme were revealed to the marketplace prior to the October 19, 2004 disclosures.

Likewise, Defendants' reliance on *Lattanzio v. Deloitte & Touche LLP*, 476 F.3d 147 (2d Cir. 2007) and *In re AOL Time Warner, Inc. Sec. Litig.*, 503 F. Supp. 2d 666 (S.D.N.Y. 2007) for the same proposition as in *Merrill Lynch* is misplaced. *See* Def. Br. at 17-18. In each of those cases, the court ruled that because there were numerous misleading statements made by other defendants, including misstatements that were "more consequential and numerous" than the allegedly false statement made by the specific defendant at issue, the complaint did not allege facts "that would allow a factfinder to ascribe some rough proportion of the whole loss to [the specific defendant's] misstatements." *Lattanzio*, 476 F.3d at 158; *see also AOL*, 503 F. Supp. 2d at 680. In contrast, in the present action, there are only eight allegedly misleading statements, all of which were misleading for the same fundamental reason (they failed to disclose the existence of the bribery scheme), and all of those statements were attributable to JAKKS; thus, unlike in *Lattanzio* and *AOL*, it is beyond question that the losses suffered by JAKKS' investors were caused by JAKKS' misleading and omissive statements.

existence of the alleged bribery scheme was publicly disclosed to investors on October 19, 2004; and (iii) JAKKS' stock price dropped in reaction to the disclosure of the alleged bribery scheme. These loss causation allegations are sufficient to provide Defendants with "fair notice of what [Plaintiffs'] claim is and the grounds upon which it rests." *Dura*, 544 U.S. at 346.

## IV.    THE ALLEGED BRIBERY SCHEME WAS MATERIAL TO INVESTORS

For an undisclosed fact to be material, "there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988) (quoting *TSC Indus. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)). Material facts include those that "affect the probable future of the company and [that] . . . may affect the desire of investors to buy, sell, or hold the company's securities." *SEC v. Texas Gulf Sulphur Co.*, 401 F.2d 833, 849 (2d Cir. 1968).

"[W]hen presented with a Rule 12(b)(6) motion, 'a complaint may not properly be dismissed . . . on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance.'" *Ganino*, 228 F.3d at 162 (citing *Goldman v. Belden*, 754 F.2d 1059, 1067 (2d Cir. 1985)); *see also Press v. Chemical Inv. Servs. Corp.*, 166 F.3d 529, 538 (2d Cir. 1999) ("The determination of materiality is a mixed question of law and fact that generally should be presented to a jury"); *In re Stac Electronics Sec. Litig.*, 89 F.3d 1399, 1405 (9th Cir. 1996) ("The 'materiality' of an omission is a fact-specific determination that should ordinarily be assessed by a jury.").

A. **The Corporate Bribery Scheme Was Material to Investors Concerned About the Potential Loss of Revenues From the WWE Licenses, Regardless of the Ultimate Outcome of the WWE Action**

In his Order, Judge Karas ruled that the omitted information concerning the commercial bribery scheme through which JAKKS obtained certain of its merchandising Licenses with WWE could have been material to JAKKS investors:

> Here, the Court cannot say that no reasonable investor would find the information regarding the alleged bribery scheme material. In deciding whether to invest in Jakks, a reasonable investor might have viewed information about the bribery as "significantly altering the 'total mix' of information made available. *Caiola*, 295 F.3d at 329. Jakks's own public statements made clear that the WWE licenses generated, and were expected to continue to generate, significant revenue for the company. (*See*, *e.g.*, CAC ¶¶ 95-96, 102.) An investor might reasonably want to know if that source of revenues was threatened because it was improperly or illegally derived.

Order at 10.

Defendants argue that the bribery scheme perpetrated by JAKKS was not material to investors because, regardless of whether that bribery scheme actually occurred, "it has [now] been judicially determined that there was never any actual threat to the continued viability of the Licenses." Def. Br. at 20.[14] However, for the reasons set forth below, this argument fails.

By this argument, Defendants are improperly seeking to assess the materiality of the concealed bribery scheme through the lens of hindsight. They argue that because it has _now_ been judicially determined that the statute of limitations had expired on WWE's claims no later than June 2002, the existence of the bribery scheme could not have been material to investors.

---

[14] At the April 18, 2008 conference regarding Defendants' proposed motion to dismiss the SAC, Defendants' counsel admitted that the materiality/duty to disclose argument in their motion is based on "a massive sea change that has occurred under us between the time of the first amended complaint and the second amended complaint" -- that is, their motion is based on the hindsight of recent events. *See* Fumerton Decl. Exh. E at 3.

However, the Second Circuit has held that "[m]ateriality is determined in light of the circumstances existing <u>at the time the alleged misstatement occurred</u>." *Ganino*, 228 F.3d at 165 (emphasis added).[15]   Therefore, the materiality of the undisclosed bribery scheme must be assessed in light of the circumstances existing during the Class Period, which extends from December 3, 1999 through October 19, 2004, not through the lens of Defendants' 2008 hindsight analysis.

The existence of the bribery scheme was material to investors at <u>all</u> times during the Class Period, because despite Defendants' confidence in JAKKS' defenses, it was far from certain during the Class Period (or at the end of the Class Period when the bribery scheme was disclosed to the public) that WWE would fail in its challenge to the validity of the Licenses.  The Second Circuit states that "[w]hen contingent or speculative events are at issue," such as the ultimate resolution of WWE's challenge to the validity of the Licenses and the revenues obtained therefrom, "the materiality of those events depends on 'a balancing of both the indicated probability that the event will occur and the anticipated magnitude of the event in light of the totality of the company activity.'"   *Castellano v. Young & Rubicam, Inc.*, 257 F.3d 171, 180 (2d Cir. 2001) (quoting *Basic*, 485 U.S. at 238).

Therefore, in assessing the materiality of the bribery scheme, the Court must first consider how investors would have assessed the probability that JAKKS would lose its revenues from the Licenses as a result of WWE's challenge to the validity of the Licenses.  On the day

---

[15] *See also In re Alliance Pharm. Corp. Sec. Litig.*, 279 F. Supp. 2d 171, 194 (S.D.N.Y. 2003) ("[T]he materiality of the alleged omission is appropriately determined at the point of the transaction, and not in hindsight."); *Spielman v. General Host Corp.*, 402 F. Supp. 190, 194 (S.D.N.Y. 1975) ("The determination of materiality is to be made upon all the facts as of the time of the transaction, and not upon a 20-20 hindsight view long after the event."); *Gebhardt v. ConAgra Foods, Inc.*, 335 F.3d 824, 830 (8th Cir. 2003) ("[T]he importance of the misrepresented facts should not be judged with the advantage of hindsight").

that the bribery scheme was first publicly disclosed, JAKKS stated that "the Company intends to vigorously defend itself against claims which it believes are without merit." *See* SAC ¶ 88 (citing JAKKS' Oct. 19, 2004 press release). However, despite that confident statement by JAKKS (which is an almost meaningless response, typical whenever a corporation is threatened with a lawsuit), there were many reasons why investors were reasonable in believing that there was still a substantial possibility that WWE would prevail on its claims, the Licenses would be declared invalid, and JAKKS' revenues therefrom would have been lost:

> (i)    In complex litigation such as the WWE Action, at the time a lawsuit is filed, there is no certainty that one side will prevail. The WWE Action was litigated in federal court for over three years, which in itself shows that the ultimate result in that case was not so obvious or "cut and dried" as Defendants contend. Further, WWE's action against JAKKS in Connecticut state court is still pending, and despite Defendants' predictions, it is by no means certain that those claims will also be dismissed. Thus, even today, there remains the possibility that JAKKS will lose the revenues obtained from the WWE Licenses.

> (ii)   Although JAKKS immediately denied that the WWE Action was without merit (as discussed above), JAKKS did not provide investors with any specific facts to inform them <u>why</u> the WWE Action was purportedly without merit. In the absence of any such information, investors did not simply accept JAKKS' response as the gospel truth, but remained concerned that the WWE Action would cause JAKKS to lose revenues from the Licenses.

> (iii)  The complaint filed by WWE contained detailed, convincing allegations setting forth the facts of the bribery scheme, which surely contributed to investors' analysis of the likelihood that WWE would prevail on its claims. *See* SAC ¶ 91. Indeed, even despite the dismissal of the WWE Action, there is no evidence in the record showing that the bribery scheme did not, in fact, occur.

> (iv)   JAKKS itself identified the WWE Action as a "material" lawsuit, and stated that the outcome of that lawsuit was uncertain, in its own SEC filings. In a registration statement filed shortly after the disclosure of the bribery scheme, JAKKS listed the WWE Action in the "Legal Proceedings" section, and stated that "because [the WWE Action and the present action] are in their preliminary stages, we cannot assure you as to the outcome of the Actions, nor can we estimate the range of potential losses to this Company." *See* Kupillas Decl. Exh. E (JAKKS Form S-3/A dated Dec. 13, 2004) at 5. Only <u>material</u> pending lawsuits are required to be disclosed in the "Legal Proceedings"

section of a Form S-3 filing with the SEC. *See* 17 CFR 229.103 ("Describe briefly any material pending legal proceedings . . . to which the registrant or any of its subsidiaries is a party ....").

Therefore, without the "20-20 hindsight" of which Defendants now seek to avail themselves, at the time the bribery scheme was disclosed there was a substantial probability that the Licenses would be declared invalid and that JAKKS would lose the valuable revenues from those Licenses.

After the Court has assessed the probability that "the event will occur," the Court must also consider "the anticipated magnitude of the event in light of the totality of the company activity" -- that is, how large of an effect the loss of revenues from the WWE Licenses would have had on JAKKS' overall prospects. *Castellano*, 257 F.3d at 180. On the day that the bribery scheme was disclosed, Defendants were asked what sort of impact the dispute would have on JAKKS' toy and video game sales; in response to those questions, Defendant Friedman stated that "we cannot comment about this subject at all," and Defendant Bennett stated that "we cannot make any further comments." SAC ¶ 90. Those responses certainly did not give any comfort to investors who were concerned about the impact of the bribery scheme on JAKKS' future prospects. However, as Judge Karas recognized, JAKKS had made many prior public statements making clear to investors that "the WWE licenses generated, and were expected to continue to generate, significant revenue for the company." Order at 10.[16] Moreover, JAKKS acknowledged in its own SEC filings that "[a] materially adverse resolution of any of these

---

[16] *See also*, *e.g.*, SAC ¶ 57 (JAKKS press release touting the "sustainable consumer appeal" of WWE video games), ¶ 63 (touting the increase in JAKKS' sales and earnings as a result of the work of Messrs. Friedman and Berman, including their work on the acquisition and renewal of the WWE Licenses), ¶ 67 (stating that JAKKS had earned $15.9 million in profit in 2000 from the joint venture that owned the WWE video game Licenses); ¶ 72 (stating that JAKKS earned $27.5 million in profit through March 31, 2002 from the joint venture that owned the WWE video game Licenses); ¶ 86 (stating that JAKKS had earned $34.6 million in profit through June 30, 2003 from the joint venture that owned the WWE video game Licenses).

lawsuits [including the WWE Action] could have a material adverse affect on our financial position and results of operations."  *See* Kupillas Decl. Exh. E (JAKKS Form S-3/A dated Dec. 13, 2004) at 8.

Therefore, in addition to the substantial possibility that JAKKS would lose its Licenses with WWE, JAKKS investors were aware that if those Licenses were lost, the anticipated financial impact from the loss of those Licenses could be very large.  Under *Castellano*, this calculus requires a finding that the concealed facts concerning the bribery scheme would have been material to investors at all times during the Class Period.

**B.    The Corporate Bribery Scheme Was Also Material to Investors For Reasons Other Than the Potential Loss of Revenues From the WWE Licenses**

Even if WWE had no ability to challenge the validity of the Licenses or the revenues obtained by JAKKS therefrom (as Defendants contend), the existence of the bribery scheme would still have been material to investors in JAKKS for a number of other important reasons.

First, as Judge Karas recognized, the facts concerning the bribery scheme "might [have been] considered material by a reasonable investor who was trying to assess the likelihood that Jakks's licenses would be renewed upon expiration."  Order at 19.  Thus, even if WWE had no ability to challenge the validity of the then-current Licenses, the bribery scheme would have still been relevant to the question of whether WWE would renew its Licenses with JAKKS upon their expiration, which would unquestionably have been material to investors.[17]  Defendants argue that the possibility that WWE might not renew their Licenses with JAKKS upon expiration was

---

[17] In a registration statement filed with the SEC shortly after the disclosure of the bribery scheme, JAKKS itself warned of the material risk that "[i]f one or more of [our] licensors were to terminate or fail to renew our license or not grant us new licenses, our business, financial condition and results of operations could be adversely affected."  *See* Kupillas Decl. Exh. E (JAKKS Form S-3/A dated Dec. 13, 2004) at 9.  This admission alone demonstrates the materiality of the risk that WWE would not renew its Licenses with JAKKS.

too "speculative" to be material to JAKKS' investors. Def. Br. at 22.[18]  However, while it may

have been speculative to assume that WWE would have been willing to renew its Licenses with

JAKKS in the absence of the bribery scheme, it was almost certain that, once WWE was aware

of the bribery scheme, WWE would be unwilling to do any further business with JAKKS.[19]

Judge Karas did not think that the possibility of non-renewal was "too speculative" to be

---

[18] Although Defendants cite to *In re Par Pharm. Sec. Litig.*, 733 F. Supp. 668, 678 (S.D.N.Y. 1990), for the proposition that "Defendants cannot be held liable for failing to 'disclose' what would have been pure speculation" (Def. Br. at 23), the holding in that case actually supports Plaintiffs' position on Defendants' duty to disclose JAKKS' bribery scheme.  *Par*, like the present Action, involved a corporate bribery scheme (to expedite the approval of applications for permission to manufacture certain drugs).  *Id*. at 672.  In fact, in that case, the court found that there was a duty to disclose the existence of the bribery scheme itself, because the failure to disclose that information made other statements about the company's success in obtaining drug approvals materially misleading (like JAKKS' public statements about its success in obtaining valuable licenses).  *Id*. at 677-78.  The court in *Par* merely held that there was no duty for the company to also disclose all of the potential underline effects of the discovery of the bribery scheme, because those effects were too numerous to require the company to disclose every possible effect.  *Id*. at 678 ("However, the company was not obligated to speculate as to the myriad of consequences, ranging from minor setbacks to complete ruin, that might have befallen the company if the bribery scheme was discovered, disclosed or terminated.").

In fact, when Defendants cited to *Par* for the proposition set forth above in their previous motion to dismiss the CAC, Plaintiffs pointed out Defendants' misreading of the holding in that case in their opposition brief.  *See* Dkt. # 70 at 14 fn. 11.  Despite their awareness that their citation to *Par* has already been refuted, Defendants repeat the same incorrect and misleading citation to that case in their current Motion.

Plaintiffs in this Action, unlike the plaintiffs in *Par*, do not allege that JAKKS had a duty to publicly speculate about the potential effects of the discovery of the bribery scheme.  Instead, Plaintiffs claim that JAKKS was simply required to disclose the existence of the bribery scheme itself, as the court in *Par* (and Judge Karas) found was necessary; JAKKS' investors would have then been free to assess the potential effects of the discovery of that scheme themselves.

[19] Indeed, after it was announced in February 2008 that WWE would not be renewing its toy license with JAKKS, JAKKS' Senior Vice President of Investor Relations admitted that JAKKS "knew it was unlikely" that WWE would renew its license with JAKKS because of the dispute over the alleged bribery scheme.  *See* Kupillas Decl. Exh. F (*Consumer Electronics Daily*, "First Working UltiMotion Game System Shown by JAKKS at Toy Fair," Feb. 19, 2008) at 2.

material; instead, his ruling on this issue is now the law of the case and should not be disturbed.[20]

Second, the SAC alleges that, upon the disclosure of the bribery scheme, securities analysts opined that the existence of the alleged bribery scheme could make other companies hesitant to do business with JAKKS. *See* SAC ¶ 93. The fact that JAKKS might lose future business from companies other than WWE as a result of the bribery scheme would doubtless have been important to reasonable investors in JAKKS, and would have been part of the "total mix" of information affecting their decision whether to invest in JAKKS. *Basic*, 485 U.S. at 231-32.

Third, citing *Roeder v. Alpha Industries, Inc.*, 814 F.2d 22, 25-26 (1st Cir. 1987), Judge Karas held that "corporate bribery, even if small in amount, is material to an investor because it is relevant to competency of management and could hurt the business." Order at 10. Because corporate bribery is always material information to investors, the disclosure of JAKKS' bribery scheme was necessarily a disclosure of a material fact.

Therefore, regardless of whether the WWE Action posed any threat to JAKKS' revenues from the Licenses, there are numerous additional reasons why the existence of JAKKS' improper

---

[20] *See United States v. Tenzer*, 213 F.3d 34, 39 (2d Cir. 2000) (under the "law of the case" doctrine, a court must usually adhere "to its own decision at an earlier stage of the litigation") (internal quotations and citations omitted); *United States v. Stanley*, 54 F.3d 103, 108 (2d Cir. 1995) (courts should not depart from the "law of the case" doctrine absent "cogent" or "compelling" reasons); *In re MTC Electronic Techs. S'holder Litig.*, 74 F. Supp. 2d 276, 282 (E.D.N.Y. 1999) (the "law of the case" doctrine prevents parties from relitigating issues already decided by the court, even in the absence of explicit legal analysis of those issues). *See also* 1B Moore's Federal Practice para. 0.404 (although a judge may not be bound by the rulings of his predecessor, he also is not free to ignore them; a judge ordinarily should not overrule the decisions of a prior judge in the same case without good cause); *German v. Universal Oil Products Co.*, 77 F.2d 70, 73 (8th Cir. 1935) (the "law of the case" doctrine "has a substantial value in securing uniformity of decision, and discouraging repeated litigation of the same question").

and illicit bribery scheme would have been important to investors. Certainly, it cannot be said that the facts of the undisclosed bribery scheme were "so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *Ganino*, 228 F.3d at 162. Given the fact-intensive nature of the materiality determination, the question of whether the undisclosed bribery scheme would have been material to investors should be reserved for the trier of fact. *Press*, 166 F.3d at 538.

## V.    THE SAC ADEQUATELY ALLEGES SCIENTER

Judge Karas previously held that Plaintiffs plead facts in the CAC that were sufficient to allege that Defendants acted with the requisite scienter. Order at 36-37 ("Defendants 'knew or were highly unreasonable in not knowing that they were doing something illicit' when they withheld material information regarding the commercial bribery scheme while making public statements about the acquisition and renewal of the WWE licenses."). The allegations demonstrating Defendants' scienter have not changed from the CAC to the SAC; therefore, those allegations remain sufficient to allege a strong inference of scienter, and Judge Karas' ruling should remain the law of the case. *See Tenzer*, 213 F.3d at 39.

Defendants' only new argument against scienter is that "the absence of any materiality of the legally stale alleged bribery scheme negates, ipso facto, any possible claim that Defendants knew they had a duty to disclose these alleged payments and consciously or recklessly failed to do so." Def. Br. at 24. However, because the bribery scheme was material to investors, Defendants' argument against scienter must fail. As demonstrated in Section IV above, the alleged bribery scheme was material to investors for a number of reasons, and the dismissal of the WWE Action in December 2007 does not change the materiality of the bribery scheme to JAKKS investors in October 2004 (at the time the scheme was publicly disclosed).

As Judge Karas has already held, because the bribery scheme was material to investors at all times during the Class Period, and because JAKKS made numerous statements touting its long-term relationship with WWE as the means by which it procured and renewed the WWE Licenses, Defendants had an obvious duty to disclose the true facts of the bribery scheme to investors.  *See* Order at 18-19.  Defendants knowingly or recklessly violated that duty by withholding the true facts of the bribery scheme from investors.  *See* Order at 36-37.  Nothing more is needed to plead scienter.[21]

## CONCLUSION

For the reasons stated above, Plaintiffs respectfully request that the Court deny Defendants' motion in its entirety.[22]

Date:  July 21, 2008

**MILBERG LLP**

s/ Matthew A. Kupillas
Kirk E. Chapman (KC-7371)
Matthew A. Kupillas (MK-6428)
Todd Kammerman (TK-0601)
One Pennsylvania Plaza
New York, NY  10119-0165
Telephone: (212) 594-5300
Fax: (212) 868-1229
Email:  mkupillas@milberg.com

---

[21] *See In re Geopharma, Inc. Sec. Litig.*, 411 F. Supp. 2d 434, 446 (S.D.N.Y. 2006) (a failure to disclose material information may constitute recklessness "if there was an obvious duty to disclose that information"); *In re Initial Pub. Offering Sec. Litig.*, 241 F. Supp. 2d 281, 360 (S.D.N.Y. 2003) (failure to disclose material facts "in the face of an obvious duty to disclose" gives rise to a strong inference of scienter).  *See generally Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 127 S. Ct. 2499, 2504-05 (2007) (to qualify as "strong," an inference of scienter "must be cogent and at least as compelling as any opposing inference of nonfraudulent intent").

[22] Plaintiffs' believe that the SAC is adequate and should not be dismissed.  However, Defendants' protestations aside, should the Court dismiss the SAC due to curable pleading deficiencies, Plaintiffs respectfully request that the Court grant Plaintiffs leave to amend to correct any such deficiecies.  *See* Fed. R. Civ. P. 15(a)(2) ("The court should freely give leave [to amend] when justice so requires"); *Ronzani v. Sanofi S.A.*, 899 F.2d 195, 198 (2d Cir. 1990) ("When a motion to dismiss is granted, the usual practice is to grant leave to amend").

**COUGHLIN STOIA GELLER
RUDMAN & ROBBINS LLP**
Samuel H. Rudman (SR-7957)
David A. Rosenfeld (DR-7564)
Mark S. Reich (MR-4166)
58 South Service Road, Suite 200
Melville, NY 11747
Tel: (631) 367-7100
Fax: (631) 367-1173
Email: srudman@csgrr.com

*Attorneys for Lead Plaintiffs and the Class*

## CERTIFICATE OF SERVICE

I, Matthew A. Kupillas, hereby certify that on July 21, 2008, I caused a true and correct copy of the attached LEAD PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE SECOND CONSOLIDATED AMENDED COMPLAINT (i) to be filed with the Clerk of the Court using the CM/ECF system, which will send notifications of filing to the following CM/ECF participants:

| | |
|---|---|
| David Avi Rosenfeld | drosenfeld@csgrr.com |
| Eric James Belfi | ebelfi@labaton.com |
| Frederick Taylor Isquith , Sr | isquith@whafh.com |
| Gustavo Fabian Bruckner | Bruckner@whafh.com |
| Jonathan Honig | jhonig@fkiwsb.com |
| Jonathan J. Lerner | jlerner@skadden.com |
| Ken H. Chang | kchang@wolfpopper.com |
| Kirk E. Chapman | kchapman@milberg.com |
| Mario Alba , Jr | malba@csgrr.com |
| Mark Samuel Reich | mreich@csgrr.com |
| Michael Adam Schwartz | mschwartz@wolfpopper.com |
| Michael H. Gruenglas | mgruengl@skadden.com |
| Peter Edward Seidman | pseidman@milberg.com |
| Samuel Howard Rudman | srudman@csgrr.com |
| Sharon Maine Lee | slee@lchb.com |
| Todd Leslie Kammerman | tkammerman@milberg.com |
| William Edward Bernarduci | wbernarduci@snlaw.net, |

and (ii) to be served via first-class mail on the following counsel:

| | |
|---|---|
| Alfred G. Yates, Jr. | Marc A. Topaz |
| Gerald L. Rutledge | Richard A. Maniskas |
| 519 Allegheny Building | Schiffrin & Barroway, L.L.P. |
| 429 Forbes Avenue | Three Bala Plaza East |
| Pittsburgh, PA 15219 | Bala Cynwyd, PA 19004. |

s/ Matthew A. Kupillas
Matthew A. Kupillas (MK-6428)
Attorney for Lead Plaintiffs and the Class
MILBERG LLP
One Pennsylvania Plaza
New York, NY  10119-0165
Telephone: (212) 594-5300

Facsimile: (212) 868-1229
Email:  mkupillas@milberg.com

438228v2