**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

**IN RE JAKKS PACIFIC, INC. SHAREHOLDERS CLASS ACTION LITIGATION**

Case No. 04-CV-8807 (RJS)

<u>ECF CASE - Electronically Filed</u>

---

## <u>DECLARATION OF MATTHEW A. KUPILLAS</u>

I, Matthew A. Kupillas, declare as follows:

1.      I am a member of the bar of this Court and a member of the firm of Milberg LLP, co-lead counsel for Plaintiffs and the putative Class in the above-referenced action.  I respectfully submit this declaration in support of Plaintiffs' opposition to Defendants' motion to dismiss the Second Consolidated Amended Complaint.

2.      Attached hereto as Exhibit A is a true and correct copy of the Amended Complaint filed by World Wrestling Entertainment, Inc. in the case captioned *World Wrestling Entertainment v. JAKKS Pacific, Inc. et al.*, 04-cv-8223 (S.D.N.Y.).

3.      Attached hereto as Exhibit B is a true and correct copy of a press release issued on *Business Wire*, titled "World Wrestling Entertainment, Inc. Files Suit Against Jakks Pacific, Inc., THQ, Inc. and Related Defendants," dated October 19, 2004.

4.      Attached hereto as Exhibit C is a true and correct copy of an article from *Dow Jones Newswires*, titled "World Wrestling Entertainment, Inc. Files Suit Agaist Jakks Pacific, Inc., THQ, Inc. and Related Defendants," dated October 19, 2004.

5.      Attached hereto as Exhibit D is a true and correct copy of an article from *Reuters News*, titled "WWE Files Suit Against Jakks, THQ," dated October 19, 2004.

6.      Attached hereto as Exhibit E is a true and correct copy of the Form S-3/A

registration statement, dated December 13, 2004, filed by JAKKS Pacific, Inc. with the United

States Securities and Exchange Commission.

7.      Attached hereto as Exhibit E is a true and correct copy of an article from

*Consumer Electronics Daily*, titled "First Working UltiMotion Game System Shown by JAKKS

at Toy Fair," dated Feb. 19, 2008.

I declare under penalty of perjury that the foregoing is true and correct.


Executed on July 21, 2008 in New York, New York

                                        s/ Matthew A. Kupillas
                                        Matthew A. Kupillas (MK-6428)
                                        Attorney for Lead Plaintiffs and the Class
                                        MILBERG LLP
                                        One Pennsylvania Plaza
                                        New York, NY  10119-0165
                                        Telephone: (212) 549-5300
                                        Facsimile: (212) 868-1229
                                        Email:  mkupillas@milberg.com

## <u>CERTIFICATE OF SERVICE</u>

I, Matthew A. Kupillas, hereby certify that on July 21, 2008, I caused a true and correct copy of the attached DECLARATION OF MATTHEW A. KUPILLAS (i) to be filed with the Clerk of the Court using the CM/ECF system, which will send notifications of filing to the following CM/ECF participants:

| | |
|---|---|
| David Avi Rosenfeld | drosenfeld@csgrr.com |
| Eric James Belfi | ebelfi@labaton.com |
| Frederick Taylor Isquith , Sr | isquith@whafh.com |
| Gustavo Fabian Bruckner | Bruckner@whafh.com |
| Jonathan Honig | jhonig@fkiwsb.com |
| Jonathan J. Lerner | jlerner@skadden.com |
| Ken H. Chang | kchang@wolfpopper.com |
| Kirk E. Chapman | kchapman@milberg.com |
| Mario Alba , Jr | malba@csgrr.com |
| Mark Samuel Reich | mreich@csgrr.com |
| Michael Adam Schwartz | mschwartz@wolfpopper.com |
| Michael H. Gruenglas | mgruengl@skadden.com |
| Peter Edward Seidman | pseidman@milberg.com |
| Samuel Howard Rudman | srudman@csgrr.com |
| Sharon Maine Lee | slee@lchb.com |
| Todd Leslie Kammerman | tkammerman@milberg.com |
| William Edward Bernarduci | wbernarduci@snlaw.net, |

and (ii) to be served via first-class mail on the following counsel:

| | |
|---|---|
| Alfred G. Yates, Jr. | Marc A. Topaz |
| Gerald L. Rutledge | Richard A. Maniskas |
| 519 Allegheny Building | Schiffrin & Barroway, L.L.P. |
| 429 Forbes Avenue | Three Bala Plaza East |
| Pittsburgh, PA 15219 | Bala Cynwyd, PA 19004. |

<u>s/ Matthew A. Kupillas</u>
Matthew A. Kupillas (MK-6428)
Attorney for Lead Plaintiffs and the Class
MILBERG LLP
One Pennsylvania Plaza
New York, NY 10119-0165
Telephone: (212) 594-5300
Facsimile: (212) 868-1229
Email: mkupillas@milberg.com

440247v1

Eugene Licker (EL 0334)
KIRKPATRICK & LOCKHART NICHOLSON GRAHAM LLP
599 Lexington Avenue
New York, New York 10022-6030
(212) 536-3900 (phone)
(212) 536-3901 (fax)

Jerry S. McDevitt
Curtis B. Krasik
Amy L. Barrette
KIRKPATRICK & LOCKHART NICHOLSON GRAHAM LLP
Henry W. Oliver Building
535 Smithfield Street
Pittsburgh, Pennsylvania 15222
(412) 355-6500 (phone)
(412) 355-6501 (fax)

Attorneys for Plaintiff, World Wrestling Entertainment, Inc.


UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X    :
                                                                  :
WORLD WRESTLING ENTERTAINMENT, INC.,                              :
                                                                  :    04 CV 8223 (KMK)
                                        Plaintiff,                :
                                                                  :
            - against -                                           :
                                                                  :    **JURY TRIAL DEMANDED**
JAKKS PACIFIC, INC.; JAKKS PACIFIC (H.K.)                         :
LIMITED; ROAD CHAMPS LIMITED; THQ, INC.;                          :
THQ/JAKKS PACIFIC LLC; STANLEY SHENKER                            :
AND ASSOCIATES, INC.; STANLEY SHENKER;                            :
BELL LICENSING, LLC; JAMES BELL; JACK                             :
FRIEDMAN; STEPHEN BERMAN; JOEL                                    :
BENNETT; and BRIAN FARRELL,                                       :
                                                                  :
                                        Defendants.               :
                                                                  :
-------------------------------------------------------------X    :


**<u>AMENDED COMPLAINT</u>**

## Nature of the Action

1.      This action is brought to (a) recover damages caused to World Wrestling Entertainment, Inc. ("WWE") by the pattern of multifaceted racketeering activities set forth herein in connection with a scheme and artifice to defraud WWE by depriving WWE of the intangible right of honest services from WWE's intellectual property licensing agent and its management supervisor of that licensing agent, and to obtain thereby valuable toy licensing rights and a lucrative videogame license at lower than competitive royalty rates; (b) recover damages caused to WWE under the Sherman Act for the per se unlawful price fixing, bid rigging, and market allocation scheme set forth herein; (c) recover damages caused to WWE by the commercial bribery scheme set forth herein pursuant to the Robinson-Patman Act; (d) obtain a declaratory judgment that the videogame license between WWE and THQ/Jakks Pacific LLC ("THQ/Jakks") and toy licensing rights between WWE and Jakks Pacific, Inc. ("Jakks") are void as a result of the illegal activities set forth herein including, but not limited to, commercial bribery and/or inducing and participating in violations of fiduciary duties and the duty of honest services owed WWE by its licensing agent and supervising manager; (e) recover as damages the financial losses which will be associated with voiding the toy and videogame licenses; (f) obtain disgorgement of all profits earned by Defendants as a result of their illegal conduct set forth herein; and (g) recover punitive and other damages for the conduct set forth herein.

2.      The licenses at issue herein were and are extremely lucrative licenses which were expected to and did produce millions of dollars in profits to the licensees.  THQ, Inc. ("THQ") and Jakks are two publicly traded companies whose stock valuations were expected to increase if the revenues from the videogame license and toy licensing rights could be secured.

3.      At all times relevant hereto, Defendants Jack Friedman, Stephen Berman and Joel Bennett were the highest ranking executives of Jakks.  Individually and collectively, they were and are in a position to control the affairs of Jakks and foreign subsidiaries owned by Jakks which were used to both implement and conceal certain aspects of the illegal conduct set forth herein.

4.      At all times relevant hereto, Defendant Brian Farrell was the highest ranking executive of THQ and was and is in a position to control the affairs of THQ.

5.      At all times relevant hereto, Defendants Friedman, Berman, Bennett and Farrell were officers of THQ/Jakks and/or otherwise were and are in a position to control the affairs of THQ/Jakks.

6.      At all times relevant hereto, Defendants Friedman, Berman and Bennett realized they would recognize several million dollars in personal profits as a result of stock ownership and options in Jakks if the videogame license and toy licensing rights were secured.

7.      At all times relevant hereto, Defendant Farrell realized he would recognize several million dollars in personal profits as a result of stock ownership and options in THQ if the revenues associated with WWE's videogame license were secured.

8.      Defendants have acted in concert through the years to conceal the unlawful conduct set forth herein by a variety of tactics to prevent WWE from discovering their illegal conduct through reasonable diligence, including concealing the relationship between Jakks and WWE's licensing agent and management supervisor, laundering commercial bribes paid to WWE's licensing agent and management supervisor through foreign corporations and bank accounts, falsification of corporate accounting records, collusive and serial perjury by certain of the Defendants in a state court proceeding, destruction of physical evidence, falsification of

physical evidence, incomplete and knowingly false responses to subpoenas duces tecum, false denials that any payments had been made to WWE's licensing agents when requested by WWE to disclose such payments, and by agreements designed to prevent WWE from learning the true set of facts involved in the bidding process for the videogame license.

<u>The Parties</u>

9.     Plaintiff, World Wrestling Entertainment, Inc. ("WWE"), is a Delaware corporation having its principal place of business at 1241 East Main Street, Stamford, Connecticut 06902.  WWE is an integrated media and entertainment company principally engaged in the development, promotion and marketing of television programming, pay-per-view programming and live arena events.  In the process, WWE creates colorful characters and personas whose names and likenesses can be licensed to third parties, such as Jakks and THQ.

10.     Defendant Jakks Pacific, Inc. ("Jakks") is a Delaware corporation with its principal place of business at 22619 Pacific Coast Highway, Suite 250, Malibu, California 90265.  Jakks is primarily in the business of selling action figures and toys.  In connection with WWE's videogame license, Jakks was a competitor of several companies with an interest in obtaining that license, including Acclaim, THQ and Activision.  In connection with that aspect of the illegal conduct set forth herein relating to the videogame license, Jakks acted on its own behalf and then also on behalf of THQ and THQ/Jakks, and has benefited greatly from the illegal conduct set forth herein.  Jakks owns and/or controls Road Champs Limited and Jakks Pacific (H.K.) Limited, two entities utilized by Jakks to effectuate the commercial bribes set forth herein.

11.     Defendant Jakks Pacific (H.K.) Limited ("Jakks Pacific (H.K.)") is a corporation organized under the laws of Hong Kong.  The owners of Jakks Pacific (H.K.) are Defendants

Friedman, who owns 1 of 1,000 outstanding shares, and Jakks Pacific, Inc., which owns 999 of

1,000 outstanding shares.  Defendants Friedman and Berman are directors of Jakks Pacific

(H.K.).

12.     Road Champs Limited ("Road Champs Ltd.") is a corporation organized under

the laws of Hong Kong.  The owners of Road Champs Ltd. are Defendants Friedman, who owns

1 of 300 outstanding shares, and Road Champs, Inc., which owns 299 of 300 outstanding shares.

Road Champs, Inc. is a wholly owned subsidiary of Jakks Pacific, Inc.  Defendants Friedman

and Berman are directors of Road Champs Ltd.

13.     Defendant Jack Friedman ("Friedman") is an individual who resides at 6351

Kanan Dume Road, Malibu, California 90265.  At all times relevant hereto, Friedman was the

highest-ranking executive at Jakks and served, and continues to serve, as Chief Executive Officer

and Chairman of the Board of Directors of Jakks.  Together with Defendant Berman, Friedman

co-founded Jakks in or about January 1995.

14.     Until January 20, 1995, Friedman had served as President, Chief Executive

Officer and as a Director of THQ's predecessor.  On January 20, 1995, in a document executed

on behalf of THQ's predecessor by Defendant Farrell, it was agreed that it was in the mutual best

interests of Friedman and THQ's predecessor that Friedman resign from each of the

aforementioned positions.

15.     Defendant Stephen Berman ("Berman") is an individual who resides at 27465

East Winding Way, Malibu, California 90265.  During a portion of the period covered by this

Amended Complaint, Berman served as an Executive Vice President of Jakks.  Since January 1,

1999, Berman has served as President, Secretary, and Chief Operating Officer of Jakks and

served, and continues to serve, on the Board of Directors of Jakks.  On information and belief,

prior to co-founding Jakks with Friedman, Berman was a Vice President and Managing Director of THQ International, Inc., a subsidiary of THQ.

16.    Defendant Joel Bennett ("Bennett") is an individual who resides at 6791 Trevino Drive, Moorpark, California 93021.  At all times relevant hereto, Bennett was the Chief Financial Officer of Jakks.

17.    Defendant THQ, Inc. ("THQ") is a Delaware corporation with its principal place of business at 27001 Agoura Road, Suite 325, Calabasas Hills, California 91301.  THQ is in the business of videogame marketing and sales.  THQ authorized Jakks to act on its behalf in order to secure the benefits of a videogame license with WWE and/or has ratified the actions of Jakks and its officers set forth herein.  As a result of its knowing and willing participation in the illegal conduct set forth herein, THQ has benefited greatly from the illegal conduct set forth herein.

18.    Defendant Brian Farrell is an individual who resides at 474 Lake Sherwood Drive, Lake Sherwood, California 91361.  At all times relevant hereto, Farrell was the President and Chief Executive Officer of THQ and a member of the Board of Directors of THQ.  Farrell has served as Chairman of the Board of Directors of THQ since at least August 21, 2001.

19.    Defendant THQ/Jakks Pacific LLC ("THQ/Jakks") is a Delaware limited liability corporation having its principal place of business at 22761 Pacific Coast Highway, Suite 226, Malibu, California 90265.  THQ/Jakks was formed on June 10, 1998 as part of the illegal conduct set forth herein by Jakks and THQ to be the official licensee for WWE's videogame license.  Defendant Berman signed the Certificate of Formation as an authorized person on behalf of THQ/Jakks.  THQ and Jakks each own 50% of THQ/Jakks and have agreements in place detailing the manner in which proceeds from the WWE videogame license will be accounted for and ultimately distributed between THQ and Jakks.  All actions alleged herein

taken by Jakks and/or THQ after June 10, 1998 in regard to the videogame license were with the authority of THQ/Jakks, which has also ratified those actions.

20.     Defendant Stanley Shenker & Associates, Inc. ("SSAI") is a New York corporation with its principal place of business at 25 Van Zant Street, Norwalk, Connecticut 06855.  SSAI was WWE's licensing agent from in or around April 1995 through June 13, 2000.

21.     Defendant Stanley Shenker ("Shenker") is an individual who resides in New Canaan, Connecticut.  Shenker is, and at all times relevant hereto has been, the President and sole owner of SSAI.  At all times relevant hereto, Shenker was also the sole owner and alter ego of a foreign corporation known as Stanfull Industrial, Ltd. ("Stanfull") in Hong Kong.  Shenker utilized Stanfull for a variety of criminal and fraudulent purposes, including as a money-laundering device to conceal the receipt and payment of bribes and kickbacks, including commercial bribes paid by Jakks utilizing foreign subsidiaries that Jakks owned and/or controlled.

22.     Defendant Bell Licensing, LLC ("Bell Licensing") is a limited liability company under the laws of Connecticut with its principal place of business located at 405 Silver Creek Lane, Norwalk, Connecticut 06850.  Bell Licensing was originally formed as Bell Consulting, LLC in or about March 6, 1998 to be a receptacle for bribes paid to Bell to influence him while serving as an executive and fiduciary of WWE, including, but not limited to, the bribes paid to him in connection with the illegal conduct described herein.  On or about July 18, 2002, Bell Consulting, LLC changed its name to Bell Licensing, LLC.

23.     Defendant James Bell ("Bell") is an individual who resides in Norwalk, Connecticut.  Bell is, and at all times relevant hereto has been, the President and sole owner of Bell Licensing.  At all times relevant hereto, Bell utilized Bell Licensing as a money-laundering

device to conceal the receipt of bribes and kickbacks, including payments from SSAI, Shenker, Stanfull and Jakks.

24.    On February 10, 2005, after the original Complaint in this matter was filed, Bell waived indictment and plead guilty in an ongoing investigation to a Criminal Information in United States District Court for the District of Connecticut to a single count of mail fraud in violation of 18 U.S.C. § 1341 in connection with Bell's receipt of bribes relating to WWE's licensing program.  In a Stipulation of Offense Conduct accompanying his plea, Bell admitted that "beginning in or before January 1998, and continuing through October 2000, in the District of Connecticut and elsewhere, JAMES K. BELL . . . and others known and unknown to the United States Attorney, did devise a scheme and artifice to defraud WWE, including depriving WWE of the intangible right of honest services, and to obtain money and property from WWE through materially false and fraudulent pretenses and representations."

25.    Bell's stipulation specifically inculpates SSAI and Shenker in the illegal scheme which began "in or before January 1998."

26.    The illegal conduct set forth herein with respect to Bell occurred in the time frame that Bell has now judicially admitted to being a corrupt fiduciary of WWE.  Indeed, the very first illegal payment to Bell for violating his duty of honest services to WWE was a payment of monies originating with Jakks in January 1998.  That first payment for corrupt services to Bell was laundered by Jakks through foreign subsidiaries and into a foreign bank account controlled by Shenker, who then split the money equally with Bell.

<u>Jurisdiction and Venue</u>

27.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1337 and 15 U.S.C. § 15(a) because WWE has alleged claims arising

under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962, the Robinson-Patman Act, 15 U.S.C. § 13 *et seq*, and the Sherman Act, 15 U.S.C. § 1.  This Court may exercise supplemental jurisdiction over WWE's state law claims pursuant to 28 U.S.C. § 1367.

28.    Venue is proper under 28 U.S.C. § 1391(b)(2) and/or (b)(3), 15 U.S.C. § 15 and 15 U.S.C. § 22 because Defendants are found in this district, transact business in this district, are inhabitants of, and/or have an agent in this district.

<div align="center">THE ILLEGAL CONDUCT</div>

<div align="center">WWE Hires Bell and SSAI</div>

29.    In or around March 1995, WWE hired Bell as its Director of Domestic Licensing. In October 1996, Bell became Senior Vice President of Licensing and Merchandising, a position he held until his termination on March 24, 2000.

30.    As Senior Vice President of Licensing and Merchandising, Bell occupied a fiduciary position and was responsible for, among other things:  (i) procuring licensees for WWE at competitive market royalty rates; (ii) negotiating license agreements between WWE and potential licensees to obtain for WWE, *inter alia*, the highest royalty rates available in a competitive market; (iii) managing WWE's licensing arrangements with its licensees; and (iv) all other activities necessary and/or attendant to the development and maintenance of WWE's licensing program.  Pursuant to WWE's licensing program, licensees were granted the right to utilize WWE intellectual property in connection with the licensees' own goods and/or services.

31.    Shortly after securing his position, Bell urged WWE to hire SSAI as an outside licensing agent, touting to WWE Shenker's reported extensive experience and contacts in the licensing business.  For at least ten years prior to Bell's introduction of Shenker to WWE in April 1995, Bell and Shenker had maintained both a business and personal relationship.

32.     On Bell's recommendation, WWE retained SSAI in or around April 1995 originally as a nonexclusive outside licensing agent.  As such, SSAI was to procure and negotiate licensing contracts by utilizing Shenker's alleged contacts in the licensing business.  Bell was responsible to supervise SSAI in its licensing endeavors and remained responsible to generate licenses for WWE using his own contacts and by negotiating with prospective licensees who contacted WWE directly.

33.     As a result of their respective positions, Bell, Shenker and SSAI occupied positions of trust and of a fiduciary nature to WWE.  During the course of their relationship with WWE, SSAI and Bell both entered into agreements with WWE reflecting and acknowledging their fiduciary roles and unique positions of trust.

34.     On March 2, 1995, Bell executed a Code of Conduct Agreement wherein he agreed, among other things, that he would not:

     a.      accept fees, commissions, or property in connection with any transaction on behalf of WWE;

     b.      accept or offer unauthorized or illegal payments;

     c.      use his position directly or indirectly for personal or financial gain;

     d.      personally take advantage of business opportunities which might be of interest to WWE; and

     e.      serve as an officer, director, employee, consultant or promoter of for-profit organizations without WWE's prior approval.

<u>Jakks Obtains Domestic Toy License</u>

35.     After SSAI agreed to be WWE's nonexclusive licensing agent, Friedman approached both Bell and Shenker at the annual New York Toy Fair inquiring whether Jakks

could obtain a toy license from WWE.  Bell and Shenker subsequently presented a deal memo to WWE indicating SSAI had procured and negotiated the terms of a toy license with Jakks.  On or about October 24, 1995, WWE entered into a domestic toy license with Jakks.  The term of the original domestic license was to end on December 31, 1997 with a one-year right to renew if Jakks achieved certain financial requirements.

36.    Pursuant to the terms of the domestic toy license, WWE granted to Jakks the right to use the intellectual property of WWE on goods manufactured for sale to the public, specifically "6 [inch] action figures, rings for the action figures, playsets for action figures, [and] action figures with sound and microphone."

### SSAI's/Shenker's Undisclosed Agency Relationship with Jakks

37.    Shortly after the domestic toy license was entered into, and unknown to WWE, but known to Jakks, Jakks personnel devised a plan to corrupt Shenker by trading on Shenker's lack of ethics and greed.

38.    Unknown to WWE, and undisclosed by SSAI, Shenker and Jakks, Shenker entered into financial transactions with Jakks soon after the domestic toy license was entered into wherein he agreed to represent Jakks' interests at the same time he continued to act as WWE's agent on licensing matters involving Jakks.

39.    Within a month of signing the domestic toy license, and fully recognizing that it would be seeking further and additional licensing rights from WWE through SSAI and Shenker, Jakks secretly began negotiations with Shenker to have him perform services on its behalf.

40.    Jakks' early efforts to corrupt Shenker as an agent were initiated by Berman on behalf of Jakks, who, as early as November 20, 1995, less than a month after the domestic toy license was executed, initiated discussions to have Shenker serve as Jakks' agent.

41.    Soon after letting Shenker know that there was money to be made working for Jakks, Berman told Shenker that Jakks desired to secure additional licensing rights from WWE through Shenker.  Shenker agreed to seek such additional rights on behalf of Jakks from WWE.

42.    In late November 1995, Berman continued to link financial rewards from Jakks to its desire to secure additional rights from WWE through Shenker, telling Shenker that a contract would be forthcoming for Shenker to be Jakks' agent regarding a perfumed doll product to be developed.  At the same time, Berman advised Shenker that he and Friedman wanted Shenker's assistance in securing additional WWE licensing rights.

43.    Unknown to WWE at the time, Shenker was neither a reputable man nor successful licensing agent.  As of the time Jakks began its efforts to compromise Shenker's loyalties, he was on the verge of personal bankruptcy and willing to abandon ethical and legal standards governing his duties as an agent for money.  On December 29, 1995, Shenker filed for bankruptcy in federal court in New Jersey without disclosing to WWE that he had done so.  In his bankruptcy petition, Shenker indicated he had no cash on hand; no income; that he was 100% owner of SSAI; that SSAI had no assets and no receivables; that he was over $70,000 in debt to unsecured creditors; and he had approximately $30,000 in secured indebtedness.

44.    On January 3, 1996, Jakks, with the knowledge of Berman and others at Jakks, transmitted by mail to Shenker a proposed agreement whereby Shenker would, in fact, act as Jakks' agent with respect to the perfumed doll product.  In the covering letter transmitting the contract, Jakks continued to trade on the undisclosed conflict of interest it was creating by asking Shenker how soon he could get the domestic toy license with WWE amended to include additional rights.

45.     At no time did Jakks, Friedman, Berman, Bennett, SSAI or Shenker ever disclose to WWE that Jakks was paying Shenker and using him as its agent during the time it was soliciting Shenker to use his status as WWE's licensing agent to obtain additional and valuable licensing rights for Jakks from WWE.

46.     On or about January 3, 1996, Jakks, through Berman, and SSAI entered into a formal contract whereby SSAI agreed to act as Jakks' agent on the perfumed doll deal. In the contract, Jakks promised Shenker a $5,000 nonrefundable advance against future royalties and a percentage of sales of the future product.

47.     In or around the same time that Jakks and SSAI entered into a contract for Shenker to be Jakks' agent on the perfumed doll toy, Friedman and Berman told Shenker that Jakks desired to secure other rights from WWE in the future, including the WWE videogame license. Friedman and/or Berman told Shenker that they wanted him to be Jakks' agent specifically to assist it in acquiring WWE's videogame license notwithstanding that he was known to be an agent of WWE.

48.     On or about February 12, 1996, Jakks paid SSAI $2,500 in connection with Shenker's work as its agent on the perfumed doll deal. The check was drawn on Jakks' corporate account at Bank of America.

49.     The conversation discussing Jakks' desire to retain Shenker to act as its agent on WWE matters occurred two days later at the annual New York Toy Fair on February 14, 1996.

50.     During the conversation regarding Shenker serving as Jakks' agent on WWE matters at the same time he was WWE's agent, a call was placed by Friedman, Berman and Shenker to Mr. Murray Skala, Jakks' outside legal counsel, a member of the Board of Directors of Jakks, and Friedman's personal friend and confidant, regarding the proposed arrangement.

Mr. Skala advised all participants in the call that it would be a conflict of interest for Shenker to serve as Jakks' agent on WWE matters at the same time Shenker was acting as WWE's agent and that such an arrangement could not be done legally without first making full disclosure to WWE and obtaining their consent.

51.     Following the conversation with Jakks' corporate counsel on February 14, 1996, neither Friedman, Berman, Shenker, SSAI nor Jakks disclosed the conversation, or Shenker's then existing position as an agent for Jakks, to WWE nor sought its consent to the relationship or the inherent conflict of interest.  On information and belief, all three men did not disclose the conversation, or the then-existing relationship between Jakks and Shenker, because they knew WWE would not agree to such an obvious conflict of interest.

52.     During the time period that Jakks was corrupting Shenker, competition in the toy industry was intense between companies seeking valuable intellectual property licenses such as WWE.  By corrupting WWE's licensing agent, Jakks knew it could avoid fairly competing for intellectual property rights by trading on the conflicting loyalties of Shenker and SSAI, a business method it utilized and refined thereafter as set forth herein.

53.     Despite knowledge of the impropriety of trading on conflicts of interest, Friedman, Berman and Jakks continued to do so.

54.     Indeed, on February 14, 1996, the same date as the aforementioned conversation with Mr. Skala, Friedman and Berman nonetheless solicited Shenker to obtain additional rights for Jakks from WWE in connection with the domestic toy license to permit Jakks to license disposable cameras and photo albums, as well as European distribution rights for certain WWE figures.

55.    On March 15, 1996, Friedman again solicited Shenker to have the Jakks domestic toy license amended as Shenker had agreed to do.

56.    On or about April 22, 1996, upon SSAI's and Shenker's recommendation, a First Amendment to the domestic toy license was signed granting Jakks the additional rights sought by Jakks.  In what would become a pattern, Shenker made no attempt to negotiate better terms for WWE and recommended the additional rights be given to Jakks on the terms offered by Jakks and without determining if competitors of Jakks would pay more for the rights.  At no time did Jakks, Berman, Friedman, SSAI or Shenker disclose to WWE that Jakks had sought the rights through Shenker while at the same time paying him monies to be its agent.

<u>Jakks' Utilization of Shenker to Eliminate Competition</u>

57.    Having utilized Shenker to secure rights for Jakks on its terms while serving as an undisclosed agent of Jakks, Jakks then utilized Shenker to perform additional and further corrupt acts in violation of his fiduciary duties to WWE and obligation of honest services to WWE.

58.    In 1996, Playmates Toys, Inc. ("Playmates") was one of the top three competitors of Jakks with respect to action figures, and the competitive environment among toy companies seeking intellectual property licenses was intense.  Rather than compete fairly, Jakks utilized its undisclosed relationship with Shenker to drive competition out of the WWE toy market and prevent competition for the videogame license it so fervently desired.

59.    In or around June 1996, WWE entered into an agreement with Playmates granting to Playmates the right to use WWE intellectual property in connection with the sale of goods, including for use in connection with action figures from 8 inches and up in size and mini-figures from 2 inches and under.  As such, Playmates would be manufacturing goods competing with those made by Jakks and in fact had the only right to make miniature toy figures of WWE talent.

60.     Under the terms of the agreement, Playmates guaranteed WWE $750,000 payable on a schedule set forth in the agreement, with $150,000 of the guarantee payable upon execution of the agreement.  Playmates made the $150,000 payment on or about June 20, 1996.

61.     The agreement with Playmates further provided that Playmates would have a right of first negotiation/last refusal to manufacture licensed products for distribution in countries outside the United States, its territories and possessions, Mexico and the U.K.  As such, Playmates stood to become the first licensee of action figures in international markets.  Jakks had no such right of first negotiation/last refusal in its domestic toy license.

62.     Jakks' officers, including Friedman and Berman, did not want competition in the domestic marketplace from others licensed to make WWE action figures, and were concerned that Playmates might be the first to be given international rights.  Jakks' officers expressed their dissatisfaction with Shenker that Playmates had been given such rights, and devised a plan in concert with SSAI and Shenker, again trading on their undisclosed agency relationship, whereby SSAI and Shenker would (a) take all actions desired by Jakks to foreclose competition in licensing areas desired by Jakks, including action figures and the videogame license; (b) obtain licensing rights for Jakks which, when granted, would facilitate Jakks' desire to drive Playmates out of the business of WWE action figures; (c) accept monies for favorable treatment on licensing matters involving Jakks which would be laundered through foreign subsidiaries of Jakks to a foreign bank account controlled by Shenker; and (d) pay Bell if need be for his participation in the illegal conduct.

63.     After learning of the Playmates deal with WWE, and to implement their illicit agreement, Berman, as Chief Operating Officer of Jakks Pacific, Inc., on stationery of Jakks (H.K.) Limited, directed two memoranda to Shenker on October 19, 1996.  The intent and

purpose of both memos was to have Shenker utilize his influence as WWE's agent to obtain

rights in practical conflict with the domestic rights previously granted to Playmates in order to

make it impossible for Playmates to effectively exploit the rights it had been granted and to gain

rights in international markets before Playmates did so.

64.     In the first of his October 19, 1996 memos to Shenker, Berman instructed Shenker

to obtain modifications to the domestic toy license to grant rights to Jakks to make 3-inch action

figures and 7-inch action figures, an action which would allow Jakks to sell miniature action toys

in direct competition with Playmates.

65.     In a second memo to Shenker of October 19, 1996, Berman instructed Shenker to

obtain international rights for Jakks for 6-inch action figures, 3-inch action figures, and 7-inch

action figures.

66.     In both October 19, 1996 memos, Berman advised Shenker of the terms Jakks

desired for the grant of such additional rights.

Jakks Obtains Second Amendment to Toy License and an International Toy License

67.     On January 21, 1997, and on SSAI's and Shenker's recommendation made on the

basis of his illicit agreement with Jakks, a Second Amendment to the domestic toy license was

executed in the manner sought by Berman in one of his October 19, 1996 memos.  The term of

the license was also extended through December 31, 1999.  Despite the increase in rights being

granted to Jakks, Shenker once again made no attempt to negotiate better terms than the terms

Berman established in his October 19, 1996 communication to Shenker and simply

recommended those terms to WWE.  Neither the conflict of interest created by Jakks nor the true

purpose of the amendment was disclosed to WWE.

68.     On January 29, 1997, Jakks issued a press release announcing what it termed the expansion of the product line covered by the domestic toy license.  The additional products noted in the release included the miniatures.

69.     Upon reading Jakks' press release, Playmates immediately expressed concern with Shenker.

70.     On January 30, 1997, Playmates directed a letter to Bell, with a copy to Shenker, regarding Jakks' press release of January 29, 1997 and questioned the good faith of WWE for granting rights to Jakks to effectively make the same product as Playmates.  Playmates accused WWE of not acting in good faith to allow two competing companies to market such similar toy lines.

71.     On or about February 10, 1997, and on the recommendation of Shenker and SSAI, WWE and Jakks entered into an international toy license having a term which was to end on December 31, 1999.  As had been done with the Second Amendment to the domestic toy license, the terms were those sought by Jakks, and Shenker made no attempt to negotiate better terms than the terms indicated by Berman in his October 19, 1996 communication to Shenker.  Once again, neither the conflict of interest nor the true purpose of the recommendation to grant international rights to Jakks was disclosed to WWE.

### WWE Retains SSAI as Exclusive Outside Licensing Agent

72.     On March 7, 1997, WWE and SSAI entered into an agreement (the "Agency Agreement") pursuant to which SSAI became WWE's exclusive outside licensing agent.

73.     WWE entered into the Agency Agreement with SSAI without knowledge of the acute improprieties between Jakks and SSAI and Shenker which had occurred and were then occurring, all of which was concealed from WWE.

74.     The Agency Agreement provided that the services thereunder would be performed specifically and primarily by Shenker personally.  At the time it entered into the March 7, 1997 Agency Agreement with SSAI, WWE did not know that Shenker had been serving as Jakks' agent, did not know of the discussions between Jakks' executives and Shenker aimed at having him be Jakks' agent on WWE matters at the same time Jakks knew he was WWE's agent, and did not know of Shenker's illicit agreement with Jakks to act favorably on Jakks licensing matters.  WWE also did not know that Shenker had already secured two amendments to the domestic toy license and the international toy license for Jakks while serving as their undisclosed agent, and did not know of the dishonest purpose of Shenker's recommendations.

75.     Under the contract to be WWE's exclusive outside licensing agent, SSAI was responsible for, *inter alia*, procuring potential licensees and negotiating the terms of prospective licenses to obtain for WWE, *inter alia*, the most favorable terms existing in the market.  SSAI was not, however, granted any right to accept licensing proposals or to execute particular agreements on behalf of WWE.  Instead, SSAI was to present all licensing proposals it procured and negotiated in deal memo format to Bell, who in turn would recommend to WWE whether to accept the proposal.

76.     In recognition of the fiduciary duties owed WWE by SSAI and Shenker, the Agency Agreement provided that WWE had the right to terminate the Agency Agreement if SSAI or Shenker "engages in any act of fraud, theft, deceit, [or] unethical conduct."  The Agency Agreement further provided that if SSAI were terminated for such reasons that it would not be entitled to any further commissions.

77.     In consideration of the services rendered under the Agency Agreement, SSAI was to receive a commission of eleven percent (11%) of royalties and other consideration paid to

WWE with respect to licensing deals specifically negotiated and procured by SSAI which were accepted by WWE. SSAI was not to receive commissions on licensing deals procured and negotiated by Bell, who remained responsible to generate licensing deals using his own contacts and with prospective licensees who contacted WWE.

78.      Under the March 7, 1997 Agency Agreement, SSAI also was not entitled to commissions on royalties paid to WWE with respect to, *inter alia*, licenses granted by WWE prior to the commencement of the Agency Agreement. The licenses on which SSAI was not entitled to receive commissions were listed on an Exhibit A to the Agency Agreement. One such license on which SSAI was not entitled to receive commissions was WWE's preexisting videogame license with Acclaim. At the time SSAI entered into the March 7, 1997 Agency Agreement, Acclaim was WWE's exclusive licensee for the manufacture and sale of videogames utilizing WWE intellectual property.

The Continuation of the Scheme to Eliminate Playmates and Obtain the Videogame License

79.      In response to the complaints of Playmates made in January of 1997 over the conflicting grant of rights to Jakks, Shenker, after securing the March 7, 1997 Agency Agreement, continued his efforts to assist Jakks in driving Playmates out of the business of WWE action figures. Pursuant to his secretive plan with Jakks, Shenker advised Bell on April 25, 1997 that Jakks was a preferable licensee to Playmates and suggested to Bell that the solution to Playmates' complaints was to have "Jakks buy them out" and shut Playmates out of any promotions or assistance.

80.      In 1997, and while the Playmates dispute was ongoing, Bell realized that his marriage was in trouble and at various times thereafter expressed concern to Shenker of potential financial ruin. Shenker, pursuant to his illicit plan with Jakks, advised Bell that there was money

to be made by Bell for favorable treatment of the licensing rights being sought for Jakks by SSAI

and Shenker, including with respect to the plan to eliminate competition by having Jakks buy out

Playmates, and for favorable treatment to Jakks in connection with its desire to obtain the

videogame license.

81.     In order to induce Bell to violate his fiduciary duties and duty of honest services,

and in furtherance of his illicit agreement with Jakks to obtain favorable treatment of licensing

matters involving Jakks, Shenker promised Bell that monies would be forthcoming originating

directly from Jakks for such favorable treatment which he would split with Bell, and that SSAI

would split commissions with Bell on the videogame license if Bell went along with the illegal

plan to see to it that it was awarded to Jakks.

82.     In response, Bell agreed to the corrupt plan to give favorable treatment to Jakks

on licensing matters and to violate his fiduciary duties and duty of honest services to WWE in

order to do so.

83.     On November 6, 1997, and without disclosure to WWE of the illegal plan and

scheme then in place, Bell advised Playmates that WWE would absolve Playmates of the

obligation of its guarantee to WWE if Playmates would give up its rights in order that those

rights could be transferred to Jakks.  The effect of this proposal, which was accepted by

Playmates, was to deny WWE $376,391.64 left to be paid by Playmates to WWE on their

guarantee, as well as royalties over and above the guarantee.

84.     In order to obtain the funds needed to pay the bribes it had agreed to pay for

favorable treatment on licensing matters, Jakks, through Friedman and/or Berman and/or

Bennett, together with Shenker, devised a scheme to conceal the true purpose of the payments, as

well as the fact of the payments, by the artifice of a phony invoice which would be paid by

Jakks' foreign subsidiaries to Shenker's foreign bank account in the name of Stanfull. A central aspect of the scheme was that no records of the payments would exist on Jakks financial records in America.

85.     At the direction of Defendants Friedman and/or Berman, and pursuant to their illicit agreement, Shenker caused to be delivered a handwritten invoice from his foreign corporation, Stanfull, to Jakks' corporate headquarters in California for $80,000 on or about January 2, 1998. The cursory description contained on the invoice stated that Jakks was being billed "For Development of Possible Latex Based Soft Toys with Special Coatings," was dated January 2, 1998, and stated it was "Payable Immediately." On the invoice, Shenker directed that the payment be made to Stanfull's account at the Hang Seng Bank in Hong Kong. A true and correct copy of the invoice is attached hereto as Exhibit 1.

86.     The January 2, 1998 invoice was a false and fraudulent invoice, known to be by all concerned, and was merely a conduit to secure corporate funds for Jakks to pay commercial bribes and otherwise continue to buy influence with and further corrupt WWE's agents. No contract existed between Jakks and Stanfull or Shenker for the development of latex based soft toys, and neither Shenker nor Stanfull ever developed or delivered any such toys to Jakks pursuant to the January 2, 1998 invoice. Aside from the invoice itself, there is not a shred of backup or documentary evidence supporting the charges nor any other evidence of any kind verifying that Shenker ever developed latex based soft toys for Jakks paid for by the invoice.

87.     Upon receipt of the January 2, 1998 invoice, Jakks did not record the invoice, nor any of the ensuing steps it took to pay the invoice, on the financial books and records of the American parent company to which the invoice had been delivered, even though the invoice purported to be, and was, payable by Jakks and not one of its foreign subsidiaries.

88.    In January of 1998, the internal financial controls of Jakks known to and implemented by Bennett as the Chief Financial Officer required the corporate official authorizing payment of an invoice to sign and approve the invoice.

89.    The January 2, 1998 invoice of Stanfull was not signed by the corporate official authorizing payment in the first of many steps designed to conceal the personal involvement of Friedman and/or Berman in the scheme.

90.    In January 1998, after delivering the $80,000 invoice to Jakks, Shenker attended the Hong Kong Toy Show.  While there, he met with Berman and further discussed their illegal plan to obtain favorable treatment on Jakks licensing matters, including Bell's agreement to participate in it.

91.    During the Hong Kong Toy Show in early January 1998, Berman and Shenker telephoned Bell to confirm Bell's participation in the illegal plan and to inquire as to when the rights owned by Playmates would be transferred to Jakks.

92.    Bell confirmed his participation in the illegal plan and that he would convince WWE management to transfer the rights formerly held by Playmates to Jakks.

93.    On January 12, 1998, on the recommendation of Shenker, SSAI and Bell, Linda McMahon, President and Chief Executive Officer of WWE, executed the Third Amendment to the domestic toy license granting to Jakks the rights formerly held by Playmates.

94.    On that same date, January 12, 1998, acting on the direction of Friedman and/or Berman, Bennett, the Chief Financial Officer of Jakks, rather than paying the invoice from available funds of the American parent corporation, advised an overseas agent of Jakks to arrange for the payment of $40,000 to Stanfull pursuant to the $80,000 invoice Shenker had delivered on January 2, 1998.

95.     On or about January 14, 1998, acting upon the direction of Bennett, $40,000 was, in fact, paid to Stanfull via a series of transactions undertaken with the intent to conceal the transactions and bury them in fraudulent accounting of foreign corporations owned by Jakks and bank accounts of those foreign subsidiaries.

96.     On January 14, 1998, $40,000 was withdrawn from an account at the Hang Seng Bank in Hong Kong of Road Champs Ltd.  The $40,000 was deposited that same day into Stanfull's bank account at the Hang Seng Bank.

97.     On January 14, 1998, the same day that the Jakks monies were deposited into Stanfull's account, Shenker, acting in concert with Jakks to conceal the disposition of the monies, and with the intent of carrying out the plan to induce Bell to violate his fiduciary duties and duty of honest services, obtained a demand draft for $20,000 payable to James Bell from the Hang Seng Bank, which he subsequently gave to Bell upon returning to the United States, thereby splitting the money from Jakks equally with Bell.

98.     At or around the same time Road Champs Ltd. paid the $40,000 to Stanfull, another foreign subsidiary owned and/or controlled by Jakks known as Jakks Pacific (H.K.) sent $40,000 by wire-transfer to Road Champs Ltd. to reimburse Road Champs Ltd. for the $40,000 paid to Stanfull.

99.     The general ledgers of Road Champs Ltd. were then falsified to conceal completely the payment to Stanfull.  Instead of recording the payment to Stanfull on the general ledger of Road Champs Ltd., the accounting entries made it appear as if the transaction was simply the intercorporate transfer of monies from Jakks Pacific (H.K.) to Road Champs Ltd., with no mention made on the ledger of the payment to Stanfull.

Shenker Returns from Hong Kong to Secure the Videogame License

100.    Upon Shenker's return to the United States and after Jakks had made its initial
payments to Shenker and Bell in mid-January 1998, Berman, Shenker and Bell met at the annual
New York Toy Fair in or around February 1998.

101.    At the New York Toy Fair of 1998, all three men discussed the WWE videogame
license, the status of renewal negotiations on that license with Acclaim, and the plan to secure
those rights to Jakks.  When Bell inquired as to how Jakks would perform a videogame license,
Shenker reminded Bell that Jakks had helped them both out and that the "favor" needed to be
returned.

102.    At that time, Bell was in charge of discussing the possible renewal of the
videogame license with Acclaim since it was the existing licensee.  If the Acclaim license were
renewed, SSAI would not receive any commission.

103.    In early 1998, competition for desirable character and product licenses remained
intense, with entities such as Jakks and THQ having to pay increasingly higher royalties in order
to secure the intellectual property rights from prospective licensors.

104.    In order to implement that aspect of the illegal conduct involving the videogame
license, it was agreed and understood by Jakks, Shenker and Bell that Bell would act against
renewing the existing videogame license with Acclaim; that neither Bell nor Shenker would
discharge their fiduciary duties and duty of honest services to WWE by soliciting bids from other
companies who would be interested in securing the videogame license; and that both Bell and
Shenker would recommend that the videogame license be granted to Jakks on rates well below
market value without ever seeking any competitive bids from any other videogame companies.

105.    After receiving his share of the initial $40,000 payment from Jakks for dishonest
services, and without WWE's knowledge or consent or prior approval, Bell formed Bell

Consulting, LLC on March 6, 1998, now known as Bell Licensing, as a for-profit organization and served as its President.  At no time during his employment with WWE did Bell ever disclose to WWE either the formation or existence of Bell Licensing or Bell's role as Bell Licensing's President.

106.     Bell formed Bell Consulting during the time the videogame licensee was ostensibly being selected in order to serve as a vehicle for the receipt of illegal bribes and kickbacks he had received and expected to receive from Jakks and Shenker, the first of which was the $20,000 in monies originating with Jakks laundered through the Hang Seng Bank on January 14, 1998, and the next of which he knew he would receive upon formally recommending to WWE that Jakks be awarded the videogame license.

107.     Following receipt of the $20,000 from Stanfull on or about January 14, 1998 of monies originating with Jakks' foreign subsidiaries in the aforementioned series of transactions and the conversations at the 1998 New York Toy Fair, Bell utilized his influence to steer WWE away from even considering the renewal of Acclaim as the videogame licensee.  Prior to the payment of the aforementioned bribe by Jakks, Bell had advised Acclaim that there would be no problem with the renewal of its existing license.

108.     After receiving the aforementioned $40,000 from Jakks in January 1998, and in violation of their fiduciary duties and duty of honest services, neither Shenker nor Bell contacted any other potential bidders for the videogame license to solicit bids before making a recommendation to WWE management.

109.     Instead, on March 25, 1998, Bell advised Acclaim that he would not even listen to any proposal that Acclaim would make for the renewal of its license.  After Acclaim went over

Bell's head and complained to senior management at WWE that it was not being permitted to submit a renewal proposal, Acclaim was told it could do so.

110.    Before Acclaim's formal proposal was ever received, however, and without Shenker or Bell ever soliciting bids from any other videogame companies, Bell initialed a deal memo on March 30, 1998 recommending to senior management at WWE that the videogame license be awarded to "Jakks Pacific-Electronic Game Division" and indicated it was for a "new videogame division of Jakks Pacific."  The deal memo listed SSAI as the agent who had negotiated and procured the deal.  The terms recommended by Shenker and Bell without even attempting to secure any other bids were well below then prevailing market rates for a videogame license of the quality of WWE.

111.    On March 31, 1998, the day after Bell had initialed the deal memo recommending that the videogame license be awarded to Jakks, Defendant Bennett again directed Mr. Wills Hon to use Jakks' foreign subsidiaries to pay another $40,000 to Stanfull.  Bennett advised Mr. Hon on the day after Bell had recommended to WWE management that it grant the videogame license to Jakks that it was "imperative" that the funds be available to Stanfull not later than April 2, 1998.

112.    On or about April 2, 1998, and at the direction of Friedman and/or Berman, Jakks Pacific (H.K.), a foreign subsidiary of Jakks acting on Bennett's instructions, wire-transferred another $40,000 into Stanfull's account at the Hang Seng Bank in Hong Kong.

113.    On or about April 7, 1998, as he had done following the first $40,000 payment from Jakks, Shenker once again split the money from Jakks with Bell by obtaining a demand draft from the Hang Seng Bank for $20,000 payable to Bell Consulting, LLC.

114.    On April 8, 1998, WWE management approved the deal memo submitted by Bell and SSAI to grant the videogame license to Jakks.  At that time, WWE was not aware of any of the aforementioned payments to Shenker or Bell by Jakks.  Notwithstanding the internal approval of the Jakks deal memo, WWE remained legally free to accept other superior offers until such time as a definitive licensing agreement was executed.

115.    On or about April 15, 1998, principally based on Bell's influence, direction and advice, WWE advised Acclaim that it did not intend to renew Acclaim's videogame license.

116.    The actions of SSAI, Shenker and Bell described above relating to the videogame license were in violation of their fiduciary duties and duty of honest services, and were in direct response to being paid commercial bribes.  SSAI, Shenker and Bell recommended to WWE management that the videogame license be given to Jakks before even seeking or obtaining any proposals from any other videogame companies interested in independently securing the license.

117.    Following Bell's and SSAI's recommendation that the videogame license be given to Jakks, a series of events occurred which threatened to expose the illegal plan to obtain the videogame license at below-market rates by the corruption of WWE's agents.

<u>THQ's Desperate Condition</u>

118.    In the years preceding 1998, THQ had a videogame license with WWE's principal competitor at the time, World Championship Wrestling, Inc. ("WCW").

119.    As a company, THQ's profitability as it entered calendar year 1998 was heavily dependent upon the WCW videogame license.  In fiscal year 1997, the WCW license accounted for 39% of THQ's sales.

120.    THQ's videogame license with WCW was scheduled to expire, however, on December 29, 1998.  If the WCW license was not renewed, THQ would lose what had become the principal economic driver of the company.

121.    On March 3, 1998, Farrell, the President and Chief Executive Officer of THQ, sold 40,000 shares of THQ stock for $1,160,000.

122.    On March 10, 1998, seven days after Farrell sold the aforementioned stock, THQ announced publicly that WCW had determined not to renew its license with THQ, and at the same time disclosed that WCW videogames accounted for 39% of its sales in 1997.  In reality, as THQ and Farrell then knew in March of 1998, THQ's economic dependence on revenues associated with its WCW wrestling themed videogames had become almost complete during THQ's first fiscal quarter in 1998.  Sales of WCW videogames accounted for 87% of the net sales of THQ in the first quarter of 1998.

123.    THQ's stock tumbled 25% the day after it announced the loss of the WCW license on March 10, 1998.  Thereafter, the Securities and Exchange Commission commenced an informal inquiry relating to trading by directors and officers of THQ prior to the public announcement that THQ had lost the WCW videogame license.

124.    At the time, Defendant Farrell attempted to finesse the problems associated with the loss of the WCW license by stating publicly that nothing prevented THQ from making wrestling videogames using either another licensor or fictitious characters.

125.    As a result of the foregoing factors, THQ and Farrell became desperate in March 1998 to secure the rights to produce wrestling videogames to replace its primary source of income which would be lost upon expiration of the WCW license.

126.    Farrell and THQ therefore decided to seek a videogame license from WWE to do so.

### Activision and THQ Emerge as Potential Bidders for Videogame License

127.    Shortly before THQ approached WWE to attempt to secure a videogame license from WWE, however, another competitor who had not been approached and asked to bid by Shenker or Bell due to their illicit agreement with Jakks emerged and expressed interest in securing the license—Activision.

128.    On April 7, 1998, just days after Shenker and Bell had recommended the videogame license be awarded to Jakks on terms well below-market rates, the chairman of Activision wrote to Bell advising that Activision was prepared to move promptly to secure the rights and indicated that Activision's financial strength would allow them to offer the most competitive financial terms.

129.    On April 16, 1998, and pursuant to an initiative undertaken by THQ, representatives of THQ, including Farrell, met with Bell and Shenker for the first time.  On information and belief, both Bell and Shenker tried to steer THQ away from seeking the videogame license or even making a proposal for it, telling THQ that it should consider making a proposal instead for arcade games and personal computers.  Shenker and Bell did so in order to effectuate their illicit agreement with Jakks and in order to prevent competing bids from ever being made.

130.    On April 17, 1998, the day after first meeting with THQ, Shenker met for the first time with Activision regarding the WWE videogame license.  During the meeting, and in the hope Activision would be dissuaded from bidding, Shenker refused to give Activision any terms for a prospective license.

131.    On April 23, 1998, THQ directed a letter signed by Farrell to both Bell and

Shenker expressing THQ's continuing desire to obtain the videogame license notwithstanding

Shenker's and Bell's attempts to dissuade THQ from bidding.  THQ indicated it would be

willing to enter into a nonexclusive multi-year license with guarantees of several million dollars,

competitive royalty rates, significant marketing commitments, and stock purchase warrants.  The

terms roughly outlined in THQ's letter were clearly superior to the deal with Jakks which Bell

and SSAI had already recommended to WWE management and which had been approved based

on their recommendation.

132.    On April 27, 1998, Activision sent an initial informal proposal to SSAI for the

videogame license with WWE.  The Activision informal proposal was only an opening offer but

was still clearly superior to the terms offered by Jakks which had already been recommended by

SSAI and Bell to WWE.  Activision's initial informal proposal included a higher guaranteed

royalty than the Jakks proposal and included stock options in Activision.

133.    On information and belief, the expression of interest from two competitors of

Jakks for the videogame license jeopardized Jakks' illicit plan to obtain valuable licensing rights

at below-market rates by corrupting Shenker and Bell since questions would be raised if WWE

went forward with the Jakks proposed license and later learned that WWE agents, SSAI and

Bell, had been told that clearly superior offers from THQ and Activision would be forthcoming.

134.    In order to conceal the illicit plan and see it to fruition, SSAI and Bell did not

provide WWE management with copies of the April 23, 1998 letter from THQ or the April 27,

1998 Activision informal proposal.

135.    On information and belief, Shenker and/or Bell instead advised Jakks, through

Friedman and/or Berman, of the terms of the two competing proposals, specifically Activision's

initial informal proposal and the terms set forth in THQ's April 23, 1998 letter. Shenker and/or

Bell also advised Jakks of the need to do something so as to avoid detection of the illicit plan.

<u>THQ Joins the Conspiracy to Secure the Videogame License</u>

136.    Jakks, through Friedman and/or Berman and/or Bennett, then engaged in further

and additional illegal conduct in order to deal with the threat of competition presented by the

undesired emergence of THQ and Activision as potential bidders for the videogame license.

137.    In direct response to the threat of competition, and in order to maintain control

over the videogame licensing process it had acquired by the corruption of WWE licensing

agents, Jakks, through Friedman and its other officers, secured the agreement of THQ, through

Farrell and other high ranking executives, not to make an independent bid to secure the

videogame license in its own right, as THQ had indicated it wanted to do and had every business

reason to do so.  Instead, Friedman told Farrell that Jakks was in control of the videogame

license; had access to the terms Activision had informally proposed; and that THQ could

participate in the revenue stream from the videogame license at a lower-than-market royalty rate

if THQ did not independently bid but instead joined with Jakks to make a proposal which would

appear competitive to Activision's initial informal proposal.

138.    Jakks, through Friedman, further advised Farrell that certain considerations would

have to be paid to Jakks and agreed to by THQ in exchange for Jakks' inclusion of THQ in the

anticipated revenue stream associated with the WWE videogame license.  Monies and

consideration which otherwise could have, and would have, been offered to WWE by THQ in an

independent, competitive process would have to be paid to Jakks instead.

139.    At the time, THQ had never before joined with Jakks to bid on a videogame

license, and THQ did not need Jakks to formulate or make a proposal for a videogame license.

THQ was completely able in its own right to perform a videogame license with WWE without any involvement by Jakks and had every legitimate business reason to do so given the circumstances existing at the time and had already told WWE it desired to do so.

140. Farrell, and THQ, knew full well that Jakks was not even in the videogame business at that time; that Friedman had been effectively removed from the videogame business by THQ itself when his services at THQ were terminated years before; that no legitimate reason existed for Jakks to be discussing with THQ the terms by which THQ would gain rights in WWE's intellectual property; that WWE had licensing agents who were to be negotiating the license on behalf of WWE; and that the information being conveyed by Jakks was at odds with what Shenker and Bell had stated in their meeting with THQ on April 16, 1998.

141. Despite Farrell's and THQ's knowledge of the improprieties involved in Jakks' role, and the impropriety associated with agreeing not to independently bid, Farrell, on behalf of THQ, never called WWE senior management or otherwise took action to alert WWE regarding the obvious irregularities in the bidding process known to him. Instead, he agreed on behalf of THQ not to submit an independent bid but rather to accept the terms insisted upon by Jakks, including the royalty rates to be offered to WWE.

142. After being contacted by Jakks and urged not to independently bid on the videogame license, neither THQ nor Farrell ever negotiated with WWE or its known authorized representatives regarding its previously stated desire to secure the videogame license for THQ independently. Instead, it conducted all negotiations with its competitor, Jakks, regarding the WWE videogame license.

143. Farrell and THQ either knew of, or were recklessly indifferent toward, the unlawful activity set forth herein but agreed to the illegal plan because they were desperate in

light of the loss of the WCW license and because the terms offered by Jakks to THQ to rig the

bids, allocate the license among the conspirators, and fix the price to be offered WWE for its

intellectual property were well below the then prevailing rates THQ would otherwise have had to

pay to secure a license of the quality of the WWE videogame license.  Farrell and THQ knew

that THQ would benefit directly and substantially from the unlawful activity.

144.    Pursuant to its agreement with Jakks, THQ did not thereafter submit an

independent proposal for the WWE videogame license.

145.    Utilizing the confidential information regarding Activision's initial informal

proposal which Shenker and/or Bell had provided to Friedman and/or Berman, Jakks and THQ

instead devised a proposal designed only to be comparable to Activision's initial informal

proposal.  On behalf of Jakks and THQ, Friedman thereafter conveyed the terms of the collusive

bid to Shenker, who simply wrote down the collusive terms in a proposed deal memo and made

no attempt to negotiate better or more substantial terms.

146.    On or about May 7, 1998, Shenker prepared a deal memo reflecting the terms

provided to him by Friedman as a result of the collusion between Jakks and THQ.  The deal

memo indicated that the licensee would be "Jakks/THQ LLC" and listed SSAI as the procuring

agent.

147.    SSAI, Shenker and Bell agreed to the corrupt scheme of Jakks and THQ knowing

that Jakks would receive monies over the length of the license which otherwise would have been

offered and paid to WWE in a true competitive bidding situation, and agreed to take all action

necessary to recommend to WWE management that the videogame license be awarded to Jakks

and THQ instead of the only remaining candidate for the license, Activision.

148.    Although the terms of Activision's initial informal proposal were provided to Friedman and/or Berman by Shenker and/or Bell and used by Jakks and THQ in formulating their collusive bid, and as an essential part of the conspiracy to foreclose competition, rig the bids, allocate the license to THQ and Jakks, and fix the price to be offered to WWE for the license, Shenker or Bell did not request Activision to increase its initial proposal after receiving the collusive bid of THQ and Jakks.  On information and belief, Activision would have improved the terms offered to WWE if it had been permitted to participate in negotiations or bona fide biddings.

149.    As a result of the unlawful conspiracy, Jakks and THQ proposed, and SSAI, Shenker and Bell agreed to recommend to WWE, that the videogame license be of the extraordinary length of ten years with a five-year right of renewal to be vested in Jakks and THQ.

150.    A licensor of intellectual property, such as WWE with respect to the videogame license, typically receives royalties on the net sales from the licensees once each financial quarter.  All Defendants knew that WWE would receive, for at least forty and potentially sixty fiscal quarters thereafter, below-market royalties and that Jakks would receive from THQ for that same period monies improperly diverted from WWE, as a result of the unlawful conduct described herein.

151.    By recommending a license of extraordinary length and advising WWE that SSAI had procured and negotiated the license, SSAI, Shenker and Bell also stood personally to make millions of dollars in illegal profits at the expense of their principal, WWE, as a result of the corrupt plan to give Jakks control of the license.  By doing so, Shenker and Bell generated a commission stream to SSAI to split equally with Bell for at least ten and potentially fifteen years.

Under the terms of the bribe offered to Bell by Shenker, while acting on behalf of SSAI and as an agent of Jakks, both Shenker and Bell would split commissions each financial quarter for ten and possibly fifteen years in amounts ultimately dependent on sales.

152.    On May 12, 1998, Bell initialed his approval on the May 7, 1998 deal memo and submitted the deal memo to management of WWE, thereby recommending that WWE grant the license to Jakks and THQ.

153.    Late in the day of May 12, 1998, Activision also sent a more formalized version of their initial informal proposal to Shenker.  Consistent with their scheme, neither Bell nor SSAI nor Shenker ever sent the formal Activision proposal of May 12, 1998 to WWE management, and neither contacted Activision to request that Activision increase its bid before recommending the Jakks/THQ deal to WWE management.  On information and belief, the version of Activision's proposal still represented only an initial proposal and understated the amount Activision would have been willing to pay to obtain the videogame license.

154.    On June 10, 1998, THQ and Jakks caused to be filed a Certificate of Formation in Delaware forming THQ/Jakks Pacific LLC.  On that same date, Farrell, as President and Chief Executive Officer of THQ/Jakks, signed the videogame license agreement with WWE on behalf of THQ/Jakks.

155.    THQ stock surged on news that it had obtained rights in a WWE videogame license with a trading volume more than three times its average.

156.    At all times relevant hereto, Jakks, THQ, and the highest ranking officers of each company knew that the THQ/Jakks LLC formed to be the ostensible signatory for the videogame license was a sham necessary to implement the scheme.  By establishing a sham LLC to be the

nominal contracting party, Jakks and THQ hoped to create legal limitations on WWE's ability to seek redress against Jakks and THQ if the unlawful conduct were ever discovered by WWE.

157.    On June 23, 1998, WWE executed a videogame license agreement with THQ/Jakks effective as of June 10, 1998 (the "videogame license").  The term of the license was to end on December 31, 2009, subject to the right to renew for an additional five years in favor of THQ/Jakks.

158.    Both Jakks and THQ have held themselves out to the public and their respective shareholders as being in a "joint venture" or "partnership" with each other with respect to the WWE videogame license and have claimed that it was "jointly obtained."  The "partnership" or "joint venture," however, had no legitimate business purpose and was merely intended to effectuate the bid-rigging and license-allocation scheme.

159.    In public announcements in the months following execution of the videogame license, both Jakks and THQ stated that they would share the profits of the videogame license equally.

160.    During the same period it had engaged in the illegal conduct with Jakks to obtain rights in the WWE videogame license, THQ anticipated that royalty rates paid to licensors would range between 19%-22% throughout 1998 in competitive situations untainted by collusion.

161.    In 1998, it was THQ's practice to pay the higher royalties to licensors with proven popularity.  WWE was such a licensor and consistently has been one of the highest revenue producers in THQ's licensing portfolio.

162.    Under the terms of the license agreement with WWE resulting from the illegal conduct set forth herein, however, WWE was only promised royalties between 7%-8% for games

on Nintendo 64; Sony PSX and Sega Katana platforms; 6% on Nintendo Game Boy; and 10% on PC videogames.

163.    The royalty rates in fact promised to WWE were between 50%-66% lower than what THQ had paid, expected to pay during the relevant time period in 1998, and would have paid, in a truly competitive situation.  Over the term of the license, the damages to WWE associated with being paid a below-market rate due to collusion instead of the free market rate exceeds hundreds of millions of dollars in revenues denied WWE.

164.    Another result of the illegal conduct orchestrated by the highest ranking executives of both Jakks and THQ was that millions of dollars would be paid by THQ to Jakks for its illegal conduct in securing and sharing the revenues from the videogame license with THQ instead of being offered to WWE, the true owner of the intellectual property.  The monies diverted to Jakks from WWE were a direct result, and indeed the whole point, of the illegal activities set forth herein insofar as Jakks was concerned.  THQ, conversely, obtained rights in one of the more lucrative videogame licenses at rates well below what THQ had paid for inferior licenses, and would have paid, in a competitive environment untainted by the multifaceted illegal conduct.

<div align="center">Extension of Toy License</div>

165.    As another central aspect of the corruption of SSAI, Shenker and Bell, which Jakks had obtained as a result of the aforementioned illegal conduct, Jakks requested, and SSAI, Shenker and Bell agreed to recommend, lengthy extensions to the two toy licenses to make the terms of the licenses coincide with the term of the videogame license.  By agreements dated June 24, 1998, the domestic and international toy licenses between WWE and Jakks were

amended to make the toy licenses coterminous with the videogame license as a necessary and essential part of the commercial bribery scheme.

<div align="center">Additional Payments Related to the Videogame License</div>

166.    On information and belief, on or about June 30, 1998, one week after the videogame license was executed, THQ awarded Friedman 230,850 shares of THQ stock worth millions of dollars.  On information and belief, the award of stock was payment by THQ to Friedman for his role in the improper and illegal conduct described herein that resulted in the videogame license being awarded to THQ/Jakks.

167.    On July 15, 1998, after the aforementioned licensing rights had been secured, Shenker caused another phony invoice to be delivered to Jakks' corporate headquarters in Malibu, California for $20,000 with a false and fraudulent description for the charges.  The fraudulent invoice dated July 15, 1998 was sent to the attention of Berman.  As he had done before, and at the direction of Friedman and/or Berman, Bennett directed an overseas agent of a Jakks' foreign subsidiary to make the payment.

168.    On August 3, 1998, Bennett was advised by an overseas agent of a Jakks' subsidiary that arrangements had been made as instructed for $20,000 to be paid to Stanfull.  The payment, once again, was made by Road Champs Ltd. to Stanfull's account at the Hang Seng Bank.

169.    On October 8, 1998, Bell Licensing invoiced Stanfull for the $20,000.  On October 8, 1998, Shenker caused the invoice to be paid to Bell Licensing on funds drawn from SSAI's account.

170.    The payment of $20,000 on August 4, 1998 to Stanfull was a further and additional payment of a bribe paid to Shenker, and then to Bell by Shenker, for their roles in the illegal conduct and the abandonment of fiduciary duties and honest services owed WWE.

### Defendants' Non-Disclosure

171.    At no time during the negotiation of the videogame license or the amendments to the toy licenses did any of the Defendants disclose the existence of the scheme to corrupt WWE's agents or the bribery scheme or the series of payments made by Jakks through foreign subsidiaries to Stanfull and to Bell.

172.    At no time during the negotiation of the videogame license did any of the Defendants disclose the existence of the bid rigging and market allocation scheme.

### Jakks and THQ Divide the Proceeds from the Illegally Obtained Videogame License

173.    Pursuant to the terms of the videogame license, THQ/Jakks was not authorized to ship any licensed products prior to the fourth quarter of 1999.

174.    After the videogame license was secured on June 10, 1998 as a result of the illegal conduct set forth herein, Jakks and THQ, through their highest ranking officers, utilized the time between execution of the license and the date they were authorized to first ship WWE products to establish how the proceeds of their illegal conduct would ultimately be divided among them, just as Shenker and Bell had done.

175.    Through agreements entered into before the first product was shipped in the fourth quarter of 1999, the true nature of the illicit arrangement was fleshed out in agreements between THQ and Jakks.

176.    On information and belief, the arrangements made between Jakks and THQ from June 10, 1998 through at least October 25, 1999 involved the highest ranking executives of both

companies, including the individual Defendants herein, and also involved numerous uses of the mails and wires, the full extent of which is known only to THQ, Jakks, and/or THQ/Jakks, the entities who have exclusive possession and control of that evidence.

177.    As a result of discussions involving the highest ranking officers of THQ and Jakks, by October 25, 1999, the month before they were authorized to ship products under the license, THQ and Jakks had entered into operating agreements relevant to the videogame license defining the true nature of their relationship and which served to define the manner in which the proceeds of their illegal conduct, including bribery, would be distributed.

178.    In the essential terms agreed upon by Jakks and THQ by at least October 25, 1999, THQ agreed to be responsible for funding all operations incidental to the WWE videogame license, including specifically all payments to WWE.  THQ also agreed to be exclusively responsible for development, manufacturing, distribution and sales of all WWE videogames, and for the day-to-day operations incidental to performing the videogame license.

179.    In consideration of Jakks' illicit role in obtaining the WWE's videogame license, THQ also agreed, and in fact guaranteed, that Jakks would be paid a "preferred return" quarterly equal to the greater of a specified dollar amount or specified percentages of the net sales of WWE videogames in amounts that varied based on platform.

180.    In other terms agreed to by THQ and insisted upon by Jakks to ensure that THQ did not disclose to WWE the facts and circumstances surrounding the issuance of the videogame license, THQ and Jakks agreed that Jakks would be the sole contact with WWE and that THQ would never initiate contact with WWE nor disclose the facts and circumstances surrounding the issuance of the videogame license known to it.

181.    As a result of the agreements negotiated between THQ and Jakks prior to the shipment of any WWE videogames, all financial risk to Jakks was eliminated and the videogame license became nothing but a guaranteed revenue stream to Jakks.

182.    As a direct result of the scheme to defraud WWE out of monies it was entitled to receive for the exploitation of its intellectual property, Jakks, which neither owns the intellectual property nor performs the videogame license, has been paid substantially more by THQ than WWE has been paid on the videogame license.

183.    In 1999, WWE was paid nothing by THQ, Jakks, or THQ/Jakks on the videogame license.  By contrast, THQ paid Jakks over $6,000,000 in 1999 related to the illicit deals between them relating to the videogame license.  The exact dates of these payments, which on information and belief utilized the mails and/or wires, are known to Jakks, THQ, THQ/Jakks and the individual defendants employed by Jakks and THQ.

184.    Through the year ended December 31, 2004, WWE has been paid approximately $54,000,000 in royalties by THQ on the videogame license.  Jakks, through the same period, was paid approximately $64,000,000 by THQ as a result of the illegal conduct set forth herein.

185.    THQ/Jakks has never performed any aspect of the videogame license.  From the first shipment of WWE product to today, the videogame license has been performed by THQ.

<u>The Coverup and Fraudulent Concealment</u>

186.    Following the corruption of Shenker and Bell and the inducement to breach their fiduciary duties and duty of honest services in connection with the licensing rights being sought by Jakks, Shenker and Bell split commissions on other licensing deals recommended by SSAI and approved by Bell and/or assigned to SSAI by Bell.  All the illegal activity was affirmatively concealed from WWE by SSAI, Shenker and Bell.

187.    On March 24, 2000, WWE terminated Bell's employment with WWE for reasons unrelated to Bell's receipt of bribes and kickbacks, none of which were known to WWE at the time.

188.    Consistent with its practice of inducing Shenker to believe monies would be forthcoming from Jakks, on or about June 9, 2000, Jakks, through Berman, entered into an "Exclusive Agency Agreement" with SSAI to serve as the exclusive official licensing agent of Road Champs Ltd., promising SSAI 25% of all compensation actually received by Road Champs Ltd. and Jakks.  This agreement, like all others, was not disclosed to WWE at the time.

189.    On June 13, 2000, WWE terminated the contract of SSAI pursuant to a provision which entitled it to do so for a change in business direction.

190.    In October of 2000, SSAI brought an action against WWE for breach of contract in Connecticut state court seeking to be paid commissions on licenses SSAI had allegedly procured, including the toy and videogame licenses (the "Shenker litigation").

191.    At various times following the initiation of the Shenker litigation, Shenker, Bell, Friedman, Berman and Bennett, individually and as agents of the corporations they each own, control, and/or operate, have acted in concert to conceal the illegal conduct, including the bribes. All involved first concealed and denied the fact of payments to Stanfull and the use of foreign accounts to do so.  After WWE eventually learned about the payments during discovery in the Shenker litigation, the Defendants directly involved in the payments gave false and inconsistent explanations for the payments, none of which are corroborated by any evidence.

192.    In an early attempt to make sure the payments were never discovered in the Shenker litigation, Friedman telephoned Linda McMahon, the Chief Executive Officer of WWE,

and made an unsolicited offer during the early phase of the Shenker litigation to use his good graces with Shenker to broker a settlement of the Shenker litigation. WWE declined his offer.

193.    In the early phases of the Shenker litigation, Bell and Shenker acted in concert and destroyed invoices Bell had sent to Shenker for the bribes he had been promised to abandon his fiduciary duties to WWE. Bell and Shenker also destroyed contracts they had related to the bribery payments at issue herein.

194.    As a further part of the concealment, Shenker committed perjury and failed to disclose the existence of Stanfull when asked if he owned any corporations other than SSAI. Shenker committed perjury in order to conceal the payments originating with Jakks made to Stanfull's foreign bank account.

195.    To further the coverup and conceal their criminal conduct, Shenker and Bell both perjured themselves in the Shenker litigation and testified that neither SSAI nor Shenker had made any payments to Bell relating to WWE licenses. In actual fact, Shenker had made directly, or via money laundered through foreign accounts he controlled, payments in excess of $1,000,000 to Bell and/or Bell Licensing as commercial bribes, including payments of hundreds of thousands of dollars of bribes paid in connection with the agreement to give favorable treatment to Jakks' licensing matters.

196.    During the same time Shenker and Bell were obstructing justice as set forth above, THQ and Jakks both represented that no payments had been made to Stanfull, SSAI, Shenker and/or Bell. In response to repeated requests by WWE, all uniformly denied making any payments to Stanfull, SSAI, Shenker and/or Bell.

197.    By subpoena dated June 11, 2002, Jakks was ordered to produce a variety of records relating to its dealings with Shenker and Bell, including all documents relating to any

agreements between Jakks and Shenker and/or SSAI and all documents relating to any payments made to SSAI and/or Shenker.

198.    Jakks' production of records in response to the subpoena was done by letter dated October 30, 2002.  Jakks concealed and did not produce either the $80,000 or the $20,000 invoice it paid to Stanfull in 1998 or any other documentation indicating such payments had been made.  Jakks also concealed, and did not produce, documents which demonstrated Shenker had acted as their agent.  Jakks' response to the subpoena gave no indication that monies had, in fact, ever been paid to Shenker.

199.    In order to police Jakks' compliance with the license, WWE exercised its right to audit the books and records of Jakks in early 2003.

200.    On January 14, 2003, WWE's auditors requested, in writing, that Jakks provide the auditors with a complete listing of all payments made by Jakks to Shenker, SSAI, Bell and/or Stanfull.

201.    On January 17, 2003, Jakks provided yet another false and misleading response to the auditors' request of January 14, 2003 by stating that they had already "provided any documents that may exist" in response to the June 11, 2002 subpoena.  As Jakks knew, it had not produced any documents evidencing payments to Shenker, SSAI or Stanfull in response to the June 11, 2002 subpoena even though such records existed.  Bennett received a copy of Jakks' false response to WWE's auditors and did nothing to correct it despite his knowledge of the payments at issue, all of which he had personally directed and orchestrated.

202.    By email dated February 25, 2003, WWE's auditors responded to Jakks' January 17, 2003 misleading response by pointing out that Jakks had not provided any documents related to payments to Shenker, SSAI or Stanfull in response to the June 11, 2002

subpoena and again asked for copies of all invoices or a description of each transaction whereby payments were made by Jakks to Shenker, SSAI and/or Stanfull.

203.    On February 25, 2003, in an email response from employees working under the direct supervision of Bennett, Jakks did not respond and disclose the payments but instead advised that the request had been forwarded to their attorneys, who would advise shortly.

204.    By March 14, 2003, no response had been received from Jakks' attorneys to the request for disclosure of payments to SSAI, Shenker and Stanfull.  By letter dated March 14, 2003 sent to Jakks' corporate counsel, Mr. Murray Skala, WWE again requested an answer to the question of whether payments had been made to Shenker, SSAI and Stanfull.

205.    On March 19, 2003, Jakks, through its counsel, continued the practice of providing false and misleading information.  By letter of that date, Jakks' counsel reiterated the false theme that "the specific information requested was provided months ago" in response to the subpoena.  Such statements were false and known by Jakks to be false, as Jakks had not provided any information on the payments made to Shenker via Stanfull in 1998.

206.    On March 25, 2003, WWE once again informed Jakks, through its counsel, that the specific information requested had not been provided and again requested specific disclosure.

207.    On March 26, 2003, Jakks' counsel acknowledged that the documents provided in response to the June 2002 subpoena did not include documents reflecting payments to Shenker, SSAI or Stanfull, and then represented "there simply is no additional information of the type you seek."  Like all previous statements by Jakks, that statement was false.  Jakks had numerous documents evidencing the payments to Stanfull buried in the records of foreign subsidiaries.

208.    Jakks' repeated refusals to disclose documents showing the complete nature of its relationship to Shenker or the payments to Stanfull in 1998 were deliberate, in bad faith, and part

of a plan to fraudulently conceal the illegal conduct and commercial bribery set forth herein at all

costs.  The relationship between Shenker and Jakks, and the payments made to Stanfull, were

known to and orchestrated by the highest-ranking executives of Jakks, at least one of whom

serves in an executive capacity for Jakks/THQ.  Instead of disclosing the relationships with

Shenker or the payments, Jakks repeatedly provided false and misleading information to the

effect that no such payments had been made and responses which failed to disclose the true

nature of the relationship between Jakks and Shenker.

209.    In the Shenker litigation, SSAI, Shenker and Bell also acted in concert to conceal

both the existence and extent of the unlawful conduct surrounding the videogame license and

amendments to the toy licenses including, but not limited to, the bribes and did so during the

same time that Jakks, THQ, and Jakks/THQ were concealing the payments to Stanfull which

Jakks had made via foreign subsidiaries.  Bell and Shenker both initially denied that any

payments had been made to Bell by Shenker.  SSAI and Shenker also denied receiving any

money from licensees of WWE.  When discovery indicated that payments had been made to Bell

by Shenker, both falsely claimed the payments were for "developmental projects" unrelated to

WWE.  As part of their scheme to conceal their illegal conduct, Bell and Shenker created and

then produced in discovery numerous fabricated invoices relating to payments from SSAI and/or

Shenker to Bell, and destroyed the true invoices reflecting that aspect of the illegal conduct

involving bribes and kickbacks.  The fabricated invoices were designed to make it appear as if

the payments made to Bell by Shenker were for "developmental projects" unrelated to WWE.

210.    In or around September 2002, however, SSAI inadvertently produced to WWE

two authentic Bell Licensing invoices it had neglected to destroy which revealed that Bell

Licensing had in fact invoiced SSAI for what was described as "consulting services" with respect

to specifically listed WWE licenses.  Neither invoice produced at that time listed the videogame

license as one of the licenses for which Bell was invoicing SSAI, and Shenker and Bell

continued to conceal the improprieties involved in the videogame license.

211.    In late December 2002, both Shenker and Bell committed serial perjury by

testifying that the invoices they had fabricated were the actual and true invoices for the payments

SSAI had made to Bell.  Their serial perjury became manifest at the end of their respective

depositions when the true invoices which had been inadvertently produced were shown to them.

212.    At Bell's deposition in December 2002, he was confronted with the October 8,

1998 check of SSAI paying Bell Consulting $20,000.  Bell falsely claimed at that time that the

payment was a "finder's fee" for brokering a deal between Jakks and Playmates.  Although Bell

admitted to receiving the payment, he repeatedly and falsely suggested that the monies had come

from Playmates, not Jakks.

213.    After being caught in manifest perjury in December 2002, SSAI, through its

counsel, advised the Court that Shenker would be recanting his prior testimony.  Shenker

thereafter spent two months devising what in reality turned out to be just another round of

perjury in which he continued to conceal the full extent and purpose of the payments he had

received from Jakks as well as all other illegal conduct associated with the videogame license.

214.    On March 3, 2003, Shenker served WWE with alleged formal recantations

covering every material aspect of his testimony.  The alleged recantations made clear that for

months, Shenker had willfully perjured himself in deposition testimony and interrogatory

answers.  Throughout four days of post-recantation deposition testimony, Shenker repeatedly

admitted to giving false and misleading testimony and then provided equally false and

misleading testimony.

215.    In his alleged recantations, Shenker continued to provide false and incomplete evidence on the payments he had received from Jakks and split with Bell.  He adopted the same story told by Bell in December of 2002 about the only payment known at that time being a "finder's fee" for brokering a transaction between Jakks and Playmates.  He testified that he had received a $40,000 payment from Jakks for a "finder's fee" and had split it with Bell.  In his alleged recantation, Shenker admitted to and disclosed only a single $40,000 payment and, like Bell, claimed that amount was paid by Jakks for brokering a deal in which Playmates sold its inventory and equipment to Jakks.  He did not, however, disclose or admit to receiving any additional monies from Jakks and continued to conceal both that he had been paid another $60,000 in 1998 by Jakks and the details of exactly when the payments were made.  He likewise claimed he had no documentation regarding the only payment from Jakks he admitted to receiving at that time and continued to conceal the invoice for $80,000 containing a description for the payment at odds with his new perjury, just as Jakks was doing at the same time.

216.    In other proceedings in March of 2003, Shenker continued to conceal the true set of facts during his alleged "recantations."  In briefings to the Court on March 5, 2003, Shenker again disclosed only one payment from Jakks of $40,000 and reiterated that it was for brokering the Playmates deal.  In Shenker's words, "For brokering this deal between licensees, Jakks paid SSAI a $40,000 brokerage fee."

217.    In deposition testimony given on March 18, 2003, Shenker continued to use perjury as a tool to conceal the facts and misdirect WWE as to the timing and sequence of payments from Jakks so as to continue to conceal that additional payments were made during the exact time rights formerly held by Playmates were being transferred to Jakks and the videogame license was being negotiated.

218.    On March 18, 2003, Shenker, under the ruse of a recantation, again perjured himself and testified that a single $40,000 payment from Jakks was the only payment he received from a WWE licensee.  To misdirect WWE further, Shenker testified that the invoice from Bell dated October 8, 1998, which was months after the videogame license was executed, was for Bell's split of the supposed "finder's fee" on the Playmates transaction.  Shenker did not disclose all the payments to Bell from Jakks; all the splits he had made of Jakks money with Bell; or that all payments were related to the illicit plan to give favorable treatment to Jakks on licensing matters.  Shenker further perjured himself and testified he had turned over all evidence of payments from Stanfull to Bell.  As he well knew, he had neither disclosed, nor turned over, the evidence of payments made by Jakks to Stanfull which he had split with Bell in January 1998 and April 1998 during the videogame license negotiation period.

219.    On March 20, 2003, Shenker continued utilizing perjury as a tool of concealment under the ruse of a recantation.  On that date, he falsely testified that there was only one $40,000 payment made to his foreign bank account which he split with Bell and continued to insist that payment was for brokering the Playmates deal.  When asked directly if he received payments from anybody affiliated with Jakks or THQ in connection with the videogame license, Shenker falsely testified:  "I don't remember receiving any payments—I don't remember.  It could be.  I just don't remember."

220.    On March 20, 2003, Shenker further perjured himself to make it appear as if he had worked long and hard putting together a videogame deal between WWE and Jakks and THQ, falsely claiming he had "worked on it for a long time."  As Shenker well knew, his "work" on that license consisted of providing Jakks with the terms of Activision's initial offer, and no more, all as previously alleged.  Shenker further concealed that aspect of the illegal activities by

testifying, falsely, that he could not remember if he told Berman or Friedman about Activision's initial proposal.

221.    WWE presented the evidence of the dishonest and abusive discovery conduct to the Court in the Shenker litigation in a motion for sanctions.  The Court wrote an opinion dated October 16, 2003 detailing Shenker and Bell's perjurious and corrupt scheme, and substantively finding they committed fraud upon the Court which warranted the dismissal with prejudice of SSAI's claims against WWE.  The Court's opinion can be found at 48 Conn. Supp. 357, 844 A.2d 964 (2003).

222.    The Court's opinion explicitly noted that Jakks was one of the WWE licensees that had paid Shenker and that Shenker perjured himself to conceal Stanfull's existence specifically to cover up its role as a conduit for payments to Shenker and Bell from WWE licensees, including specifically from Jakks.

223.    As of the time the Court issued its opinion dated October 16, 2003, which noted that Shenker had perjured himself about Stanfull in order to conceal the payment of money by Jakks, neither THQ nor Jakks had disclosed any payments to Stanfull or Shenker despite prior repeated requests that they do so.  Similarly, Jakks had not corrected the false information provided through its counsel on March 26, 2003 that there was no such information to provide.

224.    Jakks' failure to disclose such information by October 16, 2003, and correct its prior misrepresentations, was calculated, deliberate and part of a continuation of its plan to conceal the illegal conduct at all costs.  Unknown to WWE as of October 16, 2003, Jakks, through Bennett, had retrieved specific documentary evidence of the payments to Stanfull from its foreign subsidiaries and had provided it to Jakks' outside counsel not later than the first week of September 2003.  Despite their certain knowledge by that time that both Jakks and its counsel

had previously provided false and incorrect information to WWE, neither Jakks nor its counsel disclosed the information to WWE in September or October of 2003.

225.    After the Court issued its October 16, 2003 opinion in the Shenker litigation, and in violation of specific court orders of compulsion and his promise to do so, Shenker refused to obtain and produce the records of Stanfull's account at the Hang Seng Bank which were needed to determine the full extent of payments to Stanfull by Jakks.  As a result, WWE was compelled to incur considerable trouble and expense to go to Hong Kong in October 2003 to depose the records custodian of the Hang Seng Bank.

226.    In the course of that deposition, WWE confirmed that one $40,000 payment had been made to Stanfull's account by Jakks Pacific (H.K.) in April 1998—the very time that WWE was considering to whom to award its videogame license.  Records further confirmed that the $40,000 payment was then split equally by a demand draft to Bell a few days later.  Based on other incomplete records produced in that deposition, it appeared Jakks had paid Stanfull another $40,000 in January 1998 and $20,000 in August 1998.

227.    Immediately following those discoveries, on November 5, 2003, WWE's counsel directed a letter to Jakks' counsel transmitting the Court's opinion in the Shenker litigation on WWE's sanction motion and again requested that complete information regarding payments to SSAI, Shenker and/or Stanfull be provided to WWE.  By reading the Court's opinion, Jakks would have known that, despite its consistent prior denials of such payments, WWE was in possession of evidence indicating that money had, in fact, been paid to Stanfull by Jakks.

228.    On November 11, 2003, Friedman telephoned WWE's Chief Executive Officer, Linda McMahon, and told her that, in response to WWE's counsel's letter to Jakks' counsel, Jakks had searched its files and found evidence of payments to Stanfull—the fundamental fact

Jakks previously had outright denied for months. Friedman told Mrs. McMahon that the payments were for a perfume deal and $80,000 for "project development" for a mechanical dinosaur project, both of which supposedly were unrelated to WWE.

229. Friedman's statements to Mrs. McMahon were neither accurate nor complete and were a continuation of the concealment. Friedman knew all along that Jakks had paid Shenker, as he was one of the corporate officers who authorized the payments. His suggestion that Jakks had just located the information was also false, as Jakks had unquestionably forwarded the payment information to its outside counsel not later than the first week of September and had that information for two months before WWE's counsel's letter of November 5, 2003 and had not disclosed it. Additionally, the $80,000 in payments made in January and April of 1998 were not for project development as Jakks and Friedman knew, and Friedman completely failed to disclose the $20,000 payment made to Stanfull in August of 1998 after the videogame license and amendments to the toy licenses had been secured.

230. On November 14, 2003, despite its previous repeated denials, Jakks' counsel wrote to WWE's counsel reaffirming Friedman's statements to Mrs. McMahon and produced for the first time any records relating to the payments made by Jakks to Stanfull. Among other things, Jakks produced for the first time the January 2, 1998 $80,000 invoice from Stanfull in Shenker's own handwriting, which Shenker had never produced in the Shenker litigation. Jakks, through its counsel, did not disclose the $20,000 payment made in August 1998 or the phony invoice behind that payment.

231. Jakks' alleged explanation for the $80,000 in payments to Stanfull—"project development" costs for a mechanical dinosaur project unrelated to WWE—was completely

inconsistent with the purported explanation offered by Shenker and Bell that they had split a single $40,000 finder's fee for a deal involving WWE licensees, Jakks and Playmates.

232.    The January 2, 1998 invoice in Shenker's own handwriting did not bill Jakks for a finder's fee of $40,000 on Playmates as he and Bell had claimed under oath, but rather for $80,000 for the "development of possible latex based soft toys with special coatings."  On information and belief, Jakks concealed this invoice for as long as it could because it knew it was inconsistent with the testimonial positions taken by Shenker and Bell for the payments and because it knew Shenker would have no reason to split the $80,000 paid on the invoice with Bell, as he did, if in fact the payments were for a mechanical dinosaur project unrelated to WWE.

233.    Jakks produced the invoice only after it knew WWE was aware of the payments and because, as a publicly traded company, it would reasonably be expected to have some form of documentation for such payments.

234.    In January 2004, WWE again deposed representatives of the Hang Seng Bank and confirmed for the first time that, in fact, three payments had been made to Shenker's Stanfull account in 1998 totaling $100,000 by the foreign subsidiaries of Jakks.

235.    In May of 2004, Bell filed a false affidavit in the Connecticut court continuing the tact of falsely denying any connection between the payments he had received in 1998 of monies originating with Jakks and the videogame license.  Among other things, Bell claimed he had originally rejected the Jakks deal because Jakks was not then in the videogame business and that Jakks then came back with THQ as a partner.

236.    In actual fact, Bell had not originally rejected Jakks because they were not in the videogame business.  As Bell well knew, he and Shenker had recommended the license be given

to Jakks on the day Jakks paid $40,000 to Shenker's foreign bank account, which was then split with Bell.

237.    Defendants have colluded during their coverup on several different occasions.  On one occasion during the period he was planning his supposed recantation after being caught in perjury, Shenker directed his legal counsel for SSAI to contact Jakks' counsel to advise that he would be disclosing that Jakks paid him money.  SSAI's legal counsel did so.  Thereafter, Shenker disclosed only what he knew WWE was already aware of – a single $40,000 payment – and, like Jakks, did not disclose the full range and dates of payments.  On another occasion, he directed his counsel to notify Jakks' counsel that Shenker had provided information regarding statements made by Friedman reflecting Friedman's knowledge that SSAI was splitting his commissions with Bell.

238.    Friedman, Berman and Bennett were all deposed in the Shenker litigation and none initially identified the person who negotiated the payments to Stanfull or authorized the payments.  Friedman and Berman both under oath falsely denied being involved in the payments. Bennett initially falsely claimed under oath not to remember who had authorized the payments. As a result of their testimonial positions, the three highest ranking executives of Jakks hoped to obscure their involvement in the illegal conduct and avoid being questioned about their actions.

239.    In testimony given on July 28, 2004, Friedman also attempted to continue to conceal other aspects of the scheme he had orchestrated, falsely denying that he had been given the terms of Activision's initial offer by Shenker and otherwise failing to disclose the true set of facts and circumstances involved in the bid rigging and price fixing conspiracy he had orchestrated with THQ.

240.     In response to Jakks' officers not identifying the person(s) who authorized the payment, WWE moved the Connecticut Court to enter an order of compulsion requiring Jakks to identify the persons who authorized the payments.  Jakks opposed being compelled to do so.  After the Court ruled that Jakks must produce a knowledgeable witness, Bennett then appeared again and testified that, under any circumstances then existing in 1998, the payments had to have been authorized by Friedman, Berman, or both, thereby indicating that both men had provided false testimony about their involvement.

241.     Although both Jakks and THQ have derived, and continue to derive, material portions of their respective corporate revenues from the videogame license, neither has ever attached the actual operating agreements between them to filings made pursuant to the Securities and Exchange Act.  On information and belief, those agreements, and Jakks' interpretation of those agreements, reflect terms designed to prevent disclosure of the facts and circumstances surrounding the videogame license by mandating that THQ is not allowed to initiate contact with WWE nor disclose any of the facts and circumstances involved in the bidding process for WWE's videogame license.

## COUNT I
## VIOLATION OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT ("RICO"), 18 U.S.C. § 1962(c)
## (Against All Defendants)

242.     Each and every one of the foregoing allegations is incorporated herein by reference and reasserted as though fully set forth at length.

**RICO Persons**

243.    THQ/Jakks, Jakks, Jakks Pacific (H.K.), Road Champs Ltd., THQ, SSAI, Shenker, Bell Licensing, Bell, Friedman, Berman, Bennett and Farrell are each a "person" within the meaning of 18 U.S.C. § 1961(3).

**RICO Enterprise**

244.    For the purpose of 18 U.S.C. § 1962(c), THQ/Jakks, Jakks, Jakks Pacific (H.K.), Road Champs Ltd., THQ, SSAI, Shenker, Bell Licensing, Bell, Friedman, Berman, Bennett and Farrell, acting in concert, comprised an association-in-fact enterprise within the meaning of 18 U.S.C. § 1961(4) through a pattern of racketeering activity as set forth below for the purpose of conducting the unlawful activities described herein.

245.    For the purpose of 18 U.S.C. § 1962(c), THQ/Jakks, Jakks, Jakks Pacific (H.K.), Road Champs Ltd., THQ, SSAI, Shenker, Bell Licensing, Bell, Friedman, Berman, Bennett and Farrell each had authority within the enterprise described above and/or conducted or participated in the unlawful conduct set forth herein through the enterprise described above.

**Effect on Interstate Commerce**

246.    The association-in-fact of THQ/Jakks, Jakks, Jakks Pacific (H.K.), Road Champs Ltd., THQ, SSAI, Shenker, Bell Licensing, Bell, Friedman, Berman, Bennett and Farrell is an entity that engages in and affects interstate commerce by maintaining contacts and conducting economic and other activities throughout the United States and around the world.

**Predicate Acts of Racketeering Activity**

247.    Defendants conducted, engaged in and/or participated in a pattern of predicate acts through the enterprise described above, including the commission of numerous violations of the Federal Mail Fraud Statute, 18 U.S.C. § 1341, the Federal Wire Fraud Statute, 18 U.S.C. §

1343, the Federal Money Laundering Statutes, 18 U.S.C. §§ 1956 and 1957, the Federal Travel

Act, 18 U.S.C. § 1952, the National Stolen Property Act, 18 U.S.C. §§ 2314 and 2315 and New

York Penal Law § 180.03 concerning commercial bribery.  Such violations are "predicate acts"

under 18 U.S.C. § 1961(1)(A) and (B).

248.    Much of the evidence demonstrating the commission of predicate acts remains in

the exclusive possession and control of some and/or all of the Defendants.

249.    Nevertheless, Defendants' predicate acts known at this time include, but are not

limited to, the following:

    a.    In furtherance of a scheme or artifice to defraud, and with specific intent
to defraud, Defendants knowingly used or caused to be used the mails or
wire communications in violation of 18 U.S.C. § 1341 and/or 18 U.S.C. §
1343 to deprive the WWE of its intangible right of honest services from
its licensing agent and supervising managerial employee to obtain thereby
valuable licensing rights from WWE including several amendments to the
domestic toy license, an international toy license, a videogame license,
and further amendments to the domestic and international toy licenses.
Defendants' specific acts of mail and/or wire fraud include at least the
following:

        i.    In furtherance of a scheme or artifice to defraud, and with specific
intent to defraud, on November 20, 1995, Defendant Berman,
individually and on behalf of Defendant Jakks, transmitted by
facsimile a letter to Shenker and SSAI requesting that Shenker
and SSAI perform specified services on behalf of Jakks knowing
that Jakks intended to seek further licensing rights from WWE

and with the intent to create and then trade on the undisclosed conflict of interest.

ii.      In furtherance of a scheme or artifice to defraud, and with specific intent to defraud, on November 29, 1995, Defendant Berman, individually and on behalf of Defendant Jakks, transmitted a memorandum to Shenker by facsimile confirming that an agreement would be sent to Shenker that week retaining Shenker as Jakks' agent regarding the perfumed dolls and, trading on the undisclosed conflict of interest being created, further advised that "Jack [Friedman] and I would appreciate any assistance from you regarding the Junior Kodak prospect," all in reference to WWE licensing rights.

iii.     In furtherance of a scheme or artifice to defraud, and with specific intent to defraud, on January 3, 1996, Defendant Berman, individually and on behalf of Defendant Jakks, authorized a facsimile transmission to SSAI and Shenker transmitting a revised agreement whereby SSAI and Shenker agreed to perform services for Jakks and, trading on the undisclosed conflict of interest, asked "Please advise how soon you can amend the [WWE] agreement to include the disposable cameras and photo albums."

iv.     In furtherance of a scheme or artifice to defraud, and with specific intent to defraud, on February 1, 1996, at the direction of Defendants Friedman and Berman, and on behalf of Defendant Jakks, a memorandum was sent by facsimile to Shenker and SSAI

confirming that all three would meet at the New York Toy Fair on February 14, 1996, the purpose of which was to discuss additional ways Shenker, while an undisclosed agent of Jakks, could assist Jakks in securing for Jakks valuable WWE licensing rights, including amendments to the domestic toy license and the videogame license.

v.  In furtherance of a scheme or artifice to defraud, and with specific intent to defraud, on February 28, 1996, Defendant Berman, individually and on behalf of Defendant Jakks, transmitted by facsimile a memorandum to Shenker confirming their conversation at the February 14, 1996 New York Toy Fair and requesting that Shenker, while acting as an undisclosed agent of Jakks, "forward the necessary amendment to our [WWE] agreement to include Licensed Disposable Cameras and Photo Albums, as well as Europe for distribution of [WWE] Figures as Microphones."

vi.  In furtherance of a scheme or artifice to defraud, and with specific intent to defraud, on March 15, 1996, Defendant Friedman, individually and on behalf of Defendant Jakks, transmitted by facsimile to Shenker stating that he would appreciate "having the amendments sent to [sic] in writing that you verbally agreed to with us.  As it has been discussed, it should contain the following amendments:

1.  Amend the agreement for [WWE] to include the Thumb wrestling

2.      Amend the agreement for [WWE] Cameras and

Photo Albums."

vii.      In furtherance of a scheme or artifice to defraud, and with specific

intent to defraud, on April 22, 1996, Defendant Jakks, on the

authority of Defendants Berman and Friedman, transmitted by

mail to WWE executed copies of the First Amendment to the

domestic toy license granting Jakks the rights to make disposable

cameras, photo albums and thumb-operated wrestling figures, all

as had been requested of Shenker and SSAI by Jakks while

Shenker was an undisclosed agent of Jakks.  The terms of the

First Amendment were exactly as directed by Jakks in its prior

correspondence with Shenker, who did not attempt to obtain more

favorable terms for WWE.

viii.      In furtherance of a scheme or artifice to defraud, and with specific

intent to defraud, on October 19, 1996, Defendant Berman,

individually and on behalf of Defendant Jakks, continued to trade

on the undisclosed conflict of interest and transmitted by mail

and/or wire a memorandum to Shenker advising that Jakks

wanted to obtain the international licensing rights for Jakks'

WWE products and specifying the terms Jakks wanted in the

international license; all in connection with that aspect of the

illicit plan to drive Playmates out of the business of WWE toys

and to obtain the rights Playmates held at the time.

ix.      In furtherance of a scheme or artifice to defraud, and with specific

intent to defraud, on October 19, 1996, Defendant Berman,

individually and on behalf of Defendant Jakks, continued to trade on the undisclosed conflict of interest and transmitted by mail and/or wire a memorandum specifying amendments to the domestic toy license desired by Jakks and the terms desired by Jakks, all in connection with that aspect of the illicit plan to drive Playmates out of the business of WWE toys and to obtain the rights Playmates held at the time.

x.      In furtherance of a scheme or artifice to defraud, and with specific intent to defraud, on December 30, 1996, Defendant Bennett, individually and on behalf of Defendant Jakks, mailed to WWE an executed copy of the Second Amendment to the domestic toy license, which had been recommended to WWE by Shenker and SSAI while undisclosed agents of Jakks following receipt of Berman's October 19, 1996 memorandum.  The terms of the Second Amendment were exactly as directed by Jakks in its October 19, 1996 memoradum to Shenker, who did not attempt to obtain more favorable terms for WWE; all in connection with that aspect of the illicit plan to drive Playmates out of the business of WWE toys and to obtain the rights Playmates held at the time.

xi.     As a reasonably foreseeable result of the artifice to defraud, and in furtherance of it, on or about February 25, 1997, WWE transmitted by mail an executed copy of the International Toy License between Jakks and WWE which Berman, on behalf of Jakks, had sought from Shenker while an undisclosed agent of Jakks by his memorandum of October 19, 1996.  The relevant financial terms recommended by Shenker and SSAI to WWE

were the same as proposed by Berman in his October 19, 1996
memorandum, as to the royalty rate, advance guarantee,
guaranteed royalty amount and length of term, and reflect no
attempt by Shenker to negotiate more favorable terms for WWE,
all in connection with that aspect of the illicit plan to drive
Playmates out of the business of WWE toys and to obtain the
rights Playmates held at the time.

xii.    In furtherance of the scheme or artifice to defraud, and with
specific intent to defraud, Bell transmitted by facsimile on
November 6, 1997 a letter to Playmates offering to absolve
Playmates of liability to WWE if it agreed to transfer its rights to
Jakks.

xiii.   In furtherance of the scheme or artifice to defraud, and with intent
to defraud, Bell, Shenker and Berman participated in a telephone
call during the Hong Kong Toy Show sometime between
January 7-10, 1998 to discuss Bell's participation in the scheme
to act favorably on licensing matters involving Jakks.

xiv.    On January 12, 1998, as a reasonably foreseeable result of the
artifice to defraud, WWE signed and sent by mail and/or
facsimile the Third Amendment to the domestic license
transferring to Jakks the rights formerly held by Playmates.

xv.     In furtherance of a scheme or artifice to defraud, and with specific
intent to defraud, on January 12, 1998, Defendant Bennett,
individually and on behalf of Defendant Jakks, and upon
authorization of Defendants Friedman and/or Berman, transmitted

by facsimile a direction to Wills Hon of Defendant Jakks Pacific (H.K.) to make payment arrangements for Stanfull's January 2, 1998 invoice.

xvi.     In furtherance of a scheme or artifice to defraud, and with specific intent to defraud, on January 14, 1998, pursuant to Defendant Bennett's direction made on behalf of Defendant Jakks and which was authorized by Defendants Friedman and/or Berman, Defendant Road Champs Ltd. wire-transferred $40,000 from its account at the Hang Seng Bank in Hong Kong in an intra-bank transfer to Stanfull's account at the Hang Seng Bank.

xvii.    In furtherance of a scheme or artifice to defraud, and with specific intent to defraud, on January 14, 1998, pursuant to Defendant Bennett's direction made on behalf of Defendant Jakks and authorized by Defendants Friedman and/or Berman, Defendant Jakks Pacific (H.K.) transmitted by facsimile a request to Norwest Bank Minnesota, N.A. ("Norwest Bank") in Hong Kong for telegraphic transfer of $40,000 to Defendant Road Champs Ltd.'s account at the Hang Seng Bank.

xviii.   In furtherance of a scheme or artifice to defraud, and with specific intent to defraud, on January 14, 1998, pursuant to Defendant Bennett's direction made on behalf of Defendant Jakks and authorized by Defendants Friedman and/or Berman, Defendant Jakks Pacific (H.K.) wire-transferred $40,000 from Defendant Jakks Pacific (H.K.)'s account at Norwest Bank to Defendant Road Champs Ltd.'s account at the Hang Seng Bank.

xix.    As a reasonably foreseeable result of Defendants' fraudulent scheme, Norwest Bank transmitted a letter dated January 14, 1998 to Defendant Jakks Pacific (H.K.) confirming that the $40,000 wire-transfer to Defendant Road Champs Ltd. had been completed.

xx.    As a reasonably foreseeable result of Defendants' fraudulent scheme, Hang Seng Bank transmitted a letter dated January 15, 1998 to Defendant Road Champs Ltd. confirming that Defendant Road Champs Ltd.'s account at the Hang Seng Bank had been credited for $40,000 by order of Defendant Jakks Pacific (H.K.)

xxi.    In furtherance of a scheme or artifice to defraud, and with specific intent to defraud, Defendant Road Champs Ltd. falsified its corporate books and records to conceal its $40,000 payment to Stanfull by making it appear as an inter-company transfer between Defendant Jakks Pacific (H.K.) and Defendant Road Champs Ltd.

xxii.    In furtherance of a scheme or artifice to defraud, and with specific intent to defraud, Defendant Bennett, individually and on behalf of Defendant Jakks, falsified Defendant Jakks' corporate books and records by failing to record the $40,000 payment to Stanfull.

xxiii.    In furtherance of a scheme or artifice to defraud, and with specific intent to defraud, on March 31, 1998, Defendant Bennett, individually and on behalf of Defendant Jakks and upon authorization of Defendants Friedman and/or Berman, transmitted by facsimile a direction to Wills Hon of Defendant Jakks Pacific

(H.K.) to make payment arrangements for the second installment payment of Stanfull's January 2, 1998 invoice, specifically instructing Mr. Hon that it was "imperative" that the payment be made available April 2, 1998.

xxiv.    As a reasonably foreseeable result of Defendants' fraudulent scheme, Norwest Bank transmitted a letter dated April 1, 1998 to Defendant Jakks Pacific (H.K.) confirming that Defendant Jakks Pacific (H.K.)'s account had been debited in the amount of $40,000.

xxv.    In furtherance of a scheme or artifice to defraud, and with specific intent to defraud, on April 2, 1998, pursuant to Defendant Bennett's direction made on behalf of Defendant Jakks and authorized by Defendants Friedman and/or Berman, Defendant Jakks Pacific (H.K.) wire-transferred $40,000 from its account at Norwest Bank to Stanfull's account at the Hang Seng Bank.

xxvi.    In furtherance of a scheme to defraud, and with specific intent to defraud, Shenker, Friedman and/or Berman participated in telephone calls between April 27, 1998 and May 7, 1998 during which Shenker disclosed the terms of Activision's and THQ's expressions of interest in the videogame license.

xxvii.    In furtherance of a scheme to defraud, and with specific intent to defraud, Friedman and/or Berman and Farrell participated in telephone calls between April 27, 1998 and May 7, 1998 discussing the terms on which THQ would be included in the videogame license and other matters alleged herein.

xxviii.    In furtherance of a scheme to defraud, and with specific intent to defraud, Friedman, on behalf of Defendants Jakks and THQ, participated in a phone call on or about May 7, 1998 in which he provided to Shenker the terms to be offered to WWE for a videogame license to Jakks and THQ.

xxix.    In furtherance of Defendants' scheme or artifice to defraud, and with specific intent to defraud, on May 7, 1998, Defendant Berman, on behalf of Defendants Jakks and THQ, transmitted by facsimile a letter to Defendant Bell regarding toy company strength in marketing vs. videogame strength in marketing, which Defendant Bell subsequently forwarded to Linda McMahon as part of an effort to deceive her that Jakks' and THQ's participation in the videogame license was "right on target."

xxx.    As a reasonably foreseeable result of Defendants' fraudulent scheme, on May 28, 1998, Edward L. Kaufman, Esq., General Counsel of WWE ("Kaufman"), transmitted by Federal Express a letter to Murray Skala, Esq., counsel to Jakks, regarding a draft of the proposed videogame license agreement and attaching a copy of the videogame license deal memo.

xxxi.    As a reasonably foreseeable result of Defendants' fraudulent scheme, and in furtherance of Defendants' scheme or artifice to defraud, and with specific intent to defraud, on June 2, 1998, Defendant Berman, individually and on behalf of Defendants Jakks and THQ, upon authorization of Defendant Friedman, transmitted by facsimile a letter to Defendant Shenker regarding,

among other things, (i) comments regarding the proposed videogame license agreement, which was to be forwarded to Defendants Bell and Shenker on June 3, 1998; (ii) the fifth amendment to Jakks' domestic toy license with WWE; and (iii) the third amendment to Jakks' international toy license with WWE.

xxxii.    As a reasonably foreseeable result of Defendants' fraudulent scheme, and in furtherance of Defendants' scheme or artifice to defraud, on June 3, 1998, Defendant Berman, individually and on behalf of Defendants Jakks and THQ, transmitted by facsimile a letter to Defendants Bell and Shenker, and to Kaufman, enclosing comments regarding the proposed videogame license agreement.

xxxiii.    As a reasonably foreseeable result of Defendants' fraudulent scheme, and in furtherance of Defendants' scheme or artifice to defraud, on June 3, 1998, Defendant Berman, individually and on behalf of Defendants Jakks and THQ, transmitted by facsimile a letter to Defendants Bell and Shenker, and to Kaufman, enclosing revised comments regarding the proposed videogame license agreement.

xxxiv.    As a reasonably foreseeable result of Defendants' fraudulent scheme, and in furtherance of Defendants' scheme or artifice to defraud, on June 4, 1998, Daniel Offner, counsel to Defendant THQ, on behalf of Defendants THQ and Jakks, transmitted by facsimile a letter to Kaufman, Geoffrey Bass, Esq., counsel for

Defendant Jakks, Defendant Farrell and Defendant Berman enclosing revisions to the proposed videogame license agreement.

xxxv.    As a reasonably foreseeable result of Defendants' fraudulent scheme, and in furtherance of Defendants' scheme or artifice to defraud, on June 5, 1998, Defendant Berman, individually and on behalf of Defendants Jakks and THQ, transmitted by facsimile a letter to Defendant Bell enclosing revisions to the proposed videogame license agreement.

xxxvi.   As a reasonably foreseeable result of Defendants' fraudulent scheme, and in furtherance of Defendants' scheme or artifice to defraud, on June 9, 1998, Geoffrey Bass, Esq., counsel for Defendant Jakks, on behalf of Defendants Jakks and THQ, upon authorization of Defendants Friedman and/or Berman, transmitted by facsimile a letter to Kaufman enclosing comments to the revised proposed videogame license agreement.

xxxvii.  As a reasonably foreseeable result of Defendants' fraudulent scheme, on June 10, 1998, Kaufman transmitted by facsimile a redlined version of the proposed videogame license agreement to Geoffrey Bass, Esq., counsel to Defendant Jakks.

xxxviii. As a reasonably foreseeable result of Defendants' fraudulent scheme, and in furtherance of Defendants' scheme or artifice to defraud, on June 17, 1998, Geoffrey Bass, Esq., counsel for Jakks, on behalf of Defendants Jakks, THQ, and THQ/Jakks, transmitted by facsimile a letter to Kaufman requesting copies of the videogame license agreement executed by WWE for Mr. Bass

to provide to Defendants THQ and Jakks, and attaching a copy of the videogame license agreement executed by Defendant Farrell, President and Chief Executive Officer of THQ/Jakks.

xxxix.   As a reasonably foreseeable result of Defendants' fraudulent scheme, on June 24, 1998, Kaufman transmitted by Federal Express to Defendant Friedman, on behalf of Defendant Jakks, an unexecuted copy of the fifth amendment to Jakks' domestic toy license agreement with WWE.

xl.   As a reasonably foreseeable result of Defendants' fraudulent scheme, on June 24, 1998, Kaufman transmitted by Federal Express to Defendant Friedman, on behalf of Defendant Jakks, an unexecuted copy of the third amendment to Jakks' international toy license agreement with WWE.

xli.   As a reasonably foreseeable result of Defendants' fraudulent scheme, and in furtherance of Defendants' scheme or artifice to defraud, on July 1, 1998, Defendant Bennett, individually and on behalf of Defendant Jakks, upon authorization of Defendant Friedman, transmitted to WWE a copy of the fifth amendment to Jakks' domestic toy license with WWE executed by Defendant Berman.

xlii.   As a reasonably foreseeable result of Defendants' fraudulent scheme, on or about July 2, 1998, Kaufman transmitted by Federal Express to Defendant Bennett a fully executed copy of the fifth amendment to Jakks' domestic toy license agreement with WWE.

xliii.   In furtherance of a scheme or artifice to defraud, and with specific intent to defraud, on July 27, 1998, Defendant SSAI transmitted by facsimile to Defendant Berman a phony invoice directed to Jakks from Stanfull dated July 15, 1998 in the amount of $20,000 falsely purporting to invoice Defendant Jakks for alleged product development.

xliv.   In furtherance of a scheme or artifice to defraud, and with specific intent to defraud, on July 30, 1998, Defendant Bennett, individually and on behalf of or for the benefit of Defendants Jakks, THQ, and THQ/Jakks, upon authorization of Defendants Friedman and/or Berman, transmitted by facsimile to Elmen Lai of Defendant Road Champs Ltd. a copy of Stanfull's July 15, 1998 invoice, directing that payment be made.

xlv.   In furtherance of a scheme or artifice to defraud, and with specific intent to defraud, on August 3, 1998, pursuant to Defendant Bennett's direction made on behalf of and for the benefit of Defendants Jakks, THQ, and THQ/Jakks, Elmen Lai of Defendant Road Champs Ltd. transmitted an email communication to Defendant Bennett confirming that $20,000 was paid to Stanfull.

xlvi.   In furtherance of a scheme or artifice to defraud, and with specific intent to defraud, on August 4, 1998, pursuant to Defendant Bennett's direction made on behalf of and for the benefit of Defendants Jakks, THQ, and THQ/Jakks, Defendant Road Champs Ltd. wire-transferred $20,000 from its account at the

Hang Seng Bank in an intra-bank transfer to Stanfull's account at the Hang Seng Bank.

xlvii.    As a reasonably foreseeable result of Defendants' fraudulent acts and in furtherance of Defendants' scheme or artifice to defraud, on June 9, 1998, Defendant Farrell, on behalf of Defendants Jakks, THQ, and THQ/Jakks, transmitted by facsimile a letter to Defendant Bell regarding his recent meeting with Bell in Stamford, Connecticut, and meetings between Defendants THQ and Jakks.

xlviii.    As a reasonably foreseeable result of Defendants' fraudulent acts and in furtherance of Defendants' artifice to defraud, on July 2, 1998, WWE transmitted by mail a check in the amount of $301,751.54 to SSAI, all of which reflected payments to SSAI on the videogame license with THQ/Jakks.

xlix.    In furtherance of a scheme or artifice to defraud, and with specific intent to defraud, on December 21, 1998, Defendant Shenker caused Defendant SSAI to wire-transfer $280,616 from Defendant SSAI's checking account at Fleet Bank, headquartered in Fort Lee, New Jersey, to Stanfull's account at the Hang Seng Bank, consisting of $165,000 of commissions Defendant SSAI was paid by WWE on the videogame license.

l.    In furtherance of a scheme or artifice to defraud, and with specific intent to defraud, on January 11, 1999, Defendant Shenker wire-transferred $280,601 from Stanfull's account at the Hang Seng Bank to Defendant Bell Licensing's money market account at

Hudson Bank, consisting of $165,000 in commissions Defendant SSAI was paid by WWE on the videogame license.

li.    As a reasonably foreseeable result of Defendants' fraudulent acts and in furtherance of Defendants' artifice to defraud, on February 10, 2000 WWE transmitted by mail a check in the amount of $663,037.70 to SSAI, of which $165,000 represented payments to SSAI on the videogame license with THQ/Jakks.

lii.    As a reasonably foreseeable result of Defendants' fraudulent acts and in furtherance of Defendants' artifice to defraud, on June 9, 2000, WWE transmitted by mail a check in the amount of $312,788.55 to SSAI, of which $247,280.90 represented payments to SSAI on the videogame license with THQ/Jakks.

liii.    As a reasonably foreseeable result of Defendants' fraudulent acts and in furtherance of Defendants' artifice to defraud, on August 24, 2000, WWE transmitted by mail a check in the amount of $324,540.66 to SSAI, of which $132,735.44 represented payments to SSAI on the videogame license with THQ/Jakks.

liv.    In furtherance of a scheme or artifice to defraud, and with specific intent to defraud, Friedman in or around October 2000 telephoned Linda McMahon offering to broker a settlement between Shenker and WWE; said call being made in the hope that such a settlement would serve to forever conceal the illegal conduct set forth herein.

lv.      In furtherance of a scheme or artifice to defraud, and with specific intent to defraud, Friedman on or about November 11, 2003 telephoned Linda McMahon and misrepresented the nature, extent and purpose of payments made to Shenker by Jakks.

lvi.      Various uses of the mails and wires between and among Defendants Jakks, Shenker, SSAI, THQ, and THQ/Jakks in furtherance of the scheme and artifice to defraud by denying WWE the benefits of honest services from its licensing agents, the evidence of which is in the exclusive possession of Jakks, THQ and/or THQ/Jakks.

b.      In violation of the Federal Money Laundering Statutes, 18 U.S.C. §§ 1956 and 1957, Defendants' payment and/or receipt of unlawful bribes and payments to secure the videogame license and the 1998 amendments to the toy licenses, and/or subsequent receipt of benefits as a result of the unlawful bribes, involved the proceeds of commercial bribery, an enumerated unlawful activity under 18 U.S.C. § 1956, and were designed to conceal or disguise the nature and the source of such proceeds.  In addition and/or in the alternative, Defendants' payment and receipt of unlawful bribes and payments to secure the videogame license and the 1998 amendments to the toy licenses, and/or Defendants' subsequent payment, receipt or transfer of the benefits obtained by commercial bribery, involved the knowing deposit, withdrawal, transfer or exchange of funds or a monetary instrument through or to a financial institution of a value in excess of $10,000, and constituted, represented or was derived from the proceeds obtained by commercial bribery, an enumerated unlawful activity under 18 U.S.C. § 1957.  Defendants' specific acts of

money laundering in violation of 18 U.S.C. §§ 1956 and 1957 include at least the following:

i.    In furtherance of, and with the intent to conceal proceeds of the commercial bribery scheme, on January 14, 1998, pursuant to Defendant Bennett's direction made on behalf of Defendant Jakks and which was authorized by Defendants Friedman and/or Berman, Defendant Road Champs Ltd. wire-transferred $40,000 from its account at the Hang Seng Bank in Hong Kong in an intra-bank transfer to Stanfull's account at the Hang Seng Bank.

ii.   In furtherance of, and with the intent to conceal proceeds of the commercial bribery scheme, on January 14, 1998, pursuant to Defendant Bennett's direction made on behalf of Defendant Jakks and authorized by Defendants Friedman and/or Berman, Defendant Jakks Pacific (H.K.) wire-transferred $40,000 from Defendant Jakks Pacific (H.K.)'s account at Norwest Bank to Defendant Road Champs Ltd.'s account at the Hang Seng Bank.

iii.  In furtherance of, and with the intent to conceal proceeds of the commercial bribery scheme, by demand draft dated January 14, 1998 drawn on Stanfull's account at the Hang Seng Bank, Defendant Shenker paid Defendant Bell $20,000 of the $40,000 paid to Stanfull from Defendant Road Champs Ltd.

iv.   In furtherance of, and with the intent to conceal proceeds of the commercial bribery scheme, on April 2, 1998, pursuant to Defendant Bennett's direction made on behalf of Defendant Jakks and authorized by Defendants Friedman and/or Berman,

Defendant Jakks Pacific (H.K.) wire-transferred $40,000 from its account at Norwest Bank to Stanfull's account at the Hang Seng Bank.

v.      In furtherance of, and with the intent to conceal proceeds of the commercial bribery scheme, by demand draft dated April 7, 1998 drawn on Stanfull's account at the Hang Seng Bank, Defendant Shenker paid Defendant Bell Licensing $20,000 of the $40,000 paid to Stanfull from Defendant Jakks Pacific (H.K.).

vi.     In furtherance of, and with the intent to conceal proceeds of the commercial bribery scheme, on or about April 7, 1998, Defendant Bell deposited the Stanfull demand draft paid to Defendant Bell Licensing into a MBNA money market account owned by Defendant Bell, which cleared through Citibank located in New York.

vii.    In furtherance of Defendants' commercial bribery scheme, on July 3, 1998, Defendant Shenker deposited a check, dated July 3, 1998, from WWE in the amount of $301,751.54 into SSAI's Fleet Bank account, consisting of commissions related to the advance on the videogame license, which represented proceeds derived from Defendants' commercial bribery scheme.  The total of SSAI's commission related to the videogame license was $330,000; however, due to an overpayment of commissions in a prior month, WWE deducted $28,248.46 from that amount, thereby SSAI only received $301,751.54 on July 3, 1998.

viii.    In furtherance of, and with the intent to conceal proceeds of the commercial bribery scheme, on August 4, 1998, pursuant to Defendant Bennett's direction made on behalf of and for the benefit of Defendants Jakks, THQ, and THQ/Jakks, Defendant Road Champs Ltd. wire-transferred $20,000 from its account at the Hang Seng Bank in an intra-bank transfer to Stanfull's account at the Hang Seng Bank.

ix.    In furtherance of, and with the intent to conceal proceeds of Defendants' commercial bribery scheme, by check no. 1881, dated October 8, 1998, Defendant Shenker caused Defendant SSAI to pay Defendant Bell Licensing $20,000, drawn on SSAI's checking account at Fleet Bank, headquartered in Fort Lee, New Jersey.

x.    In furtherance of, and with the intent to conceal proceeds of Defendants' commercial bribery scheme, on October 9, 1998, Defendant Bell deposited the October 8, 1998 check from Defendant SSAI into Defendant Bell Licensing's Hudson Bank money market account located in Darien, Connecticut, thereby causing the check to clear at Hudson Bank's main office located in Mahwah, New Jersey.

xi.    In furtherance of, and with the intent to conceal proceeds of the commercial bribery scheme, on December 21, 1998, Defendant Shenker caused Defendant SSAI to wire-transfer $280,616 from Defendant SSAI's checking account at Fleet Bank, headquartered in Fort Lee, New Jersey, to Stanfull's account at the Hang Seng

Bank, consisting in part of $165,000 which was exactly 50% of the advance Defendant SSAI was paid by WWE on the videogame license. Defendant SSAI's transfer to Stanfull was the precursor to Defendant Bell Licensing's receipt of the unlawful proceeds, as Defendant Shenker elected to run the transaction through a foreign bank account in order to conceal the nature and source of the payments.

xii.   In furtherance of, and with the intent to conceal proceeds of the commercial bribery scheme, on January 11, 1999, Defendant Shenker wire-transferred $280,601 from Stanfull's account at the Hang Seng Bank to Defendant Bell Licensing's money market account at Hudson Bank, consisting of $165,000, exactly 50% of the advance Defendant SSAI was paid by WWE on the videogame license.

xiii.  In furtherance of Defendants' commercial bribery scheme, on February 7, 2000 Defendant Shenker deposited a check dated February 4, 2000 from WWE in the amount of $663,037.70 into SSAI's Fleet Bank account, consisting of $165,000 in commissions related to the videogame license, which represented proceeds derived from Defendants' commercial bribery scheme.

xiv.   In furtherance of, and with the intent to conceal proceeds of the commercial bribery scheme, by check no. 2595 dated February 22, 2000, drawn on SSAI's bank account at Fleet Bank, headquartered in Fort Lee, New Jersey, Defendant SSAI paid $95,396.90 to Defendant Bell Licensing, consisting of $82,500,

exactly 50% of the commissions paid to Defendant SSAI by WWE on the videogame license.

xv.    In furtherance of, and with the intent to conceal proceeds of the commercial bribery scheme, on February 23, 2000, Defendant Bell deposited the February 22, 2000 check from Defendant SSAI into Defendant Bell Licensing's Hudson Bank money market account located in Darien, Connecticut, thereby causing the check to clear at Hudson Bank's main office located in Mahwah, New Jersey.

xvi.    In furtherance of Defendants' commercial bribery scheme, on June 12, 2000, Defendant SSAI deposited a check, dated June 9, 2000, from WWE, in the amount of $312,788.55 into SSAI's Fleet Bank account, consisting of $247,180.90 of commissions related to the videogame license, which represented proceeds derived from Defendants' commercial bribery scheme.

xvii.    In furtherance of, and with the intent to conceal proceeds of the commercial bribery scheme, by check no. 2832 dated June 16, 2000 drawn on Defendant SSAI's bank account at Fleet Bank, headquartered in Fort Lee, New Jersey, Defendant SSAI paid $124,454 to Defendant Bell Licensing, consisting of $123,590.45, exactly 50% of commissions paid to Defendant SSAI by WWE on the videogame license.

xviii.    In furtherance of, and with the intent to conceal proceeds of the commercial bribery scheme, on June 19, 2000, Defendant Bell deposited Defendant SSAI's June 16, 2000 check into Defendant

Bell Licensing's Hudson Bank money market account located in Darien, Connecticut, thereby causing the check to clear at Hudson Bank's main office located in Mahwah, New Jersey.

xix.      In furtherance of Defendants' commercial bribery scheme, on August 25, 2000, Defendant Shenker deposited a check, dated August 18, 2000, in the amount of $324,540.66 into SSAI's Fleet Bank account, consisting of $132,735.44 of commissions related to the videogame license, which represented proceeds derived from Defendants' commercial bribery scheme.

xx.      In furtherance of, and with the intent to conceal proceeds of the commercial bribery scheme, by check no. 3016 dated September 10, 2000 drawn on Defendant SSAI's bank account at Fleet Bank, headquartered in Fort Lee, New Jersey, Defendant SSAI paid $84,525.29 to Defendant Bell Licensing, consisting of $66,367.72, exactly 50% of commissions paid to Defendant SSAI by WWE on the videogame license.

xxi.      In furtherance of, and with the intent to conceal proceeds of the commercial bribery scheme, on September 12, 2000, Defendant Bell deposited Defendant SSAI's September 10, 2000 check into Defendant Bell Licensing's Hudson Bank money market account located in Darien, Connecticut, thereby causing the check to clear at Hudson Bank's main office located in Mahwah, New Jersey.

xxii.      In furtherance of, and with the intent to conceal proceeds of the commercial bribery scheme, by check no. 1846 dated September 14, 2001 drawn on Defendant Shenker's account at

Fleet Bank headquartered in Fort Lee, New Jersey, Defendant Shenker paid Defendant Bell $52,948, representing a split of the proceeds from Defendant Shenker's sale of THQ and Jakks stock acquired pursuant to the videogame license.

xxiii.    In furtherance of, and with the intent to conceal proceeds of the commercial bribery scheme, on September 24, 2001, Defendant Bell deposited Defendant Shenker's September 14, 2001 check into Defendant Bell's Citibank preferred money market account, account no. 47507343, thereby causing the check to clear at Citibank in New York.

xxiv.    In furtherance of, and with the intent to conceal proceeds of the commercial bribery scheme, by check no. 1869 dated October 12, 2001 drawn on Defendant Shenker's account at Fleet Bank headquartered in Fort Lee, New Jersey, Defendant Shenker paid Defendant Bell $26,994, representing a split of the proceeds of Defendant Shenker's sale of THQ and Jakks stock acquired pursuant to the videogame license.

xxv.    In furtherance of, and with the intent to conceal proceeds of the commercial bribery scheme, on October 13, 2001, Defendant Bell deposited Defendant Shenker's October 12, 2001 check into Defendant Bell's branch account at Hudson Bank located in Connecticut, thereby causing the check to clear at Hudson Bank's main office located in Mahwah, New Jersey.

xxvi.    In furtherance of, and with the intent to conceal proceeds of the commercial bribery scheme, by check no. 1894 dated

December 11, 2001 drawn on Defendant Shenker's account at Fleet Bank headquartered in Fort Lee, New Jersey, Defendant Shenker paid Defendant Bell $26,944, representing a split of the proceeds of Defendant Shenker's sale of THQ and Jakks stock acquired pursuant to the videogame license.

xxvii.    In furtherance of, and with the intent to conceal proceeds of the commercial bribery scheme, on December 13, 2001, Defendant Bell deposited Defendant Shenker's December 11, 2001 check into Defendant Bell's branch account at Hudson Bank located in Connecticut, thereby causing the check to clear at Hudson Bank's main office located in Mahwah, New Jersey.

xxviii.    For the first quarter of 2000, on April 28, 2000, Defendant THQ/Jakks, on behalf of and with the authorization of Defendants THQ and/or Farrell and/or Jakks and/or Friedman and/or Berman, paid WWE $2,247,098.87, consisting of royalties related to the videogame license.

xxix.    For the first quarter of 2000, Defendant THQ, on behalf of and with the authorization of Defendants THQ/Jakks and/or Farrell, paid Defendant Jakks $5,303,000 in connection with the videogame license, and Defendant Jakks, with the authorization of Defendants Friedman and/or Berman and/or Bennett, engaged in monetary transactions related to the deposit and/or subsequent transfer of that payment.

xxx.    For the second quarter of 2000, on July 27, 2000, Defendant THQ/Jakks, on behalf of and with the authorization of Defendants

THQ and/or Farrell and/or Jakks and/or Friedman and/or Berman, paid WWE $1,206,685.84, consisting of royalties related to the videogame license.

xxxi.   For the second quarter of 2000, Defendant THQ, on behalf of and with the authorization of Defendants THQ/Jakks and/or Farrell, paid Defendant Jakks $1,600,000 in connection with the videogame license, and Defendant Jakks, with the authorization of Defendants Friedman and/or Berman and/or Bennett, engaged in monetary transactions related to the deposit and/or subsequent transfer of that payment.

xxxii.  For the third quarter of 2000, on October 24, 2000, Defendant THQ, on behalf of and with the authorization of Defendants THQ/Jakks and/or Farrell, paid WWE $1,593,798.96, consisting of royalties related to the videogame license.

xxxiii. For the third quarter of 2000, on dates known only to Defendants, Defendant THQ, on behalf of and with the authorization of Defendants THQ/Jakks and/or Farrell, paid Defendant Jakks $1,343,000 in connection with the videogame license, and Defendant Jakks, with the authorization of Defendants Friedman and/or Berman and/or Bennett, engaged in monetary transactions related to the deposit and/or subsequent transfer of that payment.

xxxiv.  For the fourth quarter of 2000, on January 26, 2001, Defendant THQ, on behalf of and with the authorization of Defendants THQ/Jakks and/or Farrell, paid WWE $7,200,339.75, consisting of royalties related to the videogame license.

xxxv.   For the fourth quarter of 2000, on dates known only to Defendants, Defendant THQ, on behalf of and with the authorization of Defendants THQ/Jakks and/or Farrell, paid Defendant Jakks $9,461,000 in connection with the videogame license, and Defendant Jakks, with the authorization of Defendants Friedman and/or Berman and/or Bennett, engaged in monetary transactions related to the deposit and/or subsequent transfer of that payment.

xxxvi.   For the first quarter of 2001, on April 30, 2001, Defendant THQ, on behalf of and with the authorization of Defendants THQ/Jakks and/or Farrell, paid WWE $870,836.70, consisting of royalties related to the videogame license.

xxxvii.   For the first quarter of 2001, on dates known only to Defendants, Defendant THQ, on behalf of and with the authorization of Defendants THQ/Jakks and/or Farrell, paid Defendant Jakks $1,423,000 in connection with the videogame license, and Defendant Jakks, with the authorization of Defendants Friedman and/or Berman and/or Bennett, engaged in monetary transactions related to the deposit and/or subsequent transfer of that payment.

xxxviii.   For the second quarter of 2001, on July 30, 2001, Defendant THQ, on behalf of and with the authorization of Defendants THQ/Jakks and/or Farrell, paid WWE $1,065,645.62, consisting of royalties related to the videogame license.

xxxix.   For the second quarter of 2001, on dates known only to Defendants, Defendant THQ, on behalf of and with the

authorization of Defendants THQ/Jakks and/or Farrell, paid Defendant Jakks $339,000 in connection with the videogame license, and Defendant Jakks, with the authorization of Defendants Friedman and/or Berman and/or Bennett, engaged in monetary transactions related to the deposit and/or subsequent transfer of that payment.

xl.    For the third quarter of 2001, on October 31, 2001, Defendant THQ, on behalf of and with the authorization of Defendants THQ/Jakks and/or Farrell, paid WWE $236,700.91, consisting of royalties related to the videogame license.

xli.    For the third quarter of 2001, on dates known only to Defendants, Defendant THQ, on behalf of and with the authorization of Defendants THQ/Jakks and/or Farrell, paid Defendant Jakks $342,000 in connection with the videogame license, and Defendant Jakks, with the authorization of Defendants Friedman and/or Berman and/or Bennett, engaged in monetary transactions related to the deposit and/or subsequent transfer of that payment.

xlii.    For the fourth quarter of 2001, on January 25, 2002, Defendant THQ, on behalf of and with the authorization of Defendants THQ/Jakks and/or Farrell, paid WWE $4,620,563.52, consisting of royalties related to the videogame license.

xliii.    For the fourth quarter of 2001, on dates known only to Defendants, Defendant THQ, on behalf of and with the authorization of Defendants THQ/Jakks and/or Farrell, paid Defendant Jakks $6,569,000 in connection with the videogame

license, and Defendant Jakks, with the authorization of

Defendants Friedman and/or Berman and/or Bennett, engaged in

monetary transactions related to the deposit and/or subsequent

transfer of that payment.

xliv.    For the fourth quarter of 2001, on February 1, 2002, Defendant

THQ, on behalf of and with the authorization of Defendants

THQ/Jakks and/or Farrell, paid WWE an additional $303,401.83,

consisting of royalties related to the videogame license.

xlv.    For the first quarter of 2002, on April 30, 2002, Defendant THQ,

on behalf of and with the authorization of Defendants THQ/Jakks

and/or Farrell, paid WWE $1,165,557.15, consisting of royalties

related to the videogame license.

xlvi.    For the first quarter of 2002, on dates known only to Defendants,

Defendant THQ, on behalf of and with the authorization of

Defendants THQ/Jakks and/or Farrell, paid Defendant Jakks

$1,572,000 in connection with the videogame license, and

Defendant Jakks, with the authorization of Defendants Friedman

and/or Berman and/or Bennett, engaged in monetary transactions

related to the deposit and/or subsequent transfer of that payment.

xlvii.    For the second quarter of 2002, on July 26, 2002, Defendant

THQ, on behalf of and with the authorization of Defendants

THQ/Jakks and/or Farrell, paid WWE $1,279,681.37, consisting

of royalties related to the videogame license.

xlviii.    For the second quarter of 2002, on dates known only to Defendants, Defendant THQ, on behalf of and with the authorization of Defendants THQ/Jakks and/or Farrell, paid Defendant Jakks $1,500,000 in connection with the videogame license, and Defendant Jakks, with the authorization of Defendants Friedman and/or Berman and/or Bennett, engaged in monetary transactions related to the deposit and/or subsequent transfer of that payment.

xlix.    For the third quarter of 2002, on October 25, 2002, Defendant THQ, on behalf of and with the authorization of Defendants THQ/Jakks and/or Farrell, paid WWE $1,106,996.17, consisting of royalties related to the videogame license.

l.    For the third quarter of 2002, on dates known only to Defendants, Defendant THQ, on behalf of and with the authorization of Defendants THQ/Jakks and/or Farrell, paid Defendant Jakks $1,044,000 in connection with the videogame license, and Defendant Jakks, with the authorization of Defendants Friedman and/or Berman and/or Bennett, engaged in monetary transactions related to the deposit and/or subsequent transfer of that payment.

li.    For the fourth quarter of 2002, on January 27, 2003, Defendant THQ, on behalf of and with the authorization of Defendants THQ/Jakks and/or Farrell, paid WWE $5,145,649.93, consisting of royalties related to the videogame license.

lii.    For the fourth quarter of 2002, on dates known only to Defendants, Defendant THQ, on behalf of and with the

authorization of Defendants THQ/Jakks and/or Farrell, paid Defendant Jakks $6,030,000 in connection with the videogame license, and Defendant Jakks, with the authorization of Defendants Friedman and/or Berman and/or Bennett, engaged in monetary transactions related to the deposit and/or subsequent transfer of that payment.

liii.     For the first quarter of 2003, on April 30, 2003, Defendant THQ, on behalf of and with the authorization of Defendants THQ/Jakks and/or Farrell, paid WWE $875,404, consisting of royalties related to the videogame license.

liv.     For the first quarter of 2003, on dates known only to Defendants, Defendant THQ, on behalf of and with the authorization of Defendants THQ/Jakks and/or Farrell, paid Defendant Jakks $644,000 in connection with the videogame license, and Defendant Jakks, with the authorization of Defendants Friedman and/or Berman and/or Bennett, engaged in monetary transactions related to the deposit and/or subsequent transfer of that payment.

lv.     For the second quarter of 2003, on July 28, 2003, Defendant THQ, on behalf of and with the authorization of Defendants THQ/Jakks and/or Farrell, paid WWE $950,918, consisting of royalties related to the videogame license.

lvi.     For the second quarter of 2003, on dates known only to Defendants, Defendant THQ, on behalf of and with the authorization of Defendants THQ/Jakks and/or Farrell, paid Defendant Jakks $465,000 in connection with the videogame

license, and Defendant Jakks, with the authorization of
Defendants Friedman and/or Berman and/or Bennett, engaged in
monetary transactions related to the deposit and/or subsequent
transfer of that payment.

lvii.    For the third quarter of 2003, on October 28, 2003, Defendant
THQ, on behalf of and with the authorization of Defendants
THQ/Jakks and/or Farrell, paid WWE $2,089,446, consisting of
royalties related to the videogame license.

lviii.   For the third quarter of 2003, on dates known only to Defendants,
Defendant THQ, on behalf of and with the authorization of
Defendants THQ/Jakks and/or Farrell, paid Defendant Jakks
$2,095,000 in connection with the videogame license, and
Defendant Jakks, with the authorization of Defendants Friedman
and/or Berman and/or Bennett, engaged in monetary transactions
related to the deposit and/or subsequent transfer of that payment.

lix.     For the fourth quarter of 2003, on January 23, 2004, Defendant
THQ, on behalf of and with the authorization of Defendants
THQ/Jakks and/or Farrell, paid WWE $5,460,091, consisting of
royalties related to the videogame license.

lx.      For the fourth quarter of 2003, on dates known only to
Defendants, Defendant THQ, on behalf of and with the
authorization of Defendants THQ/Jakks and/or Farrell, paid
Defendant Jakks $6,257,000 in connection with the videogame
license, and Defendant Jakks, with the authorization of
Defendants Friedman and/or Berman and/or Bennett, engaged in

monetary transactions related to the deposit and/or subsequent transfer of that payment.

lxi.     For the first quarter of 2004, on April 29, 2004, Defendant THQ, on behalf of and with the authorization of Defendants THQ/Jakks and/or Farrell, paid WWE $853,723, consisting of royalties related to the videogame license.

lxii.     For the first quarter of 2004, on dates known only to Defendants, Defendant THQ, on behalf of and with the authorization of Defendants THQ/Jakks and/or Farrell, paid Defendant Jakks $858,000 in connection with the videogame license, and Defendant Jakks, with the authorization of Defendants Friedman and/or Berman and/or Bennett, engaged in monetary transactions related to the deposit and/or subsequent transfer of that payment.

lxiii.     For the second quarter of 2004, on July 27, 2004, Defendant THQ, on behalf of and with the authorization of Defendants THQ/Jakks and/or Farrell, paid WWE $1,179,097, consisting of royalties related to the videogame license.

lxiv.     For the second quarter of 2004, on dates known only to Defendants, Defendant THQ, on behalf of and with the authorization of Defendants THQ/Jakks and/or Farrell, paid Defendant Jakks $524,000 in connection with the videogame license, and Defendant Jakks, with the authorization of Defendants Friedman and/or Berman and/or Bennett, engaged in monetary transactions related to the deposit and/or subsequent transfer of that payment.

lxv.     For the third quarter of 2004, on October 26, 2004, Defendant THQ, on behalf of and with the authorization of Defendants THQ/Jakks and/or Farrell, paid WWE $1,321,077, consisting of royalties related to the videogame license.

lxvi.     For the third quarter of 2004, on dates known only to Defendants, Defendant THQ, on behalf of and with the authorization of Defendants THQ/Jakks and/or Farrell, paid Defendant Jakks $1,512,000 in connection with the videogame license, and Defendant Jakks, with the authorization of Defendants Friedman and/or Berman and/or Bennett, engaged in monetary transactions related to the deposit and/or subsequent transfer of that payment.

lxvii.     For the fourth quarter of 2004, on January 26, 2005, Defendant THQ, on behalf of and with the authorization of Defendants THQ/Jakks and/or Farrell, paid WWE $6,632,006, consisting of royalties related to the videogame license.

lxviii.     For the fourth quarter of 2004, on dates known only to Defendants, Defendant THQ, on behalf of and with the authorization of Defendants THQ/Jakks and/or Farrell, paid Defendant Jakks $7,050,000 in connection with the videogame license, and Defendant Jakks, with the authorization of Defendants Friedman and/or Berman and/or Bennett, engaged in monetary transactions related to the deposit and/or subsequent transfer of that payment.

lxix.     For the first quarter of 2000, on April 25, 2000, Defendant Jakks, with the authorization of Defendants Friedman and/or Berman

and/or Bennett, paid WWE $187,977.12, consisting of royalties related to the international toy license.

lxx.     For the second quarter of 2000, on July 27, 2000, Defendant Jakks, with the authorization of Defendants Friedman and/or Berman and/or Bennett, paid WWE $403,619.94, consisting of royalties related to the international toy license.

lxxi.     For the third quarter of 2000, on October 25, 2000, Defendant Jakks, with the authorization of Defendants Friedman and/or Berman and/or Bennett, paid WWE $290,236.78, consisting of royalties related to the international toy license.

lxxii.     For the fourth quarter of 2000, on January 25, 2001, Defendant Jakks, with the authorization of Defendants Friedman and/or Berman and/or Bennett, paid WWE $274,729.85, consisting of royalties related to the international toy license.

lxxiii.     For the first quarter of 2001, on April 26, 2001, Defendant Jakks, with the authorization of Defendants Friedman and/or Berman and/or Bennett, paid WWE $326,135, consisting of royalties related to the international toy license.

lxxiv.     For the second quarter of 2001, on July 27, 2001 Defendant Jakks, with the authorization of Defendants Friedman and/or Berman and/or Bennett, paid WWE $491,324.43, consisting of royalties related to the international toy license.

lxxv.     For the third quarter of 2001, on October 24, 2001, Defendant Jakks, with the authorization of Defendants Friedman and/or

Berman and/or Bennett, paid WWE $823,146.52, consisting of royalties related to the international toy license.

lxxvi.    For the fourth quarter of 2001, on January 16, 2002, Defendant Jakks, with the authorization of Defendants Friedman and/or Berman and/or Bennett, paid WWE $435,597.77, consisting of royalties related to the international toy license.

lxxvii.    For the first quarter of 2002, on April 19, 2002, Defendant Jakks, with the authorization of Defendants Friedman and/or Berman and/or Bennett, paid WWE $120,016.51, consisting of royalties related to the international toy license.

lxxviii.    For the second quarter of 2002, on July 23, 2002, Defendant Jakks, with the authorization of Defendants Friedman and/or Berman and/or Bennett, paid WWE $183,495.25, consisting of royalties related to the international toy license.

lxxix.    For the third quarter of 2002, on October 24, 2002, Defendant Jakks, with the authorization of Defendants Friedman and/or Berman and/or Bennett, paid WWE $1,196,258.28, consisting of royalties related to the international toy license.

lxxx.    For the fourth quarter of 2002, on January 31, 2003, Defendant Jakks, with the authorization of Defendants Friedman and/or Berman and/or Bennett, paid WWE $348,103.55, consisting of royalties related to the international toy license.

lxxxi.    For the first quarter of 2003, on April 22, 2003, Defendant Jakks, with the authorization of Defendants Friedman and/or Berman

and/or Bennett, paid WWE $465,465.16, consisting of royalties related to the domestic and international toy licenses.

lxxxii.    For the second quarter of 2003, on July 23, 2003, Defendant Jakks, with the authorization of Defendants Friedman and/or Berman and/or Bennett, paid WWE $517,836.95, consisting of royalties related to the domestic and international toy licenses.

lxxxiii.    For the third quarter of 2003, on October 24, 2003, Defendant Jakks, with the authorization of Defendants Friedman and/or Berman and/or Bennett, paid WWE $849,644.40, consisting of royalties related to the domestic and international toy licenses.

lxxxiv.    For the fourth quarter of 2003, on January 23, 2004, Defendant Jakks, with the authorization of Defendants Friedman and/or Berman and/or Bennett, paid WWE $738,139.48, consisting of royalties related to the domestic and international toy licenses.

lxxxv.    For the first quarter of 2004, on April 27, 2004, Defendant Jakks, with the authorization of Defendants Friedman and/or Berman and/or Bennett, paid WWE $704,629.57, consisting of royalties related to the domestic and international toy licenses.

lxxxvi.    For the second quarter of 2004, on July 26, 2004, Defendant Jakks, with the authorization of Defendants Friedman and/or Berman and/or Bennett, paid WWE $768,216.05, consisting of royalties related to the domestic and international toy licenses.

lxxxvii.    For the third quarter of 2004, on October 25, 2004, Defendant Jakks, with the authorization of Defendants Friedman and/or

Berman and/or Bennett, paid WWE $1,082,458.09, consisting of royalties related to the domestic and international toy licenses.

lxxxviii. For the fourth quarter of 2004, on January 25, 2005, Defendant Jakks, with the authorization of Defendants Friedman and/or Berman and/or Bennett, paid WWE $1,334,692.83, consisting of royalties related to the domestic and international toy licenses.

c.    In violation of the National Stolen Property Act, 18 U.S.C. §§ 2314 and 2315, Defendants' payment and/or receipt of unlawful bribes and payments to secure the videogame license and the 1998 amendments to the toy licenses involved the transmittal and/or transfer in interstate commerce of money having a value of at least $5,000, knowing such proceeds were obtained by fraud against WWE.  Defendants' specific acts in violation of the National Stolen Property Act include at least the following:

i.    As a result of Defendants' unlawful conduct in connection with the videogame license and the 1998 amendments to the toy licenses by fraudulent means, on July 3, 1998, Defendant Shenker deposited a check dated July 3, 1998 from WWE in the amount of $301,751.54 into SSAI's Fleet Bank account, consisting of commissions related to the advance on the videogame license which Defendants SSAI and Shenker knew had been acquired by fraud.

ii.    As a result of Defendants' unlawful conduct in connection with the videogame license and the 1998 amendments to the toy licenses by fraudulent means, on December 21, 1998, Defendant

Shenker caused Defendant SSAI to wire-transfer $280,616 from Defendant SSAI's checking account at Fleet Bank, headquartered in Fort Lee, New Jersey, to Stanfull's account at the Hang Seng Bank, consisting of $165,000, exactly 50% of the advance Defendant SSAI was paid by WWE on the videogame license which Defendants SSAI and Shenker knew had been acquired by fraud. Defendant SSAI's transfer of this money was the precursor to Defendant Bell Licensing's receipt of the unlawful proceeds as Defendant Shenker elected to run the transaction through a foreign bank account in order to conceal the nature and source of the payment.

iii.    As a result of Defendants' unlawful conduct in connection with the videogame license and the 1998 amendments to the toy licenses by fraudulent means, on January 11, 1999, Defendant Shenker wire-transferred $280,601 from Stanfull's account at the Hang Seng Bank to Defendant Bell Licensing's money market account at Hudson Bank, consisting of $165,000, exactly 50% of the advance Defendant SSAI was paid by WWE on the videogame license which Defendants SSAI, Shenker, Bell and Bell Licensing knew had been acquired by fraud.

iv.    As a result of Defendants' unlawful conduct in connection with the videogame license and the 1998 amendments to the toy licenses by fraudulent means, on February 7, 2000 Defendant Shenker deposited a check, dated February 4, 2000, from WWE, in the amount of $663,037.70 into SSAI's Fleet Bank account, consisting of $165,000 in commissions related to the videogame

license, which Defendants SSAI and Shenker knew had been acquired by fraud.

v.　　As a result of Defendants' unlawful conduct in connection with the videogame license and the 1998 amendments to the toy licenses by fraudulent means, by check no. 2595 dated February 22, 2000, drawn on SSAI's bank account at Fleet Bank headquartered in Fort Lee, New Jersey, Defendant SSAI paid $95,396.90 to Defendant Bell Licensing, consisting of $82,500, exactly 50% of the commissions paid to Defendant SSAI on the videogame license which Defendants SSAI, Shenker, Bell and Bell Licensing knew had been acquired by fraud.

vi.　　As a result of Defendants' unlawful conduct in connection with the videogame license and the 1998 amendments to the toy licenses by fraudulent means, on February 23, 2000, Defendant Bell deposited the February 22, 2000 check from Defendant SSAI into Defendant Bell Licensing's Hudson Bank money market account located in Darien, Connecticut, thereby causing the check to clear at Hudson Bank's main office located in Mahwah, New Jersey.  Defendants SSAI, Shenker, Bell and Bell Licensing knew the proceeds of said check had been acquired by fraud.

vii.　　As a result of Defendants' unlawful conduct in connection with the videogame license and the 1998 amendments to the toy licenses by fraudulent means, on June 12, 2000, Defendant SSAI deposited a check, dated June 9, 2000, from WWE, in the amount of $312,788.55 into SSAI's Fleet Bank account, consisting of

$247,180.90 of commissions related to the videogame license which Defendants SSAI and Shenker knew had been acquired by fraud.

viii.  As a result of Defendants' unlawful conduct in connection with the videogame license and the 1998 amendments to the toy licenses by fraudulent means, by check no. 2832 dated June 16, 2000 drawn on Defendant SSAI's bank account at Fleet Bank, headquartered in Fort Lee, New Jersey, Defendant SSAI paid $124,454 to Defendant Bell Licensing, consisting of $123,590.45, exactly 50% of the commissions Defendant SSAI was paid on the videogame license which Defendants SSAI, Shenker, Bell and Bell Licensing knew had been acquired by fraud.

ix.  As a result of Defendants' unlawful conduct in connection with the videogame license and the 1998 amendments to the toy licenses by fraudulent means, on June 19, 2000, Defendant Bell deposited Defendant SSAI's June 16, 2000 check into Defendant Bell Licensing's Hudson Bank money market account located in Darien, Connecticut, thereby causing the check to clear at Hudson Bank's main office located in Mahwah, New Jersey.  Defendants SSAI, Shenker, Bell and Bell Licensing knew the proceeds of said check had been acquired by fraud.

x.  As a result of Defendants' unlawful conduct in connection with the videogame license and the 1998 amendments to the toy licenses by fraudulent means, on August 25, 2000, Defendant Shenker deposited a check, dated August 18, 2000, in the amount

of $324,540.66 into SSAI's Fleet Bank account, consisting of $132,735.44 of commissions Defendant SSAI was paid on the videogame license which Defendants SSAI and Shenker knew had been acquired by fraud.

xi.    As a result of Defendants' unlawful conduct in connection with the videogame license and the 1998 amendments to the toy licenses by fraudulent means, by check no. 3016 dated September 10, 2000 drawn on Defendant SSAI's bank account at Fleet Bank, headquartered in Fort Lee, New Jersey, Defendant SSAI paid $84,525.29 to Defendant Bell Licensing, consisting of $66,367.72, exactly 50% of the commissions Defendant SSAI was paid on the videogame license which Defendants SSAI, Shenker, Bell and Bell Licensing knew had been acquired by fraud.

xii.    As a result of Defendants' unlawful conduct in connection with the videogame license and the 1998 amendments to the toy licenses by fraudulent means, on September 12, 2000, Defendant Bell deposited Defendant SSAI's September 10, 2000 check into Defendant Bell Licensing's Hudson Bank money market account located in Darien, Connecticut, thereby causing the check to clear at Hudson Bank's main office located in Mahwah, New Jersey. Defendants SSAI, Shenker, Bell and Bell Licensing knew the proceeds of said check had been acquired by fraud.

xiii.    As a result of Defendants' unlawful conduct in connection with the videogame license and the 1998 amendments to the toy

licenses by fraudulent means, by check no. 1846 dated
September 14, 2001 drawn on Defendant Shenker's account at
Fleet Bank headquartered in Fort Lee, New Jersey, Defendant
Shenker paid Defendant Bell $52,948, representing a split of the
proceeds from Defendant Shenker's sale of THQ and Jakks stock
acquired pursuant to the videogame license which Defendants
Shenker and Bell knew had been acquired by fraud.

xiv.     As a result of Defendants' unlawful conduct in connection with
the videogame license and the 1998 amendments to the toy
licenses by fraudulent means, on September 24, 2001, Defendant
Bell deposited Defendant Shenker's September 14, 2001 check
into Defendant Bell's Citibank preferred money market account,
account no. 47507343, thereby causing the check to clear at
Citibank in New York.  Defendants Shenker and Bell knew the
proceeds of said check had been acquired by fraud.

xv.      As a result of Defendants' unlawful conduct in connection with
the videogame license and the 1998 amendments to the toy
licenses by fraudulent means, by check no. 1869 dated
October 12, 2001 drawn on Defendant Shenker's account at Fleet
Bank headquartered in Fort Lee, New Jersey, Defendant Shenker
paid Defendant Bell $26,994, representing a split of the proceeds
of Defendant Shenker's sale of THQ and Jakks stock acquired
pursuant to the videogame license which Defendants Shenker and
Bell knew had been acquired by fraud.

xvi.    As a result of Defendants' unlawful conduct in connection with
the videogame license and the 1998 amendments to the toy
licenses by fraudulent means, on October 13, 2001, Defendant
Bell deposited Defendant Shenker's October 12, 2001 check into
Defendant Bell's branch account at Hudson Bank located in
Connecticut, thereby causing the check to clear at Hudson Bank's
main office located in Mahwah, New Jersey.  Defendants Shenker
and Bell knew the proceeds of said check had been acquired by
fraud.

xvii.    As a result of Defendants' unlawful conduct in connection with
the videogame license and the 1998 amendments to the toy
licenses by fraudulent means, by check no. 1894 dated
December 11, 2001 drawn on Defendant Shenker's account at
Fleet Bank headquartered in Fort Lee, New Jersey, Defendant
Shenker paid Defendant Bell $26,944, representing a split of the
proceeds of Defendant Shenker's sale of THQ and Jakks stock
acquired pursuant to the videogame license which Defendants
Shenker and Bell knew had been acquired by fraud.

xviii.    As a result of Defendants' unlawful conduct in connection with
the videogame license and the 1998 amendments to the toy
licenses by fraudulent means, on December 13, 2001, Defendant
Bell deposited Defendant Shenker's December 11, 2001 check
into Defendant Bell's branch account at Hudson Bank located in
Connecticut, thereby causing the check to clear at Hudson Bank's
main office located in Mahwah, New Jersey.  Defendants Shenker

and Bell knew the proceeds of said check had been acquired by
fraud.

d.      In violation of the Federal Travel Act, 18 U.S.C. § 1952, Defendants'
scheme to fraudulently secure the videogame license and the 1998
amendments to the toy licenses through the payment of unlawful bribes
and payments and to use fraudulent conduct to conceal the true nature of
the bribes and payments involved the unlawful use of the mail or a facility
of interstate commerce with the intent to distribute the proceeds of, and/or
facilitate the carrying on of, commercial bribery, an enumerated unlawful
act under 18 U.S.C. § 1952 and, thereafter, the commission of an
additional act in furtherance of such commercial bribery scheme.  Each of
the specific acts identified above in violation of the Federal Mail and Wire
Fraud Statutes, 18 U.S.C. §§ 1341 and 1343, the Federal Money
Laundering Statutes, 18 U.S.C. §§ 1956 and 1957, and the National Stolen
Property Act, 18 U.S.C. §§ 2314 and 2315, also constitute separate
violations of the Federal Travel Act, and therefore such allegations are
incorporated herein by reference and reasserted as though fully set forth at
length.

e.      In violation of New York Penal Law § 180.03, as described herein, certain
Defendants made, authorized and/or participated in the payment of or
agreement to pay unlawful bribes and payments in excess of one thousand
dollars to SSAI, Shenker and/or Bell, who at all relevant times were
employees, agents or fiduciaries of WWE, without WWE's consent, with
the intent to influence their conduct in relation to WWE's affairs to secure
the videogame license and the 1998 amendments to the toy licenses, and
said acts inured to the benefit of and/or were ratified by THQ and

THQ/Jakks.  Pursuant to 18 U.S.C. § 1961(1)(A), Defendants' violations of New York Penal Law § 180.03, as set forth below, constitute separate predicate acts under RICO:

i.      In furtherance of, and with the intent to conceal proceeds of the commercial bribery scheme, on January 14, 1998, pursuant to Defendant Bennett's direction made on behalf of Defendant Jakks and which was authorized by Defendants Friedman and/or Berman, Defendant Road Champs Ltd. wire-transferred $40,000 from its account at the Hang Seng Bank in Hong Kong in an intra-bank transfer to Stanfull's account at the Hang Seng Bank.

ii.     In furtherance of, and with the intent to conceal proceeds of the commercial bribery scheme, by demand draft dated January 14, 1998 drawn on Stanfull's account at the Hang Seng Bank, Defendant Shenker paid Defendant Bell $20,000 of the $40,000 paid to Stanfull from Defendant Road Champs Ltd.

iii.    In furtherance of, and with the intent to conceal proceeds of the commercial bribery scheme, on April 2, 1998, pursuant to Defendant Bennett's direction made on behalf of Defendant Jakks and authorized by Defendants Friedman and/or Berman, Defendant Jakks Pacific (H.K.) wire-transferred $40,000 from its account at Norwest Bank to Stanfull's account at the Hang Seng Bank.

iv.     In furtherance of, and with the intent to conceal proceeds of the commercial bribery scheme, by demand draft dated April 7, 1998 drawn on Stanfull's account at the Hang Seng Bank, Defendant

Shenker paid Defendant Bell Licensing $20,000 of the $40,000 paid to Stanfull from Defendant Jakks Pacific (H.K.)

v.      In furtherance of, and with the intent to conceal proceeds of the commercial bribery scheme, on August 4, 1998, pursuant to Defendant Bennett's direction made on behalf of and for the benefit of Defendants Jakks, THQ, and THQ/Jakks, Defendant Road Champs Ltd. wire-transferred $20,000 from its account at the Hang Seng Bank in an intra-bank transfer to Stanfull's account at the Hang Seng Bank.

vi.     In furtherance of, and with the intent to conceal proceeds of Defendants' commercial bribery scheme, by check no. 1881, dated October 8, 1998, Defendant Shenker caused Defendant SSAI to pay Defendant Bell Licensing $20,000, drawn on SSAI's checking account at Fleet Bank, headquartered in Fort Lee, New Jersey.

vii.    In furtherance of, and with the intent to conceal proceeds of the commercial bribery scheme, on January 11, 1999, Defendant Shenker wire-transferred $280,601 from Stanfull's account at the Hang Seng Bank to Defendant Bell Licensing's money market account at Hudson Bank, consisting of $165,000, exactly 50% of the advance Defendant SSAI was paid by WWE on the videogame license.

viii.   In furtherance of, and with the intent to conceal proceeds of the commercial bribery scheme, by check no. 2595 dated February 22, 2000, drawn on SSAI's bank account at Fleet Bank,

headquartered in Fort Lee, New Jersey, Defendant SSAI paid $95,396.90 to Defendant Bell Licensing, consisting of $82,500, exactly 50% of the commissions paid to Defendant SSAI by WWE on the videogame license.

ix.     In furtherance of, and with the intent to conceal proceeds of the commercial bribery scheme, by check no. 2832 dated June 16, 2000 drawn on Defendant SSAI's bank account at Fleet Bank, headquartered in Fort Lee, New Jersey, Defendant SSAI paid $124,454 to Defendant Bell Licensing, consisting of $123,590.45, exactly 50% of commissions paid to Defendant SSAI by WWE on the videogame license.

x.      In furtherance of, and with the intent to conceal proceeds of the commercial bribery scheme, by check no. 3016 dated September 10, 2000 drawn on Defendant SSAI's bank account at Fleet Bank, headquartered in Fort Lee, New Jersey, Defendant SSAI paid $84,525.29 to Defendant Bell Licensing, consisting of $66,367.72, exactly 50% of commissions paid to Defendant SSAI by WWE on the videogame license.

xi.     In furtherance of, and with the intent to conceal proceeds of the commercial bribery scheme, by check no. 1846 dated September 14, 2001 drawn on Defendant Shenker's account at Fleet Bank headquartered in Fort Lee, New Jersey, Defendant Shenker paid Defendant Bell $52,948, representing a split of the proceeds from Defendant Shenker's sale of THQ and Jakks stock acquired pursuant to the videogame license.

xii.    In furtherance of, and with the intent to conceal proceeds of the commercial bribery scheme, by check no. 1869 dated October 12, 2001 drawn on Defendant Shenker's account at Fleet Bank headquartered in Fort Lee, New Jersey, Defendant Shenker paid Defendant Bell $26,994, representing a split of the proceeds of Defendant Shenker's sale of THQ and Jakks stock acquired pursuant to the videogame license.

xiii.    In furtherance of, and with the intent to conceal proceeds of the commercial bribery scheme, by check no. 1894 dated December 11, 2001 drawn on Defendant Shenker's account at Fleet Bank headquartered in Fort Lee, New Jersey, Defendant Shenker paid Defendant Bell $26,944, representing a split of the proceeds of Defendant Shenker's sale of THQ and Jakks stock acquired pursuant to the videogame license.

## Pattern of Racketeering Activity

250.    Defendants knowingly and repeatedly committed the above criminal acts in furtherance of and for the purpose of executing a fraudulent scheme to harm WWE's business.

251.    The predicate acts described herein were related to one another as part of a common scheme or plan.

252.    The unlawful conduct described herein constitutes a continuous pattern of racketeering activity. Such unlawful conduct, which began in or around 1995, continues through this date.

## Injury to WWE

253.    As a direct and proximate result of Defendants' violation of 18 U.S.C. § 1962(c) as described herein, WWE has been injured in its business and property.

## COUNT II
## CONSPIRACY TO VIOLATE RICO, 18 U.S.C. § 1962(d)
## (Against All Defendants)

254.    Each and every one of the foregoing allegations is incorporated herein by reference and reasserted as though fully set forth at length.

255.    THQ/Jakks, Jakks, THQ, Jakks Pacific (H.K.), Road Champs Ltd., SSAI, Shenker, Bell Licensing, Bell, Friedman, Berman, Bennett and Farrell formed a conspiracy for the purpose of achieving and profiting from the racketeering activities described herein in violation of 18 U.S.C. § 1962(c).

256.    As described herein, each of the Defendants knowingly and intentionally agreed and conspired to commit at least two of the predicate acts set forth above and they did so with the knowledge and intent that such acts were in furtherance of the foregoing pattern of racketeering.

257.    As described herein, Defendants' conspiracy substantially affected interstate commerce as much of the conduct that formed the overt acts of the conspiracy involved interstate commerce, and the damage caused by the conspiracy has harmed a corporation that itself substantially affects interstate commerce.

258.    As a direct and proximate result of the conspiracy in violation of 18 U.S.C. § 1962(d) as described herein, WWE has been injured in its business and property.

## COUNT III
## VIOLATION OF THE SHERMAN ACT, 15 U.S.C. § 1
## (Against All Defendants except Jakks Pacific (H.K.) and Road Champs Ltd.)

259.    Each and every one of the foregoing allegations is incorporated herein by reference and reasserted as though fully set forth at length.

260.    WWE produces and sells television programming, pay-per-view programming and live arena events in interstate commerce.  It also licenses its intellectual property in interstate commerce.

261.    Defendant THQ/Jakks markets and sells videogames in interstate commerce.

262.    Defendant THQ markets and sells videogames in interstate commerce.

263.    Defendant Jakks markets and sells action figures, toys and other products in interstate commerce.

264.    Defendant SSAI markets and sells its services as a licensing agent in interstate commerce.

265.    Acclaim and Activision market and sell videogames in interstate commerce.

266.    At all relevant times, Jakks, THQ, Activision and Acclaim were competitors for the WWE videogame license in the national market for the licensing of intellectual property in characters for videogames.

267.    All of the Defendants consciously agreed and conspired to unreasonably restrain trade, in a *per se* violation of Section 1 of the Sherman Act, 15 U.S.C. § 1 by, among other things, (a) agreeing and conspiring to rig the terms of the bid that would be offered by the conspiring competitors to WWE for the videogame license, including, but not limited to, agreeing to rig the royalty rate that would be offered for the rights under the videogame license, (b) conspiring to prevent THQ from submitting to WWE an independent bid for the videogame license in competition with Jakks, and (c) conspiring to allocate the WWE videogame license to THQ/Jakks to the mutual benefit of all the conspirators.  Defendants intended that their

conspiratorial acts would, and their acts in fact did unreasonably restrain trade by foreclosing competition for the videogame license. Further, Defendants intended to, and did, cause the licensing terms offered to WWE to be less favorable to WWE than the terms that competitive bids would have been.

268.    As part of their conspiracy, Defendants conspired to foreclose WWE from receiving competitive, market-level bids for the videogame license from Activision.

269.    As a result of Defendants' conspiracy, WWE suffered antitrust injury in that it was deprived of the benefits of a competitive market for the videogame license. Section 1 of the Sherman Act was intended to ensure WWE's right to a competitive market for the videogame license, in which WWE would receive independent bids from each of the actual and potential videogame producers which were interested in a license from WWE.

270.    WWE was injured in its business or property by the conspiracy to rig the videogame license bid and to allocate the license to THQ/Jakks. As a direct and proximate result of the conspiracy, WWE received less favorable license terms (including, but not limited to, a lower than market royalty rate) than WWE would have received if the conspiracy had not foreclosed the competitive operation of the market.

271.    The conspiracy took place in, restrained the flow of and adversely affected interstate and foreign commerce in the marketing of videogame licensing rights, the marketing of intellectual property rights and the marketing of videogames.

272.     As detailed above, Defendants have actively and willfully concealed the existence of the conspiracy and its effects on WWE in the interstate marketing of WWE's intellectual property rights.  For the reasons set forth herein previously, WWE did not know, and in the exercise of reasonable diligence could not have known, of the existence of the conspiracy to rig bids and to allocate the WWE videogame license until well after December 2002—well within the period of the statute of limitations.

## COUNT IV
## DECLARATORY JUDGMENT
### (Against THQ, THQ/Jakks and Jakks Only)

273.     Each and every one of the foregoing allegations is incorporated herein by reference and reasserted as though fully set forth at length.

274.     As described herein, the videogame license was formed or induced as a result of commercial bribery and/or illegal conduct in violation of New York law.

275.     As described herein, the 1998 amendments to the toy licenses were formed or induced as a result of commercial bribery and/or illegal conduct in violation of New York law.

276.     As described herein, the commercial bribery and/or illegal conduct was and remains central to the performance of the videogame license.

277.     As described herein, the commercial bribery and/or illegal conduct was and remains central to the performance of the 1998 amendments to the toy licenses.

278.     Under New York law a contract formed or induced as a result of commercial bribery is void *ab initio*.

279.    Thus, an actual dispute and controversy exists with respect to whether the videogame license and the 1998 amendments to the toy licenses are void *ab initio* as a result of the commercial bribery.

280.    A judicial declaration is, therefore, necessary pursuant to 28 U.S.C. § 2201 *et seq.* to determine the parties' rights and obligations under the aforementioned licenses and amendments thereto.

## COUNT V
## DECLARATORY JUDGMENT
## (Against Defendants THQ, THQ/Jakks and Jakks Only)

281.    Each and every one of the foregoing allegations is incorporated herein by reference and reasserted as though fully set forth at length.

282.    Prior to and during the time the videogame license and the 1998 amendments to the toy licenses were negotiated, Jakks knew of and created an undisclosed conflict of interest between SSAI and its principal, Stanley Shenker, and WWE.

283.    During the time Jakks knew SSAI was WWE's agent, Jakks began the practice of paying Shenker and using him as their agent, none of which was disclosed to WWE.

284.    At various times during their undisclosed relationship with Shenker, Jakks personnel would, in writing, direct and inquire of Shenker regarding matters being performed by Shenker on Jakks' behalf and at the same time request he secure modifications and/or amendments to the WWE toy licenses.

285.    Jakks traded on the undisclosed conflicts of interests and aided and abetted SSAI and Shenker to violate fiduciary obligations to WWE by seeking and obtaining licensing rights

from WWE through Shenker while he was, and remained, an undisclosed agent of Jakks, and did so detrimentally to WWE's interests.

286.    Jakks personnel were acutely aware of the impropriety of doing so, and in particular were aware of the impropriety of doing so after being advised by corporate counsel that Jakks could not do so without WWE consent.

287.    With knowledge of the impropriety involved, Jakks continued to find ways to corrupt Shenker's loyalties by the payment of monies and/or promises of more contracts, including before, during and after the time Shenker and SSAI were to be negotiating on behalf of WWE with Jakks regarding the videogame license and amendments to the toy licenses.

288.    At all times relevant hereto, Jakks knew that it was dealing with a corrupt agent capable of, and actually engaging in, unethical conduct in violation of his fiduciary duties to WWE to the detriment of WWE.  Jakks not only concealed such conduct from WWE but also directly fostered it.

289.    The payment made at Jakks' direction to Stanfull in January 1998, which was subsequently split with Bell, was the first time Shenker paid Bell monies in what evolved into a corrupt, illegal and wide-ranging bribery and kickback scheme between SSAI, Shenker and Bell during the time both SSAI and Bell were agents and fiduciaries of WWE.

290.    In order to induce Bell to act favorably on the licensing initiatives he was pursuing for Jakks, Shenker, as an agent for Jakks, promised Bell that he would split equally all commissions SSAI was paid, as well as profits from the sale of stock SSAI would also receive as compensation, if Bell did as Shenker and SSAI requested and acted favorably on licensing matters involving Jakks.

291.    Bell did recommend the videogame license be granted to THQ and Jakks and further recommended amendments to the toy licenses at the same time.  Thereafter, SSAI and Shenker did split commissions and profits from stock sales with Bell in amounts exceeding several hundred thousand dollars.

292.    As a direct result of and during the foregoing conduct, the videogame license issued to THQ/Jakks and the amendments to the toy licenses were executed.

293.    The amendments to the domestic toy license beginning with the First Amendment to that license, the international toy license, all amendments to the international toy license, the videogame license, and all amendments to the videogame license are tainted by the illegality of WWE's agents and the conflicts of interest which were known to and facilitated by Jakks for its own benefit and in connection with the videogame license for the benefit of and on behalf of THQ and Jakks.

294.    An actual dispute and controversy exists with respect to whether the aforementioned licensing rights are void for such illegality.

295.    A judicial declaration is, therefore, necessary pursuant to 28 U.S.C. § 2201 *et seq.* to determine the parties' rights and obligations under the aforementioned licenses and amendments thereto.

**COUNT VI**
**VIOLATION OF THE ROBINSON-PATMAN ACT, 15 U.S.C. § 13(c)**
**(Against THQ/Jakks, Jakks, THQ, Friedman, Berman and Bennett Only)**

296.    Each and every one of the foregoing allegations is incorporated herein by reference and reasserted as though fully set forth herein.

297.    Defendants THQ/Jakks, Jakks, THQ, Friedman, Berman and Bennett are engaged in interstate commerce and, in the course of such commerce, engaged in the course of commercial bribery described above.

298.    As described herein, Jakks, Friedman, Berman and/or Bennett authorized and/or directly paid unlawful bribes and/or payments, through Stanfull, to SSAI, Shenker, Bell Licensing and/or Bell of at least $100,000 to secure favorable and dishonest services in regard to the Jakks licensing matters.  Defendants acted with the intent to corruptly to influence the conduct of Shenker, SSAI and Bell in the performance of their duties for WWE, including inducing WWE to enter into the videogame license despite the fact that other competing opportunities were, or could be negotiated to be, more favorable for WWE.

299.    At all relevant times, SSAI, Shenker, and Bell were agents or employees of WWE and thus owed WWE fiduciary duties and obligations.

300.    The payment of unlawful bribes, through Stanfull, to SSAI, Shenker, Bell Licensing and/or Bell, of at least $100,000 as described herein constitutes commercial bribery in violation of 15 U.S.C. § 13(c).

301.    By that aspect of the scheme related to the toy licenses, Jakks was also able to foreclose competition for the rights covered by the toy licenses during and in the period those licenses would otherwise have expired but for the extended term granted by the amendments and prevented competition from Playmates.

302.    As a direct and proximate result of Defendants' unlawful conduct described herein, WWE was deprived of the benefit of competition between and among Acclaim, Activision, THQ and Jakks, for the purchase of a videogame license for its intellectual property. Jakks, THQ and THQ/Jakks, as a consequence of the commercial bribery alleged herein,

obtained the videogame license from WWE upon terms less favorable to WWE than the terms

which would have been available to WWE but for Defendants' foreclosure of such competition

through, among other things, the bribery of WWE's fiduciaries and the associated fraudulent

withholding by those agents of material information regarding Defendants' offers and the

competing offers available in a competitive market.  WWE was thereby injured in its business

and property and was deprived of a fair and competitive return on the innovation and creativity

which gave rise to WWE's intellectual property.


## COUNT VII
## VIOLATION OF NEW YORK COMMERCIAL BRIBERY LAW
## (Against THQ/Jakks, Jakks, THQ, Friedman, Berman and Bennett Only)

303.    Each and every one of the foregoing allegations is incorporated herein by

reference and reasserted as though fully set forth at length.

304.    As described herein, Jakks, Friedman, Berman and/or Bennett directly paid

unlawful bribes and/or payments, through Stanfull, to SSAI, Shenker, Bell Licensing and/or Bell

of at least $100,000 to secure favorable and dishonest services in regard to Jakks licensing

matters.

305.    At all times relevant to the payment of such bribes and/or payments, as described

herein, SSAI, Shenker, and Bell were agents or employees of WWE and thus owed WWE

fiduciary duties and obligations.

306.    Jakks, Friedman, Berman and/or Bennett's payment of unlawful bribes and/or

payments, through Stanfull, to SSAI, Shenker, Bell Licensing and/or Bell of at least $100,000 to

secure the WWE videogame license and the 1998 amendments to the toy license, constitutes

commercial bribery in violation of New York law.

307.     The bribery scheme inured not only to the benefit of Jakks, but also to the benefit of THQ and THQ/Jakks, all of whom accepted the benefits and/or ratified the acts and/or are legally liable in any event.

308.     As a direct and proximate result of Defendants' unlawful conduct described herein, WWE has been injured in its business and property.

309.     In addition, because the videogame license and the 1998 amendments to the toy licenses were obtained by bribery, they should be declared void *ab initio*.

<div align="center">

**COUNT VIII**
**FRAUDULENT INDUCEMENT**
**(<u>Against THQ/Jakks, Jakks, THQ, Friedman, Berman, Bennett and Farrell Only</u>)**

</div>

310.     Each and every one of the foregoing allegations is incorporated herein by reference and reasserted as though fully set forth at length.

311.     As detailed herein, in connection with the discussions leading to execution of the videogame license and the 1998 amendments to the toy licenses and during the performance of those licenses, THQ/Jakks, Jakks, THQ, Friedman, Berman, Bennett and/or Farrell knowingly or recklessly made false and misleading statements to, and also knowingly or recklessly concealed information from and did not disclose information to, WWE regarding (1) the payment of bribes, through Stanfull, to SSAI, Shenker, Bell Licensing and/or Bell of at least $100,000 to secure favorable and dishonest services in regard to Jakks licensing matters, including with respect to the WWE videogame license and the 1998 amendments to the toy licenses, and/or (2) their use of SSAI or Shenker as an undisclosed agent to secure the videogame license and the 1998 amendments to the toy licenses, and/or (3) the collusive and illegal nature of the bidding process.

312.     Under the circumstances, THQ/Jakks, Jakks, THQ, Friedman, Berman, Bennett and Farrell had a duty not to make such false and misleading statements, a duty to disclose the

concealed and omitted information, and a duty not to induce or otherwise aid and abet SSAI's, Shenker's and Bell's violation of fiduciary duties.

313.    As described herein, THQ/Jakks, Jakks, THQ, Friedman, Berman, Bennett and Farrell engaged in such conduct with the intent and purpose of inducing reliance thereon by WWE and inducing WWE to enter into the videogame license and the 1998 amendments to the toy licenses.

314.    The false and misleading statements, and concealed information, were material to WWE's decision to enter into, induced WWE to enter into, and were reasonably and justifiably relied upon by WWE in entering into, the videogame license and the 1998 amendments to the toy licenses.  As THQ/Jakks, Jakks, THQ, Friedman, Berman, Bennett and Farrell knew, WWE would never have entered into the videogame license or the 1998 amendments to the toy licenses had WWE known the true state of affairs regarding the payment of bribes, through Stanfull, to SSAI, Shenker, Bell Licensing and/or Bell and/or the use of SSAI or Shenker as an undisclosed agent and/or the collusive nature of the bidding process.

315.    In fraudulently inducing WWE to enter into the videogame license and the 1998 amendments to the toy licenses, as described herein, THQ/Jakks, Jakks, THQ, Friedman, Berman, Bennett and Farrell acted with malicious purpose and/or dishonest, unfair or improper means to harm WWE.

316.    As a direct and proximate result of Defendants' fraudulent conduct, WWE has been injured in its business and property.

317.    In addition, because the videogame license and the 1998 amendments to the toy licenses were obtained on the basis of fraud, the videogame license and the 1998 amendments to the toy licenses should be declared void *ab initio*.

## COUNT IX
## UNJUST ENRICHMENT
## (<u>Against THQ/Jakks, Jakks, THQ, Friedman, Berman and Bennett Only</u>)

318.     Each and every one of the foregoing allegations is incorporated herein by reference and reasserted as though fully set forth at length.

319.     As described herein, THQ/Jakks, Jakks, THQ, Friedman, Berman and Bennett have derived substantial benefits from the videogame license and/or the 1998 amendments to the toy license, to which they were not properly entitled.

320.     Accordingly, THQ/Jakks, Jakks, THQ, Friedman, Berman and Bennett have unfairly and unjustly enjoyed the benefits of monies to which they were not properly entitled.

321.     It would be unfair and unjust for THQ/Jakks, Jakks, THQ, Friedman, Berman and Bennett to retain the benefits of such monies, to which they were not properly entitled.

## COUNT X
## INDUCING BREACH OF FIDUCIARY DUTY
## (<u>Against THQ/Jakks, Jakks, THQ, Friedman, Berman and Bennett Only</u>)

322.     Each and every one of the foregoing allegations is incorporated herein by reference and reasserted as though fully set forth at length.

323.     As described herein, Bell, SSAI and/or Shenker breached their fiduciary duties owed to WWE by, *inter alia,* accepting bribes of at least $100,000 to secure the WWE videogame license and the 1998 amendments to the toy licenses, secretly acting as an agent of Jakks, participating in the bid rigging and price fixing alleged herein, and/or failing to disclose such conduct.

324.     As described herein, Defendants herein knowingly induced or participated in Bell, SSAI and/or Shenker's breach of their fiduciary duties by making bribes of at least $100,000,

through Stanfull, to secure the WWE videogame license and the 1998 amendments to the toy licenses, by failing to disclose that Shenker was secretly acting as their agent, and by inducing SSAI, Shenker and Bell to violate their fiduciary duties in connection with the bid rigging and price fixing scheme that resulted in the videogame license being awarded to THQ, Jakks and THQ/Jakks.

325.    In seeking to induce SSAI, Shenker and/or Bell to breach their fiduciary duties owed to WWE, Defendants herein acted with malicious purpose and/or dishonest, unfair or improper means to harm WWE.

326.    All actions of Jakks and/or Friedman and/or Berman and/or Bennett in regard to the videogame license were either authorized or ratified by THQ/Jakks and THQ.

327.    As a direct and proximate result of Defendants' unlawful conduct, WWE has been injured in its business and property.

## COUNT XI
## INDUCING BREACH OF FIDUCIARY DUTY
## (Against THQ/Jakks, Jakks, THQ, Friedman, Berman and Bennett Only)

328.    Each and every one of the foregoing allegations is incorporated herein by reference and reasserted as though fully set forth at length.

329.    At all relevant times, SSAI and/or Shenker were agents of WWE and thus owed WWE fiduciary duties and obligations.

330.    As described herein, during the time SSAI and/or Shenker were agents of WWE, including, but not limited to, during the time the videogame license and the 1998 amendments to the toy licenses were negotiated, Jakks and/or Friedman and/or Berman and/or Bennett knew of and created an undisclosed conflict of interest between SSAI and/or Shenker, and WWE.

331.    As described herein, during the time Jakks knew SSAI and/or Shenker was WWE's agent, Jakks began the practice of paying Shenker and using him as their agent, none of which was disclosed to WWE.

332.    As described herein, at various times during their undisclosed agency relationship with Shenker, Jakks personnel would, in writing, direct and inquire of Shenker regarding matters being performed by Shenker on Jakks' behalf and at the same time request that he secure modifications and/or amendments to Jakks' toy license with WWE on terms desired by Jakks. To the detriment of WWE, Shenker recommended such modifications and amendments without attempting to negotiate better terms from Jakks or other entities interested in such rights.

333.    As described herein, Jakks personnel were acutely aware of the impropriety of such conduct, and in particular were aware of the impropriety of such conduct after being advised by corporate counsel that Jakks could not do so without WWE's knowledge and consent.

334.    Jakks never disclosed to WWE its agency relationship with Shenker.

335.    As described herein, SSAI and/or Shenker breached their fiduciary duties to WWE through Shenker's undisclosed conflict of interest by virtue of his undisclosed agency relationship with Jakks and by acting contrary to the interests of WWE.

336.    As described herein, Defendants herein knowingly induced or participated in SSAI's and/or Shenker's breach of fiduciary duty by Jakks maintaining an agency relationship with Shenker despite knowing of Shenker's and/or SSAI's agency relationship with WWE, and Jakks failing to disclose such agency relationship and conflict of interest to WWE at the same time that Jakks was conducting business with WWE, including specifically with respect to the negotiation of valuable licensing rights sought by Jakks.

337.    Jakks induced Shenker to violate his fiduciary duties in connection with every licensing right it obtained following execution of the domestic toy license and, with the authority

of Friedman and/or Berman and/or Bennett, paid Shenker for favorable treatment with respect to

licensing matters being sought by Jakks, on its own behalf and/or on behalf of THQ and

THQ/Jakks, including in regard to obtaining the rights formerly held by Playmates and the

videogame license.

338.    All actions of Jakks and/or Freidman and/or Berman and/or Bennett in regard to

the videogame license were either authorized or ratified by THQ/Jakks and THQ.

339.    In seeking to induce SSAI and/or Shenker to breach their fiduciary duties owed to

WWE, Defendants herein acted with malicious purpose and/or dishonest, unfair or improper

means to harm WWE.

340.    As a direct and proximate result of Defendants' unlawful conduct, WWE has been

injured in its business and property.

<div align="center">

**COUNT XII**
**CONSTRUCTIVE TRUST**
**(Against Defendants THQ/Jakks, Jakks, THQ,**
**Friedman, Berman and Bennett Only)**

</div>

343.    Each and every one of the foregoing allegations is incorporated herein by

reference and reasserted as though fully set forth at length.

344.    As described herein, Bell, SSAI and/or Shenker breached their fiduciary duties

owed to WWE by, *inter alia,* accepting bribes of at least $100,000 to secure the WWE

videogame license and the 1998 amendments to the toy license and/or by participating in the bid

rigging and price fixing scheme incidental to the videogame license.

345.    As described herein, in violation of their fiduciary duties owed to WWE, Bell,

SSAI and/or Shenker caused WWE to enter into the videogame license and the 1998

amendments to the toy licenses.

346.    As described herein, Defendants herein had notice or knowledge of Bell, SSAI and/or Shenker's breach of their fiduciary duties owed to WWE in causing WWE to enter into the videogame license and the 1998 amendments to the toy licenses.

347.    Accordingly, the videogame license and the 1998 amendments to the toy license, and all revenues and profits therefrom, are held by THQ/Jakks, Jakks, THQ, Friedman, Berman and Bennett in constructive trust for WWE.

## COUNT XIII
## TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS
## (Against THQ/Jakks, Jakks, THQ, Friedman, Berman and Bennett Only)

348.    Each and every one of the foregoing allegations is incorporated herein by reference as though fully set forth at length.

349.    At all times relevant hereto, WWE maintained valid contracts with SSAI, Shenker and/or Bell which required their faithful and honest services and which prohibited unethical conduct, fraud and deceit.

350.    Defendants herein had knowledge of WWE's valid contracts with SSAI, Shenker and/or Bell and knew that SSAI, Shenker and Bell acted as fiduciaries of WWE.

351.    As described herein, Defendants herein intentionally sought to and did induce SSAI, Shenker and/or Bell to breach their contracts with WWE.

352.    In seeking to induce SSAI, Shenker and/or Bell to breach their contracts, Defendants acted with malicious purpose and/or dishonest, unfair or improper means to harm WWE.

353.    As a direct and proximate result of Defendants' unlawful conduct, WWE has been injured in its business and property.

**COUNT XIV**
**PIERCING THE CORPORATE VEIL/ALTER EGO**
**(Against THQ, Jakks, and THQ/Jakks Only)**

354.    Each and every one of the foregoing allegations is incorporated herein by reference as though fully set forth at length.

355.    THQ and Jakks exercised complete domination of THQ/Jakks Pacific LLC with respect to the formation and operation of THQ/Jakks Pacific LLC.  From inception, Jakks and THQ have each owned 50% of THQ/Jakks.

356.    Since its formation, THQ/Jakks has continued to be an instrument of fraud. THQ/Jakks has never performed the videogame license and has authorized and otherwise been complicit in the scheme to distribute the proceeds of the commercial bribery and antitrust violations set forth herein.

357.    THQ/Jakks Pacific LLC was a sham used to perpetrate and implement a fraud, specifically to be the formal signatory to the videogame license procured by the fraudulent and criminal schemes set forth herein.

358.    As a result, any and all liability of THQ/Jakks Pacific LLC to WWE should be imposed upon THQ and Jakks, jointly and severally.


**COUNT XV**
**CONSPIRACY TO COMMIT COMMERCIAL BRIBERY; FRAUDULENT**
**INDUCEMENT; INDUCING BREACH OF FIDUCIARY DUTY; AND TORTIOUS**
**INTERFERENCE WITH CONTRACTUAL RELATIONS**
**(Against THQ/Jakks, Jakks, THQ,**
**Friedman, Berman and Bennett Only)**

359.    Each and every one of the foregoing allegations is incorporated herein by reference and reasserted as though fully set forth at length.

360.     Defendants entered into an agreement to, *inter alia,* (i) commit commercial bribery; (ii) fraudulently induce WWE to execute the videogame license and the 1998 amendments to the toy licenses without knowledge of Defendants' unlawful bribes to SSAI, Shenker, Bell and/or Bell Licensing of at least $100,000 and Defendants' use of SSAI and/or Shenker as their undisclosed agent; (iii) induce SSAI, Shenker and/or Bell to breach their fiduciary duties owed to WWE; and (iv) tortiously interfere with WWE's contractual relations with SSAI, Shenker and/or Bell, as described in the foregoing substantive Counts of this Amended Complaint.

361.     Each of the Defendants committed one or more overt acts pursuant to and in furtherance of Defendants' conspiracy to unlawfully harm WWE by the unlawful conduct described herein.

362.     Pursuant to and in furtherance of Defendants' conspiracy, Defendants have, among other things, committed the acts described in Count I above, which are overt acts in furtherance of the goals of the conspiracy and which are specifically incorporated herein by reference and made a part hereof.

363.     As a direct and proximate result of Defendants' unlawful conspiracy, WWE has been injured in its business and property.


## PRAYER FOR RELIEF

WHEREFORE, WWE respectfully requests that this Honorable Court enter judgment in favor of WWE and order the following relief:

1.   All damages proven pursuant to RICO, trebled as permitted by law;

2.   All damages proven pursuant to the Sherman Act, trebled as permitted by law;

3. All damages proven pursuant to the Robinson-Patman Act, trebled as permitted by law;

4. A declaration that the videogame license and the international toy license are void;

5. A declaration that all amendments to the domestic toy license, the international toy license, and the videogame license are void;

6. An accounting of all revenues and profits obtained from all licensing rights illegally obtained;

7. Restitution and/or disgorgement of all revenues and profits obtained from licensing rights illegally obtained to which THQ/Jakks, Jakks, THQ, Friedman, Berman and Bennett were not properly entitled;

8. Restitution and/or disgorgement of all bribes and/or payments paid or received by Defendants;

9. All other actual damages sustained by WWE;

10. Punitive damages;

11. Attorneys' fees and costs; and

12. Such other and further relief as this Court deems just and appropriate.

**JURY TRIAL DEMANDED**

Respectfully submitted,

KIRKPATRICK & LOCKHART NICHOLSON
     GRAHAM LLP


_____/s_____
By: Eugene Licker (EL 0334)

KIRKPATRICK & LOCKHART NICHOLSON
     GRAHAM LLP

599 Lexington Avenue
New York, New York 10022-6030
(212) 536-3900 (phone)
(212) 536-3901 (fax)

and

Jerry S. McDevitt
Curtis B. Krasik
Amy L. Barrette

KIRKPATRICK & LOCKHART NICHOLSON
     GRAHAM LLP

535 Smithfield Street
Pittsburgh, Pennsylvania 15222
(412) 355-6500 (phone)
(412) 355-6501 (fax)

Dated: March 30, 2005         Attorneys for Plaintiff, World Wrestling
Entertainment, Inc.

Copyright 2004 Business Wire, Inc.
Business Wire

October 19, 2004 Tuesday 7:16 PM GMT

**DISTRIBUTION:** Business Editors; Toy Industry Writers; Legal Editors

**LENGTH:** 959 words

**HEADLINE:** World Wrestling Entertainment, Inc. Files Suit against Jakks Pacific, Inc., THQ, Inc. and Related Defendants

**DATELINE:** STAMFORD, Conn. Oct. 19, 2004

**BODY:**

WWE Cites RICO Violations and Commercial Bribery Scheme in Connection with Intellectual Property Licenses

World Wrestling Entertainment, Inc. ("WWE") today filed a fourteen count complaint in the United States District Court for the Southern District of New York against Jakks Pacific, Inc. ("Jakks"), two foreign subsidiaries of Jakks, THQ, Inc. ("THQ"), a joint venture involving Jakks and THQ, Stanley Shenker & Associates, Inc. ("SSAI") and Bell Licensing, LLC. The suit also names as defendants certain individuals employed by the corporate defendants, including specifically Jack Friedman, Stephen Berman and Joel Bennett, the three highest-ranking executives of Jakks, and Stanley Shenker and James Bell.

The suit alleges numerous violations of the Racketeer Influenced and Corrupt Organization Act (RICO); violations of the anti-bribery provisions of the Robinson-Patman Act; and various claims arising under state law. By the action, WWE is seeking treble, punitive and other damages, as well as a declaration that the videogame license with the joint venture of Jakks and THQ, and a related amendment to the toy license with Jakks, are void and unenforceable due to commercial bribery and other violations of state law. The lawsuit can be viewed at corporate.wwe.com.

The suit arises out of litigation initially commenced by SSAI against WWE in Connecticut state court for commissions SSAI claimed it had earned while serving as WWE's licensing agent. During that litigation, WWE discovered certain irregularities in its licensing program beginning in the 1998 time frame when SSAI served as WWE's licensing agent and Bell served as WWE's Senior Vice President of Licensing and Merchandising. Specifically, WWE learned in the Connecticut state court proceeding that SSAI split its commissions with Bell on various licenses allegedly procured by SSAI and recommended to WWE management by Bell. WWE also learned that certain licensees had paid monies into a foreign bank account controlled by Shenker during the time he was WWE's licensing agent. In the Connecticut case, the Court found that Stanley Shenker had committed serial perjury in order to cover up his payments to Bell and his receipt of monies in a foreign bank account from WWE licensees, including Jakks, and granted a default judgment in favor of WWE against SSAI on counterclaims asserted against SSAI. The Court in the Connecticut case has also granted partial summary judgment against Bell in favor of WWE on claims asserted against Bell by WWE.

The federal lawsuit filed by WWE against Jakks and the other defendants relates to a series of payments made in 1998 to Shenker's foreign bank account by two foreign subsidiaries of Jakks. The Company has discovered that the payments in question were then split with Bell by Shenker. Two of the payments in question occurred during the time that WWE was in the process of selecting a licensee for videogames featuring WWE talent. One of the payments was directed to be made by Jakks' officers on the same day that SSAI and Bell recommended that the videogame license be granted to Jakks. The third payment was made after the videogame license was awarded to a joint venture of Jakks and THQ.

In a statement issued today, Linda McMahon, the Chief Executive Officer of WWE, stated:

World Wrestling Entertainment, Inc. Files Suit against Jakks Pacific, Inc., THQ, Inc. and Related Defendants  Business
Wire October 19, 2004 Tuesday 7:16 PM GMT

"We very much regret having to take this action today, but regret even more the facts and circumstances which
have compelled us to do so. WWE's intellectual property is a valuable asset of the Company, and we believe the actions
taken today are necessary to preserve the integrity of our licensing process and essential to ensure that WWE receives
appropriate and fair compensation for the grant of a license to use our intellectual property."

Jakks has been WWE's toy licensee since late 1995 and the current toy licenses are otherwise set to expire in 2009.
The joint venture of Jakks and THQ obtained the videogame license in 1998, with its term also scheduled to expire in
2009, subject to a right to renew the license by the joint venture for another five years on certain conditions.

World Wrestling Entertainment, Inc. (NYSE: WWE) is an integrated media and entertainment company headquar-
tered in Stamford, Conn., with offices in New York City, Los Angeles, Toronto, and London.

Trademarks: The names of all World Wrestling Entertainment televised and live programming, talent names, im-
ages, likenesses, slogans and wrestling moves and all World Wrestling Entertainment logos are trademarks which are
the exclusive property of World Wrestling Entertainment, Inc.

Forward-Looking Statements: This news release contains forward-looking statements pursuant to the safe harbor
provisions of the Securities Litigation Reform Act of 1995, which are subject to various risks and uncertainties. These
risks and uncertainties include general market conditions, which could result in only a portion or none of the shares be-
ing registered to be offered and sold, the conditions of the markets for live events, broadcast television, cable television,
pay-per-view, Internet, entertainment, professional sports, and licensed merchandise; acceptance of the Company's
brands, media and merchandise within those markets; uncertainties relating to litigation; risks associated with producing
live events both domestically and internationally; uncertainties associated with international markets; risks relating to
maintaining and renewing key agreements, including television distribution agreements; and other risks and factors set
forth from time to time in Company filings with the Securities and Exchange Commission. Actual results could differ
materially from those currently expected or anticipated.

CONTACT: World Wrestling Entertainment, Inc. Gary Davis, 203-353-5066

URL: http://www.businesswire.com

LOAD-DATE: October 20, 2004

Copyright 2004 Factiva, a Dow Jones and Reuters Company
All Rights Reserved

# Dow Jones Factiva

(c) 2004 Dow Jones & Company, Inc.

## Dow Jones Newswires

Dow Jones News Service

October 19, 2004 Tuesday 7:16 PM GMT

**LENGTH:** 495 words

**HEADLINE:** World Wrestling Entertainment, Inc. Files Suit Against Jakks Pacific, Inc., THQ, Inc. And Related Defendants

**BODY:**

STAMFORD, Conn. (Dow Jones)-- World Wrestling Entertainment Inc. (WWE) filed suit against Jakks Pacific Inc. (JAKK), THQ Inc. (THQI) and others, alleging a bribery scheme related to intellectual-property licenses.

In a press release Tuesday, World Wrestling Entertainment Inc. said it wants the video-game license it has with the joint venture of Jakks Pacific and THQ declared "void and unenforceable" by the court.

World Wresting seeks a similar "void and unenforceable" ruling on a related amendment to a toy license with Jakks. Jakks has been World Wrestling's toy licensee since 1995, while its joint venture with THQ received a video-game license in 1998. Both deals expire in 2009. The venture holds a right to extend the video-game license's term for five years.

Jakks and THQ officials weren't immediately available to comment.

Corrected October 19, 2004 17:39 ET (21:39 GMT) [ 10-19-04 1557ET ]

World Wrestling Entertainment seeks punitive and other damages in the complaint filed with the U.S. District Court for the Southern District of New York.

The entertainment company said its lawsuit against Jakks Pacific, THQ and others arose from Stanley Shenker's November 2000 complaint that sought commission payments from World Wrestling. In 2003, a Connecticut court dismissed Stanley Shenker's case with prejudice.

During the trial in Connecticut, World Wrestling said it discovered irregularities in its licensing program beginning in 1998 when Stanley Shenker served as licensing agent and James Bell worked as World Wrestling's senior vice president of licensing and merchandising.

Company Web site: http://www.wwe.com

-Eamon Beltran; Dow Jones Newswires; 201-938-5400; AskNewswires@dowjones.com [ 10-19-04 1623ET ]

World Wrestling Entertainment Inc. (WWE) wants the video-game license it has with the joint venture of Jakks Pacific Inc. (JAKK) and THQ Inc. (THQI) declared "void and unenforceable" by the court.

The joint venture received the video-game license in 1998.

(An items published at 3:57 p.m. EDT incorrectly reported that Stanley Shenker & Associates Inc. is the joint venture between Jakks and THQ.) [ 10-19-04 1724ET ]

In a press release late Tuesday, JAKKS Pacific responded to the suit filed by World Wrestling Entertainment saying it denies any allegations of wrongdoing.

World Wrestling Entertainment, Inc. Files Suit Against Jakks Pacific, Inc., THQ, Inc. And Related Defendants Dow
Jones News Service October 19, 2004 Tuesday 7:16 PM GMT

JAKKS further said that it believes it will be vindicated in the litigation. [ 10-19-04 2158ET ]

THQ Inc. also commented in its own press release late Tuesday, saying that it is committed to preserving its rights under the videogame license with the WWE.

THQ noted that it is not directly accused of any wrongdoing in the complaint and is not in a position to comment on the allegations.

"In any event, either there is no basis for terminating the video game license, or THQ expects to be made whole by those whose conduct is eventually found to be unlawful," the company said.

THQ further said that it intends to vigorously protect and pursue its rights, if necessary. [ 10-19-04 2233ET ]

**NOTES:**
PUBLISHER: Dow Jones & Company Inc.

**LOAD-DATE:** December 15, 2004

Copyright 2004 Factiva, a Dow Jones and Reuters Company
All Rights Reserved

**Dow Jones** Factiva

(c) 2004 Reuters Limited



Reuters News

October 19, 2004 Tuesday 7:47 PM GMT

**LENGTH:** 94 words

**HEADLINE:** WWE files suit against Jakks, THQ.

**BODY:**

LOS ANGELES, Oct 19 (Reuters) - World Wrestling Entertainment on Tuesday said it had filed a lawsuit against Jakks Pacific Inc, video game maker THQ Inc. (THQI.

O), two other firms and three individuals seeking an order voiding certain licenses and alleging a commercial bribery scheme.

With the lawsuit, which was filed in federal court in New York, WWE said it was seeking damages and a declaration voiding a video game license to a joint venture between Jakks and THQ and an amended toy license with Jakks.

The companies could not be immediately reached for comment.

**NOTES:**
PUBLISHER: Reuters Ltd.

**LOAD-DATE:** January 7, 2005

As filed with the Securities and Exchange Commission on December 13, 2004

Registration No. 333-118866

# U.S. SECURITIES AND EXCHANGE COMMISSION
## Washington, D.C. 20549

---

### Amendment No. 1
### to
# Form S-3
### REGISTRATION STATEMENT
### UNDER THE SECURITIES ACT OF 1933

---

# JAKKS Pacific, Inc.
*(Exact name of registrant as specified in its charter)*

**Delaware**
*(State or other jurisdiction of
incorporation or organization)*

**95-4527222**
*(I.R.S. Employer
Identification No.)*

**22619 Pacific Coast Highway**
**Malibu, California 90265**
**(310) 456-7799**
*(Address, including zip code, and telephone number, including area code, of registrant's principal executive offices)*

**Jack Friedman**
**Chairman**
**JAKKS Pacific, Inc.**
**22619 Pacific Coast Highway**
**Malibu, California 90265**
**(310) 456-7799**
*(Name, address, including zip code, and telephone number, including area code, of agent for service)*

---

*Copy to:*

**Saul Kaszovitz, Esq.**
**Feder, Kaszovitz, Isaacson, Weber,**
**Skala, Bass & Rhine LLP**
**750 Lexington Avenue**
**New York, New York 10022-1200**
**(212) 888-8200**

**Fax: (212) 888-7776**

**Approximate date of commencement of proposed sale to the public:** As soon as practicable after the effective date of this Registration Statement.

If the only securities being registered on this Form are being offered pursuant to dividend or interest reinvestment plans, please check the following box.   ☐

If any of the securities being registered on this Form are to be offered on a delayed or continuous basis pursuant to Rule 415 under the Securities Act of 1933, other than securities offered only in connection with dividend or interest reinvestment plans, check the following box.   ☑

If this Form is filed to register additional securities for an offering pursuant to Rule 462(b) under the Securities Act, please check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering.   ☐

If this Form is a post-effective amendment filed pursuant to Rule 462(c) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering.   ☐

If delivery of the prospectus is expected to be made pursuant to Rule 434, please check the following box.   ☐

## CALCULATION OF REGISTRATION FEE

| Title of Each Class of Securities to be Registered | Amount to be Registered | Proposed Maximum Offering Price per Unit(1) | Proposed Maximum Aggregate Offering Price(1) | Amount of Registration Fee |
|---|---|---|---|---|
| Common Stock, par value $.001 per share | 774,754 Shares | $19.56(2) | $15,154,189 | $1,920.04(3) |

(1)  Estimated solely for the purpose of computing the amount of the registration fee pursuant to Rule 457(c).

(2)  Pursuant to Rule 457(c), represents the average of the high and low sales prices of our common stock for September 1, 2004 as reported on the Nasdaq National Market System.

(3)  Previously paid upon the initial filing of this Registration Statement.

**The registrant hereby amends this registration statement on such date or dates as may be necessary to delay its effective date until the registrant shall file a further amendment which specifically states that this registration statement shall thereafter become effective in accordance with Section 8(a) of the Securities Act or until the registration statement shall become effective on such date as the Commission, acting pursuant to said Section 8(a), may determine.**

THE INFORMATION IN THIS PROSPECTUS IS NOT COMPLETE AND MAY BE CHANGED. WE MAY NOT SELL THESE SECURITIES UNTIL THE REGISTRATION STATEMENT FILED WITH THE SECURITIES AND EXCHANGE COMMISSION IS EFFECTIVE. THIS PROSPECTUS IS NOT AN OFFER TO SELL THESE SECURITIES AND IT IS NOT SOLICITING ANY OFFER TO BUY THESE SECURITIES IN ANY STATE WHERE THE OFFER OR SALE IS NOT PERMITTED.

**SUBJECT TO COMPLETION, DATED December 13, 2004**

**PROSPECTUS**

**774,754 Shares**

# JAKKS Pacific, Inc.

## Common Stock

This prospectus relates to 774,754 shares of our common stock, par value $0.001 per share, that may be sold from time to time by the selling security holders listed under the caption "Selling Security Holders" on page 14. We will not receive any of the proceeds from the sale of the common stock. See "Use of Proceeds."

The selling security holders may determine the prices at which they will sell the common stock, which prices may be at market prices prevailing at the time of such sale or some other price.

Our common stock is traded on the Nasdaq National Market System under the symbol "JAKK." On December 7, 2004, the last reported sale price of our common stock on the Nasdaq National Market System was $19.02 per share.

---

## INVESTING IN OUR COMMON STOCK INVOLVES RISKS. SEE "RISK FACTORS" ON PAGE 8.

**Neither the Securities and Exchange Commission nor any state securities commission has approved or disapproved of these securities or determined if this prospectus is truthful and complete. Any representation to the contrary is a criminal offense.**

---

The date of this Prospectus is            , 2004

# TABLE OF CONTENTS

## TABLE OF CONTENTS

|  | Page |
|---|---|
| Summary | 1 |
| Risk Factors | 8 |
| Forward Looking Statements | 15 |
| Use of Proceeds | 15 |
| Selling Security Holders | 15 |
| Plan of Distribution | 16 |
| Legal Matters | 18 |
| Independent Auditors | 18 |
| Incorporation of Documents by Reference | 19 |
| Where You Can Find More Information | 19 |
| Disclosure of Commission Position on Indemnification For Securities Act Liabilities | 20 |
| Exhibit 5.1 | E-5.1-1 |
| EX-23.1 | E-23.1-1 |
| EX-23.2 | E-23.2-1 |
| EX-23.3 | E-23.3-1 |
| EX-24.1 | E-24.1-1 |

## ABOUT THIS PROSPECTUS

This prospectus constitutes part of a registration statement on Form S-3 that we filed with the SEC through what is known as the shelf registration process. Under this process, any selling security holder may sell the securities described in the prospectus in one or more offerings. This prospectus provides you with a general description of the securities the selling security holders may offer. A prospectus supplement may also add, update or change information contained in this prospectus. You should read both this prospectus and any prospectus supplement together with additional information described under the heading "Where You Can Find More Information."

In connection with this offering, no person is authorized to give any information or to make any representations not contained or incorporated by reference in this prospectus. If information is given or representations are made, you may not rely on that information or representations as having been authorized by us. This prospectus is neither an offer to sell nor a solicitation of an offer to buy any securities other than those registered by this prospectus, nor is it an offer to sell or a solicitation of an offer to buy securities where an offer or solicitation would be unlawful. You may not imply from the delivery of this prospectus, nor from any sale made under this prospectus, that our affairs are unchanged since the date of this prospectus or that the information contained in this prospectus is correct as of any time after the date of this prospectus. The information contained and incorporated by reference in this prospectus and any accompanying prospectus supplement is accurate only as of the date of this prospectus or the prospectus supplement or the date of the document incorporated by reference, as the case may be, regardless of the time of delivery of the prospectus.

You should not consider any information in this prospectus to be legal, business or tax advice. You should consult your own attorney, business advisor and tax advisor for legal, business and tax advice regarding an investment in our securities.

i

## SUMMARY

*This summary highlights information contained elsewhere in this prospectus. You should carefully read the entire prospectus, including "Risk Factors" beginning on page 7, before investing in the common stock. When we use the terms "JAKKS," "we," "us," or "our," we are referring to JAKKS Pacific, Inc. and its subsidiaries, unless the context requires otherwise or we expressly state otherwise in this prospectus.*

### JAKKS Pacific, Inc.

**Our Business**

We are a leading multi-line, multi-brand toy company that designs, develops, produces and markets toys and related consumer products. We focus our business on acquiring or licensing well-recognized trademarks and brand names with long product histories (evergreen brands). We seek to acquire these evergreen brands because we believe they are less subject to market fads or trends. Our products are typically lower-priced toys and accessories and include:

- Electronic products, including *Laser Challenge*™ and TV games;

- Action figures and accessories including licensed characters, principally based on the World Wrestling Entertainment™ ("WWE") and the Dragon Ball® franchises, and toy vehicles, including Road Champs® die-cast collectibles, MXS extreme sports, remote control vehicles and Remco™ toy vehicles and role-play toys and accessories;

- Craft, activity and stationery products, including Flying Colors® activity sets, compounds, playsets and lunch boxes and Colorworkshop® craft products such as Blopens® and Vivid Velvet®, and Pentech® writing instruments, stationery and activity products;

- *Child Guidance*® infant and pre-school electronic toys, toy foam puzzle mats and blocks, activity sets, outdoor products, plush toys and slumber bags;

- Seasonal toys and leisure products, including kites, *Funnoodle*® pool toys, and *Storm*™ water guns;

- Toy candy through our creation of *Tongue Tape*™;

- Junior sports, including *Disney*® products, *Gaksplat*™ and *Storm*™; and

- Fashion and mini dolls and related accessories, including *Disney* Princesses sold in The Disney Store.

We continually review the marketplace to identify and evaluate evergreen brands that we believe have the potential for significant growth. We generate growth within these brands by:

- creating innovative products under established brand names;

- focusing our marketing efforts to enhance consumer recognition and retailer interest;

- linking them with our portfolio of evergreen brands;

- adding new items to the branded product lines that we expect will enjoy greater popularity; and

- adding new features and improving the functionality of products in the line.

In addition to developing our proprietary brands and marks, we license marks such as *WWE*™, *Nickelodeon®*, *Rugrats®*, *SpongeBob SquarePants®*, *Dora the Explorer®*, *Blue's Clues®*, *Mickey Mouse®*, *Winnie the Pooh®*, *Hello Kitty®* and *NASCAR®*. Licensing enables us to use these high-profile marks at a lower cost than we would incur if we purchased these marks or developed comparable marks on our own. By licensing marks, we have access to a far greater range of marks than would be available for purchase. We also license technology produced by unaffiliated inventors and product developers to improve the design and functionality of our products.

We have obtained an exclusive worldwide license for our joint venture with THQ Inc. ("THQ"), which develops, produces, manufactures and markets video games based on WWE characters and themes. Since the

1

joint venture's first title release in 1999, it has released 23 new titles. We have recognized approximately $42.8 million in profit from the joint venture through September 30, 2004. On October 19, 2004, we were named as defendants in a lawsuit commenced by WWE, pursuant to which WWE is seeking treble, punitive and other damages (including disgorgement of profits) in an undisclosed amount and a declaration that the video game license with the joint venture and an amendment to our toy licenses with WWE are void and unenforceable (see "— Legal Proceedings").

Through the Toymax International, Inc. acquisition we also added toy brand names such as *Laser Challenge* and *Creepy Crawlers*® to our brand portfolio. In addition, pool-related products branded under the name *Funnoodle* and kites branded under the name *Go Fly a Kite*® further diversified our portfolio with products popular in the spring and summer seasons.

Through the assets we acquired from Trendmasters®, Inc. ("Trendmasters") we added to our portfolio *The Storm* brand of water guns, gliders and junior sports toys, seasonal products for Halloween, Christmas and Easter, and vehicles, action figures, dolls and playsets under multiple brands.

In May 2003 we acquired from P&M Products USA, Inc. and an affiliated United Kingdom company, P&M Products Limited (collectively, "P&M") the *Blopen, Blitzer*™, *Vivid Velvet* and *SmArty Paints*® line of products which we incorporated into our *Flying Colors*® and *Pentech* lines.

In June 2004, we acquired substantially all of the assets of the Play Along group of companies which manufactured traditional toys, including plush, dolls, action figures, and preschool and construction toys and held a number of licenses including *Cabbage Patch Kids*® for dolls, *Care Bears*® for plush and preschool learning, *Teletubbies*® for preschool and playsets and DC Comic's® *Batman*® and *Justice League of America*® for construction toys.

Most of our current products are relatively inexpensive. In 2003, approximately 70.0% of our revenue came from products priced at ten dollars or less at retail. We believe that these products have enduring appeal and are less subject to general economic conditions, toy product fads and trends, and changes in retail distribution channels. As of September 30, 2004, we had over 3,400 products in approximately 21 product categories. In addition, the simplicity of these products enables us to choose among a wider range of manufacturers and affords us greater flexibility in product design, pricing and marketing. Our product development process typically takes from three to nine months from concept to production and shipment to our customers. We believe that many licensors and retailers recognize and reward our ability to bring product to market faster and more efficiently than many of our competitors.

We sell our products through our in-house sales staff and independent sales representatives to toy and mass-market retail chain stores, department stores, office supply stores, drug and grocery store chains, club stores, toy specialty stores and wholesalers. The *Road Champs, Flying Colors* and *Pentech* products also are sold to smaller hobby shops, specialty retailers and corporate accounts, among others. Our five largest customers are Wal-Mart, Kmart, Toys 'R' Us, Target, and Kay Bee Toys, which collectively accounted for approximately 57.7% of our net sales in 2003. We have over 2,000 other customers, none of which accounted for more than 2.0% of our net sales in 2003. Kay Bee Toys filed for Chapter 11 bankruptcy protection in January 2004. As a result, we have reserved $2.1 million for potential bad debt, which represents 84% of Kay Bee Toys' $2.5 million pre-petition accounts receivable balance with us. If Kay Bee Toys is unable to extricate itself from bankruptcy and we are unable to replace the revenues previously earned by us from Kay Bee Toys with other retailers, our business, financial condition and results of operations could be materially adversely affected (see "Risk Factors").

## Our Growth Strategy

The execution of our growth strategy has resulted in increased revenues and earnings. In 2003, we generated net sales of $315.8 million, net income of $20.6 million and EBITDA of $35.0 million.

Approximately 12.7% of our increase in net sales we believe was attributable to our acquisitions. Key elements of our growth strategy include:

*Expand Core Products.* We manage our existing and new brands through strong product development initiatives, including introducing new products, modifying existing products and extending existing product lines. Our product designers strive to develop new products or product lines to offer added technological, aesthetic and functional improvements to our existing product lines. We expanded the use of real-scan technology in our action toys and we incorporated articulated joints and a flexible rubberized coating to enhance the life-like look and feel of these action toys. These innovations produce higher quality and better likenesses of the representative characters.

*Enter New Product Categories.* We will continue to use our extensive experience in the toy and related industries to evaluate products and licenses in new product categories and to develop additional product lines. We have entered the toy candy category through our creation of *Tongue Tape*, commenced marketing of licensed classic video games for simple plug-in use with television sets and expanded into slumber bags through the licensing of this category from our current licensors, such as Nickelodeon.

*Pursue Strategic Acquisitions.* We intend to supplement our internal growth rate with selected strategic acquisitions. Since our inception in 1995, we have successfully completed and integrated twelve acquisitions of companies and trademarks. These include our acquisitions of Justin Products, Road Champs, Remco, Child Guidance, Berk, Flying Colors, Pentech, Kidz Biz, Toymax®, Trendmasters®, P&M and Play Along. We will continue focusing our acquisition strategy on businesses or brands that have compatible product lines and offer valuable retail shelf space, trademarks or brands. In December 2002, we signed a three-year master toy license for *Dragon Ball®*, *Dragon Ball Z®* and *Dragon Ball GT®*. In 2003, we began to develop, manufacture and distribute action figures and action figure accessories based on these top-rated animated series, and continue to innovate and enhance the product offerings under this license.

*Acquire Additional Character and Product Licenses.* We have acquired the rights to use many familiar corporate, trade and brand names and logos from third parties that we use with our primary trademarks and brands. Currently, we have license agreements with the WWE, Nickelodeon, Disney, and Warner Bros.®, as well as with the licensors of the many popular licensed children's characters previously mentioned, among others. We intend to continue to pursue new licenses from these entertainment and media companies and other licensors. We also intend to continue to purchase additional inventions and product concepts through our existing network of product developers.

*Expand International Sales.* We believe that foreign markets, especially Europe, Australia, Canada, Latin America and Asia, offer us significant growth opportunities. In 2003, our sales generated outside the United States were approximately $44.7 million, or 14.2% of total net sales. We intend to continue to expand our international sales by capitalizing on our experience and our relationships with foreign distributors and retailers. We expect these initiatives to continue to contribute to our international growth in 2004.

*Capitalize On Our Operating Efficiencies.* We believe that our current infrastructure and low-overhead operating model can accommodate significant growth without a proportionate increase in our operating and administrative expenses, thereby increasing our operating margins.

The execution of our growth strategy, however, is subject to several risks and uncertainties and we cannot assure you that we will continue to experience growth in, or maintain our present level of, net sales (see "Risk Factors," beginning on page 7). For example, our growth strategy will place additional demands on our management, operational capacity and financial resources and systems. The increased demand on management may necessitate our recruitment and retention of qualified management personnel. We cannot assure you that we will be able to recruit and retain qualified personnel or expand and manage our operations effectively and profitably. To effectively manage future growth, we must continue to expand our operational, financial and management information systems and to train, motivate and manage our work force. There can be no assurance that our operational, financial and management information systems will be adequate to support our

3

future operations. Failure to expand our operational, financial and management information systems or to train, motivate or manage employees could have a material adverse effect on our business, financial condition and results of operations.

Moreover, implementation of our growth strategy is subject to risks beyond our control, including competition, market acceptance of new products, changes in economic conditions, our ability to obtain or renew licenses on commercially reasonable terms and our ability to finance increased levels of accounts receivable and inventory necessary to support our sales growth, if any.

Furthermore, we cannot assure you that we can identify attractive acquisition candidates or negotiate acceptable acquisition terms, and our failure to do so may adversely affect our results of operations and our ability to sustain growth.

Finally, our acquisition strategy involves a number of risks, each of which could adversely affect our operating results, including difficulties in integrating acquired businesses or product lines, assimilating new facilities and personnel and harmonizing diverse business strategies and methods of operation; diversion of management attention from operation of our existing business; loss of key personnel from acquired companies; and failure of an acquired business to achieve targeted financial results.

### *Non-GAAP Financial Measure*

We have included above a non-GAAP financial measure, EBITDA, which is Earnings before Interest, Taxes, Depreciation, and Amortization. Many analysts view EBITDA as a useful measure in determining a company's return on invested capital and the company's ability to pay interest charges.

Our EBITDA, as referred to above, is reconciled to our Net Income as follows (in thousands):

|                              | 12/31/2003 |
|------------------------------|-----------:|
| Net Income                   | $20,604    |
| Add (Deduct):                |            |
| Provision for Income Tax     | 4,205      |
| Interest, net                | 1,405      |
| Profit from Joint Venture    | (7,351)    |
| Unrealized Gain              | (609)      |
| Other (income) expense       | 232        |
| Amortization                 | 988        |
| Depreciation                 | 7,191      |
| Restricted Stock Expense     | 8,363      |
| Option Compensation Expense  | 6          |
| EBITDA                       | $35,034    |

## Legal Proceedings

On October 19, 2004, we were named as defendants in a lawsuit commenced by WWE in the U.S. District Court for the Southern District of New York concerning our toy licenses with WWE and the video game license between WWE and the joint venture company operated by THQ and us, encaptioned World Wide Wrestling Entertainment, Inc. v. JAKKS Pacific, Inc., et al., 1:04-CV-08223-KMK (the "WWE Action"). The complaint also names as defendants THQ, the joint venture, certain of our foreign subsidiaries, Jack Friedman (our Chairman and Chief Executive Officer), Stephen Berman (our Chief Operating Officer, President and Secretary and a member of our Board of Directors), Joel Bennett (our Chief Financial Officer), Stanley Shenker and Associates, Inc., Bell Licensing, LLC, Stanley Shenker and James Bell.

WWE is seeking treble, punitive and other damages (including disgorgement of profits) in an undisclosed amount and a declaration that the video game license with the joint venture, which is scheduled to expire in 2009 (subject to joint venture's right to extend that license for an additional five years), and an amendment to our toy licenses with WWE, which are scheduled to expire in 2009, are void

and unenforceable. The WWE

4

Action alleges violations by the defendants of the Racketeer Influenced and Corrupt Organization Act ("RICO") and the anti-bribery provisions of the Robinson-Patman Act, and various claims under state law.

In November 2004, several purported class action lawsuits were filed in the United States District Court for the Southern District of New York: (1) Garcia v. Jakks Pacific, Inc. et al, Civil Action No. 04-8807 (filed on 11/5/2004), (2) Jonco Investors, LLC v. Jakks Pacific, Inc. et al, Civil Action No. 04-9021 (filed on 11/16/2004), (3) Kahn v. Jakks Pacific, Inc. et al, Civil Action No. 04-8910 (filed on 11/10/2004), (4) Quantum Equities L.L.C. v. Jakks Pacific, Inc. et al, Civil Action No. 04-8877 (filed on 11/9/2004), and Irvine v. Jakks Pacific, Inc. et al, Civil Action No. 04-9078 (filed on 11/16/2004) (the "Class Actions"). The complaints in the Class Actions allege that defendants issued positive statements concerning increasing sales of our WWE licensed products which were false and misleading because the WWE licenses had allegedly been obtained through a pattern of commercial bribery, our relationship with the WWE was being negatively impacted by the WWE's contentions and there was an increased risk that the WWE would either seek modification or nullification of the licensing agreements with us. Plaintiffs also allege that we misleadingly failed to disclose the alleged fact that the WWE licenses were obtained through an unlawful bribery scheme. The plaintiffs in the Class Actions are described as purchasers of our common stock, who purchased from as early as October 26, 1999 to as late as October 19, 2004. The Class Actions seek compensatory and other damages in an undisclosed amount, alleging violations of Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder by each of the defendants (namely the Company and Messrs. Friedman, Berman and Bennett), and violations of Section 20(a) of the Exchange Act by Messrs. Friedman, Berman and Bennett.

We believe that the claims in the WWE Action and the Class Actions are without merit and we intend to defend vigorously against them. However, because these Actions are in their preliminary stages, we cannot assure you as to the outcome of the Actions, nor can we estimate the range of potential losses to this Company.

On December 2, 2004, a shareholder derivative action was filed in the Southern District of New York by Freeport Partners, LLC against our Company, nominally, and against Messrs. Friedman, Berman and Bennett, Freeport Partners v. Friedman, et al, Civil Action No. 04-9441 (the "Derivative Action"). The Derivative Action seeks to hold the individual defendants liable for damages allegedly caused to us by their actions and in particular to hold them liable on a contribution theory with respect to any liability of our Company in connection with the Class Actions.

## The Offering

This prospectus relates to 774,754 shares of our common stock that may be sold from time to time by the selling security holders, Messrs. Charles Emby, Jay Foreman, Lawrence Geller, David Lipman and John Nimmo.

In June 2004, we purchased assets of Play Along, Inc., Play Along (Hong Kong) Limited and PA Distribution, Inc. for approximately $85.7 million, consisting of approximately $70.8 million in cash and 749,005 shares of our common stock. Prior to the acquisition, Messrs. Emby, Foreman and Geller were shareholders, directors and executive officers of those companies and they are currently management level employees of ours, although not executive officers.

In December 2001, we purchased the shares of Kidz Biz Limited and Kidz Biz Far East Limited for approximately $12.4 million consisting of approximately $6.4 million in cash and 308,992 shares of our common stock. Prior to the acquisition, Messrs. Lipman and Nimmo were shareholders, directors and executive officers of those companies. Currently, Mr. Lipman is a non-executive level employee of ours and Messrs. Lipman and Nimmo own the building leased by Kidz Biz Limited in Surrey, England.

Certain of the foregoing selling security holders have agreed to limit the amount of shares they will offer, as disclosed under the caption "Plan of Distribution" on page 15.

We will not receive any of the proceeds from the sale of the common stock offered hereby (see "Use of Proceeds"), and the selling security holders listed herein may determine the prices at which they will sell the common stock, which prices may be at market prices prevailing at the time of such sale or some other price.

**Our Corporate Information**

We were formed as a Delaware corporation in 1995. Our principal executive offices are located at 22619 Pacific Coast Highway, Malibu, California 90265. Our telephone number is (310) 456-7799. Our Internet website address is www.jakkspacific.com. The contents of our website are not part of this prospectus.

<div style="border: 1px solid black; padding: 20px;">

**The Offering**

| | |
|---|---|
| Issuer | JAKKS Pacific, Inc. |
| Seller | One or more of the selling security holders. For information about the selling security holders, see "Selling Security Holders." We are not selling the securities. |
| Securities Offered | 774,754 shares of our common stock, par value $.001. |
| Common Stock to be Outstanding After the Offering[1] | 26,233,706 shares. |
| Registration Rights | We have agreed to use our best efforts keep the shelf registration statement, of which this prospectus forms a part, effective until the earlier to occur of (i) the date on which the registered shares are disposed of in accordance with this prospectus or (ii) for Messrs. Emby, Foreman and Geller, the first anniversary of the effective date of the registration statement of which this prospectus forms a part, and for Messrs. Lipman and Nimmo, the date when their registered shares can be immediately sold to the public without registration or restriction. |
| Trading | Our common stock trades on the Nasdaq National Market System under the symbol "JAKK." |
| Use of Proceeds | We will not receive any of the proceeds from the sale by the selling security holders of the shares of common stock. |

———————————

[1] Do es not include (1) 4,900,000 shares underlying our convertible notes; (2) 100,000 shares underlying our outstanding warrants; and (3) 2,115,946 shares underlying our outstanding options.

</div>

7

# RISK FACTORS

*An investment in the shares of common stock involves significant risks. In addition to reviewing other information in this prospectus, you should carefully consider the following factors before deciding to purchase the shares of common stock. If any of the following risks actually occur, our business, results of operations and financial condition could be materially adversely affected and you might lose all or part of your investment.*

**The outcome of litigation in which we have been named as a defendant is unpredictable and a materially adverse decision in any such matter could have a material adverse affect on our financial position and results of operations.**

We are defendants in litigation matters, as described under "Legal Proceedings" in our periodic reports filed pursuant to the Securities Exchange Act of 1934, including the lawsuit commenced by WWE and the purported securities class action and derivative action claims stemming from the WWE lawsuit (see "— Legal Proceedings"). These claims may divert financial and management resources that would otherwise be used to benefit our operations. Although we believe that we have meritorious defenses to the claims made in each and all of the litigation matters to which we have been named a party, and intend to contest each lawsuit vigorously, no assurances can be given that the results of these matters will be favorable to us. A materially adverse resolution of any of these lawsuits could have a material adverse affect on our financial position and results of operations.

**Our inability to redesign, restyle and extend our existing core products and product lines as consumer preferences evolve, and to develop, introduce and gain customer acceptance of new products and product lines, may materially and adversely impact our business, financial condition and results of operations.**

Our business and operating results depend largely upon the appeal of our products. Our continued success in the toy industry will depend on our ability to redesign, restyle and extend our existing core products and product lines as consumer preferences evolve, and to develop, introduce and gain customer acceptance of new products and product lines. Several trends in recent years have presented challenges for the toy industry, including:

• *The phenomenon of children outgrowing toys at younger ages, particularly in favor of interactive and high technology products;*

• *Increasing use of technology;*

• *Shorter life cycles for individual products; and*

• *Higher consumer expectations for product quality, functionality and value.*

We cannot assure you that:

• *our current products will continue to be popular with consumers;*

• *the product lines or products that we introduce will achieve any significant degree of market acceptance; or*

• *the life cycles of our products will be sufficient to permit us to recover licensing, design, manufacturing, marketing and other costs associated with those products.*

Our failure to achieve any or all of the foregoing benchmarks may cause the infrastructure of our operations to fail, thereby adversely affecting our business, financial condition and results of operations.

8

***The failure of our character-related and theme-related products to become and/or remain popular with children may materially and adversely impact our business, financial condition and results of operations.***

The success of many of our character-related and theme-related products depends on the popularity of characters in movies, television programs, live wrestling exhibitions, auto racing events and other media. We cannot assure you that:

- *media associated with our character-related and theme-related product lines will be released at the times we expect or will be successful;*

- *the success of media associated with our existing character-related and theme-related product lines will result in substantial promotional value to our products;*

- *we will be successful in renewing licenses upon expiration on terms that are favorable to us; or*

- *we will be successful in obtaining licenses to produce new character-related and theme-related products in the future.*

Our failure to achieve any or all of the foregoing benchmarks may cause the infrastructure of our operations to fail, thereby adversely affecting our business, financial condition and results of operations.

***There are risks associated with our license agreements.***

- *Our current licenses require us to pay minimum royalties*

Sales of products under trademarks or trade or brand names licensed from others account for substantially all of our net sales. Product licenses allow us to capitalize on characters, designs, concepts and inventions owned by others or developed by toy inventors and designers. Our license agreements generally require us to make specified minimum royalty payments, even if we fail to sell a sufficient number of units to cover these amounts. In addition, under certain of our license agreements, if we fail to achieve certain prescribed sales targets, we may be unable to retain or renew these licenses.

- *Some of our licenses are restricted as to use*

Under some of our license agreements, including WWE, Nickelodeon and NASCAR, the licensors have the right to review and approve our use of their licensed products, designs or materials before we may make any sales. If a licensor refuses to permit our use of any licensed property in the way we propose, or if their review process is delayed, our development or sale of new products could be impeded.

- *New licenses are difficult and expensive to obtain*

Our continued success will depend substantially on our ability to obtain additional licenses. Intensive competition exists for desirable licenses in our industry. We cannot assure you that we will be able to secure or renew significant licenses on terms acceptable to us. In addition, as we add licenses, the need to fund additional royalty advances and guaranteed minimum royalty payments may strain our cash resources.

- *A limited number of licensors account for a large portion of our net sales*

We derive a significant portion of our net sales from a limited number of licensors. If one or more of these licensors were to terminate or fail to renew our license or not grant us new licenses, our business, financial condition and results of operations could be adversely affected.

***The toy industry is highly competitive and our inability to compete effectively may materially and adversely impact our business, financial condition results of operations.***

The toy industry is highly competitive. Globally, certain of our competitors have financial and strategic advantages over us, including:

• *greater financial resources;*

• *larger sales, marketing and product development departments;*

9

- *stronger name recognition;*

- *longer operating histories; and*

- *greater economies of scale.*

In addition, the toy industry has no significant barriers to entry. Competition is based primarily on the ability to design and develop new toys, to procure licenses for popular characters and trademarks and to successfully market products. Many of our competitors offer similar products or alternatives to our products. Our competitors have obtained and are likely to continue to obtain licenses that overlap our licenses with respect to products, geographic areas and markets. We cannot assure you that we will be able to obtain adequate shelf space in retail stores to support our existing products or to expand our products and product lines or that we will be able to continue to compete effectively against current and future competitors.

### *A decline in the popularity of World Wrestling Entertainment could adversely our video game joint venture with THQ.*

The joint venture with THQ depends entirely on a single license, which gives the venture exclusive worldwide rights to produce and market video games based on World Wrestling Entertainment characters and themes. The popularity of professional wrestling, in general, and World Wrestling Entertainment, in particular, is subject to changing consumer tastes and demands. The relative popularity of professional wrestling has fluctuated significantly in recent years. A decline in the popularity of World Wrestling Entertainment could adversely affect the joint venture's and our business, financial condition and results of operations.

### *The termination of THQ's manufacturing licenses and the inability of the joint venture to otherwise obtain these licenses from other manufacturers would materially adversely affect the joint venture's and our business, financial condition and results of operations.*

The joint venture relies on hardware manufacturers and THQ's non-exclusive licenses with them for the right to publish titles for their platforms and for the manufacture of the joint venture's titles. If THQ's manufacturing licenses were to terminate and the joint venture could not otherwise obtain these licenses from other manufacturers, the joint venture would be unable to publish additional titles for these manufacturers' platforms, which would materially adversely affect the joint venture's and our business, financial condition and results of operations.

### *The failure of the joint venture or THQ to perform as anticipated could have a material adverse affect on our financial position and results of operations.*

The joint venture's failure to timely develop titles for new platforms that achieve significant market acceptance, to maintain net sales that are commensurate with product development costs or to maintain compatibility between its personal computer CD-ROM titles and the related hardware and operating systems would adversely affect the joint venture's and our business, financial condition and results of operations.

Furthermore, THQ controls the day-to-day operations of the joint venture and all of its product development and production operations. Accordingly, the joint venture relies exclusively on THQ to manage these operations effectively. THQ's failure to effectively manage the joint venture would have a material adverse effect on the joint venture's and our business and results of operations. We are also dependent upon THQ's ability to manage cash flows of the joint venture. If THQ is required to retain cash for operations, or because of statutory or contractual restrictions, we may not receive cash payments for our share of profits, on a timely basis, or at all.

### *We may not be able to sustain or manage our rapid growth, which may prevent us from continuing to increase our net revenues.*

We have experienced rapid growth in our product lines resulting in higher net sales over the last six years, which was achieved through acquisitions of businesses, products and licenses. For example, revenues associated with our acquired companies in 2003 and 2002 were $40.1 million and $84.7 million, respectively,

10

representing 12.7% and 27.3% of our total revenues for those periods. As a result, comparing our period-to-period operating results may not be meaningful and results of operations from prior periods may not be indicative of future results. We cannot assure you that we will continue to experience growth in, or maintain our present level of, net sales.

Our growth strategy calls for us to continuously develop and diversify our toy business by acquiring other companies, entering into additional license agreements, refining our product lines and expanding into international markets, which will place additional demands on our management, operational capacity and financial resources and systems. The increased demand on management may necessitate our recruitment and retention of qualified management personnel. We cannot assure you that we will be able to recruit and retain qualified personnel or expand and manage our operations effectively and profitably. To effectively manage future growth, we must continue to expand our operational, financial and management information systems and to train, motivate and manage our work force. There can be no assurance that our operational, financial and management information systems will be adequate to support our future operations. Failure to expand our operational, financial and management information systems or to train, motivate or manage employees could have a material adverse effect on our business, financial condition and results of operations.

In addition, implementation of our growth strategy is subject to risks beyond our control, including competition, market acceptance of new products, changes in economic conditions, our ability to obtain or renew licenses on commercially reasonable terms and our ability to finance increased levels of accounts receivable and inventory necessary to support our sales growth, if any. Accordingly, we cannot assure you that our growth strategy will continue to be implemented successfully.

***If we are unable to acquire and integrate companies and new product lines successfully we will be unable to implement our growth strategy.***

Our growth strategy depends in part upon our ability to acquire companies and new product lines. Revenues associated with our acquisitions represented 12.7% and 27.3% of our total revenues in 2003 and 2002, respectively. Future acquisitions will succeed only if we can effectively assess characteristics of potential target companies and product lines, such as:

• *attractiveness of products;*

• *suitability of distribution channels;*

• *management ability;*

• *financial condition and results of operations; and*

• *the degree to which acquired operations can be integrated with our operations.*

We cannot assure you that we can identify attractive acquisition candidates or negotiate acceptable acquisition terms, and our failure to do so may adversely affect our results of operations and our ability to sustain growth. Our acquisition strategy involves a number of risks, each of which could adversely affect our operating results, including:

• *difficulties in integrating acquired businesses or product lines, assimilating new facilities and personnel and harmonizing diverse business strategies and methods of operation;*

• *diversion of management attention from operation of our existing business;*

• *loss of key personnel from acquired companies; and*

• *failure of an acquired business to achieve targeted financial results.*

11

***A limited number of customers account for a large portion of our net sales, so that if one or more of our major customers were to experience difficulties in fulfilling their obligations to us, cease doing business with us, significantly reduce the amount of their purchases from us or return substantial amounts of our products, it could have a material adverse effect on our business, financial condition and results of operations.***

Our five largest customers accounted for 57.7% of our net sales in 2003. Except for outstanding purchase orders for specific products, we do not have written contracts with or commitments from any of our customers. A substantial reduction in or termination of orders from any of our largest customers could adversely affect our business, financial condition and results of operations. In addition, pressure by large customers seeking price reductions, financial incentives, changes in other terms of sale or for us to bear the risks and the cost of carrying inventory also could adversely affect our business, financial condition and results of operations. If one or more of our major customers were to experience difficulties in fulfilling their obligations to us, cease doing business with us, significantly reduce the amount of their purchases from us or return substantial amounts of our products, it could have a material adverse effect on our business, financial condition and results of operations. In addition, the bankruptcy or other lack of success of one or more of our significant retailers could negatively impact our revenues and bad debt expense. For example, one of our five largest customers in 2003, Kay Bee Toys, filed for Chapter 11 bankruptcy protection in January 2004. As a result, we have reserved $2.1 million for potential bad debt, which represents 84% of Kay Bee Toys' $2.5 million pre-petition accounts receivable balance with us. If Kay Bee Toys is unable to extricate itself from bankruptcy and we are unable to replace the revenues previously earned by us from Kay Bee Toys, our business, financial condition and results of operations could be materially adversely affected.

***We depend on our key personnel and any loss or interruption of either of their services could adversely affect our business, financial condition and results of operations.***

Our success is largely dependent upon the experience and continued services of Jack Friedman, our Chairman and Chief Executive Officer and Stephen G. Berman, our President and Chief Operating Officer. We cannot assure you that we would be able to find an appropriate replacement for Mr. Friedman or Mr. Berman if the need should arise, and any loss or interruption of Mr. Friedman's or Mr. Berman's services could adversely affect our business, financial condition and results of operations.

***We depend on third-party manufacturers, and if our relationship with any of them is harmed or if they independently encounter difficulties in their manufacturing processes, we could experience product defects, production delays, cost overruns or the inability to fulfill orders on a timely basis, any of which could adversely affect our business, financial condition and results of operations.***

We depend on approximately twenty third-party manufacturers who develop, provide and use the tools, dies and molds that we own to manufacture our products. However, we have limited control over the manufacturing processes themselves. As a result, any difficulties encountered by the third-party manufacturers that result in product defects, production delays, cost overruns or the inability to fulfill orders on a timely basis could adversely affect our business, financial condition and results of operations.

We do not have long-term contracts with our third-party manufacturers. Although we believe we could secure other third-party manufacturers to produce our products, our operations would be adversely affected if we lost our relationship with any of our current suppliers or if our current suppliers' operations or sea or air transportation with our overseas manufacturers were disrupted or terminated even for a relatively short period of time. Our tools, dies and molds are located at the facilities of our third-party manufacturers.

Although we do not purchase the raw materials used to manufacture our products, we are potentially subject to variations in the prices we pay our third-party manufacturers for products, depending on what they pay for their raw materials.

12

***We have substantial sales and manufacturing operations outside of the United States subjecting us to risks associated with the outbreak of SARS, as well as risks common to international operations.***

We sell products and operate facilities in numerous countries outside the United States. For the fiscal year ended December 31, 2003, sales to our international customers comprised approximately 14.2% of our net sales. We expect our sales to international customers to account for a greater portion of our revenues in future fiscal periods. Additionally, we utilize third-party manufacturers located principally in The People's Republic of China, or the PRC, which has been significantly impacted by the outbreak of Severe Acute Respiratory Syndrome, or SARS. The inability of the PRC to effectively control the spread of SARS within its borders or the failure of the medical community to develop a cure for this illness may deplete the workforce of the PRC available to manufacture our products, create barriers to entry into commercial markets for our products manufactured in the PRC and prevent us from sending the requisite monitors and inspectors to the PRC to ensure that our products are being manufactured in accordance with our requirements and specifications. Any of the foregoing may cause the infrastructure of our PRC operations to fail, thereby adversely affecting our business, financial condition and results of operations.

Furthermore, our PRC sales and manufacturing operations are subject to the risks normally associated with international operations, including:

• *currency conversion risks and currency fluctuations;*

• *limitations, including taxes, on the repatriation of earnings;*

• *political instability, civil unrest and economic instability;*

• *greater difficulty enforcing intellectual property rights and weaker laws protecting such rights;*

• *complications in complying with laws in varying jurisdictions and changes in governmental policies;*

• *greater difficulty and expenses associated with recovering from natural disasters;*

• *transportation delays and interruptions; and*

• *the potential imposition of tariffs.*

Our reliance on external sources of manufacturing can be shifted, over a period of time, to alternative sources of supply, should such changes be necessary. However, if we were prevented from obtaining products or components for a material portion of our product line due to medical, political, labor or other factors beyond our control, our operations would be disrupted while alternative sources of products were secured. Also, the imposition of trade sanctions by the United States against a class of products imported by us from, or the loss of "normal trade relations" status by China, could significantly increase our cost of products imported from that nation. Because of the importance of our international sales and international sourcing of manufacturing to our business, our financial condition and results of operations could be significantly and adversely affected if any of the risks described above were to occur.

***Our business is subject to extensive government regulation and any violation by us of such regulations could result in product liability claims, loss of sales, diversion of resources, damage to our reputation, increased warranty costs or removal of our products from the market, and we cannot assure you that our product liability insurance for the foregoing will be sufficient.***

Our business is subject to various laws, including the Federal Hazardous Substances Act, the Consumer Product Safety Act, the Flammable Fabrics Act and the rules and regulations promulgated under these acts. These statutes are administered by the Consumer Product Safety Commission (CPSC), which has the authority to remove from the market products that are found to be defective and present a substantial hazard or risk of serious injury or death. The CPSC can require a manufacturer to recall, repair or replace these

13

products under certain circumstances. We cannot assure you that defects in our products will not be alleged or found. Any such allegations or findings could result in:

- *product liability claims;*

- *loss of sales;*

- *diversion of resources;*

- *damage to our reputation;*

- *increased warranty costs; and*

- *removal of our products from the market.*

Any of these results may adversely affect our business, financial condition and results of operations. There can be no assurance that our product liability insurance will be sufficient to avoid or limit our loss in the event of an adverse outcome of any product liability claim.

***We depend on our proprietary rights and our inability to safeguard and maintain the same, or claims of third parties that we have violated their intellectual property rights, could have a material adverse effect on our business, financial condition and results of operations.***

We rely on trademark, copyright and trade secret protection, nondisclosure agreements and licensing arrangements to establish, protect and enforce our proprietary rights in our products. The laws of certain foreign countries may not protect intellectual property rights to the same extent or in the same manner as the laws of the United States. We cannot assure you that we or our licensors will be able to successfully safeguard and maintain our proprietary rights. Further, certain parties have commenced legal proceedings or made claims against us based on our alleged patent infringement, misappropriation of trade secrets or other violations of their intellectual property rights. We cannot assure you that other parties will not assert intellectual property claims against us in the future. These claims could divert our attention from operating our business or result in unanticipated legal and other costs, which could adversely affect our business, financial condition and results of operations.

***Market conditions and other third-party conduct could negatively impact our margins and implementation of other business initiatives.***

Economic conditions, such as rising fuel prices and decreased consumer confidence, may adversely impact our margins. In addition, general economic conditions were significantly and negatively affected by the September 11th terrorist attacks and could be similarly affected by any future attacks. Such a weakened economic and business climate, as well as consumer uncertainty created by such a climate, could adversely affect our sales and profitability. Other conditions, such as the unavailability of electronics components, may impede our ability to manufacture, source and ship new and continuing products on a timely basis. Significant and sustained increases in the price of oil could adversely impact the cost of the raw materials used in the manufacture of our products, such as plastic.

***We may not have the funds necessary to purchase our outstanding convertible notes upon a fundamental change or other purchase date, as required by the indenture governing the notes.***

On June 15, 2010, June 15, 2013 and June 15, 2018, holders of our convertible notes may require us to purchase their notes, which repurchase may be made for cash. In addition, holders may also require us to purchase their notes for cash upon the occurrence of certain fundamental changes in our board composition or ownership structure, if we liquidate or dissolve under certain circumstances or if our common stock ceases being quoted on an established over-the-counter trading market in the United States. If we do not have, or have access to, sufficient funds to repurchase the notes, then we could be forced into bankruptcy. In fact, we expect that we would require third-party financing, but we cannot assure you that we would be able to obtain that financing on favorable terms or at all.

14

***Our reported earnings per share may be more volatile because of the contingent conversion provision of our outstanding convertible notes.***

Holders of our convertible notes are entitled to convert the notes into our common stock, among other circumstances, if the closing sale price of our common stock for at least 20 trading days in the 30 trading day period ending on the last day of the preceding calendar quarter exceeds 120% of the accreted conversion price per share of common stock (the accreted principal amount of a convertible note divided by the number of shares issuable upon conversion of a convertible note on that day) on the last trading day of such preceding calendar quarter. Until this contingency or another conversion contingency is met, the shares underlying the notes are not included in the calculation of our basic or fully diluted earnings per share. Should this contingency be met, fully diluted earnings per share would be expected to decrease as a result of the inclusion of the underlying shares in the fully diluted earnings per share calculation. Volatility in our stock price could cause this condition to be met in one quarter and not in a subsequent quarter, increasing the volatility of our fully diluted earnings per share. The convertible notes were convertible at a rate of 50.0 shares of common stock per $1,000 principal amount at issuance of the convertible notes (equivalent to an initial conversion price of $20.00 per share).

## FORWARD LOOKING STATEMENTS

This prospectus includes or incorporates by reference "forward-looking statements" within the meaning of Section 27A of the Securities Act of 1933, and Section 21E of the Securities Exchange Act of 1934. For example, statements included in this prospectus regarding our financial position, business strategy and other plans and objectives for future operations, and assumptions and predictions about future product demand, supply, manufacturing, costs, marketing and pricing factors are all forward-looking statements. When we use words like "intend," "anticipate," "believe," "estimate," "plan," "will" or "expect," we are making forward-looking statements. We believe that the assumptions and expectations reflected in such forward-looking statements are reasonable, based on information available to us on the date hereof, but we cannot assure you that these assumptions and expectations will prove to have been correct or that we will take any action that we may presently be planning. We have disclosed certain important factors that could cause our actual results to differ materially from our current expectations under "Risk Factors" above and elsewhere in this prospectus. You should understand that forward-looking statements made in this prospectus are necessarily qualified by these factors. We are not undertaking to publicly update or revise any forward-looking statement if we obtain information or upon the occurrence of future events or otherwise.

## USE OF PROCEEDS

We will not receive any proceeds from the sale of the shares of common stock by the selling security holders in this offering.

## SELLING SECURITY HOLDERS

This prospectus relates to 774,754 shares of our common stock that may be sold from time to time by the selling security holders, Messrs. Charles Emby, Jay Foreman, Lawrence Geller, David Lipman and John Nimmo.

The shares of common stock being offered by Messrs. Lipman and Nimmo were originally issued by us on August 17, 2004 and the shares of common stock being offered by Messrs. Emby, Foreman and Geller were originally issued by us on June 10, 2004, in non-public transactions, which issuances were exempt from the registration requirements of the Securities Act pursuant to Section 4(2) thereof. As used herein, selling security holders includes their transferees, pledgees or donees or their successors, selling shares received from a named selling security holder after the date of this prospectus. Selling security holders may from time to time offer and sell pursuant to this prospectus any or all of the shares of common stock listed by their name below.

In June 2004, we purchased assets of Play Along, Inc., Play Along (Hong Kong) Limited and PA Distribution, Inc. for approximately $85.7 million, consisting of approximately $70.8 million in cash and

15

749,005 shares of our common stock. Prior to the acquisition, Messrs. Emby, Foreman and Geller were shareholders, directors and executive officers of those companies and they are currently management level employees of ours, although not executive officers.

In December 2001, we purchased the shares of Kidz Biz Limited and Kidz Biz Far East Limited for approximately $12.4 million consisting of approximately $6.4 million in cash and 308,992 shares of our common stock. Prior to the acquisition, Messrs. Lipman and Nimmo were shareholders, directors and executive officers of those companies. Currently, Mr. Lipman is a non-executive level employee of ours and Messrs. Lipman and Nimmo own the building leased by Kidz Biz Limited in Surrey, England.

The following table sets forth information with respect to the selling security holders and the number of shares beneficially owned by each selling security holder that may be offered pursuant to this prospectus. The information is based on information provided by or on behalf of the selling security holders on or prior to December 7, 2004. The selling security holders may offer all, some or none of the shares of common stock listed below.

| Selling Security Holders | Number of Shares Beneficially Owned Prior to the Offering(2) | Number of Shares Offered Hereby(1) | Number of Shares Beneficially Owned After Offering(2)(3) |
|---|---|---|---|
| Charles Emby | 299,602 | 299,602 | 0 |
| Jay Foreman | 299,602 | 299,602 | 0 |
| Lawrence Geller | 149,801 | 149,801 | 0 |
| David Lipman | 44,826(4) | 19,826 | 25,000(4) |
| John Nimmo | 5,923 | 5,923 | 0 |

(1)   Information regarding the selling security holders may change from time to time. Any such change will be set forth in supplements to this prospectus if and when necessary.

(2)   The number of shares of common stock beneficially owned by a person or entity is determined under rules promulgated by the United States Securities and Exchange Commission. Under such rules, beneficial ownership includes any shares as to which a person or entity has sole or shared voting power or investment power. Included among the shares owned by such person or entity are any shares which such person or entity has the right to acquire within 60 days after December 7, 2004. The inclusion herein of any shares deemed beneficially owned does not constitute an admission of beneficial ownership of such shares. Except for information in our records and reports filed by a selling shareholder with us, if any, we have no knowledge of whether such selling shareholder owns any other shares of our common stock or options or warrants to purchase shares of our common stock. We believe that none of the selling security holders listed above will own 1% or more of our outstanding shares if it sells all of the shares registered for sale hereby.

(3)   Assumes the sale of all shares offered hereby on behalf of such selling security holder.

(4)   Includes 25,000 shares that Mr. Lipman may purchase upon the exercise of certain stock options.

## PLAN OF DISTRIBUTION

The selling security holders and their successors, including their transferees, pledgees or donees or their successors, may sell the common stock directly to purchasers or through underwriters, broker-dealers or agents, who may receive compensation in the form of discounts, concessions or commissions from the selling security holders or the purchasers of the common stock. These discounts, concessions or commissions as to any particular underwriter, broker-dealer or agent may be in excess of those customary in the types of transactions involved.

The common stock may be sold in one or more transactions at fixed prices, at prevailing market prices at the time of sale, at prices related to the prevailing market prices, at varying prices determined at the time of

sale, or at negotiated prices. These sales may be affected in transactions, which may involve crosses or block transactions:

- on any national securities exchange or U.S. inter-dealer system of a registered national securities association on which the common stock may be listed or quoted at the time of sale;

- in the over-the-counter market;

- in transactions otherwise than on these exchanges or systems or in the over-the-counter market;

- through the writing of options, whether the options are listed on an options exchange or otherwise; or

- through the settlement of short sales.

In connection with the sale of the common stock, selling security holders may enter into hedging transactions with broker-dealers or other financial institutions, which may in turn engage in short sales of the common stock positions they assume. The selling security holders may also sell the common stock short and deliver these securities to close out their short positions, or loan or pledge the common stock to broker-dealers that in turn may sell these securities.

The aggregate proceeds to the selling security holders from the sale of the common stock offered by them will be the purchase price of the common stock less discounts and commissions, if any. Each of the selling security holders reserves the right to accept and, together with their agents from time to time, to reject, in whole or in part, any proposed purchase of common stock to be made directly or through agents. We will not receive any of the proceeds from this offering.

In order to comply with the securities laws of some states, if applicable, the common stock may be sold in these jurisdictions only through registered or licensed brokers or dealers. In addition, in some states the common stock may not be sold unless they have been registered or qualified for sale or an exemption from registration or qualification requirements is available and is complied with.

The selling security holders and any underwriters, broker-dealers or agents that participate in the sale of the common stock may be "underwriters" within the meaning of Section 2(11) of the Securities Act. Any discounts, commissions, concessions or profit they earn on any resale of the shares may be deemed to be underwriting discounts and commissions under the Securities Act.

Selling security holders who are "underwriters" within the meaning of Section 2(11) of the Securities Act will be subject to the prospectus delivery requirements of the Securities Act and may be subject to statutory liabilities, including, but not limited to, liability under Sections 11, 12 and 17 of the Securities Act and Rule 10b-5 under the Securities Exchange Act of 1934. The selling security holders have acknowledged that they understand their obligations to comply with the provisions of the Exchange Act and the rules thereunder relating to stock manipulation, particularly Regulation M.

To our knowledge, there are currently no plans, arrangements or understandings between any of the selling security holders and any underwriter, broker-dealer or agent regarding the sale of the common stock. A selling security holder may not sell any common stock described in this prospectus and may not transfer, devise or gift these securities by other means not described in this prospectus. In addition, any securities covered by this prospectus which qualify for sale pursuant to Rule 144 or Rule 144A of the Securities Act may be sold under Rule 144 or Rule 144A rather than pursuant to this prospectus.

We entered into registration rights agreements for the benefit of holders of the common stock to register their common stock under applicable federal and state securities laws under specific circumstances and at specific times. The registration rights agreements provide for cross-indemnification of the selling security holders and us (and our directors, officers and controlling persons) against specific liabilities in connection with the offer and sale of the common stock, including liabilities under the Securities Act. We will pay substantially all of the expenses incurred by the selling security holders incident to the offering and sale of the common stock.

Under the registration rights agreements, we are obligated to use our reasonable best efforts to keep the registration statement of which this prospectus is a part effective until the earlier to occur of (i) the date when all of the securities registered hereby are disposed of in accordance with the terms of the shelf registration statement or (ii) for Messrs. Emby, Foreman and Geller, the first anniversary of the effective date of the registration statement of which this prospectus forms a part, and for Messrs. Lipman and Nimmo, the date when their registered shares can be immediately sold to the public without registration or restriction.

Except for Messrs. Lipman and Nimmo, each of the selling security holders has agreed not sell more than 75% of his registered shares until after March 7, 2005. Commencing on March 8, 2005 there will be no limitation on the number of shares a selling security holder may sell.

The above notwithstanding, none of these limitations shall apply in the event the closing sales price of our common stock, as reported on the Nasdaq National Market, exceeds $25.00 for five consecutive trading days.

Our obligation to keep the registration statement to which this prospectus relates effective is subject to specified, permitted exceptions set forth in the registration rights agreements. In these cases, we may prohibit offers and sales of the shares of common stock pursuant to the registration statement to which this prospectus relates.

When we are notified by any selling security holder that any material arrangement has been entered into with a broker-dealer for the sale of the common stock covered by this prospectus through a block trade, special offering, exchange distribution or secondary distribution or purchase by a broker or dealer, we will file a supplement to this prospectus, if required, pursuant to Rule 424(b) under the Securities Act, or, if appropriate, a post-effective amendment to the registration statement of which this prospectus forms a part, disclosing (a) the name of each such selling security holder and of the participating broker-dealer or dealers, (b) the number of shares of common stock involved, (c) the price at which the common stock was sold, (d) the commissions paid or discounts or concessions allowed to such broker-dealer or dealers, if applicable, and (e) other facts material to the transaction. In addition, when we are notified by any selling security holder that a donee or pledgee intends to sell more than 500 shares, a supplement to this prospectus will be filed.

We may suspend the use of this prospectus if we learn of any event that causes this prospectus to include an untrue statement of a material fact required to be stated in the prospectus or necessary to make the statements in the prospectus not misleading in light of the circumstances then existing. If this type of event occurs, a prospectus supplement or post-effective amendment, if required, will be distributed to each selling security holder. Each selling security holder has agreed not to trade securities from the time the selling security holder receives notice from us of this type of event until the selling security holder receives a prospectus supplement or amendment.

## LEGAL MATTERS

The legality of the common stock being offered hereby will be passed upon for us by Feder, Kaszovitz, Isaacson, Weber, Skala, Bass & Rhine LLP, New York, New York. Murray L. Skala, a partner of that firm, is one of our directors, an owner of 1,000 shares of our common stock, a holder of options to purchase 82,771 shares of our common stock, and a trustee under a trust that owns 3,186 shares of our common stock.

## INDEPENDENT AUDITORS

Our consolidated financial statements as of December 31, 2002 and 2003 and for each of the three years in the period ended December 31, 2003 incorporated by reference in this prospectus have been audited by PKF, Certified Public Accountants, A Professional Corporation, Los Angeles, California, independent auditors, as stated in their report incorporated by reference herein.

The financial statements of PA Distribution, Inc. and Play Along, Inc. for the twelve-month periods ended March 31, 2003 and 2002 and the nine-month period ended December 31, 2003, incorporated by

18

reference into this prospectus have been audited by Daszkal Bolton LLP, Certified Public Accountants, Boca Raton, Florida, independent auditors, as stated in their report incorporated by reference herein.

The financial statements of Play Along (Hong Kong) Limited for the twelve-month period ended March 31, 2003 and the nine-month period ended December 31, 2003, incorporated by reference into this prospectus have been audited by Grant Thornton, Certified Public Accountants, Hong Kong, independent auditors, as stated in their reports incorporated by reference herein.

## INCORPORATION OF DOCUMENTS BY REFERENCE

This prospectus "incorporates by reference" certain of the reports and other information that we have filed with the SEC under the Exchange Act. This means that we are disclosing important information to you by referring you to those documents. Information filed with the SEC after the date of this prospectus will update and supersede this information. The following documents filed with the SEC are incorporated by reference:

(1) Our Annual Report on Form 10-K for the year ended December 31, 2003;

(2) Our Quarterly Reports on Form 10-Q for the quarters ended March 31, June 30, and September 30, 2004;

(3) Our Current Reports on Form 8-K filed with the SEC on February 17, March 12, April 21, June 16, July 20, August 6, September 7, October 15, October 19, and November 16, 2004;

(4) The description of our common stock contained in our Registration Statement on Form 8-A (File No. 0-28104), filed March 29, 1996, and as incorporated therein by reference to our Registration Statement on Form SB-2 (Reg. No. 333-2048-LA).

Any future filings we make with the SEC under Section 13(a), 13(c), 14 or 15(d) of the Exchange Act (File No. 0-28104) after the date hereof are incorporated by reference until all of the securities offered by this prospectus are sold. Any statement contained in this prospectus or in a document incorporated by reference shall be deemed to be modified or superseded for all purposes to the extent that a statement contained in those documents modifies or supersedes that statement. Any statements so modified or superseded will not be deemed to constitute a part of this prospectus except as so modified or superseded. In addition, any supplement prepared in relation to this prospectus shall be deemed to supersede for all purposes any earlier supplement prepared in relation to this prospectus.

We will provide each person to whom a copy of this prospectus has been delivered, without charge, a copy of any of the documents referred to above as being incorporated by reference. You may request a copy by writing or telephoning Joel M. Bennett, c/o JAKKS Pacific, Inc., 22619 Pacific Coast Highway, Malibu, California, 90265 (telephone: 310-456-7799).

## WHERE YOU CAN FIND MORE INFORMATION

We are subject to the information requirements of the Securities Exchange Act of 1934. In accordance with the Exchange Act, we file reports, proxy statement and other information with the SEC. Such reports, proxy statements and other information can be inspected and copied at prescribed rates at the public reference facilities maintained by the SEC at Judiciary Plaza, 450 Fifth Street, N.W., Washington, D.C. 20549. The SEC also maintains a website at http://ww.sec.gov that contains reports, proxy and information statements and other information. Please call the SEC at 1-800-SEC-0330 for further information on the public reference room. Our common stock is listed on the Nasdaq National Market and reports and information concerning us can also be inspected through such exchange. We intend to furnish our stockholders with annual reports containing audited financial statements and such other periodic reports as we deem appropriate or as may be required by law.

19

## DISCLOSURE OF COMMISSION POSITION ON
## INDEMNIFICATION FOR SECURITIES ACT LIABILITIES

Our certificate of incorporation provides that the personal liability of our directors shall be limited to the fullest extent permitted by the provisions of Section 102(b)(7) of the General Corporation Law of the State of Delaware ("DGCL"). Section 102(b)(7) of the DGCL generally provides that no director shall be liable personally to a company or its security holders for monetary damages for breach of fiduciary duty as a director, provided that the certificate of incorporation does not eliminate the liability of a director for (1) any breach of the director's duty of loyalty to it or its security holders; (2) acts or omissions not in good faith or that involve intentional misconduct or a knowing violation of law; (3) acts or omissions in respect of certain unlawful dividend payments or stock redemptions or repurchases; or (4) any transaction from which such director derives an improper personal benefit. The effect of this provision is to eliminate the rights of a company and its security holders to recover monetary damages against a director for breach of her or his fiduciary duty of care as a director (including breaches resulting from negligent or grossly negligent behavior) except in the situations described in clauses (1) through (4) above. The limitations summarized above, however, do not affect the ability of a company or its security holders to seek nonmonetary remedies, such as an injunction or rescission, against a director for breach of her or his fiduciary duty.

In addition, our certificate of incorporation provides that we shall, to the fullest extent permitted by Section 145 of the DGCL, indemnify all persons whom it may indemnify pursuant to Section 145 of the DGCL. In general, Section 145 of the DGCL permits us to indemnify our directors, officers, employees or agents or, when so serving at our request, another company who was or is a party or is threatened to be made a party to any proceeding because of his or her position, if he or she acted in good faith and in a manner reasonably believed to be in or not opposed to our best interests and, with respect to any criminal action or proceeding, had no reasonable cause to believe his or her conduct was unlawful.

We maintain a directors' and officers' liability insurance policy covering certain liabilities that may be incurred by any director or officer in connection with the performance of his or her duties and certain liabilities that we may incur, including the indemnification payable to any director or officer. This policy provides for $30 million in maximum aggregate coverage, including defense costs. We pay the entire premium for such insurance.

Insofar as indemnification for liabilities arising under the Securities Act of 1933 may be permitted to our directors, officers, or persons controlling us pursuant to the foregoing provisions, we have been informed that in the opinion of the Securities and Exchange Commission, such indemnification is against public policy as expressed in the Securities Act and is therefore unenforceable.

## PART II — INFORMATION NOT REQUIRED IN PROSPECTUS

**Item 14.**　*Other Expenses of Issuance and Distribution*

The following table sets forth the various expenses payable by the Registrant in connection with the sale and distribution of the securities being registered hereby. The Registrant is paying all of the selling security holders' expenses related to this offering, except that the selling security holders will pay any applicable broker's commissions and expenses. All amounts are estimated except the Securities and Exchange Commission registration fee.

| | |
|---|---:|
| SEC Registration fee | $ 1,920 |
| Printing and Edgarization | 4,000 |
| Accountants' fees and expenses | 20,000 |
| Attorneys' fees and expenses | 45,000 |
| Miscellaneous | 4,080 |
| Total | $75,000 |

**Item 15.**　*Indemnification of Directors and Officers*

The Registrant's Certificate of Incorporation provides that the personal liability of the directors of the Registrant shall be limited to the fullest extent permitted by the provisions of Section 102(b)(7) of the General Corporation Law of the State of Delaware ("DGCL"). Section 102(b)(7) of the DGCL generally provides that no director shall be liable personally to the Registrant or its security holders for monetary damages for breach of fiduciary duty as a director, provided that the Certificate of Incorporation does not eliminate the liability of a director for (1) any breach of the director's duty of loyalty to the Registrant or its security holders; (2) acts or omissions not in good faith or that involve intentional misconduct or a knowing violation of law; (3) acts or omissions in respect of certain unlawful dividend payments or stock redemptions or repurchases; or (4) any transaction from which such director derives an improper personal benefit. The effect of this provision is to eliminate the rights of the Registrant and its security holders to recover monetary damages against a director for breach of her or his fiduciary duty of care as a director (including breaches resulting from negligent or grossly negligent behavior) except in the situations described in clauses (1) through (4) above. The limitations summarized above, however, do not affect the ability of the Registrant or its security holders to seek nonmonetary remedies, such as an injunction or rescission, against a director for breach of her or his fiduciary duty.

In addition, the Certificate of Incorporation provides that the Registrant shall, to the fullest extent permitted by Section 145 of the DGCL, indemnify all persons whom it may indemnify pursuant to Section 145 of the DGCL. In general, Section 145 of the DGCL permits the Registrant to indemnify a director, officer, employee or agent of the Registrant or, when so serving at the Registrant's request, another company who was or is a party or is threatened to be made a party to any proceeding because of his or her position, if he or she acted in good faith and in a manner reasonably believed to be in or not opposed to the best interests of the Registrant and, with respect to any criminal action or proceeding, had no reasonable cause to believe his or her conduct was unlawful.

The Registrant maintains a directors' and officers' liability insurance policy covering certain liabilities that may be incurred by any director or officer in connection with the performance of his or her duties and certain liabilities that may be incurred by the Registrant, including the indemnification payable to any director or officer. This policy provides for $30 million in maximum aggregate coverage, including defense costs. The entire premium for such insurance is paid by the Registrant.

Insofar as indemnification for liabilities arising under the Securities Act of 1933 may be permitted to directors, officers, or persons controlling the Registrant pursuant to the foregoing provisions, the Registrant has been informed that in the opinion of the Securities and Exchange Commission, such indemnification is against public policy as expressed in the Securities Act and is therefore unenforceable.

**Item 16.**    *Exhibits*

| Exhibit Number | Description |
|---|---|
| 2.1 | Form of certificate evidencing shares of common stock(1) |
| 2.2 | Asset Purchase and Sale Agreement, dated as of June 10, 2004, by and among the Registrant (and certain subsidiaries) and Messrs. Emby, Foreman and Geller (and certain affiliated companies)(2) |
| 2.3 | Stock Purchase Agreement, dated as of December 27, 2001, by and among the Registrant, Kidz Biz Limited, Kidz Biz Far East Limited, Messrs. Lipman and Nimmo and Marilyn* |
| 2.4 | Settlement Agreement, dates as of August 2004, by and between the Registrant and David Lipman* |
| 2.5 | Compromise Agreement, dated August 2004, by and between JAKKS Pacific/Kidz Biz Limited and David Lipman* |
| 4.1 | Registration Rights Agreement, dated as of June 10, 2004, by and among the Registrant and Messrs. Emby, Foreman and Geller(3) |
| 4.2 | Registration Rights Agreement, dated as of December 27, 2001, by and among the Registrant and Messrs. Lipman and Marilyn Lipman* |
| 5.1 | Opinion of Feder, Kaszovitz, Isaacson, Weber, Skala, Bass & Rhine LLP(3) |
| 23.1 | Consent of PKF, Certified Public Accountants, A Professional Corporation* |
| 23.2 | Consent of Daszkal Bolton LLP* |
| 23.3 | Consent of Grant Thornton, Certified Public Accountants, Hong Kong* |
| 23.4 | Consent of Feder, Kaszovitz, Isaacson, Weber, Skala, Bass & Rhine LLP (included in Exhibit 5.1) |
| 24.1 | Power of Attorney* |

---

\*  Filed herewith.

(1)  Filed on May 1, 1996 as an exhibit to the Company's Registration Statement on Form SB-2 (Reg. No. 333-2048-LA), and incorporated herein by reference.

(2)  Filed on June 16, 2004 as an exhibit to the Company's Current Report on Form 8-K.

(3)  Filed on September 8, 2004 as an exhibit to the initial filing of this Registration Statement.

**Item 17.**    *Undertakings*

The undersigned registrant hereby undertakes:

(1) To file, during any period in which offers or sales are being made, a post-effective amendment to this registration statement

(i) to include any prospectus required by Section 10(a)(3) of the Securities Act of 1933,

(ii) to reflect in the prospectus any facts or events arising after the effective date of the registration statement (or the most recent post-effective amendment thereof) which, individually or in the aggregate, represent a fundamental change in the information set forth in the registration statement. Notwithstanding the foregoing, any increase or decrease in volume of securities offered (if the total dollar value of securities offered would not exceed that which was registered) and any deviation from the low or high end of the estimated maximum offering range may be reflected in the form of prospectus filed with the Commission pursuant to Rule 424(b) if, in the aggregate, the changes in volume and price represent no more than a 20% change in the maximum aggregate offering price set forth in the "Calculation of Registration Fee" table in the effective registration statement, and

(iii) to include any material information with respect to the plan of distribution not previously disclosed in the registration statement or any material change to such information in the registration statement.

II-2

Provided, however, that paragraphs 1(i) and 1(ii) above do not apply if the registration statement on Form S-3, Form S-8 or Form F-3, and the information required to be included in a post-effective amendment by those paragraphs, is contained in periodic reports filed with or furnished to the Commission by the registrant pursuant to Section 13 or Section 15(d) of the Securities Exchange Act of 1934 that are incorporated by reference in the registration statement.

(2) That, for the purpose of determining any liability under the Securities Act of 1933, each such post-effective amendment shall be deemed to be a new registration statement relating to the securities offered therein, and the offering of such securities at that time shall be deemed to be the initial bona fide offering thereof.

(3) To remove from registration by means of a post-effective amendment any of the securities being registered which remain unsold at the termination of the offering.

The undersigned registrant hereby undertakes that, for purposes of determining any liability under the Securities Act of 1933, each filing of the registrant's annual report pursuant to Section 13(a) or Section 15(d) of the Securities Exchange Act of 1934 (and, where applicable, each filing of an employee benefit plan's annual report pursuant to Section 15(d) of the Securities Exchange Act of 1934) that is incorporated by reference in the registration statement shall be deemed to be a new registration statement relating to the securities offered therein, and the offering of such securities as that time shall be deemed to be the initial bona fide offering thereof.

The undersigned registrant hereby undertakes to deliver or cause to be delivered with the prospectus, to each person to whom the prospectus is sent or given, the latest annual report to security holders that is incorporated by reference in the prospectus and furnished pursuant to and meeting the requirements of Rule 14a-3 or Rule 14c-3 under the Securities Exchange Act of 1934; and, where interim financial information required to be presented by Article 3 of Regulation S-X is not set forth in the prospectus, to deliver, or cause to be delivered to each person to whom the prospectus is sent or given, the latest quarterly report that is specifically incorporated by reference in the prospectus to provide such interim financial information.

Insofar as indemnification for liabilities arising under the Securities Act of 1933 may be permitted to directors, officers and controlling persons of the registrant pursuant to the foregoing provisions, or otherwise, the registrant has been advised that in the opinion of the Securities and Exchange Commission such indemnification is against public policy as expressed in the Act and is, therefore, unenforceable. In the event that a claim for indemnification against such liabilities (other than the payment by the registrant of expenses incurred or paid by a director, officer or controlling person of the registrant in the successful defense of any action, suit or proceeding) is asserted by such director, officer or controlling person in connection with the securities being registered, the registrant will, unless in the opinion of its counsel the matter has been settled by controlling precedent, submit to a court of appropriate jurisdiction the question whether such indemnification by it is against public policy as expressed in the Act and will be governed by the final adjudication of such issue.

## SIGNATURES

Pursuant to the requirements of the Securities Act of 1933, the Registrant certifies that it has reasonable grounds to believe that it meets all of the requirements for filing on Form S-3 and has duly caused this Registration Statement to be signed on its behalf by the undersigned, thereunto duly authorized, in the City of Malibu, State of California, on December 13, 2004.

JAKKS PACIFIC, INC.

By: /s/ JACK FRIEDMAN

Jack Friedman
*Chairman*

Pursuant to the requirements of the Securities Act of 1933, this Registration Statement has been signed below by the following persons in the capacities and on the dates indicated:

| Signature | Title | Date |
|---|---|---|
| /s/ JACK FRIEDMAN<br>Jack Friedman | Chairman and Chief Executive Officer (Principal Executive Officer) | December 13, 2004 |
| /s/ JOEL M. BENNETT<br>Joel M. Bennett | Chief Financial Officer (Principal Financial and Accounting Officer) | December 13, 2004 |
| /s/ DAN ALMAGOR<br>Dan Almagor | Director | December 13, 2004 |
| /s/ STEPHEN G. BERMAN<br>Stephen G. Berman | Director | December 13, 2004 |
| /s/ DAVID C. BLATTE<br>David C. Blatte | Director | December 13, 2004 |
| /s/ ROBERT E. GLICK<br>Robert E. Glick | Director | December 13, 2004 |
| /s/ MICHAEL G. MILLER<br>Michael G. Miller | Director | December 13, 2004 |
| /s/ MURRAY L. SKALA<br>Murray L. Skala | Director | December 13, 2004 |

II-4

# EXHIBIT INDEX

| Exhibit Number | Description |
|---|---|
| 2.1 | Form of certificate evidencing shares of common stock(1) |
| 2.2 | Asset Purchase and Sale Agreement, dated as of June 10, 2004, by and among the Registrant (and certain subsidiaries) and Messrs. Emby, Foreman and Geller (and certain affiliated companies)(2) |
| 2.3 | Stock Purchase Agreement, dated as of December 27, 2001, by and among the Registrant, Kidz Biz Limited, Kidz Biz Far East Limited, Messrs. Lipman and Nimmo and Marilyn* |
| 2.4 | Settlement Agreement, dates as of August 2004, by and between the Registrant and David Lipman* |
| 2.5 | Compromise Agreement, dated August 2004, by and between JAKKS Pacific/Kidz Biz Limited and David Lipman* |
| 4.1 | Registration Rights Agreement, dated as of June 10, 2004, by and among the Registrant and Messrs. Emby, Foreman and Geller(3) |
| 4.2 | Registration Rights Agreement, dated as of December 27, 2001, by and among the Registrant and Messrs. Lipman and Nimmo and Marilyn Lipman* |
| 5.1 | Opinion of Feder, Kaszovitz, Isaacson, Weber, Skala, Bass & Rhine LLP(3) |
| 23.1 | Consent of PKF, Certified Public Accountants, A Professional Corporation* |
| 23.2 | Consent of Daszkal Bolton LLP* |
| 23.3 | Consent of Grant Thornton, Certified Public Accountants, Hong Kong* |
| 23.4 | Consent of Feder, Kaszovitz, Isaacson, Weber, Skala, Bass & Rhine LLP (included in Exhibit 5.1) |
| 24.1 | Power of Attorney* |

---

\*    Filed herewith.

(1)   Filed on May 1, 1996 as an exhibit to the Company's Registration Statement on Form SB-2 (Reg. No. 333-2048-LA), and incorporated herein by reference.

(2)   Filed on June 16, 2004 as an exhibit to the Company's Current Report on Form 8-K.

(3)   Filed on September 8, 2004 as an exhibit to the initial filing of this Registration Statement.

Copyright 2008 Warren Publishing, Inc.
All Rights Reserved
CONSUMER ELECTRONICS DAILY

February 19, 2008 Tuesday

**SECTION:** TODAY'S NEWS

**LENGTH:** 1081 words

**HEADLINE:** First Working UltiMotion Game System Shown By Jakks at Toy Fair

**BODY:**

The first working samples of Jakks Pacific's new Swing Zone Sports "UltiMotion" wireless videogame system will be shown at this week's American International Toy Fair in New York City, Senior Vice President of Interactive Marketing John Ardell told Consumer Electronics Daily Friday. Swing Zone is one of three UltiMotion systems that Jakks will release this fall at $79.99 each, he said, but working samples of the Playhouse Disney and Disney Fairies/Sleeping Beauty UltiMotion SKUs won't be ready for the show.

The UltiMotion systems come with unique wireless controllers for each game -- including a baseball bat, golf club, tennis racket, bowling ball and football for the sports title -- and they offer a lower-cost alternative to Wii, Senior Vice President-Investor Relations Genna Rosenberg told us during the CES ShowStoppers event in Las Vegas last month (CED Jan 15 p4). At the time, however, the company showed only an early version of the systems' packaging, with no working samples and we were told UltiMotion was just a "working title." Ardell said Friday the systems will be marketed under that brand.

Also shipping this fall from Jakks will be Hannah Montana and High School Musical "G2: Game Girl" systems, another extension of Jakks's Plug It In & Play technology first used in its TV Games devices. The G2 devices are for girls 6 to 11 and, like TV Games, feature built-in games. With TV Games sales "flat" last year, the company looked for new ways to extend its technology and decided there was an "underserved" market for "tween" girls who don't own videogame consoles, said Ardell, noting that's the target audience for the G2 systems. An added benefit is that Jakks might be able to expand its distribution base with mall-based stores that cater to tweens, he said. But he said Jakks is still "locking up orders" for the fall. Preschoolers are also underserved by the videogame market and the UltiMotion systems are aimed at them, Ardell said.

The new version of Jakks's EyeClops Bionic Eye shown last month, which features three magnifications -- 100x, 200x and 400x, will ship this fall, probably at the same $49.99 SRP the current model sells for, Ardell said. The first EyeClops was a hit during the holiday season, but some consumers complained their young kids had a hard time handling the 200x magnification -- the only one offered until now -- because even the slightest movement they made was magnified 200x, he said. The 100x magnification is "a little more forgiving." Also shipping this fall will be the Eye-Clops BioniCam portable/recordable version of the toy with an LCD screen, at $79.99. There will be no onboard memory, but users will be able to save still images and video on it using an included USB "key," Ardell said. Not clear Friday was how much capacity will be offered out of the box. Jakks has started shipping an activity map set for the current EyeClops at $7.99, and a "Bug Vac" accessory for the toy this week that will ship this fall at $14.99. The small vacuum can be used by kids to collect small insects and other miniature specimens into a secure chamber that can be attached to the Bionic Eye for viewing.

Also new for the EyeClops line are Night Vision infrared "stealth" goggles that will ship this fall at $79.99. The final version of the device isn't being shown yet, but Jakks will have working samples at the show this week, Ardell said. "We're looking at other extensions" for the EyeClops, Ardell said.

Also being shown for the first time by Jakks this week are Hannah Montana and Pokemon electronic savings-bank games that will ship this fall at $29.99 each. But the company isn't showing working samples of those yet.

First Working UltiMotion Game System Shown By Jakks at Toy Fair CONSUMER ELECTRONICS DAILY February 19, 2008 Tuesday

New for the TV Games line are systems based on the TV game show Are You Smarter Than a 5th Grader? and Sleeping Beauty (both shipping now), the online casual game Bejeweled Deluxe and Power Rangers (fall), the animated Disney/Pixar film Wall-E (May) and High School Musical (March). Also new for the spring is Wheel of Fortune 2. And Jakks is resurrecting the Atari classics SKU that "launched the whole category" this fall with the same 10 games, said Ardell. Each SKU will cost $19.99.

Despite flat business, Ardell said TV Games has become an "evergreen business" for Jakks that truly attracts all kinds of consumers -- including women, thanks to Bejeweled and an increase in the number of game show SKUs.

Jakks announced last week it signed an exclusive five- year, worldwide master toy license deal with Total Nonstop Action (TNA) Entertainment for TNA Wrestling, with a planned launch of products expected to start in 2010. At the same time, rival Mattel announced it will become the new master toy licensee for World Wrestling Entertainment (WWE) toys in 2010, after the current deal with Jakks expires. Jakks and WWE have been a long court battle. Jakks "hoped" to renew the toy deal with WWE, but "we knew it was unlikely" because of the dispute, Rosenberg told us Friday. The exclusive videogame license that Jakks and THQ have as part of a joint venture runs through 2014, she said.

Electronic, interactive toys and games were expected to be among the most heavily represented items again at Toy Fair, which is the same week as Game Developers Conference in San Francisco. Toy Fair falls a week after NPD said retail sales of toys generated $22.1 billion in 2007 -- only a 2 percent decline from 2006 despite heavily publicized toy industry recalls and difficult economic conditions that the research firm said "plagued the industry" in 2007. The "strong performance of two key super-categories helped to offset losses," it said, and sales of action figures and accessories were up 8 percent over 2006, while vehicles experienced a 6 percent increase. The "most significant losses were experienced in infant/preschool, outdoor and sports toys, and dolls, with declines of 5 percent, 5 percent and 8 percent, NPD said.

An "emerging trend in the industry is the increase in sales of connected Web play toys," NPD said. "Thanks in large part to the popular Webkinz brand, this type of play is expanding into new categories and across many properties," said NPD analyst Anita Frazier. The past year marked the first time in several years that the mass merchant/discount channel didn't see an increase in toy dollar share, coming in at 55 percent, NPD said; dollar sales increased in the online channel by 9 percent, boosting its share of toy industry sales to 7 percent in 2007. -- Jeff Berman

**LOAD-DATE:** February 15, 2008